# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

AMERICAN ALLIANCE
FOR EQUAL RIGHTS,

      *Plaintiff,*

      *v.*

FEARLESS FUND
MANAGEMENT, LLC, *et al.*,

      *Defendants.*

Case No. 1:23-CV-3424-TWT

**ORAL ARGUMENT
REQUESTED**

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ........................................................ 1

II.   BACKGROUND ........................................................ 4

III.  STANDARD OF REVIEW ......................................... 7

IV.  ARGUMENT ............................................................. 8

     A.    Plaintiff Is Unlikely To Succeed On The Merits. .......................... 8

         1.    Plaintiff Lacks Organizational Standing. ........................... 8

         2.    Plaintiff's Section 1981 Claim Is Unlikely To Succeed...... 14

              a.    The First Amendment Bars Plaintiff's Claim ............. 14

              b.    The Foundation's Official Rules Are Not A "Contract." ..................................................... 18

              c.    The Grant Program Is A Valid Affirmative Action Program Under *Johnson*................................. 20

     B.    Plaintiff Cannot Show Irreparable Harm. ................................... 22

     C.    The Balance Of Equities And Public Interest Favor Denying Plaintiff's Motion For A Mandatory Injunction. .......................... 24

V.   CONCLUSION................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis,*
   143 S. Ct. 2298 (2023)........................................................................ 2, 15, 25

*AAER v. Morrison & Foerster LLP,*
   23-cv-23189 (S.D. Fla.) .................................................................. 12

*AAER v. Perkins Coie LLP,*
   23-cv-1877 (N.D. Tex.) ................................................................... 12

*Am. Legal Found. v. FCC,*
   808 F.2d 84 (D.C. Cir. 1987)......................................................... 12

*Bayse v. Dozier,*
   2018 WL 5779606 (M.D. Ga. Oct. 11, 2018) ........................... 18, 22

*In re Birmingham Reverse Discrimination Emp. Litig.,*
   20 F.3d 1525 (11th Cir. 1994)................................................... 20, 21

*Claybrooks v. ABC,*
   898 F. Supp. 2d 986 (M.D. Tenn. 2012) ................................... 2, 17

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
   140 S. Ct. 1009 (2020)................................................................... 13

*Conservative Baptist Ass'n of Am., Inc. v. Shinseki,*
   42 F. Supp. 3d 125 (D.D.C. 2014)................................................ 12

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,*
   6 F.4th 1247 (11th Cir. 2021) .............................................*passim*

*Dantzler, Inc. v. Hubert Moore Lumber Co.,*
   2013 WL 2452697 (M.D. Ga. June 5, 2013).................................8

*Doe v. Frank,*
   951 F.2d 320 (11th Cir. 1992).................................................. 10, 11

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Doe v. Kamehameha Schs.*,
470 F.3d 827 (9th Cir. 2006).................................................................. 18, 22

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) .......................................................................... 19

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) .................................................................. 10

*Ethredge v. Hail*,
996 F.2d 1173 (11th Cir. 1993)........................................................... 19

*Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*,
194 F.3d 1227 (11th Cir. 1999)............................................................9

*Ga. Cemetery Ass'n, Inc. v. Cox*,
353 F.3d 1319 (11th Cir. 2003)........................................................... 12

*Ga. Republican Party v. SEC*,
888 F.3d 1198 (11th Cir. 2018)........................................................ 9, 10

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*,
788 F.3d 1318 (11th Cir. 2015)........................................................ 8, 24

*Greater Atl. Home Builders Ass'n, Inc. v. Atlanta*,
149 F. App'x 846 (11th Cir. 2005) ...................................................... 13

*Gresham v. Windrush*,
730 F.2d 1417 (11th Cir. 1984)........................................................... 23

*Hayes v. ATL Hawks, LLC*,
2019 WL 13059765 (N.D. Ga. Dec. 13, 2019), *aff'd*, 844 F.
App'x 171 (11th Cir. 2021)............................................................... 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)...................................................................... 11

iii

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995) ............................................................................... 16, 25

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) .................................................................... 10

*Johnson v. Transport. Agency*,
   480 U.S. 616 (1987) ......................................................................... 3, 20, 22

*Klopfenstein v. Deutsche Bank Sec., Inc.*,
   592 F. App'x 812 (11th Cir. 2014) .............................................................. 12

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
   222 F.3d 289 (7th Cir. 2000) ...................................................................... 25

*Lee v. Satilla Health Servs., Inc.*,
   470 S.E.2d 461 (Ga. Ct. App. 1996) ........................................................... 19

*Moses v. Comcast Cable Commc'ns Mgmt., LLC*,
   2022 WL 2046345 (S.D. Ind., June 7, 2022) ........................................... 3, 23

*Moye v. Chrysler Corp.*,
   465 F. Supp. 1189 (D. Mo. 1979), *aff'd* 615 F.2d 1365 (8th Cir. 1979) ........................................................................................................ 18

*Nat'l Rosin Oil & Size Co. v. S. Atl. Coal Co.*,
   97 S.E. 559 (Ga. Ct. App. 1918) ................................................................. 19

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
   508 U.S. 656 (1993) ..................................................................................... 14

*Powers v. Sec'y, Fla. Dep't of Corr.*,
   691 F. App'x 581 (11th Cir. 2017) ............................................................... 8

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC,*
2 F.4th 1002 (7th Cir. 2021) ............................................................ 10

*Rabbani v. Gen. Motors Corp.,*
2000 WL 36752977 (N.D. Fla. July 26, 2000) ................................... 20, 21

*Roberts v. Bassett,*
2022 WL 16936210 (2d Cir. Nov. 15, 2022) ...................................... 14

*Shea v. Kerry,*
796 F.3d 42 (D.C. Cir. 2015) .......................................................... 20

*Speech First, Inc. v. Shrum,*
2023 WL 2905577 (W.D. Okla. Apr. 10, 2023) ................................ 10

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.,*
143 S. Ct. 2141 (2023) ................................................................ 9, 12, 24

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ..................................................................... 2, 9

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) .................................................................. 13

*United Steelworkers of Am., AFL-CIO-CLC v. Weber,*
443 U.S. 193 (1979) ...................................................................... 3

*Wreal, LLC v. Amazon.com, Inc.,*
840 F.3d 1244 (11th Cir. 2016) ...................................................... 24

**Statutes**

15 U.S.C. § 631 ............................................................................. 25

42 U.S.C. § 1981 .....................................................................*passim*

# **TABLE OF AUTHORITIES**
(continued)

Page(s)

**Constitutional Provisions**

U.S. Const., amend I.................................................................*passim*

U.S. Const., amend XIII .................................................................. 25

## I.    INTRODUCTION

Congress enacted 42 U.S.C. § 1981 after the Civil War to ensure formerly enslaved people would have the same right to make and enforce contracts "as is enjoyed by white citizens."  Today, Plaintiff seeks to distort the purpose and text of this seminal civil rights statute to use it against Black people—the same people the Reconstruction Congress sought to protect.  Specifically, Plaintiff asks this Court to find that a charitable grant program aimed at leveling the playing field for Black women businessowners violates Section 1981.

Defendant Fearless Foundation is a nonprofit organization that seeks to increase access to capital for small businesses owned by women of color.  The Foundation's Fearless Strivers Grant program furthers this aim by awarding $20,000 grants and mentorship to Black women-owned small businesses, which historically have been disadvantaged in their ability to obtain funding. The remedial purpose of this program is wholly aligned with that of Section 1981—to ensure that Black women enjoy the same right to make and enforce contracts "as is enjoyed by white citizens."

Plaintiff now moves for a preliminary injunction, seeking to bar the Foundation from limiting its applicant pool to Black women.  *See* Compl. (Dkt. 1) at 12.  According to Plaintiff, the grant program violates Section 1981 because non-Black women cannot apply, and "[e]ntry in the program forms a

1

contractual relationship between Fearless Fund and the applicant." *Id.* ¶ 75. For at least four reasons, Plaintiff's motion should be rejected.

*First*, Plaintiff—the so-called "American Alliance for Equal Rights" ("AAER")—lacks standing.  Article III requires that an organization suing on behalf of its members "*name* the individuals who were harmed." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (emphasis added).  Here, AAER not only fails to name any of its members, Decl. of G. Dickey (Dkt. 1-3), Exs. I-K, but it also fails to cite a single case that suggests the failure to be considered for a discretionary gift is a cognizable harm sufficient to confer standing.

*Second*, even if AAER had standing, it still could not show a substantial likelihood of success on the merits.  "[T]he Supreme Court has expressly found that the First Amendment can trump the application of antidiscrimination laws to protected speech." *Claybrooks v. ABC*, 898 F. Supp. 2d 986, 993 (M.D. Tenn. 2012); *see, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2321-22 (2023).  "[D]onating money qualifies" as protected speech. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021).  So, too, does offering "acts of expressive association," *303 Creative*, 143 S. Ct. at 2312, like mentorship.  For that reason, even if the grant program's Official Rules were a contract subject to Section 1981, the Foundation could not be compelled to alter its program's eligibility criteria because doing so would

"'modify the content of [the Foundation's] expression'—and thus modify [the Foundation's] 'speech itself.'" *Coral Ridge*, 6 F.4th at 1256.  Putting aside these First Amendment problems, Plaintiff cannot show a substantial likelihood of success for another reason: the grant program is a valid remedial program, which seeks to address the "manifest imbalance" in Black women's ability to obtain start-up funding and does not "unnecessarily trammel" the interests of non-Black women businessowners, who can obtain funding from many other sources.  *Johnson v. Transport. Agency*, 480 U.S. 616, 630-31 (1987); *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979).

*Third*, Plaintiff cannot show that any of its anonymous members would suffer *any* harm in the absence of injunctive relief, much less the "irreparable harm" required to obtain a mandatory injunction.  Other courts have rejected requests to preliminarily enjoin minority-focused charitable giving programs like the one at issue here for exactly this reason.  *See Moses v. Comcast Cable Commc'ns Mgmt., LLC*, 2022 WL 2046345, at *3-4 (S.D. Ind., June 7, 2022).

*Fourth*, the balance of equities disfavors the relief that Plaintiff seeks. The public has a strong interest in addressing manifest racial imbalances and encouraging expressive philanthropy; the grant program furthers these aims.

For all these reasons, and those set forth in further detail below, Plaintiff's bid to invoke a pivotal civil rights law on behalf of three anonymous

individuals to forbid a foundation from giving charitable donations to Black women entrepreneurs should be rejected.

## II.   BACKGROUND

The Foundation's Fearless Strivers Grant program can only be understood with reference to the context in which it originated.  Black women are the fastest growing entrepreneurial demographic in the United States, with 42% of new businesses from 2014 through 2019 being founded by Black women.  Decl. of A. Simone (Ex. 1), Ex. A at 11.  But despite this boom in entrepreneurship, Black women are significantly underrepresented in business ownership, running just 3% of mature businesses (*i.e.*, businesses surviving past 5 years).  Decl. of M. Bradley (Ex. 3) ¶ 25.  Although Black women comprise roughly 6% of the U.S. population, they own just 2% of the country's businesses with more than one employee.  *Id.*

One of the principal reasons that Black women struggle to sustain their businesses at the same rate as their non-Black peers is a lack of equal access to capital.  According to the Federal Reserve System's 2016 Small Business Credit Survey, 66% of Black women businessowners describe access to funds for expansion as one of their greatest challenges, while only 39% of their non-Black peers say the same.  Ex. 3 ¶ 26.

The hurdles Black entrepreneurs face in accessing capital take many

forms. One traditional path for funding a new business is to rely first on friends and family. But when Black entrepreneurs seek this capital, they are disadvantaged compared to their white counterparts, given this country's well-documented racial wealth and income gap. The typical white family has eight times the wealth of the typical Black family. Ex. 3 ¶ 18. In 2021, the U.S. Census Bureau reported the median household income for Black Americans was just $48,297, compared to $77,999 for non-Hispanic white Americans. *Id.*

With less access to funding from friends and family, Black entrepreneurs rely heavily on other private sources of funding to start businesses. Ex. 3 ¶ 20. But Black entrepreneurs face challenges in accessing these sources of capital, too. The 2021 Small Business Credit Survey conducted by the 12 Federal Reserve Banks found a majority of Black business owners who sought credit reported receiving less than the amount they requested. *Id.* Only a quarter of white business owners reported the same. *Id.* This lack of equal access to private capital is particularly acute for Black women. They face a rejection rate three times higher than that of white business owners when seeking business funding. *Id.* ¶ 27. Between 2014 and 2022, Black women received, on average, less than 2% of private funding. Ex. 1-A at 11. And of the $288 billion in venture capital funding that went to U.S. startups in 2022, only 0.13% went to startups with at least one Black woman founder. Ex. 3 at ¶ 27.

Armed with statistics showing dramatic disparities in access to capital for women of color, and driven by her own experience as a Black woman who struggled to secure start-up funding, Arian Simone launched the Fearless Foundation in 2018 to reduce racial and gender disparities in venture capital funding.  Ex. 1 ¶ 12.  The Foundation provides grants and educational opportunities for businesses founded by women of color.  *Id.* ¶ 13.[1]  In the last two years, the Foundation has partnered with corporate sponsors to award more than $3.6 million in grants.  *Id.*  These grants "deepen[]" the Foundation's "relationships with the community of women-of-color entrepreneurs" and express the Foundation's vision of "economic empowerment and investment in" those same entrepreneurs.  *Id.* ¶¶ 10, 16.

In 2021, the Foundation launched the Fearless Strivers Grant program. The program is open to Black women who are owners of a U.S. business with annual revenue up to $3 million.  Decl. of L. Cleckley (Ex. 2) ¶ 12.  The program also requires, among other criteria, that applicants be U.S. residents over the age of majority in their home state.  Ex. 2-A at I.  2023 grant winners will

---

[1] In 2018, Simone partnered with former corporate executive Ayana Parsons to launch the Fearless Fund—a venture capital fund that provides early-stage funding to women of color-led businesses.  Ex. 1 ¶¶ 9, 11.  Although Fearless Fund Management, LLC, Fearless Fund II, GP, LLC, and Fearless Fund II, LP are named Defendants, none manage the grant program that Plaintiff challenges; that program is managed solely by the Foundation.  Ex. 2 ¶ 11.

receive a $20,000 grant and tools to help grow their businesses.  Ex. 2 ¶ 13.
Grantees also receive the Foundation's support and mentorship, becoming full-
fledged members of the "Fearless Family."  *Id.* ¶ 14.  The grant program's goal
is to create a pipeline of successful, high-growth businesses founded and led by
Black women.  Ex. 1 ¶ 14.  The grants help remove systemic barriers that
impede Black women entrepreneurs, providing early-stage funding to facilitate
growth and better situating owners to apply for and receive further funding.
Ex. 2 ¶ 16.

 The terms governing the grant program are set forth in Official Rules,
which explain the requirements of the application process, and the criteria on
which the applications are judged, including the viability and strength of the
owners' businesses, the intended uses of the grant, and the potential growth of
the businesses.  Ex. 2-A at IV.  Although the most recent grant application
period was originally due to close on August 31, 2023, the Foundation extended
the deadline to September 30, 2023.  Dkt. 36 ¶ 4.[2]

## III.   STANDARD OF REVIEW

 "A preliminary injunction is an extraordinary and drastic remedy not to
be granted unless the movant clearly carries its burden of persuasion on each

---

[2] Plaintiff's sole claim is under Section 1981.  The program's focus on women
entrepreneurs is therefore not at issue in this lawsuit.

of these prerequisites": namely, that (1) it has a "substantial likelihood of success on the merits"; (2) it would suffer "irreparable injury" absent an injunction; and (3) the balance of equities and public interest favor injunctive relief. *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015). Here, Plaintiff seeks to compel the Foundation to "do some positive act," *Dantzler, Inc. v. Hubert Moore Lumber Co.*, 2013 WL 2452697, at *1 (M.D. Ga. June 5, 2013), by forcing it to change the eligibility criteria for its grant program, *see* Dkt. 1 at 12. This type of mandatory relief—which would alter the status quo—"is particularly disfavored," and should not be granted "unless the facts and law clearly favor" the plaintiff. *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017).

## IV.   ARGUMENT

### A.   Plaintiff Is Unlikely To Succeed On The Merits.

#### 1.   Plaintiff Lacks Organizational Standing.

AAER brings this suit not on its own behalf, but on behalf of three of its "members." Dkt. 2-1 at 5. Where an organization seeks to establish Article III standing as the representative of its members, it bears the burden to prove that "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

8

participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (citation omitted).  Here, AAER has failed to satisfy any of these requirements, which requires denial of Plaintiff's motion.  *See Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1229 (11th Cir. 1999) (denying preliminary injunction for lack of standing).

To show that its members have standing, Plaintiff must "'make specific allegations establishing that at least one *identified* member ha[s] suffered or [will] suffer harm.'"  *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009) (emphasis added)).  "This requirement of *naming* the affected members" can only be dispensed with "where *all* the members of the organization are affected by the challenged activity."  *Summers*, 555 U.S. at 498-99 (emphases added).  Critically, Plaintiff concedes that the grant program at issue has harmed only "some"—not all—of its members.  Decl. of E. Blum (Dkt. 1-11) ¶ 4.  For that reason, AAER must "name the individuals who were harmed."  *Summers*, 555 U.S. at 498.  Yet Plaintiff has not named *any* of its members, instead relying only on anonymous declarations from "Owner A," "Owner B," and "Owner C."  Dkt. 1-3, Exs. I-K.  That does not suffice.

Courts routinely find that organizational plaintiffs lack standing where

9

they fail to identify by name "at least one member who has or will suffer harm." *Ga. Republican Party*, 888 F.3d at 1204; *see also, e.g.*, *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021); *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016); *Speech First, Inc. v. Shrum*, 2023 WL 2905577, at *2-3 (W.D. Okla. Apr. 10, 2023). For example, in *Do No Harm v. Pfizer Inc.*—another Section 1981 case filed by AAER's counsel—the plaintiff sought to establish standing based on anonymous declarations from its "members." --- F. Supp. 3d. ----, 2022 WL 17740157, at *6-8 (S.D.N.Y. Dec. 16, 2022). Citing to Eleventh Circuit precedent (along with that from four other circuits), the court held that the "anonymous member declarations [were] not enough" to prove standing. *Id.* at *12 (denying motion for preliminary injunction and dismissing case). The same result is warranted here. *See, e.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020).

Nor can Plaintiff justify its members' anonymity simply by asserting that Owners A, B, and C "fear reprisal" if their "participation in this litigation becomes public." Dkt. 1-3, Exs. I-K. "Lawsuits are public events," and a plaintiff is permitted "to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Doe v. Frank*, 951 F.2d 320,

323-24 (11th Cir. 1992).  None of those circumstances are present here.[3]  While Owners A, B, and C "may wish not to publicize their identities," a plaintiff suing in federal court "bears the burden of establishing the Court's Article III power to adjudicate its case."  *Do No Harm*, 2022 WL 17740157, at *9.  AAER cannot do so based on anonymous affidavits.  *See id.*

Not only has AAER failed to identify by name a single one of its members with standing, but it also has failed to establish that it is a genuine membership organization seeking to protect interests "germane to the organization's purpose," and that "the claim asserted" does not "require[] the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  AAER claims it is "a nationwide membership organization dedicated to challenging distinctions and preferences made on the basis of race and ethnicity."  Dkt. 1 ¶ 6.  But AAER "bears none of the indicia of a traditional membership organization discussed in *Hunt*"; instead, AAER appears to be a recently-created sham organization with a "broadly defined mission as a . . . 'watchdog'" for race-based programs; it "serves no discrete, stable group of persons with a definable set of common

---

[3] Blum's assertion that he has "witnessed firsthand the retaliation that individuals can receive for bringing litigation challenging racial preferences," Dkt. 1-11 ¶ 9, is not sufficient to show that any individual member of AAER would be at risk of "physical harm" if their identity were revealed.

interests." *Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987). AAER's purported anonymous "members" apparently range from first-year law students seeking summer internships in Texas and Florida to small businessowners seeking charitable funding in New York and Virginia.[4] Plaintiff has not shown that any one of this diverse collection of "members" has the "'indicia' of membership" needed for standing—such as, for example, a role in "electing the leadership of the association, guiding the association's activities, and financing those activities,'" *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 133 (D.D.C. 2014), or even "the opportunity to have input and direction on [AAER]'s case," *Students for Fair Admissions*, 134 S. Ct. at 2158. *See, e.g.*, Dkt. 1-3, Exs. H-K (making no allegations about involvement of Owners A, B, or C in electing AAER leadership, guiding or financing its activities, or providing input in this litigation).

Nor has Plaintiff shown that this case could be tried without the participation of Owners A, B, or C. To the contrary, Plaintiff's Section 1981 claim "depend[s] upon the [] circumstances of each of its members." *Ga. Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). A Section

---

[4] *See AAER v. Morrison & Foerster LLP*, 23-cv-23189 (S.D. Fla.); *AAER v. Perkins Coie LLP*, 23-cv-1877 (N.D. Tex.). This Court may take judicial notice of complaints filed in other actions. *See, e.g.*, *Klopfenstein v. Deutsche Bank Sec., Inc.*, 592 F. App'x 812, 816 n.5 (11th Cir. 2014).

1981 plaintiff must prove that their race was the "but for" cause of their injury. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1013 (2020). Adjudication of this case thus would require an individualized assessment of each member's business, proposed application, and compliance with the grant program's Official Rules to determine whether, "but for" their race, they would have been eligible to apply and be considered for the program. This deprives Plaintiff of organizational standing. *See, e.g.*, *Greater Atl. Home Builders Ass'n, Inc. v. Atlanta*, 149 F. App'x 846, 848 (11th Cir. 2005) (no organizational standing where claims were "different for each member").

Even if AAER *had* identified any of its members by name, it still fails to show that any member has suffered a cognizable Article III injury-in-fact. AAER suggests that the injury at the heart of this case is the alleged harm its anonymous members experience by virtue of being unable to compete "for *a chance* at $20,000." *See* Dkt. 1 ¶¶ 21, 75 (emphasis added); Dkt. 2-1 at 8. But AAER cites no case to support its novel claim that the failure to "obtain a chance at $20,000" from a charitable entity is a "concrete and particularized" Article III injury. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203-04 (2021) (plaintiff bears the burden to "identif[y] a close historical or common-law analogue for their asserted injury"). It is true that an individual member of a group suffers an injury-in-fact sufficient to confer Article III standing when

13

"*the government* erects a barrier that makes it more difficult for members of [that] group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (emphasis added); *Roberts v. Bassett*, 2022 WL 16936210, at *2 (2d Cir. Nov. 15, 2022) (noting one of the "elements" of standing under *Jacksonville* is that "there exists a *government*-erected barrier" (emphasis added)).  But Plaintiff cites no case extending this reasoning to private-sector charitable donations.

For all these reasons, Plaintiff has not carried its burden of demonstrating it has Article III standing to bring its Section 1981 claim.

### 2.   Plaintiff's Section 1981 Claim Is Unlikely To Succeed.

Even if Plaintiff had standing, Plaintiff still cannot show a substantial likelihood of success on the merits because the Foundation's charitable giving is protected by the First Amendment; the Official Rules governing the grant are not a "contract" under Section 1981; and even if they were, the grant program is a valid affirmative action program under *Johnson*.

### a.   *The First Amendment Bars Plaintiff's Claim*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  "'Constitutional protection for freedom of speech does not end at the spoken or written word';

the First Amendment also protects expressive conduct." *Coral Ridge*, 6 F.4th at 1254 (citation omitted).  An organization engages in "expressive conduct" when it decides the recipients of its charity, since "[a] reasonable person would interpret this as [the organization] conveying '*some* sort of message'" about the causes "it wishes to support." *Id.*  And as the Supreme Court has made clear, when it comes to expressive association, antidiscrimination statutes cannot be used "to compel an individual to create speech she does not believe." *303 Creative*, 143 S. Ct. at 2308.  In *303 Creative*, the Court held that Colorado's antidiscrimination law could not be used to compel a website designer to produce a wedding website for a same-sex couple because the First Amendment protects an individual's "acts of expressive association." *Id.* at 2312.

Likewise, in *Coral Ridge*, the Eleventh Circuit upheld the district court's dismissal of a religious discrimination claim against Amazon brought by a Christian ministry. *See* 6 F.4th at 1254.  There, the ministry claimed that by setting eligibility criteria for a charitable program that excluded from consideration the plaintiff and other organizations identified as anti-LGBTQ, Amazon had violated Title II of the Civil Rights Act (Title II) by discriminating on the basis of religion.  Rejecting this argument, the Eleventh Circuit found that the plaintiff's "interpretation of Title II would violate the First Amendment by essentially forcing Amazon to donate to organizations it does

15

not support." *Id*.  The court reasoned that "Amazon's choice of what charities are eligible to receive donations" was "expressive conduct," and that applying Title II as the plaintiff proposed "would not further the statute's purpose" but "would instead 'modify the content of [Amazon's] expression'—and thus modify Amazon's 'speech itself'—by forcing it to donate to an organization it does not wish to promote." *Id*. at 1255-56 (quoting *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995)).

This case is no different.  The Foundation's decision to donate to and mentor Black women is core protected First Amendment expressive activity; Plaintiff cannot dispute that "donating money qualifies as expressive conduct." *Coral Ridge*, 6 F.4th at 1254.  As a part of its grant program, the Foundation espouses its First Amendment belief that "Black women-owned businesses are vital to our economy." Dkt. 1-3, Ex. A.  The program furthers this speech and association by "deepening" Defendants' "commitment to this community" of entrepreneurs who might otherwise lack the access to capital necessary to bring their businesses to life.  *Id*.; *see also id.*, Ex. D.  In receiving a charitable donation, grant winners also get access to the Fearless Fund's broader network of leaders and stakeholders, becoming part of the "Fearless Family."  Ex. 2 ¶ 14.  Because the grant application process is the vehicle through which the Foundation selects the recipients of its donations, support, and mentorship,

16

that process is "part and parcel" of the expressive conduct and "merit[s] First Amendment protection." *Claybrooks*, 898 F. Supp. 2d at 993.  Just as in *Coral Ridge*, applying Section 1981 as AAER proposes would impermissibly "'modify the content of [the Foundation's] expression'"—and thus modify its 'speech itself.'" 6 F.4th at 1255.  The "First Amendment prevents [plaintiff] from . . . forcing the defendants to employ race-neutral criteria" for their donations and mentorship in this way.  *Claybrooks*, 898 F. Supp. 2d at 1000.

*Claybrooks* is instructive.  There, minority applicants to the *Bachelor* television franchise sued ABC, alleging that it denied them equal opportunity to contract to be on the show in violation of Section 1981.  898 F. Supp. 2d at 990.  ABC argued Section 1981 could not be applied to "force [ABC] to employ race-neutral criteria in the casting process, thereby regulating the creative content of the [s]hows" in violation of the First Amendment.  *Id.* at 993.  The court agreed, finding that "casting and the resulting work of entertainment are inseparable and must *both* be protected to ensure that the producers' freedom of speech is not abridged."  *Id.* at 999.  The court dismissed the case, since Section 1981 could not be used "to alter the [show's] *messaging*."  *Id.*

AAER cannot forcibly alter the Foundation's messaging here.  The Foundation has a First Amendment right to donate its funds as it sees fit— including to support and mentor Black women.  For this reason, Plaintiff has

not shown it is likely to succeed—let alone so "clearly" as to justify a mandatory injunction. *Bayse v. Dozier*, 2018 WL 5779606, at *2 (M.D. Ga. Oct. 11, 2018).

        b.     *The Foundation's Official Rules Are Not A "Contract."*

Not only does the First Amendment bar Plaintiff's claim, but Plaintiff also is unlikely to succeed under Section 1981 because the Official Rules governing the program are not a "contract" subject to Section 1981.

Section 1981 only protects the right to "enjoy all the privileges of the *contractual* relationship" and does not go "further to protect someone in the provision of non-contractual related rights." *Hayes v. ATL Hawks, LLC*, 2019 WL 13059765, at *12 (N.D. Ga. Dec. 13, 2019), *aff'd*, 844 F. App'x 171 (11th Cir. 2021) (emphasis added); *see generally Doe v. Kamehameha Schs.*, 470 F.3d 827, 889 (9th Cir. 2006) (Kozinski, J., dissenting) (noting absence of any "case where section 1981 has been applied to a charity"). Here, Section 1981 is inapposite because the Foundation's provision of a charitable donation is a discretionary gift, not a contractual award. *See, e.g.*, *Moye v. Chrysler Corp.*, 465 F. Supp. 1189, 1190 (D. Mo. 1979) (Section 1981 not implicated by payroll plan, which permitted a deduction for certain charitable contributions, because the decision "to voluntarily confer the benefit of the payroll deduction . . . does not . . . rise to the level of contract"), *aff'd* 615 F.2d 1365 (8th Cir. 1979).

Although the grant program's Official Rules previously used the word "contract," the use of that term "does not make it one" and is "immaterial." *Nat'l Rosin Oil & Size Co. v. S. Atl. Coal Co.*, 97 S.E. 559, 561 (Ga. Ct. App. 1918); *see also Lee v. Satilla Health Servs., Inc.*, 470 S.E.2d 461, 462 (Ga. Ct. App. 1996) ("the labels ascribed by a contract are not determinative of the parties' legal relationship.").  Moreover, to ensure clarity and conformity with the purpose of the grant program, the Foundation has revised the Official Rules to omit the word "contract" and to clarify that the Rules merely set forth the criteria under which individuals can apply for a gift to be awarded at the sole discretion of the Foundation; the Rules do not bind the Foundation in any way.  *See* Ex. 2-A at 1-3 & I.  And as Plaintiff's own caselaw confirms (*see* Dkt. 2-1 at 1), "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006). Because no grant applicant has any contractual right vis-à-vis the Foundation by virtue of the program's Official Rules, Plaintiff cannot sustain a Section 1981 claim.  And, to the extent that Plaintiff based its Section 1981 claim on the program's prior Official Rules, the claim is moot.  *See, e.g., Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993).

c. *The Grant Program Is A Valid Affirmative Action Program Under* Johnson.

Even if Plaintiff could overcome the First Amendment hurdles of its claim and even if the grant program's Official Rules were sufficient to place the program within the ambit of Section 1981, a defendant still can defeat a Section 1981 claim by showing that it acted pursuant to a valid affirmative action plan.  *See, e.g.*, *Johnson*, 480 U.S. at 626-27; *see also Doe,* 470 F.3d at 836-40 (applying *Johnson* in Section 1981 case).  "[A] valid affirmative action plan should satisfy two general conditions."  *Shea v. Kerry*, 796 F.3d 42, 57 (D.C. Cir. 2015).  "First, a valid plan rests on an adequate factual predicate justifying its adoption, such as a 'manifest racial imbalance.'"  *Id.* (cleaned up).  "Second, a valid plan refrains from unnecessarily trammeling the rights of white" people.  *Id.* (cleaned up); *see also In re Birmingham Reverse Discrimination Emp. Litig.*, 20 F.3d 1525, 1537 (11th Cir. 1994).

In *Rabbani v. General Motors Corp.*, 2000 WL 36752977 (N.D. Fla. July 26, 2000), the court rejected a Section 1981 challenge to GM's "Minority Dealer Development Program" because it was a valid affirmative action program.  *Id.* at *1.  There, GM proved that while "minorities would have been expected . . . to own 845 of the 8,090 GM dealerships in 1997" based on a pool of qualified potential owners, "only 280 GM dealerships were minority owned."  *Id.* at *3.

That disparity "demonstrated a 'manifest imbalance' and a justification for the plan." *Id.* GM also did "not set aside certain dealerships for MDDP graduates," and the program did not present "a significant obstacle toward non-minority individuals acquiring dealerships" in other ways. *Id.* at *4.

Like the program upheld in *Rabbani*, the Foundation's grant program seeks to address the "manifest racial imbalance" in access to capital for Black women-owned businesses. As Defendants' expert, Georgetown University Professor Melissa Bradley, attests, Black women make up roughly six percent of the U.S. population but own just two percent of employer businesses. Ex. 3 ¶ 25. Black women face disproportionate financial barriers to creating businesses and accessing venture capital funding. *Id.* ¶¶ 16, 29. In fact, funding applications from Black women are rejected *three times* more often than applications from white business owners. *Id.* ¶ 27; *see Birmingham*, 20 F.3d at 1537 (noting the "appropriate comparison" to assess "manifest racial imbalance" is an assessment of "black representation" in the field). In 2022, Black women business founders received just ***0.13%*** of total venture capital spent in the U.S. Ex. 3 ¶ 27. *See Birmingham*, 20 F.3d at 1540 (manifest racial imbalance shown where only 42 of 453 firefighters were black). The grant program thus rests on a valid factual predicate of a manifest racial imbalance. Ex. 3 ¶¶ 16, 19-23, 26-28. And it promotes the very goals that Section 1981

was enacted to advance: providing Black people with economic freedom—equal access to capital to build businesses, grow communities, and support families.

So, too, does the program avoid "unnecessarily trammeling" the rights of AAER members. Plaintiff's members have access to funding: More than 99% of venture capital funding goes to people who are not Black women. *Id.* ¶ 26. Denial of the Foundation's modest grant—to which Plaintiff's members have no "absolute entitlement"—does not limit Plaintiff's members' access to funding in any meaningful way, nor does it "unnecessarily trammel" their interests. *Johnson*, 480 U.S. at 638; *see, e.g.*, *Kamehameha*, 470 F.3d at 843-45 (rejecting Section 1981 challenge to private school program that addressed a "manifest racial imbalance" and noting that the plaintiff "'had no absolute entitlement' to admission" to the school).

## B. Plaintiff Cannot Show Irreparable Harm.

Plaintiff's motion also should be denied because Plaintiff cannot show that a preliminary injunction would avert any harm to its three anonymous members—much less irreparable harm. *Bayse*, 2018 WL 5779606, at *4. Plaintiff's attempt to suggest otherwise fails for two primary reasons.

*First*, there is no case-law to support Plaintiff's novel argument that denial of the opportunity to compete for funding on the basis of race in the context of private, charitable giving is *per se* irreparable. Indeed, at least one

district court has expressly rejected the contention that "irreparable harm [is] inherent or presumed in a private company's use of racial classifications." *Moses*, 2022 WL 2046345, at *4. In *Moses*, the court refused to preliminarily enjoin under Section 1981 a program that offered resources to minority-owned small businesses in the wake of the COVID-19 pandemic because the plaintiffs had failed to demonstrate "irreparable harm." *Id.* at *1. As the court explained, where claims "are based on a statute rather than the Constitution, courts ordinarily 'may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy.'" *Id.* at *3 (quoting *First W. Cap. Mgmt. Co. v. Malamed*, 847 F.3d 1136, 1140 (10th Cir. 2017)).[5] Because Section 1981 "does not mandate injunctive relief," the court rejected the contention that the program's "express race-based classifications show[ed] irreparable harm on their own—presumptively—with no further proof." *Id.* Of course, Plaintiff has provided no such "further proof" of irreparable harm to its anonymous members in this Section 1981 case.

---

[5] Although the Eleventh Circuit in *Gresham v. Windrush*, 730 F.2d 1417 (11th Cir. 1984) suggested that courts can presume harm in housing discrimination cases, the court based its holding on the fact that the anti-discrimination statute at issue specifically authorized injunctive relief for violations, "without regard to their actual effect on the community." *Id.* at 1423-24. Here, by contrast, Section 1981 does not mention injunctive relief at all, let alone authorize the issuance of injunctive relief absent a showing of tangible harm.

*Second*, Plaintiff's delay in moving for a preliminary injunction "undermines" its irreparable harm claim. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). A "delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm." *Id.* Here, the grant program has been in operation since 2021, and this year's iteration was advertised as early as February 2023. *See* Ex. 2 ¶¶ 9-10, 13. Yet Plaintiff waited over seven months to file this action, despite arguing that the program has been "plainly illegal . . . for many decades." Dkt. 2-1 at 8.[6] Plaintiff's "failure to act with speed or urgency in moving for a preliminary injunction," *Wreal*, 840 F.3d at 1248, justifies denial of its request.

## C. The Balance Of Equities And Public Interest Favor Denying Plaintiff's Motion For A Mandatory Injunction.

The balance of equities and the public interest also strongly favor denial of Plaintiff's motion. *See, e.g.*, *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1322.

Plaintiff has failed to even identify any of its members by name, much less explain how any of these anonymous members would suffer a concrete, tangible harm to their business if they were not able to apply for a single,

---

[6] By asserting that the program has been "plainly illegal" for "decades," Plaintiff undermines any argument it later seeks to make that its motion was timely due to the recent issuance of *Students for Fair Admissions*. Moreover, that case involved the Equal Protection Clause and Title VI—not Section 1981.

24

discretionary grant.  By contrast, the Foundation would be irreparably harmed by the injunctive relief that Plaintiff seeks.   Requiring the Foundation to consider non-Black women applicants would undermine its "acts of expressive association," *303 Creative*, 143 S. Ct. at 2312, and force the Foundation to change its messaging in violation of the First Amendment, *Hurley*, 515 U.S. at 573.  Moreover, any injunction that forced the Foundation to delay its award of grants or decision-making with respect to grant recipients would impose tangible harms on those recipients.  *See* Decl. of E. Gamble (Ex. 4) ¶¶ 11-15.

An injunction is also not in the public interest.  The public has an interest in encouraging the First Amendment right to donate.  The public also has an interest in addressing manifest racial imbalances.  Section 1981 "reflects the exercise of congressional authority under the Thirteenth Amendment to relieve African Americans of the 'badges and incidents' of slavery."  *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 301 (7th Cir. 2000).  Congress has stated "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups [such as] . . . Black Americans." 15 U.S.C. § 631(f)(1)(C)-(D).  The Strivers grant program furthers this public interest, and is consistent with the original purpose of Section 1981.

## V.   CONCLUSION

The Court should deny Plaintiff's motion for preliminary injunction.

Dated:  August 31, 2023

Respectfully submitted,

**\*\*  /s/ Alphonso David**

 /s/ Mylan L. Denerstein

Alphonso David (*pro hac vice*)
GLOBAL BLACK ECONOMIC
FORUM
34 35th Street, Suite 5A
Brooklyn, NY 11232
(212) 287-5864
alphonso.david@gbef.com

*Attorneys for Defendants Fearless
Fund Management, LLC; Fearless
Fund II, GP, LLC; Fearless Fund II,
LP; and Fearless Foundation, Inc.*

Mylan L. Denerstein (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
mdenerstein@gibsondunn.com
lcrain@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
Zakiyyah T. Salim-Williams (*pro hac
vice*)
Molly T. Senger (*pro hac vice*)
Naima L. Farrell (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
jschwartz@gibsondunn.com
zswilliams@gibsondunn.com
msenger@gibsondunn.com
nfarrell@gibsondunn.com

Katherine Marquart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kmarquart@gibsondunn.com

*Attorneys for Defendants Fearless
Fund Management, LLC; Fearless
Fund II, GP, LLC; Fearless Fund II,
LP; and Fearless Foundation, Inc.*

26

**\*\***  */s/ Brooke Cluse*

Brooke Cluse (*pro hac vice*)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
(844) 964-1002
Brooke@bencrump.com

*Attorneys for Defendants Fearless
Fund Management, LLC; Fearless
Fund II, GP, LLC; Fearless Fund II,
LP; and Fearless Foundation, Inc.*

**\*\***   */s/ Byung J. Pak*

Byung J. Pak (GA Bar #559457)
Leila N. Knox (GA Bar #242279)
ALSTON & BIRD
1201 W. Peachtree St.
Atlanta, GA 30309
(404) 881-7000
Bjay.pak@alston.com
Leila.knox@alston.com

*Attorneys for Defendants Fearless Fund
Management, LLC; Fearless Fund II,
GP, LLC; Fearless Fund II, LP; and
Fearless Foundation, Inc.*

*\*\*Pursuant to Appendix H to the
Civil Local Rules, the electronic
signatory has confirmed that the
content of the document is acceptable.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

/s/ *Mylan L. Denerstein*
Mylan L. Denerstein

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that on August 31, 2023, the foregoing complies with the font and point selection approved by this Court in Local Rule 5.1(B).  This paper was prepared on a computer using Century Schoolbook thirteen-point font, double-spaced.

/s/ *Mylan L. Denerstein*
Mylan L. Denerstein