# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, <br><br> *Plaintiff,* <br><br> *v.* <br><br> FEARLESS FUND MANAGEMENT, LLC, *et al.,* <br><br> *Defendants.* | Case No. 1:23-CV-3424-TWT |

**DECLARATION OF MELISSA BRADLEY IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

I, Melissa Bradley, have personal knowledge of the facts in this declaration, and declare as follows:

## I.   Qualifications

1.     I am a Professor of Practice at the McDonough School of Business at Georgetown University, where I have taught courses on impact investing, social entrepreneurship, peer-to-peer economies, and innovation since August 2015.  Attached hereto as **Exhibit A** is a true and correct copy of my current resume.

2.     I have a Bachelor's of Science Degree in Finance from Georgetown University, and a Master's Degree in Business Administration from the Kogod School of Business at American University.

3.     I have more than 20 years of experience in the entrepreneurship, investment, and leadership sectors.

4.     Currently, I am the Founder and Managing Partner of 1863 Ventures, a Black-led national business development nonprofit accelerator and venture capital fund for entrepreneurs.  I am also a General Partner of the 1863 Venture Fund I and the Inclusive Innovation

1

Equity Impact Fund.

5.     I have many different responsibilities at 1863 Ventures.  As relevant to this declaration, I spearhead overall organizational strategy and oversee the firm's fundraising efforts.  I also strategize with my colleagues to develop content for the educational and mentoring programs we offer to our "founders" (i.e., the entrepreneurs who work with 1863 Ventures).  I am in frequent contact with our founders about their successes and the challenges facing their businesses, and I conduct trainings on growing and sustaining their businesses, and offer coaching to them.

6.     Both in my work with Georgetown University and 1863 Ventures, I am heavily involved in applied research in the area of entrepreneurship.  This research focuses on the financial cost of being a diverse entrepreneur, diverse entrepreneurs' lack of access to capital, and the variation in business longevity by race.  Part of this work involves analyzing the performance of our founders over time, including assessing their performance against other similar businesses to better understand the longitudinal differences between minority and non-minority business

owners.

7.     In 2018, I co-founded Ureeka, a company that provided "always-on coaching" to minority entrepreneurs who lack such coaching and mentoring opportunities, including 24/7 access to peers and colleagues via an app or website.  Ureeka was later purchased by Zen Business.

8.     Earlier in my career, I served as a Presidential Appointee in two Presidential administrations.  I first served as a Financial Regulatory Affairs Fellow at the Department of Treasury's Office of Thrift Supervision, where I researched the impact of welfare reform and microenterprise lending on the financial industry.  Later, I served as the Acting Director of the Social Innovation Fund, a White House initiative and program of the Corporation for National and Community Service.

9.     From 2010 to 2013, I served as CEO of Tides, Inc., an organization that engages in social impact investing and fiscal sponsorship of nonprofits to advance social justice.

10.     I am also the former Co-Chair and current member of the National Advisory Council on Innovation and Entrepreneurship, a

federal advisory committee tasked with identifying and recommending solutions to drive the innovation economy.

## II.   Scope of Engagement

11.   I have been asked by counsel for defendants Fearless Fund Management, LLC, Fearless Fund II, GP, LLC, Fearless Fund II, LP, and Fearless Foundation, Inc. (together, "Fearless Fund") to provide expert testimony concerning racial disparities in financing for Black-owned businesses, and the importance of grant funding for starting and scaling Black-owned businesses.

12.   I am not being paid for my services.   I have no financial interest in the outcome of this case.

13.   The materials I cite in this testimony are attached as **Exhibits A–Z** to my declaration.

## III.   Opinions

**A.   Black Americans Have Historically Been Underrepresented in Business Ownership as Compared to White Americans.**

14.   It is well-established in research literature and survey data that Black Americans have historically been underrepresented in self-

4

employment and business ownership.[1]  A research study published in 2019 reported that while white Americans represented nearly 72.9% of the U.S. population, white Americans owned 78% percent of all private U.S. businesses.[2]   Conversely, Black Americans represented approximately 13.3% of the U.S. population, but owned only 9% of private U.S. businesses.   This data reflects that Black Americans are disproportionately underrepresented in domestic business ownership and white Americans are disproportionately overrepresented.[3]

15.    Black-owned businesses also tend to be smaller than white-owned businesses and less likely to have any employees.[4]  According to the Census Bureau's 2021 Survey of Business Owners, 96% of Black-

---

[1] Ex. B, David G. Blanchflower & Jon Wainwright, *An Analysis of the Impact of Affirmative Action Programs on Self-Employment in the Construction Industry* 1, 17 (Nat'l Bureau of Econ. Rsch., Working Paper No. 11793, 2005).

[2] Ex. C, M'BALOU CAMARA ET AL., ENTERING ENTREPRENEURSHIP: RACIAL DISPARITIES IN THE PATHWAYS INTO BUSINESS OWNERSHIP 3 (2019).

[3] According to the Brookings Institution, in 2020, Black people represented 14.2% of all Americans but only 2.4% of all employer-firm owners. Latino or Hispanic people represented 18.7% of the population and 6.5% of employer-firm owners, while Asian Americans represented 6% of the population and 10.6% of employer-firm owners.   This data shows that Black Americans are most significantly underrepresented even among minority groups.  *See* Ex. D, Andre M. Perry et al., *Who Is Driving Black Business Growth?  Insights from the Latest Data on Black-Owned Businesses*, BROOKINGS INST. (May 24, 2023), available at https://www.brookings.edu/articles/who-is-driving-black-business-growth-insights-from-the-latest-data-on-black-owned-businesses/#:~:text=One%20key%20finding%20pertains%20to,seemed%20to%20drive%20overall%20growth.

[4] Ex. E, MCKINSEY & CO., BUILDING SUPPORTIVE ECOSYSTEMS FOR BLACK-OWNED US BUSINESSES 2 (2020).

owned companies have no employees versus 78% of white-owned businesses.

## B. Black Americans Have Faced, and Continue to Face, Considerable Barriers in Accessing Capital to Start and Scale Their Businesses as Compared to White Americans.

16.    One of the reasons for the disparities in prevalence and size of Black-owned and white-owned businesses is that Black Americans have historically faced, and continue to face, significant barriers accessing capital to start and grow their businesses.  Across all industries, a larger share of Black-owned businesses have inadequate initial startup capital as compared to white-owned businesses.[5]  The average level of startup capital among Black entrepreneurs is $35,205 compared with $106,720 for white entrepreneurs.[6]  As sources including the U.S. Census Bureau's Annual Survey of Entrepreneurs, the Federal Reserve's Survey of Small Business Finance, and the Kauffman Foundation make clear, Black-owned businesses are more reliant on

---

[5] *Id.* at 10.
[6] Ex. F, Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority Owned Startups* 11 (Nat'l Bureau of Econ. Rsch., Working Paper No. 28154, 2020).

owner investment, and less able to access bank financing, than white-owned Businesses.[7]  This is true even when controlling for differences in factors such as credit scores, industry, owner experiences,[8] and education levels.[9]  This disparity is a significant obstacle hindering Black Americans attempting to start businesses.  Without the right inflows of capital, a business cannot scale in the way that it needs to in order to be successful in the long term.  For example, purchasing inventory, fulfilling orders, marketing, covering overhead expenses, hiring additional employees and even conducting research and development to improve goods and services requires a significant amount of capital especially in the initial stages of a business.

17.   Outside capital such as bank financing and debt financing more generally, is a fundamentally important source of capital for young companies.[10]  The Kauffman Foundation Research Series on Firm Formation and Economic Growth consists of reports that explore the

---

[7] Ex. G, Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context on Access to Small Business Financing*, 30 ECON. DEV. Q. 159, 159, 161–63 (2016).

[8] *Id.* at 166.

[9] Ex. C at 9.

[10] Ex. H, William R. Kerr et al., *Entrepreneurship as Experimentation*, 28 J. ECON. PERSPECTIVES 25, 41 (2014).

relationship between firm formation and economic growth in the United States from a variety of angles.  In one of its reports analyzing nearly 5000 businesses, the Kauffman Firm Survey found that within the first three years of founding, 40% of the startup funding is typically constituted by outside debt capital, and only 4% consists of an owner's credit cards and personal loans.[11]  However, studies have shown that Black entrepreneurs borrow only half as much as they contribute from their own capital, while white entrepreneurs on average borrow nearly 1.7 times what they contribute from their own capital.[12]  This data shows that there's a significant disparity in the amount of non-personal capital that Black entrepreneurs are able to rely on in their ventures compared to white entrepreneurs, which impedes the ability of Black entrepreneurs to scale and grow their businesses.

18.   To understand why Black businesses are more reliant on owner investment, it is important to understand the funding ecosystem in which Black entrepreneurs operate.  One traditional path for funding a new business is to rely first on friends and family for startup capital.

---

[11] *Id.*
[12] Ex. F at 12.

But when Black entrepreneurs seek these funds, they are disadvantaged compared to their white counterparts, given this country's well-documented wealth and income gap. For instance, 2019 Federal Reserve data reflects that the typical white family has eight times the wealth of the typical Black family.[13] And in 2021, the U.S. Census Bureau reported that the median household income for Black Americans was just $48,297, compared to $77,999 for non-Hispanic white Americans.[14]

19.   This wealth and income gap also affects a Black business owner's ability to self-fund their venture, which can be exacerbated by student loan debt. Black Americans, on average, have higher rates of student loan debt than other racial groups. The 2023 Education Data Initiative study of student loan debt statistics revealed that Black college graduates owe $25,000 more in student loan debt, on average, compared to white college graduates. The study also found that Black students

---

[13] Ex. I, Neil Bhutta et al., *Disparities in Wealth by Race and Ethnicity in 2019 Survey of Consumer Finances*, BD. OF GOVERNORS OF THE FED. RESERVE SYS., (Sept. 28, 2020), *available at* https://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.html.
[14] Ex. J, JESSICA SEMEGA & MELISSA KOLLAR, U.S. DEP'T OF COMMERCE, U.S. CENSUS BUREAU, INCOME IN THE UNITED STATES: 2021 at 2 (Sept. 2022).

borrowed 188% more in student loans than white students.[15]  Student loan debt reduces the amount of discretionary income Black entrepreneurs have to invest in their ventures.

20.    With less access to funding from friends and family, and less discretionary income of their own, Black entrepreneurs must rely on other private sources of funding—including bank financing and venture capital—to start and scale their businesses.   But here too, Black entrepreneurs face significant barriers to access.   The 2021 Small Business Credit Survey conducted by the 12 Federal Reserve Banks found that more than half of Black business owners who sought credit reported receiving less than the amount they requested.  Only a quarter of white business owners reported the same.  Black Americans are also charged more to borrow money, paying higher interest rates on their debt.[16]   Confronted with these hurdles to accessing bank financing, Black-owned businesses are more likely to not apply for or to receive a

---

[15] Ex. K, Melanie Hanson, *Student Loan Debt By Race*, EDUC. DATA INITIATIVE (May 17, 2023), *available at* https://educationdata.org/student-loan-debt-by-race.
[16] Ex. L, David Blanchflower et al., *Discrimination in the Small Business Credit Market* 20, 26 (Nat'l Bureau of Econ. Rsch., Working Paper No. 6840, 1998).

traditional loan than white businesses, losing out on a significant source of startup capital for their businesses.[17]

21.    In lieu of traditional bank financing that offers lower interest rates, Black business owners often turn to more costly sources of startup funding, including credit cards and Fintech financing.[18]  More costly debt is a drain on the already limited capital Black businesses have to grow. Fintech lending is automated and anonymized, and the lender therefore typically does not know the race of the applicant.  Given this anonymity, Fintech lenders like Paypal can be more attractive to Black-owned businesses than traditional financial institutions.[19]  In fact, 25% of Black-owned businesses applied for PPP loans from Fintech lenders, and Black-owned businesses turned to Fintech firms at twice the rate of those owned

---

[17] Ex. M, ALICIA ROBB, OFFICE OF ADVOCACY, U.S. SMALL BUSINESS ADMIN., FINANCING PATTERNS AND CREDIT MARKET EXPERIENCES: A COMPARISON BY RACE AND ETHNICITY FOR U.S. EMPLOYER FIRMS 4, 10, 12, 49, (Feb. 2018).

[18] Ex. N, Aaron K. Chatterji & Robert C. Seamans, *Entrepreneurial Finance, Credit Cards and Race*, 106 J. FIN. ECON. 182, 182–83 (2012).

[19] Ex. O, Celine Yue Fei, What Drives Racial Minorities to Use Fintech Lending? Evidence from a Structural Estimation 4 (Sept. 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3949148.

by white, Hispanic, and Asian individuals.[20]   However, Fintech funders such as Lending Club tend to have higher interest rates than traditional funding sources such as banks, small business loans and credit unions (often twice as high),[21] and as a result, are a more costly source of capital for the businessowner.   For instance, when a majority of a company's revenue and profits are allocated towards paying off high interest debt, a business will inevitably struggle with maintaining its cashflow sufficient to expand its operations.

22.   Another important source of business funding is venture capital.   Venture capital is a type of financing that private investors provide to startups and small businesses that are believed to have potential to show long-term growth.   But there, too, is a wide racial divide in the investments to Black-owned versus white-owned businesses.   2022 Crunchbase data on venture capital funding shows that Black startup

---

[20] Ex. P, Jessica Battisto et al., *Who Received PPP Loans by Fintech Lenders*, FED. RESERVE BANK OF N.Y. (May 27, 2021), https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders/.

[21] Ex. Q, Julapa Jagtiani & Catharine Lemieux, Fed. Reserve Bank of Phila., Fintech Lending: Financial Inclusion, Risk Pricing, and Alternative Information 9–10 (June 16, 2017), *available at* https://www.fdic.gov/analysis/cfr/bank-research-conference/annual-17th/papers/14-jagtiani.pdf.

founders in the United States raised only around $264 million out of the total $33.6 *billion* in venture capital allocated in Q4 2022.[22]  In total, U.S. Black founders raised only an estimated $2.254 billion out of the $215.9 billion in U.S. venture capital allocated last year, which amounts to only about 1% of total venture capital funding.[23]

23.    Notably, while there was an uptick in corporate commitment to funding Black-led startups in 2021 following the murder of George Floyd and the national attention that followed, that attention to funding Black businesses was not sustained.  In 2020, America's Fortune 1000 companies committed $66 billion to racial injustice, but so far, few of these commitments have been met, and the pace of monetary commitments has slowed year-over-year.[24]  Compounding this problem, financing for Black business owners dropped 45% in 2022 due to

---

[22] Ex. R, Dominic-Madori Davis, *Black Founders Still Raised Just 1% of All VC Funds in 2022*, TECHCRUNCH (Jan. 6, 2023), *available at* https://techcrunch.com/2023/01/06/black-founders-still-raised-just-1-of-all-vc-funds-in-2022/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAADOeO0N4FG9XtUygcJY5N-nUq5sm_fqNg1IR2MSNrL2LjspqwJZIYI_scQ2TATxWnPF0Gsu9MNN23ITxULN4OW3x5AshW9FFVi8P4f-bF7_I5XM_IL1-EQMtqG5ln2Eci-NIZg8AfKQNS15Ci8ixyWRixI5mLWrabO-oWE6J0tQk.

[23] *Id*.

[24] Ex. S, MEGAN ARMSTRONG ET AL., MCKINSEY & CO., CORPORATE COMMITMENTS TO RACIAL JUSTICE: AN UPDATE 2–3 (Feb. 2023)

changing market conditions.[25]

## C.    Black Female Entrepreneurs Are Especially Disadvantaged in Accessing Capital Markets.

24.    Black women are arguably the most economically disadvantaged demographic in the U.S.  In a report by compensation data and software company PayScale, it was reported that Black women begin to earn more than white men with an associate degree only when they obtain a master's degree.[26]  In other words, Black women must earn three times as many degrees as a white man to earn the same pay, let alone aim for slightly more.

25.    Against this backdrop of being highly disadvantaged in the workforce, Black women have begun to gravitate toward entrepreneurship as a means toward economic freedom.  Black women are starting businesses at a record pace—between 2014 and 2019, 42% of

---

[25] Ex. T, Gabrielle Fonrouge, *Venture Capital for Black Entrepreneurs Plummeted 45% in 2022, Data Shows*, CNBC (Feb. 2, 2023), https://www.cnbc.com/2023/02/02/venture-capital-black-founders-plummeted.html.

[26] Ex. U, Stephen Miller, *Black Workers Still Earn Less Than Their White Counterparts*, SHRM (June 11, 2020), https://www.shrm.org/resourcesandtools/hr-topics/compensation/pages/racial-wage-gaps-persistence-poses-challenge.aspx.

new businesses were created by Black women.[27]   However, they are significantly underrepresented in ownership of *mature* businesses (i.e., a business surviving past 5 years) with just 3% of Black women running mature businesses.[28]   And although Black women make up roughly 6% of the U.S. population, they own just 2% of employer businesses (i.e., businesses with more than one employee).[29]

26.    What I know from my own experience, and what is supported by the data, is that challenges accessing capital play a significant role in limiting the ability of Black women to grow their businesses.[30]   According to the Federal Reserve System's 2016 Small Business Credit Survey, 66% of Black women business owners identify access to credit and funds for expansion as one of their greatest financial challenges.[31]   Only 39% of their nonminority peers say the same.  In fact, despite making up 20.3%

---

[27] Ex. V, Fearless Fund 2023 Impact Report at 11.
[28] Ex. W, Donna Kelley et al., *Black Women Are More Likely to Start a Business than White Men*, Harvard Business Rev., (May 2021), *available at* https://hbr.org/2021/05/black-women-are-more-likely-to-start-a-business-than-white-men.
[29] Ex. X, GIZELLE GEORGE-JOSEPH & DANIEL MILO, GOLDMAN SACHS, BLACK WOMENOMICS: EQUALIZING ENTREPRENEURSHIP 3 (Feb. 9, 2022).
[30] *Id.*
[31] Ex. Y, DELL GINES, FED. RESERVE BANK OF KANSAS CITY, BLACK WOMEN BUSINESS STARTUPS 12 (2017).

of the U.S. population, Black women received less than 0.4% in venture capital funding in 2022.[32]  This is wholly consistent with my experience working in this industry for over twenty years both as a Black female founder and as Managing Partner at 1863 Ventures, where I regularly interact with Black entrepreneurs who report to me on the hurdles they face accessing capital for their businesses.

27.    Even within the venture capital industry, Black women face roadblocks to accessing private capital.  For instance, Black female business owners who apply for funding face a three-times higher rejection rate than that of white business owners.  And although U.S. startups raised $329.9 billion in venture investments in 2021, nearly doubling the previous record of $166.6 billion in 2020, Black female founders raised just 0.13% of the total venture capital spend in 2022.[33]

28.    A biennial study on Black and Latinx woman founders conducted in January 2021 by digitalundivided found that only 93 Black women founders had ever raised over $1 million in venture capital for

---

[32] Ex. V at 9.
[33] *Id.* at 13.

16

their businesses.[34]   And among the vast majority of Black women founders who have not met that milestone, the median amount of funds raised in the founder's seed round was only $125,000 compared to the national average of $2.5 million.[35]  And prior to 2018, just 34 Black women founders had raised over $1 million, according to the most recent findings by Project Diane.[36]  These numbers further reflect how Black female-led firms are struggling to access meaningful capital sufficient to sustain and scale a business.

## D.   Racial Discrimination is One of the Reasons Black Entrepreneurs Face Challenges in Accessing Capital Markets.

29.   Research shows that racial discrimination is one reason why Black entrepreneurs face barriers in accessing the capital they need to start and grow their businesses.

30.   A 2012 study found that Black entrepreneurs were more

---

[34] Ex. Z, Dominic-Madori Davis, *The VC Landscape is Dire for Black Women.  7 Black Women Who Have Raised Millions in Funding Reveal Their Best Fundraising Advice*, BUS. INSIDER (Nov. 10, 2021), *available at* https://www.businessinsider.com/how-to-raise-venture-capital-as-black-female-founder-2021-11.
[35] *Id.*
[36] *Id.*

likely to fear being turned down by lending institutions than white entrepreneurs in states with higher levels of historical racial inequality.[37] In particular, the study revealed that local areas with high levels of historical racial inequality have much higher levels of fear of denial and unmet capital needs among Black entrepreneurs relative to white entrepreneurs than areas with low levels of racial inequality.[38]

31.    Other studies have shown that Black entrepreneurs fare poorly in raising capital even in areas with a strong local banking community that is more favorable toward small startups.[39] Researchers attributed this result to discrimination or banks treating Black entrepreneurs differently because Black small businesses should presumably fare better with smaller local banks that rely on "soft" subjective information than larger national banks that tend to rely on objectively "hard" information like credit scores.  But that was not the case, and the root cause of the disparity appeared to be the negative attitudes and perceptions about Black borrowers in credit markets.[40]

---

[37] Ex. N at 184, 190, 193–94.
[38] *Id.* at 184.
[39] Ex. F at 5.
[40] *Id.* at 24–26.

Therefore, while minorities in general face some form of discrimination in the U.S., the negative attitudes toward Black borrowers in particular have significantly impacted Black entrepreneurs' ability to borrow and scale their businesses in the long term.

**E.    Grant Funding Is an Important Source of Capital for Black Businesses.**

32.    Confronted with these documented barriers to accessing capital, Black startups look to grant funding—like the Fearless Foundation grants at issue in this case—to grow their businesses.  I have been involved in many small-business grant programs in my career.  In my experience, grant funds are particularly important for Black entrepreneurs who use this capital to fill gaps in funding for their businesses that they cannot access from traditional sources like family, friends, private credit lenders, and venture capital.  For instance, grant recipients often apply their awards toward marketing to improve the visibility of their businesses.  Marketing is typically one of the most expensive parts of a startup venture, but it is also hard to secure financing for marketing expenses through traditional debt because it is effectively a sunk cost.

33.    Grant funding also often comes with meaningful intangible benefits for small businessowners.  In my work, I have been involved in grant programs that provide coaching, mentorship, and financial guidance to grant recipients.  For example, under my leadership, Ureeka coached and trained grant recipients on customer acquisition and customer retention in a post-COVID virtual world.  These intangible benefits of grant programs are especially helpful for Black entrepreneurs, many of whom lack role models, mentors, or business leaders in their communities who they can turn to for guidance and advice in their entrepreneurial journeys.

34.  Additionally, grant programs often connect Black businessowners with peers at various stages of business development, thus helping to foster leadership networks that may not otherwise exist for many Black entrepreneurs.  Black founders rely on these networks for advice and guidance on scaling their businesses.

## IV.   <u>Materials Cited</u>

35.   Attached hereto as **Exhibit A** is a true and correct copy of my current resume.

36.   Attached hereto as **Exhibit B** is a true and correct copy of David G. Blanchflower & Jon Wainwright, *An Analysis of the Impact of Affirmative Action Programs on Self-Employment in the Construction Industry* (Nat'l Bureau of Econ. Rsch., Working Paper No. 11793, 2005).

37.   Attached hereto as **Exhibit C** is a true and correct copy of M'BALOU CAMARA ET AL., ENTERING ENTREPRENEURSHIP: RACIAL DISPARITIES IN THE PATHWAYS INTO BUSINESS OWNERSHIP (2019).

38.   Attached hereto as **Exhibit D** is a true and correct copy of Andre M. Perry et al., *Who is Driving Black Business Growth?  Insights from the Latest Data on Black-Owned Businesses*, BROOKINGS INST. (May 24, 2023), *available at* https://www.brookings.edu/articles/who-is-driving-black-business-growth-insights-from-the-latest-data-on-black-owned-businesses/#:~:text=One%20key%20finding%20pertains%20to,seemed%20to%20drive%20overall%20growth.

39.     Attached hereto as **Exhibit E** is a true and correct copy of MCKINSEY & CO., BUILDING SUPPORTIVE ECOSYSTEMS FOR BLACK-OWNED US BUSINESSES (2020).

40.     Attached hereto as **Exhibit F** is a true and correct copy of Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority-Owned Startups* (Nat'l Bureau of Econ. Rsch., Working Paper No. 28154, 2020).

41.     Attached hereto as **Exhibit G** is a true and correct copy of Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context on Access to Small-Business Financing*, 30 ECON. DEV. Q. 159 (2016).

42.     Attached hereto as **Exhibit H** is a true and correct copy of William R. Kerr et al., *Entrepreneurship as Experimentation*, 28 J. ECON. PERSPECTIVES 25 (2014).

43.     Attached hereto as **Exhibit I** is a true and correct copy of Neil Bhutta et al., *Disparities in Wealth by Race and Ethnicity in 2019 Survey of Consumer Finances*, BD. OF GOVERNORS OF THE FED. RESERVE SYS., (Sept.           28,           2020),           *available           at*

https://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.html.

44.   Attached hereto as **Exhibit J** is a true and correct copy of JESSICA SEMEGA & MELISSA KOLLAR, U.S. DEP'T OF COMMERCE, U.S. CENSUS BUREAU, INCOME IN THE UNITED STATES: 2021 (Sept. 2022).

45.   Attached hereto as **Exhibit K** is a true and correct copy of Melanie Hanson, *Student Loan Debt By Race*, EDUC. DATA INITIATIVE (May 17, 2023), *available at* https://educationdata.org/student-loan-debt-by-race.

46.   Attached hereto as **Exhibit L** is a true and correct copy of David Blanchflower et al., *Discrimination in the Small Business Credit Market* (Nat'l Bureau of Econ. Rsch., Working Paper No. 6840, 1998).

47.   Attached hereto as **Exhibit M** is a true and correct copy of ALICIA ROBB, OFFICE OF ADVOCACY, U.S. SMALL BUSINESS ADMIN., FINANCING PATTERNS AND CREDIT MARKET EXPERIENCES: A COMPARISON BY RACE AND ETHNICITY FOR U.S. EMPLOYER FIRMS (Feb. 2018).

48.   Attached hereto as **Exhibit N** is a true and correct copy of

Aaron K. Chatterji & Robert C. Seamans, *Entrepreneurial Finance, Credit Cards and Race*, 106 J. FIN. ECON. 182 (2012).

49.   Attached hereto as **Exhibit O** is a true and correct copy of Celine Yue Fei, What Drives Racial Minorities to Use Fintech Lending? Evidence from a Structural Estimation (Sept. 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3949148.

50.   Attached hereto as **Exhibit P** is a true and correct copy of Jessica Battisto et al., *Who Received PPP Loans by Fintech Lenders*, FED. RESERVE BANK OF N.Y. (May 27, 2021), https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders/.

51.   Attached hereto as **Exhibit Q** is a true and correct copy of Julapa Jagtiani & Catharine Lemieux, Fintech Lending: Financial Inclusion, Risk Pricing, and Alternative Information, FED. RESERVE BANK OF PHILA. (June 16, 2017), *available at* https://www.fdic.gov/analysis/cfr/bank-research-conference/annual-17th/papers/14-jagtiani.pdf.

52.   Attached hereto as **Exhibit R** is a true and correct copy of

Dominic-Madori Davis, *Black Founders Still Raised Just 1% of All VC Funds in 2022*, TECHCRUNCH (Jan. 6, 2023), *available at* https://techcrunch.com/2023/01/06/black-founders-still-raised-just-1-of-all-vc-funds-in-2022/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmN vbS8&guce_referrer_sig=AQAAADOeO0N4FG9XtUygcJY5N-nUq5sm_fqNg1IR2MSNrL2LjspqwJZIYI_scQ2TATxWnPF0Gsu9MNN2 3ITxULN4OW3x5AshW9FFVi8P4f-bF7_I5XM_IL1-EQMtqG5ln2Eci-NIZg8AfKQNS15Ci8ixyWRixI5mLWrabO-oWE6J0tQk.

53. Attached hereto as **Exhibit S** is a true and correct copy of MEGAN ARMSTRONG ET AL., MCKINSEY & CO., CORPORATE COMMITMENTS TO RACIAL JUSTICE: AN UPDATE (Feb. 2023).

54. Attached hereto as **Exhibit T** is a true and correct copy of Gabrielle Fonrouge, *Venture Capital for Black Entrepreneurs Plummeted 45% in 2022, Data Shows*, CNBC (Feb. 2, 2023), https://www.cnbc.com/2023/02/02/venture-capital-black-founders-plummeted.html.

55. Attached hereto as **Exhibit U** is a true and correct copy of

Stephen Miller, *Black Workers Still Earn Less Than Their White Counterparts*, SHRM (June 11, 2020), https://www.shrm.org/resourcesandtools/hr-topics/compensation/pages/racial-wage-gaps-persistence-poses-challenge.aspx.

56. Attached hereto as **Exhibit V** is a true and correct copy of the 2023 Fearless Fund Impact Report.

57. Attached hereto as **Exhibit W** is a true and correct copy of Donna Kelley et al., *Black Women Are More Likely to Start a Business than White M*en, HARV. BUS. REV., (May 2021), *available at* https://hbr.org/2021/05/black-women-are-more-likely-to-start-a-business-than-white-men.

58. Attached hereto as **Exhibit X** is a true and correct copy of GIZELLE GEORGE-JOSEPH & DANIEL MILO, GOLDMAN SACHS, BLACK WOMENOMICS: EQUALIZING ENTREPRENEURSHIP (Feb. 9, 2022).

59. Attached hereto as **Exhibit Y** is a true and correct copy of DELL GINES, FED. RESERVE BANK OF KANSAS CITY, BLACK WOMEN

BUSINESS STARTUPS 12 (2017).

60.   Attached hereto as **Exhibit Z** is a true and correct copy of
Dominic-Madori Davis, *The VC Landscape is Dire for Black Women. 7
Black Women Who Have Raised Millions in Funding Reveal Their Best
Fundraising Advice*, BUS. INSIDER (Nov. 10, 2021), *available at*
https://www.businessinsider.com/how-to-raise-venture-capital-as-black-
female-founder-2021-11.

* * *

I declare under penalty of perjury that the foregoing is true and
correct to the best of my knowledge and belief.

Date: August 31, 2023

Melissa Bradley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2023, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ Mylan L. Denerstein*
Mylan L. Denerstein

# Exhibit A

**MELISSA LYNN BRADLEY**
4200 Wisconsin Avenue, NW, #106-123, Washington, DC 20016
melissabradley@mac.com
(917) 549-6092

## Education

| | | |
|---|---|---|
| 1991-1993 | **AMERICAN UNIVERSITY** | **WASHINGTON, DC** |

Master's in Business Administration, Marketing
*Graduate Fellow*

| | | |
|---|---|---|
| 1985-1989 | **GEORGETOWN UNIVERSITY** | **WASHINGTON, DC** |

Bachelor of Science, Finance

## Academic Experience

**2015-Present**   **Georgetown University McDonough School of Business**
Professor of Practice, Management Department
Awards: Entrepreneurship Faculty Excellence Award, the Joseph F. LeMoine Award for Undergraduate and Graduate Teaching Excellence, the Peter W. Gonzalez, Jr. Award for Excellence in Adjunct Faculty Teaching, and The Ideas Worth Teaching Award

**2016-2018**   **American University, Kogod School of Business**
Professor, Management Department and Founder, AU Center for Innovation

**2021-2022**   **Spelman College & Morehouse University**
Founding Director, Center for Black Entrepreneurship

## Original Research

The ROI of D&I: The Cost of Being A Diverse Entrepreneur, 2018.

Beyond 5: Small Business Survivability of New Majority Entrepreneurs, 2022.

## Publications

Books
Melissa L. Bradley. *Introduction to Media Investing For The Creative and Investment Communities.* New York City: New Capitalist, 2004.

Melissa L. Bradley. *A Young Entrepreneur's Casebook.* Washington, DC: The Entrepreneurial Development Institute (TEDI), 1995.

Melissa L. Bradley. *Business Basics: A Young Entrepreneur's Guide.* Washington, DC: The Entrepreneurial Development Institute (TEDI), 1995.

Articles in Journals
Melissa L. Bradley. "Instructions Included: An Open Letter to Future Change Agents." *National Civic Review*, 86, 3 (1997): 245-249.

Melissa L. Bradley. "Reducing Recidivism through Entrepreneurship." *State of Corrections, American Correctional Association* (1996)

Articles in Conference/Workshop Proceedings (1)

Melissa L. Bradley. "Individual Development Accounts (IDAs): Strategy for Asset Accumulation.", San Francisco, CA: Office of Thrift Supervision, 1998.

Presentations

"Total Portfolio Activation: A Framework for Creating Social and Environmental Impact Across Asset Classes." 2012. Trillium Asset Management.

Other

Melissa L. Bradley, Brad Dudding, Zachary Wenner. "Thriving in an Outcomes-Based Market." (2015).

Ascend at the Aspen Institute. "The Bottom Line, Investing for Impact on Economic Mobility in the U.S." (2014).

| | | |
|---|---|---|
| **Professional Experience** | **UREEKA Inc.** | **WASHINGTON, DC /SAN FRANCISCO, CA** |

*Venture-backed platform to democratize opportunity via coaching and capital to small business owners*

2019-2022 **CO-FOUNDER**
- Built and launched a tech platform to reduce risk and costs for small business growth
- Secured over $12M+ in venture capital
- Responsible for organizational strategy, small business recruitment/retention, and partnerships
- Manage a community of over 15k entrepreneurs globally
- Provide leadership to 20+ remote staff and serve on the company's Board of Directors
- Sold the company to Zen Business in July 2022

2016-Present **1863 VENTURES**                                                     **WASHINGTON, DC**

*Business development program to accelerate New Majority entrepreneurs to create $100B in new wealth*

**FOUNDER & MANAGING PARTNER and General Partner**
- Founded organization to accelerate New Majority entrepreneurs from high potential to high growth
- Responsible for organizational strategy, financial sustainability, governance, and partnerships
- Serve as General Partner for affiliated revenue-based financing fund, 1863 Venture Fund I and Inclusive Innovation Equity Impact Fund
- Manage and raise a budget of $3M+ annually

2013-2015 **CORPORATION FOR NATIONAL AND COMMUNITY SERVICE      WASHINGTON, DC**

*Federal agency that promotes and supports AmeriCorps programs across the United States*

**ACTING DIRECTOR, SOCIAL INNOVATION FUND**

White House Initiative and program of the Corporation for National and Community Service (CNCS)
- Led the creation of a departmental strategic plan
- Co-developed the FY 2015 NOFA releases for SIF and Pay for Success
- Developed SIF Week – a national campaign to promote the SIF and evidence-based programs

**CHIEF STRATEGY OFFICER**

Presidential Appointee responsible for the agency's strategic plan and creating and sustaining inter-agency and private sector partnerships.
- Secured a $10M partnership between CNCS, Citi Foundation, and Points of Light to create the nation's largest corporate-sponsored AmeriCorps program in 10 cities nationwide
- Serve as the agency representative on the President's "My Brother's Keeper" Initiative and the Interagency Working Group on Opportunity Youth
- Co-created an investment mechanism to secure and scale private sector support for the education awards of AmeriCorps members
- Detailed to the Department of Education to support the President's My Brother's Keeper Initiative, designed to bring attention to, and support for decreasing, the disparities facing boys and young men of color. As part of the launch of the President's initiative, authored the chapter on mentoring, launched the national engagement call to action for mentors, served as the agency lead on the interagency task force, and identified public-private partnerships to support this important work which included a $13M commitment from AT&T.

3

| | | |
|---|---|---|
| 2010-2013 | **TIDES** | **SF, CA; NYC, NY; WASHINGTON, DC** |

*International social enterprise providing sophisticated financial and management service to donors/doers*

**CEO**
- Managed over 120 staff in four locations with an annual budget over $20MM and $200MM AUM
- Led innovation through new products, services and partnerships that doubled donors in one year
- Initiated customer service and business model improvements for client base of over 500 donors/activists
- Initiated Network rebranding campaign as well as a transition to a multi-tenancy IT platform
- Generated highest contributions since 2000 and produced break-even budget after 5 years of losses
- Served as first professional CEO following the founder's departure after 35 years

| | | |
|---|---|---|
| 1999-Present | **NEW CAPITALIST™** | **WASHINGTON, DC** |

*A business development firm specializing in media, technology, and financial services industries*

**Founder & President**
- Facilitated over $20MM in venture capital transactions for seed stage companies with 20 percent ROI
- Created proprietary investment vehicles instrumental in capital sourcing for minority-owned firms
- Provide strategic planning, marketing, and business development services to early-stage companies
- Offer advisory services to investors – institutions, individuals, and philanthropic organizations
- Generate and manage over $1MM in business development annually

| | | |
|---|---|---|
| 2008-2010 | **GREEN FOR ALL** | **OAKLAND, CA** |

*National policy organization committed to an inclusive green economy*

**Senior Strategist, Capital Access Program (CAP)**
- Established the Energy Efficiency Opportunity Fund (EEOF) in partnership with Living Cities
- Co-created the Green Jobs Award Program with SJF Ventures and Advisory Services
- Created online entrepreneurship center and offline business academies to support green entrepreneurship, particularly for minority and women-owned firms
- Researched and developed policy recommendations to support green business

| | | |
|---|---|---|
| 2004-2008 | **REENTRY STRATEGIES INSTITUTE™** | **WASHINGTON, DC** |

*National criminal justice intermediary explicitly focused on reentry*

**Founder & President**
- Selected as a Fellow by the Open Society Institute and the Draper Richards Foundation
- Established partnerships with the North Carolina Department of Corrections, the Office of the District Attorney of San Francisco, and the Criminal Justice Coordinating Council in Washington, DC
- Supported over 50 grassroots organizations in capacity building and sustainability planning
- Hosted four National Dialogues on Reentry and Criminal Justice in New York, Chicago, San Francisco, and North Carolina and launched the Reentry Donors Network

| | | |
|---|---|---|
| 2006-2008 | **CIT GAP FUNDS** | **HERNDON, VIRGINIA** |

*Providing seed-stage equity investments in Virginia-based technology and life science companies*

**Director, Investment Services**
- Responsible for sourcing regionally based deals in sectors including IT, Biotech, Healthcare, Consumer Services, Mobile, Financial Services, etc.[SEP]
- Conducted all due diligence and completed all investment documentation for investment committee presentations on a quarterly basis[SEP]
- Led all portfolio management activities for invested companies including board-level relationships

| | | |
|---|---|---|
| 2004-2006 | **POSITIVE IMPACT™** | **WASHINGTON, DC & NEW YORK, NY** |

*Collaborative initiative to promote diverse voices and visions within independent media*

**Founder & President**
- Successfully launched initiative at 2004 *Sundance Film Festival*
- Secured 15 project partners including Sundance Film Festival & Sundance Institute, NY Latino Film Festival, IFP-NY, Screen Actors Guild, OneVibe TV/Film Group, LLC, etc.
- Facilitated over 50 investor meetings that supported over $1MM in investments to media makers of color
- Established *Media Training Fund (MTF)* grant program to assist media makers of color participate in training and professional development programs which has provided over $20,000 in grants

| | | |
|---|---|---|
| 2001-2003 | **UBS** | **NEW YORK, NY** |

*Private Client Services*

**Vice President**
- Recruited as a Marketing Associate and promoted to Assistant Vice President within one year
- Selected to participate in internal leadership development training program
- Managed the development and re-launch of the private client website for high-net-worth clients and received internal recognition for leadership in the re-design process
- Developed and implemented training for top ranking financial advisors and select private clients to increase assets under management to $1 trillion
- Responsible for site management/maintenance, client interface, content development, vendor sourcing and relationship management for private client website

| | | |
|---|---|---|
| 1997-1998 | **DEPARTMENT OF TREASURY** | **WASHINGTON, DC** |

*Office of Thrift Supervision*

**Financial Regulatory Affairs Fellow,** Presidential Appointee
- Researched the impact of welfare reform, microenterprise lending and Individual Development Accounts on the financial services industry
- Provided strategic recommendations for action on behalf of the banking sector
- Deliverables included: conference lectures; published research papers; informational and marketing materials on each subject; and industry-wide conference and training modules

**Professional Service**

- Board Member, The Nathan Cummings Foundation
- Board Member, AEO
- Board member, The Motley Fool Foundation
- Advisor, Goldman Sachs One Billion Black Women Initiative
- Advisor, Goldman Sachs Launch with GS Program
- Member, Fast Company Executive Board
- Member, Square & Forbes Small Business Advisory Team
- Member, Target Accelerators Entrepreneurship Advisory Council
- Current Member & Former Co-Chair, National Advisor Council on Innovation and Entrepreneurship, Department of Commerce
- Former Advisor, Credit Suisse New Markets Advisory board
- Former Nonresident Senior Fellow in the Metropolitan Policy Program, Brookings Institution
- Founding Member, Dell Center for Entrepreneurs Advisory Board
- Founder & Former Chair, Georgetown Entrepreneurship Alliance

# Exhibit B

NBER WORKING PAPER SERIES

AN ANALYSIS OF THE IMPACT OF AFFIRMATIVE
ACTION PROGRAMS ON SELF-EMPLOYMENT
IN THE CONSTRUCTION INDUSTRY

David G. Blanchflower
Jon Wainwright

Working Paper 11793
http://www.nber.org/papers/w11793

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
November 2005

We thank Barry Hirsch, Colette Holt, John Scott, Chris Snyder, Jon Skinner, Doug Staiger and Jonathan Zinman for helpful comments and suggestions. All errors are ours The views expressed herein are those of the author(s) and do not necessarily reflect the views of the National Bureau of Economic Research.

©2005 by David G. Blanchflower and Jon Wainwright.  All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

An Analysis of the Impact of Affirmative Action Programs on Self-Employment in the
Construction Industry
David G. Blanchflower and Jon Wainwright
NBER Working Paper No. 11793
November 2005
JEL No. J4

## ABSTRACT

The main findings of this paper are that despite the existence of various affirmative action programs designed to improve the position of women and minorities in public construction, little has changed in the last twenty five years. We present evidence showing that where race conscious affirmative action programs exist they appear to generate significant improvements: when these programs are removed or replaced with race-neutral programs the utilization of minorities and women in public construction declines rapidly. We show that the programs have not helped minorities to become self-employed or to raise their earnings over the period 1979-2004, using data from the Current Population Survey and the Census, but have improved the position of white females. There has been a growth in incorporated self-employment rates of white women in construction such that currently their rate is significantly higher than that of white men. The data are suggestive of the possibility that some of these companies are 'fronts' which are actually run by their white male spouses or sons to take advantage of the affirmative action programs.

David G. Blanchflower
Department of Economics
6106 Rockefeller Hall
Dartmouth College
Hanover, NH 03755-3514
and NBER
blanchflower@dartmouth.edu

Jon Wainwright
NERA Economic Consulting
jon.wainwright@nera.com

## 1. Introduction

Construction is an important sector.  In 2003, over 8 million workers, or approximately six per cent of total employment in the United States, held a construction job.[1] This is made up of 6.7 million wage and salary jobs and 1.6 million self-employed and unpaid family non-government jobs. The construction industry accounts for a disproportionate share of union members and of the self-employed. The self-employment rate is over 30% for painters, carpenters, roofers and carpet, floor and tile installers.[2] The construction industry, in 2003, accounted for 13.5% of all private sector union members and 16.7% of all of the unincorporated self-employed and approximately 14.9% of the incorporated self-employed.[3] Employment of production workers in construction has increased over the last ten years, beginning at 4,113,000 in 1995 and rising to 5,332,000 in 2001.  In 2004 employment of production workers averaged 5,300,000.

The construction industry accounts for about 9.7% of all private sector *establishments*. More than four out of five establishments in the industry employ fewer than 10 employees.    There were about 698,000 construction establishments in the United States in 2002 using the 2002 NAICS; 216,000 were building construction contractors; 37,000 were heavy and civil engineering construction or highway contractors and 447,000 were specialty trade contractors. Building construction accounted for 24.9% of wage and salary employment in 2002; heavy and civil for 12.1% and specialty trades for 63.0%.[4]

According to the 2002 Economic Census Survey of Business Owners, of the 2,770,888 firms in construction, 2.4% were owned by African Americans; 7.0% by Hispanics; 1.1% by American Indians or Alaskan natives; 1.4% by Asians and Pacific Islanders and 10.5% by women.  The representation of minorities in particular among the ownership of firms in construction is well below their representation in the population as a whole. As a proportion of the population, according to the 2004/5 Statistical Abstract of the United States Table 13, in 2003 African Americans were 12.7%; Hispanics 13.7%; Asian/Pacific Islanders 4.3%; American Indians/Alaskan Native 1.0% and two or more races 1.3%.[5]

---

[1]  The main construction occupations  in 2003 were, with number in thousands in parentheses, First-line supervisors (897); Brick masons (218); Carpenters (1,595); Carpet floor finishers (271); Cement masons (120); Construction laborers (1,151); Operating engineers (376); Drywall installers (205); Electricians (774); Painters (660); Pipe layers and plumbers (595); Roofers (233); Sheet metal workers (147); Helpers (114) and Inspectors (95).  Source: Table 597 Statistical Abstract of the United States 2004-5 downloadable at www.census.gov/prod/2004pubs/04statab/labor.pdf

[2]  Source: www.bls.gov/oco/cg/pdf/cgs003.pdf

[3] Source: Statistical Abstract of the United States: 2004-2005, U.S. Census Bureau at www.census.gov/statab/www/ Table 586 and Union Membership and Coverage Database http://www.unionstats.com/ and own weighted estimates from the basic monthly files of the CPS for those aged 16-74.

[4]  Source: Statistical Abstract of the United States, 2004-5 Table 919

[5] Large disparities between blacks and whites, for example, are also found in relation to *wealth* (Kennickel, 2003); *income* (Bound and Freeman, 1992; Chandra, 2003; Heckman, Lyons and Todd, 2000 and Smith and Welch, 1989), *educational achievement* (Jencks and Phillips, 1998); *out-of-wedlock childbearing* (Ventura and Bachrach, 2000), *health* (see Chandra and Skinner, 2003), *happiness* (Blanchflower and Oswald, 2004) *crime* (Freeman, 2000) and even *names* (Fryer and Leavitt, 2003).  The degree of residential segregation by race, though lower today than in the past is still high (Cutler, Glaeser and Vigdor, 1999).

Ray Marshall (2000) has noted that there are several factors that make the construction industry especially important for minority development because it "provides opportunity for upward occupational mobility since workers commonly become managers and contractors".  Glover (1977) notes that minorities have a long tradition in this industry as laborers, skilled workers and contractors and that it is possible to increase minority employment and income more effectively in construction than is the case with most other minority businesses.

There is a good deal of evidence that the under-representation of women and minorities in construction especially is due to widespread and pervasive discrimination that has changed little over time.  Not only is the proportion of firms owned by African Americans especially relatively low, so also are their representation in the construction workforce in general and in self-employment in particular.  Where firms owned by minorities and women do exist in construction they are more likely than non-minority males to be in special trades rather than heavy and civil.  They are also more likely to be sub-contractors than prime contractors.  This does not appear to be because of a lack of an ability to expand to undertake these activities because it is well-known that small construction companies can expand rapidly as demand changes by hiring workers and renting equipment and making use of sub-contractors.  A particular concern in construction is that it is hard for minority and women-owned firms to obtain capital, especially working capital, and this causes increased difficulties when bonds have to be posted.  This is often made more difficult still when bonding firms are members of local construction associations.  Also unions are pervasive in the sector and these unions have tended to be dominated by white males and have successfully controlled entry to craft jobs (Ashenfelter, 1972).

Construction projects especially in the public sector are frequently subject to competitive *bidding* procedures.  There is some evidence to suggest that there is collusion among bidders.  Typically governments award contracts for construction of highways and buildings through low-price sealed bid auctions.  On the day of the auction sealed bids are publicly reported along with complete information about the bidder's identity and bids and the project is awarded to the lowest bidder.  In a study of bidding in highway construction projects in Florida from 1981-1986 Gupta (2002) found that bid prices fall as the number of bidders increase.  Gupta concluded that "collusion is commonplace in these markets," (p.22, 2002). Gupta (2001) used the same data on Florida and showed that bid prices were higher when repeated interaction among firms is present.  "Recurring market contact among rivals can facilitate bid-rigging by discouraging the ring members to stray from collusive agreement" (p.466, 2001). Porter and Zona (1993) examined auctions in New York State highway construction projects in Long Island in the early 1980s and found evidence of bid-rigging. Firms had many opportunities to communicate with each other and some firms even submitted joint bids.  They found evidence that several ring members bid on most jobs but one was a serious bidder and others submitted phoney higher bids.  Porter and Zona argue that "the characteristics of this particular market tend to facilitate collusion" (p. 524, 1993).  Feinsten et al (1985) studied North Carolina highway contracts and found that non-competitive bidding led to a clustering of bids in an attempt to influence engineer's estimates of the cost of future lettings.

Ingraham (2005) considered the possibility of bidder-official collusion in contracting and examined bidder data from New York City School Construction Authority auctions relating to

school repair and construction for the period 1990-1997. In April 1993 a scandal relating to bid rigging became public and a number of prosecutions ensued: officials in the School Construction Authority colluded with contractors by operating a "magic-number" scheme. The corrupt official who acted as auctioneer would collude with a contractor and at the bid letting meeting would keep his bid until last and knowing the low bid would read aloud a false bid just below this price. Then after the bid opening the official would use White-Out to doctor the bid form. Ingraham's regression analysis suggested that two *auctioneers* (other than the auctioneer already convicted) may have been guilty of such magic-number cheating. Furthermore, an analysis of specific bidders yielded weak evidence that two additional *bidders* may have been guilty of magic number cheating. Such collusive arrangements between longstanding industry participants make it very hard for new firms, especially those owned by women and minorities, to enter and be successful.

The mechanism by which firms owned by minorities and women are likely excluded is that without the collusion and rotating of bids, so that prices are above the competitive level, firms would subcontract to minority owned businesses and use minority employees to lower costs and undercut the prices of their rivals. But, of course if the firms are dividing up the business, taking turns winning with higher than competitive bids, they have no need to compete by using low-cost inputs, so the benefits of competition are not only lost regarding the price that the public pays for the construction projects, but the benefits of competition for minorities are lost as well. The role of the bid letting organizations is probably mostly to tacitly, or in many localities even overtly, go along with or encourage the combination of banking and bonding discrimination on the financial side with the established construction firms' discriminatory subcontracting and hiring decisions. It appears to be a complex confluence of actions by non-minorities that keeps minority owned businesses from establishing themselves and surviving. The discrimination likely results from a combination of actions from bid letting organizations, bidding companies, banks, and bonding companies. The bid letting organizations go along and probably in some locales even encourage the discrimination, the bidding firms in the club do not have competitive incentives to hire lower-cost subcontractors and employees, the banks and other financiers and bonding companies discriminate so they do not qualify as bidders on the financial side whatever their business qualifications. So, collusion aids discrimination in subcontracting and in employment.[6]

Affirmative action programs in construction have been implemented in many jurisdictions to help overcome some of these problems. To prevent fraud, firms eligible for participation in the programs have to register and be approved before they can participate. In many jurisdictions the programs have been challenged in the courts on constitutional grounds and subsequently removed entirely or replaced in whole or part with much weaker programs that are "race and gender neutral" or their goals have been lowered. We document below that when such programs are removed any improvements that have been achieved seem to rapidly disappear. Jurisdictions continue to have difficulties in ensuring that firms that are fronted by minorities or women but are really owned by white males are not benefiting from these programs.

---

[6] We thank John Scott for helpful discussion on these points.

In response to legal action and the threat of potential legal action the U.S. Department of Transportation (USDOT), which operates one of the most significant federal programs for affirmative action in construction, now allows its grant recipients to set annual goals for participation by minorities, women, and other disadvantaged businesses with either a race/gender conscious component, a race/gender neutral component, or both. Since the implementation of this policy beginning in FY2000, there has been a huge increase in the portion of grant recipients' goals that are approved to be met exclusively or predominantly through race/gender neutral means.  These USDOT affirmative action programs are run under the auspices the Federal Transit Authority (FTA), the Federal Aviation Authority (FAA) and the biggest of them by the Federal Highways Administration (FHWA)

For example, of 201 FTA grant recipients we reviewed for FY2002, only 61 (30%) had goals that were predominantly race/gender conscious.  By contrast, 93 entities (46%) had FY2002 DBE goals that were completely race/gender neutral and another 47 entities (23%) had goals that were predominantly race/gender neutral.  This phenomenon was even more pronounced for FY2003. In and of itself, the increasing use of race/gender neutral goals in the FTA's implementation of the DBE program is not a cause for concern.  Indeed, few if any would argue that race/gender conscious goals should be used instead of race/gender neutral ones if they are equally effective at remediating discriminatory problems.

To test this, we obtained information from the FHWA containing the affirmative action goals established by state departments of transportation for the years 1998-2004 as well as the amount of disadvantaged business participation achieved in each year. Between 2000 and 2002 approximately 21% of state DOTs adopted DBE goals that were predominantly race/gender neutral. Another 14% adopted goals that were entirely race/gender neutral. Although Federal highway construction aid dollars increased from $14.7 billion in 1998  to $24.3 billion in 2002, and although *overall* disadvantaged business goals remained virtually constant during this time, the proportion of federal aid dollars actually awarded to such businesses declined almost 30% between 1998 and 2002. The vastly increased use of race/gender neutral goals in the implementation of the USDOT DBE program appears to have been accompanied by greatly reduced participation by minority and women firms.

Since 1998 the FAA has not been reaching the goals it set for itself for minority-owned businesses but it has done so for women-owned.  Indeed, there is some evidence that the gap between the goal and achievement has widened over time for minority businesses.  For example, in 2004 the FAA had a goal of 10% for minority-owned businesses but achieved only 7% whereas it had a goal of 5% for women-owned businesses and accomplished 6%.In 2005 the minority goal was cut to 5%.  We were unable to obtain information on the relative importance of race conscious versus race neutral goals in the FAA program.[7]

In the next section we examine the history of affirmative action programs in construction.  In section three we document what happens when race and gender conscious programs are halted.  In section four we perform an econometric analysis of self-employment to determine how effective the various affirmative action programs have been.  Our main findings are that the programs have not helped minorities to become self-employed or to raise their earnings but have

---

[7] See www.sbo.faa.gov/sbo/goalsprevious.asp.

improved the position of white females.  We find that there has been a growth in incorporated self-employment rates of white women in construction such that currently they are significantly higher than those for white men.  The data are suggestive of the possibility that some of these companies are 'fronts' which are actually run by their white male spouses to take advantage of the affirmative action programs.

## 2.  A History of Affirmative Action Programs in Public Construction.

Congressional efforts to promote minority-owned business enterprises have their origins in Section 8(a) of the Small Business Act of 1958, which originally empowered the Small Business Administration (SBA) to "set-aside" certain federal contracts for performance by "small business concerns or others."[8]  The SBA initially used its powers under Section 8(a) to hire businesses agreeing to locate in or near certain low-income areas and provide training and jobs to the unemployed or underemployed residents of those areas.[9]

Between 1969 and 1971 the Executive branch encouraged the focus of the 8(a) program to shift from creation of jobs in low income areas to creation of demand for minority-owned business enterprises (MBEs). Executive Order 11458 (1969) established the Office of Minority Business Enterprise (OMBE) within the Department of Commerce and directed the Secretary of Commerce to develop programs and coordinate interagency activities to promote the growth of minority business.  Executive Order 11625 (1971) further extended the mission of OMBE, including supply-side measures such as subsidizing the provision of technical and managerial assistance to MBEs by various public and private organizations and additional demand-side measures requiring "best efforts" by prime contractors to utilize minority businesses as subcontractors on large federal contracts.[10]  In 1973 the Justice Department also promulgated regulations pursuant to Title VI of the Civil Rights Act of 1964 prohibiting state and local governments from discriminating against minority contractors in federally-funded programs.[11]  In 1978 Congress provided a statutory basis for promoting minority business development through the SBA 8(a) program with the passage of Public Law 95-507.  The first specific numerical goals for minority participation in federal contracts appeared as part of the Public Works Employment Act of 1977 which directed that 10 percent of the funds provided by the act be expended with MBEs.[12]

In 1982, through the U.S. Department of Transportation (USDOT), Congress established the Disadvantaged Business Enterprise (DBE) program, designed to increase the participation of MBEs and other socially and economically disadvantaged businesses in federally-assisted highway, transit, and airport contracts.  The Surface Transportation Assistance Act of 1982 and

---

[8] 15 USCS § 637(a).

[9] Dale, Charles V. "Affirmative Action Revisited: A Legal History and a Prospectus," Congressional Research Service, Library of Congress, 2004.

[10] 48 CFR 19.201, 19.702 (superceding 41 CFR 1-1.1302, 1310-2).

[11] 28 CFR 42.104(b)(vi).

[12] 42 U.S.C.A.§ 6705(f)(2).

the Airport and Airway Improvement Act of 1982 contained the first statutory provisions for DBEs, requiring that a minimum of 10 percent of the funds provided by the acts be expended with small businesses owned and controlled by socially and economically disadvantaged individuals.  Non-minority women-owned businesses (WBEs) were not included initially as socially and economically disadvantaged individuals.  The Surface Transportation and Uniform Relocation Assistance Act of 1987 continued the DBE program and included non-minority women in the statutory definition of socially and economically disadvantaged individuals, thereby allowing states to use contracts with both minority- and women-owned businesses (MWBEs) to meet their DBE goals.  The Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), the Transportation Equity Act for the 21st Century of 1998 (TEA-21), and the Safe, Accountable, Flexible, Efficient Transportation Equity Act: a Legacy for Users (SAFETEA-LU) of 2005 reauthorized the program, continuing the combined 10 percent provision for participation by minority-owned and non-minority women-owned DBEs.[13]

Following the lead of the federal government, policies to promote the inclusion of MWBEs in government contracting activities spread gradually throughout the 1970s and 1980s to many states and municipalities throughout the U.S. States such as Texas, Illinois, and Maryland and cities such as Chicago, Denver, San Francisco, Baltimore, and Atlanta also established their own demand-side goals programs on their construction spending on projects funded by state or local dollars.  These programs have taken various forms, employed different approaches to goal-setting, and achieved different results.  Some jurisdictions have included supply-side programs as well, for example to assist small firms in their access to capital, obtaining surety bonds, or obtaining technical or managerial assistance.  Some of the demand-side programs and most if not all of the supply-side programs are race neutral in nature in that they are designed to help all small firms not just minority-owned or woman-owned firms.  By 1989 more than 35 states and almost 200 local governments had passed some sort of affirmative action initiative directed at MWBEs.[14]

There is a presumption underlying all of this legislation that discrimination against minorities and women in business, and especially in the construction industries where much of the legislation has focused, continues to persist.  Senator Lautenberg, for example, stated during the course of Senate hearings in relation to TEA-21.

> "Jim Crow laws were wiped off the books over 30 years ago. However, their pernicious effects on the construction industry remain. Transportation construction has historically relied on the old boy network which, until the last decade, was almost exclusively a white, old boy network. … This is an industry that relies heavily on business friendships and relationships established decades, sometimes generations, ago — years before minority-owned firms were even allowed to compete."[15]

---

[13] See http://osdbuweb.dot.gov/documents/pdf/legislation/SAFETEA-LU.pdf

[14] Wainwright (2000), p. 8.

[15] p. 5101 Federal Register / Vol. 64, No. 21 / Tuesday, February 2, 1999 / Rules and Regulations.

The U.S. Supreme Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989*)*, established the current constitutional contours of permissible race-based public contracting programs.  Reversing long established law, the U.S. Supreme Court for the first time extended the highest level of judicial examination to legislation to benefit rather than injure the historic victims of discrimination.  However benign the government's motive, race is now always so suspect a classification that its use must now pass the highest constitutional test of "strict scrutiny."

In affirming the Court of Appeals' determination that Richmond's plan was unconstitutional, Justice O'Connor's plurality opinion rejects the extreme positions that local governments either have *carte blanche* to enact race-based legislation, or must prove their own illegal conduct before they can enact race-based legislation.

> "[A] state or local subdivision . . . has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction. . . . [Richmond] can use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment. . . . [I]f the City could show that it had essentially become a 'passive participant' in a system of racial exclusion . . .[it] could take affirmative steps to dismantle such a system."[16]

Apparently recognizing that the opinion might be misconstrued to categorically eliminate all race-conscious contracting efforts, Justice O'Connor closes with these admonitions:

> "Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. If the City of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. . . . Under such circumstances, the City could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. . . In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion. . . . Moreover, evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified."[17]

Thus,

---

[16] *Id*. at 491-492.

[17] *Id*. at 509 (citations omitted).

"[t]he strict scrutiny test involves two questions. The first is whether the interest cited by the government as its reason for injecting the consideration of race into the application of law is sufficiently compelling to overcome the suspicion that racial characteristics ought to be irrelevant as far as treatment by the government is concerned. The second is whether the government has narrowly tailored its use of race, so that race-based classifications are applied only to the extent absolutely required to reach the proffered interest. . . . The strict scrutiny test is thus a recognition that while classifications based on race may be appropriate in certain limited legislative endeavors, such enactments must be carefully justified and meticulously applied so that race is determinative of the outcome in only the very narrow circumstances in which it is relevant." *Adarand Constructors, Inc. v. Peña*, 965 F.Supp. 1556, 1569 (D. Colo. 1997) ("*Adarand IV*").

In addition to the federal government many cities and states had adopted demand-side goals programs and supply-side technical assistance programs. After *Croson*, however, numerous city, state, and federal programs that had race conscious components were challenged in the courts and, in most cases, ruled unconstitutional. Important cases include: City of Richmond; City of Philadelphia; City of Columbus; Fulton County, Georgia (Atlanta); Dade County, Florida (Miami); King County, Washington (Seattle); Cook County, Illinois (Chicago); Hillsborough County, Florida (Ft. Lauderdale); the District of Columbia; the State of Ohio, the State of Florida, and the Michigan DOT. In some jurisdictions a settlement was reached before the courts ruled and the program was dropped entirely such as in the South Florida Water Management District, the City of Charlotte and the City of Memphis. The State of Texas DOT added white males to its program effectively making the program race-neutral, while the State of Maryland and the City of Jacksonville adopted revised race-conscious programs. In other jurisdictions such as the City of Columbus and the New Jersey DOT race conscious programs were replaced with programs that were entirely race blind.[18] Other jurisdictions dropped their programs for fear of being sued.

The challenging party has the ultimate burden of production and persuasion that an affirmative action program in public contracting is unconstitutional. While the government has the burden of producing a 'strong basis in evidence' in support of its program, it does not bear the burden to prove it constitutional. When the statistical information is sufficient to support the inference of discrimination, the plaintiff must prove that the statistics are flawed. A plaintiff cannot rest upon general criticisms of studies or other evidence; it must carry the case that the government's proof is inadequate to meet strict scrutiny, rendering the legislation illegal. The determination whether a plaintiff has met this burden is a question of law, subject to *de novo* review.

Much of the dissension in the case law has revolved around what type of evidence is sufficiently 'strong' to establish the continuing existence and effects of economic discrimination against minorities resulting in diminished opportunities to do business with the government. Discrimination has to be demonstrated through the use of statistics and economic models to

---

[18] Whether affirmative action procurement programs that benefit women are subject to the lesser constitutional standard of 'intermediate scrutiny' has yet to be settled by the Supreme Court.

examine the effects of systems or markets on different groups, as well as by evidence of personal experiences with discriminatory conduct, policies or systems.    Specific evidence of discrimination or its absence may be direct or circumstantial, and include economic factors and opportunities in the private sector affecting the success of Minority and Business Owned Enterprises (MWBEs).  Anecdotal evidence of experiences with discrimination in contracting opportunities, including testimony from other governments' studies and programs, is relevant since it goes to the question whether observed statistical disparities are due to discrimination and not to some other no-discriminatory cause or causes.  Discrimination by prime contractors, unions, bonding companies, suppliers and lenders has also been found relevant to the creation of barriers both to minority subcontractors' business formation and to their success on governmental projects.  Race- and gender- neutral approaches have become a necessary component of a defensible MBE program despite the fact that as noted by Ray Marshall, there remains little or no evidence that race blind measures have anything other than minimal impacts.

> "Because of the difficulties in applying general antidiscrimination measures to businesses, federal, state and local governments have used their purchasing power as the most effective way to overcome the effects of, and to prevent, discrimination against minority businesses.  The federal government adopted this approach after other so-called 'race neutral' approaches had failed to overcome the effects of discrimination in the construction industry".[19]

Whether every race-neutral approach must be implemented and then proven to be ineffective before race-conscious remedies may be utilized, remains uncertain.

Recently there have been a number of cases that have reversed the immediate post-*Croson* trend and found affirmative action programs to be constitutional.[20]  These include *Sherbrooke Turf v. Minnesota DOT* and *Gross Seed v. Nebraska DOT* that related to the federal DBE program.[21]  Here, the courts ruled that the U.S. Congress had established 'compelling interest' and that the state programs were 'narrowly tailored.'  In both these cases the U.S. Department of Justice and the U.S. Department of Transportation acted as intervenors, with the U.S. government defending the programs.[22]  Recently the U.S. District Court in Illinois, in the case of *Northern Contracting Inc vs. the State of Illinois Department of Transportation* (IDOT), ruled in favor of IDOT, citing the findings in the *Sherbrooke Turf* case as precedent, finding a compelling need for IDOT's plan which was "narrowly tailored to the goal of remedying the effects of racial and gender

[19] Ray Marshall (2000), citing Croson, 488 U.S. 469, 550 (Marshall, J., dissenting), noting that while race neutral measures are "theoretically appealing, [they] have been discredited as ineffectual in eradicating the effects of discrimination" in the construction industry.)

[20] See Holt (2003).

[21] Sherbrooke Turf, Inc. v. Minnesota Department of Transportation, et al, No.02-1665 (8th Cir. October 6, 2003) (Sherbrooke III), and Gross Seed Company v. Nebraska Department of Roads, et al, No. 02-3016 (8th Cir. October 6, 2003).

[22] Appellee briefs filed by the U.S. government in the district court in Western States, and in both the district and the 8th Circuit Court of Appeal in Sherbrooke Turf and Gross Seed, along with the court decisions are available at http://www.usdoj.gov/crt/app/briefs_aa.htm

discrimination within the construction industry."[23]  In a similar case relating to the federal DBE program of *Western States Paving v. State of Washington Department of Transportation* (WsDOT), the court granted the defendant summary judgment dismissing the case but this was overturned in part on appeal to the 9th Circuit Court of Appeals because WsDOT did not offer any evidence of discrimination in the Washington state construction industry and hence their program was not narrowly tailored.  The 9th Circuit did, however, find the DBE Program constitutional on its face.

Two further cases relate to programs established not by the federal government with the approval of Congress but by two cities - Denver and Chicago.  In *Concrete Works v. the City and County of Denver* and in *Builders Association of Greater Chicago (BAGC) v. City of Chicago* affirmative action programs for MWBEs in construction were challenged as unconstitutional.  The defendants did not have the benefit of arguing that Congress had established compelling interest and thus had a higher bar to reach since they had to establish compelling interest themselves within their own jurisdictions.  Despite this, after lengthy trials, defendants in both cases successfully argued they had established a compelling interest in having their programs and in the *Concrete Works* case, after a decision of the 10th Circuit Court of Appeals overturning the lower court's decision, that the program was narrowly tailored.[24]  The U.S. Supreme Court refused to overturn the 8th and 10th Circuit Appeals Court decisions respectively in *Concrete Works*, *Sherbrooke Turf* and *Gross Seed* by refusing to grant writs of certiorari.  In the *Concrete Works* case, however, Justices Scalia and Rehnquist wrote a dissent from denial of certiorari.[25]  In the BAGC case the district court temporarily enjoined the program but permitted the City of Chicago to take steps to narrowly tailor its program, which it did a few months later when it introduced a new program.  The authors were defendants' experts in the *Concrete Works*; *Sherbrooke Turf*, *Gross Seed*, *BAGC* and *Northern Contracting* cases.[26]

A recent report on affirmative action programs across all federal contracting by the U.S. Commission on Civil Rights (2005) makes interesting reading and shows the diversity of views

---

[23] *Northern Contracting Inc v. the State of Illinois Department of Transportation* (N.D., Il.), No. 00C4515 September 8th 2005, p. 52.

[24] Initially the trial court in *Concrete Works* found the program unconstitutional but the district court's decision was overturned by the 10th Circuit Court of Appeals.  In both the *Gross Seed* and *Sherbrooke Turf* cases the 8th Circuit Court of Appeals, in an opinion where it consolidated the two cases, upheld the lower court's decision that Congress had established compelling interest for the programs and that defendants had established them to be narrowly tailored.

[25] In Concrete Works the U.S. government filed amicus briefs on the side of the City and County of Denver with the 10th Court of Appeals opposing the district court's decision declaring the program unconstitutional.  See http://www.usdoj.gov/crt/briefs/concrete.htm.  The 10th circuit court of Appeals decision is available at http://www.usdoj.gov/crt/app/briefs_aa.htm.  The U.S. Supreme Court dissent by Scalia and Rehnquist in Concrete Works is available at www.supremecourtus.gov/opinions/03pdf/02-1673.pdf.

[26] Both authors contributed to expert reports for defendants in all five of these cases, Blanchflower testified at trial in Concrete Works, Gross Seed and BAGC and Wainwright testified at trial in Northern Contracting.  Blanchflower and Wainwright both gave depositions in Sherbrooke Turf but this case did not go to trial but rather was dismissed under summary judgment in favor of defendants.

on the issue.[27]   The majority report extols the virtues of race neutral contracting but does not present any evidence of discrimination, for example, by race or gender in construction or elsewhere or whether it has improved or worsened over time, or how it varies by sector and/or location.   There is merely a presumption in the report that race neutral measures work, unaccompanied by any evidence one way or the other to justify such a conclusion.   A considerable part of the report consists of a dissent by Commissioner Michael Yaki who calls the majority report 'fatally flawed" and argues that "there is significant data demonstrating that socially and economically disadvantaged firms continue to lag well behind where they should be in proportion to the country's demographic composition or labor force representation." (p86).   He presents statistical evidence to support his arguments in a "Dissent Appendix."

There is evidence since the 1980s in the United States that race and gender conscious affirmative action programs in construction and elsewhere can have a substantial impact.

Enchautegui et al (1997) found that there are substantial disparities between the share of public contract dollars received by minority-owned firms and the share of all firms that they represent. The difference in these disparities is especially marked between jurisdictions which have affirmative action programs and those that have never had them or removed them.   The disparities are much less where affirmative action programs exist.

Chay and Fairlie (1998) examined whether the set-aside programs established in many of the largest U.S. cities during the 1980s had an impact on the self-employment rates of blacks and whites.   Their analysis was based on data from the Current Population Survey for 1979-1988. They stopped at 1988 since the 1989 Croson decision led to the dismantling of set-aside programs in many cities.   They had some difficulty in ascertaining the exact starting dates of a number of the programs because there were inconsistencies in the data sources used.   The paper examined what happened to self-employment rates when programs were introduced.   They found that self-employment rates in construction for black men increased from about 12% before the programs were introduced to about 18% after.   On the other hand, rates for white men were relatively stable before and after the programs were passed.   Chay and Fairlie argued that "these figures provide strong evidence that set-aside programs worked".

As previously indicated, a condition of accepting federal funding for highway construction, state departments of transportation need to ensure a proportion of those dollars are awarded to DBEs - a large percentage of which are owned by minorities and women.   A number of these states do not have a goal program when they spend their own dollars. Utilization of minority- and female-owned firms in such states is much higher where federal dollars are used than where state dollars are used.  Figure 1 provides the details based on data for fiscal year 1996.  In all of these ten states, utilization of DBEs was higher on federally funded projects *with* goals than on state funded contracts *without* them.

New data have recently become available from the Federal Highways Administration on participation of DBEs on federal DBE programs in seventeen states in 2002 that do not have such a program for spending on highway construction funded by state dollars.   Usefully,

---

[27] www.usccr.gov/pubs/080505_fedprocadarand.pdf

information is available in these states on firm's DBE status under the auspices of the federal program. As is apparent from Table 1, of the seventeen states only three – Florida, Mississippi and Wyoming have higher utilization of DBEs on state projects without goals than is found when federal money is spent with attached goals. Overall, utilization of DBEs is 10% when goals are in place and 5.7% when they are not. We now turn to examine what happens when such goals programs are removed or replaced with race-neutral efforts in response to litigation or the threat thereof.

**3. What happens when race conscious affirmative action programs are halted?**

Over the last few years the courts have either permanently or temporarily halted programs that benefited MWBEs in many jurisdictions across the United States. In some cases the programs have started up again when the injunctions were lifted or a new program instituted. This provides an opportunity to examine what happened to utilization of such firms when the program is removed. This is a good way to get at the scale of the impact of the programs. As can be seen below the impact was devastating – utilization dropped to zero in at least one case. Examples include the following.

- After the Supreme Court invalidated Richmond's minority business set-aside program, minority participation fell from 30 percent to 4 percent, representing a drop of more than 87 percent.

- In Atlanta, minority participation in City contracts declined from about 35 percent in 1988 to 14 percent in 1989 after the Georgia Supreme Court invalidated the city's program.

- In Fulton County, minorities increased their participation in county procurement business from .004 percent in 1977-79 before the county's program was adopted, but declined from 17 percent to 1.7 percent after that program was temporarily enjoined in 1986.

- In Philadelphia, public works subcontracts awarded to minority-owned firms fell by 97 percent during the first month after the city's program was enjoined in 1990.

- In Hillsborough County, Florida, minority contractor participation fell by 99 percent after their program was struck down.

- In the City of Elyria, Ohio (a suburb of Cleveland), minority participation in public works contracting virtually disappeared after their program was permanently enjoined by the court in 1991. Participation fell from approximately $1 million dollars (25 percent) in 1991 to $26,000 (0.6 percent) in 1992. In 1993, participation fell further to a mere $19,000 (less than one-half of one percent of the total).

- In the City of Tampa, black participation in city contracting fell by 99 percent and Hispanic participation fell by 50 percent.

- In San Jose, California, minority participation in the city's prime contracts fell by more than 80 percent in 1989 when their program was originally suspended.

- In the wake of Proposition 209, the State of California Department of Transportation halved

its state-funds for Minority and Women-Owned Business Enterprise (MWBE) goal from 20 percent to 10 percent. Subsequently, MWBE participation fell from 25.8 percent in 1995 to 14.7 percent in 1996 to 12.2 percent in 1997.

In a study of disadvantaged business enterprises the General Accounting Office (2001) reported that MWBE participation in transport contracting declined after Louisiana's nonfederal program was discontinued.  As shown in Figure 2, taken from the GAO report, MWBE participation in state transportation contracting increased from 1992 to 1995. In 1996, the year the nonfederal program was discontinued, the participation rate of MWBEs in state transportation contracting dropped and continued to decline over the next 4 years (Page 40).  The GAO reported that an official from Louisiana attributed the decline in MWBEs' participation in state transportation contracting to the removal of affirmative action requirements on state funded projects and the realization by contractors that efforts to include MWBEs were no longer necessary.

The GAO also obtained data on DBE participation in Louisiana's federal DBE program from 1995 to 2000. In their review of the data on DBE and MWBE participation in federally assisted and state contracting, they did not observe a shift of MWBEs to federally assisted contracts after the Louisiana's MWBE program was discontinued.  This evidence is entirely consistent with the evidence presented above that the goals programs work: removing them impacts negatively the usage of minority and women-owned firms.[28]

On September 2nd, 1998, in the case of *Sherbrooke Turf v. the Minnesota Department of Transportation* and Judge Rosenbaum enjoined Minnesota Department of Transportation's (MnDOT) MWBE Program. In August 1999, Judge Rosenbaum ruled that the injunction only applied to ISTEA and not to TEA-21.  On April 28, 2000, MnDOT let its first contracts using goals under the TEA-21 MWBE Program. MnDOT did not operate any sort of MWBE program during the time the program was enjoined.  MnDOT also did not certify any new MWBEs during that time.  MnDOT did not monitor the certification status of MWBEs certified prior to the injunction.  Strictly speaking, there were no certified MWBEs during the 1999 construction season because there was no program under which minority and female owned firms could be certified.  During the period of enjoinment, MnDOT continued to monitor the participation in federal aid projects by the MWBEs certified under the enjoined program.  This monitoring spanned the 1999 construction season, which is based on the federal fiscal year ("FFY"), October 1st, 1998 through September 30th, 1999.

When monitoring MWBE participation during the period of enjoinment, MnDOT relied upon prime contractors voluntarily submitting information to MnDOT.  MnDOT did not receive a 100

---

[28] During the Senate hearings on TEA-21 Senator Baucus cited the experience of Michigan where participation in the state-funded portion of the highway program fell to zero in a nine month period after the state terminated its MBE/WBE program while the federal program was able to maintain 12.7% participation. Senator Kerry also cited similar decreases in MBE/WBE participation in Louisiana, Hillsborough County, Florida, and San Jose, California. Senator Moseley-Braun added the examples of Arizona, Arkansas, Rhode Island and Delaware where state-funded projects without a MBE/WBE program have significantly less MBE/WBE participation than federally funded projects subject to the highway program.  Senator Kennedy added Nebraska, Missouri, Tampa, and Philadelphia to the list of jurisdictions that experienced precipitous drops in MBE/WBE participation after goals programs ended. See p 5101 Federal Register / Vol. 64, No. 21 / Tuesday, February 2, 1999 / Rules and Regulations.

percent return rate from the contractors. During the 1999 construction season, MWBEs certified under the enjoined MWBE Program received approximately 2.6 percent of the contract dollars. That number was subsequently used by MnDOT to reflect the amount it believed it could achieve through race and gender neutral means. When MnDOT began implementing its TEA-21 MWBE Program, it required all firms seeking MWBE certification under the TEA-21 MWBE Program to submit an application. Firms certified under the enjoined MWBE Program were required to submit a new application.

MnDOT examined their construction expenditure data for the calendar year 1996-1999 and produced the results reported in Table 3a. The total amount of contract dollars grew from $210 million in FFY96 to $296 million in FFY 1999. In the years 1996-1998 when the program was in existence the proportion of contract dollars given to MWBEs averaged 10.8 percent, split up as 2.2 percent for minority men; 0.1 percent for minority women and 8.5 percent for Caucasian women. For the year 1999 when the program was enjoined, the proportion of contract dollars paid to MWBEs fell to 2.25 percent. The amount paid to women fell to 1.95 percent but the most precipitous decline was for minority men who in 1999 received only 0.28 percent of contract dollars. In 1999 the amount of dollars received by minority males fell from just over $6.5 million to $841,000. The amount of contract dollars received in 1999 by minority men was only 12.7 percent of the amount they received when the program was in existence. Michigan and Minnesota appear to be similar – remove the goals and the participation of MWBEs falls precipitously. The evidence on the decline in DBE participation when the program was enjoined was used by MnDOT to determine the proportion of their goals that could be obtained by race neutral means.

Once Judge Rosenbaum lifted the injunction on the program, utilization rose again rapidly to levels comparable to those pertaining prior to the temporary restraining order. Table 3b provides further supporting evidence: it provides quarterly information for the five quarters for which data are available since the program restarted and MWBEs once again were re-certified. It shows dramatic increases in the use of MWBEs once the program was reintroduced. MWBEs gained no contracts at all in Q1- FFY 2000. By the 1st quarter of 2001 participation of MWBEs had risen to 8.7 percent. Most notable was the increase in the participation of minority men.

The GAO report also examined the evidence for Minnesota and confirmed the findings that after the discontinuance of Minnesota's federal DBE program in 1998, Disadvantaged Business Enterprises (DBEs) participation in federal transportation contracting dramatically declined. This evidence is confirmed in Figure 3 taken from their report, which confirms dramatic declines post 1998 both in the number of construction contracts and dollars awarded to DBEs.

There is also evidence on the impact of the removal of set-aside programs in the City of Chicago. First the Chicago Metropolitan Water District had a very low utilization of firms owned by women or minorities during the 1970s. From 1972-1974 Minority Business Enterprises (MBEs) utilization in dollars spent was only 0.46 percent. From July 1977- May 1979 it was 2 percent. Effective from May 1979 a goals program was implemented with goals of 10-15 percent on EPA funded contracts. From this point utilization jumped rapidly and remained high during the years the program was in effect, as can be seen below

| May 1979-January 1982 | 12.7% MBE | |
| 1982 | 12.3% MBE | |
| 1983 | 12.8% MBE | |
| 1984 | 12.5% MBE | |
| 1985 | 10.6% MBE | 2.2% WBE |
| 1986 | 12.3% MBE | 6.5% WBE |
| 1987 | 17.7% MBE | 7.7% WBE |
| 1988 | 16.8% MBE | 7.7% WBE |
| 1989 | 13.9% MBE | 9.6% WBE |

When the goals program was suspended in 1989, the utilization of MBEs and Women-Owned Business Enterprises (WBEs) dropped dramatically.  During the first half of 1989 $19.6 million of contracts were awarded with the goals still in place.  Utilization of MBEs was 23.6 percent with a further to 16.3 percent going to WBEs., half 1989 contracts without goals.  During the second half of 1989 when the goals program had gone and contractors were free to determine their own usage of MWBEs of the $63.6 million awarded only 10.8 percent went to MBEs and a further 7.4 percent went to WBEs.[29]

In 2002 the County of Cook's sub-contractor goals program in construction was struck down.[30] Prior to the entry of the injunction the Cook County ordinance set – and apparently met - sub-contractor goals for MBEs of 30 percent and for WBEs of an additional 10 percent making 40 percent in all.  In a subsequent case involving the same plaintiff, evidence was presented at trial from Cook County on the utilization of minority and women-owned firms.[31]  When contracts relating to medical equipment and supplies were omitted and restricting the analysis to contracts involving 'dirt' upon examining contracts awarded by Cook County post-litigation in 2001 and thereafter it was found that MBE utilization had fallen dramatically.  Out of a total of $51,045,508.09 in contract dollars spent, $19,741,139.25 was for equipment and was removed from the calculations.  This leaves $31,304,368.83 of which $4,016,641.58 went to MBEs (12.83 percent) and $1,579,768.97 went to WBEs (5.05 percent).  Overall then $5,596,410.55 out of $31,304,368.83 went to MWBEs (17.88 percent).  This is a dramatic drop from the pre-injunction levels at a time when these contractors were likely aware that they were under scrutiny and likely to be on their best behavior as they were plaintiffs in ongoing litigation on the same issue with an overlapping jurisdiction.

A race and gender conscious MWBE program appears to be needed not just to overcome the effects of past discrimination, but to prevent future discrimination as well.  Several state Departments of Transportation such as Arizona, Arkansas and Connecticut have quite high utilization of MWBEs when they spend federal dollars that require their use, but the same

---

[29] These numbers are taken from the Chicago Metropolitan Water District Study, 1990

[30] Builders Association of Greater Chicago vs. County of Cook, in the U.S. District Court for the Northern District of Illinois Eastern Division, Case # 96 c 1121, November 2, 2000, Decided

[31] Builders Association of Greater Chicago vs. City of Chicago in the U.S. District Court for the Northern District of Illinois Eastern Division, Case No. 96 C, 1122, December 29th 2003, Decided.

organizations make use of hardly any of these firms when they spend their state monies, which do not have goals programs. The gaps are not small – in Rhode Island for example they were 12.5 percent and zero respectively. Evidence from many state and municipal jurisdictions suggests that once these programs are removed the utilization of MWBEs drops precipitously. Analogously, when they are put in place, utilization of minority and women-owned firms *increases*. There is *no* evidence that we are aware of that suggests that when programs are removed utilization of minorities and women goes *up* or remains *constant*. The evidence is universally that utilization drops when these programs are enjoined or dropped. Goals programs are effective in promoting the utilization of MWBEs in construction. We are aware of *no* evidence that suggests that race neutral programs improve the relative position of minorities. The big question is how effective have these programs been in improving the position of minorities and women in the construction labor market? Race conscious affirmative action programs appear to work when they are in place but legal action has removed and/or severely restricted their presence. To what extent has this impacted the position of minorities and women in construction? This is what we now examine.

## 4. Analysis of the Impact of Affirmative Action Programs in Construction.

We now turn to examine the construction labor market and see what has happened to the self-employment rate of women and minorities over time. Given the existence of Prevailing Wage Laws[32] and widespread affirmative action programs it is of interest to determine whether the position of women and minorities in the construction sector has improved or worsened over time. In particular it is of interest to examine the changes post-Croson, so we compare self-employment rates pre-1991 to the post-1991 rates. We show that the position of white females appears to have improved but there is little or no evidence to support that conclusion in the case of African Americans or Hispanics. The evidence is more mixed for other racial groups such as Asians and Native Americans.

Here we concentrate on publicly available nationally representative data on *individuals*. We look here at both the owners of firms as well as their employees. At the level of the individual, of course, we have very good data on the individual's education, race and gender. It is not unreasonable to look at the self-employed given our finding above from the 2002 Economic Census Survey of Minority-owned Business Enterprises that approximately 74% of construction firms have no employees. We have data both on the unincorporated self-employed as well as the incorporated self-employed who receive wages and salaries but are not counted as part of the official self-employment rate in the U.S. government counts.

A continuing puzzle in the literature in the U.S. has been why the self-employment rate of black males is one third of that of white males and has remained roughly constant since 1910. Moreover, minorities start businesses at much lower rates than non-Hispanic whites. Using the Public Use Microdata Samples (PUMS) data from the 1990 Census, Wainwright (2000) demonstrated that these disparities persist even when factors such as geography, industry, occupation, age, education and assets are held constant.

---

[32] Prevailing Wage Laws (PWLS) exist at the federal and in addition the majority of states have their own PWLs. The intent of such legislation is primarily to protect the local wage rates in construction. These laws appear to have only small impacts on construction labor markets (Kessler and Katz, 2001).

Fairlie and Meyer (2000), rule out a number of explanations for the difference in the self-employment rates of white and black males.  They found that trends in demographic factors, including the Great Migration and the racial convergence in education levels "did not have large effects on the trend in the racial gap in self-employment" (p. 662). They also found that an initial lack of business experience "cannot explain the current low levels of black self-employment." Further they found that "the lack of traditions in business enterprise among blacks that resulted from slavery cannot explain a substantial part of the current racial gap in self-employment" (p. 664 Fairlie (1999) and Wainwright (2000) have shown that a considerable part of the explanation of the differences between the African American and white self-employment rate can be attributed to discrimination. Bates (1989) finds strong supporting evidence that racial differences in levels of financial capital have significant effects upon racial patterns in business failure rates. Fairlie (1999) also found that the black exit rate from self-employment is twice as high as that of whites.

The gap between the black and white male self-employment rates has persisted for the best part of a century.  The white male self-employment rate decreased from its highest point in 1910 (16.0 percent) to its lowest point in 1970 (10.0 percent).  In 1970 the downward trend in the self-employment rate ended and began a climb to 11.4 percent in 1990.  Since that time the rate has declined.   The similar trends in the white and black rates resulted in a roughly constant black/white ratio during the past 80 years.  As Fairlie and Meyer (2000) note:

> "The constancy of the black/white ratio is surprising in light of the substantial gains blacks have made in education, earnings and civil rights during the twentieth century…and the numerous government programs created to promote minority business ownership" (p. 656)

In contrast, there has been a striking growth over time in the self-employment rate of females. Devine (1994) showed, using the March Current Population Survey data that the number of self-employed females aged 18-64 in the non-agricultural sector increased by 2.2 million or 145 percent between 1975 and 1990.  This represented an increase in the self-employment rate from 4 percent to 6.6 percent.

If the various affirmative action programs had been successful we might expect to see a growth in the number of firms owned by women and minorities, an increase in the self-employment rate, an increase in the earnings of women and minority business owners. We do not; discrimination against minorities in general, and African-Americans and Hispanics in particular, continues to persist despite efforts on the part of state, federal and local governments to speed its demise.[33]

---

[33] One thing that makes construction an attractive sector for affirmative action is the relatively large importance of the government in that sector – hence more leverage. Total *spending* on construction in 2004 was $1,027,736 million.  Of this 77.7% was private, made up of 54.8% private residential and 22.9% private non-residential; of the remainder 20.6% state and local and 1.7% federal (Source: Statistical Abstract of the United States, 2004-5, Table 642).  Even in construction though, the private sector is far larger than the public sector. So even with affirmative action in place the public sector is still only a relatively small slice of the overall economy.

Table 3 presents new evidence on self-employment rates by race and gender for the period 1979-2004 using data from the Merged Outgoing Rotation Group (MORG) files of the Current Population Survey (CPS). Weighted estimates were obtained for each year and then averaged over groupings of years for all industries as well as for construction for white males, white females, African-Americans and Hispanics. Additional data are available for Asians/Pacific Islanders and Native Americans since 1992 but they are excluded from this table as there is no long run consistent time series. We examine them in detail below. Data are presented for total self-employment which is the sum of incorporated and unincorporated as well as separately. The figures in the table are percentages so 3.6 in the top left of the table should be interpreted as 3.6% of employed white males on average from 1979-1983 were classified as incorporated self-employed, compared with 11.5% who were unincorporated in part B of the Table and hence 15.1% overall in part C and so on. The main findings from the table are as follows.

1) There has been a growth in the proportion of workers who are classified as incorporated self-employed that the Census Bureau counts as wage and salary workers.

2) The self-employment rate of white males, whether incorporated or unincorporated, is markedly higher than is the case of any other group.

3) There has been a decline in the unincorporated and the overall self-employment rate of white males but increases for the other groups.

4) Construction self-employment rates, incorporated and unincorporated, have declined for white males but increased for white females, blacks and Hispanics.

5) Incorporated self-employment rates for white women in construction are now *higher* than they are for white males.

6) The differential between the overall self-employment rates of white males and white females in construction has narrowed dramatically over time. The narrowing is much more apparent than is found for 'all Industries'.

7) The differential between the overall self-employment rates in construction of white males and blacks has narrowed but less than it has for white women.

8) The differential between the overall self-employment rates in construction of white males and Hispanics has widened over time.

We now move on to examine in more detail the disparity in business formation/self-employment rates between racial and ethnic minorities and non-minorities.[34] We examine the private sector in general as well as construction in particular. Blanchflower (2000, 2004) provides summaries of the literature, and compares the determinants of self-employment in the U.S. with that in other OECD countries. Probit regression is used to examine the relationship between whether a person is self-employed (yes or no) and a set of socioeconomic characteristics of that person. The data used first are from the MORG files of the CPS. Data are available in a comparable form from

---

[34] We use the phrases "business formation rates" and "self-employment rates" interchangeably in this chapter.

1979 and the most recent comparable data are from 2004.  Results are also presented using data from the 2000 Census. The sample used in these regressions includes men and women who were working at the time they were interviewed either as self-employed (dependent variable=1) or as a private sector employee (dependent variable=0). Controls for age, location, industry, and education are included along with indicators for race and gender. Coefficients represent percentage point differences between a minority group and comparable whites—comparable in age, location, industry, and education. The dependent variable is set to zero if the individual is a private sector employee and 1 if self-employed, either incorporated or unincorporated.  These equations are estimating the probability of being self-employed, holding constant the named characteristics.

In 2002 the industry classification system changed from the Standard Industrial Classification (SIC) to using the 1997 North American Industry Classification System (NAICS).  While many of the individual SIC industries correspond directly to industries as defined under NAICS, most of the higher level groupings do not.  Particular care has to be taken in comparing data for retail trade, wholesale trade and manufacturing which are sector titles used in both the SIC and NAICS but cover somewhat different groups of industries.  In the case of construction some changes affecting it are within construction itself but in the NAICS it now includes industries that were previously classified in other sectors.  For this reason we only make use of data for 2003 and 2004 in columns 5-7 which are for construction because of the difficulty in obtaining consistent industry codes for the All Industries grouping over these years.

Columns 1, 3 and 4 of Table 4 are for the pre-*Croson* period 1979-1991 and columns 2 and 5-7 for the subsequent post-*Croson* period 1992-2002.  Columns 1 and 2 are for all industries while columns 3-7 are restricted to the construction industry.  Different education controls are used in the two periods because that is what is available in our data.   Columns 4 and 7 are for construction where the dependent variable is set to one if the respondent was incorporated self-employed, zero otherwise.  Column 6 is also for construction where the dependent variable is set to one if the respondent was unincorporated self-employed, zero otherwise.

The main findings from Table 4 are as follows:

1) Holding constant an array of worker and workplace characteristics, white males have highly statistically significantly higher self-employment rates than do any other groups. This is evident in the U.S. as a whole, as well as in Construction.

2) Blacks and Hispanics have especially low self-employment rates in construction.

3) Disparities by race and gender are considerably higher in construction than overall.

4) The magnitude of the difference in self-employment rates between white females and white males has *declined* over time.  Post-*Croson* the position of white females has improved relative to that of white males.  This is true for the private sector as a whole but especially so in construction.

5) The magnitude of the difference in self-employment rates between both blacks and Hispanics

and white males has narrowed post-*Croson* overall but remained roughly constant in construction.

6) White females in construction have a significantly *higher* incorporated self-employment rate than is found for white males in both periods, but the gap has increased post-Croson.

7) Asians/Pacific Islanders and American Indians have significantly lower self-employment rates than white males or white females in construction, driven by their much lower incorporated rates.

Table 5 provides supporting evidence for the findings for construction when a much larger sample from the 2000 census is used.  Once again we estimate probit equations which model the probability that an individual is self-employed, holding constant characteristics.  We include the same set of controls as used in Table 4 using the MORG data.  We exclude any case where one or more of the variables we use have data that are imputed.[35]    Column 1 is for total self-employment, column 2 for the unincorporated and column 3 for the incorporated.  Overall there are significant differences between white males and all race and gender groups overall and for the unincorporated.  In column 3 there is a *positive* and significant coefficient on white females confirming the results in column of Table 4 using the MORG data.  The coefficient on the Asian/Pacific Islander variable is insignificant in column 3 and smaller than for other groups in column 1.

The question then is why has there been an increase in *incorporated* self-employment among white females in construction and not in other sectors.  One possibility is that this has arisen to take advantage of the various affirmative action programs that exist in construction and what we are observing is that firms owned by white males are bringing their spouses into the business to take advantage of the programs.  Who are these women?  In the 2000 Census there are 3,950 white female incorporated business owners whose status was not imputed.  Of these 86% were married compared with 63% of all white female workers in the construction sector and 68% of white female unincorporated self-employed in the sector.  In terms of family types 71% of the white female incorporated self-employed were a married couple where both the husband and wife were in the labor force compared with 51% for all white females in construction and 48% of the unincorporated self-employed white females.

We examined the occupational mix of both the incorporated and unincorporated self-employed in construction once again using data from the 2000 Census.  We omitted any case where the class of worker was imputed.  White females who are *incorporated self-employed* are more likely to be in bookkeeping and accounting and especially likely to be secretaries or administrative assistants. 43% of white females who were incorporated self-employed were bookkeepers, secretaries or administrative assistants compared with 0.2% of white men and 23% of minority women.  There is much less difference in the occupation distribution for the unincorporated self-employed between white women and minority women than is the case for the incorporated self-employed.  It is likely that what is going on here is that some white females are fronting firms that are actually being run by their white male spouses.  They are doing so to

---

[35] For a discussion of the problems of using imputed data in the MORG files of the CPS see Blanchflower and Bryson (2003, 2004 and Hirsch and Schumacher (2002).

take advantage of the benefits of the affirmative action programs.  A number of prosecutions around the country have occurred because contracts were fraudulently obtained by companies that were 'fronted' by women and minorities but who were not true owners of the firm and played no active part in its operations.[36]

We now move on to examine whether self-employed minority and white female entrepreneurs receive lower earnings from the businesses they start than white males with similar characteristics receive from their businesses. The ORG files do not contain data on the earnings of the self-employed. Annual earnings, whether from wage or self-employment, are available from the March CPS, also known as the Annual Demographic File. This file also contains the basic monthly demographic and labor force data. In the March CPS, data on employment, earnings, and income refer to the preceding year, although demographic data refer to the time of the survey. Sample sizes are much lower than previously with around 194,000 observations per annum.  Information on self-employed earnings is available for approximately 6,000 cases per annum.  We supplement this information for construction with data on annual earnings in the year preceding interview (1999) from the 2000 Census.

Table 6 reports estimates of the log of annual self-employment earnings differentials between white females and minority groups and comparable white males. Columns 1 and 2 are for all industries for the periods 1978-1990 and 1991-2001 respectively.  Columns 3 and 4 are for construction over the same periods while column 5 is for construction in 1999.

White females, blacks and other minority groups have significantly lower self-employment earnings than white males with similar personal characteristics.  This is true in the private sector as a whole and in construction using both the March CPS files and the Census.   Interestingly, controlling for occupation in the final column reduces in absolute size the coefficient on the white female dummy – in part their lower earnings are due to their occupations.  This is not the case for the other minority groups whose negative differentials are essentially unchanged in columns 5 and 6.  Their lower earnings are not because of their occupations.

One important impediment to minority entrepreneurship is lack of capital.  As noted by Nobel Laureate Kenneth Arrow.

> "Racial discrimination pervades every aspect of a society in which it is found.  It is found above all in attitudes of both races, but also in social relations, in intermarriage, in residential location, and frequently in legal barriers.  It is also found in levels of economic accomplishment; that is income, wages, prices paid, *and credit extended*" (1998, p.91 italics added)

Blanchflower, Levine and Zimmerman (2003) examined the availability of credit to minority and female-owned small businesses using data from the 1993 and 1998 National Surveys of Small

---

[36] For example, James Duff was fined more than $22 million and sentenced to nearly 10 years in prison in May 2005 after he pleaded guilty to falsely portraying Windy City Maintenance as woman-controlled and Remedial Environmental Manpower as minority-controlled and for defrauding the City of Chicago by taking $120 million in city contracts reserved for minority- and women-owned companies.  Other associates were also fined and received jail time.  See the *Chicago Sun-Times*, May 19th, 2005 and May 21st, 2005 and *Chicago Tribune*, October 21st, 2005.

Business Finances conducted by the Reserve Board of Governors.  They demonstrated that loan denial probabilities for African-American owned firms are approximately double those for comparable white-owned firms.  Even when African-Americans were able to obtain loans they have to pay higher interest rates.  Comparable but smaller effects are found for Hispanics.  These differences were not explained by differences in creditworthiness or other observables. Such differences disappeared when the use of credit cards was examined, where the banks were unaware of the race of the applicant.  The authors found that firms owned by minorities are discriminated against in the credit market.  Similar results were found by Cavalluzzo, Cavalluzzo and Wolken (2002).

Table 7 replicates the finding from Table 3 of Blanchflower, Levine and Zimmerman (2003) using data from both the 1993 and 1998 surveys to estimate a series of equations estimating the probability of a loan application being denied.  Variables are included to control for region, industry, type of organization and creditworthiness. It is clear from Table 3 of Blanchflower *et al*. (2003) paper that adding further controls for characteristics of the loan, other firm characteristics has little substantive impact on the results so for ease of exposition we use this limited set of controls here. In both 1993 and 1998 firms owned by blacks have dramatically higher probabilities of having their loans denied, holding constant their characteristics.  Firms owned by Asians/Pacific Islanders also have higher denial rates although the size of the impact, although large, is smaller than for black-owned firms.  There is evidence of a large positive effect n 1998 for Hispanics but not in 1993.  We find no evidence of any impact for white women.  In columns 2 and 4 we include a series of interaction terms between the race and gender variables and a construction dummy to test if the results are different in the Construction industry.  They are not: all of the interaction terms are insignificant. Construction firms owned by minorities are discriminated against in the credit market.

In the two surveys of small business finances used above, business owners were asked variously about the main problems that they faced.  In the 1993 survey owners were asked about a variety of problems that they had experienced during the preceding 12 months.  They were also asked to report the most important issues facing the firm over the following 12 months.  In the 1998 survey respondents were asked to report the "single most important problem facing your business today". Credit availability turned out to be the most important problem in all three cases for firms owned by African-Americans and to a lesser extent Hispanics.  The problem appeared to be even more serious in construction than elsewhere.

### a)  Problems firms experienced during preceding 12 months - credit market conditions.  (% reporting serious problem)

|  | All | Black | Hispanic |
|---|---|---|---|
| All industries | 14 | 31 | 23 |
| Construction | 14 | 34 | 23 |

Source: Authors' calculations from 1993 NSSBF

**b) Percentage of firms reporting most important issues affecting them
over the next 12 months – credit availability**

|  | All | Black | Hispanic |
|---|---|---|---|
| All industries | 6 | 21 | 5 |
| Construction | 7 | 26 | 3 |

Source: Authors' calculations from 1993 NSSBF.

**c) What is the single most important problem facing your business today?
% reporting "financing and interest rates"**

|  | All | Black | Hispanic |
|---|---|---|---|
| All industries | 7 | 18 | 10 |
| Construction | 10 | 36 | 11 |

Source: Authors' calculations from 1998 NSSBF.

In the 1992 Characteristics of Business Owners Survey conducted by the Bureau of the Census firms were asked to report the impact of various kinds of costs upon their profitability (Table 1, p.21).  Black and Hispanic-owned firms reported stronger negative impacts of credit market conditions and a lack of financial capital; there are no strong race or gender effects for the various other reasons given.  The survey also reported on reasons why a discontinued business was unsuccessful.  Black-owned and to a lesser degree Hispanic-owned firms were much more likely to report that the reason was due to lack of access to business or personal loans or credit than was true for other races.[37]

A recent study published by the U.S. Chamber of Commerce (2005) confirms the findings in Blanchflower, Levine and Zimmerman (2003).  The survey was conducted in March and April 2005 and detailed the financing problems experienced by small business owners, 95% of whom had less than 100 employees: 1080 business owners were interviewed and reported that minority businesses rely heavily on credit cards to fund their businesses, often do not apply for credit, even though they need it, for fear of being denied and were especially likely to need working capital.   In particular they report that availability of credit is their top problem, exactly as reported by Blanchflower, Levine and Zimmerman.  The biggest difference in responses between minorities and Caucasian men and women was availability of credit:  19% of Caucasian males report credit as their top problem compared with 54% for minority males – a 35 percentage point difference.  There was a 15 percentage point difference for women.  In no other category is there more than a 10 percentage point difference for men or women.

---

[37] When asked if lack of financial capital was a serious problem affecting business profitability 29% of firms owned by white males in the CBO survey answered in the affirmative compared with 46% owned by blacks and 38% by Hispanics.  For firms that were discontinued 7% of firms owned by white males reported it was due to lack of access to business capital compared to 16% for firms owned by blacks and 9% for Hispanics.  A further 3% of white males said it was due to lack of personal capital compared to a further 8% for firms owned by blacks and 6% for Hispanics.  See tables 3a and 3b, Blanchflower, Levine and Zimmerman (1998)

Overall, we have shown that there has been no significant change over time in the relative position of African-Americans compared to white males in construction. The probability that they are self-employed is markedly lower than white males and is unchanged over time. Their self-employment earnings remain markedly lower. The probability of being self-employed for Hispanics compared to white males has widened over time although the magnitude of the effects are smaller than for African Americans. The position of white females has improved over time, especially in terms of self-employment probabilities, although it is unclear whether this is simply because firms owned by their white male spouses are transferring ownership to take advantage of the affirmative action programs. Credit market discrimination appears to be important in construction and especially so for firms owned by African Americans and to a lesser extent for Hispanics.

## 7. Conclusion

The main findings of this paper are that despite the existence of various programs designed to improve the position of women and minorities in construction, little has changed in the last twenty five years. We presented evidence that showed that where race conscious affirmative action programs exist they appear to generate significant improvements. For example, there is evidence that when they are put in place the self-employment rate of minorities rises. We also showed that when these programs are removed or replaced with race-neutral programs the utilization of minorities and women in public construction declines rapidly.

The *Croson* decision in 1989, however, made it very difficult to maintain affirmative action programs and many were subsequently struck down by the courts. Where they did remain in existence many were watered down to the extent that many only had race-neutral components left. The evidence we have available to us suggests that very rapidly after the race and gender conscious programs were removed the utilization of firms owned by women and minorities collapsed. The position is particularly serious for African-Americans and less so for Hispanics. They have lower business formation rates, lower self-employment rates and earnings than white males. The position of white females, in contrast, appears to have improved, but some of this improvement is likely via 'front' companies where the white female is reported as the owner but the firm is actually run by their white male spouse.

Several recent cases such as *Concrete Works*, *Gross Seed*, *Sherbrooke Turf*, *BAGC*, *Northern Contracting* appear to have stemmed, at least temporarily, the judicial tide pushing against race conscious affirmative action programs in contracting. However, such affirmative action programs have not achieved their objectives of improving the position of minority firms in construction, not because they don't work, as it appears that they do, but because they have not been allowed to work by non-minority contractors and by the courts. Discrimination against minorities in general and African-Americans and Hispanics in particular continues to persist in construction. *Plus ca change, plus c'est la meme chose*.

Table 1.  Participation of Disadvantaged Business Enterprises on Federal construction projects with goals and state construction projects without goals, 2002.

|  | State funded | Federal funds |
|---|---|---|
| Alabama | 3.46% | 7.23% |
| Arizona | 2.80% | 7.22% |
| Connecticut | 6.79% | 15.86% |
| Delaware | 3.95% | 8.16% |
| Florida | 8.30% | 5.59% |
| Idaho | 3.77% | 9.81% |
| Kansas | 1.93% | 8.26% |
| Kentucky | 3.87% | 10.17% |
| Michigan | 5.06% | 12.65% |
| Minnesota | 4.42% | 6.63% |
| Mississippi | 12.11% | 10.68% |
| Nebraska | 3.68% | 7.24% |
| Nevada | 1.11% | 6.61% |
| New Hampshire | 14.27% | 22.11% |
| Oregon | 1.68% | 7.88% |
| Utah | 2.57% | 5.81% |
| Vermont | 6.31% | 12.85% |
| Wyoming | 16.32% | 14.40% |
| Average | 5.7% | 10.0% |

Source: Federal Highways Administration

| Table 2a.  Summary of MWBE Participation in Contracts Awarded by MnDOT 1996-1999 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Total Federal $ | Minority men $ | % | Minority Women $ | % | Caucasian Women $ | % | Total MWBE $ awarded | % |
| FFY96 | $209,964,333 | $3,467,523 | 1.65 | $176,480 | 0.08 | $20,056,922 | 9.55 | $23,700,825 | 11.29 |
| FFY97 | $241,031,074 | $6,002,497 | 2.49 | $108,519 | 0.05 | $19,441,750 | 8.07 | $25,552,766 | 10.80 |
| FFY98 | $285,081,558 | $6,589,434 | 2.31 | $129,647 | 0.04 | $22,515,424 | 7.89 | $29,234,500 | 10.25 |
| FFY99 | $295,835,471 | $841,239 | 0.28 | $40,028 | 0.01 | $5,761,276 | 1.95 | $6,642,543 | 2.25 |

| Table 2b.  Summary of MWBE Participation in Contracts Awarded by MnDOT 2000Q1-2001Q1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Total Federal $ | Minority Men $ | % | Women $ | % | Total MWBE $ | Total MWBE % |
| Q1-FFY00 | $22,099,798.27 | $0 | 0 | $0 | 0 | $0 | 0 |
| Q2-FFY00 | $55,219,499.00 | $0 | 0 | $126,224.00 | 0.23 | $126,224.00 | 0.2 |
| Q3-FFY00 | $172,252,885.00 | $353,805.00 | 0.21 | $2,005,974.00 | 1.16 | $2,359,779.00 | 1.4 |
| Q4-FFY00 | $79,898,976.00 | $1,128,366.51 | 1.41 | $3,364,234.50 | 4.21 | $4,492,601.02 | 5.6 |
| FFY00 | $329,471,158.27 | $1,482,171.51 | 0.45 | $5,496,432.50 | 1.67 | $6,978,604.03 | 2.1 |
| | | | | | | | |
| Q1-FFY01 | $14,184,474.65 | $1,003,401.33 | 7.07 | $234,880.11 | 1.66 | $1,238,281.51 | 8.7 |

Table 3.  Self-employment rates 1979-2005 by race and gender

| | All industries | | | | Construction industry | | | |
|---|---|---|---|---|---|---|---|---|
| | White male | White female | Black | Hispanic | White male | White female | Black | Hispanic |
| **A) Incorporated** | | | | | | | | |
| 1979-83 | 3.6 | 1.0 | 0.3 | 0.8 | 4.8 | 4.9 | 1.1 | 1.2 |
| 1984-88 | 4.2 | 1.3 | 0.4 | 1.0 | 5.3 | 6.7 | 1.2 | 1.3 |
| 1989-93 | 4.5 | 1.5 | 0.5 | 1.1 | 5.9 | 8.5 | 1.6 | 2.2 |
| 1994-98 | 5.0 | 2.1 | 0.8 | 1.2 | 6.7 | 11.2 | 1.9 | 2.2 |
| 1999-04 | 5.2 | 2.1 | 1.1 | 1.3 | 7.6 | 9.8 | 2.3 | 1.8 |
| **B) Unincorporated** | | | | | | | | |
| 1979-83 | 11.5 | 5.6 | 3.2 | 4.7 | 19.4 | 7.4 | 10.0 | 10.9 |
| 1984-88 | 11.4 | 6.4 | 3.4 | 5.4 | 19.9 | 10.3 | 11.3 | 11.6 |
| 1989-93 | 11.3 | 6.6 | 3.7 | 5.7 | 21.1 | 12.0 | 14.6 | 12.6 |
| 1994-98 | 10.4 | 7.2 | 3.7 | 5.2 | 19.6 | 14.3 | 12.2 | 9.8 |
| 1999-04 | 9.4 | 6.6 | 3.9 | 5.2 | 18.9 | 11.5 | 13.2 | 10.4 |
| **C) All Self-employed** | | | | | | | | |
| 1979-83 | 15.1 | 6.6 | 3.5 | 5.5 | 24.2 | 12.4 | 11.1 | 12.1 |
| 1984-88 | 15.6 | 7.6 | 3.8 | 6.5 | 25.2 | 17.0 | 12.5 | 12.8 |
| 1989-93 | 15.8 | 8.1 | 4.2 | 6.8 | 27.0 | 20.5 | 16.2 | 14.8 |
| 1994-98 | 15.4 | 9.3 | 4.4 | 6.4 | 26.3 | 25.5 | 14.1 | 12.0 |
| 1999-04 | 14.6 | 8.6 | 4.9 | 6.5 | 26.5 | 21.2 | 15.5 | 12.2 |

Source: MORG files of the CPS (weighted).  For years 1979-1982 the 1970 SIC is used to define industry.  1980 SIC is used until 2002 which is then replaced with the 2000 NAICS

Table 4.  Private Sector Self-employment Probabilities, 1979-2004.

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| | 1979-1991 | 1992-2002 | 1979-1991 | 1979-1991 | 1992-2004 | 1992-2004 | 1992-2004 |
| | All industries | All industries | Construction | Construction | Construction | Construction | Construction |
| | Self-employed | Self-employed | Self-employed | Incorporated | Self-employed | Unincorporated | Incorporated |
| White Female | -.0458 | -.0271 | -.1083 | .0029 | -.0492 | -.0689 | .0158 |
| | (142.24) | (66.35) | (32.95) | (2.25) | (13.89) | (22.26) | (9.53) |
| Black | -.0556 | -.0440 | -.1174 | -.0259 | -.1103 | -.0615 | -.0372 |
| | (116.14) | (65.57) | (29.46) | (16.37) | (24.43) | (15.23) | (18.22) |
| Hispanic | -.0399 | -.0374 | -.0817 | -.0204 | -.0898 | -.0649 | -.0228 |
| | (67.40) | (52.93) | (17.65) | (10.26) | (21.12) | (17.56) | (10.84) |
| Other races | -.0256 | n/a | -.1192 | -.0160 | n/a | n/a | n/a |
| | (33.69) | | (17.94) | (6.11) | | | |
| Asian | | -.0060 | | | -.0793 | -.0520 | -.0193 |
| | | (5.86) | | | (8.74) | (6.41) | (4.88) |
| American Indian | | -.0213 | | | -.0945 | -.0654 | -.0242 |
| | | (11.70) | | | (10.83) | (8.65) | (5.68) |
| Construction | -.0506 | -.0481 | n/a | | n/a | n/a | n/a |
| | (59.21) | (44.62) | | | | | |
| Years of education | .0101 | No | .0172 | .0084 | No | No | No |
| | (171.23) | | (41.36) | (49.81) | | | |
| Schooling dummies | No | Yes | No | No | Yes | Yes | Yes |
| Year dummies | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry Dummies | Yes | Yes | No | No | No | No | No |
| State Dummies | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| | | | | | | | |
| N | 2,808,248 | 1,994,519 | 196,951 | 196,951 | 158,939 | 158,939 | 158,939 |
| Pseudo $R^2$ | .2537 | .2210 | .0886 | .1130 | .0718 | -70608 | -33957 |
| Log Likelihood | -819449 | -609,176 | -100,987 | -36171 | -81564 | .0525 | .0940 |

Notes: Probit analysis is performed using the dProbit command in STATA on a sample of workers. The percentages reported here are the coefficients from the Probit analysis and indicate the percentage point differences in self-employment rates between the indicated group and Whites. Equations also include age and its square as controls.  Self-employment includes both the incorporated and unincorporated.  T-statistics in parentheses.  Source: Outgoing Rotation Group files of the Current Population Survey, 1979-2004.

Table 5.  Private Sector Self-employment Construction Industry Dprobits, 2000.

| | (1) | (2) | (3) |
|---|---|---|---|
| | 2000 | 2000 | 2000 |
| | Self-employed | Unincorporated | Incorporated |
| White Female | -.0859 | -.0923 | .0085 |
| | (39.55) | (49.90) | (6.97) |
| Black | -.1064 | -.0693 | -.0305 |
| | (36.95) | (28.02) | (19.27) |
| Hispanic | -.0788 | -.0605 | -.0151 |
| | (26.14) | (23.72) | (8.67) |
| Other races | -.0844 | -.0635 | -.0183 |
| | (31.12) | (27.75) | (11.49) |
| Asian/Pacific Islander | -.0395 | -.0287 | -.0066 |
| | (6.06) | (5.14) | (1.87) |
| American Indian | -.0847 | -.0576 | -.0230 |
| | (14.77) | (11.84) | (7.02) |
| | | | |
| Schooling dummies | Yes | Yes | Yes |
| State Dummies | Yes | Yes | Yes |
| | | | |
| N | 436,437 | 436,437 | 436,437 |
| Pseudo $R^2$ | .0707 | .0572 | .0582 |
| Log Likelihood | -229178 | -242383 | -108475 |

Notes: Probit analysis is performed using the dProbit command in STATA on a sample of workers. The percentages reported here are the coefficients from the Probit analysis and indicate the percentage point differences in self-employment rates between the indicated group and Whites. Equations also include age and its square as controls.  Self-employed includes both the incorporated and unincorporated.  State dummies include Puerto Rico.  All cases with imputed data to one or more variables are deleted.
Source: 2000 Census.  T-statistics in parentheses.

Table 6.  Log Self Employment Earnings Equations, 1979–2002

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
|  | All | All | Construction | Construction | Construction | Construction |
|  | 1978-1990 | 1991-2001 | 1978-1990 | 1991-2001 | 1999 | 1999 |
| White female | -.729 | -.617 | -.835 | -.839 | -.702 | -.513 |
|  | (68.07) | (31.34) | (21.63) | (15.73) | (28.67) | (17.81) |
| Black | -.500 | -.591 | -.428 | -.323 | -.387 | -.350 |
|  | (15.64) | (14.85) | (5.73) | (2.40) | (12.09) | (11.03) |
| Hispanic | -.278 | -.390 | -.252 | -.145 | -.146 | -.118 |
|  | (9.46) | (9.8) | (3.96) | (1.38) | (4.96) | (4.05) |
| Other races | -.328 | -.221 | -.208 | -.180 | -.160 | -.122 |
|  | (8.29) | (3.41) | (1.79) | (0.84) | (5.08) | (4.52) |
| Asian/Pacific Islanders |  |  |  |  | .004 | .045 |
|  |  |  |  |  | (0.08) | (0.85) |
| Native Americans |  |  |  |  | -.397 | -.361 |
|  |  |  |  |  | (7.15) | (6.60) |
|  |  |  |  |  |  |  |
| Occupation dummies (284) | No | No | No | No | No | Yes |
| Education controls (16) | No | Yes | No | Yes | Yes | Yes |
| Year dummies (13) | Yes | Yes | Yes | Yes | No | No |
| State dummies (51) | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry dummies (88) | Yes | Yes | No | No | No | No |
|  |  |  |  |  |  |  |
| N | 82,094 | 55,639 | 12,577 | 8,446 | 64,188 | 64,188 |
| Adjusted $R^2$ | .177 | .128 | .077 | .064 | .064 | .093 |

Notes: The percents indicate the percent difference in self-employment earnings between the indicated group and Whites. Controls also include age, age squared and a full set of year dummies.

Source: Annual Demographic (March) files of the Current Population Survey for 1979-2002 and 2000 Census.

Table 7.   Determinants of Loan Denial Rates

| | 1993 | 1993 | 1998 | 1998 |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Black | .3132 | .3338 | .2923 | .2471 |
| | (7.16) | (6.73) | (4.40) | (3.45) |
| Asian/Pacific islander | .1553 | .1646 | .1822 | .1437 |
| | (2.84) | (2.84) | (2.66) | (2.01) |
| Hispanic | .0522 | .0113 | .2528 | .2446 |
| | (1.05) | (0.21) | (3.45) | (3.20) |
| Female-Owned | .0373 | .0305 | .0581 | .0411 |
| | (1.26) | (0.94) | (1.38) | (0.94) |
| Black*Construction | | -.0713 | | .2537 |
| | | (0.89) | | (1.43) |
| Asian/Pacific Islander*Construction | | -.0701 | | .3306 |
| | | (0.48) | | (1.44) |
| Hispanic*Construction | | .1908 | | .0373 |
| | | (1.51) | | (0.18) |
| Female-Owned*Construction | | .0113 | | .1806 |
| | | (0.21) | | (1.15) |
| | | | | |
| N | 1986 | 1986 | 962 | 962 |
| Pseudo $R^2$ | .1651 | .1667 | .2633 | .2671 |
| $Chi^2$ | 387.3 | 391.1 | 289.7 | 293.9 |
| Log likelihood | -979.1 | -977.2 | -405.3 | -403.1 |

Source:  Authors' calculations from 1993 and 1998 NSSBF. Notes:  controls for 1993 are 8 region dummies, 51 industry dummies, 3 types of organization dummies and 4 creditworthiness variables.  Controls for 1998 are 8 region dummies, 37 industry dummies, 43 type of organization dummies, 4 Dunn and Bradstreet credit rating variables and 4 creditworthiness variables.

Reported estimates are derivatives from Probit models, t-statistics are in parentheses)



Figure  1.  Disadvantaged Business Enterprise (DBE) Participation Levels in States
That Use DOT's DBE Program But Have no State DBE Program

**Figure 2: MWBEs' Participation in Louisiana's State-Funded Transportation Contracting, 1992-2000**
(Source: GAO's analysis of data from Louisiana's Department of Transportation)



34

**Figure 3: DBEs' Participation in Federal Transportation Contracting in Minnesota, 1995-2000**
(Source: GAO's analysis of data from Minnesota's Department of Transportation).



References

Arrow, K.J. (1998), 'What has economics to say about racial discrimination?', Journal of Economic Perspectives, 12(2), pp. 91-100.

Ashenfelter, O. (1972), 'Race discrimination and trade unionism', Journal of Political Economy, Volume 80, Issue 3, Part 1, May-June pp.  pp. 435-464.

Blanchflower, D.G., (2000), 'Self-employment in OECD countries', Labour Economics, 7, September, pp. 471-505.

Blanchflower, D.G., (2004), 'Self-employment: more may not be better', Swedish Economic Policy Review, 11(2), Fall, pp.15-74.

Blanchflower, D.G. and A. Bryson (2003), 'Changes over time in union relative wage effects in the UK and the US revisited', International Handbook of Trade Unions, Edward Elgar, edited by John Addison and Claus Schnabel.

Blanchflower, D.G. and A. Bryson (2004), 'What effect do unions have on wages now and would Freeman and Medoff be surprised?', Journal of Labor Research, 25(3), Summer, pp. 383-414 and in What do unions do?: the evidence twenty years later, edited by James T. Bennett and Bruce E. Kaufman, forthcoming.

Blanchflower, P. Levine and D. Zimmerman (1998), 'Discrimination in the small business credit market', National Bureau of Economic Research Working Paper #W6840, Cambridge, MA.

Blanchflower, P. Levine and D. Zimmerman (2003), 'Discrimination in the small business credit market', Review of Economics and Statistics, November, 85(4), pp. 930-943.

Blanchflower D.G. and A.J. Oswald (2004), 'Wellbeing over time in Britain and the United States', Journal of Public Economics, 88(7-8), pp.1359-1386.

Cavalluzzo, K., L. Cavalluzzo and J. Wolken (2002), 'Competition, small business financing and discrimination: evidence from a new survey', Journal of Business, 75, October, pp.641-679.

Chandra, A. and J. Skinner (2003), 'Geography and racial health disparities,' in Critical perspectives on racial and ethnic differences in health in late life, edited by N. B. Anderson, R.A. Bulatao, and B. Cohen, Panel on race, ethnicity, and health in later life, National Research Council, pp.604-639.

Chay, K.Y. and R. W. Fairlie (1998), 'Minority business set-asides and black self-employment, Working Paper, December.

Cutler, D.M. Glaeser, E.L. and J.L. Vigdor (1999), 'The rise and decline of the American ghetto', Journal of Political Economy, 107(3), pp. 455-506.

Enchautegui, M.E., M. Fix, P. Loprest, S. von der Lippe, and D. Wissoker (1997), <u>Do Minority-Owned Businesses Get a Fair Share of Government Contracts?</u>   Washington, D.C.: Urban Institute.

Fairlie, R. W. (1999), 'The absence of the African-American owned business: an analysis of the dynamics of self-employment', <u>Journal of Labor Economics</u>, 17(1), pp. 80-108.

Fairlie, R.W. and B.D. Meyer (2000), 'Trends in self-employment among white and black men during the twentieth century', <u>Journal of Human Resources</u>, XXXV(4), pp. 643-669.

Feinstein, J.S. M.K. Block and F.C. Nold (1985), 'Asymmetric information and collusive behavior in auction markets', <u>American Economic Review</u>, 75, June, pp. 441-460.

Freeman, R.B (2000), 'Disadvantaged young men and crime' in <u>Youth employment and joblessness in advanced countries</u>, edited by D.G. Blanchflower and R.B. Freeman, University of Chicago Press and NBER.

Fryer, R.G. and S. Levitt (2003), 'The causes and consequences of distinctively black names', NBER Working Paper #9938.

General Accounting Office (2001), <u>Disadvantaged business enterprises</u>, Report to Congressional Committees, GAO-01-586, June, Washington DC**.**

Glover, R.W (1977), <u>Minority enterprise in construction</u>, Praeger Publications.

Gupta, S. (2001), 'The effect of bid rigging on prices: a study of the highway construction industry' , <u>Review of Industrial Organization</u>, December, 19(4), pp. 453-467

Gupta, S. (2002), 'Competition and collusion in government procurement auction market', <u>Atlantic Economic Journal</u>, 30(1), March, pp. 13-25

Heckman, J., T. Lyons and P. Todd (2000), 'Understanding black-white wage differentials, 1960-1990,' <u>American Economic Review</u>, 90(2), pp. 344-49.

Hirsch, B.T., and E.J. Schumacher (2004), 'Match bias in wage gap estimates due to earnings imputation', <u>Journal of Labor Economics</u>, Vol. 22, No. 3, July, pp. 689-722.

Holt, C. (2003) 'Strict constitutional scrutiny is not fatal in fact: federal courts uphold affirmative action programs in public contracting,' <u>Labor Law Journa</u>l, Winter, 54(4), pp. 248-262.

Ingraham, Allan, T. (2005), 'A test for collusion between a bidder and an auctioneer in sealed-bid auctions', <u>Contributions to Economic Analysis & Policy</u>, Volume 4, Issue 1, pp. 1-32

Jencks, C., and M. Phillips (1998), 'The black-white test score gap', Washington DC: The Brookings Institute.

Kessler, D.P. and L.F. Katz (2001), 'Prevailing Wage Laws and construction labor markets', Industrial and Labor Relations Review, 54(2), January, pp. 259-274.

Marshall, R. (2000), 'Minority and female business development after Croson', University of Texas Working Paper.

Porter, R. H. and D. J. Zona (1993), 'Detection of bid-rigging in procurement auctions,' Journal of Political Economy,  101(3), pp. 518-538.

Smith, J.P. and F.R. Welch (1989), 'Black economic progress after Myrdal', Journal of Economic Literature, 27(2), June, pp.519-64.

U.S. Chamber of Commerce (2005), Access to capital: what funding sources work for you?, U.S. Chamber of Commerce, May, Washington DC.

U.S. Commission on Civil Rights (2005), Federal procurement after Adarand, September, Washington DC.

Ventura, S. and C. Bachrach (2000), 'Non-marital childbearing in the United States, 1940-1999,' National Vital Statistics Reports, 48(16), Hyattsville, MD: National Center for Health Statistics.

Wainwright, J. (2000), Racial discrimination and minority business enterprise: evidence from the 1990 census, Studies in Entrepreneurship Series, New York and London: Garland Publishing.

# Exhibit C

<u>**Entering Entrepreneurship**</u>: **Racial Disparities in the Pathways into Business Ownership**

Authors**:** M'Balou Camara, Khaing Zaw, Darrick Hamilton, and William Darity Jr.

*The Samuel DuBois Cook Center on Social Equity, Duke University*

*The Institute on Assets and Social Policy, Brandeis University*

*The Kirwan Institute for the Study of Race and Ethnicity, The Ohio State University*

October 2019

---

# 1. Introduction

The current landscape of entrepreneurship in the United States is radically different than it was a century ago, but the connections between entrepreneurship and the capital needed to finance it still greatly contribute to today's racially-embedded disparities. Research on entrepreneurship often highlights that business ownership is a key element for building wealth (AEO, 2017). Moreover, a substantial literature suggests that the story of business ownership does not look the same for blacks as it does for whites. While black Americans are almost twice as likely to start a business, black-owned businesses persistently lag behind their white counterparts, appear disproportionately less in high-revenue-earning industries, and fail at higher rates. In fact, even when comparing the same industries, black-owned businesses that do survive have fewer employees and smaller revenues than white-owned businesses (Kollinger & Minniti, 2006; Fairlie & Krashinsky, 2012; Bates, 1998).

Despite past studies, this body of work is silent on the role of prior wealth in shaping the pathways into business ownership and the corresponding racial disparities associated with entering entrepreneurship. On this account, this report aims to address the following question: **How do characteristics of black business owners (or black entrepreneurs) and black-owned businesses differ from characteristics of white business owners and white-owned businesses at the time of entry into business ownership?** This study aims to contextualize patterns of initial ownership and to shed some light on the mechanisms and processes by which racial stratification in business ownership persists. Insight into racial disparities in business will move us one step closer to understanding how we can tackle structural inequality in contemporary America.

# 2. Description of Racial Disparities in the Rate of Business Ownership

### 2.1 Employer Businesses vs Nonemployer Businesses, by Race

Based on the US Census' ASE and SBO, "business ownership" by race, gender or ethnicity is defined as having 51 percent or more of the stock or equity in a business. Therefore, a "black-owned business" is one in which 51 percent or more of the stock or equity is owned by black Americans. But one cannot fully understand how racial disparities in business ownership operate without considering the difference between nonemployer and employer businesses. All privately-owned U.S. businesses can be defined as the sum of *nonemployer businesses*—those that have no paid employees other than the owner—and *employer businesses*—those with at least one other paid employee. While nonemployer businesses outnumber employer businesses in the US, the latter generate a significantly larger proportion of total annual revenue as measured by sales (AEO, 2017). Employer businesses receive nearly 97 percent of the total annual revenue but comprise less than 20 percent of all privately-owned businesses. A nonemployer business often requires less start-up capital than does an employer business to acquire a business (SBCS, 2018). According to the 2012 Survey of Business Owners (SBO), 35.4 percent of all nonemployer businesses used less than $5,000 in start-up capital; only 17.9 percent of all employer businesses did likewise. Conversely, only 4.5 percent of all nonemployer used more than $100,000 of capital to start or acquire the business, compared to 16.7 percent of all employer businesses[1].



Across race, the dynamics distinguishing employer and nonemployer business ownership are much more pronounced. Roughly 79% of all white-owned businesses and 96% of black-owned businesses are nonemployer, respectively (SBO, 2012). Nevertheless, while 7.7% of sales revenue of all white-owned businesses comes from those that are nonemployer, 31% of all sales revenue of black-

---

[1] 20.5 percent of employer businesses and 10.4 percent of nonemployer businesses do not know how much capital was used to start or acquire the corresponding business.

owned businesses are nonemployer-generated (SBO, 2012). In sum, nonemployer businesses (despite bringing in relatively less revenue) play a larger role amongst black-owned businesses than they do amongst white-owned businesses. Understanding these trends is important for conceptualizing how the implications of the racial disparities may vary depending on the types of businesses we observe.

### 2.2 Racial Disparities in the Rate of Business Ownership Across the United States

While white Americans represent nearly 72.9 percent of the U.S. population[2], 78 percent of all private U.S. businesses are white-owned, according to the 2012 Survey of Business Owners (SBO). On the other hand, black Americans represent approximately 13.3 percent of the U.S. population, but own just 9 percent of all the nation's private businesses. Put simply, black Americans across the country are disproportionately underrepresented as business owners while white Americans are disproportionately overrepresented. The portrait is even more unequal when comparing the average annual business revenues and average salaries of employees of black-owned and white-owned employer businesses (See Appendix B).

As displayed in Table 2.1 the racial composition across all fifty states varies dramatically from a 1 percent working-age black population in Idaho to a 38 percent working-age black population in Mississippi.  Analogously, the black-owned business composition varies from 0 percent in Montana to 28 percent in Georgia. The discrepancy between the racial composition of the entire U.S. population versus the racial composition of privately-owned U.S. businesses illustrates one key aspect of racial disparities in business ownership. Across every single state the rate of business ownership for black Americans falls below that group's prevalence in the overall population. *In other words, in no single state are black Americans as likely to own a business as the average resident of that state.* On the other hand, white Americans are overrepresented in business ownership in every state except for California, where their true working age proportion equally represents their business ownership composition (See Appendix A).

**Table 2.1:** Black American Share of Population and Business Ownership (2012)

| State | Share of total working age population | Share of all businesses | Share of employer businesses | Share of nonemployer businesses |
|---|---|---|---|---|
| **Alabama** | 0.27 | 0.20 | 0.03 | 0.23 |
| **Alaska** | 0.05 | 0.02 | 0.01 | 0.02 |
| **Arizona** | 0.05 | 0.03 | 0.01 | 0.04 |
| **Arkansas** | 0.16 | 0.09 | 0.02 | 0.11 |
| **California** | 0.07 | 0.06 | 0.02 | 0.07 |
| **Colorado** | 0.05 | 0.02 | 0.01 | 0.03 |

---

[2] 2012 American Community Survey Population Estimates (ACS)

3

| | | | | |
|---|---|---|---|---|
| **Connecticut** | 0.12 | 0.06 | 0.01 | 0.07 |
| **Delaware** | 0.23 | 0.11 | 0.03 | 0.14 |
| **Florida** | 0.17 | 0.12 | 0.03 | 0.15 |
| **Georgia** | 0.32 | 0.28 | 0.06 | 0.33 |
| **Hawaii** | 0.03 | 0.01 | 0.01 | 0.01 |
| **Idaho** | 0.01 | 0.00 | 0.00 | 0.00 |
| **Illinois** | 0.15 | 0.13 | 0.02 | 0.16 |
| **Indiana** | 0.10 | 0.07 | 0.01 | 0.09 |
| **Iowa** | 0.04 | 0.02 | 0.00 | 0.02 |
| **Kansas** | 0.07 | 0.03 | 0.01 | 0.04 |
| **Kentucky** | 0.09 | 0.04 | 0.01 | 0.05 |
| **Louisiana** | 0.33 | 0.23 | 0.04 | 0.27 |
| **Maine** | 0.02 | 0.01 | 0.00 | 0.01 |
| **Maryland** | 0.31 | 0.24 | 0.06 | 0.28 |
| **Massachusetts** | 0.09 | 0.04 | 0.01 | 0.05 |
| **Michigan** | 0.15 | 0.13 | 0.02 | 0.15 |
| **Minnesota** | 0.06 | 0.04 | 0.01 | 0.05 |
| **Mississippi** | 0.38 | 0.28 | 0.04 | 0.33 |
| **Missouri** | 0.12 | 0.08 | 0.03 | 0.09 |
| **Montana** | 0.01 | 0.00 | 0.00 | 0.00 |
| **Nebraska** | 0.06 | 0.03 | 0.01 | 0.04 |
| **Nevada** | 0.10 | 0.07 | 0.01 | 0.09 |
| **New Hampshire** | 0.02 | 0.01 | 0.00 | 0.01 |
| **New Jersey** | 0.15 | 0.08 | 0.02 | 0.10 |
| **New Mexico** | 0.03 | 0.02 | 0.01 | 0.02 |
| **New York** | 0.18 | 0.12 | 0.02 | 0.14 |
| **North Carolina** | 0.23 | 0.14 | 0.04 | 0.17 |
| **North Dakota** | 0.02 | 0.01 | 0.00 | 0.01 |
| **Ohio** | 0.13 | 0.09 | 0.02 | 0.11 |
| **Oklahoma** | 0.09 | 0.04 | 0.01 | 0.05 |
| **Oregon** | 0.03 | 0.02 | 0.01 | 0.02 |
| **Pennsylvania** | 0.12 | 0.06 | 0.01 | 0.07 |
| **Rhode Island** | 0.09 | 0.04 | 0.01 | 0.05 |
| **South Carolina** | 0.28 | 0.17 | 0.04 | 0.20 |
| **South Dakota** | 0.02 | 0.01 | 0.00 | 0.01 |
| **Tennessee** | 0.18 | 0.14 | 0.03 | 0.16 |
| **Texas** | 0.13 | 0.10 | 0.03 | 0.11 |
| **Utah** | 0.02 | 0.01 | 0.00 | 0.01 |
| **Vermont** | 0.02 | 0.01 | 0.00 | 0.01 |
| **Virginia** | 0.2 | 0.13 | 0.04 | 0.15 |
| **Washington** | 0.05 | 0.03 | 0.01 | 0.03 |
| **West Virginia** | 0.04 | 0.02 | 0.01 | 0.02 |
| **Wisconsin** | 0.07 | 0.05 | 0.01 | 0.06 |
| **Wyoming** | 0.02 | 0.01 | 0 | 0.01 |
| **United States** | 0.13 | 0.09 | 0.02 | 0.11 |

Source: 2012 American Community Survey Population Estimates and 2012 Survey of Business Owners (SBO)

When observing the rate of business ownership across states, black-owned businesses are also disproportionately underrepresented in the employer businesses. To understand the scale of this disparity, we also observe that average annual sales of black-owned businesses and average annual salaries of

employees from black owned businesses significantly lag behind those of white-owned businesses. For example, in North Carolina, the average black-owned employer business generates $666,168 in annual revenue sales while the average white-owned employer business generates $2,037,372, nearly twice as much. The average annual salary of an employee of a black-owned business in North Carolina makes $23,544. For a white-owned business, the average annual salary is $33,690 (See Appendix B).



This disproportionality, however, is not as pronounced when only looking at nonemployer businesses. In fact, the nonemployer black-owned business composition in California, Georgia, Illinois, and Michigan is either an equal or overrepresentation of the black working-age proportion in those respective states. The relatively high nonemployer entrepreneurial activity (as opposed to employer activity) among black-owned businesses suggests that they are lacking in the number of rapidly-growing, "commercially-oriented keystone organizations" (McKoy and Johnson, 2018). Why are there are fewer black-owned businesses (and at varying magnitudes) than we might expect given the population size across different states? In this report, we aim to shed the light on how racial differences in prior wealth help explain the racial differences in four dimensions of entry into business ownership: (1) the method of acquiring a business, (2) the source and amount of start-up capital used for the business, (3) the duration or age of the business, and (4) the business performance.

## 3. Racial Disparities in How Owners Enter Entrepreneurship

What is the portrait of entry into business ownership by race? Based on the latest data available on business owners, the 2012 and 2015 Survey of Business Owners, the most common method of acquiring ownership of a business is by founding or starting one, as summarized in tables 3.1 and 3.2. However, quantitative racial disparities exist in the likelihood of entering entrepreneurship by each of the

four possible methods: (1) founding or starting the business, (2) purchasing the business, (3) inheriting the business, or (4) receiving a transfer of ownership of the business[3]. Each method of entry into entrepreneurship suggests a very different story about the initial experiences, barriers, and choice sets that business owners must navigate. Purchasing a firm typically requires more capital than starting or founding one, and establishing a new firm often entails a tougher and longer road to startup. Those businesses that are purchased, inherited, or transferred are typically bigger and more mature than those that are newly established (SBCS, 2017).

**Table 3.1.** How Owners Initially Acquired Employer businesses, by Race (2016)

| How the owner initially acquired the business | Number of black owners of respondent employer-firms | Number of white owners of respondent employer-firms |
|---|---|---|
| Founded or started | 72,364 | 3,183,089 |
| Purchased | 11,460 | 951,604 |
| Inherited | 2,432 | 203,525 |
| Transfer of ownership or gift | 3,767 | 346,640 |
| Total reporting | 88,202 | 4,569,600 |

**Table 3.2.** How Owners Initially Acquired Nonemployer businesses, by Race (2012)[4]

| How the owner initially acquired the business | Number of black owners of respondent nonemployer businesses | Number of white owners of respondent nonemployer businesses |
|---|---|---|
| Founded or started | 781,464 | 12,707,791 |
| Purchased | 55,609 | 1,105,094 |
| Inherited | 11,953 | 373,395 |
| Transfer of ownership or gift | 24,206 | 512,580 |
| Total reporting | 862,833 | 14,510,034 |

As shown in Figure 3.1, 82 percent of black owners of employer businesses founded or started their businesses, whereas the corresponding figure for white owners is 69.7 percent. This finding means that black owners of employer businesses are 17.6 percent more likely than white owners to enter business ownership by founding or starting a new enterprise. Conversely, white owners of employer businesses are 60 percent more likely to enter business ownership via acquisition by purchase, 60.7

---

[3] Note that respondents could select more than one answer to the question regarding initial mode of acquisition. Therefore, the cumulative amount of responses across all four categories may exceed the total reporting amount. This applies to Table 3.1, Table 3.2, Figure 3.1, Figure 3.2, and Table 3.3.
[4] The latest survey data on owners of nonemployer businesses is from 2012.

percent more likely to acquire by way of inheritance, and nearly 76.7 percent more likely to acquire through a transfer of ownership or gift than are black business owners of employer businesses.

**Figure 3.1.** How Black and White Owners Initially Acquired their Employer Businesses (2016)



As expected, it is even more common for owners of nonemployer businesses than owners of employer businesses to acquire a business by founding or starting it, regardless of the owner's race. Nearly 91 percent of black owners and 88 percent of white owners of nonemployer businesses founded or started their businesses. Figure 3.2 illustrates that, like owners of employer businesses, white owners of nonemployer businesses are more likely to enter business ownership through purchase, through inheritance, and through a transfer of ownership or gift than are black owners of nonemployer businesses.

**Figure 3.2.** How Black and White Owners Initially Acquired their Nonemployer Businesses (2012)



We observe similar patterns of initially acquiring employer businesses across nine different sectoral categories. As displayed in Table 3.3, black business owners are more likely than white business owners to found or start their own business in each of these sectors except for the information sector. However, white business owners are more likely than black business to receive business ownership as a transfer or gift in all of nine industry categories. Furthermore, white business owners are more likely than black business owners to initially acquire a business by purchasing it in every category except for the information sector. This gap widens within higher-end sectors. In fact, more than half (66 percent) of white-owned businesses in the comparatively more lucrative management sector (bolded in the table) were acquired either by purchase, inheritance, or transfer, while only about 33 percent of black-owned businesses in that sector were acquired in one of those three ways.

**Table 3.3.** How Owners Initially Acquired Employer Businesses, by Industry (2016)

| Industry | Founded or started | | Inherited | | Purchased | | Transfer of ownership or gift | |
|---|---|---|---|---|---|---|---|---|
| | Black | White | Black | White | Black | White | Black | White |
| **Accommodation and food services** | 0.66 | 0.60 | 0.03 | 0.04 | 0.33 | 0.34 | 0.03 | 0.06 |
| **Administrative and support and waste management and remediation services** | 0.87 | 0.76 | 0.03 | 0.03 | 0.08 | 0.16 | 0.03 | 0.07 |
| **Agriculture, forestry, fishing and hunting** | 0.75 | 0.73 | 0.25 | 0.06 | 0.01 | 0.14 | 0% | 0.10 |
| **Construction** | 0.88 | 0.77 | 0.04 | 0.04 | 0.04 | 0.12 | 0.05 | 0.09 |
| **Finance and insurance** | 0.86 | 0.71 | 0.03 | 0.05 | 0.08 | 0.19 | 0.05 | 0.08 |
| **Information** | 0.69 | 0.73 | 0.03 | 0.04 | 0.25 | 0.18 | 0.04 | 0.08 |
| **Management of companies and enterprises** | **0.73** | **0.44** | **0.11** | **0.16** | **0.15** | **0.29** | **0.07** | **0.21** |
| **Manufacturing** | 0.72 | 0.54 | 0.08 | 0.09 | 0.19 | 0.27 | 0.09 | 0.14 |
| **Other services (except public administration)** | 0.75 | 0.66 | 0.06 | 0.04 | 0.16 | 0.25 | 0.06 | 0.07 |

In short, black business owners are far more likely to enter into business ownership by starting a new enterprise than white business owners, which coincides well with the proposition that black Americans have historically been undercapitalized because of barriers in wealth accumulation, credit and loan discrimination, and lack of intergenerational transfers (Herring & Loren, 2016). Compared to white owners, black owners likely enter into businesses with less, if any, financial and institutional support and mentorship networks in their respective locations.



## 4. Racial Disparities in the Source and Amount of Start-Up Capital Used

Depending on the type and amount of capital needed by potential business owners, different sources of funding may be optimal for supporting them at the start-up stage of ownership. Independent of scale and sector, an aspiring entrepreneur and even an already established business entrepreneur require some degree of monetary support. Along with the figures presented in Table 4.1, evidence suggests that even after controlling for education levels, blacks are less likely than whites to have their business loans approved "and the loans they do receive from financial institutions are much smaller than those flowing to white business borrowers" (Bates, 1998). Given these trends, some would argue that black Americans are not given the opportunity to realize their full potential as entrepreneurs.

**Table 4.1.** The Amount of Start-Up Capital Used (2016)

| Amount of Capital to Start or Acquire the Employer Firm (2016) | Percent of Black-Owned Employer Businesses | Percent of White-Owned Employer Businesses |
|---|---|---|
| **$3,000,000 or more** | 0.2 | 0.5 |
| **$1,000,000 to $2,999,999** | 0.7 | 1.5 |
| **$250,000 to $999,999** | 4.5 | 6.5 |
| **$100,000 to $249,999** | 7.6 | 9.6 |
| **$50,000 to $99,999** | 10.8 | 9.4 |
| **$25,000 to $49,999** | 9.6 | 9.0 |
| **$10,000 to $24,999** | 15.5 | 11.8 |
| **$5,000 to $9,999** | 10.8 | 8.8 |
| **Less than $5,000** | 19.0 | 16.3 |
| **Don't know** | 12.8 | 17.2 |
| **Not applicable** | 8.4 | 9.3 |
| **Total reporting (number)** | 62,670 | 2,966,595 |

As displayed in Table 4.1, 45.3% of black-owned employer businesses compared with 36.9% of white-owned employer businesses used less than $25,000 of capital to start-up. In contrast, only 13% of black-owned compared with 18.1% of white-owned businesses used more than $100,000 in capital to start up. Clearly, black-owned businesses are starting off at a relatively smaller scale.

Like the amount of start-up capital, the source start-up capital has implications for what kind of support the business owners have. The source can be in the form of a personal account, a loan from a financial institution, an investment by a venture capitalist, or a government grant. As Table 4.2 shows, 21.8 percent of white-owned employer businesses receive business loans from banks, financial institutions, or families and friends; only 15.5 percent of similar black-owned businesses received start-up capital from equivalent sources. Furthermore, black-owned employer business are 59 percent more likely to use start-up capital in the form of personal credit cards than are white-owned employer businesses.

**Table 4.2.** The Source of Capital Used to Start Business (2016)

| Sources of Capital Used to Start or Acquire the Business | Percent of Black-Owned Employer Firms (%) | Percent of White-Owned Employer Firms (%) |
|---|---|---|
| **Personal/family savings of owner(s)** | 69.6 | 64.8 |
| **Personal/family assets other than savings of owner(s)** | 9.0 | 8.7 |
| **Personal/family home equity loan** | 5.2 | 6.3 |
| **Personal credit card(s) carrying balances** | 14.7 | 9.2 |
| **Business credit card(s) carrying balances** | 6.3 | 5.0 |
| **Business loan from federal, state, or local government** | 0.5 | 0.4 |
| **Government-guaranteed business loan from a bank or financial institution** | 1.9 | 1.8 |
| **Business loan from a bank or financial institution** | 12.6 | 17.2 |
| **Business loan/investment from family/friends** | 2.9 | 4.6 |
| **Investment by venture capitalist(s)** | 0.5 | 0.5 |
| **Grants** | 0.5 | 0.2 |
| **Other source(s) of capital** | 4.4 | 2.9 |
| **Don't know** | 8.1 | 10.0 |
| **None needed** | 8.4 | 9.3 |
| **Total Reporting (number)** | 62,657 | 2,966,829 |

All told, black American business owners have a limited access to capital relative to their white counterparts. In fact, financial banks are rarely a source of credit for black-owned businesses and when they are approved for credit, they often receive less than what they applied for. 20% of black households are un-banked, while only 4% of white non-Hispanic households remain unbanked (AEO, 2017). Historic

racial bias and discrimination play roles at nearly every step of the process of obtaining a loan and this leads to a somewhat dangerous trend and interplay between the amount and type of financial capital black Americans typically seek to the financial capital they get. Black Americans are often forced to rely more heavily on personal credit cards for financing a business. Consequently, this can deplete their assets even further by damaging their credit scores further and suppressing their business prospects.



## 5. Racial Disparities in the Age of Employer Businesses

How long ago were existing employer and nonemployer businesses established? The duration or "age" of a business is the difference between the year when the ASE survey was conducted—2012 for nonemployer businesses; 2016 for employer businesses—and the year the business was originally established. This corresponding duration of an employer-business has implications for business stabilization, quantity of sales, and whether the business can withstand changing market conditions over time. Older firms, by virtue of their longevity, tend to be more stable and more experienced. Moreover, they typically generate more annual revenue from sales and have more market-navigation resources. Thus, one would expect that older firms are not only larger in size but are also in stronger and more successful positions than firms that were established more recently.

11

**Figure 5.1.** Age of Employer Business, by Race (2016)[5]



Based on the 2012 and 2016 ASE, white-owned employer businesses are older than black-owned employer businesses. As displayed in Figure 5.1, 43.6 percent of all existing white-owned firms are 16 years or older (established prior to the 200s), while only 27.1 percent of black-owned firms are 16 years or older[6].  In contrast, 35.2 percent of black-owned firms are 7 years or younger, whereas 21.6 percent of white-owned firms are 7 years or younger. Therefore, close to half of all white-owned firms that exist today were established before the turn of the twenty-first century, whereas most existing black-owned firms were originally started in the 2000s.

For nonemployer businesses existing as of 2012, we observe similar patterns. While the most common age of nonemployer businesses in 2012 was between 5 and 12 years old regardless of race, white-owned nonemployer businesses were generally older than black-owned nonemployer businesses. In fact, 62.1 percent of existing black-owned nonemployer firms in 2012 were originally established after 2000 while less than one third of all white-owned nonemployer businesses were originally established between 2008 and 2012. Moreover, the proportion of white-owned nonemployer businesses that were older than the age of 32 as of 2012 was roughly four times the proportion of black-owned nonemployer businesses older than 32 years old. Over one-fourth of black-owned nonemployer businesses existing in 2012 were only one year old or younger.

---

[5] The age/duration of a business is calculated from "year business was started". For example, "Older than 35" refers to businesses that were started before 1980.

[6] 13.1 percent and 10.4 percent of white-owned and black-owned businesses, respectively, do not know the year their businesses were originally established.

**Figure 5-2.** Age of Nonemployer Businesses, by Race (2012)[7]



Given that more black-owned firms are younger, black business owners of those firms are likely less experienced and lack the capacity to offer mentorship to other black American entrepreneurs who are just starting off. One can imagine that this can create a serious disadvantage for one who is looking to receive guidance on how to overcome historically-embedded barriers and how to navigate discriminatory environments as they pertain to the business ownership experience for black Americans.

## 6. Racial Disparities in Characteristics of Employer Businesses, by Age

For white-owned businesses, older firms tend to generate more revenue in sales than younger firms. This, however, does not hold true for black-owned businesses. As shown in Table 6.1, 50 percent of sales from black-owned employer businesses comes those that are 9 to 26 years old. 15 percent of sales from black-owned employer businesses come from those 27 years or older, while the proportion of sales coming from for white-owned employer businesses that are 27 years or older is 51 percent. In other words, a majority of the total revenue from black-owned firms are earned by firms that are relatively younger than white-owned firms (ASE, 2016).

---

[7] Note that data on nonemployer firms ended in 2012.

13

**Table 6-1.** Wage and Sales of Black-owned and White-owned Employer businesses, by Age (2016)

| Duration of Business as of 2016 | Black-Owned Employer Businesses | | | | White-Owned Employer Businesses | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent of businesses (%) | Average salary per employee ($1000) | Percent of Sales (%) | Average Sales ($1,000) | Percent of businesses (%) | Average salary per employee ($1000) | Percent of Sales (%) | Average Sales ($1,000) |
| Older than 36 | 0.04 | 31 | 0.05 | 1242 | 0.12 | 47 | 0.35 | 6699 |
| 27 to 35 | 0.07 | 32 | 0.10 | 1355 | 0.12 | 45 | 0.16 | 3025 |
| 17 to 26 | 0.14 | 33 | 0.20 | 1343 | 0.17 | 43 | 0.16 | 2215 |
| 9 to 16 | 0.26 | 30 | 0.30 | 1115 | 0.20 | 41 | 0.13 | 1466 |
| 4 to 8 | 0.22 | 29 | 0.17 | 755 | 0.14 | 36 | 0.07 | 1105 |
| 3 | 0.05 | 36 | 0.03 | 556 | 0.03 | 35 | 0.01 | 905 |
| 2 | 0.06 | 21 | 0.02 | 340 | 0.04 | 31 | 0.01 | 750 |
| 1 | 0.05 | 21 | 0.03 | 487 | 0.03 | 31 | 0.01 | 728 |
| Don't Know | 0.11 | 31 | 0.11 | 968 | 0.14 | 37 | 0.11 | 1828 |

All told, the association between sales for older firms and larger firms does not hold across race. Older black-owned firms are on average smaller than white-owned firms that are younger. For example, black-owned businesses that are older than 36 years old generate less in average revenue sales ($1,242,000) as do white-owned businesses ($1,466,000) that are between 9 and 16 years old. At every age category, the average salary per employee—measured by dividing annual payroll by the number of employees in each age category—is greater for employees of white-owned employer firms than for employees of black-owned employer firms[8].  In fact, the average employee from a black-owned employer business that is older than 36 years earns ($31,000) just as much as the average employee of a white-owned employer business that is only two years old. Most strikingly, across every age category, black-owned employer businesses bring in less average revenue than white-owned firms originally established around the same time. Much of this disparity in the performance of different aged black- and white-owned businesses can be attributed to aspects related to the initial stage of ownership; particularly related to racial differentials in prior wealth and access to capital. many differences in economic outcomes across individuals operate through lingering effects of racially-motivated historical injustices of violence and hostility.

---

[8] This holds with the exception of employer firms whose duration is only three years as of 2015.

## 7. Wealth as an Input for the Pathway into Business Ownership

Empirically, black Americans are more likely than white Americans to start a business, but white-owned businesses are more likely to grow and succeed. Similarly, white American adults have 13 times the wealth than black American adults, and on average "black business owners have fewer assets, lower wealth, and less disposable income to invest into the business than white business owners" (AEO, 2017). The prevalence of racial wealth inequality in the U.S. has long been examined and well documented by past scholarship. Wealth is arguably the foremost indicator of economic well-being, signifying what people own and whether a household has access to life-enhancing and income-producing assets. Herring and Hynes (2017) state that "racial disparities in wealth provide material goods, opportunities, resources, services, and psychological satisfactions for Whites, and they serve to penalize African Americans by decreasing their quality of life." Moreover, wealth has a tendency to aggregate in the hands of very few and accumulate intergenerationally over time (Chiteji and Hamilton, 2002; Addo, Houle, & Simon, 2016; Brown, 2016).

This suggests that prior wealth endowments (and the various economic, social, and political benefits that come with them) may influence the capability of an individual to become a business owner. Lack of wealth and access to capital serves as a current barrier that governs the pathway into business ownership for black Americans. In order to support an ecosystem for black business owners, it is critical that more attention is given to wealth as an input into the business ownership experience.



## 8. Policy Implications and Conclusion

Virtually all commentaries on the relationship between entrepreneurship and wealth emphasize the contribution of business ownership to wealth accumulation; very little consideration is given to the role of prior wealth in shaping pathways of business ownership. Our study exploring racial differences in patterns of entry into entrepreneurship points us toward the latter, less recognized relationship—the influence of initial asset endowments on the capability of individuals to become business owners.

Racial differences in prior wealth are implicated in racial differences in the ways in which people acquire businesses. Adding the dimension of multiple pathways toward business ownership enrichens the entry story. For both employer and nonemployer businesses, whites are far more likely than blacks to become owners via routes that require direct (or network) access to wealth.

A body of literature establishes how racial disparities are not merely a function of the political, social, and economic processes as we know them today (Archarya, Blackwell, & Sen, 2018). Rather, many differences in economic outcomes across individuals operate through lingering effects of racially-motivated historical injustices and hostilities. While the construction of freeways to cut through Hayti and Black Wall Street in Durham, North Carolina, reveals one of the historical methods used to disrupt and block black business ownership, the 1921 white massacre in Tulsa, Oklahoma, exemplifies the explicit acts of violence mounted against the economic prosperity of black Americans.

These injustices were legitimated through "official narratives that discredit(ed), vilifi(ed)," and targeted black communities and infrastructures that were prosperous or thriving (Messer et al., 2018). Social and economic structures of historical racial violence not only have laid the foundation for maintenance of white supremacy in the past, but arguably also have had lasting effects on the business opportunities, economic prospects, and corresponding potential support networks at present. Much of the black-white business ownership disparity observed today may be linked to how conducive or damaging social structures have been in supporting black wealth and opportunity. Future research should explore how localities with different histories of racial hostility make black business ownership more or less likely today.

This study aimed to contextualize patterns of initial ownership and to shed some light on the mechanisms and processes by which racial stratification in business ownership persists. Our results suggest that tackling the racial business ownership disparity will require tackling the racial wealth disparity prior to increasing business ownership among blacks. It points us toward public targeting of seed capital for black entrepreneurs or major redistributive measures to build black wealth *in advance of accumulation that takes place due to business ownership.* This could mean, in turn, adoption of general policies aimed at closing the racial wealth gap, which might include "baby bonds" (young adult trust

accounts) and/or, more direct and substantial, a program of reparations for black Americans. In sum, policies focused on pathways into business ownership should consider how critical prior wealth can be for the fostering a more equitable ecosystem for business.

## 9. References

Addo, F. R., et al. (2016). Young, Black, and (still) in the red: Parental wealth, race, and student loan debt. *Race and Social Problems, 8*, 64–76.

Annual Survey of Entrepreneurs (2016). *United States Census Bureau.*

Archarya, A., Blackwell, M., & Sen, M. (2018). *Deep Roots How Slavery Still Shapes Southern Politics.* Princeton University Press.

Association for Enterprise Opportunity (2017). The Tapestry of Black Business Ownership in America: Untapped Opportunities for Success, *The Association for Enterprise Opportunity (AEO).*

Bates, T. (1998), *Race, Self-Employment and Upward Mobility: An Illusive American Dream.* Washington, DC; The Woodrow Wilson Center Press and Baltimore: The Johns Hopkins University Press.

Brown, T. H. (2016). Diverging fortunes: Racial/ethnic inequality in wealth trajectories in middle and late life. *Race and Social Problems, 8*, 29–41.

Chiteji, N, and D. Hamilton (2002). "Family Connections and the Black-White Wealth Gap among the Middle Class." Review of Black Political Economy, 30(1): 9-27.

Darity, W. et al. (2017). The Tapestry of Black Business Ownership in America: Untapped Opportunities for Success. *Association for Enterprise Opportunity* (AEO).

Fairlie, Robert W. "The Absence of the African-American Owned Business: An Analysis of the Dynamics of Self-Employment." Journal of Labor Economics, 17(1), January 1999: 80-108.

Fairlie, Robert. (2012). Immigrant Entrepreneurs and Small Business Owners, and Their Access to Financial Capital. Topics in Entrepreneurship: Select Research.

Herring, C., & Loren, H. (2016). Wealth inequality in Black and White: Cultural and structural sources of the racial wealth gap. *Race and Social Problems, 8*, 4–17.

Hurst, E., & Lusardi, A. (2004). Liquidity Constraints, Household Wealth, and Entrepreneurship. *Journal of Political Economy, 112*(2), 319-347. doi:10.1086/381478

Köllinger, P. and Minniti, M. Not Lack of Trying: American Entrepreneurship in Black and White. Small Business Economics (2006) 27: 59-79. https://doi.org/10.1007/s11187-006-0019-6

McKoy, H. C. and Johnson J. H. (2018). Do Business Ecosystems See Color? *International Journal of Social Ecology and Sustainable Development.*

Meschede, T., et al. (2016a). Inequality in the "cradle of liberty": Race/ethnicity and wealth in greater Boston. Race and Social Problems, 8, 18–28.

Meschede, T., et al. (2016b). Wealth mobility of families raising children in the twenty-first century. Race and Social Problems, 8, 77–92.

Messer, C. M., Shriver, T. E., & Beamon, K. K. (2018). Official Frames and the Tulsa Race Riot of 1921: The Struggle for Reparations. Sociology of Race and Ethnicity, 4(3), 386–399.

Small Business Credit Survey (2017). Report on Employer Firms. *Federal Reserve Banks.*

Small Business Credit Survey (2018). Report on Nonemployer Firms. *Federal Reserve Banks.*

Survey of Business Owners (2012). *United States Census Bureau.*

Survey of Business Owners (2015). *United States Census Bureau.*

# 10. Appendix

**Appendix A.** White American Share of Population and Business Ownership (2012)

| State | White American | |
|---|---|---|
| | **Population Share** | **Share of All Businesses** |
| **Alabama** | 0.70 | 0.76 |
| **Alaska** | 0.68 | 0.82 |
| **Arizona** | 0.84 | 0.89 |
| **Arkansas** | 0.80 | 0.87 |
| **California** | 0.74 | 0.74 |
| **Colorado** | 0.88 | 0.93 |
| **Connecticut** | 0.82 | 0.89 |
| **Delaware** | 0.72 | 0.83 |
| **Florida** | 0.78 | 0.83 |
| **Georgia** | 0.63 | 0.64 |
| **Hawaii** | 0.33 | 0.4 |
| **Idaho** | 0.94 | 0.97 |
| **Illinois** | 0.78 | 0.79 |
| **Indiana** | 0.87 | 0.9 |
| **Iowa** | 0.93 | 0.96 |
| **Kansas** | 0.87 | 0.93 |
| **Kentucky** | 0.89 | 0.93 |
| **Louisiana** | 0.64 | 0.72 |
| **Maine** | 0.95 | 0.97 |
| **Maryland** | 0.61 | 0.67 |
| **Massachusetts** | 0.84 | 0.9 |
| **Michigan** | 0.80 | 0.83 |
| **Minnesota** | 0.86 | 0.92 |
| **Mississippi** | 0.60 | 0.69 |
| **Missouri** | 0.84 | 0.89 |
| **Montana** | 0.90 | 0.96 |
| **Nebraska** | 0.90 | 0.94 |
| **Nevada** | 0.77 | 0.81 |
| **New Hampshire** | 0.94 | 0.97 |
| **New Jersey** | 0.74 | 0.8 |
| **New Mexico** | 0.83 | 0.89 |
| **New York** | 0.71 | 0.74 |
| **North Carolina** | 0.72 | 0.81 |
| **North Dakota** | 0.90 | 0.96 |
| **Ohio** | 0.83 | 0.88 |
| **Oklahoma** | 0.76 | 0.84 |
| **Oregon** | 0.88 | 0.92 |
| **Pennsylvania** | 0.83 | 0.89 |
| **Rhode Island** | 0.86 | 0.92 |
| **South Carolina** | 0.69 | 0.79 |
| **South Dakota** | 0.86 | 0.96 |
| **Tennessee** | 0.79 | 0.83 |
| **Texas** | 0.81 | 0.82 |
| **Utah** | 0.92 | 0.95 |
| **Vermont** | 0.95 | 0.98 |
| **Virginia** | 0.71 | 0.77 |
| **Washington** | 0.82 | 0.87 |
| **West Virginia** | 0.94 | 0.96 |
| **Wisconsin** | 0.88 | 0.92 |
| **Wyoming** | 0.93 | 0.97 |

Source: Survey of Business Owners (2012)

**Appendix B:** White-Owned vs. Black-Owned Sales and Salaries of Employer Businesses (2012)

| State | White-Owned Businesses | | Black-Owned Businesses | |
|---|---|---|---|---|
| | Average Annual Sales in USD | Average Annual Employee Salary in USD | Average Annual Sales in USD | Average Annual Employee Salary In USD |
| **Alabama** | 2,510,078 | 34,310 | 42,288 | 1,025,705 |
| **Alaska** | 2,275,223 | 46,222 | 118,656 | 834,808 |
| **Arizona** | 1,849,125 | 33,335 | 68,080 | 879,470 |
| **Arkansas** | 2,372,633 | 30,339 | 39,255 | 591,900 |
| **California** | 2,376,776 | 45,483 | 84,177 | 1,128,511 |
| **Colorado** | 1,598,580 | 38,143 | 97,087 | 1,010,609 |
| **Connecticut** | 2,492,964 | 43,938 | 47,552 | 653,300 |
| **Delaware** | 2,100,689 | 38,724 | 44,151 | 380,435 |
| **District of Columbia** | 2,744,202 | 56,913 | 113,922 | 1,437,584 |
| **Florida** | 1,532,142 | 35,001 | 44,645 | 718,506 |
| **Georgia** | 2,338,896 | 36,320 | 37,324 | 646,629 |
| **Hawaii** | 1,951,869 | 34,466 | 121,644 | 797,335 |
| **Idaho** | 1,526,704 | 29,618 | 108,884 | 912,906 |
| **Illinois** | 2,353,729 | 41,505 | 51,596 | 1,246,749 |
| **Indiana** | 2,485,203 | 34,131 | 111,085 | 2,483,369 |
| **Iowa** | 2,362,056 | 33,500 | 100,293 | 1,703,721 |
| **Kansas** | 2,372,540 | 35,247 | 79,667 | 931,713 |
| **Kentucky** | 2,240,284 | 31,976 | 82,870 | 1,109,809 |
| **Louisiana** | 2,581,325 | 38,153 | 35,592 | 657,779 |
| **Maine** | 1,588,498 | 32,557 | 119,729 | N/A |
| **Maryland** | 2,328,619 | 42,507 | 68,671 | 1,039,304 |
| **Massachusetts** | 2,448,372 | 45,168 | 83,172 | 1,049,822 |
| **Michigan** | 2,198,558 | 35,844 | 48,254 | 1,349,167 |
| **Minnesota** | 2,342,317 | 37,291 | 80,484 | 1,066,135 |
| **Mississippi** | 2,280,364 | 31,309 | 31,933 | 617,004 |
| **Missouri** | 2,194,089 | 35,434 | 66,986 | 564,842 |
| **Montana** | 1,244,546 | 30,194 | 81,260 | 597,034 |
| **Nebraska** | 2,460,743 | 35,189 | 65,000 | N/A |
| **Nevada** | 2,419,465 | 36,932 | 55,290 | 1,058,853 |
| **New Hampshire** | 1,855,538 | 37,439 | 94,049 | 784,671 |
| **New Jersey** | 2,440,137 | 41,505 | 65,587 | 843,437 |
| **New Mexico** | 1,653,151 | 32,220 | 121,866 | 843,824 |
| **New York** | 2,123,946 | 46,132 | 48,406 | 744,787 |
| **North Carolina** | 2,037,372 | 33,690 | 53,674 | 666,169 |
| **North Dakota** | 2,849,648 | 38,689 | 82,714 | 1,155,440 |
| **Ohio** | 2,551,218 | 34,908 | 112,621 | 2,300,496 |
| **Oklahoma** | 2,313,248 | 35,968 | 54,115 | 635,379 |
| **Oregon** | 1,746,953 | 36,801 | 107,718 | 1,056,919 |
| **Pennsylvania** | 2,313,371 | 37,138 | 54,333 | 724,157 |
| **Rhode Island** | 1,758,156 | 37,533 | 55,747 | 696,400 |
| **South Carolina** | 1,929,716 | 31,788 | 54,134 | 913,623 |
| **South Dakota** | 2,217,621 | 31,754 | 76,941 | 1,093,000 |
| **Tennessee** | 2,585,799 | 33,768 | 40,274 | 780,106 |
| **Texas** | 549,280 | 37,576 | 54,795 | 839,817 |
| **Utah** | 467,462 | 34,556 | 209,924 | 1,938,787 |
| **Vermont** | 354,558 | 34,640 | 26,570 | 191,000 |
| **Virginia** | 490,426 | 40,337 | 98,233 | 1,117,020 |
| **Washington** | 552,652 | 35,034 | 86,838 | 743,617 |
| **West Virginia** | 463,807 | 30,106 | 76,079 | 746,247 |
| **Wisconsin** | 615,201 | 34,514 | 76,270 | 1,086,545 |

20

| **Wyoming** | 514,931 | 38,162 | 86,006 | N/A |

Source: Survey of Business Owners (2012)

# Exhibit D

# BROOKINGS

COMMENTARY

# Who is driving Black business growth? Insights from the latest data on Black-owned businesses

Andre M. Perry, Manann Donoghoe, Hannah Stephens

May 24, 2023

**Follow the authors**

🐦 @andreperryedu

🐦 @ManannanAD

## EXECUTIVE SUMMARY

Using the Census Bureau's Annual Business Survey (ABS) data on employer firms (those that have at least one employee), this third installment of Brookings Metro's series of reports on Black-owned businesses focuses on the overall state of those firms across U.S. metropolitan areas. These reports are in support of the Path to 15|55 initiative (https://www.pathto1555.org/) , which endeavors to transition 15% of Black-owned sole proprietorships into employer firms, adding $55 billion to the U.S. economy. The ABS data, collected in 2020, allows for an in-depth analysis of employer firms during the initial stages of the pandemic. In addition, this report places a spotlight on employer firms owned by Black women. We find that:

**In 2020, Black people represented 14.2% of all Americans but only 2.4% of all employer-firm owners. Latino or Hispanic people represented 18.7% of the population and 6.5% of employer-firm owners, while Asian Americans represented 6% of the population and 10.6% of employer-firm owners.** [1] From 2019 to 2020, Black-owned businesses grew by 6,351 firms, or 4.72%—behind Latino or Hispanic (8.19%) and Asian American (5.33%) firms, but above white-owned businesses, which shrunk by 0.9%.

Case 1:23-cv-03424-BWT Document 59-4 Filed 08/31/23 Page 102 of 801

Black business growth was trending upward before the COVID-19 pandemic. From 2017 to 2020, **the number of Black-owned businesses across the country increased by 13.64%—larger than all businesses in general, which increased by 0.53% over the same period.** Black-owned firms brought in an estimated $141.1 billion in gross revenue in 2020—an 11% increase since 2017.

More so than other racial groups, Black-owned businesses had pronounced increases in revenue, employees, and payroll. **In 2020, Black business owners employed 1.321 million people, and created 48,549 new jobs—adding an additional $1.7 billion in aggregate payroll to the U.S. economy.**

**If Black business ownership continues to grow at its current rate (4.72%), it will take 256 years to reach parity with the share of Black people in America—a timeline that leaves racial wealth gaps entrenched.** Reaching parity in 15 years would take a 74.4% growth rate; for 25 years, a 44.6% growth rate; and for 50 years, a 22.3% growth rate.

**The 10 metro areas with the highest proportional representation of Black-owned businesses are all in the Southeast, including three in North Carolina.** However, in 2020, as in previous survey years, no metro area had a share of Black employer firms equal to or greater than its share of Black residents.

**Despite the impacts of COVID-19, from 2017 to 2020, the number of employer businesses owned by Black women rose to 52,374—encompassing 37.2% of all Black-owned businesses and representing an increase of 1.41 percentage points.** However, though Black women accounted for about 7% of the total U.S. population and 13.9% of American women in 2020, they only owned 0.91% of all businesses and 4.23% of women-owned businesses.

**A comparatively substantial portion (37.9%) of all Black women business owners have an advanced degree, including 19.1% with master's degrees.** This is more than 10 percentage points higher than the national average of 23.5%.

**Though far from equitable, the rate of business ownership for Black women is growing rapidly. Black-women-owned employer businesses increased by 18.14% between 2017 and 2020—outpacing women-owned businesses (9.06%) and Black-owned businesses (13.64%).** These trends parallel the growth in small sole-proprietor businesses owned by Black and Latino or Hispanic women. However, the extent to which this growth rate is the result of structural changes in the business and lending sectors that have made room for more inclusive growth is questionable. A closer

8/31/23, 6:54 PM                Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT    Document 59-4    Filed 08/31/23    Page 103 of 801

evaluation of these trends could help develop more intentional strategies to uplift these businesses and promote further growth.

---

## INTRODUCTION

The COVID-19 pandemic and protests stemming from the murder of George Floyd put a spotlight on Black wealth, health, and overall well-being. The social crises illuminated connections between attitudes that lead to a disproportionate number of stops, arrests, and convictions among Black Americans, as well as the underinvestment in Black businesses. Amid nationwide shutdowns, Black businesses felt significant pain, as they were less likely to obtain federal COVID-19 relief loans (https://www.nber.org/digest/202112/racial-disparities-paycheck-protection-program-lending) .

After Floyd's death, America's 50 largest public companies collectively pledged $49.5 billion to address racial inequality. (According to a Washington Post analysis (https://www.washingtonpost.com/business/interactive/2021/george-floyd-corporate-america-racial-justice/) , 90% of those commitments were loans or investments the corporations could profit from.) While many of those dollars focused on saving and developing Black-owned businesses, broader federal relief funds seemed to enhance Black business ownership. The National Bureau of Economic Research (https://www.nber.org/papers/w28787) found correlations between a surge of new businesses in Black neighborhoods from 2019 to 2020 and the first two rounds of pandemic relief checks.

Similarly, federal and state bodies are investing in businesses owned by people of color. The Biden administration has signed executive orders to strengthen racial equity and support underserved communities (https://www.whitehouse.gov/briefing-room/statements-releases/2023/02/16/fact-sheet-president-biden-signs-executive-order-to-strengthen-racial-equity-and-support-for-underserved-communities-across-the-federal-government/) , with a focus on economic justice. This has included initiatives to ensure 50% or more of federal contracting dollars are awarded to small, disadvantaged businesses by 2025, as well as the establishment of racial equity committees to address disparities in financial inclusion and access to capital, among other areas.

Intentional and passive investments in Black businesses during the pandemic might forge a pathway for future development efforts—or it may prove to be an anomaly that

cannot be replicated. There are strong signs that racialized gaps are closing; for example, unemployment disparities between Black and white Americans have lessened since 2010, while the aggregate unemployment rate for Black Americans (5%) (https://www.bls.gov/charts/employment-situation/civilian-unemployment-rate.htm) is now as low as its pre-pandemic rate, and down from 9.9% in April 2021. Still, Black unemployment is higher than the national rate (3.5% as of March 2023).

Given the extent of racial wealth and prosperity disparities, the rate of progress is slow. While racial wealth gaps have narrowed slightly since 2013 (https://www.federalreserve.gov/econres/notes/feds-notes/recent-trends-in-wealth-holding-by-race-and-ethnicity-evidence-from-the-survey-of-consumer-finances-20170927.html) , income inequality has ballooned, with increasing gaps between the poorest and wealthiest households. For example, the highest-income white households have seen the largest growth in wealth (https://www.pewresearch.org/fact-tank/2017/11/01/how-wealth-inequality-has-changed-in-the-u-s-since-the-great-recession-by-race-ethnicity-and-income/) —75 times that of lower-income families and 195 times the wealth of the median low-income Black family. These wealth inequalities have implications for rates of racial and ethnic representation in business ownership, and threaten to undermine progress on Black-owned businesses.

This report focuses on the state of businesses owned and run by Black people between 2017 and 2020. One key finding pertains to Black women, who are one of the nation's most underserved groups (https://www.brookings.edu/essay/to-protect-black-women-and-save-america-from-itself-elect-black-women/) , with the lowest proportional democratic representation (https://www.pewresearch.org/fact-tank/2023/02/16/22-states-have-ever-elected-a-black-woman-to-congress/#:~:text=Two%20Black%20women%20have%20served,are%20both%20Black%20and%20 and the largest median income gap for full-time workers (https://www.nationalpartnership.org/our-work/resources/economic-justice/fair-pay/african-american-women-wage-gap.pdf) . However, amid a rise in Black-owned businesses, increases in Black women founders seemed to drive overall growth. This report provides an analysis of this rise in business ownership among Black women and what it means for equity in business ownership in America.

---

RECENT TRENDS
## Recent trends show a rise in Black-owned businesses

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 105 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

In 2020, Black people represented 14.2% of all Americans but accounted for 2.4% of all employer-firm owners. Table 1 shows this is in comparison to Latino or Hispanic Americans (18.7% of the population and 6.5% of employer-firm owners), Asian Americans (6% of the population, 10.6% of employer-firm owners), and white Americans (61.6% of the population, 82.67% of employer-firm owners).

TABLE 1

## Characteristics of businesses by race and ethnicity of owner
2020

| Race/ethnicity of owner | % of total businesses | Average revenue per employer ($1,000) | Average employees per business | Average payroll per business ($1,000) |
|---|---|---|---|---|
| Black-owned | 2.44 | 1,001 | 9 | 300 |
| Hispanic-owned | 6.50 | 1,259 | 8 | 281 |
| white-owned | 82.67 | 2,852 | 12 | 570 |
| Asian | 10.60 | 1,374 | 8 | 307 |
| **Total** | **100.00** | **6,727** | **22** | **1,272** |

**Source:** Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table.png)

The underrepresentation of Black and brown business ownership represents a substantial obstacle for progress toward developing a racially inclusive economy in the U.S. Black businesses are important—not only to restore the value that racism has extracted from Black communities and households, but also for the strength of our national and local economies. A lack of Black-owned employer businesses constrains economic growth (https://www.brookings.edu/essay/to-expand-the-economy-invest-in-black-businesses/) and stymies opportunities for investment and inclusive development, especially in our most diverse cities and regions.

Between 2010 and 2020, the share of the minority population (https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html) (those not identifying as white alone) has grown from 36.3% to 42.4%, with the number of Americans identifying as two or more races more than tripling (https://www.brookings.edu/research/why-the-federal-government-needs-to-change-how-it-collects-data-on-native-americans/) . Yet the rate of minority-owned

8/31/23, 6:54 PM · Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 106 of 801

businesses has grown at a much slower pace, meaning there is a widening gap between population share and business representation. This gap has real implications for the state of the U.S. economy and the extent to which all people can benefit from it. However, there are signs of progress.

Between 2017 and 2020, the number of Black-owned businesses increased by 13.64% —larger than the increase in all businesses combined, which was 0.53% over the same period. The average yearly growth rate in the number of Black-owned businesses during this time was 4.2%, which is more than 20 times the overall business growth rate of 0.18%. Black-owned business growth was greatest between 2018 and 2019, when it rose by 8%; it declined to 4.7% between 2019 and 2020, likely representing the pandemic's early impacts on foreclosure rates and investment decisions. Still, Black-owned firms brought in an estimated $141.1 billion in gross revenue in 2020—an 11% increase since 2017.

If Black business ownership continues to grow at a rate of 4.2%, it will take 256 years to reach parity with the percentage of Black people in America—a timeline that leaves racial wealth gaps entrenched. Reaching parity in 15 years would take a 74.4% growth rate; for 25 years, a 44.6% growth rate; and for 50 years, a 22.3% growth rate.

8/31/23, 6:54 PM          Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 107 of 801



(https://www.brookings.edu/wp-content/uploads/2023/05/Figure1-2.png)

Black-owned businesses were resilient to the pandemic's impact on revenue and closure rates. Figure 2 shows that from 2019 to 2020, the number of Black owned businesses is estimated to have grown by 6,351, or 4.7%—well above white-owned employer firms (which shrunk by 0.9%), but behind Latino or Hispanic-owned employer firms (which grew by 8.2%) and Asian American-owned employer firms (5.3%). Over the same period, Black-owned businesses increased their proportional share of employees and revenue by a greater extent: Between 2019 and 2020, Black business owners employed more than 1.32 million people, adding 48,549 new jobs and an additional $1.7 billion in aggregate payroll to the U.S. economy.

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 108 of 801

FIGURE 2

## Percentage changes in business characteristics

By race and ethnicity 2019-2020



(https://www.brookings.edu/wp-content/uploads/2023/05/Figure2-1.png)

GEOGRAPHIC PATTERNS (AND INTERACTIVE)

## Black business ownership continued to grow in the South, with weaker trends in other metro areas

This report updates the 2022 report's metro-level data visualization, estimating the impacts to the U.S. economy if the proportion of Black-owned employer business in a metro area matched the Black population share. The ABS cannot accurately capture information on race and ethnicity in each survey year, so to provide a more complete picture of metro areas, this interactive includes data from across all survey years as well as the most recent 2020 data.



8/31/23, 6:54 PM                Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 110 of 801

There are 295 Black businesses, accounting for 3.7% of employer businesses. If Black businesses accounted for 23.6% of employer firms (equivalent to the Black population), **there would be 2,166 more Black businesses**.

Black businesses create an average of 7 jobs per firm, compared to 21 for all businesses. If the average employees per Black business reached parity, it would **create approximately 4,272 new jobs.**

Black businesses pay their employees an average of $57,721, compared to $61,717 for all businesses. If Black businesses paid this much, then those employees would see an **increase in total pay by approximately $8,115,633.**

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 112 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

If the number of Black businesses matched the population size and the employees per firm matched the average business, it would **create 50,552 jobs.**

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 13 of 804
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Table 2 shows that the top 10 metro areas with the highest proportional representation of Black-owned firms are all in the Southeast, including three in North Carolina alone. Atlanta had the highest representation in 2020 at 7.42%, followed by Washington, D.C., Virginia Beach, Va., Columbus, Ga., Memphis, Tenn., and Richmond, Va. As noted above, the most recent data excludes some key metro areas; looking across all data from 2017 to 2020, Fayetteville, N.C. continues to have the highest representation of Black business ownership of all metro areas, at over 11%.

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT    Document 59-4    Filed 08/31/23    Page 114 of 801

TABLE 2

## Metro areas with the highest percentage of Black-owned employer businesses

2020

| Metro Areas | Number of Black Businesses | % Black businesses | % Black population | Ratio of % Black businesses to % Black population |
|---|---|---|---|---|
| Atlanta-Sandy Springs-Roswell, GA Metro Area | 8,663 | 7.42 | 36.27 | 0.20 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area | 7,933 | 7.01 | 27.57 | 0.25 |
| Virginia Beach-Norfolk-Newport News, VA-NC Metro Area | 1,937 | 6.83 | 33.16 | 0.21 |
| Columbus, GA-AL Metro Area | 273 | 6.72 | 44.82 | 0.15 |
| Memphis, TN-MS-AR Metro Area | 1,158 | 6.42 | 48.55 | 0.13 |
| Richmond, VA Metro Area | 1,397 | 5.88 | 31.44 | 0.19 |
| St. Louis, MO-IL Metro Area | 2,566 | 5.12 | 19.47 | 0.26 |
| Charlotte-Concord-Gastonia, NC-SC Metro Area | 2,414 | 4.94 | 24.63 | 0.20 |
| Baltimore-Columbia-Towson, MD Metro Area | 2,331 | 4.54 | 31.26 | 0.15 |
| Greensboro-High Point, NC Metro Area | 621 | 4.48 | 29.27 | 0.15 |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table2-2.png)

Table 3 shows that larger cities—including New York, Washington, D.C., Chicago, and Los Angeles—had higher absolute numbers of Black-owned businesses. Several of these, including New York, Chicago, and Dallas, are the nation's largest Black and Latino-majority cities (https://www.brookings.edu/research/recognizing-black-and-latino-majority-cities-is-the-first-step-to-finding-a-real-world-wakanda/) , with nearly equal proportions of Black and Latino or Hispanic residents.

TABLE 3

## Metro areas with the highest number of Black-owned employer businesses

2021

| Metro Areas | Number of Black Businesses | % Black businesses | % Black population | Ratio of % Black businesses to % Black population |
|---|---|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA Metro Area | 14,265 | 2.95 | 19.01 | 0.16 |
| Atlanta-Sandy Springs-Roswell, GA Metro Area | 8,663 | 7.42 | 36.27 | 0.20 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area | 7,933 | 7.01 | 27.57 | 0.25 |
| Miami-Fort Lauderdale-West Palm Beach, FL Metro Area | 7,072 | 3.99 | 22.69 | 0.18 |
| Los Angeles-Long Beach-Anaheim, CA Metro Area | 6,864 | 2.13 | 7.70 | 0.28 |
| Chicago-Naperville-Elgin, IL-IN-WI Metro Area | 4,838 | 2.44 | 17.66 | 0.14 |
| Houston-The Woodlands-Sugar Land, TX Metro Area | 3,586 | 3.30 | 18.59 | 0.18 |
| Dallas-Fort Worth-Arlington, TX Metro Area | 3,414 | 2.62 | 17.58 | 0.15 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD Metro Area | 3,151 | 2.80 | 22.76 | 0.12 |
| St. Louis, MO-IL Metro Area | 2,566 | 5.12 | 19.47 | 0.26 |

Source: Brookings analysis of American Business Survey data



**(https://www.brookings.edu/wp-content/uploads/2023/05/Table3-1.png)** Table 4 lists the top 10 metro areas by the ratio of Black businesses to Black residents. It shows that most of the areas that are closest to achieving parity (a Black business ownership rate equal to the share of Black residents in the metro area) tend to have smaller numbers of Black-owned businesses. The top three—Portland, Maine; Fresno, Calif.; and Santa Rosa, Calif.—all have fewer than 300 Black-owned employer firms across their entire metro areas. Metro areas with larger Black populations—such as Washington, D.C. and St. Louis—are outliers, having high numbers of both Black residents and Black-owned employer businesses.

8/31/23, 6:54 PM          Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 116 of 801

TABLE 4

## Top ten Metro Areas for ratio of Black-owned businesses to Black population

2021

| Metro Areas | Number of Black Businesses | % Black businesses | % Black population | Ratio of % Black businesses to % Black population |
|---|---|---|---|---|
| Portland-South Portland, ME Metro Area | 171 | 1.10 | 2.85 | 0.38 |
| Fresno, CA Metro Area | 299 | 2.23 | 6.01 | 0.37 |
| Santa Rosa, CA Metro Area | 113 | 0.95 | 2.69 | 0.35 |
| Reading, PA Metro Area | 151 | 2.39 | 8.13 | 0.29 |
| Los Angeles-Long Beach-Anaheim, CA Metro Area | 6,864 | 2.13 | 7.70 | 0.28 |
| St. Louis, MO-IL Metro Area | 2,566 | 5.12 | 19.47 | 0.26 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area | 7,933 | 7.01 | 27.57 | 0.25 |
| San Antonio-New Braunfels, TX Metro Area | 712 | 2.08 | 8.35 | 0.25 |
| Albuquerque, NM Metro Area | 136 | 0.97 | 3.99 | 0.24 |
| Orlando-Kissimmee-Sanford, FL Metro Area | 2,425 | 4.32 | 18.72 | 0.23 |

**Note:** Excludes metro areas with less than 100 Black owned businesses in 2020.

**Source:** Brookings analysis of American Business Survey data.



(https://www.brookings.edu/wp-content/uploads/2023/05/Table4.png)

Despite substantial growth in the number of Black-owned businesses, their share is still far behind parity with the percentage of Black residents across all metro areas. While philanthropic and policy attention is increasingly focused on racial equity, this has not always translated to more equitable rates of business ownership. For example, innovation economies in Pennsylvania (https://www.brookings.edu/research/commonwealth-of-innovation-a-policy-agenda-for-revitalizing-pennsylvanias-economic-dynamism/) and Pittsburgh (https://www.brookings.edu/research/centering-racial-equity-and-inclusion-in-pittsburghs-innovation-economy/) have struggled to make diversity and inclusion a core component of investments in the business environment.

In 2020, as in previous survey years, no metro area had proportional representation in Black business ownership. Figure 3 shows that areas with smaller Black populations

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses

Case 1:23-cv-03424-TWT   Document 59-4   Filed 08/31/23   Page 117 of 801

Brookings tended to have better proportional representation; for example, Portland, Maine has a 2.85% Black population share and a 1.09% Black business ownership rate.

As the number of Black residents in a metro area increases, the business ownership gap also tends to increase. Figure 3 orders all metro areas surveyed in the ABS from 2017 to 2020 by the percentage share of the Black population, beginning with Albany, Ga. at 54% and ending with Boulder, Colo. at 1.8%. The graph demonstrates that metro areas with the highest shares of Black residents also tend to be the most unequal in terms of business ownership representation. In other words, despite a better opportunity for investment in Black communities, regions with a higher percentage of Black residents do not see those opportunities realized as employer businesses.



FIGURE 3

**Percentage difference from an equitable business ownership rate by metro area**

Metro areas are ordered by the percentage of Black residents

Source: Brookings analysis of American Business Survey

Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure3_v2-01.png)

Figure 4 shows this same data as a scatter plot. The orange, yellow, and red lines indicate how far away a city is from parity. Fayetteville, N.C., and St. Louis, for example, have high Black representation and some of the most equal Black business representation rates of all metro areas. Most metro areas, including Memphis, Tenn.,

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 118 of 801

and Birmingham, Ala., are at least four to eight times away from parity, while cities such as Montgomery, Ala., and Hinesville, Ga. have rates over 12 times off parity.



FIGURE 4

**Percentage of Black residents and Black-owned businesses**

Note: Lines show the difference from parity - a Black business ownership rate equal to the share of the Black residents
Source: Brookings analysis of American Business Survey

B | Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure4_v2-01.png)

Figure 5 shows that the average number of Black-owned businesses sees a drastic decline for metro areas with Black population shares greater than 40%. This includes cities such as Jackson, Miss., Montgomery, Ala., and Albany, Ga. Moreover, as the share of Black residents increases, the average number of employees per business decreases—from an average of 16 employees in metro areas with a Black population share lower than 10%, to seven for metro areas with a Black population share greater than 40%.

These figures provide another indication that Black-owned businesses are not representative of their population size, especially in metro areas with the highest shares of Black residents. Moreover, the economic impact of the average Black-owned business tends to be smaller in metro areas with more Black residents. Taken together,

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-BWT Document 59-4 Filed 08/31/23 Page 119 of 801

these statistics highlight the continued underinvestment in Black-majority communities and regions—paralleling similar disparities we have documented in the [absence of premium grocers (https://www.brookings.edu/research/what-the-lack-of-premium-grocery-stores-says-about-disinvestment-in-black-neighborhoods/)](https://www.brookings.edu/research/what-the-lack-of-premium-grocery-stores-says-about-disinvestment-in-black-neighborhoods/) and the [lower value of commercial real estate (https://www.brookings.edu/research/the-devaluation-of-assets-in-black-neighborhoods-the-case-of-commercial-property/)](https://www.brookings.edu/research/the-devaluation-of-assets-in-black-neighborhoods-the-case-of-commercial-property/) in Black neighborhoods, even controlling for differences in income and wealth. This has implications for the capacity of locally owned Black businesses to generate inclusive growth and employment opportunities in their communities. Black-owned businesses [tend to create more opportunities for people of color (https://www.irp.wisc.edu/publications/dps/pdfs/dp123601.pdf)](https://www.irp.wisc.edu/publications/dps/pdfs/dp123601.pdf) , and contribute to building more equitable regional economies.



FIGURE 5

**Average number of Black-owned businesses and employees by % share of the Black population in Metro Areas**

2020

[(https://www.brookings.edu/wp-content/uploads/2023/05/Figure5.png)](https://www.brookings.edu/wp-content/uploads/2023/05/Figure5.png)

Looking across all survey years, the largest trends toward parity in business ownership occurred in Columbus, Ga., where the percentage of Black business ownership increased 2.35 percentage points. Albany, Ga. has seen the greatest decline, at 2.42 percentage points. Metro areas such as Columbus, Ga. and Virginia Beach, Va. have

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT   Document 59-4   Filed 08/31/23   Page 120 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

wealthy and stable markets and are located close to military bases. And the growth in areas such as Atlanta and Richmond, Va. align with other indicators of development in these areas (https://www.brookings.edu/research/metro-monitor-2023-examining-pandemic-era-patterns-of-inclusive-growth-across-the-u-s/) , which show high rates of population growth and business development.



FIGURE 6
**Metro Areas with the greatest increases and decreases in the proportion of Black-owned businesses**
2017 to 2020

Note: Only includes Metro areas with more than 100 Black-owned businesses
Source: Brookings analysis of American Business Survey data

B Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure6.png)

Progress in Black business ownership is variable between metro areas, with booming growth in upward trending areas and higher-than-average closure rates in declining areas. Figure 7 shows the fastest-growing and declining metro areas for the total

8/31/23, 6:54 PM
Who is driving Black business growth? Insights from the latest data on Black-owned businesses

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 121 of 801

number of Black-owned businesses, and compares growth between Black-owned and non-Black-owned businesses.

Most metro areas with high Black-owned business growth also have high total business growth, except Reading, Penn., New Haven, Conn., and Trenton, N.J., where Black business ownership has increased despite overall business declines. Similarly, areas with the largest declines in Black-owned businesses also have declines across all businesses. However, Black-owned businesses tend to be disproportionately impacted in these places, with much larger decreases in the number of Black businesses compared to the region's average.

Map 1 shows an overall positive picture of growth for Black-owned businesses across the U.S., with high-growth areas in the Southeast and Southwest, but some pronounced declines in other areas, particularly the Midwest.



MAP 1

**Percentage changes in the number Black-owned employer businesses by Metro area**

2017 to 2020

Increase in Black Owned Businesses
- < 10%
- 10 - 20%
- 20 - 40%
- 40 - 60%
- > 60%

Decrease in Black Owned Businesses
- > 60%
- 40 - 60%
- 20 - 40%
- 10 - 20%
- < 10%

**Source:** Brookings analysis of American Business Survey data

**B** | Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Map1.png)



FIGURE 7

## Fastest growing and declining Metro areas for the number of Black-owned businesses

2017 to 2020

Source: Brookings analysis of American Business Survey data

Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure7_v2-01.png)

Figure 8 provides more detail on the variability Black-owned businesses experience in different metro areas. In some areas, Black-owned businesses are responsible for markedly high growth in overall business ownership. For example, in Washington, D.C. and Charlotte, N.C., Black-owned businesses accounted for 41.5% and 31.9% of total business growth, respectively. Conversely, in declining metro areas such as St. Louis and Milwaukee, Black-owned businesses have been highly impacted, representing 43.2% and 55.9% of the loss in regional businesses, respectively.

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 123 of 801



FIGURE 8

## Changes in Black and non-Black owned businesses for select Metro Areas

2017 to 2020

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure8.png)

PANDEMIC REBOUND
## Black-owned businesses rebounded strongly from the pandemic

8/31/23, 6:54 PM                    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 124 of 801

This report includes the first year of ABS data that captures the impacts of the COVID-19 pandemic on employer businesses. Our previous report used data from the Small Business Credit Survey (https://www.newyorkfed.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color) (conducted between September and October 2020), which showed that the pandemic was disproportionately impacting (https://www.nber.org/papers/w27462) Black-owned businesses. However, the 2021 ABS data on employer businesses—which captures the state of businesses over 2020—reveals strong rebounds for businesses overall, and Black-owned businesses in particular.

The pandemic initially hit new businesses hard, drastically reducing the rate of new business applications from January to April 2020. But by July, application rates had more than recovered (https://www.census.gov/econ/bfs/visualizations/geovisualization.html) , reaching numbers above those prior to the pandemic. From March 2020 to March 2021, new business applications rose by 73.9%, driven by increases in the South and Midwest, which saw jumps of 83.5% and 80.7%, respectively. As recently as February 2023, the rates of business applications remain high, indicating a sustained recovery.

However, the pandemic affected existing Black businesses in distinctive ways, dampening growth for some while buoying others. In addition to capturing the pandemic's overall impact on employer businesses, the most recent ABS data reports subjective responses to the impact on business operations. Table 5 shows that a slightly smaller proportion of Black-owned businesses (3.9%, versus 4.1% for all businesses) were unable to maintain operations, while a higher proportion (36.2%, versus 29.7% for all businesses) were able to maintain operations with minimal impacts. However, a lower percentage of Black business owners reported they were able to maintain operations *or above* current levels—reflecting the fact that though many Black employers were able to maintain operations, they may not have been able to take full advantage of the subsequent boom in businesses or recovery funds.

8/31/23, 6:54 PM   Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 125 of 801

TABLE 5

## Impact of Covid-19 on business operations

2020

| Impact of Covid-19 on business operations in 2020 | Total (%) | Black-owned (%) |
|---|---|---|
| Unable to maintain operations | 4.1 | 3.9 |
| Able to maintain operations at or below current levels | 29.7 | 36.2 |
| Able to maintain operations at or above the levels | 53.1 | 42.5 |

**Source:** Brookings analysis of American Business Survey data

 Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Table5_v2.png)

Black-owned firms were slightly more likely than all other businesses to report that sales decreased due to the pandemic (37.7% compared to 35.56%). The number of businesses impacted varied by firm size, with smaller and midsized employers less likely to report a decrease in sales than larger employers. However, Black-owned businesses were also more likely to report that sales increased due to the pandemic: An average of 12% of Black-owned businesses reported an uptick in sales, compared to only 5.5% of all businesses. These seemingly contradictory findings regarding sales demonstrate a great deal of variability among Black-owned firms. Some were more able to adapt and take advantage of the new economic environment while others were hit hard.

Closure rates by industry provide a more nuanced insight into the types of Black-owned businesses that were negatively impacted. Table 6 shows the percentage of Black-owned businesses and overall businesses by industry in 2020. Unsurprisingly, the hardest-hit industry for both groups was accommodations and food services, which saw revenues plummet during lockdowns, especially for Black-owned businesses (https://www.tandfonline.com/doi/epdf/10.1080/24694452.2022.2095971?needAccess=true&role=button) . Black-owned businesses also saw slightly higher-than-average closure rates in the transportation and warehousing sector as well as the arts, entertainment, and recreation sector. These sectors are also large employers of Black people (http://dln.jaipuria.ac.in:8080/jspui/bitstream/123456789/1332/1/COVID-19s-effect-on-minority-owned-small-businesses-in-the-United-States.pdf) .

Black Americans had [higher rates of job loss than other racial or ethnic groups (https://edworkforce.house.gov/uploadedfiles/wilson_testimony.pdf)](https://edworkforce.house.gov/uploadedfiles/wilson_testimony.pdf) during the pandemic. But in this regard, Black business owners' [decreasing "opportunity share" (https://indicators.kauffman.org/wp-content/uploads/sites/2/2021/03/2020_Early-Stage-Entrepreneurship-National-Report.pdf)](https://indicators.kauffman.org/wp-content/uploads/sites/2/2021/03/2020_Early-Stage-Entrepreneurship-National-Report.pdf) in 2020 (an estimate of the relative influence of opportunity over necessity in new business activity) shows that higher unemployment seems to have been a push factor for the decision to start a business.

Sectors that have high proportions of Black-owned businesses—including health care and professional, scientific, and technical services—were less impacted on average. [Non-store retailers grew substantially (https://www.nber.org/system/files/working_papers/w28912/w28912.pdf)](https://www.nber.org/system/files/working_papers/w28912/w28912.pdf) over the first 40 weeks of the pandemic, and there is some evidence that COVID-19 relief funding was associated with [higher rates of startups in higher-income Black-majority neighborhoods (https://www.nber.org/system/files/working_papers/w28787/w28787.pdf)](https://www.nber.org/system/files/working_papers/w28787/w28787.pdf) . Though a shift toward virtual businesses may have lowered the barriers to entry for Black owners, more work is needed to understand its effects on Black neighborhoods, where physical assets [can help drive investment and growth (https://www.brookings.edu/research/the-devaluation-of-assets-in-black-neighborhoods-the-case-of-commercial-property/)](https://www.brookings.edu/research/the-devaluation-of-assets-in-black-neighborhoods-the-case-of-commercial-property/) .

TABLE 6

## Percentage of businesses that are currently operating

| Industry | Total (%) | Black-owned (%) |
|---|---|---|
| Accommodation and food services | 94 | 94.4 |
| Transportation and warehousing | 95.5 | 95 |
| Arts, entertainment, and recreation | 95.3 | 95.8 |
| Administrative and support and waste management and remediation services | 95.5 | 96.7 |
| Educational services | 93.9 | 96.7 |
| Health care and social assistance | 94.6 | 96.7 |
| Other services (except public administration) | 95.7 | 96.9 |
| Wholesale trade | 96.7 | 97.6 |
| Retail trade | 95.9 | 97.7 |
| Professional, scientific, and technical services | 96.2 | 97.9 |
| Construction | 96.7 | 98.4 |
| Real estate and rental and leasing | 97.6 | 98.7 |
| Information | 96.9 | 99.1 |
| Manufacturing | 96.9 | 99.1 |
| Finance and insurance (662) | 97 | 100 |
| Utilities | 94.2 | 100 |
| Agriculture, forestry, fishing and hunting (660) | 97 | – |
| Industries not classified | 89.6 | – |
| Management of companies and enterprises | 96.3 | – |
| Mining, quarrying, and oil and gas extraction | 94.7 | – |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table6.png)

An employer's capacity to weather the pandemic partially depended on the ability of employees to work from home. According to the Bureau of Labor Statistics (https://www.bls.gov/ors/) , in May 2020, 29.3% of Black employees were teleworking, compared to 35.4% overall. Teleworking rates were especially low for sectors in which Black employees were over-represented, such as health care, where only 1.7% of employees had the ability to telework.

Table 7 shows the proportion of Black-owned and non–Black-owned businesses that reported having employees who worked from home and those that reported having

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 128 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

employees who never worked from home. Results varied by the age of the business. Newer Black-owned businesses seemed to have more flexibility for employees to work from home, especially those between four to five years of operation, while businesses over 10 years old were less flexible on average.

Table 8 shows some of the reasons that business owners gave for not having employees work from home. These are similar for Black-owned and non-Black-owned businesses, with slightly higher rates of Black employers citing security and IT concerns as a limiting factor. This may be a remnant of the differences in average revenue between Black-owned and other businesses, which may constrain investments in expensive remote work technology.

TABLE 7

## Ability of employees to work from home

| Years of operation | Had employees who worked from home | | Had employees that never worked from home | |
|---|---|---|---|---|
| | Total (%) | Black-owned (%) | Total (%) | Black-owned (%) |
| <2 | 63.7 | 66.6 | 19.4 | 14 |
| 2 to 3 | 61.1 | 56.4 | 22.6 | 19 |
| 4 to 5 | 62.7 | 69.9 | 25.2 | 25.7 |
| 6 to 10 | 59 | 53.9 | 28.9 | 11 |
| 11 to 15 | 58.8 | 41.9 | 31.7 | 13 |
| >15 | 56.3 | 49.6 | 42.4 | 18.1 |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table7.png)

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT   Document 59-4   Filed 08/31/23   Page 129 of 801

TABLE 8

## Reason that employees were not able to work from home

| Reason for not working from home | Total employers (%) | Black-owned employers (%) |
|---|---|---|
| Job or parts of job cannot be performed at home | 64.95 | 63.90 |
| Management of employees too costly or complicated | 3.73 | 4.97 |
| No limiting factors | 31.45 | 30.77 |
| Other reasons | 3.00 | 4.20 |
| Security (IT or other) concerns | 4.67 | 6.50 |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table8.png)

---

BLACK WOMEN ARE STARTING MORE BUSINESSES

## Black women are starting more businesses, but still lag in revenue and payroll

Between 2017 and 2020, the number of employer businesses owned by Black women rose to 52,374—encompassing 37.2% of all Black-owned businesses and representing an increase of 1.76 percentage points. Yet despite this growth, there is still significant progress to be made. Though Black women account for about 7% of the total U.S. population and 13.9% of American women, their businesses accounted for only 0.9% of total businesses and 4.2% of women-owned businesses in 2020.

Figure 9 shows how under-represented all women are in employer businesses, accounting for only 23.6% of the total share of owners. White women own 82.9% of these businesses (and 17.9% of all businesses). Latino or Hispanic women also have lower rates of business ownership, representing 18.5% of American women but only 6.8% of all female business owners, and about 1.8% of all business owners. Asian American women represent 6.3% of American women and 12.8% of female business owners, and around 3% of all business owners.

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 130 of 801

Figure 10 shows that revenue is distributed even more unevenly. Black-women-owned businesses represent 1% of all employer businesses, but bring in only 0.3% of total revenue—behind businesses owned by white women (11%), Asian American women (1.2%), and Latino or Hispanic women (0.6%). Figure 11 shows that most businesses owned by Black women make mid-level revenue (between $100,000 to $250,000 per year) and are over-represented in the lowest-earning categories (below $50,000 per year).

Though far from equitable, business ownership among Black women is growing rapidly. The number of Black-women-owned employer businesses increased by 18.1% between 2017 and 2020, outpacing women-owned businesses in general (9.1%) and Black-owned businesses (13.6%). These trends parallel the growth in small and sole proprietorships owned by Black and Latino or Hispanic women. These microbusinesses account for nearly 80% of all small businesses in the U.S. (https://sbecouncil.org/about-us/facts-and-data/) , and could be a viable pathway to greater representation in employer businesses (https://www.brookings.edu/blog/the-avenue/2021/07/14/how-to-include-microbusinesses-in-economic-growth-strategies/) if we can create a supportive business environment for owners of color, and women in particular, to grow their businesses.

The extent to which these high growth rates are the result of structural changes in the business and lending sectors that have made room for more inclusive growth is questionable. For example, microbusinesses owned by women of color face unique structural barriers in access to microfinance (https://smallbusinessmajority.org/our-research/access-capital/small-businesses-struggling-access-capital-harming-their-financial-recovery) , as well as opportunities for development and coaching. A closer scrutiny of these trends could help develop more intentional strategies to uplift these businesses and promote lasting growth by transitioning them into employer firms.

Ultimately, these disparities illustrate the still highly racialized and uneven business environment that women of color—and Black women in particular—face. These structural barriers are an impediment to the growing entrepreneurship among Black women. For example, 17% of all Black women in the U.S. are in the process of starting or running a new business (https://hbr.org/2021/05/black-women-are-more-likely-to-start-a-business-than-white-men) , compared to 10% of white men and 15% of white women. In 2017, Black women owned over 19% of all women-owned businesses (https://ventureneer.com/wp-content/uploads/2017/11/2017-AMEX-SWOB-FINAL.pdf) —above their proportional representation within the U.S. population. However, these businesses were much more likely to be sole proprietorships than employer firms, with eight out of 10 businesses owned by Black women being non-employer firms (https://www.kauffman.org/currents/women-of-color-in-entrepreneurship-new-sbo-data-and-what-it-means-for-the-economy/) . Due to decades of racial discrimination

8/31/23, 6:54 PM                    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 131 of 801

and sexist loaning practices, Black women face more structural barriers in accessing capital, with about 61% of Black women self-funding (https://www.gemconsortium.org/report/gem-usa-2015-report) their business and an higher-than-average level of debt (https://journals.sagepub.com/doi/abs/10.1111/etap.12137) . This is particularly the case for growing businesses, which face greater barriers to capital access than other businesses; only 3% of Black-women-owned companies survive longer than five years (https://www.forbes.com/sites/jenniferpalumbo/2023/01/20/why-african-american-women-entrepreneurs-have-found-success-through-buying-existing-companies/?sh=574dd4071218) .



FIGURE 9

**Employer business ownership by gender, race, and ethnicity**
2020

Source: Brookings analysis of American Business Survey

B Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure9.png)

8/31/23, 6:54 PM                    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 132 of 801



(https://www.brookings.edu/wp-content/uploads/2023/05/Figure10.png)

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 133 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings



FIGURE 11

## Percentage of businesses by size of receipts
Black women owned and total

Source: Brookings analysis of American Business Survey

B Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure11.png)

---

FACTORS DRIVING GROWTH
## Structural factors, rather than an equitable business environment, seem to be driving growth in business ownership among Black women

A deeper look at the 2020 data adds nuance to the economic and structural factors that are driving higher rates of business creation for Black women, but also preventing the establishment of larger and more profitable businesses.

Table 9 shows that businesses owned by Black women are more likely to be a first business and less likely to be a primary source of income than the national average. Among Black-women-owned businesses, 50.8% are the owner's first business—about 2.2% higher than the rate for all businesses and about 3% lower than the rate for all

8/31/23, 6:54 PM — Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 134 of 801

women-owned businesses. Additionally, 67.6% of Black-women-owned businesses are the owner's primary source of income—about 3.3% lower than the average and 4.8% lower than male-owned businesses. In other words, employer businesses owned by Black women are more likely to be secondary to another income source, which limits the potential for business growth. This may be an indicator of larger economic trends that are leading people—especially low-income women—to supplement their income with multiple jobs (https://www.census.gov/library/stories/2021/02/new-way-to-measure-how-many-americans-work-more-than-one-job.html) to ensure financial security.

While on the one hand, these statistics illustrate that Black women are starting businesses at a higher rate than the national average, it also captures the ways that a lack of financial support and structural barriers in access to capital (https://www.weforum.org/agenda/2023/03/the-ebb-and-flow-of-vc-funding-how-to-support-black-women-in-business/) have resulted in Black business owners having a higher rate of failure for first businesses (https://link.springer.com/article/10.1007/s41996-021-00081-6) than the national average.

TABLE 9

## Business characteristics by gender and race

| | Primary source of income (%) | First business (%) |
|---|---|---|
| Total | 70.90 | 48.60 |
| Women owned | 67.60 | 53.70 |
| Male owned | 72.40 | 46.20 |
| Black-women owned | 67.60 | 50.80 |

**Source:** Brookings analysis of American Business Survey data

B | Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Table9.png)

Most Black-women-owned employer businesses are in the health care and social services sector, which is also the largest sector for Black-owned businesses overall. Working in certain health care occupations in 2020 put Black women on the frontlines of the COVID-19 pandemic, meaning more than any other population, Black women were being exposed to and witnessing the gaps in our health care, economic, and political systems. Table 10 shows that in 2020, Black women started 5,364 health care

8/31/23, 6:54 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 135 of 801
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

businesses—the largest number by sector, followed by the professional, scientific, and technical services sector.

Qualitative data collected during the pandemic suggested that Black women were entering into health care to fill gaps left by federal and state policies (https://time.com/5866854/black-women-health-care/) , and the ABS data seems to confirm that. Despite often being the last to receive federal Paycheck Protection Program loans (https://www.jstor.org/stable/j.ctv2vr9d90.11?seq=4) , there was a boom in Black women opening health care businesses to support their communities, which had higher COVID-19 death and morbidity rates.

TABLE 10

## Number of new businesses owned by Black women

| Black-women owned first businesses by industrty | No. | % |
|---|---|---|
| Total for all sectors | 14,789 | 50.80 |
| Health care and social assistance | 5,364 | 49.50 |
| Professional, scientific, and technical services | 2,354 | 56.20 |
| Administrative and support and waste management and remediation services | 1,131 | 53.00 |
| Retail trade | 939 | 61.80 |
| Accommodation and food services | 890 | 58.20 |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table10.png)

The reasons that Black women choose to start businesses are varied, but structural pressures, such as poor job markets and a desire to help local communities, look to be crucial factors. Figure 12 shows that in 2020, 24.6% of Black women cited an inability to find work as a motivation to start a business—behind Black men (at over 27%), but 2.9% higher than the average rate and 6.8% higher than the rate for white women, who cited this reason the least. At the onset of the COVID-19 pandemic, an extreme drop in business revenues and stable employment struck Black communities at proportionally higher rates than most other racial groups. The inequity already baked into the economy—including in structural disparities in liquidity and credit (http://dln.jaipuria.ac.in:8080/jspui/bitstream/123456789/1332/1/COVID-19s-effect-on-minority-owned-small-businesses-in-the-United-States.pdf) —meant more Black-

owned business closed quickly and permanently. Black workers suffered disproportionately from job loss (https://edworkforce.house.gov/uploadedfiles/wilson_testimony.pdf) , given their overrepresentation in frontline sectors such as health care and service industries.

Black women were also more motivated by a desire to help their community. Over 75% of Black women listed "wanting to help my community" as a key factor when deciding to start a new business. This is 15.5% higher than the average percentage for all businesses and over 18.3% higher than for white men, who were the least likely to cite this as an influential factor. The ABS data captures some businesses created in 2020, but includes a larger set of already established businesses from across the U.S. Thus, while these figures may be higher due to the disproportionate impacts of COVID-19 on Black communities, it also captures the realities of decades of structural racism limiting the economic opportunities for Black Americans.

FIGURE 12

## Reasons for starting a business by gender and race

■ Very   ■ Somewhat   ■ Not important

**How important was "not being able to find a job" in your decision to start a business?**



How important was "wanting to help my community" in your decision to start a business?

| | Very | Somewhat | Not important |
|---|---|---|---|
| Total | 25.70% | 34.50% | 39.30% |
| Black-women owned | 48.70% | 27.00% | 24.10% |
| Black men | 41.80% | 31.20% | 26.50% |
| Women owned | 26.70% | 33.30% | 39.60% |

8/31/23, 6:54 PM
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 138 of 801



(https://www.brookings.edu/wp-content/uploads/2023/05/Figure12.png)

Black women business owners tend to be younger and more educated than business owners of other groups, possibly illustrating the higher barriers that exist for Black women to access the capital and financial support needed to start a business, as well as the entrepreneurial drive among younger Black women. Figure 13 shows that most Black women business owners are 45 to 54 years old, compared to 55 to 64 for all businesses. Additionally, 6.6% are 34 years old or younger, compared to 5.7% for all businesses.

Table 11 shows that a comparatively substantial portion of Black women business owners (37.9%) have an advanced degree, including 19.1% with a master's degree. This is more than 10 percentage points higher than the national average of 23.5%. This discrepancy indicates that the barriers to business ownership are still higher for Black women, who cannot receive equal economic support without earning more credentials.

On the other hand, these figures also highlight the role that highly educated Black women are playing in the growth of new employer businesses. Like in other arenas, including voter participation and community engagement (https://www.pewresearch.org/fact-tank/2022/10/12/key-facts-about-black-eligible-voters-in-2022/) , Black women are a potent force, helping to shape a more inclusive and innovative economy despite structural barriers. It is likely that decades of civil rights activism have paved the way for generational change—finally creating viable space for young, educated Black women to start businesses at such high rates.



FIGURE 13

## Age profile of Black women owned business: % by age group

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure13.png)

TABLE 11

## Average level of education of Black-women business owners

| Level of education | Total | Black-women |
|---|---|---|
| Less than high school graduate | 2.70 | 1.10 |
| Technical, trade, or vocational school | 5.60 | 3.30 |
| Some college, but no degree | 14.00 | 13.00 |
| Associate degree | 5.60 | 9.90 |
| Bachelor's degree | 30.10 | 24.70 |
| Master's degree | 9.80 | 19.10 |
| Doctorate degree | 2.10 | 5.80 |
| Professional degree beyond a bachelor's degree | 11.60 | 13.00 |

Source: Brookings analysis of American Business Survey data



(https://www.brookings.edu/wp-content/uploads/2023/05/Table11.png)

Figure 14 shows how the economic and business environment has changed for Black women since the 1980s. The relatively small proportion of Black women who owned businesses pre-2008 is testament to the lasting impacts of racist policies on business longevity, which have lowered the security of Black businesses by blocking opportunities for household and community wealth retention (https://www.brookings.edu/essay/homeownership-racial-segregation-and-policies-for-racial-wealth-equity/) , thus limiting the potential for sustained growth.

Most businesses owned by Black women today were started between 2013 and 2017, with the number growing since at least 2008, and at proportionally higher rates than other gender and racial or ethnicity groups. Conversely, businesses owned by white men and women are older, with proportionally more businesses started between 1980 and 2007.

In some respects, this illustrates the low survival rate for Black-women-owned businesses. However, the notable increases since 2008 could illustrate that greater numbers of Black women are seeing business ownership as a pathway to a more secure and stable livelihood, responding to increasingly precarious employment, financial, and housing conditions. Like during the pandemic, the post-2008 global financial economy involved heavy structural change, which undermined the stability of many low-income and Black and brown households (https://www.epi.org/blog/the-great-recession-education-race-and-homeownership/) . It may be that these structural factors—rather than improvements in racial equity—have driven the growth in Black-women-owned employer businesses.



FIGURE 14
## Year of business opening by gender and race

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure14.png)

---

CALIFORNIA BOOMING
## California is booming for Black women business owners

Figure 15 shows that many of the fastest-growing areas for Black-women-owned businesses are in California. Between 2017 and 2020, the number of employer businesses owned by Black women grew by 93.14% in San Francisco (to 817 businesses); by 52% in Riverside (to 376 businesses); and by 44% in Los Angeles (to 2,310 businesses). Compared to Black men, the top metro areas for business growth for Black women are spread more evenly across the geographic regions of the U.S. Except for Los Angeles and Philadelphia, most of these large increases have occurred in cities with smaller total numbers of Black-women-owned businesses (fewer than 500).

In contrast, some of the largest declines in the number of Black-women-owned businesses have been in large eastern cities, including Hartford, Conn. and Baltimore, as well as some southern cities, such as Houston.

Table 12 displays Black women business owners as a proportion of all women business owners. It shows that seven of the top 10 metro areas are in the Southeast, including Memphis, Tenn. (15%); Jackson, Miss. (15%); and Atlanta (11%). St. Louis has the highest percentage of Black-women-owned businesses, at 21% of all women-owned businesses and 2,566 businesses in total. Most of these metro areas (except Durham, N.C.) also have higher percentages of Black-owned employer businesses.

TABLE 12

## Top Metro areas with the highest percentage of businesses owned by Black women

| Metro Area | Number of businesses | % of all women-owned businesses |
|---|---|---|
| St. Louis, MO-IL Metro Area | 2,566 | 20.61 |
| Memphis, TN-MS-AR Metro Area | 490 | 15.45 |
| Jackson, MS Metro Area | 230 | 15.21 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area | 3,211 | 11.53 |
| Atlanta-Sandy Springs-Roswell, GA Metro Area | 2,837 | 10.99 |
| Greensboro-High Point, NC Metro Area | 273 | 10.76 |
| Columbia, SC Metro Area | 220 | 9.57 |
| Baltimore-Columbia-Towson, MD Metro Area | 935 | 8.41 |
| Durham-Chapel Hill, NC Metro Area | 175 | 8.33 |
| Augusta-Richmond County, GA-SC Metro Area | 121 | 7.53 |

Source: Brookings analysis of American Business Survey data



B | Brookings Metro

(https://www.brookings.edu/wp-content/uploads/2023/05/Table12.png)

8/31/23, 6:54 PM                    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 143 of 801



FIGURE 15

## Highest percentage increases and decreases in the total number of businesses owned by Black women by Metro area

2017 to 2020

| Metro area | Percentage |
| --- | --- |
| San Francisco-Oakland-Hayward, CA | 93.14% |
| Providence-Warwick, RI-MA | 80.53% |
| Nashville-Davidson–Murfreesboro–Franklin, TN | 67.48% |
| Huntsville, AL | 65.28% |
| Seattle-Tacoma-Bellevue, WA | 60.97% |
| Orlando-Kissimmee-Sanford, FL | 57.01% |
| Riverside-San Bernardino-Ontario, CA | 51.61% |
| Los Angeles-Long Beach-Anaheim, CA | 43.93% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 42.14% |
| Phoenix-Mesa-Scottsdale, AZ | 37.54% |
| Baltimore-Columbia-Towson, MD | -9.40% |
| Houston-The Woodlands-Sugar Land, TX | -11.91% |
| Greenville-Anderson-Mauldin, SC | -13.27% |
| Virginia Beach-Norfolk-Newport News, VA-NC | -21.14% |
| St. Louis, MO-IL | -21.31% |
| San Antonio-New Braunfels, TX | -30.77% |
| Portland-Vancouver-Hillsboro, OR-WA | -33.33% |
| Oklahoma City, OK | -35.48% |
| Fayetteville, NC | -39.45% |
| Bridgeport-Stamford-Norwalk, CT | -43.75% |

**Note:** Only includes Metro Areas with a total number of Black women owned businesses greater than 100.

**Source:** Brookings analysis of American Business Survey data

B **Brookings Metro**

**[(https://www.brookings.edu/wp-content/uploads/2023/05/Figure15-01.png)](https://www.brookings.edu/wp-content/uploads/2023/05/Figure15-01.png)**

Figure 16 displays the percentage point changes in proportional representation for Black women employers. It shows that large southern cities—including Nashville, Tenn.; Memphis, Tenn.; and Birmingham, Ala.—are becoming more equitable, while Lansing, Mich.; Mobile, Ala.; and St. Louis have become more inequitable. Between 2017 and 2020, Killeen, Texas and Jackson, Miss. have had the largest shifts toward a more equitable rate of business ownership.

8/31/23, 6:54 PM          Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 144 of 801



FIGURE 16

## Highest percentage increases and decreases in the proportion of total businesses owned by Black women by Metro area

2017 to 2020

(https://www.brookings.edu/wp-content/uploads/2023/05/Figure16-01.png)

**MORE ACTION IS NEEDED**
## More action is needed to transform strong growth into lasting change

Looking across the data from 2017 to 2020, it's clear that there has been substantial progress toward equal racial representation in owners of employer businesses. Black

8/31/23, 6:54 PM    Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT    Document 59-4    Filed 08/31/23    Page 145 of 801

women in particular have made strides, with growth rates well beyond other racial, ethnicity, and gender groups. And this progress ought to be celebrated.

However, more action is needed to deliver lasting and transformative change toward a more inclusive economy. Realistically, these growth rates are well behind a pace that could ameliorate racial disparities in employer-firm ownership anytime soon, and large structural barriers across the economy—not least of which is the [racialized nature of investments in place (https://www.brookings.edu/research/what-the-lack-of-premium-grocery-stores-says-about-disinvestment-in-black-neighborhoods/)](https://www.brookings.edu/research/what-the-lack-of-premium-grocery-stores-says-about-disinvestment-in-black-neighborhoods/) —continue to undermine transformative change.

Given that many of these disparities are structural in nature, the solutions must be as well. Past reports in this series have highlighted policy targets to expediate the growth in Black business ownership, including [general targets (https://www.brookings.edu/essay/to-expand-the-economy-invest-in-black-businesses/)](https://www.brookings.edu/essay/to-expand-the-economy-invest-in-black-businesses/) and more [pointed structural changes in federal funding and philanthropy (https://www.brookings.edu/research/black-owned-businesses-in-u-s-cities-the-challenges-solutions-and-opportunities-for-prosperity/)](https://www.brookings.edu/research/black-owned-businesses-in-u-s-cities-the-challenges-solutions-and-opportunities-for-prosperity/) , and we reiterate those here. While there are strong signs of real progress, if we are to translate gains and policy commitments into lasting change, we need to take seriously the notion that a more inclusive economy is a powerful vehicle for delivering a more robust and prosperous economy.

In this moment of historic federal funding across the innovation sector as well as in climate change adaptation and mitigation, the opportunities are ripe to invest in and grow Black business ownership, especially in historically underinvested areas. The Biden administration has shown a real appetite to act on racial justice, including guidelines (such as the Justice40 initiative and the executive order to strengthen racial equity) to ensure investments flow to historically disadvantaged communities. These systems must also be supported by local-level policy that can bend investments toward more equitable ends, including proactively forecasting how different racial groups will be impacted by how those investments are spent. This kind of active approach to structural change is necessary if we are serious about fostering and accelerating the development of Black-owned employer businesses.

8/31/23, 6:54 PM
Who is driving Black business growth? Insights from the latest data on Black-owned businesses | Brookings

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 146 of 801

## AUTHORS



**Andre M. Perry** Senior Fellow - Brookings Metro  @andreperryedu



**Manann Donoghoe** Senior Research Associate - Brookings Metro
 @ManannanAD



**Hannah Stephens** Research Assistant - Brookings Metro

---

### Footnotes

1.  Throughout this report, figures for "Black residents" refers to those who identify as Black alone or in combination with one or more other races, while "Black-owned businesses" refers to business with owners who identify as Black alone. Latino or Hispanic population and business owner figures refer to those who are Latino or Hispanic alone, as do figures for Asian Americans and white Americans. Population data is drawn from the 2020 census.

Copyright 2023 The Brookings Institution

# Exhibit E

McKinsey
& Company

# Building supportive ecosystems for Black-owned US businesses

The right business ecosystems can mitigate or negate the effects of structural obstacles to business building for Black business owners— and add $290 billion in business equity.

October 2020

Cover image:
© FG Trade/Getty Images

Copyright © 2020 McKinsey &
Company. All rights reserved.

This publication is not intended to
be used as the basis for trading in
the shares of any company or for
undertaking any other complex or
significant financial transaction
without consulting appropriate
professional advisers.

No part of this publication may be
copied or redistributed in any form
without the prior written consent of
McKinsey & Company.

**Public Sector Practice**

# Building supportive ecosystems for Black-owned US businesses

The right business ecosystems can mitigate or negate the effects of structural obstacles to business building for Black business owners— and add $290 billion in business equity.

October 2020

# Contents

**2**  **Introduction**

**6**  **Barriers to business building for Black entrepreneurs**

**12**  **Interventions**

**15**  **Conclusion**

**16**  **Endnotes**

# Introduction

By David Baboolall,
Kelemwork Cook,
Nick Noel,
Shelley Stewart, and
Nina Yancy

**Entrepreneurship and business ownership—**particularly of community-based businesses—are crucial ways to develop community wealth, for both business owners and the people they employ. Healthy Black-owned businesses could be a critical component for closing the United States' Black–white wealth gap, which we project will cost the economy $1 trillion to $1.5 trillion (in 2018 dollars) per year by 2028.[1] The COVID-19 crisis, however, has further stressed Black-owned businesses and may cause the racial wealth gap to widen. This gap includes a $290 billion—and growing—opportunity to grow overall wealth by achieving revenue parity between Black- and white-owned businesses in addition to providing aid to small and medium-size businesses (SMBs)—those with up to 500 employees—with nonwhite owners.[2]

Black business owners have been disproportionately affected by the pandemic-linked economic downturn,[3] partly because they were more likely to already be in a precarious position, including more likely to be located in communities with business environments that are more likely to produce poor business outcomes. Indeed, about 58 percent of Black-owned businesses were at risk of financial distress before the pandemic, compared with about 27 percent of white-owned businesses.[4] The pandemic contributed to tipping 41 percent of Black-owned US businesses into closure from February to April 2020.[5] More than 50 percent of the owners of surviving Black businesses surveyed in May reported being very or extremely concerned about the viability of their businesses. This concern may be linked to having a more difficult time accessing credit since the COVID-19 crisis began; 36 percent of Black business owners responding to the survey said they had experienced this, compared with 29 percent of all respondents.[6]

Black Americans have never had an equal ability to reap the benefits of business ownership. While about 15 percent of white Americans hold some business equity, only 5 percent of Black Americans do. Among those with business equity, the average Black American's business equity is worth about 50 percent of the average American's and a third of the average white American's (Exhibit 1).[7]

Black-owned businesses also tend to earn lower revenues in most industries and are overrepresented in low-growth, low-revenue industries such as food service and accommodations.[8]

This gap in business activity contributes to an overall lower level of prosperity for Black families: the median white family's wealth is more than ten times the wealth of the median Black family's.[9] This disparity is also a lost opportunity for the US economy as a whole. If existing Black-owned businesses reached the same average revenue as their white-owned industry counterparts (excluding publicly held companies), the result would be an additional $200 billion in recurring direct revenues, which could equal about $190 billion in additional GDP, or a roughly 1 percent increase in 2017 GDP. (For our analytical approach, see sidebar "Quantifying the impact of revenue parity.")

Exhibit 1

## Black Americans hold significantly less business equity than their white counterparts.

**Status of business equity ownership in the United States,** by race

**Mean business equity,** thousands of 2019 dollars



**1 in 20**
Proportion of Black Americans holding business equity

**4×**
Value of mean business equity held by white Americans relative to Black Americans in 2019

## Quantifying the impact of revenue parity

**To quantify the economic impact** of achieving revenue parity between Black-owned and white-owned US small and medium-size businesses (SMBs), we used the most recent results of the US Census Bureau's Survey of Business Owners, from 2007 and 2012. We first estimated the rate of new-business formation and revenue growth for businesses owned by Black and white US residents. Then we used those growth rates to estimate the number of companies owned by Black and white Americans in each industry as well as to estimate the revenues of those businesses.

Our analysis shows that if Black-owned companies were to attain the same average revenue in their industries as white-owned companies, their revenue gains would be about $200 billion. These revenue gains would be concentrated in the healthcare, retail, and wholesale sectors, which would account for 51 percent of Black-owned SMBs' total new revenue. This estimate does not account for the higher revenue's multiplier effects, which would represent the impact of the change on the overall economy.

To estimate the macroeconomic effects of revenue parity between Black- and white-owned businesses, we used a model that draws on data from about 141 countries and 60 sectors to translate disruptions, shocks, and policy changes into cross-industry and macroeconomic effects. A $200 billion increase in revenues is worth about $190 billion in additional annual GDP, or a roughly 1 percent increase in 2017 GDP.[1]

---

[1] For our analysis, we assumed that the economy can absorb most of the revenue increases, so any cannibalization of revenues from Black-owned firms' revenue growth (to attain parity with white-owned firms) is not offset by losses in white-owned firms.

# A silver lining of COVID-19 and the racially charged violence in 2020 may end up being that some large companies have now launched programs to support Black-owned businesses.

Before the pandemic, the average American held 15.3 percent of his or her wealth in business equity, with a mean value of $147,000. SMBs constituted 99 percent of US businesses and were responsible for 62 percent of the net increase in private-sector jobs from 1993 to 2017.[10] Entrepreneurship and an ability to start new businesses matter significantly here, as more than 50 percent of this net increase was the result of the formation of new businesses, defined as those less than 3.5 years old.[11]

Our analysis mapped barriers throughout the entrepreneurial pathway: ideation and starting up, sustaining, scaling, and exiting (see sidebar "Entrepreneurial pathway: Building a business, from ideation to exit").

We focus here on the systemic barriers that hinder Black entrepreneurs' efforts to ideate and start and sustain local businesses—that is, community-based SMBs that are part of existing supply chains.[12] We then outline interventions that can counteract the effects of these obstacles, particularly opportunities for coordinated efforts. Indeed, US institutions need to repair Black business owners' trust in the business ecosystem—particularly in companies in financial and business services.[13] This historic lack of trust may be slowing business creation; research shows that Black business owners may believe that they need to be better qualified than their white counterparts: 30 percent of Black owners of employer firms (businesses with at least one paid employee) hold an advanced degree, which is true of 22 percent of their white peers.[14]

A silver lining of COVID-19 and the racially charged violence in 2020 may end up being that some large companies have now launched programs to support Black-owned businesses: a major social media company dedicated $40 million in grants to support Black-owned US businesses with 50 or fewer employees[15]; a financial services firm pledged $1.15 billion, including $350 million in procurement spending on Black-owned businesses, to close the racial wealth gap.[16] However, these individual actions will not in themselves be enough to effect the needed change. For this work to have a systemic impact, entire business ecosystems will need to be involved. Once successful, however, this effort would benefit not only the US economy but US society as a whole.

## Entrepreneurial pathway: Building a business, from ideation to exit

**Entrepreneurship generally follows a** five-step process that culminates in an exit for the founder (exhibit).

During *ideation*, prospective entrepreneurs research and assess business ideas before developing business plans in preparation for launch. Foundational activities at this stage include obtaining the relevant patents, participating in business incubators, and securing funding and support, often from the entrepreneur's networks.

In the *start-up* stage, which lasts about three and a half years, entrepreneurs focus

on establishing the business and ensuring its survival. They may hire employees, raise additional capital, and develop a financial cushion for the business.

While *sustaining* the business, entrepreneurs focus on increasing revenue and reaching profitability. In this stage, entrepreneurs develop growth strategies, further develop their companies' sales and marketing efforts, expand their teams, and scale business functions. Businesses may continue to raise venture capital.

Once businesses attain annual revenues of at least $1 million, they can *scale*. The focus of this stage is on increasing working capital to support growth and expanding into new geographic or product markets. Businesses in this phase may also acquire or merge with another company.

Finally, entrepreneurs can *exit* their businesses through an acquisition or an initial public offering (IPO) that enables them to receive a one-time realization of the business's value.

Exhibit

## Entrepreneurship follows five stages.



Source: Dow Jones VentureSource, 2016; Global Entrepreneurship Monitor, 2017; *2016 annual survey of entrepreneurs*, US Census Bureau

# Barriers to business building for Black entrepreneurs

Throughout the business-building process, Black business owners face economic, market, sociocultural, and institutional barriers, which are all linked to racial discrimination in the United States. Economic barriers relate to disempowerment and the costs of low starting levels of capital—for individuals, families, and communities. Market barriers result from unaddressed needs, often related to challenges of access—to capital, expertise, and services. Sociocultural barriers encompass the biased and exclusionary ways in which Black entrepreneurs are more likely to be blocked from gaining social capital, such as helpful relationships that make up business networks. Finally, institutional barriers are supported by the systems in which Black-owned businesses operate and include factors as basic as their locations.

**Ideating**

Black entrepreneurs tend to make decisions in the business-ideation stage that are likely to keep their businesses small. Black entrepreneurs generally pursue businesses in less lucrative sectors. Only five industries represent employer businesses (that is, businesses that employ paid employees) owned by 74 percent of Black women business owners and 62 percent of Black male business owners: healthcare and social assistance; professional, scientific, and technical services; administrative support and waste management services; construction; and transportation and warehousing (Exhibit 2).[17]

These sectors represent only 20 percent of business revenues overall. Meanwhile, although wholesale businesses represent 24 percent of business revenues, only 1 percent of Black women and 2 percent of Black men who are entrepreneurs are in the sector (see sidebar "Uphill climb for Black women in entrepreneurship").[18]

Location can also limit Black entrepreneurs' business potential. Sixty-five percent of Black Americans live in 16 states that are below the US average on indicators of economic opportunity.[19] Within their communities, Black Americans are also disproportionately concentrated in economically disadvantaged neighborhoods.[20] Black entrepreneurs from these communities are less likely than their white peers to have exposure and access to lucrative business opportunities.

Black entrepreneurs might also lack access to the networks and relationships that could help them make optimal business decisions. Research on New York–based start-ups shows that founders who are mentored by top-performing entrepreneurs are three times more likely than their co-located peers without mentors to become top performers themselves.[21] Outside the start-up world, a knowledgeable contact may help a prospective entrepreneur make decisions such as whether to buy a franchise for up-front capital or to build an independent business.

Exhibit 2

## Black-owned employer businesses are concentrated in only five industries.

■ Black women  ■ Black men  ■ White women  ■ White men

| Distribution of employer firms[1] by sector, % of businesses | Revenues by sector, % of sales | Distribution of employer firms[1] by sector, % of businesses | Revenues by sector, % of sales |
|---|---|---|---|
| Healthcare and social assistance — 48 / 19 / 15 / 9 | 6 | Finance and insurance — 2 / 5 / 4 / 5 | 11 |
| Professional, scientific, and technical services — 13 / 14 / 17 / 16 | 5 | Real estate — 2 / 3 / 7 / 5 | 2 |
| Administrative, support, and waste-management services — 7 / 10 / 7 / 6 | 2 | Construction — 2 / 10 / 6 / 16 | 4 |
| Retail trade — 6 / 8 / 12 / 10 | 13 | Transportation and warehousing — 2 / 9 / 2 / 4 | 3 |
| Accommodation and food services — 5 / 6 / 8 / 7 | 2 | Wholesale trade — 1 / 2 / 4 / 6 | 24 |
| Other services[2] — 5 / 6 / 8 / 6 | 1 | | |

Note: Chart excludes the following sectors: agriculture, forestry, fishing, and hunting; arts, entertainment, and recreation; educational services; information; management of companies and enterprises; manufacturing; mining, quarrying, and oil and gas extraction; utilities; and other or unclassified services and industries (except public administration).

[1] A business with at least one paid employee.

[2] Includes businesses such as advocacy, death-care services, dry cleaning and laundry, equipment and machinery repair, hair and nail salons, personal-care services, pet-care services, photofinishing services, and religious activities.

Source: *2012 survey of business owners and 2016 annual survey of entrepreneurs*, US Census Bureau

## Uphill climb for Black women in entrepreneurship

**About 20 percent** of the 12.3 million women-owned businesses in the United States are owned by Black women.[1] Indeed, Black women were the first to exceed 50 percent of business ownership within their racial or ethnic group.[2] However, Black women encounter cross-cutting economic and institutional barriers because of their race and gender.

Black women's high rates of entrepreneurship may reflect economic necessity rather than opportunity; 64 percent of Black women spend less than 40 hours a week on their businesses, which suggests that the business may be one of several sources of income or that they are unable to focus on entrepreneurship. What's more, 68 percent of Black women entrepreneurs with paid employees are in three industries that make up only 13 percent of overall business revenues[3]: healthcare and social assistance, professional services, and administrative, support, and waste-management services.[4]

Black women also tend to have fewer employees than Black men do, even though Black women own 50 percent more businesses.[5] As a result of these disparities, employer businesses owned by Black men earn an average of $660,000 more per year than Black women–owned employer businesses.[6] Worse, Black women's business revenues actually declined by 11 percent, or an average of $3,000 per year, from 2012 to 2018.[7]

Black women are also disproportionately shut out of venture-capital funding, which can rapidly fuel business growth. Women of color receive less than 0.2 percent of venture-capital funding, and at 4 percent of funded US start-ups,[8] Black women founders are underrepresented and underfunded. Indeed, the average Black woman–led start-up that received funding raised $42,000.

1  *The 2018 state of women-owned business report*, American Express, americanexpress.com.
2  Dell Gines, "Black women business startups," Federal Reserve Bank of Kansas City, 2018, kansascityfed.org.
3  *2016 annual survey of entrepreneurs*, US Census Bureau, 2016, census.gov.
4  *2016 annual survey of entrepreneurs*, US Census Bureau, 2016, census.gov.
5  "Statistics for all U.S. firms by industry, gender, ethnicity, and race for the U.S., states, metro areas, counties, and places: 2012," US Census Bureau, 2012, data.census.gov.
6  "Annual business survey: Statistics for employer firms by industry, sex, ethnicity, race, and veteran status for the U.S., states, metro areas, counties, and places: 2017," US Census Bureau, 2017, data.census.gov.
7  "The state of women-owned businesses," American Express, 2018, womenentrepreneurscharleston.com.
8  https://www.projectdiane.com/.

Crucially, Black entrepreneurs struggle more to secure capital and access to credit. Even with strong personal credit, Black business owners and other entrepreneurs from marginalized groups are about half as likely as their white counterparts to receive full financing.[22] Friends and family may not be able to contribute capital either. Most Black families surveyed said that they didn't know anyone who could lend them $3,000.[23]

### Starting up and sustaining

The focus of the start-up and sustain phases of entrepreneurship should be on ensuring the business's survival and increasing its profitability. However, Black entrepreneurs' mistrust of institutions—based on their experiences and knowledge of the United States' history of discrimination—can make them wary of using potential resources outside their communities. Combined with a lack of informal and geographic connections to such resources—including venture-capital networks—this tendency can isolate Black entrepreneurs from potential sources of support.[24] (For an overview of the public sector's attempts at closing the gap between Black- and white-owned businesses—and their pitfalls—see sidebar "Legislating for more equitable business outcomes.")

## Legislating for more equitable business outcomes

**Since 1974,** legislation has partially closed the gap between Black- and white-owned businesses. As a result of many of these advancements, the Small Business Administration backed about $210 million in loans and helped award $2.3 billion in federal contracts to disadvantaged businesses in 2019.[1] However, the laws and programs are often imperfectly implemented, with gaps such as a lack of information on how to apply to programs that may benefit Black entrepreneurs.

In 1974, the Equal Credit Opportunity Act was passed. It prohibits credit issuers from discriminating on the basis of traits such as race, gender, and marital status. The Community Reinvestment Act followed, in 1977. A tool to discourage redlining, the act encourages financial institutions to meet the credit needs of customers in low- and moderate-income neighborhoods. However, "credit redlining" persists: consumers who live in mostly white neighborhoods are more likely to be approved for credit cards than those in mostly Black neighborhoods.[2]

In response to the savings and loan crisis, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which increased the ability of third-party watchdogs to analyze bank records and identify discriminatory lending practices. However, loan originators also shifted from denying loans to Black residents to targeting Black communities for higher-cost, higher-risk loans.[3] Later, in 1998, the Small Business Administration directly targeted small and medium-size businesses (SMBs) from marginalized communities by creating the Mentor-Protégé Program. Designed to pair SMBs from communities with relatively few resources with experienced government contractors, the program was later found to lack effective controls to ensure that the application review process was consistent with its intention. This oversight may have impeded Black-owned businesses' participation, especially if they were already skeptical of the program.[4]

In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act required some federal agencies, including the Securities and Exchange Commission, to establish Offices of Minority and Women Inclusion. However, the difficulty of enforcing the spirit of the act often put Black-owned businesses behind. During the most recent—and ongoing—crisis, the Coronavirus Aid, Relief, and Economic Security Act aimed to provide emergency relief to SMBs but failed to reach many Black-owned businesses. Part of the gap came from a failure to include many community-development funding institutions in its program. The act also fails to provide information and training on how to apply for the programs and access funds.[5]

---

[1] Ashley D. Bell, "Opportunities for black-owned businesses are thriving," press release, February 21, 2020, US Small Business Administration, sba.gov.
[2] Connie Prater, "Who gets credit cards may be a matter of black and white," CreditCards.com, June 4, 2008, creditcards.com. The rules that govern the Community Reinvestment Act's implementation are under revision by the US Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Board.
[3] Justin P. Steil et al., "The social structure of mortgage discrimination," *Housing Studies*, Volume 33, Issue 5, 2018, pp. 759–76, ncbi.nlm.nih.gov.
[4] *Evaluation of SBA's All Small Mentor-Protégé Program*, US Small Business Administration, September 17, 2019, buildsmartbradley.com.
[5] Ben Popken, "Why are so many black-owned small businesses shut out of PPP loans?" NBC News, April 29, 2020, nbcnews.com.

Only 4 percent of Black American businesses survive the start-up stage, even though 20 percent of Black Americans start businesses.[25] Even if they survive the start-up stage, Black-owned businesses still disproportionately struggle with debt and raising capital in addition to challenges such as a lack of helpful relationships in the business community. Indeed, participants in focus groups said that they feel that their race—and sometimes age and gender—makes loan officers hesitant to lend to them.[26] Such obstacles make Black-owned businesses less likely to survive and grow.

Start-up capital is associated with better business performance,[27] but Black entrepreneurs have less of it. Black entrepreneurs start their businesses with about $35,000 of capital, white entrepreneurs $107,000.[28] As a partial consequence, Black-owned businesses report higher levels of debt relative to revenues. Almost 30 percent of Black-owned businesses spent more than 50 percent of their revenues to service their debt in 2019.[29] Indeed, Black entrepreneurs are three times as likely as white entrepreneurs to say that a lack of access to capital negatively affects their businesses' profitability and almost twice as likely to cite the cost of capital.[30] This lack of capital occurs even though the requirements for Black applicants are more stringent. In one study, 73 percent of Black loan applicants were asked to provide financial statements for their businesses, compared with 50 percent of white applicants with comparable profiles. In addition, 31 percent of Black applicants were asked to provide their personal W-2 forms. No white applicants received such a request.[31]

These interactions with financial institutions are consistent with findings that nonwhite ownership of a business is a strong predictor of loan denial outside of majority-nonwhite communities.[32] However, simply being located in a co-ethnic market—where community members, customers, and business owners are of the same ethnicity—results in lower revenue, even for businesses of comparable quality.[33] Indeed, research shows that even when they have better Yelp reviews, businesses in majority-Black communities have lower revenues than those outside majority-Black communities. Black-owned businesses are in a double bind that results in missing revenues.

Black entrepreneurs can also have difficulty accessing expertise and business services. Black owners of employer firms, which are more likely to benefit from services such as legal and financial advisory, are less likely to seek them out. Only 58 percent of Black owners sought professional services, for reasons including expense, inaccessibility, and mistrust, compared with 70 percent of white owners.[34]

# Black entrepreneurs are three times as likely as white entrepreneurs to say that a lack of access to capital negatively affects their businesses' profitability and almost twice as likely to cite the cost of capital.

Business networks can support Black entrepreneurs, but Black entrepreneurs are less likely to know and hear about relevant networks that can help support and promote their businesses. Indeed, Black entrepreneurs are likely to be excluded from receiving information about high-potential opportunities, even though focus-group participants said that they would like to connect with a variety of business professionals and mentors. This exclusion translates into fewer connections to formal hubs, such as banks and venture-capital funds,[35] and from informal networks.[36] One sign of this disconnection is that corporate and government procurement programs that target Black-owned businesses tend to be underused. The Minority Business Development Agency (MBDA) found in 2016 that Black-owned businesses saw less utilization relative to their availability than white-owned businesses did in the same industries. The median share of contract dollars awarded to Black-owned businesses across five key industries—architecture and engineering, construction, goods and supplies, professional services, and other services—was 4 to 44 percent of contractors' availability, compared with 49 to 61 percent for white-owned businesses.[37]

The aggregate barriers to starting and sustaining a Black-owned business translate structural bias into less access to capital, lower revenue, and dimmer prospects for business growth. The mainstream financial system's role in those barriers has helped to maintain Black Americans' distrust of the financial sector as well as fear of debt.[38]

# Interventions

**Insufficient access to capital, knowledge, and support** ultimately leaves many Black entrepreneurs less economically mobile and limits the potential of entrepreneurship to grow wealth for Black families and communities. Interventions to tackle these barriers will require public-, private-, and social-sector stakeholders to evaluate current business ecosystems and rebuild them to be equitable and more supportive for Black business owners. In particular, local anchor institutions such as hospitals and universities can take the lead on collaborating with the public and social sectors to coordinate the work of disparate organizations. Local economic-development institutions, community development financial institutions, chambers of commerce, and other government agencies such as the Small Business Administration or MBDA are already engaged in these activities. But because anchor institutions are tethered to their communities, they stand to reap long-term benefits from investing in more equitable—and healthier—business communities.

Indeed, this work requires instituting policies that create more equitable outcomes in addition to assuring equitable access to capital. Black leaders' input can help create positive experiences and build Black entrepreneurs' trust in institutions and ecosystems that have felt exclusionary. In addition, the private and social sectors should help Black-owned businesses build capabilities and facilitate knowledge sharing. Expanded opportunities for mentorship (advisory) and sponsorship (advocacy) can further solidify bonds between Black entrepreneurs and other stakeholders in business ecosystems.

## Implement policies that produce equitable outcomes

The public, private, and social sectors can all participate in removing institutional barriers for Black-owned businesses. Stakeholders could ensure that laws, policies, and practices are designed to produce equitable opportunities and outcomes.

Policy makers, industry groups, affinity groups, and coalitions of stakeholders could enforce laws and policies aimed at preventing inequitable processes and outcomes. After a review of the current laws and policies and their effects, stakeholders could consider updating antidiscrimination policies. Crucially, stakeholders could set up—or support—internal and external watchdog groups dedicated to creating research on equity in processes and policy outcomes.

In addition, procurement practices, especially at anchor institutions and large organizations, can evolve to be more inclusive of Black-owned businesses. Besides dedicating funds to procurement from Black-owned businesses, large organizations could simplify their minority-supplier certification processes so that they can take on new suppliers more quickly. Organizations should also dedicate funding to supplier-development programs that can help Black-owned suppliers better participate in supply chains.

Once their supplier programs are established, organizations should track their procurement spending with important categories of suppliers and make the data more widely available to track progress and promote accountability. For instance, one North American bank committed to tracking its spending with diverse suppliers, the number of minority-certified suppliers it engages, and the number of requests for information and proposals to these suppliers.[39] This work is especially urgent during the pandemic-linked economic crisis, and entities that have an interest in keeping business ecosystems vibrant may be able to lead the effort.

**Enable equitable access to capital**

To overcome economic barriers, Black-owned SMBs need direct investment or in-kind equity contributions, including grants, subsidies, loans, and revenue-participation agreements. Direct investment is especially important during the COVID-19 crisis. Our analysis suggests that an additional $7.6 billion to $15.4 billion in liquidity for Black-owned SMBs in the 2020–21 time frame—less than 3 percent of the $659 billion authorized under the Paycheck Protection Program—could preserve 460,000 to 815,000 jobs,[40] for an average of $9,325 to $33,478 per job.

The public and private sectors' immediate priority during the COVID-19 economic crisis has been to provide SMBs with grants and loan deferrals. However, increasing the availability of financial resources, particularly start-up and expansion capital, for Black entrepreneurs, will be crucial to improving business owners' experience and replenishing the pipeline of growing businesses. For example, banks, conventional and social-impact investors, foundations, and public programs could make more capital available to Black-owned businesses. Possible programs include ones that make extending capital to Black-owned businesses less risky through measures such as guaranteeing funds and programs that help entrepreneurs from marginalized backgrounds acquire more capabilities. A short-term counterweight to the effects of bias in the loan process could be conducting fewer in-person transactions. Indeed, Black entrepreneurs are already more likely to borrow online, where their race may be less salient.[41] A program for small-business investment companies that provides high-growth small businesses with capital and R&D funding could also accelerate the growth of Black-owned businesses that hold intellectual property and may foster Black entrepreneurship in high-growth industries.

A network of volunteer professional services providers and coaches could help Black-owned businesses navigate the process of attaining loans, grants, and other affordable capital, including from large corporations and nonprofit organizations.[42]

# An additional $7.6 billion to $15.4 billion in liquidity for Black-owned SMBs in the 2020–21 time frame—less than 3 percent of the $659 billion authorized under the Paycheck Protection Program—could preserve 460,000 to 815,000 jobs, for an average of $9,325 to $33,478 per job.

In addition to continuing the long-term project of cultivating Black leaders in positions of influence on capital funding, cross-sector entities could convene and support a consortium of Black fund managers to participate in issuing and managing debt and equity investments in small businesses. The SBA already licenses small-business investment companies that guarantee funds that invest in SMBs. Increasing the share of Black fund managers in this program and simultaneously investing in Black managers—and the pipeline of Black leaders—in the private sector could have compounding effects.

### Build business capabilities and facilitate knowledge sharing

To overcome market barriers, Black-owned SMBs need support for building capabilities and sharing a greater amount of knowledge. Black service providers, compensated by organizations working to support equity in entrepreneurship, can lead these capability-building efforts. This work would protect and strengthen Black-owned businesses and build business networks with Black-owned SMBs as hubs.

The private and social sectors—particularly anchor institutions—could provide resources, including help with reskilling and upskilling Black-owned businesses' workers, to make Black-owned SMBs nimbler. For instance, a major social-media platform built a resource hub to provide businesses with industry-specific information they could use during the pandemic. Similarly, on-the-job training and free web-based courses are both resources that can be easily shared among multiple—indeed, many—businesses. Business-services providers could also facilitate digital transformations to help businesses identify new market opportunities.

Finally, digital capabilities will increase Black entrepreneurs' share of opportunities, but the corresponding business services are long-unmet needs. Many Black-owned businesses lack the resources to hire service providers that can help them digitize their businesses, but private-sector and social-sector organizations can provide free technology services and managerial assistance. Free or subsidized installation, tech support, and staff training can help Black-owned businesses acquire more digital capabilities and become more able to share this knowledge with other Black-owned businesses in their communities.

### Expand opportunities for mentorship and sponsorship

Representation and participation in networking, mentorship, and sponsorship programs can help Black entrepreneurs overcome some sociocultural barriers. The private sector should take the lead by building more inclusive teams. Managers at every level should consciously develop—and sponsor the careers of—more Black leaders to counteract the effects of structural bias. Indeed, only about 3 percent of current Fortune 100 company CEOs are Black, and fewer than 4 percent of leaders with responsibility for departments' profit and loss—roles that tend to accelerate career progression—are Black.[43] Moreover, unconscious bias can affect mentorship and sponsorship, because humans tend to gravitate toward mentoring people they view as similar to themselves.[44]

Community programs can help Black entrepreneurs connect with role models and commercial networks that can help Black prospective entrepreneurs pursue business ownership with more confidence and support. For instance, the private and social sectors could facilitate networking and partnerships between established businesses and compatible start-ups.

# Conclusion

An investment in more business ecosystems that provide Black business owners equitable access to resources and opportunities can unlock part of the $1 trillion to $1.5 trillion in annual GDP that would come from closing the racial wealth gap. More important, by making social and economic institutions supportive of a wider swath of people, stakeholders can rectify the mistrust that has developed between Black entrepreneurs and institutions. That restorative effect, along with economic gains, could be a step forward for US society.

**David Baboolall** and **Nina Yancy** are consultants in McKinsey's New York office; **Kelemwork Cook** is a consultant in the Cleveland office; **Nick Noel** is a consultant in the Washington, DC, office; and **Shelley Stewart** is a partner in the New Jersey office.

The authors wish to thank Katie Chen, Michael Chui, JP Julien, Mike Kerlin, Michael Lazar, Ricardo Pena, and Duwain Pinder for their contributions to this article.

Copyright © 2020 McKinsey & Company. All rights reserved.

# Endnotes

1    Nick Noel, Duwain Pinder, Shelley Stewart, and Jason Wright, "The economic impact of closing the racial wealth gap," August 13, 2019, McKinsey.com.

2    Our estimate of the wealth-building opportunity is based on an additional $200 billion per year in revenue for Black-owned businesses that attain revenue parity. We assumed that US private companies' enterprise value is 2.54 times annual revenue and applied a debt-to-equity ratio of 0.43. These assumptions translate the $200 billion revenue increase to $290 billion in additional business equity. André Dua, Deepa Mahajan, Ingrid Millán, and Shelley Stewart, "COVID-19's effect on minority-owned small businesses in the United States," May 27, 2020, McKinsey.com; Electronic Code of Federal Regulations, Part 121—Small Business Size Regulations, October 5, 2020, sba.gov.

3    For more on the effects of the COVID-19 pandemic on Black Americans, see Aria Florant, Nick Noel, Shelley Stewart, and Jason Wright, "COVID-19: Investing in Black lives and livelihoods," April 14, 2020, McKinsey.com.

4    Claire Kramer Mills and Jessica Battisto, "Double jeopardy: COVID-19's concentrated health and wealth effects in Black communities," Federal Reserve Bank of New York, August 2020, newyorkfed.org.

5    Robert Fairlie, "The impact of COVID-19 on small business owners: Evidence of early-stage losses from the April 2020 current population survey," Stanford Institute for Economic Policy Research, working paper 20-022, May 2020, siepr.stanford.edu.

6    McKinsey & Company COVID-19 US SMB Financial Pulse Survey, n = 1,004; responses collected May 8–13, 2020, from small and medium-size businesses with less than $500 million in annual revenue.

7    McKinsey Survey of Consumer Finances, 2019.

8    For more on COVID-19's effect on minority-owned small businesses, see Andre Dua, Deepa Mahajan, Ingrid Millán, and Shelley Stewart, "COVID-19's effect on minority-owned small businesses in the United States," May 27, 2020, McKinsey.com.

9    For more on the racial wealth gap, see Nick Noel, Duwain Pinder, Shelley Stewart, and Jason Wright, "The economic impact of closing the racial wealth gap," August 13, 2019, McKinsey.com.

10   "Frequently asked questions," US Small Business Administration Office of Advocacy, October 2017, sba.gov.

11   For more on what constitutes an SMB and for a data set on US SMBs, see "Size standards tools," US Small Business Administration, sba.gov; and "Frequently asked questions," US Small Business Administration Office of Advocacy, August 2017, sba.gov.

12   The same systemic obstacles affect Black entrepreneurs who lead potentially high-growth start-ups, which merit their own future discussion.

13   A business ecosystem is a network of entities that collaborate and compete to produce a product or service.

14   *2016 annual survey of entrepreneurs*, US Census Bureau, census.gov.

15   Sheryl Sandberg, "How we're supporting Black-owned businesses," Facebook, August 19, 2020, fb.com.

16   Chauncey Alcorn, "Citi is spending $1.15 billion to help close America's racial wealth gap," CNN Business, September 23, 2020, cnn.com.

17   *2012 survey of business owners*, US Census Bureau, census.gov; *2016 annual survey of entrepreneurs*, US Census Bureau, census.gov.

18    *2012 survey of business owners*, US Census Bureau, census.gov; *2016 annual survey of entrepreneurs*, US Census Bureau, census.gov.

19    *2017 American community survey*, US Census Bureau, census.gov; Leading States Index, 2018, McKinsey.com.

20    For more, see Nick Noel, Duwain Pinder, Shelley Stewart, and Jason Wright, "The economic impact of closing the racial wealth gap," August 13, 2019, McKinsey.com.

21    Rhett Morris, "Mentors are the secret weapons of successful startups," TechCrunch, March 22, 2015, techcrunch.com.

22    *2016 small business credit survey: Report on minority-owned firms*, Federal Reserve, November 30, 2017, fedsmallbusiness.org. Minority population includes Black, Hispanic, and Asian-American business owners. "Based on self-reported business credit score or personal credit score, depending on which is used to obtain financing for their business. If the firm uses both, the highest risk rating is used. 'Low credit risk' is an 80–100 business credit score or 720+ personal credit score."

23    *What resources do families have for financial emergencies? The role of emergency savings in family financial security*, Pew Charitable Trusts, November 2015, pewtrusts.org; and Lisa J. Dettling et al., "Recent trends in wealth-holding by race and ethnicity: Evidence from the survey of consumer finances," Federal Reserve Board, September 27, 2017, federalreserve.gov.

24    Venture networks can be especially geographically concentrated. See also Michael S. Barr, *Minority and women entrepreneurs: Building capital, networks, and skills*, Policy Proposal 2015-031, The Hamilton Project, March 9, 2015, ww.hamiltonproject.org.

25    Global Entrepreneurship Monitor, 2017, gemconsortium.org; Dow Jones VentureSource, 2018.

26    Sponsored by a major US financial institution, the focus groups were conducted in May 2019. Researchers recruited both Black and non-Black entrepreneurs in Atlanta, Detroit, New York, and Oakland. The entrepreneurs' reported business revenues were $100,000 to $1 million.

27    Brian Headd, "Redefining business success: distinguishing between closure and failure," Small Business Economics, Volume 21, Number 1, August 2003, pp. 51–61, springer.com.

28    Robert Fairlie, Alicia Robb, and David T. Robinson, "Black and white: Access to capital among minority-owned startups," Stanford Institute for Economic Policy Research, working paper 17-003, February 2017, siepr.stanford.edu.

29    McKinsey & Company COVID-19 US SMB Financial Pulse Survey, n = 1,004; responses collected: May 8–13, 2020, from small and medium-size businesses with less than $500 million in annual revenue.

30    Alicia Robb and Arnobio Morelix, *Startup financing trends by race: How access to capital impacts profitability*, Ewing Marion Kauffman Foundation, October 2016, kauffman.org.

31    Sterling A. Bone et al., "Shaping small business lending policy through matched-pair mystery shopping," *Journal of Public Policy & Marketing*, February 26, 2019, journals.sagepub.com.

32    Timothy Bates and Alicia Robb, *Loan availability among small businesses operating in urban minority communities*, Reserve System Community Development Research Conference, April 11, 2013. frbatlanta.org.

33    Rachel S. Shinnar, Michael B. Aguilera, and Thomas S. Lyons, "Co-ethnic markets: Financial penalty or opportunity?" *International Business Review*, Volume 11, Issue 6, December 2002, pp. 646–58.

34    2016 Annual Survey of Entrepreneurs, "Providers of Business Advice or Mentoring," US Census Bureau, census.gov. For more on Black entrepreneurs' higher levels of mistrust, see "The tapestry of Black business ownership in America: Untapped for success," Association for Enterprise Opportunity, 2016, aeoworks.org.

35    Robb and Morelix, *Startup financing trends by race: How access to capital impacts profitability*; Transparent Collective, transparentcollective.com.

36    For more on Black professionals' exclusion from information networks, see Nick Noel, Duwain Pinder, Shelley Stewart, and Jason Wright, "The economic impact of closing the racial wealth gap," August 13, 2019, McKinsey.com.

37    "Contracting barriers and factors affecting minority business enterprises: A review of existing disparity studies," Minority Business Development Agency, mbda.gov.

38    2018 Annual Business Survey, US Census Bureau, census.gov. For more on inclusion in the financial services sector, see Aria Florant, JP Julien, Shelley Stewart, Nina Yancy, and Jason Wright, "The case for accelerating financial inclusion in black communities," February 25, 2020, McKinsey.com.

39    "Supplier diversity at RBC," Royal Bank of Canada, rbc.com.

40    "The CARES Act provides assistance to small businesses," US Department of the Treasury, treasury.gov.

41    Cameron Costa, "Minority entrepreneurs at a tipping point as Black-owned banks dwindle in the U.S." CNBC, August 25, 2020, cnbc.com.

42    "Verizon small business recovery fund," Local Initiatives Support Corporation, 2020, lisc.org.

43    David F. Larcker and Brian Tayan, *Fortune 100 C-suite organizational charts*, Corporate Governance Research Initiative, Stanford Graduate School of Business, February 2020, gsb.stanford.edu.

44    Alexandra E. Petri, "When potential mentors are mostly white and male," *Atlantic*, July 7, 2017, theatlantic.com.



Copyright © McKinsey & Company. All rights reserved.

McKinsey.com

# Exhibit F

NBER WORKING PAPER SERIES

BLACK AND WHITE:
ACCESS TO CAPITAL AMONG MINORITY-OWNED STARTUPS

Robert W. Fairlie
Alicia Robb
David T. Robinson

Working Paper 28154
http://www.nber.org/papers/w28154

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
November 2020

We are grateful for comments and suggestions from Pat Bayer, Elijah Brewer, Scott Frame, John Graham, Melinda Petre, Amit Seru, Per Stromberg, participants at the AEA meetings, the Society for Government Economists meetings, the CESifo Conference on Entrepreneurship and Economics, the Federal Deposit Insurance Corporation, Federal Reserve Bank of Cleveland and Kauffman Foundation Conference on Entrepreneurial Finance, the International Conference on Panel Data, the APPAM meetings, as well as seminar participants at Illinois, IFN Stockholm, McGill University, Stockholm University, Stockholm School of Economics, University of British Columbia, University of Melbourne, University of Southern California, and Vanderbilt University. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2020 by Robert W. Fairlie, Alicia Robb, and David T. Robinson. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Black and White: Access to Capital among Minority-Owned Startups
Robert W. Fairlie, Alicia Robb, and David T. Robinson
NBER Working Paper No. 28154
November 2020
JEL No. J15,J71,L26

## **ABSTRACT**

We use confidential and restricted-access data from the Kauffman Firm Survey and matched administrative data on credit scores to explore racial disparities in access to capital for new business ventures. The novel results on racial inequality in startup financing indicate that black-owned startups start smaller and stay smaller over the entire first eight years of their existence. Black startups face more difficulty in raising external capital, especially external debt. We find that disparities in credit-worthiness constrain black entreprenuers, but perceptions of treatment by banks also hold them back. Black entrepreneurs apply for loans less often than white entrepreneurs largely because they expect to be denied credit, even when they have a good credit history and in settings where strong local banks favor new business development.

Robert W. Fairlie
Department of Economics
Engineering 2 Building
University of California at Santa Cruz
Santa Cruz, CA 95064
and NBER
rfairlie@ucsc.edu

David T. Robinson
Fuqua School of Business
Duke University
100 Fuqua Drive
Durham, NC 27708
and NBER
davidr@duke.edu

Alicia Robb
333 18th Street
Boulder, CO 80302
alicia@nextwaveimpact.com

# 1   Introduction

More than half a century after the passage of the Civil Rights Act, economic differences between whites and African-Americans continue to be a source of social and political tension in the United States. Median black and white households live under substantially different economic circumstances. For example, the median household income for black families is $37,000; for white families the number is $63,000. One out of four black families live in poverty; the poverty rate for white families is 9 percent (U.S. Census Bureau 2016). Inequality is even higher for wealth and financial assets. For example, the ratio of median household net worth for black families to that of white famlies is 11 to 1, and only 7 percent of black families own stocks or mutual funds compared with 23 percent of white families (U.S. Census Bureau 2019).

Entrepreneurship is often viewed as a mechanism for promoting economic mobility, wealth accumulation and job creation in minority communities, representing a potential tool for alleviating these racial disparities (Bradford and Osborne 1976; Borjas 1999; Boston, 1999, 2006; Bradford 2003). Yet, access to financial capital is a critical element of new business formation (Kerr and Nanda 2011; Simoes et al. 2016). This paper explores racial differences in capital market outcomes associated with launching a new businesses. Although previous research provides evidence that *established* minority-owned firms experience higher loan denial probabilities, we know little about the racial differences in financing that occur when firms are initially started.[1] To our knowledge, our analysis is the first to provide a detailed analysis of race, financing, and creditworthiness at the time a business is first launched.

To explore these racial differences, we use the confidential, restricted-access version of the Kauffman Firm Survey (KFS) with matched administrative data on credit scores. The KFS is the only dataset that provides panel data on startups with detailed information on financing outcomes, credit worthiness and credit expectations. The panel structure of

---

[1]See Bostic and Lampani 1999, Cole 1999, Cavalluzzo, Cavaluzzo and Wolken 2002, Blanchflower, Levine and Zimmerman 2003, and Blanchard et al. 2008 for evidence of racial disparities in loan outcomes among established businesses in the SSBF. See Bates (1989, 1991) for evidence of racial disparities in total capital and loan outcomes from a sample of businesses started in the past 6 years in the 1987 CBO.

the KFS allows us to focus on both the initial capital that firms receive in their founding year, as well as later capital injections secured over the firm's next seven years of operations. Ultimately this allows us not only to measure initial differences, but also study whether any differences diminish or persist over time as a startup builds an observable track record of performance.

The panel structure of our data offers two key advantages relative to previous work on racial differences in funding, which has focused on cross-sectional differences in firms that are already operating. First, it allows us to avoid problems with restropective question recall bias and survival bias found with cross-sectional data. Second, if we restrict our analysis to the sample of firms that survive eight years, the initial racial differences in startup capital are considerably smaller than if we look at the full sample, which includes firms that do not survive. This suggests that conditioning on survival understates the degree of racial differences in access to capital. Previous research has highlighted the differences in rates of job creation, responsiveness, and growth between young firms and small firms (Hurst and Pugsley, 2011; Haltiwanger, Jarmin and Miranda, 2013; Adelino, Ma and Robinson, 2016). Previous research showing racial differences in capital access in a cross-section of established businesses could be attributed to racial differences in human capital that have played out over time, inducing sorting of minority-owned businesses into low-growth industries where small firms are the dominant mode of organization. Our work instead demonstrates that there are within-industry, within-geography differences in access to capital at firm inception, which may have important implications for understanding racial differences in regional economic growth and employment.

Our analysis proceeds in three steps. In the first step we demonstrate large racial differences in the sources and amounts of financial capital that are used to launch businesses. Black-owned startups start smaller in terms of overall financial capital and invest less on average as they mature. Racial differences in outside debt account for more than half of the difference in total financial capital. Indeed, the ratio of debt to total capital (i.e., the leverage ratio) for black-owned startups is persistently below that observed for white-

owned startups. But, the disparities do not end here: alternative sources of capital such as loans from friends and family, personal equity and credit cards do little to attenuate these differences. Black-owned startups also have lower levels of all other major sources of funding than do white-owned startups.

The second step is to explore the underlying causes of these financing patterns. Throughout the paper, we use the term *access to capital* to capture the amount of capital obtained by a particular business, understanding that this quantity is an equilibrium capital market outcome affected by both supply-side and demand-side factors. Large racial disparities in access to capital could reflect racial differences in either demand for capital, in the underlying quality of the business opportunity, or in attitudes towards credit markets. Under these demand-side explanations, black borrowers obtain less capital because they need or want less, because they are more risk averse (perhaps the stigma of bankruptcy affects them more greatly) or because they anticipate rejection when they apply for credit. There are also supply-side channels, through which race matters to lenders. A long literature in economics going back to Becker (1971) and Phelps (1972) debates whether this ultimately traces back to taste-based discrimination rooted in racial animus or instead statistical discrimination based on differences in endowments and incomplete information. Under both sets of explanations the race of the borrower affects the level of capital they receive.

Although we cannot definitively rule out any particular explanation, our data allow us to paint a rich descriptive picture of racial differences in access to capital by exploring these potential explanations in considerable detail. First, because we have new confidential administrative data on credit ratings from Dun & Bradstreet that have been matched to all businesses in the restricted-access version of the KFS, as well as information on founder net worth, we can condition on an extensive set of founder and business characteristics that are correlated with race, and likely affect lending decisions. Thus, we can identify key traits contributing to inequality and can examine whether correlated traits are the primary source of racial disparities. After we control for industry, business credit

3

scores, founder net worth, education and experience, as well as many business characteristics that may ultimately be endogenous to the amount of funding received, we can explain about one-third of the initial funding gap between black-owned and white-owned startups. Lower credit scores among black startups contribute the most among correlated traits.

Nevertheless, as is common with much work that attempts to explain firm-level differences in capital structure, our analysis cannot fully account for the unobserved differences in opportunity sets that might drive firm-level differences in borrowing. Including fixed effects for business location dramatically increases the explanatory power of our regressions, but does little to alter the estimated differences between black- and white-owned businesses in initial size. That is, including a fixed effect for the core-based statistical area (CBSA) of the business raises the regression $R^2$ from around 15% to around 30%, and specifications including zipcode fixed effects produce $R^2$ values over 60%.[2] In short, racial differences across neighborhoods within the same city are as large as racial differences across cities.

Moreover, the initial differences in funding are not erased by later injections of capital. In order for black- and white-owned businesses to converge in size, black-owned businesses would need substantially larger capital injections in the years after inception to make up for differences at founding. Racial differences in the size of later injections of new funding are smaller than the initial differences, but they remain significantly smaller in later years. Thus, on average, businesses started by black founders do not converge to the size of white-owned businesses as they age.

This persistent difference in funding is driven primarily by differences in the amount of bank loans and other bank credit products, which in turn are not substituted by other sources of capital. Lower amounts of banking services could reflect worse treatment by banks, less demand for banking services, or could reflect differences in borrower attitudes

---

[2]Core-based statistical areas include metropolitan statistical areas (MSAs) but also include "micropolitan" statistical areas, defined by the US Census as "areas that have at least one urban cluster of at least 10,000 but less than 50,000 population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties."

and expectations, and ultimately less willingness to approach banks. One important advantage of our data is that they include measures of loan application expectations, even among those who did not seek funding. Typically, differential average participation rates confound the measurement of discrimination; here, detailed questions in the KFS measuring the demand for loans, the rate of loan rejections, and the expected fear of denial among borrowers who chose not to attempt to borrow allow us to explore how *expectations* of discrimination may impact participation in financial markets.

Black entrepreneurs apply for bank loans less frequently than white entrepreneurs. This stems largely from differences in the fear of rejection. Overall, black entrepreneurs are about three times more likely to state that they did not apply for credit when needed for fear of having their loan application denied. Similarly, black-owned startups are about three times less likely than white-owned startups to report that their loan requests are always approved. These differences persist even after controlling for credit scores and net worth: indeed, even black founders in the top quartile of the credit score distribution are more than twice as likely to report a fear of denial than white founders with below median credit scores. These effects are stronger in areas where historical and current racial tension is higher, and weaker in areas where racial tensions are less severe, which suggests that actual or perceived statistical or taste-based discrimination could be a factor in these results.

Banks use both hard information (objective, easily codified and transmitted information like credit scores) and soft information (potentially more precise, but subjective and difficult to verify information) in their lending decisions, and to varying degrees based on bank characteristics. Because black-owned startups tend to be at a hard-information disadvantage relative to white-owned startups, we next explore whether they face fewer constraints in settings where soft information is potentially more actionable. Given that large national banks tend to rely more on hard information when making lending decisions, while local banks tend to rely more on soft information (Berger, Miller, Petersen, Rajan, and Stein, 2005; Petersen and Rajan, 2002), we exploit regional variation in the

5

strength of local banks to ask whether these attitudes and outcomes are different in regions where soft information could play a bigger role in the lending decision. Areas with stronger local banks are indeed areas where the average founder is less afraid of loan denial, and where average business loan amounts to startups in our sample is higher. But these effects are exclusive to white-owned startups. Black founders are not less afraid of loan denial in these markets; if anything, they are somewhat more likely to report that they did not apply for fear of denial in regions with stronger local banks. In these areas, white-owned startups receive larger amounts of bank debt on average but black-owned startups do not.

The third step and final piece of our analysis attempts to assess the importance of these differences to cumulative capital disparities. For this, we use decomposition techniques developed by Blinder (1973) and Oaxaca (1973) to assess how much of the size difference between black-owned and white-owned businesses is attributable to the characteristics we observe. We can explain around one-half of the total difference in firm size with observables. Of these, business credit scores and founder net worth (which presumably measures collateral) account for about two-thirds of the difference. Differences in education and experience account for only a modest portion of the difference. If the average black-owned business had the observable characteristics of the average white-owned business, it would be about 75% larger.

This paper adds to the literature on racial differences in financial market outcomes. Chatterji and Seamans (2012) find that the expansion of credit card availability stimulated entry into entrepreneurship especially for black entrepreneurs, and find that the strongest results in areas with high rates of historical racial discrimination. Dougal, Gao, Mayew and Parsons (2017) find that historically black colleges pay higher issuing costs for bonds than other higher-education bond issuers, and attribute these higher spreads to racial animus among wealthy white bond purchasers. Earlier studies provide cross-sectional evidence from the SSSBF of racial differences in lending markets for established businesses (Bostic and Lampani 1999; Cole 1999; Cavalluzzo, Cavaluzzo and Wolken 2002;

Blanchflower, Levine and Zimmerman 2003; Blanchard et al. 2008; Mitchell and Pearce 2011). Apart from our study being the first to focus on new business ventures, rather than more-established, existing businesses, our work departs from earlier work in the breadth and depth of our empirical measures of overall capital sources, creditworthiness and loan expectations, and use of longitudinal data on a cohort of firms.

The balance of the paper is organized as follows. In Section 2, we describe the restricted-access KFS panel that follows startups from their founding through seven years of operations after their startup year and the matched Dun and Bradstreet (D&B) administrative data on credit scores. In Section 3, we examine whether there are differences in the use of financial capital (levels and detailed sources) between black and white firms at startup and in the years following startup. Section 4 explores potential causes of racial differences in financial capital. In Section 5, we explore racial differences in credit market explanations. Section 6 explores the potential role of racial bias in capital markets, and Section 7 explores the question of how much of the racial gap in funding disappears after controlling for startup characteristics. Section 8 concludes. An online appendix provides additional details regarding racial differences in survival, profitability, and funding sources.

## 2   The Kauffman Firm Survey

We use the confidential, restricted access version of the Kauffman Firm Survey (KFS) to study how startups access capital markets. The KFS is a longitudinal survey of new businesses in the United States, collecting annual information for a sample of 4,928 firms that began operations in 2004. The underlying sample frame for the KFS is Dun and Bradstreet (D&B) data.

The KFS data contain unprecedented detail on the financing patterns of startups, as well as detailed information on both the firm itself and up to ten business owners of the firm. In addition to the 2004 baseline year data, we also use the seven years of follow up data covering calendar years 2005 through 2011. Detailed information on the owners

7

includes race, gender, age, education, previous startup experience, and previous work experience. Detailed information on the firm includes industry, physical location, employment, sales, intellectual property, and financial capital used at start-up and over time. The detailed financing information in the KFS allows us to examine the relative importance of each source of financing at start up and over time. The confidential, restricted-access version of the KFS includes credit scores, continuous measures of key variables, such as financing, and more detail on industries and geographic locations than the publicly-available KFS. The KFS was also designed using sample weights to be representative of all new businesses in the U.S. economy and not restricted to a narrow set of industries or business types.

Our administrative data on credit scores from D&B for all firms in the KFS allows for a novel analysis of racial differences among startups. Credit scores are not available on most surveys, perhaps because most entrepreneurs do not know readily know what their scores are. To be sure, the Survey of Small Business Finances (SSBF) includes information on credit scores, but only for larger, more established, and older businesses (Cavalluzo and Wolken 2005). While the KFS contains unprecedented detail on the business formation process, the availability of business credit scores allows us to control for many differences in firm characteristics that would be observable by bank lending personnel but typically unobservable to the econometrician.

The KFS is the only large, nationally representative, longitudinal dataset providing detailed information on new firms and their financing activities. Most previous research on the use of financial capital among small businesses has relied on cross-sectional data on existing businesses. For example, the Survey of Business Owner (SBO) data provide information on the amount of startup capital, but provide only retrospective information for surviving businesses and do not provide information on the relative importance of the different sources of financing. Another commonly-used dataset, the Federal Reserve Board's Survey of Small Business Finances (SSBF), provides information on recent financing, but does not provide information on financing at startup or the early stages of firm

growth (and was discontinued after 2003). Furthermore, both the SBO and the SSBF are cross sectional surveys that do not provide information on firm financing over time for the same sets of firms. Finally, fundraising levels in the KFS are measured annually, and are thus less prone to recall bias as is the case with both the SBO and the SSBF.

We restrict our attention to the set of firms that either survived over the sample period or that have been verified as going out of business over the sample period. In most analyses, we condition on survival in that year, but we also conduct robustness checks taking alternative approaches to addressing survival. Our main results are not sensitive to the approach, and we discuss the robustness check results below. We also specifically focus on firms that have a white or black primary owner. These restrictions result in a sample of 3,551 startups out of the total sample of 4,124 startups with owners of any race that began operations in 2004 and either continued through the final year in the sample period (2011) or can be verified to have exited sometime over the period.

We assign owner demographics at the firm level based on the primary owner. For firms with multiple owners (35 percent of the sample), the primary owner is designated by having the largest equity share in the business. In cases where two or more owners owned equal shares, hours worked and a series of other variables are used to create a rank ordering of owners in order to define a primary owner following the algorithm proposed in Ballou et al (2008). We include businesses with owners of all races in the regression analysis, but focus our comparisons on black- and white-owned businesses. Following standard conventions in the literature, the white category includes only non-Hispanic whites. Using these definitions, we find that 9.1 percent of the KFS sample of startups is black-owned. The percentage of black-owned startups does not notably change over time indicating similar survival rates. In the seventh year after startup we find that 8.4 percent of the KFS sample is black-owned.

Because so much of our analysis centers around founder net worth and creditworthiness, we also compare the distribution of net worth among startup owners in our data with that of the broader U.S. population as a whole. The most recent government source

9

for data on U.S. net worth is from the 2013 Survey of Income and Program Participation (SIPP). Figure 1 compares the KFS and SIPP net worth distributions. Solid bars represent the U.S. population and dotted bars represent startup owners. The bottom two quartile categories are collapsed because of reporting restrictions. Additionally, the quartiles are inexact due to data availability in the published net worth statistics from SIPP.

Insert Figure 1 here

There are two key findings here. First, both black and white owners have net worth distributions to the right of their respective population net worth distributions. Thus, both black and white startup owners are less likely to be from the lower tail of the wealth distribution than the population as a whole. Second, the wealth disparity between whites and blacks found in the overall U.S. population also holds among startup owners. Black startup owners have a wealth distribution to the left of the white startup owners distribution, and the same holds for the U.S. population.

## 3   Are There Racial Differences in Access To Startup Capital?

Table I reports average amounts of capital by type of capital for startups (and Figures 1 and 2). The KFS contains finely detailed sources of funding for startups, which are reported along with summary statistics in Appendix Table I. To facilitate an analysis of broad patterns in the data, in most of our analysis we follow Robb and Robinson (2014) and group the detailed categories into six broad buckets based on the source of capital and the structure of the capital (reported in Table I). The three alternative sources of capital are owners, insiders, and outsiders; the two alternative types of capital are debt and equity. The distinction between sources captures whether the funding source is the founder, informal channels such as friends or close associates of the founder who are not direct owners of the business, or formal channels such as banks, venture capital firms, and angel investors. Robb and Robinson (2014) make distinctions along these lines because the personal balance sheets of business owners and the balance sheets of the firms

10

themselves are often deeply intertwined at the time the business is founded, and therefore there is little practical distinction between, for instance, a business credit card and a personal credit card, or a personal bank loan and a business bank loan.

Insert Table I Here

In the initial year of the KFS, black-owned startups are started with substantially less capital than white entrepreneurs. The average level of startup capital among black entrepreneurs is $35,205 compared with $106,720 for white entrepreneurs. Racial differences in the sources of capital are also pronounced. In the year the business is founded, black owners contribute around $19,500 of personal equity, compared with around $34,500 for white business owners. Inside equity–equity stakes taken by family members or other business insiders–are relatively modest for both groups, but are about five times larger for white-owned than black-owned startups.

Differences in outside equity—venture capital, angel financing, and the like are even more stark. The average black-owned startup has around $500 of outside equity, whereas the average white-owned business has more than $18,500 from outside equity at founding. These numbers are a reflection of the fact that while outside equity is relatively uncommon for white-owned businesses, it is exceedingly rare for black-owned startups.

Owner debt includes personal loans extended to the business by the founder. These are small on average for both black-owned and white-owned firms, but white-owned businesses have higher average amounts here as well, by a factor of five in the initial year. Inside debt–money lent to the firm by family members or business insiders–is about the same order of magnitude as owner debt, although there is no statistically significant difference across racial groups.

The largest quantitative difference between white- and black-owned startups is in the amount of outside debt associated with their businesses. Outside debt includes personal loans, business loans, personal and business credit cards, as well as other types of loans made by banks either directly to business owners for the purpose starting their business or else to the business itself. Robb and Robinson (2014) show that on average, this is

11

the largest source of financing for firms in the KFS. Here, we see that this is only true of white-owned firms. At startup, black-owned firms borrow about one-half as much as they put in of their own capital, whereas white-owned firms borrow about 1.7 times what they put in of their own capital. In the year of founding, white-owned firms on average borrow nearly six times as much black-owned firms. Although the amount of outside debt accessed by black-owned startups grows steadily over time, average outside debt for black-owned startups is substantially lower than that seen among white-owned firms.

Insert Figure 2 here

In the later years of the survey, there is significant convergence in the average amounts of personal equity injected into the business, but this largely reflects the fact that personal equity injections from white startup owners dramatically decline in the years after found-ing: the average amount drops to around $11,000 in years 1-3 after startup and to around $4,000 by years 4-7 after startup on average for white-owned businesses. On average, insider equity (that is, equity injections from friends, family or other non-business owner acquaintances) is a negligible source of financing for most firms after founding, and the differences between white- and black-owned startups is not statistically significant. In-deed, across most of the individual categories, differences in new capital cease to be sta-tistically different after the initial founding year. Because these numbers track *new* dollars coming into the firm, however, this means that the accumulated difference in size grows over time.

Insert Figure 3 here

In the appendix, we dig deeper into the differences in access to debt for minority and white-owned startups by looking at the specific sources of debt financing. This is presented in Table A.4 digs. In the founding year, there are differences between black and white owned businesses across a wide array of debt sources. Only one percent of black owners obtain business loans, compared with 7% for white-owned firms. While 30% of

white-owned businesses use business credit cards in their founding year, only 15% of black owned businesses do. Similarly, 18% of white business owners rely on personal loans for their business in the founding year, while only 14% of black-owned startups do. All these differences are statistically significant.

What sources offset these differences? As we show in the Appendix, it is not the case that black-owned startups rely more on personal credit cards. In fact, the opposite is true. Instead, black-owned startups appear to rely more on informal borrowing from family members: 14% of black-owned startups relied on family loans in their founding year, while only 9% of white-owned businesses do. Interestingly, the average amounts borrowed from family and other sources are not statistically different between minority and non-minority businesses. This could be a reflection of liquidity constraints in the network of family members that are stronger for black-owned startups than for white-owned firms (Fairlie and Robb 2008). Average amounts of capital from personal bank loans and business bank loans are statistically smaller for black-owned startups. Black-owned startups continue to rely on family loans to a greater degree than white-owned firms in the three years following the firm's founding. This suggests that access to formal debt channels remains limited for minorities.

All told, the descriptive evidence thus far indicates that black-owned startups access less formal credit. It suggests that they partially substitute for this with a heavier reliance on informal channels and personal equity, but this substitution is an imperfect one (perhaps due to lower levels of personal and family wealth). This results in businesses that start with smaller amounts of financial capital and that do not converge over time. To illustrate this, Figure 4 reports average firm size, for all firms as well as white- and black-owned firms, over time from startup to seven years after startup.

# 4   What Explains Racial Differences in Access to Capital?

In this section, we investigate the causes of racial inequality in financial capital reported in the previous section. We focus on the question of whether credit scores, and other founder

and business characteristics limit the ability of black startups to obtain comparable levels of financial capital as white startups. We first examine differences in access to capital in the firm's initial year, then examine differences as the startup ages.

## 4.1   Differences in Initial Capital

We begin by examining the difference in total capital raised across all sources. Given its importance, we then turn to examining differences in the amount of outside debt. The final step is to examine differences in business bank loans.

### 4.1.1   Total Financial Capital

Table II models variation in the natural log of the total amount of capital (from all sources) in the startup year based on race, owner characteristics and business characteristics. Industry fixed effects at the two-digit NAICS level are included in all specifications to capture general differences in capital levels based on types of businesses started. The inclusion of industry fixed effects partly addresses the concern that black and white businesses differ in their need for capital because they cluster in industries with different capital requirements.

In column (1) we report the baseline specification, which includes only a dummy for the race of the founder and industry fixed effects with no additional controls. The loading on the black-owned startup dummy variable illustrates that black-owned startups have total capital investments that are roughly 0.73 log points lower in terms of initial total capital than white-owned businesses.

Insert Table II Here

The remaining columns of the table in some sense seek to explain away this difference with a variety of control variables. Including the credit score lowers the loading on the black-owned startup dummy from -0.73 to -0.60. Credit scores are much lower among black startups than white startups, and the loading on the credit score indicates that credit

14

scores have a large positive effect on the amount of capital raised.[3] We find that moving up 10 percentile points in the credit score distribution is associated with an increase in financial capital by roughly 20 percent. These results are consistent with previous research focusing on larger, established businesses, which finds that credit scores have a negative effect on loan denial rates (Cavalluzzo and Wolken 2005). But, even after controlling for credit scores, the black indicator estimate remains large and statistically significant.

In Column (3) we introduce founder net worth. Although founder net worth is not available in the survey until the fourth followup year, we rely on the high persistence in net worth, especially as measured categorically in the KFS. We treat this as a proxy of owner's net worth in the startup year and note some caution in interpreting the estimates. The net worth categories included in Column (3) indicate that high net worth individuals launch businesses at a much larger scale than others. Controlling for net worth attenuates the loading on the black-owned startup indicator variable but does not diminish its statistical significance.

Next we include measures of formal education (in the form of dummy variables for levels), prior work experience to starting the business (both industry specific and non-industry specific), and previous entrepreneurial experience. These are included in Column (4), and capture the human capital of the entrepreneur. Education and prior work experience in the same industry have been found to be important determinants of business success in previous research (Van Praag et al. 2005; Parker 2009). We find some evidence that education is important, but no evidence of important effects for prior work experience. Previous entrepreneurial experience is positively associated with capital investments, perhaps due to prior knowledge of finding capital. Rather than further erase the difference between white-owned and black-owned startups, controlling for human capital widens the racial difference slightly. The loading on the black-owned startup dummy remains statistically significant in these specifications.

Columns (5) and (6) introduce a range of detailed additional controls for business

---

[3]In unreported regressions, we tested whether credit scores had a different effect for white and black owned startups and found no statistically significant difference.

type, growth goals and performance. These variables may be endogenous to the amount of capital the firm was able to raise, but including them does not diminish the racial difference in total capital. In column (5) we add controls for firm characteristics to condition on the fact that black and white founders may open different types of businesses with different capital needs. We include dummies for whether the firm sells a product or service, whether it is based out of the founder's home, and whether it has patents or other intellectual property. In column (6) we include a dummy for whether the business is full-time or part-time, its incorporation status, and employment level (i.e. employees). Interestingly, when we control for the type of business started (i.e., whether it sells a product or service, whether it has intellectual property, and whether it is incorporated) the effect of prior startup experience drops in half and becomes statistically insignificant: serial entrepreneurs, on average, start observationally different types of businesses than first-time entrepreneurs.

The inclusion of controls for business characteristics in Columns (5) and (6) has little affect on the measured racial difference in startup capital, but the controls themselves indicate that home-based businesses invest less capital, and product-centered businesses and businesses with intellectual property invest more capital, as would be expected. When we further add additional controls for firm performance and growth goals, such as whether the business is full-time or part-time, its incorporation status, and employment level, the black-founder loading does not change. Although many of these controls may well be endogenous, the stability of the black-owner loading across different specifications suggests that remaining black/white differences in capital use are not primarily driven by easily observable differences in firm characteristics. Moreover, the addition of these variables does not substantially change the coefficient estimates on credit scores and human capital measures, which suggests that credit scores are not simply proxying for the type of business.

In the remaining two columns we attempt to control for the effect that business location may have on demand conditions, unobservable business quality, and hence demand

16

for capital. In Column (7) we introduce Core-Based Statistical Area (CBSA) fixed effects. CBSAs include the standard MSAs but add to them 'micropolitan' statistical areas, which the Census describes as 1a new set of statistical areas that have at least one urban cluster of at least 10,000 but less than 50,000 population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties.' As column (7) shows, including a CBSA fixed effect does little to change the point estimates on the main initial lending outcomes. This suggests that unobserved differences in business quality captured by coarse location measures—the difference between being located in Duluth, Minnesota instead of Mobile, Alabama, for example—does little to explain away the observed racial difference in startup capital.

In Column (8) we include zipcode-level fixed effects. Because this results in an extremely large number of model parameters, we cannot use the sampling weights included in Columns (1)-(7), thus we urge caution in comparing the point estimate on the Black-owned Startup indicator with the preceding estimates. In addition, this parameter is only identified using survey zipcodes which contain both black and white survey respondents, limiting the sample size. Nevertheless, there remains a statistically significant racial difference in total capital. Thus, black-owned startups access less capital than their white-owned neighbors in the same zip code.

### 4.1.2   Outside Debt

Given the importance of outside debt as illustrated in Section 3, we now turn to exploring the potential causes of racial differences in access to outside debt. Exploring potential explanations for differences in outside debt may also be useful for shedding further light on the importance of credit scores and provide a useful consistency check on this variable. Credit ratings are undoubtedly one of the most important pieces of information used by banks and other financial institutions in loan determination. Table III reports regression results, which follow the same format as Table II, except that the dependent variable is the log of total outside debt instead of the log of total financial capital.

Insert Table III Here

17

The results for the determinants and patterns across the regression specifications for outside debt are similar to those for total financial capital. Credit scores exert a strong influence on the ability of businesses to find outside debt. Even controlling for an extensive list of business characteristics proxying for need and ability to raise capital (i.e. make products, intellectual property, home-based, part-time, incorporated, and employment) the coefficient on credit scores is large, positive and statistically significant. The results for human capital measures are also similar, with previous startup experience demonstrating the strongest association with outside debt capital, but also some evidence of the influence of education and work experience. Wealth is a stronger predictor of outside debt, which may be due to the importance of personal wealth as collateral in obtaining loans. Racial differences persist even after controlling for business location using either coarser CBSA fixed effects or narrower zipcode fixed effects.

### 4.1.3  Business Bank Loans

To zero in on borrower/lender effects, we refine our analysis one step further by examining only business bank loans. Whereas total capital includes all sources of debt and equity financing, and total outside debt includes many forms of debt (e.g. credit cards) that do not require any interaction between a borrower and a loan officer, by studying business bank loans separately we are honing in on the empirical setting in which there is the greatest scope for personal interactions between the borrower and lender to influence outcomes.

Insert Table IV Here

Table IV reports regressions of the log of business bank loans on the same set of observables that were used to explain total capital and total outside debt. The results are largely consistent with the previous analysis, in that about 1/3 of the initial industry-adjusted racial difference is attenuated with controls for credit score, net worth, and business characteristics. The raw magnitude of the racial difference is smaller for business bank loans than for total debt, which reflects the fact that differences in access to business bank loans

18

are not attenuated by access to other forms of outside debt. These results remain statistically significant in the presence of location fixed effects.

## 4.2   Differences in Capital at Later Stages

The previous tables examine racial differences in the year of founding and demonstrate that controlling for a rich set of observable characteristics only partially removes the large difference in funding between white-owned and black-owned startups. In Table V we ask whether these racial differences abate over time, as startups build track records that might help them overcome information asymmetries with lenders. We repeat the same basic specification from Column (6) of the previous three tables, but form two groups, one for years 1-3 and one for years 4-7 after startup. We include followup year fixed effects in each model to absorb variation over time in access to capital.[4]

In Columns (1) and (2), the dependent variable is the log of business bank debt that the business received; this is the narrowest of the three sources of capital investigated in the preceding tables, the source of capital with the greatest scope to be influenced by direct, personal borrower/lender interactions. In both the years 1-3 period and the years 4-7 period, there continues to be a statistically significant difference between black-owned and white-owned businesses in the amount of business bank debt they receive. In terms of magnitudes, the years 4-7 point estimate is about 1/3 the size of the point estimate in the initial survey year, meaning that the black-white funding gap persists but is considerably smaller.

Columns (3) and (4) focus on total outside debt from all sources. In the years 1-3 sample, the point estimate is about half as large as the comparable point estimate in the initial year, meaning that about half the black-white difference is erased over the next

---

[4]These followup year fixed effects also capture differences in survival rates between black and white startups. The results are not sensitive to their inclusion. We also examine the sensitivity of the results to survival bias by conditioning the sample on including only firms surviving through the last year in the survey (year 7 after startup). Taking this approach, we also find similar results. To push the analysis further, we also take an approach that is in the spirit of a bounds analysis (e.g. Fairlie, Karlan and Zinman 2015). We estimate the regressions assuming as a lower bound that all non-surviving businesses would have used zero financial capital in that year. And, as a potential upper bound we alternatively impute all non-surviving firm observations as equal to the median level of financial capital among surviving firms. The regression results are not sensitive to this imputation.

three years of the firm's life. In the years 4-7 period, the difference between black-owned and white-owned businesses is no longer statistically significant. The final two columns broaden the scope further to include all forms of financial capital. Here the differences between black-owned and white-owned businesses ceases to be statistically significant, even in the years 1-3 sample.

Taken together, these point estimates illustrate that differences in bank lending to black-owned and white-owned businesses persist over time, but that over time black borrowers are able to substitute into other forms of capital. The fact that we are able to condition on a rich set of observables means that the remaining differences are unlikely to be explained by creditworthiness, collateral, aspects of the business operating strategy, or the industry in which operates. It is important to recognize that the dependent variable here is measured in terms of new dollars flowing in during a given survey year: it is a measure of the flow of new capital, not the outstanding stock of capital. This in turn means that the initial differences in funding do not dissipate; they do not converge in the level of cumulative total capital over time. In the Appendix we provide estimations that include zipcode-level fixed effects. These specifications produce results that are quality similar to those presented here.

## 5   Do Black Borrowers Expect To Be Treated Differently

The previous section asks whether observable differences in borrower characteristics that might be important for lenders can explain the large unconditional differences in the levels of capital that white-owned and black-owned businesses receive. In this section, we ask whether differences in attitudes and expectations about the bank borrowing experience are important for understanding differences in access to capital. To explore this question, we use survey information in the KFS that gauges demand and unmet need for credit among entrepreneurs.

Access to measures of attitudes towards borrowing among entrepreneurs is rare in survey data sets, but beginning in the third followup year, the KFS included a series

of questions gauging borrowing intentions. The new questions ask whether the startup business applied for a loan that year, and whether it did not apply for a loan that year because of a fear of rejection. Among those startups that did apply, a follow-up question asks whether they were always approved, always denied, or sometimes approved and sometimes denied.

Racial differences in responses to these questions are analyzed in Table VI. We report survey-weighted averages by minority ownership status, both for the sample as a whole, as well as splits based on notable points in the distribution of credit scores. White entrepreneurs are more likely to apply for loans than black entrepreneurs, which potentially reflects different capital needs, but could also reflect different attitudes and expectations of the loan application process. When we focus on borrowers with below-median credit scores, there is no statistical difference in the rates of loan application, but among above-median borrowers, loan application rates are lower for blacks than for whites.

Turning to those who did not apply for loans that year, we also study racial differences in whether they did not apply for fear of rejection in Table VI.[5] There are massive differences in fear of rejection between white and black business owners. Overall, black business owners are about three times more likely to not apply for loans because of fear of rejection than white business owners. This difference is highly statistically significant. Although it is even more pronounced among below-median credit borrowers, even among credit worthy borrowers we find that blacks are more than twice as likely than whites to fear rejection. Black business owners whose credit scores are above the 75th percentile for the entire sample are still more than twice as likely as white business owners of similar creditworthiness to not apply for a loan for fear of having their loan application denied.

Another measure of unmet financing needs is whether loans are always approved, always denied, or sometimes approved and sometimes denied. Here, the results mirror those from the discussion above. Black business owners are significantly less likely to

---

[5]Although the question, did not apply for fear of rejection, is asked of all respondents, some owners who applied for loans might have wanted to apply for additional loans. We do not include these owners and focus on only those firms who did not apply for a new loan for clarity. The results are unchanged if we examine all responses to this question.

report that they are always approved for loans. This holds throughout the distribution of credit scores.

A useful summary measure of whether a startup experiences unmet capital need combines responses to being denied a loan application and not applying for a loan because of fear of rejection. Affirmative answers to these two questions imply that the startup did not obtain all of the capital it needed. Using this measure, black startups are much more likely to face unmet need for capital than are white startups.

Taken together, these results provide further evidence that the lower levels of borrowing among black-owned businesses are a reflection of unmet need, stemming at least in part from different attitudes and perceptions of the banking process, and not simply because black-owned startups need or want less capital. But they are still unconditional in nature; to address this, Table VII examines these findings in a multivariate setting.

Even controlling for a detailed set of firm and founder characteristics, we still observe pronounced differences in the fear of denial and loan denial rates based on the race of the firm founder. These findings are consistent with previous findings for larger, more established and older businesses (i.e. SSBF data) that minority-owned firms experience higher loan denial probabilities than white-owned businesses even after controlling for differences in credit-worthiness and other factors (Bostic and Lampani 1999; Cole 1999; Cavalluzzo, Cavaluzzo and Wolken 2002; Blanchflower, Levine and Zimmerman 2003; Blanchard et al. 2008; Bates and Robb, 2014). Finally, these findings also provide evidence that racial differences in financing patterns are not simply due to lower levels of financing needs among black startups.

Of course, one reason why a borrower might fear denial is because they had already received a lot of debt in prior years, so that they were near their maximum debt capacity for the business. Thus, one reason why black founders might be fearful of borrowing is that they had already borrowed. To explore this possibility we split the sample into black-owned businesses and all other businesses and regressed a dummy variable for fear of denial or denied credit on the amount of prior accumulated debt as well as the

22

same set of controls we have used throughout the preceding analysis.

The results are presented in Table VIII. Columns (1) and (2) focus on the fear of denial. Among white-owned businesses, high levels of past borrowing are a strong predictor of failing to apply for a loan for fear of denial. The opposite is true for black borrowers; those with more past borrowing are less likely to indicate that they are afraid to apply. Similarly, in Columns (3) and (4) we find that among white-owned businesses, high past borrowing is associated with a greater likelihood of being denied credit. Among black borrowers, there is no statistically significant relationship, and the sign of the relation is the opposite of what we find in the white-owned sample.

These results suggest that not only are there pronounced racial differences in the fear of loan denial, but the determinants of having this fear are a function of race. Among white borrowers, fear of denial is correlated with remaining debt capacity: white borrowers are more likely to fear denial when they have borrowed heavily in the past and perhaps worry about perceived debt levels being too high. Among black borrowers, fear of denial is correlated with past borrowing experience: those who have borrowed in the past are less afraid of denial than those who have not perhaps because they perceive discrimination to have declined.

## 6   Do Banks Treat Black Borrowers Differently

The previous sections demonstrate pronounced differences in capital access based on the race of the business founder. This section attempts to discern whether discrimination is the root cause of the differences we find. We do this in three steps. First, we make use of the fact that small, local banks rely more on soft information, while larger, national banks rely more heavily on credit scores and other types of quantifiable borrower characteristics to examine whether differences in local banking conditions exacerbate or alleviate racial differences. Next, we develop two measures of regional variation in the degree of racial bias and ask how perceptions about access to capital by black borrowers vary according to these measures. One is based on a historical measure of racial inequality, the other a

23

contemporaneous measure. Both measures provide evidence that areas where racial bias is stronger are areas where black business founders are more likely to anticipate being denied credit.

## 6.1   Do Stronger Local Banks Help?

A large literature in banking draws a distinction between soft information and hard information. Hard information—like that contained in credit scores—is quantitative and impersonal, and can be easily transmitted, while soft information is qualitative, and while it may be very precise, it is difficult to communicate credibly (see Petersen and Rajan, 2002). While large, national banks have been shown to have an advantage in obtaining hard information, small banks tend to have a comparative advantage in lending to small businesses, which are traditionally more informationally opaque, since small banks tend to rely more on soft information than do large banks (Berger, Cerquiero and Penas, 2014; Berger, Miller, Petersen, Rajan, and Stein, 2005; Brickley, Link, and Smith, 2003).

In this section we ask whether racial differences in startup funding vary with the strength of local banks. On the one hand, minority-owned businesses should face fewer financing hurdles in areas with stronger local banks if the main source of their disadvantage is that they have good ideas but little ability to signal their quality objectively. In this case, the funding gap between black- and white-owned startups would be smaller in areas with stronger local banks, because local banks, with their increased reliance on soft information, would award capital to minority borrowers with good ideas but potentially weaker verifiable credit history. On the other hand, a greater reliance on soft information might create greater scope for lenders to cater to racial preferences or biases, which could mean that black-owned businesses face greater funding challenges in environments where more objective creditworthiness criteria might receive less weight in lending decisions.

Table IX explores these issues. In Panel A, we estimate models for did not apply for fear of denial. Column (1) verifies the previous finding that black startups have higher rates of fear of denial than white startups. In column (2) we add the share of county bank

deposits held by local banks and find that areas with higher local bank concentration are areas in which new businesses are much less likely to report that they do not apply for fear of denial. [6] This comports with a wide body of evidence suggesting that small, informationally opaque businesses have an easier time securing bank loans in areas where local bank concentrations are higher. Column (2) suggests that startups recognize that they will face an easier time in markets where local banks are stronger.

Column (3) introduces an interaction term to explore whether black and white-owned businesses experience different outcomes in high local bank concentration areas. If black-owned startups found it easier to borrow in these markets, presumably because they expected lenders acting on soft information to be easier to work with, then we would expect the interaction term to be negative–their reluctance to apply for loans for fear of denial would be attenuated in these markets.

Instead, we do not find evidence that black-owned startups receive more financing in these markets. The interaction term is statistically significant, but has the wrong sign. Of course, we cannot rule out the possibility that borrower perceptions of their own creditworthiness differ according to bank market structure, nevertheless, the results do not provide evidence that minority business owners expect it to be easier to obtain bank loans in markets where local banks are stronger.

To guard against the possibility that black borrowers fear rejection due to concerns about underlying credit quality, in Columns (4)-(6) repeats the analysis of columns (1)-(3) but includes the borrowers credit score and net worth as controls. This effectively holds constant the hard information available to lenders. This has no qualitative impact on the findings. Black founders continue to be more afraid of denial, not less afraid of denial, in higher soft information environments when we condition on available hard information.

To examine how these perceptions are correlated with financing, in Panel B of Table IX, we report regressions of log business bank debt on race and interactions with the local banking variables. In keeping with prior research, areas with higher local bank

---

[6]We follow Cortes (2015) and Adelino, Ma and Robinson (2017) and define a local bank as one with at least 75% of its deposits coming from that MSA. Deposit data are taken from the FDIC Summary of Deposits. See https://www5.fdic.gov/sod/.

concentration are areas with higher bank lending to startups. But while entrepreneurs in areas with stronger local banks receive larger amounts of bank loans, this is an effect that is confined almost entirely to white borrowers. Comparing the main effect of local bank share with the interaction term between race and local bank share suggests that the effect of stronger local banks is almost zero for black-owned businesses.

As a further check, we also examine whether the competitiveness of the local banking market affects our results. A more competitive local banking market could make it more likely that black borrowers obtained loans in those markets by increasing a borrower's ability to shop for a loan. These results are presented in the Appendix. Here, we also find no impact on the black dummy variable after including a Herfindahl index of local banking competition.

In sum, areas with stronger local banks are areas where banks are perceived, and indeed act, more favorably towards startups. But there is no evidence that areas with stronger local banks are areas where black-owned businesses have an easier time raising capital. Black founders are not less afraid of loan denial in these markets, nor do they receive larger amounts of capital in these markets. The pro-startup effects of a strong local banking community do not appear to accrue to minority business founders.

## 6.2   Historical Inequality and Racial Bias

Because contemporaneous measures of inequality are likely to be correlated with con-temporaneous business conditions, we use a measure of historical inequality obtained from Braggion, Dwarkasing, and Ongena (2015). They instrument current measures of income inequality at the MSA level with data on the historical distribution of farm plot-sizes in 1890. Braggion, Dwarkasing and Ongena (2015) show that this historical distri-bution of plot sizes in 1890 is highly correlated with current measures of inequality and use this measure to show that more historically unequal regions have lower rates of self-employment. Based on the fact that areas with high degree of skewness in the historical size distribution of landholdings are areas in which slavery was common, we build on their insight and ask whether racial differences in borrowing attitudes and outcomes are

26

more pronounced in these areas by exploring interactions of the Gini coefficient with the business owner's race.

The main idea is to ask whether perceptions of lending outcomes are different in areas with high historical inequality. The first three columns of Table X indicate that they are. In Panel A, we report regression results for the fear of denial on race, the historical Gini coefficient, and the race/gini interaction, along with all the variables listed in Table IV. Local areas with high levels of historical inequality have much higher levels of the fear of denial among black entrepreneurs relative to white entrepreneurs than areas with low levels of inequality. In columns (4) through (6), we repeat the analysis in the first three columns but include the business credit score as an independent variable. The results are qualitatively identical.

In Panel B of Table X, we report a probit analysis for unmet capital need on race, the historical Gini coefficient, and the race/gini interaction. Regions with high levels of historical inequality have higher average levels of respondents reporting that they have unmet capital need, and these effects are more pronounced among black borrowers in areas with high inequality. As in Panel (A), this conclusion holds even when we include the business credit score as a control variable in Columns (4) through (6).

## 6.3   Contemporary Inequality and Racial Bias

Next we turn to a contemporaneous measure of potential discrimination that varies regionally and is likely to be correlated with racial bias, but not necessarily with contemporaneous business conditions. Views about interracial marriage and resulting actual rates of interracial marriage are likely to be associated with racial prejudice. Racial prejudice measured along other dimensions and wage disparities are higher and when views against interracial marriage are more negative (Charles and Guryan 2008). Thus, a finding of lower levels of fear of denial and unmet capital needs in geographical areas with high interracial marriage rates provides evidence that is at least consistent with black entrepreneurs perceiving and facing racial bias in lending markets.

To create regional interracial marriage rates we use Census 2000 5 Percent PUMS mi-

27

crodata. We condition the sample on married couples that involve at least one black or white partner.[7] At the state level, we calculate the percentage of blacks who have white marital partners. We then normalize the interracial marriage rate by the probability of marriage to a white partner that would occur if this were random. For example, if 10 percent of blacks are married to white partners and the population is 90 percent white then the normalized interracial marriage rate is $\frac{0.10}{0.90}$=0.11, whereas the normalized interracial marriage rate for an area with 10 percent of blacks married to whites and a population that is 70 percent white would have a higher normalized rate (0.14) because the underlying probability of an interracial marriage for a black is lower.[8]

Table XI reports the same set of specifications as Table X. In Panel A, we report regression results for the fear of denial on race, the interracial marriage rate coefficient, and the race/marriage interaction, along with all the variables listed in Table IV.

Local areas with high levels of interracial marriage have much lower levels of fear of denial among black entrepreneurs relative to white entrepreneurs than areas with low levels of interracial marriage. In Panel B of Table XI, we report a probit analysis for unmet capital need on race, the interracial marriage coefficient, and the race/marriage interaction. Regions with high levels of interracial marriage have lower average levels of unmet capital need among black borrowers relative to white borrowers. Overall, fear of denial and unmet capital are lower among black entrepreneurs relative to white entrepreneurs in areas where interracial marriage is higher, and thus potentially racial bias is lower.

# 7   What if Black-owned Startups Looked Like White-Owned Ones?

The final part of our analysis asks how much of the racial gap in funding documented above would disappear if black-owned startups had similar observable characteristics to white-owned startups. To explore this, we use a technique pioneered by Blinder (1973)

---

[7]We use the Census microdata to match heads of households to their spouses using household identifier codes.

[8]The normalization also results in similar rates when the focus is shifted to the percentage of whites married to blacks. In these two examples, we would have 1.11 and 1.43 percent of whites married to blacks, with the same normalized interracial marriage rates of 0.11 and 0.14.

and Oaxaca (1973) that decomposes the inter-group differences in a dependent variable into those due to different observable characteristics across groups (sometime referred to as the endowment effect) and those due to different "prices" of characteristics of groups. Consider a regression $Y = X\beta + \epsilon$ with group means of the independent variables for the black and white subpopulations given by $\bar{X}^B$ and $\bar{X}^W$. To implement the standard Blinder-Oaxaca decomposition, we begin by writing the inter-group difference in the average value of a dependent variable, Y, as:

$$\bar{Y}^W - \bar{Y}^B = \left[ \bar{X}^W - \bar{X}^B \right] \hat{\beta}^W + \bar{X}^B \left[ \hat{\beta}^W - \hat{\beta}^B \right] \tag{1}$$

The first term, $\left[ \bar{X}^W - \bar{X}^B \right] \hat{\beta}^W$, reflects the part of the inter-group difference that can be attributed to differences in the group averages of the independent variables $X$—differences in observables. The second term reflects the different "prices" or factor loadings of the characteristics across the two groups.

There are two issues associated with implementing Equation 1. The first concerns how to deal with the second term of the equation, $\bar{X}^B \left[ \hat{\beta}^W - \hat{\beta}^B \right]$. This "unexplained" component of the decomposition partly captures contributions from group differences in unobserved characteristics. This part is sensitive to the choice of omitted characteristics making the results difficult to interpret. Another issue that arises is the "index" problem is that the decomposition itself can either be written using coefficient weights $\beta^W$ or $\beta^B$.[9]

To deal with this issue, we use an alternative method developed by Oaxaca and Ransom (2004), which is to weight the first term of the decomposition expression using coefficient estimates from a pooled sample of the two groups. Following this approach, we calculate the decompositions by using coefficient estimates from regressions that includes a sample of all racial groups. We thus calculate the first term in the decompositions as:

$$\left[ \bar{X}^W - \bar{X}^B \right] \hat{\beta}^* \tag{2}$$

where $X^j$ are means of firm characteristics of race j, $\hat{\beta}^*$ is a vector of pooled coefficient

---

[9]Note that an alternative formulation of Equation 1 is $\bar{Y}^W - \bar{Y}^B = \left[ \bar{X}^W - \bar{X}^B \right] \hat{\beta}^B + \bar{X}^W \left[ \hat{\beta}^W - \hat{\beta}^B \right]$.

estimates, and $j = W$ or $B$ for white or black, respectively.

We report estimates using pooled estimates from a regression that includes both white and black observations (Oaxaca and Ransom 1994). It is becoming increasingly popular when studying racial differences to use the full sample of all races to estimate the coefficients (Fairlie and Robb 2007). This version of the pooled sample is advantageous in that it incorporates the full market response and does not exclude other racial groups. The full set of racial and ethnic dummies in the regression specification are included to allow us to remove any influence on the coefficients from racial differences that are correlated with any of the explanatory variables.

Table XII reports Blinder/Oaxaca decompositions of the difference in business size in the seventh year after startup, which is the final year of the KFS.[10] The top panel of Table XII shows that the accumulated difference in business size by the end of the survey is about $336,000. Around one-half of this difference can be explained with observable characteristics. The lower panel shows how much can be attributable to each set of observable characteristics.

Roughly speaking, the explanatory components of this difference can be grouped into three equally sized categories. About one-third of the difference is attributable to differences in business credit scores. Another one-third is attributable to differences in founder net worth. And the final one-third is attributable to all other observable characteristics: gender, founder education and work experience (collectively labeled human capital), as well as business characteristics such as incorporation status, whether it generates a product or service, whether it operates in or outside the home, and whether it owns intellectual property.

Given that the average black-owned business is around $200,000 in size in year 7, assigning average white characteristics to an average black-owned business would result in it being about seventy-five percent larger. Merely assigning white credit scores to a black-owned business would result in a business about 25% larger. On the one hand, to

---

[10]Similar decompositions for individual sources of capital and for individual years mirrors the results presented here and are available from the authors upon request.

the extent that this score can be improved by better financial management, rather than simply being a manifestation of circumstances that are difficult to control, these results suggest that improving credit scores would have a non-trivial impact on the racial gap in funding. These results also illustrate that about half the difference in size cannot be explained by observables, which illustrates the importance of attitudes and perceptions by and about black borrowers in credit markets.

# 8   Conclusion

This paper uses confidential, restricted-access microdata from the KFS and matched administrative data on credit scores to explore racial inequality in access to capital among startups. Our analysis of detailed financial data available in the KFS and panel data following startups through the first seven years of existence provides several novel findings. Black entrepreneurs start businesses at a substantially smaller scale than white entrepreneurs, and while the disparity in later-stage capital injections narrows over time, they continue to take on less capital in the early years of the firm's operation than white entrepreneurs. Thus, initial funding differences persist. We also find that black entrepreneurs access less outside debt in the founding year and in the years that follow, which is by the far the largest cause of disparities in total financial capital. Alternative sources of capital such as loans from friends and family, personal equity and credit cards also do little to attenuate these disparities. Black-owned startups have lower levels of all sources of funding than do white-owned startups.

These differences in financial capital use do not appear to be due to differences in the need for capital between black and white entrepreneurs. Black startups report substantially higher levels of loan denials and overall unmet need for capital than white startups, even after controlling for differences in credit scores and founder wealth. Moreover, industry differences, which should represent first-order differences in need for capital do not explain racial disparities. The inclusion of detailed, potentially endogenous business characteristics such as goals for growth and type of business also has little effect on the

31

racial differences we find providing further evidence against need differences.

Focusing on supply-side channels, we find that racial differences in financial capital cannot be attributed entirely to white lenders looking unfavorably upon black borrowers. There are large differences in credit worthiness between black and white entrepreneurs. Detailed administrative data on credit ratings linked to all KFS businesses provides the first evidence in the literature of extensive differences in creditworthiness between black and white startups and their effects on financing outcomes. Our analysis also reveals that the relatively low credit scores for black business owners explain a substantial amount of the gaps in both financing at startup and in the years after startup. These results imply that a great deal of the capital investment differences between black- and white-owned businesses is the result of persistent differences in the founder's financial health that are present at the very inception of the firm. This connects our findings to an increasing concern over inequality in household finance and financial literacy and suggests interesting connections between household financial planning, behavioral finance, race and entrepreneurship.

At the same time, on the demand side our evidence clearly indicates an enduring belief among even the most credit-worthy black borrowers that they will be turned away by banks. The fact that many well-qualified black entrepreneurs do not apply for credit, even when they feel they need it, because they anticipate being denied credit suggests that overcoming differences between black and white borrowers is not simply a matter of expanding the supply of credit available to lower income borrowers. Interestingly, we also find that simply increasing the strength of local banks is unlikely to help – although white-owned startups receive large amounts of bank debt on average in areas with stronger local banks black-owned startups do not. [11] Getting to the root cause of racial differences in the way that new businesses are financed likely requires changes in perceptions and financial planning behaviors as much as it requires augmenting the supply of credit to traditionally underserved borrowers.

---

[11]Further increases in credit card access might help reduce disparities (Chatterji and Seamans 2012), but this source provides only high interest borrowing which might be prohibitive for larger borrowing needs.

# References

[1] Adelino, M. , Ma, S. and Robinson, D. (2017), Firm Age, Investment Opportunities, and Job Creation. The Journal of Finance, 72: 999-1038. doi:10.1111/jofi.12495

[2] Altonji, J. G., and Pierret, C. R. (2001). Employer learning and statistical discrimination. The Quarterly Journal of Economics, 116(1), 313-350.

[3] Ballou, J., Barton, T., DesRoches, D., Potter, F., Reedy, E.J., Robb, A., Shane, S. and Zhao, Z. (2008). Kauffman Firm Survey: Results from the Baseline and First Follow-Up Surveys. Kauffman Foundation.

[4] Bates, Timothy. "The changing nature of minority business: A comparative analysis of Asian, Non-Minority and Black owned businesses." The Review of Black Political Economy (1989): 25-42.

[5] Bates, Timothy. "Commercial bank financing of white and black owned small business start-ups." Quarterly Review of Economics and Business (1991): 64-80.

[6] Bates, Timothy and Alicia Robb (2014). "Has the Community Reinvestment Act Increased Loan Availability Among Small Businesses Operating in Minority Neighborhoods?" Urban Studies, May, pp. 1-20.

[7] Berger, Allen, Geraldo Cerquiero, and Maria Fabiana Penas (2014). "Market size structure and small business lending: Are crisis times different from normal times?" Review of Finance 19(5): 1965-1995.

[8] Berger, Allen, Nathan Miller, Mitchell Petersen, Raghuram Rajan, and Jeremy Stein. 2005. "Does function follow organizational form? Evidence from the lending practices of large and small banks." Journal of Financial Economics, 76(2): 237-269.

[9] Blanchflower, David G., P. Levine and D. Zimmerman. 2003. "Discrimination in the small business credit market", Review of Economics and Statistics, November, 85(4), pp. 930-943.

[10] Blinder, Alan S. 1973. "Wage Discrimination: Reduced Form and Structural Variables." Journal of Human Resources 8: 436-455.

[11] Board of Governors of the Federal Reserve System. 2007. "Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit."

[12] Bone, Sterling A., Glenn Christensen and Jerome Williams. 2014. "Rejected, Shackled, and Alone: The Impact of Systemic Restricted Choice on Minority Consumers' Construction of Self" Journal of Consumer Research 41. 451–474.

[13] Borjas, George J. 1999. "The Wage Structure and Self-Selection into Self-Employment." Working paper. Cambridge, MA: Harvard University.

[14] Bostic, R. W. and K. P. Lampani. 1999. "Racial Differences in Patterns of Small Business Finance: The Importance of Local Geography," Proceedings of the Conference on Business Access to Capital and Credit, August, 149-179.

[15] Boston, Thomas D. 1999. "Generating Jobs Through African American Business Development", in J. Whitehead and C. Harris, eds. Readings in Black Political Economy (Dubuque: Kendall-Hunt)

[16] Boston, Thomas D. 2006. "Black Patronage of Black-owned startups and Black Employment" in J. Whitehead, J. Stewart and C. Conrad (eds). African Americans in the United States (Rowman & Littlefield Publishers, Inc).

[17] Bradford, William D., and Alfred E. Osborne. 1976. "The entrepreneurship decision and black economic development." The American Economic Review 66.2: 316-319.

[18] Bradford, William D. 2003. "The Wealth Dynamics of Entrepreneurship for Black and White Families in the U.S.," Review of Income and Wealth, 49(1): 89-116.

[19] Brickley, James, James Link, and Clifford Smith. 2003. "Boundaries of the Firm: Evidence from the Banking Industry." Journal of Financial Economics, 70(3): 351-383.

[20] Cavalluzzo, Ken, Linda Cavalluzzo, and John Wolken. 2002. "Competition, Small Business Financing, and Discrimination: Evidence from a New Survey," Journal of Business, Vol. 75(4): 641-679.

[21] Cavalluzzo, Ken and John Wolken. 2005. "Small Business Loan Turndowns, Personal Wealth and Discrimination." Journal of Business, 78(6): 2153-2177.

[22] Charles, Kerwin Kofi, and Jonathan Guryan. (2008). "Prejudice and wages: an empirical assessment of Becker?s The Economics of Discrimination." Journal of Political Economy, 116(5): 773-809.

[23] Charles, Kerwin Kofi, and Jonathan Guryan. (2011). "Studying discrimination: Fundamental challenges and recent progress." Annual Review of Economics, 3(1), 479-511.

[24] Chatterji, Aaron K., and Robert C. Seamans. 2012. "Entrepreneurial finance, credit cards, and race." Journal of Financial Economics 106(1): 182-195.

[25] Cole, R. A. (1999). "Availability of credit to small and minority-owned businesses: Evidence from the 1993 National Survey of Small Business Finances."

[26] Cole, Rebel A., and Tatyana Sokolyk. 2013. "How do start-up firms finance their assets? Evidence from the Kauffman Firm Surveys."

[27] Cortes, Kristle R., 2015, "Rebuilding after disaster strikes: How local lenders aid in the recovery," Federal Reserve Bank of Cleveland Working Paper.

[28] Dougal, Casey, Pengjie Gao, Bill Mayhew and Chris Parsons, 2017. "What's in a (School) Name? Racial Discrimination in Higher Education Bond Markets." Working paper.

[29] Fairlie, Robert W.,Dean Karlan, and Jonathan Zinman. 2015. "Behind the GATE Experiment: Evidence on Effects of and Rationales for Subsidized Entrepreneurship Training," American Economic Journal: Economic Policy, 7(2): 125-61.

34

[30] Fairlie, Robert W., and Alicia M. Robb. 2007. "Why are Black-owned startups Less Successful than White-Owned Businesses: The Role of Families, Inheritances, and Business Human Capital," Journal of Labor Economics, 25(2): 289-323.

[31] Fairlie, Robert W., and Alicia M. Robb. 2008. "Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States," Cambridge: MIT Press.

[32] Farhat, Joseph B., and Alicia Robb. "Applied survey data analysis using Stata: The Kauffman firm survey data." (2014).

[33] Haltiwanger, John, Ron Jarmin and Javier Miranda. 2013. "Who Creates Jobs? Small vs. Large vs. Young." Review of Economics and Statistics, 347-361.

[34] Hurst, Erik and Benjamin Pugsley. 2011. "What do Small Businesses Do?" NBER Working Paper #17041.

[35] Kerr, William R., and Ramana Nanda. 2011. "Financing constraints and entrepreneurship." Handbook of Research on Innovation and Entrepreneurship eds. David B. Audretsch, Oliver Falck, Stephan Heblich and Adam Leder: 88.

[36] Koellinger, Phillipp, and Maria Minniti. 2006. "Not for lack of trying: American entrepreneurship in black and white," Small Business Economics 27(1): 59-79.

[37] Mitchell, Karlyn, and Douglas Pearce. 2011 "Lending technologies, lending specialization, and minority access to small-business loans." Small Business Economics 37, no. 3: 277-304.

[38] Oaxaca, Ronald. 1973. "Male-Female Wage Differentials in Urban Labor Markets," International Economic Review, 14 (October), 693-709.

[39] Oaxaca, Ronald, and Michael Ransom. 1994. "On Discrimination and the Decomposition of Wage Differentials," Journal of Econometrics, 61, 5-21.

[40] Parker, Simon C. (2009). The Economics of Entrepreneurship. Cambridge: Cambridge University Press.

[41] Petersen, Mitchell and Raghuram Rajan, 2002. "Does Distance Still Matter? The Information Revolution in Small Business Lending," Journal of Finance 57(6): 2533-2570.

[42] Robb, Alicia, et al. "An overview of the Kauffman Firm Survey: Results from the 2004-2008." Ewing Marion Kauffman Foundation Research Paper (2010).

[43] Robb, Alicia and David Robinson, "The Capital Structure Decisions of New Firms." Review of Financial Studies, Vol 27, No 1, 2014.

[44] Stangler, Dane, Inara Tareque, and Arnobio Morelix. "Trends in Venture Capital, Angel Investments, and Crowdfunding across the Fifty Largest US Metropolitan Areas." Angel Investments, and Crowdfunding across the Fifty Largest US Metropolitan Areas (December 1, 2016) (2016).

35

[45] Simoes, Nadia, Nuno Crespo, and Sandrina B. Moreira. "Individual determinants of self-employment entry: What do we really know?." Journal of economic surveys 30.4 (2016): 783-806.

[46] U.S. Bureau of Labor Statistics. 2014. Table A-2. Employment status of the civilian population by race, sex, and age, http://www.bls.gov/news.release/empsit.t02.htm

[47] U.S. Census Bureau. 2012. Wealth and Asset Ownership: Table 1. Median Value of Assets for Households, by Type of Asset Owned and Selected Characteristics: 2011, http://www.census.gov/people/wealth/

[48] U.S. Census Bureau. 2015. 2012 Survey of Business Owners: Company Summary

[49] U.S. Census Bureau. 2016. Income and Poverty in the United States: 2015, Income and Earnings Summary Measures by Selected Characteristics: 2014 and 2015, http://www.census.gov/library/publications/2016/demo/p60-256.html

[50] U.S. Census Bureau. 2017. Wealth, Asset Ownership, & Debt of Households Detailed Tables: 2013, https://www.census.gov/data/tables/2013/demo/wealth/wealth-asset-ownership.html.

[51] U.S. Census Bureau. 1997. 1992 Economic Census: Characteristics of Business Owners. Washington, D.C.: U.S. Government Printing Office.

[52] van der Sluis, J., van Praag, M., and Vijverberg, W. (2005), "Education and Entrepreneurship in Industrialized Countries: A Meta-Analysis," World Bank Economic Review, 19(2): 225-261.

[53] Walstad, William B. and Marilyn L. Kourilsky. 1998. "Entrepreneurial Attitudes and Knowledge of Black Youth," Entrepreneurship Theory & Practice, 23(2): 5-18.

**Figure 1:** Racial Differences in Wealth in the Kauffman Firm Survey



**Figure 2:** Racial Differences in Sources of Initial Capital for Startups



**Figure 3:** Racial Differences in Sources of New Capital for Startups, Years 1-3

**Figure 4:** Racial Differences in the Evolution of Total Assets over Time



**Table I:** Racial Differences in Sources of Funding

This table reports survey-weighted mean values by race for broad funding categories. The components of the classifications (Owner, Insider, Outsider/Debt, Equity) are described in detail in Appendix Table A.1. The final column reports p-values from the t-test of the difference between black- and white-owned businesses.

|  | Overall Mean | White Mean | Black Mean | p-value(diff) |
|---|---|---|---|---|
| **KFS Initial Survey Year** | | | | |
| Owner's Equity | 33,078 | 34,426 | 19,562 | 0.00 |
| Inside Equity | 2,117 | 2,139 | 440 | 0.14 |
| Outside Equity | 16,768 | 18,543 | 536 | 0.10 |
| Owner Debt | 4,890 | 5,228 | 1,010 | 0.05 |
| Inside Debt | 6,663 | 7,195 | 2,849 | 0.17 |
| Outside Debt | 51,680 | 56,663 | 10,809 | 0.01 |
| Total Financial Capital | 99,344 | 106,720 | 35,205 | 0.00 |
| Leverage Ratio | 0.19 | 0.19 | 0.12 | 0.00 |
| | | | | |
| **KFS Survey Years 1-3** | | | | |
| Owner's Equity | 13,047 | 13,308 | 8,555 | 0.13 |
| Outside Equity | 14,864 | 16,499 | 551 | 0.07 |
| Inside Equity | 1,206 | 1,284 | 664 | 0.48 |
| Owner Debt | 4,200 | 4,336 | 2,297 | 0.15 |
| Inside Debt | 5,385 | 5,713 | 2,491 | 0.49 |
| Outside Debt | 51,147 | 54,813 | 14,883 | 0.19 |
| Total Financial Capital | 69,256 | 72,958 | 29,107 | 0.00 |
| Leverage Ratio | 0.29 | 0.30 | 0.21 | 0.00 |
| | | | | |
| **KFS Survey Years 4-7** | | | | |
| Owner's Equity | 8,327 | 7,944 | 4,678 | 0.42 |
| Outside Equity | 7,663 | 8,339 | 1,227 | 0.20 |
| Inside Equity | 1,037 | 1,047 | 254 | 0.63 |
| Owner Debt | 3,618 | 3,671 | 3,482 | 0.42 |
| Inside Debt | 4,898 | 5,176 | 979 | 0.21 |
| Outside Debt | 48,616 | 49,809 | 20,265 | 0.64 |
| Total Financial Capital | 58,684 | 59,825 | 27,348 | 0.54 |
| Leverage Ratio | 0.29 | 0.29 | 0.20 | 0.00 |

### Table II: Initial Differences in Log Total Capital

This table models variation in the amount of total capital from all sources, include founder, insider and outside debt and equity. All columns include 2-digit NAICS industry fixed effects and controls for gender and other racial categories (Asian, Hispanic, and Other). Missing or negative net worth is the omitted category. Column (7) includes CBSA fixed effects, while Column (8) includes zipcode-level fixed effects. Survey weights are used in Columns (1)-(7), but not in Column (8). One, two and three asterisks denote statistical significance at the 10, 5 and 1% level, respectively.

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Black-owned Startup | -0.731*** | -0.599*** | -0.485*** | -0.512*** | -0.496*** | -0.501*** | -0.502*** | -0.857*** |
| | (0.113) | (0.111) | (0.110) | (0.109) | (0.111) | (0.102) | (0.114) | (0.330) |
| Credit Score | | 0.021*** | 0.020*** | 0.020*** | 0.020*** | 0.012*** | 0.012*** | 0.010*** |
| | | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.004) |
| Net Worth: Up to 50K | | | -0.517*** | -0.498*** | -0.504*** | -0.313*** | -0.288** | -0.465* |
| | | | (0.119) | (0.121) | (0.120) | (0.109) | (0.127) | (0.278) |
| Net Worth: 50-100K | | | -0.581*** | -0.566*** | -0.566*** | -0.392*** | -0.332** | -0.050 |
| | | | (0.130) | (0.130) | (0.129) | (0.116) | (0.131) | (0.283) |
| Net Worth: 100-250K | | | -0.167 | -0.151 | -0.153 | -0.061 | -0.035 | -0.167 |
| | | | (0.108) | (0.108) | (0.108) | (0.103) | (0.114) | (0.241) |
| Net Worth: Over 250K | | | 0.360*** | 0.332*** | 0.330*** | 0.277*** | 0.232** | 0.099 |
| | | | (0.100) | (0.102) | (0.101) | (0.095) | (0.104) | (0.186) |
| Previous Industry Experience | | | | -0.007 | -0.006 | -0.006 | -0.008* | -0.005 |
| | | | | (0.004) | (0.004) | (0.004) | (0.004) | (0.008) |
| Experience Outside Industry | | | | 0.001 | 0.002 | 0.011*** | 0.011*** | 0.012 |
| | | | | (0.004) | (0.004) | (0.003) | (0.004) | (0.008) |
| Some College | | | | 0.051 | 0.048 | 0.001 | 0.041 | 0.217 |
| | | | | (0.109) | (0.108) | (0.101) | (0.115) | (0.258) |
| College Deg. | | | | 0.113 | 0.096 | 0.002 | 0.023 | 0.009 |
| | | | | (0.121) | (0.120) | (0.115) | (0.128) | (0.276) |
| Grad. Deg. | | | | 0.306** | 0.310** | 0.139 | 0.182 | 0.028 |
| | | | | (0.140) | (0.139) | (0.131) | (0.143) | (0.288) |
| Prev. Startup Exp. | | | | 0.289*** | 0.264*** | 0.105 | 0.109 | 0.100 |
| | | | | (0.073) | (0.073) | (0.068) | (0.075) | (0.148) |
| Makes Product | | | | | 0.344*** | 0.219*** | 0.211** | 0.321** |
| | | | | | (0.083) | (0.076) | (0.085) | (0.162) |
| Intel. Property | | | | | 0.216** | 0.083 | 0.017 | 0.372** |
| | | | | | (0.091) | (0.081) | (0.090) | (0.173) |
| Home-based | | | | | | -0.728*** | -0.699*** | -0.825*** |
| | | | | | | (0.075) | (0.082) | (0.167) |
| Part time Bus. | | | | | | -0.821*** | -0.861*** | -0.854*** |
| | | | | | | (0.085) | (0.091) | (0.179) |
| Incorporated | | | | | | 0.658*** | 0.705*** | 0.506*** |
| | | | | | | (0.071) | (0.082) | (0.170) |
| Employment | | | | | | 0.060*** | 0.061*** | 0.045*** |
| | | | | | | (0.012) | (0.012) | (0.009) |
| Observations | 4,124 | 4,038 | 4,038 | 3,975 | 3,975 | 3,840 | 3,590 | 1,214 |
| R-squared | 0.055 | 0.097 | 0.117 | 0.131 | 0.139 | 0.281 | 0.394 | 0.624 |

42

### Table III: Initial Differences in Total Outside Debt

This table models variation in the log of the amount of total outside debt. All columns include 2-digit NAICS industry fixed effects and controls for gender and other racial categories (Asian, Hispanic, and Other). Missing or negative net worth is the omitted category. Column (7) includes CBSA fixed effects, while Column (8) includes zipcode-level fixed effects. Survey weights are used in Columns (1)-(7), but not in Column (8). One, two and three asterisks denote statistical significance at the 10, 5 and 1% level, respectively.

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Black-owned Startup | -0.654*** | -0.544*** | -0.442*** | -0.438*** | -0.419*** | -0.431*** | -0.417*** | -0.922*** |
| | (0.111) | (0.109) | (0.111) | (0.112) | (0.112) | (0.110) | (0.121) | (0.355) |
| Credit Score | | 0.019*** | 0.018*** | 0.018*** | 0.018*** | 0.013*** | 0.013*** | 0.011*** |
| | | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) | (0.004) |
| Net Worth: Up to 50K | | | -0.406*** | -0.377*** | -0.380*** | -0.247** | -0.216* | -0.171 |
| | | | (0.121) | (0.122) | (0.122) | (0.119) | (0.129) | (0.299) |
| Net Worth: 50-100K | | | -0.296** | -0.273** | -0.268** | -0.133 | -0.100 | 0.120 |
| | | | (0.130) | (0.130) | (0.129) | (0.126) | (0.137) | (0.305) |
| Net Worth: 100-250K | | | -0.044 | -0.029 | -0.032 | 0.032 | 0.099 | -0.245 |
| | | | (0.125) | (0.126) | (0.126) | (0.124) | (0.137) | (0.260) |
| Net Worth: Over 250K | | | 0.328*** | 0.305** | 0.306** | 0.258** | 0.207* | 0.150 |
| | | | (0.117) | (0.121) | (0.120) | (0.119) | (0.125) | (0.201) |
| Previous Industry Experience | | | | -0.003 | -0.003 | -0.004 | -0.003 | -0.006 |
| | | | | (0.005) | (0.005) | (0.005) | (0.005) | (0.009) |
| Experience Outside Industry | | | | 0.005 | 0.005 | 0.010** | 0.011** | 0.013 |
| | | | | (0.004) | (0.004) | (0.004) | (0.004) | (0.008) |
| Some College | | | | 0.069 | 0.072 | 0.032 | 0.101 | -0.012 |
| | | | | (0.124) | (0.124) | (0.122) | (0.133) | (0.278) |
| College Deg. | | | | 0.048 | 0.045 | -0.046 | 0.060 | -0.124 |
| | | | | (0.136) | (0.136) | (0.136) | (0.147) | (0.297) |
| Grad. Deg. | | | | 0.318** | 0.337** | 0.208 | 0.263 | -0.076 |
| | | | | (0.158) | (0.159) | (0.158) | (0.167) | (0.310) |
| Prev. Startup Exp. | | | | 0.229*** | 0.214*** | 0.093 | 0.133 | -0.238 |
| | | | | (0.082) | (0.082) | (0.082) | (0.087) | (0.159) |
| Makes Product | | | | | 0.337*** | 0.258*** | 0.206** | 0.198 |
| | | | | | (0.092) | (0.090) | (0.098) | (0.175) |
| Intel. Property | | | | | 0.003 | -0.125 | -0.141 | -0.130 |
| | | | | | (0.101) | (0.097) | (0.103) | (0.187) |
| Home-based | | | | | | -0.385*** | -0.322*** | -0.464** |
| | | | | | | (0.083) | (0.090) | (0.180) |
| Part time Bus. | | | | | | -0.326*** | -0.368*** | -0.659*** |
| | | | | | | (0.089) | (0.092) | (0.193) |
| Incorporated | | | | | | 0.460*** | 0.479*** | 0.249 |
| | | | | | | (0.083) | (0.093) | (0.183) |
| Employment | | | | | | 0.075*** | 0.072*** | 0.068*** |
| | | | | | | (0.013) | (0.012) | (0.010) |
| Observations | 4,124 | 4,038 | 4,038 | 3,975 | 3,975 | 3,840 | 3,590 | 1,214 |
| R-squared | 0.032 | 0.064 | 0.074 | 0.082 | 0.086 | 0.155 | 0.310 | 0.585 |

43

### Table IV: Initial Differences in Total Business Debt

This table models variation in the amount of total debt for the business. All columns include 2-digit NAICS industry fixed effects and controls for gender and other racial categories (Asian, Hispanic, and Other). Missing or negative net worth is the omitted category. Column (7) includes CBSA fixed effects, while Column (8) includes zipcode-level fixed effects. Survey weights are used in Columns (1)-(7), but not in Column (8). One, two and three asterisks denote statistical significance at the 10, 5 and 1% level, respectively.

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Black-owned Startup | -0.339*** | -0.302*** | -0.251*** | -0.239*** | -0.222*** | -0.212*** | -0.200*** | -0.423* |
| | (0.044) | (0.044) | (0.045) | (0.047) | (0.047) | (0.048) | (0.055) | (0.218) |
| Credit Score | | 0.006*** | 0.006*** | 0.006*** | 0.006*** | 0.003** | 0.004*** | 0.006** |
| | | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) | (0.003) |
| Net Worth: Up to 50K | | | -0.005 | 0.009 | 0.006 | 0.072 | -0.018 | 0.146 |
| | | | (0.079) | (0.079) | (0.079) | (0.079) | (0.073) | (0.184) |
| Net Worth: 50-100K | | | -0.074 | -0.060 | -0.055 | 0.005 | -0.106* | -0.056 |
| | | | (0.070) | (0.071) | (0.071) | (0.072) | (0.060) | (0.187) |
| Net Worth: 100-250K | | | -0.057 | -0.045 | -0.048 | -0.005 | -0.050 | -0.179 |
| | | | (0.073) | (0.074) | (0.074) | (0.075) | (0.077) | (0.159) |
| Net Worth: Over 250K | | | 0.239*** | 0.235*** | 0.236*** | 0.210*** | 0.182** | 0.141 |
| | | | (0.079) | (0.082) | (0.081) | (0.081) | (0.083) | (0.123) |
| Previous Industry Experience | | | | -0.002 | -0.002 | -0.003 | -0.003 | -0.003 |
| | | | | (0.003) | (0.003) | (0.003) | (0.003) | (0.006) |
| Experience Outside Industry | | | | -0.001 | -0.001 | -0.000 | -0.001 | -0.001 |
| | | | | (0.002) | (0.002) | (0.002) | (0.002) | (0.005) |
| Some College | | | | -0.119 | -0.115 | -0.144* | 0.009 | -0.219 |
| | | | | (0.076) | (0.075) | (0.075) | (0.075) | (0.170) |
| College Deg. | | | | -0.033 | -0.032 | -0.082 | 0.100 | -0.071 |
| | | | | (0.087) | (0.087) | (0.086) | (0.086) | (0.182) |
| Grad. Deg. | | | | 0.092 | 0.112 | 0.038 | 0.149 | -0.059 |
| | | | | (0.105) | (0.105) | (0.105) | (0.096) | (0.190) |
| Prev. Startup Exp. | | | | 0.084* | 0.074 | 0.012 | 0.024 | -0.288*** |
| | | | | (0.051) | (0.050) | (0.050) | (0.051) | (0.097) |
| Makes Product | | | | | 0.279*** | 0.243*** | 0.230*** | 0.217** |
| | | | | | (0.059) | (0.060) | (0.060) | (0.107) |
| Intel. Property | | | | | -0.050 | -0.102* | -0.052 | -0.190* |
| | | | | | (0.066) | (0.062) | (0.058) | (0.114) |
| Home-based | | | | | | -0.190*** | -0.127** | -0.117 |
| | | | | | | (0.048) | (0.051) | (0.110) |
| Part time Bus. | | | | | | 0.039 | -0.013 | -0.127 |
| | | | | | | (0.056) | (0.054) | (0.118) |
| Incorporated | | | | | | 0.144*** | 0.095* | -0.003 |
| | | | | | | (0.050) | (0.054) | (0.112) |
| Employment | | | | | | 0.056*** | 0.053*** | 0.069*** |
| | | | | | | (0.011) | (0.010) | (0.006) |
| Observations | 4,124 | 4,038 | 4,038 | 3,975 | 3,975 | 3,840 | 3,590 | 1,214 |
| R-squared | 0.022 | 0.032 | 0.039 | 0.044 | 0.052 | 0.110 | 0.346 | 0.590 |

44

**Table V: Later-Stage Differences in Debt**

This table models variation in the amount of total debt, outside debt, and business debt for the later survey years. The regression specifications mirror those in Column (6) of the previous three tables. All columns include industry fixed effects controls for gender and other racial categories and dummy variables for the survey years. Human capital controls include education, previous work experience and previous startup experience. Product characteristics control for whether the business sells a product or a service (or both), and whether it has intellectual property. Firm characteristics control for whether the business is fulltime or parttime, whether it is home-based, incorporated and has employees. Standard errors appear in parentheses below point estimates. One, two and three asterisks denote significance at the ten, five and one per cent level, respectively.

| | Business Bank Debt | | Total Outside Debt | | Total Financial Capital | |
|---|---|---|---|---|---|---|
| | Years 1-3 (1) | Years 4-7 (2) | Years 1-3 (3) | Years 4-7 (4) | Years 1-3 (5) | Years 4-7 (6) |
| Black-owned Startup | -0.163*** (0.031) | -0.084*** (0.032) | -0.260*** (0.084) | -0.122 (0.079) | -0.017 (0.092) | 0.067 (0.096) |
| Controls: | | | | | | |
| Credit Score | Yes | Yes | Yes | Yes | Yes | Yes |
| Net Worth | Yes | Yes | Yes | Yes | Yes | Yes |
| Human Capital | Yes | Yes | Yes | Yes | Yes | Yes |
| Product Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 9,482 | 8,979 | 9,608 | 8,981 | 9,608 | 8,981 |
| R-squared | 0.157 | 0.124 | 0.135 | 0.139 | 0.051 | 0.046 |

**Table VI:** Racial Differences in Attitudes Towards Formal Debt

This table reports survey-weighted averages by racial group to questions in the KFS that capture attitudes and intentions with respect to borrowing. "Applied for a loan" is a dummy equaling one if the respondent applied for a loan, regardless of whether the loan was approved. "Did not apply for fear of rejection" is one for those borrowers who did not apply for a loan, but who did not only because they anticipated the loan being denied. "Loan Always Approved" is only available for those who applied for a loan: it is a dummy for whether the respondent received the full amount they were asking for, or whether sometimes their loans are denied or reduced in size. "Unmet Need" is 1 if the respondent either did not apply for fear of rejection, or else applied but did not always get the full amount. The column labeled Overall is for all respondents. The remaining columns split the sample on whether the respondent had below or above median credit score, or whether credit scores were above the 75th percentile of observed scores across the whole sample.

| | | | Credit Score: | | |
|---|---|---|---|---|---|
| | | Overall | Below Median | Above Median | Above 75th |
| **Applied for a Loan** | | | | | |
| | White | 0.1200 | 0.0838 | 0.1414 | 0.1617 |
| | Black | 0.0785 | 0.0752 | 0.0834 | 0.1125 |
| | | | | | |
| **Loan Always Approved** | | | | | |
| | White | 0.6826 | 0.6201 | 0.7038 | 0.7225 |
| | Black | 0.2240 | 0.1153 | 0.3862 | 0.2530 |
| | | | | | |
| **Did Not Apply For Fear of Rejection** | | | | | |
| | White | 0.1617 | 0.1666 | 0.1590 | 0.1497 |
| | Black | 0.4181 | 0.4746 | 0.3244 | 0.3228 |
| | | | | | |
| **Unmet Need** | | | | | |
| | White | 0.1633 | 0.1671 | 0.1611 | 0.1525 |
| | Black | 0.4295 | 0.4929 | 0.3246 | 0.3174 |

46

**Table VII:** Race and the Demand for Capital

This table provides a multivariate analysis of the relation between founder race and the demand for capital. In Panel A, the dependent variable is a dummy for whether the borrower did not apply for a loan for fear of denial. In Panel B, the dependent variable is a dummy for whether they applied but were denied credit or else received less than they asked for. Human capital controls include education, previous work experience and previous startup experience. Product characteristics control for whether the business sells a product or a service (or both), and whether it has intellectual property. Firm characteristics control for whether the business is fulltime or parttime, whether it is home-based, incorporated and has employees. Standard errors appear in parentheses below point estimates. One, two and three asterisks denote significance at the ten, five and one per cent level, respectively.

#### Panel A: Did Not Apply for Fear of Denial

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Black-owned Startup | 0.856*** | 0.798*** | 0.638*** | 0.621*** | 0.628*** | 0.617*** |
|  | (0.058) | (0.059) | (0.070) | (0.070) | (0.070) | (0.074) |
| Controls: |  |  |  |  |  |  |
| Credit Score | No | Yes | Yes | Yes | Yes | Yes |
| Net Worth | No | No | Yes | Yes | Yes | Yes |
| Human Capital | No | No | No | Yes | Yes | Yes |
| Product Characteristics | No | No | No | No | Yes | Yes |
| Firm Characteristics | No | No | No | No | No | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 11,380 | 11,337 | 8,982 | 8,878 | 8,878 | 8,620 |

#### Panel B: Denied Credit or Received Less than Requested

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Black-owned Startup | 0.450*** | 0.432*** | 0.275** | 0.288** | 0.307** | 0.292** |
|  | (0.101) | (0.102) | (0.124) | (0.122) | (0.122) | (0.128) |
| Controls: |  |  |  |  |  |  |
| Credit Score | No | Yes | Yes | Yes | Yes | Yes |
| Net Worth | No | No | Yes | Yes | Yes | Yes |
| Human Capital | No | No | No | Yes | Yes | Yes |
| Product Characteristics | No | No | No | No | Yes | Yes |
| Firm Characteristics | No | No | No | No | No | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 9,954 | 9,915 | 7,829 | 7,736 | 7,736 | 7,515 |

47

**Table VIII:** Past Borrowing and Credit Beliefs

This table explores the relation between prior loan balances and lack of access to capital by race. The dependent variable in the first two columns is a dummy variable for whether the respondent was afraid to apply for a loan for fear of denial. Column (1) includes all businesses that are not black-owned, while Column (2) focuses only on black-owned startups. In columns (3) and (4), the dependent variable is a dummy for whether the respondent reported that they were either denied credit or they received less than they asked for: again, the columns split the samples according to the race of the founder. Prior Accumulated Debt is the sum of all outside debt up through the previous survey round, in hundreds of thousands of dollars. Human capital controls include education, previous work experience and previous startup experience. Product characteristics control for whether the business sells a product or a service (or both), and whether it has intellectual property. Firm characteristics control for whether the business is fulltime or parttime, whether it is home-based, incorporated and has employees. Standard errors appear in parentheses below point estimates. One, two and three asterisks denote significance at the ten, five and one per cent level, respectively.

|  | Fear of Denial | | Denied Credit | |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
|  |  |  |  |  |
| Prior Accumulated Debt | 0.007*** | -0.011* | 0.007*** | -0.005 |
|  | (0.002) | (0.007) | (0.002) | (0.004) |
|  |  |  |  |  |
| Controls: |  |  |  |  |
| Credit Score | Yes | Yes | Yes | Yes |
| Net Worth | Yes | Yes | Yes | Yes |
| Human Capital | Yes | Yes | Yes | Yes |
| Product Characteristics | Yes | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes |
|  |  |  |  |  |
| Black-Owned Startup Sample | No | Yes | No | Yes |
|  |  |  |  |  |
| Observations | 8,209 | 639 | 7,265 | 405 |

48

**Table IX:** Local Banking Conditions and Racial Differences in Access to Credit

Panel A reports Probit regressions in which the dependent variable is a dummy if the respondent answered yes to "Did Not Apply for Fear of Rejection" or if they reported that they did not always get the full amount they asked for. Panel B reports regressions (Pooled OLS with year dummies) in which the dependent variable is the natural log of total business debt. Local bank share is the share of total county-level deposits held by local banks. Standard errors in parentheses, with one, two and three asterisks denoting significance at the 10, 5 and 1 percent level. Controls from Table IV included but not shown.

| Panel A: Dependent variable is Did Not Apply for Fear of Denial | | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Black-Owned Startup | 0.820*** | 0.815*** | 0.794*** | 0.621*** | 0.618*** | 0.591*** |
| | (0.066) | (0.066) | (0.086) | (0.070) | (0.070) | (0.091) |
| Local Bank Share | | -0.306*** | -0.321*** | | -0.241** | -0.262** |
| | | (0.116) | (0.121) | | (0.120) | (0.127) |
| Local Bank Share $\times$ Black | | | 0.146 | | | 0.192 |
| | | | (0.407) | | | (0.414) |
| Credit Score | No | No | No | Yes | Yes | Yes |
| Net Worth | No | No | No | Yes | Yes | Yes |
| Human Capital | Yes | Yes | Yes | Yes | Yes | Yes |
| Product Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 8,433 | 8,424 | 8,424 | 8,412 | 8,403 | 8,403 |

| Panel B: Dependent variable is log Business Bank Debt | | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Black-Owned Startup | -0.206*** | -0.199*** | -0.148*** | -0.133*** | -0.125*** | -0.082*** |
| | (0.019) | (0.019) | (0.024) | (0.020) | (0.020) | (0.025) |
| Local Bank Share | | 0.327*** | 0.352*** | | 0.328*** | 0.350*** |
| | | (0.059) | (0.063) | | (0.060) | (0.063) |
| Local Bank Share $\times$ Black | | | -0.360*** | | | -0.309** |
| | | | (0.128) | | | (0.130) |
| Credit Score | No | No | No | Yes | Yes | Yes |
| Net Worth | No | No | No | Yes | Yes | Yes |
| Human Capital | Yes | Yes | Yes | Yes | Yes | Yes |
| Product Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm Characteristics | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Survey-Year Dummies | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 21,677 | 21,648 | 21,648 | 21,441 | 21,412 | 21,412 |
| R-squared | 0.015 | 0.017 | 0.017 | 0.023 | 0.025 | 0.025 |

**Table X:** Historical Inequality and Racial Bias

Panel A reports regressions (Pooled OLS with year dummies) in which the dependent variable is a dummy equaling one if the respondent answered yes to "Did Not Apply for Fear of Rejection." The dependent variable in Panel B is a dummy equaling one if they reported that they did not always get the full amount they asked for. Regional Historical Gini is the gini coefficient of the MSA in 1890; data from Braggion, Dwarkasing, and Ongena (2015). In each panel a constant is estimated but suppressed for brevity. Standard errors in parentheses, with one, two and three asterisks denoting significance at the 10, 5 and 1 percent level. Controls from Table IV included but not shown.

### Panel A: Dependent Variable is Did Not Apply For Fear of Denial

| | | | | | | |
|---|---|---|---|---|---|---|
| Black | 0.8141*** | 0.7514*** | 0.2008 | 0.7605*** | 0.7022*** | 0.1819 |
| | (0.058) | (0.061) | (0.276) | (0.059) | (0.061) | (0.274) |
| Historical Inequality | | 0.5565*** | 0.4507*** | | 0.6057*** | 0.5056*** |
| | | (0.159) | (0.166) | | (0.159) | (0.166) |
| Gini × Minority | | | 1.1465** | | | 1.0848* |
| | | | (0.568) | | | (0.563) |
| Credit Score | | | | -0.0035*** | -0.0032*** | -0.0032*** |
| | | | | (0.001) | (0.001) | (0.001) |
| Constant | -1.0867*** | -1.3712*** | -1.3198*** | -0.9541*** | -1.2731*** | -1.2252*** |
| | (0.097) | (0.133) | (0.135) | (0.099) | (0.135) | (0.137) |
| Observations | 11,247 | 9,436 | 9,436 | 11,204 | 9,396 | 9,396 |

### Panel B: Dependent variable is Unmet Capital Need

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Black | 0.8323*** | 0.7622*** | 0.1579 | 0.7808*** | 0.7165*** | 0.1405 |
| | (0.058) | (0.060) | (0.275) | (0.059) | (0.061) | (0.273) |
| Historical Inequality | | 0.5762*** | 0.4609*** | | 0.6239*** | 0.5139*** |
| | | (0.157) | (0.164) | | (0.157) | (0.165) |
| Gini × Minority | | | 1.2586** | | | 1.2012** |
| | | | (0.566) | | | (0.560) |
| Credit Score | | | | -0.0034*** | -0.0030*** | -0.0030*** |
| | | | | (0.001) | (0.001) | (0.001) |
| Constant | -1.0384*** | -1.3343*** | -1.2784*** | -0.9091*** | -1.2429*** | -1.1903*** |
| | (0.096) | (0.132) | (0.134) | (0.098) | (0.134) | (0.136) |
| Observations | 11,249 | 9,437 | 9,437 | 11,206 | 9,397 | 9,397 |

50

**Table XI:** Attitudes towards Interracial Marriage and Access to Capital

Panel A reports regressions (Pooled OLS with year dummies) in which the dependent variable is a dummy equaling one if the respondent answered yes to "Did Not Apply for Fear of Rejection." The dependent variable in Panel B is a dummy equaling one if they reported that they did not always get the full amount they asked for. "Interracial Marriage" is the state level percentage of black married persons who have white marital partners, scaled by the proportion of white married persons in the state. In each panel a constant is estimated but suppressed for brevity. Standard errors in parentheses, with one, two and three asterisks denoting significance at the 10, 5 and 1 percent level. Controls from Table IV included but not shown.

### Panel A: Dependent Variable is Did Not Apply For Fear of Denial

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Black | 0.8141*** | 0.8105*** | 1.0072*** | 0.7605*** | 0.7559*** | 0.9670*** |
|  | (0.058) | (0.059) | (0.101) | (0.059) | (0.060) | (0.102) |
| Interracial Marriage |  | 0.2741 | 0.3860* |  | 0.2895 | 0.4099* |
|  |  | (0.207) | (0.210) |  | (0.210) | (0.213) |
| Black× Interracial |  |  | -2.3124** |  |  | -2.4790** |
|  |  |  | (0.982) |  |  | (0.983) |
| Credit Score |  |  |  | -0.0035*** | -0.0036*** | -0.0036*** |
|  |  |  |  | (0.001) | (0.001) | (0.001) |
| Constant | -1.0867*** | -1.0932*** | -1.1125*** | -0.9541*** | -0.9596*** | -0.9802*** |
|  | (0.097) | (0.101) | (0.102) | (0.099) | (0.103) | (0.104) |
| Observations | 11,247 | 10,830 | 10,830 | 11,204 | 10,787 | 10,787 |

### Panel B: Dependent variable is Unmet Capital Need

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Black | 0.8323*** | 0.8370*** | 1.0509*** | 0.7808*** | 0.7848*** | 1.0139*** |
|  | (0.058) | (0.059) | (0.101) | (0.059) | (0.060) | (0.102) |
| Interracial Marriage |  | 0.4813** | 0.6007*** |  | 0.5034** | 0.6315*** |
|  |  | (0.207) | (0.210) |  | (0.210) | (0.213) |
| Black× Interracial |  |  | -2.5134** |  |  | -2.6890*** |
|  |  |  | (0.981) |  |  | (0.982) |
| Credit Score |  |  |  | -0.0034*** | -0.0035*** | -0.0035*** |
|  |  |  |  | (0.001) | (0.001) | (0.001) |
| Constant | -1.0384*** | -1.0696*** | -1.0906*** | -0.9091*** | -0.9403*** | -0.9627*** |
|  | (0.096) | (0.100) | (0.100) | (0.098) | (0.102) | (0.103) |
| Observations | 11,249 | 10,832 | 10,832 | 11,206 | 10,789 | 10,789 |

51

**Table XII:** Oaxaca-Blinder Decompositions of Business Size

This table presents Oaxaca-Blinder decompositions of size differences in businesses in the final survey year based on whether or not the founder is black. The upper panel reports differences in the mean values of black-owned and white-owned size, expressed both in dollars and in log size. The bottom panel decomposes the mean difference into amounts explained by each set of independent variables. Human capital controls include education, previous work experience and previous startup experience. Business characteristics control for whether the business sells a product or a service (or both), whether it has intellectual property, and whether the business is fulltime or parttime, whether it is home-based, incorporated and has employees.

| Average Business Size, 2011: | (1) Dollar Value | (2) Log(Size) |
|---|---|---|
| White-Owned | $533,726.05 | 11.693 |
| Black-Owned | $197,634.84 | 10.845 |
| Difference | $336,091.21 | 0.848 |

| Explanatory Components: | (1) Dollar Value | (2) Log(Size) |
|---|---|---|
| Race and Gender | $5,459.03 | 0.047 |
| Human Capital | $40,695.11 | 0.059 |
| Business Characteristics | $4,966.81 | 0.119 |
| Business Credit Score | $51,105.07 | 0.175 |
| Founder Net Worth | $59,158.65 | 0.097 |
| | | |
| Total Explained | $161,384.67 | 0.5510 |

# A   Appendix

This appendix presents information on financing, and racial differences in owner and business characteristics in the KFS.

Table A.1 describes the detailed financing choices in the founding year for the firms in our sample (2004). The detailed sources are grouped into six broad categories, based on the source of the capital and the type of capital following Robb and Robinson (2014). These are (owner, informal, formal)×(debt, equity). The first column, labelled "Full KFS", includes all 4,928 firms in the Kauffman Firm Survey. For some of these firms, it cannot be verified that they either went out of business or remain in operations, therefore in the remaining columns we include 3,972 firms that either survived over the followup years 1-3 period or were verified as going out of business over the same period. This Column is labelled "Analysis Sample." These two columns report means that include firms with $0 amounts of a particular source of capital. The third column, labelled "Mean if > 0" reports the mean, in dollars, for only firms with positive amounts of that source of funding. The number of respondents reporting a positive amount of each source of funding is reported in the final column.

Table A.2 provides summary statistics for key variables based on the race of the firm owner.

**Table A.1:** Detailed Sources of Financing for All Startups in the KFS

| Category | Funding Source | Full KFS | Analysis Sample | Mean if $> 0$ | Count |
|---|---|---|---|---|---|
| Owner Equity | | 33,640 | 31,734 | 40,536 | 3,093 |
| | | | | | |
| Total Owner Debt: | | 4,952 | 5,037 | 15,765 | 1,241 |
| | Personal Credit Card balance, owner | 2,812 | 2,811 | 9,375 | 1,158 |
| | Personal Credit Card balance, others | 1,906 | 238 | 7,415 | 132 |
| | Personal loan, other owners | 235 | 1,989 | 124,124 | 67 |
| | | | | | |
| Total Insider Equity: | | 2,221 | 2,102 | 44,956 | 177 |
| | Spouse equity | 524 | 646 | 40,436 | 62 |
| | Parent equity | 1,697 | 1,456 | 42,509 | 126 |
| | | | | | |
| Total Insider Debt: | | 7,257 | 6,362 | 47,873 | 480 |
| | Family loan | 2,760 | 2,749 | 29,232 | 327 |
| | Family loan to other owners | 1,719 | 284 | 34,509 | 29 |
| | Personal loan to other owners | 272 | 550 | 28,988 | 73 |
| | Other personal loans | 649 | 924 | 81,452 | 45 |
| | Business loan by family | 1,156 | 1,760 | 57,207 | 115 |
| | Business loan by owner | 635 | 15 | 9,411 | 5 |
| | Business loan by other employees | 52 | 79 | 22,198 | 9 |
| | | | | | |
| Total Outsider Equity: | | 19,257 | 15,935 | 354,540 | 205 |
| | Angels and other investors | 5,148 | 6,350 | 244,707 | 110 |
| | Business equity | 6,621 | 3,645 | 321,351 | 56 |
| | Govt. equity | 5,242 | 798 | 146,624 | 27 |
| | VC equity | 701 | 4,804 | 1,162,898 | 26 |
| | Other equity | 1,546 | 337 | 187,046 | 8 |
| | | | | | |
| Total Outsider Debt: | | 50,130 | 47,847 | 128,706 | 1,439 |
| | Personal bank loan | 18,031 | 15,859 | 92,433 | 641 |
| | Owner business credit card | 16,213 | 1,009 | 7,107 | 543 |
| | Personal bank loan by other owners | 5,017 | 1,859 | 80,650 | 92 |
| | Business credit card | 4,227 | 812 | 6,976 | 452 |
| | Other Business credit cards | 2,275 | 135 | 7,852 | 62 |
| | Business bank loans | 1,591 | 17,075 | 261,358 | 243 |
| | Credit line balance | 1,030 | 5,057 | 95,058 | 210 |
| | Nonbank business loan | 133 | 3,627 | 214,920 | 72 |
| | Business loan from Govt. | 857 | 1,331 | 154,743 | 34 |
| | Other business loan | 241 | 231 | 78,281 | 19 |
| | Other individual loan | 206 | 226 | 43,202 | 22 |
| | Other debt | 308 | 626 | 119,493 | 22 |
| | | | | | |
| Total Financial Capital | | 117,458 | 109,016 | 121,981 | 3,536 |

**Table A.2:** Summary Statistics by Race

|  | Overall Mean | White Mean | Black Mean | p-value(diff) |
|---|---|---|---|---|
| KFS Initial Survey Year |  |  |  |  |
| Female | 0.31 | 0.30 | 0.36 | 0.00 |
| Yrs. Work Experience | 11.70 | 11.88 | 9.91 | 0.00 |
| Yrs. Non-Work Experience | 13.54 | 13.57 | 13.23 | 0.21 |
| Previous Startup Experience | 0.43 | 0.43 | 0.38 | 0.45 |
| Attended Some College | 0.36 | 0.36 | 0.48 | 0.00 |
| Graduated College | 0.30 | 0.31 | 0.24 | 0.05 |
| Graduate Degree | 0.17 | 0.18 | 0.16 | 0.54 |
| Credit Score | 35.99 | 36.50 | 30.47 | 0.00 |
| KFS Survey Years 1-3 |  |  |  |  |
| Female | 0.30 | 0.29 | 0.35 | 0.00 |
| Yrs. Work Experience | 12.07 | 12.25 | 10.11 | 0.00 |
| Yrs. Non-Work Experience | 13.30 | 13.33 | 13.06 | 0.09 |
| Previous Startup Experience | 0.43 | 0.44 | 0.38 | 0.43 |
| Attended Some College | 0.36 | 0.36 | 0.48 | 0.00 |
| Graduated College | 0.31 | 0.32 | 0.26 | 0.00 |
| Graduate Degree | 0.18 | 0.19 | 0.16 | 1.00 |
| Credit Score | 41.39 | 42.27 | 32.28 | 0.00 |
| KFS Survey Years 4-7 |  |  |  |  |
| Female | 0.30 | 0.29 | 0.36 | 0.00 |
| Yrs. Work Experience | 12.70 | 12.84 | 11.12 | 0.00 |
| Yrs. Non-Work Experience | 12.73 | 12.76 | 12.35 | 0.21 |
| Previous Startup Experience | 0.44 | 0.44 | 0.40 | 0.43 |
| Attended Some College | 0.35 | 0.35 | 0.47 | 0.00 |
| Graduated College | 0.33 | 0.34 | 0.26 | 0.00 |
| Graduate Degree | 0.19 | 0.20 | 0.16 | 0.49 |
| Credit Score | 52.88 | 54.51 | 35.80 | 0.00 |
| Net Worth: Neg. or Zero | 0.07 | 0.06 | 0.18 | 0.00 |
| Net Worth: $1-50,000 | 0.15 | 0.13 | 0.30 | 0.00 |
| Net Worth: $51,000-100,000 | 0.14 | 0.14 | 0.16 | 0.01 |
| Net Worth: $100,001-250,000 | 0.18 | 0.19 | 0.13 | 0.00 |
| Net Worth: $250,000+ | 0.39 | 0.42 | 0.16 | 0.00 |
| Net Worth: Missing | 0.07 | 0.07 | 0.08 | 0.23 |

**Table A.3:** Summary Statistics on Key Firm and Founder Characteristics

| Variable | Group | Survey Wave: | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| % Black | | 9.1 | 8.8 | 9.0 | 8.4 | 8.1 | 7.9 | 8.4 | 8.4 |
| % Survived | ALL | 100 | 91 | 78 | 65 | 60 | 54 | 48 | 45 |
| | | (0.0) | (0.5) | (0.8) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) |
| | White | 100 | 91 | 79 | 66 | 61 | 55 | 49 | 45 |
| | | (0.0) | (0.6) | (0.8) | (1.0) | (1.0) | (1.0) | (1.0) | (0.9) |
| | Black | 100 | 88 | 73 | 56 | 50 | 45 | 42 | 40 |
| | | (0.0) | (2.2) | (3.0) | (3.4) | (3.3) | (3.2) | (3.1) | (3.0) |
| Total Assets | ALL | 152917 | 223911 | 274108 | 296380 | 306185 | 340459 | 340769 | 343096 |
| | | (12797) | (17935) | (22636) | (26416) | (27481) | (30976) | (31799) | (31094) |
| | White | 166211 | 239464 | 277122 | 311040 | 318626 | 356439 | 348634 | 360265 |
| | | (14269) | (19894) | (23123) | (28931) | (30178) | (33909) | (33568) | (34125) |
| | Black | 40942 | 74559 | 194978 | 93689 | 139103 | 141007 | 148748 | 177364 |
| | | (10372) | (16548) | (82296) | (22010) | (40682) | (50197) | (43440) | (63926) |
| Outside Debt | ALL | 51847 | 48261 | 55766 | 49380 | 46340 | 53783 | 48539 | 40157 |
| | | (4779) | (6652) | (14600) | (7768) | (6008) | (7523) | (9049) | (5703) |
| | White | 56663 | 52368 | 59274 | 52669 | 45360 | 56523 | 48735 | 42657 |
| | | (5336) | (7430) | (16317) | (8614) | (5392) | (8303) | (9877) | (6331) |
| | Black | 10809 | 14425 | 17053 | 12637 | 17301 | 17447 | 31149 | 15557 |
| | | (2611) | (3648) | (4406) | (3300) | (4109) | (5366) | (16485) | (5992) |
| Outside Equity | ALL | 16619 | 19978 | 12666 | 10523 | 4847 | 11263 | 6512 | 8196 |
| | | (3369) | (5369) | (5174) | (1399) | (1399) | (6378) | (2638) | (3581) |
| | White | 18543 | 22116 | 14159 | 11660 | 5330 | 12419 | 6880 | 8858 |
| | | (3772) | (6007) | (5796) | (5981) | (1557) | (7084) | (2942) | (3994) |
| | Black | 536 | 604 | 206 | 912 | 164 | 678 | 1628 | 2672 |
| | | (300) | (275) | (106) | (752) | (164) | (666) | (1601) | (2589) |
| Total Financing | ALL | 115233 | 96546 | 90549 | 79693 | 70293 | 84940 | 69914 | 64108 |
| | | (7102) | (10098) | (16471) | (10893) | (7002) | (11458) | (10752) | (8745) |
| | White | 124195 | 103653 | 96096 | 85164 | 69169 | 89334 | 70518 | 67081 |
| | | (7898) | (11273) | (18394) | (6602) | (6602) | (12644) | (11724) | (9707) |
| | Black | 35205 | 34462 | 29033 | 22647 | 32194 | 26015 | 39460 | 25566 |
| | | (6002) | (5245) | (5187) | (3950) | (7344) | (6026) | (16755) | (6751) |
| % Have Out. Debt | ALL | 37.5 | 42.4 | 43.8 | 42.6 | 42.2 | 40.3 | 35.5 | 34.0 |
| | | (0.9) | (1.0) | (1.1) | (1.2) | (1.2) | (1.2) | (1.3) | (1.3) |
| | White | 38.5 | 42.9 | 44.6 | 43.4 | 43.0 | 40.6 | 36.2 | 34.7 |
| | | (0.9) | (1.0) | (1.1) | (1.2) | (1.3) | (1.3) | (1.3) | (1.3) |
| | Black | 29.4 | 37.7 | 37.7 | 36.9 | 35.1 | 35.4 | 28.3 | 28.2 |
| | | (2.7) | (3.4) | (3.7) | (4.3) | (4.3) | (4.7) | (4.2) | (4.4) |
| % Out. Debt Ratio (Out. Debt≥0) | ALL | 49.4 | 63.1 | 69.5 | 71.2 | 72.7 | 73.6 | 77.5 | 75.8 |
| | | (0.9) | (1.0) | (1.0) | (1.2) | (1.2) | (1.3) | (1.3) | (1.5) |
| | White | 50.1 | 64.2 | 70.1 | 72.5 | 73.6 | 73.7 | 78.3 | 77.3 |
| | | (1.0) | (1.1) | (1.1) | (1.2) | (1.2) | (1.3) | (1.3) | (1.5) |
| | Black | 41.8 | 52.4 | 61.5 | 55.2 | 62.6 | 66.6 | 66.0 | 58.7 |
| | | (3.1) | (4.0) | (3.4) | (5.1) | (4.8) | (5.5) | (6.5) | (6.3) |

Racial Differences in Profitability and Survival

| VARIABLES | (1)<br>survive | (2)<br>survive | (3)<br>survive | (4)<br>netpro |
|---|---|---|---|---|
| black | -0.199*** | -0.014 | 0.038** | -53,72 |
| | (0.035) | (0.037) | (0.018) | (48,30 |
| score | | 0.011*** | 0.002*** | |
| | | (0.000) | (0.000) | |
| Constant | -0.109*** | -0.643*** | | 2,399 |
| | (0.023) | (0.030) | | (5,367 |
| | | | | |
| Observations | 28,527 | 28,309 | 30,608 | 23, |
| R-squared | | | 0.609 | 0.0 |

Standard errors in paren
*** p<0.01, ** p<0.05, *

**Table A.4:** A Closer Look at Sources of Debt

This table reports survey-weighted mean values by race for dummy variables that track the use of particular types of credit, as well as for mean values of these sources of credit. The final column reports p-values from the t-test of the difference between black- and white-owned businesses. The first block of numbers for each year range ("Uses") reports the proportion of the sample that indicates they use that form of debt. The lower block of numbers for each year range (indicated with $) reports the average dollar amounts for that funding category.

|  | Overall | White Mean | Black Mean | p-value(diff) |
|---|---|---|---|---|
| KFS Initial Survey Year |  |  |  |  |
| Uses Personal Credit Cards | 0.48 | 0.49 | 0.34 | 0.00 |
| Uses Personal Bank Loan | 0.18 | 0.18 | 0.14 | 0.01 |
| Uses Business Credit Cards | 0.28 | 0.30 | 0.15 | 0.00 |
| Uses Loans from Family Members | 0.10 | 0.09 | 0.14 | 0.00 |
| Uses Business Bank Loans | 0.06 | 0.07 | 0.01 | 0.00 |
|  |  |  |  |  |
| Personal Bank Loan ($) | 13,660 | 14,497 | 6,971 | 0.04 |
| Personal Loans from Fam. ($) | 2,465 | 2,571 | 1,801 | 0.36 |
| Personal Loans, Other Sources ($) | 4,360 | 4,659 | 2,161 | 0.24 |
| Business Bank Loan ($) | 9,540 | 10,551 | 1,106 | 0.03 |
| Business Non-bank Loans ($) | 5,510 | 6,035 | 866 | 0.06 |
|  |  |  |  |  |
| KFS Survey Years 1-3 |  |  |  |  |
| Uses Personal Credit Cards | 0.38 | 0.38 | 0.35 | 0.84 |
| Uses Personal Bank Loan | 0.13 | 0.13 | 0.08 | 0.01 |
| Uses Business Credit Cards | 0.42 | 0.43 | 0.32 | 0.00 |
| Uses Loans from Family Members | 0.07 | 0.07 | 0.12 | 0.00 |
| Uses Business Bank Loans | 0.06 | 0.06 | 0.03 | 0.02 |
|  |  |  |  |  |
| Personal Bank Loan ($) | 7,992 | 8,228 | 4,171 | 0.05 |
| Personal Loans from Fam. ($) | 1,454 | 1,491 | 1,323 | 0.17 |
| Personal Loans, Other Sources ($) | 1,999 | 2,070 | 1,451 | 0.60 |
| Business Bank Loan ($) | 5,039 | 5,589 | 625 | 0.01 |
| Business Non-bank Loans ($) | 2,933 | 3,085 | 742 | 0.08 |
|  |  |  |  |  |
| KFS Survey Years 4-7 |  |  |  |  |
| Uses Personal Credit Cards | 0.33 | 0.33 | 0.30 | 0.23 |
| Uses Personal Bank Loan | 0.08 | 0.09 | 0.05 | 0.08 |
| Uses Business Credit Cards | 0.41 | 0.43 | 0.27 | 0.00 |
| Uses Loans from Family Members | 0.06 | 0.06 | 0.08 | 0.00 |
| Uses Business Bank Loans | 0.05 | 0.05 | 0.02 | 0.08 |
|  |  |  |  |  |
| Personal Bank Loan ($) | 2,523 | 2,719 | 635 | 0.04 |
| Personal Loans from Fam. ($) | 677 | 702 | 298 | 0.34 |
| Personal Loans, Other Sources ($) | 944 | 973 | 343 | 0.58 |
| Business Bank Loan ($) | 2,589 | 2,624 | 1,392 | 0.25 |
| Business Non-bank Loans ($) | 1,484 | 1,507 | 521 | 0.43 |

**Table A.5:** Later Stage Differences in Access to Capital with Zipcode Fixed Effects

| VARIABLES | (1) 2005-2007 | (2) 2008-2011 | (3) 2005-2007 | (4) 2008-2011 | (5) 2005-2007 | (6) 2008-2011 |
|---|---|---|---|---|---|---|
| Black | -0.317** | -0.265* | -0.462** | -0.511** | 0.120 | -0.473* |
| | (0.133) | (0.151) | (0.211) | (0.225) | (0.226) | (0.244) |
| Asian | -0.121 | 0.075 | -0.302 | -0.810*** | 0.154 | -0.068 |
| | (0.160) | (0.174) | (0.255) | (0.260) | (0.269) | (0.279) |
| Hispanic | -0.296** | 0.116 | -0.439** | 0.291 | 0.097 | 0.417 |
| | (0.140) | (0.167) | (0.223) | (0.249) | (0.238) | (0.267) |
| Other | 0.064 | -0.376 | -1.276*** | -0.773** | -0.707** | -0.084 |
| | (0.198) | (0.263) | (0.316) | (0.392) | (0.337) | (0.431) |
| Female | -0.207*** | -0.107 | -0.139 | -0.127 | -0.178 | -0.265** |
| | (0.073) | (0.084) | (0.117) | (0.125) | (0.124) | (0.135) |
| Previous Industry Experience | -0.001 | 0.004 | 0.002 | -0.009 | 0.011* | -0.003 |
| | (0.003) | (0.004) | (0.006) | (0.006) | (0.006) | (0.006) |
| Experience Outside Industry | -0.000 | -0.003 | 0.015*** | 0.004 | 0.019*** | 0.013** |
| | (0.003) | (0.004) | (0.005) | (0.006) | (0.005) | (0.006) |
| Some College | 0.113 | 0.182 | 0.156 | 0.109 | 0.229 | -0.046 |
| | (0.111) | (0.137) | (0.176) | (0.205) | (0.187) | (0.220) |
| College Deg. | 0.025 | 0.020 | 0.061 | -0.303 | 0.209 | -0.325 |
| | (0.118) | (0.146) | (0.188) | (0.217) | (0.200) | (0.233) |
| Grad. Deg. | -0.042 | -0.029 | -0.027 | -0.239 | 0.146 | -0.305 |
| | (0.123) | (0.148) | (0.195) | (0.222) | (0.200) | (0.238) |
| Prev. Startup Exp. | -0.088 | 0.035 | 0.178* | 0.262** | 0.188* | 0.174 |
| | (0.060) | (0.068) | (0.096) | (0.102) | (0.102) | (0.110) |
| Makes Product | 0.080* | -0.009 | 0.204*** | -0.002 | 0.364*** | 0.109 |
| | (0.044) | (0.046) | (0.070) | (0.068) | (0.074) | (0.073) |
| Intel. Property | 0.028 | -0.028 | 0.156** | 0.145** | 0.481*** | 0.203*** |
| | (0.045) | (0.049) | (0.072) | (0.073) | (0.076) | (0.078) |
| Home-based | -0.086 | -0.167** | -0.421*** | -0.575*** | -0.832*** | -0.885*** |
| | (0.059) | (0.066) | (0.094) | (0.099) | (0.100) | (0.106) |
| Part time Bus. | -0.121 | 0.084 | -0.743*** | 0.088 | -0.614*** | -0.208 |
| | (0.074) | (0.083) | (0.118) | (0.124) | (0.125) | (0.133) |
| Incorporated | -0.029 | 0.037 | 0.340*** | 0.367*** | 0.390*** | 0.247** |
| | (0.063) | (0.073) | (0.100) | (0.109) | (0.106) | (0.117) |
| Employment | 0.008*** | 0.013*** | 0.009*** | 0.008*** | 0.008*** | 0.009*** |
| | (0.001) | (0.002) | (0.002) | (0.003) | (0.002) | (0.004) |
| Credit Score | 0.002** | 0.002* | 0.003** | 0.006*** | 0.001 | 0.003* |
| | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) | (0.002) |
| | | | | | | |
| Observations | 7,903 | 7,819 | 7,903 | 7,819 | 7,736 | 7,790 |
| R-squared | 0.531 | 0.501 | 0.640 | 0.659 | 0.650 | 0.661 |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

**Table A.6:** Local Banking Conditions and Racial Bias

Panel A reports regressions (Pooled OLS with year dummies) in which the dependent variable is the natural log of total business debt. Panel B reports Probit regressions in which the dependent variable is a dummy if the respondent had unmet capital needs, which is true if the respondent answered yes to "Did Not Apply for Fear of Rejection" or if they reported that they did not always get the full amount they asked for. Local bank share is the share of total county-level deposits held by local banks. Local bank herfindahl is the herfindahl of local banks at the county level computed using deposits. Standard errors in parentheses, with one, two and three asterisks denoting significance at the 10, 5 and 1percent level. Controls from Table IV included but not shown.

| Panel A: Dependent variable is Did Not Apply for Fear of Denial | | | | | |
|---|---|---|---|---|---|
| Black-owned Startup | 0.7605*** | 0.7571*** | 0.7238*** | 0.7117*** | 0.5778*** |
| | (0.059) | (0.059) | (0.077) | (0.078) | (0.128) |
| Local Bank Share | | -0.2623** | -0.2881*** | -0.2594** | -0.2557** |
| | | (0.105) | (0.111) | (0.115) | (0.116) |
| Local Bank Share × Minority | | | 0.2358 | 0.3086 | 0.1578 |
| | | | (0.366) | (0.381) | (0.387) |
| Local Bank Herfindahl | | | | -0.5995*** | -0.6727*** |
| | | | | (0.191) | (0.203) |
| Bank Conc. × Minority | | | | | 0.9212 |
| | | | | | (0.706) |
| Credit Score | -0.0035*** | -0.0035*** | -0.0035*** | -0.0035*** | -0.0035*** |
| | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) |
| Observations | 11,204 | 11,193 | 11,193 | 11,193 | 11,193 |

| Panel B: Dependent variable is Log(Business Debt) | | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Black-owned Startup | -0.1604*** | -0.1527*** | -0.1071*** | -0.1044*** | -0.0241 |
| | (0.020) | (0.020) | (0.025) | (0.025) | (0.037) |
| Local Bank Share | | 0.3285*** | 0.3508*** | 0.3354*** | 0.3333*** |
| | | (0.060) | (0.063) | (0.064) | (0.064) |
| Local Bank Share × Minority | | | -0.3260** | -0.3357** | -0.2801** |
| | | | (0.131) | (0.132) | (0.132) |
| Local Bank Herfindahl | | | | 0.2481** | 0.2798*** |
| | | | | (0.101) | (0.107) |
| Bank Conc. × Minority | | | | | -0.5215*** |
| | | | | | (0.159) |
| Credit Score | 0.0038*** | 0.0038*** | 0.0038*** | 0.0037*** | 0.0038*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Observations | 21,441 | 21,412 | 21,412 | 21,412 | 21,412 |
| R-squared | 0.020 | 0.022 | 0.022 | 0.023 | 0.023 |

# Exhibit G

 Check for updates

*Research and Practice*

# Impacts of Owner Race and Geographic Context on Access to Small-Business Financing

Economic Development Quarterly
2016, Vol. 30(2) 159–170
© The Author(s) 2015
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0891242415620484
edq.sagepub.com
SAGE

Timothy Bates[1] and Alicia Robb[2]

## Abstract

Multiple studies document both the scarcity of small-business financing in inner-city minority communities and the higher loan application rejection rates among minority business enterprises (MBEs), compared with equally creditworthy White-owned firms. When MBEs do receive bank financing, they get smaller loans than Whites. Two aspects of these findings are troublesome. First, urban MBEs are heavily concentrated geographically in minority communities, raising the issue of whether difficulties accessing financing reflect firm location, minority ownership, or both. Second, applicable studies rest on weak theoretical foundations. The authors' findings suggest that banks engage in discriminatory practices limiting access to MBEs. Controlling for risk factors, however, firm location in a minority or inner-city neighborhood has no apparent impact on loan availability or size. Owner race/ethnicity, in contrast, is important. Subtle processes discourage MBEs from seeking bank loans. Owner race and wealth both powerfully shape loan access: high wealth opens doors, minority ownership closes them.

## Keywords

bank loans, racial differentials, redlining, minority neighborhood firms

Small businesses located in inner-city minority neighborhoods undisputedly face multiple difficulties when they seek commercial bank financing. Neighborhoods, where poverty rates are high and minority residents are numerous, have traditionally been viewed as unattractive markets by risk-averse financial institutions. This much we agree on. Exactly *why* local firms struggle to obtain financing in these environs is unclear. Varying degrees of bank redlining in minority neighborhoods have been documented in past studies, but those findings have not ruled out alternative explanations for loan scarcity. Bank lending patterns may be because of firm location in minority communities or, alternatively, lender discriminatory treatment of subgroups (minority owners) overrepresented in minority neighborhoods, greater applicant credit risk, low credit demand, or a combination of these factors. Our study probes these explanations to develop a better understanding of why small-business credit availability is limited.

Our primary objective is to investigate causes of small-business racial and spatial differences in unmet credit needs and differentials in loan terms while proposing theoretical justifications for these differentials: We seek to disentangle the effects of race and space. Using Kauffman Firm Survey (KFS) data to investigate loan accessibility among urban small businesses, our analysis utilizes firm and owner characteristics, controls for neighborhood economic well-being, and firm-specific geographic location identifiers.

## Background: Discriminatory Practices Limiting Access to Bank Loans

Access to bank loans is important because financial institutions provide more debt capital to small businesses than all other sources combined. According to the Federal Reserve Board's Survey of Small Business Finances (SSBF) data, banks account for over 90% of all small-business debt financing. Very young firms and minority business enterprises (MBEs) of all ages, although somewhat less reliant on bank loans than others, nonetheless obtain the majority of their debt capital from banks (Bates, 2011).

Passage of the 1977 Community Reinvestment Act (CRA) provides our analytical starting point. The CRA sought to make banks responsive to the credit needs of the communities in which they operate. A key CRA rationale was to pressure financial institutions to expand their provision of loans to support the housing and economic development needs of urban minority neighborhoods. Although serious CRA

---

[1]Wayne State University, Detroit, MI, USA
[2]Ewing Marion Kauffman Foundation, Kansas City, MO, USA

**Corresponding Author:**
Timothy Bates, Wayne State University, 42 W Warren Avenue, Detroit, MI 48202, USA.
Email: tbates7893@gmail.com

enforcement by regulatory authorities began only in the 1990s, these actions did ultimately pressure banks to reexamine their lending policies, leading gradually to greater loan availability for minority neighborhood small businesses (Bates & Robb, 2015; Immergluck, 2004).

Since the CRA's passage, the banking industry has undergone profound changes, including the increasing concentration of assets into a small number of institutions, each holding hundreds of billions in assets. Small banks in urban America were often displaced by branches of these huge institutions. In the process, lending policies evolved for a variety of reasons. Community activism was certainly a catalyst. Effective regulation under the CRA was often instigated by neighborhood associations, civil rights groups, community development corporations, and coalitions of these groups (Bates & Robb, 2015; Immergluck, 2004).

Under the CRA, activist groups like the Woodstock Institute of Chicago could intervene when banks requested permission to expand operations by acquiring another bank or opening a branch. This was done by opposing banker requests on the grounds of their failure to meet the credit needs of local communities (Casey, 2009). The threat of formal challenges often motivated large banks to seek relationships with activists. CRA agreements thus emerged whereby activist groups pressured banks and the latter agreed to alter lending policies to avoid challenges (Immergluck, 2004). Bank treatment of minority clients was typically the issue of contention, and CRA challenges were concentrated in cities where residents were predominantly minorities. Presence of a CRA agreement in a metropolitan area, according to Casey, Glasberg, and Beeman (2011), encouraged Black and Latino residents—but not Whites—to submit more loan applications to banks, compared with residents in areas lacking agreements. "Community activism forced regulators to create institutional processes such as public hearings and the consideration of CRA agreements in assessing CRA performance under the law" (Immergluck, 2004, p. 167).

The large banks currently predominant in many urban regions are intensely concerned about their public images and therefore seek outstanding CRA ratings. Regulatory authorities have assigned to them, without exception, the highest possible ratings (Immergluck, 2004). Focusing public attention on bank-lending practices in minority neighborhoods has encouraged banks to adopt more liberal lending policies (Bates & Robb, 2015; Immergluck, 2004). Whether the public spotlight is focused on bank-lending policies by community activists, the mass media, articles in scholarly journals, bank regulatory authorities, Michael Porter, the Initiative for a Competitive Inner City (ICIC), or other activist groups, the consequence appears to be wider credit availability in minority neighborhoods. Among banks sensitive about their public images, high CRA ratings convey multiple advantages, including the immunity it provides from activist challenges. Stegman, Cochran, and Farris (2002) estimated

that a $1 billion increase in bank assets was associated with a 5% increase in a high CRA rating likelihood. Large banks are a growing presence in many minority neighborhoods and their branches sometimes actively target minority clients. Complementary strategies entail staffing branches in minority communities with minority employees and monitoring branches to ensure employees are sensitive to the banking needs of minority clients (Lubin, 2008).

Certain facts, nonetheless, are clear: MBEs account for nearly half of all small firms located in urban minority neighborhoods nationwide (Bates & Robb, 2014). MBE owners, second, view their access to financing as severely constrained. The U.S. Chamber of Commerce surveyed 1,080 small business owners: 19% of responding Whites identified access to credit as their top problem, compared with 54% for minority owners (U.S. Chamber of Commerce, 2005, cited in Blanchflower, 2009). Influential studies have documented small-business financing scarcity in inner-city minority communities (Immergluck, 2002, 2004; Smith, 2003), while complementary studies documented the higher loan-application rejection rates of MBEs, in comparison to equally creditworthy White-owned firms (Blanchflower, Levine, & Zimmerman, 2003; Mitchell & Pierce, 2011). When MBEs do receive bank financing, they pay higher interest rates and receive smaller loans than their White counterparts (Bates & Robb, 2013).

A common initial objective of firm owners seeking business loans is to identify bank-lending criteria. In their audit study of small business owners seeking bank loans, Bone, Christensen, and Williams (2014) focused directly on this inquiry stage and found that Black and Latino owners were treated differently than matched Whites. Typifying audit studies, the White and minority testers were matched regarding age, gender, credit history, personal net north, characteristics of the loans being sought, and other traits, and their differential treatment was strongly consistent with minority owners being treated worse than Whites.

A key objective of this study was to determine whether the testers encountered similar scrutiny from loan officers when applying for loans. In comparison to White testers, minorities were more often asked to provide business financial statements (83% vs. 50%), income tax returns (86% vs. 52%), bank account information (25% vs. 0%), personal financial asset details (60% vs. 22%), and credit card debt (42% vs. 13%). Additionally, minorities were offered less frequent assistance than Whites in completing loan applications (18% vs. 59%), and loan officers offered business cards to minority testers less often (43% vs. 82%; Bone et al., 2014). Overall, minorities were consistently offered less assistance and subjected to greater scrutiny, in comparison with the White testers.

Bates and Robb (2015) analyzed KFS data describing firm and owner traits to determine both the extent of unmet small-business credit needs and outcomes of their

applications for bank loans over the 2008 to 2011 period. Nationwide, Black-, Latino-, and Asian-owned firms, compared with Whites, were more likely to be discouraged borrowers *and* more likely to have their applications denied by banks, controlling for credit-risk factors. Examining firms in urban areas only, they next compared these same outcomes in differing geographic contexts—minority neighborhoods and other urban areas—while controlling for firm and owner characteristics, neighborhood traits, and other risk-related factors. Regarding unmet credit needs, minority neighborhood location had no impact on outcomes, although owner race/ethnicity powerfully explained the incidence of discouraged borrowers (those with unmet credit needs). Among otherwise equally creditworthy firms, those owned by African Americans, Asian Americans, and Latinos had significantly higher unmet credit needs compared with Whites, and these outcomes characterized firms operating in both minority neighborhoods and other urban environs.

Among small firms actually applying for bank loans, however, very different findings emerged. Logistic regression analysis revealed that MBEs located in minority neighborhoods were actually more likely to have their applications approved by banks than minority businesses located elsewhere in urban America (Bates & Robb, 2015). They attributed this unexpected finding to banker sensitivity about meeting their CRA obligations. In the minority neighborhood context, CRA requirements are apparently being taken seriously by bankers. This finding is, nonetheless, counterintuitive, in light of companion findings of higher unmet credit needs among MBEs. Findings of the Bone et al. (2014) audit study, however, provide a logical explanation of this apparent paradox. The harsh scrutiny potential MBE applicants are subjected to at the loan inquiry stage, combined with loan officers offering less assistance to minority owners, compared with Whites, appears to suppress the incidence of loan applications actually being filed by MBEs. MBE-discouraged borrowers are numerous, in part because the applicant review practices of loan officers actively discourage potential MBE applicants from actually applying for loans.[1]

Older studies based on nationwide SSBF data consistently find large denial-rate differences across business applicant groups of different race/ethnicities. Examining their most recent loan application, only 9% of White applicants for non-line-of-credit bank loans were denied versus 56% of Blacks and 63% of Hispanics (Mitchell & Pierce, 2011). Over the time frame covered by 2003 SSBF data, the average loan size was $89,833 (White-owned firms) and $53,843 for minorities among firms with annual sales under $500,000. Corresponding loan mean interest rates were 6.9% and 9.1%, respectively, for White borrowers and MBEs (Bates & Robb, 2013).

Black-owned firms have been more widely studied than other MBEs and their difficulty accessing financing is not controversial (see Bates, 1973; Blanchflower, 2009). The issue emphasized by SSBF-based studies is whether Black firms (and MBEs generally) possessing identical risk-related traits (other than race) have less access to bank credit than Whites. The consistent finding is that Black (and Latino) applicants experience a higher incidence of loan denials and pay higher interest rates than Whites (Blanchflower, 2009; Blanchflower et al., 2003; Cavalluzzo & Wolken, 2005). Furthermore, among SSBF firms needing credit, owners often report not applying for loans because they fear rejection. After controlling statistically for the presumed greater credit risks posed by MBEs needing but not applying for credit, Blanchflower et al. (2003) found remaining gaps of 26 and 15 percentage points, respectively, for Blacks and Hispanics (relative to Whites).[2]

Bostic and Lampani (1999), like other SSBF-based studies, found statistically significant disparities in Black/White loan approvals after controlling for risk factors, but they found, as well, that firm location was a determinant of loan denials. The economic and demographic characteristics of a firm's local geography, they concluded, was important: Black applicants were rejected disproportionately, in part, because their firms were often located in economically depressed African American residential areas.

Pursuing small-firm location as a determinant of applicant outcomes, Smith (2003) analyzed CRA data describing bank lending in Chicago to determine if loan availability differed in predominantly minority neighborhoods and nonminority areas. Smith disaggregated the city into 77 neighborhoods (zip codes) and examined loan availability relative to the number of small businesses. He found that loan availability and size in lower income minority areas were relatively lower than in higher income, predominantly White areas. Loan availability was highest in Forest Glen, an affluent White neighborhood, and lowest in Washington Park, a low-income African American neighborhood. A firm in Forest Glen was 3.04 times more likely to receive bank credit than one in Washington Park; average loan size was $39,600 in the former and $9,500 in the latter. Short-term, expensive credit-card borrowings were predominant among Washington Park firms. Neighborhoods lowest in loan availability and size rankings were all low-income minority neighborhoods (Smith, 2003).

Immergluck's (2002) analysis of small-business lending in Philadelphia found similar patterns. Small firms in predominantly White census tracts received, on average, 11.0 bank loans per 100 businesses (excluding credit card balances), versus 1.2 loans in African American tracts. Controlling for family income, business credit score, and other characteristics, going from an all-White to an all-Black neighborhood resulted in a drop of 6.8 loans per 100 firms. Complementary findings of Immergluck (2002), Smith (2003), and Bostic and Lampani (1999), in summary, all portray minority neighborhoods as areas where credit availability is constrained in comparison with loan access elsewhere.

## Discriminatory Processes: Redlining, Racial Discrimination, or Both?

Mainstream finance theory studies loan access by assuming that debt providers have complete, accurate information about businesses seeking loans (Parker, 2009). In reality, small businesses are opaque: Banks financing these ventures have imperfect information about entrepreneurs' abilities and prospects for profitable operation. Lenders, additionally, are vulnerable to opportunistic defaults, often rooted in moral-hazard issues (Aghion & Bolton, 1997). Business owners best positioned to attract bank loans are high-net-worth individuals: Abundant personal wealth serves as collateral, alleviating banker moral-hazard concerns, encouraging loan approval, and larger loans at lower interest rates (Aghion & Bolton, 1997; Cagnetti & De Nardi, 2006).

Although existing evidence suggests that owner race is an independent factor shaping banker decisions about business lending, key questions remain. If owner race, other factors being equal, truly affects loan availability and lending terms, then understanding the *how* and *why* of these impacts raises deeper questions: *Why* does owner race matter? Anchoring banker risk aversion in uncertainty about applicant profitability, entrepreneurs' abilities, and moral-hazard concerns seems straightforward, but *how* is owner race causally related to these factors? Is "minority owner" a proxy for inadequate expertise? Moral-hazard concerns? Gunnar Myrdal in the 1940s observed

> the Negro businessman encounters greater difficulties than Whites in securing credit. This is partially due to the marginal position of Negro business. It is also partially due to the prejudicial opinions among Whites concerning the business ability and personal reliability of Negroes. (Myrdal, 1944, p. 308)

The rationale for banker aversion to lending in minority neighborhoods is altogether different than motivations for discriminating against MBE borrowers. In his classic study, Jackson (1985) traced the historical origins of bank redlining. Institutionalized in the 1930s was the notion that neighborhoods where "racially inharmonious groups" resided were risky places for banks to lend. Color-coded maps were used subsequently by banks and government agencies to rank neighborhoods according to their degree of lending risk. Racially mixed (and African American only) areas were shaded in red, signifying the highest risk: They were "redlined" and loan availability was minimal, irrespective of other borrower credit-risk factors.

Providing a theoretical framework explaining why redlining might be practiced by profit-oriented banks, Stiglitz and Weiss (1981) argued, "It is difficult for banks to identify 'good' borrowers, and to do so requires a variety of screening devices" (p. 393). Using the racially mixed neighborhood trait as a screening device could

conceivably make sense, if it was otherwise difficult for bankers to assess credit risks efficiently.

Bankers may also practice statistical discrimination in their dealings with MBE clients. Past studies demonstrate that in markets where shoppers incur substantial search costs, minorities often fare badly, relative to Whites. Their disparate treatment is caused in part by sellers' inferences about racial differences in customer reservation prices—higher among Blacks than Whites (Salop & Stiglitz, 1977). Reservation prices are, by definition, the prices (and terms) customers are willing to pay for specific products (bank loans, new cars). Among well-defined customer groups differing in one trait (Whites, minorities), one group accepting less favorable prices/terms than the other implies that reservation price differentials exist. Stated differently, sellers may decide to exploit racial differentials in reservation prices by charging minority customers higher prices than otherwise identical White customers because it is profitable to do so.

In their classic audit study of new-car buying, for example, Ayres and Siegelman (1995) concluded that the higher new car prices quoted to African American shoppers were not based on a psychological distaste for dealing with Blacks but on their relatively high reservation prices: "Even a market in which no participants are prejudiced might exhibit discrimination if the dealers use buyers' race or gender to make statistical inferences about the expected profitability of selling to them" (p. 304). Dealers sought higher prices from Black shoppers because it was profitable to do so. Auto dealerships owned by African Americans quoted the same higher prices as White dealers, consistent with the higher average reservation prices of Black shoppers, compared with Whites.

Audit study findings of Bone et al. (2014) indicate that starkly differential treatment is real in the experiences of minorities investigating small-business financing sources. By themselves, these findings provide no direct evidence of racial reservation price differentials regarding loan terms. What they do provide is audit study evidence of minorities being treated badly, compared with Whites. In this sense, they confirm, with control-group precision, past findings that banks treat MBEs badly, relative to equally creditworthy Whites. Studies using regression analysis to demonstrate disproportionate bank rejection of minority loan applicants, their unfavorable loan terms, and high discouraged-borrower incidence are all subject to omitted variable-bias criticisms (Becker, 1993). No such criticisms apply to the audit study findings of Bone et al. (2014).

Five types of evidence, in summary, suggest that MBEs expect to encounter difficulty when seeking bank financing. First, surveys indicate that minority owners are more likely than Whites to view credit access as their top problem. Second, studies measuring discouraged-borrower incidence indicate that minority owners, fearing denial, are less likely than equally creditworthy Whites to seek loans. Third, the higher denial rates among MBEs applying for bank financing,

in comparison to otherwise identical Whites, confirm discouraged-borrower suspicions that banks penalize them for being minorities. Fourth, compared with equally creditworthy White-owned firms, Black and Hispanic borrowers pay higher interest rates. Fifth, audit study evidence of owners inquiring about bank loans reveals that Blacks and Latinos receive greater scrutiny and are offered less assistance than matched Whites.[3] Expecting their search for financing to be difficult shapes reservation prices of MBE borrowers. Questions about underlying causes of limited MBE loan access nonetheless persist.

## Analyzing Credit Demand and Loan Terms: Database, Summary Statistics, Hypotheses, and Econometric Findings

The KFS provides the only nationally representative small-business database with firm-specific information on geographic location, loan application outcomes, and debt sources. KFS tracks firms starting operations in 2004; their strength is inclusion of annual follow-up information on financing raised subsequent to start up. Tracking a cohort of new businesses through year-end 2011,[4] KFS collected information annually on 4,928 firms, including industry, location, employee numbers, sales, profits, owner characteristics, equity and debt capital, and other traits.[5] Each calendar year is treated as a separate observation in the sense, for example, that a firm receiving a loan in 2008 is a different observation than the same firm self-identifying as a discouraged borrower in 2011. Because firm, owner, and environmental traits are recorded annually, traits of the same firm often vary, depending on the period under consideration. Additional KFS details appear in Robb, Ballou, DesRoches, Potter, and Zhao (2009).

To investigate loan access in different geographic contexts, we sorted firms, based on zip code, into businesses in (a) predominantly minority residential areas and (b) all other urban regions. We analyzed small-business credit needs and borrower loan terms. Our analyses are conducted separately for firms in (a) inner-city neighborhoods, (b) minority neighborhoods, and (c) firms located anywhere in urban America. When analyzing loan size, we focused solely on bank loan recipients. Credit-card borrowing was excluded, as were loans from informal sources, including family, friends, and/or nonbank firms.

### Statistics Describing Small-Business Borrowers in Urban America

Among the firms under consideration, those in minority neighborhoods were more likely to self-identify as discouraged borrowers and less likely to have their bank loan applications accepted compared with firms located elsewhere.

Recall that discouraged borrowers are those needing loans but not applying because they feared rejection. We chose to narrow this definition. Owners self-identifying as discouraged borrowers sometimes apply for loans anyway, despite their rejection fears. We define discouraged borrowers narrowly as those meeting two conditions: (a) they explicitly state their firms need credit but nonetheless do not seek bank loans and (b) they do not subsequently apply for bank loans in the current calendar year. Relative discouraged-borrower frequencies were 22.2% among minority neighborhood businesses and 14.8% for firms located in other urban environs. Among firms actually submitting loan applications to financial institutions, 56.7% of minority area applicants and 62.0% of applicants in other urban areas reported their applications were always approved. These applicant, loan recipient, and discouraged-borrower percentages are annual percentages.

Among discouraged borrowers, average net profits were negative, minority ownership was relatively frequent, and nearly 38% had low credit scores (Table 1). Nearly 27% of discouraged-borrower firm owners, however, reported personal wealth of at least $250,000 and 48% were college graduates. Breaking discouraged borrowers into minority neighborhood and White-neighborhood subsets, the former reported lower profits than the latter, as well as lower credit scores, personal wealth holdings, and annual sales. Judged by conventional credit-risk standards, minority neighborhood firms are collectively less creditworthy than small businesses located in other urban areas.

Compared with discouraged borrowers, bank loan recipients were better credit risks, reporting higher average profits and sales; over 57% of the owners were college graduates, owner high-wealth incidence was noteworthy, and White ownership incidence was high (Table 2). Bank loan recipients in minority neighborhoods reported higher average loan sizes ($138,300) in comparison to borrowers located elsewhere ($115,000). The minority neighborhood borrowers, furthermore, were larger, more profitable firms, on average, than borrowing firms located in other urban environs.

Looking solely at MBEs irrespective of geographic location, their discouraged-borrower incidence was higher compared with White-owned ventures, the percentage of approved loan applicants was lower, and borrower loan sizes were lower. Among firms in minority neighborhoods, loan size differentials are striking: Average loan size was $167,100 for White-owned firms and $97,200 among MBEs.

We have not reported descriptive statistics explicitly for firms in inner-city areas. According to an ICIC study, over 80% of inner-city residents are minorities (ICIC, 2005). There is, however, a major difference because inner-city areas, by definition, are characterized by a high incidence of poverty and relatively low household incomes. Predominantly minority neighborhoods, in contrast, may or may not fit this high poverty/low household income profile. This distinction is important because small businesses—MBEs and

**Table 1.** Firms Needing Credit That Choose Not to Apply for Bank Loans: Statistics Describing Firm, Owner, and Neighborhood Traits.

| | All urban firms | Minority neighborhood firms | White neighborhood firms |
|---|---|---|---|
| *A. Firm traits* | | | |
| Annual sales, 1,000 (M) | $396.7 | $377.1 | $409.1 |
| Net profit lagged 1 year, 1,000 (M) | −$11.6 | −$19.7 | −$6.7 |
| Minority neighborhood | 39.0% | 100% | 0% |
| *B. Owner characteristics* | | | |
| Black | 20.6% | 37.9% | 9.3%*** |
| Latino | 8.6% | 14.9% | 4.8%*** |
| Asian | 6.2% | 7.3% | 5.4% |
| College graduate | 48.0% | 44.6% | 49.9%*** |
| Wealth $250,000+ | 26.9% | 24.0% | 28.9%*** |
| Wealth $50,000-250,000 | 32.2% | 27.9% | 35.1%** |
| Wealth under $50,000 | 41.0% | 48.1% | 36.0%*** |
| Credit score high | 25.4% | 17.0% | 30.9%*** |
| Credit score medium | 36.8% | 40.1% | 34.4% |
| Credit score low | 37.8% | 43.0% | 34.7%*** |
| *C. Neighborhood traits* | | | |
| Household poverty rate | 9.6% | 14.8% | 6.3%*** |
| *N* | 814 | 301 | 513 |

*Note.* One, two, and three asterisks denote significance at the 10%, 5%, and 1% levels, respectively.
*Source.* Kauffman Firm Survey (KFS).
*p < 1.

**Table 2.** Bank Loan Recipients: Statistics Describing Loan Size, Firm, and Owner Traits.

| | All urban firms | Minority neighborhood firms | White neighborhood firms |
|---|---|---|---|
| *A. Firm traits (M)* | | | |
| Annual sales, 1,000 | $581.3 | $667.8 | $548.4*** |
| Net profit lagged 1 year, 1,000 | $34.9 | $39.7 | $30.9*** |
| *B. Owner characteristics (%)* | | | |
| Minority | 20.1 | 40.3 | 11.2*** |
| White | 79.5 | 58.8 | 88.6*** |
| College graduate | 57.1 | 56.0 | 57.8 |
| Wealth $250,000+ | 44.9 | 38.5 | 47.7** |
| Wealth $50,000-250,000 | 34.0 | 33.3 | 34.6 |
| Wealth under $50,000 | 21.1 | 28.2 | 17.8** |
| *C. Loan size, $ amount* | | | |
| All owners | 121.2 | 138.3 | 115.0** |
| Minority owners | 100.0 | 97.2 | 108.6 |
| White owners | 126.3 | 167.1 | 115.8 |
| *N* | 657 | 173 | 484 |

*Note.* One, two, and three asterisks denote significance at the 10%, 5%, and 1% levels, respectively.
*Source.* Kauffman Firm Survey (KFS).
*p < 1.

White-owned ventures—concentrate disproportionately in minority neighborhoods where poverty rates are below the thresholds identifying inner-city areas, and household incomes are higher. Our KFS business sample size is thus considerably smaller for inner-city firms compared with minority neighborhood ventures, thus reducing the reliability of statistics. Breaking inner-city businesses into minority neighborhood and all-others subsets is unproductive, furthermore, because the latter is too small to support meaningful statistics. Inner-city area impacts on discouraged-borrower incidence and borrower loan sizes are investigated in the econometric findings section of this study.

## Hypotheses

Our primary objective is to investigate small-business racial and spatial differences in (a) discouraged-borrower incidence and (b) differentials in loan terms of bank borrowers. Past evidence suggests that owner race and business place do affect business access to bank loans, yet key questions remain unanswered. Which among these factors really matters—business location, owner race, both, neither? Although banks face regulatory agency requirements to serve the credit needs of minority neighborhood firms and activist demands to fulfill their CRA obligations, their lending decisions are nonetheless shaped by risk aversion reflecting uncertainty about borrower repayment capacity and owner intent to repay. How do these diverse factors play out in practice?

**Hypothesis 1:** Among equally creditworthy firms, businesses in minority neighborhoods are more likely than those located elsewhere to be discouraged borrowers.

Traits often associated with urban minority neighborhoods include low, fluctuating household incomes, high crime rates, inferior public services, outdated infrastructure, and other disamenities (Bates, 2010). Because minority neighborhood firms needing credit assume bankers will penalize them for these disadvantages, they are presumably hesitant to incur the time costs and application fees required to prepare loan applications. Consistent with Bostic and Lampani's findings (1999), Hypothesis 1 assumes that minority neighborhood location is an independent risk factor.

**Hypothesis 2:** Among equally creditworthy firms, businesses owned by minorities are more likely than White-owned firms to be discouraged borrowers.

As Myrdal (1944) observed, bankers may view minority ownership as a proxy for moral hazard. Alternatively, they may simply be averse to dealing with minorities. MBE owners seeking financing incur substantial search costs and most expect the process to be difficult. Discouraged borrowers are unwilling to incur the costs of actually applying for loans—which, by their own admission, they need—because they expect to be turned down. Because MBE owners needing credit often assume bankers will penalize them for being minorities, many are hesitant to incur the time costs and fees required to complete loan applications.

**Hypothesis 3:** Among equally creditworthy firms receiving bank loans, businesses in minority neighborhoods are likely to receive loans smaller in dollar amount than firms located elsewhere.

If minority neighborhoods are indeed riskier locations for operating small businesses than other locations in urban America, other factors being equal, then bankers would logically protect themselves from these risks by offering less attractive terms to loan recipients in these areas. These terms partially compensate bankers for their increased risk exposure. Smaller loans lessen potential losses in the event of default since fewer loan dollars are at risk and borrower collateral coverage is greater, relative to loan size, thus increasing expected recoupment of the loan balance in the event of borrower default.

**Hypothesis 4:** Among equally creditworthy firms receiving bank loans, MBEs are likely to receive loans smaller in dollar amount than White-owned firms.

Assuming minority ownership is an independent factor heightening default risk, offering less attractive loan terms partially compensates bankers for their greater risk, as explained in Hypothesis (3). Alternatively, bankers may engage in statistical discrimination—providing smaller loans—to MBE borrowers because they perceive the credit market offers them fewer borrowing options, compared with equally creditworthy Whites. In this environment of fewer choices, providing MBEs with relatively inferior loan terms is consistent with banker perceptions that minority owner reservation prices differ from those of Whites. Stated differently, MBE borrowers are expected to be willing to accept smaller loans than equally creditworthy Whites, effectively lessening bank risk exposure without driving away customers. As Ayres and Siegelman (1995) observed, bankers are using borrower's race "to make statistical inferences about the expected profitability of selling to them" (p. 304). Bankers, seeking maximum profits, are presumably setting loan terms for MBEs based on what the market will bear.

We have not specified hypotheses regarding impacts of inner-city firm location regarding either discouraged-borrower incidence or borrower loan size because we have no empirical or theoretical basis for doing so. Applicable theories and findings of past studies refer to neighborhoods in terms of residential racial composition, covered already (Hypotheses 1 and 3). We could perhaps hypothesize that neighborhood poverty rates affect discouraged-borrower incidence and loan terms, but we did not because adequate theoretical underpinnings are lacking for such hypotheses. We have controlled for zip-code-level poverty rates in our regression analyses.

## Econometric Findings

One trait distinguishes minority neighborhood KFS firms from others: over 48% are MBEs, whereas 14.5% of the urban firms located elsewhere are minority owned. Marion (2009) has documented similar patterns of MBE geographic concentration. Analyzing construction firms, he found that MBEs "are disproportionately located in zip codes with the

**Table 3.** Logistic Regression—Delineating Firms Needing Credit but Not Applying for Bank Loans From Others.

|  | Regression coefficient | Standard error |
|---|---|---|
| Minority area | 0.204 | 0.162 |
| Black | 1.271* | 0.231 |
| Latino | 0.824* | 0.258 |
| Asian | 0.295 | 0.247 |
| Other minority | −0.135 | 0.376 |
| Minority area * minority owner | −0.324 | 0.273 |
| Industry experience | −0.006 | 0.006 |
| Owner hours worked | 0.014* | 0.002 |
| College graduate | −0.056 | 0.121 |
| Wealth high | −0.929* | 0.152 |
| Wealth medium | −0.731* | 0.139 |
| # Employees | 0.001 | 0.003 |
| Net profit | −0.092* | 0.003 |
| Credit score high | −0.826* | 0.152 |
| Credit score medium | −0.888* | 0.137 |
| Household poverty rate | −0.035* | 0.011 |
| Constant | 0.632 | 1.173 |
| N | 4,332 | |
| Log likelihood (significant level) | −(0.000) | |
| Efron's $R^2$ | .111 | |
| Cragg–Uhler (Nagelkerke) $R^2$ | .170 | |

*Source.* Kauffman Firm Survey database.
*Significant 5% level.

greatest concentration of own-race residents" (p. 441). This locational pattern highlights the issue of whether the numerous discouraged borrowers in minority communities reflect the high incidence of MBEs, banker aversion to lending in these neighborhoods, or both. To clarify this issue, we utilize logistic regression analysis to delineate discouraged borrowers from others, controlling for credit-risk factors. The dependent variable equals 1 for discouraged borrowers (otherwise 0): Positive regression coefficients indicate a greater likelihood of being a discouraged borrower; results are reported in Table 3.

Regression analysis results indicate that minority neighborhood firm location is unrelated to discouraged-borrower likelihood, other factors being constant. We therefore reject Hypothesis 1: discouraged borrowers apparently recognize that minority neighborhood location is not, by itself, penalized by banks. Instead, strong discouraged-borrower identifiers include (a) owner wealth of $50,000 or less, (b) firm ownership by African Americans or Latinos, (c) low profits, and (d) low credit scores (Table 3).[6] The high discouraged-borrower incidence in minority neighborhoods is apparently rooted in conventional borrower credit-risk measures *and* owner race/ethnicity, not firm location per se. The low-net-worth owner operating an unprofitable firm, in other words, correctly recognizes that banker loan-application approval is unlikely, particularly if the business has a history of credit problems. Filing a loan application is therefore a waste of

time. Interestingly, firms in neighborhoods characterized by high household poverty rates are no more likely to be discouraged borrowers than those operating in more affluent areas (Table 3). Bank regulatory authorities often stress that CRA enforcement focuses on bank lending adequacy in low-income areas (Immergluck, 2004).

Black- and Latino-owned firms, according to our regression findings, recognize that bankers view minority ownership negatively. They are therefore less likely to submit loan applications, compared with equally creditworthy White firms, because they expect to be penalized by bankers for being minority owners. We therefore accept Hypothesis 2. Race, not space, emerges as a key factor explaining the high discouraged-borrower incidence typifying urban minority communities.

We estimated a variant of Table 3's analysis to test whether inclusion of a variable identifying inner-city firms was useful for delineating discouraged borrowers from others (results not reported). Previously included variables identifying minority neighborhoods and neighborhood poverty rates were excluded from this exercise. The inner-city variable had no explanatory power: Neither inner-city nor minority neighborhood location, per se, appears to influence owner decisions about whether to apply for loans.

Ordinary least squares regression analysis is next utilized to explain the loan sizes received by small firms receiving bank loans. Two variants are reported: In Model 1, a

**Table 4.** Regression Model Explaining Loan Size Among Small Firms Receiving Bank Loans.

| | Model 1 | | Model 2 | |
|---|---|---|---|---|
| | Regression coefficient | Standard error | Regression coefficient | Standard error |
| Minority area | 0.047 | 0.244 | — | |
| Black owner | −0.618* | 0.172 | −0.676* | 0.272 |
| Latino owner | −0.551 | 0.403 | −0.370 | 0.375 |
| Asian owner | 0.200 | 0.270 | 0.294 | 0.321 |
| Other minority owner | 0.217 | 0.305 | 0.169 | 0.320 |
| Industry experience | −0.007 | 0.008 | −0.006 | 0.008 |
| Owner hours worked | 0.003 | 0.004 | 0.002 | 0.004 |
| College graduate | 0.373* | 0.169 | 0.392* | 0.187 |
| Wealth high | 0.716* | 0.244 | 0.696* | 0.252 |
| Wealth medium | −0.266 | 0.255 | −0.398 | 0.257 |
| # Employees | 0.022* | 0.006 | 0.034* | 0.007 |
| Net profit | 0.018 | 0.030 | 0.023 | 0.035 |
| Credit score high | 0.380 | 0.231 | 0.320 | 0.250 |
| Credit score medium | 0.343 | 0.241 | 0.324 | 0.269 |
| Inner-city area | — | | 0.343 | 0.442 |
| Household poverty rate | −0.002 | 0.012 | — | |
| Constant | 11.33* | 1.499 | 11.33* | 1.422 |
| N | 656 | | 549 | |
| $R^2$ | .278 | | .308 | |

*Source.* Kauffman Firm Survey database.[7]
*Significant 5% level.

locational variable identifying minority neighborhood firm location is included, while in Model 2, an inner-city identifier is employed (Table 4). The issues of interest are (a) whether minority neighborhood or inner-city location or (b) minority ownership are statistically significant determinants of loan size, after controlling for credit-risk factors. We are testing Hypothesis 3 that minority neighborhood (inner city) firm location shapes loan amounts and Hypothesis 4 that owner race/ethnicity influences loan amounts.

Consistent regression findings emerge in the sense that firm location, per se, has no impact on loan size once credit-risk factors and owner race/ethnicity are controlled for (Table 4). Hypothesis 3 is therefore rejected. Firm and owner traits related to larger borrower loan size include owner wealth of $250,000 or more, college graduate owners, and, to a small degree, being a large firm, measured by employee numbers. Owner race/ethnicity, additionally, stands out as important, but less so than in our previous analysis of discouraged borrowers; we therefore accept Hypothesis 4 with reservations. Determinants of the loan amounts banks provide to small-business borrowers include owner race in one instance: Black firm ownership, other factors being equal, is associated with smaller loan amounts. Racial differences in firm owner reservation prices are consistent with this pattern of Black-owned firms receiving smaller loans than other borrowers. Importantly, Table 4's regression exercise controls for firm industry. The coefficient attached to the Latino

borrower variable is similarly large and negative (−0.551 in Model 1), but the corresponding standard error (0.403) negates statistical significance and suggests widely varying banker treatment of Latino-owned firms in determining bank loan amounts. Although these findings are provocative, they are insufficient to justify acceptance of Hypothesis 4 in the case of Latino-owned borrowers.[8]

## Conclusion

The high discouraged-borrower incidence documented in our study confirms the consensus view that business owners needing credit often do not seek bank financing. Discouraged-borrower firms are particularly numerous in minority neighborhoods, where the percentage of small businesses needing credit, yet not applying, *far exceeds* the incidence of firms actually applying for bank loans. Numerous discouraged borrowers typifying minority neighborhoods are a reflection of their bleak credit-risk profiles *and* the high incidence of Black- and Latino-owned small businesses, not firm location, per se. The confirmed absence of a direct causal link between being located in a minority neighborhood and the likelihood of being a discouraged-borrower firm advances our understanding of why credit is scarce for small businesses in inner city, predominantly minority areas.

In light of these widespread unmet credit needs, it is important to understand why inner-city firms are so often

discouraged borrowers. The mere fact of being owned by an African American or Latino individual explains why many suffer from limited loan access. Firms benefitting from factors like the abundant, low-cost local labor supply may thrive in the same inner-city environs where others suffer, and these locational advantages often lead to solidly profitable businesses with high credit scores and owners with rising personal wealth. Our findings suggest that banks readily assist these firms, particularly if their owners are White.

Other small firms, meanwhile, cope with very real operational disadvantages, often rooted in inner-city neighborhood disamenities. Excessive competition among small firms catering to clients in overcrowded product niches is a related problem (Bates & Robb, 2014). These in turn affect firm credit histories and profitability negatively, eventually reducing owner wealth and producing high credit-risk profiles, which in turn minimize business prospects for obtaining needed financing. Bankers, our findings suggest, focus heavily on these conventional credit-risk measures (and minority ownership), not firm location, when deciding which firms to cultivate as clients. Client screening and loan-application evaluation practices assigning greater risk to all minority neighborhood firms in an across-the-board fashion harm stronger and weaker area businesses alike, but we have no clear evidence that banks pursue such strategies (Bates & Robb, 2015). We found no evidence that bankers are discriminating against local firms solely because of locational factors. Focusing narrowly on minority neighborhood/inner-city location while ignoring conventional credit-risk indicators describing those same firms is not useful if one's objective is to delineate small businesses having greater access to bank loans from those with less access.

Although our findings may appear to be inconsistent with those of previous studies documenting bank loan scarcity in minority neighborhoods, in fact they are not. Immergluck (2002), for example, documented the relatively low level of loan availability typifying Black neighborhoods in Philadelphia, but he did not investigate impacts of individual firm characteristics or owner traits on loan availability because the CRA data he analyzed lacked these variables. Our contrasting findings, based on KFS data more completely describing business/owner risk profiles, clarify the findings of Immergluck (2002), Smith (2003), and others. We are not suggesting Immergluck's findings of low Black-neighborhood loan frequency would disappear had he based his analysis on better data. We found a high incidence of discouraged MBE borrowers in minority neighborhoods, one that persisted after controlling for risk factors. This high discouraged-borrower incidence, heavily rooted in widespread MBE presence, is a likely cause of the low bank loan frequency documented by Immergluck (2002).

Regarding widespread unmet small-business credit needs, low firm profitability, credit scores, and owner wealth levels are important causal factors, but owner race stands out as an additional independent factor limiting MBE access to bank loans. By identifying owner race/ethnicity as an important causal factor, a remedial policy is obvious. Banker treatment of potential MBE clients at the applicant screening stage stands out when one considers policy options useful for increasing business loan access, both in minority neighborhoods and throughout urban America. Relatively harsh banker screening of potential MBE loan applicants (Bone et al., 2014) discourages some from completing the application process. Regarding marketing their lending services, we have no direct measures of the differing degrees to which banks target MBEs and White-owned firms. Both the audit study findings reported by Bone et al. (2014) and the higher risk-adjusted incidence of discouraged MBE borrowers documented in this study suggest that bankers more proactively seek White-owned businesses as clients than MBEs.

Our finding that banks are providing smaller loans to Black-owned small businesses (in comparison to equally creditworthy White ventures) is speculative. Whereas racial differences in borrower reservation prices provide a logical explanation for these smaller loans, other explanations are possible. Our present policy implication is that bank provision of smaller loans to Black-owned firms is discriminatory, but this assumes supply-side constraints limit loan size, not demand-side considerations. Although Black-owned firms collectively may possibly seek smaller loans than equally creditworthy Whites, we doubt that such demand-side considerations determine their smaller loan amounts.

Undercapitalization of Black-owned firms, importantly, is widely recognized as a major determinant of their lower profits and higher closure rates, in comparison to White-owned businesses (see, e.g., Bates, 1997; Fairlie & Robb, 2008). The lower levels of financial capitalization typifying Black-owned firms are "the single most important fact explaining racial differences in business outcomes" (Fairlie & Robb, 2008, p. 130). The Black-owned business borrowers receiving the larger loans are more profitable and less likely to go out of business than others, controlling for firm and owner traits. Stated differently, seeking loans equal in dollar amount to those sought by equally creditworthy White-owned firms is a sound business strategy. A possible demand-side constraint hypothesis worthy of investigation is that owners fearing rejection because of who they are possibly request smaller loans to enhance their odds of having bankers approve their loan applications.

We believe, finally, that racial differences in owner reservation prices are an important cause of the differing loan terms received by MBEs and White business borrowers. Applicable loan terms include not only loan dollar amount but loan maturity and interest rate as well. Our operating hypothesis is that the restricted borrowing choices faced by minority business owners produce observed loan-term differentials. Debt providers recognizing racial differences in these reservation prices are able to provide less favorable

loan terms, on average, to MBE owners than to White loan recipients. To test this hypothesis, an empirical analysis of factors explaining the higher interest rates paid by MBEs, in comparison with White borrowers, needs to be conducted. Although Blacks may conceivably prefer smaller loans or loans with shorter maturities than equally creditworthy White owners, they certainly do not want to pay higher interest rates. As MBEs become a growing presence among bank clients, understanding their higher average borrowing costs and smaller loan amounts may eventually become a greater focus than our traditional concerns with understanding racial differentials in unmet credit needs and loan approval rates.

A useful present-day strategy for increasing small business loan availability in inner-city minority neighborhoods involves having bank regulators actually enforce the Equal Opportunity Credit Act (EOAC) prohibiting banks from discriminating against minority applicants. The Federal Reserve Board is responsible for EOAC enforcement; an effective strategy would entail conducting the type of audit study described in Bone et al. (2014). Effective EOAC enforcement would ideally motivate bankers to subject potential MBE applicants to the same degree of scrutiny as White clients seeking loans. A complementary strategy would be to assist business owners in a color-blind manner.

Demand-side strategies possibly useful for increasing MBE access to bank loans include encouraging discouraged minority borrowers to go ahead and actually apply for bank loans. Organizations offering assistance to minority entrepreneurs should actively encourage creditworthy discouraged borrowers to complete the application process. Equal treatment of equally creditworthy firms, irrespective of race/ethnicity, at all stages of the loan application and approval process would help alleviate the higher barriers constraining minority entrepreneurs seeking financing, thus allowing more to enter into and operate successful small businesses, whether those firms are located in minority communities or elsewhere in America.

## Authors' Note

All errors are the authors' responsibility. Certain data included herein are derived from the Kauffman Firm Survey release 4.0. Any opinions, findings, and conclusions or recommendations expressed in this material are those of the authors and do not necessarily reflect the views of the Ewing Marion Kauffman Foundation.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: Research reported in this study was generously supported by the Ewing Marion Kauffman Foundation.

## Notes

1. High-level bank officials often appear to encourage nondiscriminatory lending practices, but this sentiment may or may not filter down to the branch bank level. For this reason, the type of audit study described by Bone et al. (2014) is sometimes commissioned by banks seeking to monitor the loan evaluation policies pursued by their individual branches (Lubin, 2008).
2. Asian-owned firms are routinely identified as less likely than Whites to have their loan applications approved, but owner race emerges inconsistently as a significant determinant of application rejection, perhaps because of sample-size constraints.
3. Owners were asked about loans each year and asked to include new as well as renewal applications.
4. The KFS sampling frame is based on Dun & Bradstreet data. The KFS excludes branches/subsidiaries owned by existing businesses. A "business," by definition, was created by one or more people and includes purchasing an existing business or a franchise. Firms generating trivial annual sales were excluded.
5. Because certain firm subgroups were oversampled, we weighted the KFS data to compensate.
6. Alternative specifications of Table 3's regression model generate results consistent with the findings discussed here; see Bates and Robb (2015). Definitions of explanatory variables used in regression analyses, often self-explanatory, require some clarification. Net profit is measured in hundreds of thousands (e.g., $20,000 = 0.2$).
7. Year dummy variables, industry, owner age, and owner gender also controlled for in Tables 3 and 4 regressions.
8. Another interesting variant of our loan-size analysis entails delineating White Latino owners from non-Whites. Roughly 30% of Latino firm owners self-identify as White, under 4% identify themselves as Black, and the rest self-identify as other minorities. White Latinos may be treated differently than other Latino owners when bankers set loan terms. We are unaware of any studies testing this possibility.

## References

Aghion, P., & Bolton, P. (1997). A theory of trickle-down growth and development. *Review of Economic Studies*, *64*, 151-172.

Ayres, I., & Siegelman, P. (1995). Race and gender discrimination in bargaining for a new car. *American Economic Review*, *85*, 304-321.

Bates, T. (1973). An econometric analysis of lending to Black-owned businesses. *Review of Economics and Statistics*, *55*, 272-283.

Bates, T. (1997). *Race, self employment, and upward mobility: An illusive American dream*. Baltimore: Johns Hopkins University Press.

Bates, T. (2010). Alleviating the financial capital barriers impeding business development in inner cities. *Journal of the American Planning Association*, *76*, 349-362.

Bates, T. (2011). Minority entrepreneurship. *Foundations and Trends in Entrepreneurship*, *7*, 151-311.

Bates, T., & Robb, A. (2013). Greater access to capital is needed to unleash the local economic development potential of minority-owned businesses. *Economic Development Quarterly*, *27*, 250-259.

Bates, T., & Robb, A. (2014). Small-business viability in America's urban minority communities. *Urban Studies*, *51*, 2844-2862.

Bates, T., & Robb, A. (2015). Has the Community Reinvestment Act increased loan availability among small businesses operating in minority neighborhoods? *Urban Studies*, *52*, 1702-1721.

Becker, G. (1993). Nobel lecture: The economic way of looking at behavior. *Journal of Political Economy*, *101*, 385-389.

Blanchflower, D. (2009). Minority self-employment in the United States and the impact of affirmative action programs. *Annals of Finance*, *5*, 361-396.

Blanchflower, D., Levine, P., & Zimmerman, D. (2003). Discrimination in the small business credit markets. *Review of Economics and Statistics*, *85*, 930-943.

Bone, S., Christensen, G., & Williams, J. (2014). Rejected, shackled, and alone: The impact of systematic restricted consumer choice among minority customers' construction of self. *Journal of Consumer Research*, *41*, 451-474.

Bostic, R., & Lampani, P. (1999). Racial differences in patterns of small business finance. In J. Blanton, A. Williams & S. Rhine (Eds.), *Business access to capital and credit* (pp. 253-276). Washington, DC: Federal Reserve System.

Cagnetti, M., & De Nardi, M. (2006). Entrepreneurship, frictions, and wealth. *Journal of Political Economy*, *114*, 835-870.

Casey, C. (2009). Linking social capital and indirect policy tools: Fostering equitable community investment responses. *Journal of Planning Education and Research*, *28*, 413-425.

Casey, C., Glasberg, D., & Beeman, A. (2011). Racial disparities in access to mortgage credit: Does governance matter? *Social Science Quarterly*, *92*, 783-806.

Cavalluzzo, K., & Wolken, J. (2005). Small business loan turndowns, personal wealth and discrimination. *Journal of Business*, *78*, 2153-2178.

Fairlie, R., & Robb, A. (2008). *Race and entrepreneurial success: Black-Asian- and White-owned businesses in the United States*. Cambridge: MIT Press.

Immergluck, D. (2002). Redlining redux: Black neighborhoods, Black-owned firms, and the regulatory cold shoulder. *Urban Affairs Review*, *38*, 22-44.

Immergluck, D. (2004). *Credit in the community*. Armonk, NY: M. E. Sharpe.

Initiative for a Competitive Inner City. (2005). *State of the inner city economies: Small businesses in the inner city* (Research Contract SBAHQ03-M-056). Washington, DC: U.S. Small Business Administration.

Jackson, K. (1985). *Crabgrass frontier: The suburbanization of America*. New York, NY: Oxford University Press.

Lubin, P. (2008). *Fair lending testing: Best practices, trends, and training*. Cambridge, MA: Joint Center for Housing Studies, Harvard University.

Marion, J. (2009). Firm racial segregation and affirmative action in the highway construction industry. *Small Business Economics*, *14*, 441-453.

Mitchell, K., & Pearce, D. (2011). Lending technologies, lending specialization, and minority access to small-business loans. *Small Business Economics*, *37*, 277-304.

Myrdal, G. (1944). *An American dilemma: The Negro problem and modern democracy*. New York, NY: Harper & Row.

Parker, S. (2009). *The economics of entrepreneurship*. Cambridge, England: Cambridge University Press.

Robb, A., Ballou, J., DesRoches, D., Potter, F., & Zhao, Z. (2009). *Overview of the Kauffman firm survey*. Kansas City, MO: Ewing Marion Kauffman Foundation.

Salop, S., & Stiglitz, J. (1977). Bargains and rip-offs: A model of monopolistically competitive price dispersion. *Review of Economic Studies*, *44*, 493-510.

Smith, G. (2003). Small business lending in the Chicago region, 2001. *Reinvestment Alert*, *23*, 1-17.

Stegman, M., Cochran, K., & Farris, R. (2002). Toward a more performance-driven service test: Strengthening basic banking services under the Community Reinvestment Act. *Georgetown Journal of Poverty Law & Policy*, *9*, 405-452.

Stiglitz, J., & Weiss, A. (1981). Credit rationing in markets with imperfect information. *American Economic Review*, *71*, 393-410.

## Author Biographies

**Timothy Bates** is a distinguished professor at Wayne State University. Previously, he was chair of the graduate program of urban policy analysis at the New School for Social Research. He is currently writing a book, "Black Detroit and the Promise of America," coauthored by Beth Bates.

**Alicia Robb** is a senior fellow with the Ewing Marion Kauffman Foundation and the founder of Next Wave Ventures, which is focused on driving diversity in angel investing. She is also a visiting scholar with the University of California, Berkeley.

# Exhibit H

*Journal of Economic Perspectives—Volume 28, Number 3—Summer 2014—Pages 25–48*

# Entrepreneurship as Experimentation[†]

## William R. Kerr, Ramana Nanda, and Matthew Rhodes-Kropf

**A**lthough the fundamental importance of entrepreneurship has been generally recognized by economists since at least Schumpeter (1911 [1934]; 1943), it has not been the subject of substantial research and is more-or-less absent from standard textbooks. Over the last decade, however, entrepreneurship has flourished as a research topic within economics. As entrepreneurship emerges from the shadows, many central and unresolved questions linger: How should we define entrepreneurship? What are its key aspects? Is entrepreneurship about the next Skype or the next self-employed accountant? We assert in this paper that effective entrepreneurship—especially among high-growth ventures and for the economy as a whole—builds upon a process of experimentation in deep and nuanced ways.

Entrepreneurship is fundamentally about experimentation because the knowledge required to be successful cannot be known in advance or deduced from some set of first principles. As Hayek (1948) put it, "the solution of the economic problem of society is . . . always a voyage of exploration into the unknown." For entrepreneurs, it can be virtually impossible to know whether a particular technology or product or business model will be successful, until one has actually invested in it.

Two interesting examples help frame the discussion. In 1999, the venture capital firms Sequoia Capital and Kleiner Perkins Caufield & Byers each invested $12.5 million in Google, a brand new startup that claimed to have a superior search engine. By the time Sequoia sold its stake in 2005, that investment was worth over

■ *William Kerr, Ramana Nanda, and Matthew Rhodes-Kropf are Associate Professors at Harvard Business School, Harvard University, Boston, Massachusetts, and Faculty Research Fellows at the National Bureau of Economic Research, Cambridge, Massachusetts. Their email addresses are wkerr@hbs.edu, RNanda@hbs.edu, and mrhodeskropf@hbs.edu.*

[†] To access the data Appendix, visit
http://dx.doi.org/10.1257/jep.28.3.25                    doi=10.1257/jep.28.3.25

$4 billion, returning 320 times the initial cost (Sahlman 2010). The staggering success should not obscure a key point—Google was by no means a sure-shot investment in 1999. The search algorithm space was already crowded and dominated by other players such as Yahoo! and Altavista. Google, founded by two students, might well have turned out to just be a "me too" investment. In fact, other venture capitalists had turned down the opportunity to invest in Google at the time. One such firm was Bessemer Ventures. Partner David Cowan, on being asked by a friend to meet with the two Google founders who had rented space in her garage, is believed to have quipped, "How can I get out of this house without going anywhere near your garage?" (Bessemer Venture Partners, no date). Over the years, Bessemer has been so successful that they playfully mock at their "anti-portfolio" of deals that they passed on (at http://www.bvp.com/portfolio/antiportfolio).

Not many investors are as candid about great opportunities that they have passed on, but more recently, Fred Wilson of Union Square Ventures has similarly written about his regret at passing on Airbnb, a startup that lets people rent rooms or homes to prospective guests online. Started in 2008, Airbnb currently lists 500,000 properties in more than 34,000 cities across 192 countries, far more than any hotel chain—thereby making it the largest lodging company and brand in the world (Levere 2013). Wilson (2011) explains Union Square Venture's decision to pass on the deal in 2009: "we couldn't wrap our heads around air mattresses on the living room floors as the next hotel room. . . . Others saw the amazing team that we saw, funded them, and the rest is history."

These two examples highlight several challenges associated with commercialization of new ideas, products, and technologies. First, the actual distribution of returns in such ventures has a low median value but very high variance (Scherer and Harhoff 2000; Hall and Woodward 2010). Most new ventures fail badly, but some turn out to be wildly successful. Second, even for professional investors or managers making resource allocation decisions, it is impossible to know in advance which ideas will work. As we describe in greater detail below, venture capital investors make their returns on the one investment out of many that turns out to be a wild success like Google or Airbnb. The vast majority of venture capital investments, however, return less than the face value of the investment.

How entrepreneurs and investors respond to these inherent challenges has important implications for their own success and also for the broader economy in terms of the "best ideas" being commercialized. To flesh out this point, it is important to separate two frames of reference regarding experimentation. The first relates to economic experimentation in a Darwinian sense, which is the natural starting point for most economists. In this conceptual model, new ventures compete with existing products and technologies, and the ensuing competition leads to the survival of the fittest, just as Google surpassed its early rivals due to its superior technology. This competition can be described as experimentation at the level of the economy. In settings where the best approach among several options is unknown, a great benefit of market-based economies is that winners are often chosen by consumers and competition. As Rosenberg (1994) has argued, one of the defining features

*Table 1*
**US Venture Capital Statistics for 2010**

| | |
|---|---|
| Number of active venture capital firms | 462 |
| Amount invested by venture capital firms | $22 billion |
| Number of companies receiving venture capital investment | 2,749 |
| Number of companies receiving funding for first time | 1,001 |
| Share of dollars invested in Information Technology firms | 51% |
| Share of dollars invested in Life Science firms | 27% |

*Source:* Data from National Venture Capital Association, nvac.org.

of capitalism is the freedom it provides entrepreneurs to pursue novel approaches to value creation in the pursuit of economic gain. The promise of large rewards drives entrepreneurs to experiment with new ideas, helping to create a dynamic and growing economy. An institutional environment that facilitates experimentation is thus central to maintaining a vibrant entrepreneurial ecosystem (Dosi and Nelson 2010). This experimentation, combined with a willingness to let losing incumbents fail, is the underlying notion behind Schumpeter's (1943) process of "creative destruction."

While this Darwinian depiction is important and a natural starting point, a second reference point emphasizes that we should be cautious of assuming that market-based mechanisms can always serve as a guiding hand with respect to experimentation. As in the Google example, it is often very difficult to know whether a particular technology or venture will succeed until one has made an investment. Moreover, the investments to obtain this vital information can be nontrivial: in Google's case, a total of $25 million was invested in the first round. Table 1 documents some basic facts about the venture capital industry, including the number of active investors. Given the relatively small number of financiers that invest in this sector, it is easy to imagine scenarios where Google or other highly productive investments fail to receive the required funding.

In an entrepreneurial setting, where the benefit of pursuing different approaches is not clear and the costs of tests are expensive, each individual endeavor is also engaged in a process of experimentation. As these experiments provide information about the likelihood of ultimate success, entrepreneurs and investors gain information about whether to continue the project. However, the investment and continuation decisions for entrepreneurs are often not made in a competitive Darwinian contest, because the decisions to invest further or shut down a firm are often made by only a few investors, well before startups can compete in the product market or have positive cash flow. Moreover, the decisions are made by discrete individuals, often in venture capital firms or other early-stage financing vehicles, whose actions are impacted by a myriad of incentive, agency, and coordination problems. Thus, the extent to which the best idea goes forward may depend on factors such as the organizational structure or incentive system of the firm where the investor is based, available information sets (for example, access to certain networks),

coordination costs, and other such frictions. Taken together, these factors affect how much experimentation is undertaken in the economy and also the trajectory of experimentation, with potentially very deep economic consequences.

The lens of experimentation has implications for what types of innovations will occur, who will pursue them and when. As Stern (2005) argued, "a favorable environment for entrepreneurship and a high level of economic experimentation go hand in hand." Although experiments can be conducted in large companies or in the public sector, new technologies and innovative products are often commercialized by entrepreneurs and often cluster at particular times. We argue that the costs and constraints on the ability to experiment alter the type of organizational form surrounding innovation and influence when innovation is more likely to occur.

This article considers these costs and constraints to experimentation by investors and the implications that these issues have on the type of entrepreneurship across time and across economies. We start with a micro-level examination of experimentation and focus on the processes used by investors to experiment and the issues that individual firms face. We then turn to the macro perspective of the economy and the policies that shape entrepreneurship and its effectiveness.

## A Closer Look at the Process of Experimentation

High-impact entrepreneurship requires, almost by definition, going against the grain. Rajan (2012) argues that an entrepreneur "must be willing to strike out, largely on the basis of intuition, on courses of action in direct opposition to the established settled patterns." A consequence of this setting is extreme uncertainty about whether a particular technology, product, or business model will be successful. This uncertainty is fundamentally different from risk, as Knight (1921) stressed. With risk, such as placing money on a spin of a roulette wheel, one can define exact probabilities and expected values. With Knightian uncertainty, these probabilities are not known, and even the form of the potential outcomes may be unclear. For example, looking forward from today, at what rate will electric cars, if at all, replace traditional automobiles and how will the supporting infrastructure for battery recharging be designed? What will be the impact of nascent augmented reality technologies for how humans interact? Which, if any, of the several current ideas to cure cancer will be successfully commercialized?

In this environment of tremendous uncertainty, experimentation allows entrepreneurs and investors to assess and commercialize projects without investing the full amount. Crucially, experimentation offers more than just a possibility of higher returns—it also allows entrepreneurs and investors to pursue projects that are not feasible in an all-or-nothing bet. For example, consider a project that requires $110 to commercialize and will be worth $0 with 99 percent probability or $10,000 with 1 percent probability. This project will not be pursued, because its expected value is negative ($-\$10$). But imagine we can conduct an experiment that will reveal if the project has a 10 percent chance of working. (Suppose further that the probability

of the experiment having a positive outcome is only 10 percent, so that in this example the 1 percent chance of overall success is unchanged.) If the experiment gives a positive signal, the project has a larger expected value of $890. Thus, as long as the experiment costs less than $89 (10 percent × $890), the experiment should be conducted, with the project then being either shut down or commercialized based upon the results.

This simple example provides insights into many features of the entrepreneurial landscape, as we elaborate below. The test resolves uncertainty about the project's potential and creates a real option value for further pursuit. Thus, experimentation is particularly valuable in cases where initial information can be especially informative about the overall quality of the project and this information is cost effective to obtain.[1]

The example also illustrates that the costs of experimenting are important. Our simple example was phrased in terms of the direct costs of conducting the test. More broadly, important indirect costs must be borne by either the investor or entrepreneur when they fail. Even if direct costs are small, significant indirect costs like a stigma of failure (Landier 2005) may still prevent entrepreneurs from pursuing otherwise valuable tests if they only have a 10 percent chance to succeed. Moreover, the ability to document and transmit the results of experiments is important, because the information from the experiment is only valuable if it can be acted upon. Can an investor use the information to decide to provide the follow-on investment required to realize the project? The framework also begins to highlight the distinct roles of the entrepreneur and the investor.

We trace these features out next by first looking more closely at the economics of a venture capital firm. This setting provides a powerful archetype of high-impact entrepreneurship more broadly and the role of experimentation. We then discuss frictions to experimentation that are observed in the economy and the extent to which agents are able to address them.

### The Economics of Experimentation in a Venture Capital Firm

The economics and structure of a venture capital firm provide insights into entrepreneurship as experimentation (Sahlman 1990). A crucial starting point is the recognition that venture capital firms do not simply act as a portfolio of risky startups. While the portfolio nature of a venture capital firm is important, it is quite distinct from what is observed in stock market mutual funds, for example, where the portfolio is designed to smooth out the idiosyncrasies of individual stocks. Venture capital firms are better thought of as conducting a portfolio of tests across a number of highly uncertain ideas with skewed economics (similar to the example described above). In most cases, the tests come out negative. In fact, the majority of venture-capital-backed firms fail, despite the investments made into them by highly skilled investors. Once venture capital firms identify the

---

[1] Weitzman (1979) introduces and analyzes the optimal search behaviors under these uncertainties.

cases that deliver positive test results, however, they pursue them aggressively and invest ever larger amounts on the promising candidates to scale them up. Whereas mutual fund investors do not need to be an early investor in a company in order to be allowed to invest more later, this is precisely the way that venture capital firms aim to make money—by starting small and owning a larger share of the firms that turn out to be successful, while attempting to cut their losses on the unsuccessful ones as early as possible.[2]

Some simple calculations document these skewed returns using data on all venture capital investments in the United States. Using data from Thompson Venture Economics, we identify all startup ventures that received their first round of early-stage financing for the years between 1985 and 2009. We calculate both the total investment made by venture capital investors in each of these firms, as well as the gross return at the time of exit—either through an acquisition deal, an initial public offering, or bankruptcy. We then group each of these startups based on their economic return to investors at the time of exit—that is, the ratio of the gross return at the point of exit divided by the total amount invested in the startup. About 55 percent of startups that received venture capital over this period were terminated at a loss, and only 6 percent of them returned more than five times their investment. This 6 percent group, however, was extremely successful and together accounted for about 50 percent of the gross return generated over the period.[3] The fact that the returns are so skewed across the portfolio is *prima facie* evidence that the (quite knowledgeable) investors cannot distinguish in advance the next Google from the other cases.

A second example provides more systematic evidence on the difficulty of predicting outcomes, even conditional on a venture capital firm making an investment. For a single large and successful venture capital firm that has invested more than $1 billion over the last decade, we have access to both the outcomes of individual investments and the scores that partners assigned to each venture at the time of their first investment. We place the investments of this firm into buckets according

[2] Gompers and Lerner (2004) and Da Rin, Hellman, and Puri (2013) provide a comprehensive overview of these intermediaries. Chemmanur, Krishnan, and Nandy (2011) and Puri and Zarutskie (2012) provide recent evidence on the performance of venture-capital-backed startups. Parker (2004) provides a broader review of the literature on entrepreneurship.

[3] Total gross returns need to be estimated due to the fact that a venture's value at exit is missing for a large number of acquisitions, for firms that went bankrupt, and for the "living dead"—firms that are coded as still private but have not received follow-on financing for several years. Our research suggests that most of the acquisitions without data are fire sales and that firms that are coded as "alive" but have not received a follow-on round of financing within three years of the last financing are likely to be bankrupt. In the calculation reported above, we have conservatively assumed that unreported acquisitions were undertaken at 1.5 times cost and that firms that did not receive subsequent rounds of financing for three years, but were coded as still private, were liquidated at 0.25 times cost. The results are robust to assuming a wide range of possible values for these outcomes, including an (implausible) average of two times the dollars invested in the firm. These numbers correspond closely with numbers from Sahlman (2010) who uses data from eleven early-stage venture capital firms to show that 64 percent of their investments were terminated at a loss, while 8 percent of the investments, those that returned over five times the investment, generated about 60 percent of the gross return of the portfolio.

*Figure 1*
**Total Cost and Total Return for a Venture Capital Firm**



*Source:* Authors using proprietary data from an anonymous venture capital firm that has invested more than $1 billion over the last decade.
*Notes:* Investments are placed into buckets according to their return multiple. For each bucket, we show the total cost and total return for that group of investments.

to their return multiples, and in Figure 1, show the total cost and total return for each bucket of investments. The distribution of outcomes for this firm follows the same pattern as the aggregate data on venture capital (with about 60 percent of investments terminated at a loss and 10 percent generating a return more than five times the capital invested).

The firm has an excellent track record in the industry, which implies a well-functioning algorithm for choosing and managing investments. Conditional on making an investment, however, Figures 2A and 2B show the limited ability of the venture capital investors to tell the most successful investments from the less successful ones—even for these experienced investors. Figure 2A highlights that the distribution of scores assigned to investments that ended up performing extremely well is statistically no different from the distribution of scores assigned to investments that ultimately failed or had mediocre returns.[4] (The labels on the horizontal axis

---

[4] The Kolmogorov–Smirnov test for equality of distribution functions could not reject the hypothesis that these were the same.

*Figure 2*

**Scores Assigned to Investments at Time of First Investment and the Ultimate Returns of Those Investments, for One Venture Capital Firm**

A: Distribution of Scores by Outcome



B: Correlation between Scores and Outcomes



*Note:* The labels on the horizontal axis have been suppressed to maintain the confidentiality of the investor's rating scale, but lower predictions were on the left and higher predictions were on the right.

have been suppressed to maintain the confidentiality of the investor's rating scale, but lower predictions were on the left and higher predictions were on the right.) Figure 2B is a scatterplot showing, for each of the firm's investments, the average score assigned at the time of first investment on the x-axis versus a function of the return multiple on the y-axis. The raw correlation between scores and the return multiple from the investments is 0.1.

This example shows that even conditional on making an investment, it is hard for the investors to predict which firm will be successful. Using a similar framework from a sample of early-stage "angel investors" in Kerr, Lerner, and Schoar (2014), the correlation among the interest levels assigned to funded deals and their ultimate success is less than 0.1. Again, these examples help illustrate the high degree of uncertainty present in these investments.

Thus, venture capital firms need to experiment, and many aspects of their business model facilitate or emphasize this experimentation. One example is their focus on sectors that are capital-efficient for both experimentation and subsequent scaling and that can generate large returns for the successful investments in a short period of time. Under these conditions, most notably associated with information technology investments, venture capital firms can run initial experiments of manageable financial sizes and then fund the winners to completion. The corollary to this, which is further elaborated upon below, is that venture capital activity is concentrated in a narrow range of technological opportunities. Some sectors, like renewable energy production, need to be proven at large scale to demonstrate technical feasibility and unit economics. Commercializing such ventures requires building large manufacturing plants and hence is significantly more capital intensive, and takes much longer. Following a brief period where venture capitalists invested heavily in biofuel and solar technologies only to learn these lessons the hard way, they have largely shied away from funding renewable energy production startups, instead devoting their attention within clean energy to startups commercializing energy efficiency, smart grid, and other software technologies (Nanda, Younge, and Fleming, forthcoming). Fleming (2001) and Fleming and Sorenson (2004) discuss the aggregate implications of a narrower range of search or recombination.

In addition to focusing on specific sectors, venture capital structures and contractual choices also address experimental challenges. For example, in a way that is similar to our earlier numerical example, venture capital investors provide staged financing to startup companies that tie each financial infusion to milestones—points at which information is revealed about the quality of the project. This structured financing builds real options (for example, Gompers 1995; Bergemann and Hege 2005; Bergemann, Hege, and Peng 2008), by matching the amount of money raised in each round to the specific uncertainty that needs to be resolved with that round of funding: for example, proof that the technology works, that consumers will buy the product, and so on. The most successful investors and entrepreneurs are able to identify the most important uncertainties facing a new idea and experiment in a way that resolves the greatest proportion of the uncertainty around them effectively and quickly.

The consequence of this staging approach is that an important role of venture capital firms is to shut down ventures for which they are receiving bad signals. Investors exercise the abandonment options in several ways. Across financing rounds, the investors can choose to not reinvest in the company; within each financing round, venture capital firms also structure contracts to provide them with control and cash flow rights. Control rights allow venture capital firms to replace underperforming chief executive officers, and the investors can also push the company to reposition itself if the chosen path turns sour. These rights appear to be exercised often (for example, Hellman and Puri 2000; Kaplan, Sensoy, and Strömberg 2009; Tian 2011).[5]

The available evidence suggests that this process of venture capital experimentation does lead to successful economic outcomes. Kortum and Lerner (2000) and Samila and Sorenson (2011) document spillover effects from venture capital activity within industries and cities, respectively. Using Census Bureau data, we provide descriptive evidence of how this sort of experimentation is associated with outcomes for ventures. We use name and address matching to identify new entrants that received venture capital investments during the 1986–1997 period. Looking ahead to 2007, 75 percent of these venture-capital-backed ventures have shut down, but the remaining firms have grown to a level where they combine to equal 364 percent of the total employment of the original investments (including those that failed). For comparison, we generated a second sample of non-venture-capital-backed entrants that have the same four-digit industry, year, and starting employment level as the investment sample. In 2007, a greater share of this second group remains alive—only 66 percent have shut down. However, those that are alive only account for two-thirds (67 percent) of the total employment of their original sample. These matched ventures have thus grown, but not nearly to the extent of the venture-capital-backed group. While our simple matching procedure may leave residual differences across the groups and also does not account for either the role of selection or the effect of venture capital on startups' outcomes, it should not obscure the broad overall point: the venture-capital-backed ventures experienced a higher if similar rate of failure (75 versus 66 percent) but also experienced far greater employment gains (364 versus 67 percent of employment in their samples). High-growth ventures typically constitute a small proportion of new startups but are responsible for a disproportionate share of employment and GDP. As a rough benchmark, about 1,000 of the over 500,000 firms founded each year in the United States obtain venture capital finance, but these firms account for about 40 percent of new US publicly-listed companies over the last three decades (Ritter 2014).

---

[5] Many other aspects of the venture capital model reflect these cash-flow and control rights (for example, Kaplan and Strömberg 2003, 2004). One prominent example is convertible preferred stock that protects venture capital firms in bad outcomes by allowing them to redeem the full value of their investment, thereby treating the investment as debt to the extent that the failed venture has any residual value. On the other hand, in positive outcomes, the venture capital firm can choose to convert the preferred to common stock, allowing them to share in the upside when things go well.

**Frictions for the Process of Experimentation—Costs of Experiments**

The costs of running experiments play a big role in entrepreneurship. Technological change in the last decade has dramatically lowered these costs, particularly in industries that have benefited from the emergence of the Internet, including trends like open-source software and cloud computing. Industry observers suggest that firms in these sectors that would have cost $5 million to set up a decade ago can be done for under $50,000 today. For example, open-source software lowers the costs associated with hiring programmers. In addition, fixed investments in high-quality infrastructure, servers, and other hardware are no longer necessary at the birth of many software firms because they can be rented in tiny increments from cloud computing providers and efficiently scaled up as demand for their products increases (Blacharski 2013; Palmer 2012). This reduced entry barrier has led to an explosion of experimentation with new entrepreneurial ideas in this area. Funding sources have also proliferated as the ability to finance these smaller and cheaper experiments is possible for individuals and groups beyond the traditional venture capital investors with large pools of capital.

One prominent example of this shift is the Lean Startup methodology advocated by serial entrepreneur Steve Blank and popularized by Eric Ries's (2011) book, "The Lean Startup." Many startup founders have shaped their efforts using the Lean Startup approach, and the ideas have reached the leadership of large companies like Jeff Immelt, the chief executive officer of General Electric. The core of the management style is a focus on identifying and developing "minimal viable products" (MVPs) that reveal how well the overall opportunity will fare. An example of an MVP is the release of a consumer website that has only 10 percent of the functionality that the founders ultimately envision for the product. However, by quickly building a workable version with only the bare essentials, the MVP approach seeks to validate as many assumptions as possible about the viability of the final product before expending enormous effort and financial resources. From the information collected during these experiments, the venture adjusts its course in a way that may involve pivoting from the original agenda. The followers of this methodology frequently discuss how to make their experiments ever more cost-effective, in large part so that they do not need to raise as much money to pursue a range of possible ideas.

This approach to building companies has coincided with the rapid rise of angel investors and crowd-funding platforms,[6] particularly for consumer Internet startups.

[6] Angel investors are defined as individuals investing their own capital in startup ventures. Given the decentralized nature of such investments, it is extremely difficult to accurately quantify the size of the market. The Angel Capital Association (2012) estimates that its membership consists of about 8,000 accredited investors (who are individuals allowed by the Securities and Exchange Commission to make investments in risky, private startups) who invest in approximately 800 companies per year. The size of the broader angel market has been estimated to be as large as $20 billion dollars, but the vast majority of this is tiny investments made by individuals in firms that are already cash-flow positive (Shane 2009). The total does, however, provide a sense of how large the crowd-funding market could be given recent changes in regulation through the Jumpstart Our Business Startups (JOBS) Act of 2012, which allow a larger number of individuals to invest legally in private companies (Nanda and Kind 2013).

For example, AngelList, a platform dedicated to matching startups with angel investors experienced rapid growth since its founding in 2007, and in June 2013 had approximately 100,000 startups and 18,000 accredited investors on its platform, of which 2,000 had been funded (Nanda and Kind 2013). The lower costs associated with initial experiments implies that those with pools of capital smaller than typical venture capitalists can more easily become involved in these financing decisions. Because positive information from experiments leads the valuation of startups in subsequent rounds to increase substantially, this leads to less dilution for early-stage financiers and makes it even more attractive for investors with smaller pools of capital to get involved with financing decisions. Equally important, however, is the fact that as these experiments get better at quickly telling apart projects with high and low potential, they allow startups that would probably not have received funding in the past due to their uncertain outcomes to now receive financing. Ewens, Nanda, and Rhodes-Kropf (2014) show that these are particularly likely to be startups that had a very small chance of being extremely successful, such as those founded by young, inexperienced, first-time entrepreneurs. While these individuals would not have received capital in the past, the financing environment has changed in recent years, creating room for cohort-based accelerator programs with an educational component, such as Y-Combinator, that aim to provide mentoring, networks, and capital to such founders (Graham 2008). Fehder and Hochberg (2014) document that there were no such programs in the United States in 2004, but by 2013 over 40 such accelerators were functioning across the United States.

While a trend toward lower start-up costs is particularly true in software and information technology businesses, where the cost of experimentation has declined dramatically and the frequency with which one learns new information about the product is very high, the same forces exist in very capital-intensive industries as well. An example is Terrapower, a startup trying to commercialize a new way of producing nuclear energy (Sahlman, Nanda, Lassiter, and McQuade 2012). Bill Gates, an early backer of Terrapower, noted that rapid advances in computing power provide this startup with significant advances toward experimentation. In the past, Terrapower would have had to construct an entire nuclear power plant to test whether its new technology would work in practice, costing several billion dollars and taking years to complete, making it impossible to finance in the first place. Now, with the introduction of supercomputers, Terrapower's engineers can simulate the inside of a nuclear reactor, learn whether its technology will work, and make rapid (and much cheaper) iterations to gain more confidence about the potential of the technology before ever constructing the physical nuclear power plant. This in turn makes it viable to finance an initial exploration for an early-stage investor.

These examples reinforce two points about the cost of experimentation. First, differences across industries in the ability and cost to learn about the final outcome have a huge bearing on the degree of experimentation that we see in early stages—the very long time frames and costs for learning about potential technologies in renewable energy or different approaches to curing cancer create a dearth of experimentation, despite intense societal interest (Fernandez, Stein, and Lo 2012). Even

for venture capital firms, the levels of investment required for clean energy efforts or certain healthcare investments tend to be too high per project for them to bear.

Second, the pace of technological progress has a feedback effect on new innovations. As technological advances such as supercomputers or cloud computing diffuse, they affect the cost of experimentation in completely different sectors like nuclear energy and consumer Internet. The advances mean that projects that had a negative expected value in the past become viable. Referring to our earlier numerical example, they may drop the cost of the hypothetical test from several hundred dollars to less than $89. This spillover effect helps sustain and potentially even increase high rates of technological progress.

**Frictions for the Process of Experimentation—Organizational**

A key part of experimentation is the ability to terminate projects, but organizations differ in their ability and willingness to terminate underperforming ventures. The venture capital industry has long used the expression "throwing good money after bad money" to warn against continual investment in startups for whom the initial experiments reveal poor information. Venture capital firms that shut down more ventures do not necessarily perform worse, and, in fact, some of the best venture capital firms have among the highest rates of abandoning projects—in part because their skill at designing experiments and acting upon the results allows them to pursue more aggressive strategies and enter into more uncertain domains.[7]

This capacity to terminate projects, while certainly not exclusive to the venture capital community, is often difficult to replicate within large corporations or through equity markets. Large corporations, for example, often find it difficult to terminate experiments that aren't working out, due in part to career concerns of the managers in charge of the effort, the "soft budget constraints" that arise when a large corporation can keep providing funding for a time, and similar traits. The initial experiment may also provide ambiguous or slightly negative information that can be interpreted in different ways depending upon the biases of parties. In several ways, the venture capital system is designed to counteract these tendencies, beginning with an industry structure where venture capital firms are separate from the startup itself but still capable of intensive monitoring. Another mechanism often used by venture capital firms is to bring in new investors with each financing round to ensure that the deal is evaluated by outsiders. In academia, the academic tenure process that includes external review after a specific time horizon generates comparable features.

Of course, because venture capital investors consider each investment as contributing to overall portfolio returns, their incentives are not always aligned with entrepreneurs in terms of strategic decisions such as when to shut down or exit

---

[7] While the higher rate of abandoning projects does not jump out from the statistics we provided above, it is worth noting that venture capital investors also likely select better projects, so that a simple comparison of realized failure rates does not provide a complete picture of how much more they abandon projects compared to non-venture-capital-backed firms.

an investment. For example, Gompers (1996) has documented the incentives of venture capital firms to engage in grandstanding (taking companies public earlier than may be optimal) to develop a reputation that enables them to raise follow-on funds. Venture capital investors may also choose to shut down an underperforming firm if it is unlikely to generate high gross returns, or they may continue to reinvest if they want to build a reputation as entrepreneur-friendly. These decisions may not always be optimal for the firm.

These examples highlight a related tension with organizational design, however. Innovation requires running experiments that will often fail, and such failures will occur even if the idea looked promising at the start and all parties acted in good faith. These features may require an organizational tolerance for failure in the short-term, with compensation rewards over the long-run based upon success (Manso 2011). This tolerance allows opportunities for early experimentation to identify the best course of action, while the long-term compensation tied to performance combats the "moral hazard" concern that decision makers might take excessive risks, and it solicits their best efforts.

How organizations balance the termination of poor experiments with maintaining a tolerance for failure in turn affects the overall set of projects that they choose to start. Nanda and Rhodes-Kropf (2012) show that the inability or the unwillingness to terminate projects when intermediate information is negative leads organizations to start projects that are less experimental in the first place. In other words, organizations can pick a radical range of projects at the start and terminate a high percentage of them, or pick a more limited range of projects at the start and terminate fewer of them. Large bureaucratic organizations often struggle with terminating projects, and these differences provide a rationale for why large companies are comparatively better at pursuing incremental improvements than radical innovations, although this is of course not true in every case. March (1991) and Akcigit and Kerr (2010) provide greater discussion on firm sizes and exploration versus exploitation choices. Lerner (2012) provides a discussion of the relative benefits of the traditional model of research and development within firms versus the model of venture capital investors, and Thomke (2003) discusses how large companies can take insights from the model of experimentation to improve the way in which they develop and advance innovations.

**Frictions for the Process of Experimentation—Continuation and Financing Risk**

Successful experimentation requires being able to capitalize on experiments that reveal positive outcomes, and these upside scenarios can be as tricky as termination decisions. Financing projects in stages requires that startups return to the capital markets at regular intervals for more capital. Thus far, we have emphasized positive aspects of multiple financing rounds (for example, the advantages of having an outside investor not previously involved with the company value the venture). A negative aspect is that entrepreneurs and early-stage investors feel vulnerable to the state of the financial markets at each round of financing. At times, financial capital is freely available, while in other instances it may be hard to come by, even

for otherwise sound projects. These financing constraints can be marketwide or they can be specific to sectors due to the degree to which investors herd around certain hot sectors.

Venture capital investors routinely refer to "financing risk" (similar to rollover risk) to describe how otherwise sound projects may not obtain capital for the next experiment. One way to protect against financing risk is to go less frequently to the capital markets, by taking larger chunks of money at each stage. This, however, reduces the value of the abandonment options for venture capital firms. Nanda and Rhodes-Kropf (2010, 2013) argue that hot markets—times when financing risk is low—allow projects with the highest real option values to be funded, because the continuation risk is lower for all projects in the economy. Empirically, venture-capital-backed firms that are first funded during hot markets have the highest failure rates, but conditional on being successful, startups funded in more-active periods were valued higher at initial public stock offering or acquisition compared to startups funded in less-active periods exiting at the same time. Financing risk is most salient for projects that need to go back to the capital markets many times, and thus projects that are worst hit by this risk are experimental new technologies that tend to have the highest option value. In fact, a possible implication of this work, which is related to work on the role of stock markets in financing innovation (Brown, Fazzari, and Petersen 2009), is that the most innovative projects in the economy may *need* times of low financing risk ("hot financial markets") to drive their initial commercialization.

Financing risk is representative of a broader class of continuation features that govern the degree to which experimentation can be pursued. To illustrate, consider some of the differences between clean energy and biotech; biotech also requires substantial investment and very long horizons but is the beneficiary of substantially more venture capital investment. Biotech startups and the pharmaceutical industry are part of a vibrant "market for ideas" (Gans, Hsu, and Stern 2002) that allows biotech companies to sell the results of their experiments at milestones. That is, a biotech company can undertake a first experiment to show that a project that originally seemed to have had a 0.1 percent chance of becoming a blockbuster drug has in fact a 5 percent chance. This experiment has generated substantial information value, and pharmaceutical companies are willing to buy the remaining 1-in-20 opportunity for their drug development portfolios. This market works because the science used in the first experiment is observable and verifiable, a patent system protects the startup from intellectual theft, and the long-term opportunity is more protected compared to clean energy innovations (which can face competition from all alternative sources of energy, including the opening up of strategic oil reserves). Such a "market for ideas" is much less developed for clean energy, and as a consequence entrepreneurs and investors who are considering an experiment in this area face additional continuation risks (Nanda, Younge, and Fleming, forthcoming). Relatedly, competition to acquire new technologies among pharmaceutical firms combined with a relatively robust market for initial public offerings have meant that the upside from biotechnology innovation, if successful, is sufficiently high to warrant the financing of upstream

experimentation. We return to the role of the markets for initial public offerings in greater detail in the next section.

**Discrete Choices and Individuals—A Process of Experimentation**

We close this section by emphasizing its most prominent feature—the role of humans, often just a few humans, in making these decisions. Economic models often focus on the fact that in well-functioning economies, good ideas are rewarded and flourish relative to worse ideas. But they are silent on how these ideas emerge.

A central theme of this section is that entrepreneurs and investors must make discrete choices, often with quite incomplete information and uncertainty about the future, about which ideas to progress and which to shut down. Financiers rather than markets dictate which projects are realized, as they choose which experiments to attempt, how to interpret the results, and whether to continue or abandon the investment. The entrepreneurial landscape at the micro-level is thus characterized by individuals choosing the fate of a venture based on what they have learned about what is likely to work *before* it competes in the product market.

This section has emphasized how constraints on the ability of investors to experiment efficiently can shape which industries, organizations, and time periods see the most radical innovations. It also sets the framework for understanding where barriers to experimentation may lead to market failures. For example, intermediate experiments may reveal very little about the ultimate success of some projects (such as building a particle collider or the nuclear power startup before the advent of simulation), requiring extremely large investments before one can learn about their viability. Alternatively, the horizon for commercialization may be extremely uncertain and distant, such as in the case of research in basic science. Institutional regimes such as academia (and at times the government) may thus be critical to enable experimentation in areas that are of importance to society but where a process of serial experimentation by profit-seeking investors is unlikely to provide a set of stepping-stones to the technologies behind disruptive innovation.

## Economic Experiments at the Society Level

While we have focused our attention on the difficulty in predicting outcomes for new technologies, many of these challenges also exist for firms in the broader economy. For example, Shane (2009) documents that of the approximately 500,000 startups that were founded in the United States in 1996, over half had failed by 2002 and only about 3,500 achieved sales of greater than $10 million. Haltiwanger, Jarmin, and Miranda (2013) note the difficulty in predicting upfront which firms will succeed even among producers of homogeneous goods such as cement. The laws and institutions at the regional and national level can therefore play a critical role in driving productivity growth—often through the incentives they create or the costs that they impose on the ability to effectively experiment. For example, Glaeser, Kerr, and Kerr (forthcoming) trace the effects of entrepreneurship on long-run

urban growth by documenting how cities with industrial and mining legacies in 1900 found it harder to create the up-or-out dynamic associated with productivity growth. They argue that the institutions (industrial structure, culture, and skill base) created by the predominantly large mining firms in the 1900s hindered entrepreneurship in the modern era, leading to systematically lower urban growth in these regions post-1970.

Although some institutions are extremely persistent and hard to change, we outline some types of policies that seem to be particularly effective in promoting "economic experiments" in the form of entrepreneurship.

### Democratizing Entry and Facilitating Efficient Failure

Bank finance and debt financing more generally is an extremely important source of capital for young companies. The US Small Business Administration has estimated that there were 21 million small business commercial and industrial loans outstanding in 2010 (defined as loans being below $1 million) that were valued at $310 billion (Office of Advocacy, US SBA 2013). While many small businesses are not young, Robb and Robinson (2014) document that debt finance is important even among young firms. They look at the sample of startups in the Kauffman Firm Survey and find that within the first three years of founding, 40 percent of the funding source for these startups is constituted by outside debt, over and above the 4 percent of debt that consists of the owner's credit cards and personal loans.

Changes in the availability and terms of bank finance can therefore have important implications for entrepreneurship. For example, Kerr and Nanda (2009) consider how the banking competition fostered by the state-level US banking deregulations that occurred from the 1970s through the 1990s affected entrepreneurship and the economy. These deregulations facilitated greater competition by allowing out-of-state banks to enter local markets, thereby increasing access to credit and lowering the cost of external finance. Using micro-level data from the US Census Bureau, Kerr and Nanda (2009) find evidence for the standard story of creative destruction—a few strong entrants challenging and later replacing incumbent firms. However, the mechanism through which this was achieved was through widespread entry that largely resulted in failure, so that the most pronounced impact was a massive increase in churning among new entrants.[8] Similarly, Chava, Oettle, Subramanian, and Subramanian (2013) examine innovation outcomes following the banking deregulations and find that banking deregulation facilitated greater risk taking and experimentation by small firms. Because it is hard to know beforehand which projects are going to be successful, "democratizing entry" seems to be an important trait of well-functioning capital markets.

Efficient experimentation implies that institutional environments facilitating exit are as important as those that facilitate entry. Two areas that have received

---

[8] Prior work by Black and Strahan (2002) and Cetorelli and Strahan (2006) connected the deregulations to higher entry rates, but it was quite puzzling that the elasticity for entrepreneurship was about ten times higher than the response observed on any other dimension like productivity change.

significant attention in recent years are the role of bankruptcy law and employment protection laws and tradeoffs involved as they relate to experimentation.

On the one hand, bankruptcy laws that favor creditors allow them to recoup as much capital as they can from the startup—encouraging them to lend in the first place (Berkowitz and White 2004; Cumming forthcoming; Cerqueiro, Hegde, Penas, and Seamans 2013). Such laws also discourage the moral hazard that might otherwise arise among entrepreneurial agents if they faced little need to repay creditors. On the other hand, entrepreneurial failure allows society to test uncertain projects. This process requires separating the entrepreneur from the firm, as is accomplished to some extent by the limited liability provision that entrepreneurs are not personally liable for the debts of a firm, and thus provides entrepreneurs with the ability to terminate projects and move on. As an example, Eberhart, Eesley, and Eisenhardt (2013) find that a bankruptcy reform in Japan that reduced the consequences of closing a firm encouraged greater levels of entrepreneurship and risk taking following the reform. The best policy appears to involve striking a balance between a good measure of limited liability for entrepreneurs, allowing them to transition across projects without severe and lasting penalties, along with some protections or restrictions for small or unsophisticated investors who may not comprehend fully the low likelihood of the entrepreneur's success. While legal factors play a role in reducing the downside from failure, cultural factors such as a stigma of failure can also play a role in hindering entry. In some regions, such as Silicon Valley, past failure can even be seen as a badge of honor, making it much easier for individuals to take big risks in terms of startup ventures.

A related set of issues can arise from strict employment protection laws that limit the ability of firms to adjust their workforce rapidly and in that way act as an effective tax on employment adjustments (Autor, Kerr, and Kugler 2007). Many ultimately successful startups have had to undertake one or more critical changes in their business model, which in turn require substantial adjustments in their workforce. One of the tradeoffs of legal mandates for employment is that they make it much more difficult for high-growth startups to experiment and for innovative, volatile sectors to form (for example, Saint-Paul 2002; Samaniego 2006). Indeed, venture capital investment is lower in countries with stringent employment protection laws, and the more-volatile sectors are the most affected (Bozkaya and Kerr forthcoming). In this sense, the flexibility of labor markets governs the types of projects that entrepreneurs can undertake (Fallick, Fleischman, and Rebitzer 2006).

**Appropriating Value in Successful States of the World**

Beyond the policies that shape an entrepreneur's ability to experiment when things are going poorly, policies or conditions that limit the value that entrepreneurs or investors receive in good states of the world are also important. Some conditions like the extent of patent protection were noted earlier in our comparison of biotech and clean energy investments. More generally, the investors and state-contingent financial contracts that we describe require strong property rights

and a sound rule of law (for example, La Porta, Lopez-de-Silanes, Shleifer, and Vishny 1997). Similarly, public equity markets are critical to rewarding startups that are successful, by allowing investors and entrepreneurs to cash out on the expectation of future growth. When equity markets do not work well or there are limited opportunities to exit and retrieve at least a portion of the earlier investment, it becomes much harder to experiment (for example, Black and Gilson 1998; Michelacci and Suarez 2004).

**Policy Implications**

How should policymakers interested in promoting entrepreneurship think about the role of experimentation? Clearly, difficult entry regulations suppress the experimentation undertaken by startups (Klapper, Laeven, and Rajan 2006) and often are difficult to justify on any grounds. As one example, Fairlee, Kapur, and Gates (2011) describe the extent to which the prevalence of employer-provided health insurance in the US economy serves as an implicit entry barrier for potential founders of new firms, making it more difficult for them to leave current jobs.

In addition, taking the experimental perspective seriously suggests that it is a poor idea for government to seek to pick and promote individual firms. After all, even the most-experienced venture capital firms have substantial success in only one of every ten investments they pick, so we shouldn't expect inexperienced and possibly not-very-objective politicians to do better. Indeed, one of the features that make market-based economies better at commercializing radical innovations is the decentralized and parallel nature with which new ideas are tested (Rosenberg 1994; Qian and Xu 1998; Scherer and Harhoff 2000). Politicians also have greater difficulty terminating projects—that is, telling taxpayers that legislative decisions have spent their money with little or no return. In our experience, most economists buy into this wariness of policymakers acting as a venture capital firm, and many go a step further and caution against picking an individual sector or industry to support. Virtually every state has a biotech initiative, but few will be successful. Lerner (2009) emphasizes the dismal performance of policies attempting to seed specific ventures or industries.

Governments are more likely to facilitate effective entrepreneurship if they work to reduce the costs of experimentation in general. What we have in mind here is not so much government programs that seek to target start-ups with particular benefits, but instead a careful consideration of the broader regulatory framework, including labor laws and requirements with which new entrants need to comply, with a focus on how they affect incentives for entry. These efforts to structure a better playing field are admittedly less glamorous than announcing a new biotech cluster initiative, but they are far more likely to have sustained effects.

As alluded to in the previous section, the experimentation view also suggests that there may be systematic market failures when the costs associated with experimentation are too high or the returns are too uncertain and far into the future. This creates a framework for thinking about which sectors, such as say basic science, may warrant sustained government support.

Finally, government should be cautious about industrial policies that seek to minimize business failures, as such policies may only be propping up firms that need to fail. For example, Acemoglu, Akcigit, Bloom, and Kerr (2013) build a model of firm-level innovation, productivity growth, and reallocation featuring endogenous entry and exit, and calibrate it using firm-level micro data from the Census. Their results highlight a key role for new entrants in policies to promote innovation and growth. Acemoglu et al. (2013) find that while policies like research and development tax credits to entrants can help and may encourage growth, their impact pales in comparison to removing artificial support for inefficient incumbents.

## Conclusions

Picking up a quotation originally made by Michael Jordan to describe missing basketball shots, a prominent venture capitalist, Vinod Khosla, emphasizes, "our willingness to fail gives us the ability and opportunity to succeed where others may fear to tread" (Khosla Ventures, no date; Khosla 2013). This paper has outlined our perspective on entrepreneurship that emphasizes this fundamental role for experimentation. Viewing entrepreneurship as experimentation allows individuals and societies to evaluate businesses and technologies in domains with greater uncertainty than otherwise possible, unlocking deep growth opportunities.

Economists should bear in mind two very different forms of experimentation that are associated with entrepreneurship. One form is the economic experimentation that takes place in market-based economies when several new ideas, products and technologies are continually tested and either displace existing technologies or more likely fail themselves. A second less-appreciated form of experimentation happens at the micro-level, before these ideas compete, and relates to the process of bringing new ideas to the market. There are too many opportunities to pursue with scarce resources, and the best-designed experiments can come back with misleading or ambiguous results. Under these conditions, specific choices made by discrete individuals—especially founders of firms and early-stage investors—become very important. Recent research in financial economics, organizational design, and related fields highlight how the costs associated with the ability of investors to experiment can alter the nature of entrepreneurship and help to explain why entrepreneurship is more prevalent in certain industries, regions, or periods of time.

Less than a decade ago, research on entrepreneurship within economics had little internal cohesion; instead, researchers working on entrepreneurship were spread out within broader fields like finance, labor economics, or macroeconomics. Today, while most researchers in this area continue to keep one foot firmly planted in a traditional field, the internal cohesion for entrepreneurial research has formed and is rapidly obtaining scale. Researchers on entrepreneurship are themselves experimenting with new ideas and new directions, and we expect this area of research to develop rapidly in the coming years.

■ *We appreciate comments and editorial direction by David Autor, Chang-Tai Hsieh, and Timothy Taylor. The research in this paper was conducted while the authors were Special Sworn Status researchers of the US Census Bureau at the Boston Census Research Data Center (BRDC). Support for this research from the NSF grant ITR-0427889 [BRDC], the Division of Research and Faculty Development at Harvard Business School, and from the Kaufman Foundation is gratefully acknowledged. Research results and conclusions expressed are the authors and do not necessarily reflect the views of the Census Bureau or the NSF. This paper has used proprietary data from a venture capital firm that requests it remain anonymous, and it has screened the paper to ensure that no confidential data are revealed.*

# References

**Acemoglu, Daron, Ufuk Akcigit, Nicholas Bloom, and William R. Kerr.** 2013. "Innovation, Reallocation and Growth." NBER Working Paper 18993.

**Akcigit, Ufuk, and William Kerr.** 2010. "Growth through Heterogeneous Innovations." NBER Working Paper 16443.

**Angel Capital Association.** 2012. "ACA, Angel Groups and Angel-Backed Companies." Slides, September. http://www.angelcapitalassociation.org/data/Documents/Resources/ACAandAngelGroupBackground09-12.pdf.

**Autor, David H., William R. Kerr, and Adriana D. Kugler.** 2007. "Does Employment Protection Reduce Productivity? Evidence from US States." *Economic Journal* 117(521): 189–217.

**Bergemann, Dirk, and Ulrich Hege.** 2005. "The Financing of Innovation: Learning and Stopping." *RAND Journal of Economics* 36(4): 719–52.

**Bergemann, Dirk, Ulrich Hege, and Liang Peng.** 2008. "Venture Capital and Sequential Investments." Working paper.

**Berkowitz, Jeremy, and Michelle J. White.** 2004. "Bankruptcy and Small Firms' Access to Credit." *Rand Journal of Economics* 35(1): 69–84.

**Bessemer Venture Partners.** No date. "Anti-portfolio." http://www.bvp.com/portfolio/antiportfolio.

**Blacharski, Dan.** 2013. "Top Ten Ways the Cloud Has Changed How Startups Launch." Techie.com, November, 26. http://techie.com/top-ten-ways-the-cloud-has-changed-how-startups-launch/.

**Black, Bernard S., and Ronald J. Gilson.** 1998. "Venture Capital and the Structure of Capital Markets: Banks versus Stock Markets." *Journal of Financial Economics* 47(3): 243–77.

**Black, Sandra E., and Philip E. Strahan.** 2002. "Entrepreneurship and Bank Credit Availability." *Journal of Finance* 57(6): 2807–33.

**Bozkaya, Ant, and William Kerr.** Forthcoming. "Labor Regulations and European Venture Capital." *Journal of Economics and Management Strategy.*

**Brown, James R., Steven M. Fazzari, and Bruce C. Petersen.** 2009. "Financing Innovation and Growth: Cash Flow, External Equity and the 1990s R&D Boom." *Journal of Finance* 64(1): 151–85.

**Cerqueiro, Geraldo, Deepak Hegde, María Fabiana Penas, and Robert Seamans.** 2013. "Debtor Rights, Credit Supply, and Innovation." Unpublished paper.

**Cetorelli, Nicola, and Philip Strahan.** 2006. "Finance as a Barrier to Entry: Bank Competition and Industry Structure in Local U.S. Markets." *Journal of Finance* 61(1): 437–61.

**Chava, Sudheer, Alexander Oettl, Ajay Subramanian, and Krishnamurthy Subramanian.**

2013. "Banking Deregulation and Innovation." *Journal of Financial Economics* 109(3): 759–74.

**Chemmanur, Thomas J., Karthik Krishnan, and Debarshi K. Nandy.** 2011. "How Does Venture Capital Financing Improve Efficiency in Private Firms? A Look beneath the Surface." *Review of Financial Studies* 24(12): 4037–90.

**Cumming, Douglas.** Forthcoming. "Measuring the Effect of Bankruptcy Laws on Entrepreneurship across Countries." *Journal of Entrepreneurial Finance.*

**Da Rin, Marco, Thomas Hellmann, and Manju Puri.** 2013. "A Survey of Venture Capital Research." Chap. 8 in *Handbook of the Economics of Finance*, Vol. 2, Part A, edited by George Constantinides, Milton Harris, and René M. Stulz. Amsterdam: North Holland.

**Dosi, Giovanni, and Richard R. Nelson.** 2010. "Technical Change and Industrial Dynamics as Evolutionary Processes." In *Handbook of the Economics of Innovation*, Vol. 1 edited by B. H. Hall and N. Rosenberg, 51–127. Amsterdam: North Holland.

**Eberhart, Robert, Charles E. Eesley, and Kathleen M. Eisenhardt.** 2013. "Failure is an Option: Failure Barriers and New Firm Performance." Stanford University Working Paper 111.

**Ewens, Michael, Ramana Nanda, and Matthew Rhodes-Kropf.** 2014. "Entrepreneurship and the Cost of Experimentation." Unpublished paper.

**Fairlee, Robert W., Kanika Kapur, and Susan Gates.** 2011. "Is Employer-based Health Insurance a Barrier to Entrepreneurship?" *Journal of Health Economics* 30(1): 146–62.

**Fallick, Bruce, Charles A. Fleischman, and James Rebitzer.** 2006. "Job-hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster." *Review of Economics and Statistics* 88(3): 472–81.

**Fehder, Daniel C., and Yael V. Hochberg.** 2014. "Accelerators and the Regional Supply of Venture Capital Investment." Unpublished paper.

**Fernandez, Jose-Maria, Roger M. Stein, and Andrew W. Lo.** 2012. "Commercializing Biomedical Research through Securitization Techniques." *Nature Biotechnology* 30(10): 964–75.

**Fleming, Lee.** 2001. "Recombinant Uncertainty in Technological Search." *Management Science* 47(1): 117–32.

**Fleming, Lee, and Olav Sorenson.** 2004. "Science as a Map in Technological Search." *Strategic Management Journal* 25(5–9): 909–28.

**Gans, Joshua, David H. Hsu, and Scott Stern.** 2002. "When Does Start-up Innovation Spur the Gale of Creative Destruction?" *RAND Journal of Economics* 33(4): 571–86.

**Glaeser, Edward L., Sari Pekkala Kerr, and William R. Kerr.** Forthcoming. "Entrepreneurship and Urban Growth: An Empirical Assessment with Historical Mines." *Review of Economics and Statistics.*

**Gompers, Paul A.** 1995. "Optimal Investment, Monitoring, and the Staging of Venture Capital." *Journal of Finance* 50(5): 1461–89.

**Gompers, Paul A.** 1996. "Grandstanding in the Venture Capital Industry." *Journal of Financial Economics* 42(1): 133–56.

**Gompers, Paul, and Josh Lerner.** 2004. *The Venture Capital Cycle.* Cambridge, MA: MIT Press.

**Graham, Paul.** 2008. "A New Venture Animal." March, http://paulgraham.com/ycombinator.html.

**Grenadier, Steven R., and Andrey Malenko.** 2011. "Real Options Signaling Games with Applications to Corporate Finance." *Review of Financial Studies* 24(12): 3993–4036.

**Hall, Robert E., and Susan E. Woodward.** 2010. "The Burden of the Nondiversifiable Risk of Entrepreneurship." *American Economic Review* 100(3): 1163–94.

**Haltiwanger, John, Ron S. Jarmin, and Javier Miranda.** 2013. "Who Creates Jobs? Small versus Large versus Young." *Review of Economics and Statistics* 95(2): 347–61.

**Hayek, Friedrich A.** 1948. *Individualism and Economic Order.* University of Chicago Press.

**Hellmann, Thomas, and Manju Puri.** 2000. "The Interaction between Product Market and Financing Strategy: The Role of Venture Capital." *Review of Financial Studies* 13(4): 959–84.

**Kaplan, Steven N., Berk A. Sensoy, and Per Strömberg.** 2009. "Should Investors Bet on the Jockey or the Horse? Evidence from the Evolution of Firms from Early Business Plans to Public Companies." *Journal of Finance* 64(1): 75–115.

**Kaplan, Steven N., and Per Strömberg.** 2003. "Financial Contracting Theory Meets the Real World: An Empirical Analysis of Venture Capital." *Review of Economic Studies* 70(2): 281–315.

**Kaplan, Steven N., and Per Strömberg.** 2004. "Characteristics, Contracts, and Actions: Evidence from Venture Capitalist Analyses." *Journal of Finance* 59(5): 2177–2210.

**Kerr, William R., Josh Lerner, and Antoinette Schoar.** 2014. "The Consequences of Entrepreneurial Finance: Evidence from Angel Financings." *Review of Financial Studies* 27(1): 20–55.

**Kerr, William R., and Ramana Nanda.** 2009. "Democratizing Entry: Banking Deregulations, Financing Constraints, and Entrepreneurship." *Journal of Financial Economics* 94(1): 124–49.

**Klapper, Leora F., Luc Laeven, and Raghuram G. Rajan.** 2006. "Entry Regulation as a Barrier to Entrepreneurship." *Journal of Financial Economics* 82(3): 591–625.

**Knight, Frank H.** 1921. *Risk, Uncertainty, and Profit.* Boston, MA: Houghton Mifflin.

**Kortum, Samuel S., and Josh Lerner.** 2000. "Assessing the Contribution of Venture Capital to Innovation." *RAND Journal of Economics* 31(4): 674–92.

**Khosla Ventures.** No date. Company website mainpage, http://www.khoslaventures.com/ (accessed 5/14/14).

**Khosla, Vinod.** 2013. "Fail as Often as You Want, And Fail Well." Video of a speech posted March 10, 2013, at Wunderman Reports.com. http://www.wundermanreports.com/fail-as-often-as-you-want-and-fail-well.

**Landier, Augustin.** 2005. "Entrepreneurship and the Stigma of Failure." Unpublished paper.

**La Porta, Rafael, Florencio Lopez-de-Silanes, Andrei Shleifer, and Robert Vishny.** 1997. "Legal Determinants of External Finance." *Journal of Finance* 52(3): 1131–50.

**Lerner, Josh.** 2009. *Boulevard of Broken Dreams: Why Public Efforts to Boost Entrepreneurship and Venture Capital Have Failed—And What to Do about It.* Princeton University Press.

**Lerner, Josh.** 2012. *The Architecture of Innovation: The Economics of Creative Organizations.* Boston, MA: Harvard Business School Press.

**Levere, Jane L.** 2013. "Airbnb Campaign Uses Birdhouses to Widen Its Reach." *New York Times,* December 15. http://www.nytimes.com/2013/12/16/business/media/airbnb-campaign-uses-birdhouses-to-widen-its-reach.html.

**Manso, Gustavo.** 2011. "Motivating Innovation." *Journal of Finance* 66(5): 1823–69.

**March, James G.** 1991. "Exploration and Exploitation in Organizational Learning." *Organizational Science* 2(1): 71–87.

**Michelacci, Claudio, and Javier Suarez.** 2004. "Business Creation and the Stock Market." *Review of Economic Studies* 71(2): 459–81.

**Nanda, Ramana, and Liz Kind.** 2013. "AngelList." Harvard Business School Case 814-036.

**Nanda, Ramana, and Matthew Rhodes-Kropf.** 2010. "Financing Risk and Innovation." Harvard Business School Working Paper 11–013.

**Nanda, Ramana, and Matthew Rhodes-Kropf.** 2012. "Innovation and the Financial Guillotine." Harvard Business School Working Paper 13–038.

**Nanda, Ramana, and Matthew Rhodes-Kropf.** 2013. "Investment Cycles and Startup Innovation." *Journal of Financial Economics* 110(2): 403–18.

**Nanda, Ramana, Ken Younge, and Lee Fleming.** Forthcoming. "Innovation and Entrepreneurship in Renewable Energy." In *The Changing Frontier: Rethinking Science and Innovation Policy* edited by Adam Jaffe and Ben Jones. National Bureau of Economic Research.

**Office of Advocacy, US Small Business Association.** 2013. *Small Business Lending in the United States 2012.* http://www.sba.gov/sites/default/files/files/sbl_12study.pdf.

**Palmer, Maija.** 2012. "Cloud Computing Cuts Start-up Costs." *Financial Times,* February 29.

**Parker, Simon C.** 2004. "The Economics of Self-Employment and Entrepreneurship." Cambridge University Press.

**Puri, Manju, and Rebeca Zarutskie.** 2012. "On the Lifecycle Dynamics of Venture-Capital- and Non-Venture-Capital-Financed Firms." *Journal of Finance* 67(6): 2247–93.

**Qian, Yingyi, and Chenggang Xu.** 1998. "Innovation and Bureaucracy under Soft and Hard Budget Constraints." *Review of Economic Studies* 65(1): 151–64.

**Rajan, Raghuram G.** 2012. "Presidential Address: The Corporation in Finance." *Journal of Finance* 67(4): 1173–1217.

**Ries, Eric.** 2011. *The Lean Startup: How Today's Entrepreneurs Use Continuous Innovation to Create Radically Successful Businesses.* Crown Business Publishing.

**Ritter, Jay R.** 2014. "Initial Public Offerings: Updated Statistics."

**Robb, Alicia M., and David T. Robinson.** 2014. "The Capital Structure Decisions of New Firms." *Review of Financial Studies* 27(1): 153–79.

**Rosenberg, Nathan.** 1994. "Economic Experiments." In Chap. 5 in *Exploring the Black Box: Technology, Economics, and History.* Cambridge University Press.

**Sahlman, William A.** 1990. "The Structure and Governance of Venture-Capital Organizations." *Journal of Financial Economics* 27(2): 473–521.

**Sahlman, William A.** 2010. "Risk and Reward in Venture Capital." Harvard Business School Background Note 811-036.

**Sahlman, William, Ramana Nanda, Joseph B. Lassiter III, and James McQuade.** 2012. "Terra-Power." Harvard Business School Case Study 813-108.

**Saint-Paul, Gilles.** 2002. "Employment Protection, International Specialization, and Innovation." *European Economic Review* 46(2): 375–95.

**Samaniego, Roberto M.** 2006. "Employment Protection and High-Tech Aversion." *Review of Economic Dynamics* 9(2): 224–41.

**Samila, Sampsa, and Olav Sorenson.** 2011. "Venture Capital, Entrepreneurship and Economic Growth." *Review of Economics and Statistics* 93(1): 338–49.

**Scherer, F. M., and Dietmar Harhoff.** 2000. "Technology Policy for a World of Skew-distributed Outcomes." *Research Policy* 29(4–5): 559–66.

**Schumpeter, Joseph.** 1911 [1934]. *The Theory of Economic Development: An Inquiry into Profits, Capital, Credit, Interest and the Business Cycle.* Cambridge, MA: Harvard University Press.

**Schumpeter, Joseph.** 1943. *Capitalism, Socialism, and Democracy.* Harper Brothers, New York, NY.

**Shane, Scott A.** 2009. *Fool's Gold? The Truth behind Angel Investing in America.* Oxford University Press.

**Stern, Scott**. 2005. "Economic Experiments: The Role of Entrepreneurship in Economic Prosperity." In *Understanding Entrepreneurship: A Research and Policy Report*, edited by Carl J. Schramm, 16–20. Ewing Marion Kauffman Foundation.

**Thomke, Stefan H.** 2003. *Experimentation Matters: Unlocking the Potential of New Technologies for Innovation.* Boston, MA: Harvard Business School Press.

**Tian, Xuan.** 2011. "The Causes and Consequences of Venture Capital Stage Financing." *Journal of Financial Economics* 101(1): 132–59.

**Weitzman, Martin.** 1979. "Optimal Search for the Best Alternative." *Econometrica* 47(3): 641–54.

**Wilson, Fred.** 2011. "Airbnb." March 16. http://www.avc.com/a_vc/2011/03/airbnb.html.

**This article has been cited by:**

1. Hyeonsuh Lee. 2023. Unraveling the effect of pre-entry knowledge of founders on experimentation in nascent industries: A configurational approach. *Journal of Business Research* **167**, 114155. [Crossref]

2. Gerardo Reyes Ruiz. Aversion of a Person Facing the Risk of Failure When Starting a Business in Mexico 50-81. [Crossref]

3. Pontus Braunerhjelm, Roger Svensson. 2023. Inventions, commercialization strategies, and knowledge spillovers in SMEs. *Small Business Economics* **32**. . [Crossref]

4. MATTHEW DENES, SABRINA T. HOWELL, FILIPPO MEZZANOTTI, XINXIN WANG, TING XU. 2023. Investor Tax Credits and Entrepreneurship: Evidence from U.S. States. *The Journal of Finance* **1**. . [Crossref]

5. Indu Khurana, Alexis Habiyaremye, Veysel Avsar, Siri Terjesen. 2023. The impact of policy uncertainty on entrepreneurial activity: a cross-country analysis. *Entrepreneurship & Regional Development* **35**:7-8, 593-616. [Crossref]

6. Thomas Zellweger, Todd Zenger. 2023. Entrepreneurs as Scientists: A Pragmatist Approach to Producing Value Out of Uncertainty. *Academy of Management Review* **48**:3, 379-408. [Crossref]

7. Shad Morris, Chad Carlos, Geoffrey M. Kistruck, Robert B. Lount, Tumsifu Elly Thomas. 2023. The impact of growth mindset training on entrepreneurial action among necessity entrepreneurs: Evidence from a randomized control trial. *Strategic Entrepreneurship Journal* **38**. . [Crossref]

8. Yuan Shi. 2023. A Change of Tune: The Democratization of Market Mediation and Crossover Production in the U.S. Commercial Music Industry. *Administrative Science Quarterly* **68**:2, 319-354. [Crossref]

9. Silvia Sanasi. 2023. Entrepreneurial experimentation in business model dynamics: Current understanding and future opportunities. *International Entrepreneurship and Management Journal* **19**:2, 805-836. [Crossref]

10. Frank P. Balz, Florian Brinkmann, Dominik K. Kanbach. 2023. The impact of independent and heterogeneous corporate venture capital on firm efficiency. *Journal of Business Venturing Insights* **19**, e00384. [Crossref]

11. Rebecca Karp. 2023. Gaining Organizational Adoption: Strategically Pacing the Position of Digital Innovations. *Academy of Management Journal* **66**:3, 773-796. [Crossref]

12. Som Sekhar Bhattacharyya. 2023. Elucidating technology-based social entrepreneurs' scale and scope perspectives: a study of environmental and organizational variables. *International Journal of Organizational Analysis* **31**:4, 1001-1023. [Crossref]

13. Jade Y. Lo, Lei Xu, Haemin Dennis Park. 2023. Hot Markets, Sociocognitive Cues, and New Market Entry in the U.S. Venture Capital Industry. *Entrepreneurship Theory and Practice* **37**, 104225872311736. [Crossref]

14. Pravin Krishna, Andrei A. Levchenko, Lin Ma, William F. Maloney. 2023. Growth and risk: A view from international trade. *Journal of International Economics* **142**, 103755. [Crossref]

15. Jianhong Cao, Siong Hook Law, Abdul Rahim Abdul Samad, Wan Norhidayah W. Mohamad. 2023. Internal mechanism analysis of the financial vanishing effect on green growth: Evidence from China. *Energy Economics* **120**, 106579. [Crossref]

16. Ben Spigel, Fizza Khalid, David Wolfe. 2023. Alacrity: a new model for venture acceleration. *International Entrepreneurship and Management Journal* **19**:1, 237-259. [Crossref]

17. Andrés Redchuk, Federico Walas Mateo, Guadalupe Pascal, Julian Eloy Tornillo. 2023. Adoption Case of IIoT and Machine Learning to Improve Energy Consumption at a Process Manufacturing Firm, under Industry 5.0 Model. *Big Data and Cognitive Computing* **7**:1, 42. [Crossref]

18. Dante Ayaviri-Nina, Jessica Cáceres-Guzmán, Gabith Miriam Quispe Fernández, Alba Isabel Maldonado-Nuñez. 2023. The Determinants of Success in Entrepreneurship: A Study in the Urban Area of Ecuador. *Sustainability* **15**:6, 5277. [Crossref]

19. Christoph Carnehl, Johannes Schneider. 2023. on Risk and Time Pressure: When to Think and When to Do. *Journal of the European Economic Association* **21**:1, 1-47. [Crossref]

20. Nataliya Langburd Wright, Rembrand Koning, Tarun Khanna. 2023. Judging foreign startups. *Strategic Management Journal* **58**. . [Crossref]

21. Qianqian Zhang, Chunzi Jiang, Xiaomei Zhang. 2023. Exploration or exploitation? A study on equity incentive design, dynamic decision making, and economic consequences. *PLOS ONE* **18**:1, e0277965. [Crossref]

22. Joshua S. Gans. 2023. Experimental Choice and Disruptive Technologies. *Management Science* **82**. . [Crossref]

23. Qingjie Zhou, Dongyao Yu, Feng Xu, Jiamin Sun. 2023. The Impact of Institutional Friction Cost on Economic Growth: Evidence from OECD Countries. *Sustainability* **15**:1, 427. [Crossref]

24. Pravin Krishna, Andrei A. Levchenko, Lin Ma, William F. Maloney. 2023. Growth and Risk: A View from International Trade. *SSRN Electronic Journal* **59**. . [Crossref]

25. Silvia Dalla Fontana, Ramana Nanda. 2023. Innovating to Net Zero: Can Venture Capital and Start-Ups Play a Meaningful Role?. *Entrepreneurship and Innovation Policy and the Economy* **2**, 79-105. [Crossref]

26. Maxime Bonelli. 2023. The Adoption of Artificial Intelligence by Venture Capitalists. *SSRN Electronic Journal* **3**. . [Crossref]

27. Ramana Nanda, Matthew Rhodes-Kropf. Financing Booms in Venture Capital 1-5. [Crossref]

28. Yongwook Paik, Sunu Kim. 2023. How Incumbent Firms Cope with Economic Policy Uncertainty: The Case of Corporate Venture Capital Investments in Innovative Startups as a Real Option. *SSRN Electronic Journal* **73**. . [Crossref]

29. Sylvia Hubner-Benz, Michael Frese. Creativity in entrepreneurship: Dancing between nothing and structure 377-392. [Crossref]

30. Nataliya Wright. 2023. Where Strategy Matters: Evidence from a Global Startup Field Study. *SSRN Electronic Journal* **39**. . [Crossref]

31. Juanita Gonzalez-Uribe, Robyn Klingler-Vidra, Su Wang, Xiang Yin. 2023. The Broader Impact of Venture Capital on Innovation: Reducing Entrepreneurial Capability Constraints Through Due Diligence. *SSRN Electronic Journal* . [Crossref]

32. Jorge Guzman, Fiona E. Murray, Scott Stern, Heidi Williams. 2023. Accelerating Innovation Ecosystems: The Promise and Challenges of Regional Innovation Engines. *SSRN Electronic Journal* **113**. . [Crossref]

33. Yang Pan, Wei-Ling Song. 2023. Tech Giants and New Entry Threats. *SSRN Electronic Journal* **80**. . [Crossref]

34. Victor M. Bennett, Aaron K. Chatterji. 2023. The entrepreneurial process: Evidence from a nationally representative survey. *Strategic Management Journal* **44**:1, 86-116. [Crossref]

35. Anne Tryba, Holger Patzelt, Nicola Breugst. 2023. Knowledge Diversity and Venture Growth: The Contingent Effects of Early Planning and Experimentation. *British Journal of Management* **34**:1, 343-362. [Crossref]

36. Silvia Sanasi, Jacopo Manotti, Antonio Ghezzi. 2022. Achieving Agility in High-Reputation Firms: Agile Experimentation Revisited. *IEEE Transactions on Engineering Management* **69**:6, 3529-3545. [Crossref]

37. Suting Hong, Guangwei Li, Wangshuai Wang, Zhiqi Zhao. 2022. Does winning a venture competition encourage entrepreneurial exploration? Evidence from China. *China Economic Review* **76**, 101876. [Crossref]

38. Mike G. Tsionas, Pankaj C. Patel. 2022. An entrepreneur's dilemma: An optimal stopping rule in pivoting. *Managerial and Decision Economics* **43**:8, 3498-3515. [Crossref]

39. Yves Guéron, Jihong Lee. 2022. Learning by Selling, Knowledge Spillovers, and Patents*. *The Journal of Industrial Economics* **70**:4, 867-912. [Crossref]

40. Ari Hyytinen, Petri Rouvinen, Mika Pajarinen, Joosua Virtanen. 2022. Ex Ante Predictability of Rapid Growth: A Design Science Approach. *Entrepreneurship Theory and Practice* **30**, 104225872211282. [Crossref]

41. Shai Bernstein. 2022. The Effects of Public and Private Equity Markets on Firm Behavior. *Annual Review of Financial Economics* **14**:1, 295-318. [Crossref]

42. Randall Morck. 2022. Kindleberger Cycles: Method in the Madness of Crowds?. *Annual Review of Financial Economics* **14**:1, 563-585. [Crossref]

43. Thomas Zellweger, Todd Zenger. 2022. Entrepreneurs as scientists, Bayesian inference, and belief revision. *Journal of Business Venturing Insights* **18**, e00350. [Crossref]

44. Sandy Yu, Lee Fleming. 2022. Regional crowdfunding and high tech entrepreneurship. *Research Policy* **51**:9, 104348. [Crossref]

45. Minsi Liu, Kevin Lo. 2022. Eco-cities as urban laboratories of Chinese ecological modernization: eco-experimentation and the modernization of urban governance. *Urban Geography* **185**, 1-25. [Crossref]

46. Olivia Aronson, Irene Henriques. 2022. Shared Value Creation in Equivocal CSR Environments: A Configuration Approach. *Journal of Business Ethics* **38**. . [Crossref]

47. Frank P. Balz, Benjamin M. Bugl, Dominik K. Kanbach. 2022. New Venture Value Creation in Syndicates Between Independent and Corporate Investors. *International Journal of Innovation and Technology Management* **19**:06. . [Crossref]

48. Antonella Zucchella, Pietro Previtali, Roger Strange. 2022. Proactive and reactive views in the transition towards circular business models. A grounded study in the plastic packaging industry. *International Entrepreneurship and Management Journal* **18**:3, 1073-1102. [Crossref]

49. Rembrand Koning, Sharique Hasan, Aaron Chatterji. 2022. Experimentation and Start-up Performance: Evidence from A/B Testing. *Management Science* **68**:9, 6434-6453. [Crossref]

50. Andrea Contigiani, Trevor Young-Hyman. 2022. Experimentation, planning, and structure in early-stage ventures: Evidence from pitch decks. *Strategic Entrepreneurship Journal* **16**:3, 425-459. [Crossref]

51. Joshua D Gottlieb, Richard R Townsend, Ting Xu. 2022. Does Career Risk Deter Potential Entrepreneurs?. *The Review of Financial Studies* **35**:9, 3973-4015. [Crossref]

52. Christian Hopp, Stefan Rose, Jermain Kaminski. 2022. The Pervasive Role of Campaign and Product-Related Uncertainties in Inhibiting Crowdfunding Success. *Journal of Risk and Financial Management* **15**:8, 370. [Crossref]

53. Diego Zunino, Gary Dushnitsky, Mirjam van Praag. 2022. How Do Investors Evaluate Past Entrepreneurial Failure? Unpacking Failure Due to Lack of Skill versus Bad Luck. *Academy of Management Journal* **65**:4, 1083-1109. [Crossref]

54. Kathryn Shaw, Anders Sørensen. 2022. Coming of age: Watching young entrepreneurs become successful. *Labour Economics* **77**, 102033. [Crossref]

55. John S. Chen, Daniel W. Elfenbein, Hart E. Posen, Ming zhu Wang. 2022. The Problems and Promise of Entrepreneurial Partnerships: Decision-Making, Overconfidence, and Learning in Founding Teams. *Academy of Management Review* **47**:3, 489-520. [Crossref]

56. Michael Wessel, Ferdinand Thies, Alexander Benlian. 2022. The role of prototype fidelity in technology crowdfunding. *Journal of Business Venturing* **37**:4, 106220. [Crossref]

57. Timo Ehrig, Jens Schmidt. 2022. Theory-based learning and experimentation: How strategists can systematically generate knowledge at the edge between the known and the unknown. *Strategic Management Journal* **43**:7, 1287-1318. [Crossref]

58. Randall E. Westgren, Travis L. Holmes. 2022. Entrepreneurial Beliefs and Agency under Knightian Uncertainty. *Philosophy of Management* **21**:2, 199-217. [Crossref]

59. Jose P. Arrieta, Yash R. Shrestha. 2022. On the strategic value of equifinal choice. *Journal of Organization Design* **11**:2, 37-45. [Crossref]

60. Jose-Luis Hervas-Oliver, Carles Boronat-Moll, Marta Peris-Ortiz, Ronald Rojas-Alvarado. 2022. Understanding spatial networking and industrial district evolution from firms' strategies. *European Planning Studies* **1**, 1-29. [Crossref]

61. Jorge Melegati, Henry Edison, Xiaofeng Wang. 2022. XPro: A Model to Explain the Limited Adoption and Implementation of Experimentation in Software Startups. *IEEE Transactions on Software Engineering* **48**:6, 1929-1946. [Crossref]

62. Shashi Bhushan Kumar, Nandan Sudarsanam. 2022. A Decision-Making Framework for Entrepreneurial Venture in Emerging Economies. *International Journal of Global Business and Competitiveness* **17**:1, 11-23. [Crossref]

63. Wang Chengbin, Wang Hongbin, Dai Min, Fang Yongyan. 2022. Lean Startup Approaches(LSAs): Convergence, Integration and Improvement. *Technological Forecasting and Social Change* **179**, 121640. [Crossref]

64. Simon Mayer. 2022. Financing breakthroughs under failure risk. *Journal of Financial Economics* **144**:3, 807-848. [Crossref]

65. Daniel S. Hamermesh, Andrew K. Leigh. 2022. "Beauty too rich for use": Billionaires' assets and attractiveness. *Labour Economics* **76**, 102153. [Crossref]

66. Luís Guimarães, Pedro Mazeda Gil. 2022. Explaining the Labor Share: Automation Vs Labor Market Institutions. *Labour Economics* **75**, 102146. [Crossref]

67. Jorge Melegati, Eduardo Guerra, Xiaofeng Wang. 2022. HyMap: Eliciting hypotheses in early-stage software startups using cognitive mapping. *Information and Software Technology* **144**, 106807. [Crossref]

68. Lauren Lanahan, Daniel Erian Armanios, Amol M. Joshi. 2022. Inappropriateness Penalty, Desirability Premium: What Do More Certifications Actually Signal?. *Organization Science* **33**:2, 854-871. [Crossref]

69. Arti Grover, Somik V. Lall, William F. Maloney. Local Economic Development Policies 187-220. [Crossref]

70. Margarida Madaleno, Max Nathan, Henry Overman, Sevrin Waights. 2022. Incubators, accelerators and urban economic development. *Urban Studies* **59**:2, 281-300. [Crossref]

71. Jeroen Mahieu, Francesca Melillo, Peter Thompson. 2022. The long-term consequences of entrepreneurship: Earnings trajectories of former entrepreneurs. *Strategic Management Journal* **43**:2, 213-236. [Crossref]

72. Mirjana Grčić Fabić. Perspectives and Challenges in the Development of the Croatian Digital Startup Sector 139-156. [Crossref]

73. Alexander Styhre. Status Relations and Associations in Life Science Venturing 145-166. [Crossref]

74. Ufuk Akcigit, Douglas Hanley, Stefanie Stantcheva. 2022. Optimal Taxation and R&D Policies. *Econometrica* **90**:2, 645-684. [Crossref]

75. Vladimir A. Gatchev, Christo A. Pirinsky, Buvaneshwaran Venugopal. 2022. A language-based approach to measuring creative exploration. *Research Policy* **51**:1, 104426. [Crossref]

76. Mari Sako, Matthias Qian, Mark Verhagen. 2022. Knowledge Similarity Among Founders and Joiners: Impact on Venture Scaleup in Fintech and Lawtech. *SSRN Electronic Journal* **20**. . [Crossref]

77. William F. Maloney, Andres Zambrano. 2022. Learning to Learn: Experimentation, Entrepreneurial Capital, and Development. *SSRN Electronic Journal* **41**. . [Crossref]

78. Simone Santamaria. 2022. Portfolio Entrepreneurs' Behavior and Performance: A Resource Redeployment Perspective. *Management Science* **68**:1, 333-354. [Crossref]

79. Joshua S. Gans. 2022. A Theory of Visionary Disruption. *SSRN Electronic Journal* **57**. . [Crossref]

80. Joshua Gans. 2022. A Theory of Visionary Disruption. *SSRN Electronic Journal* **57**. . [Crossref]

81. Simon Rudat. 2022. Philanthropic Investments in Deep Tech Start-Ups: An Exploratory Study. *SSRN Electronic Journal* **139**. . [Crossref]

82. Marco Da Rin, Marina Di Giacomo, Alessandro Sembenelli. 2022. Leverage at Entry and the Growth of Newly Incorporated Companies. *SSRN Electronic Journal* **108**. . [Crossref]

83. Louis Kaplow. 2022. Optimal Income Taxation. *SSRN Electronic Journal* **44**. . [Crossref]

84. Rebecca Janßen, Reinhold Kesler, Michael Kummer, Joel Waldfogel. 2022. Gdpr and the Lost Generation of Innovative Apps. *SSRN Electronic Journal* **54**. . [Crossref]

85. Mario Daniele Amore, Annamaria Conti, Valerio Pelucco. 2022. Micro VC. *SSRN Electronic Journal* **35**. . [Crossref]

86. Stephen Michael Impink. 2022. Outsourcing IT and Technological Differentiation: Evidence from Digital Startups. *SSRN Electronic Journal* **72**. . [Crossref]

87. William F. Maloney, Andres Zambrano. Learning to Learn: Experimentation, Entrepreneurial Capital, and Development **120**, . [Crossref]

88. Roberto Pessoa de Queiroz Falcão, Michel Mott Machado, Eduardo Picanço Cruz, Robson Moreira Cunha. 2021. TRAJETÓRIAS EMERGENTES DE STARTUPS BRASILEIRAS-CANADENSES À LUZ DO MODELO DE UPPSALA, EMPREENDEDORISMO DE IMIGRANTES E DA EFFECTUATION. *REAd. Revista Eletrônica de Administração (Porto Alegre)* **27**:3, 835-869. [Crossref]

89. Mujtaba Ahsan, Martina Musteen. 2021. International opportunity development on crowdfunding platforms: A spatial, temporal, and structural framework. *International Business Review* **30**:6, 101912. [Crossref]

90. Jeroen Mahieu, Francesca Melillo, Toke Reichstein, Peter Thompson. 2021. Shooting stars? Uncertainty in hiring entrepreneurs. *Strategic Entrepreneurship Journal* **15**:4, 526-567. [Crossref]

91. JASON RODERICK DONALDSON, GIORGIA PIACENTINO, ANJAN THAKOR. 2021. Intermediation Variety. *The Journal of Finance* **76**:6, 3103-3152. [Crossref]

92. Elena Cefis, Franco Malerba, Orietta Marsili, Luigi Orsenigo. 2021. Time to exit: "revolving door effect" or "Schumpeterian gale of creative destruction"?. *Journal of Evolutionary Economics* **31**:5, 1465-1494. [Crossref]

93. Irfan Qureshi, Donghyun Park, Gustavo Atilio Crespi, Jose Miguel Benavente. 2021. Trends and determinants of innovation in Asia and the Pacific vs. Latin America and the Caribbean. *Journal of Policy Modeling* **43**:6, 1287-1309. [Crossref]

94. William H. Janeway, Ramana Nanda, Matthew Rhodes-Kropf. 2021. Venture Capital Booms and Start-Up Financing. *Annual Review of Financial Economics* **13**:1, 111-127. [Crossref]

95. Lin William Cong, Sabrina T. Howell. 2021. Policy Uncertainty and Innovation: Evidence from Initial Public Offering Interventions in China. *Management Science* **67**:11, 7238-7261. [Crossref]

96. Geerten van de Kaa, Linda Kamp. 2021. Exploring design dominance in early stages of the dominance process: The case of airborne wind energy. *Journal of Cleaner Production* **321**, 128918. [Crossref]

97. Hong Luo, Jeffrey Macher, Michael Wahlen. 2021. Judgment Aggregation in Creative Production: Evidence from the Movie Industry. *Management Science* **67**:10, 6358-6377. [Crossref]

98. Jillian Grennan, Roni Michaely. 2021. FinTechs and the Market for Financial Analysis. *Journal of Financial and Quantitative Analysis* **56**:6, 1877-1907. [Crossref]

99. Ajay Agrawal, Joshua S. Gans, Scott Stern. 2021. Enabling Entrepreneurial Choice. *Management Science* **67**:9, 5510-5524. [Crossref]

100. Joshua L. Krieger. 2021. Trials and Terminations: Learning from Competitors' R&D Failures. *Management Science* **67**:9, 5525-5548. [Crossref]

101. Ziliang Liu, Shengjun Zhu. 2021. Changing institutional context and regional industrial dynamics: New evidence from the establishment of administrative approval centers in China. *Growth and Change* **52**:3, 1271-1294. [Crossref]

102. Rafael Fazzi Bortolini, Marcelo Nogueira Cortimiglia, Angela de Moura Ferreira Danilevicz, Antonio Ghezzi. 2021. Lean Startup: a comprehensive historical review. *Management Decision* **59**:8, 1765-1783. [Crossref]

103. Chia-Hui Chen, Junichiro Ishida, Wing Suen. 2021. Reputation Concerns in Risky Experimentation. *Journal of the European Economic Association* **19**:4, 1981-2021. [Crossref]

104. Takao Fujiwara. Star Biotech Start-ups' Past R&D Investment in the Financial Crisis Time 1-9. [Crossref]

105. Leonardo Mazzoni, Luciana Lazzeretti, Niccolò Innocenti. 2021. Entrepreneurship, complexity and the emergent order in the techno-economic scenario of the twenty-first century. Evidence from a field study in Tuscany. *Industry and Innovation* **28**:5, 570-593. [Crossref]

106. Ximena Alejandra Flechas Chaparro, Leonardo Augusto de Vasconcelos Gomes. 2021. Pivot decisions in startups: a systematic literature review. *International Journal of Entrepreneurial Behavior & Research* **27**:4, 884-910. [Crossref]

107. Sabrina T Howell. 2021. Learning from Feedback: Evidence from New Ventures*. *Review of Finance* **25**:3, 595-627. [Crossref]

108. Onesun Steve Yoo, Tingliang Huang, Kenan Arifoğlu. 2021. A Theoretical Analysis of the Lean Start-up Method. *Marketing Science* **40**:3, 395-412. [Crossref]

109. FELIX SCHEUENSTUHL, PETER M. BICAN, ALEXANDER BREM. 2021. HOW CAN THE LEAN STARTUP APPROACH IMPROVE THE INNOVATION PROCESS OF ESTABLISHED COMPANIES? AN EXPERIMENTAL APPROACH. *International Journal of Innovation Management* **25**:03, 2150029. [Crossref]

110. Antonella Zucchella. 2021. International entrepreneurship and the internationalization phenomenon: taking stock, looking ahead. *International Business Review* **30**:2, 101800. [Crossref]

111. Stephen X. Zhang, Renfei Gao, Nicolás Odeh, Michael Leatherbee. 2021. A microfoundational model of real options reasoning: The roles of individual search propensity and perceived uncertainty. *Strategic Entrepreneurship Journal* **15**:1, 98-120. [Crossref]

112. Nicolai J. Foss, Peter G. Klein, Lasse B. Lien, Thomas Zellweger, Todd Zenger. 2021. Ownership competence. *Strategic Management Journal* **42**:2, 302-328. [Crossref]

113. Gilles Chemla, Katrin Tinn. How Wise are Crowds on Crowdfunding Platforms? 397-406. [Crossref]

114. Michael Fritsch, Michael Wyrwich. Entrepreneurship, Gründungen, Marktdynamik 5-19. [Crossref]

115. Martin Andersson, Johan P. Larsson. Geography and Entrepreneurship 1361-1373. [Crossref]

116. Ryan Shuwei Hsu, Aichia Chuang, An-Chih Wang. 2021. Business founders' work design and new venture development. *Journal of Business Venturing* 36:1, 106000. [Crossref]

117. Simon Neugebauer, Lukas Rippitsch, Florian Sobieczky, Manuela Geiß. 2021. Explainability of AI-predictions based on psychological profiling. *Procedia Computer Science* 180, 1003-1012. [Crossref]

118. Adrian L. Merida, Vera Rocha. 2021. It's about time: The timing of entrepreneurial experience and the career dynamics of university graduates. *Research Policy* 50:1, 104135. [Crossref]

119. Sasan Mansouri, Paul P. Momtaz. 2021. Financing Sustainable Entrepreneurship: ESG Measurement, Valuation, and Performance in Token Offerings. *SSRN Electronic Journal* . [Crossref]

120. Nuri Ersahin, Ruidi Huang, Naveen Khanna. 2021. The Achilles Heel of Reputable VCs. *SSRN Electronic Journal* 119. . [Crossref]

121. Xiqian Cai, Lata Gangadharan, Yi Lu, Xiaojian Zhao. 2021. Does a Sea Fishing Legacy Explain Differences in Risk Attitudes and Entrepreneurship?. *SSRN Electronic Journal* 95. . [Crossref]

122. Randall K. Morck. 2021. Kindleberger Cycles & Economic Growth: Method in the Madness of Crowds?. *SSRN Electronic Journal* 124. . [Crossref]

123. Nataliya Wright, Rembrand Koning, Tarun Khanna. 2021. Judging Foreign Startups. *SSRN Electronic Journal* 47. . [Crossref]

124. Yifei Zhang. 2021. Corporate Venture Capital and Firm Scope. *SSRN Electronic Journal* 26. . [Crossref]

125. Andrey Malenko, Ramana Nanda, Matthew Rhodes-Kropf, Savitar Sundaresan. 2021. Investment Committee Voting and the Financing of Innovation. *SSRN Electronic Journal* 128. . [Crossref]

126. Joshua S. Gans. 2021. A Synthetic Model of Disruption and Experimentation. *SSRN Electronic Journal* 129. . [Crossref]

127. Elena Novelli, Chiara Spina. 2021. When do Entrepreneurs Benefit from Acting Like Scientists? A Field Experiment in the UK. *SSRN Electronic Journal* 1. . [Crossref]

128. Joshua Gans. 2021. A Synthetic Model of Disruption and Experimentation. *SSRN Electronic Journal* 129. . [Crossref]

129. Jorge Guzman. 2021. Treatment Effects in Strategic Management: With an Application to Choosing Early Stage Venture Capital. *SSRN Electronic Journal* 21. . [Crossref]

130. Suting Hong, Pierre Mella-Barral. 2021. Heterogeneous Venture Capitalists and Syndicate Switching. *SSRN Electronic Journal* 138. . [Crossref]

131. Vladimir A. Gatchev, Christo Angelov Pirinsky, Buvaneshwaran Venugopal. 2021. A Language-Based Approach to Measuring Creative Exploration. *SSRN Electronic Journal* 60. . [Crossref]

132. Michael Leatherbee, Riitta Katila. 2020. The lean startup method: Early-stage teams and hypothesis-based probing of business ideas. *Strategic Entrepreneurship Journal* 14:4, 570-593. [Crossref]

133. Jan Konietzko, Brian Baldassarre, Phil Brown, Nancy Bocken, Erik Jan Hultink. 2020. Circular business model experimentation: Demystifying assumptions. *Journal of Cleaner Production* 277, 122596. [Crossref]

134. Ehsan Azarmsa, Lin William Cong. 2020. Persuasion in relationship finance. *Journal of Financial Economics* 138:3, 818-837. [Crossref]

135. H.R. Ganesh, P. S. Aithal. 2020. Extending the Concept of Delayed Gratification to Retail Start-ups in India: An Imperative Strategy for the Success, Long-Term Sustainability, and Protection of Founding Members' Majority Shareholding. *International Journal of Management, Technology, and Social Sciences* 252-265. [Crossref]

136. Jorge Guzman, Scott Stern. 2020. The State of American Entrepreneurship: New Estimates of the Quantity and Quality of Entrepreneurship for 32 US States, 1988–2014. *American Economic Journal: Economic Policy* **12**:4, 212-243. [Abstract] [View PDF article] [PDF with links]

137. Ahmad Beltagui, Achilleas Sesis, Nikolaos Stylos. 2020. A bricolage perspective on democratising innovation: The case of 3D printing in makerspaces. *Technological Forecasting and Social Change* 120453. [Crossref]

138. Javier Monllor, Aracely Soto-Simeone. 2020. The impact that exposure to digital fabrication technology has on student entrepreneurial intentions. *International Journal of Entrepreneurial Behavior & Research* **26**:7, 1505-1523. [Crossref]

139. Jermain C. Kaminski, Christian Hopp. 2020. Predicting outcomes in crowdfunding campaigns with textual, visual, and linguistic signals. *Small Business Economics* **55**:3, 627-649. [Crossref]

140. Jorge Melegati, Eduardo Guerra, Xiaofeng Wang. 2020. Understanding Hypotheses Engineering in Software Startups through a Gray Literature Review. *Information and Software Technology* **51**, 106465. [Crossref]

141. Suting Hong, Konstantinos Serfes, Veikko Thiele. 2020. Competition in the venture capital market and the success of startup companies: Theory and evidence. *Journal of Economics & Management Strategy* **29**:4, 741-791. [Crossref]

142. Doan Winkel, Justin Wilcox, Atul Teckchandani. 2020. The 60-Minute MVP. *Entrepreneurship Education and Pedagogy* **3**:4, 371-386. [Crossref]

143. Anna Goldstein, Claudia Doblinger, Erin Baker, Laura Díaz Anadón. 2020. Patenting and business outcomes for cleantech startups funded by the Advanced Research Projects Agency-Energy. *Nature Energy* **5**:10, 803-810. [Crossref]

144. Robin De Cock, Johan Bruneel, Annelies Bobelyn. 2020. Making the lean start-up method work: The role of prior market knowledge. *Journal of Small Business Management* **58**:5, 975-1002. [Crossref]

145. Kieron J. Meagher, Arlene Wong, Klaus G. Zauner. 2020. A competitive analysis of fail fast: Shakeout and uncertainty about consumer tastes. *Journal of Economic Behavior & Organization* **177**, 589-600. [Crossref]

146. Kellilynn M. Frias, Deidre L. Popovich, Dale F. Duhan, Robert F. Lusch. 2020. Perceived Market Risk in New Ventures: A Study of Early-Phase Business Angel Investment Screening. *Journal of Macromarketing* **40**:3, 339-354. [Crossref]

147. Jorge Melegati, Rafael Chanin, Afonso Sales, Rafael Prikladnicki, Xiaofeng Wang. MVP and experimentation in software startups: a qualitative survey 322-325. [Crossref]

148. Ross Brown, Augusto Rocha, Marc Cowling. 2020. Financing entrepreneurship in times of crisis: Exploring the impact of COVID-19 on the market for entrepreneurial finance in the United Kingdom. *International Small Business Journal: Researching Entrepreneurship* **38**:5, 380-390. [Crossref]

149. Alexander Styhre. 2020. Thinly and Thickly Capitalized Projects: Theorizing the Role of the Finance Markets and Capital Supply in Project Management Studies. *Project Management Journal* **51**:4, 378-388. [Crossref]

150. Tom Vanacker, Daniel P. Forbes, Mirjam Knockaert, Sophie Manigart. 2020. Signal Strength, Media Attention, and Resource Mobilization: Evidence from New Private Equity Firms. *Academy of Management Journal* **63**:4, 1082-1105. [Crossref]

151. Yaroslav Rosokha, Kenneth Younge. 2020. Motivating Innovation: The Effect of Loss Aversion on the Willingness to Persist. *The Review of Economics and Statistics* **102**:3, 569-582. [Crossref]

152. Rory M. McDonald, Kathleen M. Eisenhardt. 2020. Parallel Play: Startups, Nascent Markets, and Effective Business-model Design. *Administrative Science Quarterly* **65**:2, 483-523. [Crossref]

153. Ewa Sońta-Drączkowska, Matthias Mrożewski. 2020. Exploring the Role of Project Management in Product Development of New Technology-Based Firms. *Project Management Journal* **51**:3, 294-311. [Crossref]

154. Giulio Bosio, Federica Origo. 2020. Who gains from active learning in higher education?. *Education Economics* **28**:3, 311-331. [Crossref]

155. Ploypailin Kijkasiwat, Pongsutti Phuensane. 2020. Innovation and Firm Performance: The Moderating and Mediating Roles of Firm Size and Small and Medium Enterprise Finance. *Journal of Risk and Financial Management* **13**:5, 97. [Crossref]

156. Gilles Chemla, Katrin Tinn. 2020. Learning Through Crowdfunding. *Management Science* **66**:5, 1783-1801. [Crossref]

157. Kim Claes, Balagopal Vissa. 2020. Does Social Similarity Pay Off? Homophily and Venture Capitalists' Deal Valuation, Downside Risk Protection, and Financial Returns in India. *Organization Science* **31**:3, 576-603. [Crossref]

158. Ratan J.S. Dheer, Tomasz Lenartowicz. 2020. Effect of generational status on immigrants' intentions to start new ventures: The role of cognitions. *Journal of World Business* **55**:3, 101069. [Crossref]

159. Alessandro Spiganti. 2020. Can Starving Start-ups Beat Fat Labs? A Bandit Model of Innovation with Endogenous Financing Constraint*. *The Scandinavian Journal of Economics* **122**:2, 702-731. [Crossref]

160. Pierre Azoulay, Benjamin F. Jones, J. Daniel Kim, Javier Miranda. 2020. Age and High-Growth Entrepreneurship. *American Economic Review: Insights* **2**:1, 65-82. [Abstract] [View PDF article] [PDF with links]

161. Sandeep D. Pillai, Brent Goldfarb, David A. Kirsch. 2020. The origins of firm strategy: Learning by economic experimentation and strategic pivots in the early automobile industry. *Strategic Management Journal* **41**:3, 369-399. [Crossref]

162. Erin L. Scott, Pian Shu, Roman M. Lubynsky. 2020. Entrepreneurial Uncertainty and Expert Evaluation: An Empirical Analysis. *Management Science* **66**:3, 1278-1299. [Crossref]

163. Arnaldo Camuffo, Alessandro Cordova, Alfonso Gambardella, Chiara Spina. 2020. A Scientific Approach to Entrepreneurial Decision Making: Evidence from a Randomized Control Trial. *Management Science* **66**:2, 564-586. [Crossref]

164. 2020. Innovation: Organization & Management Special Issue on    Experimentation for innovation What's now and what's next. *Innovation* **22**:1, 91-96. [Crossref]

165. Alexander Styhre. Governing Innovation-Led Economies: The Role of Business Creation and Creativity 37-77. [Crossref]

166. Jorge Melegati, Xiaofeng Wang. Hypotheses Elicitation in Early-Stage Software Startups Based on Cognitive Mapping 211-220. [Crossref]

167. Martin Andersson, Johan P. Larsson. Geography and Entrepreneurship 1-13. [Crossref]

168. Sanjay Goel, Ranjan Karri. 2020. Entrepreneurial aspirations and poverty reduction: the role of institutional context. *Entrepreneurship & Regional Development* **32**:1-2, 91-111. [Crossref]

169. Yves Guéron, Jihong Lee. 2020. Learning by Selling, Knowledge Spillovers, and Patents. *SSRN Electronic Journal* . [Crossref]

170. Ganesha H. R., P. S. Aithal. 2020. Extending the Concept of Delayed Gratification to Retail Start-ups in India: An Imperative Strategy for the Success, Long-Term Sustainability, and Protection of Founding Members' Majority Shareholding. *SSRN Electronic Journal* . [Crossref]

171. John S. Chen, Daniel W. Elfenbein, Hart E. Posen, Ming zhu Wang. 2020. Pivot Rules for (Overconfident) Entrepreneurs. *SSRN Electronic Journal* **47**. . [Crossref]

172. Ruiqing Cao. 2020. Crowd-Based Rankings and Frictions in New Venture Finance. *SSRN Electronic Journal* . [Crossref]

173. Ernad Kahrović. 2020. Entrepreneurial universities and intermediary organizations as a success factor in SMEs: Literature review. *Ekonomika preduzeca* **68**:3-4, 229-247. [Crossref]

174. Christian Granz, Marisa Henn, Eva Lutz. Research on Venture Capitalists' and Business Angels' Investment Criteria: A Systematic Literature Review 105-136. [Crossref]

175. Matthew Denes, Sabrina Howell, Filippo Mezzanotti, Xinxin Wang, Ting Xu. 2020. Investor Tax Credits and Entrepreneurship: Evidence from U.S. States. *SSRN Electronic Journal* **2**. . [Crossref]

176. Michael Ewens, Ramana Nanda, Christopher Stanton. 2020. The Evolution of CEO Compensation in Venture Capital Backed Startups. *SSRN Electronic Journal* **59**. . [Crossref]

177. Snehal Banerjee, Martin Szydlowski. 2020. Friends Don't Lie: Monitoring and Communication With Risky Investments. *SSRN Electronic Journal* **62**. . [Crossref]

178. Ruiqing Cao, Rembrand Koning, Ramana Nanda. 2020. Biased Sampling of Early Users and the Direction of Startup Innovation. *SSRN Electronic Journal* **5**. . [Crossref]

179. Steven Chong Xiao, Serena Wenjing Xiao. 2020. Renter Protection and Entrepreneurship. *SSRN Electronic Journal* **117**. . [Crossref]

180. Orie Shelef, Robert Wuebker, Jay B. Barney. 2020. Heisenberg Effects On Business Ideas. *SSRN Electronic Journal* **29**. . [Crossref]

181. Liinus Hietaniemi, simone santamaria, Aleksandra Kacperczyk, Juhana Peltonen. 2020. Entrepreneurial Hiring Strategies in Standalone and Portfolio Ventures. *SSRN Electronic Journal* **10**. . [Crossref]

182. Elżbieta Pohulak-Żołędowska. 2019. Changes of Venture Capital Financing in the USA and in Europe. *Studia i Materiały Wydziału Zarządzania UW* **2/2018 cz.2**:29, 41-46. [Crossref]

183. Nirosha Hewa Wellalage, Viviana Fernandez. 2019. Innovation and SME finance: Evidence from developing countries. *International Review of Financial Analysis* **66**, 101370. [Crossref]

184. Åsa Lindholm-Dahlstrand, Martin Andersson, Bo Carlsson. 2019. Entrepreneurial experimentation: a key function in systems of innovation. *Small Business Economics* **53**:3, 591-610. [Crossref]

185. Carolin Bock, Martin Watzinger. 2019. The Capital Gains Tax: A Curse but Also a Blessing for Venture Capital Investment. *Journal of Small Business Management* **57**:4, 1200-1231. [Crossref]

186. Horia Tigau. 2019. The Importance of FDI on Stimulating Entrepreneurship – A Regional Study in the Case of Romania. *Proceedings of the International Conference on Applied Statistics* **1**:1, 484-495. [Crossref]

187. Sari Pekkala Kerr, William R. Kerr, Margaret Dalton. 2019. Risk attitudes and personality traits of entrepreneurs and venture team members. *Proceedings of the National Academy of Sciences* **116**:36, 17712-17716. [Crossref]

188. Vedapradha. R, Hariharan Ravi. 2019. Challenges or survival instinct of Tibetan entrepreneurs. *Asia Pacific Journal of Innovation and Entrepreneurship* **13**:2, 203-213. [Crossref]

189. Thomas F. Hellmann, Paul H. Schure, Chloe Tergiman, Dan H. Vo. 2019. Ownership dynamics within founder teams: The role of external financing. *Strategic Entrepreneurship Journal* **13**:3, 256-287. [Crossref]

190. Ian Appel, Joan Farre-Mensa, Elena Simintzi. 2019. Patent trolls and startup employment. *Journal of Financial Economics* **133**:3, 708-725. [Crossref]

191. Antonio Ghezzi. 2019. Digital startups and the adoption and implementation of Lean Startup Approaches: Effectuation, Bricolage and Opportunity Creation in practice. *Technological Forecasting and Social Change* **146**, 945-960. [Crossref]

192. Ethan Gifford, Maureen McKelvey. 2019. Knowledge-Intensive Entrepreneurship and S3: Conceptualizing Strategies for Sustainability. *Sustainability* **11**:18, 4824. [Crossref]

193. Sharon Belenzon, Victor Manuel Bennett, Andrea Patacconi. 2019. Flexible Production and Entry: Institutional, Technological, and Organizational Determinants. *Strategy Science* **4**:3, 193-216. [Crossref]

194. Christina Lüthy, Chris Steyaert. 2019. The onto-politics of entrepreneurial experimentation: re-reading Hans-Jörg Rheinberger's understanding of 'experimental systems'. *Entrepreneurship & Regional Development* **31**:7-8, 652-668. [Crossref]

195. Simon Quinn, Christopher Woodruff. 2019. Experiments and Entrepreneurship in Developing Countries. *Annual Review of Economics* **11**:1, 225-248. [Crossref]

196. Pamela Adams, Patrick Burd. 2019. Classic soccer shoes: From an informal to a formal business start-up. *The International Journal of Entrepreneurship and Innovation* **20**:3, 220-226. [Crossref]

197. Jonathan T. Eckhardt. Chapter 2 The Distinctive Domain as a Durable Way Forward 21-33. [Crossref]

198. David B. Audretsch, Erik E. Lehmann, Nikolaus Seitz. 2019. Amenities, subcultures, and entrepreneurship. *Small Business Economics* **28**. . [Crossref]

199. Alexander Konon, Alexander S. Kritikos. 2019. Prediction based on entrepreneurship-prone personality profiles: sometimes worse than the toss of a coin. *Small Business Economics* **53**:1, 1-20. [Crossref]

200. Diego Comin, Ramana Nanda. 2019. Financial Development and Technology Diffusion. *IMF Economic Review* **67**:2, 395-419. [Crossref]

201. Elena Cefis, Orietta Marsili. 2019. Good times, bad times: innovation and survival over the business cycle. *Industrial and Corporate Change* **28**:3, 565-587. [Crossref]

202. Joshua S. Gans, Scott Stern, Jane Wu. 2019. Foundations of entrepreneurial strategy. *Strategic Management Journal* **40**:5, 736-756. [Crossref]

203. Russell E. Browder, Howard E. Aldrich, Steven W. Bradley. 2019. The emergence of the maker movement: Implications for entrepreneurship research. *Journal of Business Venturing* **34**:3, 459-476. [Crossref]

204. Eric Christian Brun. 2019. Understanding a Business Incubator as a Start-Up Factory: A Value Chain Model Perspective. *International Journal of Innovation and Technology Management* **16**:03. . [Crossref]

205. David W. Williams, Matthew S. Wood, J. Robert Mitchell, Diemo Urbig. 2019. Applying experimental methods to advance entrepreneurship research: On the need for and publication of experiments. *Journal of Business Venturing* **34**:2, 215-223. [Crossref]

206. Abdel Malik Ola, Catherine Deffains-Crapsky, Régis Dumoulin. 2019. Vers une nouvelle approche de l'investissement en amorçage : un raisonnement à travers la théorie de l'alignement structurel. *Finance Contrôle Stratégie* :NS-5. . [Crossref]

207. Andrin Spescha. 2019. R&D expenditures and firm growth – is small beautiful?. *Economics of Innovation and New Technology* **28**:2, 156-179. [Crossref]

208. Arti Grover Goswami, Denis Medvedev, Ellen Olafsen. Searching for Winners 117-163. [Crossref]

209. Markus Grillitsch, Torben Schubert, Martin Srholec. 2019. Knowledge base combinations and firm growth. *Research Policy* **48**:1, 234-247. [Crossref]

210. Jermain Kaminski, Christian Hopp, Tereza Tykvová. 2019. New technology assessment in entrepreneurial financing – Does crowdfunding predict venture capital investments?. *Technological Forecasting and Social Change* **139**, 287-302. [Crossref]

211. Alexander Styhre. Passion: The Motivation Behind Venture Work 105-144. [Crossref]

212. Werner Bönte, Diemo Urbig. Connecting People and Knowledge: Knowledge Spillovers, Cognitive Biases, and Entrepreneurship 385-397. [Crossref]

213. Jorge Melegati, Rafael Chanin, Xiaofeng Wang, Afonso Sales, Rafael Prikladnicki. Enablers and Inhibitors of Experimentation in Early-Stage Software Startups 554-569. [Crossref]

214. Michael Fritsch. Entrepreneurship, Gründungen, Marktdynamik 5-19. [Crossref]

215. Mika Maliranta, Satu Nurmi. 2019. Business owners, employees, and firm performance. *Small Business Economics* **52**:1, 111-129. [Crossref]

216. David de Meza, Christopher Dawson, Andrew Henley, G. Reza Arabsheibani. 2019. Curb your enthusiasm: Optimistic entrepreneurs earn less. *European Economic Review* **111**, 53-69. [Crossref]

217. Godfrey Keller, Vladimír Novák, Tim Willems. 2019. A note on optimal experimentation under risk aversion. *Journal of Economic Theory* **179**, 476-487. [Crossref]

218. Raymond J. Jones, Anat Barnir. 2019. Properties of opportunity creation and discovery: Comparing variation in contexts of innovativeness. *Technovation* **79**, 1-10. [Crossref]

219. Yujin Kim, Chirantan Chatterjee, Matthew John Higgins. 2019. Moving Beyond the Valley of Death: Regulation and Venture Capital Investments in Early-Stage Biopharmaceutical Firms. *SSRN Electronic Journal* . [Crossref]

220. Kenneth A. Younge, Jeffrey M. Kuhn. 2019. First Movers and Follow-on Invention: Evidence from a Vector Space Model of Invention. *SSRN Electronic Journal* . [Crossref]

221. Sabrina Howell, Ramana Nanda. 2019. Networking Frictions in Venture Capital, and the Gender Gap in Entrepreneurship. *SSRN Electronic Journal* . [Crossref]

222. William R. Kerr, Frédéric Robert-Nicoud. 2019. Tech Clusters. *SSRN Electronic Journal* . [Crossref]

223. Sanjay Goel, Raymond J. Jones, Ranjan Karri. Conceptualizing and Investigating Entrepreneurial Action in Family Firms: A Few Promising Directions 873-907. [Crossref]

224. Simon Mayer. 2019. Financing Breakthroughs under Failure Risk. *SSRN Electronic Journal* **101**. . [Crossref]

225. Johannes Schneider, Christoph Wolf. 2019. Switching Forth and Back: Problem Solving under Time Pressure. *SSRN Electronic Journal* **68**. . [Crossref]

226. Tong Liu. 2019. Financing Experimentation. *SSRN Electronic Journal* **25**. . [Crossref]

227. Raffaele Conti, Alfonso Gambardella, Elena Novelli. 2019. Specializing in Generality: Firm Strategies When Intermediate Markets Work. *Organization Science* **30**:1, 126-150. [Crossref]

228. Rustam Abuzov. 2019. The Impact of Venture Capital Screening. *SSRN Electronic Journal* **49**. . [Crossref]

229. Ana Paula Cusolito, William F. Maloney. Entry and Exit: Creating Experimental Societies 69-113. [Crossref]

230. Gordon Burtch, Seth Carnahan, Brad N. Greenwood. 2018. Can You Gig It? An Empirical Examination of the Gig Economy and Entrepreneurial Activity. *Management Science* **64**:12, 5497-5520. [Crossref]

231. Matthew J. Kotchen, Christopher Costello. 2018. Maximizing the impact of climate finance: Funding projects or pilot projects?. *Journal of Environmental Economics and Management* **92**, 270-281. [Crossref]

232. Irene Ng. 2018. Mimicking Firms: Future of Work and Theory of the Firm in a Digital Age. *Journal of Creating Value* **4**:2, 205-210. [Crossref]

233. Michael Fritsch, Sandra Kublina. 2018. Related variety, unrelated variety and regional growth: the role of absorptive capacity and entrepreneurship. *Regional Studies* **52**:10, 1360-1371. [Crossref]

234. Gilles Duruflé, Thomas Hellmann, Karen Wilson. 2018. Catalysing entrepreneurship in and around universities. *Oxford Review of Economic Policy* **34**:4, 615-636. [Crossref]

235. Ufuk Akcigit, William R. Kerr. 2018. Growth through Heterogeneous Innovations. *Journal of Political Economy* **126**:4, 1374-1443. [Crossref]

236. Michael Ewens, Ramana Nanda, Matthew Rhodes-Kropf. 2018. Cost of experimentation and the evolution of venture capital. *Journal of Financial Economics* **128**:3, 422-442. [Crossref]

237. Alessandro Nuvolari, Pier Angelo Toninelli, Michelangelo Vasta. 2018. What makes a successful (and famous) entrepreneur? Historical evidence from Italy (XIX-XX centuries). *Industrial and Corporate Change* **27**:3, 425-447. [Crossref]

238. Indraneel Chakraborty, Michael Ewens. 2018. Managing Performance Signals Through Delay: Evidence from Venture Capital. *Management Science* **64**:6, 2875-2900. [Crossref]

239. Philip T. Roundy, Mike Bradshaw, Beverly K. Brockman. 2018. The emergence of entrepreneurial ecosystems: A complex adaptive systems approach. *Journal of Business Research* **86**, 1-10. [Crossref]

240. J. Daniel Kim. 2018. Is there a startup wage premium? Evidence from MIT graduates. *Research Policy* **47**:3, 637-649. [Crossref]

241. Juanita Gonzalez-Uribe, Michael Leatherbee. 2018. The Effects of Business Accelerators on Venture Performance: Evidence from Start-Up Chile. *The Review of Financial Studies* **31**:4, 1566-1603. [Crossref]

242. Paige Clayton, Maryann Feldman, Nichola Lowe. 2018. Behind the Scenes: Intermediary Organizations that Facilitate Science Commercialization Through Entrepreneurship. *Academy of Management Perspectives* **32**:1, 104-124. [Crossref]

243. Karen A. Murdock, Claus J. Varnes. 2018. Beyond effectuation. *International Journal of Entrepreneurial Behavior & Research* **24**:1, 256-272. [Crossref]

244. Renee Barnes, Margaretha Johanna de Villiers Scheepers. 2018. Tackling Uncertainty for Journalism Graduates. *Journalism Practice* **12**:1, 94-114. [Crossref]

245. Scott Morton Ninomiya, Sarah Burch. Beyond "The Business Case": The Emerging Role of Entrepreneurs in the Multilevel Governance of Urban Decarbonization in Canada 325-342. [Crossref]

246. Nancy Richter, Thomas Schildhauer. Startup Clinics: Applied Research and 'First Aid' for Early Stage Startups 29-40. [Crossref]

247. Suting Hong, Konstantinos Serfes, Veikko Thiele. 2018. Competition in the Venture Capital Market and the Success of Startup Companies: Theory and Evidence. *SSRN Electronic Journal* . [Crossref]

248. Xuan Tian, Jiajie Xu. 2018. Do Place-Based Programs Affect Local Innovation and Entrepreneurship?. *SSRN Electronic Journal* . [Crossref]

249. Jillian Grennan, Roni Michaely. 2018. FinTechs and the Market for Financial Analysis. *SSRN Electronic Journal* . [Crossref]

250. Andrea Contigiani, Trevor Young-Hyman. 2018. Evaluation of Early-Stage Ventures: Coherent Combinations of Experimentation, Planning, and Structure. *SSRN Electronic Journal* . [Crossref]

251. Johan Hombert, Adrien Matray. 2018. The Long-Term Consequences of the Tech Bubble on Skilled Workers' Earnings. *SSRN Electronic Journal* . [Crossref]

252. Gilles Durufll, Thomas F. Hellmann, Karen E. Wilson. 2018. Catalysing Entrepreneurship in and Around Universities. *SSRN Electronic Journal* . [Crossref]

253. Sandeep Devanatha Pillai, Brent D. Goldfarb, David Kirsch. 2018. When Does Economic Experimentation Matter? Finding the Pivot in the Early History of the Automobile Industry. *SSRN Electronic Journal* . [Crossref]

254. Vladimmr Novvk, Tim Willems. 2018. A Note on Optimal Experimentation Under Risk Aversion. *SSRN Electronic Journal* . [Crossref]

255. Wei Chen, Mingfeng Lin, Bryan Zheng Zhang. 2018. Lower Taxes, Smarter Crowd? The Impact of Tax Incentives on Equity Crowdfunding. *SSRN Electronic Journal* . [Crossref]

256. Gary Dushnitsky, Diego Zunino. 2018. The Role of Crowdfunding in Entrepreneurial Finance. *SSRN Electronic Journal* . [Crossref]

257. Andrea Contigiani. 2018. Experimentation, Learning, and Appropriability in Early-Stage Ventures. *SSRN Electronic Journal* . [Crossref]

258. Marco Da Rin, Marina Di Giacomo, Alessandro Sembenelli. 2018. Corporate Income Taxation, Leverage at Entry, and the Growth of Entrepreneurial Companies. *SSRN Electronic Journal* . [Crossref]

259. Trond Døskeland, Per Stromberg. 2018. Evaluating investments in unlisted equity for the Norwegian Government Pension Fund Global (GPFG). *SSRN Electronic Journal* **26**. . [Crossref]

260. Galina Shirokova, Oleksiy Osiyevskyy, Michael H. Morris, Karina Bogatyreva. 2017. Expertise, university infrastructure and approaches to new venture creation: assessing students who start businesses. *Entrepreneurship & Regional Development* **29**:9-10, 912-944. [Crossref]

261. Ramana Nanda, Matthew Rhodes-Kropf. Innovation Policies 37-80. [Crossref]

262. Suna Løwe Nielsen, Poul Rind Christensen, Astrid Heidemann Lassen, Mette Mikkelsen. 2017. Hunting the Opportunity: The Promising Nexus of Design and Entrepreneurship. *The Design Journal* **20**:5, 617-638. [Crossref]

263. Michael Fritsch. The Effect of New Business Formation on Regional Development 379-400. [Crossref]

264. Pamela Adams, Victor Ricci. 2017. Trend Pie. *The International Journal of Entrepreneurship and Innovation* **18**:3, 210-215. [Crossref]

265. Alicia DeSantola, Ranjay Gulati. 2017. Scaling: Organizing and Growth in Entrepreneurial Ventures. *Academy of Management Annals* **11**:2, 640-668. [Crossref]

266. Sabrina T. Howell. 2017. Financing Innovation: Evidence from R&D Grants. *American Economic Review* **107**:4, 1136-1164. [Abstract] [View PDF article] [PDF with links]

267. M. Diane Burton, Tom Nicholas. 2017. Prizes, patents and the search for longitude. *Explorations in Economic History* **64**, 21-36. [Crossref]

268. SHAI BERNSTEIN, ARTHUR KORTEWEG, KEVIN LAWS. 2017. Attracting Early-Stage Investors: Evidence from a Randomized Field Experiment. *The Journal of Finance* **72**:2, 509-538. [Crossref]

269. Marvin B. Lieberman, Gwendolyn K. Lee, Timothy B. Folta. 2017. Entry, exit, and the potential for resource redeployment. *Strategic Management Journal* **38**:3, 526-544. [Crossref]

270. James Caton. 2017. Entrepreneurship, search costs, and ecological rationality in an agent-based economy. *The Review of Austrian Economics* **30**:1, 107-130. [Crossref]

271. Dennis Lyth Frederiksen, Alexander Brem. 2017. How do entrepreneurs think they create value? A scientific reflection of Eric Ries' Lean Startup approach. *International Entrepreneurship and Management Journal* **13**:1, 169-189. [Crossref]

272. Matthias Dorner, Helmut Fryges, Kathrin Schopen. 2017. Wages in high-tech start-ups – Do academic spin-offs pay a wage premium?. *Research Policy* **46**:1, 1-18. [Crossref]

273. Swati Bhatt. The Three Trends: Granularity, Behemoths and Cooperation 29-55. [Crossref]

274. Kurt Dopfer, Jason Potts, Andreas Pyka. Upward and Downward Complementarity: The Meso Core of Evolutionary Growth Theory 69-80. [Crossref]

275. Marijn A. van Weele, Frank J. van Rijnsoever. Between a Soft Landing and a Hard Place: How Silicon Valley Software and Life Sciences Business Incubators Facilitate Learning 167-201. [Crossref]

276. Ross Cullen. 2017. Evaluating renewable energy policies. *Australian Journal of Agricultural and Resource Economics* **61**:1, 1-18. [Crossref]

277. Gilles Chemla, Katrin Tinn. 2017. Learning Through Crowdfunding. *SSRN Electronic Journal* . [Crossref]

278. Lin William Cong, Sabrina T. Howell, Ran Zhang. 2017. Does High-Growth Entrepreneurship Need Public Markets? Evidence from Chinese IPOs. *SSRN Electronic Journal* **124**. . [Crossref]

279. Ramana Nanda, Matthew Rhodes-Kropf. 2017. Coordination Frictions in Venture Capital Syndicates. *SSRN Electronic Journal* . [Crossref]

280. Jing Gong, Yiping Song. 2017. Uber Might Buy Me a Mercedes Benz: An Empirical Investigation of the Sharing Economy and Durable Goods Purchase. *SSRN Electronic Journal* **36**. . [Crossref]

281. Buvaneshwaran Gokul Venugopal. 2017. Homophily, Information Asymmetry and Performance in the Angels Market. *SSRN Electronic Journal* . [Crossref]

282. Kevin Boudreau. 2017. Amateurs: Low-Cost Development, Market Participation & Innovation on Digital Platforms. *SSRN Electronic Journal* . [Crossref]

283. Ehsan Azarmsa, Lin William Cong. 2017. Insider Investor and Information. *SSRN Electronic Journal* . [Crossref]

284. Onesun Steve Yoo, Tingliang Huang, Kenan Arifoglu. 2017. A Theoretical Analysis of the Lean Startup's Product Development Process. *SSRN Electronic Journal* . [Crossref]

285. Katherine Lim. 2017. Self-Employment, Workplace Flexibility, and Maternal Labor Supply: A Life-Cycle Model. *SSRN Electronic Journal* **98**. . [Crossref]

286. Kijpokin Kasemsap. The Importance of Entrepreneurship in Global Business 92-115. [Crossref]

287. Tom Vanacker, Daniel P. Forbes. 2016. Disentangling the Multiple Effects of Affiliate Reputation on Resource Attraction in New Firms. *Organization Science* **27**:6, 1525-1547. [Crossref]

288. Katerina Nicolopoulou, Nada K. Kakabadse, Kanellos Panagiotis Nikolopoulos, Jose M. Alcaraz, Konstantina Sakellariou. 2016. Cosmopolitanism and transnational elite entrepreneurial practices. *Society and Business Review* **11**:3, 257-275. [Crossref]

289. Kurt Dopfer, Jason Potts, Andreas Pyka. 2016. Upward and downward complementarity: the meso core of evolutionary growth theory. *Journal of Evolutionary Economics* **26**:4, 753-763. [Crossref]

290. Arup Varma, Nenad Jukic, Almir Pestek, Clifford J. Shultz, Svetlozar Nestorov. 2016. Airbnb: Exciting innovation or passing fad?. *Tourism Management Perspectives* **20**, 228-237. [Crossref]

291. Gerard Roe, Jason Potts. 2016. Detecting new industry emergence using government data: a new analytic approach to regional innovation policy. *Innovation* **18**:3, 373-388. [Crossref]

292. Gustavo Manso. 2016. Experimentation and the Returns to Entrepreneurship. *The Review of Financial Studies* **29**:9, 2319-2340. [Crossref]

293. Ethan Mollick, Ramana Nanda. 2016. Wisdom or Madness? Comparing Crowds with Expert Evaluation in Funding the Arts. *Management Science* **62**:6, 1533-1553. [Crossref]

294. Renato Gomes, Daniel Gottlieb, Lucas Maestri. 2016. Experimentation and project selection: Screening and learning. *Games and Economic Behavior* **96**, 145-169. [Crossref]

295. David B. Audretsch, Erik E. Lehmann, Stefano Paleari, Silvio Vismara. 2016. Entrepreneurial finance and technology transfer. *The Journal of Technology Transfer* **41**:1, 1-9. [Crossref]

296. Ramana Nanda, Matthew Rhodes-Kropf. 2016. Financing Entrepreneurial Experimentation. *Innovation Policy and the Economy* **16**, 1-23. [Crossref]

297. Yael V. Hochberg. 2016. Accelerating Entrepreneurs and Ecosystems: The Seed Accelerator Model. *Innovation Policy and the Economy* **16**, 25-51. [Crossref]

298. Nathan Furr, Jackson A. Nickerson, Robert Wuebker. 2016. A Theory of Entrepreneuring. *SSRN Electronic Journal* . [Crossref]

299. Ali Mohammadi, Kourosh Shafi. 2016. How Wise Are Crowd? A Comparative Study of Crowd and Institutions in Peer-to-Business Online Lending Markets. *SSRN Electronic Journal* . [Crossref]

300. Jason Potts, Gerry Roe. 2016. Detecting New Industry Emergence Using Government Data: A New Analytic Approach to Regional Innovation Policy. *SSRN Electronic Journal* . [Crossref]

301. Josh Lerner, James Tighe, Ann Leamon, Susana Garcia Robles. 2016. Impact of Early Stage Equity Funds in Latin America. *SSRN Electronic Journal* . [Crossref]

302. Kevin Boudreau. 2016. Notes on Developing a Strategy and Designing a Company. *SSRN Electronic Journal* . [Crossref]

303. Jermain Kaminski, Christian Hopp, Tereza Tykvova. 2016. New Technology Assessment in Entrepreneurial Financing - Can Crowdfunding Predict Venture Capital Investments?. *SSRN Electronic Journal* . [Crossref]

304. Joshua S. Gans, Scott Stern, Jane Wu. 2016. Foundations of Entrepreneurial Strategy. *SSRN Electronic Journal* . [Crossref]

305. Yaroslav Rosokha, Kenneth A. Younge. 2016. Motivating Innovation: The Effect of Loss Aversion on the Willingness to Persist. *SSRN Electronic Journal* **27**. . [Crossref]

306. Ian Appel, Joan Farre-Mensa, Elena Simintzi. 2016. Patent Trolls and Small Business Employment. *SSRN Electronic Journal* . [Crossref]

307. Yujin Kim, Chirantan Chatterjee. 2016. Improving Investor-Investee Matches with Regulation: Evidence from the Orphan Drug Act & Global Biotechnology Industry. *SSRN Electronic Journal* . [Crossref]

308. Michael Leatherbee, Riitta Katila. 2016. Stay the Course or Pivot? Antecedents of Cognitive Refinements of Business Models in Young Firms. *SSRN Electronic Journal* **59**. . [Crossref]

309. Michael Fritsch. Entrepreneurship, Gründungen, Marktdynamik 5-17. [Crossref]

310. William R. Kerr, Ramana Nanda. 2015. Financing Innovation. *Annual Review of Financial Economics* **7**:1, 445-462. [Crossref]

311. Emily Cox Pahnke, Rory McDonald, Dan Wang, Benjamin Hallen. 2015. Exposed: Venture Capital, Competitor Ties, and Entrepreneurial Innovation. *Academy of Management Journal* **58**:5, 1334-1360. [Crossref]

312. Rasananda Panda, Surbhi Verma, Bijal Mehta. 2015. Emergence and Acceptance of Sharing Economy in India. *International Journal of Online Marketing* **5**:3, 1-17. [Crossref]

313. Ramana Nanda, Matthew Rhodes-Kropf. 2015. Financing experiments. *Science* **348**:6240, 1200-1200. [Crossref]

314. Asif Islam. 2015. Entrepreneurship and the Allocation of Government Spending Under Imperfect Markets. *World Development* **70**, 108-121. [Crossref]

315. STOYAN TANEV, ERIK STAVNSAGER RASMUSSEN, ERIK ZIJDEMANS, ROY LEMMINGER, LARS LIMKILDE SVENDSEN. 2015. LEAN AND GLOBAL TECHNOLOGY START-UPS: LINKING THE TWO RESEARCH STREAMS. *International Journal of Innovation Management* **19**:03, 1540008. [Crossref]

316. Gerald Carlino, William R. Kerr. Agglomeration and Innovation 349-404. [Crossref]

317. János Kornai. 2015. Milyen is hát a tőke a 21. században?. *Innováció Kelet-Közép-Európában* **62**:9, 909-942. [Crossref]

318. Charles E. Eesley, Lynn Wu. 2015. Entrepreneurial Adaptation and Social Networks: Evidence from a Randomized Experiment on a MOOC Platform. *SSRN Electronic Journal* . [Crossref]

319. Erin L. Scott, Pian Shu, Roman Lubynsky. 2015. Are 'Better' Ideas More Likely to Succeed? An Empirical Analysis of Startup Evaluation. *SSRN Electronic Journal* . [Crossref]

320. Sharon Belenzon, Victor Manuel Bennett. 2015. Factor Substitutability and Entry. *SSRN Electronic Journal* . [Crossref]

321. Karthik Krishnan, Lucas Lohmer, Pinshuo Wang. 2015. What Do Crowds Really Want? Crowdfunding and Early Product Access. *SSRN Electronic Journal* . [Crossref]

322. Sabrina T Howell. 2015. Financing Constraints as Barriers to Innovation: Evidence from R&D Grants to Energy Startups. *SSRN Electronic Journal* . [Crossref]

323. Timothy Terrell. 2015. Uncertainty, Asset Specificity, and Entrepreneurial Adaptation. *SSRN Electronic Journal* . [Crossref]

324. Tania Babina, Paige Parker Ouimet, Rebecca Zarutskie. 2015. Going Entrepreneurial? IPOs and New Firm Creation. *SSRN Electronic Journal* **124**. . [Crossref]

325. Per L. Bylund, Robert Wuebker. 2014. Where Do Factor Markets Come from? Toward a Resource-Based Theory of the Entrepreneurial Firm. *SSRN Electronic Journal* . [Crossref]

326. Shai Bernstein, Arthur G. Korteweg, Kevin Laws. 2014. Attracting Early Stage Investors: Evidence from a Randomized Field Experiment. *SSRN Electronic Journal* **55**. . [Crossref]

327. Gerald A. Carlino, William R. Kerr. 2014. Agglomeration and Innovation. *SSRN Electronic Journal* **3**. . [Crossref]

328. William R. Kerr, Ramana Nanda. 2014. Financing Innovation. *SSRN Electronic Journal* . [Crossref]

329. Diego Comin, Ramana Nanda. 2014. Financial Development and Technology Diffusion. *SSRN Electronic Journal* **91**. . [Crossref]

330. Gustavo Manso. 2014. Experimentation and the Returns to Entrepreneurship. *SSRN Electronic Journal* . [Crossref]

331. Ufuk Akcigit, William R. Kerr. 2010. Growth Through Heterogeneous Innovations. *SSRN Electronic Journal* . [Crossref]

332. Kijpokin Kasemsap. The Importance of Entrepreneurship in Global Business 1989-2012. [Crossref]

# Exhibit I

# FEDS Notes

 Twitter → Share 🔊 RSS

September 28, 2020

## Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances

Neil Bhutta, Andrew C. Chang, Lisa J. Dettling, and Joanne W. Hsu with assistance from Julia Hewitt[1]

New data from the 2019 Survey of Consumer Finances (SCF) show that long-standing and substantial wealth disparities between families in different racial and ethnic groups were little changed since the last survey in 2016; the typical White family has eight times the wealth of the typical Black family and five times the wealth of the typical Hispanic family.

This FEDS Note explores patterns in wealth holding by race and ethnicity, as well as some key issues related to the accumulation of wealth, using new data from the 2019 Survey of Consumer Finances (SCF). We first analyze total wealth among families classified, according to their self-identification during the interview, as White non-Hispanic, Black or African American non-Hispanic, Hispanic or Latino, and other or multiple race (we will henceforth refer to these groups as White, Black, Hispanic, and other, respectively).[2] Wealth is defined as the difference between families' gross assets and their liabilities.[3] We will describe patterns at the median (the typical household within each group) and at the mean (the average among households in each group).

In the 2019 survey, White families have the highest level of both median and mean family wealth: $188,200 and $983,400, respectively (Figure 1). Black and Hispanic families have considerably less wealth than White families. Black families' median and mean wealth is less than 15 percent that of White families, at $24,100 and $142,500, respectively. Hispanic families' median and mean wealth is $36,100 and $165,500, respectively. Other families—a diverse group that includes those identifying as Asian, American Indian, Alaska Native, Native Hawaiian, Pacific Islander, other race, and all respondents reporting more than one racial identification— have lower wealth than White families but higher wealth than Black and Hispanic families. The same patterns of inequality in the distribution of wealth across all families are also evident within race/ethnicity groups; for each of the four race/ethnicity groups, the mean is substantially higher than the median, reflecting the concentration of wealth at the top of the wealth distribution for each group.

> **Figure 1. White families have more wealth than Black, Hispanic, and other or multiple race families in the 2019 SCF.**



Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Figures displays median (top panel) and mean (bottom panel) wealth by race and ethnicity, expressed in thousands of 2019 dollars.

Accessible version

The SCF data provide a snapshot of families' wealth at a point in time. This point-in-time observation is a result of many complex societal, governmental, and individual factors that play out over the life cycle and even across generations. Among other factors, inter-generational transfers, homeownership opportunities, access to tax-sheltered savings plans, and individuals'

8/29/23, 5:13 PM
Case 1:23-cv-03424-TWT   Document 59-4   Filed 08/31/23   Page 293 of 801
Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances

savings and investment decisions contribute to wealth accumulation and families' financial security.[4] In the remainder of this note, we use the SCF to shed light on how these factors differ by race and ethnicity and how patterns in wealth-holding have changed since the Great Recession.[5] Before we move on, we note that families were primarily interviewed for the 2019 SCF before the onset of the COVID-19 pandemic and associated changes to the economy.[6] Therefore, we urge readers to exercise caution in making any inferences based on the patterns described in this Note about how US families are faring in 2020.

## Recent trends in wealth-holding

Between 2016 and 2019, median wealth rose for all race and ethnicity groups (Figure 2). Growth rates for the 2016–19 period were faster for Black and Hispanic families, rising 33 and 65 percent, respectively, compared to White families, whose wealth rose 3 percent, and other families, whose wealth rose 8 percent. That said, the faster growth in wealth for Black and Hispanic families only resulted in modest changes in the gaps in wealth between these families and White families. The White-Black gap in median wealth was little changed, from $163,700 in 2016 to $164,100 in 2019, and the White-Hispanic gap fell modestly from $160,000 in 2016 to $152,100 in 2019.

Figure 2. Black and Hispanic families experienced faster growth in wealth over the last two surveys after experiencing larger declines in wealth caused by the Great Recession.

Source: Federal Reserve Board, Survey of Consumer Finances.

Notes: Figure displays percent changes in median wealth by race and ethnicity between the 2007 and 2019 Surveys. Survey years are displayed in order from left to right.

Accessible version

The patterns for the 2016-2019 period follow variation across groups in experiences in the Great Recession (2007 to 2010), the immediate aftermath (2010 to 2013), and the continued economic expansion (2013-2019). Median wealth fell about 30 percent for all groups during the Great Recession. However, Black and Hispanic families' wealth continued to fall an additional 20 percent from 2010 to 2013, while White families' wealth was essentially unchanged, and other families' wealth fell a more modest 10 percent. After 2013, median wealth rose for all groups, with faster growth for Black, Hispanic, and other families.

Despite growth over the last two surveys, the typical White family and the typical Black family have yet to recover to their pre-Great Recession levels of wealth. Over the entire 2007-2019 period, wealth fell by 11 percent for the typical White family and by 7 percent for the typical Black family. Only the typical Hispanic family has seen an increase in wealth relative to before the Great Recession, rising by about 39 percent, while the typical other family's wealth is about unchanged since before the Great Recession.

While these cumulative changes in wealth from 2007-2019 may seem striking, there are two important issues related to the interpretation of changes over time in the SCF from Figure 2, particularly over the full time period.

First, the SCF interviews a different random sample of US families every three years. The same family does not appear in consecutive SCFs. Therefore, the appropriate interpretation of the survey-to-survey changes for a particular group, or cumulative changes over multiple surveys for a particular group, is about the typical (or average) family within that group. The inappropriate interpretation is changes for a specific family over time.

Second, the types and number of families that make up each race or ethnicity group change over time as the underlying population of US families changes. Among other factors, population aging, changes to immigration flows, and the evolution of self-identification patterns alter the composition of each race or ethnicity group between surveys. For example, in the 2016 survey, the other or multiple race group was composed of 50 percent reporting more than one racial identification and 30 percent reporting Asian, whereas in 2019 these figures changed to 69 percent and 23 percent, respectively. Therefore, appropriately interpreting changes in a group's wealth, especially over longer time periods, requires acknowledging compositional shifts within each group. In particular, the robust growth in Hispanic wealth over the last two surveys and the marked slowdown of growth for other families in 2019 are at least partially attributable to compositional shifts in the types of families that make up these groups.

## Wealth over the life-cycle

Wealth accumulation generally follows a predictable life-cycle arc, wherein families generally accumulate wealth during their working years, in preparation for retirement. Table 1 displays

median wealth by age category based on the age of the reference person, separately, for White, Black, Hispanic, and other families.[7] Following the expected life-cycle savings patterns, within each race or ethnicity group median wealth is sharply higher for middle-aged families (35 to 54) compared to young families (under 35) and is highest among older families (55 and over).

**Table 1: Wealth rises with age for all families, but substantial wealth gaps between White and non-White families persist throughout the life-cycle.**

|          | White | Black | Hispanic | Other |
|----------|------:|------:|---------:|------:|
| Under 35 |  25.4 |   0.6 |     11.2 |  13.5 |
| 35-54    | 185.0 |  40.1 |     46.1 | 154.5 |
| Over 55  | 315.0 |  53.8 |    111.5 | 213.2 |

Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Table displays median wealth by age group and by race and ethnicity in thousands of 2019 dollars.

Within each age group, the SCF data indicate large differences in wealth across racial and ethnic groups. Even among young families who have had relatively little time to accumulate wealth, there are sizeable differences in wealth by race and ethnicity, most starkly between young Black and young White families. The median young Black family has almost no wealth ($600). In contrast, the median young White family has a wealth of $25,400. Young Hispanic and other families fall in between, with $11,200 and $13,500 in median wealth, respectively. Differences in parental resources may contribute to these early life cycle gaps, which we will discuss in the next section.

In absolute terms, the gaps in median wealth between White and non-White families widen considerably at older ages. For example, amongst families under 35, White families have between $11,900 and $24,800 more in median wealth than Black, Hispanic, or other families. For families over age 55, the gaps widen to between $101,700 and $261,100. In proportional terms, however, the gaps are relatively stable or diminish with age. With respect to the Black-White gap at middle and older ages, the median wealth of White families is four to six times greater than the median wealth of Black families. These within-age ratios are somewhat lower than the Black-White ratio of nearly eight for all families combined (implied by Figure 1).

## Inheritances and other family support

Wealth-holding can differ across groups due to the intergenerational transmission of wealth. There are numerous ways families can transmit wealth and resources across generations. Families can directly transfer their wealth to the next generation in the form of a bequest. They can also provide the next generation with *inter vivos* transfers (gifts), for example, providing down payment support to enable a home purchase or a substantial wedding gift. By some estimates bequests and transfers account for at least half of aggregate wealth (Gale and Scholz 1994), have recently averaged 3 percent of total household disposable personal income (Feiveson and Sabelhaus 2018), and account for more of the racial wealth gap than any other demographic or socioeconomic indicator (Hamilton and Darrity 2010).[8] In addition to direct transfers or gifts, families can make investments in their children that indirectly increase their wealth. For example, families can invest in their children's educational success by paying for

college or private schools, which can in turn increase their children's ability to accumulate wealth. For these reasons, wealth (or a lack thereof) can persist across generations and reflect, among other factors, a legacy of discrimination or unequal treatment in housing, education, and labor markets.[9]

One reason wealth-holding is relatively high among White families is they are considerably more likely to have received an inheritance or gift. Another reason is White families report other indicators associated with higher levels of family support (Table 2). For example, nearly 30 percent of White families report having received an inheritance or gift, compared to about 10 percent of Black families, 7 percent of Hispanic families, and 18 percent of other families. Conditional upon receiving an inheritance or gift, White families also tend to receive larger inheritances.

## Table 2: White families are substantially more likely to receive inheritances, gifts and other family support than Black and Hispanic families

|  | White | Black | Hispanic | Other |
|---|---|---|---|---|
| Recieved an Inheritance (Percent) | 29.9 | 10.1 | 7.2 | 17.8 |
| Conditional Median Inheritance (Thousands of 2019 dollars) | 88.5 | 85.8 | 52.2 | 59.4 |
| Expect an Inheritance (Percent) | 17.1 | 6.0 | 4.2 | 14.7 |
| Conditional Median Expected Inheritance (Thousands of 2019 dollars) | 195.5 | 100.0 | 150.0 | 100.0 |
| Could get $3,000 from family or friends (Percent) | 71.9 | 40.9 | 57.8 | 63.4 |
| Parent(s) have a College Degree (Percent) | 34.4 | 24.8 | 15.2 | 40.0 |

Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Table displays inheritances and gifts received, expected inheritances, and other indicators of family support, by race and ethnicity, expressed in either Percent or Thousands of 2019 dollars. Parent(s) with a college degree refers to the parents of the reference person.

Some families may not yet have received an inheritance (for example, if their parents are still alive), but expect to receive one in the future. White families are both more likely to have received an inheritance and are also more likely to expect to receive an inheritance: about 17 percent of White families expect an inheritance, compared to 6 percent of Black families, 4 percent of Hispanic families, and 15 percent of other families. Similarly, conditional upon expecting to receive an inheritance in the future, White families expect to receive relatively larger inheritances.

White and other families are more likely to report other indicators associated with higher levels of family support. For example, White and other families are considerably more likely to report being able to obtain $3,000 from a family member or friend in a financial emergency than Black or Hispanic families. They are also more likely to have a parent with a college degree. Since higher levels of education are associated with higher levels of wealth (see, for example, the *Bulletin* article), this association suggests White and other families are likely to have wealthier parents than Black or Hispanic families.

## Homeownership

For many families, housing is the biggest component of wealth. The relationship between housing and family wealth is complex. On the one hand, the ability to purchase a home is a reflection of wealth a family already has (or their parents' wealth, as noted earlier), as significant funds are generally required for a down payment and closing costs. On the other hand, homeownership has also been found to yield strong financial returns on average and to be a key channel through which families build wealth (Goodman and Mayer 2018).[10]

Life-cycle patterns of homeownership by age and by race and ethnicity are similar to the patterns of wealth (Figure 3). Homeownership rises sharply from young to middle-age regardless of race or ethnicity. At the same time, within each age group there are significant gaps in homeownership between White and non-White families, with the biggest gaps between White and Black families. Among young families, about 46 percent of White families own their home, compared to just 17 percent of Black families. This gap may partially reflect differences in parental wealth, as previous research has found that Black families are far less likely to receive down payment assistance from their parents, delaying transitions into homeownership (Charles and Hurst 2002).[11]



Figure 3. Homeownership rises with age regardless of race or ethnicity, though there are significant differences in homeownership between White and non-White families throughout the life-cycle.

Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Figure displays homeownership rates by age group and by race and ethnicity. Race categories are displayed in order from left to right.

Accessible version

Case 1:23-cv-03424-TWT  Document 59-4  Filed 08/31/23  Page 298 of 801

This Black-White gap of nearly 30 percentage points narrows somewhat among middle-aged and older families. For example, 73 percent of middle-aged White families own their home compared to about 51 percent of middle-aged Black families. Meanwhile, the gap in the homeownership rate between young White families and young Hispanic families is about 18 percentage points. In contrast to the White-Black gap, the White-Hispanic homeownership gap expands somewhat among middle-aged and older families.

In addition to gaps in homeownership, there are also significant gaps in home values among homeowners by race and ethnicity. For homeowners, the typical White families' home value is $230,000 and the typical other families' home value is $310,000. The typical Black and Hispanic families' home values are lower, at $150,000 and $200,000, respectively. Gaps in home values are caused both by gaps in purchase prices and housing appreciation, which are a reflection of a combination of factors including resource gaps (e.g., income and down payments), residential segregation, and age of entry into homeownership.[12]

## Retirement accounts and plan participation

Participation in retirement accounts and retirement plans is another important channel through which families build wealth, and they provide financial security in retirement. These assets include individual retirement accounts (IRAs), which typically are not dependent on a family's employer, and two types of employer-sponsored plans: defined contribution plans (DC), which are account-type job pensions such as 401(k)s, and traditional pensions (defined benefit plans, DB). Assets held in IRA and DC account plans are subject to preferential tax treatment, and DB plans guarantee a stream of income in retirement.

Ownership of IRA and DC retirement accounts rises among middle-aged families and then falls among older families (Figure 4). In all age groups, Black and Hispanic families are far less likely to have such retirement accounts. For example, among middle-aged families –who have the highest rates of account ownership— 65 percent of White families have at least one retirement account, compared to 44 percent of Black families, and just 28 percent of Hispanic families.



**Figure 4. Retirement account ownership peaks at middle age, though ownership is less likely for Black and Hispanic families at all ages.**



Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Figure displays the percent of families that own a retirement account (IRA or DC plan) with a net positive balance by age group and by race and ethnicity. Race categories are displayed in order from left to right.

Accessible version

One reason for gaps in participation in retirement accounts is that not all families are eligible to participate in an employer-sponsored retirement plan. Families may not be eligible for an employer plan because their employer does not offer plans at all or they are offered but the employee is not eligible (for example, because the employee works part time or the employee has insufficient tenure at the company). Families who lack access to employer-sponsored plans miss out on a common added benefit: many employers contribute to these plans, either by matching some or all of the employee's contributions to the plan in the case of DC plans or by providing employees a guaranteed income stream in retirement for DB plans.

Among working-age families (those under age 55), White families and – to a lesser extent other families – have more widespread access to employer-sponsored retirement plans than Black or Hispanic families (Figure 5, blue bars).[13] The disproportionate access for White families relative to Hispanic families is the most stark – for every three White families that can access an employer-sponsored retirement plan only two Hispanic families have access.

Figure 5. White and other or multiple race families have broader access and participate more in employer-sponsored retirement plans.



Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Figures displays the percent of families with access to employer-sponsored retirement plans (DC or DB plans, blue bars) and the percent of families that participate in an employer-sponsored retirement plan (orange bars) among families under 55 years old, by race or ethnicity. Key identifies bar chart in order left to right.

Accessible version

Even for those families with access to an employer-sponsored plan, not all families opt to participate in a plan. For working-age families, participation rates are lower than access rates (Figure 5, orange bars). About 60 percent of White and 54 percent of other families participate in a retirement plan, compared to 45 percent of Black families and 34 percent of Hispanic families. The share of each group that participates among those with access –also known as the "take-up" rate—also varies across groups. In addition to having higher rates of access, take-up rates are higher amongst White and other families than Black or Hispanic families. While about 90 percent of White and other families with access to a plan participate, about 80 percent of Black families and about 75 percent of Hispanic families with access to a plan participate (implied by Figure 5). These differences in participation may be caused by a variety of factors, including whether or not a family has sufficient income to enable saving in this manner, the types of funds offered by employer-sponsored plans, whether participation is by default or not, and financial literacy.

IRA and DC plans can only provide financial security in retirement if families accrue sufficient balances in the plans through investment contributions and subsequent returns on those contributions. Among working-age families, balances in retirement accounts also vary by race and ethnicity, and balances are larger amongst groups with higher rates of access and participation. For working-age families that have balances in such accounts, the typical White family has about $50,000 saved, which is two and a half times the amount saved as the typical

Black or Hispanic family, who have about $20,000 saved in retirement accounts. The median balances for other families falls in between White and Black or Hispanic families, at about $34,000. Difference in balances likely reflect a combination of factors including differences in returns from the funds that contributions are invested in, differences families' lifetime contributions to retirement accounts, and differences in employer matching to DC plans. For example, the differences in access to employer-sponsored plans (Figure 5) imply that fewer Black or Hispanic families are eligible for a plan with an employer match.

Overall, these gaps in retirement plan access, participation, and account balances suggest non-White families will be less financially secure in retirement than White families. But our discussion ignores Social Security benefits and the net present value of DB plans, which are key components of many families' retirement planning. These benefits are hard to account for because they involve assumptions about families' future earnings and years of work. Still, research suggests that accounting for these benefits can reduce overall inequality in retirement resources (Bricker, Goodman, Moore, and Volz, 2020; Sabelhaus and Volz, forthcoming).[14]

## Emergency Savings

Families often aim to build up easily-accessible savings to help deal with unexpected expenses and disruptions to their income. Although interest rates on highly-liquid transaction accounts are generally quite low and, as a result, these highly-liquid accounts are less important for long-term wealth-building than higher-return assets like housing or retirement accounts, savings can help families avoid costly borrowing or missed payments when unexpected events arise.

Nearly all families have some type of highly-liquid asset, such as a checking account, savings account, or pre-paid card (Table 3). Conditional upon having a liquid asset, however, the typical White family has considerably more liquid savings than the typical Black, Hispanic, or other family. While the typical Black or Hispanic family has $2,000 or less in liquid savings, the typical White family has more than four times that amount. Other families fall somewhere in the middle, with the typical family holding $5,000 in liquid savings.

### Table 3: White families have more emergency savings than Black or Hispanic families.

|  | White | Black | Hispanic | Other |
|---|---|---|---|---|
| Has Liquid Assets (Percent) | 98.8 | 96.8 | 95.5 | 98.8 |
| Conditional Mean Liquid Assets (Thousands of 2019 dollars) | 8.1 | 1.5 | 2.0 | 5.0 |
| Has Direct or Indirect Equity (Percent) | 60.8 | 33.5 | 24.2 | 53.8 |
| Conditional Median of Equities (Thousands of 2019 dollars) | 50.6 | 14.4 | 14.9 | 28.8 |

Source: Federal Reserve Board, 2019 Survey of Consumer Finances.

Notes: Liquid assets and equities by race and ethnicity, expressed in either Percent or Thousands of 2019 dollars.

Families may also choose to tap into higher-return assets in a financial emergency, such as money stored in directly or indirectly-held equities. These assets include directly-held stocks and mutual funds, which can be sold, and equities held in quasi-liquid accounts (such as retirement accounts), which can be liquidated or borrowed against if a financial emergency were to occur.

There are substantial disparities in ownership of equities across families grouped by their race and ethnicity. While more than half of White and other families have equities, just over 24 percent of Hispanic families and just under 34 percent of Black families have any equities. Conditional on having equities, there are also substantial gaps in amounts held. For example, the typical White family has $50,600 in equities they could tap into in an emergency, compared to just $14,400 for the typical Black family and $14,900 for the typical Hispanic family.

These gaps in emergency savings are particularly relevant in light of the COVID-19 pandemic and associated job losses. Because the 2019 SCF data were collected just before the onset of the pandemic, these gaps in savings suggest large disparities in families' ability to weather the pandemic. Indeed, Bhutta, Blair, Dettling, and Moore (2020) find that without the substantial cash assistance included in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, there would be large disparities by race and ethnicity in the share of families who could cover their normal, recurring expenses if they were to lose their job for six months or more.[15] They find that just 10 percent of Hispanic families and 14 percent of Black families have enough savings to cover six months of expenses, compared to 36 percent of White families and 27 percent of other families. But with the cash assistance in the CARES Act (i.e., unemployment insurance and direct stimulus payments), over 90 percent of all family-groups could cover their expenses for six months. Still, much of the CARES Act has expired or will expire in the coming months. If job losses persist, then unequal levels of savings could lead to disparities by race or ethnicity in financial distress during the pandemic. Furthermore, growing evidence suggests Black, Hispanic, and Native American communities are being disproportionally affected by the health and economic effects of COVID-19.[16]

---

1. Division of Research and Statistics, Board of Governors of the Federal Reserve System. The analysis and conclusions set forth are those of the authors and do not reflect the views of the Board of Governors or the Federal Reserve staff. Bhutta: neil.bhutta@frb.gov, Chang: andrew.c.chang@frb.gov, ORCID 0000-0002-9769-789X, Dettling: lisa.j.dettling@frb.gov, Hsu: joanne.w.hsu@frb.gov, ORCID 0000-0002-0715-6230. Return to text

2. For more on the race and ethnicity classifications used in this FEDS Note, see the appendix to Neil Bhutta, Jesse Bricker, Andrew C. Chang, Lisa J. Dettling, Sarena Goodman, Joanne W. Hsu, Kevin B. Moore, Sarah Reber, Alice Henriques Volz, and Richard A. Windle. 2020. "Changes in U.S. Family Finances from 2016 to 2019: Evidence from the Survey of Consumer Finances (PDF)," *Federal Reserve Bulletin* 106(5) (henceforth, the *Bulletin* article). The other or multiple race group consists of a very racially/ethnically diverse set of families, including those identifying as Asian, American Indian, Alaska Native, Native Hawaiian, Pacific Islander, other race, and all respondents reporting more than one racial identification. Because of small sample sizes, we do not have statistical power to further disaggregate this group of families. In 2019, families reporting more than one racial identification were the largest subgroup of the other or multiple race group (about 69 percent of families), followed by Asian families (about 23 percent of families). Because of the varied composition of the other group and changes in its composition over time, readers should exercise caution when making inferences. Return to text

3. Our concept of wealth is equivalent to the net worth concept defined in the *Bulletin* article. See the appendix to the *Bulletin* article for more details on components of wealth or net worth. Except for received inheritances, dollar values are adjusted to 2019 dollars using the "current methods" version of the consumer price index for all urban consumers (CPI-U-RS), which is available since 1977. Received inheritances are adjusted to 2019 dollars using the consumer price index for all urban consumers (CPI-U) to account for inheritances received prior to 1977. Return to text

4. For a recent discussion of the Black-White wealth gap, see Kriston McIntosh, Emily Moss, Ryan Nunn, and Jay Shambaugh. 2020. "Examining the Black-white wealth gap. [图] " Brookings Institution, February 27, 2020. Return to text

5. For more information on how other components of wealth and socio-demographic characteristics vary by race and ethnicity –which were, in general, little changed since the 2016 survey—see Lisa J. Dettling, Joanne W. Hsu, Lindsay Jacobs, Kevin B. Moore, and Jeffrey P. Thompson. 2017. "Recent Trends in Wealth-Holding by Race and Ethnicity: Evidence from the Survey of Consumer Finances [图] ," FEDS Notes. Washington: Board of Governors of the Federal Reserve System, September 27, 2017. Return to text

6. See the appendix to the *Bulletin* article for more information on the timing of interviews. Return to text

7. See the appendix to the *Bulletin* article for the definition of the reference person. Return to text

8. William Gale and John Karl *Scholz*. 1994. "Intergenerational Transfers and the Accumulation of Wealth. [图] " *Journal of Economic Perspectives*, 8(4): 145-160. Laura Feiveson and John Sabelhaus. 2018. "How Does Intergenerational Wealth Transmission Affect Wealth Concentration? [图] " FEDS Notes. Washington: Board of Governors of the Federal Reserve System, June 1, 2018. Darrick Hamilton and William Darity. 2010. "Can 'Baby Bonds' Eliminate the Racial Wealth Gap in Putative Post-Racial America? [图] " *The Review of Black Political Economy* 37(3–4): 207–16. Return to text

9. For a more detailed discussion of discrimination and institutional barriers in housing markets, see, for example, *The Color of Law* (2017) by Richard Rothstein or *Race for Profit* (2019) by Keeanga-Yamahtta Taylor. For more on inequities in educational opportunities, see, for example, Ivy Morgan and Ary Amerikaner (2018) "Funding Gaps: An Analysis of School Funding Equity Across the U.S. and within Each State [图] " or *Children of the Dream* (2019) by Rucker C. Johnson. For more on labor market outcomes, see, for example, Devah Pager (2007) "The Use of Field Experiments for Studies of Employment Discrimination: Contributions, Critiques, and Directions for the Future [图] " *Annals of the American Academy of Political and Social Sciences* 609 (January): 104-133, or Raj Chetty, Nathaniel Hendren, Maggie R. Jones, and Sonya R. Porter (2020) "Race and Economic Opportunity in the United States: an Intergenerational Perspective [图] " *The Quarterly Journal of Economics* 135(2); 711–783. Return to text

10. Laurie S. Goodman and Christopher Mayer. 2018. "Homeownership and the American Dream. [图] " *Journal of Economic Perspectives* 32(1): 31-58. Return to text

11. Kerwin Kofi Charles and Erik Hurst. 2002. "The Transition to Home Ownership and the Black-White Wealth Gap. [图] " *The Review of Economics and Statistics* 84(2): 281–297. Return to text

12. A previous FEDS Note on this topic has additional information on income and other resource gaps by race and ethnicity (Dettling, Hsu, Jacobs, Moore, and Thompson 2017). *The Color of Law* (2017) by Richard Rothstein provides a detailed discussion on the lasting effects of residential segregation. Return to text

13. We count families as having access to an employer-sponsored plan if either the reference person or the spouse/partner of the reference person is eligible to participate in a DC or a DB plan provided by a current employer plus all families that participate in DC or a DB plan, which are those families that have a retirement account with a balance from a previous employer, have the rights to a future pension from a previous employer, or are self-employed at a business that offers a pension, retirement, or tax-deferred savings plan. Return to text

14. Jesse Bricker, Sarena Goodman, Kevin Moore, and Alice Henriques Volz. 2020. "Wealth and Income Concentration in the SCF: 1989-2019," FEDS Notes. John Sabelhaus and Alice Henriques Volz (forthcoming). "Social Security Wealth, Inequality, and Lifecycle Saving," in *Measuring and Understanding the Distribution and Intra/Inter-Generational Mobility of Income and Wealth*. NBER Book Series Studies in Income and Wealth. The University of Chicago Press. Return to text

15. Neil Bhutta, Jacqueline Blair, Lisa Dettling, and Kevin Moore. 2020. "COVID-19, the CARES Act, and Families' Financial Security [图] " *National Tax Journal* 73(3): 645-672. Return to text

16. For health effects, see, for example, "The COVID Racial Data Tracker [图] ". For economic effects, see, for example, Steven Brown (2020) "How COVID-19 is Affecting Black and Latino Families' Employment and Financial

**Please cite this note as:**

Bhutta, Neil, Andrew C. Chang, Lisa J. Dettling, and Joanne W. Hsu (2020). "Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances," FEDS Notes. Washington: Board of Governors of the Federal Reserve System, September 28, 2020, https://doi.org/10.17016/2380-7172.2797.

*Disclaimer: FEDS Notes are articles in which Board staff offer their own views and present analysis on a range of topics in economics and finance. These articles are shorter and less technically oriented than FEDS Working Papers and IFDP papers.*

Last Update: September 28, 2020

# Exhibit J

# Income in the United States: 2021

**Current Population Reports**

by Jessica Semega and Melissa Kollar

Issued September 2022

P60-276



**U.S. Department of Commerce**

U.S. CENSUS BUREAU

*census.gov*

# Acknowledgments

The Social, Economic, and Housing Statistics Division of the U.S. Census Bureau recognizes Trudi J. Renwick for her 14 years of service with the Census Bureau. Dr. Renwick retired in 2022. From her dissertation that developed a methodology for basic family budgets to her research on the development of the Supplemental Poverty Measure, she spent her career dedicated to improving the measurement of poverty and the well-being of low-income families. While at the Census Bureau, Dr. Renwick provided leadership to the income, poverty, and program participation branches. Her dedication to her staff, subject matter expertise, and overall guidance were appreciated and will be greatly missed.

**Jessica Semega** and **Melissa Kollar** prepared this report, **Daniel C. Lin** prepared the tax model and provided content for Appendix C, and **Matthew Unrath** prepared Appendix D, all of the Income Statistics Branch. **Jonathan Spader**, Assistant Division Chief for Housing Characteristics in the Social, Economic, and Housing Statistics Division, reviewed and provided overall guidance.

**Mallory Bane** and **Susan S. Gajewski**, under the supervision of **David Watt**, all of the Demographic Systems Division, and **Lisa Cheok** of the Demographic Programs Directorate—Survey Operations, processed the Current Population Survey, 2022 Annual Social and Economic Supplement (CPS ASEC) file.

**Adam W. Reilly**, with the assistance of **Kirk E. Davis**, **Raymond E. Dowdy**, **Lan N. Huynh**, and **Chandararith R. Phe**, programmed and produced the historical, detailed, and publication tables under the direction of **Hung X. Pham**, Chief of the Tabulation and Applications Branch, Demographic Surveys Division.

**Emily Hood**, under the supervision of **David V. Hornick**, of the Demographic Statistical Methods Division, conducted statistical review.

**Lisa Cheok**, assisted by **Roberto Cases**, of the Demographic Programs Directorate—Survey Operations, provided overall direction for the survey implementation. **Charlie Carter**, **Agatha Jung**, and **Johanna Rupp**, of the Application Development and Services Division, prepared and programmed the computer-assisted interviewing instrument used to conduct the CPS ASEC.

Additional people within the U.S. Census Bureau also made significant contributions to the preparation of the report. **Liana E. Fox**, **Charles Hokayem**, **Matthew Marlay**, **Lindsay Monte**, **Rachel Shattuck**, and **Bruce Webster Jr.** reviewed the contents.

**Stacey Barber**, **Faye E. Brock**, and **Steven Brown** provided publication management, editorial review, and 508 compliancy for print and electronic media. **Paula Lancaster** and **Stephen Gibson** provided graphic design and composition, all under the direction of **Corey Beasley**, Chief of the Graphic and Editorial Services Branch, Public Information Office.

The authors would like to also thank the **Census Bureau field representatives** and **telephone interviewers** who conducted the interviews that provide the data in this report. Without their dedication, the preparation of this report or any report from the Current Population Survey would be impossible.

# Income in the United States: 2021

Issued September 2022

P60-276



**U.S. Census Bureau**
**Robert L. Santos**,
Director

## Suggested Citation

Jessica Semega and Melissa Kollar,
U.S. Census Bureau,
Current Population Reports,
P60-276,
*Income in the United States: 2021,*
U.S. Government Publishing Office,
Washington, DC,
September 2022.



**U.S. CENSUS BUREAU**

**Robert L. Santos**,
Director

**Ron S. Jarmin**,
Deputy Director and Chief Operating Officer

**Victoria A. Velkoff**,
Associate Director for Demographic Programs

**David G. Waddington**,
Chief, Social, Economic, and Housing Statistics Division

## Contents

### TEXT

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**HOUSEHOLD INCOME BY SELECTED CHARACTERISTICS** . . . . . . . . . . 2
All Households . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Type of Household . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Race and Hispanic Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Age of Householder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Nativity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Residence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Educational Attainment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**INCOME INEQUALITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Money Income Inequality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Equivalence-Adjusted Income Inequality . . . . . . . . . . . . . . . . . . . . . . . 7

**EARNINGS AND WORK STATUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Total and Full-Time, Year-Round Workers . . . . . . . . . . . . . . . . . . . . . . 7
Workers by Sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


### FIGURES

Figure 1.     Median Household Income and Percent Change by
              Selected Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Figure 2.     Real Median Household Income by Race and Hispanic
              Origin: 1967 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Figure 3.     Income Distribution Measures and Percent Change
              Using Money Income and Equivalence-Adjusted
              Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Figure 4.     Median Earnings and Percent Change by Work Status
              and Sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Figure 5.     Total and Full-Time, Year-Round Workers 15 Years and
              Older With Earnings by Sex: 1967 to 2021 . . . . . . . . . . . . . . 9
Figure 6.     Female-to-Male Earnings Ratio and Median Earnings of
              Full-Time, Year-Round Workers 15 Years and Older
              by Sex: 1960 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Figure D-1.   Historical Median Income Using Alternative Price
              Indexes: 1967 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Figure D-2.   Real Year-Over-Year Income Growth Using Alternative
              Price Indexes: 2016 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . 51

## APPENDIXES

Appendix A. **Estimates of Income**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   How Income Is Measured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   Business Cycles—Recessions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   Cost-of-Living Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Appendix B. **Effects of 2020 Census-Based Population Controls on 2020 Income Estimates** . . . . . . . . . . . . . 39
   Effects on Income and Earnings Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Appendix C. **Post-Tax Household Income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Appendix D. **Historical Income Alternative Inflation Series and Request for Comments** . . . . . . . . . . . . . . . . 49
   Alternative Price Indexes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   Implications for Income Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   Request for Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Appendix E. **Additional Information**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   Source and Accuracy of the Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   Accessing Income Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   Other Sources of Income Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   Questions and Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## APPENDIX TABLES

Table A-1.  Income Summary Measures by Selected Characteristics: 2020 and 2021 . . . . . . . . . . . . . . . . . . . . . 15
Table A-2.  Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021. . 16
Table A-3.  Income Distribution Measures Using Money Income and Equivalence-Adjusted Income:
            2020 and 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Table A-4a. Selected Measures of Household Income Dispersion: 1967 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . . 30
Table A-4b. Selected Measures of Household Income Dispersion: 1967 to 2021 . . . . . . . . . . . . . . . . . . . . . . . . . 31
Table A-5.  Selected Measures of Equivalence-Adjusted Income Dispersion: 1967 to 2021 . . . . . . . . . . . . . . 33
Table A-6.  Earnings Summary Measures by Selected Characteristics: 2020 and 2021 . . . . . . . . . . . . . . . . . . . . 36
Table A-7.  Number and Real Median Earnings of Total Workers and Full-Time, Year-Round Workers
            With Earnings by Sex and Female-to-Male Earnings Ratio: 1960 to 2021. . . . . . . . . . . . . . . . . . . 37
Table B-1.  Income Summary Measures by Selected Characteristics: 2020 Estimates Using 2010
            Census-Based Population Controls and 2020 Census-Based Population Controls . . . . . . . . . . 40
Table B-2.  Earnings Summary Measures by Selected Characteristics: 2020 Estimates Using 2010
            Census-Based Population Controls and 2020 Census-Based Population Controls . . . . . . . . . . 41
Table C-1.  Post-Tax Household Income Summary Measures by Selected Characteristics: 2020 and 2021. . . 45
Table C-2.  Summary Measures by Selected Characteristics Using Money Income and Post-Tax
            Income: 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Table C-3.  Distribution Measures Using Post-Tax Income and Equivalence-Adjusted Post-Tax
            Income: 2020 and 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Table C-4.  Distribution Measures Using Money Income, Post-Tax Income, Equivalence-Adjusted Income,
            and Equivalence-Adjusted Post-Tax Income: 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Table D-1.  Historical Median Income Using Alternative Price Indexes: 1967 to 2021 . . . . . . . . . . . . . . . . . . . . 53

# Income in the United States: 2021

## INTRODUCTION

The U.S. Census Bureau collects data and publishes estimates on income, earnings, and inequality in order to evaluate national economic trends and to understand their effect on the well-being of households and individuals.

This report presents estimates on income in the United States for calendar year 2021, based on information collected in the 2022 and earlier Current Population Survey Annual Social and Economic Supplements (CPS ASEC) conducted by the Census Bureau.* Estimates for 2020 in this report will not match those published last year due to the implementation of the 2020 Census-based population controls. Appendix B provides details. To adjust for changes in the cost of living over time, historical income estimates in this report are expressed in real or 2021 dollars.[1] This inflation adjustment is based on the Consumer Price Index for all Urban Consumers Retroactive Series (R-CPI-U-RS) for 2021 and earlier years, which measured a 4.7 percent increase in consumer prices between 2020 and 2021.[2] This is the largest annual increase in the cost-of-living adjustment since 1990. It is important to note that this report covers income estimates for 2021 and prior years

and does not account for changes in income or inflation that have occurred more recently in 2022.[3]

In 2021, Congress passed the American Rescue Plan Act (ARPA) in response to the COVID-19 pandemic. ARPA provided additional income to families through a third round of stimulus payments and expansions to the Child Tax Credit, Earned Income Tax Credit, and the Child and Dependent Care Credit. The income estimates in the main sections of this report are based on the concept of money income, as measured by the CPS ASEC. It includes all income received by each person in the household who is aged 15 and older, excluding certain receipts such as capital gains. Money income is pretax and does not include stimulus payments and tax credits such as those from ARPA. Appendix A provides a detailed explanation of how income is measured using the CPS ASEC. For post-tax household income estimates that include stimulus payments and tax credits, refer to Appendix C.

The continued response to the COVID-19 pandemic, rising inflation, shifts in worker composition, and other macroeconomic conditions also shaped the experiences of households in 2021. The purpose of this report is to present estimates of median household income, income inequality, worker earnings, and related measures for 2021 based on data from the CPS ASEC.

This report begins with a section on median household income

by select characteristics of the householder, followed by a section on income inequality and one on median earnings and work status.[4]

This report is released alongside two other reports focused on poverty estimates and health insurance coverage in the United States. For poverty and health insurance estimates, refer to "Poverty in the United States: 2021" and "Health Insurance Coverage in the United States: 2021."[5]

### Highlights

- Real median household income was $70,784 in 2021, not statistically different from the 2020 estimate of $71,186 (Figure 1 and Table A-1).

- Based on the money income Gini index, income inequality increased by 1.2 percent between 2020 and 2021; this represents the first time the Gini index has shown an annual increase since 2011 (Figure 3 and Table A-3).

- Between 2020 and 2021, the change in the number of total workers was not statistically significant; however, there was an increase of about 11.1 million full-time, year-round workers (from approximately 106.3 million to 117.4 million), suggesting a shift from working part-time or part-year in 2020 to full-time, year-round work in 2021 (Table A-6).

- The real median earnings of all workers (including part-time and full-time workers) increased 4.6 percent between

---

* The Census Bureau reviewed this data product for unauthorized disclosure of confidential information and approved the disclosure avoidance practices applied to this release CBDRB-FY22-357. All comparative statements have undergone statistical testing and are statistically significant at the 90 percent confidence level unless otherwise noted.

2020 and 2021, while median earnings of those who worked full-time, year-round decreased 4.1 percent (Figure 4).

More information on these topics can be found in the relevant sections of this report.

## HOUSEHOLD INCOME BY SELECTED CHARACTERISTICS

This section focuses on real median household income by selected characteristics of the householder such as race and Hispanic origin, nativity, region, and education. The householder is the person (or one of the people) in whose name the home is owned or rented and the person to whom the relationship of other household members is recorded. Each household has one householder, and those in group quarters are excluded from the household population.[6]

For most demographic characteristics of the householder shown in Figure 1, the 2021 real median household income estimates were not statistically different from the 2020 estimates. Between 2020 and 2021, declines in median household income were experienced by nonfamily households, those with a householder aged 65 and older, those maintained by a native-born person, and those with a householder with some college. The only demographic group to experience an increase in median household income between 2020 and 2021 was householders with at least a bachelor's degree. More details are available in the sections below.

### All Households

Real median household income was $70,784 in 2021. This estimate is not statistically different from the 2020 estimate of $71,186 and 2.8 percent lower than the 2019 median, the year before the most recent recession (Figure 1 and Table A-1).[7] Household income in 2019 was the highest since 1967, even after adjusting for the effect of the CPS ASEC survey redesign, subsequent processing changes, and nonresponse bias (Figure 2 and Table A-2).[8]

### Type of Household[9]

The 2021 real median income of family households was not statistically different from the 2020 estimate, while nonfamily households experienced a 1.9 percent decline over the same period (Figure 1 and Table A-1). Among family households, married couples had the highest median income in 2021 ($106,921), followed by those maintained by men with no spouse present ($70,525). Family households maintained by women with no spouse present had the lowest median income ($51,168).

Looking at nonfamily households, real median household income for female householders decreased 4.7 percent between 2020 and 2021, while the change for male householders was not statistically significant.[10]

### Race and Hispanic Origin[11]

Real median household incomes in 2021 for non-Hispanic Whites, Blacks, Asians, and Hispanics were not statistically different

from 2020 (Figure 2 and Table A-1).[12] Among the race groups, Asian households had the highest median income ($101,418) in 2021, followed by non-Hispanic Whites ($77,999) and Hispanics ($57,981).[13] Black households had the lowest median income ($48,297).

The real median incomes of different groups can be compared by calculating the ratio of the median income of a specific group to the median income of non-Hispanic White households. For 2021, the ratio of Asian to non-Hispanic White household income was 1.30. In other words, the median Asian household had a household income 1.30 times greater than that of the median non-Hispanic White household. The ratio of Black to non-Hispanic White household income was 0.62, while the ratio of Hispanic to non-Hispanic White household income was 0.74. None of these ratios were statistically different from 2020.

### Age of Householder

Real median income in 2021 for householders under the age of 65 ($80,734) was not statistically different from the 2020 median. However, median income for householders aged 65 and over declined 2.6 percent between 2020 and 2021 (Figure 1). Table A-1 provides estimates for a more detailed set of age categories. Among the age categories, householders aged 15 to 24 and those 45 to 54 experienced increases of 5.2 percent and 2.6 percent, respectively, in their median household incomes.[14]

Figure 1.
**Median Household Income and Percent Change by Selected Characteristics**
(Households as of March of the following year)



¹ Householders aged 25 and older. In 2021, the median household income for this group was $72,046.

Note: Statistically significant indicates the change is statistically different from zero at the 90 percent confidence level. Margins of error and other related estimates and notes are available in Table A-1. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.

Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Householders aged 45 to 54 ($97,089) had the highest median income in 2021, followed by householders aged 35 to 44 ($90,312), 55 to 64 ($75,842), 25 to 34 ($74,862), and 15 to 24 ($51,645).¹⁵ Householders aged 65 and over ($47,620) had the lowest median incomes.

**Nativity¹⁶**

Between 2020 and 2021, real median income of households maintained by a native-born person declined 1.4 percent, while



Figure 2.
**Real Median Household Income by Race and Hispanic Origin: 1967 to 2021**
(Households as of March of the following year)

Note: The data for 2017 and beyond reflect the implementation of an updated processing system. The data for 2013 and beyond reflect the implementation of the redesigned income questions. Refer to Table A-2 for historical race footnotes. The data points are placed at the midpoints of the respective years. Median household income data are not available prior to 1967. More information on the R-CPI-U-RS dollar adjustment and recessions is available in Appendix A. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.
Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

the median income of households maintained by a foreign-born person was not statistically different from 2020 (Figure 1 and Table A-1). The foreign-born can be classified into two categories: those who are naturalized U.S. citizens and those who are not U.S. citizens. Neither group experienced a statistically significant change in their median household income between 2020 and 2021.[17]

Households maintained by naturalized citizens had the highest median household income in 2021 ($74,150), followed by native-born householders ($71,522). Households maintained by non-citizens had the lowest median household income ($57,132).

**Region[18]**

Median incomes were highest in the West ($79,430) and the Northeast ($77,472), followed by the Midwest ($71,129) and the South ($63,368).[19] None of the regions experienced a statistically significant change in median household income between 2020 and 2021 (Figure 1 and Table A-1).[20]

**Residence[21]**

In 2021, households inside metropolitan statistical areas (MSAs) but outside principal cities had the highest median income ($79,599), followed by households inside principal cities ($64,839). Households outside metropolitan areas had the lowest median

income ($53,750). The 2021 real median incomes of households for all categories of MSAs available in Table A-1 were not statistically different from their respective 2020 incomes.[22]

**Educational Attainment[23]**

This section pertains to householders aged 25 and over. From 2020 to 2021, real median household income increased 2.7 percent for householders with at least a bachelor's degree and declined 4.0 percent for those with some college. The 2021 real median incomes of householders with no high school diploma and those with a high school diploma but no college were not statistically different from their respective 2020

median incomes (Figure 1 and Table A-1).[24]

Householders with more education had higher income. In 2021, households maintained by someone with at least a bachelor's degree had the highest median income ($115,456), followed by those with some college ($64,378) and those with a high school diploma ($50,401). Householders aged 25 and over with no high school diploma had the lowest median income ($30,378).

The median household income of different education groups can be compared by calculating the ratio of the median income of a specific group to the median income of householders with no high school diploma. For 2021, the ratio for householders with a bachelor's degree or higher was 3.8, meaning that householders with a bachelor's degree or higher had median incomes 3.8 times greater than householders with no high school diploma. The ratio for householders with some college was 2.1, while the ratio for householders with a high school diploma but no college was 1.7. The 2021 ratio for householders with at least a bachelor's degree was higher than their 2020 ratio of 3.6, while the differences in the ratios from 2020 were not statistically significant for those with some college and those with a high school diploma.

## INCOME INEQUALITY

While the median represents the mid-point of the household income distribution, other points along the distribution provide additional information on how income is changing for those above and below the median. Income inequality refers to how evenly income or income growth

is distributed across the population; higher income inequality represents less equal income distribution or growth. The Census Bureau reports various measures of income inequality: (1) the Gini index, (2) the ratio of income percentiles, (3) the shares of aggregate household income by quintiles, (4) the Theil index, (5) the mean logarithmic deviation of income (MLD), and (6) the Atkinson measures. This section focuses on the first three measures pertaining to money income and equivalence-adjusted income, which are defined below and shown in Table A-3 and Figure 3. Historical estimates for all six summary measures of money income inequality are available in Table A-4a and Table A-4b, and corresponding estimates for equivalence-adjusted income are available in Table A-5. Post-tax income inequality estimates are available in Tables C-3 and C-4.

### Money Income Inequality

The Gini index is a statistical measure of income inequality ranging from 0.0 to 1.0. It measures the amount that any two incomes differ, on average, relative to mean income. It is a natural indicator of how far apart or "spread out" incomes are from one another. A value of 0.0 represents perfect equality, and a value of 1.0 indicates total inequality. Based on the money income Gini index, income inequality increased by 1.2 percent between 2020 and 2021 (from 0.488 to 0.494); this represents the first time the Gini index has shown an annual increase since 2011.[25]

An increase in the Gini index indicates that the distribution of income is becoming more

unequal, but it does not offer insight into whether the top of the distribution is increasing disproportionally compared to the middle of the distribution ("upper-tail" inequality) or if the middle of the distribution is gaining more compared to the lower end ("lower-tail" inequality). Percentile income ratios, particularly of the 90th, 50th, and 10th percentiles of the overall income distribution, are widely used to provide additional information on observed changes in income inequality.[26] The ratio of the 90th to 10th percentile increased from 12.90 in 2020 to 13.53 in 2021, meaning income at the 90th percentile was 13.53 times higher than income at the 10th percentile, an increase of 4.9 percent. The ratio of the 50th to 10th percentile ("lower-tail" inequality) increased 4.0 percent, from 4.34 in 2020 to 4.52 in 2021, while the ratio of the 90th to 50th percentile ("upper-tail" inequality) was not significantly different over this period.[27] Specifically, household income decreased 4.4 percent at the 10th percentile limit, while the change in income at the 90th percentile limit was not statistically significant between 2020 and 2021.[28] This indicates that declines in income at the bottom of the income distribution may be contributing to the increase in the Gini index.

The quintile shares of aggregate household income provide additional information about how income is distributed across the population. A quintile is one of five equal groups ranked by income from lowest to highest, so that 20 percent of all households are in each group. In 2021, households in the lowest quintile received 2.9 percent of aggregate household income, while households

Figure 3.
## Income Distribution Measures and Percent Change Using Money Income and Equivalence-Adjusted Income



**MONEY INCOME**

| Shares of Aggregate Income by Percentile | 2020[1] | 2021 |
|---|---|---|
| Lowest quintile | 3.0 | 2.9 |
| Second quintile | 8.2 | 8.0 |
| Third quintile | 14.0 | 13.9 |
| Fourth quintile | 22.6 | 22.6 |
| Highest quintile | 52.2 | 52.7 |
| Top 5 percent | 23.0 | 23.5 |

**Summary Measures**

| Gini index of income inequality: | 0.488 | 0.494 |
|---|---|---|
| Income percentile ratios: | | |
| 90th/10th | 12.90 | 13.53 |
| 90th/50th | 2.97 | 2.99 |
| 50th/10th | 4.34 | 4.52 |

**EQUIVALENCE-ADJUSTED INCOME**

| Shares of Aggregate Income by Percentile | | |
|---|---|---|
| Lowest quintile | 3.4 | 3.3 |
| Second quintile | 8.9 | 8.8 |
| Third quintile | 14.5 | 14.4 |
| Fourth quintile | 22.4 | 22.3 |
| Highest quintile | 50.8 | 51.2 |
| Top 5 percent | 22.5 | 23.0 |

**Summary Measures**

| Gini index of income inequality: | 0.469 | 0.474 |
|---|---|---|
| Income percentile ratios: | | |
| 90th/10th | 10.73 | 10.89 |
| 90th/50th | 2.80 | 2.81 |
| 50th/10th | 3.83 | 3.88 |

**Percent Change: 2020 to 2021**

Money Income percent changes: Lowest quintile -3.6, Second quintile -1.7, Third quintile -1.0, Fourth quintile -0.2, Highest quintile 0.8, Top 5 percent 2.2. Gini index 1.2. 90th/10th 4.9, 90th/50th 0.8, 50th/10th 4.0.

Equivalence-Adjusted Income percent changes: Lowest quintile -2.0, Second quintile -0.7, Third quintile -0.6, Fourth quintile -0.8, Highest quintile 0.8, Top 5 percent 2.0. Gini index 0.9. 90th/10th 1.5, 90th/50th 0.1, 50th/10th 1.3.

■ Denotes a statistically significant change

[1] Implementation of 2020 Census-based population controls.

Note: Percent change estimate may be different due to rounded components. Statistically significant indicates the change is statistically different from zero at the 90 percent confidence level. Margins of error and other related estimates are available in Table A-3. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.

Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

in the highest quintile received 52.7 percent of aggregate household income. Within the highest quintile, the top 5 percent of households received 23.5 percent of aggregate household income. The share of aggregate household income decreased in the lowest quintile (from 3.0 percent to 2.9 percent) and in the second quintile (from 8.2 percent to 8.0 percent) between 2020 and 2021. The changes in the other quintiles were not statistically significant.

In 2021, households in the lowest quintile had incomes of $28,007 or less. Households in the second quintile had incomes from $28,008 to $55,000, those in the third quintile had incomes from $55,001 to $89,744, and those in the fourth quintile had incomes from $89,745 to $149,131. Households in the highest quintile had incomes of $149,132 or more. The top 5 percent of households in the income distribution had incomes of $286,305 or more. Table A-4a provides the income limits for each decile and household income ratios at selected percentiles for income years 1967 to 2021. Table A-4b provides quintile measures, as well as the Gini index, MLD, Theil index, and Atkinson measures, for income years 1967 to 2021.

### Equivalence-Adjusted Income Inequality

Another way to measure income inequality is to replace money income with an equivalence-adjusted income estimate that takes into consideration the number of people living in the household and how those people share resources and benefit from economies of scale. For example,

the distribution based on money income treats a household income of $30,000 the same, regardless of whether one person or four people live in the household. In contrast, the equivalence-adjusted income would be the same for a single-person household with an income of $30,000 and a household with two married adults and two children and an income of nearly $65,000. The equivalence adjustment used here is based on the equivalence scale used in the Supplemental Poverty Measure (SPM).[29] This section presents the same inequality measures as the prior section but using equivalence-adjusted income. These equivalence-adjusted income inequality measures are located in Table A-3 and Figure 3.

For both 2020 and 2021, the Gini index was lower when based on an equivalence-adjusted income estimate (0.469 in 2020 and 0.474 in 2021) than on the traditional money-income estimate (0.488 in 2020 and 0.494 in 2021), suggesting a more equal income distribution when household composition is taken into account. Generally, the income shares in the lowest, second, and third quintiles are higher with equivalence-adjusted income than money income, while the reverse is true for the fourth and highest quintiles. This redistribution reflects the higher concentration of single-person households and smaller household sizes at the lower end of the income distribution. While the money income Gini index increased between 2020 and 2021, the change in the equivalence-adjusted Gini index was not statistically significant.

Based on equivalence-adjusted income, changes in inequality between 2020 and 2021 were not statistically significant as measured by the shares of aggregate income and the ratios of income percentiles (Table A-3). Table A-5 shows equivalence-adjusted measures of the income distribution, as well as the Gini index, MLD, Theil index, and Atkinson measures, for income years 1967 to 2021.

### EARNINGS AND WORK STATUS

This section presents median earnings and work status for individuals aged 15 and older with earnings. Earnings are the sum of wage and salary income and non-farm and farm self-employment income (gross receipts minus expenses), comprising 78 percent of aggregate total income. Unemployment insurance payments are not included in earnings. Total workers (also referred to as "all workers") include both part-time and full-time workers. A full-time, year-round worker is a person who worked at least 35 hours per week (full-time) and at least 50 weeks per year (year-round).[30] As with median household income, earnings estimates are expressed in real or constant dollar terms, meaning that median earnings estimates for 2020 are inflation-adjusted by 4.7 percent to 2021 dollars. Year-to-year percent changes reflect this adjustment.[31]

### Total and Full-Time, Year-Round Workers

Between 2020 and 2021, the change in the number of total workers was not statistically



Figure 4.
**Median Earnings and Percent Change by Work Status and Sex**
(People 15 years and older with earnings as of March of the following year)

**2021 Median Earnings**

**Change: 2020 to 2021**

**Total Workers** — $45,470 — 4.6
Men — $50,983 — -0.9
Women — $39,201 — 4.5

**Full-Time, Year-Round Workers** — $56,473 — -4.1
Men — $61,180 — -4.7
Women — $51,226 — -4.0

■ Denotes a statistically significant change

Note: Statistically significant indicates the change is statistically different from zero at the 90 percent confidence level. Margins of error and other related estimates and notes are available in Table A-6. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.
Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

significant; however, there was an increase of about 11.1 million full-time, year-round workers (from approximately 106.3 million to 117.4 million), suggesting a shift from working part-time or part-year in 2020 to full-time, year-round work in 2021.[32] The increase in the number of full-time, year-round workers corresponds with an increase of 4.6 percent in the real median earnings of all workers between 2020 and 2021. Conversely, the 2021 real median earnings of those who worked full-time, year-round decreased 4.1 percent from 2020. This decline in median earnings may reflect both the effects of inflation surpassing nominal gains in earnings as well as the addition of full-time jobs in the lower half of the earnings distribution.

**Workers by Sex**

Looking at the details of median earnings and worker composition by sex can add more context to the annual changes experienced by the total working population. The 2021 median earnings among all workers increased 4.6 percent from 2020, but the increase was not experienced equally by men and women. The 2021 median earnings of working women increased 4.5 percent from their 2020 median, while the change for their male counterparts was not statistically significant (Figure 4 and Table A-6).[33] Between 2020 and 2021, the changes in the number of male and female workers were not statistically significant.



Figure 5.
**Total and Full-Time, Year-Round Workers 15 Years and Older With Earnings by Sex: 1967 to 2021**
(People with earnings as of March of the following year)

Note: Refer to Table A-7 for historical footnotes. The data points are placed at the midpoints of the respective years. Data on earnings of full-time, year-round workers are not readily available before 1960. Data are for people aged 14 and older for years prior to 1980. More information on recessions is available in Appendix A. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.
Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

Consistent with the findings for all full-time, year-round workers, median earnings of men ($61,180) and women ($51,226) who worked full-time, year-round decreased by 4.7 percent and 4.0 percent, respectively, between 2020 and 2021 (Figure 4 and Table A-6).[34]

The number of male full-time, year-round workers increased by about 6.1 million between 2020 and 2021, while the increase in the number of their female counterparts was approximately 5.0 million (Figure 5 and Table A-6). In 2021, the share of men working full-time, year-round increased 9.7 percent from the 2020 estimate of 68.0 percent to 74.6 percent. The share of women working full-time, year-round increased 11.4 percent from 57.9 percent in 2020 to 64.5 percent in 2021.



Figure 6.
**Female-to-Male Earnings Ratio and Median Earnings of Full-Time, Year-Round Workers 15 Years and Older by Sex: 1960 to 2021**
(People as of March of the following year)

Notes: Refer to Table A-7 for historical footnotes. The data points are placed at the midpoints of the respective years. Data on earnings of full-time, year-round workers are not readily available before 1960. Data are for people aged 14 and older for years prior to 1980. More information on the R-CPI-U-RS dollar adjustment and recessions is available in Appendix A. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.

Source: U.S. Census Bureau, Current Population Survey, 1961 to 2022 Annual Social and Economic Supplements (CPS ASEC).

The female-to-male earnings ratio compares the median earnings of women working full-time, year-round to the median earnings of men working full-time, year-round. The 2021 female-to-male earnings ratio was 0.837, not statistically different from the 2020 ratio (0.831). The last time the female-to-male earnings ratio experienced a statistically significant annual change was in 2016 (Figure 6 and Table A-7). For historical statistics from 1960 to 2021 on median earnings and number of workers by sex, refer to Table A-7.

## SUMMARY

This report provides estimates of household income, income inequality, and worker earnings in the United States for 2021. Overall, real median household income in 2021 was not statistically different from 2020, although income inequality increased due to declines in income at the bottom of the income distribution as measured by the Gini index and percentile ratios. In 2021, there was a shift from individuals working part-time or part-year to full-time, year-round work. This shift was accompanied by an increase in real median earnings among all workers and, conversely, a decrease in median earnings for full-time, year-round workers. The decline in real median earnings among full-time, year-round workers between 2020 and 2021 may reflect the addition of full-time jobs in the lower half of the earnings distribution, the effects of inflation surpassing nominal gains in earnings, or other factors. Further analysis of the data would be necessary to know how these and other factors affected the earnings estimates.

## ENDNOTES

[1] "Real" refers to income after adjusting for inflation.

[2] The R-CPI-U-RS is provided by the U.S. Bureau of Labor Statistics (BLS). In 2021, BLS renamed the Consumer Price Index Research Series (CPI-U-RS), the Retroactive Series (R-CPI-U-RS). More information on the R-CPI-U-RS and the index values for 1947 to 2021 are available in Appendix A. For an in-depth discussion of the effects of using different inflation indexes on household income estimates and information on a proposed change to the index used in this report, refer to Appendix D.

[3] For more information on the 2021 inflation-adjustment, refer to "How Inflation Affects the Census Bureau's Income and Earnings Estimates," at <www.census.gov/newsroom/blogs/random-samplings/2022/09/inflation-income-and-earnings-estimates.html>.

[4] Median income is the amount that divides the income distribution into two equal groups, one-half having incomes above the median, one-half having incomes below the median. Calculated differences throughout this report may differ due to rounding.

[5] Creamer, John, Emily A. Shrider, Kalee Burns, and Frances Chen, "Poverty in the United States: 2021," *Current Population Reports*, P60-277, U.S. Census Bureau, Washington, DC, September 2022, <www.census.gov/library/publications/2022/demo/p60-277.html> and Keisler-Starkey, Katherine and Lisa N. Bunch, "Health Insurance in the United States: 2021," *Current Population Reports*, P60-278, U.S. Census Bureau, Washington, DC, September 2022, <https://www.census.gov/library/publications/2022/demo/p60-278.html>.

[6] If a married couple owns the home jointly, either spouse may be listed as the householder.

[7] Refer to Appendix A for information on business cycles and recessions as defined by the National Bureau of Economic Research. For more information on changes in household income during previous recessions, refer to DeNavas-Walt, Carmen, Bernadette D. Proctor, and Jessica C. Smith, "Income, Poverty, and Health Insurance Coverage in the United States: 2008," *Current Population Reports*, P60-236, U.S. Census Bureau, Washington, DC, September 2009, <www.census.gov/prod/2009pubs/p60-236.pdf>.

[8] For more information on historical income comparisons across the recent survey redesigns, refer to "Was Household Income the Highest Ever in 2019?" at <www.census.gov/library/stories/2020/09/was-household-income-the-highest-ever-in-2019.html>.

[9] A family household is a household maintained by a householder who is related to at least one other person in the household by birth, marriage, or adoption and includes any unrelated individuals who reside there. Married-couple households include both opposite-sex and same-sex couples. A nonfamily household is a householder living alone (a one-person household) or sharing the home exclusively with nonrelatives.

[10] The difference between the 2020–2021 percent change in median income of nonfamily households and those maintained by male householders was not statistically significant.

[11] Federal surveys give respondents the option of reporting more than one race. Therefore, two basic ways of defining a race group are possible. A group, such as Asian, may be defined as those who reported Asian and no other race (the race-alone or single-race concept) or as those who reported Asian regardless of whether they also reported another race (the race-alone-or-in-combination concept). The body of this report (text and figures) provides data using the first approach (race alone). The appendix tables provide data using both approaches. Use of the single-race population does not imply that it is the preferred method of presenting or analyzing data. The Census Bureau uses a variety of approaches. In this report, the terms "White, not Hispanic" and "non-Hispanic White" are used interchangeably and refer to people who are not Hispanic and who reported White and no other race. This report uses non-Hispanic Whites as the comparison group for other race groups and Hispanics.

Since Hispanics may be any race, data in this report for Hispanics overlap with data for race groups. Of those who reported only one race, being Hispanic was reported by 16.6 percent of White householders, 5.6 percent of Black householders, and 2.9 percent of Asian householders.

Data users should exercise caution when interpreting aggregate results for the Hispanic population or for race groups because these populations consist of many distinct groups that differ in socioeconomic characteristics, culture, and nativity. Data were first collected for Hispanics in 1972 and for Asians and Pacific Islanders in 1987. More information is available at <www.census.gov/programs-surveys/cps.html>.

[12] The differences among the 2020–2021 percent changes in household median income for the race groups were not statistically significant.

[13] The small sample size of the Asian population and the fact that the CPS ASEC does not use separate population controls for weighting the Asian sample to national totals contribute to the large variances surrounding estimates for this group. The American Community Survey, based on a much larger sample of the population, is a better source for estimating and identifying changes for small subgroups of the population.

[14] The following differences between the 2020–2021 percent changes in median household income were not statistically significant: householders under the age of 65 and each age category of households aged 25 to 54; householders aged 15 to 24 and each age category of households aged 25 to 54; householders aged 25 to 34 and each age category 35 and older; householders aged 35 to 44 and every other age category; and householders aged 55 to 64 and those over the age of 65.

[15] The difference between the 2021 median household income for householders aged 25 to 34 and those aged 55 to 64 was not statistically significant.

[16] Native-born households are those in which the householder was born in the United States, Puerto Rico, the U.S. Island Areas of Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, the Virgin Islands of the United States, or a foreign country but had at least one parent who was a U.S. citizen. All other households are considered foreign-born regardless of the date of entry into the United States or citizenship status. The CPS does not interview households in Puerto Rico. Of all householders, 84.4 percent were native-born; 8.6 percent were foreign-born, naturalized citizens; and 6.9 percent were not U.S. citizens.

[17] The differences among the 2020–2021 percent changes in median household income by nativity of the householder were not statistically significant.

[18] The Northeast region includes Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont. The Midwest region includes Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin. The South region includes Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia, and the District of Columbia. The West region includes Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

[19] The difference in 2021 median household incomes for the Northeast and the West was not statistically significant.

[20] The differences among the 2020–2021 percent changes in median household income for the regions were not statistically significant.

[21] The definitions of metropolitan statistical areas and principal cities are available at <www.census.gov/programs-surveys/metro-micro/about.html>.

[22] The differences among the 2020–2021 percent changes in median household incomes for all categories of metropolitan statistical areas were not statistically significant.

[23] Information on educational attainment in the CPS ASEC is available at <www.census.gov/programs-surveys/cps/technical-documentation/subject-definitions.html#educationalattainment>. Those with an associate degree are included in the "some college" category.

[24] The 2020–2021 percent change in median household income for all householders aged 25 and over declined 1.3 percent, not statistically different from the 2020–2021 percent changes for householders with no high school diploma and those with a high school diploma but no college. The differences among the 2020–2021 percent changes in median household income for householders with no high school diploma were not statistically significant from either those with a high school diploma or those with some college. The difference between the 2020–2021 percent change in median household income for householders with a high school diploma but no college and those with at least a bachelor's degree was not statistically significant.

[25] Money income is the baseline measure of income in this report. Money income is calculated pretax; refer to Appendix A for a detailed list of all income components. For inequality estimates based on post-tax income, refer to Appendix C.

[26] Wimer, Christopher, Zachary Parolin, Amy Fenton, Liana Fox, and Christopher Jencks, "The Direct Effect of Taxes and Transfers on Changes in the U.S. Income Distribution, 1967–2015," *Demography*, August 24, 2020, <https://read.dukeupress.edu/demography/article/57/5/1833/168378/The-Direct-Effect-of-Taxes-and-Transfers-on>, accessed on June 21, 2022.

[27] The difference between the 2020–2021 percent changes in the ratios of the 90th- to 10th-percentile and the 50th- to 10th-percentile was not statistically significant.

[28] The differences among the 2020–2021 percent changes in household income at each percentile limit were not statistically significant.

[29] For more details on the three-parameter equivalence scale, refer to Creamer, John, Emily A. Shrider, Kalee Burns, and Frances Chen, "Poverty in the United States: 2021," *Current Population Reports*, P60-277, U.S. Census Bureau, Washington, DC, September 2022, <www.census.gov/library/publications/2022/demo/p60-277.html>.

[30] For school personnel, summer vacation is counted as weeks worked if they are scheduled to return to their job in the fall. For more detailed information on work experience, refer to Table PINC-05, "Work Experience in 2021—People 15 Years Old and Over by Total Money Earnings in 2021, Age, Race, Hispanic Origin, and Sex" at <www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-05.html>.

[31] The index used in this report to inflation-adjust is Consumer Price Index (R-CPI-U-RS); more information and historical index values are available in Appendix A.

[32] Estimates for counts of workers in 2020 and 2021 are based on 2020 Census population controls and not directly comparable to estimates for 2019, which were 2010 Census-based. Refer to Appendix B for more information on the change in population controls.

[33] The differences between the 2020–2021 percent changes in median earnings for all workers and working females with earnings were not statistically significant.

[34] The following differences between the 2020–2021 percent changes in median earnings were not statistically significant: all full-time, year-round workers and female full-time, year-round workers; and male full-time, year-round workers and female full-time, year-round workers.

## APPENDIX A. ESTIMATES OF INCOME

### How Income Is Measured

For each person 15 years and older in the sample, the Current Population Survey Annual Social and Economic Supplement (CPS ASEC) asks questions on the amount of money income received in the preceding calendar year from each of the following sources.

1. Earnings
2. Unemployment compensation
3. Workers' compensation
4. Social Security
5. Supplemental Security Income
6. Public assistance
7. Veterans' payments
8. Survivor benefits
9. Disability benefits
10. Pension or retirement income
11. Interest
12. Dividends
13. Rents, royalties, and estates and trusts
14. Educational assistance
15. Alimony
16. Child support
17. Financial assistance from outside of the household
18. Other income

Data on income collected in the CPS ASEC by the U.S. Census Bureau cover money income received (exclusive of certain money receipts such as capital gains) before payments for personal income taxes, Social Security, union dues, Medicare deductions, etc. Money income also excludes tax credits such as the Earned Income Tax Credit, the Child Tax Credit, and special COVID-19-related stimulus payments. Money income does not reflect that some families receive noncash benefits

| Business Cycles—Recessions | | | |
|---|---|---|---|
| Peak month | Year | Trough month | Year |
| November | 1948 | October | 1949 |
| July | 1953 | May | 1954 |
| August | 1957 | April | 1958 |
| April | 1960 | February | 1961 |
| December | 1969 | November | 1970 |
| November | 1973 | March | 1975 |
| January | 1980 | July | 1980 |
| July | 1981 | November | 1982 |
| July | 1990 | March | 1991 |
| March | 2001 | November | 2001 |
| December | 2007 | June | 2009 |
| February | 2020 | April | 2020 |

Source: National Bureau of Economic Research, <www.nber.org/research/data/us-business-cycle-expansions-and-contractions>.

such as Supplemental Nutrition Assistance/food stamps, health benefits, and subsidized housing. In addition, money income does not reflect the fact that noncash benefits often take the form of the use of business transportation and facilities, full or partial payments by business for retirement programs, or medical and educational expenses.

The income of the household does not include amounts received by people who were members during all or part of the previous year if these people no longer resided in the household at the time of the interview. However, the CPS ASEC includes income data for people who are current residents but did not reside in the household during the previous year. It should be noted that although the income statistics refer to receipts during the preceding calendar year, the demographic characteristics, such as age, labor force status, and household composition, are as of the survey date.

Data users should consider these elements when comparing income levels. Moreover, readers should be aware that for many different reasons there is a tendency in household surveys for respondents to underreport their income. Based on an analysis of independently derived income estimates, the Census Bureau determined that respondents report income earned from wages or salaries more accurately than other sources of income, and that the reported wage and salary income is nearly equal to independent estimates of aggregate income.

### Business Cycles—Recessions

Business cycle peaks and troughs used to delineate the beginning and end of recessions, as shown in the text box "Business Cycles—Recessions," are determined by the National Bureau

of Economic Research (NBER), a private research organization. The data points in the time series figures in this report use July as a reference. According to the NBER chronology, the most recent peak occurred in February 2020. The most recent trough occurred in April 2020. More information on business cycle dating is available at <www.nber.org/research/business-cycle-dating>.

## Cost-of-Living Adjustment

To accurately assess changes in income and earnings over time, an adjustment for changes in the cost of living is required. This report and other data products, such as tables and figures based on the CPS ASEC, use the Consumer Price Index Retroactive Series for all Urban Consumers All Items (R-CPI-U-RS), provided by the U.S. Bureau of Labor Statistics (BLS) for 1978 through 2021, to adjust for changes in the cost of living. The R-CPI-U-RS was formerly known as the Consumer Price Index Research Series (CPI-U-RS). For years prior to 1978, the Census Bureau used estimates provided by BLS from the CPI-U-X1 series. The CPI-U-X1 is an experimental series that preceded the R-CPI-U-RS and estimates the inflation rate in the Consumer Price Index for all Urban Consumers (CPI-U) when applying the current rental equivalence method of measuring the cost of homeownership for years prior to 1983. The index used to make the constant dollar conversions in the main body of this report is shown in the text box "Annual Average Consumer Price Index Retroactive Series (R-CPI-U-RS) Using Current Methods All Items: 1947 to 2021." Appendix D discusses alternative price indexes and how they would affect estimates of income over time including a proposal to change the index used in this report to make historical income adjustments.

**Annual Average and Annual Percent Change of the Consumer Price Index Retroactive Series (R-CPI-U-RS) Using Current Methods All Items: 1947 to 2021**

| Income year | R-CPI-U-RS[1] index (December 1977 = 100) | Percentage change from year prior | Income year | R-CPI-U-RS[1] index (December 1977 = 100) | Percentage change from year prior |
|---|---|---|---|---|---|
| 1947 . . . . . | 37.5 | X | 1985 . . . . . | 165.7 | 3.4 |
| 1948 . . . . . | 40.5 | 8.0 | 1986 . . . . . | 168.6 | 1.8 |
| 1949 . . . . . | 40.0 | –1.2 | 1987 . . . . . | 174.4 | 3.4 |
| 1950 . . . . . | 40.5 | 1.3 | 1988 . . . . . | 180.7 | 3.6 |
| 1951 . . . . . | 43.7 | 7.9 | 1989 . . . . . | 188.6 | 4.4 |
| 1952 . . . . . | 44.5 | 1.8 | 1990 . . . . . | 197.9 | 4.9 |
| 1953 . . . . . | 44.8 | 0.7 | 1991 . . . . . | 205.1 | 3.6 |
| 1954 . . . . . | 45.2 | 0.9 | 1992 . . . . . | 210.2 | 2.5 |
| 1955 . . . . . | 45.0 | –0.4 | 1993 . . . . . | 215.5 | 2.5 |
| 1956 . . . . . | 45.7 | 1.6 | 1994 . . . . . | 220.0 | 2.1 |
| 1957 . . . . . | 47.2 | 3.3 | 1995 . . . . . | 225.3 | 2.4 |
| 1958 . . . . . | 48.5 | 2.8 | 1996 . . . . . | 231.3 | 2.7 |
| 1959 . . . . . | 48.9 | 0.8 | 1997 . . . . . | 236.3 | 2.2 |
| 1960 . . . . . | 49.7 | 1.6 | 1998 . . . . . | 239.5 | 1.4 |
| 1961 . . . . . | 50.2 | 1.0 | 1999 . . . . . | 244.6 | 2.1 |
| 1962 . . . . . | 50.7 | 1.0 | 2000 . . . . . | 252.9 | 3.4 |
| 1963 . . . . . | 51.4 | 1.4 | 2001 . . . . . | 260.1 | 2.8 |
| 1964 . . . . . | 52.1 | 1.4 | 2002 . . . . . | 264.2 | 1.6 |
| 1965 . . . . . | 52.9 | 1.5 | 2003 . . . . . | 270.2 | 2.3 |
| 1966 . . . . . | 54.4 | 2.8 | 2004 . . . . . | 277.5 | 2.7 |
| 1967 . . . . . | 56.1 | 3.1 | 2005 . . . . . | 286.9 | 3.4 |
| 1968 . . . . . | 58.3 | 3.9 | 2006 . . . . . | 296.2 | 3.2 |
| 1969 . . . . . | 60.9 | 4.5 | 2007 . . . . . | 304.6 | 2.8 |
| 1970 . . . . . | 63.9 | 4.9 | 2008 . . . . . | 316.3 | 3.8 |
| 1971 . . . . . | 66.7 | 4.4 | 2009 . . . . . | 315.2 | –0.3 |
| 1972 . . . . . | 68.7 | 3.0 | 2010 . . . . . | 320.4 | 1.6 |
| 1973 . . . . . | 73.0 | 6.3 | 2011 . . . . . | 330.5 | 3.2 |
| 1974 . . . . . | 80.3 | 10.0 | 2012 . . . . . | 337.5 | 2.1 |
| 1975 . . . . . | 86.9 | 8.2 | 2013 . . . . . | 342.5 | 1.5 |
| 1976 . . . . . | 91.9 | 5.8 | 2014 . . . . . | 348.3 | 1.7 |
| 1977 . . . . . | 97.7 | 6.3 | 2015 . . . . . | 348.9 | 0.2 |
| 1978 . . . . . | 104.4 | 6.9 | 2016 . . . . . | 353.4 | 1.3 |
| 1979 . . . . . | 114.3 | 9.5 | 2017 . . . . . | 361.0 | 2.2 |
| 1980 . . . . . | 127.1 | 11.2 | 2018 . . . . . | 369.8 | 2.4 |
| 1981 . . . . . | 139.1 | 9.4 | 2019 . . . . . | 376.5 | 1.8 |
| 1982 . . . . . | 147.5 | 6.0 | 2020 . . . . . | 381.2 | 1.2 |
| 1983 . . . . . | 153.8 | 4.3 | 2021 . . . . . | 399.0 | 4.7 |
| 1984 . . . . . | 160.2 | 4.2 | | | |

X Not applicable.

[1] The U.S. Census Bureau uses the Bureau of Labor Statistics' (BLS) Consumer Price Index for all Urban Consumers Retroactive Series (R-CPI-U-RS) for 1978 through 2021. In 2021, BLS renamed the Research Series (CPI-U-RS) the Retroactive Series. For 1967 to 1977, the Census Bureau uses estimates provided by BLS from the CPI-U-X1 series. The CPI-U-X1 is an experimental series that preceded the R-CPI-U-RS and estimates the inflation rate in the CPI-U when applying the current rental equivalence method of measuring the cost of homeownership for years prior to 1983. The Census Bureau derived the R-CPI-U-RS for years before 1967 by applying the 1967 R-CPI-U-RS-to-CPI-U ratio to the 1947 to 1966 CPI-U.

Note: Data users can compute the percentage changes in prices between earlier years' data and 2021 data by dividing the annual average R-CPI-U-RS for 2021 by the annual average for the earlier year(s). More information on the R-CPI-U-RS is available at <www.bls.gov/cpi/research-series/r-cpi-u-rs-home.htm>.

Table A-1.

# Income Summary Measures by Selected Characteristics: 2020 and 2021

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Characteristic | 2020[1] | | | 2021 | | | Percent change in real median income (2021 less 2020)* | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number (thousands) | Median income (dollars) | | Number (thousands) | Median income (dollars) | | | |
| | | Estimate | Margin of error[2] (±) | | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) |
| **HOUSEHOLDS** | | | | | | | | |
| **All households . . . . . . . . . . . . . . . . . . . . . .** | **129,244** | **71,186** | **921** | **131,202** | **70,784** | **605** | **–0.6** | **1.31** |
| **Type of Household** | | | | | | | | |
| Family households. . . . . . . . . . . . . . . . . . . . . | 83,711 | 90,722 | 894 | 84,265 | 91,162 | 787 | 0.5 | 1.15 |
| Married-couple. . . . . . . . . . . . . . . . . . . . . . | 61,288 | 106,582 | 891 | 61,435 | 106,921 | 937 | 0.3 | 1.09 |
| Female householder, no spouse present. . | 15,461 | 51,554 | 1,515 | 15,618 | 51,168 | 925 | –0.7 | 3.10 |
| Male householder, no spouse present . . . . | 6,963 | 70,478 | 2,458 | 7,212 | 70,525 | 1,904 | 0.1 | 4.09 |
| Nonfamily households . . . . . . . . . . . . . . . . . . | 45,533 | 42,607 | 676 | 46,937 | 41,797 | 590 | *–1.9 | 1.75 |
| Female householder . . . . . . . . . . . . . . . . . | 23,859 | 37,516 | 712 | 24,221 | 35,737 | 811 | *–4.7 | 2.49 |
| Male householder. . . . . . . . . . . . . . . . . . . . | 21,674 | 49,625 | 1,329 | 22,716 | 49,466 | 1,467 | –0.3 | 3.42 |
| **Race[3] and Hispanic Origin of Householder** | | | | | | | | |
| White. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100,931 | 74,978 | 771 | 102,057 | 74,262 | 912 | –1.0 | 1.30 |
| White, not Hispanic . . . . . . . . . . . . . . . . . . | 84,712 | 78,912 | 889 | 85,078 | 77,999 | 1,080 | –1.2 | 1.43 |
| Black. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,319 | 48,175 | 1,327 | 17,698 | 48,297 | 1,679 | 0.3 | 4.08 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,002 | 99,622 | 3,983 | 7,276 | 101,418 | 2,868 | 1.8 | 4.52 |
| Hispanic (any race) . . . . . . . . . . . . . . . . . . . . | 18,340 | 58,015 | 1,213 | 19,230 | 57,981 | 1,585 | –0.1 | 3.09 |
| **Age of Householder** | | | | | | | | |
| Under 65 years. . . . . . . . . . . . . . . . . . . . . . . . | 94,593 | 80,456 | 771 | 95,370 | 80,734 | 613 | 0.3 | 1.09 |
| 15 to 24 years. . . . . . . . . . . . . . . . . . . . . | 5,498 | 49,094 | 1,612 | 6,061 | 51,645 | 1,575 | *5.2 | 4.65 |
| 25 to 34 years. . . . . . . . . . . . . . . . . . . . . | 20,570 | 74,958 | 1,213 | 20,990 | 74,862 | 1,932 | –0.1 | 2.90 |
| 35 to 44 years. . . . . . . . . . . . . . . . . . . . . | 22,304 | 89,711 | 1,788 | 22,601 | 90,312 | 1,561 | 0.7 | 2.52 |
| 45 to 54 years. . . . . . . . . . . . . . . . . . . . . | 21,803 | 94,633 | 2,024 | 21,647 | 97,089 | 1,598 | *2.6 | 2.45 |
| 55 to 64 years. . . . . . . . . . . . . . . . . . . . . | 24,417 | 77,872 | 2,176 | 24,070 | 75,842 | 1,443 | –2.6 | 3.01 |
| 65 years and older. . . . . . . . . . . . . . . . . . . . . | 34,651 | 48,866 | 976 | 35,832 | 47,620 | 1,037 | *–2.6 | 2.46 |
| **Nativity of Householder** | | | | | | | | |
| Native-born. . . . . . . . . . . . . . . . . . . . . . . . . . | 109,633 | 72,552 | 1,022 | 110,800 | 71,522 | 692 | *–1.4 | 1.41 |
| Foreign-born. . . . . . . . . . . . . . . . . . . . . . . . . | 19,611 | 65,061 | 1,052 | 20,402 | 66,043 | 1,494 | 1.5 | 2.57 |
| Naturalized citizen. . . . . . . . . . . . . . . . . . | 11,202 | 72,467 | 2,140 | 11,332 | 74,150 | 2,458 | 2.3 | 3.86 |
| Not a citizen . . . . . . . . . . . . . . . . . . . . . . . | 8,409 | 57,804 | 1,813 | 9,070 | 57,132 | 2,152 | –1.2 | 4.85 |
| **Region** | | | | | | | | |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,471 | 79,032 | 1,576 | 22,640 | 77,472 | 2,705 | –2.0 | 3.54 |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,811 | 70,528 | 1,881 | 28,050 | 71,129 | 1,284 | 0.9 | 2.63 |
| South . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49,759 | 64,355 | 859 | 50,612 | 63,368 | 1,218 | –1.5 | 2.03 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,203 | 78,755 | 1,225 | 29,900 | 79,430 | 1,482 | 0.9 | 2.20 |
| **Residence[4]** | | | | | | | | |
| Inside metropolitan statistical areas . . . . . . | 111,460 | 74,622 | 694 | 113,267 | 73,823 | 941 | –1.1 | 1.33 |
| Inside principal cities. . . . . . . . . . . . . . . . | 43,273 | 65,609 | 1,385 | 43,625 | 64,839 | 1,503 | –1.2 | 2.53 |
| Outside principal cities. . . . . . . . . . . . . . . | 68,188 | 80,017 | 913 | 69,642 | 79,599 | 1,109 | –0.5 | 1.61 |
| Outside metropolitan statistical areas . . . . . | 17,784 | 54,300 | 1,222 | 17,935 | 53,750 | 2,026 | –1.0 | 3.27 |
| **Educational Attainment of Householder** | | | | | | | | |
| Total, aged 25 and older. . . . . . . . . . . . . . | 123,746 | 73,013 | 912 | 125,141 | 72,046 | 627 | *–1.3 | 1.28 |
| No high school diploma . . . . . . . . . . . . . . . . . | 9,961 | 31,130 | 1,098 | 10,012 | 30,378 | 774 | –2.4 | 3.90 |
| High school, no college . . . . . . . . . . . . . . . . | 31,401 | 49,965 | 1,103 | 32,214 | 50,401 | 795 | 0.9 | 2.30 |
| Some college . . . . . . . . . . . . . . . . . . . . . . . . | 33,434 | 67,075 | 1,426 | 33,791 | 64,378 | 1,483 | *–4.0 | 2.59 |
| Bachelor's degree or higher . . . . . . . . . . . . . | 48,950 | 112,393 | 1,692 | 49,125 | 115,456 | 1,771 | *2.7 | 1.94 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.

[1] Implementation of 2020 Census-based population controls.

[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.

[3] Federal surveys give respondents the option of reporting more than one race. Therefore, two basic ways of defining a race group are possible. A group, such as Asian, may be defined as those who reported Asian and no other race (the race-alone or single-race concept) or as those who reported Asian regardless of whether they also reported another race (the race-alone-or-in-combination concept). This table shows data using the first approach (race alone). The use of the single-race population does not imply that it is the preferred method of presenting or analyzing data. The Census Bureau uses a variety of approaches. Data for American Indians and Alaska Natives, Native Hawaiians and Other Pacific Islanders, and those reporting Two or More Races are not shown separately.

[4] Information on metropolitan statistical areas and principal cities is available at <www.census.gov/programs-surveys/metro-micro/about/glossary.html>.

Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding.

Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| **ALL RACES** | | | | | | | | | | | | | | | |
| 2021 | 131,202 | 100 | 9.3 | 8.1 | 7.8 | 10.9 | 16.2 | 11.9 | 15.9 | 8.3 | 11.6 | 70,784 | 605 | 102,316 | 1,029 |
| 2020 | 129,244 | 100 | 8.8 | 8.2 | 8.1 | 11.0 | 16.2 | 12.3 | 15.8 | 8.4 | 11.3 | 71,186 | 921 | 102,020 | 1,098 |
| 2019 | 128,451 | 100 | 8.5 | 7.5 | 8.0 | 11.3 | 16.1 | 12.1 | 16.3 | 8.7 | 11.5 | 72,808 | 959 | 103,949 | 1,104 |
| 2018 | 128,579 | 100 | 9.4 | 8.3 | 8.4 | 11.5 | 16.4 | 12.8 | 15.6 | 7.9 | 9.8 | 68,168 | 746 | 97,129 | 969 |
| 2017 | 127,669 | 100 | 9.4 | 8.6 | 8.6 | 11.8 | 15.8 | 12.6 | 15.2 | 7.7 | 10.1 | 67,571 | 585 | 96,868 | 1,037 |
| 2017 | 127,586 | 100 | 9.5 | 8.5 | 8.5 | 11.8 | 15.6 | 12.8 | 15.3 | 7.9 | 9.7 | 67,832 | 609 | 95,296 | 945 |
| 2016 | 126,224 | 100 | 9.8 | 8.5 | 8.6 | 11.8 | 16.5 | 12.2 | 15.6 | 7.8 | 9.2 | 66,657 | 810 | 93,871 | 871 |
| 2015 | 125,819 | 100 | 9.8 | 9.3 | 9.3 | 11.7 | 16.2 | 12.1 | 15.7 | 7.6 | 8.4 | 64,631 | 604 | 90,645 | 758 |
| 2014 | 124,587 | 100 | 10.7 | 9.7 | 9.5 | 12.0 | 16.6 | 11.9 | 14.7 | 7.1 | 7.8 | 61,468 | 739 | 86,763 | 840 |
| 2013[3] | 123,931 | 100 | 10.5 | 9.9 | 9.2 | 11.8 | 16.5 | 12.4 | 14.5 | 7.1 | 8.0 | 62,425 | 1,253 | 87,599 | 1,272 |
| 2013 | 122,952 | 100 | 10.4 | 10.1 | 9.5 | 12.1 | 16.9 | 12.9 | 14.2 | 6.9 | 6.9 | 60,507 | 529 | 84,624 | 956 |
| 2012 | 122,459 | 100 | 10.4 | 10.3 | 9.2 | 12.9 | 16.6 | 12.5 | 14.5 | 6.9 | 6.9 | 60,313 | 406 | 84,262 | 819 |
| 2011 | 121,084 | 100 | 10.6 | 9.8 | 9.8 | 13.3 | 17.0 | 12.2 | 14.4 | 6.8 | 6.8 | 60,428 | 498 | 84,118 | 731 |
| 2010[4] | 119,927 | 100 | 10.6 | 10.1 | 9.1 | 12.8 | 16.6 | 12.3 | 14.9 | 6.9 | 6.8 | 61,364 | 666 | 83,924 | 737 |
| 2009 | 117,538 | 100 | 9.3 | 9.4 | 9.6 | 12.5 | 17.1 | 12.8 | 15.3 | 7.0 | 7.0 | 63,011 | 444 | 86,048 | 506 |
| 2008 | 117,181 | 100 | 9.3 | 9.3 | 9.5 | 12.4 | 16.8 | 12.9 | 15.6 | 7.2 | 7.0 | 63,455 | 284 | 86,314 | 502 |
| 2007 | 116,783 | 100 | 8.9 | 9.4 | 8.9 | 12.0 | 17.1 | 12.8 | 15.9 | 7.5 | 7.7 | 65,801 | 302 | 89,674 | 509 |
| 2006 | 116,011 | 100 | 9.0 | 8.9 | 8.8 | 12.8 | 17.2 | 12.6 | 15.8 | 7.8 | 7.7 | 64,930 | 459 | 88,562 | 569 |
| 2005 | 114,384 | 100 | 9.3 | 9.0 | 9.4 | 12.1 | 17.1 | 13.0 | 15.8 | 7.7 | 7.4 | 64,427 | 355 | 88,094 | 547 |
| 2004[8] | 113,343 | 100 | 9.1 | 9.1 | 9.1 | 12.3 | 17.4 | 12.7 | 15.8 | 7.0 | 7.1 | 63,745 | 464 | 86,940 | 539 |
| 2003 | 112,000 | 100 | 9.4 | 9.3 | 8.7 | 12.4 | 17.2 | 12.5 | 16.1 | 7.1 | 7.1 | 63,967 | 457 | 87,223 | 525 |
| 2002 | 111,278 | 100 | 9.5 | 9.5 | 8.7 | 12.6 | 16.7 | 13.4 | 15.9 | 7.4 | 6.8 | 64,047 | 345 | 87,369 | 539 |
| 2001 | 109,297 | 100 | 8.7 | 9.3 | 8.5 | 12.6 | 16.9 | 13.4 | 16.1 | 7.2 | 7.3 | 64,779 | 345 | 89,293 | 585 |
| 2000[9] | 108,209 | 100 | 8.4 | 8.9 | 8.6 | 12.5 | 17.1 | 13.4 | 16.3 | 7.3 | 7.3 | 66,248 | 343 | 90,142 | 584 |
| 1999[10] | 106,434 | 100 | 8.3 | 9.0 | 8.7 | 12.6 | 16.9 | 13.5 | 16.3 | 7.3 | 7.3 | 66,385 | 510 | 89,289 | 762 |
| 1998 | 103,874 | 100 | 9.1 | 9.3 | 8.7 | 12.4 | 17.2 | 13.7 | 16.2 | 7.1 | 6.4 | 64,781 | 630 | 86,389 | 767 |
| 1997 | 102,528 | 100 | 9.4 | 9.5 | 9.3 | 12.2 | 17.9 | 13.3 | 15.9 | 6.5 | 6.0 | 62,484 | 475 | 83,907 | 772 |
| 1996 | 101,018 | 100 | 9.7 | 9.9 | 9.4 | 12.6 | 17.8 | 13.4 | 15.8 | 6.0 | 5.5 | 61,225 | 508 | 81,289 | 749 |
| 1995[11] | 99,627 | 100 | 9.7 | 10.0 | 9.4 | 13.0 | 18.4 | 13.5 | 15.1 | 5.9 | 5.0 | 60,348 | 574 | 79,584 | 717 |
| 1994[12] | 98,990 | 100 | 10.5 | 10.1 | 9.6 | 13.1 | 18.1 | 13.0 | 15.0 | 5.6 | 4.9 | 58,515 | 439 | 78,228 | 692 |
| 1993[13] | 97,107 | 100 | 10.9 | 10.1 | 9.4 | 13.5 | 18.3 | 13.0 | 14.5 | 5.7 | 4.5 | 57,843 | 445 | 76,704 | 682 |
| 1992[14] | 96,426 | 100 | 10.8 | 10.4 | 9.4 | 13.2 | 18.4 | 13.7 | 14.7 | 5.5 | 4.0 | 58,153 | 453 | 73,726 | 509 |
| 1991 | 95,669 | 100 | 10.6 | 9.9 | 9.1 | 13.6 | 18.7 | 13.9 | 14.7 | 5.6 | 4.0 | 58,607 | 464 | 73,773 | 499 |
| 1990 | 94,312 | 100 | 10.2 | 9.6 | 9.0 | 13.0 | 19.5 | 13.7 | 15.0 | 5.5 | 4.4 | 60,370 | 507 | 75,411 | 524 |

Footnotes provided at end of table.

Table A-2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| 1989 | 93,347 | 100 | 9.8 | 9.4 | 9.5 | 12.7 | 18.9 | 14.0 | 15.5 | 5.8 | 4.5 | 61,153 | 553 | 77,261 | 553 |
| 1988 | 92,830 | 100 | 10.5 | 9.4 | 9.2 | 12.9 | 18.5 | 14.6 | 15.3 | 5.4 | 4.3 | 60,115 | 483 | 75,112 | 552 |
| 1987[15] | 91,124 | 100 | 10.8 | 9.5 | 9.3 | 14.3 | 18.7 | 14.3 | 15.2 | 5.3 | 3.9 | 59,624 | 463 | 74,149 | 501 |
| 1986 | 89,479 | 100 | 11.1 | 9.6 | 9.1 | 13.5 | 18.7 | 14.4 | 14.8 | 5.1 | 3.7 | 58,920 | 502 | 72,793 | 487 |
| 1985[16] | 88,458 | 100 | 11.1 | 10.0 | 9.6 | 13.7 | 19.5 | 14.0 | 14.3 | 4.6 | 3.2 | 56,871 | 507 | 69,990 | 456 |
| 1984[17] | 86,789 | 100 | 11.1 | 10.5 | 9.8 | 13.9 | 19.6 | 13.7 | 14.0 | 4.5 | 3.0 | 55,828 | 418 | 68,403 | 414 |
| 1983 | 85,407 | 100 | 11.4 | 10.4 | 10.3 | 14.1 | 19.7 | 14.0 | 13.3 | 4.0 | 2.6 | 54,182 | 405 | 65,897 | 405 |
| 1982 | 83,918 | 100 | 11.7 | 10.5 | 10.1 | 14.0 | 20.4 | 13.9 | 13.1 | 3.8 | 2.6 | 54,564 | 405 | 65,758 | 400 |
| 1981 | 83,527 | 100 | 11.5 | 10.3 | 10.7 | 13.8 | 20.0 | 14.3 | 13.4 | 3.8 | 2.6 | 54,713 | 472 | 65,363 | 392 |
| 1980 | 82,368 | 100 | 11.0 | 10.4 | 10.2 | 13.7 | 20.2 | 15.0 | 13.4 | 4.0 | 2.2 | 55,596 | 470 | 66,122 | 398 |
| 1979[18] | 80,776 | 100 | 10.8 | 9.9 | 9.6 | 13.7 | 20.1 | 15.3 | 13.9 | 4.1 | 2.6 | 57,462 | 448 | 68,259 | 425 |
| 1978 | 77,330 | 100 | 10.5 | 10.3 | 9.7 | 13.7 | 20.1 | 15.5 | 13.9 | 3.9 | 2.4 | 57,572 | 384 | 67,761 | 428 |
| 1977 | 76,030 | 100 | 10.8 | 11.0 | 9.7 | 13.9 | 20.6 | 14.9 | 13.5 | 3.3 | 2.2 | 55,427 | 343 | 65,751 | 329 |
| 1976[19] | 74,142 | 100 | 11.0 | 10.6 | 10.1 | 13.9 | 21.2 | 15.3 | 12.7 | 3.3 | 2.0 | 55,078 | 336 | 64,786 | 329 |
| 1975[20] | 72,867 | 100 | 11.2 | 10.9 | 10.0 | 14.2 | 21.7 | 14.8 | 12.4 | 2.9 | 1.8 | 54,180 | 363 | 63,266 | 325 |
| 1974[20,21] | 71,163 | 100 | 10.8 | 10.4 | 9.7 | 14.4 | 21.7 | 15.3 | 13.4 | 3.3 | 2.3 | 55,636 | 351 | 65,062 | 335 |
| 1973 | 69,859 | 100 | 10.7 | 10.4 | 9.1 | 13.4 | 21.5 | 15.7 | 13.4 | 3.6 | 2.3 | 57,456 | 360 | 66,447 | 333 |
| 1972[22] | 68,251 | 100 | 11.4 | 10.0 | 9.6 | 13.7 | 21.8 | 15.6 | 12.5 | 3.3 | 2.2 | 56,319 | 353 | 65,548 | 334 |
| 1971[23] | 66,676 | 100 | 12.4 | 9.7 | 9.8 | 14.7 | 23.2 | 14.6 | 11.3 | 2.8 | 1.6 | 56,008 | 344 | 62,111 | 325 |
| 1970 | 64,778 | 100 | 12.4 | 9.6 | 9.4 | 14.5 | 23.5 | 14.9 | 11.3 | 2.8 | 1.7 | 54,536 | 329 | 62,448 | 329 |
| 1969 | 63,401 | 100 | 12.3 | 9.3 | 9.2 | 14.6 | 23.8 | 15.5 | 11.1 | 2.7 | 1.6 | 54,962 | 334 | 62,530 | 323 |
| 1968 | 62,214 | 100 | 12.5 | 9.7 | 9.6 | 15.5 | 24.3 | 14.9 | 9.9 | 2.2 | 1.3 | 52,992 | 315 | 59,953 | 315 |
| 1967[24] | 60,813 | 100 | 13.8 | 10.0 | 9.0 | 17.1 | 24.6 | 13.3 | 8.7 | 2.1 | 1.4 | 50,803 | 304 | 56,820 | 304 |
| **WHITE ALONE[25]** | | | | | | | | | | | | | | | |
| 2021 | 102,057 | 100 | 8.2 | 7.6 | 7.6 | 10.8 | 16.2 | 12.3 | 16.6 | 8.6 | 12.1 | 74,262 | 912 | 105,804 | 1,183 |
| 2020 | 100,931 | 100 | 7.5 | 7.7 | 7.9 | 10.9 | 16.1 | 12.7 | 16.5 | 8.8 | 11.8 | 74,978 | 771 | 105,209 | 1,250 |
| 2019 | 100,568 | 100 | 7.2 | 7.1 | 7.5 | 11.1 | 16.3 | 12.5 | 17.0 | 9.1 | 12.2 | 76,519 | 848 | 107,812 | 1,264 |
| 2018 | 100,528 | 100 | 7.8 | 8.1 | 8.1 | 11.3 | 16.6 | 13.3 | 16.4 | 8.3 | 10.4 | 72,229 | 697 | 101,366 | 1,115 |
| 2017 | 100,113 | 100 | 8.0 | 8.3 | 8.3 | 11.6 | 16.0 | 13.0 | 16.0 | 8.2 | 10.8 | 71,658 | 931 | 101,153 | 1,167 |
| 2016 | 100,065 | 100 | 8.0 | 8.3 | 8.4 | 11.5 | 15.8 | 13.1 | 16.2 | 8.5 | 10.3 | 72,144 | 756 | 99,067 | 1,095 |
| 2015 | 99,400 | 100 | 8.3 | 8.0 | 9.2 | 11.7 | 16.8 | 12.5 | 16.5 | 8.2 | 9.7 | 69,840 | 620 | 97,485 | 992 |
| 2014 | 99,313 | 100 | 8.1 | 8.8 | 9.2 | 11.7 | 16.2 | 12.5 | 16.6 | 7.9 | 8.9 | 68,740 | 717 | 94,033 | 884 |
| 2013[8] | 98,679 | 100 | 9.2 | 9.3 | 9.0 | 11.9 | 16.8 | 12.4 | 15.5 | 7.5 | 8.4 | 65,144 | 669 | 90,374 | 986 |
| 2013[4] | 98,807 | 100 | 9.0 | 9.6 | 9.2 | 11.6 | 16.6 | 13.0 | 15.2 | 7.5 | 8.5 | 66,106 | 991 | 90,663 | 1,453 |
| 2012 | 97,774 | 100 | 8.8 | 9.9 | 9.2 | 12.0 | 17.1 | 13.5 | 14.9 | 7.4 | 7.4 | 64,372 | 814 | 88,350 | 1,043 |
| 2011 | 96,964 | 100 | 8.7 | 9.9 | 9.1 | 12.8 | 16.7 | 13.0 | 15.3 | 7.2 | 7.4 | 63,036 | 447 | 87,903 | 838 |
| 2010[26] | 96,306 | 100 | 8.8 | 9.8 | 8.8 | 12.8 | 16.9 | 12.6 | 15.8 | 7.3 | 7.3 | 64,394 | 518 | 87,685 | 830 |

Footnotes provided at end of table.

Table A-2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error (±) |
| 2009 . . . . . . . . . | 95,489 | 100 | 7.8 | 9.0 | 9.4 | 12.3 | 17.3 | 13.2 | 16.0 | 7.5 | 7.5 | 65,649 | 321 | 89,299 | 566 |
| 2008 . . . . . . . . . | 95,297 | 100 | 7.9 | 9.0 | 9.2 | 12.2 | 16.8 | 13.4 | 16.4 | 7.5 | 7.5 | 65,990 | 315 | 89,805 | 569 |
| 2007 . . . . . . . . . | 95,112 | 100 | 7.5 | 9.0 | 8.7 | 11.8 | 17.2 | 13.1 | 16.6 | 8.0 | 8.0 | 68,266 | 332 | 92,128 | 577 |
| 2006 . . . . . . . . . | 94,705 | 100 | 7.6 | 8.5 | 8.6 | 12.6 | 17.4 | 13.0 | 16.6 | 7.5 | 8.2 | 68,260 | 326 | 93,091 | 638 |
| 2005 . . . . . . . . . | 93,588 | 100 | 7.8 | 8.5 | 9.2 | 12.1 | 17.2 | 13.3 | 16.6 | 7.9 | 7.9 | 67,525 | 485 | 91,735 | 625 |
| 2004[8] . . . . . . . | 92,880 | 100 | 8.0 | 8.9 | 8.9 | 12.1 | 17.5 | 13.0 | 16.5 | 7.6 | 7.6 | 67,087 | 433 | 90,453 | 613 |
| 2003 . . . . . . . . . | 91,962 | 100 | 8.0 | 8.8 | 8.6 | 12.3 | 17.4 | 12.8 | 16.8 | 7.6 | 7.6 | 67,383 | 435 | 90,945 | 600 |
| 2002 . . . . . . . . . | 91,645 | 100 | 7.7 | 9.1 | 8.5 | 12.3 | 16.7 | 13.8 | 16.8 | 7.8 | 7.3 | 68,090 | 455 | 90,864 | 609 |
| **WHITE[26]** | | | | | | | | | | | | | | | |
| 2001 . . . . . . . . . | 90,682 | 100 | 7.4 | 9.0 | 8.3 | 12.4 | 16.9 | 13.7 | 16.8 | 7.6 | 7.8 | 68,290 | 527 | 92,827 | 656 |
| 2000[29] . . . . . . | 90,030 | 100 | 7.2 | 8.6 | 8.2 | 12.3 | 17.2 | 13.7 | 17.1 | 7.8 | 7.8 | 69,286 | 503 | 93,485 | 659 |
| 1999[30] . . . . . . | 88,893 | 100 | 7.0 | 8.6 | 8.6 | 12.4 | 17.1 | 13.8 | 17.2 | 7.6 | 7.7 | 69,042 | 574 | 92,533 | 861 |
| 1998 . . . . . . . . . | 87,212 | 100 | 7.6 | 8.8 | 8.5 | 12.3 | 17.3 | 14.2 | 16.9 | 7.5 | 7.0 | 68,158 | 562 | 90,307 | 874 |
| 1997 . . . . . . . . . | 86,106 | 100 | 8.0 | 9.1 | 9.1 | 12.0 | 18.0 | 13.7 | 16.7 | 6.9 | 6.5 | 65,805 | 686 | 87,638 | 878 |
| 1996 . . . . . . . . . | 85,059 | 100 | 8.2 | 9.4 | 9.2 | 12.5 | 17.9 | 14.0 | 16.5 | 6.3 | 5.9 | 64,104 | 545 | 84,516 | 823 |
| 1995[31] . . . . . . | 84,511 | 100 | 8.2 | 9.5 | 9.2 | 12.9 | 18.7 | 13.9 | 15.9 | 6.3 | 5.4 | 63,341 | 545 | 82,756 | 789 |
| 1994[32] . . . . . . | 83,737 | 100 | 8.8 | 9.7 | 9.3 | 13.1 | 18.6 | 13.4 | 15.8 | 6.0 | 5.5 | 61,714 | 570 | 81,675 | 782 |
| 1993[33] . . . . . . | 82,387 | 100 | 9.1 | 9.6 | 9.2 | 13.4 | 18.8 | 13.6 | 15.4 | 6.0 | 4.9 | 61,026 | 585 | 80,143 | 761 |
| 1992[34] . . . . . . | 81,795 | 100 | 8.9 | 9.8 | 9.2 | 13.2 | 18.8 | 14.2 | 15.6 | 5.9 | 4.4 | 61,139 | 487 | 77,055 | 565 |
| 1991 . . . . . . . . . | 81,675 | 100 | 8.7 | 9.4 | 9.0 | 13.6 | 19.1 | 14.4 | 15.6 | 6.0 | 4.3 | 61,414 | 490 | 76,888 | 550 |
| 1990 . . . . . . . . . | 80,968 | 100 | 8.5 | 9.1 | 8.9 | 13.0 | 19.9 | 14.2 | 15.9 | 5.8 | 4.8 | 62,967 | 474 | 78,453 | 577 |
| 1989 . . . . . . . . . | 80,163 | 100 | 8.1 | 8.9 | 9.2 | 12.5 | 19.3 | 14.7 | 16.3 | 6.2 | 4.9 | 64,327 | 515 | 80,479 | 613 |
| 1988 . . . . . . . . . | 79,734 | 100 | 8.8 | 8.6 | 9.0 | 12.8 | 19.0 | 15.2 | 16.1 | 5.8 | 4.6 | 63,551 | 617 | 78,316 | 607 |
| 1987[35] . . . . . . | 78,519 | 100 | 9.0 | 8.9 | 9.0 | 12.8 | 19.2 | 15.0 | 16.1 | 5.7 | 4.2 | 62,820 | 519 | 77,318 | 549 |
| 1986 . . . . . . . . . | 77,284 | 100 | 9.5 | 9.0 | 8.8 | 13.4 | 19.1 | 15.0 | 15.8 | 5.4 | 4.0 | 61,944 | 494 | 75,824 | 533 |
| 1985[36] . . . . . . | 76,576 | 100 | 9.5 | 9.5 | 9.3 | 13.6 | 19.9 | 14.6 | 15.1 | 5.0 | 3.5 | 59,978 | 527 | 72,863 | 503 |
| 1984[37] . . . . . . | 75,328 | 100 | 9.5 | 9.8 | 9.4 | 13.9 | 20.2 | 14.4 | 14.7 | 4.8 | 3.2 | 58,896 | 488 | 71,225 | 455 |
| 1983 . . . . . . . . . | 74,376 | 100 | 9.7 | 9.7 | 10.1 | 14.1 | 20.3 | 14.7 | 14.1 | 4.3 | 2.9 | 56,820 | 422 | 68,632 | 440 |
| 1982 . . . . . . . . . | 73,182 | 100 | 10.1 | 9.9 | 9.7 | 14.1 | 20.9 | 14.5 | 13.9 | 4.1 | 2.8 | 57,123 | 427 | 68,468 | 441 |
| 1981 . . . . . . . . . | 72,845 | 100 | 9.9 | 9.6 | 10.4 | 13.8 | 20.6 | 15.0 | 14.1 | 4.1 | 2.4 | 57,808 | 439 | 68,103 | 425 |
| 1980 . . . . . . . . . | 71,872 | 100 | 9.5 | 9.7 | 9.8 | 13.7 | 20.7 | 15.7 | 14.2 | 4.3 | 2.4 | 58,654 | 496 | 68,791 | 434 |
| 1979[38] . . . . . . | 70,766 | 100 | 9.4 | 9.2 | 9.2 | 13.6 | 20.6 | 16.0 | 14.7 | 4.5 | 2.8 | 60,248 | 471 | 70,951 | 465 |
| 1978 . . . . . . . . . | 68,028 | 100 | 9.1 | 9.8 | 9.4 | 13.6 | 20.4 | 16.3 | 14.6 | 4.2 | 2.7 | 59,850 | 434 | 70,272 | 465 |
| 1977 . . . . . . . . . | 66,934 | 100 | 9.7 | 10.3 | 9.3 | 13.7 | 21.2 | 15.6 | 14.3 | 3.6 | 2.4 | 58,286 | 403 | 68,320 | 363 |
| 1976[39] . . . . . . | 65,353 | 100 | 9.8 | 9.8 | 9.8 | 13.9 | 21.6 | 16.0 | 13.5 | 3.4 | 2.2 | 57,697 | 393 | 67,279 | 355 |
| 1975[40] . . . . . . | 64,392 | 100 | 10.0 | 10.3 | 9.8 | 14.0 | 22.2 | 15.4 | 13.2 | 3.1 | 2.0 | 56,659 | 340 | 65,603 | 355 |
| 1974[20,3] . . . . . | 62,984 | 100 | 9.6 | 10.0 | 9.3 | 14.2 | 22.3 | 16.0 | 13.3 | 3.6 | 2.2 | 58,185 | 360 | 67,472 | 360 |
| 1973 . . . . . . . . . | 61,965 | 100 | 9.6 | 9.6 | 8.7 | 13.2 | 21.9 | 16.4 | 14.3 | 3.8 | 2.5 | 60,216 | 378 | 69,016 | 360 |
| 1972[22] . . . . . . | 60,618 | 100 | 10.3 | 9.2 | 9.0 | 13.5 | 22.4 | 16.2 | 13.3 | 3.6 | 2.4 | 59,083 | 373 | 68,097 | 363 |
| 1971[23] . . . . . . | 59,463 | 100 | 11.2 | 9.1 | 9.3 | 14.4 | 23.9 | 15.3 | 12.0 | 3.0 | 1.8 | 56,488 | 354 | 64,360 | 344 |
| 1970 . . . . . . . . . | 57,575 | 100 | 11.3 | 8.9 | 8.9 | 14.3 | 24.2 | 15.6 | 12.0 | 3.0 | 1.8 | 56,803 | 360 | 64,633 | 349 |

Footnotes provided at end of table.

Table A–2.
## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error (±) |
| 1969 | 56,248 | 100 | 11.1 | 8.6 | 8.7 | 14.3 | 24.5 | 16.3 | 11.8 | 2.9 | 1.7 | 57,360 | 345 | 64,849 | 356 |
| 1968 | 55,394 | 100 | 11.4 | 9.0 | 9.1 | 15.5 | 25.1 | 15.7 | 10.5 | 2.3 | 1.5 | 55,176 | 338 | 62,108 | 338 |
| 1967[7,a] | 54,188 | 100 | 12.6 | 9.2 | 8.6 | 17.0 | 25.5 | 14.0 | 9.3 | 2.2 | 1.5 | 52,980 | 316 | 58,897 | 328 |
| **WHITE ALONE, NOT HISPANIC[25]** | | | | | | | | | | | | | | | |
| 2021 | 85,078 | 100 | 7.6 | 7.5 | 7.2 | 10.2 | 15.7 | 12.3 | 17.0 | 9.2 | 13.3 | 77,999 | 1,080 | 110,758 | 1,388 |
| 2020[2] | 84,712 | 100 | 7.1 | 7.4 | 7.5 | 10.3 | 15.7 | 12.7 | 17.0 | 9.4 | 12.9 | 78,912 | 889 | 110,284 | 1,451 |
| 2019 | 84,868 | 100 | 6.8 | 6.9 | 7.0 | 10.7 | 15.7 | 12.5 | 17.6 | 9.6 | 13.3 | 80,602 | 928 | 113,033 | 1,440 |
| 2018 | 84,727 | 100 | 7.3 | 7.4 | 7.6 | 10.7 | 16.3 | 13.3 | 17.1 | 8.8 | 11.5 | 76,220 | 703 | 106,020 | 1,262 |
| 2017[7] | 84,706 | 100 | 7.5 | 7.8 | 7.9 | 11.1 | 15.6 | 13.1 | 16.5 | 8.8 | 11.8 | 75,367 | 1,225 | 105,839 | 1,284 |
| 2017 | 84,681 | 100 | 7.5 | 8.0 | 7.9 | 11.0 | 15.4 | 13.1 | 16.7 | 9.0 | 11.3 | 75,318 | 1,160 | 103,290 | 1,202 |
| 2016 | 84,387 | 100 | 7.8 | 7.6 | 8.0 | 11.3 | 16.6 | 12.4 | 17.1 | 8.7 | 10.6 | 73,433 | 947 | 101,339 | 1,131 |
| 2015 | 84,445 | 100 | 8.5 | 8.5 | 8.6 | 11.3 | 15.9 | 12.7 | 17.5 | 8.5 | 9.6 | 71,989 | 1,020 | 97,875 | 999 |
| 2014 | 84,228 | 100 | 8.6 | 8.9 | 8.6 | 11.4 | 16.5 | 12.6 | 16.1 | 8.1 | 9.2 | 69,027 | 693 | 94,469 | 1,091 |
| 2013[3] | 84,432 | 100 | 8.4 | 9.0 | 8.3 | 11.0 | 16.7 | 13.5 | 15.9 | 8.0 | 9.3 | 70,281 | 1,021 | 94,628 | 1,625 |
| 2013 | 83,641 | 100 | 8.1 | 9.2 | 8.6 | 11.6 | 17.0 | 13.8 | 15.5 | 8.0 | 8.0 | 67,882 | 1,173 | 92,428 | 1,209 |
| 2012 | 83,792 | 100 | 7.9 | 9.4 | 8.7 | 12.2 | 16.6 | 13.4 | 16.0 | 7.8 | 8.1 | 67,397 | 698 | 92,428 | 1,002 |
| 2011 | 83,573 | 100 | 8.1 | 9.0 | 8.6 | 12.6 | 17.1 | 13.0 | 15.8 | 7.7 | 8.1 | 66,897 | 651 | 91,828 | 949 |
| 2010[a] | 83,314 | 100 | 8.1 | 9.4 | 8.3 | 12.3 | 16.7 | 12.9 | 16.6 | 7.8 | 8.0 | 67,820 | 914 | 91,323 | 942 |
| 2009 | 83,158 | 100 | 7.3 | 8.5 | 8.9 | 11.8 | 17.3 | 13.4 | 16.7 | 8.0 | 8.1 | 68,940 | 581 | 92,712 | 623 |
| 2008 | 82,884 | 100 | 7.5 | 8.6 | 8.8 | 11.6 | 16.6 | 13.6 | 17.1 | 8.2 | 8.2 | 70,049 | 467 | 93,477 | 629 |
| 2007 | 82,765 | 100 | 7.0 | 8.7 | 8.3 | 11.2 | 17.0 | 13.2 | 17.3 | 8.6 | 8.7 | 71,941 | 532 | 95,862 | 636 |
| 2006 | 82,675 | 100 | 7.1 | 8.2 | 8.2 | 12.1 | 17.1 | 13.2 | 17.2 | 8.0 | 8.9 | 70,617 | 417 | 96,645 | 702 |
| 2005 | 82,003 | 100 | 7.4 | 8.3 | 8.6 | 11.7 | 16.9 | 13.5 | 17.3 | 7.9 | 8.5 | 70,627 | 393 | 95,408 | 693 |
| 2004[a] | 81,628 | 100 | 7.5 | 8.6 | 8.4 | 11.7 | 17.1 | 13.2 | 17.3 | 7.9 | 7.9 | 70,325 | 530 | 93,830 | 672 |
| 2003 | 81,148 | 100 | 7.5 | 8.5 | 8.2 | 11.7 | 17.2 | 13.0 | 17.5 | 8.2 | 8.2 | 70,552 | 561 | 94,341 | 658 |
| 2002 | 81,166 | 100 | 7.3 | 8.8 | 8.1 | 11.8 | 16.5 | 14.0 | 17.4 | 8.3 | 7.9 | 70,829 | 457 | 93,807 | 656 |
| **WHITE, NOT HISPANIC[26]** | | | | | | | | | | | | | | | |
| 2001 | 80,818 | 100 | 7.1 | 8.7 | 8.0 | 12.0 | 16.6 | 13.8 | 17.4 | 8.1 | 8.4 | 71,033 | 485 | 95,791 | 714 |
| 2000[a] | 80,527 | 100 | 6.9 | 8.4 | 7.9 | 12.0 | 16.9 | 13.7 | 17.6 | 8.3 | 8.3 | 71,979 | 475 | 96,330 | 711 |
| 1999[10] | 79,819 | 100 | 6.6 | 8.2 | 8.3 | 12.0 | 16.8 | 14.0 | 17.7 | 8.1 | 8.2 | 72,030 | 749 | 95,568 | 931 |
| 1998 | 78,577 | 100 | 6.9 | 8.7 | 8.1 | 11.9 | 17.2 | 14.4 | 17.7 | 7.9 | 7.4 | 70,702 | 669 | 93,199 | 937 |
| 1997 | 77,936 | 100 | 7.3 | 8.7 | 8.7 | 11.7 | 17.9 | 13.9 | 17.4 | 7.3 | 6.9 | 68,516 | 589 | 90,446 | N |
| 1996 | 77,240 | 100 | 7.6 | 8.9 | 8.8 | 12.3 | 17.9 | 14.4 | 17.2 | 6.7 | 6.3 | 66,909 | 755 | 87,073 | N |
| 1995[1] | 76,932 | 100 | 7.4 | 9.0 | 8.9 | 12.5 | 18.7 | 14.3 | 16.6 | 6.7 | 5.8 | 65,841 | 565 | 85,455 | 842 |
| 1994[2] | 77,004 | 100 | 8.2 | 9.3 | 9.1 | 12.9 | 18.6 | 13.7 | 16.3 | 6.2 | 5.6 | 63,706 | 555 | 83,706 | 817 |
| 1993[13] | 75,697 | 100 | 8.6 | 9.1 | 9.1 | 13.1 | 18.8 | 14.0 | 15.9 | 6.3 | 5.2 | 63,272 | 609 | 82,255 | 807 |
| 1992[14] | 75,107 | 100 | 8.4 | 9.4 | 8.9 | 12.9 | 18.7 | 14.5 | 16.2 | 6.2 | 4.7 | 63,191 | 643 | 79,012 | 600 |
| 1991 | 75,625 | 100 | 8.3 | 9.1 | 8.7 | 13.4 | 19.1 | 14.6 | 16.1 | 6.3 | 4.5 | 62,881 | 509 | 78,537 | 576 |
| 1990 | 75,035 | 100 | 8.0 | 8.7 | 8.7 | 12.8 | 19.9 | 14.4 | 16.4 | 6.1 | 5.0 | 64,407 | 494 | 80,191 | 597 |

Footnotes provided at end of table.

Table A-2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| 1989 | 74,495 | 100 | 7.6 | 9.0 | 8.7 | 12.3 | 19.3 | 14.8 | 16.7 | 6.4 | 5.1 | 65,710 | 529 | 82,091 | 661 |
| 1988 | 74,067 | 100 | 8.4 | 8.3 | 8.8 | 12.7 | 19.0 | 15.4 | 16.6 | 6.0 | 4.8 | 65,302 | 632 | 79,915 | 617 |
| 1987[15] | 73,120 | 100 | 8.5 | 8.6 | 8.8 | 12.7 | 19.3 | 15.2 | 16.6 | 5.9 | 4.4 | 64,547 | 591 | 78,830 | 602 |
| 1986 | 72,067 | 100 | 9.1 | 8.7 | 8.5 | 13.3 | 19.2 | 15.3 | 16.2 | 5.6 | 4.2 | 63,352 | 537 | 77,329 | 584 |
| 1985[16] | 71,540 | 100 | 9.1 | 9.2 | 9.1 | 13.5 | 20.0 | 14.8 | 15.5 | 5.2 | 3.7 | 61,326 | 515 | 74,281 | 555 |
| 1984[17] | 70,586 | 100 | 9.0 | 9.5 | 9.3 | 13.9 | 20.2 | 14.6 | 15.1 | 4.9 | 3.4 | 60,119 | 549 | 72,463 | 533 |
| 1983 | 69,648 | 100 | 9.3 | 9.4 | 10.0 | 13.9 | 20.4 | 14.9 | 14.5 | 4.5 | 3.1 | 58,280 | 482 | 70,435 | 495 |
| 1982 | 69,214 | 100 | 9.8 | 9.6 | 9.6 | 14.0 | 21.0 | 14.7 | 14.2 | 4.3 | 2.9 | 58,642 | 481 | 69,475 | 489 |
| 1981 | 68,996 | 100 | 9.6 | 9.4 | 10.2 | 13.7 | 20.5 | 15.2 | 14.4 | 4.3 | 2.5 | 58,642 | 491 | 68,960 | 472 |
| 1980 | 68,106 | 100 | 9.2 | 9.5 | 9.6 | 13.6 | 20.8 | 15.9 | 14.5 | 4.4 | 2.5 | 59,693 | 558 | 69,695 | 516 |
| 1979[18] | 67,203 | 100 | 9.2 | 9.1 | 9.1 | 13.4 | 20.6 | 16.2 | 15.0 | 4.6 | 2.9 | 61,096 | 557 | 71,771 | 517 |
| 1978 | 64,836 | 100 | 9.4 | 9.6 | 9.2 | 13.4 | 20.4 | 16.5 | 14.9 | 4.3 | 2.8 | 60,977 | 528 | 71,101 | 503 |
| 1977 | 63,721 | 100 | 10.0 | 10.0 | 9.2 | 13.5 | 21.2 | 15.8 | 14.7 | 3.7 | 2.5 | 59,442 | 551 | 69,165 | 537 |
| 1976[19] | 62,365 | 100 | 9.5 | 9.6 | 9.6 | 13.7 | 21.7 | 16.2 | 13.9 | 3.5 | 2.3 | 58,873 | 564 | 68,143 | 500 |
| 1975[20] | 61,533 | 100 | 9.8 | 10.1 | 9.6 | 13.9 | 22.2 | 15.6 | 13.5 | 3.2 | 2.1 | 57,086 | 498 | 66,407 | 529 |
| 1974[20,21] | 60,164 | 100 | 9.5 | 9.3 | 9.1 | 14.0 | 22.3 | 16.2 | 13.6 | 3.2 | 2.0 | 58,682 | 474 | 68,232 | 490 |
| 1973 | 59,236 | 100 | 9.5 | 9.5 | 8.5 | 12.9 | 21.8 | 16.5 | 14.6 | 4.0 | 2.6 | 60,746 | 468 | 69,787 | 486 |
| 1972[22] | 58,005 | 100 | 10.2 | 9.0 | 8.9 | 13.3 | 22.4 | 16.5 | 13.6 | 3.7 | 2.4 | 59,926 | 468 | 68,887 | 506 |
| **BLACK ALONE OR IN COMBINATION** | | | | | | | | | | | | | | | |
| 2021 | 18,698 | 100 | 15.7 | 11.5 | 10.0 | 13.5 | 16.9 | 10.4 | 11.6 | 4.7 | 5.7 | 48,815 | 1,663 | 71,528 | 1,879 |
| 2020[*] | 18,287 | 100 | 16.5 | 11.2 | 10.4 | 12.6 | 17.3 | 10.4 | 11.8 | 4.5 | 5.4 | 48,936 | 1,319 | 72,130 | 1,928 |
| 2019 | 18,055 | 100 | 15.9 | 10.7 | 11.5 | 12.9 | 16.9 | 10.0 | 11.6 | 5.0 | 5.5 | 48,827 | 1,217 | 71,983 | 2,034 |
| 2018 | 18,095 | 100 | 15.7 | 11.8 | 11.1 | 13.8 | 16.3 | 10.3 | 10.2 | 4.7 | 4.0 | 44,984 | 989 | 64,050 | 1,439 |
| 2017 | 17,813 | 100 | 17.5 | 12.4 | 11.1 | 14.2 | 15.3 | 10.5 | 10.7 | 4.0 | 4.1 | 44,197 | 1,249 | 64,522 | 1,442 |
| 2017[2] | 17,801 | 100 | 17.7 | 12.0 | 10.8 | 14.4 | 15.1 | 11.1 | 10.7 | 4.1 | 4.1 | 44,867 | 911 | 65,194 | 1,453 |
| 2016 | 17,505 | 100 | 18.2 | 10.9 | 10.9 | 13.3 | 16.4 | 10.4 | 10.9 | 4.2 | 3.8 | 45,235 | 1,083 | 65,622 | 1,738 |
| 2015 | 17,322 | 100 | 18.8 | 13.1 | 11.3 | 12.9 | 16.2 | 9.8 | 10.3 | 4.2 | 3.4 | 42,554 | 1,027 | 62,675 | 1,631 |
| 2014 | 17,198 | 100 | 19.7 | 13.2 | 12.0 | 13.5 | 16.1 | 9.0 | 9.7 | 3.6 | 3.2 | 40,843 | 889 | 59,135 | 1,306 |
| 2013[13] | 16,723 | 100 | 19.2 | 13.1 | 11.8 | 14.1 | 16.3 | 9.0 | 9.4 | 4.2 | 3.1 | 41,664 | 1,491 | 60,198 | 2,535 |
| 2013 | 16,855 | 100 | 19.3 | 14.1 | 11.5 | 13.9 | 16.1 | 9.1 | 9.8 | 3.5 | 2.6 | 40,512 | 1,341 | 57,906 | 1,669 |
| 2012 | 16,559 | 100 | 20.1 | 13.9 | 10.7 | 14.2 | 15.8 | 9.7 | 9.5 | 3.6 | 2.5 | 39,862 | 1,552 | 56,936 | 1,435 |
| 2011 | 16,165 | 100 | 21.1 | 13.6 | 10.7 | 14.1 | 15.7 | 9.3 | 9.2 | 3.6 | 2.4 | 39,074 | 1,098 | 57,352 | 1,535 |
| 2010[6] | 15,909 | 100 | 20.9 | 13.0 | 11.1 | 14.3 | 15.5 | 10.2 | 9.0 | 3.5 | 2.4 | 40,044 | 963 | 56,661 | 1,284 |
| 2009 | 15,212 | 100 | 18.0 | 13.2 | 11.7 | 14.6 | 16.3 | 9.9 | 10.4 | 3.3 | 2.6 | 41,457 | 870 | 58,584 | 1,074 |
| 2008 | 15,056 | 100 | 17.8 | 11.9 | 12.2 | 14.5 | 17.1 | 10.3 | 9.9 | 3.8 | 2.5 | 43,325 | 911 | 58,884 | 1,013 |
| 2007 | 14,976 | 100 | 18.1 | 12.4 | 10.3 | 13.8 | 17.1 | 10.6 | 11.0 | 3.9 | 2.7 | 44,656 | 1,002 | 61,345 | 1,103 |
| 2006 | 14,709 | 100 | 17.9 | 12.4 | 10.7 | 14.9 | 16.7 | 10.1 | 10.4 | 2.9 | 2.9 | 43,284 | 527 | 61,282 | 1,236 |
| 2005 | 14,399 | 100 | 18.7 | 12.1 | 11.7 | 13.3 | 17.0 | 10.6 | 10.0 | 3.6 | 2.7 | 43,049 | 675 | 59,422 | 1,064 |
| 2004[8] | 14,151 | 100 | 19.1 | 11.3 | 11.5 | 14.5 | 17.0 | 10.3 | 10.5 | 3.2 | 2.5 | 43,473 | 655 | 58,605 | 1,024 |
| 2003 | 13,969 | 100 | 18.1 | 12.9 | 10.5 | 14.2 | 16.7 | 10.6 | 10.6 | 3.8 | 2.5 | 43,841 | 906 | 59,534 | 1,037 |
| 2002 | 13,778 | 100 | 17.6 | 13.0 | 10.5 | 14.8 | 16.7 | 10.2 | 10.5 | 3.8 | 2.8 | 44,064 | 954 | 60,913 | 1,168 |

Footnotes provided at end of table.

Table A-2.
## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Total | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| **BLACK ALONE[27]** | | | | | | | | | | | | | | | |
| 2021 | 17,698 | 100 | 15.9 | 11.7 | 10.0 | 13.4 | 17.0 | 10.4 | 11.4 | 4.6 | 5.7 | 48,297 | 1,679 | 70,902 | 1,943 |
| 2020 | 17,319 | 100 | 16.7 | 11.4 | 10.6 | 12.7 | 17.2 | 10.3 | 11.5 | 4.3 | 5.3 | 48,175 | 1,327 | 70,933 | 2,048 |
| 2019 | 17,054 | 100 | 16.3 | 10.8 | 11.6 | 13.0 | 16.9 | 9.9 | 11.6 | 4.8 | 5.2 | 48,153 | 1,284 | 70,530 | 1,994 |
| 2018 | 17,167 | 100 | 18.1 | 11.8 | 11.0 | 13.9 | 16.2 | 10.4 | 10.0 | 4.7 | 3.9 | 44,627 | 977 | 63,297 | 1,452 |
| 2017[7] | 17,019 | 100 | 17.8 | 12.6 | 11.0 | 14.3 | 15.2 | 10.5 | 10.5 | 4.0 | 4.1 | 43,509 | 1,542 | 64,137 | 1,493 |
| 2017 | 16,997 | 100 | 18.0 | 12.2 | 10.7 | 14.5 | 15.0 | 11.0 | 10.5 | 4.1 | 4.0 | 44,496 | 1,049 | 64,761 | 1,500 |
| 2016 | 16,733 | 100 | 18.7 | 11.9 | 10.9 | 13.3 | 16.2 | 10.3 | 10.9 | 4.0 | 3.7 | 44,585 | 1,339 | 64,857 | 1,731 |
| 2015 | 16,539 | 100 | 18.9 | 13.2 | 11.3 | 13.1 | 16.1 | 9.7 | 10.3 | 4.2 | 3.3 | 42,196 | 965 | 62,157 | 1,620 |
| 2014 | 16,437 | 100 | 19.8 | 13.2 | 12.1 | 13.5 | 16.2 | 8.9 | 9.6 | 3.5 | 3.2 | 40,551 | 869 | 58,687 | 1,302 |
| 2013 | 16,009 | 100 | 19.7 | 13.1 | 11.6 | 14.2 | 15.9 | 9.2 | 9.3 | 4.0 | 3.0 | 41,151 | 1,642 | 58,777 | 2,271 |
| 2013 | 16,108 | 100 | 19.4 | 14.2 | 11.5 | 13.9 | 16.1 | 9.2 | 9.7 | 3.5 | 2.6 | 40,305 | 1,395 | 57,816 | 1,696 |
| 2012 | 15,872 | 100 | 20.3 | 14.1 | 10.7 | 14.3 | 15.7 | 9.7 | 9.3 | 3.5 | 2.4 | 39,393 | 1,536 | 56,436 | 1,464 |
| 2011 | 15,583 | 100 | 21.3 | 13.6 | 10.7 | 14.1 | 15.7 | 9.3 | 9.2 | 3.6 | 2.5 | 38,909 | 1,011 | 57,049 | 1,595 |
| 2010[9] | 15,265 | 100 | 21.1 | 13.0 | 11.2 | 14.3 | 15.5 | 10.4 | 8.9 | 3.4 | 2.3 | 40,005 | 1,022 | 55,986 | 1,282 |
| 2009 | 14,730 | 100 | 18.0 | 13.3 | 11.7 | 14.6 | 16.3 | 9.8 | 10.5 | 3.3 | 2.5 | 41,247 | 820 | 58,288 | 1,093 |
| 2008 | 14,595 | 100 | 17.9 | 11.9 | 12.2 | 14.5 | 17.1 | 10.3 | 9.8 | 3.7 | 2.5 | 43,165 | 915 | 58,700 | 1,033 |
| 2007 | 14,551 | 100 | 18.2 | 12.4 | 10.4 | 13.9 | 17.1 | 10.6 | 11.0 | 3.9 | 2.5 | 44,427 | 1,024 | 61,083 | 1,121 |
| 2006 | 14,354 | 100 | 18.1 | 12.4 | 10.8 | 14.9 | 16.7 | 10.1 | 10.4 | 3.8 | 2.9 | 43,064 | 534 | 60,789 | 1,236 |
| 2005 | 14,002 | 100 | 18.8 | 12.5 | 11.7 | 13.3 | 17.1 | 10.5 | 9.9 | 3.5 | 2.8 | 42,915 | 689 | 59,042 | 1,055 |
| 2004[8] | 13,809 | 100 | 19.2 | 11.4 | 11.6 | 14.5 | 16.9 | 10.3 | 10.4 | 3.2 | 2.5 | 43,272 | 740 | 58,424 | 1,041 |
| 2003 | 13,629 | 100 | 18.2 | 12.9 | 10.5 | 14.3 | 16.8 | 10.5 | 10.5 | 3.8 | 2.5 | 43,776 | 938 | 59,261 | 1,045 |
| 2002 | 13,465 | 100 | 17.7 | 13.1 | 10.6 | 14.8 | 16.7 | 10.2 | 10.5 | 3.8 | 2.8 | 43,836 | 971 | 60,425 | 1,148 |
| **BLACK[28]** | | | | | | | | | | | | | | | |
| 2001 | 13,315 | 100 | 17.3 | 12.1 | 10.7 | 14.5 | 16.8 | 11.7 | 11.0 | 3.7 | 2.3 | 45,208 | 876 | 60,207 | 1,045 |
| 2000[9] | 13,174 | 100 | 16.3 | 11.5 | 11.4 | 14.0 | 17.6 | 11.8 | 10.6 | 4.3 | 2.5 | 46,806 | 1,020 | 61,811 | 1,030 |
| 1999[10] | 12,838 | 100 | 17.0 | 12.3 | 10.5 | 14.6 | 16.2 | 11.1 | 10.5 | 4.6 | 3.2 | 45,528 | 1,395 | 62,741 | 1,481 |
| 1998 | 12,579 | 100 | 19.8 | 12.9 | 11.2 | 13.5 | 16.3 | 10.3 | 10.3 | 3.5 | 2.2 | 42,234 | 1,088 | 56,875 | 1,250 |
| 1997 | 12,474 | 100 | 18.8 | 12.8 | 11.4 | 14.2 | 17.2 | 11.0 | 9.9 | 3.0 | 2.2 | 42,298 | 1,197 | 55,659 | 1,314 |
| 1996 | 12,109 | 100 | 19.7 | 14.2 | 11.3 | 13.3 | 17.4 | 9.8 | 9.7 | 2.8 | 1.8 | 40,507 | 1,311 | 55,995 | 1,799 |
| 1995[11] | 11,577 | 100 | 20.2 | 13.7 | 10.9 | 14.6 | 17.0 | 10.5 | 9.3 | 2.5 | 1.8 | 39,657 | 1,113 | 53,838 | 1,515 |
| 1994[12] | 11,655 | 100 | 22.2 | 13.2 | 11.9 | 13.8 | 15.0 | 10.0 | 9.3 | 3.1 | 1.6 | 38,135 | 1,167 | 53,065 | 1,253 |
| 1993[13] | 11,281 | 100 | 23.6 | 14.4 | 11.1 | 14.5 | 15.4 | 8.8 | 8.1 | 2.8 | 1.4 | 36,166 | 1,176 | 50,415 | 1,377 |
| 1992[14] | 11,269 | 100 | 24.5 | 14.6 | 10.6 | 13.7 | 15.6 | 9.7 | 7.8 | 2.4 | 1.1 | 35,601 | 1,196 | 48,309 | 1,077 |
| 1991 | 11,083 | 100 | 24.1 | 13.6 | 10.7 | 13.7 | 16.6 | 10.1 | 7.9 | 2.4 | 1.1 | 36,587 | 1,264 | 48,718 | 1,046 |
| 1990 | 10,671 | 100 | 23.3 | 14.0 | 10.5 | 13.5 | 16.6 | 9.9 | 8.3 | 2.7 | 1.1 | 37,654 | 1,413 | 50,029 | 1,111 |

Footnotes provided at end of table.

Table A-2.
**Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021**—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error (±) |
| 1989 | 10,486 | 100 | 22.7 | 13.0 | 11.6 | 14.0 | 16.1 | 9.6 | 9.2 | 2.6 | 1.2 | 38,256 | 1,281 | 50,764 | 1,135 |
| 1988 | 10,561 | 100 | 23.5 | 14.9 | 10.4 | 13.8 | 14.9 | 10.0 | 9.0 | 2.1 | 1.4 | 36,228 | 1,242 | 49,631 | 1,191 |
| 1987[15] | 10,192 | 100 | 24.3 | 13.7 | 11.5 | 14.2 | 15.6 | 9.5 | 7.7 | 2.3 | 1.2 | 35,855 | 1,129 | 48,413 | 1,095 |
| 1986 | 9,922 | 100 | 24.3 | 13.9 | 11.3 | 14.2 | 15.5 | 10.1 | 7.5 | 2.3 | 0.9 | 35,688 | 1,152 | 47,880 | 1,071 |
| 1985[16] | 9,797 | 100 | 23.6 | 14.3 | 11.8 | 14.9 | 16.0 | 9.3 | 7.7 | 1.6 | 0.7 | 35,684 | 1,141 | 46,558 | 994 |
| 1984[17] | 9,480 | 100 | 24.0 | 15.6 | 12.7 | 14.4 | 15.1 | 8.1 | 7.5 | 1.7 | 0.5 | 33,551 | 1,061 | 44,747 | 905 |
| 1983 | 9,236 | 100 | 25.0 | 15.9 | 12.0 | 14.7 | 15.1 | 8.9 | 6.6 | 1.5 | 0.4 | 32,244 | 994 | 42,886 | 871 |
| 1982 | 8,916 | 100 | 24.7 | 15.4 | 13.3 | 13.3 | 17.1 | 9.1 | 5.7 | 1.1 | 0.4 | 32,374 | 854 | 42,597 | 877 |
| 1981 | 8,961 | 100 | 24.8 | 15.7 | 13.3 | 13.7 | 15.7 | 8.7 | 6.8 | 1.1 | 0.2 | 32,439 | 897 | 42,614 | 849 |
| 1980 | 8,847 | 100 | 23.3 | 15.8 | 13.1 | 13.7 | 16.6 | 9.3 | 6.6 | 1.2 | 0.4 | 33,791 | 1,048 | 43,855 | 888 |
| 1979[18] | 8,586 | 100 | 22.0 | 15.6 | 12.6 | 14.8 | 16.3 | 9.9 | 7.2 | 1.3 | 0.3 | 35,372 | 1,062 | 45,388 | 919 |
| 1978 | 8,066 | 100 | 21.8 | 15.3 | 12.4 | 14.5 | 17.4 | 9.4 | 7.5 | 1.4 | 0.3 | 35,967 | 1,251 | 45,965 | 987 |
| 1977 | 7,977 | 100 | 21.4 | 16.8 | 13.1 | 15.7 | 16.1 | 9.3 | 6.3 | 0.9 | 0.4 | 34,395 | 759 | 44,070 | 645 |
| 1976[19] | 7,776 | 100 | 21.3 | 16.9 | 13.1 | 14.4 | 17.6 | 9.6 | 5.8 | 0.9 | 0.3 | 34,308 | 700 | 43,834 | 643 |
| 1975[20] | 7,489 | 100 | 22.1 | 17.0 | 13.4 | 15.4 | 17.5 | 9.1 | 5.4 | 0.8 | 0.2 | 34,014 | 823 | 42,457 | 619 |
| 1974[20,21] | 7,263 | 100 | 21.3 | 16.1 | 13.6 | 16.1 | 17.2 | 8.9 | 5.7 | 0.8 | 0.3 | 34,603 | 687 | 43,035 | 629 |
| 1973 | 7,040 | 100 | 19.8 | 17.1 | 12.6 | 15.6 | 17.6 | 10.2 | 5.4 | 1.1 | 0.5 | 35,445 | 908 | 44,016 | 719 |
| 1972[22] | 6,809 | 100 | 21.5 | 16.1 | 13.7 | 15.3 | 16.6 | 10.0 | 5.3 | 1.0 | 0.5 | 34,487 | 850 | 43,565 | 764 |
| 1971[23] | 6,578 | 100 | 23.2 | 15.2 | 13.8 | 16.7 | 17.3 | 7.9 | 5.0 | 0.7 | 0.2 | 33,368 | 817 | 41,348 | 699 |
| 1970 | 6,180 | 100 | 22.7 | 15.3 | 13.3 | 16.6 | 17.3 | 8.7 | 5.1 | 0.8 | 0.3 | 34,574 | 781 | 42,217 | 750 |
| 1969 | 6,053 | 100 | 22.3 | 15.1 | 14.2 | 17.7 | 17.0 | 8.2 | 4.7 | 0.6 | 0.2 | 34,672 | 841 | 41,276 | 722 |
| 1968 | 5,870 | 100 | 22.9 | 16.6 | 14.8 | 16.3 | 17.0 | 7.8 | 3.9 | 0.6 | 0.1 | 32,536 | 777 | 39,626 | 687 |
| 1967[24] | 5,728 | 100 | 25.0 | 17.4 | 13.1 | 18.3 | 15.4 | 6.7 | 3.0 | 0.8 | 0.3 | 30,761 | 842 | 36,963 | 679 |
| **ASIAN ALONE OR IN COMBINATION** | | | | | | | | | | | | | | | |
| 2021 | 7,852 | 100 | 7.8 | 5.8 | 5.2 | 6.7 | 13.6 | 10.2 | 18.1 | 12.1 | 20.6 | 101,056 | 2,708 | 137,769 | 4,867 |
| 2020[2] | 7,555 | 100 | 7.0 | 5.8 | 5.0 | 7.9 | 13.6 | 11.1 | 16.0 | 12.2 | 21.4 | 99,411 | 3,722 | 138,316 | 4,428 |
| 2019 | 7,334 | 100 | 6.2 | 4.6 | 5.1 | 8.0 | 13.0 | 11.8 | 18.3 | 12.8 | 20.2 | 102,956 | 2,910 | 139,510 | 4,603 |
| 2018 | 7,416 | 100 | 7.9 | 5.8 | 5.9 | 8.2 | 13.0 | 12.2 | 18.3 | 10.6 | 18.2 | 93,670 | 2,623 | 128,301 | 3,807 |
| 2017[5] | 7,124 | 100 | 7.8 | 5.8 | 5.8 | 8.8 | 13.9 | 12.6 | 16.7 | 11.6 | 16.9 | 89,534 | 2,002 | 125,899 | 4,634 |
| 2017 | 7,114 | 100 | 8.3 | 6.0 | 5.5 | 8.8 | 13.5 | 12.7 | 16.3 | 11.1 | 17.6 | 89,483 | 2,095 | 125,691 | 4,376 |
| 2016 | 6,750 | 100 | 8.3 | 5.8 | 5.7 | 7.9 | 13.6 | 12.9 | 17.5 | 12.2 | 16.1 | 91,251 | 2,101 | 120,675 | 3,291 |
| 2015 | 6,640 | 100 | 8.7 | 6.4 | 5.9 | 8.1 | 15.1 | 10.9 | 17.5 | 11.5 | 15.8 | 87,783 | 2,632 | 120,228 | 4,137 |
| 2014 | 6,333 | 100 | 9.0 | 6.8 | 6.9 | 9.4 | 13.9 | 12.3 | 17.8 | 11.5 | 13.3 | 85,721 | 3,733 | 112,428 | 3,651 |
| 2013[3] | 6,160 | 100 | 9.2 | 6.8 | 5.3 | 8.5 | 15.6 | 11.6 | 18.7 | 9.9 | 14.3 | 84,427 | 6,117 | 117,752 | 8,095 |
| 2013[9] | 6,111 | 100 | 9.6 | 6.0 | 7.4 | 9.1 | 15.9 | 13.0 | 16.9 | 9.7 | 12.3 | 78,479 | 3,492 | 106,398 | 4,341 |
| 2012 | 5,872 | 100 | 9.6 | 5.8 | 6.4 | 10.0 | 15.9 | 12.8 | 17.3 | 10.1 | 12.7 | 80,606 | 3,378 | 108,413 | 3,683 |
| 2011 | 5,705 | 100 | 8.9 | 7.4 | 6.4 | 10.9 | 14.9 | 13.1 | 18.1 | 9.7 | 10.6 | 78,466 | 3,106 | 103,565 | 4,077 |
| 2010[9] | 5,550 | 100 | 9.1 | 6.9 | 7.1 | 9.1 | 15.6 | 12.4 | 17.2 | 10.3 | 12.3 | 79,111 | 3,001 | 104,249 | 3,294 |

Footnotes provided at end of table.

Table A-2.
**Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021**—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| 2009 | 4,940 | 100 | 9.3 | 6.2 | 7.0 | 9.4 | 14.4 | 12.3 | 17.5 | 10.4 | 13.6 | 82,373 | 2,988 | 114,067 | 3,686 |
| 2008 | 4,805 | 100 | 8.9 | 6.3 | 7.3 | 9.7 | 14.0 | 11.8 | 18.3 | 11.5 | 12.2 | 82,710 | 2,932 | 108,893 | 3,086 |
| 2007 | 4,715 | 100 | 7.9 | 6.3 | 6.5 | 8.5 | 14.9 | 12.7 | 19.7 | 11.1 | 12.5 | 86,292 | 2,987 | 110,768 | 3,116 |
| 2006 | 4,664 | 100 | 7.4 | 5.8 | 6.0 | 9.6 | 15.7 | 11.9 | 18.8 | 11.8 | 13.0 | 86,077 | 3,583 | 117,906 | 4,060 |
| 2005 | 4,500 | 100 | 8.5 | 6.2 | 6.7 | 7.9 | 15.2 | 13.3 | 18.7 | 10.2 | 13.3 | 84,901 | 1,668 | 111,254 | 3,194 |
| 2004[8] | 4,346 | 100 | 8.1 | 6.3 | 6.0 | 9.1 | 16.6 | 12.9 | 19.0 | 10.0 | 12.0 | 82,602 | 2,739 | 109,464 | 3,399 |
| 2003 | 4,235 | 100 | 11.2 | 6.6 | 6.1 | 7.6 | 15.9 | 11.7 | 19.6 | 10.0 | 11.2 | 81,605 | 2,993 | 102,500 | 2,900 |
| 2002 | 4,079 | 100 | 8.1 | 6.0 | 7.1 | 10.5 | 15.1 | 14.0 | 17.3 | 11.0 | 10.9 | 78,962 | 1,965 | 104,924 | 3,282 |
| **ASIAN ALONE[28]** | | | | | | | | | | | | | | | |
| 2021 | 7,276 | 100 | 7.8 | 6.0 | 5.3 | 6.6 | 13.4 | 10.0 | 17.7 | 12.2 | 21.1 | 101,418 | 2,868 | 138,939 | 5,144 |
| 2020[9] | 7,002 | 100 | 7.0 | 5.8 | 4.9 | 8.1 | 13.4 | 11.1 | 15.9 | 12.5 | 21.3 | 99,622 | 3,983 | 137,494 | 4,300 |
| 2019 | 6,853 | 100 | 6.3 | 4.6 | 5.1 | 8.0 | 12.5 | 11.7 | 18.4 | 12.8 | 20.7 | 104,041 | 3,252 | 141,066 | 4,705 |
| 2018 | 6,981 | 100 | 8.0 | 5.6 | 5.9 | 8.1 | 12.9 | 11.9 | 18.3 | 10.8 | 18.4 | 94,079 | 3,027 | 129,277 | 4,013 |
| 2017[7] | 6,750 | 100 | 7.8 | 5.9 | 5.6 | 8.8 | 13.8 | 12.7 | 16.9 | 11.7 | 16.9 | 89,960 | 1,965 | 126,456 | 4,787 |
| 2017 | 6,735 | 100 | 8.3 | 6.1 | 5.3 | 8.6 | 13.4 | 12.8 | 16.4 | 11.2 | 17.7 | 89,892 | 2,169 | 126,116 | 4,465 |
| 2016 | 6,392 | 100 | 8.2 | 5.6 | 5.7 | 7.9 | 13.4 | 12.8 | 17.6 | 12.3 | 16.5 | 91,938 | 2,164 | 121,926 | 3,380 |
| 2015 | 6,328 | 100 | 8.6 | 6.3 | 5.9 | 8.1 | 15.0 | 11.0 | 17.7 | 11.3 | 16.2 | 88,247 | 3,192 | 120,554 | 4,189 |
| 2014 | 6,040 | 100 | 9.3 | 5.7 | 7.1 | 9.3 | 13.7 | 12.1 | 17.6 | 11.8 | 13.5 | 85,112 | 3,971 | 111,764 | 3,618 |
| 2013[7] | 5,818 | 100 | 9.3 | 7.0 | 5.2 | 7.9 | 16.2 | 11.3 | 18.7 | 9.9 | 14.5 | 84,324 | 6,443 | 117,905 | 8,558 |
| 2013 | 5,759 | 100 | 9.6 | 6.1 | 7.5 | 9.1 | 15.8 | 13.1 | 16.5 | 10.0 | 12.2 | 78,128 | 3,296 | 105,723 | 4,419 |
| 2012 | 5,560 | 100 | 9.1 | 5.8 | 6.4 | 9.9 | 15.6 | 12.9 | 17.6 | 10.1 | 12.6 | 81,143 | 3,676 | 108,055 | 3,571 |
| 2011 | 5,374 | 100 | 8.8 | 7.3 | 6.6 | 10.8 | 15.0 | 13.1 | 18.3 | 9.8 | 10.4 | 78,628 | 3,112 | 103,395 | 4,117 |
| 2010[9] | 5,212 | 100 | 9.3 | 6.8 | 7.0 | 9.0 | 15.2 | 12.3 | 17.3 | 10.4 | 10.6 | 80,023 | 3,226 | 105,334 | 3,474 |
| 2009 | 4,687 | 100 | 9.2 | 6.2 | 7.0 | 9.2 | 14.2 | 12.6 | 17.4 | 10.5 | 13.6 | 82,875 | 2,638 | 114,954 | 3,842 |
| 2008 | 4,573 | 100 | 9.1 | 6.1 | 7.4 | 9.6 | 14.0 | 11.7 | 18.2 | 11.6 | 12.3 | 82,798 | 2,876 | 108,719 | 3,119 |
| 2007 | 4,494 | 100 | 7.8 | 6.4 | 6.5 | 8.4 | 14.8 | 12.4 | 20.0 | 11.0 | 12.6 | 86,589 | 2,984 | 111,366 | 3,232 |
| 2006 | 4,454 | 100 | 7.4 | 6.0 | 6.0 | 9.6 | 15.4 | 11.8 | 19.0 | 11.5 | 13.4 | 86,533 | 3,709 | 118,936 | 4,210 |
| 2005 | 4,273 | 100 | 8.6 | 6.4 | 6.7 | 7.6 | 15.2 | 13.4 | 18.6 | 10.2 | 13.4 | 84,965 | 1,629 | 111,392 | 3,233 |
| 2004[8] | 4,123 | 100 | 8.1 | 6.3 | 6.0 | 9.1 | 16.5 | 12.8 | 19.1 | 9.9 | 12.3 | 82,681 | 2,890 | 110,019 | 3,501 |
| 2003 | 4,040 | 100 | 11.3 | 6.6 | 5.9 | 7.5 | 15.7 | 11.7 | 19.6 | 10.1 | 12.6 | 82,250 | 2,657 | 103,328 | 3,010 |
| 2002 | 3,917 | 100 | 7.9 | 6.1 | 7.1 | 10.6 | 14.8 | 14.0 | 17.2 | 11.1 | 11.1 | 79,477 | 2,288 | 105,786 | 3,394 |
| **ASIAN AND PACIFIC ISLANDER[26]** | | | | | | | | | | | | | | | |
| 2001 | 4,071 | 100 | 8.0 | 6.2 | 6.3 | 10.0 | 15.3 | 14.0 | 17.8 | 10.8 | 11.7 | 82,277 | 3,230 | 112,228 | 4,358 |
| 2000[9] | 3,963 | 100 | 6.8 | 6.1 | 5.7 | 9.8 | 15.1 | 12.8 | 20.1 | 9.8 | 13.8 | 87,968 | 2,468 | 114,852 | 3,922 |

Footnotes provided at end of table.

Table A–2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution — Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Median income (dollars) — Estimate | Median income — Margin of error[1] (±) | Mean income (dollars) — Estimate | Mean income — Margin of error[1] (±) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1999[10] | 3,742 | 100 | 8.0 | 6.7 | 5.6 | 9.5 | 16.1 | 13.5 | 17.4 | 9.9 | 9.9 | 83,128 | 4,819 | 109,924 | 4,583 |
| 1998 | 3,308 | 100 | 8.5 | 7.0 | 6.6 | 10.2 | 16.1 | 12.8 | 19.1 | 10.6 | 9.1 | 77,696 | 3,557 | 100,305 | 4,766 |
| 1997 | 3,125 | 100 | 8.6 | 7.5 | 6.6 | 9.3 | 17.3 | 13.1 | 18.3 | 10.4 | 8.9 | 76,404 | 3,494 | 99,438 | 5,069 |
| 1996 | 2,998 | 100 | 9.7 | 7.0 | 6.8 | 9.3 | 17.8 | 12.4 | 19.0 | 9.8 | 8.2 | 74,653 | 4,401 | 97,545 | 5,755 |
| 1995[11] | 2,777 | 100 | 9.1 | 8.6 | 7.1 | 9.5 | 18.5 | 13.6 | 18.1 | 8.0 | 7.5 | 71,926 | 2,969 | 97,807 | 6,491 |
| 1994[12] | 2,040 | 100 | 9.2 | 7.8 | 7.2 | 9.9 | 16.8 | 13.7 | 19.2 | 7.6 | 8.5 | 73,420 | 4,577 | 95,328 | 5,588 |
| 1993[13] | 2,233 | 100 | 10.8 | 7.5 | 7.5 | 10.9 | 15.5 | 12.0 | 19.2 | 8.8 | 7.2 | 71,000 | 5,744 | 93,027 | 6,162 |
| 1992[14] | 2,262 | 100 | 8.9 | 7.9 | 8.7 | 9.6 | 17.4 | 14.7 | 17.6 | 8.1 | 7.1 | 71,754 | 3,407 | 88,930 | 4,022 |
| 1991 | 2,094 | 100 | 9.4 | 6.8 | 6.6 | 12.8 | 17.0 | 13.6 | 18.2 | 8.3 | 7.1 | 70,908 | 3,763 | 90,029 | 4,365 |
| 1990 | 1,958 | 100 | 7.7 | 7.6 | 6.6 | 9.0 | 17.5 | 15.6 | 19.2 | 8.9 | 7.9 | 77,522 | 3,778 | 93,574 | 4,358 |
| 1989 | 1,988 | 100 | 6.4 | 8.1 | 6.7 | 10.1 | 18.3 | 13.6 | 20.0 | 8.6 | 8.2 | 76,377 | 3,397 | 94,948 | 4,545 |
| 1988 | 1,913 | 100 | 7.5 | 8.6 | 8.0 | 10.5 | 16.9 | 14.6 | 17.8 | 8.4 | 7.6 | 71,248 | 4,816 | 89,076 | 4,377 |
| 1987[15] | N | 100 | 9.3 | 9.0 | 8.4 | 9.5 | 14.2 | 15.0 | 18.6 | 9.0 | 6.9 | 73,728 | 4,509 | N | N |
| **AMERICAN INDIAN AND ALASKA NATIVE ALONE OR IN COMBINATION** | | | | | | | | | | | | | | | |
| 2021 | 2,475 | 100 | 15.3 | 10.8 | 9.3 | 12.4 | 17.3 | 11.6 | 12.4 | 5.4 | 5.6 | 51,282 | 1,407 | 73,176 | 4,864 |
| 2020 | 2,333 | 100 | 10.9 | 12.5 | 8.5 | 12.6 | 18.2 | 12.7 | 13.7 | 5.8 | 5.1 | 56,661 | 3,812 | 77,676 | 4,959 |
| 2019 | 2,350 | 100 | 12.6 | 9.9 | 10.5 | 13.7 | 15.7 | 12.7 | 14.1 | 6.0 | 4.9 | 54,052 | 2,141 | 73,721 | 4,129 |
| 2018 | 2,481 | 100 | 14.8 | 12.0 | 9.5 | 13.1 | 18.6 | 11.1 | 12.1 | 4.6 | 4.2 | 50,995 | 3,795 | 68,850 | 3,651 |
| 2017 | 2,514 | 100 | 15.3 | 10.7 | 11.6 | 13.9 | 16.4 | 12.3 | 10.7 | 4.0 | 5.7 | 49,268 | 4,737 | 70,503 | 3,906 |
| 2017 | 2,510 | 100 | 15.0 | 11.3 | 10.9 | 15.4 | 15.6 | 12.8 | 11.6 | 4.1 | 5.3 | 49,746 | 4,343 | 69,842 | 3,688 |
| 2016 | 2,443 | 100 | 14.7 | 11.8 | 10.2 | 13.1 | 17.0 | 10.8 | 10.5 | 4.9 | 5.3 | 48,036 | 2,891 | 72,914 | 4,949 |
| 2015 | 2,436 | 100 | 16.0 | 11.6 | 10.2 | 12.6 | 17.6 | 11.4 | 10.8 | 5.8 | 3.8 | 48,914 | 4,047 | 67,622 | 4,081 |
| 2014 | 2,247 | 100 | 15.6 | 11.8 | 11.7 | 12.6 | 17.0 | 10.6 | 11.8 | 4.4 | 4.4 | 47,961 | 2,637 | 65,331 | 2,851 |
| 2013 | 2,041 | 100 | 15.3 | 12.4 | 12.8 | 14.4 | 13.5 | 12.8 | 10.7 | 4.4 | 2.5 | 46,333 | 6,523 | 62,308 | 11,816 |
| 2013 | 2,119 | 100 | 18.8 | 13.0 | 11.7 | 11.7 | 17.7 | 10.5 | 10.8 | 3.7 | 2.5 | 43,632 | 2,836 | 59,190 | 3,816 |
| 2012 | 2,233 | 100 | 15.3 | 13.2 | 12.7 | 14.3 | 14.3 | 9.4 | 9.8 | 4.3 | 3.4 | 43,345 | 2,111 | 59,253 | 3,049 |
| 2011 | 2,162 | 100 | 17.3 | 13.0 | 11.5 | 14.6 | 14.6 | 10.8 | 9.4 | 3.5 | 3.4 | 44,317 | 2,807 | 61,944 | 3,047 |
| 2010 | 2,040 | 100 | 15.3 | 12.5 | 11.5 | 13.0 | 16.9 | 9.8 | 11.6 | 5.4 | 2.6 | 46,273 | 4,571 | 62,176 | 3,408 |
| 2009[7] | 1,820 | 100 | 16.6 | 11.8 | 11.6 | 14.4 | 17.4 | 11.0 | 11.0 | 4.9 | 3.5 | 46,988 | 2,694 | 66,602 | 3,368 |
| 2008 | 1,932 | 100 | 14.3 | 9.9 | 11.3 | 15.1 | 17.3 | 12.8 | 12.5 | 4.5 | 3.0 | 50,032 | 2,985 | 68,030 | 4,019 |
| 2007 | 1,919 | 100 | 13.6 | 10.9 | 10.7 | 13.9 | 17.4 | 11.6 | 12.5 | 3.6 | 3.6 | 50,128 | 2,568 | 66,902 | 3,158 |
| 2006 | 1,848 | 100 | 14.8 | 12.5 | 11.2 | 14.3 | 17.5 | 10.3 | 12.0 | 4.6 | 4.3 | 48,933 | 2,548 | 67,421 | 3,341 |
| 2005 | 1,873 | 100 | 13.3 | 11.0 | 11.0 | 13.3 | 16.9 | 11.5 | 13.5 | 4.8 | 3.6 | 50,363 | 2,777 | 68,245 | 3,022 |
| 2004[8] | 1,894 | 100 | 15.7 | 9.8 | 9.4 | 15.3 | 17.0 | 12.8 | 13.2 | 3.9 | 4.5 | 51,692 | 3,144 | 73,405 | 5,050 |
| 2003 | 1,752 | 100 | 12.6 | 12.5 | 10.4 | 12.9 | 16.5 | 12.5 | 13.9 | 4.7 | 4.3 | 53,275 | N | 71,205 | N |
| 2002 | 1,651 | 100 | 13.6 | 10.9 | 9.6 | 15.1 | 19.6 | 11.3 | 11.5 | 5.3 | 3.3 | 51,385 | N | 69,157 | N |

Footnotes provided at end of table.

Table A-2.
**Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021**—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Percent distribution | | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| **AMERICAN INDIAN AND ALASKA NATIVE ALONE[29]** | | | | | | | | | | | | | | | |
| 2021 | 1,430 | 100 | 14.8 | 11.5 | 9.0 | 12.9 | 17.9 | 12.1 | 10.6 | 5.3 | 5.9 | 51,097 | 2,532 | 73,101 | 7,727 |
| 2020 | 1,377 | 100 | 12.3 | 13.4 | 8.8 | 14.8 | 17.1 | 12.1 | 12.0 | 3.9 | 5.6 | 51,151 | 4,705 | 72,766 | 6,096 |
| 2019 | 1,329 | 100 | 14.2 | 9.2 | 10.2 | 15.0 | 14.9 | 13.6 | 13.4 | 5.6 | 3.9 | 52,338 | 4,100 | 69,979 | 4,852 |
| 2018 | 1,331 | 100 | 15.5 | 12.6 | 9.9 | 14.1 | 18.1 | 10.7 | 11.2 | 4.5 | 3.4 | 47,232 | 5,050 | 66,456 | 4,959 |
| 2017[5] | 1,327 | 100 | 17.9 | 11.3 | 12.7 | 13.1 | 15.5 | 11.5 | 8.8 | 4.2 | 5.1 | 42,448 | 5,369 | 66,817 | 5,809 |
| 2017 | 1,326 | 100 | 17.6 | 12.5 | 10.4 | 13.6 | 14.9 | 11.5 | 10.4 | 3.7 | 5.3 | 45,559 | 4,637 | 68,389 | 6,100 |
| 2016 | 1,314 | 100 | 16.1 | 11.2 | 10.1 | 15.3 | 17.1 | 10.5 | 10.9 | 3.7 | 5.2 | 47,056 | 2,657 | 71,508 | 7,747 |
| 2015 | 1,417 | 100 | 17.6 | 11.5 | 10.4 | 13.6 | 17.4 | 11.9 | 8.7 | 5.1 | 3.8 | 45,662 | 4,819 | 64,025 | 4,075 |
| 2014 | 1,264 | 100 | 16.1 | 10.7 | 12.4 | 12.9 | 17.2 | 11.6 | 11.6 | 4.1 | 3.5 | 47,547 | 3,232 | 64,648 | 3,647 |
| 2013 | 1,045 | 100 | 21.4 | 13.3 | 8.9 | 15.2 | 10.8 | 15.3 | 9.4 | 2.4 | 3.4 | 41,438 | 7,573 | 57,600 | 6,827 |
| 2013[7] | 1,108 | 100 | 16.1 | 15.0 | 12.6 | 14.1 | 19.5 | 8.8 | 9.5 | 2.4 | 2.0 | 40,028 | 3,182 | 53,998 | 3,973 |
| 2012 | 1,196 | 100 | 21.3 | 12.7 | 10.6 | 15.4 | 17.2 | 9.2 | 8.3 | 3.3 | 2.1 | 40,648 | 3,574 | 55,874 | 4,790 |
| 2011 | 1,108 | 100 | 17.3 | 15.3 | 12.0 | 15.5 | 16.1 | 9.3 | 8.4 | 2.7 | 3.4 | 39,386 | 3,646 | 56,701 | 4,284 |
| 2010 | 1,036 | 100 | 18.5 | 14.3 | 12.5 | 12.5 | 14.4 | 10.7 | 11.0 | 4.0 | 2.1 | 39,867 | 4,686 | 56,670 | 4,744 |
| 2009 | 907 | 100 | 16.2 | 13.5 | 10.2 | 15.7 | 17.5 | 10.5 | 10.2 | 3.7 | 2.1 | 43,664 | 2,352 | 60,695 | 4,479 |
| 2008 | 977 | 100 | 15.2 | 11.5 | 11.9 | 15.9 | 16.2 | 12.9 | 11.1 | 3.3 | 2.1 | 44,482 | 3,545 | 63,329 | 6,662 |
| 2007 | 943 | 100 | 18.2 | 9.2 | 12.5 | 14.2 | 20.1 | 10.1 | 10.1 | 3.3 | 2.5 | 46,697 | 3,656 | 59,903 | 4,448 |
| 2006 | 888 | 100 | 16.3 | 14.2 | 11.3 | 15.2 | 18.5 | 8.7 | 8.4 | 3.7 | 3.5 | 43,430 | 2,940 | 60,007 | 4,751 |
| 2005 | 817 | 100 | 18.3 | 10.8 | 10.1 | 13.2 | 16.7 | 11.6 | 11.6 | 4.7 | 2.9 | 47,163 | 4,453 | 63,504 | 4,325 |
| 2004[8] | 824 | 100 | 15.7 | 12.7 | 11.1 | 15.2 | 16.9 | 10.0 | 11.2 | 4.2 | 3.1 | 45,552 | 3,216 | 63,958 | 5,887 |
| 2003 | 754 | 100 | 15.7 | 13.2 | 10.7 | 12.9 | 14.8 | 9.8 | 12.5 | 5.7 | 4.8 | 47,629 | N | 68,530 | N |
| 2002 | 764 | 100 | 14.1 | 11.1 | 8.5 | 17.5 | 20.3 | 10.2 | 11.7 | 4.9 | 1.9 | 49,426 | N | 61,741 | N |
| **AMERICAN INDIAN AND ALASKA NATIVE[26]** | | | | | | | | | | | | | | | |
| 2001 | 1,229 | 100 | 14.8 | 10.2 | 10.5 | 15.2 | 18.6 | 10.7 | 12.9 | 3.4 | 3.8 | 49,216 | N | 67,639 | N |
| 2000 | 1,041 | 100 | 14.2 | 13.1 | 10.1 | 13.8 | 17.1 | 13.2 | 11.6 | 4.1 | 2.7 | 49,426 | N | 65,435 | N |
| 1999[10] | 961 | 100 | 16.4 | 13.2 | 11.4 | 9.7 | 18.1 | 14.4 | 9.8 | 4.5 | 2.6 | 49,239 | N | 63,330 | N |
| 1998 | 775 | 100 | 12.6 | 12.2 | 8.9 | 13.5 | 17.2 | 17.3 | 11.6 | 4.0 | 2.5 | 52,525 | N | 65,091 | N |
| 1997 | 823 | 100 | 12.9 | 14.8 | 10.0 | 18.3 | 18.7 | 11.2 | 11.3 | 4.3 | 2.6 | 47,756 | N | 62,586 | N |
| 1996 | 851 | 100 | 19.4 | 13.0 | 10.0 | 18.3 | 11.0 | 7.7 | 11.9 | 2.0 | 2.6 | 40,932 | N | 61,330 | N |
| 1995[11] | 763 | 100 | 16.2 | 15.9 | 13.1 | 14.8 | 16.8 | 7.7 | 11.5 | 3.3 | 0.7 | 38,353 | N | 52,418 | N |
| 1994[12] | 547 | 100 | 16.1 | 12.5 | 8.9 | 14.2 | 18.3 | 14.2 | 9.5 | 4.3 | 1.8 | 47,639 | N | 59,186 | N |
| 1993[13] | 614 | 100 | 16.8 | 12.5 | 10.6 | 15.9 | 19.8 | 11.9 | 6.9 | 3.8 | 1.8 | 44,973 | N | 55,200 | N |
| 1992[14] | 752 | 100 | 17.2 | 13.6 | 11.8 | 14.8 | 17.7 | 11.3 | 9.6 | 3.1 | 1.8 | 42,987 | N | 54,281 | N |
| 1991 | 608 | 100 | 15.8 | 10.8 | 12.5 | 14.6 | 19.0 | 12.1 | 11.6 | 3.1 | 0.6 | 46,716 | N | 56,472 | N |
| 1990 | 530 | 100 | 16.9 | 11.0 | 11.5 | 12.1 | 23.9 | 10.8 | 8.9 | 3.1 | 1.7 | 46,341 | N | 56,891 | N |

Footnotes provided at end of table.

Table A-2.

## Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Total | Percent distribution | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error (±) |
| 1989 | 511 | 100 | 18.9 | 18.9 | 10.5 | 12.1 | 19.4 | 7.7 | 9.7 | 1.7 | 1.0 | 36,682 | N | 49,870 | N |
| 1988 | 469 | 100 | 16.3 | 18.3 | 14.0 | 13.7 | 16.6 | 10.1 | 7.3 | 3.3 | 0.2 | 36,432 | N | 48,916 | N |
| 1987[15] | 469 | 100 | 20.1 | 14.3 | 11.2 | 14.7 | 18.3 | 10.7 | 7.3 | 2.4 | 1.0 | 39,172 | N | 50,054 | N |
| **TWO OR MORE RACES** | | | | | | | | | | | | | | | |
| 2021 | 2,330 | 100 | 11.4 | 7.8 | 8.7 | 11.5 | 16.4 | 10.7 | 18.1 | 7.1 | 8.3 | 63,986 | 5,019 | 90,460 | 5,274 |
| 2020[2] | 2,242 | 100 | 9.9 | 8.1 | 7.4 | 8.9 | 18.0 | 12.6 | 16.9 | 8.1 | 10.2 | 72,775 | 3,373 | 106,094 | 8,018 |
| 2019 | 2,269 | 100 | 8.6 | 9.4 | 9.5 | 11.7 | 17.5 | 11.5 | 13.5 | 9.2 | 9.2 | 65,237 | 3,453 | 93,522 | 5,862 |
| 2018 | 2,207 | 100 | 10.8 | 10.4 | 9.8 | 11.6 | 18.1 | 12.0 | 14.1 | 5.4 | 7.6 | 59,955 | 3,856 | 84,645 | 5,918 |
| 2017 | 2,086 | 100 | 11.4 | 8.3 | 11.2 | 12.8 | 17.7 | 11.9 | 13.1 | 4.8 | 8.7 | 58,916 | 4,249 | 83,150 | 4,754 |
| 2017 | 2,094 | 100 | 10.8 | 7.9 | 11.6 | 13.5 | 16.9 | 12.6 | 13.7 | 5.2 | 7.7 | 59,620 | 4,970 | 83,192 | 4,729 |
| 2016 | 2,015 | 100 | 10.0 | 9.0 | 11.6 | 13.3 | 18.6 | 12.2 | 11.9 | 7.2 | 6.6 | 58,083 | 2,755 | 82,816 | 5,243 |
| 2015 | 1,870 | 100 | 13.7 | 10.3 | 10.0 | 10.9 | 18.8 | 11.2 | 12.3 | 7.5 | 5.3 | 56,730 | 3,281 | 80,954 | 6,999 |
| 2014 | 1,793 | 100 | 13.1 | 11.6 | 10.0 | 12.5 | 16.9 | 11.6 | 13.0 | 5.5 | 5.7 | 53,397 | 2,911 | 77,264 | 5,112 |
| 2013 | 1,843 | 100 | 11.2 | 10.2 | 11.0 | 11.8 | 18.1 | 9.5 | 13.7 | 5.5 | 6.9 | 56,438 | 6,609 | 96,186 | 18,060 |
| 2013 | 1,860 | 100 | 9.2 | 9.2 | 11.9 | 13.2 | 16.7 | 10.9 | 14.0 | 5.0 | 5.9 | 53,528 | 3,035 | 74,935 | 5,158 |
| 2012 | 1,776 | 100 | 13.8 | 11.0 | 10.7 | 12.2 | 18.1 | 10.1 | 12.8 | 6.0 | 5.3 | 52,382 | 2,716 | 73,529 | 4,820 |
| 2011 | 1,764 | 100 | 13.3 | 10.0 | 11.6 | 13.6 | 16.6 | 12.3 | 11.9 | 5.0 | 5.6 | 52,844 | 4,787 | 74,572 | 4,289 |
| 2010 | 1,810 | 100 | 13.9 | 10.7 | 9.7 | 13.4 | 18.3 | 9.8 | 12.8 | 6.6 | 4.8 | 52,085 | 2,321 | 74,155 | 4,633 |
| 2009 | 1,484 | 100 | 13.1 | 9.3 | 11.2 | 13.1 | 17.1 | 11.5 | 12.5 | 6.2 | 6.0 | 53,342 | 2,395 | 76,546 | 3,899 |
| 2008 | 1,465 | 100 | 11.5 | 9.0 | 9.8 | 13.8 | 17.1 | 12.5 | 14.9 | 6.3 | 6.0 | 56,485 | 3,994 | 78,361 | 4,903 |
| 2007 | 1,457 | 100 | 11.4 | 11.0 | 8.7 | 13.1 | 15.8 | 13.2 | 14.0 | 6.6 | 6.1 | 56,136 | 4,511 | 77,265 | 3,536 |
| 2006 | 1,393 | 100 | 9.7 | 9.7 | 9.7 | 12.7 | 17.9 | 12.4 | 14.7 | 7.8 | 5.4 | 60,002 | 4,292 | 80,071 | 5,008 |
| 2005 | 1,506 | 100 | 12.1 | 8.2 | 11.2 | 13.1 | 17.2 | 11.1 | 15.8 | 5.9 | 5.3 | 57,917 | 3,684 | 79,470 | 5,093 |
| 2004 | 1,517 | 100 | 10.3 | 9.7 | 7.7 | 13.7 | 19.2 | 13.6 | 15.2 | 5.0 | 5.3 | 59,904 | 2,445 | 81,290 | 5,902 |
| 2003 | 1,407 | 100 | 9.0 | 11.2 | 10.0 | 12.8 | 17.5 | 14.4 | 15.8 | 4.9 | 4.2 | 60,246 | N | 76,748 | N |
| 2002 | 1,243 | 100 | 12.5 | 9.7 | 9.2 | 13.7 | 19.1 | 12.3 | 12.5 | 6.0 | 5.1 | 55,278 | N | 79,382 | N |
| **HISPANIC (ANY RACE)[30]** | | | | | | | | | | | | | | | |
| 2021 | 19,230 | 100 | 11.2 | 8.3 | 9.4 | 13.9 | 18.4 | 12.0 | 14.3 | 5.9 | 6.6 | 57,981 | 1,585 | 80,879 | 1,653 |
| 2020[2] | 18,340 | 100 | 10.1 | 9.2 | 10.0 | 14.1 | 18.4 | 12.8 | 13.8 | 5.9 | 5.7 | 58,015 | 1,213 | 78,803 | 1,472 |
| 2019 | 17,667 | 100 | 10.1 | 8.1 | 10.2 | 13.5 | 19.2 | 12.5 | 13.9 | 6.3 | 6.1 | 59,467 | 1,243 | 79,543 | 1,718 |
| 2018 | 17,758 | 100 | 10.6 | 10.1 | 10.5 | 14.2 | 18.3 | 13.3 | 12.6 | 5.4 | 5.0 | 55,513 | 793 | 76,547 | 1,746 |
| 2017 | 17,336 | 100 | 11.1 | 10.0 | 10.7 | 14.3 | 18.4 | 12.5 | 12.9 | 5.1 | 5.1 | 55,448 | 838 | 74,785 | 1,671 |
| 2017 | 17,318 | 100 | 10.8 | 10.0 | 10.8 | 14.1 | 17.9 | 12.8 | 13.3 | 5.5 | 4.9 | 55,800 | 796 | 75,510 | 1,571 |
| 2016 | 16,915 | 100 | 11.1 | 10.4 | 10.2 | 15.1 | 17.9 | 12.5 | 12.9 | 5.4 | 4.5 | 53,827 | 1,256 | 75,436 | 1,501 |
| 2015 | 16,667 | 100 | 12.0 | 10.7 | 12.2 | 14.0 | 18.2 | 11.8 | 11.8 | 4.8 | 4.5 | 51,631 | 1,157 | 72,746 | 1,575 |
| 2014 | 16,239 | 100 | 12.7 | 11.6 | 12.4 | 14.4 | 18.6 | 11.3 | 11.7 | 3.9 | 4.3 | 48,676 | 972 | 65,909 | 1,236 |
| 2013 | 16,088 | 100 | 12.8 | 13.0 | 13.2 | 15.1 | 16.6 | 10.0 | 10.8 | 4.2 | 3.4 | 46,234 | 2,277 | 67,122 | 3,262 |
| 2013 | 15,811 | 100 | 13.2 | 12.1 | 12.4 | 14.5 | 18.1 | 11.6 | 11.3 | 4.0 | 2.8 | 47,720 | 1,058 | 63,658 | 1,412 |

Footnotes provided at end of table.

Table A-2.
**Households by Total Money Income, Race, and Hispanic Origin of Householder: 1967 to 2021**—Con.

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Race and Hispanic origin of householder and year | Number (thousands) | Total | Percent distribution | | | | | | | | | Median income (dollars) | | Mean income (dollars) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Under $15,000 | $15,000 to $24,999 | $25,000 to $34,999 | $35,000 to $49,999 | $50,000 to $74,999 | $75,000 to $99,999 | $100,000 to $149,999 | $150,000 to $199,999 | $200,000 and over | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
| 2012 | 15,589 | 100 | 14.1 | 12.4 | 11.6 | 16.0 | 17.7 | 10.6 | 10.8 | 3.7 | 3.0 | 46,113 | 1,038 | 63,157 | 1,357 |
| 2011 | 14,939 | 100 | 13.7 | 11.7 | 11.8 | 16.5 | 18.4 | 10.4 | 10.6 | 3.9 | 3.0 | 46,629 | 1,086 | 63,203 | 1,180 |
| 2010[6] | 14,435 | 100 | 13.8 | 12.2 | 11.7 | 15.6 | 17.8 | 10.9 | 10.8 | 4.2 | 2.9 | 46,863 | 1,192 | 64,002 | 1,352 |
| 2009 | 13,298 | 100 | 11.9 | 11.9 | 12.5 | 15.4 | 17.8 | 11.7 | 11.3 | 4.3 | 3.3 | 48,152 | 1,045 | 66,115 | 1,193 |
| 2008 | 13,425 | 100 | 11.9 | 11.9 | 11.8 | 16.2 | 18.1 | 11.5 | 11.3 | 4.3 | 3.1 | 47,826 | 1,008 | 65,056 | 1,108 |
| 2007 | 13,339 | 100 | 11.2 | 11.2 | 11.2 | 15.6 | 18.5 | 12.8 | 11.8 | 4.0 | 3.0 | 50,666 | 1,121 | 66,580 | 1,153 |
| 2006 | 12,973 | 100 | 11.4 | 10.8 | 11.4 | 15.9 | 19.2 | 11.6 | 11.9 | 4.3 | 3.1 | 50,893 | 1,119 | 68,128 | 1,285 |
| 2005 | 12,519 | 100 | 11.5 | 10.5 | 13.0 | 15.3 | 19.3 | 12.0 | 11.2 | 4.0 | 3.2 | 50,020 | 817 | 65,556 | 1,084 |
| 2004[8] | 12,178 | 100 | 11.8 | 11.0 | 12.4 | 15.3 | 20.0 | 11.1 | 11.2 | 4.0 | 3.0 | 49,276 | 1,135 | 65,964 | 1,327 |
| 2003 | 11,693 | 100 | 11.4 | 11.3 | 11.7 | 16.7 | 19.1 | 11.3 | 11.7 | 3.6 | 3.3 | 48,726 | 1,115 | 65,665 | 1,195 |
| 2002 | 11,339 | 100 | 10.9 | 11.3 | 11.6 | 16.2 | 18.3 | 12.9 | 11.5 | 4.2 | 3.0 | 49,993 | 1,197 | 67,789 | 1,491 |
| 2001 | 10,499 | 100 | 10.4 | 12.0 | 10.7 | 15.6 | 19.6 | 12.1 | 12.2 | 4.2 | 3.1 | 51,490 | 1,075 | 68,085 | 1,416 |
| 2000[9] | 10,034 | 100 | 10.2 | 11.1 | 11.6 | 15.2 | 19.7 | 13.0 | 12.5 | 3.7 | 3.2 | 52,329 | 1,241 | 69,384 | 1,643 |
| 1999[10] | 9,579 | 100 | 10.6 | 12.1 | 11.4 | 16.4 | 18.8 | 11.9 | 12.1 | 3.8 | 3.0 | 50,154 | 1,199 | 65,886 | 1,924 |
| 1998 | 9,060 | 100 | 13.7 | 13.0 | 11.1 | 15.6 | 18.2 | 11.8 | 10.3 | 3.7 | 2.7 | 47,197 | 1,496 | 63,773 | 2,231 |
| 1997[15] | 8,590 | 100 | 14.5 | 12.7 | 12.3 | 15.1 | 19.0 | 11.3 | 9.6 | 3.2 | 2.4 | 44,962 | 1,319 | 60,590 | 2,011 |
| 1996 | 8,225 | 100 | 14.7 | 13.7 | 13.3 | 15.1 | 18.2 | 10.4 | 9.7 | 2.6 | 2.3 | 42,964 | 1,371 | 58,660 | 2,233 |
| 1995[11] | 7,939 | 100 | 16.3 | 14.1 | 12.9 | 15.9 | 17.6 | 10.0 | 8.8 | 2.7 | 1.6 | 40,484 | 1,451 | 55,256 | 2,039 |
| 1994[12] | 7,735 | 100 | 16.3 | 13.9 | 12.0 | 15.6 | 18.0 | 10.0 | 9.3 | 2.9 | 2.0 | 42,477 | 1,298 | 57,278 | 2,351 |
| 1993[13] | 7,362 | 100 | 15.1 | 12.1 | 12.1 | 16.5 | 18.8 | 9.5 | 9.5 | 2.5 | 1.4 | 42,374 | 1,401 | 56,084 | 1,940 |
| 1992[14] | 7,153 | 100 | 15.1 | 14.1 | 12.4 | 15.8 | 18.8 | 10.6 | 9.1 | 2.7 | 1.4 | 42,893 | 1,458 | 54,710 | 1,415 |
| 1991 | 6,379 | 100 | 14.4 | 13.7 | 11.6 | 16.2 | 18.7 | 11.5 | 9.1 | 2.8 | 1.9 | 44,143 | 1,510 | 56,167 | 1,478 |
| 1990 | 6,220 | 100 | 14.2 | 13.9 | 11.5 | 15.4 | 20.0 | 11.4 | 9.2 | 2.6 | 1.9 | 45,021 | 1,519 | 56,396 | 1,529 |
| 1989 | 5,933 | 100 | 14.6 | 11.2 | 11.9 | 15.6 | 18.9 | 12.2 | 10.5 | 3.1 | 2.0 | 46,376 | 1,479 | 59,220 | 1,674 |
| 1988 | 5,910 | 100 | 15.2 | 12.5 | 12.3 | 14.9 | 18.8 | 12.2 | 9.4 | 2.5 | 2.1 | 44,954 | 1,874 | 57,395 | 2,001 |
| 1987[15] | 5,642 | 100 | 15.7 | 12.9 | 12.7 | 15.1 | 18.3 | 11.2 | 9.6 | 2.8 | 1.8 | 44,238 | 1,581 | 56,707 | 1,727 |
| 1986 | 5,418 | 100 | 15.5 | 13.4 | 12.2 | 15.7 | 18.0 | 11.5 | 9.8 | 2.8 | 1.8 | 43,431 | 1,861 | 54,840 | 1,483 |
| 1985[16] | 5,213 | 100 | 15.7 | 14.5 | 12.3 | 15.3 | 19.3 | 10.7 | 9.1 | 2.1 | 1.0 | 42,055 | 1,616 | 52,549 | 1,406 |
| 1984[17] | 4,883 | 100 | 16.6 | 14.1 | 11.7 | 14.7 | 20.3 | 10.9 | 8.6 | 2.1 | 1.1 | 42,321 | 1,745 | 52,625 | 1,688 |
| 1983 | 4,326 | 100 | 16.3 | 15.0 | 11.9 | 16.5 | 19.2 | 10.5 | 7.9 | 2.1 | 0.7 | 41,265 | 1,720 | 52,549 | 1,588 |
| 1982 | 4,085 | 100 | 15.9 | 15.4 | 12.2 | 16.0 | 19.0 | 10.8 | 8.4 | 1.2 | 1.1 | 41,058 | 1,784 | 50,672 | 1,691 |
| 1981 | 3,980 | 100 | 14.2 | 12.8 | 13.5 | 16.3 | 21.2 | 10.9 | 9.3 | 1.5 | 0.9 | 43,887 | 1,977 | 52,702 | 1,656 |
| 1980 | 3,906 | 100 | 14.6 | 13.0 | 13.7 | 16.3 | 19.3 | 12.1 | 8.3 | 1.8 | 0.9 | 42,854 | 1,911 | 52,344 | 1,714 |
| 1979[18] | 3,684 | 100 | 13.0 | 12.4 | 12.2 | 17.2 | 20.8 | 12.2 | 8.9 | 2.2 | 1.0 | 45,527 | 2,159 | 55,085 | 1,820 |
| 1978 | 3,291 | 100 | 12.6 | 12.8 | 12.8 | 18.1 | 20.5 | 12.7 | 8.0 | 1.7 | 0.8 | 45,109 | 1,798 | 53,284 | 1,773 |
| 1977 | 3,304 | 100 | 12.5 | 14.5 | 12.8 | 18.5 | 20.7 | 11.8 | 6.9 | 1.8 | 0.8 | 43,482 | 1,256 | 51,315 | 1,303 |
| 1976[19] | 3,081 | 100 | 14.7 | 14.2 | 13.6 | 17.2 | 20.3 | 11.6 | 6.2 | 1.7 | 0.4 | 41,545 | 1,457 | 49,096 | 1,314 |
| 1975[20] | 2,948 | 100 | 14.7 | 14.4 | 14.3 | 17.6 | 21.4 | 10.3 | 5.7 | 1.0 | 0.7 | 40,704 | 1,480 | 48,321 | 1,412 |
| 1974[20,21] | 2,897 | 100 | 11.9 | 14.2 | 13.5 | 18.2 | 22.1 | 11.3 | 6.9 | 1.3 | 0.7 | 40,253 | 1,594 | 51,264 | 1,373 |
| 1973 | 2,722 | 100 | 11.1 | 13.1 | 13.7 | 18.4 | 22.4 | 12.6 | 6.9 | 1.3 | 0.5 | 44,513 | 1,663 | 51,717 | 1,385 |
| 1972[22] | 2,655 | 100 | 10.8 | 14.7 | 13.3 | 19.6 | 23.7 | 10.1 | 6.1 | 1.3 | 0.8 | 44,587 | 1,433 | 51,249 | 1,433 |

Footnotes provided on the next page.

N Not available.

[1] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights beginning with 2010. Before 2010, standard errors were calculated using the generalized variance function.

[2] Implementation of 2020 Census-based population controls.

[3] Estimates reflect the implementation of an updated processing system and should be used to make comparisons to 2018 and subsequent years.

[4] The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. All of the approximately 98,000 addresses were eligible to receive the redesigned set of health insurance coverage questions. The redesigned income questions were implemented to a subsample of these 98,000 addresses using a probability split panel design. Approximately 68,000 addresses were eligible to receive a set of income questions similar to those used in the 2013 CPS ASEC, and the remaining 30,000 addresses were eligible to receive the redesigned income questions. The source of these 2013 estimates is the portion of the CPS ASEC sample that received the redesigned income questions, approximately 30,000 addresses.

[5] The source of these 2013 estimates is the portion of the CPS ASEC sample that received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses.

[6] Implementation of 2010 Census-based population controls. Beginning with 2010, standard errors in this table were calculated using replicate weights. Before 2010, standard errors were calculated using the generalized variance function.

[7] Median income is calculated using $2,500 intervals. Beginning with 2009 income data, the Census Bureau expanded the upper income intervals used to calculate medians to $250,000 or more. Medians falling in the upper open-ended interval are plugged with "$250,000." Before 2009, the upper open-ended interval was $100,000 and a plug of "$100,000" was used.

[8] Data have been revised to reflect a correction to the weights in the 2005 CPS ASEC.

[9] Implementation of a 28,000-household sample expansion.

[10] Implementation of 2000 Census-based population controls.

[11] Full implementation of 1990 Census-based sample design and metropolitan definitions, 7,000-household sample reduction, and revised editing of responses on race.

[12] Introduction of 1990 Census sample design.

[13] Data collection method changed from paper and pencil to computer-assisted interviewing. In addition, the 1994 CPS ASEC was revised to allow for the coding of different income amounts on selected questionnaire items. Limits either increased or decreased in the following categories: earnings limits increased to $999,999; Social Security limits increased to $49,999; Supplemental Security Income and public assistance limits increased to $24,999; veterans' benefits limits increased to $99,999; child support and alimony limits decreased to $49,999.

[14] Implementation of 1990 Census population controls.

[15] Implementation of a new CPS ASEC processing system.

[16] Recording of amounts for earnings from longest job increased to $299,999. Full implementation of 1980 Census-based sample design.

[17] Implementation of Hispanic population weighting controls and introduction of 1980 Census-based sample design.

[18] Implementation of 1980 Census population controls. Questionnaire expanded to allow the recording of up to 27 possible values from a list of 51 possible sources of income.

[19] First-year medians were derived using both Pareto and linear interpolation. Before this year, all medians were derived using linear interpolation.

[20] Some of these estimates were derived using Pareto interpolation and may differ from published data, which were derived using linear interpolation.

[21] Implementation of a new CPS ASEC processing system. Questionnaire expanded to ask 11 income questions.

[22] Full implementation of 1970 Census-based sample design.

[23] Introduction of 1970 Census sample design and population controls.

[24] Implementation of a new CPS ASEC processing system.

[25] Beginning with the 2003 CPS ASEC, respondents were allowed to choose one or more races. White alone refers to people who reported White and did not report any other race category. The use of this single-race population does not imply that it is the preferred method of presenting or analyzing the data. The Census Bureau uses a variety of approaches.

[26] For the year 2001 and earlier, the CPS ASEC allowed respondents to report only one race group.

[27] Black alone refers to people who reported Black and did not report any other race category.

[28] Asian alone refers to people who reported Asian and did not report any other race category.

[29] American Indian and Alaska Native alone refers to people who reported American Indian and Alaska Native and did not report any other race category.

[30] Since Hispanics may be any race, data in this report for Hispanics overlap with data for racial groups. Of those who reported only one race, being Hispanic was reported by 16.6 percent of White householders, 5.6 percent of Black householders, 2.9 percent of Asian householders, and 29.7 percent of American Indian and Alaska Native householders. Data users should exercise caution when interpreting aggregate results for the Hispanic population and for race groups because these populations consist of many distinct groups that differ in socioeconomic characteristics, culture, and recency of immigration. Data were first collected for Hispanics in 1972.

Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding.

Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-3.

## Income Distribution Measures Using Money Income and Equivalence-Adjusted Income: 2020 and 2021

(Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Measure | 2020[1] | | 2021 | | Percent change (2021 less 2020)[*, 3] | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) |
| **MONEY INCOME** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile............................ | 3.0 | 0.06 | 2.9 | 0.06 | *–3.6 | 2.19 |
| Second quintile ............................ | 8.2 | 0.10 | 8.0 | 0.09 | *–1.7 | 1.45 |
| Third quintile................................ | 14.0 | 0.14 | 13.9 | 0.12 | –1.0 | 1.16 |
| Fourth quintile .............................. | 22.6 | 0.18 | 22.6 | 0.17 | –0.2 | 1.01 |
| Highest quintile ............................ | 52.2 | 0.39 | 52.7 | 0.37 | 0.8 | 0.89 |
| Top 5 percent ......................... | 23.0 | 0.46 | 23.5 | 0.44 | 2.2 | 2.52 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality ........... | 0.488 | 0.0040 | 0.494 | 0.0038 | *1.2 | 0.96 |
| 90th/10th percentile income ratio.......... | 12.90 | 0.345 | 13.53 | 0.431 | *4.9 | 3.94 |
| 90th/50th percentile income ratio ......... | 2.97 | 0.044 | 2.99 | 0.034 | 0.8 | 1.78 |
| 50th/10th percentile income ratio .......... | 4.34 | 0.101 | 4.52 | 0.130 | *4.0 | 3.64 |
| **EQUIVALENCE-ADJUSTED INCOME** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile............................ | 3.4 | 0.07 | 3.3 | 0.06 | –2.0 | 2.23 |
| Second quintile ............................ | 8.9 | 0.10 | 8.8 | 0.10 | –0.7 | 1.38 |
| Third quintile................................ | 14.5 | 0.13 | 14.4 | 0.12 | –0.6 | 1.14 |
| Fourth quintile .............................. | 22.4 | 0.18 | 22.3 | 0.16 | –0.8 | 1.01 |
| Highest quintile ............................ | 50.8 | 0.40 | 51.2 | 0.36 | 0.8 | 0.97 |
| Top 5 percent ......................... | 22.5 | 0.48 | 23.0 | 0.43 | 2.0 | 2.68 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality ........... | 0.469 | 0.0042 | 0.474 | 0.0038 | 0.9 | 1.07 |
| 90th/10th percentile income ratio.......... | 10.73 | 0.285 | 10.89 | 0.274 | 1.5 | 3.11 |
| 90th/50th percentile income ratio ......... | 2.80 | 0.034 | 2.81 | 0.034 | 0.1 | 1.61 |
| 50th/10th percentile income ratio .......... | 3.83 | 0.091 | 3.88 | 0.087 | 1.3 | 2.89 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.

[1] Implementation of 2020 Census-based population controls.

[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.

[3] Calculated estimate may be different due to rounded components.

Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-4a.

## Selected Measures of Household Income Dispersion: 1967 to 2021

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Further explanation of income inequality measures is available at "The Changing Shape of the Nation's Income Distribution: 1947–1998," *Current Population Reports*, Series P60-204. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Measures of income dispersion | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Household income at selected percentiles | | | | | | | | | | Household income ratios at selected percentiles | | |
| | 10th percentile limit | 20th percentile limit | 30th percentile limit | 40th percentile limit | 50th (median) | 60th percentile limit | 70th percentile limit | 80th percentile limit | 90th percentile limit | 95th percentile limit | 90th/10th | 90th/50th | 50th/10th |
| 2021 | 15,660 | 28,007 | 40,524 | 55,000 | 70,784 | 89,744 | 113,210 | 149,131 | 211,956 | 286,304 | 13.53 | 2.99 | 4.52 |
| 2020[1] | 16,386 | 28,544 | 41,763 | 55,044 | 71,186 | 89,534 | 113,519 | 148,620 | 211,438 | 287,841 | 12.90 | 2.97 | 4.34 |
| 2019 | 16,984 | 29,762 | 42,815 | 56,700 | 72,808 | 91,657 | 116,267 | 151,017 | 213,171 | 286,138 | 12.55 | 2.93 | 4.29 |
| 2018 | 15,784 | 27,621 | 39,924 | 53,948 | 68,168 | 85,823 | 108,071 | 140,265 | 198,844 | 268,368 | 12.60 | 2.92 | 4.32 |
| 2017[2] | 15,809 | 27,440 | 38,752 | 52,188 | 67,571 | 85,280 | 108,317 | 139,932 | 200,892 | 269,781 | 12.71 | 2.97 | 4.27 |
| 2017 | 15,716 | 27,231 | 38,700 | 52,069 | 67,832 | 85,715 | 108,115 | 140,208 | 197,927 | 261,985 | 12.59 | 2.92 | 4.32 |
| 2016 | 15,364 | 27,099 | 39,192 | 51,484 | 66,657 | 84,530 | 106,298 | 136,633 | 192,541 | 254,316 | 12.53 | 2.89 | 4.34 |
| 2015 | 15,163 | 26,074 | 36,888 | 49,759 | 64,631 | 82,340 | 103,707 | 133,803 | 185,468 | 245,257 | 12.23 | 2.87 | 4.26 |
| 2014 | 14,063 | 24,552 | 35,186 | 47,181 | 61,468 | 78,141 | 99,120 | 128,603 | 180,402 | 236,637 | 12.83 | 2.93 | 4.37 |
| 2013[3] | 14,211 | 24,464 | 35,485 | 47,804 | 62,425 | 78,286 | 99,068 | 128,416 | 181,066 | 238,967 | 12.74 | 2.90 | 4.39 |
| 2013[4] | 14,447 | 24,348 | 35,018 | 46,816 | 60,507 | 76,306 | 95,529 | 123,381 | 174,745 | 228,333 | 12.10 | 2.89 | 4.19 |
| 2012 | 14,466 | 24,353 | 35,230 | 47,010 | 60,313 | 76,350 | 95,302 | 123,065 | 172,604 | 225,989 | 11.93 | 2.86 | 4.17 |
| 2011 | 14,487 | 24,462 | 35,338 | 46,504 | 60,428 | 75,374 | 95,374 | 122,636 | 173,376 | 224,551 | 11.97 | 2.87 | 4.17 |
| 2010[5] | 14,771 | 24,906 | 35,404 | 47,322 | 61,364 | 76,587 | 97,135 | 124,568 | 172,822 | 224,761 | 11.70 | 2.82 | 4.15 |
| 2009[6] | 15,342 | 25,891 | 36,909 | 48,799 | 63,011 | 78,232 | 98,246 | 126,586 | 174,223 | 227,857 | 11.36 | 2.76 | 4.11 |
| 2008 | 15,341 | 26,127 | 37,411 | 49,197 | 63,455 | 79,125 | 99,542 | 126,449 | 174,460 | 227,063 | 11.37 | 2.75 | 4.14 |
| 2007 | 15,931 | 26,579 | 38,773 | 51,218 | 65,801 | 81,215 | 102,214 | 130,991 | 178,148 | 231,855 | 11.18 | 2.71 | 4.13 |
| 2006 | 16,165 | 26,988 | 38,954 | 50,884 | 64,930 | 80,824 | 101,206 | 130,708 | 179,159 | 234,405 | 11.08 | 2.76 | 4.02 |
| 2005 | 15,699 | 26,671 | 37,717 | 50,066 | 64,427 | 80,189 | 100,132 | 127,537 | 175,357 | 230,861 | 11.17 | 2.72 | 4.10 |
| 2004[7] | 15,681 | 26,580 | 37,384 | 49,857 | 63,745 | 79,412 | 99,642 | 126,533 | 173,786 | 225,959 | 11.08 | 2.73 | 4.07 |
| 2003 | 15,558 | 26,557 | 37,555 | 50,207 | 63,967 | 80,410 | 100,784 | 128,275 | 174,544 | 227,587 | 11.22 | 2.73 | 4.11 |
| 2002 | 16,039 | 27,057 | 37,964 | 50,407 | 64,047 | 80,286 | 100,475 | 126,883 | 172,334 | 226,536 | 10.75 | 2.69 | 3.99 |
| 2001 | 16,393 | 27,566 | 38,707 | 51,105 | 64,779 | 81,303 | 101,299 | 128,091 | 174,308 | 230,869 | 10.63 | 2.69 | 3.95 |
| 2000[8] | 16,695 | 28,272 | 39,681 | 52,064 | 66,248 | 82,315 | 102,550 | 129,002 | 176,702 | 229,113 | 10.58 | 2.67 | 3.97 |
| 1999[9] | 16,877 | 27,953 | 39,737 | 52,069 | 66,385 | 82,188 | 102,076 | 129,246 | 175,811 | 231,635 | 10.42 | 2.65 | 3.93 |
| 1998 | 16,160 | 26,849 | 38,840 | 50,659 | 64,781 | 80,528 | 99,795 | 124,948 | 168,763 | 220,240 | 10.44 | 2.61 | 4.01 |
| 1997 | 15,560 | 26,003 | 37,148 | 49,305 | 62,484 | 77,672 | 96,126 | 120,730 | 164,905 | 213,684 | 10.60 | 2.64 | 4.02 |
| 1996 | 15,370 | 25,475 | 36,226 | 47,887 | 61,225 | 75,912 | 93,980 | 117,328 | 158,789 | 206,210 | 10.33 | 2.59 | 3.98 |
| 1995[10] | 15,365 | 25,502 | 35,667 | 47,664 | 60,348 | 74,384 | 91,851 | 115,333 | 155,312 | 200,120 | 10.11 | 2.57 | 3.93 |
| 1994[11] | 14,560 | 24,350 | 34,689 | 45,704 | 58,515 | 72,727 | 90,718 | 113,971 | 153,947 | 199,175 | 10.57 | 2.63 | 4.02 |
| 1993[12] | 14,231 | 24,009 | 34,432 | 45,693 | 57,843 | 71,826 | 89,339 | 111,646 | 151,344 | 193,740 | 10.64 | 2.62 | 4.06 |
| 1992[13] | 14,236 | 23,917 | 34,262 | 45,822 | 58,153 | 71,941 | 88,522 | 110,108 | 147,205 | 187,959 | 10.34 | 2.53 | 4.08 |
| 1991 | 14,439 | 24,494 | 35,177 | 46,689 | 58,607 | 72,116 | 88,340 | 110,419 | 147,622 | 187,536 | 10.22 | 2.52 | 4.06 |
| 1990 | 14,758 | 25,202 | 36,291 | 47,707 | 60,370 | 72,985 | 89,889 | 111,303 | 149,398 | 191,028 | 10.12 | 2.47 | 4.09 |
| 1989 | 15,232 | 25,590 | 36,631 | 48,659 | 61,153 | 74,786 | 91,520 | 113,628 | 152,225 | 194,105 | 9.99 | 2.49 | 4.01 |
| 1988 | 14,494 | 25,132 | 35,771 | 47,474 | 60,115 | 73,984 | 89,909 | 111,713 | 147,941 | 189,100 | 10.21 | 2.46 | 4.15 |
| 1987[14] | 14,269 | 24,709 | 35,542 | 46,901 | 59,624 | 73,211 | 89,340 | 110,647 | 145,974 | 185,151 | 10.23 | 2.45 | 4.18 |
| 1986 | 14,157 | 24,250 | 35,285 | 46,384 | 58,920 | 71,988 | 87,799 | 108,819 | 142,821 | 182,475 | 10.09 | 2.42 | 4.16 |
| 1985[15] | 14,200 | 23,938 | 34,097 | 45,039 | 56,871 | 69,771 | 84,760 | 104,934 | 137,635 | 173,383 | 9.69 | 2.42 | 4.01 |
| 1984[16] | 14,189 | 23,661 | 33,624 | 44,284 | 55,828 | 68,226 | 83,349 | 103,063 | 135,565 | 170,609 | 9.55 | 2.43 | 3.93 |
| 1983 | 13,638 | 23,216 | 32,678 | 43,169 | 54,182 | 66,255 | 80,812 | 100,129 | 131,050 | 164,737 | 9.61 | 2.40 | 4.00 |
| 1982 | 13,690 | 22,723 | 32,531 | 43,216 | 54,564 | 66,031 | 80,322 | 98,465 | 129,852 | 162,538 | 9.48 | 2.38 | 3.99 |
| 1981 | 13,941 | 23,016 | 32,712 | 43,027 | 54,713 | 66,548 | 80,546 | 98,387 | 128,520 | 158,338 | 9.22 | 2.35 | 3.92 |
| 1980 | 14,127 | 23,475 | 33,424 | 44,025 | 55,596 | 67,494 | 81,131 | 98,824 | 128,405 | 159,038 | 9.09 | 2.31 | 3.94 |
| 1979[17] | 14,330 | 24,436 | 34,908 | 45,381 | 57,462 | 69,820 | 83,780 | 101,234 | 131,042 | 163,580 | 9.14 | 2.28 | 4.01 |
| 1978 | 14,596 | 24,146 | 34,416 | 45,656 | 57,572 | 69,080 | 83,148 | 100,469 | 129,943 | 160,727 | 8.90 | 2.26 | 3.95 |
| 1977 | 14,302 | 23,417 | 33,370 | 44,106 | 55,427 | 67,230 | 80,988 | 98,014 | 125,009 | 155,189 | 8.74 | 2.25 | 3.89 |
| 1976[18] | 14,128 | 23,467 | 33,513 | 43,721 | 55,078 | 66,601 | 79,253 | 95,821 | 122,869 | 151,959 | 8.70 | 2.23 | 3.90 |
| 1975[19] | 14,050 | 22,957 | 32,792 | 43,086 | 54,180 | 65,107 | 77,895 | 93,483 | 119,838 | 147,520 | 8.53 | 2.22 | 3.84 |
| 1974[19,20] | 14,444 | 24,149 | 34,345 | 44,794 | 55,636 | 66,190 | 79,502 | 96,063 | 123,869 | 152,047 | 8.58 | 2.23 | 3.85 |
| 1973 | 14,348 | 24,033 | 34,828 | 46,213 | 57,456 | 68,377 | 81,986 | 98,449 | 127,079 | 158,234 | 8.86 | 2.20 | 4.02 |
| 1972[21] | 13,701 | 23,522 | 34,266 | 45,301 | 56,319 | 66,953 | 79,649 | 95,830 | 123,127 | 154,228 | 8.99 | 2.19 | 4.11 |
| 1971[22] | 12,849 | 22,732 | 32,901 | 43,334 | 54,006 | 63,768 | 75,409 | 90,927 | 116,649 | 144,394 | 9.08 | 2.16 | 4.21 |
| 1970 | 12,651 | 23,028 | 33,631 | 44,115 | 54,536 | 64,165 | 75,704 | 91,545 | 116,609 | 144,708 | 9.22 | 2.13 | 4.32 |
| 1969 | 12,946 | 23,422 | 34,069 | 44,945 | 54,962 | 65,000 | 76,000 | 91,069 | 115,553 | 142,828 | 8.93 | 2.10 | 4.25 |
| 1968 | 12,620 | 22,742 | 33,535 | 43,117 | 52,992 | 61,801 | 72,545 | 86,836 | 109,503 | 135,852 | 8.68 | 2.07 | 4.20 |
| 1967[23] | 11,593 | 21,337 | 31,877 | 41,607 | 50,803 | 59,053 | 70,917 | 84,210 | 106,969 | 135,134 | 9.23 | 2.11 | 4.38 |

Footnotes provided at the end of Table A-4b.

Table A-4b.
## Selected Measures of Household Income Dispersion: 1967 to 2021

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Further explanation of income inequality measures is available at "The Changing Shape of the Nation's Income Distribution: 1947–1998," Current Population Reports, Series P60-204. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Mean household income of quintiles | | | | | | Shares of household income of quintiles | | | | | | Gini index of income inequality | Mean logarithmic deviation of income | Theil | Atkinson | | |
| | Lowest quintile | Second quintile | Third quintile | Fourth quintile | Highest quintile | Top 5 percent | Lowest quintile | Second quintile | Third quintile | Fourth quintile | Highest quintile | Top 5 percent | | | | e=0.25 | e=0.50 | e=0.75 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | 14,859 | 41,025 | 70,879 | 115,462 | 269,356 | 480,236 | 2.9 | 8.0 | 13.9 | 22.6 | 52.7 | 23.5 | 0.494 | 0.634 | 0.448 | 0.108 | 0.211 | 0.320 |
| 2020[1] | 15,350 | 41,599 | 71,421 | 115,403 | 266,326 | 468,469 | 3.0 | 8.2 | 14.0 | 22.6 | 52.2 | 23.0 | 0.488 | 0.617 | 0.437 | 0.105 | 0.206 | 0.313 |
| 2019 | 16,199 | 43,082 | 73,058 | 117,752 | 269,655 | 478,081 | 3.1 | 8.3 | 14.1 | 22.7 | 51.9 | 23.0 | 0.484 | 0.590 | 0.432 | 0.104 | 0.203 | 0.306 |
| 2018 | 14,863 | 40,237 | 68,592 | 109,590 | 252,364 | 449,409 | 3.1 | 8.3 | 14.1 | 22.6 | 52.0 | 23.1 | 0.486 | 0.616 | 0.436 | 0.105 | 0.205 | 0.311 |
| 2017[2] | 14,725 | 39,239 | 67,808 | 109,442 | 253,127 | 449,175 | 3.0 | 8.1 | 14.0 | 22.6 | 52.3 | 23.2 | 0.489 | 0.617 | 0.441 | 0.106 | 0.207 | 0.313 |
| 2017 | 14,654 | 39,128 | 68,044 | 109,454 | 245,198 | 425,846 | 3.1 | 8.2 | 14.3 | 23.0 | 51.5 | 22.3 | 0.482 | 0.609 | 0.424 | 0.103 | 0.202 | 0.307 |
| 2016 | 14,613 | 38,957 | 66,781 | 107,459 | 241,546 | 423,486 | 3.1 | 8.3 | 14.2 | 22.9 | 51.5 | 22.6 | 0.481 | 0.601 | 0.426 | 0.103 | 0.201 | 0.305 |
| 2015 | 14,246 | 37,316 | 64,992 | 105,246 | 231,425 | 401,253 | 3.1 | 8.2 | 14.3 | 23.2 | 51.1 | 22.1 | 0.479 | 0.596 | 0.420 | 0.101 | 0.199 | 0.303 |
| 2014 | 13,376 | 35,612 | 61,908 | 100,619 | 222,301 | 380,724 | 3.1 | 8.2 | 14.3 | 23.2 | 51.2 | 21.9 | 0.480 | 0.611 | 0.419 | 0.102 | 0.200 | 0.307 |
| 2013[3] | 13,507 | 35,895 | 62,606 | 100,738 | 225,248 | 389,639 | 3.1 | 8.2 | 14.3 | 23.0 | 51.4 | 22.2 | 0.482 | 0.606 | 0.428 | 0.103 | 0.202 | 0.307 |
| 2014[4] | 13,573 | 35,541 | 60,953 | 97,296 | 215,758 | 375,518 | 3.2 | 8.4 | 14.4 | 23.0 | 51.0 | 22.2 | 0.476 | 0.578 | 0.415 | 0.100 | 0.196 | 0.298 |
| 2012 | 13,584 | 35,107 | 60,505 | 97,058 | 215,052 | 376,008 | 3.2 | 8.3 | 14.4 | 23.0 | 51.0 | 22.3 | 0.477 | 0.586 | 0.423 | 0.101 | 0.198 | 0.300 |
| 2011 | 13,568 | 35,257 | 60,173 | 96,678 | 214,917 | 375,995 | 3.2 | 8.4 | 14.3 | 23.0 | 51.1 | 22.3 | 0.477 | 0.585 | 0.422 | 0.101 | 0.198 | 0.300 |
| 2010[5] | 13,691 | 35,531 | 61,229 | 98,227 | 210,946 | 357,656 | 3.3 | 8.5 | 14.6 | 23.4 | 50.3 | 21.3 | 0.470 | 0.574 | 0.400 | 0.097 | 0.191 | 0.293 |
| 2009[6] | 14,624 | 37,035 | 62,703 | 99,616 | 216,265 | 373,921 | 3.4 | 8.6 | 14.6 | 23.2 | 50.3 | 21.7 | 0.468 | 0.550 | 0.403 | 0.097 | 0.190 | 0.288 |
| 2008 | 14,704 | 37,234 | 63,239 | 100,614 | 215,781 | 371,764 | 3.4 | 8.6 | 14.7 | 23.3 | 50.0 | 21.5 | 0.466 | 0.541 | 0.398 | 0.096 | 0.188 | 0.285 |
| 2007 | 15,131 | 38,566 | 65,454 | 103,628 | 220,028 | 376,196 | 3.4 | 8.7 | 14.8 | 23.4 | 49.7 | 21.2 | 0.463 | 0.532 | 0.391 | 0.095 | 0.185 | 0.281 |
| 2006 | 15,291 | 38,765 | 64,959 | 102,820 | 226,535 | 400,623 | 3.4 | 8.6 | 14.5 | 22.9 | 50.5 | 22.3 | 0.470 | 0.543 | 0.417 | 0.099 | 0.192 | 0.289 |
| 2005 | 14,818 | 38,046 | 64,392 | 101,280 | 221,936 | 391,011 | 3.4 | 8.6 | 14.6 | 23.0 | 50.4 | 22.2 | 0.469 | 0.545 | 0.411 | 0.098 | 0.192 | 0.289 |
| 2004[7] | 14,729 | 37,688 | 63,855 | 100,686 | 217,743 | 379,440 | 3.4 | 8.7 | 14.7 | 23.2 | 50.1 | 21.8 | 0.466 | 0.543 | 0.406 | 0.097 | 0.190 | 0.286 |
| 2003 | 14,761 | 37,918 | 64,365 | 101,883 | 217,188 | 373,953 | 3.4 | 8.7 | 14.8 | 23.4 | 49.8 | 21.4 | 0.464 | 0.530 | 0.397 | 0.095 | 0.187 | 0.283 |
| 2002 | 15,087 | 38,359 | 64,640 | 101,678 | 217,084 | 379,080 | 3.5 | 8.8 | 14.8 | 23.3 | 49.7 | 21.7 | 0.462 | 0.514 | 0.398 | 0.095 | 0.186 | 0.279 |
| 2001 | 15,548 | 39,068 | 65,394 | 102,532 | 223,922 | 399,559 | 3.5 | 8.7 | 14.6 | 23.0 | 50.1 | 22.4 | 0.466 | 0.515 | 0.413 | 0.098 | 0.189 | 0.282 |
| 2000[8] | 16,025 | 40,011 | 66,631 | 103,581 | 224,458 | 398,210 | 3.6 | 8.9 | 14.8 | 23.0 | 49.8 | 22.1 | 0.462 | 0.490 | 0.404 | 0.096 | 0.185 | 0.275 |
| 1999[9] | 16,173 | 39,713 | 66,473 | 103,457 | 220,624 | 383,466 | 3.6 | 8.9 | 14.9 | 23.2 | 49.4 | 21.5 | 0.458 | 0.476 | 0.386 | 0.092 | 0.180 | 0.268 |
| 1998 | 15,365 | 38,797 | 64,918 | 100,401 | 212,460 | 370,317 | 3.6 | 9.0 | 15.0 | 23.2 | 49.2 | 21.4 | 0.456 | 0.488 | 0.389 | 0.093 | 0.181 | 0.271 |
| 1997 | 14,925 | 37,313 | 62,774 | 97,229 | 207,290 | 363,771 | 3.6 | 8.9 | 15.0 | 23.2 | 49.4 | 21.7 | 0.459 | 0.484 | 0.396 | 0.094 | 0.183 | 0.272 |
| 1996 | 14,827 | 36,393 | 61,214 | 94,742 | 199,265 | 347,111 | 3.6 | 9.0 | 15.1 | 23.3 | 49.0 | 21.4 | 0.455 | 0.464 | 0.389 | 0.093 | 0.179 | 0.266 |
| 1995[10] | 14,779 | 36,123 | 60,400 | 92,850 | 193,764 | 334,409 | 3.7 | 9.1 | 15.2 | 23.3 | 48.7 | 21.0 | 0.450 | 0.452 | 0.378 | 0.090 | 0.175 | 0.261 |
| 1994[11] | 13,990 | 34,865 | 58,735 | 91,398 | 192,146 | 331,975 | 3.6 | 8.9 | 15.0 | 23.4 | 49.1 | 21.2 | 0.456 | 0.471 | 0.387 | 0.092 | 0.179 | 0.268 |
| 1993[12] | 13,625 | 34,542 | 57,901 | 89,981 | 187,471 | 321,763 | 3.6 | 9.0 | 15.1 | 23.5 | 48.9 | 21.0 | 0.454 | 0.467 | 0.385 | 0.092 | 0.178 | 0.268 |
| 1992[13] | 13,774 | 34,511 | 58,143 | 89,255 | 172,944 | 274,494 | 3.8 | 9.4 | 15.8 | 24.2 | 46.9 | 18.6 | 0.433 | 0.417 | 0.324 | 0.080 | 0.160 | 0.243 |
| 1991 | 14,058 | 35,309 | 58,649 | 89,405 | 171,442 | 267,549 | 3.8 | 9.6 | 15.9 | 24.2 | 46.5 | 18.1 | 0.428 | 0.411 | 0.313 | 0.078 | 0.156 | 0.237 |
| 1990 | 14,448 | 36,351 | 60,043 | 90,528 | 175,682 | 279,755 | 3.8 | 9.6 | 15.9 | 24.0 | 46.6 | 18.5 | 0.428 | 0.402 | 0.317 | 0.078 | 0.156 | 0.236 |
| 1989 | 14,796 | 36,813 | 61,194 | 92,563 | 180,944 | 292,342 | 3.8 | 9.5 | 15.8 | 24.0 | 46.8 | 18.9 | 0.431 | 0.406 | 0.324 | 0.080 | 0.158 | 0.239 |
| 1988 | 14,274 | 36,030 | 60,261 | 91,093 | 173,906 | 274,276 | 3.8 | 9.6 | 16.0 | 24.2 | 46.3 | 18.3 | 0.426 | 0.401 | 0.314 | 0.078 | 0.155 | 0.236 |
| 1987[14] | 14,029 | 35,655 | 59,610 | 90,103 | 171,352 | 269,966 | 3.8 | 9.6 | 16.1 | 24.3 | 46.2 | 18.2 | 0.426 | 0.408 | 0.314 | 0.078 | 0.155 | 0.237 |
| 1986 | 13,665 | 35,149 | 58,819 | 88,611 | 167,720 | 262,744 | 3.8 | 9.7 | 16.2 | 24.3 | 46.1 | 18.0 | 0.425 | 0.416 | 0.310 | 0.077 | 0.155 | 0.237 |
| 1985[15] | 13,518 | 34,258 | 56,864 | 85,535 | 159,777 | 246,465 | 3.9 | 9.8 | 16.2 | 24.4 | 45.6 | 17.6 | 0.419 | 0.403 | 0.300 | 0.075 | 0.151 | 0.231 |
| 1984[16] | 13,539 | 33,722 | 55,884 | 84,145 | 154,720 | 233,557 | 4.0 | 9.9 | 16.3 | 24.6 | 45.2 | 17.1 | 0.415 | 0.391 | 0.290 | 0.073 | 0.147 | 0.225 |
| 1983 | 13,109 | 32,930 | 54,443 | 81,698 | 150,000 | 226,633 | 4.0 | 9.9 | 16.4 | 24.6 | 45.1 | 17.0 | 0.414 | 0.397 | 0.288 | 0.072 | 0.147 | 0.226 |
| 1982 | 12,956 | 32,789 | 54,275 | 80,720 | 148,047 | 223,702 | 4.0 | 10.0 | 16.5 | 24.5 | 45.0 | 17.0 | 0.412 | 0.401 | 0.287 | 0.072 | 0.146 | 0.226 |
| 1981 | 13,201 | 32,883 | 54,475 | 81,202 | 145,051 | 215,545 | 4.1 | 10.1 | 16.7 | 24.8 | 44.3 | 16.5 | 0.406 | 0.387 | 0.277 | 0.070 | 0.141 | 0.220 |
| 1980 | 13,530 | 33,676 | 55,569 | 81,867 | 145,965 | 218,130 | 4.2 | 10.2 | 16.8 | 24.7 | 44.1 | 16.5 | 0.403 | 0.375 | 0.274 | 0.069 | 0.140 | 0.216 |
| 1979[17] | 13,985 | 34,784 | 57,348 | 84,156 | 151,031 | 230,339 | 4.1 | 10.2 | 16.8 | 24.6 | 44.2 | 16.9 | 0.404 | 0.369 | 0.279 | 0.070 | 0.141 | 0.216 |
| 1978 | 14,084 | 34,588 | 57,110 | 83,658 | 149,361 | 227,344 | 4.2 | 10.2 | 16.8 | 24.7 | 44.1 | 16.8 | 0.402 | 0.363 | 0.275 | 0.069 | 0.139 | 0.213 |
| 1977 | 13,620 | 33,523 | 55,457 | 81,255 | 144,896 | 221,665 | 4.2 | 10.2 | 16.9 | 24.7 | 44.0 | 16.8 | 0.402 | 0.364 | 0.276 | 0.069 | 0.139 | 0.213 |
| 1976[18] | 13,687 | 33,506 | 55,101 | 80,019 | 141,619 | 215,783 | 4.3 | 10.3 | 17.0 | 24.7 | 43.7 | 16.6 | 0.398 | 0.361 | 0.271 | 0.068 | 0.137 | 0.211 |
| 1975[19] | 13,358 | 32,810 | 53,832 | 78,219 | 138,101 | 209,574 | 4.3 | 10.4 | 17.0 | 24.7 | 43.6 | 16.5 | 0.397 | 0.361 | 0.270 | 0.067 | 0.136 | 0.210 |
| 1974[19, 20] | 13,827 | 34,367 | 55,390 | 79,993 | 141,729 | 215,427 | 4.3 | 10.6 | 17.0 | 24.6 | 43.5 | 16.5 | 0.395 | 0.352 | 0.267 | 0.067 | 0.134 | 0.207 |
| 1973 | 13,878 | 34,893 | 57,234 | 82,333 | 147,317 | 226,914 | 4.2 | 10.4 | 17.0 | 24.5 | 43.9 | 16.9 | 0.400 | 0.360 | 0.275 | 0.069 | 0.139 | 0.213 |
| 1972[21] | 13,260 | 34,251 | 55,896 | 80,246 | 144,065 | 223,293 | 4.1 | 10.4 | 17.0 | 24.5 | 43.9 | 17.0 | 0.401 | 0.371 | 0.279 | 0.070 | 0.140 | 0.216 |
| 1971[22] | 12,515 | 33,077 | 53,626 | 76,240 | 135,090 | 207,204 | 4.1 | 10.6 | 17.3 | 24.5 | 43.5 | 16.7 | 0.396 | 0.370 | 0.273 | 0.068 | 0.138 | 0.214 |
| 1970 | 12,437 | 33,693 | 54,256 | 76,477 | 135,393 | 207,813 | 4.1 | 10.8 | 17.4 | 24.5 | 43.3 | 16.6 | 0.394 | 0.370 | 0.271 | 0.068 | 0.138 | 0.214 |
| 1969 | 12,657 | 34,174 | 54,608 | 76,488 | 134,442 | 206,935 | 4.1 | 10.9 | 17.5 | 24.5 | 43.0 | 16.6 | 0.391 | 0.357 | 0.268 | 0.067 | 0.135 | 0.209 |
| 1968 | 12,358 | 33,141 | 52,560 | 73,320 | 127,404 | 194,786 | 4.2 | 11.1 | 17.6 | 24.5 | 42.6 | 16.3 | 0.386 | 0.352 | 0.261 | 0.065 | 0.133 | 0.206 |
| 1967[23] | 11,378 | 31,526 | 50,337 | 70,428 | 126,743 | 199,925 | 4.0 | 10.8 | 17.3 | 24.2 | 43.6 | 17.2 | 0.397 | 0.377 | 0.280 | 0.070 | 0.141 | 0.218 |

Footnotes provided on the next page.

[1] Implementation of 2020 Census-based population controls.

[2] Estimates reflect the implementation of an updated processing system and should be used to make comparisons to 2018 and subsequent years.

[3] The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. All of the approximately 98,000 addresses were eligible to receive the redesigned set of health insurance coverage questions. The redesigned income questions were implemented to a subsample of these 98,000 addresses using a probability split panel design. Approximately 68,000 addresses were eligible to receive a set of income questions similar to those used in the 2013 CPS ASEC, and the remaining 30,000 addresses were eligible to receive the redesigned income questions. The source of these 2013 estimates is the portion of the CPS ASEC sample that received the redesigned income questions, approximately 30,000 addresses.

[4] The source of these 2013 estimates is the portion of the CPS ASEC sample that received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses.

[5] Implementation of 2010 Census-based population controls.

[6] Median income is calculated using $2,500 intervals. Beginning with 2009 income data, the Census Bureau expanded the upper income intervals used to calculate medians to $250,000 or more. Medians falling in the upper open-ended interval are plugged with "$250,000." Before 2009, the upper open-ended interval was $100,000 and a plug of "$100,000" was used.

[7] Data have been revised to reflect a correction to the weights in the 2005 CPS ASEC.

[8] Implementation of a 28,000-household sample expansion.

[9] Implementation of 2000 Census-based population controls.

[10] Full implementation of 1990 Census-based sample design and metropolitan definitions, 7,000-household sample reduction, and revised editing of responses on race.

[11] Introduction of 1990 Census sample design.

[12] Data collection method changed from paper and pencil to computer-assisted interviewing. In addition, the 1994 CPS ASEC was revised to allow for the coding of different income amounts on selected questionnaire items. Limits either increased or decreased in the following categories: earnings limits increased to $999,999; Social Security limits increased to $49,999; Supplemental Security Income and public assistance limits increased to $24,999; veterans' benefits limits increased to $99,999; child support and alimony limits decreased to $49,999.

[13] Implementation of 1990 Census population controls.

[14] Implementation of a new CPS ASEC processing system.

[15] Recording of amounts for earnings from longest job increased to $299,999. Full implementation of 1980 Census-based sample design.

[16] Implementation of Hispanic population weighting controls and introduction of 1980 Census-based sample design.

[17] Implementation of 1980 Census population controls. Questionnaire expanded to allow the recording of up to 27 possible values from a list of 51 possible sources of income.

[18] First year medians were derived using both Pareto and linear interpolation. Before this year, all medians were derived using linear interpolation.

[19] Some of these estimates were derived using Pareto interpolation and may differ from published data, which were derived using linear interpolation.

[20] Implementation of a new CPS ASEC processing system. Questionnaire expanded to ask 11 income questions.

[21] Full implementation of 1970 Census-based sample design.

[22] Introduction of 1970 Census sample design and population controls.

[23] Implementation of a new CPS ASEC processing system.

Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding. Margins of error are available via e-mail at <sehsd.isb.list@census.gov>.

Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-5.
**Selected Measures of Equivalence-Adjusted Income Dispersion: 1967 to 2021**

(Further explanation of income inequality measures is available at "The Changing Shape of the Nation's Income Distribution: 1947-1998," *Current Population Reports*, Series P60-204. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Shares of equivalence-adjusted income of quintiles | | | | | Measures of income dispersion | | | | | | | | | |
| | | | | | | Equivalence-adjusted income ratios at selected percentiles | | | Summary measures | | | | | | |
| | | | | | | | | | | | | | Atkinson | | |
| | Lowest quintile | Second quintile | Third quintile | Fourth quintile | Highest quintile | 90th/10th | 90th/50th | 50th/10th | Gini index of income inequality | Mean logarithmic deviation of income | Theil | e=0.25 | e=0.50 | e=0.75 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 . . . | 3.3 | 8.8 | 14.4 | 22.3 | 51.2 | 10.89 | 2.81 | 3.88 | 0.474 | 0.662 | 0.419 | 0.101 | 0.199 | 0.308 |
| 2020[1] . . . | 3.4 | 8.9 | 14.5 | 22.4 | 50.8 | 10.73 | 2.80 | 3.83 | 0.469 | 0.643 | 0.410 | 0.099 | 0.195 | 0.302 |
| 2019 . . . | 3.6 | 9.0 | 14.6 | 22.3 | 50.5 | 9.78 | 2.71 | 3.61 | 0.465 | 0.597 | 0.404 | 0.097 | 0.190 | 0.291 |
| 2018 . . . | 3.5 | 9.1 | 14.7 | 22.4 | 50.3 | 10.09 | 2.70 | 3.74 | 0.464 | 0.628 | 0.405 | 0.097 | 0.191 | 0.296 |
| 2017[2] . . . | 3.4 | 8.9 | 14.4 | 22.4 | 50.9 | 10.59 | 2.78 | 3.80 | 0.471 | 0.643 | 0.416 | 0.100 | 0.196 | 0.304 |
| 2017 . . . | 3.5 | 9.0 | 14.7 | 22.7 | 50.1 | 10.45 | 2.75 | 3.80 | 0.463 | 0.639 | 0.397 | 0.096 | 0.191 | 0.298 |
| 2016 . . . | 3.5 | 9.1 | 14.7 | 22.5 | 50.2 | 10.38 | 2.70 | 3.84 | 0.464 | 0.629 | 0.403 | 0.097 | 0.192 | 0.297 |
| 2015 . . . | 3.4 | 9.0 | 14.8 | 22.9 | 49.8 | 10.48 | 2.68 | 3.92 | 0.462 | 0.623 | 0.396 | 0.096 | 0.190 | 0.295 |
| 2014 . . . | 3.3 | 9.0 | 14.8 | 22.9 | 50.0 | 10.71 | 2.72 | 3.93 | 0.464 | 0.648 | 0.397 | 0.096 | 0.192 | 0.301 |
| 2013[3] . . . | 3.5 | 8.8 | 14.7 | 22.8 | 50.3 | 10.65 | 2.73 | 3.91 | 0.467 | 0.635 | 0.409 | 0.098 | 0.194 | 0.301 |
| 2013[4] . . . | 3.5 | 9.1 | 14.9 | 22.9 | 49.6 | 10.09 | 2.66 | 3.79 | 0.459 | 0.620 | 0.392 | 0.095 | 0.188 | 0.293 |
| 2012 . . . | 3.4 | 9.0 | 14.8 | 22.9 | 49.9 | 10.38 | 2.66 | 3.91 | 0.463 | 0.629 | 0.405 | 0.097 | 0.192 | 0.298 |
| 2011 . . . | 3.4 | 9.0 | 14.8 | 22.8 | 50.0 | 10.19 | 2.69 | 3.79 | 0.463 | 0.626 | 0.404 | 0.097 | 0.191 | 0.297 |
| 2010[5] . . . | 3.4 | 9.2 | 15.0 | 23.1 | 49.2 | 10.44 | 2.67 | 3.91 | 0.456 | 0.617 | 0.382 | 0.093 | 0.185 | 0.290 |
| 2009 . . . | 3.6 | 9.3 | 15.0 | 22.9 | 49.4 | 10.07 | 2.63 | 3.82 | 0.456 | 0.605 | 0.390 | 0.094 | 0.186 | 0.289 |
| 2008 . . . | 3.7 | 9.4 | 15.1 | 22.8 | 48.9 | 9.50 | 2.58 | 3.68 | 0.450 | 0.568 | 0.377 | 0.091 | 0.180 | 0.278 |
| 2007 . . . | 3.8 | 9.5 | 15.3 | 22.8 | 48.5 | 9.19 | 2.55 | 3.60 | 0.444 | 0.548 | 0.368 | 0.089 | 0.175 | 0.271 |
| 2006 . . . | 3.8 | 9.4 | 14.9 | 22.5 | 49.3 | 9.12 | 2.57 | 3.55 | 0.452 | 0.557 | 0.393 | 0.093 | 0.182 | 0.278 |
| 2005 . . . | 3.8 | 9.5 | 15.1 | 22.7 | 49.1 | 9.27 | 2.55 | 3.64 | 0.450 | 0.571 | 0.386 | 0.092 | 0.181 | 0.280 |
| 2004[6] . . . | 3.8 | 9.6 | 15.2 | 22.7 | 48.7 | 9.22 | 2.55 | 3.62 | 0.447 | 0.559 | 0.380 | 0.091 | 0.179 | 0.276 |
| 2003 . . . | 3.9 | 9.5 | 15.2 | 22.8 | 48.6 | 9.15 | 2.56 | 3.58 | 0.445 | 0.548 | 0.373 | 0.090 | 0.176 | 0.272 |
| 2002 . . . | 4.0 | 9.6 | 15.2 | 22.7 | 48.4 | 8.73 | 2.51 | 3.48 | 0.443 | 0.523 | 0.373 | 0.089 | 0.174 | 0.267 |
| 2001 . . . | 4.0 | 9.6 | 15.2 | 22.4 | 48.8 | 8.63 | 2.50 | 3.45 | 0.446 | 0.527 | 0.386 | 0.091 | 0.177 | 0.270 |
| 2000[7] . . . | 4.1 | 9.8 | 15.2 | 22.3 | 48.6 | 8.58 | 2.50 | 3.44 | 0.442 | 0.501 | 0.380 | 0.090 | 0.174 | 0.263 |
| 1999[8] . . . | 4.0 | 9.7 | 15.3 | 22.6 | 48.4 | 8.72 | 2.50 | 3.49 | 0.441 | 0.492 | 0.366 | 0.088 | 0.171 | 0.260 |
| 1998 . . . | 4.0 | 9.8 | 15.4 | 22.6 | 48.1 | 8.72 | 2.44 | 3.57 | 0.439 | 0.506 | 0.369 | 0.088 | 0.172 | 0.262 |
| 1997 . . . | 4.0 | 9.8 | 15.4 | 22.6 | 48.3 | 8.93 | 2.47 | 3.61 | 0.440 | 0.500 | 0.374 | 0.089 | 0.173 | 0.263 |
| 1996 . . . | 4.0 | 9.8 | 15.5 | 22.7 | 47.9 | 8.76 | 2.45 | 3.57 | 0.437 | 0.474 | 0.370 | 0.088 | 0.170 | 0.256 |
| 1995[9] . . . | 4.1 | 9.9 | 15.5 | 22.8 | 47.6 | 8.59 | 2.42 | 3.55 | 0.433 | 0.463 | 0.356 | 0.085 | 0.166 | 0.251 |
| 1994[10] . . . | 4.0 | 9.8 | 15.6 | 22.8 | 47.8 | 8.95 | 2.43 | 3.68 | 0.436 | 0.474 | 0.363 | 0.087 | 0.169 | 0.256 |
| 1993[11] . . . | 3.9 | 9.8 | 15.6 | 23.0 | 47.7 | 9.08 | 2.43 | 3.73 | 0.436 | 0.472 | 0.363 | 0.087 | 0.169 | 0.256 |
| 1992[12] . . . | 4.2 | 10.4 | 16.3 | 23.7 | 45.5 | 8.60 | 2.34 | 3.68 | 0.412 | 0.416 | 0.298 | 0.074 | 0.149 | 0.230 |
| 1991 . . . | 4.3 | 10.6 | 16.5 | 23.6 | 45.0 | 8.30 | 2.31 | 3.59 | 0.406 | 0.398 | 0.289 | 0.071 | 0.144 | 0.222 |
| 1990 . . . | 4.4 | 10.6 | 16.3 | 23.5 | 45.1 | 8.07 | 2.31 | 3.49 | 0.406 | 0.386 | 0.292 | 0.072 | 0.143 | 0.220 |

Footnotes provided at end of table.

Table A-5.
**Selected Measures of Equivalence-Adjusted Income Dispersion: 1967 to 2021**—Con.

(Further explanation of income inequality measures is available at "The Changing Shape of the Nation's Income Distribution: 1947–1998," Current Population Reports, Series P60-204. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Shares of equivalence-adjusted income of quintiles | | | | | Measures of income dispersion | | | | | | | | | |
| | | | | | | Equivalence-adjusted income ratios at selected percentiles | | | Summary measures | | | | | | |
| | Lowest quintile | Second quintile | Third quintile | Fourth quintile | Highest quintile | 90th/10th | 90th/50th | 50th/10th | Gini index of income inequality | Mean logarithmic deviation of income | Theil | Atkinson | | | |
| | | | | | | | | | | | | e=0.25 | e=0.50 | e=0.75 | |
| 1989 . . . . . . . . | 4.4 | 10.5 | 16.3 | 23.4 | 45.3 | 7.93 | 2.31 | 3.43 | 0.408 | 0.390 | 0.297 | 0.073 | 0.145 | 0.222 |
| 1988 . . . . . . . . | 4.4 | 10.7 | 16.5 | 23.7 | 44.7 | 8.06 | 2.28 | 3.53 | 0.402 | 0.379 | 0.285 | 0.070 | 0.141 | 0.216 |
| 1987[13] . . . . . . | 4.4 | 10.8 | 16.7 | 23.8 | 44.4 | 8.07 | 2.25 | 3.58 | 0.399 | 0.379 | 0.280 | 0.069 | 0.139 | 0.215 |
| 1986 . . . . . . . . | 4.5 | 10.8 | 16.6 | 23.8 | 44.3 | 7.80 | 2.27 | 3.44 | 0.397 | 0.375 | 0.276 | 0.068 | 0.137 | 0.212 |
| 1985[14] . . . . . . | 4.6 | 10.9 | 16.7 | 23.7 | 44.1 | 7.77 | 2.25 | 3.46 | 0.394 | 0.369 | 0.269 | 0.067 | 0.135 | 0.208 |
| 1984[15] . . . . . . | 4.6 | 11.0 | 16.8 | 23.6 | 43.6 | 7.81 | 2.23 | 3.50 | 0.389 | 0.366 | 0.261 | 0.065 | 0.132 | 0.205 |
| 1983 . . . . . . . . | 4.6 | 11.0 | 16.9 | 24.0 | 43.5 | 7.52 | 2.21 | 3.41 | 0.389 | 0.373 | 0.260 | 0.065 | 0.132 | 0.207 |
| 1982 . . . . . . . . | 4.7 | 11.1 | 17.0 | 24.0 | 43.2 | 6.94 | 2.15 | 3.23 | 0.384 | 0.370 | 0.255 | 0.064 | 0.129 | 0.203 |
| 1981 . . . . . . . . | 5.0 | 11.4 | 17.2 | 24.0 | 42.4 | 6.75 | 2.13 | 3.17 | 0.373 | 0.346 | 0.240 | 0.060 | 0.122 | 0.192 |
| 1980 . . . . . . . . | 5.2 | 11.6 | 17.3 | 24.0 | 41.9 | 6.52 | 2.10 | 3.11 | 0.367 | 0.325 | 0.233 | 0.058 | 0.118 | 0.184 |
| 1979[16] . . . . . . | 5.3 | 11.7 | 17.2 | 23.8 | 41.9 | 6.33 | 2.09 | 3.03 | 0.366 | 0.314 | 0.233 | 0.058 | 0.117 | 0.182 |
| 1978 . . . . . . . . | 5.4 | 11.8 | 17.3 | 23.7 | 41.8 | 6.20 | 2.08 | 2.98 | 0.363 | 0.308 | 0.230 | 0.057 | 0.115 | 0.178 |
| 1977 . . . . . . . . | 5.5 | 11.7 | 17.3 | 23.7 | 41.7 | 6.06 | 2.06 | 2.95 | 0.362 | 0.309 | 0.230 | 0.057 | 0.115 | 0.178 |
| 1976[17] . . . . . . | 5.6 | 11.8 | 17.4 | 23.8 | 41.5 | 6.07 | 2.06 | 2.94 | 0.359 | 0.301 | 0.225 | 0.056 | 0.112 | 0.174 |
| 1975[18] . . . . . . | 5.6 | 11.9 | 17.3 | 23.6 | 41.6 | 5.86 | 2.05 | 2.86 | 0.359 | 0.298 | 0.226 | 0.056 | 0.113 | 0.174 |
| 1974[18,19] . . . . | 5.8 | 12.1 | 17.3 | 23.5 | 41.2 | 6.11 | 2.09 | 2.92 | 0.354 | 0.288 | 0.220 | 0.055 | 0.110 | 0.169 |
| 1973 . . . . . . . . | 5.6 | 12.0 | 17.2 | 23.5 | 41.7 | 6.11 | 2.08 | 2.94 | 0.360 | 0.288 | 0.228 | 0.056 | 0.113 | 0.173 |
| 1972[20] . . . . . . | 5.6 | 11.9 | 17.2 | 23.4 | 41.9 | 5.89 | 2.07 | 2.85 | 0.362 | 0.301 | 0.233 | 0.057 | 0.115 | 0.177 |
| 1971[21] . . . . . . | 5.7 | 12.0 | 17.2 | 23.4 | 41.7 | 5.86 | 2.05 | 2.86 | 0.359 | 0.297 | 0.229 | 0.056 | 0.113 | 0.174 |
| 1970 . . . . . . . . | 5.7 | 12.1 | 17.3 | 23.4 | 41.5 | 5.76 | 2.03 | 2.84 | 0.357 | 0.297 | 0.227 | 0.056 | 0.112 | 0.174 |
| 1969 . . . . . . . . | 5.8 | 12.2 | 17.3 | 23.4 | 41.3 | 5.70 | 2.02 | 2.83 | 0.353 | 0.281 | 0.223 | 0.055 | 0.109 | 0.168 |
| 1968 . . . . . . . . | 5.8 | 12.3 | 17.4 | 23.4 | 41.1 | 5.94 | 2.07 | 2.87 | 0.351 | 0.284 | 0.220 | 0.054 | 0.109 | 0.168 |
| 1967[22] . . . . . . | 5.6 | 12.0 | 17.1 | 23.2 | 42.1 | 5.84 | 2.05 | 2.84 | 0.362 | 0.302 | 0.238 | 0.058 | 0.116 | 0.178 |

Footnotes provided on the next page.

[1] Implementation of 2020 Census-based population controls.

[2] Estimates reflect the implementation of an updated processing system and should be used to make comparisons to 2018 and subsequent years.

[3] The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. All of the approximately 98,000 addresses were eligible to receive the redesigned set of health insurance coverage questions. The redesigned income questions were implemented to a subsample of these 98,000 addresses using a probability split panel design. Approximately 68,000 addresses were eligible to receive a set of income questions similar to those used in the 2013 CPS ASEC, and the remaining 30,000 addresses were eligible to receive the redesigned income questions. The source of these 2013 estimates is the portion of the CPS ASEC sample that received the redesigned income questions, approximately 30,000 addresses.

[4] The source of these 2013 estimates is the portion of the CPS ASEC sample that received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses.

[5] Implementation of 2010 Census-based population controls.

[6] Data have been revised to reflect a correction to the weights in the 2005 CPS ASEC.

[7] Implementation of a 28,000-household sample expansion.

[8] Implementation of 2000 Census-based population controls.

[9] Full implementation of 1990 Census-based sample design and metropolitan definitions, 7,000-household sample reduction, and revised editing of responses on race.

[10] Introduction of 1990 Census sample design.

[11] Data collection method changed from paper and pencil to computer-assisted interviewing. In addition, the 1994 CPS ASEC was revised to allow for the coding of different income amounts on selected questionnaire items. Limits either increased or decreased in the following categories: earnings limits increased to $999,999; Social Security limits increased to $49,999; Supplemental Security Income and public assistance limits increased to $24,999; veterans' benefits limits increased to $99,999; child support and alimony limits decreased to $49,999.

[12] Implementation of 1990 Census population controls.

[13] Implementation of a new CPS ASEC processing system.

[14] Recording of amounts for earnings from longest job increased to $299,999. Full implementation of 1980 Census-based sample design.

[15] Implementation of Hispanic population weighting controls and introduction of 1980 Census-based sample design.

[16] Implementation of 1980 Census population controls. Questionnaire expanded to allow the recording of up to 27 possible values from a list of 51 possible sources of income.

[17] First-year medians were derived using both Pareto and linear interpolation. Before this year, all medians were derived using linear interpolation.

[18] Some of these estimates were derived using Pareto interpolation and may differ from published data, which were derived using linear interpolation.

[19] Implementation of a new CPS ASEC processing system. Questionnaire expanded to ask 11 income questions.

[20] Full implementation of 1970 Census-based sample design.

[21] Introduction of 1970 Census sample design and population controls.

[22] Implementation of a new CPS ASEC processing system.

Note: Some estimates have been slightly revised from previous estimates due to an improved table processing system. Margins of error are available via e-mail at <sehsd.isb.list@census.gov>.

Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-6.
**Earnings Summary Measures by Selected Characteristics: 2020 and 2021**

(Earnings in 2021 dollars, adjusted using the R-CPI-U-RS. People 15 years and older as of March of the following year with earnings. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Characteristic | 2020[1] | | | 2021 | | | Percent change (2021 less 2020)* | |
|---|---|---|---|---|---|---|---|---|
| | Number (thou-sands) | Median earnings (dollars) | | Number (thou-sands) | Median earnings (dollars) | | Estimate | Margin of error[2] (±) |
| | | Estimate | Margin of error[2] (±) | | Estimate | Margin of error[2] (±) | | |
| **PEOPLE WITH EARNINGS** | | | | | | | | |
| **Total workers . . . . . . . . . . . . . . . . .** | **168,148** | **43,461** | **209** | **168,041** | **45,470** | **303** | **\*4.6** | **0.76** |
| Men. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 88,645 | 51,446 | 973 | 88,941 | 50,983 | 222 | –0.9 | 1.85 |
| Women . . . . . . . . . . . . . . . . . . . . . . . . . | 79,504 | 37,527 | 319 | 79,100 | 39,201 | 753 | *4.5 | 2.02 |
| | | | | | | | | |
| **Full-time, year-round workers . . .** | **106,297** | **58,897** | **396** | **117,357** | **56,473** | **356** | **\*–4.1** | **0.74** |
| Men. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 60,295 | 64,217 | 296 | 66,366 | 61,180 | 294 | *–4.7 | 0.58 |
| Women . . . . . . . . . . . . . . . . . . . . . . . . . | 46,002 | 53,387 | 290 | 50,991 | 51,226 | 295 | *–4.0 | 0.66 |
| Female-to-male earnings ratio . . . . . . . . . . | X | 0.831 | 0.0051 | X | 0.837 | 0.0057 | 0.7 | 0.89 |

\* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.
X Not applicable.
[1] Implementation of 2020 Census-based population controls.
[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.
Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding.
Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Table A-7.

## Number and Real Median Earnings of Total Workers and Full-Time, Year-Round Workers With Earnings by Sex and Female-to-Male Earnings Ratio: 1960 to 2021

(Earnings in 2021 dollars, adjusted using the R-CPI-U-RS. People 15 years and older as of March of the following year beginning in 1980, and people 14 years old and older as of March of the following year for previous years. Before 1989 earnings are for civilian workers only. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Total workers | | | | | | Full-time, year-round workers | | | | | | Female-to-male earnings ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | | | Female | | | Male | | | Female | | | |
| | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | |
| | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | |
| 2021 | 88,941 | 50,983 | 222 | 79,100 | 39,201 | 753 | 66,366 | 61,180 | 294 | 50,991 | 51,226 | 295 | 0.837 |
| 2020[2] | 88,645 | 51,446 | 973 | 79,504 | 37,527 | 319 | 60,295 | 64,217 | 296 | 46,002 | 53,387 | 290 | 0.831 |
| 2019 | 89,023 | 51,684 | 871 | 80,779 | 37,967 | 281 | 67,123 | 60,890 | 917 | 52,035 | 50,126 | 389 | 0.823 |
| 2018 | 88,115 | 50,432 | 439 | 79,440 | 35,232 | 745 | 67,205 | 59,657 | 512 | 50,795 | 48,658 | 525 | 0.816 |
| 2017[3] | 88,020 | 49,811 | 745 | 78,291 | 35,244 | 211 | 66,500 | 57,679 | 247 | 49,227 | 47,105 | 964 | 0.817 |
| 2017 | 88,101 | 49,083 | 1,356 | 78,196 | 34,937 | 189 | 66,379 | 57,635 | 249 | 49,293 | 46,396 | 229 | 0.805 |
| 2016 | 86,886 | 47,668 | 266 | 77,742 | 34,867 | 228 | 64,953 | 58,303 | 238 | 48,328 | 46,916 | 277 | 0.805 |
| 2015 | 86,435 | 47,591 | 263 | 76,974 | 34,589 | 201 | 63,887 | 58,566 | 256 | 47,211 | 46,592 | 275 | 0.796 |
| 2014 | 84,494 | 46,553 | 245 | 75,572 | 32,527 | 543 | 62,455 | 57,717 | 249 | 46,226 | 45,388 | 822 | 0.786 |
| 2013[4] | 83,855 | 46,865 | 581 | 74,821 | 31,908 | 540 | 61,240 | 58,266 | 1,088 | 44,629 | 45,192 | 1,334 | 0.776 |
| 2013[5] | 83,555 | 46,486 | 837 | 74,545 | 32,311 | 698 | 60,769 | 58,287 | 471 | 45,068 | 45,616 | 696 | 0.783 |
| 2012 | 83,003 | 44,825 | 805 | 74,188 | 31,780 | 266 | 59,009 | 58,399 | 908 | 44,042 | 44,677 | 702 | 0.765 |
| 2011 | 81,366 | 45,080 | 330 | 73,094 | 32,053 | 262 | 57,993 | 58,192 | 941 | 43,683 | 44,811 | 306 | 0.770 |
| 2010[6] | 80,856 | 45,808 | 326 | 72,716 | 33,005 | 268 | 56,283 | 59,714 | 1,002 | 43,175 | 45,937 | 299 | 0.769 |
| 2009[7] | 81,934 | 45,990 | 246 | 72,972 | 32,950 | 194 | 56,053 | 59,656 | 306 | 43,217 | 45,923 | 219 | 0.770 |
| 2008 | 84,039 | 46,129 | 222 | 74,538 | 32,356 | 201 | 59,861 | 58,490 | 301 | 44,156 | 45,091 | 220 | 0.771 |
| 2007 | 84,482 | 47,989 | 228 | 74,295 | 33,898 | 196 | 62,984 | 59,094 | 323 | 45,613 | 45,981 | 220 | 0.778 |
| 2006 | 83,928 | 48,331 | 237 | 73,683 | 32,957 | 339 | 63,055 | 56,928 | 195 | 44,663 | 43,800 | 410 | 0.769 |
| 2005 | 82,934 | 47,770 | 643 | 72,476 | 32,090 | 327 | 61,500 | 57,557 | 206 | 43,351 | 44,306 | 185 | 0.770 |
| 2004[8] | 81,448 | 46,705 | 381 | 71,930 | 32,001 | 187 | 60,088 | 58,658 | 213 | 42,380 | 44,918 | 187 | 0.766 |
| 2003 | 80,508 | 47,325 | 192 | 71,372 | 32,493 | 197 | 58,772 | 60,054 | 219 | 41,908 | 45,370 | 202 | 0.755 |
| 2002 | 80,500 | 47,794 | 204 | 71,411 | 32,362 | 186 | 58,761 | 59,546 | 606 | 41,876 | 45,613 | 199 | 0.766 |
| 2001 | 80,209 | 48,113 | 199 | 71,232 | 31,986 | 199 | 58,712 | 58,715 | 651 | 41,639 | 44,817 | 416 | 0.763 |
| 2000[9] | 80,494 | 48,831 | 202 | 71,657 | 31,975 | 200 | 59,602 | 58,772 | 262 | 41,719 | 43,327 | 265 | 0.737 |
| 1999[10] | 79,322 | 49,066 | 389 | 71,053 | 30,080 | 435 | 58,299 | 59,362 | 365 | 40,871 | 42,928 | 303 | 0.723 |
| 1998 | 77,295 | 47,905 | 639 | 68,846 | 29,514 | 441 | 56,951 | 58,884 | 364 | 38,785 | 43,085 | 323 | 0.732 |
| 1997 | 76,694 | 45,325 | 339 | 67,736 | 28,225 | 300 | 54,909 | 56,860 | 892 | 37,683 | 42,168 | 431 | 0.742 |
| 1996 | 76,121 | 44,480 | 349 | 66,661 | 27,649 | 309 | 53,787 | 55,449 | 326 | 36,430 | 40,901 | 471 | 0.738 |
| 1995[11] | 74,619 | 44,306 | 460 | 65,557 | 27,135 | 297 | 52,667 | 55,779 | 335 | 35,482 | 39,842 | 399 | 0.714 |
| 1994[12] | 74,264 | 42,903 | 552 | 64,706 | 25,977 | 391 | 51,580 | 55,958 | 370 | 34,155 | 40,272 | 328 | 0.720 |
| 1993[13] | 73,198 | 41,553 | 399 | 63,660 | 25,729 | 414 | 49,818 | 56,299 | 356 | 33,524 | 40,265 | 292 | 0.715 |
| 1992[14] | 73,120 | 41,576 | 359 | 62,408 | 25,677 | 418 | 48,551 | 57,320 | 356 | 33,241 | 40,574 | 318 | 0.708 |
| 1991 | 72,040 | 42,520 | 352 | 61,796 | 25,064 | 400 | 47,888 | 57,235 | 707 | 32,436 | 39,984 | 314 | 0.699 |
| 1990 | 72,348 | 43,392 | 338 | 61,732 | 24,698 | 265 | 49,171 | 55,804 | 687 | 31,682 | 39,965 | 421 | 0.716 |
| 1989 | 72,045 | 45,223 | 362 | 61,338 | 24,829 | 271 | 49,678 | 57,821 | 390 | 31,340 | 39,707 | 438 | 0.687 |
| 1988 | 70,467 | 45,513 | 410 | 60,658 | 24,501 | 287 | 48,285 | 58,859 | 425 | 31,237 | 38,875 | 458 | 0.660 |
| 1987[15] | 69,545 | 45,340 | 546 | 59,359 | 24,295 | 263 | 47,013 | 59,360 | 406 | 29,912 | 38,690 | 297 | 0.652 |
| 1986 | 68,728 | 44,449 | 541 | 57,686 | 23,703 | 323 | 45,912 | 59,770 | 420 | 28,420 | 38,414 | 331 | 0.643 |
| 1985[16] | 67,809 | 42,811 | 535 | 56,296 | 22,462 | 372 | 44,943 | 58,261 | 559 | 27,383 | 37,622 | 325 | 0.646 |
| 1984[17] | 66,454 | 42,406 | 389 | 55,226 | 21,606 | 344 | 43,808 | 57,828 | 488 | 26,466 | 36,812 | 356 | 0.637 |
| 1983 | 65,138 | 41,695 | 376 | 53,108 | 21,351 | 256 | 41,528 | 56,765 | 427 | 25,166 | 36,099 | 363 | 0.636 |
| 1982 | 64,730 | 41,585 | 387 | 51,820 | 20,791 | 249 | 40,105 | 57,015 | 396 | 23,702 | 35,204 | 392 | 0.617 |
| 1981 | 65,233 | 43,202 | 406 | 51,940 | 20,716 | 245 | 41,773 | 58,115 | 335 | 23,329 | 34,424 | 236 | 0.592 |
| 1980 | 64,730 | 43,984 | 501 | 51,448 | 20,794 | 279 | 41,881 | 58,428 | 485 | 22,859 | 35,150 | 253 | 0.602 |
| 1979[18] | 64,648 | 45,199 | 500 | 50,897 | 20,865 | 293 | 42,437 | 59,393 | 385 | 22,082 | 35,435 | 299 | 0.597 |
| 1978 | 62,903 | 46,370 | 371 | 48,398 | 20,061 | 302 | 41,036 | 60,118 | 339 | 20,914 | 35,734 | 327 | 0.594 |
| 1977 | 61,704 | 45,074 | 383 | 46,194 | 19,088 | 275 | 39,263 | 59,732 | 464 | 19,238 | 35,195 | 262 | 0.589 |
| 1976[19] | 60,450 | 44,724 | 336 | 44,565 | 18,652 | 286 | 38,184 | 58,417 | 379 | 18,073 | 35,163 | 286 | 0.602 |
| 1975[20] | 59,268 | 44,418 | 393 | 42,926 | 18,150 | 317 | 37,267 | 58,578 | 378 | 17,452 | 34,454 | 287 | 0.588 |
| 1974[20,21] | 59,866 | 45,321 | N | 42,854 | 17,704 | N | 37,916 | 58,946 | 417 | 16,945 | 34,633 | 278 | 0.588 |
| 1973 | 59,438 | 47,454 | N | 41,583 | 17,862 | N | 39,581 | 61,140 | N | 17,195 | 34,626 | N | 0.566 |
| 1972[22] | 57,774 | 46,411 | N | 39,470 | 18,481 | N | 38,184 | 59,252 | N | 16,675 | 34,284 | N | 0.579 |

Footnotes provided at end of table.

Table A-7.

## Number and Real Median Earnings of Total Workers and Full-Time, Year-Round Workers With Earnings by Sex and Female-to-Male Earnings Ratio: 1960 to 2021—Con.

(Earnings in 2021 dollars, adjusted using the R-CPI-U-RS. People 15 years and older as of March of the following year beginning in 1980, and people 14 years old and older as of March of the following year for previous years. Before 1989 earnings are for civilian workers only. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Total workers | | | | | | Full-time, year-round workers | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | | | Female | | | Male | | | Female | | | |
| | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | Number of workers (thousands) | Median earnings (dollars) | | Female-to-male earnings ratio |
| | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | |
| 1971[23]........ | 56,886 | 44,195 | N | 38,485 | 17,862 | N | 36,819 | 56,225 | N | 16,002 | 33,457 | N | 0.595 |
| 1970......... | 55,821 | 44,658 | N | 38,273 | 17,046 | N | 36,132 | 55,985 | N | 15,476 | 33,238 | N | 0.594 |
| 1969......... | 55,273 | 45,200 | N | 37,737 | 16,799 | N | 37,008 | 53,901 | N | 15,374 | 32,608 | N | 0.605 |
| 1968......... | 54,026 | 44,088 | N | 35,695 | 17,192 | N | 37,068 | 52,452 | N | 15,013 | 30,503 | N | 0.582 |
| 1967[24]........ | 53,222 | 42,816 | N | 34,391 | 16,721 | N | 36,645 | 51,081 | N | 14,846 | 29,516 | N | 0.578 |
| 1966[25]........ | N | 43,296 | N | N | 17,339 | N | N | 50,286 | N | N | 28,942 | N | 0.576 |
| 1965[26]........ | N | 40,760 | N | N | 17,491 | N | N | 48,182 | N | N | 28,873 | N | 0.599 |
| 1964......... | N | 40,367 | N | N | 16,389 | N | N | 47,505 | N | N | 28,098 | N | 0.591 |
| 1963......... | N | 42,943 | N | N | 15,781 | N | N | 46,421 | N | N | 27,363 | N | 0.589 |
| 1962[27]........ | N | 38,672 | N | N | 15,441 | N | N | 45,283 | N | N | 26,852 | N | 0.593 |
| 1961[28]........ | N | 37,484 | N | N | 14,871 | N | N | 44,470 | N | N | 26,348 | N | 0.592 |
| 1960......... | N | 36,127 | N | N | 14,684 | N | N | 43,095 | N | N | 26,148 | N | 0.607 |

N Not available.

[1] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights beginning with 2010. Before 2010, standard errors were calculated using the generalized variance function.

[2] Implementation of 2020 Census-based population controls.

[3] Estimates reflect the implementation of an updated processing system and should be used to make comparisons to 2018 and subsequent years.

[4] The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. All of the approximately 98,000 addresses were eligible to receive the redesigned set of health insurance coverage questions. The redesigned income questions were implemented to a subsample of these 98,000 addresses using a probability split panel design. Approximately 68,000 addresses were eligible to receive a set of income questions similar to those used in the 2013 CPS ASEC, and the remaining 30,000 addresses were eligible to receive the redesigned income questions. The source of these 2013 estimates is the portion of the CPS ASEC sample that received the redesigned income questions, approximately 30,000 addresses.

[5] The source of these 2013 estimates is the portion of the CPS ASEC sample that received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses.

[6] Implementation of 2010 Census-based population controls. Beginning with 2010, standard errors in this table were calculated using replicate weights. Before 2010, standard errors were calculated using the generalized variance function.

[7] Median earnings are calculated using $2,500 intervals. Beginning with 2009 income data, the Census Bureau expanded the upper income intervals used to calculate medians to $250,000 or more. Medians falling in the upper open-ended interval are plugged with "$250,000." Before 2009, the upper open-ended interval was $100,000 and a plug of "$100,000" was used.

[8] Data have been revised to reflect a correction to the weights in the 2005 CPS ASEC.

[9] Implementation of a 28,000-household sample expansion.

[10] Implementation of 2000 Census-based population controls.

[11] Full implementation of 1990 Census-based sample design and metropolitan definitions, 7,000-household sample reduction, and revised editing of responses on race.[12] Introduction of 1990 Census sample design.

[13] Data collection method changed from paper and pencil to computer-assisted interviewing. In addition, the 1994 CPS ASEC was revised to allow for the coding of different income amounts on selected questionnaire items. Limits either increased or decreased in the following categories: earnings limits increased to $999,999; Social Security limits increased to $49,999; Supplemental Security Income and public assistance limits increased to $24,999; veterans' benefits limits increased to $99,999; child support and alimony limits decreased to $49,999.

[14] Implementation of 1990 Census population controls.

[15] Implementation of a new CPS ASEC processing system.

[16] Recording of amounts for earnings from longest job increased to $299,999. Full implementation of 1980 Census-based sample design.

[17] Implementation of Hispanic population weighting controls and introduction of 1980 Census-based sample design.

[18] Implementation of 1980 Census population controls. Questionnaire expanded to allow the recording of up to 27 possible values from a list of 51 possible sources of income.

[19] First year medians were derived using both Pareto and linear interpolation. Before this year, all medians were derived using linear interpolation.

[20] Some of these estimates were derived using Pareto interpolation and may differ from published data, which were derived using linear interpolation.

[21] Implementation of a new CPS ASEC processing system. Questionnaire expanded to ask 11 income questions.

[22] Full implementation of 1970 Census-based sample design.

[23] Introduction of 1970 Census sample design and population controls.

[24] Implementation of a new CPS ASEC processing system.

[25] Questionnaire expanded to ask eight income questions.

[26] Implementation of new procedures to impute missing data only.

[27] Full implementation of 1960 Census-based sample design and population controls.

[28] Introduction of 1960 Census-based sample design. Implementation of first hotdeck procedure to impute missing income entries.

Source: U.S. Census Bureau, Current Population Survey, 1961 to 2022 Annual Social and Economic Supplements (CPS ASEC).

## APPENDIX B. EFFECTS OF 2020 CENSUS-BASED POPULATION CONTROLS ON 2020 INCOME ESTIMATES

To create estimates for the U.S. population from a sample, the Current Population Survey Annual Social and Economic Supplement (CPS ASEC) applies weights to the sample based on independent estimates of the civilian, noninstitutionalized population by sex, age, race, and Hispanic/non-Hispanic categories.[1] These independent estimates are based off the date of the most recent decennial census and measure population change from one year to the next using administrative data and other sources on births, deaths, and net migration. Population change is added to a base to produce estimates for the following year. The estimates are updated annually to include an additional year of data and to revise earlier years of the time series. Each decade, the base of the estimates is updated to reflect new census results.[2] Weighting adjustments mitigate nonresponse bias based on age, sex, race, and Hispanic origin and ensure that the weighted sample is representative of the U.S. population.

Updated population controls that use the 2020 Census have been employed to weight the 2020 and 2021 estimates in this report, to show year-to-year changes across consistently weighted data. As a result, even when accounting for inflation, the 2020 estimates (including medians, counts of households, and number of workers) will not match the estimates published in last year's annual report, "Income and Poverty in the United States: 2020," which used 2010 Census-based population controls.

Tables B-1 and B-2 demonstrate the effect of using the 2020 Census-based population controls on the 2020 data by presenting key income and earnings estimates using both the 2010 and 2020 Census-based population controls. Overall, using 2020 Census-based population controls resulted in statistically significant but substantively minor differences in the 2020 estimates. For median income and earnings estimates, the differences between the estimates using the 2020 Census-based population controls and the estimates using the 2010 Census-based population controls were all less than 1.0 percent.

### Effects on Income and Earnings Estimates

Table B-1 shows the effect of the 2020 population controls on the 2020 median household income estimates by selected demographic characteristics. With a few exceptions, the 2020 Census-based population controls resulted in higher 2020 median income estimates, though these increases were all less than 1.0 percent. Median household income was higher for all characteristics in Table B-1 aside from family households maintained by men with no spouse present, and householders aged 15 to 24, 35 to 44, and 45 to 54. The estimates for these four groups were not statistically different from those using 2010 population controls.

Median earnings estimates are presented in Table B-2. As with household income, all differences between estimates using the 2010 Census-based population controls and those using the 2020 Census-based population controls were under 1.0 percent; however, they vary in direction. Median earnings decreased for all workers (both sexes combined), all working men, and men who worked full-time, year-round. For all working women and women who worked full-time, year-round, median earnings increased when the 2020 population controls were applied.[3] The change for all full-time, year-round workers was not significant. The decrease for full-time, year-round working men and increase for full-time, year-round working women corresponds with an increase from 0.830 to 0.831 in the female-to-male earnings ratio.

For more information on the effects of the 2020 Census-based population controls on poverty and health insurance estimates, refer to the working paper entitled "Effects of 2020 Census-Based Population Controls on 2020 Income, Poverty, Supplemental Poverty, and Health Insurance in the United States Estimates," available at <www.census.gov/library/working-papers/2022/demo/SEHSD-wp2022-14.html>.

### ENDNOTES

[1] More information on CPS survey design is available in Current Population Survey Design and Methodology Technical Paper 77 <https://www2.census.gov/programs-surveys/cps/methodology/CPS-Tech-Paper-77.pdf>.

[2] In recent decades, the decennial census has usually provided all data necessary to produce the population base used in the population controls. However, changes in disclosure avoidance practices and delays in the 2020 Census necessitated changes to the data sources that produce the base population for the Vintage 2021 population estimates. The updated population controls use a Blended Base that draws on the 2020 Census, 2020 Demographic Analysis Estimates, and Vintage 2020 Postcensal Population Estimates. More information on this methodology can be found at <https://www2.census.gov/programs-surveys/popest/technical-documentation/methodology/2020-2021/methods-statement-v2021.pdf>.

[3] The percent change in earnings for working women and full-time, year-round working women were not statistically different.

Table B-1.
## Income Summary Measures by Selected Characteristics: 2020 Estimates Using 2010 Census-Based Population Controls and 2020 Census-Based Population Controls

(Income in 2020 dollars. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar21.pdf>)

| Characteristic | 2020 | | | | | | Percent change in real median income (2020 Census-based controls less 2010 Census-based controls)* | |
| | 2010 Census-based controls | | | 2020 Census-based controls | | | | |
| | Number (thousands) | Median income (dollars) | | Number (thousands) | Median income (dollars) | | Estimate | Margin of error[1] (±) |
| | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | | |
|---|---|---|---|---|---|---|---|---|
| **HOUSEHOLDS** | | | | | | | | |
| **All households** . . . . . . . . . . . . . . . . | **129,931** | **67,521** | **782** | **129,244** | **68,010** | **880** | ***0.72** | **0.23** |
| **Type of Household** | | | | | | | | |
| Family households. . . . . . . . . . . . . . . . . . . . | 83,907 | 86,372 | 851 | 83,711 | 86,675 | 855 | *0.35 | 0.04 |
| Married-couple . . . . . . . . . . . . . . . . . . | 61,454 | 101,517 | 850 | 61,288 | 101,827 | 851 | *0.31 | 0.03 |
| Female householder, no spouse present. . | 15,490 | 49,214 | 1,444 | 15,461 | 49,254 | 1,447 | *0.08 | 0.06 |
| Male householder, no spouse present . . . . | 6,963 | 67,304 | 2,317 | 6,963 | 67,334 | 2,348 | 0.04 | 0.10 |
| Nonfamily households . . . . . . . . . . . . . . . . | 46,024 | 40,464 | 652 | 45,533 | 40,706 | 646 | *0.60 | 0.07 |
| Female householder . . . . . . . . . . . . . . . | 24,244 | 35,574 | 685 | 23,859 | 35,842 | 680 | *0.75 | 0.10 |
| Male householder. . . . . . . . . . . . . . . . . . | 21,781 | 47,259 | 1,227 | 21,674 | 47,411 | 1,270 | *0.32 | 0.14 |
| **Race[2] and Hispanic Origin of Householder** | | | | | | | | |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 101,582 | 71,231 | 736 | 100,931 | 71,633 | 737 | *0.56 | 0.05 |
| White, not Hispanic . . . . . . . . . . . . . . . . | 85,336 | 74,912 | 936 | 84,712 | 75,392 | 850 | *0.64 | 0.15 |
| Black . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,358 | 45,870 | 1,268 | 17,319 | 46,025 | 1,268 | *0.34 | 0.08 |
| Asian . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,987 | 94,903 | 3,794 | 7,002 | 95,177 | 3,805 | *0.29 | 0.15 |
| Hispanic (any race) . . . . . . . . . . . . . . . . . . | 18,349 | 55,321 | 1,183 | 18,340 | 55,427 | 1,159 | *0.19 | 0.09 |
| **Age of Householder** | | | | | | | | |
| Under 65 years . . . . . . . . . . . . . . . . . . . . . | 94,243 | 76,800 | 737 | 94,593 | 76,867 | 736 | *0.09 | 0.01 |
| 15 to 24 years . . . . . . . . . . . . . . . . . . . | 5,485 | 46,886 | 1,540 | 5,498 | 46,904 | 1,540 | 0.04 | 0.06 |
| 25 to 34 years . . . . . . . . . . . . . . . . . . . | 20,654 | 71,566 | 1,154 | 20,570 | 71,614 | 1,159 | *0.07 | 0.03 |
| 35 to 44 years . . . . . . . . . . . . . . . . . . . | 22,105 | 85,694 | 1,712 | 22,304 | 85,709 | 1,708 | 0.02 | 0.03 |
| 45 to 54 years . . . . . . . . . . . . . . . . . . . | 21,663 | 90,359 | 1,958 | 21,803 | 90,411 | 1,934 | 0.06 | 0.06 |
| 55 to 64 years . . . . . . . . . . . . . . . . . . . | 24,336 | 74,270 | 2,105 | 24,417 | 74,398 | 2,079 | *0.17 | 0.08 |
| 65 years and older . . . . . . . . . . . . . . . . . . | 35,688 | 46,360 | 934 | 34,651 | 46,686 | 932 | *0.70 | 0.11 |
| **Nativity of Householder** | | | | | | | | |
| Native-born. . . . . . . . . . . . . . . . . . . . . . . . | 110,348 | 68,795 | 977 | 109,633 | 69,316 | 977 | *0.76 | 0.07 |
| Foreign-born . . . . . . . . . . . . . . . . . . . . . . | 19,584 | 61,984 | 907 | 19,611 | 62,159 | 1,005 | *0.28 | 0.26 |
| Naturalized citizen . . . . . . . . . . . . . . . . | 11,201 | 68,760 | 2,074 | 11,202 | 69,234 | 2,045 | *0.69 | 0.24 |
| Not a citizen . . . . . . . . . . . . . . . . . . . . | 8,382 | 55,099 | 1,791 | 8,409 | 55,225 | 1,732 | *0.23 | 0.19 |
| **Region** | | | | | | | | |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . | 22,082 | 75,211 | 1,640 | 22,471 | 75,506 | 1,506 | *0.39 | 0.27 |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . | 27,865 | 66,968 | 1,734 | 27,811 | 67,382 | 1,797 | *0.62 | 0.16 |
| South . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50,385 | 61,243 | 821 | 49,759 | 61,484 | 821 | *0.39 | 0.04 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,600 | 74,951 | 1,275 | 29,203 | 75,242 | 1,170 | *0.39 | 0.19 |
| **Residence[3]** | | | | | | | | |
| Inside metropolitan statistical areas . . . . . . | 111,999 | 70,956 | 666 | 111,460 | 71,293 | 663 | *0.47 | 0.04 |
| Inside principal cities. . . . . . . . . . . . . . | 43,470 | 62,444 | 1,178 | 43,273 | 62,682 | 1,323 | *0.38 | 0.31 |
| Outside principal cities. . . . . . . . . . . . . | 68,528 | 76,022 | 874 | 68,188 | 76,447 | 872 | *0.56 | 0.05 |
| Outside metropolitan statistical areas . . . . . | 17,933 | 51,616 | 1,157 | 17,784 | 51,878 | 1,167 | *0.51 | 0.11 |
| **Educational Attainment of Householder** | | | | | | | | |
| Total, aged 25 or older. . . . . . . . . . . . . . | 124,446 | 69,228 | 918 | 123,746 | 69,756 | 872 | *0.76 | 0.14 |
| No high school diploma . . . . . . . . . . . . . . . . | 10,052 | 29,547 | 1,063 | 9,961 | 29,741 | 1,049 | *0.66 | 0.17 |
| High school, no college . . . . . . . . . . . . . . . | 31,647 | 47,405 | 973 | 31,401 | 47,736 | 1,054 | *0.70 | 0.21 |
| Some college . . . . . . . . . . . . . . . . . . . . . . | 33,646 | 63,653 | 1,364 | 33,434 | 64,083 | 1,363 | *0.68 | 0.11 |
| Bachelor's degree or higher . . . . . . . . . . . | 49,102 | 106,936 | 1,490 | 48,950 | 107,379 | 1,617 | *0.41 | 0.16 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.

[1] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.

[2] Federal surveys give respondents the option of reporting more than one race. Therefore, two basic ways of defining a race group are possible. A group, such as Asian, may be defined as those who reported Asian and no other race (the race-alone or single-race concept) or as those who reported Asian regardless of whether they also reported another race (the race-alone-or-in-combination concept). This table shows data using the first approach (race alone). The use of the single-race population does not imply that it is the preferred method of presenting or analyzing data. The Census Bureau uses a variety of approaches. Data for American Indians and Alaska Natives, Native Hawaiians and Other Pacific Islanders, and those reporting two or more races are not shown separately.

[3] Information on metropolitan statistical areas and principal cities is available at <www.census.gov/programs-surveys/metro-micro/about/glossary.html>.

Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC).

Table B-2.
**Earnings Summary Measures by Selected Characteristics: 2020 Estimates Using 2010 Census-Based Population Controls and 2020 Census-Based Population Controls**
(Earnings in 2020 dollars. People 15 years and older as of March of the following year with earnings. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar21.pdf>)

| Characteristic | 2020 | | | | | | Percent change (2020 Census-based controls less 2010 Census-based controls)* | |
| | 2010 Census-based controls | | | 2020 Census-based controls | | | | |
| | Number (thousands) | Median income (dollars) | | Number (thousands) | Median income (dollars) | | | |
| | | Estimate | Margin of error[1] (±) | | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
|---|---|---|---|---|---|---|---|---|
| **PEOPLE WITH EARNINGS** | | | | | | | | |
| **Total workers . . . . . . . . . . . . . . . . . .** | **166,847** | **41,535** | **200** | **168,148** | **41,522** | **199** | ***−0.03** | **0.03** |
| Men. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 87,599 | 49,389 | 919 | 88,645 | 49,151 | 930 | *−0.48 | 0.18 |
| Women . . . . . . . . . . . . . . . . . . . . . . . . . . | 79,248 | 35,838 | 305 | 79,504 | 35,853 | 305 | *0.04 | 0.02 |
| **Full-Time, Year-Round Workers . . .** | **105,493** | **56,287** | **379** | **106,297** | **56,270** | **378** | **−0.03** | **0.04** |
| Men. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59,634 | 61,417 | 284 | 60,295 | 61,353 | 283 | *−0.10 | 0.04 |
| Women . . . . . . . . . . . . . . . . . . . . . . . . . . | 45,859 | 50,982 | 277 | 46,002 | 51,005 | 277 | *0.04 | 0.01 |
| Female-to-male earnings ratio . . . . . . . . . . . . | X | 0.830 | 0.0051 | X | 0.831 | 0.0051 | *0.15 | 0.05 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.
X Not applicable.
[1] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.
Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC).

# APPENDIX C. POST-TAX HOUSEHOLD INCOME

In response to the COVID-19 pandemic, Congress passed the American Rescue Plan Act (ARPA) in 2021 to aid individuals and families. ARPA provided additional income in the form of a third stimulus payment (economic impact payment) that was sent to households starting March 2021. ARPA also changed several refundable tax credits, including expanding the Earned Income Tax Credit to filers without children and making the Child Tax Credit and Child and Dependent Care Credit fully refundable. For consistency with past reports, the income estimates in the main sections of this report are based on the concept of money income, which is pretax and does not include the stimulus payment and tax credits. Given the large scale of the stimulus payment and tax credits, it is important to account for them in income and inequality estimates. Post-tax income is defined as money income net of federal and state taxes and credits, payroll taxes (FICA), the third stimulus payment, and state stimulus payments.[1] This appendix presents post-tax household income estimates and inequality measures for 2020 and 2021 that are shown in Tables C-1 through C-4. For post-tax poverty estimates that include the third stimulus payment and tax credits, refer to the Supplemental Poverty Measure estimates in the report "Poverty in the United States: 2021."[2]

Since the Current Population Survey Annual Social and Economic Supplement (CPS ASEC) does not collect information on taxes, it relies on a tax calculator to simulate federal and state taxes paid and credits received. Post-tax income used in this appendix and the Supplemental Poverty Measure is based on the CPS ASEC tax model. These simulations include federal and state income taxes, as well as FICA taxes, and incorporate any changes in federal and state tax laws for calendar year 2021.[3] The model estimates the third stimulus payment received by households in 2021 following a methodology described in a working paper entitled "Imputing 2020 Economic Impact Payments in the 2021 CPS ASEC," updated with parameters for the third stimulus payment.[4] The methodology for estimating stimulus payments and tax credits relies on 2021 adjusted gross income and tax filing status calculated using the tax model, along with household size and composition information collected in the 2022 CPS ASEC. For more details about the Child Tax Credit methodology, refer to "Modeling the 2021 Child Tax Credit in the CPS ASEC" at <www.census.gov/library/working-papers/2022/demo/SEHSD-wp2022-17.html>.

As with pretax money income (Table A-1) discussed in the main body of this report, real median post-tax household income in 2021 was not statistically different from 2020.[5] Refer to Table C-1 for changes in post-tax median income between 2020 and 2021 by selected demographic characteristics of the householder.

Table C-2 compares median household money income estimates (which are pretax) to post-tax estimates by demographic characteristics of the householder in 2021. Accounting for all taxes and credits reduced median household income by 7.7 percent in 2021. In 2021, three groups of households shown in C-2 experienced increases in median income post-tax: those maintained by a female householder with no spouse present (4.9 percent), those with a householder aged 25 and over with no high school diploma (14.0 percent), and those maintained by noncitizens (3.0 percent).[6] All other householder demographics displayed in Table C-2 had post-tax median income that was either not statistically different or lower than their pretax income.

Table C-3 presents post-tax inequality estimates for 2020 and 2021. In contrast to the 1.2 percent increase in the Gini index using pretax income between 2020 and 2021 (Table A-3), the annual percent change in the Gini index calculated by post-tax income was not statistically different. In 2021, post-tax income did not have any statistically significant changes from 2020 in the shares of aggregate income or summary measures shown in Table C-3.

Looking at the measures of equivalence-adjusted, post-tax income, there were declines in income inequality between 2020 and 2021 as measured by the aggregate shares of income, the Gini Index, and the percentile income ratios (Table C-3). The share of income in the lowest quintile increased 6.0 percent, while the share in the fourth quintile declined 1.2 percent.[7] The Gini index and the ratios of the 90th to 10th percentile and the 50th to 10th percentile for post-tax, equivalence-adjusted income each declined between 2020 and 2021. For more information on inequality measures and equivalence-adjusted income, refer to the Income Inequality section in the main text of this report.

Comparing inequality measures using pretax money income and post-tax income in 2021 illustrates the redistributive nature of the tax system (Table C-4). In 2021, after accounting for taxes and credits, aggregate shares of income in the bottom four quintiles increased, while the share of aggregate income of the highest quintile decreased. Inequality, as measured by the Gini index, was 12.9 percent lower when calculated using post-tax income compared to pretax income. Equivalence-adjusted pretax money income compared to post-tax, equivalence-adjusted income followed the same pattern in the redistribution of the aggregate shares: aggregate shares of income in the bottom four

quintiles increased, while the share of aggregate income of the highest quintile decreased, and there was a decline of 16.8 percent in the Gini index in 2021.

## ENDNOTES

[1] In the 2022 CPS ASEC, only the third stimulus payment is modeled. State stimulus payments in calendar year 2021 are modeled. States with stimulus payments in 2021 are California (Golden State Stimulus I and II), Maine (Disaster Relief Payment), and Maryland (Economic Impact Payment).

[2] John Creamer, Emily A. Shrider, Kalee Burns, Frances Chen, "Poverty in the United States: 2021," *Current Population Reports*, P60-277, U.S. Census Bureau, Washington, DC, September 2022, <https://www2.census.gov/library/publications/2022/demo/p60-277.html>.

[3] Laura Wheaton and Kathryn Stevens compare the Census Bureau's tax calculator to TAXSIM and the Bakija tax model and find consistency in tax estimates across the models in "The Effect of Different Tax Calculators on the Supplemental Poverty Measure," April 2016.

[4] Adam Bee, Charles Hokayem, and Daniel Lin, "Imputing 2020 Economic Impact Payments in the 2021 CPS ASEC," SEHSD Working Paper 2021-18, U.S. Census Bureau, Washington, DC, September 14, 2021, <www.census.gov/library/working-papers/2021/demo/SEHSD-WP2021-18.html>

[5] The difference between the 2020–2021 percent change in median household income both pretax and post-tax was not statistically significant.

[6] The difference between the 2020–2021 percent changes in median household income for females with no spouse present and noncitizens was not statistically different. The CPS ASEC Tax Model treats all respondents as U.S. residents. The model may assign payments and credits to foreign-born noncitizens who do not meet the Internal Revenue Service definition of "resident alien" and, hence, are not eligible to receive stimulus payments and certain tax credits.

[7] The difference in the 2020–2021 percent changes of aggregate income in the third quintile between post-tax income and equivalence-adjusted, post-tax income was not statistically different.

Table C-1.
## Post-Tax Household Income Summary Measures by Selected Characteristics: 2020 and 2021

(Income in 2021 dollars, adjusted using the R-CPI-U-RS. Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Characteristic | 2020[1] | | | 2021 | | | Percent change in real median post-tax income (2021 less 2020)* | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number (thousands) | Median post-tax income[2] (dollars) | | Number (thousands) | Median post-tax income[2] (dollars) | | | |
| | | Estimate | Margin of error[3] (±) | | Estimate | Margin of error[3] (±) | Estimate | Margin of error[3] (±) |
| **HOUSEHOLDS** | | | | | | | | |
| **All households** | **129,244** | **66,008** | **605** | **131,202** | **65,345** | **582** | **–1.0** | **1.08** |
| **Type of Household** | | | | | | | | |
| Family households | 83,711 | 84,000 | 721 | 84,265 | 84,171 | 698 | 0.2 | 1.04 |
| Married-couple | 61,288 | 96,124 | 889 | 61,435 | 96,439 | 887 | 0.3 | 1.18 |
| Female householder, no spouse present | 15,461 | 52,590 | 1,075 | 15,618 | 53,690 | 874 | 2.1 | 2.48 |
| Male householder, no spouse present | 6,963 | 66,982 | 2,209 | 7,212 | 68,287 | 1,659 | 1.9 | 3.94 |
| Nonfamily households | 45,533 | 39,594 | 656 | 46,937 | 38,464 | 608 | *–2.9 | 1.91 |
| Female householder | 23,859 | 35,613 | 776 | 24,221 | 33,793 | 711 | *–5.1 | 2.61 |
| Male householder | 21,674 | 44,784 | 911 | 22,716 | 43,459 | 848 | *–3.0 | 2.30 |
| **Race[4] and Hispanic Origin of Householder** | | | | | | | | |
| White | 100,931 | 68,908 | 720 | 102,057 | 68,167 | 660 | –1.1 | 1.15 |
| White, not Hispanic | 84,712 | 71,535 | 792 | 85,078 | 70,623 | 786 | *–1.3 | 1.24 |
| Black | 17,319 | 47,319 | 1,174 | 17,698 | 47,595 | 893 | 0.6 | 2.93 |
| Asian | 7,002 | 87,823 | 2,803 | 7,276 | 88,097 | 3,701 | 0.3 | 4.77 |
| Hispanic (any race) | 18,340 | 57,290 | 871 | 19,230 | 58,513 | 823 | *2.1 | 1.98 |
| **Age of Householder** | | | | | | | | |
| Under 65 years | 94,593 | 72,673 | 699 | 95,370 | 72,841 | 630 | 0.2 | 1.10 |
| 15 to 24 years | 5,498 | 47,758 | 1,293 | 6,061 | 49,648 | 1,365 | *4.0 | 3.94 |
| 25 to 34 years | 20,570 | 67,734 | 1,055 | 20,990 | 67,745 | 1,223 | Z | 2.27 |
| 35 to 44 years | 22,304 | 81,465 | 1,479 | 22,601 | 82,751 | 1,142 | 1.6 | 2.16 |
| 45 to 54 years | 21,803 | 83,324 | 1,986 | 21,647 | 85,444 | 1,440 | 2.5 | 2.72 |
| 55 to 64 years | 24,417 | 69,433 | 1,412 | 24,070 | 66,638 | 1,385 | *–4.0 | 2.58 |
| 65 years and older | 34,651 | 49,533 | 811 | 35,832 | 47,454 | 985 | *–4.2 | 2.17 |
| **Nativity of Householder** | | | | | | | | |
| Native-born | 109,633 | 66,624 | 683 | 110,800 | 65,630 | 678 | *–1.5 | 1.21 |
| Foreign-born | 19,611 | 62,920 | 1,144 | 20,402 | 64,081 | 1,150 | 1.8 | 2.42 |
| Naturalized citizen | 11,202 | 67,994 | 1,520 | 11,332 | 69,546 | 2,148 | 2.3 | 3.45 |
| Not a citizen | 8,409 | 57,351 | 1,371 | 9,070 | 58,863 | 1,404 | 2.6 | 3.36 |
| **Region** | | | | | | | | |
| Northeast | 22,471 | 70,655 | 1,592 | 22,640 | 70,038 | 2,014 | –0.9 | 3.10 |
| Midwest | 27,811 | 65,095 | 1,329 | 28,050 | 65,121 | 1,125 | Z | 2.14 |
| South | 49,759 | 61,032 | 900 | 50,612 | 60,441 | 775 | –1.0 | 1.70 |
| West | 29,203 | 72,321 | 1,074 | 29,900 | 72,372 | 1,032 | 0.1 | 1.87 |
| **Residence[5]** | | | | | | | | |
| Inside metropolitan statistical areas | 111,460 | 68,439 | 658 | 113,267 | 67,727 | 686 | –1.0 | 1.18 |
| Inside principal cities | 43,273 | 61,395 | 922 | 43,625 | 60,452 | 1,038 | –1.5 | 1.82 |
| Outside principal cities | 68,188 | 73,190 | 839 | 69,642 | 72,645 | 768 | –0.7 | 1.40 |
| Outside metropolitan statistical areas | 17,784 | 53,327 | 1,354 | 17,935 | 53,437 | 1,224 | 0.2 | 2.50 |
| **Educational Attainment of Householder** | | | | | | | | |
| Total, aged 25 and older | 123,746 | 67,164 | 633 | 125,141 | 66,547 | 601 | –0.9 | 1.12 |
| No high school diploma | 9,961 | 34,512 | 1,036 | 10,012 | 34,642 | 986 | 0.4 | 3.57 |
| High school, no college | 31,401 | 49,936 | 768 | 32,214 | 50,124 | 868 | 0.4 | 1.98 |
| Some college | 33,434 | 63,262 | 828 | 33,791 | 61,111 | 843 | *–3.4 | 1.63 |
| Bachelor's degree or higher | 48,950 | 97,019 | 1,268 | 49,125 | 98,461 | 1,284 | 1.5 | 1.60 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.
Z Rounds to zero.
[1] Implementation of 2020 Census-based population controls.
[2] Post-tax income is defined as money income net of federal and state income taxes and credits, payroll taxes (FICA), economic impact payments (EIP), and state stimulus payments. Information on money income collected in the CPS ASEC is available in "Appendix A. How Income Is Measured."
[3] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.
[4] Federal surveys give respondents the option of reporting more than one race. Therefore, two basic ways of defining a race group are possible. A group, such as Asian, may be defined as those who reported Asian and no other race (the race-alone or single-race concept) or as those who reported Asian regardless of whether they also reported another race (the race-alone-or-in-combination concept). This table shows data using the first approach (race alone). The use of the single-race population does not imply that it is the preferred method of presenting or analyzing data. The Census Bureau uses a variety of approaches. Data for American Indians and Alaska Natives, Native Hawaiians and Other Pacific Islanders, and those reporting two or more races are not shown separately.
[5] Information on metropolitan statistical areas and principal cities is available at <www.census.gov/programs-surveys/metro-micro/about/glossary.html>.
Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding.
Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Table C-2.
## Summary Measures by Selected Characteristics Using Money Income and Post-Tax Income: 2021

(Households as of March of the following year. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Characteristic | Money income[1] | | | Post-tax income[3] | | | Percent difference in median income* | |
|---|---|---|---|---|---|---|---|---|
| | Number (thousands) | Median income (dollars) | | Number (thousands) | Median income (dollars) | | | |
| | | Estimate | Margin of error[2] (±) | | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) |
| **HOUSEHOLDS** | | | | | | | | |
| **All households** . . . . . . . . . . . . . . . . | **131,202** | **70,784** | **605** | **131,202** | **65,345** | **582** | ***-7.7** | **0.31** |
| **Type of Household** | | | | | | | | |
| Family households. . . . . . . . . . . . . . . . . . . | 84,265 | 91,162 | 787 | 84,265 | 84,171 | 698 | *-7.7 | 0.29 |
| Married-couple. . . . . . . . . . . . . . . . . . | 61,435 | 106,921 | 937 | 61,435 | 96,439 | 887 | *-9.8 | 0.27 |
| Female householder, no spouse present. . | 15,618 | 51,168 | 925 | 15,618 | 53,690 | 874 | *4.9 | 0.89 |
| Male householder, no spouse present . . . . | 7,212 | 70,525 | 1,904 | 7,212 | 68,287 | 1,659 | *-3.2 | 1.19 |
| Nonfamily households . . . . . . . . . . . . . . . . | 46,937 | 41,797 | 590 | 46,937 | 38,464 | 608 | *-8.0 | 0.43 |
| Female householder . . . . . . . . . . . . . . . | 24,221 | 35,737 | 811 | 24,221 | 33,793 | 711 | *-5.4 | 0.63 |
| Male householder. . . . . . . . . . . . . . . . . . | 22,716 | 49,466 | 1,467 | 22,716 | 43,459 | 848 | *-12.1 | 1.14 |
| **Race[4] and Hispanic Origin of Householder** | | | | | | | | |
| White . . . . . . . . . . . . . . . . . . . . | 102,057 | 74,262 | 912 | 102,057 | 68,167 | 660 | *-8.2 | 0.47 |
| White, not Hispanic. . . . . . . . . . . . . . . . . | 85,078 | 77,999 | 1,080 | 85,078 | 70,623 | 786 | *-9.5 | 0.52 |
| Black. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,698 | 48,297 | 1,679 | 17,698 | 47,595 | 893 | -1.5 | 2.04 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,276 | 101,418 | 2,868 | 7,276 | 88,097 | 3,701 | *-13.1 | 1.63 |
| Hispanic (any race) . . . . . . . . . . . . . . . . . . | 19,230 | 57,981 | 1,585 | 19,230 | 58,513 | 823 | 0.9 | 1.67 |
| **Age of Householder** | | | | | | | | |
| Under 65 years. . . . . . . . . . . . . . . . . . . . . | 95,370 | 80,734 | 613 | 95,370 | 72,841 | 630 | *-9.8 | 0.34 |
| 15 to 24 years. . . . . . . . . . . . . . . . . . . | 6,061 | 51,645 | 1,575 | 6,061 | 49,648 | 1,365 | *-3.9 | 1.46 |
| 25 to 34 years. . . . . . . . . . . . . . . . . . . | 20,990 | 74,862 | 1,932 | 20,990 | 67,745 | 1,223 | *-9.5 | 1.21 |
| 35 to 44 years. . . . . . . . . . . . . . . . . . . | 22,601 | 90,312 | 1,561 | 22,601 | 82,751 | 1,142 | *-8.4 | 0.78 |
| 45 to 54 years. . . . . . . . . . . . . . . . . . . | 21,647 | 97,089 | 1,598 | 21,647 | 85,444 | 1,440 | *-12.0 | 0.68 |
| 55 to 64 years. . . . . . . . . . . . . . . . . . . | 24,070 | 75,842 | 1,443 | 24,070 | 66,638 | 1,385 | *-12.1 | 0.69 |
| 65 years and older. . . . . . . . . . . . . . . . . . . | 35,832 | 47,620 | 1,037 | 35,832 | 47,454 | 985 | -0.3 | 0.58 |
| **Nativity of Householder** | | | | | | | | |
| Native-born. . . . . . . . . . . . . . . . . . . . . . . . | 110,800 | 71,522 | 692 | 110,800 | 65,630 | 678 | *-8.2 | 0.33 |
| Foreign-born. . . . . . . . . . . . . . . . . . . . . . . | 20,402 | 66,043 | 1,494 | 20,402 | 64,081 | 1,150 | *-3.0 | 0.94 |
| Naturalized citizen. . . . . . . . . . . . . . . . | 11,332 | 74,150 | 2,458 | 11,332 | 69,546 | 2,148 | *-6.2 | 1.06 |
| Not a citizen . . . . . . . . . . . . . . . . . . . . . | 9,070 | 57,132 | 2,152 | 9,070 | 58,863 | 1,404 | *3.0 | 2.17 |
| **Region** | | | | | | | | |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . | 22,640 | 77,472 | 2,705 | 22,640 | 70,038 | 2,014 | *-9.6 | 1.09 |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,050 | 71,129 | 1,284 | 28,050 | 65,121 | 1,125 | *-8.4 | 0.69 |
| South . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50,612 | 63,368 | 1,218 | 50,612 | 60,441 | 775 | *-4.6 | 0.84 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,900 | 79,430 | 1,482 | 29,900 | 72,372 | 1,032 | *-8.9 | 0.77 |
| **Residence[5]** | | | | | | | | |
| Inside metropolitan statistical areas . . . . . . | 113,267 | 73,823 | 941 | 113,267 | 67,727 | 686 | *-8.3 | 0.47 |
| Inside principal cities. . . . . . . . . . . . . . . | 43,625 | 64,839 | 1,503 | 43,625 | 60,452 | 1,038 | *-6.8 | 0.81 |
| Outside principal cities. . . . . . . . . . . . . . | 69,642 | 79,599 | 1,109 | 69,642 | 72,645 | 768 | *-8.7 | 0.58 |
| Outside metropolitan statistical areas . . . . . | 17,935 | 53,750 | 2,026 | 17,935 | 53,437 | 1,224 | -0.6 | 1.74 |
| **Educational Attainment of Householder** | | | | | | | | |
| Total, aged 25 and older. . . . . . . . . . . . . . | 125,141 | 72,046 | 627 | 125,141 | 66,547 | 601 | *-7.6 | 0.32 |
| No high school diploma . . . . . . . . . . . . . . . | 10,012 | 30,378 | 774 | 10,012 | 34,642 | 986 | *14.0 | 1.60 |
| High school, no college . . . . . . . . . . . . . . . | 32,214 | 50,401 | 795 | 32,214 | 50,124 | 868 | -0.5 | 0.70 |
| Some college . . . . . . . . . . . . . . . . . . . . . . | 33,791 | 64,378 | 1,483 | 33,791 | 61,111 | 843 | *-5.1 | 1.08 |
| Bachelor's degree or higher . . . . . . . . . . . . | 49,125 | 115,456 | 1,771 | 49,125 | 98,461 | 1,284 | *-14.7 | 0.48 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.
[1] Information on money income collected in the CPS ASEC is available in "Appendix A. How Income Is Measured."
[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. The MOEs shown in this table are based on standard errors calculated using replicate weights.
[3] Post-tax income is defined as money income net of federal and state income taxes and credits, payroll taxes (FICA), economic impact payments (EIP), and state stimulus payments.
[4] Federal surveys give respondents the option of reporting more than one race. Therefore, two basic ways of defining a race group are possible. A group, such as Asian, may be defined as those who reported Asian and no other race (the race-alone or single-race concept) or as those who reported Asian regardless of whether they also reported another race (the race-alone-or-in-combination concept). This table shows data using the first approach (race alone). The use of the single-race population does not imply that it is the preferred method of presenting or analyzing data. The Census Bureau uses a variety of approaches. Data for American Indians and Alaska Natives, Native Hawaiians and Other Pacific Islanders, and those reporting two or more races are not shown separately.
[5] Information on metropolitan statistical areas and principal cities is available at <www.census.gov/programs-surveys/metro-micro/about/glossary.html>.
Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding.
Source: U.S. Census Bureau, Current Population Survey, 2022 Annual Social and Economic Supplement (CPS ASEC).

Table C-3.
## Distribution Measures Using Post-Tax Income and Equivalence-Adjusted Post-Tax Income: 2020 and 2021

(Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Measure | 2020[1] | | 2021 | | Percent change (2021 less 2020)[1, 3] | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) |
| **POST-TAX INCOME[4]** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile.............................. | 4.2 | 0.06 | 4.1 | 0.06 | –1.3 | 1.83 |
| Second quintile ............................ | 9.9 | 0.09 | 9.8 | 0.09 | –0.6 | 1.14 |
| Third quintile............................... | 15.5 | 0.11 | 15.4 | 0.10 | –0.3 | 0.89 |
| Fourth quintile ............................. | 23.4 | 0.14 | 23.4 | 0.14 | 0.2 | 0.78 |
| Highest quintile ............................ | 47.1 | 0.33 | 47.2 | 0.31 | 0.2 | 0.82 |
| Top 5 percent ........................... | 19.5 | 0.36 | 19.7 | 0.33 | 1.0 | 2.22 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality ............. | 0.428 | 0.0034 | 0.430 | 0.0033 | 0.5 | 0.94 |
| 90th/10th percentile income ratio........... | 8.77 | 0.204 | 8.94 | 0.198 | 2.0 | 3.11 |
| 90th/50th percentile income ratio .......... | 2.51 | 0.032 | 2.53 | 0.028 | 0.9 | 1.67 |
| 50th/10th percentile income ratio ........... | 3.49 | 0.065 | 3.53 | 0.068 | 1.1 | 2.69 |
| **EQUIVALENCE-ADJUSTED POST-TAX INCOME[4]** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile.............................. | 5.1 | 0.07 | 5.4 | 0.07 | *6.0 | 1.76 |
| Second quintile ............................ | 10.9 | 0.09 | 10.9 | 0.09 | 0.8 | 1.03 |
| Third quintile............................... | 16.0 | 0.11 | 16.0 | 0.10 | –0.2 | 0.87 |
| Fourth quintile ............................. | 22.8 | 0.14 | 22.6 | 0.12 | *–1.2 | 0.77 |
| Highest quintile ............................ | 45.2 | 0.33 | 45.1 | 0.31 | –0.2 | 0.91 |
| Top 5 percent ........................... | 18.9 | 0.37 | 19.0 | 0.33 | 0.5 | 2.36 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality ............. | 0.399 | 0.0036 | 0.394 | 0.0034 | *–1.1 | 1.09 |
| 90th/10th percentile income ratio........... | 6.52 | 0.103 | 6.14 | 0.093 | *–5.8 | 1.90 |
| 90th/50th percentile income ratio .......... | 2.33 | 0.022 | 2.30 | 0.023 | –1.1 | 1.31 |
| 50th/10th percentile income ratio ........... | 2.80 | 0.038 | 2.67 | 0.032 | *–4.8 | 1.61 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.

[1] Implementation of 2020 Census-based population controls.

[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.

[3] Calculated estimate may be different due to rounded components.

[4] Post-tax income is defined as money income net of federal and state income taxes and credits, payroll taxes (FICA), economic impact payments (EIP), and state stimulus payments. Information on money income collected in the CPS ASEC is available in "Appendix A. How Income Is Measured."

Source: U.S. Census Bureau, Current Population Survey, 2021 and 2022 Annual Social and Economic Supplements (CPS ASEC).

Table C-4.
## Distribution Measures Using Money Income, Post-Tax Income, Equivalence-Adjusted Income, and Equivalence-Adjusted Post-Tax Income: 2021

(Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Measure | Money income[1] | | Post-tax income[3] | | Percent difference[, 4] | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) | Estimate | Margin of error[2] (±) |
| **INCOME** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.9 | 0.06 | 4.1 | 0.06 | *41.3 | 0.88 |
| Second quintile . . . . . . . . . . . . . . . . . . . . . . . . . | 8.0 | 0.09 | 9.8 | 0.09 | *22.3 | 0.49 |
| Third quintile . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13.9 | 0.12 | 15.4 | 0.10 | *11.5 | 0.31 |
| Fourth quintile . . . . . . . . . . . . . . . . . . . . . . . . . . | 22.6 | 0.17 | 23.4 | 0.14 | *3.9 | 0.26 |
| Highest quintile . . . . . . . . . . . . . . . . . . . . . . . . . | 52.7 | 0.37 | 47.2 | 0.31 | *−10.4 | 0.11 |
| Top 5 percent . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.5 | 0.44 | 19.7 | 0.33 | *−16.1 | 0.32 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality . . . . . . . . . . . . . | 0.494 | 0.0038 | 0.430 | 0.0033 | *−12.9 | 0.13 |
| 90th/10th percentile income ratio . . . . . . . . . . . . | 13.53 | 0.431 | 8.94 | 0.198 | *−33.9 | 1.17 |
| 90th/50th percentile income ratio . . . . . . . . . . . | 2.99 | 0.034 | 2.53 | 0.028 | *−15.5 | 0.46 |
| 50th/10th percentile income ratio . . . . . . . . . . . . | 4.52 | 0.130 | 3.53 | 0.068 | *−21.9 | 1.32 |
| **EQUIVALENCE-ADJUSTED INCOME** | | | | | | |
| **Shares of Aggregate Income by Percentile** | | | | | | |
| Lowest quintile . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.3 | 0.06 | 5.4 | 0.07 | *61.6 | 1.27 |
| Second quintile . . . . . . . . . . . . . . . . . . . . . . . . . | 8.8 | 0.10 | 10.9 | 0.09 | *23.9 | 0.46 |
| Third quintile . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14.4 | 0.12 | 16.0 | 0.10 | *11.1 | 0.29 |
| Fourth quintile . . . . . . . . . . . . . . . . . . . . . . . . . . | 22.3 | 0.16 | 22.6 | 0.12 | *1.3 | 0.22 |
| Highest quintile . . . . . . . . . . . . . . . . . . . . . . . . . | 51.2 | 0.36 | 45.1 | 0.31 | *−11.8 | 0.11 |
| Top 5 percent . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.0 | 0.43 | 19.0 | 0.33 | *−17.4 | 0.32 |
| **Summary Measures** | | | | | | |
| Gini index of income inequality . . . . . . . . . . . . . | 0.474 | 0.0038 | 0.394 | 0.0034 | *−16.8 | 0.14 |
| 90th/10th percentile income ratio . . . . . . . . . . . . | 10.89 | 0.274 | 6.14 | 0.093 | *−43.6 | 0.92 |
| 90th/50th percentile income ratio . . . . . . . . . . . | 2.81 | 0.034 | 2.30 | 0.023 | *−17.9 | 0.42 |
| 50th/10th percentile income ratio . . . . . . . . . . . . | 3.88 | 0.087 | 2.67 | 0.032 | *−31.3 | 1.10 |

* An asterisk preceding an estimate indicates change is statistically different from zero at the 90 percent confidence level.
[1] Information on money income collected in the CPS ASEC is available in "Appendix A. How Income Is Measured."
[2] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights.
[3] Post-tax income is defined as money income net of federal and state income taxes and credits, payroll taxes (FICA), economic impact payments (EIP), and state stimulus payments.
[4] Calculated estimate may be different due to rounded components.
Source: U.S. Census Bureau, Current Population Survey, 2022 Annual Social and Economic Supplement (CPS ASEC).

## APPENDIX D. HISTORICAL INCOME ALTERNATIVE INFLATION SERIES AND REQUEST FOR COMMENTS

To accurately assess changes in income and earnings over time, it is necessary to adjust for changes in the cost of living or inflation. Price levels in the United States in 2021 were elevated relative to previous years. Therefore, adjustment for inflation is especially important when analyzing income data from 2021. There are multiple inflation measures—each with its own function, scope, coverage, and formula—available to the U.S. Census Bureau for this purpose. Estimates of changes in real income and earnings are sensitive to the price index the Census Bureau chooses to use for this adjustment.

This report uses the Consumer Price Index Retroactive Series for all Urban Consumers All Items (R-CPI-U-RS), produced by the Bureau of Labor Statistics (BLS), to adjust median income and earnings statistics for inflation from 1978 onward.[1] This appendix compares historical real median income and earnings estimates using two alternative inflation indexes: the Chained Consumer Price Index for Urban Consumers (C-CPI-U) produced by BLS and the Personal Consumption Expenditures Price Index (PCEPI) produced by the Bureau of Economic Analysis (BEA).

The Census Bureau has considered using a "chained-type" price index to inflation-adjust its historical income and earnings estimates for several years. The Income and Poverty in the United States reports from 2019 and 2020 both contain an appendix similar to this one, documenting how applying alternative inflation indexes would affect historical income and earnings estimates and requesting comments about the merits of using these indexes. Such a change would also be consistent with the guidance in a recent report issued by the Interagency Technical Working Group on Consumer Inflation Measures (ITWG), which presents a set of principles to help federal agencies select the most appropriate inflation index for their specific purpose.

For more information about the motivation for this potential change, the relative merits of these alternative inflation indexes, and implications for the CPS ASEC's historical estimates of income and earnings, refer to the working paper "The Impact of Alternative Inflation Adjustments on CPS ASEC Income Statistics" available at <www.census.gov/library/working-papers/2022/demo/SEHSD-wp2022-10.html>.

### Alternative Price Indexes

The R-CPI-U-RS retroactively incorporates the numerous improvements made to the most well-known and widely used inflation index, the Consumer Price Index for All Urban Consumers (CPI-U). For the years 1967 through 1977, the Census Bureau used inflation estimates from the CPI-U-X1 series, an experimental series that preceded the R-CPI-U-RS.[2] For prior years, the Census Bureau used a backwards projection of the R-CPI-U-RS, assuming the same ratio between the R-CPI-U-RS and CPI-U as there was in 1967. Hereafter, these estimates are referred to as the Census Bureau's "current method" for inflation-adjusting historical income and earnings estimates.

Despite the improvements made to the CPI-U and incorporated into the R-CPI-U-RS, neither measure fully accounts for how individuals shift consumption in response to changes in relative prices; both measures thereby risk overstating increases in the cost of living. Inflation measures that better account for this substitution—including the C-CPI-U and PCEPI—are known as "chained" measures and are widely considered to be less biased measures of price-adjusted income and earnings.

The C-CPI-U relies on the same sample and consumption data as the CPI-U but uses a different formula and set of expenditure weights than the CPI-U in order to compute changes in the true cost of living in adjacent periods. The C-CPI-U is available from 2000 onward.[3]

The PCEPI tracks changes in the prices of goods and services purchased by consumers, as well as by nonprofit institutions that serve households. BEA does not collect price or consumption data on its own, so the PCEPI aggregates data collected by BLS to construct the CPIs and Producer Price Indexes (PPIs). Though it largely tracks the same goods and services, some items in CPI-U are out of scope for the PCEPI, and vice versa. Like the C-CPI-U, the PCEPI uses a different formula and set of expenditure weights from the CPI-U in order to account for consumer substitution in adjacent periods. The PCEPI is available from 1959 onward.[4]

Between 2000 and 2021, the compound annual growth rates in the C-CPI-U and the PCEPI have been an average of 0.31 percentage points and 0.27 percentage



Figure D-1.
**Historical Median Income Using Alternative Price Indexes: 1967 to 2021**

Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding. The data for 2017 and beyond reflect the implementation of an updated processing system. The data for 2013 and beyond reflect the implementation of the redesigned income questions. Details on the alternative price indexes shown and historical footnote are available in Appendix Table D-1. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.
Source: U.S. Census Bureau, Current Population Survey, 1968 to 2022 Annual Social and Economic Supplements (CPS ASEC).

points lower than for the R-CPI-U-RS, respectively.[5] The compound annual growth rate in prices as measured by the R-CPI-U-RS was 2.20 percent, compared to 1.92 percent in the C-CPI-U and 1.88 percent in the PCEPI. These small annual differences have a limited effect on estimates of annual growth in real median income, but compound to have large impacts over longer periods.

The annual inflation rate between 2020 and 2021 according to the R-CPI-U-RS was 4.67 percent, compared to 4.57 and 3.87 percent according to the C-CPI-U and PCEPI, respectively. While the difference between the R-CPI-U-RS and the PCEPI was larger (0.80 percentage points) than the annual average difference over the prior 2 decades, the difference between the R-CPI-U-RS and the C-CPI-U was smaller (0.10 percentage points). The two BLS price indexes tracked each other closely last year, despite significant shifts in consumption after the pandemic began and inflation running at a 40-year high.

**Implications for Income Estimates**

Figure D-1 compares historical median household income from 1967 onward using three different inflation series: (1) the current method based on the R-CPI-U-RS used in this report, (2) the C-CPI-U from 2000 onward combined with the current method for prior years, and (3) the C-CPI-U from 2000 onward combined with the PCEPI for prior years. Recall that the C-CPI-U is not available for years prior to 2000.



Figure D-2.
**Real Year-Over-Year Income Growth Using Alternative Price Indexes: 2016 to 2021**
(In percent)

Note: The data for 2017 reflect the implementation of an updated processing system. The current method uses the Consumer Price Index Retroactive Series (R-CPI-U-RS) for the years shown in this figure. The C-CPI-U is the Chained Consumer Price Index for All Urban Consumers. Statistically significant indicates the change is statistically different from zero at the 90 percent confidence level. Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.
Source: U.S. Census Bureau, Current Population Survey, 2017 to 2022 Annual Social and Economic Supplements (CPS ASEC).

Real median household income in 2020 adjusted to 2021 dollars using the R-CPI-U-RS ($71,186) is not statistically different from the estimate using the C-CPI-U ($71,117). For 2000, the median income estimate in 2021 dollars adjusted using the R-CPI-U-RS (current method) is $66,248, which is 5.8 percent higher than the estimate ($62,612) adjusted using the C-CPI-U. For 1967, the estimate of median household income in 2021 dollars using the current method ($50,803) is 12.4 percent higher than the estimate using the C-CPI-U and the PCEPI for earlier years ($45,211).

Figure D-2 reports estimates of annual growth in real median household income according to the current method and the C-CPI-U from 2016 onward. While annual growth in inflation-adjusted income appears slightly higher according to the chained price index (since chained indexes tend to estimate slightly lower rates of inflation), none of the within-year differences are statistically significant. If the Census Bureau had used C-CPI-U to inflation-adjust prior year estimates in recent reports, neither the direction nor statistical significance of the changes would be different from the published estimates. It is reasonable to expect this will remain the case in future years.

**Request for Comments**

Based on the strengths of the chained price measures and following recommendations from the recently convened ITWG, the Census Bureau is considering using the C-CPI-U and PCEPI to inflation-adjust prior year and historical median income and earnings statistics in future reports.[6] Given the additional bias corrected for by the C-CPI-U and the close correspondence between the PCEPI and C-CPI-U in the years both are available, the Census Bureau is considering the adoption of the C-CPI-U series using the PCEPI prior to 2000 as the price index used to adjust historical income tables for changes in the cost of living over time. For more information about this proposed change, refer to <www.census.gov/topics/income-poverty/income/guidance/alternative-inflation.html>.

The Census Bureau would like to receive feedback and evidence on the relative technical merits of income series deflated by the C-CPI-U/PCEPI index as compared to our current R-CPI-U-RS-based adjustment. Refer to the *Federal Register* Notice Docket Number 220715-0157 issued on September 1, 2022, for more information, <www.federalregister.gov/documents/2022/09/01/2022-18938/request-for-comment-on-inflation-measures-for-adjusting-historical-income>. Send comments about this issue to <sehsd.isb.inflation.comments@census.gov>.

Matthew Unrath, PhD
Economist, Income Statistics Branch
Social, Economic, and Housing Statistics Division,
U.S. Census Bureau
<matthew.unrath@census.gov>

**ENDNOTES**

[1] In 2001, the Census Bureau began using the CPI-U-RS to adjust historical income estimates for changes in the cost of living. For more information, refer to Carmen DeNavas-Walt, Robert W. Cleveland, and Marc I. Roemer, "Money Income in the United States: 2000," *Current Population Reports*, P60-213, U.S. Census Bureau, Washington, DC, September 2001, <https://www2.census.gov/library/publications/2001/demographics/p60-213.pdf>. In 2021, BLS renamed the Research Series (CPI-U-RS) the Retroactive Series (R-CPI-U-RS). In this paper and all other associated content, it is referred to as the R-CPI-U-RS. While the R-CPI-U-RS is used to adjust the historical income and earnings series, the CPI-U is used to adjust poverty thresholds.

[2] BLS created the CPI-U-X1 to estimate the inflation rate in the CPI-U when applying the current rental equivalence method of measuring the cost of homeownership for years prior to 1983.

[3] For more information about the C-CPI-U, refer to <www.bls.gov/cpi/additional-resources/chained-cpi-questions-and-answers.htm>.

[4] For more information about the PCEPI, refer to <www.bea.gov/data/personal-consumption-expenditures-price-index>.

[5] A simple arithmetic mean is not appropriate for averaging percent changes in these indexes for multiple periods. For example, the average of a 50 percent increase in t=1 followed by a 50 percent decrease in t=2 does not imply an average change equal to zero. Instead, the more appropriate rate of return formula to calculate the compounded average percent change over this period is applied.

[6] For more information about the ITWG report and recommendations, refer to <www.bls.gov/evaluation/home.htm>.

Table D-1.
## Historical Median Income Using Alternative Price Indexes: 1967 to 2021

(Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>)

| Year | Current dollars | | R-CPI-U-RS/current method | | Chained CPI-U (2000–2021) | | | |
| | | | | | PCEPI (1967–1999) | | R-CPI-U-RS/current method (1967–1999) | |
| | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) | Estimate | Margin of error[1] (±) |
|---|---|---|---|---|---|---|---|---|
| 2021 . . . . . . . . . | 70,784 | 605 | 70,784 | 605 | 70,784 | 605 | 70,784 | 605 |
| 2020[2] . . . . . . . . | 68,010 | 880 | 71,186 | 921 | 71,117 | 920 | 71,117 | 920 |
| 2019 . . . . . . . . . | 68,703 | 905 | 72,808 | 959 | 72,613 | 956 | 72,613 | 956 |
| 2018 . . . . . . . . . | 63,179 | 691 | 68,168 | 746 | 67,746 | 741 | 67,746 | 741 |
| 2017[3] . . . . . . . . | 61,136 | 529 | 67,571 | 585 | 66,877 | 579 | 66,877 | 579 |
| 2017 . . . . . . . . . | 61,372 | 551 | 67,832 | 609 | 67,136 | 603 | 67,136 | 603 |
| 2016 . . . . . . . . . | 59,039 | 717 | 66,657 | 810 | 65,724 | 799 | 65,724 | 799 |
| 2015 . . . . . . . . . | 56,516 | 528 | 64,631 | 604 | 63,502 | 593 | 63,502 | 593 |
| 2014 . . . . . . . . . | 53,657 | 645 | 61,468 | 739 | 60,218 | 724 | 60,218 | 724 |
| 2013[4] . . . . . . . . | 53,585 | 1,076 | 62,425 | 1,253 | 61,007 | 1,225 | 61,007 | 1,225 |
| 2013[5] . . . . . . . . | 51,939 | 454 | 60,507 | 529 | 59,132 | 517 | 59,132 | 517 |
| 2012 . . . . . . . . . | 51,017 | 343 | 60,313 | 406 | 58,793 | 396 | 58,793 | 396 |
| 2011 . . . . . . . . . | 50,054 | 413 | 60,428 | 498 | 58,808 | 485 | 58,808 | 485 |
| 2010[6] . . . . . . . . | 49,276 | 535 | 61,364 | 666 | 59,663 | 648 | 59,663 | 648 |
| 2009[7] . . . . . . . . | 49,777 | 351 | 63,011 | 444 | 61,129 | 431 | 61,129 | 431 |
| 2008 . . . . . . . . . | 50,303 | 225 | 63,455 | 284 | 61,485 | 275 | 61,485 | 275 |
| 2007 . . . . . . . . . | 50,233 | 231 | 65,801 | 302 | 63,691 | 292 | 63,691 | 292 |
| 2006 . . . . . . . . . | 48,201 | 341 | 64,930 | 459 | 62,659 | 443 | 62,659 | 443 |
| 2005 . . . . . . . . . | 46,326 | 255 | 64,427 | 355 | 61,969 | 341 | 61,969 | 341 |
| 2004[8] . . . . . . . . | 44,334 | 323 | 63,745 | 464 | 61,022 | 444 | 61,022 | 444 |
| 2003 . . . . . . . . . | 43,318 | 309 | 63,967 | 457 | 61,117 | 437 | 61,117 | 437 |
| 2002 . . . . . . . . . | 42,409 | 228 | 64,047 | 345 | 61,081 | 329 | 61,081 | 329 |
| 2001 . . . . . . . . . | 42,228 | 213 | 64,779 | 326 | 61,579 | 310 | 61,579 | 310 |
| 2000[9] . . . . . . . . | 41,990 | 217 | 66,248 | 343 | 62,612 | 324 | 62,612 | 324 |
| 1999[10] . . . . . . . . | 40,696 | 313 | 66,385 | 510 | 62,191 | 478 | 62,742 | 482 |
| 1998 . . . . . . . . . | 38,885 | 378 | 64,781 | 630 | 60,309 | 587 | 61,226 | 595 |
| 1997 . . . . . . . . . | 37,005 | 281 | 62,484 | 475 | 57,850 | 440 | 59,055 | 449 |
| 1996 . . . . . . . . . | 35,492 | 294 | 61,225 | 508 | 56,451 | 468 | 57,865 | 480 |
| 1995[11] . . . . . . . . | 34,076 | 324 | 60,348 | 574 | 55,357 | 527 | 57,036 | 542 |
| 1994[12] . . . . . . . . | 32,264 | 242 | 58,515 | 439 | 53,517 | 402 | 55,304 | 415 |
| 1993[13] . . . . . . . . | 31,241 | 240 | 57,843 | 445 | 52,902 | 407 | 54,669 | 421 |
| 1992[14] . . . . . . . . | 30,636 | 239 | 58,153 | 453 | 53,169 | 414 | 54,962 | 428 |
| 1991 . . . . . . . . . | 30,126 | 239 | 58,607 | 464 | 53,678 | 425 | 55,391 | 439 |
| 1990 . . . . . . . . . | 29,943 | 251 | 60,370 | 507 | 55,135 | 463 | 57,057 | 479 |
| 1989 . . . . . . . . . | 28,906 | 261 | 61,153 | 553 | 55,563 | 502 | 57,797 | 523 |
| 1988 . . . . . . . . . | 27,225 | 219 | 60,115 | 483 | 54,617 | 439 | 56,816 | 456 |
| 1987[15] . . . . . . . . | 26,061 | 202 | 59,624 | 463 | 54,325 | 422 | 56,352 | 438 |
| 1986 . . . . . . . . . | 24,897 | 212 | 58,920 | 502 | 53,498 | 456 | 55,687 | 474 |
| 1985[16] . . . . . . . . | 23,618 | 211 | 56,871 | 507 | 51,854 | 462 | 53,750 | 479 |
| 1984[17] . . . . . . . . | 22,415 | 168 | 55,828 | 418 | 50,930 | 381 | 52,764 | 395 |
| 1983 . . . . . . . . . | 20,885 | 156 | 54,182 | 405 | 49,245 | 368 | 51,209 | 383 |
| 1982 . . . . . . . . . | 20,171 | 150 | 54,564 | 405 | 49,585 | 368 | 51,570 | 383 |
| 1981 . . . . . . . . . | 19,074 | 165 | 54,713 | 472 | 49,493 | 427 | 51,710 | 446 |
| 1980 . . . . . . . . . | 17,710 | 150 | 55,596 | 470 | 50,070 | 423 | 52,545 | 444 |
| 1979[18] . . . . . . . . | 16,461 | 128 | 57,462 | 448 | 51,551 | 402 | 54,309 | 423 |
| 1978 . . . . . . . . . | 15,064 | 100 | 57,572 | 384 | 51,367 | 343 | 54,413 | 363 |
| 1977 . . . . . . . . . | 13,572 | 84 | 55,427 | 343 | 49,499 | 306 | 52,385 | 324 |
| 1976[19] . . . . . . . . | 12,686 | 77 | 55,078 | 336 | 49,278 | 301 | 52,055 | 318 |
| 1975[20] . . . . . . . . | 11,800 | 79 | 54,180 | 363 | 48,352 | 324 | 51,207 | 343 |
| 1974[20, 21] . . . . . . . | 11,197 | 71 | 55,636 | 351 | 49,703 | 314 | 52,583 | 332 |
| 1973 . . . . . . . . . | 10,512 | 66 | 57,456 | 360 | 51,521 | 323 | 54,303 | 340 |
| 1972[22] . . . . . . . . | 9,697 | 61 | 56,319 | 353 | 50,086 | 314 | 53,228 | 334 |
| 1971[23] . . . . . . . . | 9,028 | 58 | 54,006 | 344 | 48,221 | 307 | 51,042 | 325 |
| 1970 . . . . . . . . . | 8,734 | 53 | 54,536 | 329 | 48,632 | 293 | 51,543 | 311 |
| 1969 . . . . . . . . . | 8,389 | 51 | 54,962 | 334 | 48,895 | 297 | 51,946 | 316 |
| 1968 . . . . . . . . . | 7,743 | 46 | 52,992 | 315 | 47,161 | 280 | 50,084 | 298 |
| 1967[24] . . . . . . . . | 7,143 | 43 | 50,803 | 304 | 45,211 | 271 | 48,015 | 287 |

Footnotes provided on the next page.

[1] A margin of error (MOE) is a measure of an estimate's variability. The larger the MOE in relation to the size of the estimate, the less reliable the estimate. This number, when added to and subtracted from the estimate, forms the 90 percent confidence interval. MOEs shown in this table are based on standard errors calculated using replicate weights beginning with 2010. Before 2010, standard errors were calculated using the generalized variance function.

[2] Implementation of 2020 Census-based population controls.

[3] Estimates reflect the implementation of an updated processing system and should be used to make comparisons to 2018 and subsequent years.

[4] The 2014 CPS ASEC included redesigned questions for income and health insurance coverage. All of the approximately 98,000 addresses were eligible to receive the redesigned set of health insurance coverage questions. The redesigned income questions were implemented to a subsample of these 98,000 addresses using a probability split panel design. Approximately 68,000 addresses were eligible to receive a set of income questions similar to those used in the 2013 CPS ASEC, and the remaining 30,000 addresses were eligible to receive the redesigned income questions. The source of these 2013 estimates is the portion of the CPS ASEC sample that received the redesigned income questions, approximately 30,000 addresses.

[5] The source of these 2013 estimates is the portion of the CPS ASEC sample that received the income questions consistent with the 2013 CPS ASEC, approximately 68,000 addresses.

[6] Implementation of 2010 Census-based population controls. Beginning with 2010, standard errors in this table were calculated using replicate weights. Before 2010, standard errors were calculated using the generalized variance function.

[7] Median income is calculated using $2,500 intervals. Beginning with 2009 income data, the Census Bureau expanded the upper income intervals used to calculate medians to $250,000 or more. Medians falling in the upper open-ended interval are plugged with "$250,000." Before 2009, the upper open-ended interval was $100,000 and a plug of "$100,000" was used.

[8] Data have been revised to reflect a correction to the weights in the 2005 CPS ASEC.

[9] Implementation of a 28,000-household sample expansion.

[10] Implementation of 2000 Census-based population controls.

[11] Full implementation of 1990 Census-based sample design and metropolitan definitions, 7,000-household sample reduction, and revised editing of responses on race.

[12] Introduction of 1990 Census sample design.

[13] Data collection method changed from paper and pencil to computer-assisted interviewing. In addition, the 1994 CPS ASEC was revised to allow for the coding of different income amounts on selected questionnaire items. Limits either increased or decreased in the following categories: earnings limits increased to $999,999; Social Security limits increased to $49,999; Supplemental Security Income and public assistance limits increased to $24,999; veterans' benefits limits increased to $99,999; child support and alimony limits decreased to $49,999.

[14] Implementation of 1990 Census population controls.

[15] Implementation of a new CPS ASEC processing system.

[16] Recording of amounts for earnings from longest job increased to $299,999. Full implementation of 1980 Census-based sample design.

[17] Implementation of Hispanic population weighting controls and introduction of 1980 Census-based sample design.

[18] Implementation of 1980 Census population controls. Questionnaire expanded to allow the recording of up to 27 possible values from a list of 51 possible sources of income.

[19] First year medians were derived using both Pareto and linear interpolation. Before this year, all medians were derived using linear interpolation.

[20] Some of these estimates were derived using Pareto interpolation and may differ from published data, which were derived using linear interpolation.

[21] Implementation of a new CPS ASEC processing system. Questionnaire expanded to ask 11 income questions.

[22] Full implementation of 1970 Census-based sample design.

[23] Introduction of 1970 Census sample design and population controls.

[24] Implementation of a new CPS ASEC processing system.

Note: Inflation-adjusted estimates may differ slightly from other published data due to rounding. Details of the Consumer Price Index for All Urban Consumers (CPI-U) are available at <www.bls.gov/cpi/questions-and-answers.htm>. The Consumer Price Index retroactive series (R-CPI-U-RS) is described at <www.bls.gov/cpi/research-series/r-cpi-u-rs-home.htm>. The Chained Consumer Price Index for All Urban Consumers (C-CPI-U) is described at <www.bls.gov/cpi/additional-resources/chained-cpi.htm>. The Personal Consumption Expenditure Prices Index (PCEPI) is described at <www.bea.gov/data/personal-consumption-expenditures-price-index>. The current method for historical income adjustment uses the R-CPI-U-RS from 1978 to the present and the CPI-U-X1 from 1967–1977. The CPI-U-X1 was an experimental series that preceded the R-CPI-U-RS and shows what the inflation rate in the CPI-U might have been, if current rental equivalence method of measuring the cost of homeownership had been in place prior to 1983.

Source: U.S. Census Bureau, Current Population Survey, 1968 through 2022 Annual Social and Economic Supplements (CPS ASEC).

# APPENDIX E. ADDITIONAL INFORMATION

## SOURCE AND ACCURACY OF THE ESTIMATES

The Current Population Survey (CPS) is the longest-running survey conducted by the U.S. Census Bureau. The CPS is a household survey primarily used to collect employment data. The sample universe for the basic CPS consists of the resident civilian, noninstitutionalized population of the United States. People in institutions, such as prisons, long-term care hospitals, and nursing homes, are not eligible to be interviewed in the CPS. Students living in dormitories are included in the estimates only if information about them is reported in an interview at their parents' home. Since the CPS is a household survey, people who are homeless and not living in shelters are not included in the sample.

The CPS Annual Social and Economic Supplement (CPS ASEC), which estimates in this report are based on, collects data in February, March, and April each year, asking detailed questions categorizing income into over 50 sources. The key purpose of the survey is to provide timely and comprehensive estimates of income, poverty, and health insurance and to measure change in these national-level estimates.

The CPS ASEC collects data in the 50 states and the District of Columbia; these data do not represent residents of Puerto Rico or the U.S. Island Areas (American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and U.S. Virgin Islands). The 2022 CPS ASEC sample consists of about 89,200 addresses. The CPS ASEC includes military personnel who live in a household with at least one civilian adult, regardless of whether they live off post or on post. All other armed forces personnel are excluded. The estimates in this report are controlled to March 2022 independent national population estimates by age, sex, race, and Hispanic origin. Beginning with 2020, population estimates are based on 2020 Census population counts and are updated annually, taking into account births, deaths, emigration, and immigration. More information on Vintage 2021 population estimates and the methodology can be found at <https://www2.census.gov/programs-surveys/popest/technical-documentation/methodology/2020-2021/methods-statement-v2021.pdf>.

The estimates in this report that may be shown in text, figures, and tables are based on responses from a sample of the population and may differ from actual values because of sampling variability or other factors. As a result, apparent differences between the estimates for two or more groups may not be statistically significant. All comparative statements have undergone statistical testing and are statistically significant at the 90 percent confidence level unless otherwise noted.

In this report, the variances of estimates were calculated using replication methods. For estimates prior to 2010, or as noted in historical tables, the Generalized Variance Function method was used. More Information on replicate weights, standard errors, income top-coding and data swapping on the public-use file, and changes to the CPS ASEC data file from the prior year is available at <https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar22.pdf>.

### The Impact of the Coronavirus (COVID-19) Pandemic on the CPS ASEC

The Census Bureau administers the CPS ASEC each year between February and April by telephone and in-person interviews, with most data collected in March. In 2020, data collection faced extraordinary circumstances due to the onset of the COVID-19 pandemic; the Census Bureau suspended in-person interviews and closed telephone contact centers. The response rate for the CPS basic household survey was 73 percent in March 2020, about 10 percentage points lower than preceding months and the same period in 2019, which were regularly above 80 percent.

During collection of the 2022 CPS ASEC, in-person interviews resumed except for in geographic areas with a high risk of exposure to COVID-19. The response rate for the CPS basic household survey declined from about 76 percent in March 2021 to 72 percent in March 2022. Since the response rates remain below prepandemic levels, it is important to examine how respondents differ from nonrespondents, as this difference could affect estimates. Using administrative data, Census Bureau researchers have documented that nonrespondents in the 2020 to 2022 surveys are less similar to respondents than in earlier years. Notably, respondents from 2020 to

2022 had relatively higher income than nonrespondents. For more details on how sample differences and the associated nonresponse bias impact income and official poverty estimates, refer to <www.census.gov/newsroom/blogs/research-matters/2022/09/how-did-the-pandemic-affect-survey-response.html>. The effects of data collection issues on 2020 health insurance coverage estimates are detailed in this working paper: <www.census.gov/library/working-papers/2020/demo/SEHSD-WP2020-13.html>.

## ACCESSING INCOME DATA

### Additional CPS ASEC Estimates

Additional estimates from the CPS ASEC are available on the Census Bureau's income websites. This includes detailed tables, historical tables, press releases, briefings, and working papers. The websites may be accessed through the Census Bureau's home page at <www.census.gov> or directly at <www.census.gov/topics/income-poverty/income.html>.

### Public-Use Microdata

Public-use CPS ASEC microdata are available for data users of all skill levels.

Data users can create custom statistics from Public Use Microdata files using the Microdata Access Tool (MDAT), available at <https://data.census.gov/mdat>.

Microdata for the 2022 CPS ASEC and earlier years are available online at <www.census.gov/data/datasets/time-series/demo/cps/cps-asec.html>. Technical methods have been applied to CPS microdata to avoid disclosing respondents' identities.

## OTHER SOURCES OF INCOME DATA

Since the CPS ASEC produces thorough and timely estimates of income, the Census Bureau recommends that people use it for national estimates. However, the Census Bureau produces other data that are appropriate for subnational areas and that can be used for longitudinal analysis. The American Community Survey (ACS) and the Small Area Income and Poverty Estimates (SAIPE) program can be used for subnational income estimates, while the Survey of Income and Program Participation (SIPP) provides monthly and longitudinal estimates.

### American Community Survey

The ACS is an ongoing survey that collects comprehensive information on social, economic, and housing topics. Due to its large sample size, the ACS provides estimates at many levels of geography and for smaller population groups.

The Census Bureau presents annual estimates of income by state and other smaller geographic units based on data collected in the ACS. Single-year estimates from the ACS are available for geographic units with populations of 65,000 or more. Estimates of income and poverty for all geographic units, including census tracts and block groups, are available by pooling 5 years of ACS data. Estimates from the ACS are available at <https://data.census.gov>.

### Small Area Income and Poverty Estimates

The SAIPE program uses statistical models to produce estimates of median household income and poverty for states and all counties, as well as population and poverty estimates for school districts. Statistics from the SAIPE program are used by the Department of Education to allocate funding under Title 1 of the Elementary and Secondary Education Act. SAIPE methodology combines data from a variety of sources, including administrative records, population estimates, the decennial census, and the ACS, to provide consistent and reliable single-year estimates for all counties and school districts regardless of size each year. In general, SAIPE estimates have lower variances than ACS estimates but offer fewer demographic details than the ACS. Estimates from this program are available at <www.census.gov/programs-surveys/saipe.html>.

### Survey of Income and Program Participation

The SIPP provides both monthly and longitudinal data about labor force participation and income sources and amounts at the individual, family, and household level by following the same respondents over time. Whereas the CPS ASEC provides reliable estimates of the net change from one year to the next in the overall distribution of economic characteristics for the whole population, it cannot show how these characteristics change for the same person, family, or household. By collecting monthly data for the same respondents over multiple years, SIPP makes it possible to see how economic characteristics change at the individual level. This yields insights into the dynamic nature of these experiences as well as the economic mobility of U.S. residents.

Estimates from these data are available in table packages, working papers, and the Census Bureau's P70 series reports, available at <www.census.gov/programs-surveys/sipp/library/publications.html>.

## QUESTIONS AND COMMENTS

For questions and assistance with income data, contact the U.S. Census Bureau Customer Service Center at 1-800-923-8282 (toll-free), or search your topic of interest using the Census Bureau's "Question and Answer Center" found at <https://ask.census.gov/>.

The Census Bureau also welcomes the comments and advice of data and report users. If you have suggestions or comments on this report, e-mail the Income Statistics Branch of the Social, Economic, and Housing Statistics Division at <sehsd.isb.list@census.gov>.

U.S. Department of Commerce
U.S. CENSUS BUREAU
Washington, DC  20233
**OFFICIAL BUSINESS**

Penalty for Private Use $300

FIRST-CLASS MAIL
POSTAGE & FEES PAID
U.S. Census Bureau
Permit No. G-58

P60-276

Income in the United States: 2021

Current Population Reports

U.S. Census Bureau

# Exhibit K

■

# INITIATIVE

Research by Topic          Refinance    About    Donate

---

# Student Loan Debt by Race

By **Melanie Hanson**

Last Updated: May 17, 2023

Fact Checked          **Cite this Webpage**

**Report Highlights.** Student loan debt statistics among racial and ethnic groups reflect dramatic differences in financial health, habits, and resource availability from one community to the next.



**Student Loan Debt by Race & Ethnicity**

**Student Loan Debt Payments by Race**

**Student Loan Debt Impact**

**Student Loans by Race and Ethnicity**

**Student Loan Debt Forgiveness by Race**

**Private Student Loans by Source**

Black and African American college graduates owe an average of **$25,000** more in student loan debt than White college graduates.

Four years after graduation, Black students owe an average of **188% more** than White students borrowed.

Black and African American student borrowers are the most likely to struggle financially due to student loan debt making monthly payments of **$250.**

Asian college graduates are the fastest to repay their loan debt and the most likely to earn a salary that exceeds their student loan debt balance.

Related reports include [Student Loan Debt Statistics](#) |
[Student Debt by Age](#) | [Student Debt by Sex & Gender](#) |
[Economic Effects of Student Loan Debt](#) | [Student Loan Refinancing](#)



**Federal Student Loans for Associate's and Bachelor's Degree Holders**

| | Associates Degree | Bachelor's Degree |
|---|---|---|
| White and Caucasian | 38.0 | 57.2% |
| Black and African American | 54.3 | 76.1% |
| Hispanic and Latino | 33.9 | 63.8% |
| Asian | 18.8 | 38.3% |
| Pacific Islander | 37.9 | 41.3% |
| American Indian or Alaskan Native | 27.3 | 62.1% |
| Multiracial | 31.6 | 55.1% |

Source: National Center for Education Statistics

> Scientists, economists, and sociologists agree that
> racial and ethnic variations in student loan debt and
> repayment are the result of socioeconomic factors,
> rather than physical or inborn characteristics.
> Charting trends in student debt across racial and/or
> ethnic lines helps define these socioeconomic
> factors. This information influences public policy, as
> well as financial and academic strategies.

# Student Loan Debt by Race and Ethnicity

The fact that borrowers of certain races and ethnicities face
exceptional obstacles in their quest for advanced education
is universally accepted among academic financial
specialists.

Black and African American bachelor's degree holders have an average of $52,000 in student loan debt.

45% of this debt is from student loans for graduate school.

40% of Black graduates have student loan debt from graduate school while 22% of White college graduates have graduate school debt.

Over 50% of Black student borrowers report their net worth is less than they owe in student loan debt.

At 52%, Asian student borrowers are the most likely to have a net worth that exceeds their student loan debt.

Asian bachelor's degree holders are the most likely to have paid off their student loan debt.

59% of Asian student borrowers still have educational loan debt.

67% of Hispanic and Latino student borrowers have educational debt.

70% of White and Caucasian student borrowers have student loan debt.

White college graduates have over 7 times the amount of wealth than Black college graduates.

8/31/23, 5:35 PM
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 374 of 801
Student Loan Debt by Race [2023]: Analysis of Statistics



Source: National Center for Education Statistics

# Student Loan Debt Payments by Race

Student loan repayment plans typically establish a regular monthly payment. It may be based on a percentage of their income and/or the size of their remaining debt. Lower monthly payments mean a higher ultimate cost due to interest rates.

Black and Asian student borrowers owe the highest monthly payments.

Black and African American student borrowers are the second-most likely to have monthly payments of $250 or more.

American Indians and Native Alaskans are the most likely to have monthly payments of less than $250.

The proportion of White students paying and receiving Federal student loans is about equal to the percentage of American Indian/Alaskan Native borrowers receiving student loans, yet American Indian/Alaskan Natives

acquire larger loan sums than White student borrowers.



## Student Loan Debt Impact by Race

Student loan debt may have a significant effect on an indebted borrower's financial decisions. Many student borrowers report that they've delayed life goals and milestones due to debt. Stress related to educational debt may also hinder personal timelines.

Hispanic and Latino borrowers were the most likely to delay getting married and having children due to student loan debt.

33% of Hispanic student borrowers say they put off getting married due to their student loan debt.

37% of Hispanic borrowers delayed having children due to debt.

At 46%, Black student borrowers were the most likely to put off buying a home.

At 43%, Black indebted student borrowers are also the most likely to report having to work more than they

would prefer.

In 2007/'08, Black bachelor's degree holders were the most likely among their indebted peers to describe their educational debt-related stress as "very high."

Multiracial people reported the lowest amounts of stress.

In 2012, multiracial people were the most likely to report high-stress levels.

Multiracial people were also the most likely to call their stress levels "very low."

58% of Black borrowers do not believe student loans have advanced racial equality.

66% of Black borrowers report they regret having taken out student loans to fund their education.



**Average Cumulative Amount Borrowed for Undergraduate Study**

| | |
|---|---|
| White | $17,850 |
| Black | $22,550 |
| Hispanic | $21,240 |
| Asian | $21,260 |
| American Indian/Alaskan Native | $19,310 |
| Two or More Races | $13,820 |

Source: National Center for Education Statistics

# Student Loans by Race and Ethnicity

Logically, the initial amount borrowed has a tremendous impact on outstanding student loan debt as well as the

amount a borrower ultimately pays. Most undergraduate students borrow less than $25,000 in total.

- 86% of White undergraduate students use student loans to pay for school.
- 58% of student loans go to White students.
- 50.8% of Black students use student loans.
- 14% of loans go to Black students.
- Asian students use 16% of student loans.
- 0.5% of loans go to Pacific Islanders.
- Black students are the most likely to receive Federal loans.
- Asian students are least likely to receive Federal loans.
- Black students are most likely to receive nonfederal loans.
- Asians are the least likely to receive nonfederal loans.
- In the 2017-2018 academic year, Pacific Islanders received the largest average loan at $23,850.
- That same year, White students received the second-largest average loan at $25,920.
- Asians received the lowest average loan amount at $23,080.
- 73.2% of Black and African American undergraduate student loan recipients borrow $57,700, cumulatively.

# Student Loan Debt Forgiveness & Race

Most research regarding student loan debt forgiveness and race focuses on the impact on Black borrowers (most likely

because this demographic is the most likely among races to pay a disproportionate amount in student loan interest). While the elimination of loan payments allows households to reallocate those funds to investments, lawmakers disagree on how student loan debt forgiveness might impact racial wealth gaps in the long run.

- Student loan debt forgiveness would immediately increase the wealth of Black Americans by up to 40%.

- Black college attendees have a net worth that is $8,500 less than their White peers.

- White bachelor's degree holders make between 19% (among women) and 30% (among men) more in median annual income than their Black counterparts.

- White households have a homeownership rate of 71% while 51% of Black households own their home.

- 60% of still-indebted Black student loan borrowers do not have a savings account.

- Among Black student borrowers on income-driven repayment plans, 71% do not have a savings account.

# Source

| 1 | The Education Trust, Jim Crow Debt: How Black Borrowers Experience Student Loans |

| 2 | National Center for Education Statistics (NCES), Digest of Education Statistics |

| 3 | NCES, Debt After College: Employment, Enrollment, and Student-Reported Stress and Outcomes |

| 4 | ED, Fact Sheet: Black College Graduates and the Student Debt Gap |

| 5 | New York Department of Consumer Affairs, Unequal Burden: Black Borrowers and the Student Loan Debt Crisis |

| 6 | Roosevelt Institute, How Canceling Student Debt Would Bolster the Economic Recovery and Reduce the Racial Wealth Gap |

| 7 | Student loans, the racial wealth divide, and why we need full student debt cancellation |

| 8 | Student loan debt has a lasting effect on Black borrowers, despite the latest freeze in payments | PBS NewsHour |

| 9 | Economic Well-Being of U.S. Households in 2020 – May 2021 – Student Loans |

About

Donate

Privacy

Contact us

Media Coverage

Twitter

We're a team of researchers who believe important discussions in education deserve to start from a place of fact, not opinion. From hot button topics like student loan debt to high school graduation rates, our mission is to make sure the data surrounding these topics is open & accessible.

© 2023, EducationData.org. All Rights Reserved.

# Exhibit L

NBER WORKING PAPER SERIES

DISCRIMINATION IN THE SMALL
BUSINESS CREDIT MARKET

David G. Blanchflower
Phillip B. Levine
David J. Zimmerman

Working Paper 6840
http://www.nber.org/papers/w6840

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
December 1998

We would like to thank Duane Benjamin, Karl Case, Robert Fairlie, Richard Freeman, Jon Skinner, Doug Staiger, and Steve Venti and seminar participants at the Federal Reserve Bank of Boston, CILN, and NBER Labor Studies for helpful comments and suggestions. The views expressed here are those of the author and do not reflect those of the National Bureau of Economic Research.

© 1998 by David G. Blanchflower, Phillip B. Levine, and David J. Zimmerman . All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Discrimination in the Small Business Credit Market
David G. Blanchflower, Phillip B. Levine,
and David J. Zimmerman
NBER Working Paper No. 6840
December 1998

## ABSTRACT

This paper uses data from the 1993 National Survey of Small Business Finances to determine the extent to which minority-owned small businesses face constraints in the credit market beyond those faced by white-owned small businesses. First, we present qualitative evidence indicating that black- and white-owned firms report similar concerns about the factors that may affect their businesses except that blacks are far more likely to report problems with credit availability. Second, we conduct an econometric analysis of loan denial probabilities by race and find that black-owned small businesses are almost three times more likely to have a loan application denied. Even after controlling for the differences in credit-worthiness and other factors that exist between black- and white-owned firms, blacks are still about twice as likely to be denied credit. A series of specification checks indicates that this gap is unlikely to be largely attributed to omitted variable bias. Third, we conduct a similar analysis regarding interest rates charged to approved loans and find black-owned firms pay higher interest rates as well. Finally, even these results are likely to understate differences in credit access because many potential black-owned firms are not in operation due to the lack of credit and those in business may be too afraid to apply. These results indicate that the racial disparity in credit availability is likely caused by discrimination.

David G. Blanchflower
Department of Economics
Dartmouth College
Hanover, NH 03755
and NBER
blanchflower@dartmouth.edu

David J. Zimmerman
Department of Economics
Fernald House
34 Sawyer Library Drive
Williams College
Williamstown, MA 02167

Phillip B. Levine
Department of Economics
Wellesley College
Wellesley, MA 02181
and NBER
plevine@wellesley.edu

**I. Introduction**

Discrimination occurs whenever the terms of a transaction are affected by personal characteristics of the participants that are not relevant to the transaction.  By far, the most commonly considered characteristics are those of race and gender.  In labor markets this might translate into equally productive workers in similar jobs being paid different salaries based on their race or gender.  In credit markets – the subject of study in this paper -- it might translate into loan approvals differing across racial groups with otherwise similar financial backgrounds.

In this paper we use data from the Federal Reserve Board and the U.S. Small Business Administration to examine the existence or otherwise of discrimination in the small business credit market.  Discrimination in the credit market against minority-owned small businesses can have an important effect on the likelihood that that business will succeed.  Moreover, discrimination in the credit market might even prevent the business from opening in the first place.  We provide qualitative and quantitative evidence supporting the view that blacks are discriminated against in this market. For example, we find that black-owned firms are much more likely to report being seriously concerned with credit market problems and report being less likely to apply for credit because they fear the loan would be denied.  Moreover, we find, after controlling for a large number of characteristics of the firms, that black-owned firms are substantially more likely to be denied credit than other groups. We find little or no evidence that women are discriminated against in this market.

The structure of the paper is as follows.  We begin by briefly reviewing the theory of economic discrimination and provide some background to our analyses by reviewing prior research relevant to discrimination in credit markets.  We then discuss the empirical framework employed in our analyses and describe the data used in the remainder of the paper.  We then

analyze the qualitative data available to us regarding the beliefs reported by small business owners. The following sections present econometric evidence of loan denial differences by race along with an analysis of possible sample selection biases. We then provide a series of caveats to these analyses. Finally, we present our conclusions.

## II. Theoretical Framework and Review of the Literature

Most recent economic studies of discrimination draw on the analyses contained in Gary Becker's The Economics of Discrimination (1957). Becker's main contribution was to translate the notion of discrimination into financial terms. Discrimination, in this view, results from the desire of owners, workers, or customers to avoid contact with certain groups. This being the case, transactions with the undesired groups would require more favorable terms than those that occur with a desired group. Assume that the primary objective of a financial institution is to maximize their expected profits. The expected return on a loan will depend on the interest rate charged and the likelihood that a borrower defaults. The financial institution would approve any loan for which the expected return on the loan exceeded the cost of the funds to the institution. Discrimination would then result either in a) higher interest rates being charged to undesired groups having otherwise similar characteristics to the desired group, or b) requiring better characteristics (i.e. a lower expected default rate) for the undesired group at any given interest rate. In other words, the disadvantaged group might either be appraised more rigorously or, they would be given less favorable terms on the loan.

A similar connection between the likelihood of loan approval and the race of the applicant might also be found if firms employ statistical discrimination. In this case, firms use personal characteristics - such as race or gender - to infer the likelihood of default on the loan. If

experience has suggested that certain groups of individuals -- defined by race or gender - are, on average, more or less likely to default, then the firm may use this information to economize on the costs of gathering more directly relevant information.  Hence discrimination would not reflect the preferences of the owner but would rather reflect an attempt to minimize costs.  Empirically, the racial characteristics of the applicant could proxy for unobserved characteristics of their credit worthiness.

There has been an active debate on the question of whether banks discriminate against minority applicants for mortgages.  In particular, banks were often accused of "redlining" - that is, not granting loans for properties located in certain areas.  To analyze that issue, the Home Mortgage Disclosure Act was passed which required lenders to disclose information on the geographic location of their home mortgage loans.  These data, while interesting, were not sufficient to assess whether or not there was discrimination in the market for mortgage loans.

In 1992 researchers at the Federal Reserve Bank of Boston collected additional information from the lenders (Munnell et al., 1996).  In particular, they tried to collect any information that might be deemed economically relevant to whether a loan would be approved.  In the raw data whites had 10 percent of their loans rejected versus rejection rates of 28 percent for blacks and Hispanics.  After controlling for the large number of variables collected to establish the credit worthiness of the borrowers (including, the amount of the debt, debt/income ratio, credit history, loan characteristics, etc.) blacks were still 7 percent less likely to be granted the loan. A variety of criticisms have been launched at this study (see, for example, Horne 1994; Day and Liebowitz, 1998; Harrison, 1998).  Responses to these criticisms are found in Browne and Tootell (1996).

In addition to the type of statistical analysis done in the Munnell et al. (1996) study, two other approaches have been used to measure discrimination in mortgage markets. First, Federal Reserve regulators can examine a lending institution's files to try to identify any cases where a loan rejection looks suspicious. Second, audit studies have been used with paired "identical" applicants. Such studies have also found evidence of discrimination (c.f. Cloud and Galster, 1993) although the audit approach is not without its critics (Heckman, 1998).

Another relevant literature concerns the severity of liquidity constraints affecting consumers in non-mortgage credit markets. A consumer is said to be liquidity constrained when lenders refuse to make the household a loan or offer the household less than they wished to borrow. (Ferri and Simon, 1997). A variety of studies have suggested that roughly twenty percent of U.S families are liquidity constrained. (cf. Hall and Mishkin, 1982; and Jappelli, 1990). As might be expected, constrained households are typically younger with less wealth and accumulated savings. (Hayashi, 1985; and Jappelli, 1990). Significantly, after including detailed control variables for the households financial characteristics, the research shows nonwhite households to be substantially more likely to be liquidity constrained (Jappelli, 1990; and Ferri and Simon, 1997).

We now turn to the more directly relevant evidence on liquidity constraints facing small businesses. Discrimination in the credit market against minority-owned small businesses can have a devastating effect on the success of that business. Further, discrimination in the credit market might even prevent them from opening in the first place. Evidence to that effect is provided in the significant literature on self-employment. Evans and Leighton (1989) and Evans and Jovanovic (1989) have argued formally that entrepreneurs face difficulties borrowing money. As in the discussion above, such individuals are labeled liquidity constrained by economists. Using data

from the National Longitudinal Survey of Youth from 1966-1981 and the Current Population Surveys from 1968-1987, these authors find that, all else equal, people with greater family assets are more likely to switch to self-employment from employment.  Blanchflower and Oswald (1998) studied the probability that an individual reports him or herself as self-employed.  Consistent with the existence of capital-constraints on potential entrepreneurs, their econometric estimates imply that the probability of being self-employed depends positively upon whether the individual ever received an inheritance or gift.  Second, when directly questioned in interview surveys, potential entrepreneurs say that raising capital is their principal problem. Holtz-Eakin et al. (1994a, 1994b), examine flows in and out of self-employment and finds that inheritances both raise entry and slow exit. Black, de Meza and Jeffreys (1996) find that housing equity plays an important role in shaping the supply of entrepreneurs. Lindh and Ohlsson (1996) suggest that the probability of being self-employed increases when people receive windfall gains in the form of lottery winnings and inheritances.

Additional evidence indicates that capital constraints for black-owned businesses are particularly large. For instance, Bates (1989) finds that racial differences in levels of financial capital do have a significant effect upon racial patterns in business failure rates.  Fairlie and Meyer (1996) find that racial groups with higher levels of unearned income have higher levels of self-employment.  In an important new paper Fairlie (1998) uses data from the 1968-1989 Panel Study of Income Dynamics (PSID) to examine why African-American men are one-third as likely to be self-employed as white men.  The author finds that the large discrepancy is due to a black transition rate into self-employment that is approximately one half the white rate and a black transition rate out twice the white rate.  He finds that capital constraints -- measured by interest income and lump-sum cash payments -- significantly reduce the flow into self-employment from

wage/salary work, with this effect being nearly seven times larger for black self-employed than for white self-employed in the case of black-owned firms. This paper then attempts to decompose the racial gap in the transition rate into self-employment into a part due to differences in the distributions of individual characteristics and a part due to differences in the processes generating the transitions. He finds that differences in the distributions of characteristics between blacks and whites explain only a part of the racial gap in the transition rate into self-employment. In addition, racial differences in specific variables, such as levels of assets and the likelihood of having a self-employed father provide important contributions to the gap. He concludes, however, that "the remaining part of the gap is large and is due to racial differences in the coefficients. Unfortunately, we know much less about the causes of these differences. They may be partly caused by lending or consumer discrimination against blacks" (1998, p.14).

Finally, we know of only one paper that has investigated the specific topic of racial differentials in access to credit among small businesses. Cavalluzzo and Cavalluzzo (1998) use data from the 1988-1989 National Survey of Small Business Finances (NSSBF), conducted by the Board of Governors of the Federal Reserve System, to analyze differences in application rates, denial rates, and other outcomes by race and gender in a manner similar to the econometric models reported in this study. This paper documents that a large discrepancy does exist in credit access between whites and minority-owned firms that cannot be explained by a handful of characteristics of firms. Unfortunately, the earlier NSSBF data that they used did not over-sample minority-owned firms and focuses only on loan requests made in the preceding 12 months. This limits the size of the sample and restricts the power of the econometric tests conducted compared to the 1993 NSSBF data that we use, as described below. Moreover, those data include limited information on a firm's credit history and that of its owner, reducing the ability to identify the

cause of the racial disparity.  In fact, the authors conclude that "although our ability to draw strong conclusions from the denial analysis is limited by sample size, at this point, we have no evidence that points *unambiguously* to prejudicial discrimination as a cause of the black disadvantage" (p. 790).  Our study provides an increased sample size of minority-owned firms, better statistical controls for credit-worthiness, an extensive set of specification checks designed to examine alternative interpretations of our results, along with qualitative evidence all designed to distinguish whether racial disparities in credit access can be attributed to discrimination.

## III.  Empirical Framework and Description of the Data

Disputes about discrimination typically originate in differences in the average outcomes for two groups.  For example, suppose black-owned firms are less likely to be approved for a loan than white-owned firms. Is such a difference due to discrimination?  To answer this question it is appropriate to compare black and white firms that have similar risks of default.  In effect, we want to know what fraction of the black firms' loans would have been approved if they had the same credit worthiness as the white firms.  A standard approach to this problem is to statistically control for characteristics of the firms that are deemed to be relevant to the loan decision.  If we compare firms that have the same likelihood of default and yet find the black firms to be less likely to be approved then it would be appropriate to attribute such a difference to discrimination.

Following in the spirit of the Munnell et al. (1996) study we estimate the following loan denial equations:

$$\text{Prob}(D_i = 1) = \beta_0 + \beta_1 * CW_i + \beta_2 X_i + \beta_3 R_i + \varepsilon_i$$

where $D_i$ represents an indicator variable for loan denial for firm i, CW represents measures of credit worthiness, X represents other firm characteristics, and R represents the race of the firm's

ownership. Within the framework of this model, evidence of discrimination would appear if $\beta_3$ is less than zero. It is important to recognize at this point that a finding that $\beta_3$ is less than zero does not identify whether the source of the discrimination is prejudice on the part of banks or statistical discrimination. We apply a more legalistic definition of discrimination here that would encompass any disparity in loan denial rates between applicants of different races that is not attributable to differences in other characteristics besides race.

To examine whether such a disparity exists, we use national data available from the 1993 National Survey of Small Business Finances (NSSBF). These data contain substantial information regarding credit availability on a nationally representative sample of small businesses. The survey was conducted during 1994-95 for the Board of Governors of the Federal Reserve System and the U.S. Small Business Administration; the data relate to the years 1992 and 1993. The data file used here contains 4,637 firms with less than 500 employees.[1] In the NSSBF file minority-owned firms were over-sampled, but sampling weights are provided to generate nationally representative estimates. Of the firms surveyed, 12 percent are owned by blacks, 6 percent are owned by Hispanics, and individuals of other races (mostly Asian/Pacific Islander, but some American Indian/Eskimo and mixed race) own 7 percent.

Table 1 presents weighted sample means from these data for these four racial groups. The estimates indicate that black-owned firms are more than twice as likely to have a loan application rejected relative to white-owned firms (65.9 percent versus 26.9 percent).[2] Other minority groups

---

[1]   The median size was 5.5 and mean size was 31.6 full-time equivalent employees; 440 firms out of 4,637 had 100 full-time equivalent employees or more. For further details of the NSSBF survey see Appendix A.

[2]   The 1987 NSSBF also conducted by the Board of Governors of the Federal Reserve System and used by Cavalluzzo and Cavalluzzo (1998) also contained information on loan applications and denial rates. Unlike the 1993 survey, minorities were not oversampled. Also the survey only inquires about loans made over the preceding twelve months compared to three years in the 1993 survey so sample sizes are smaller (n=686). Denial rates

are denied at rates higher than whites as well, but the magnitude of the black-white differential is especially striking.  Minority-owned firms, however, do have characteristics that are different than those of white-owned firms that may contribute to these differences.  For instance, minority-owned firms were younger, smaller (whether measured in terms of sales or employment), and more likely to be located in urban areas, a sole-proprietorship and with an owner with fewer years of experience than their white counterparts.   Black-owned firms, in particular, were also generally less credit-worthy than firms owned by other racial groups measured by whether the owner had:  a) been bankrupt over the preceding 7 years b) over the prior three years had been delinquent for more than 60 days on personal obligations c) had legal judgments against him or her over the previous three years and d) whether, over the preceding three years, the firm had been delinquent for more than 60 days on business obligations.

## IV.    Qualitative Evidence

Before moving on to the results of our multivariate analysis, we first report on what business owners themselves say are the main problems confronting them.  Table 2 reports the results of asking specific questions about problems confronted over the 12-month period before the date of interview.  In the top panel respondents were asked to what extent credit market conditions had been a problem.  Blacks were much more likely to say that it had been a "serious" problem (31 percent) than Hispanics (23 percent) or whites (13 percent) or those from other racial groups (13 percent).  The bottom panel of the table reports the results for eight other designated problem areas -- i) training costs; ii) worker's compensation costs; iii) health insurance

---

(weighted) are considerably lower for minorities: white-owned firms had a denial rate for loans of 22% compared with 56% for blacks, 36% for Hispanics and 24% for other races, which are broadly similar to the differences reported here.

costs;  iv) IRS regulation or penalties;  v) environmental regulations;  vi) The American with Disabilities Act;  vii) the Occupational Safety and Health Act; viii) The Family and Medical Leave Act.  Differences by race are much less pronounced in these eight areas than they were in relation to credit market conditions. We also estimated a series of ordered logit equations (available on request from the authors) to control for differences across firms in their credit-worthiness, location, industry size, and the like.  It is apparent from these regressions that blacks were more likely to report that credit market conditions were especially serious.  Only in the case of the Family and Medical Leave Act were blacks significantly more likely to report this problem.  The finding that black firms are largely indistinguishable from white firms in reporting a variety of problems, <u>except</u> for the case of credit, suggests that credit really is a problem for minority-owned firms.

Table 3A provides supporting evidence for these results with the NSSBF with data from another entirely different survey -- the 1992 Characteristics of Business Owners Survey, 1992 which was conducted by the Bureau of the Census.[3]   Firms were asked to report the impact of various kinds of costs upon their profitability.  Blacks and Hispanic-owned firms report stronger negative impacts of credit market conditions, a lack of financial capital and crime.  There are no strong differences by race or gender for the other reasons.  Table 3B presents results from the same data source on the reasons why a discontinued business was unsuccessful.  Multiple responses are possible.  Black-owned, and to a lesser degree, Hispanic-owned firms were much more likely to report that the reason was due to the lack of access to business or personal loans or credit than was true for other races.

---

[3]  For further details of the survey see the Data Appendix at the end of this report.  The full Census Bureau report is available from the following Census Bureau  website --  http://www.census.gov/agfs/www/cbo.html.

Table 4 reports the views of NSSBF respondents on the most important issue they reported they were likely to have to confront over the 12-month period from the date of interview.  Credit availability again appears to be an issue for minority firms.  For blacks it was the most important reason - one in five gave this response.   In contrast only 6 percent of white owners and 5 percent of Hispanics gave this answer.  Whites were especially worried about health care costs.  In summary, black owners report that they had problems with the availability of credit in the past and expected that such difficulties would continue into the future.[4]

## V.  Estimates of Differences in Loan Denial Rates by Race/Ethnicity

Evidence presented to this point indicates that minority-owned firms are more likely to be denied loans and report that their lack of access to credit significantly impairs their business. Can these differences be explained by such things as differences in size, credit-worthiness, location etc. as some have suggested in relation to the parallel work on discrimination in mortgage lending (see Horne, 1994; Bauer and Cromwell, 1994, and Yezer, Phillips and Trost, 1994)?  To address this question we now turn to an econometric examination of whether the loan requests made by minority-owned firms are more likely to be denied, holding constant differences across firms.  As we show below, we find strong statistical evidence of discrimination in the market for small business credit.

In Table 5 the results of estimating a series of loan denial probit regressions using data from the 1993 NSSBF are reported. As indicated earlier, this survey has the particular advantage

---

[4]   We spoke with a representative of the Massachusetts Commission Against Discrimination to determine the extent to which minority-business owners pursue legal recourse in cases in which they have had small business loan applications denied.  Apparently, few such cases are ever filed, but the Commission does not conduct any outreach activities to increase awareness of the law and the possibility of legal action.

that it includes a number of variables that can be used to proxy an applicant's credit-worthiness. All estimates are obtained from probit models of loan denials. We report estimated derivatives from these models that can be interpreted as the effect on the probability of loan denial of an infinitesimal change in each independent continuous variable and the discrete change in the probability for dummy variables. In Column 1 which contains only race and gender indicators, for instance, the coefficient of 0.426 can be interpreted as indicating that the denial rate for black-owned businesses is 42.6 percentage points higher than that for those firms in the excluded category of white-owned firms. This estimate simply replicates the raw difference in denial rates between black- and white-owned businesses reported earlier.

The remainder of Table 5 includes additional explanatory variables to hold constant differences in the characteristics of firms that may vary by race.[5] In Column 2 a number of controls are included that distinguish the credit-worthiness of the firm and the owner. Virtually all are statistically significant on a two-tailed test at conventional levels of significance with the expected signs. Having been bankrupt or had legal judgments against the firm or owner raises the probability of denial; stronger sales lowers this probability. Even after controlling for these differences in credit-worthiness, black-owned firms remain 28 percentage points more likely to have their loan request denied compared to white-owned firms. The models reported in Columns 3 and 4 control for a vast array of additional characteristics of firms, including its size and age, its organizational type, the educational qualifications of the owner, whether or not it had any

---

[5] We have also estimated these models separately, focusing specifically on the differences in coefficient estimates between whites and blacks. The F-Test we conducted to determine whether parameter estimates were the same for blacks and whites rejected this null hypothesis. Then we used the estimates obtained by estimating the model separately by race and conducted an Oaxaca (1973) decomposition. The results from this analysis were similar to those obtained by restricting the coefficients to be the same between blacks and whites and using the coefficient on a black indicator variable to measure the gap between groups. We have chosen to report all the results in this simpler format for ease of exposition and interpretation.

business lines of credit or revolving credit agreements in 1993, and its location and industry. The estimated disadvantage that black-owned firms face in obtaining credit is virtually unchanged even after including this extensive list of control variables. These firms are still about 25 percentage points more likely to have their applications denied compared with white-owned firms. We also experimented with a number of other controls including profitability, equity (assets less liabilities), values of inventory, wages and salaries paid to workers and officers' cash holdings, the value of any land owned by the firm and the type of financial institution used but they never achieved significance and were omitted.[6] The results also indicate that Asians/Pacific Islanders also had significantly higher denial rates than whites. There is no evidence that denial rates for firms owned by women or other racial groups were significantly different from the denial rates of firms owned by whites.

An important consideration in interpreting the results reported so far is whether or not we have adequately controlled for differences in credit-worthiness of firms.[7] If black-owned firms are less creditworthy and we have failed to adequately capture those differences, even with our extensive set of control variables, then we would be inappropriately attributing the racial

---

[6] Approximately four out of five (80.5%) of the firms who required a loan applied to a commercial bank. Overall seventeen different types of financial institution were used, although only the following accounted for more than 1% of the total (weighted) -- Credit Unions (2.0%); Savings Banks (2.5%); Savings & Loans (2.3%); Finance Companies(4.9%); Lease Companies (2.1%) and other business firms (1.7%).

[7] Another potential problem involves the type of loans for which black- and white-owned firms are applying. Black firms are more apt to apply for working capital rather than for capital expansion, equipment purchases or other reasons. These latter types of loan requests are more secure since they provide at least some of their own collateral. If blacks are less likely to apply for funds for these purposes their overall loan denial rate would be higher for reasons unrelated to discrimination. Yet we found that blacks remain at a similar disadvantage regardless of the type of credit for which they are applying. We find that blacks are 29 percent and 18 percent more likely to have their loans denied for working capital and other types of loans, respectively. These estimates are both significantly different from zero, but not significantly different from each other.

difference in loan denial rates to discrimination.  The next several specifications are designed to determine the sensitivity of our results to this concern.

The first problem we address pertains to the specific functional form with which we control for differences in credit history across firms.  As shown in Table 1, black-owned firms are considerably more likely to have had troubles in the past in the form of judgments against them, late payments by the firm or its owner, or past bankruptcies.  The model specifications reported in Table 5 implicitly assumes that these past problems are additive in their effect on loan denials and one might suspect the marginal impact would rise as past problems rise.  Therefore, in the first three rows of Table 6 we separate firms by the number of types of past problems experienced.  In Row 1, we restrict the sample to those firms that have never had any past credit problems. The second row restricts the sample to firms that reported only one of these problems and the third row includes firms that have experienced more than one of them. The results suggest that even black-owned firms with clean credit histories are at a significant disadvantage in getting their loans approved, holding constant their other characteristics.  In fact, the estimated differential in loan approval rates between black- and white-owned firms is virtually identical in all three groups.

Next, we considered whether black-owned firms are treated differently from white-owned firms when requesting credit from other sources, including suppliers and credit card companies. If minority-owned firms really are less credit-worthy, then other types of creditors also may be reluctant to provide them with credit.  On the other hand, if they approve credit requests at roughly the same rate regardless of the owner's race, then perhaps the disadvantage that black-owned firms face when they apply for loans from financial institutions is more likely attributable to discrimination.  Suppliers, in particular, are likely to have had a long-standing relationship with the firm and its owner(s) and are better able to make judgments regarding credit-worthiness based

on this knowledge. Therefore, their credit decisions are far less likely to be driven by group characteristics than may be true for financial institutions with less information that may be practicing statistical discrimination. An examination of credit cards provides a different advantage. Because credit card applications are more likely to be filled out and mailed in, it is quite likely that the race of the applicant is unknown to the financial institution.[8]

To address this we use data from the NSSBF, which also asked respondents whether they had been denied trade credit from a supplier and whether they use business or personal credit cards to finance business expenses. Regarding trade credit, one shortcoming of this analysis is that firms who are denied trade credit can be distinguished from all other firms, but we do not know which firms sought such credit.[9] If black-owned firms were less likely to apply for such credit, the share of them that were denied would be downward biased relative to white-owned firms.[10] Subject to this limitation the results still provide useful information. Overall 6.2 percent of applicants responded that they were denied trade credit. Once more there are considerable differences by racial groups: 5.7 percent of whites answered positively compared with 13.5 percent of blacks, 6.4 percent for other races and 10.2 percent of Hispanics.

In Row 4 of Table 6 we modeled the probability of a request for a trade credit application being denied on the full sample of 4,480 observations (only firms with missing values are deleted)

---

[8] In fact, it is our understanding that it is illegal for creditors to ask an applicant about his/her race on a credit application. Lenders to small businesses appear to be exempt from this restriction, from what we can determine, so long as they are asking whether the entity is a certified minority-owned small business for the purpose of determining eligibility for Small Business Administration loan guarantees. In either case, it is illegal to use race as a factor in determining whether or not to grant a loan.

[9] The exact wording of the question was "has any supplier that offers trade credit to business customers denied a request by your firm for trade credit -- yes or no?"

[10] Interestingly the current use of trade credit varied only a little by race. Respondents were asked if the firm purchased any goods or services on account during 1993 rather than pay for them before or at the time of delivery: 64.8% of white-owned firms answered in the affirmative compared with 60.7% for blacks; 55.1% for Hispanics

controlling for measures of credit-worthiness and other firm characteristics.  Results of this analysis suggest that black-owned firms are only 3 percent more likely to be denied trade credit compared to white-owned firms, ceteris paribus, which is very small compared to the 25 percent difference observed in financial loan applications. This finding can be interpreted in one of two ways.  Firms' trading partners may also discriminate against minority-owned firms, but to a far lesser extent.  Alternatively, if trade credit is granted without any discrimination, then this 3 percent estimate indicates the extent to which our measures of credit-worthiness fail to capture differences between white and minority-owned firms.  Either way, the gap between this estimate and that obtained regarding the loan decisions of financial institutions' strengthens our conclusion that these institutions treat minority-owned firms unfairly.

In Rows 5 and 6 of Table 6 we examine the probability that a firm uses either a business credit card (Row 5) or a personal credit card (Row 6) to finance business expenses in 1993.[11]  In neither case could we find any evidence that black-owned firms were less likely to have access to such cards.  We also had information available on the maximum amount that could be billed to these accounts and could find no significant differences by race in a regression that modeled the amount that could be charged.  No racial differences were observed when we modeled the typical balance remaining on these cards at the end of a typical month.

The final approach we undertook to determine whether our model adequately controls for differences in credit worthiness was to compare our measures to the information requested when a small business applies for a loan. To do this, we went to some local banks and obtained small

---

and 55.7% for other races.

[11] On average, 29 percent of all firms use business credit cards and 41 percent use personal credit cards for business use; these levels vary only modestly by race/ethnicity. Blanchflower, Evans and Oswald (1998a) use these same data to examine the role of credit cards and find that the presence of business credit cards enhances employment growth. Blanchflower, Evans and Oswald (1998b) used data from various Surveys of Consumer

business loan applications. To supplement this small sample, we searched the internet and examined web sites that provide general business advice to small firms, including a description of the loan application process and the information typically requested of applicants. An example of a typical application form is presented as Appendix B. We found that detailed information is requested of both the firm and its owner. Regarding the firm, banks typically request information like the following: (a) type of business, (b) years in business, (c) number of full-time employees, (d) annual sales, (e) organization type (corporation or proprietorship), (f) owner's share, (g) assets and liabilities, (h) whether the business is a party to any lawsuit, and (i) whether any back taxes are owed. Regarding the owner's personal finances, banks typically ask for: (a) assets and liabilities, (b) sources and levels of income, and (c) whether the owner has any contingent liabilities. Some applications ask explicitly if the firm qualifies as a minority-owned enterprise for the purposes of certain government loan guarantee programs. The race of the applicant, however, would be readily identifiable even in the absence of such a question since most of these loans would be originated through face-to-face contact with a representative of the financial institution.

These criteria seem to match reasonably closely the information available to us in the NSSBF. The particular strength of the survey is the detail available on the firm, which covers much of the information typically requested on loan application forms. Less detail is available for the owner of the firm. On the other hand, we have no direct information regarding the owner's assets, liabilities, and income, which would be necessary to determine the personal collateral available should the firm default on its obligation. However, we do have information regarding the characteristics of the owner that are frequently used as correlates of these factors, like their education and experience. In addition, we have data on the owner's financial history, including

Finances to show that credit cards reduced households' transactions balances.

whether or not they have been delinquent on previous loan payments or have gone bankrupt in the past seven years. Nevertheless, our potentially incomplete characterization of the business owner's financial condition may introduce a bias into our analysis if black business owners have fewer personal resources than white business owners to cover the loan should the firm default.

We conducted several additional analyses to assess the potential impact of this problem on our results by separately examining groups of firms who differ in the degree to which personal finances should influence the loan decision. For instance, in Table 6, Rows 7 and 8 we consider proprietorships/partnerships separately from corporations and estimate the disadvantage experienced by black-owned firms in obtaining credit. Since owners of an incorporated business are significantly shielded from incurring the costs of a failed business, differences in personal finances should be far less important in evaluating the loan applications they file. But our estimates indicate that black-owned firms are still almost 25 percent less likely to have their loan application approved regardless of whether the business is organized as a corporation or proprietorship/partnership.

We also considered differences in loan approval rates by race for larger firms versus smaller and for older firms versus younger.[12] In both cases one might expect the owner's personal finances would be less important. Our results, reported in Rows 9 through 12 of Table 6 indicate that black-owned firms face similarly lower rates of loan denials regardless of their size or age.

One additional factor that suppliers of credit may consider in determining loan approvals is the specific location of the firm. If a firm is located in the center city, for example, banks may

---

[12] The mean and median age of firms in the survey is 15 and 12 years, respectively. Only 14.5 percent are less than five years old and only 4.1 percent are less than three years old. As reported in footnote 1, the mean and median size of firms is 5.5 and 31.6 full-time equivalent workers, respectively. Fourteen percent of firms have one or fewer employees and 27 percent have two or fewer employees.

judge the future profit prospects of these firms as more uncertain and may be less likely to approve the loan.  Although such behavior may be consistent with profit maximization, if black-owned firms were more likely to be located in these areas it would still qualify as statistical discrimination and would be illegal.

Although we do not know the specific location of the firms in the NSSBF data, we conducted two additional specification checks to see if lenders' behavior was consistent with this hypothesis.  First, we separated firms by whether the were located in an SMSA, since those not in an SMSA cannot be located in the central city.  Second, we separated firms by their industry classification into those in retail trade, repair services, and personal services and firms in all other industries.  We chose these categories in order to distinguish those firms whose market is more likely to be local (like a neighborhood grocer, hair stylist, or auto mechanic) compared to those who sell their products/services to the broader community.[13]  If locating in the central city has any impact on future profit expectations, it should be greater for those firms whose market is more local in nature.  Therefore, if minority-owned firms are more likely to locate in these areas, racial differences in loan approval rates should be smaller in the other industries.

The results of these tests, reported in Rows 13 through 16 of Table 6, reject the hypothesis that differences in loan denial rates are attributable to different propensities to locate in the center of a city.  We find no difference in loan denial rates between white- and black-owned firms in the retail trade, personal services, and repair services industries, but a substantial difference in other industries.  This pattern is the opposite of what we would have predicted if lenders discriminated against central city locations, assuming black-owned businesses are more

---

[13] We examined the sensitivity of the results to this definition by looking at retail trade only, then including just repair services, including construction businesses, etc. and found the results to be robust to these alternatives.

likely to locate there.  In addition, although we do find that black-owned firms located in an SMSA face a larger disadvantage in obtaining credit, those in other locations still experience about a 25 percent greater likelihood of having a loan application denied.

Although most of our analysis has addressed whether minority and white-owned firms are treated equally in terms of their probability of loan denial, another way that differential treatment may emerge is through the interest rate charged for approved loans.  Discrimination may be apparent if banks approve loans to equally credit-worthy minority and white-owned firms, but charge the minority-owned firms a higher rate of interest.[14]  Therefore, we estimated model specifications analogous to those reported previously for loan denials, but now the dependent variable represents the interest rate charged for firms whose loans were approved.  In these models, we also control for whether the loan carried a fixed or variable interest rate since fixed rate loans charge a premium to cover their additional risk.

The results of this analysis for all approved loans, reported in Row 1 of Table 7, indicate that black-owned firms pay rates of interest that are approximately one percentage point higher than white-owned firms after controlling for differences in credit-worthiness. Even black-owned firms with good credit histories are charged higher interest rates (Row 2).[15]  The remainder of the Table presents similar specification checks to those reported in Table 6.  Recall that most of these models identify firms for which the firm's own history is likely to be a more important contributor to its creditworthiness.  The specifications by SMSA and industry are designed to distinguish those firms located in center cities or whose products/services are more likely to be sold in the

---

[14]   The size of the loans requested by, or granted to, white and minority-owned firms are not statistically significantly different.

[15] We do not report results for firms that have had past credit problems because their higher likelihood of being denied credit significantly restricts our ability to provide a powerful test of the interest rates they are charged if

local marketplace.  Although sample sizes are smaller for approved loans and reduce the power of this analysis, we find little evidence that interest rate differentials charged to black-owned firms differ between proprietorships/partnerships and corporations, older and younger firms, bigger and smaller firms, and industry. The limited power of the analysis makes it difficult to draw conclusions regarding differences by a firm's location in an SMSA. Overall the evidence presented indicates that blacks face a significant disadvantage in the market for small business credit that does not appear to be due to differences in credit-worthiness or even their geography.

## VI.  Loan Approval Rates versus Access to Credit

In fact, these results may be biased toward finding too small a disparity between white and black-owned firms because those minority-owned firms that actually apply for credit may represent a selected sample of the most credit-worthy.  More marginal minority-owned firms whose loans may have been accepted had they been owned by whites may not even be among the pool of loan applicants.  First, these firms may have gone out of business or may not have had the opportunity to commence operations because of their inability to obtain capital.  Second, some existing firms may have chosen not to apply for credit because they were afraid their application would be rejected due to prejudice.

---

approved.

21

Although we have no evidence supporting the first proposition, data from the NSSBF provides some support for the second: black- and Hispanic-owned firms are much more likely to report that they did not apply for a loan, even though they needed credit, because they thought they would be rejected.  Table 8 reports estimates from Probit models in which the dependent variable is an indicator variable representing failure to apply for a loan fearing denial for all firms. The first row presents racial differences without controlling for any other characteristics of firms and the results indicate that black- and Hispanic-owned firms are 40 and 22 percentage points more likely to withhold an application fearing denial than are white-owned firms.[16]

Of course, some of this difference may be attributable to differences in credit-worthiness across firms since firms that are bad credit risks should be afraid that their loan would be denied. To adjust for this, the second row of Table 8 reports comparable models that control for differences in credit-worthiness and other characteristics of firms.  The results from this specification does show that the higher degree of fear of rejection among black-and Hispanic-owned firms can partially be explained by these differences.  Nevertheless, a gap of 26 and 15 percentage points still exists between black-and Hispanic-owned firms, respectively compared to white-owned firms.  In fact, when asked directly why they were afraid to apply for loans, minority-owned firms were far more likely to report prejudice as the reason (18 percent for black-owned firms, five percent for Hispanic-owned firms, and two percent for white-owned firms).[17]

If these minority-owned firms had applied for credit and were rejected because of discrimination, estimates of racial disparities only based upon loan applicants would be

---

[16] The actual percentages for each group are: 22.5 percent for white-owned businesses, 41.7 percent for firms owned by Hispanics, and 60.8 percent for black-owned businesses.

[17]  The other reasons given, including too little collateral, poor credit history, and poor balance sheet, are comparable across groups (firms could report more than one reason).

understated.  The perception of prejudice, however, among these firms does not necessarily imply that  selection bias is present.  Those firms that failed to apply because they feared rejection may have had similar loan denial rates as other minority-owned firms with comparable levels of credit-worthiness that did apply.  If those firms chose to apply for a loan, differences by race in the combined denial rate of the actual and potential applicants would be the same as we have estimated for the observed sample of applicants.

More formally, suppose that loan denial rates for equally credit-worthy white- and minority-owned firms that applied for credit are $\theta^w$ and $\theta^m$, respectively; the measure of discrimination employed in the previous analysis is $\theta^m - \theta^w$.  Now suppose that firms that are equally credit-worthy, but chose not to apply for a loan because they feared rejection, would have been denied at the rates $\theta^w$ and $\psi^m$ for white- and minority-owned firms, respectively.  Among the white-owned firms, the denial rate is identical regardless of whether the firm chose to apply or not, conditional upon credit-worthiness.  Among minority-owned firms, however, those who were afraid to apply may have been denied at a higher rate (perhaps because of their greater propensity to locate in the central city or other factors that are related to their race, but unrelated to credit-worthiness) compared to other minority-owned firms.  Then the correct representation of the disadvantage faced by minority-owned firms is $[\eta\theta^m + (1-\eta)\,\psi^m] - \theta^w$, where $\eta$ represents the share of minority-owned firms desiring credit that submitted an application.  Our earlier findings are biased if $\theta^m$ is not equal to $\psi^m$.

One approach that is frequently employed to address such a problem is to estimate a "Heckman-correction" that would formally model the application process in conjunction with the loan outcome for those who applied.  The difficulty with this methodology in the present context

is that it is only correctly implemented when some variable is present that is correlated with a firm's decision to apply for a loan, but is independent of the financial institution's decision to approve or deny the request. Unfortunately, the NSSBF data does not appear to contain any variables that would satisfy these conditions, so we are unable to implement this methodology.[18]

   As an alternative that answers a different, but related question, we consider the ability of firms to get credit among those who desired it, regardless of whether or not they applied. This amounts to analyzing access to credit rather than loan approval and includes in the denominator those firms that needed credit but did not apply because they feared rejection. If differences by race in this rate among all firms who needed credit are greater than differences by race in the rate of denial among loan applicants, then this would indicate that black- and Hispanic-owned firms have even less access to credit than an analysis of loan applicants would indicate.

   To test this proposition, we estimate a regression model comparable to the one reported in Table 5 for the sample of firms that applied for a loan, except that this analysis considers all firms seeking credit and treats those who did not apply for fear of rejection as denials. The sample excludes firms that did not need additional credit in the preceding three years. The results, reported in Table 9, are consistent with the previous analysis; we find that selection is not much of an issue for black-owned firms. Regardless of whether we consider denial rates among applicants or denial rates among firms that desired additional credit, black-owned firms are roughly 25 percent less likely to obtain credit. For Hispanic-owned firms, however, selection bias is evident.

---

[18]  The only variable that we felt potentially could meet these conditions in the NSSBF data is the distance between a firm and the nearest financial institution. If greater distance reduced a firm's information regarding the availability of funds, it might be related to the decision to apply for a loan. On the other hand, the credit-worthiness of the firm should be independent of its location and should be unlikely to enter into the approval process. Unfortunately, we did not find a direct relationship between distance to the nearest financial institution and the probability of applying for a loan. This may be due to the fact that few firms are located more than a very short distance from the nearest financial institution.

Among the pool of loan applicants, Hispanic-owned firms are not statistically significantly more likely to be denied than other firms with the same characteristics.  The previously statistically insignificant result for Hispanics in Table 5 now becomes significant in Table 9.  Among the pool of firms seeking additional credit, Hispanic-owned firms are 12 percent more likely to be denied access to credit, and this difference is statistically significant.

## VII.  Caveats

The results presented indicate that black-owned firms particularly face obstacles in obtaining credit that are unrelated to their credit worthiness.  Although one explanation for these findings is that these firms are discriminated against, we raise a few factors worth considering before one can draw definitive conclusions.

First, as in any regression-based study, our analysis hinges upon the proposition that all the factors that are related to loan denial rates by race have been included in our statistical model.  If, for example, blacks possess some unobservable characteristic that makes them less creditworthy, then our statistical finding would overstate the extent of discrimination.  Although such an omitted variable bias is always a possibility, we have included an extensive array of information on firm characteristics and it is not clear what additional information would be pertinent in examining loan decisions. In addition, we have estimated alternative specifications that address other forms of credit that firms receive and different subgroups of banks and in each case the results are consistent with our interpretation that discrimination exists in this market. Finally, we have also supplemented the regression estimates with alternative, more qualitative approaches, which all suggest the possibility of discrimination in lending.

It is conceivable that the reason why blacks are more likely to have their loans denied is that the firms that they own are inherently less profitable than the ones owned by whites. There are two counters to this argument. First, modeling a firm's profitability normalized either by equity or employment shows no evidence of racial differences.[19] Second, controlling for a firm's profitability does not change the race coefficients significantly in the loan denial equations reported earlier.

Another potential criticism is that this study has examined loan denial rates rather than loan default rates; some have claimed that the latter provides a more appropriate strategy for identifying discrimination. For example, if banks only approve loans for relatively good black firms then black firms should exhibit relatively low default rates. Such an approach has several significant shortcomings that are detailed in Browne and Tootell (1995) and Ladd (1998). For instance, one problem is that it relies on the distribution of default probabilities being similar for black and white applicants meeting the acceptance standard used for white firms. A further problem is that it assumes that the loan originators know with a high degree of precision what determines defaults, but little hard information exists on what causes default. Additionally, it would be hard to disentangle the factors associated with differences in default rates between white and black-owned firms given the fact that black-owned firms that obtain credit are charged higher interest rates, as we have shown.

In addition, many of the criticisms levied against Munnell et al. (1996) may be relevant here as well. That work has been attacked because of the fragility of the results. Yet these criticisms appear to have been effectively countered by the authors (see Browne and Tootell,

---

[19] Results not reported. This is true with or without controls for industry, location, creditworthiness and all of the other controls used in the various denial equations. There is some evidence of a negative race effect in an equation where profits are normalized by sales but this is an inappropriate and certainly unusual normalization.

1995; Tootell, 1996). It is also not obvious that the criticisms directed towards that research are applicable to the results presented here. Importantly, our reported estimates appear to be highly stable to changes in econometric specification. Moreover, the absolute size of the raw racial differences found in the mortgage study are considerably smaller than those observed in this study regarding business credit.[20] Some of the difference in denial rates between the races in both studies appears to be due to differences in the characteristics of the applicants. Even after controlling for these differences, however, the gap in denial rates in the small business credit market is considerably larger than that found in the mortgage market.[21] The larger size and significance of the effects found in this report reduce the possibility that the observed differences can be explained away by some quirk of the econometric estimation procedure.

## VIII. Conclusions

Our analysis finds significant evidence that black-owned businesses face impediments to obtaining credit that go beyond observable differences in their credit worthiness. These firms are more likely to report that credit availability was a problem in the past and expect it to be a problem in the future. In fact, these concerns prevent more black-owned firms from applying for loans because they feared being turned down due to prejudice or discrimination. We also found that loan denial rates are significantly higher for black-owned firms than for white-owned firms even after taking into account differences in an extensive array of measures of credit-worthiness and other characteristics. This result appears to be largely insensitive to changes in econometric

---

[20]    In the Boston Fed study 10% of white's mortgage applications were rejected compared with 28% for blacks; loan denial rates for business credit in this study were 26.9 percent and 65.9 percent for white- and black-owned firms respectively.

[21]    The ceteris paribus gap between blacks and whites is 25 percentage points in denial rates between the races in

specification.  Overall, the evidence is consistent that black-owned firms are disadvantaged in the market for small business credit, which would traditionally be attributed to discrimination.  We found little or no evidence that female-owned firms are discriminated against in this market.

The magnitude of the racial difference in small business loan approval rates is substantial, even after controlling for observed differences in credit-worthiness, and considerably larger than that found in the analysis of discrimination in mortgage markets.   Why do the results for small business loans differ so markedly from those obtained from mortgage loans?   First, many mortgages are sold in the secondary market and a substantial fraction of mortgage lenders have little intention of keeping the loans they make.  This added "distance" in the transaction might reduce the likelihood of discrimination.  As Day and Liebowitz, (1998) point out, "economic self-interest, therefore, should reduce racial discrimination in this market more completely than in many others" (p.6).  A highly sophisticated secondary market for loans to small firms does not exist.  Second, the presence of special programs and regulatory incentives to encourage banks and others to increase their mortgage lending to minorities gives these groups some advantages in obtaining a mortgage.  Additional research might seek to provide alternative explanations.

---

the small business credit market compared with 7 percentage points in the mortgage market.

## References

Bates, T., (1989).  "The Changing Nature of Minority Business: A Comparative Analysis of Asian, Non-minority, and Black-Owned Businesses," The Review of Black Political Economy, pp. 25-42.

Bauer, P.W. and B.A. Cromwell (1994).  "A Monte Carlo examination of bias tests in mortgage lending", Federal Reserve Bank of Cleveland Economic Review, 30(3), pp. 27-40.

Becker, G. S. (1957). The Economics of Discrimination.  Chicago:  University of Chicago Press.

Black, J., D. de Meza, and D. Jeffreys (1996).  "House Price, the Supply of Collateral and the Enterprise Economy.  Economic Journal,  January, 106(434), pp. 60-75.

Blanchflower, D.G., Evans, D.S. and A.J. Oswald (1998a). "Credit cards and entrepreneurs", working paper, National Economic Research Associates, Cambridge, MA.

Blanchflower, D.G., Evans, D.S. and A.J. Oswald (1998b). "Credit cards and consumers", working paper, National Economic Research Associates, Cambridge, MA.

Blanchflower, D.G. and A.J. Oswald. "What makes an entrepreneur?",  Journal of Labor Economics, January, 16(1), pp. 26-60 1998.

Browne, L. E. and G. M.B. Tootell, (1995). "Mortgage Lending in Boston-A Response to the Critics",  New England Economic Review, pp. 53-78, September-October.

Cavalluzzo, K.S. and L.C. Cavalluzzo, (1998).  "Market Structure and Discrimination:  The Case of Small Businesses."  Journal of Money, Credit, and Banking.  November, 30(4), pp. 771-792.

Cloud C. and G. Galster, (1993). "What Do We Know about Racial Discrimination in Mortgage Markets",  Review of Black Political Economy, Summer, 22(1), pp. 101-120.

Cole, R.A. and J. D. Wolken, (1995). "Financial Services Used by Small Businesses: Evidence from the 1993 National Survey of Small Business Finances", Federal Reserve Bulletin, vol. 81, July, pp. 630-67.

Cole, R.A., R. L. Woodburn, and J. D. Wolken, (1996).  "Bank and Nonbank Competition for Small Business Credit: Evidence from the 1987 and 1993 National Surveys of Small Business Finances", Federal Reserve Bulletin, vol. 82, November, pp. 938-95.

Day, T.S. and S.J. Liebowitz (1998).   "Mortgage lending to minorities: where's the bias?" Economic Inquiry, XXXVI, January, pp. 3-28.

Evans, D. and Leighton, Linda (1989). "Some empirical aspects of entrepreneurship", American Economic Review, 79, pp. 519-535.

29

Evans, D. and B. Jovanovic, (1989). "An estimated model of entrepreneurial choice under liquidity constraints", Journal of Political Economy, 97, pp. 808-827.

Fairlie, R.W. (1998). "The absence of the African-American owned business: an analysis of the dynamics of self-employment", Journal of Labor Economics, forthcoming.

Fairlie, R. W., and B. D. Meyer (1996). "Ethnic and Racial Self-Employment Differences and Possible Explanations," Journal of Human Resources, 31(4), pp. 757-793.

Ferri, G. and P. Simon (1997). "Constrained consumer lending: exploring business cycle patterns using the Survey of Consumer Finances", working paper, Princeton University.

Harrison, G.W. (1998). "Mortgage lending in Boston: a reconsideration of the evidence", Economic Inquiry, XXXVI, January, pp. 29-38.

Hayashi, F. (1985). "The effect of liquidity constraints on consumption: a cross-sectional analysis", Quarterly Journal of Economics, February, 100(1), pp. 183-206.

Heckman, J.J. (1998). "Detecting discrimination", Journal of Economic Perspectives, Spring, 12(2), pp. 101-116.

Holtz-Eakin, D., Joulfaian, D., and R.S., Harvey (1994a). "Entrepreneurial decisions and liquidity constraints", Journal of Political Economy, 102, pp. 53-75.

Holtz-Eakin, D., Joulfaian, D., and R.S., Harvey (1994b). "Sticking it out: entrepreneurial survival and liquidity constraints", Rand Journal of Economics, 25(2), pp. 334-347, Summer.

Horne, D. (1994). "Evaluating the role of race in mortgage lending", FDIC Banking Review, 7(1), Spring/Summer, pp. 1-15.

Jappelli, T. (1990). "Who is credit constrained in the U.S. economy?", Quarterly Journal of Economics, February, 105(1), pp. 219-234.

Ladd, H.F. (1998). "Evidence on discrimination in mortgage lending", Journal of Economic Perspectives, Spring, 12(2), pp. 41-62.

Lindh T., and H.Ohlsson (1996). "Self-employment and windfall gains: Evidence from the Swedish lottery", Economic Journal, November, 106: (439), pp. 1515-1526.

Munnell, A.G., M.B Tootell, L.E. Browne and J. McEneaney (1996). "Mortgage lending in Boston: interpreting HMDA data", American Economic Review, March, 86(1), pp. 25-53.

Oaxaca, R.L. (1973) "Male-Female Wage Differences in Urban Labor Markets. International Economic Review. October, 14(3), pp. 693-709.

30

Tootell, G.M.B. (1996). "Turning a critical eye on the critics", in <u>Mortgage lending, racial discrimination and federal policy</u>, edited by J. Goering and R. Wienk, Urban Institute Press, Washington, D.C..

Yezer, M.J., R.F. Phillips and R.P. Trost (1994). "Bias in estimates of discrimination and default in mortgage lending; the effects of simultaneity and self-selection", <u>Journal of Real Estate Finance and Economics</u>, 9(3), pp. 196-215.

**Table 1:  Selected Sample Means from 1993 NSSBF Data**

|  | All | White | Black | Hispanic | Other Races |
|---|---|---|---|---|---|
| Loan denial rates | 0.288 | 0.269 | 0.659 | 0.359 | 0.400 |
| *Credit History* | | | | | |
| Judgments against owner | 0.051 | 0.043 | 0.150 | 0.093 | 0.092 |
| Firm delinquent | 0.19 | 0.185 | 0.328 | 0.249 | 0.144 |
| Personally delinquent | 0.134 | 0.12 | 0.366 | 0.223 | 0.179 |
| Bankrupt past 7yrs | 0.027 | 0.025 | 0.051 | 0.036 | 0.038 |
| *Other Firm Characteristics* | | | | | |
| Female-owned | 0.261 | 0.257 | 0.235 | 0.277 | 0.330 |
| Total employment | 8.49 | 8.75 | 6.18 | 6.73 | 6.71 |
| Firm age | 14.28 | 16.42 | 11.99 | 12.92 | 10.22 |
| $1992 Sales (in 1,000s) | 1,001 | 1,057 | 421 | 685 | 599 |
| $1992 Assets  (in 1,000s) | 489 | 516 | 169 | 321 | 321 |
| $1992 Liabilities (in 1,000s) | 285 | 304 | 87 | 136 | 181 |
| Sole Proprietorship | 0.432 | 0.417 | 0.621 | 0.571 | 0.476 |
| Partnership | 0.083 | 0.081 | 0.042 | 0.081 | 0.078 |
| S Corporation | 0.203 | 0.213 | 0.097 | 0.091 | 0.185 |
| C Corporation | 0.284 | 0.289 | 0.241 | 0.256 | 0.260 |
| Line of credit | 0.257 | 0.264 | 0.213 | 0.275 | 0.149 |
| Owner years experience | 18.9 | 19.4 | 15.8 | 15.4 | 14.7 |
| <=8th grade education | 0.018 | 0.015 | 0.01 | 0.075 | 0.035 |
| 9-11th grade education | 0.028 | 0.028 | 0.026 | 0.033 | 0.033 |
| High school graduate | 0.234 | 0.238 | 0.155 | 0.301 | 0.166 |
| Some college | 0.253 | 0.254 | 0.356 | 0.208 | 0.214 |
| College graduate | 0.263 | 0.261 | 0.254 | 0.269 | 0.306 |
| Postgraduate education | 0.203 | 0.205 | 0.203 | 0.114 | 0.245 |
| East North Central Region | 0.159 | 0.168 | 0.156 | 0.084 | 0.056 |
| East South Central Region | 0.045 | 0.045 | 0.115 | 0.028 | 0.013 |
| Middle Atlantic Region | 0.153 | 0.159 | 0.111 | 0.099 | 0.132 |
| Mountain Region | 0.058 | 0.060 | 0.020 | 0.032 | 0.052 |
| New England | 0.069 | 0.074 | 0.025 | 0.026 | 0.050 |
| Pacific Region | 0.182 | 0.164 | 0.181 | 0.413 | 0.307 |
| South Atlantic Region | 0.148 | 0.148 | 0.229 | 0.127 | 0.118 |
| West North Central Region | 0.081 | 0.088 | 0.051 | 0.020 | 0.023 |
| West South Central Region | 0.100 | 0.090 | 0.108 | 0.164 | 0.245 |
| Sample Size (unweighted) | 4637 | 3559 | 442 | 290 | 344 |

Notes:  Sample weights are used to provide statistics that are nationally representative of all small businesses. Some variable means are computed from slightly smaller samples because of missing values.

Source:  Authors' calculations from 1993 NSSBF.

**Table 2:  Problems Firms Experienced During Preceding 12 Months**

|  | All | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Credit Market Conditions |  |  |  |  |  |
| % reporting not a problem | 66 | 67 | 43 | 59 | 66 |
| % reporting somewhat of a problem | 20 | 20 | 26 | 18 | 21 |
| % reporting serious problem | 14 | 13 | 31 | 23 | 13 |
|  |  |  |  |  |  |
| Other Potential Problems |  |  |  |  |  |
| (% reporting problem is serious) |  |  |  |  |  |
|  |  |  |  |  |  |
| Training costs | 7 | 7 | 7 | 6 | 4 |
| Worker's compensation costs | 22 | 21 | 19 | 30 | 29 |
| Health insurance costs | 33 | 32 | 38 | 45 | 35 |
| IRS regulation or penalties | 12 | 12 | 17 | 17 | 14 |
| Environmental regulations | 8 | 8 | 6 | 7 | 11 |
| Americans with Disabilities Act | 3 | 3 | 4 | 3 | 4 |
| Occupational Safety and Health Act | 5 | 5 | 4 | 4 | 6 |
| Family and Medical Leave Act | 3 | 3 | 5 | 3 | 5 |

Source:  Authors' calculations from 1993 NSSBF

**Table 3A:  Reported Factors Affecting Business Profitability**

| Factors | All | White Men | Black | Hispanic | Other Races | Women |
|---|---|---|---|---|---|---|
| **1) Lack of Financial Capital** | | | | | | |
| % reporting minor negative impact | 25.2 | 25.6 | 19.5 | 22.1 | 20.0 | 25.5 |
| % reporting strong negative impact | 30.7 | 29.0 | 46.4 | 38.1 | 33.3 | 32.9 |
| **2) Health Insurance Costs** | | | | | | |
| % reporting minor negative impact | 22.2 | 22.9 | 14.0 | 17.2 | 20.5 | 21.4 |
| % reporting strong negative impact | 25.0 | 25.4 | 22.6 | 24.4 | 16.9 | 24.9 |
| **3) IRS Regulations or Penalties** | | | | | | |
| % reporting minor negative impact | 23.2 | 24.2 | 17.3 | 21.8 | 20.8 | 21.8 |
| % reporting strong negative impact | 19.6 | 21.0 | 21.0 | 20.3 | 14.5 | 16.1 |
| **4) Environmental Regulations** | | | | | | |
| % reporting minor negative impact | 20.4 | 21.6 | 15.2 | 20.1 | 18.6 | 16.5 |
| % reporting strong negative impact | 12.3 | 13.2 | 8.1 | 11.7 | 13.8 | 10.2 |
| **5) The Americans with Disabilities Act** | | | | | | |
| % reporting minor negative impact | 9.6 | 9.7 | 7.7 | 10.1 | 11.2 | 9.0 |
| % reporting strong negative impact | 4.4 | 4.5 | 3.6 | 3.5 | 7.6 | 3.7 |
| **6) The Occupational Safety and Health Act** | | | | | | |
| % reporting minor negative impact | 17.3 | 18.7 | 13.9 | 14.3 | 17.1 | 13.1 |
| % reporting strong negative impact | 9.0 | 9.5 | 6.3 | 9.7 | 7.6 | 8.1 |
| **7) Credit Market Conditions** | | | | | | |
| % reporting minor negative impact | 16.2 | 16.2 | 15.0 | 16.0 | 16.4 | 15.9 |
| % reporting strong negative impact | 15.0 | 13.4 | 19.6 | 16.7 | 15.0 | 17.8 |
| **8) Crime** | | | | | | |
| % reporting minor negative impact | 26.5 | 26.6 | 29.4 | 27.6 | 29.8 | 25.8 |
| % reporting strong negative impact | 9.2 | 7.9 | 20.6 | 16.5 | 19.9 | 9.3 |

**Table 3B:  Reported Factors Contributing to Failure among Discontinued Businesses from the 1992 Characteristics of Business Owners Survey**

| Factors (% reporting) | All | White Men | Black | Hispanic | Other Races | Women |
|---|---|---|---|---|---|---|
| Lack of Access to Business Credit | 8.2 | 7.3 | 15.5 | 8.8 | 6.1 | 9.3 |
| Lack of Access to Personal Credit | 3.3 | 2.7 | 8.4 | 5.8 | 6.4 | 3.3 |
| Inadequate Cash Flow | 71.7 | 73.7 | 63.4 | 67.1 | 67.6 | 70.2 |
| Other | 71.7 | 69.3 | 69.3 | 68.3 | 75.9 | 75.8 |

Notes:  The source for Tables 3A and 3B is, Characteristics of Business Owners Survey: 1992.  Table 1, p. 21.

**Table 4:  Percentage of Firms Reporting Most Important Issues Affecting Them
Over the Next 12 Months**

|  | All | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Credit availability | 6 | 6 | 21 | 5 | 4 |
| Health care, health insurance | 21 | 22 | 12 | 14 | 15 |
| Taxes, tax policy | 6 | 6 | 3 | 8 | 4 |
| General U.S. business conditions | 12 | 11 | 9 | 14 | 17 |
| High interest rates | 5 | 6 | 2 | 3 | 4 |
| Costs of conducting business | 3 | 3 | 4 | 4 | 4 |
| Labor force problems | 3 | 3 | 4 | 6 | 4 |
| Profits, cash flow, expansion, sales | 10 | 10 | 20 | 10 | 12 |
| Number of observations (unweighted) | 4,388 | 3,383 | 424 | 323 | 258 |

Source:  Authors' calculations from 1993 NSSBF.

**Table 5:  Determinants of Loan Denial Rates**
(Reported Estimates are Derivatives from Probit Models, t-Statistics are in Parentheses)

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Black | 0.426 | 0.277 | 0.249 | 0.258 |
|  | (10.87) | (6.69) | (5.99) | (5.85) |
| Asian/Pacific Islanders | 0.207 | 0.161 | 0.128 | 0.104 |
|  | (3.90) | (3.02) | (2.42) | (1.92) |
| American Indian/Alaskan Eskimo | -0.051 | -0.152 | -0.143 | -0.101 |
|  | (0.35) | (1.17) | (1.07) | (0.70) |
| Hispanic | 0.113 | 0.061 | 0.055 | 0.034 |
|  | (2.33) | (1.27) | (1.15) | (0.69) |
| Female-Owned | 0.073 | 0.039 | 0.029 | 0.018 |
|  | (2.54) | (1.36) | (1.00) | (0.62) |
| Owner years experience |  | -0.003 | -0.001 | -0.002 |
|  |  | (2.58) | (1.14) | (1.51) |
| Owners' share of business |  | 0.001 | 0.000 | 0.00 |
|  |  | (1.96) | (0.73) | (0.12) |
| Judgments |  | 0.142 | 0.131 | 0.129 |
|  |  | (2.83) | (2.61) | (2.50) |
| Firm delinquent |  | 0.177 | 0.182 | 0.201 |
|  |  | (6.54) | (6.63) | (7.04) |
| Personally delinquent |  | 0.160 | 0.145 | 0.143 |
|  |  | (4.41) | (3.97) | (3.86) |
| Bankrupt past 7yrs |  | 0.208 | 0.169 | 0.154 |
|  |  | (3.10) | (2.57) | (2.30) |
| $1992 Sales*($10^8$) |  | -0.439 | -0.332 | -0.382 |
|  |  | (3.62) | (2.52) | (2.63) |
| $1992 Assets (*$10^8$) |  | -0.168 | 0.109 | 0.195 |
|  |  | (0.65) | (0.42) | (0.69) |
| $1992 liabilities (*$10^8$) |  | 0.716 | 0.217 | 0.139 |
|  |  | (1.80) | (0.54) | (0.33) |
| Line of credit |  |  | -0.109 | -0.104 |
|  |  |  | (4.90) | (4.50) |
| Total employment |  |  | 0.0002 | 0.0002 |
|  |  |  | (1.14) | (1.05) |

| | | | | |
|---|---|---|---|---|
| Firm age | | | -0.001 | -0.000 |
| | | | (1.11) | (0.38) |
| In an MSA | | | 0.094 | 0.087 |
| | | | (3.71) | (3.25) |
| New firm since 1990 | | | 0.108 | 0.128 |
| | | | (2.56) | (2.93) |
| Partnership | | | -0.077 | -0.085 |
| | | | (1.64) | (1.81) |
| S-Corporation | | | -0.018 | -0.028 |
| | | | (0.54) | (0.84) |
| C-Corporation | | | -0.041 | -0.048 |
| | | | (1.26) | (1.44) |
| | | | | |
| Owner education dummies | | | 5 | 5 |
| Area dummies | | | | 8 |
| Industry dummies | | | | 60 |
| N | 2,007 | 2,007 | 2,007 | 1,986 |
| Pseudo $R^2$ | 0.061 | 0.141 | 0.163 | 0.194 |
| Chi$^2$ | 143.0 | 332.5 | 385.8 | 454.7 |
| Log likelihood | -1,109.0 | -1,014.3 | -987.6 | -945.4 |

Source:  Authors' calculations from 1993 NSSBF.

**Table 6:    Alternative Models of Loan Denials**
(Probit Derivatives, t-statistics in Parentheses)

| Specification | Black | Asian/Pacific Islanders | Native Americans | Hispanic | Sample Size |
|---|---|---|---|---|---|
| Creditworthiness | | | | | |
| 1) No past problems | .236 | .150 | - | -.007 | 1329 |
| | (4.12) | (2.62) | | (0.16) | |
| 2) One or more problem | .283 | .020 | -.115 | .217 | 591 |
| | (4.15) | (0.18) | (0.47) | (2.06) | |
| 3) More than one problem | .252 | .134 | -.319 | .074 | 200 |
| | (2.28) | (0.68) | (0.83) | (0.39) | |
| Source of Loan | | | | | |
| 4) Suppliers:  Trade Credit | 0.032 | 0.010 | -0.032 | 0.029 | 4,480 |
| | (2.88) | (0.73) | (1.06) | (2.08) | |
| 5) Credit Card:  Business | 0.035 | -0.102 | 0.050 | 0.032 | 4,628 |
| | (1.33) | (3.42) | (0.60) | (1.02) | |
| 6) Credit Card:  Personal | 0.002 | -0.009 | -0.008 | -0.036 | 4,635 |
| | (0.07) | (0.07) | (0.09) | (1.17) | |
| Organization Type | | | | | |
| 7) Proprietorships and Partnerships | 0.240 | .074 | .670 | .058 | 522 |
| | (2.87) | (0.71) | (1.86) | (0.66) | |
| 8) Corporations | 0.243 | .123 | --- | .025 | 1,438 |
| | (4.46) | (1.83) | | (0.40) | |
| Age of Firm | | | | | |
| 9) 12 Years or Under | 0.310 | 0.169 | -0.059 | 0.043 | 1,062 |
| | (5.15) | (2.32) | (0.31) | (0.61) | |
| 10) Over 12 Years | 0.218 | 0.021 | --- | 0.65 | 883 |
| | (3.16) | (0.23) | | (0.94) | |
| 1990 Firm Size | | | | | |
| 11) Fewer than 10 Employees | 0.258 | .064 | -.030 | .016 | 947 |
| | (4.45) | (0.83) | (0.15) | (0.24) | |
| 12) 10 or More Employees | 0.293 | .145 | __ | .072 | 1,004 |
| | (3.62) | (1.66) | | (0.88) | |
| Industry | | | | | |
| 13) Retail Trade, Repair and Personal Services | 0.008 | .259 | --- | .053 | 542 |
| | (0.10) | (2.33) | | (0.63) | |
| 14) All Other Industries | 0.329 | .083 | -.107 | .095 | 1,443 |
| | (6.40) | (1.27) | (0.73) | (1.50) | |
| Urban/rural | | | | | |
| 15) MSA | .241 | .100 | -.203 | -.034 | 1558 |
| | (5.08) | (1.71) | (1.27) | (0.64) | |
| 16) Non-MSA | .485 | -.047 | .261 | .403 | 387 |
| | (2.99) | (0.51) | (1.03) | (3.00) | |

Notes:  Each line of this table represents a separate regression with the same control variables as Column 4 of Table 5.  The dependent variable in all specifications except those for credit cards represents an indicator for whether or not a loan application was denied.  For credit cards, the dependent variable indicates whether the firm used business or personal credit cards to finance business expenses. In the source of loan specifications, the sample size is all firms. In models separated by industry, firm size, and firm age, the sample size reflects the number of loan applications in each category.  Native Americans include American Indians and Alaskan Eskimo.

Source:  Authors' calculations from 1993 NSSBF.

**Table 7:  Models of Interest Rate Charged**
(OLS coefficients, t-statistics in Parentheses)

| Specification | Black | Asian/Pacific Islanders | Native Americans | Hispanic | Fixed Interest Loan | Sample Size |
|---|---|---|---|---|---|---|
| 1) All Loans | 1.029 | .450 | -.480 | .471 | .496 | 1455 |
| | (3.72) | (1.47) | (0.68) | (1.78) | (4.22) | |
| 2)  No credit problems | 1.494 | .381 | .981 | .414 | .511 | 1138 |
| | (4.24) | (1.08) | (1.15) | (1.46) | (3.98) | |
| | | | | | | |
| Organization Type | | | | | | |
| 3) Proprietorships and | 1.679 | .671 | 1.498 | .387 | .608 | 365 |
| Partnerships | (2.77) | (0.97) | (0.55) | (0.70) | (2.11) | |
| 4) Corporations | .721 | .399 | -.646 | .635 | .414 | 1090 |
| | (2.32) | (1.16) | (0.93) | (2.04) | (3.24) | |
| | | | | | | |
| Age of Firm | | | | | | |
| 5) 12 years or under | 1.336 | .377 | -.520 | .386 | .646 | 721 |
| | (3.38) | (0.86) | (0.58) | (1.01) | (3.59) | |
| 6) Older than 12 years | .676 | .696 | -.011 | .680 | .351 | 734 |
| | (1.65) | (1.50) | (0.01) | (1.76) | (2.18) | |
| | | | | | | |
| 1990 Firm Size | | | | | | |
| 7) Fewer than 10 | 1.151 | .302 | -1.040 | .590 | .728 | 644 |
| Employees | (2.85) | (0.62) | (0.85) | (1.49) | (3.46) | |
| 8) 10 or More | .493 | .628 | -.058 | .676 | .399 | 811 |
| Employees | (1.12) | (1.52) | (0.07) | (1.61) | (2.86) | |
| | | | | | | |
| Industry | | | | | | |
| 9) Retail Trade, Repair | .653 | -.164 | 4.157 | .383 | .500 | 392 |
| and Personal Services | (1.06) | (0.21) | (1.72) | (0.75) | (1.84) | |
| 10) All Other Industries | .653 | .667 | -.979 | .552 | .452 | 1063 |
| | (1.06) | (2.05) | (1.40) | (1.72) | (3.48) | |
| | | | | | | |
| Urban/rural | | | | | | |
| 11)  MSA | 1.164 | .533 | -.554 | .505 | .458 | 1103 |
| | (3.94) | (1.62) | (0.66) | (1.75) | (3.25) | |
| 12)  Non-MSA | -.640 | -.419 | .724 | -.029 | .477 | 352 |
| | (0.57) | (0.39) | (0.56) | (0.04) | (2.16) | |

Notes:  Each line of this table represents a separate regression with the same control variables as Column 4 of Table 5 except for an indicator variable for whether the loan request was for a fixed interest rate loan.  Sample consists of firms who had applied for a loan and had their application approved.  Native Americans include American Indians and Alaskan Eskimo.  'No credit problems' means  that neither the firm nor the owner had been delinquent on payments over 60 days , no judgements against the owner for the preceding 3 years and the owner had not been bankrupt in the preceding 7 years..

Source:  Authors' calculations from 1993 NSSBF.

**Table 8:  Racial Differences in Failing to Apply for Loans Fearing Denial**
(Probit Derivatives, t-statistics in Parentheses)

| Specification | Black | Asian/Pacific Islanders | Native Americans | Hispanic |
|---|---|---|---|---|
| No Other Control Variables | 0.398 | 0.094 | -0.135 | 0.223 |
| (n=4,635) | (16.57) | (3.49) | (1.76) | (7.89) |
| | | | | |
| Full Set of Control Variables | 0.262 | 0.041 | 0.036 | 0.149 |
| (same as Table 5, Column 4) | (10.13) | (1.48) | (0.50) | (5.17) |
| (n=4,627) | | | | |

Notes:  Sample consists of all firms.  Native Americans include American Indians and Alaskan Eskimo.  Dependent variable is 1 if the firm said they did not apply for a loan fearing denial, zero otherwise.

Source:  Authors' calculations from 1993 NSSBF.

**Table 9: Models of Failure to Obtain Credit Among Firms that Desired Additional Credit**
(Probit Derivatives, t-statistics in Parentheses)

| Specification | Black | Asian/Pacific Islanders | Native Americans | Hispanic |
|---|---|---|---|---|
| No Other Control Variables | 0.437 | 0.283 | 0.163 | 0.268 |
| (n=2,647) | (14.17) | (6.47) | (1.37) | (6.93) |
| | | | | |
| Full Set of Control Variables | 0.282 | 0.152 | 0.009 | 0.127 |
| (same as Table 5, Column 4) | (7.22) | (2.92) | (0.06) | (2.78) |
| (n=2,638) | | | | |

Notes:  The sample consists of all firms that applied for loans along with those who needed credit, but didn't apply for fear of refusal.  Failure to obtain credit includes those firms that were denied and those that did not apply for fear of refusal.  Dependent variable = 1 if the firm failed to obtain credit and zero if the firm applied for credit and had their loan application approved.  Native Americans include American Indians and Alaskan Eskimo.

Source:  Authors' calculations from 1993 NSSBF.

Appendix A.  Data Appendix

1. The 1993 National Survey of Small Business Finances

The 1993 National Survey of Small Business Finances provides information about a nationally representative sample of small businesses in the United States. The survey was conducted during 1994-95 for the Board of Governors of the Federal Reserve System and the U.S. Small Business Administration. The target population is the population of all for-profit, non-financial, non-farm business enterprises that had fewer than 500 employees and were in operation as of year-end 1992. The sample was drawn from firms listed on the Dun's Market Identifier file as of November, 1993.  The DMI list, containing nearly 10 million businesses, is broadly representative of all businesses but does not include many of the newest start-up firms or the self-employed individuals filing business tax returns. In contrast, the Internal Revenue Service reports that for 1991 about 20 million individuals filed business tax returns, including about 13 million sole proprietorships, of which about 3 million reported less than $2,500 in annual receipts.  The public use dataset contains 4,637 firms. These firms represent 4.99 million small businesses.

The sample was a stratified random design with over sampling to ensure the ability to estimate separately the reporting domains by employment size groups, urban or rural location, and in census regions. The specific sampling strata were five employment-size groups (0-19, 20-49, 50-99, 100-499, unknown), nine Census regions (East North Central, East South Central, Middle Atlantic Mountain, New England, Pacific, South Atlantic, West North Central and West South Central), and urban or rural location. In addition, three minority partitions of firms likely to be owned by Asians, Blacks, and Hispanics were extracted from the Dun's frames prior to sampling to create samples of minority-owned businesses (see [2] for details). Each of the minority partitions was proportionately stratified by urban or rural location.  Because the larger and minority-owned firms are small percentages of the population of small businesses but are of special interest to researchers, the survey over sampled larger firms (20 to 499 employees), as well as Black-owned, Asian-owned, and Hispanic-owned firms to ensure sufficient numbers for analyses of these groups.

Businesses were contacted in advance of the survey to determine eligibility, verify addresses, and identify a contact person. Not all businesses were eligible (i.e., met the target-population definition). Some businesses could not be contacted, some failed at least one of the eligibility criteria (e.g., not in business, for profit, etc.), and some had erroneous frame data. The eligibility rate of sampled businesses averaged about 60 percent.

The average duration of the telephone interviews was fifty minutes. assisted telephone interviews, which were conducted by Price Waterhouse. The survey was voluntary. The response rate was about 50 percent.

The survey collected the following types of information from each business:

-Demographic information on the owners and characteristics of the firm, such as the industry to which it belongs, age, and type of organization (sections A, B, C, and D of the questionnaire).

-An inventory of the firm's deposit and savings accounts, capital leases, credit lines, mortgages, motor vehicle loans, equipment loans, other loans, and selected other financial products. For each of these services, the supplier of the service was also identified (sections E, F, and G of the questionnaire).

-Information about the characteristics of the financial service suppliers: type (e.g., bank, individual), location vis-a-vis the firm, method of conducting business, number of years the firm has done business with the supplier, and reasons for choosing the source (sections H and J of the questionnaire and section I of the codebook).

-Experience in the past three years in applying for credit (section J of the questionnaire).

-Data from each firm's income statement and balance sheet (sections P, R, and S of the questionnaire).

-Information on the recent credit history of the firm and its owners (section U of the questionnaire).

Generally, the reference period for the survey data is 1993. However, the income statement and balance sheet data were collected for fiscal year 1992 because that date was the time of the last complete set of financial statements for most firms.  Sales and employment data were collected for 1992 and for 1990.

The NSSBF does not use an equal-probability sample design, so that the weights play a critical role in interpreting the survey data. The weights included with this data set are based on the original weights computed by Price Waterhouse.  As is true of all surveys, there is some amount of missing data for nearly every NSSBF question. An attempt has been made to impute most missing values. The general model used to perform imputations in the NSSBF is a randomized regression model. The methodology employed is similar to that used in the first-stage procedures of the Survey of Consumer Finances.  Multiple-categorical response questions (e.g., check all responses that apply) were converted to a series of yes-no responses, and then each of these yes-no responses was estimated using a randomized linear-probability model (i.e., randomized regression where the dependent variable takes on one of two values).  Not all variables lend themselves to estimation by regression. In particular, questions that evoked single discrete categorical responses (e.g., type of source) are typically imputed using a randomized hot-deck procedure.

Further details of the survey may be found in Cole, R.A. and J. D. Wolken, (1995) and Cole, R.A., R. L. Woodburn, and J. D. Wolken, (1996).  Additional documentation, codebooks and data are available for download on the web page of the Federal Reserve Board of Governors at the following address --  http://www.bog.frb.fed.us/pubs/oss/oss3/nssbftoc.htm.

2.  Characteristics of Business Owners Survey, 1992

The Characteristics of Business Owners (CBO) Survey provides basic economic, demographic, and sociological data on the characteristics of minority, women, and non-minority male business owners and their business activities. The data were collected by the Bureau of the Census through a statistically chosen mail sample survey and were combined with administrative records data, which were originally obtained for use in the 1992 Economic Census.  Any business which filed an IRS form 1040, Schedule C (individual proprietor-ship or self-employed person); form 1065 (partnership); or form 1120S (subchapter S corporation) in 1992 is included in the survey universe. A subchapter S corporation is a special IRS designation for legally incorporated businesses with 35 or fewer shareholders who, because of tax advantages, elect to be taxed as individual shareholders rather than as corporations.  The 1992 CBO survey used five sampling frames: 1) Hispanic; 2) Black; 3) Other minority (Asians and Pacific Islanders, American Indians, and Alaska Natives); 4) Women; and 5) Non-minority male.  Each business was eligible for sampling from exactly one CBO frame, to which they were assigned in the following order of precedence: Hispanic, other minority, Black, women, and non-minority male. For tabulation purposes, women-owned businesses sampled in the Hispanic, other minority, or Black frames were used to produce the estimates for women-owned businesses.  The five frames were stratified by state, industry division, and receipts size class before sample selection. The total sample size was 116,557 owners, approximately evenly distributed among the five sampling frames.

Additional documentation, codebooks and results are available for download on the web page of the Bureau of the Census at the following address:-  http://www.census.gov/agfs/www/cbo.html.

## Appendix B:  Typical Application Form Used for Small Business Loan

1. **About your Financing Request.**  Indicate the type and term of your loan request, as well as your plan for repayment.

What type of loan are you requesting?

| | | |
|---|---|---|
| Fixed Rate Term Loan | Loan Requested $: | Number of Months (1 - 60) |
| Variable Rate Term Loan | Loan Requested $: | Number of Months (1 - 60) |
| Variable Rate Line of Credit | Credit Line Requested $: | |
| Business Equity Loan | Loan Requested $: | Number of Months (1 - 60) |
| Business Equity Line of Credit | Credit Line Requested $: | |

What is the purpose of the loan?  (Attach other pages if necessary)
What is the primary source of business income to be used for repayment of the loan requested?

2. **About the Business**

Business Name (d/b/a if any))
Street
City                    State                    Zip
Telephone
Fax

Type of Business:
Years in Business:

Number of full-time employees:
Annual revenues:$
How long has the business been under its current ownership?
Under what legal form does the business operate?

Corporation
General Partnership
Sole Proprietorship
Other

**Bank Reference:**

Bank Name
Account Number
Is this your primary business bank?
Yes          No

3. **About the Owner(s) and Guarantor(s).**  Provide background information about owners and guarantors.

| | |
|---|---|
| Name | Name |
| Title | Title |
| % Ownership | % Ownership |
| Social Security Number | Social Security Number |

Does your business qualify as a minority-owned (more than 51 %) enterprise?     Yes          No

4. **Existing Assets and Liabilities of the Business**

Provide basic balance sheet information about the business

| | Original Value | Current Value | Loan Balance | Lender/Lessor |
|---|---|---|---|---|
| Machinery & Equipment | | | | |
| Furniture & Fixtures | | | | |
| Land & Buildings | | | | |
| Leasehold Improvements | | | | |
| Accounts Receivable | | | | |

For any 'yes' reply in this section, please attach a separate summary of relevant circumstances

| | | |
|---|---|---|
| Is the business responsible for any debts not listed on the business financial statements? | Yes | No |
| Is the business a party of any lawsuit or claim? | Yes | No |
| Does the business owe any taxes for years prior to the current year? | Yes | No |
| Is the business controlled by a person who is an executive officer, director of, or owner of more than 10% of any banking institution? | Yes | No |
| If yes, name of bank: | | |

5. **Primary Business Relationships.**  List the business' two largest suppliers, along with other background information about the business.

**Two Largest Suppliers**

| | | | |
|---|---|---|---|
| Name | City/State | Phone | Contact Person |
| Name | City/State | Phone | Contact person |

**Attorney**

Name                                                    Phone            Since (Date)

**Accountant**

Name                                                    Phone            Since (Date)

**6. Personal Information.** Provide background information about yourself and your business or employer:

Name                                                    Business Employers Name
Residential Address                                     Business Address
City                    State              Zip          City                    State              Zip
Residential Telephone                                   Business Telephone
                                                        Position or Occupation

**7. Personal Financial Condition**

| Assets | In Dollars | Liabilities | In Dollars |
|---|---|---|---|
| Cash on hand and in banks | $ | Notes payable to banks | $ |
| Securities, marketable and closely held | $ | Unpaid income tax | |
| Real estate owned | | Real estate mortgages payable | |
| Autos and other personal property | | Other debts | |
| Cash value - life insurance | | **Total Liabilities** | |
| **Total Assets** | $ | **Net Worth** (total assets - total liabilities) | |
| | | **Total Liabilities plus Net Worth** | |

**8. Your financial Status.** List your personal income sources and bank account along with any contingent liabilities.

**Income**                                              **In Dollars**

Salary, bonuses and commissions
Dividends
Other income

**Total Income**

Do you have any contingent liabilities?        Yes        No
        If yes, please describe:
As endorser, co-maker, or guarantor           $
On leases or contracts                        $
Legal claims                                  $
Other special debt                            $
Contested income tax liens                    $
Are you a partner or officer in any other venture?        Yes        No
        If so, describe:
At what bank is your personal bank account?
        Bank Name                             Account Number

**9. Schedules.** Provide detailed information about your personal assets and any personal debts.

| A  Securities, marketable and closely held | Number of Shares, face value, or ownership share | Description | In name of | Are these pledged? | Market value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

| B  Personal residence & other real estate | Address and type of property | Title in name of | Percent of ownership | Date acquire | Cost | Market value | Mortgage maturity | Mortgage amount |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

| C Personal installment loans | Creditor | Date issued | Secured/Unsecured | Line amount or original balance | Current balance |
|---|---|---|---|---|---|
| | | | | | |
| Credit card debt | Total Available Credit: | | | Total Outstanding Balance: | |

# Exhibit M

# Financing Patterns and Credit Market Experiences:
# A Comparison by Race and Ethnicity for U.S. Employer Firms

by
**Alicia Robb, Ph.D.**
**Robb Consulting**

for
Office of Advocacy
U.S. Small Business Administration
under contract number SBAHQ-16-M-0175
Release Date: February 2018



*This report was developed under a contract with the Small Business Administration, Office of Advocacy, and contains information and analysis that were reviewed by officials of the Office of Advocacy. However, the final conclusions of the report do not necessarily reflect the views of the Office of Advocacy.*

## Table of Contents

Executive Summary ................................................................................................................ 3

    Policy implications ........................................................................................................... 5

Background .......................................................................................................................... 7

Research Methodology ...................................................................................................... 13

    Sources of Financing Used to Start or Acquire the Business ............................................... 14

    Amount of Financing Used to Start or Acquire the Business ............................................... 18

    Amounts of Financing used in 2014 by Sources of Financing ............................................ 19

    Establishing New Funding Relationships ........................................................................... 24

    Unmet Credit Needs ....................................................................................................... 26

    New Funding Relationships and Outcomes by Firm Age .................................................... 28

    New Funding Relationships and Outcomes by Firm Industry ............................................. 32

    Avoidance of Financing when Needed .............................................................................. 34

    Avoidance of Financing when needed by Firm Age .......................................................... 37

    Access and Cost of Capital and Negative Impact on Profitability by Industry and
    Minority/Non-Minority Ownership ................................................................................... 44

    Reasons for Business Closure .......................................................................................... 46

Conclusions ....................................................................................................................... 47

References .......................................................................................................................... 50

Appendix 1 ........................................................................................................................ 53

Appendix 2 ........................................................................................................................ 57

    **Annual Survey of Entrepreneurs (ASE)** ........................................................................ 57

    **Characteristics of Businesses: 2014 Tables Used in Report** ............................................ 57

## Executive Summary

Access to capital for small businesses is one of the biggest policy issues in the United States today. Given the role of small businesses in job creation and economic growth, policymakers need to ensure that entrepreneurs and creditworthy firms are able to secure adequate financial resources for growth and success. Ensuring that these firms have adequate access to financial capital enables them to continue to drive innovation, growth, and job creation in the U.S. economy.

Prior research documents racial differences in both financing patterns and capital access, but timely data on this topic have been lacking. With the new annualized version of the Survey of Business Owners (SBO), which has been named the Annual Survey of Entrepreneurs (ASE), unprecedented detail on both of these topics is now available for employer businesses. The first ASE was released in September 2016 and covers calendar year 2014.

With questions on financing patterns, credit market experiences, and detailed data on the sources of financing and the amounts of financing by source, these data yield an incredibly rich picture of the current status of business financing and credit market experiences by U.S. employer businesses by race and ethnicity. This report provides an overview by race, ethnicity, and minority/ non-minority comparisons in terms of sources of capital, amounts of capital, credit market experiences, the impacts of access and cost of capital on firm profitability, and the role that financial capital played in firm closures in 2014.

The 2014 ASE data show Blacks and Hispanics continue to be underrepresented in business ownership. The data also show a greater reliance among minority-owned businesses on personal and family savings as a source of startup capital, despite wealth levels of Blacks and Hispanics being less than one tenth those of non-Hispanic Whites. Blacks and Hispanics were

less likely to have business bank loans compared with Whites. Black-owned businesses were more likely to use credit card financing for debt, which is a much more expensive source, than they were to access lower cost business bank loans through financial institutions.

In terms of startup capital, Blacks and Hispanics were more likely to be undercapitalized when launching their businesses. They were about twice as likely to start their businesses with less than $10,000 in financial capital, compared with Whites and Asians.  A greater percentage of Hispanics and Blacks attempted new financing relationships with a variety of sources, including banks, compared with Whites, which likely reflects the higher denial rates they experienced, when compared with Whites.  Hispanics were more likely than Whites to not receive the full amounts requested from most of the various sources, while Blacks were often twice as likely (or more) to not receive the full amount requested, compared with Whites.

Many businesses needed credit at some point in 2014, but decided not to apply for a variety of reasons.  Fewer than 10 percent of White-owned businesses stated this occurred, compared with 14.8 percent of Hispanics and 25.7 percent of Blacks.  In terms of reasons given, 47.4 percent of Whites said that they thought the lender would not approve their loan application, compared with 58.5 percent of Blacks and 53.1 percent of Hispanics.  Only 10 percent of Whites suggested that the lack of access to credit had a negative impact on profitability, compared with 17.4 percent of Hispanic-owned businesses and 28.4 percent of Black-owned businesses.  Firms owned by Blacks and Hispanics were also more likely to state that the cost of capital had a negative impact on their profitability (22.6 percent and 15.8 percent respectively), compared with businesses owned by Whites (10.6 percent).  Finally, for firms that closed down in 2014, Blacks were twice as likely as Whites to state that financial reasons drove their firm closure.

Hispanics were also more likely to cite financial reasons, compared with Whites, but the gap was much smaller.

To briefly summarize the report's findings:

- Blacks and Hispanics have lower levels of business financing.

- Blacks and Hispanics tend to be discouraged from entering capital markets.

- Blacks and Hispanics view their exclusion from capital markets as affecting their businesses. (Blacks and Hispanics are close to three  times more likely to report a lack of access to capital affecting profitability than White owners, but like other owners generally felt taxes and slow sales as bigger factors in profitability.)

- On the contrary, Asian results are so strong that they can mask Black and Hispanic differences when combining all minority groups together.

Clearly access to capital is still a driving factor that is disproportionately affecting minority-owned businesses, especially those owned by Blacks and Hispanics.  Given their lower wealth levels, these groups need to rely even more on other sources of financing external to their own personal assets.  These newly available data illustrate that financing challenges for minority firms remain front and center for employer businesses across the United States.  It appears that financing remains a critical challenge for minority entrepreneurs, even after nearly a decade following the financial crisis.

**Policy implications.** Access to capital for small businesses is one of the biggest policy issues in the United States today. Given the role of small businesses in job creation and economic growth, policymakers need to ensure that entrepreneurs and creditworthy firms are able to secure adequate financial resources for growth and success. Ensuring that these firms have adequate access to financial capital enables them to continue to drive innovation, growth, and job creation in the U.S. economy.

While minorities make up 40 percent of the U.S. population, they own only 20 percent of

the employer businesses.  As the minority population continues to rise, it is more important than ever that these prospective business owners have the resources they need to launch and grow successful firms.  Significant changes are needed if minority businesses are going to access capital in sufficient amounts needed for them to start, grow and thrive.

## Background

Business ownership is often viewed as a mechanism for promoting economic growth, wealth accumulation, and job creation (Boston, 2006; Bradford 2003).  Access to financial capital is a critical element of new business formation and success.  Prior research documents racial differences in both financing patterns and capital access, but timely data on this topic have been lacking. With the new annualized version of the Survey of Business Owners (SBO), which has been named the Annual Survey of Entrepreneurs (ASE), unprecedented detail on both of these topics is now available for employer businesses.  The first ASE was released in September 2016 and covers calendar year 2014.

With questions on financing patterns, credit market experiences, and detailed data on the sources of financing and the amounts of financing by source, these data yield an incredibly rich picture of the current status of business financing and credit market experiences by U.S. employer businesses by race and ethnicity.  This report provides an overview by race, ethnicity, and minority/ non-minority comparisons in terms of sources of capital, amounts of capital, credit market experiences, the impacts of access and cost of capital on firm profitability, and the role that financial capital played in firm closures in 2014.

The economics and finance literatures provide strong evidence that sufficient starting capital is a binding constraint for new firms. Entry into entrepreneurship increases with sudden increases in personal wealth, e.g. via bequest (Cagetti and De Nardi 2006) or external change in taxation rate (Nanda 2008), and with increased access to bank financing through deregulation and loosening of branching restrictions (Black and Strahan 2002). Likewise, the absence of funds inhibits entry. For example, Evans and Jovanovic (1989) find that borrowing capacity limits entrepreneurial entry; using the National Longitudinal Survey they estimate that new

entrepreneurs are limited by the size of their initial assets in starting a new business. So inequalities in personal wealth could translate into disparities in business creation and ownership.

Indeed, we certainly see disparities in business ownership by race and ethnicity. The most recent Census data available are for employer businesses and come from the 2014 Annual Survey of Entrepreneurs. As shown in Table 1, these data show that Whites own 86 percent of employer businesses and Asians own nearly 10 percent of the employer businesses. Whites and Asians are overrepresented in business ownership, compared with their shares in the general population (61.6 and 5.6 percent respectively).[1]  Hispanics and Blacks are greatly underrepresented in business ownership.  Hispanics own 5.8 percent of employer businesses, but make up 17.6 percent of the population.  Blacks make up 13.2 percent of the population, but own just 2.1 percent of employer businesses. In total, minority-owned firms make up 18.4 percent of the employer firm population, with firms owned equally minority/nonminority making up another 1.4 percent.  So while they make up nearly 20 percent of the business owners, they are 40 percent of the population.  As the minority population continues to rise, it is more important than ever that these prospective business owners have the resources they need to launch and grow successful firms.

| Table 1: Statistics for U.S. Employer Firms by Race and Ethnicity for the U.S. (2014) | | |
|---|---|---|
| | Number of Firms | Percentage |
| White | 4,441,550 | 86.0% |
| Black or African American | 108,473 | 2.1% |
| American Indian and Alaska Native | 26,757 | 0.5% |
| Asian | 506,595 | 9.8% |
| Native Hawaiian and Other Pacific Islander | 4,701 | 0.1% |
| Some other race | 81,002 | 1.6% |
| Hispanic | | |

---

[1] All population data come from the American Community Survey from the U.S. Census Bureau. Non-Hispanic Whites make up 61.6 percent of the population.

| | | |
|---|---|---|
| All | 298,563 | 5.8% |
| White | 226,741 | 4.4% |
| Black or African American | 5,339 | 0.1% |
| American Indian and Alaska Native | 2,808 | 0.1% |
| Asian | 3,739 | 0.1% |
| Native Hawaiian and Other Pacific Islander | 615 | 0.0% |
| Some other race | 66,619 | 1.3% |
| Minority | 949,318 | 18.4% |
| Equally minority/nonminority | 74,672 | 1.4% |
| | | |
| Nonminority | 4,141,816 | 80.2% |
| All firms classifiable by gender, ethnicity, and race | 5,165,806 | 100.0% |
| Publicly held and other firms not classifiable by gender, ethnicity, and race | 271,976 | |
| All firms | 5,437,782 | |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | |
| Notes: | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") | | |

Financial capital is one such resource.  Previous research shows that much of the financial capital used to start businesses comes from the owners themselves.  Yet estimates from the 2011 Survey of Income and Program Participation by the U.S. Census Bureau indicate that half of all Hispanic households have less than $7,683 in wealth and half of all African-American households have less than $6,314. This compares to a median net worth of White non-Hispanic households of $110,500.  Only Asians have wealth levels close to those of non-Hispanic Whites at $89,339.  Data from the 2013 Federal Reserve Board's Consumer Finance Survey found that the median wealth of a White family was $134,000, while for Asians it was $91,440.  For Blacks and Hispanics, the figures were $13,900 and $11,184 respectively (Boshara, Emmons and Noeth, 2015).

Low levels of wealth and liquidity constraints can create substantial challenges for

9

business owners because the owner's wealth can be invested directly in the business, used as collateral to obtain business loans, or used to acquire other businesses. In addition, banks and other investors frequently require a substantial level of an owner's investment of his/her own capital as an incentive.  These large disparities in wealth levels severely impact the ability of Blacks and Hispanics to invest their own money into their businesses and attract other sources of capital for investment.

      Previous research has looked at differences in access to capital from financial institutions. Disparate bank lending practices have been analyzed in studies using data from the Federal Reserve Bank's Survey of Small Business Finances. In summary, Minority Business Enterprises (MBEs) have been found to pay higher interest rates and experience greater incidences of loan denial than nonminority borrowers (Fairlie and Robb, 2008). Black-owned firms have the most difficulty accessing capital, as compared to other minority-owned and nonminority-owned firms, even after controlling for many firm and owner characteristics (Cavalluzzo and Wolken 2005; Blanchflower, Levine, and Zimmerman, 2003; Blanchard et al., 2008). Evidence of unfavorable bank-loan application outcomes similarly handicaps Hispanic- and Asian-owned firms, even when borrower risk factors were the same in comparison to nonminority-owned firms.

      Two studies using different years of the SSBF (1998 and 2003) provide additional striking evidence. Using 1998 SSBF data, a large difference remained in denial rates across demographic groups, even after controlling for personal wealth. African Americans, Hispanics, and Asians were all more likely to be denied credit, compared to Whites, even after controlling for a number of owner and firm characteristics, including credit history, credit score, and wealth (Cavalluzzo and Wolken, 2005).[2]  In the analysis of 2003 SSBF data, Asian Americans,

---

[2]They also found that Hispanics and African Americans were more likely to pay higher interest rates on loans that were obtained. *See also* Blanchflower, 2009.

Hispanics, and Blacks were more likely than Whites to be denied credit, even after controlling for creditworthiness and other factors, affirming the findings from the study using earlier data (Blanchflower, 2007).

While the SSBF is no longer conducted, a consortium of the Community Development Offices of the 12 Federal Reserve Banks now collaborate on an annual Small Business Credit Survey, which is designed to provide timely information on small business financing needs, decisions, and outcomes to policy makers, researchers, and service providers. An April 2017 report on employer firms, which used the 2016 data, indicates that this may be an important source of new data for studies of capital access and financing patterns of minority-owned businesses (Federal Reserve System, 2017).  One interesting finding from a study from the Cleveland Federal Reserve Bank was around the use of online lenders by minority-owned businesses. Minorities were found to comprise a much larger share of the online applicant pool (36 percent) than of the traditional source applicants (14 percent). (Wiersch, Lipman, and Barkley, 2016). They have a report focused on minority business borrowing which will be published in the Fall of 2017.

Research using data from the Kauffman Firm Survey, which covered the years 2004-2011, found that that firms owned by Blacks and Hispanics relied disproportionately upon owner equity investments and employed relatively less debt from outside sources (primarily banks), compared with firms owned by Whites.  The average firm in these minority business subgroups operated with substantially less capital overall – both at startup and in subsequent years – relative to their nonminority counterparts (Robb, 2013; Bates and Robb, 2016; Fairlie, Robb, and Robinson, 2016; Robb and Robinson, 2017).

The KFS data showed that minorities were less likely than their non-minority counterparts to apply for new loans in the early years of firm operations. The analyses also suggest that minority owners who did not apply for new loans were significantly more likely than their nonminority counterparts to avoid applying for loans when needed because they were afraid that lenders would decline their loan application. This is even after controlling for credit quality and a host of owner and firm characteristics. (Robb, 2013; Fairlie, Robb, and Robinson, 2016; Robb and Robinson, 2017).  Research has shown that minority business owners' fears of being declined for a loan were not necessarily unwarranted. In particular, in terms of loan application outcomes, even after controlling for such factors as industry, legal form, credit score, wealth, and human capital, minority owners of young firms were significantly less likely to have their loan applications approved than were similar white business owners (Robb, 2013).

In spite of the challenges around access to capital, the number of minority-owned businesses continues to grow.  A recent study by the Minority Business Development Agency found that the number of minority business enterprises (MBEs) has been growing at a rate at least twice that of nonminority-owned firms, and this trend is expected to continue well into the future.  Thus, one of the key constraints limiting the growth of MBEs is access to sufficient financial capital. The Minority Business Development Agency (MBDA) and the Small Business Administration (SBA) have both reported evidence of continuing disparities to accessing capital in recent research studies (Fairlie and Robb, 2010; Cole, 2014).  This report seeks to add to this knowledge base with newly available data from the ASE.  There has been one research report using the 2014 ASE so far, which was published by the Aspen Institute and focuses on the challenges facing minority businesses and how business ownership can help close the racial wealth gap (Klein, 2017).  The report shows that the low levels of business assets held by

Hispanic and Black Americans are driving the racial and ethnic wealth gaps we see. However, the fact that business creation among these two groups exceeds that of Whites is a trend in the right direction.

## Research Methodology

The 2014 Annual Survey of Entrepreneurs, which was released in September 2016, provides, for the first time, detailed financing information and credit market experiences of more than 200,000 businesses broken out by owner demographics (race, ethnicity, and gender) and firm characteristics, such as age and industry.  The level of detail for this number of firms is unprecedented (Foster and Norman, 2016).[3]

This study leverages the detailed tabular output of the data provided by the U.S. Census Bureau.  While the public use microdata will not be available for some time, the detailed output published by the Census Bureau provides an opportunity to delve into the descriptive statistics for firm financing by owner race and ethnicity, as well as, in some cases, additionally by firm age and industry.  The specific financing questions that were analyzed for this report can be found in Appendix 1, while Appendix 2 provides a list of publicly available tables produced by the Census Bureau that were used for this report.

For minority/non-minority comparisons in the following tables, all of the non-white racial groups (Black, Asian, American Indian, Alaska Native, Native Hawaiian, Other Pacific Islander, and "Other") and Hispanics are combined together into one group: minority.  This implies that

---

[3] Since the Survey of Small Business Finances was canceled after the 2003 survey and the Kauffman Firm Survey covered just one cohort of startups that began operations in 2004 and tracked over the eight-year period of 2004-2011, researchers and policymakers have been extremely limited in terms of access to data on financing by small businesses with owner demographics. The 2012 Survey of Business Owners has only limited information on the amounts and sources of financing and does not have detail on the amounts by source, so the relative importance of the different sources are unknown.  There is also no information on credit market experiences.

13

non-minority would include only those businesses owned by non-Hispanic Whites.  Since those that were equally owned by minorities and non-minorities are such a small group (1.4 percent), they are included in the minority group in the following tables and not presented separately. Likewise, because many of the minority groups are small in number and sample sizes are too small to present them separately, only White, Black, Asian, and Hispanic are individually presented in the following tables.

### Sources of Financing Used to Start or Acquire the Business

In terms of the financing detail for starting or acquiring the business, the ASE asks respondents about sources of capital used to start or acquire the business, as well as the amount of financial capital by source.  Business owners are asked to provide detail on the number of different sources of financial capital:  the business owners themselves, insiders (such as family, friends, and employees); debt financing from banks for other financial institutions; equity from outside investors (venture capitalists, angel investors, and other businesses); and government grants (such as the Small Business Innovation Research (SBIR) program).

**Table 2** provides the percentage of businesses that use each source of financial capital to start or acquire the business.[4]  Personal and family savings of the owner(s) is the most commonly used source of financing for starting or acquiring the business for all firms, regardless of race or ethnicity.  About two-thirds of all firms stated that they used the personal savings of the owner(s) to start or acquire their businesses.  For the various minority groups, these percentages were even higher.  More than 70 percent of firms with Black or African-American owners, Asian owners, and Hispanic owners invested financial capital from their personal and/or family savings to start

---

[4] Data for this table come from ASE Table SE1400CSCB07.

or acquire their businesses.  For Blacks and Hispanics, recall that their household wealth was less than one tenth that of White households.  The amount of capital available to these two minority groups is clearly much lower on average than for Whites.

The next most common source of startup capital, at least overall and for Whites, was a business loan from a bank or a financial institution.  Nearly 18 percent of all firms used a bank loan or loan from another type of financial institution for startup financing.  The percentages for minority-owned firms were slightly lower: 15.2 percent for Black and African American firms, 15.7 percent for Asian firms, and just 12.9 percent for Hispanic firms.  Between six percent and 10 percent of owners stated that they didn't know or remember the sources of financing, while nearly five percent of Asians, six percent of Hispanics, seven percent of Blacks, and nine percent of whites stated that no financial capital was needed to start or acquire their businesses.

| Table 2: Sources of Startup Financing by Race/Ethnicity | | | | | |
|---|---|---|---|---|---|
| (Percentage of responding firms using each source) | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic |
| Personal/family savings of owner(s) | 63.9 | 64.5 | 70.6 | 73.2 | 72.3 |
| Personal/family assets other than savings of owner(s) | 9.8 | 9.9 | 11.3 | 11.4 | 9.9 |
| Personal/family home equity loan | 7.3 | 7.3 | 7.8 | 9 | 7.7 |
| Personal credit card(s) carrying balances | 10.3 | 10.3 | 17.6 | 10.8 | 14.9 |
| Business credit card(s) carrying balances | 5.3 | 5.4 | 8.1 | 5.2 | 6 |
| Business loan from federal, state, or local government | 0.4 | 0.4 | 0.8 | 0.4 | 0.4 |
| Government-guaranteed business loan from a bank/fin. institution | 1.9 | 1.9 | 2.8 | 2.2 | 1.3 |
| Business loan from a bank or financial institution | 17.9 | 18.7 | 15.2 | 15.7 | 12.9 |
| Business loan/investment from family/friends | 5 | 5.1 | 3.5 | 5.9 | 4.5 |
| Investment by venture capitalist(s) | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 |
| Grants | 0.3 | 0.2 | 0.6 | 0.3 | 0.2 |

| Other source(s) of capital | 3.7 | 3.3 | 5.1 | 3.3 | 3.8 |
| Don't know | 10.4 | 9.4 | 6.1 | 9.8 | 6.9 |
| None needed | 8.9 | 8.9 | 7.3 | 4.7 | 6.1 |
| | | | | | |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | |
| Notes: | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE | | | | | |

A greater percentage of Black and African American firms relied on personal credit cards as a source of startup capital (17.6 percent) than on bank loans (15.2 percent). The same was the case for Hispanics (14.9 percent versus 12.9 percent).  Only about 10 percent of white-owned firms used personal credit cards as a source of startup capital.  Note that these firms are using credit cards as a source of financing, carrying balances and paying a much higher interest rate than a typical bank loan, and not using credit cards solely for transactional purposes.  Credit cards are seen as an inferior source of borrowing because of the high costs associated with them.

The next table presents minority and non-minority comparisons.  As shown in **Table 3,** some sources of financial capital were rarely used, regardless of firm owner demographics.  Less than one percent of firms relied on outside equity from venture capitalists, business loans from the government, or grant funding.[5]  The only source of startup financing that was used by a larger percentage of non-minority firms, compared with minority firms, was business loans from a bank or other financial institutions (19 percent versus 15 percent).  Non-minority-owned businesses were also more likely than minority-owned businesses to state that no financing was needed to start or acquire their businesses (9.1 percent versus 5.6 percent).  In all other cases, minority-

[5] Data for this table come from ASE Table SE1400CSCB07.

owned firms were as likely as or more likely to use the other sources of financing than were non-minority-owned firms.  Given previous research, which shows lower levels of financing on average, at least among Blacks and Hispanics, compared with Whites, this would indicate minority-owned firms had to seek out financing from a number of sources, given the lower amounts of financing available from each source.  Indeed, we'll see a bit later that minorities had higher rates of seeking new financing relationships, compared with non-minorities.  One important note to point out with minority/non-minority comparisons is that some differences can be more muted given the similarities between Asians and Whites. By combining Asians with Hispanics and Blacks, some of the racial and ethnic differences seen in the financing patterns and sources across the individual groups are more muted when the minority groups are combined together.

| Table 3: Sources of Startup Financing by Race/Ethnicity | | |
|---|---|---|
| (Percentage of responding firms using each source) | | |
|  | Minority | Non-minority |
| Personal/family savings of owner(s) | 72.2 | 64 |
| Personal/family assets other than savings of owner(s) | 11.0 | 9.9 |
| Personal/family home equity loan | 8.6 | 7.2 |
| Personal credit card(s) carrying balances | 13.2 | 10 |
| Business credit card(s) carrying balances | 6.1 | 5.3 |
| Business loan from federal, state, or local government | 0.5 | 0.4 |
| Government-guaranteed business loan from a bank/financial institution | 2.1 | 1.9 |
| Business loan from a bank or financial institution | 15.1 | 19 |
| Business loan/investment from family/friends | 5.3 | 5.1 |
| Investment by venture capitalist(s) | 0.5 | 0.5 |
| Grants | 0.3 | 0.2 |
| Other source(s) of capital | 3.7 | 3.2 |
| Don't know | 8.4 | 9.7 |
| None needed | 5.6 | 9.1 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | |

| Notes: |
| --- |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE |

## Amount of Financing Used to Start or Acquire the Business

There are striking differences by race and ethnicity in terms of the total amount of capital used to start or acquire the business.[6]  As shown in **Table 4,** about 15 percent of firms used $5,000 or less to start or acquire their businesses, but this varied from a low of 9.4 percent for Asians to nearly 20 percent for African Americans.  About 18 percent of white-owned firms used $100,000 or more in financing to start or acquire their businesses, compared with just 13.5 percent of African Americans and 13.7 percent for Hispanics, and more than 28.2 percent for Asians.  As noted previously, because the financing patterns by Asians look quite different than the patterns by African Americans and Hispanics, we see that the Minority/Non-Minority comparisons are not as different as when we look at the comparisons by the individual racial and ethnic groups.  The similarities of Asians and whites masks the racial and ethnic differences in these financing patterns when Asians are combined with African Americans, Hispanics, and other minorities in the all-minority grouping.  The findings that Blacks and Hispanics used less financing to start or acquire their businesses is consistent with findings from prior research, which used the Survey of Business Owners, the Surveys of Small Business Finances, and the Kauffman Firm Survey.

---

[6] Data for this table come from ASE Table SE1400CSCB08.

| Table 4: Amounts of Startup Financing by Race/Ethnicity | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Distribution of Firms by Financing Amounts) | | | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| Less than $5,000 | 14.9 | 15.8 | 19.1 | 9.4 | 16 | 12.83 | 15.8 |
| $5,000 to $9,999 | 8.3 | 8.7 | 10.8 | 6.3 | 12.6 | 8.78 | 8.4 |
| $10,000 to $24,999 | 11.9 | 12.1 | 15.5 | 11.4 | 16.4 | 13.27 | 11.9 |
| $25,000 to $49,999 | 9.4 | 9.4 | 10.8 | 11.2 | 11.7 | 11.26 | 9.3 |
| $50,000 to $99,999 | 10.1 | 9.9 | 11.8 | 14 | 11.3 | 12.75 | 9.9 |
| $100,000 to $249,999 | 10 | 9.6 | 7.7 | 16.2 | 8.3 | 12.65 | 9.7 |
| $250,000 to $999,999 | 6.6 | 6.5 | 4.7 | 9.4 | 4.5 | 7.36 | 6.5 |
| $1,000,000 or more | 2.2 | 2 | 1.1 | 2.6 | 0.9 | 1.97 | 2.1 |
| Don't know | 17.7 | 17.1 | 11.2 | 14.6 | 12.2 | 13.53 | 17.5 |
| Not applicable | 8.9 | 8.9 | 7.3 | 4.8 | 6.1 | 5.60 | 9.1 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

## Amounts of Financing used in 2014 by Sources of Financing

The next set of tables breaks out the amounts of financial capital used by businesses in 2014 by the source of financing. [7]  The first table, **Table 5,** shows the distribution of owner financing used by firm owner race and ethnicity.  For example, while 45 percent of firms overall did not rely on owner financing in 2014, only 26.5 percent of African American-owned firms and one third of Asian-owned and Hispanic-owned firms did not rely on owner financing in

---

[7] Data for this table come from ASE Table SE1400CSCB09.

2014.  Nearly a quarter of white-owned firms used up to $25,000 in owner financing, while 10 percent of white-owned firms used $250,000 or more.  The corresponding percentages for African-American- owned firms were 33 percent and 16.1 percent.  For Asians, the percentages were 24.7 percent and 16.1 percent and for Hispanics, 30.5 percent and 12.2 percent.

Given the lower wealth levels of African Americans and Hispanics, it's interesting to note the reliance on owner financing in the highest amount category exceeded that of whites.  It would be interesting to look at whether or not those firms using such high amounts of owner financing were those that had the most unmet credit needs from sources such as financial institutions.  Unfortunately, such analyses require access to the confidential microdata in the Center for Economic Studies or in one of the research data centers.

| Table 5: Amounts of Financing in 2014 by Owner by Race/Ethnicity | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Distribution of Firms by Owner Financing Amounts) | | | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| $0 | 45.3 | 47.1 | 26.5 | 33.4 | 35.1 | 34.1 | 47.7 |
| $1 to $4,999 | 6.1 | 6.2 | 7.8 | 5.2 | 6.8 | 5.9 | 6.2 |
| $5,000 to $9,999 | 5.4 | 5.3 | 6.9 | 5.6 | 7.4 | 6.2 | 5.2 |
| $10,000 to $24,999 | 12.6 | 12.2 | 18.3 | 13.9 | 16.3 | 14.9 | 12.1 |
| $25,000 to $49,999 | 5.9 | 5.8 | 9.5 | 6.2 | 7.9 | 7.1 | 5.7 |
| $50,000 to $99,999 | 7.1 | 6.8 | 9.4 | 9.3 | 8 | 8.8 | 6.7 |
| $100,000 to $249,999 | 6.9 | 6.6 | 7.7 | 10.2 | 6.3 | 8.6 | 6.6 |
| $250,000 or more | 10.7 | 10 | 14 | 16.1 | 12.2 | 14.3 | 9.9 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

Family, friends and employees are the next source of financing for ongoing business needs in 2014.  As shown in **Table 6,** this source of financing was used by more than a quarter of Asian-owned businesses, but only 11 percent of white-owned businesses.[8]  About 18.6 percent of African-American owned businesses relied on this source of financing, compared with 17.6 percent of Hispanic-owned businesses.  The percentage of firms using high amounts of financing from this source was quite small across the board, but it's interesting to note that a higher percentage of African American firms, Asian firms, and Hispanic firms were in the top category of $250,000 or more, compared with white-owned firms.  Most notably, 7.6 percent of Asian firms used $100,000 or more from family, friends, and employees, compared with just 2.5 percent of white-owned firms, 3.7 percent of African-American firms, and 3.9 percent of Hispanic-owned firms.

The next source of financing for 2014 is banks and other financial institutions.  The issue of access to bank loans is important because financial institutions provide more debt capital to small businesses than all other sources combined. According to statistics based on the Federal Reserve's Survey of Small Business Finances (SSBF) database, banks account for over 90 percent of all small business debt financing. Minority business enterprises (MBEs), although somewhat less reliant on bank loans than others, nonetheless obtain much of their debt capital from banks (Bates, 2011).

---

[8] Data for this table come from ASE Table SE1400CSCB09.

| Table 6: Amounts of Financing in 2014 by Family, Friends, and Employees by Race/Ethnicity | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Distribution of Firms by Family, Friends, and Employees Financing Amounts) | | | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| $0 | 87.5 | 89 | 81.4 | 73.7 | 82.4 | 78.5 | 89.3 |
| >$0 | 12.5 | 11 | 18.6 | 26.3 | 17.6 | 11.5 | 10.7 |
| $1 to $4,999 | 2.4 | 2.2 | 4 | 3.7 | 3.7 | 3.5 | 2.2 |
| $5,000 to $9,999 | 1.5 | 1.4 | 2.6 | 2.7 | 2.4 | 2.5 | 1.3 |
| $10,000 to $24,999 | 2.9 | 2.6 | 4.7 | 6.3 | 4.2 | 5.1 | 2.5 |
| $25,000 to $49,999 | 1.3 | 1.1 | 1.8 | 2.7 | 1.6 | 2.1 | 1.1 |
| $50,000 to $99,999 | 1.4 | 1.2 | 1.7 | 3.3 | 1.9 | 2.5 | 1.2 |
| $100,000 to $249,999 | 1.2 | 1 | 0.9 | 3.2 | 1.4 | 2.2 | 1 |
| $250,000 or more | 1.8 | 1.5 | 2.8 | 4.4 | 2.5 | 3.4 | 1.5 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race")<br>Minority includes both minority owned and 50/50 minority/non-minority owned<br>Non-Minority indicates ownership of more than 50% by non-Hispanic white owners<br>Racial/Ethnic groups indicate more than 50% of ownership held by that group<br>Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

As shown in **Table 7,** about one third of businesses used banks and other financial institutions as a source of capital for financing business operations in 2014, regardless of race or ethnicity.[9]  Nearly 14 percent of White and Asian-owned businesses borrowed $100,000 or more from financial institutions, compared with just over 11 percent for businesses owned by Blacks and Hispanics.  Blacks and Hispanics were also more likely to be in the smallest amount categories ($25,000 or less), compared with Whites and Asians.

---

[9] Data for this table come from ASE Table SE1400CSCB09.

| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
|---|---|---|---|---|---|---|---|
| **Table 7: Amounts of Financing in 2014 by Banks and Other Financial Institutions by Race/Ethnicity** | | | | | | | |
| (Distribution of Firms by Banks and Other Financial Institutions Financing Amounts) | | | | | | | |
| $0 | 65.4 | 64.8 | 63.9 | 68.7 | 64.3 | 66.2 | 64.8 |
| $1 to $4,999 | 2 | 2 | 3.4 | 2.2 | 2.8 | 2.5 | 2 |
| $5,000 to $9,999 | 2.5 | 2.6 | 3.5 | 2.3 | 3.5 | 2.8 | 2.6 |
| $10,000 to $24,999 | 6.6 | 6.9 | 7.7 | 5.6 | 7.9 | 6.7 | 6.8 |
| $25,000 to $49,999 | 4.4 | 4.7 | 4.8 | 3.2 | 4.6 | 3.9 | 4.7 |
| $50,000 to $99,999 | 5 | 5.2 | 5.5 | 4.2 | 5.4 | 4.9 | 5.2 |
| $100,000 to $249,999 | 5 | 5.1 | 3.8 | 4.8 | 4.2 | 4.6 | 5.2 |
| $250,000 or more | 8.9 | 8.7 | 7.5 | 9 | 7.2 | 8.4 | 8.8 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race")<br>Minority includes both minority owned and 50/50 minority/non-minority owned<br>Non-Minority indicates ownership of more than 50% by non-Hispanic white owners<br>Racial/Ethnic groups indicate more than 50% of ownership held by that group<br>Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

### Establishing New Funding Relationships

Business owners were asked if the business attempted to establish any new funding relationships in 2014 with a number of different sources.[10]   If they did attempt to establish a new funding relationship, they were asked if they received the entire amount that they requested or just part (or none) of the amount that they requested.   Results for establishing new funding relationships are shown in **Table 8,** while the outcomes of those attempts are shown in **Table 9.**

The two most common sources of financing for new funding relationship attempts in 2014 were banks and other financial institutions (13.1 percent of firms) and credit cards (10.5 percent of firms). African-American businesses and Hispanic businesses were the most likely to attempt these new funding relationships with both sources. 17.8 percent of African-American business owners and 14.6 percent of Hispanic business owners attempted new funding relationships with banks or other financial institutions. This compares with 13.2 percent of white-owned businesses and 12.2 percent of Asian-owned businesses.   Nearly 16 percent of African-American and Hispanic-owned businesses attempted new funding relationships through credit cards, compared with 13 percent of Asians and 10.3 percent of white-owned firms.   As we'll see in **Table 9,** African American and Hispanic-owned firms were less successful in obtaining funding from the various sources and hence their reliance on multiple sources of financing for their companies.

---

[10] Data for this table come from ASE Table SE1400CSCB10.

| Table 8: Attempted New Funding Relationships by Race/Ethnicity | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Distribution of Firms by Attempt to Establish New Funding Relationships) | | | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| Owner(s) | 1.8 | 1.6 | 2.7 | 3.2 | 2.7 | 2.9 | 1.5 |
| Friends, Family, Employees | 2.8 | 2.2 | 5.9 | 7.7 | 4.3 | 6.2 | 2.1 |
| Banks Credit Unions, or other Fin. Institutions | 13.1 | 13.2 | 17.8 | 12.2 | 14.6 | 13.7 | 13.1 |
| Home equity loans in name of business owner(s) | 2.4 | 2.2 | 3.1 | 4.4 | 2.8 | 3.7 | 2.2 |
| Credit Cards | 10.5 | 10.3 | 15.8 | 13 | 15.8 | 14.3 | 9.9 |
| Trade Credit | 3.1 | 3 | 3.9 | 3.7 | 3.9 | 3.8 | 3 |
| Angel Investors | 0.7 | 0.6 | 1 | 1.6 | 0.9 | 1.3 | 0.6 |
| Venture Capitalists | 0.7 | 0.6 | 1.2 | 1.7 | 1 | 1.3 | 0.6 |
| Other Investor Businesses | 1.9 | 1.7 | 2.4 | 2.5 | 2.3 | 2.4 | 1.7 |
| Crowdfunding Platform | 0.5 | 0.4 | 0.9 | 1.3 | 0.7 | 1 | 0.4 |
| Grants | 0.8 | 0.6 | 1.7 | 1.6 | 0.9 | 1.4 | 0.6 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-minority indicates ownership of 50% or more by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

## Unmet Credit Needs

As shown in **Table 9,** minorities, especially African-Americans, were much more likely to have unmet credit needs.[11]  With many of the sources, African-Americans were twice as likely (or more) as white business owners to state that they did not receive the full amount of funding requested.  For example, 53 percent of African-Americans stated that they did not receive the amount of funding requested from banks or other financial institutions, compared with just 24.5 percent of whites.  The percentages for Hispanics and Asians for not receiving the full amount requested from banks and financial institutions were 39 percent and 34.2 percent respectively. Nearly half of African-Americans (49.4 percent) said that they did not receive the full amounts requested from the home equity loans. This compares with more than a quarter (27.5 percent) of Whites, 37.4 percent of Hispanics, and 32.6 percent of Asians.  For equity financing, the percentages for Blacks were even higher: 58.8 percent for angel investors and 55.9 percent for venture capitalists.  The percentages for whites were about 39 percent for angel investors and venture capitalists.  Even among internal sources, African-Americans had much higher levels of unmet credit needs.  Asians and Hispanics also had higher unmet credit needs when compared with whites, but the gap was smaller than it was for African Americans.

This is broadly consistent with previous research.  Bates and Robb (2015) analyzed KFS data describing firm and owner traits to determine both the extent of unmet small business credit needs and outcomes of their applications for bank loans over the 2008-2011 period.  Firms owned by Blacks, Hispanics, and Asians were more likely to have their loan applications denied by banks, compared with businesses owned by Whites.   Older studies based on nationwide SSBF data consistently find large denial-rate differences across business applicant groups of

---

[11] Data for this table come from ASE Table SE1400CSCB10.

different race/ethnicities. Examining their most recent loan application only, 9 percent of white applicants for non-line-of-credit bank loans were denied, versus 56 percent of blacks and 63 percent of Hispanics (Mitchell and Pierce, 2011).  Black-owned firms have been more widely studied than other MBEs, and their difficulty accessing financing is widely acknowledged (see Bates, 2011; Blanchflower, 2009). The issue emphasized by SSBF-based studies is whether black firms (and MBEs generally) possessing identical risk-related traits (other than race), have less access to bank credit than whites. The consistent finding is that black (and Hispanic) applicants experience a higher incidence of loan denials and pay higher interest rates than whites (Cavalluzzo and Wolken, 2005; Blanchflower, et al., 2003; Blanchflower, 2009).

| Table 9: Unmet Credit Needs | | | | | | | |
|---|---|---|---|---|---|---|---|
| (% of firms who established new funding relationship, but who did not receive amount of funding requested by source) | | | | | | | |
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| Owner(s) | 27.4 | 25.7 | 43.0 | 31.5 | 29.8 | 32.4 | 25.4 |
| Friends, Family, Employees | 28.4 | 24.6 | 38.8 | 35.4 | 31.4 | 34.6 | 24.3 |
| Banks Credit Unions, or other Fin. Inst. | 26.2 | 24.5 | 53.0 | 34.2 | 39.0 | 38.6 | 23.6 |
| Home equity loans in name of business owner(s) | 29.2 | 27.5 | 49.4 | 32.6 | 37.4 | 35.2 | 27.0 |
| Credit Cards | 18.3 | 16.7 | 37.6 | 24.6 | 25.1 | 26.3 | 16.1 |
| Trade Credit | 17.2 | 16.0 | 32.2 | 23.4 | 26.3 | 25.1 | 15.4 |
| Angel Investors | 38.9 | 39.0 | 58.8 | 39.5 | 27.7 | 38.7 | 40.0 |
| Venture Capitalists | 38.6 | 39.1 | 55.9 | 36.9 | 37.5 | 38.2 | 39.5 |
| Other Investor Businesses | 17.4 | 15.6 | 27.2 | 26.5 | 14.3 | 22.4 | 15.8 |
| Crowdfunding Platform | 29.5 | 29.4 | 39.9 | 28.7 | 31.3 | 30.2 | 29.6 |
| Grants | 38.9 | 38.7 | 54.4 | 32.9 | 40.4 | 37.1 | 39.3 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |

Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race")
Minority includes both minority owned and 50/50 minority/non-minority owned
Non-Minority indicates ownership of more than 50% by non-Hispanic white owners
Racial/Ethnic groups indicate more than 50% of ownership held by that group
Percentages indicate % of firms responding to the 2014 ASE

### New Funding Relationships and Outcomes by Firm Age

The next table breaks down the attempted funding relationships by firm age for the top four sources of financing: financial institutions, home equity lines of credit, credit cards, and trade credit.[12]  As can be seen in **Table 10,** both groups (minorities and non-minorities) had similar application rates to financial institutions and trade credit.  However, minorities were around 50 percent more likely than non-minorities to attempt funding through a home equity line of credit, even though overall rates of use were less than five percent.  In addition, credit cards had higher rates of application (8-19 percent) and minorities were much more likely to attempt new applications for this source, across all of the firm age groups.

| Table 10: Attempted New Funding Relationship by Source | | | |
|---|---|---|---|
| (By Minority/Non-Minority Ownership and Firm Age) | | | |
| | Minority | Non-Minority | Minority/ Non-Minority Difference |
| Banks, credit unions, or other financial institutions: | | | |
|    Applied for New Funding Relationship | 13.6% | 13.0% | 0.5% |
|    Firms with less than 2 years in business | 14.6% | 14.6% | 0.0% |
|    Firms with 2 to 3 years in business | 13.2% | 14.2% | -1.0% |
|    Firms with 4 to 5 years in business | 14.7% | 14.8% | 0.0% |
|    Firms with 6 to 10 years in business | 14.1% | 13.8% | 0.3% |
|    Firms with 11 to 15 years in business | 12.5% | 11.8% | 0.7% |
|    Firms with 16 or more years in business | 16.1% | 16.3% | -0.3% |

---

[12] Data for this table come from ASE Table SE1400CSCB10

| Home equity loans in name of business owners | | | |
|---|---|---|---|
| Applied for New Funding Relationship | 3.4% | 2.0% | 1.3% |
| Firms with less than 2 years in business | 3.0% | 2.0% | 0.9% |
| Firms with 2 to 3 years in business | 3.1% | 2.3% | 0.8% |
| Firms with 4 to 5 years in business | 3.0% | 2.1% | 0.9% |
| Firms with 6 to 10 years in business | 3.8% | 2.2% | 1.6% |
| Firms with 11 to 15 years in business | 3.4% | 1.9% | 1.5% |
| Firms with 16 or more years in business | 2.9% | 1.9% | 1.0% |
| Credit Cards | | | |
| Applied for New Funding Relationship | 14.0% | 9.8% | 4.2% |
| Firms with less than 2 years in business | 18.7% | 14.4% | 4.3% |
| Firms with 2 to 3 years in business | 16.9% | 13.5% | 3.4% |
| Firms with 4 to 5 years in business | 14.6% | 12.0% | 2.6% |
| Firms with 6 to 10 years in business | 15.2% | 11.8% | 3.4% |
| Firms with 11 to 15 years in business | 10.6% | 7.7% | 2.9% |
| Firms with 16 or more years in business | 11.6% | 7.7% | 3.9% |
| Trade credit (for example, buy now, pay later): | | | |
| Applied for New Funding Relationship | 3.5% | 2.8% | 0.7% |
| Firms with less than 2 years in business | 4.3% | 3.6% | 0.7% |
| Firms with 2 to 3 years in business | 4.1% | 3.6% | 0.6% |
| Firms with 4 to 5 years in business | 3.4% | 3.3% | 0.1% |
| Firms with 6 to 10 years in business | 3.4% | 2.8% | 0.6% |
| Firms with 11 to 15 years in business | 3.1% | 2.5% | 0.6% |
| Firms with 16 or more years in business | 1.2% | 3.4% | -2.1% |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | |
| Notes: | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Percentages indicate % of firms respondents | | | |

The real differences occur when we look at outcomes, which are shown in **Table 11**.[13]

When we look at the outcomes of attempted new funding relationships for banks, credit unions, or other financial institutions, we see that nearly half of minority-owned firms with less than two

---

[13] Data for this table come from ASE Table SE1400CSCB10.

years in business did not receive the amount they requested.  While this percentage declines as firm age rises, we see that 30 percent of minority-owned firms with 16 or more years in business did not receive the full amount requested.  If we look at the overall average of not receiving the total amount requested by minorities (38.7 percent), it is much higher than the 23.7 percent for non-minorities. In fact, the 34.8 percent for the youngest firms for non-minorities is lower than all the firm age groups of 10 years or less for minorities.  Surprisingly, the percentage point differences between minorities and non-minorities range from 11.5 percent to nearly 16 percent for the firms in the oldest age category.

| Table 11: Outcomes of Attempted New Funding Relationship by Source | | | |
|---|---|---|---|
| ( By Minority/Non-Minority Ownership and Firm Age) | | | |
| | Minority | Non-Minority | Minority/Non-Minority Difference |
| Banks, credit unions, or other financial institutions: | | | |
| Did not receive total amount requested | 38.7% | 23.7% | 15.0% |
| Firms with less than 2 years in business | 49.1% | 34.8% | 14.2% |
| Firms with 2 to 3 years in business | 44.4% | 30.9% | 13.5% |
| Firms with 4 to 5 years in business | 40.8% | 27.6% | 13.3% |
| Firms with 6 to 10 years in business | 37.1% | 25.6% | 11.5% |
| Firms with 11 to 15 years in business | 31.7% | 19.0% | 12.7% |
| Firms with 16 or more years in business | 30.2% | 14.3% | 15.9% |
| Home equity loans in name of business owners | | | |
| Did not receive total amount requested | 38.4% | 29.0% | 9.3% |
| Firms with less than 2 years in business | 41.9% | 36.0% | 5.9% |
| Firms with 2 to 3 years in business | 40.8% | 35.8% | 5.0% |
| Firms with 4 to 5 years in business | 35.2% | 32.6% | 2.6% |
| Firms with 6 to 10 years in business | 38.2% | 29.9% | 8.3% |
| Firms with 11 to 15 years in business | 37.0% | 25.7% | 11.3% |
| Firms with 16 or more years in business | 43.1% | 18.0% | 25.1% |
| Credit Cards | | | |
| Did not receive total amount requested | 26.2% | 16.3% | 9.9% |
| Firms with less than 2 years in business | 28.8% | 20.5% | 8.3% |
| Firms with 2 to 3 years in business | 30.2% | 19.9% | 10.3% |
| Firms with 4 to 5 years in business | 26.5% | 19.3% | 7.2% |
| Firms with 6 to 10 years in business | 24.9% | 16.0% | 8.9% |
| Firms with 11 to 15 years in business | 22.0% | 13.5% | 8.5% |
| Firms with 16 or more years in business | 21.3% | 10.5% | 10.8% |
| Trade credit (for example, buy now, pay later): | | | |
| Did not receive total amount requested | 26.4% | 16.3% | 10.1% |
| Firms with less than 2 years in business | 26.9% | 25.3% | 1.5% |
| Firms with 2 to 3 years in business | 28.4% | 19.0% | 9.4% |
| Firms with 4 to 5 years in business | 21.1% | 20.5% | 0.7% |
| Firms with 6 to 10 years in business | 28.9% | 17.6% | 11.3% |
| Firms with 11 to 15 years in business | 25.1% | 12.6% | 12.5% |
| Firms with 16 or more years in business | 4.3% | 7.9% | -3.5% |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | |
| Notes: | | | |

Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native,
Native Hawaiian and Other Pacific Islander, and "Some Other Race")
Minority includes both minority owned and 50/50 minority/non-minority owned
Non-Minority indicates ownership of more than 50% by non-Hispanic white owners
Percentages indicate % of firms respondents

Overall, the percentage point differences between minorities and non-minorities for the other three sources are all about 10 percentage points. More than 26 percent of minority-owned firms did not receive all the funding requested from credit cards and trade credit, compared with about 16 percent for non-minorities.  The gaps were generally pretty consistent across the age groups.  For home equity lines of credit, the percentages were higher: 38.4 percent for minorities and 29 percent for non-minorities.  For this source, it was actually the older firms that had the higher differences across the two groups, which was a surprise.  The most unexpected finding was firms that were 16 years or older had such large racial differences in outcomes for bank financing and home equity lines of credit.  This may be why minorities were found to be more likely to access financing from online lenders, compared with traditional financing in the newest Small Business Credit Survey by the Federal Reserve System (Wiersch, Lipman, and Barkley, 2016).

### New Funding Relationships and Outcomes by Firm Industry

If we break things down by industry, we see more differences in the attempted funding relationships.  For example, as seen in the left hand columns of **Table 12,** for finance and insurance, as well as real estate and leasing, professional, scientific, and technical services, and educational services, we see much higher attempts at new funding relationships by minority-

owned firms, compared with firms owned by non-minorities.[14]  The columns on the right show the percentage of firms who did not receive the total amount requested.  Again, minority-owned firms, across the board, had higher rates of unmet credit needs, compared with non-minority-owned firms.  The differences ranged from minorities having unmet needs of 114% (accommodation and food services) of the non-minority rates to more than 220% (wholesale).  Several industries, including agriculture, manufacturing, transportation and warehousing, and administrative and support and waste management and remediation services, had unmet credit needs for minority business owners that were about twice the rates of nonminority business owners.  Part of this may be due to higher capital requirements for certain capital intensive industries.

| Table 12: Attempted New Funding Relationship with Banks, Credit Unions, or Other Financial Institution(s) and Outcomes | | | | |
|---|---|---|---|---|
| ( By Minority/Non-Minority Ownership and Industry) | | | | |
| | Attempted New Funding Relationship w/Financial Institution | | Did Not Receive Total Amount Requested (of those seeking funding) | |
| | Minority | Non-Minority | Minority | Non-Minority |
| Agriculture, forestry, fishing and hunting | 19.7 | 22.2 | 25.2 | 12.4 |
| Construction | 15.4 | 16.4 | 37.9 | 22.3 |
| Manufacturing | 18.0 | 17.6 | 45.7 | 20.6 |
| Wholesale trade | 17.4 | 15.0 | 41.5 | 22.1 |
| Retail trade | 12.7 | 13.4 | 42.2 | 27.2 |
| Transportation and warehousing | 22.1 | 23.6 | 35.3 | 18.0 |
| Information | 9.5 | 10.4 | 48.3 | 27.2 |
| Finance and insurance | 13.1 | 7.7 | 40.6 | 27.3 |
| Real estate and rental and leasing | 13.5 | 9.8 | 27.7 | 19.7 |
| Professional, scientific, and technical services | 11.9 | 8.6 | 43.1 | 26.9 |
| Administrative and support and waste management and remediation services | 15.0 | 15.6 | 44.6 | 22.2 |
| Educational services | 13.7 | 9.3 | 54.6 | 32.6 |

[14] Data for this table come from ASE Table SE1400CSCB10.

| | | | | |
|---|---|---|---|---|
| Health care and social assistance | 13.5 | 12.1 | 30.5 | 20.3 |
| Arts, entertainment, and recreation | 13.4 | 10.9 | 50.1 | 28.3 |
| Accommodation and food services | 11.7 | 12.9 | 34.2 | 28.7 |
| Other services (except public administration) | 11.6 | 12.9 | 44.4 | 28.4 |
| Industries not classified | 24.9 | 18.2 | 41.0 | 12.5 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | |
| Notes: | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Percentages indicate % of firms respondents | | | | |

### Avoidance of Financing when Needed

Related to their credit market experiences, business owners were also asked if at any time during the year the business needed additional financing and the owner(s) chose not to apply.  If they answered yes to that question they were then asked for reasons why the business chose not to apply for additional financing.  The first row in **Table 13** gives the percentage of firms that said they needed additional financing, but chose not to apply.[15]  Overall, 9.6 percent of firms responded in the affirmative to this question, however it varied dramatically by race and ethnicity.  More than a quarter of African-Americans (25.7 percent) and nearly 15 percent of Hispanics responded affirmatively to this question, compared with just 9.4 percent of whites and 9.8 percent of Asians.

The next set of rows of **Table 13** provides the reasons why the business owners didn't apply for financing even when they needed it.  Here we see African-Americans and Hispanics were much more likely to think that their loan application would not be approved.  58.5 percent

---

[15] Data for this table come from ASE Table SE1400CSCB11.

of African-Americans and 53.1 percent of Hispanics cited this as a reason, compared with 47.4 percent of whites and 43.6 percent of Asians.  The most common reason given by whites and Asians was that they didn't want to accrue debt.  Hispanics also cited this as the most common reason, although it was cited only slightly more than the fear of denial.  The cost of the financing was cited by about a third of all business owners.  The other reasons given were cited much less frequently than these top three reasons listed above.

| Table 13: Discouraged Borrowers (Percentage of firms that needed additional financing but chose not to apply (and reasons why)) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| Needed additional financing but chose not to apply | 9.6 | 9.4 | 25.7 | 9.8 | 14.8 | 13.3 | 9.0 |
| Did not think business would be approved by lender | 47.5 | 47.4 | 58.5 | 43.6 | 53.1 | 50.6 | 46.6 |
| Did not want to accrue debt | 63.0 | 64.1 | 56.3 | 59.3 | 56.2 | 58.3 | 64.8 |
| Decided the financing costs would be too high | 29.6 | 29.4 | 31.6 | 33.2 | 31.6 | 32.2 | 28.9 |
| Preferred to reinvest the business profits instead | 14.5 | 14.4 | 15.2 | 15.2 | 17.4 | 16.2 | 14.1 |
| Felt the loan search/application process would be too time consuming | 16.1 | 16.2 | 16.1 | 16.4 | 15.3 | 16.3 | 16.0 |
| Decided the additional financing was no longer needed | 5.5 | 5.4 | 4.0 | 7.4 | 5.0 | 5.7 | 5.4 |
| Decided to wait until funding conditions improved | 14.3 | 14.1 | 17.4 | 14.6 | 17.0 | 15.7 | 13.8 |
| Decided to wait until company hit milestones to be in stronger position | 13.7 | 13.6 | 16.6 | 13.5 | 13.8 | 14.3 | 13.4 |
| Other reason for not | 6.6 | 6.8 | 3.8 | 5.0 | 5.8 | 5.3 | 6.9 |

| applying for additional financing | | | | | | | |
|---|---|---|---|---|---|---|---|
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE Excluded those who answered, "Not applicable" or "Don't know" | | | | | | | |

These findings are consistent with previous research and other data sources.  Using the KFS, Fairlie, Robb, and Robinson (2016) found that even the most credit-worthy minority borrowers anticipated being denied credit, which caused many well qualified minority borrowers to not apply for credit, even when they felt they needed it.  Among SSBF firms needing credit, furthermore, owners often report not applying for loans because they fear rejection. After controlling statistically for the presumed greater credit risks posed by MBEs needing but not applying for credit, Blanchflower et al., (2003), found remaining gaps of 26 and 15 percentage points, respectively, for Blacks and Hispanics (relative to whites) [16]

A recent audit study of small-business owners seeking bank loans by Bone et al. (2015) focused on identifying bank-lending criteria at the initial stage of inquiry. They found that Black- and Hispanic-owners were treated differently than matched whites. Typifying audit studies, the white and minority testers were matched regarding age, gender, credit history, personal net worth, characteristics of the loans being sought, and other traits, and their differential treatment was strongly consistent with minority owners being treated worse than whites.

---

[16] Asian-owned firms are routinely identified as less likely than whites to have their loan applications approved, but owner race emerges inconsistently as a significant determinant of application rejection, perhaps due to sample-size constraints.

A key objective of this study was to determine whether the testers encountered similar scrutiny from loan officers when applying for loans. In comparison to white testers, minorities were more often asked to provide business financial statements (83 vs. 50 percent), income-tax returns (86 vs. 52 percent), bank account information (25 vs. 0 percent), personal financial asset details (60 vs. 22 percent), and credit-card debt (42 vs. 13 percent). Additionally, minorities were offered less frequent assistance than whites in completing loan applications (18 vs. 59 percent), and loan officers offered business cards to minority testers less often (43 vs. 82 percent) (Bone, et al., 2015). Overall, minorities were consistently offered less assistance and subjected to greater scrutiny, in comparison with the white testers. MBE discouraged borrowers are numerous in part because the applicant review practices of loan officers actively discourage potential MBE applicants from actually applying for loans.

These research findings, on both the supply side and demand side, suggest that overcoming racial and ethnic differences between borrowers (and potential borrowers) is not simply a matter of expanding the supply of credit available.  Getting to the root cause of racial differences in the way businesses are financed likely requires changes in perceptions and financial planning behaviors of borrowers, as well as changes in lending practices by suppliers, as much as it requires augmenting the supply of credit to traditionally underserved borrowers (Fairlie, Robb, and Robinson, 2017).

### Avoidance of Financing when needed by Firm Age

The data allow us to break this out further by firm age.  The first table shows the three groups broken out separately: Blacks, Asians, and Hispanics. The second table shows all firms,

minority-firms, and non-minority firms.[17]  Both tables also break out firms by the youngest and oldest firm age categories.  We can see in **Table 14** that choosing not to apply for capital when it's needed generally declines with firm age for both Blacks and Asians.  For Blacks, the youngest firms (<2 years) had the highest rates (around 29 percent), dropping down to 14.4 percent of firms in the oldest firm category (16+ years).

Nearly 70 percent of Black-owned firms less than two years old stated that they did not apply because they didn't think the lender would approve their loan application.  Just over a third of firms in the oldest firm age category cited this reason.  More than two thirds in the oldest category stated not wanting to accrue debt as a reason, while half cited high financing costs.  For Asians, fewer  than 10 percent stated that they didn't apply for credit when needed, with the youngest firms being more likely (11.1 percent) and the oldest firms being the least likely (8.7 percent). The reasons differed by firm age as well, with older firms less likely to cite not being approved by the lender and most likely to cite not wanting to accrue debt.  About a third of companies, regardless of firm age cited the high costs of financing.

Hispanics, on the other hand, had a less clear relationship of avoidance of financing when needed and firm age.  About 18 percent of the youngest and oldest firms cited they had avoided financing, while the middle age categories ranged from 13 to 16 percent.  As firms age, they are less likely to cite that the lender wouldn't approve their loan application as the reason for not applying for a loan. This went from a high of more than 60 percent for the youngest firms to less than 30 percent for the oldest firms.

---

[17] Data for this table come from ASE Table SE1400CSCB11.

Overall, we see that the incidence of not applying for funding when needed declines steadily with firm age.  As shown in **Table 15,** it went from a high of 12.7 percent for firms less than two years old, to a low of 6.5 percent for firms 16 years and older.

**Table 14: Discouraged Borrowers**

| Black or African American | All | Less than 2 years | 16+ years |
|---|---|---|---|
| Needed Financing but Chose Not to Apply | 25.7 | 28.8 | 14.4 |
| Did not think business would be approved by lender | 58.5 | 69.1 | 34.0 |
| Did not want to accrue debt | 56.3 | 61.8 | 66.7 |
| Decided the financing costs would be too high | 31.6 | 27.4 | 50.0 |
| Preferred to reinvest the business profits instead | 15.2 | 17.0 | 0.7 |
| Felt the loan search/application process would be too time consuming | 16.1 | 17.0 | 17.4 |
| Decided the additional financing was no longer needed | 4.0 | 3.1 | 0.0 |
| Decided to wait until funding conditions improved | 17.4 | 17.7 | 35.4 |
| Decided to wait until the company hit milestones to be in stronger position | 16.6 | 16.0 | 0.7 |
| Other reason for not applying for additional financing | 3.8 | 1.7 | 2.8 |
| Asian | | | |
| Needed Financing but Chose Not to Apply | 9.8 | 11.1 | 8.7 |
| Did not think business would be approved by lender | 43.6 | 41.4 | 26.4 |
| Did not want to accrue debt | 59.3 | 59.5 | 73.6 |
| Decided the financing costs would be too high | 33.2 | 35.1 | 33.3 |
| Preferred to reinvest the business profits instead | 15.2 | 13.5 | 9.2 |
| Felt the loan search/application process would be too time consuming | 16.4 | 13.5 | 13.8 |
| Decided the additional financing was no longer needed | 7.4 | 8.1 | 9.2 |
| Decided to wait until funding conditions improved | 14.6 | 13.5 | 28.7 |
| Decided to wait until the company hit milestones to be in stronger position | 13.5 | 16.2 | 9.2 |
| Other reason for not applying for additional financing | 5.0 | 3.6 | 9.2 |
| Hispanic | | | |
| Needed Financing but Chose Not to Apply | 14.8 | 17.7 | 18.4 |

| | | | |
|---|---|---|---|
| Did not think business would be approved by lender | 53.1 | 60.5 | 29.3 |
| Did not want to accrue debt | 56.2 | 54.8 | 47.3 |
| Decided the financing costs would be too high | 31.6 | 31.6 | 32.6 |
| Preferred to reinvest the business profits instead | 17.4 | 21.5 | 15.8 |
| Felt the loan search/application process would be too time consuming | 15.3 | 14.1 | 0.0 |
| Decided the additional financing was no longer needed | 5.0 | 5.6 | 5.4 |
| Decided to wait until funding conditions improved | 17.0 | 18.6 | 21.2 |
| Decided to wait until the company hit milestones to be in stronger position | 13.8 | 20.9 | 6.0 |
| Other reason for not applying for additional financing | 5.8 | 4.0 | 0.0 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | |
| Notes: | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race")<br>Minority includes both minority owned and 50/50 minority/non-minority owned<br>Non-Minority indicates ownership of more than 50% by non-Hispanic white owners<br>Racial/Ethnic groups indicate more than 50% of ownership held by that group<br>Percentages indicate % of firms responding to the 2014 ASE | | | |

| Table 15: Discouraged Borrowers | | | |
|---|---|---|---|
| (by Minority/Non-Minority Ownership and Firm Age) | | | |
| All firms | All | Less than 2 years | 16+ years |
| Needed Financing but Chose Not to Apply | 9.6 | 12.7 | 6.5 |
| Did not think business would be approved by lender | 47.5 | 52.8 | 43.1 |
| Did not want to accrue debt | 63.0 | 60.6 | 56.9 |
| Decided the financing costs would be too high | 29.6 | 29.9 | 24.6 |
| Preferred to reinvest the business profits instead | 14.5 | 15.7 | 10.8 |
| Felt the loan search/application process would be too time consuming | 16.1 | 15.7 | 12.3 |
| Decided the additional financing was no longer needed | 5.5 | 4.7 | 4.6 |
| Decided to wait until funding conditions improved | 14.3 | 13.4 | 12.3 |
| Decided to wait until the company hit milestones to be in stronger position | 13.7 | 17.3 | 9.2 |
| Other reason for not applying for additional financing | 6.6 | 7.1 | 10.8 |
| Minority-Owned Firms | | | |
| Needed Financing but Chose Not to Apply | 13.3 | 15.5 | 11.1 |
| Did not think business would be approved by lender | 50.6 | 54.8 | 32.3 |
| Did not want to accrue debt | 58.3 | 57.6 | 61.3 |
| Decided the financing costs would be too high | 32.2 | 31.4 | 35.7 |
| Preferred to reinvest the business profits instead | 16.2 | 17.3 | 11.1 |
| Felt the loan search/application process would be too time consuming | 16.3 | 14.7 | 8.9 |
| Decided the additional financing was no longer needed | 5.7 | 5.6 | 5.7 |
| Decided to wait until funding conditions improved | 15.7 | 15.7 | 23.0 |
| Decided to wait until the company hit milestones to be in stronger position | 14.3 | 17.5 | 7.7 |
| Other reason for not applying for additional financing | 5.3 | 5.0 | 3.5 |
| Non-Minority Owned Firms | | | |
| Needed Financing but Chose Not to Apply | 9.0 | 12.0 | 7.0 |
| Did not think business would be approved by lender | 46.6 | 52.5 | 47.1 |
| Did not want to accrue debt | 64.8 | 62.5 | 57.1 |
| Decided the financing costs would be too high | 28.9 | 29.2 | 22.9 |
| Preferred to reinvest the business profits instead | 14.1 | 15.0 | 10.0 |
| Felt the loan search/application process would be too time consuming | 16.0 | 16.7 | 14.3 |
| Decided the additional financing was no longer needed | 5.4 | 4.2 | 4.3 |

41

| | | | |
|---|---|---|---|
| Decided to wait until funding conditions improved | 13.8 | 12.5 | 10.0 |
| Decided to wait until the company hit milestones to be in stronger position | 13.4 | 16.7 | 8.6 |
| Other reason for not applying for additional financing | 6.9 | 7.5 | 10.0 |
| | | | |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | |
| Notes:<br>Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race")<br>Minority includes both minority owned and 50/50 minority/non-minority owned<br>Non-Minority indicates ownership of more than 50% by non-Hispanic white owners<br>Racial/Ethnic groups indicate more than 50% of ownership held by that group<br>Percentages indicate % of firms responding to the 2014 ASE | | | |

## The Impact of Access and Cost of Capital on Firm Profitability

The survey also asked business owners if various challenges, such as access to financial capital and/or the cost of financial capital, had a negative impact on the profitability of the business. These two challenges, as well as a variety of others, are shown in **Table 16**.[18]  Minority businesses, especially African American-owned businesses, were much more likely than non-minorities to state that access to financial capital and the cost of financial capital had negative impacts on business profits.  Nearly 29 percent of African American businesses said that access to financial capital had a negative impact on business profits, compared with just 10 percent of white-owned businesses.  More than 17 percent of Hispanic-owned businesses and nearly 14 percent of Asian-owned businesses stated that access to financial capital had a negative impact on their profits.  Cost of capital was also more likely to have a negative impact on minority-owned firms than firms owned by whites.  Nearly 23 percent of black-owned firms and nearly 16 percent of Asians and Hispanics noted this was the case, compared with less than 11 percent for firms owned by whites. It is interesting to note, however, that access to capital and cost of capital were cited by fewer

---

[18] Data for this table come from ASE Table SE1400CSCB13.

businesses than most of the other challenges, such as unpredictability of business conditions, slow or lost sales, or late or nonpayment from customers.

| Table 16: Sources of Negative Impact on Profitability | | | | | | | |
|---|---|---|---|---|---|---|---|
| (% Of firms who experienced a negative impact by race/ethnicity) | | | | | | | |
| Source of Negative Impact: | All firms | White | Black or African American | Asian | Hispanic | Minority | Non-minority |
| Access to Financial Capital | 10.8 | 10.1 | 28.4 | 13.9 | 17.5 | 16.3 | 9.7 |
| Cost of Financial Capital | 11.3 | 10.6 | 22.6 | 15.9 | 15.8 | 16.3 | 10.4 |
| Not Finding Qualified Labor | 27.2 | 27.3 | 31.3 | 28.3 | 26.8 | 28.6 | 27.2 |
| Taxes | 48.8 | 50.2 | 50.0 | 43.5 | 45.6 | 46.0 | 50.3 |
| Slow Business or Lost Sales | 43.8 | 42.9 | 54.4 | 53.6 | 48.7 | 51.5 | 42.6 |
| Late or Non-payment from Customers | 30.3 | 30.9 | 41.1 | 26.4 | 34.0 | 30.7 | 30.7 |
| Unpredictability of Business Conditions | 43.9 | 44.0 | 49.1 | 46.1 | 43.1 | 45.6 | 44.0 |
| Changes or Updates in Technology | 15.8 | 15.2 | 17.7 | 22.5 | 15.0 | 19.2 | 15.2 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | | | | |
| Notes: | | | | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Racial/Ethnic groups indicate more than 50% of ownership held by that group Percentages indicate % of firms responding to the 2014 ASE | | | | | | | |

## Access and Cost of Capital and Negative Impact on Profitability by Industry and Minority/Non-Minority Ownership

**Table 17** presents the results for the negative impacts of access to capital and cost of capital by minority and non-minority ownership and firm industry.[19]  In terms of access to capital, minority-owned business were much more likely to state that this had a negative impact on profitability, compared with firms owned by non-minorities, across all the different industries. Some industries, such has mining, manufacturing, wholesale trade, transportation, finance, real estate, professional services, and health care, minorities were two to three times as likely to experience a negative impact from the lack of access to credit.  Minority firms in mining, construction, manufacturing, wholesale, retail, and transportation had the highest percentages of firms citing a negative impact on profitability from the lack of access to credit.

In terms of the cost of capital, minority-owned firms were more likely than non-minorities to experience a negative impact from this on profitability in every industry except information.  The widest gaps were in the industries of wholesale, finance, transportation, and educational services.  The industries with the highest percentage of minority-owned firms citing a negative impact from the cost of capital (18 percent or more) were manufacturing, wholesale, retail, and transportation.   The highest for non-minorities were retail, accommodation, and food services (between 13 and 14 percent).

---

[19] Data for this table come from ASE Table SE1400CSCB13.

| Table 17: Access and Cost of Capital and Negative Impact on Profitability | | | | |
|---|---|---|---|---|
| (By Minority/Non-Minority Ownership and Firm Industry) | | | | |
| | Negative impact from access to financial capital | | Negative impact from cost of financial capital | |
| | Minority | Non-Minority | Minority | Non-Minority |
| Agriculture, forestry, fishing and hunting | 10.9 | 9.0 | 12.7 | 11.3 |
| Mining, quarrying, and oil and gas extraction | 19.2 | 6.3 | 14.7 | 7.9 |
| Construction | 18.2 | 11.5 | 15.8 | 11.7 |
| Manufacturing | 20.2 | 10.6 | 18.3 | 12.6 |
| Wholesale trade | 19.9 | 10.8 | 19.0 | 11.2 |
| Retail trade | 18.4 | 12.9 | 18.7 | 13.8 |
| Transportation and warehousing | 23.2 | 10.7 | 22.4 | 12.4 |
| Information | 14.8 | 13.1 | 11.7 | 12.6 |
| Finance and insurance | 15.8 | 6.7 | 13.7 | 6.4 |
| Real estate and rental and leasing | 15.4 | 6.9 | 13.5 | 7.1 |
| Professional, scientific, and technical services | 13.6 | 7.2 | 12.3 | 7.1 |
| Management of companies and enterprises | 10.1 | 8.1 | 11.5 | 10.4 |
| Administrative and support and waste management and remediation services | 17.9 | 10.3 | 17.0 | 10.3 |
| Educational services | 16.3 | 10.2 | 17.0 | 9.9 |
| Health care and social assistance | 13.2 | 6.6 | 14.2 | 8.5 |
| Arts, entertainment, and recreation | 17.2 | 10.6 | 16.0 | 11.3 |
| Accommodation and food services | 15.5 | 11.7 | 17.6 | 13.1 |
| Other services (except public administration) | 16.4 | 11.0 | 17.5 | 11.8 |
| Industries not classified | 22.3 | 5.4 | 20.5 | 9.0 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | |
| Notes: | | | | |
| Minority includes:  Black or African American, Asian, Hispanic, American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander, and "Some Other Race") Minority includes both minority owned and 50/50 minority/non-minority owned Non-Minority indicates ownership of more than 50% by non-Hispanic white owners Percentages indicate % of firms respondents | | | | |

**Reasons for Business Closure**

One final question on the survey addressed the implications of financial capital, or lack thereof, for businesses.  Respondents were asked if their businesses were still operating in 2014. If respondents indicated that the businesses had ceased operations, they were asked why operations had ceased.  A few of the reasons were related to financial capital:  inadequate cash flow or sales, lack of business loans/credit, and/or a lack of personal loans/credit.  These were grouped into one category.  All of the other reasons - owner(s) had military deployment, retired, died, started another business, or sold the business, or because the business operated for a specific or one-time event, or for some other reason - were grouped in a separate category.

As shown in **Table 18,** nearly five percent of African-American owned firms indicated they had ceased operations due to reasons around financing.[20]  White owned firms were much more likely to cite other reasons for closure (4.5 percent) than financial reasons (2.4 percent). This was similar to Asians (5.4 percent versus 2.8 percent).  The opposite was true for African Americans (4.6 percent versus 2.9 percent). For Hispanics, the percentages for both sets of reasons were similar (2.9 percent cited reasons related to financial capital and 3.1 percent cited other reasons).  Thus, Blacks and Hispanics were much more likely to cite financial reasons for their closure, compared with White and Asian owners.

---

[20] Data for this table come from ASE Table SE1400CSCB27.

| Table 18: Reasons that a Business Ceased Operations | | | | |
|---|---|---|---|---|
| | White | Black | Asian | Hispanic |
| Business is currently operating | 93.1 | 92.5 | 91.8 | 93.9 |
| Reasons for Ceasing Operations: | | | | |
| Inadequate cash flow or sales, lack of business or personal loans/credit | 2.4 | 4.6 | 2.8 | 2.9 |
| Operations ceased for another reason | 4.5 | 2.9 | 5.4 | 3.2 |
| Source: 2014 Annual Survey of Entrepreneurs (U.S. Census Bureau 2016) | | | | |
| Notes: | | | | |
| Racial/Ethnic groups indicate more than 50% of ownership held by that group<br>Percentages indicate % of firms responding to the 2014 ASE and question. | | | | |

## Conclusions

The picture portrayed by these new ASE data is one of continued financing challenges by minority-owned firms.  Consistent with prior research using a variety of other data sources, the ASE data show a greater reliance among minority-owned businesses on personal and family savings as a source of startup capital, despite wealth levels of Blacks and Hispanics being less than one tenth those of non-Hispanic Whites.  Blacks and Hispanics were less likely to have business bank loans compared with Whites and Asian-owned businesses, which were more likely to use credit card financing for debt than business bank loans.

In terms of startup capital, Blacks and Hispanics were about twice as likely to start their businesses with less than $10,000 in financial capital, compared with Whites and Asians. According to ASE data, Hispanics were more likely than Whites to not receive the full amounts requested from most of the various sources, while Blacks were often twice as likely (or more) to not receive the full amount requested, compared with Whites.

Blacks were also more than two and a half times more likely than Whites to state that their businesses needed credit at some point in 2014, but decided not to apply for a variety of

reasons. Hispanics were 50 percent more likely than whites to state this. In terms of reasons given, 47.4 percent of Whites said that they thought the lender would not approve their loan application, compared with 58.5 percent of Blacks and 53.1 percent of Hispanics. Only 10 percent of Whites suggested that the lack of access to credit had a negative impact on profitability, compared with 17.4 percent of Hispanic-owned businesses and 28.4 percent of Black-owned businesses.  Firms owned by Blacks and Hispanics were also more likely to state that the cost of capital had a negative impact on their profitability (22.6 percent and 15.8 percent respectively), compared with businesses owned by Whites (10.6 percent).  Finally, for firms that closed down in 2014, Blacks were twice as likely as Whites to state that financial reasons drove their firm closure.  Hispanics were also more likely to cite financial reasons, compared with Whites, but the gap was much smaller.

The challenge of access to capital is clearly having a disproportionate effect on minority-owned businesses, especially those owned by Blacks and Hispanics.  Given their much lower wealth levels,[21] compared to Whites and Asians, this is even more troubling.  These newly available data illustrate that financing remains a critical challenge for minority entrepreneurs, even after nearly a decade following the financial crisis.

While minorities make up 40 percent of the U.S. population, their employer business ownership rates are half that.  As the minority population continues to rise, it is more important than ever that these prospective business owners have the resources they need to launch and grow successful firms.  Improving credit scores and wealth among minorities should be priorities for policymakers. As described earlier in this paper, even among the most creditworthy black

---

[21] As noted earlier in this paper, the 2011 Survey of Income and Program Participation by the U.S. Census Bureau indicates that half of all Hispanic households have less than $7,683 in wealth and half of all African-American households have less than $6,314. This compares to a median net worth of White non-Hispanic households of $110,500, and Asians have wealth levels close to those of non-Hispanic Whites at $89,339.

borrowers, there is still a fear of being turned down for funding.[22]  The fact that many well-qualified minority borrowers do not apply for credit, even when they need it, because they think they'll be turned down, suggests that overcoming racial differences in financing is not just a matter of expanding the supply of credit available.

Understanding the drivers of these racial differences is going to require delving into perceptions on both sides of the financing table, as well as changes in financial planning and how credit histories can be built over time.  However, it is clear that something needs to be fixed, for example, improving credit scores, raising wealth levels, and increasing banking relationships for Blacks and Hispanics.  These improvements are not only needed for fairness, but for our economy to operate at full capacity.  As the minority population in this country continues to grow, we need to prioritize the policy discussions around how to improve the financial health of minority entrepreneurs as well their access to financial capital.

---

[22] Using the Kaufman Firm Survey data, Fairlie, Robb, and Robinson (2016) found that even the most credit-worthy minority borrowers anticipated being denied credit, which caused many well qualified minority borrowers to not apply for credit, even when they felt they needed it.

## References

*2012 Survey of Business Owners.*  http://www.census.gov/csd/sbo.

*2014 Annual Survey of Entrepreneurs.*
https://www.census.gov/programs-surveys/ase.html

Bates, Timothy. 1997. *Race, Self-Employment and Upward Mobility: An Elusive American Dream.* Washington, D.C.: Woodrow Wilson Center Press and Baltimore: John Hopkins University Press.

Bates, T. 2011. Minority entrepreneurship. *Foundations and Trends in Entrepreneurship,* 7: 151-311.

Bates, Timothy, and Alicia Robb. 2016. "Impacts of Owner Race and Geographic Context on Access to Small Business Financing," *Economic Development Quarterly.*

Bates, T., and Robb, A. 2013. Greater access to capital is needed to unleash the local economic development potential of minority-owned businesses, *Economic Development Quarterly.* 27: 250-59.

Bates, T., and Robb, A. 2014. Small-business viability in America's urban minority communities. *Urban Studies.* 51: 2844-62.

Black, Sandra E., and Philip E. Strahan. 2002. Entrepreneurship and bank credit availability, Journal of Finance 57, 2807-2833."

Blanchflower, D. 2009. Minority self-employment in the United States and the impact of affirmative action programs, *Annals of Finance,* 5: 361-96.

Blanchflower, David. 2007. Entrepreneurship in the United States, IZA working paper No. 3130

Blanchflower, David G., P. Levine and D. Zimmerman. 2003. "Discrimination in the small business credit market", *Review of Economics and Statistics*, November, 85(4), pp. 930-943.

Bone, S., Christensen, G., and Williams, J. 2015. Rejected, shackled, and alone: The experience of systematic restricted consumer choice among minority entrepreneurs, *Journal of Consumer Research.*

Boshara, Ray, William R. Emmons, and Bryan J. Noeth. 2015. The Demographics of Wealth. Federal Reserve Bank of St. Louis. St. Louis, MO.

Boston, Thomas D. 2006. "The Role of Minority-owned Businesses in Minority Community Development" ed. Paul Ong, *Jobs and Economic Development in Minority Communities: Realities, Challenges, and Innovation.* Temple University Press

Bradford, William D. 2003. The Wealth Dynamics of Entrepreneurship for Minority and

White Families in the U.S., *Review of Income and Wealth*, 49(1): 89-116.

Cagetti, Marco, and Mariacristina De Nardi.. 2006. "Entrepreneurship, frictions, and wealth, Journal of Political Economy 114, 835-870."

Cavalluzzo, Ken and John Wolken. 2005. "Small Business Loan Turndowns, Personal Wealth and Discrimination," *Journal of Business*, 2153-2177.

Cavalluzzo, Ken, Linda Cavalluzzo, and John Wolken. 2002. "Competition, Small Business Financing, and Discrimination: Evidence from a New Survey." The Journal of Business 75 (4): 641–79.

Cole, Rebel. 2014. *Credit Scores and Credit Market Outcomes: Evidence from the Survey of Small Business Finances and the Kauffman Firm Survey*. U.S. Small Business Administration Report. Washington, D.C.

Evans, David S. and Boyan Jovanovic. 1989. "An Estimated Model of Entrepreneurial Choice under Liquidity Constraints," *Journal of Political Economy*, 808-827.

Fairlie, R., and Robb, A. 2010. *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs* (pp. 1–66). Washington, DC: U.S. Department of Commerce, Minority Business Development Agency. Retrieved from http://www.mbda.gov/sites/default/files/DisparitiesinCapitalAccessReport.pdf.

Fairlie, R., Robb. A., and Robinson, D. 2016. "Black and White: Racial Differences in New Firm Financing," Working paper.

Fairlie, Robert W. and Alicia M. Robb. 2008. *Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States*. Cambridge, MA: The MIT Press.

Fairlie, Robert W. and Alicia M. Robb. 2007. "Why are Black-Owned Businesses Less Successful then White-Owned Businesses: The Role of Families, Inheritances, and Business Human Capital," *Journal of Labor Economics,* 289-323.

Fairlie, Robert W. and Christopher Woodruff. 2009. "Mexican-American Entrepreneurship." University of California Working Paper.

Fairlie, Robert W. and Harry A. Krashinsky. 2008. "Liquidity Constraints, Household Wealth, and Entrepreneurship Revisited," Working Paper.

Fairlie, Robert W., and Bruce D. Meyer. 1996. "Ethnic and Racial Self-Employment Differences and Possible Explanations," *Journal of Human Resources*, 31, Fall 1996, pp. 757-793.

Federal Reserve System. 2017. Small Business Credit Survey: Report on Employer Firms. Federal Reserve Bank of New York, New York, NY.

Foster, Lucia and Norman, Patrice, The Annual Survey of Entrepreneurs: An Introduction. 2016. US Census Bureau Center for Economic Studies Paper No. CES-WP-15-40R. Available at SSRN: http://ssrn.com/abstract=2689868

Klein, Joyce. 2017. Bridging the Divide: How Business Ownership Can Help Close the Racial

Wealth Gap. Aspen Institute. Washington DC.

Mitchell, K. and Pearce, D.K.2011. Lending technologies, lending specialization, and minority access to small-business loans. *Small Business Economics*, *37*(3), pp.277-304.

Nanda, Ramana. 2008. Cost of external finance and selection into entrepreneurship." Harvard Business School Working Paper 08-047."

Orman, Ingrid and Connie E. Evans. 2017. The Tapestry of Black Business Ownership in America. AEO. Washington, D.C.

Robb, Alicia. 2002. "Entrepreneurship: A Path for Economic Advancement for Women and Minorities?" *Journal of Developmental Entrepreneurship,* Volume 7, No. 4.

Robb, A. 2013. Access to Capital Among Young Firms, Minority-Owned Firms, Women-Owned Firms and High-Tech Firms. Available at www.sba.gov/advocacy/7540/584931

Robb, A. and Robinson, D.T. 2017. Testing for racial bias in business credit scores. *Small Business Economics*, pp.1-15.

Wiersch, Ann Marie, Barbara J. Lipman, and Brett Barkley. 2016. Click, Submit: New Insights on Online Lender Applicants from the Small Business Credit Survey. Federal Reserve Bank of Cleveland. Cleveland, OH.

## Appendix 1

### Financing Questions Extracted for Report from 2014 Annual Survey of Entrepreneurs Survey Instrument

**FUNDING FROM OWNER(S)**

For 2014, what was the total amount of money that the owner(s) personally put into the business? *Your best estimate is fine. Please report in thousands.*

Include:

- Investments from personal savings
- Personal retirement accounts
- Home equity loans
- Personally borrowed funds

  $_____ ,000

**CAPITAL FUNDING**

For the owners reported, what was the source(s) of capital used to start or initially acquire this business? If you did not report any owners skip to Amount of Capital Needed to Start or Initially Acquire Business. **Select all that apply.**

☐ Personal/family savings of owner(s)

☐ Personal/family assets other than savings of owner(s)

☐ Personal/family home equity loan

☐ Personal credit card(s) carrying balances

☐ Business credit card(s) carrying balances

☐ Government-guaranteed business loan from a bank or financial institutions, including SBA-guaranteed loans

☐ Business loan from a bank or financial institution

☐ Business loan from a federal, state, or local government

☐ Business loan/investment from family/friend(s)

☐ Investment by venture capitalist(s)

☐ Grants

☐ Other source(s) of capital

☐ Don't know

☐ None needed – Skip to Family, Friends, and Employees

For the owners you reported, what was the total amount of capital used to start or initially acquire this business? (Capital includes savings, other assets, and borrowed funds of owner(s).)

☐ Less than $5,000                 ☐ $100,000 - $249,999

☐ $5,000 - $9,999                  ☐ $250,000 - $999,999

☐ $10,000 - $24,999                ☐ $1,000,000 - $2,999,999

☐ $25,000 - $49,999                ☐ $3,000,000 or more

☐ $50,000 - $99,999                ☐ Don't know

**FUNDING FROM GOVERNMENT GRANTS**

For 2014, what was the total amount of money this business received from government grants (such as the Small Business Innovation Research (SBIR) and/or Small Business Technology Transfer (STTR) programs)? *Your best estimate is fine. Please report in thousands.*

  $_____ ,000

53

**FUNDING FROM FAMILY, FRIENDS, AND EMPLOYEES**

For 2014, what was the amount of money this business received from family, friends, and employees?  *Your best estimate is fine.  Please report in thousands.*

$_____ ,000

**FUNDING FROM BANKS OR OTHER FINANCIAL INSTITUTIONS**

For 2014, what was the total amount of money this business borrowed from a bank or other financial institutions, including business loans, a business credit card carrying a balance, or a business line of credit?  *Include all draws on a business line of credit, even if paid off during the year.  Your best estimate is fine.  Please report in thousands.*

$_____ ,000

**FUNDING FROM OUTSIDE INVESTORS**

For 2014, what was the total amount of money this business received from angel investors, venture capitalists, or other businesses in return for a share of ownership in this business?  *Your best estimate is fine.  Please report in thousands.* (An "angel investor" is an affluent individual who provides capital for a business start-up, usually in exchange for convertible debt or ownership equity.)

$_____ ,000

54

**NEW FUNDING RELATIONSHIPS**

In 2014, did this business attempt to establish any **new funding relationships** (for example, loans, investments, or gifts) with any of the following sources? *(Select one for each row)*

| | No | Yes, received <u>total amount</u> of the funding requested | Yes, but <u>did not receive the total amount</u> requested |
|---|---|---|---|
| Other owner(s) (if applicable) | ☐ | ☐ | ☐ |
| Family, friends, or employees | ☐ | ☐ | ☐ |
| Banks, credit unions, or other financial institutions | ☐ | ☐ | ☐ |
| Home equity loans in name of business owners | ☐ | ☐ | ☐ |
| Credit cards | ☐ | ☐ | ☐ |
| Trade credit (for example, buy now, pay later) | ☐ | ☐ | ☐ |
| Angel Investors | ☐ | ☐ | ☐ |
| Venture capitalists | ☐ | ☐ | ☐ |
| Other investor businesses | ☐ | ☐ | ☐ |
| Crowdfunding platform (for example, Prosper, Kickstarter, etc.) | ☐ | ☐ | ☐ |
| Grants (for example, Federal government's Small Business Technology Transfer Program (STTR) or Small Business Innovation Research Program (SBIR) | ☐ | ☐ | ☐ |
| Other (Specify) ✏ | ☐ | ☐ | ☐ |

**AVOIDANCE OF ADDITIONAL FINANCING**

At any time during 2014, did this business need additional financing and **the owner(s) chose not to apply?**

☐ Yes

☐ No - Skip to Profitability

**AVOIDANCE OF ADDITIONAL FINANCING CONTINUED**

Why did this business choose not to apply for additional financing? **(Select all that apply)**

☐ Did not think business would be approved by lender

☐ Did not want to accrue debt

☐ Decided the financing costs would be too high

☐ Preferred to reinvest the business profits instead

☐ Felt the loan search/application process would be too timing consuming

☐ Decided the additional financing was no longer needed

☐ Decided to wait until funding conditions improved

☐ Decided to wait until company hit milestones to be in stronger position to raise funds

☐ Other (Specify) ✏

**PROFITABILITY**

For 2014, did this business have profits, losses, or break even? **(Select one)**

☐ Profits
☐ Losses
☐ Break even

**NEGATIVE IMPACT ON PROFITABILITY**

For 2014, did each of the following negatively impact the profitability of this business?  **(Select one in each row)**

| | Yes | No |
|---|---|---|
| Access to financial capital | ☐ | ☐ |
| Cost of financial capital | ☐ | ☐ |
| Finding qualified labor | ☐ | ☐ |
| Taxes | ☐ | ☐ |
| Slow business or lost sales | ☐ | ☐ |
| Customers or clients not making payments or paying late | ☐ | ☐ |
| The unpredictability of business conditions | ☐ | ☐ |
| Changes or updates in technology | ☐ | ☐ |
| Other (Specify) ✒ | ☐ | ☐ |

**CURRENTLY OPERATING**

Is this business currently operating?

☐ Yes – Skip to Remarks
☐ No

**CEASE OPERATION**

Did the operations cease for any of the following reasons?  **Select all that apply.**

☐ Owner's military deployment
☐ Owner's illness or injury
☐ Owner(s) retired
☐ Owner(s) deceased
☐ Operated for a specific or one-time event
☐ Inadequate cash flow or low sales

☐ Lack of business loans/credit
☐ Lack of personal loans/credit
☐ Started another business
☐ Sold this business
☐ Other

56

**Appendix 2**

SE1400CSCB07: Statistics for U.S. Employer Firms by Sources of Capital Used to Start or Acquire the Business by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB08: Statistics for U.S. Employer Firms by Total Amount of Capital Used to Start or Acquire the Business by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB09: Statistics for U.S. Employer Firms by Funding Sources and Total Amount of Funding by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB010: Statistics for U.S. Employer Firms by New Funding Relationships Attempted by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB011: Statistics for U.S. Employer Firms by Reasons for Avoiding Additional Financing by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB013: Statistics for U.S. Employer Firms by Negative Impacts on Profitability by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

SE1400CSCB027:   Statistics for U.S. Employer Firms by Reasons that a Business Ceased Operations by Sector, Gender, Ethnicity, Race, Veteran Status, and Years in Business for the U.S., States, and Top 50 MSAs: 2014

**Source of Tables:**
http://www.census.gov/data/tables/2014/econ/ase/2014-ase-characteristics-of-businesses.html

**The full survey instrument can be found here:**
https://www2.census.gov/econ2014/SE/sector00/ase_2014_preview.pdf

# Exhibit N

Journal of Financial Economics 106 (2012) 182–195



Contents lists available at SciVerse ScienceDirect

# Journal of Financial Economics

journal homepage: www.elsevier.com/locate/jfec



# Entrepreneurial finance, credit cards, and race ☆

## Aaron K. Chatterji [a], Robert C. Seamans [b],*

[a] Fuqua School of Business, Duke University, United States
[b] Stern School of Business, New York University, Suite 7-58, 44 West 4th Street, New York, NY 10012, United States

### ARTICLE INFO

Article history:
Received 23 December 2010
Received in revised form
30 August 2011
Accepted 1 September 2011
Available online 21 April 2012

JEL classification:
J15
L26
M13

Keywords:
Financial constraints
Entrepreneurship
Barriers to entry
Race

### ABSTRACT

This paper examines the impact of financial deregulation on entrepreneurship. We assess the impact of credit card deregulation on transitions into self-employment using state-level removal of credit card interest rate ceilings following the US Supreme Court's 1978 *Marquette* decision as a quasi-natural experiment. We find that credit card deregulation increases the probability of entrepreneurial entry, with a particularly strong effect for black entrepreneurs. We demonstrate that these effects are magnified in states with a history of racial discrimination and link the results to discrimination-based barriers to entry.

© 2012 Elsevier B.V. All rights reserved.

## 1. Introduction

This paper examines the impact of financial deregulation on entrepreneurship, a key driver of economic growth. We provide evidence that the deregulation of

☆ We are grateful to an anonymous referee and thank Heski Bar-Isaac, William Darity, J.P. Eggers, Greg Fairchild, Marcin Kacperczyk, Alexey Levkov, Alexander Ljungqvist, David Mowery, Ramana Nanda, Gabriel Natividad, Matthew Rhodes-Kropf, Manju Puri, Adriano Rampini, Alicia Robb, David Robinson, Jason Snyder, Victor Stango, Justin Sydnor, Kristin Wilson, Catherine Wolfram, and Jonathan Zinman for helpful discussions. We benefited from comments of seminar participants at University of California—Berkeley, Duke University, New York University, the American Economic Association's Annual Meeting, the University of Virginia's Entrepreneurship Conference, the National Bureau of Economic Research's Entrepreneurship Working Group Meeting, and the Atlanta Federal Reserve Board's Small Business Entrepreneurship Conference. We thank Chris Knittel, Victor Stango, Randall Kroszner, Philip Strahan, and Kristin Wilson for generously sharing data. All errors are our own.
  * Corresponding author. Tel.: +1 212 998 0417; fax: +1 212 995 4235.
  E-mail address: rseamans@stern.nyu.edu (R.C. Seamans).

credit card markets in the late 1970s expanded access to credit in the US economy, enabling liquidity-constrained individuals to borrow money and increase the rate of new businesses formation. While several previous studies of US financial deregulation investigate how commercial banking sector liberalization influenced economic growth through firm entry and exit, other less examined examples exist of financial deregulation that were significant enough to spur new firm formation. In particular, despite anecdotal evidence about the importance of credit cards in financing new enterprises, no previous study has explored how exogenous policy shocks to the availability of credit cards influences key economic activities, such as entrepreneurship.

Our empirical approach leverages differential credit constraints facing black and white entrepreneurs by estimating the impact of credit market deregulation on entrepreneurship by race. This strategy is underpinned by an important finding from previous studies that, depending on demographic characteristics, some individuals are more likely to use credit cards to finance their ventures

0304-405X/$ - see front matter © 2012 Elsevier B.V. All rights reserved.
http://dx.doi.org/10.1016/j.jfineco.2012.04.007

This material may be protected by Copyright law (Title 17 U.S. Code)

than others. In particular, black entrepreneurs are more likely to finance their ventures using credit cards than white entrepreneurs due to differences in frictions encountered when accessing traditional bank loans and other external finance (Blanchflower, Levine, and Zimmerman, 2003; and Fairlie and Robb, 2008). Specifically, we use a differences-in-differences approach that exploits the removal of state level credit card interest rate ceilings following the US Supreme Court's 1978 decision in *Marquette National Bank of Minneapolis v. First Omaha Service Corp.* Our research design helps rule out plausible alternative explanations and establishes a credible causal link between credit card deregulation and entrepreneurial entry.

We first use data contemporaneous to the Supreme Court's *Marquette* decision to demonstrate that black borrowers were systematically more likely than white borrowers to face barriers to finance in the 1970s and 1980s. Our finding accords with results in Blanchflower, Levine, and Zimmerman (2003) who study barriers to finance using data from the 1990s. We then examine differences in credit card availability and ownership patterns following removal of state-level credit card interest rate ceilings. The patterns reveal that individuals based in states with no ceiling on credit card interest rates had more credit card debt and higher annual percentage rates (APRs) than individuals in states not affected by a similar policy change. These findings complement a study by Zinman (2002), which shows a significant increase in credit card ownership following a state's removal of its credit card interest rate ceiling, and are in line with anecdotal evidence that credit card issuers were likely to move to states without ceilings following a state-level policy change (Ausubel, 1997). More broadly, the results are consistent with the findings in Gross and Souleles (2002) linking credit card debt to changes in credit limits.

After establishing the link between a state's removal of credit card interest rate ceilings and the amount of credit cards in the state, we next examine how this type of credit card deregulation affected entrepreneurial entry. To do this we use data from the *Current Population Survey* (CPS) for 1971–1990 on transitions into self-employment. Our results suggest that living in a no-limit state resulted in a significant increase in the probability of a transition into self-employment, and the effect is particularly pronounced for black entrepreneurs. The results are robust to alternative models, including multinomial logit, and alternative specifications. Thus, one of the main contributions of our paper is to use a large sample setting to demonstrate the importance of credit cards to entrepreneurs. A likely explanation for the differential effect for black entrepreneurs is that, due to discrimination in traditional lending markets, black entrepreneurs with good projects relied more heavily on credit cards to fund new ventures than did white entrepreneurs. Such an explanation was originally suggested by Blanchflower, Levine, and Zimmerman (2003, p. 940), who write that "if financial institutions discriminate against blacks in obtaining small-business loans, we may even expect to see them use credit cards more often than whites, because they have fewer alternatives."

To examine this explanation in more detail, we next test whether the effects of credit card deregulation on black entrepreneurial entry differ depending on the history of discrimination in the state. We split states along several measures of discrimination and show that the effect on black transitions into self-employment is larger in states with a history of discrimination. These results suggest that the increase in competition between credit card companies following a state's removal of its credit card interest rate ceiling reduced discrimination-based barriers to entry for black entrepreneurs.

Finally, we assess the extent to which credit card deregulation was endogenously determined by factors important to our study, such as the percent of self-employed or black individuals in a state. We find no evidence that the timing of credit card deregulation depended on these variables. We use data provided by Kroszner and Strahan (1999) to instead provide evidence that the timing of credit card deregulation was related to political economy variables. We also show patterns from the *Survey of Consumer Finance* (SCF) that suggest black entrepreneurs are more likely to own credit cards than white entrepreneurs in states that remove credit card interest rate ceilings.

We believe our findings provide a substantial contribution to two streams of literature. First, we contribute to a stream of literature that links the role of financial development to economic growth (Fazzari, Hubbard, and Peterson, 1988; Kaplan and Zingales, 1997; Levine, 2005). This literature has recently focused on the relation between bank deregulation and entrepreneurship (Black and Strahan, 2002; Cetorelli and Strahan, 2006; Bertrand, Schoar, and Thesmar, 2007; Huang, 2008; Kerr and Nanda, 2009) and shows that the removal of financial constraints increases entrepreneurial entry.[1] Our paper adds to this literature by studying a different source of financial deregulation, namely, removal of barriers to the access of credit cards. In doing so, we also demonstrate that financial deregulation can differentially affect entrepreneurs depending on demographic characteristics, such as race. This finding is relevant to the literature that examines the social effects of changes to credit market competition (Garmaise and Moskowitz, 2006). We also build on Levine, Levkov, and Rubinstein (2008), which shows a larger decrease in the black-white wage gap following bank deregulation in states with comparatively higher discrimination.

We also add to existing literature on entrepreneurial finance that focuses primarily on sources of finance such as bank loans and venture capital (Kortum and Lerner, 2000; Hsu, 2004; Zarutskie, 2006; Hochberg, Ljungqvist, and Lu, 2007; Hellmann, Lindsey, and Puri, 2008; Kerr and Nanda, 2009) and has only recently started to focus on alternative lending sources. To the best of our knowledge, the only other study on the link between credit cards and entrepreneurial finance is Scott (2010), which uses *Kauffman Firm Survey* data to show that a number of entrepreneurs use credit cards to start companies, although other studies have focused on the link between consumer debt and credit cards (e.g.; Gross and Souleles,

---

[1] For dissenting views, see Petersen and Rajan (2002) and Hurst and Lusardi (2004).

2002). Other examples of alternative lending sources include Morse (2011), which finds that access to payday loans helps alleviate unanticipated financial distress, and Ravina (2008) and Pope and Sydnor (2011), which study online lending markets. Our findings are also related to Benmelech and Moskowitz 2010, whose study of historical interest rates in the US shows that tighter interest rate ceilings lower economic activity, particularly for small firms.

The remainder of the paper proceeds as follows. Section 2 provides background for our study. Section 3 describes our methods and data. Section 4 describes the main results. Section 5 concludes and discusses the implications of our analysis.

## 2. Background

This section provides background on several facets of our study. We first document a link between race and liquidity constraints. We then describe the US Supreme Court's *Marquette* decision and the effect that the decision had on state-level policies and credit card availability and use

### 2.1. Race and liquidity constraints

Prior literature using data from the 1990s to the present (Blanchflower, Levine, and Zimmerman, 2003; and Robb, Fairlie, and Robinson, 2009) shows that blacks are more likely than whites to be turned down by bank lenders. In results reported in Table 1, we verify that blacks were more likely than whites to be turned down, or fear being turned down, by bank lenders in the late 1970s and early 1980s. To do this, we report the correlations between survey respondents who self-identify as *black* and answers to selected questions from the 1977 and 1983 *Survey of Consumer Finances*, controlling for individual characteristics and state of residence.

The questions differ across the two surveys. For the 1977 survey, respondents were asked about their opinions on institutions that lend money or extend credit, including stores, banks, finance companies, and credit unions. Respondents were not asked to distinguish between lenders and creditors.[2] In Column 1, we report results of answers to the question: "In your opinion, have you ever been treated unfairly in your credit transactions?" In Column 2, we report results of answers to the question: "Are there any (other) practices of creditors or lenders that you think are unfair and would like to see changed?" For the 1983 survey, respondents were asked about their experience obtaining loans or credit. In Column 3, we report results of answers to the question: "In the past few years, has a particular lender or creditor turned down any request you (or your husband/wife) made for credit or have you been unable to get as much credit as you applied for?" In Column 4, we report results of answers to the question: "Was there any time in the

---

[2] The specific language is: "In this interview please think of the terms 'creditors' and 'lenders' as the same thing."

**Table 1**
Survey of Consumer Fairness (SCF) questions on fairness of lenders and availability of loans.

This table reports results of linear probability regressions of "Yes" answers to the questions indicated in each column on an indicator for black. The data are from the *Survey of Consumer Finances* for year indicated. Individual characteristics include female, age, high school graduate, married, homeowner, and household income. State fixed effects are included for 35 states covered by the SCF; the SCF excludes DC, HI, ID, KS, MD, MT, ND, NH, NM, NV, RI, VT, WV, and WY. Robust standard errors are included in brackets and clustered at state. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

|  | Treated unfairly? (1) | Unfair practices you want to change? (2) | Turned down or unable to obtain? (3) | Afraid of being turned down? (4) |
|---|---|---|---|---|
| Black | 3.7915 [2.2671] | 2.1454 [1.5042] | 0.0692* [0.0370] | 0.1155*** [0.0221] |
| Year | 1977 | 1977 | 1983 | 1983 |
| Individual characteristics | Y | Y | Y | Y |
| State fixed effects | Y | Y | Y | Y |
| Number of observations | 1534 | 1534 | 2077 | 2080 |
| R-squared | 0.032 | 0.047 | 0.090 | 0.071 |
| Clusters | 35 | 35 | 35 | 35 |

past few years that you (or your husband/wife) *thought* of applying for credit at a particular place, but changed your mind because you thought you might be turned down?" (Emphasis in the original SCF survey questionnaire). Black individuals were more likely to answer yes to all four questions, and this result is statistically significant at the 10% level in Column 3 and 1% level in Column 4. Taken together, survey answers suggest that black individuals in the 1970s and 1980s encountered frictions, or believed they would encounter frictions, when attempting to access finance. Blanchflower, Levine, and Zimmerman (2003), using *Survey of Small Business Finance* data from 1993 and 1998, report qualitatively similar findings: Black-owned firms were more likely to report being concerned about credit market problems and less likely to apply for credit because of fear of being turned down.

### 2.2. State policy changes following the Marquette decision

In December 1978, the Supreme Court considered the case of *Marquette National Bank of Minneapolis v. First Omaha Service Corp.* The case centered around First Omaha's marketing of credit cards to customers in Minnesota. At that time, states were allowed to set their own caps on credit card interest rates, and the ceilings in Nebraska and Minnesota were different. Thus, First Omaha could charge a higher interest rate, as allowed by Nebraska law, than Minnesota-based banks could legally offer to customers in Minnesota. As a result, the Minnesota attorney general argued that First Omaha's activities interfered with the state's ability to enforce its usury laws. After a favorable state trial court decision for Marquette was overturned by the Minnesota Supreme Court, the case went to the US

A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195                                                                                    185



**Fig. 1.** The figure shows the increase in number of states with no ceiling on credit card interest rates following the Supreme Court's *Marquette* decision in December 1978 (left axis), as well as the average interest rate ceiling across states (right axis). By 1985, 15 states had no ceiling on credit card interest rates, up from one (New Hampshire) in 1971. States that removed caps during this time period were Arizona (1980), Delaware (1981), Idaho (1983), Illinois (1981), Montana (1981), Nevada (1981), New Jersey (1981), New Mexico (1981), North Dakota (1985), Oregon (1974), South Dakota (1981), Utah (1981), Virginia (1983), and Wisconsin (1981). Source of the data is *The Cost of Personal Borrowing in the United States*, various years.

Supreme Court.[3] The Court ruled that the National Bank Act stipulated that nationally chartered banks could charge the highest allowable rate in their home state, regardless of the interest rate ceiling in the customer's state of residence (Ausubel, 1997). Two years later, the Depository Institutions Deregulation and Monetary Control Act became law, providing state chartered banks with similar protection to "export" interest rates across state boundaries (Furletti, 2004).

From 1980 to 1985 a number of states removed their credit card interest rate ceilings (see Fig. 1; New Hampshire and Oregon had no ceiling during this period). By removing the rate ceilings, these states switch from having a limit on credit card interest rates to having no limit. According to some accounts, states removed interest rate ceilings in an attempt to attract and retain banks, and major banks such as Citibank moved to no-limit states such as South Dakota and Delaware (DeMuth, 1986). However, despite Citibank's high profile move to South Dakota, there was not an immediate migration to no-limit states because of legal restrictions on interstate banking. Many of these restrictions remained in place until the mid-1980s (Kroszner and Strahan, 1999). As a result, there was not an immediate saturation of interstate credit cards marketed from banks in no-limit states to individuals in states with limits. Instead, individuals living in no-limit states were immediately affected, but not individuals residing in states with limits. Knittel and Stango (2003) report that, as of 1984, only 8–9% of customers held out-of-state bank cards.

### 2.3. Effect on credit card availability and use

Following their move to no-limit states, credit card companies significantly increased the marketing of their

cards. Marketing was primarily accomplished via direct mail solicitation. Accounts from the 1980s suggest that credit card companies aggressively and indiscriminately marketed their cards (DeMuth, 1986).[4] Credit scoring technology, while available, was estimated to be used in only 20–30% of consumer credit decisions (Capon, 1982). Zinman (2002) uses *Survey of Consumer Finances* to study the effect of credit card deregulation and shows that credit card ownership significantly increased following a state's removal of credit card interest rate ceilings. In Table 2 we provide additional details on the effect of a state's removal of credit card interest rate ceilings on credit card supply. We first examine data from Knittel and Stango (2003) on state-level Herfindahl-Hirschman Index (HHI) of credit card companies. HHI is lower in states with no ceiling on credit card interest rates, but not statistically significant. Next, we use data from the *Survey of Consumer Finances* to study individual differences across states. By 1983, 72% of individuals living in limit states owned a credit card compared with 77% of individuals living in no-limit states. In addition, the distribution of financing provided by credit cards shifted to include higher interest rates and larger amounts of debt. The findings presented in Zinman (2002) and in Table 2 provide evidence that a state's switch to no limit increased the equilibrium quantity of credit cards and credit card debt in the state. Our empirical design takes advantage of this shock to examine the role of credit card availability on black and white entrepreneurial entry.

### 3. Empirical strategy and data

#### 3.1. Empirical strategy

We hypothesize that access to credit cards is an important determinant of entrepreneurial activity. Our prediction is that the removal of state-level credit card interest rate ceilings following the *Marquette* decision increased entrepreneurship and that the effect was especially pronounced among blacks because of difficulty accessing traditional forms of external finance. We treat the state-level changes to credit card interest rate ceilings as exogenous deregulatory shocks to the availability of credit card financing. We subsequently provide empirical support that the shocks were exogenous with respect to the variables of interest in our study. We focus on transitions into self-employment as a measure of entrepreneurial entry. Accordingly, the main specification is

$$y^*_{imt} = \alpha + \beta_1 rate_{mt} + \beta_2 rate_{mt} * black_{imt} \\ + \delta_m + T_t + trend * \delta_m + \mathbf{X_{imt}}\boldsymbol{\beta} + e_{imt} \quad (1)$$

where $y^*_{imt}$ is the probability of individual $i$ living in market $m$ transitioning from full-time paid employment to full-time self-employment at time $t$. When $y^*_{imt} > 0$, we observe $y_{imt}=1$ indicating that the individual has

---

[3] *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 US 299 (1978).

[4] As one interesting example, an editor's footnote in DeMuth (1986) describes how several of the editors of *Yale Journal on Regulation* received mail solicitation for student-specific credit cards. See also Time (1986).

A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195

**Table 2**

Credit characteristics of states and individuals.

State-level data on Herfindahl-Hirschman Index (HHI) of credit card issuers are from Knittel and Stango (2003) and are available for 33 states in 1983 and 38 states in 1986. Individual-level credit data are from the *Survey of Consumer Finances*. The number of observations varies from 1,900 to 4,103, due to missing observations. APR=annual percentage rate.

| | Sample restriction: no-limit state? | | |
| --- | --- | --- | --- |
| | No | Yes | T-test |
| *State-level credit characteristics* | | | |
| State-level HHI credit card issuers (1983) | 0.23 | 0.19 | 0.53 |
| State-level HHI credit card issuers (1986) | 0.27 | 0.17 | 1.40 |
| *Individual-level credit characteristics* | | | |
| Credit card debt (1983) | 283.58 | 370.35 | −3.13 |
| Last month's credit card balance (1983) | 204.35 | 275.63 | −2.89 |
| APR on credit card (1983) | 17.72 | 18.17 | −2.09 |
| Number of bank-issued credit cards (1983) | 0.72 | 0.77 | −1.32 |

transitioned to self-employment, and when $y^*_{imt} < 0$, the individual has not transitioned. $Rate_{mt}$ is the prevailing ceiling on credit card interest rates in the state. Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year, an approach consistent with Benmelech and Moskowitz, 2010. The rate ceiling for no-limit states is 24% prior to 1981 and 25% in 1981 and after.[5] Fig. 1 shows that, as more states switch to no limit, the average rate ceiling across states increases. We include year effects ($T_t$) to control for macroeconomic fluctuations that affect the employment opportunity set faced by each individual. We include market fixed effects ($\lambda_m$) to control for differences in employment opportunities, local regulations regarding business start-up costs, and other entry barriers across markets. A market is defined at the metropolitan statistical area (MSA)-state level. For example, the boundary of the Philadelphia metro area crosses into two states (Pennsylvania and New Jersey) and so is divided into two mutually exclusive areas. In addition, areas in each state not part of an MSA are grouped into a statewide non-MSA area. To allow for different trends across market areas we include an interaction between a time trend and the market fixed effect $Trend*\delta_m$, an approach that follows Besley and Burgess (2004) and Wolfers (2006). $\mathbf{X}_{imt}$ is a vector of individual characteristics, including a dummy for *black*, and industry dummies.

Throughout all of our specifications the error terms $e_{imt}$ are clustered at the MSA-state level to account for autocorrelation in the data across individuals. This clustering relaxes the assumption of independence of the error terms of individuals that live in close proximity to one another and ensures that the standard errors are not underestimated (Bertrand, Duflo, and Mullainathan, 2007). We are particular interested in the coefficients $\beta_1$ and $\beta_2$. We expect that a state's switch to no limit results in increased probability of transition into self-employment in the

population, with a particularly strong effect for black individuals. That is, we expect both $\beta_1$ and $\beta_2$ to be positive.

To test the role of credit cards as a mechanism that addresses discrimination-based barriers to entry, we categorize states along different measures of discrimination and compare $\beta_2$ across these state types. Specifically, we run Eq. (1) separately for different groups of states and then compare the resulting $\beta_2$ coefficients using $\chi^2$ tests. For each measure of discrimination, we expect that $\beta_2^{high\_discrimination} > \beta_2^{low\_discrimination}$.

### 3.2. Description of data

Data on the credit card interest rate ceiling for each state during our sample period was hand-collected from annual volumes of *The Cost of Personal Borrowing in the United States*. We use *Current Population Survey* data from 1971 to 1990 to establish the link between changes in availability of credit card financing and self-employment transition rates. The CPS is ideal for this analysis because it includes many demographic variables that we use to control for alternative explanations. We restrict our observations to individuals who are white or black, who are between ages 18 and 65, who work full time, and who do not work for the military or on a farm. Consistent with other work in this area (e.g.; Fairlie, 1999), *transition into self-employment* is our dependent variable in all regressions on entrepreneurial entry. Self-employment is commonly used to identify entrepreneurs and is the best variable we have given the nature of the CPS data. For most models, we identify transitions into self-employment by restricting the sample to individuals who worked full time in paid employment in the prior year. The results are robust to including in the risk set workers in both paid employment and unemployment sectors.

We use a number of demographic characteristics from the CPS that previous studies have shown are important predictors of self-employment. These variables include indicators for *black, female, married, home owner, urban, high school graduate,* and *non-metro area* as well as continuous variables for *age* and its square. *Household income* is censored from above so we instead use a dummy to indicate if the household is in the bottom 20th percentile of household income in that year. It is particularly important to control

---

[5] The results are consistent across several robustness checks suggested in Benmelech and Moskowitz 2010. The robustness checks include using a rate ceiling of 25% for no limit states across all years, using a rate ceiling of 30% for no limit states, and using a dummy variable equal to one when the state has no limit and zero otherwise. See Table A1 in the appendix.

A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195

187

**Table 3**
Summary statistics of variables used in analyses; full sample and split sample.

   This table presents summary statistics of variables used in regressions. Data come from the *Current Population Survey* (*CPS*) for years 1971–1990. We restrict the sample to individuals who are white or black, who are between ages 18 and 65, who are employed full time, and who do not work for the military or on a farm. There are 546,612 observations. The variable *transition into self-employment* is constructed by limiting the sample to individuals who worked full time in the paid employment sector in the prior year who then switched into self-employment in the current year. The variable *rate* is the prevailing interest rate ceiling in the state, unless the state is a no-limit state in which case the rate is set equal to the highest rate ceiling across states in that year. *No limit* indicator equals one if the state has no interest rate ceiling and zero otherwise. For the split sample, a limit state is a state that never switches to no limit. A no-limit state is a state that switches to no limit by 1990 (the last year of the dataset). Data for the split sample are from 1977, which is the year prior to the Supreme Court's *Marquette* decision and the first year that the CPS includes information on all 50 states plus Washington, DC.

| | Full sample | | | | Split sample | | |
|---|---|---|---|---|---|---|---|
| | Mean | Standard deviation | Minimum | Maximum | Limit | No limit | *T*-test |
| Transition into self-employment | 0.009 | 0.097 | 0.000 | 1.000 | 0.007 | 0.008 | −0.49 |
| Black | 0.086 | 0.281 | 0.000 | 1.000 | 0.088 | 0.066 | 6.33 |
| Female | 0.373 | 0.484 | 0.000 | 1.000 | 0.348 | 0.339 | 1.58 |
| Homeowner | 0.554 | 0.497 | 0.000 | 1.000 | 0.659 | 0.657 | 0.37 |
| Household income | 29,626 | 28,635 | −10,618 | 999,999 | 18,788 | 19,483 | −5.19 |
| Age | 37.020 | 12.207 | 18.000 | 65.000 | 37.0135 | 36.8777 | 0.85 |
| High school graduate | 0.786 | 0.410 | 0.000 | 1.000 | 0.734 | 0.764 | −5.52 |
| Married | 0.659 | 0.474 | 0.000 | 1.000 | 0.699 | 0.708 | −1.62 |
| Non-metro | 0.221 | 0.415 | 0.000 | 1.000 | 0.295 | 0.149 | 26.34 |
| Unemployed % (percent) | 0.033 | 0.013 | 0.000 | 0.167 | 0.037 | 0.036 | 5.61 |
| Rural % (percent) | 0.023 | 0.041 | 0.000 | 0.286 | 0.037 | 0.045 | −13.88 |
| Rate | 0.196 | 0.030 | 0.100 | 0.250 | | | |
| No limit indicator | 0.120 | 0.325 | 0.000 | 1.000 | | | |

for low-income households given other research that shows changes in credit market competition affect income distribution (Beck, Levine, and Levkov, 2010) and business activity (Garmaise and Moskowitz, 2006). We also construct demographic variables by market for *unemployment rate* and *percent of population living in a rural area*. Self-employment transitions could vary by industry based on different financing needs across industries. For example, according to the Federal Reserve Bank's 1987 *National Survey of Small Business Finance* (NSSBF), the median starting capital in the construction industry was $9,500, whereas the median starting capital in retail trade was $55,200.[6] Hence, 67 industry dummies are included to control for differences in entrepreneurial entry rates across industry. The CPS data include weights, and the main results are robust to the use of these weights. However, consistent with the approach taken in Puri and Robinson (2009), we do not use weights in any of the reported results because our intent is to measure the effect of changes in availability of finance on an individual's decision to enter entrepreneurship.

   Table 3 presents summary statistics and a comparison of variable means between states that removed their credit card interest rate ceiling (*no limit*) during the sample time frame and those that did not (*limit*). The comparison uses data from 1977 as that was the first year in which the CPS provided data from all 50 states and the District of Columbia and because 1977 is the year prior to the *Marquette* decision. Individuals living in no-limit states are less likely to be black, more likely to be high school graduates, more likely to have higher household income, and more likely to live in areas with lower unemployment and a higher percent of population in

rural areas. While there appear to be differences across the two types of states, our analyses rely on within-state effects. In addition, as reported in Section 4, we find no evidence that the percentages of self-employed, black, or black self-employed individuals in a state predict a state's hazard for removal of its credit card interest rate ceiling.

## 4. Results

   This section reports our empirical results. We first provide results from our basic model and then show that the results are robust to alternative specifications. We also break the results out into split samples by various measures of discrimination. Finally, we discuss alternative explanations for our results, and provide further support for our findings.

### 4.1. Results from the basic model

   Results of linear probability regressions are reported in all tables unless otherwise described; coefficients for control variables are suppressed for presentation purposes. Table 4 presents the results of entrepreneurial entry as described in Eq. (1) using *Current Population Survey* data from 1971 to 1990. Each column focuses on a different risk set of individuals. Column 1 investigates the effects of credit card availability on transitions into self-employment at time $t$ from paid employment at time $t-1$. The coefficient on *rate* is 0.0300 and significant at the 5% level. The coefficient on *black*∗*rate* is 0.0362 and significant at the 5% level. Column 2 next investigates the effects of credit card availability on transitions into self-employment at time $t$ from unemployment at time $t-1$. None of the coefficients is significant. Finally, Column 3 investigates the effects of credit card availability on transitions into self-employment at time $t$ from either

---

[6] NSSBF statistics are cited in Hurst and Lusardi (2004). The earliest year for the NSSBF data is 1987.

**Table 4**
Effect of state level credit card interest rate ceilings on entrepreneurial entry.
   This table reports linear probability models of transitions into self-employment on state-level credit card interest rate ceilings, black, and their interaction, using data from the *Current Population Survey* for 1971–1990. In Column 1 the variable transition into self-employment equals one if the individual worked in paid employment in the previous year but switched into self-employment in the current year and zero otherwise. In Column 2 the variable transition into self-employment equals one if the individual was unemployed in the previous year but switched into self-employment in the current year and zero otherwise. In Column 3 the variable transition into self-employment equals one if the individual was in paid employment or if the individual was unemployed in the previous year but switched into self-employment in the current year and zero otherwise. Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year. This implies the rate ceiling varies from 24 for no-limit states prior to 1981 and 25 for no-limit states in 1981 and after. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, non-metro area indicator, local unemployment rate, and percent of local population living in rural areas. Fixed effects for years, 67 industries and 347 metropolitan statistical area (MSA)-state areas are included. Robust standard errors are included in brackets and clustered at the MSA-state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

| | Risk set | | |
|---|---|---|---|
| | Paid employment in prior year (1) | Unemployment in prior year (2) | Paid employment or unemployment in prior year (3) |
| Rate | 0.0300** | −0.117 | 0.0209 |
| | [0.0125] | [0.1446] | [0.0134] |
| Black | −0.0087** | −0.0339 | −0.0098** |
| | [0.0035] | [0.0261] | [0.0038] |
| Black*rate | 0.0362** | 0.0488 | 0.0332* |
| | [0.0177] | [0.1284] | [0.0189] |
| Individual characteristics | Y | Y | Y |
| Industry dummies | Y | Y | Y |
| Year fixed effects (1971–1990) | Y | Y | Y |
| MSA-state fixed effects | Y | Y | Y |
| Trend*MSA-state fixed effects | Y | Y | Y |
| Number of observations | 546,612 | 28,014 | 574,626 |
| *R*-squared | 0.0158 | 0.1692 | 0.0218 |

paid employment or unemployment at time $t-1$. The coefficient on *rate* is not significant, whereas the coefficient on *black*rate* is 0.0332 and significant at the 10% level. The coefficients on *black* are negative across all columns, indicating that black individuals are on average less likely than white individuals to transition into self-employment.
   The effect of credit card deregulation appears to affect employment transitions of individuals in the paid employment sector but not unemployment sector. One reason could be the difference in characteristics of individuals that comprise these different risk sets. As shown in the Appendix, individuals in paid employment differ from individuals in unemployment along a number of dimensions (see Table A2). Hence, in subsequent models we restrict the sample to individuals who worked full time in paid employment in

the prior year, an approach that follows Evans and Jovanovic (1989), Holtz-Eakin, Joulfaian, and Rosen (1994), Fairlie (1999), and others.

### 4.2. Alternative models and specifications

   In Table 5 we investigate the robustness of the results to alternative models. Column 1 presents results of a probit model on the choice to transition into self-employment. The coefficient on *black*rate* is positive and statistically significant. Columns 2 and 3 present results of a multinomial logit model of the choice between staying in the paid employment sector (the base case), transitioning into self-employment and transitioning into unemployment. In Columns 2 and 3, the coefficients in the models are relative to the base case. The coefficient on *black*rate*

**Table 5**
Effect of state-level credit card interest rate ceilings on entrepreneurial entry: alternative models of transition.
   This table reports models of transitions into self-employment on state-level credit card interest rate ceilings, black, and their interaction, using data from the *Current Population Survey* for 1971–1990. The dependent variable *self-employment* equals one if the individual worked in paid employment in the previous year but switched into self-employment in the current year. The dependent variable *unemployment* equals one if the individual worked in paid employment in the previous year but switched into unemployment in the current year. Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year. This implies the rate ceiling varies from 24 for no-limit states prior to 1981 and 25 for no-limit states in 1981 and after. Column 1 presents results of a probit model on the choice to transition into self-employment and includes the earnings difference to control for opportunity cost of the choice. Columns 2 and 3 present results of a multinomial logit model of the choice between staying in a full-time job (the base case), transitioning into self-employment (2) and transitioning into unemployment (3). The coefficients in models (2) and (3) are relative to the base case. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, non-metro area indicator, local unemployment rate and percent of local population living in rural areas. Fixed effects for years, 67 industries and metropolitan statistical area (MSA)-state areas are included. Robust standard errors are included in brackets and clustered at the MSA-state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

| | Probit model | Multinomial logit model | |
|---|---|---|---|
| | Self-employment (1) | Self-employment (2) | Unemployment (3) |
| Rate | 0.2277 | 0.491 | −0.7212 |
| | [0.4868] | [1.2128] | [0.5152] |
| Black | −0.4807** | −1.2361** | 0.2925* |
| | [0.2002] | [0.5445] | [0.1516] |
| Black*rate | 1.9642* | 5.2558* | 1.4423* |
| | [1.0074] | [2.7443] | [0.8060] |
| Individual characteristics | Y | Y | Y |
| Industry dummies | Y | Y | Y |
| Year fixed effects (1971–1990) | Y | Y | Y |
| MSA-state fixed effects | Y | Y | Y |
| Number of observations | 534,538 | 546,612 | 546,612 |
| Pseudo *R*-squared | 0.125 | 0.108 | 0.108 |

is positive and statistically significant in both columns, indicating that black individuals living in a state that raises or eliminates the ceiling on credit card interest rates is more likely to transition into self-employment and also more likely to transition into unemployment.

In Table 6 we present results from several robustness checks. Columns 1 and 2 investigate the sensitivity of the results to different year ranges. In Column 1 the year range is restricted to 1977–1990. The year 1977 was the first in which data on all states were reported, whereas prior to this period the CPS included data from a subset of US states. In Column 2 the year range is restricted to 1977–1985 so as to focus on the years immediately prior and following the *Marquette* decision. The coefficient on *black∗rate* remains positive and significant across these different year ranges.

Columns 3–5 in Table 6 include various additional interaction terms to rule out plausible alternative explanations. Column 3 includes information on state bank branching deregulation. Banking deregulation was contemporaneous to credit card deregulation and so presents a potential confounding effect that could explain the results shown thus far. To address this possibility, we include an indicator for *interstate banking deregulation* and its interaction with *black*. The basic model includes only the interaction between *black* and *rate*, which might also capture unobserved interactions between *rate* and other indicators for low socioeconomic status that are correlated with *black*. Column 4 controls for this possibility by interacting *rate* with other individual characteristics. Column 5 includes interactions between *black* and the industry dummies to control for the possibility that black individuals

**Table 6**
Effect of state-level credit card interest rate ceilings on entrepreneurial entry, various specifications.

This table reports linear probability models of transitions into self-employment on state-level credit card interest rate ceilings, black, and their interaction, using data from the *Current Population Survey* for 1971–1990. The variable transition into self-employment equals one if the individual worked in paid employment in the previous year but switched into self-employment in the current year and zero otherwise. Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year. This implies the rate ceiling varies from 24 for no-limit states prior to 1981 and 25 for no-limit states in 1981 and after. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, non-metro area indicator, local unemployment rate, and percent of local population living in rural areas. Column 1 restricts the sample to 1977–1990. Column 2 restricts the sample to 1977–1985. Column 3 uses the full sample and adds an indicator for interstate bank deregulation and its interaction with *black*. Column 4 uses the full sample and adds additional interactions between individual characteristics and the interest rate ceiling. Column 5 uses the full sample and adds additional interactions between *black* and industry dummies. Column 6 and Column 7 split the sample into low-cost and high-cost industries, respectively. Column 8 and Column 9 split the sample into those states with a low percent of national banks and high percent of national banks, respectively. Fixed effects for years, 67 industries and metropolitan statistical area (MSA)-state areas are included. Robust standard errors are included in brackets and clustered at the MSA-state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

| | Sample restriction | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year > 1976 (1) | Year > 1976 and Year < 1986 (2) | Full sample (3) | Full sample (4) | Full sample (5) | Low-cost industries (6) | High-cost industries (7) | Low percent national banks (8) | High percent national banks (9) |
| Rate | 0.0281 [0.0180] | 0.0185 [0.0193] | 0.0031 [0.0272] | 0.0050 [0.0276] | 0.0302** [0.0125] | 0.0293 [0.0361] | 0.0442** [0.0187] | 0.0242 [0.0255] | 0.0365 [0.0298] |
| Black | −0.0100** [0.0041] | −0.0138*** [0.0046] | −0.0125*** [0.0032] | −0.0089** [0.0035] | −0.0190*** [0.0071] | −0.0177** [0.0072] | −0.0030 [0.0039] | −0.0135*** [0.0050] | −0.0064 [0.0053] |
| Black∗rate | 0.0441** [0.0202] | 0.0726*** [0.0230] | 0.0635*** [0.0166] | 0.0372** [0.0172] | 0.0328* [0.0174] | 0.0862** [0.0362] | 0.0088 [0.0200] | 0.0596** [0.0251] | 0.0282 [0.0263] |
| Individual characteristics | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Industry dummies | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Year fixed effects | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| MSA-state fixed effects | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Trend∗MSA-state fixed effects | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Bank deregulation interaction | – | – | Y | – | – | – | – | – | – |
| Rate∗individual characteristics | – | – | – | Y | – | – | – | – | – |
| Black∗ industry dummies | – | – | – | – | Y | – | – | – | – |
| Number of observations | 458,221 | 309464 | 546,612 | 546,612 | 546,612 | 170,661 | 256,077 | 194,269 | 263,952 |
| R-squared | 0.0160 | 0.0153 | 0.0159 | 0.0159 | 0.0160 | 0.0186 | 0.0176 | 0.0178 | 0.0150 |

could be more likely to work in certain industries, perhaps due to different skills, preferences, or access to start-up capital. The coefficient on *black∗rate* remains positive and significant across these different specifications.

Columns 6 and 7 in Table 6 investigate how *black∗rate* varies by industry capital requirements. We use the NSSBF statistics cited in Hurst and Lusardi (2004) to designate an industry as low cost or high cost. The coefficient on *rate* is positive but not significant in Column 6 and positive and significant in Column 7, but a $\chi^2$ test cannot reject the null hypothesis that the coefficients are the same across the two columns. The coefficient on *black∗rate* is positive and significant in Column 6 and positive but not significant in Column 7. A $\chi^2$ test rejects the null hypothesis that the coefficients are the same across the two Columns at the 10% level. These results suggest that the black entrepreneurial entry increased more in low capital intensive industries than in high capital intensive industries following removal of credit card interest rate ceilings.

Columns 8 and 9 in Table 6 investigate how *black∗rate* varies by state-level bank composition. Under the *Marquette* decision, credit cards offered by nationally chartered banks are subject to the higher of the state-level credit card interest rate ceiling or the ceiling in the nationally chartered bank's home state. We, therefore, expect that the removal of a state's credit card interest rate ceiling has a larger effect in states with fewer nationally chartered banks. Prior to the removal of the ceiling, these states have fewer banks with the potential to offer credit cards at rates above the state's prevailing ceiling. We use Summary of Deposits data from the Federal Deposit Insurance Corporation (FDIC) to identify the share of deposits held by nationally chartered and state-chartered bank branches located within each state in 1980. We categorize a state as having a low percent of nationally chartered banks if its percent of nationally chartered banks is below the national median (results presented in Column 8), and otherwise categorize the state as high (results presented in Column 9). The coefficient on *rate* is positive but not significant in both columns. The coefficient on *black∗rate* is positive and significant at the 5% level in Column 8 and positive but not significant in Column 9. However, a $\chi^2$ test cannot reject the null hypothesis that the coefficients are the same across the two columns.

### 4.3. The role of discrimination

A consistent finding across the results in Tables 4–6 is that black individuals who reside in a state that increases the ceiling on credit card interest rates and who worked in the paid employment sector at $t-1$ were more likely to enter self-employment by time *t*. A likely explanation for the differential effect on black and white entrepreneurs is that black entrepreneurs faced discrimination in traditional lending markets. As a result, black entrepreneurs relied more heavily on credit cards to fund new ventures than did white entrepreneurs (Blanchflower, Levine, and Zimmerman, 2003). To understand the role of discrimination in access to credit, we investigate whether the impact of credit card deregulation differentially affected black

entrepreneurs in states with a history of discrimination. As argued in prior research, variation in institutions and norms in an earlier time period can explain variation across these same areas in later periods (Acemoglu, Johnson, and Robinson, 2001). Thus, we first focus on historical state characteristics by identifying states that allowed slavery at the start of the Civil War (*slave state*). We next focus on more recent state characteristics contemporaneous to the *Marquette* decision. We identify states that were among the last to remove anti-miscegenation laws (*anti-miscegenation law state*). We obtain information on the states that repealed anti-miscegenation laws after the US Supreme Court's 1967 decision in *Loving v. Virginia* from Fryer (2007). We also identify states that did not have fair housing laws (*no fair housing law state*) until the federal Fair Housing Act of 1968 from Collins (2004). Finally, we use the racial bias index reported in Levine, Levkov, and Rubinstein (2008), which measures the difference between actual and predicted interracial marriage rates in 1970, to classify states as above or below the median interracial marriage bias (*interracial marriage bias state*).

All the results presented in Table 7 replicate the model in Table 4, Column 1 with results split by state type across adjacent columns. Column 1 focuses on states that were not slave states immediately prior to the Civil War; the coefficient on *black∗rate* is −0.0125 but not significant. Column 2 focuses on states that were slave states immediately prior to the Civil War; the coefficient on *black∗rate* is 0.1428 and significant at the 1% level. A $\chi^2$ test rejects the null hypothesis that the coefficients on *black∗rate* are the same across two samples at the 1% level. Columns 3 and 4 present results from splitting the sample into states with and without anti-miscegenation laws in 1967; Columns 5 and 6, results from splitting the sample into states with and without fair housing laws in 1968; and Columns 7 and 8, results from splitting the sample into states with low or high interracial bias. In each case, the coefficient on *black∗rate* is larger in magnitude for black individuals residing in states with higher levels of discrimination. The null hypotheses that the coefficients for *black∗rate* are the same across the two samples for the *anti-miscegenation law* state measure can be rejected at the 5% level, for the *no fair housing law* state measure at the 1% level, and for the *interracial marriage bias* state measure at the 10% level. The results in Table 7 indicate that black individuals residing in states with a history of discrimination were more likely to transition into self-employment following an increase in credit card interest rate ceilings than were black individuals in other states.

### 4.4. Additional robustness checks

The validity of our empirical results relies on several assumptions. First, we treat states' elimination of credit card interest rate ceilings as an exogenous shock, conditional on the control variables included in regressions. This is the strongest assumption we make in our analysis and requires additional analysis. The text of the *Marquette* decision does not mention the impact of credit cards on entrepreneurs, and in general we surmise that it is unlikely that states removed interest rate ceilings because

A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195

**Table 7**
Effect of state-level credit card interest rate ceilings on entrepreneurial entry, by state-level discrimination measure.

This table reports split sample results from linear probability models of transitions into self-employment on state level-credit card interest rate ceilings, black, and their interaction, using data from the *Current Population Survey* for 1971–1990. For each set of regressions, the data are split into two mutually exclusive samples: slave state in the year immediately prior to the Civil War (yes or no); anti-miscegenation law not repealed until after the US Supreme Court's 1967 decision in *Loving v. Virginia* (yes or no); no fair housing law until federally mandated by the Fair Housing Act of 1968 (yes or no); racial bias rate, as measured by the interracial marriage rate (low or high). The variable transition into self-employment equals one if the individual worked in paid employment in the previous year but switched into self-employment in the current year and zero otherwise Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year. This implies the rate ceiling varies from 24 for no-limit states prior to 1981 and 25 for no-limit states in 1981 and after. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, non–metro area indicator, local unemployment rate, and percent of local population living in rural areas. Fixed effects for years, 67 industries and 347 metropolitan statistical area (MSA)-state areas are included. Robust standard errors are included in brackets and clustered at the MSA-state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

| | Sample restrictions | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Former slave state? | | Anti-miscegenation law? | | No fair housing law? | | Interracial marriage bias | |
| | No (1) | Yes (2) | No (3) | Yes (4) | No (5) | Yes (6) | Low bias (7) | High bias (8) |
| Rate | 0.0387** | −0.0125 | 0.0352** | 0.0076 | 0.0273 | 0.0365 | 0.0242 | 0.0371 |
| | [0.0173] | [0.0442] | [0.0171] | [0.0514] | [0.0183] | [0.0333] | [0.0178] | [0.0351] |
| Black | 0.0037 | −0.0296*** | 0.0021 | −0.0263*** | 0.0016 | −0.0217*** | −0.0026 | −0.0227*** |
| | [0.0040] | [0.0069] | [0.0039] | [0.0078] | [0.0039] | [0.0057] | [0.0037] | [0.0078] |
| Black∗rate | −0.0183 | 0.1421*** | −0.0098 | 0.1236*** | −0.0083 | 0.0980*** | 0.0104 | 0.1034** |
| | [0.0192] | [0.0367] | [0.0187] | [0.0421] | [0.0192] | [0.0295] | [0.0180] | [0.0414] |
| | | | | | | | | |
| Individual characteristics | Y | Y | Y | Y | Y | Y | Y | Y |
| Industry dummies | Y | Y | Y | Y | Y | Y | Y | Y |
| Year fixed effects | Y | Y | Y | Y | Y | Y | Y | Y |
| MSA-state fixed effects | Y | Y | Y | Y | Y | Y | Y | Y |
| Trend∗MSA-state fixed effects | Y | Y | Y | Y | Y | Y | Y | Y |
| | | | | | | | | |
| Number of observations | 386,543 | 160,069 | 389,214 | 157,398 | 305,875 | 240,737 | 343,985 | 202,627 |
| R-squared | 0.0149 | 0.0187 | 0.0146 | 0.0195 | 0.0149 | 0.0173 | 0.0154 | 0.0181 |

credit-constrained black or white entrepreneurs lobbied the statehouse to change the law. In fact, recent research suggests that, if anything, incumbents are more likely to engage in this type of political activity than potential entrants (Rajan and Zingales, 2003).

To more rigorously test our assumption, we run a series of state-level hazard analyses predicting when a state removes its credit card interest rate ceiling, the results of which are presented in Table 8. To conduct the hazard analysis, we first aggregate CPS data to the state level and then match the data to state-level political economy variables provided by Randall Kroszner and Philip Strahan. Column 1 includes all the demographic variables from the CPS, including *self-employed* and *black*. Column 2 adds an interaction between *black* and *self-employed*. Column 3 adds four variables that Kroszner and Strahan (1999) show affect state level adoption of bank deregulation: *small bank share of assets*, the *difference in the capital-asset ratio* between large and small banks, the *share of small firms* in the state, and an indicator equal to one if there is *single party control of state government*. Only *single party control of state government* appears to weakly predict the timing of a state's removal of its credit card interest rate ceiling. Across the columns, the coefficients on *self-employed*, *black*, and *black∗self-employed* are insignificant, suggesting that, conditional on the control variables, a state's removal of its credit card interest rate ceiling is exogenous to the variables of interest in our analyses. Similar to the finding in Kroszner and Strahan

(1999), credit card deregulation, like bank deregulation, can be partially explained by political economy factors.

Second, we assume that black entrepreneurial entry following an increase in the interest rate ceiling is due to access to credit cards as opposed to some other mechanism. Summary statistics presented in Section 2 show that credit card ownership and activity increased following a state's switch to no limit. To more closely link self-employment to credit card ownership we next use data from the *Survey of Consumer Finance* to examine the effect of *rate* on levels of self-employment and the extent to which this effect varies by credit card ownership. In Table 9, Column 1, the coefficient on *black∗rate* is positive and significant, indicating that black individuals residing in a state that removes its credit card interest rate ceiling were more likely to be self-employed. This result accords with the basic result presented in Table 4. In Columns 2 and 3 we investigate the effect of credit card ownership on self-employment. To do this, we split the sample into individuals who own a credit card in Column 2 and individuals who do not own a credit card in Column 3. The coefficient on *black∗rate* is positive and significant for the subsample that owns a credit card and positive but not significant for the subsample that does not own a credit card. We interpret this set of results as weak evidence that black individuals who own a credit card are more likely to be self-employed if they live in a state with no ceiling on credit card interest rates. While consistent with our argument, the difference in coefficients across Columns 2–3 is

**Table 8**
Hazard models predicting when a state removes its credit card interest rate ceiling.

This table reports hazard models predicting when a state removes its credit card interest rate ceiling. We aggregate Current Population Survey data from 1970 to 1990 to the state level and match to state-level data provided by Randall Kroszner and Philip Strahan. Variables from Kroszner and Strahan are small bank share of assets, the difference in the capital asset ratio between large and small banks, the share of small firms in the state, and an indicator equal to one if there is single party control of the state government. Kroszner and Strahan (1999, Table III, Column 6) show that these variables affect the timing of state bank branching deregulation. Demographic variables and state and year fixed effects are included in all models. Demographic variables include female percent, average age, high school graduation rate, marriage rate, homeownership rate, average household income, average unemployment rate, and percent of population living in rural areas. Robust standard errors are included in brackets and clustered at the state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

|  | (1) | (2) | (3) |
|---|---|---|---|
| Self-employed | −0.7819 | −0.9225 | −0.0919 |
|  | [0.711] | [0.750] | [1.184] |
| Black | −0.0828 | −0.2172 | 0.0797 |
|  | [0.199] | [0.243] | [0.350] |
| Black∗self-employed |  | 3.4596 | 6.0627 |
|  |  | [2.587] | [4.985] |
| Small bank share of assets |  |  | 0.8093 |
|  |  |  | [0.786] |
| Difference in small-large bank capital asset ratio |  |  | 1.5156 |
|  |  |  | [1.741] |
| Share of small firms |  |  | 0.5866 |
|  |  |  | [0.581] |
| Single party control of state government |  |  | −0.0323* |
|  |  |  | [0.019] |
| Demographic variables | Y | Y | Y |
| State and year fixed effects | Y | Y | Y |
| Number of observations | 558 | 558 | 314 |
| R-squared | 0.4 | 0.4 | 0.48 |
| Number of clusters | 51 | 51 | 37 |

**Table 9**
Effect of state-level credit card interest rate ceilings on entrepreneurship levels, using Survey of Consumer Finance (SCF) data.

This table reports the linear probability of self-employment levels on state-level credit card interest rate ceilings, black, and their interaction, using data from SCF for 1977, 1983, and 1986. The sample is split by credit card ownership in columns 2–3. Credit card interest rate ceilings for states with no limit are set equal to the highest rate ceiling across states in that year. This implies the rate ceiling varies from 24 for no-limit states prior to 1981 and 25 for no-limit states in 1981 and after. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, urban area indicator, local unemployment rate, and percent of local population living in rural areas. Fixed effects for years and 36 states are included (the SCF excludes DC, HI, ID, KS, MD, MT, ND, NH, NM, NV, RI, VT, WV, and WY). Robust standard errors are included in brackets and clustered at the state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

|  |  | Owns credit card? | |
|---|---|---|---|
|  | (1) | No (2) | Yes (3) |
| Rate | −0.2146 | 0.007 | −0.2339 |
|  | [0.2478] | [0.4017] | [0.3071] |
| Black | −0.1462*** | −0.0983 | −0.1347*** |
|  | [0.0291] | [0.0592] | [0.0345] |
| Black∗rate | 0.6147*** | 0.3055 | 0.5830*** |
|  | [0.1323] | [0.3015] | [0.1501] |
| Individual characteristics | Y | Y | Y |
| Year fixed effects | Y | Y | Y |
| State fixed effects | Y | Y | Y |
| Number of observations | 4889 | 1203 | 3686 |
| R-squared | 0.029 | 0.049 | 0.034 |

not statistically significant. The low statistical power of the test is not surprising, however, given the low number of observations in the SCF data-set.

Our analysis relies on several additional assumptions. We assume that within-state changes to credit card interest rate ceilings had an immediate effect on the rates offered to individuals with credit cards in that state and that rate ceilings in other states had little to no effect on the rates offered within state. Knittel and Stango (2003) provide evidence supportive of this assumption. The differences-in-differences research design compares changes in states that switch to no limit to changes in states that do not. This assumption means that any effect we find could be attenuated from the actual effect. For example, while a state could have retained an 18% ceiling on credit card interest rates, individuals in that state could, in later periods, be using out-of-state credit cards with much higher interest rates issued by a bank in a no-limit state. Hence, any difference in self-employment or credit card use between such a state and a state that changes from an 18% ceiling to no ceiling is reduced. The direction of this bias works against us finding a result. We also assume that the types of credit cards offered to individuals in no-limit states were similar to the types of credit cards offered to individuals in limit states. This assumption accords well with historical features of the credit card industry. Prior to the 1990s, most cards were offered with a fixed rate not pegged to any market rate, frequent flyer plans and other inducements were uncommon, and the cards were more or less homogenous (Stango, 2000; Knittel and Stango, 2003).

A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195

## 5. Discussion and conclusion

Our paper examines how financial deregulation impacts entrepreneurial activity. We use state-level variation in credit card interest rate ceilings, which were eliminated altogether in several states following the Supreme Court's 1978 *Marquette* decision, to study the differential effect of credit cards on black and white entrepreneurial entry. Prior work has demonstrated that credit card deregulation led to an increase in the probability of owning a credit card (Zinman, 2002), and we provide additional evidence that it leads to an increase in the APR on the card and an increase in the amount of credit card debt. We next examine how the increase in supply of credit cards and credit card debt affected entrepreneurial entry. We use transitions from paid employment into self-employment to measure entrepreneurial entry and show that credit card deregulation increased entrepreneurial entry, especially for black individuals. We also show that the differential effects on black entrepreneurial entry were amplified in states with a history of discrimination.

This work contributes to literature exploring the implications of financial development, regulation, and deregulation. While several studies have examined the impact of US bank deregulation on growth and firm formation (Black and Strahan, 2002; Cetorelli and Strahan, 2006; Bertrand, Schoar, and Thesmar, 2007; Huang, 2008; and Kerr and Nanda, 2009), our paper is the first to explore the impact of credit card deregulation on key economic activities, such as entrepreneurship.

We believe our empirical findings have two major implications. First, credit cards are an important means of entrepreneurial finance and, second, black entrepreneurs faced discrimination-based barriers to entry in the 1970s and 1980s and used credit cards as a mechanism to overcome those barriers. In the first case, our findings, which are based on results from a quasi-natural experiment, provide the first robust evidence we are aware of in favor of anecdotal stories linking credit cards to entrepreneurial entry. For example, film producer Spike Lee and Google cofounders Sergey Brin and Larry Page are among the many entrepreneurs to use credit cards to fund entrepreneurial ventures, but no large-scale empirical studies have assessed the economic significance of this phenomenon (Scott, 2009; McGarvey, 2000). In addition, these findings could be especially important when assessing the impact of the 2008 financial crisis on access to credit for entrepreneurs and small businesses. While lending to small businesses and available credit lines declined precipitously during the crisis (Council of Economic Advisers, 2011, Chapter 7), further analysis is required to assess whether these developments could have disproportionately harmed particular groups of entrepreneurs.

The second implication of our findings—that the differential effect of credit card deregulation on black entrepreneurs could be attributable to discrimination-based barriers to entry—accords well with existing empirical evidence on discrimination-based frictions in lending markets (Fairlie and Robb, 2008; Ravina, 2008; Pope and Sydnor, 2011). As suggested by Blanchflower, Levine, and Zimmerman (2003), black entrepreneurs could be more likely to use credit cards than white entrepreneurs to circumvent discrimination in lending. While our study focuses on a specific time period, 1971–1990, recent research (Ravina, 2008; Cohen-Cole (2011); Pope and Sydnor, 2011) demonstrates that discrimination still

**Table A1**

Effect of state-level credit card interest rate ceilings on entrepreneurial entry with various rate definitions.

This table reports linear probability models of transitions into self-employment on state-level credit card interest rate ceilings, black, and their interaction, using data from the *Current Population Survey* for 1971–1990. The variable *transition into self-employment* equals one if the individual worked in paid employment in the previous year but switched into self-employment in the current year and zero otherwise. In Column 1, credit card interest rate caps for states with no limit are set equal to the highest rate cap across states in all years. This implies the rate cap is 25 for no-limit states in all years. In Column 2, credit card interest rate caps for states with no limit are set equal to 25 across all years. In Column 3, credit card interest rate caps for states with no limit are set equal to 30 across all years. In Column 4, a dummy variable equal to one is used to indicate states with no limit on credit card interest rates and zero otherwise. Individual characteristics include female, age, age squared, high school graduate, married, homeowner, household income, non-metro area indicator, local unemployment rate, and percent of local population living in rural areas. Fixed effects for years, 67 industries and 347 metropolitan statistical area (MSA) areas are included. Robust standard errors are included in brackets and clustered at the MSA-state level. *Significant at 10%; **Significant at 5%; ***Significant at 1%.

| | Original model (1) | Rate for no-limit states=0.25 (2) | Rate for no-limit states=0.30 (3) | Dummy: no limit=1; limit=0 (4) |
|---|---|---|---|---|
| Rate | 0.0300** | 0.0297** | 0.0232*** | 0.0020** |
| | [0.0125] | [0.0119] | [0.0087] | [0.0010] |
| Black | −0.0087** | −0.0089*** | −0.0084*** | −0.0020*** |
| | [0.0035] | [0.0034] | [0.0027] | [0.0005] |
| Black∗rate | 0.0362** | 0.0389*** | 0.0339*** | 0.0048*** |
| | [0.0177] | [0.0165] | [0.0130] | [0.0017] |
| | | | | |
| Individual characteristics | Y | Y | Y | Y |
| Industry dummies | Y | Y | Y | Y |
| Year fixed effects (1971–1990) | Y | Y | Y | Y |
| MSA-state fixed effects | Y | Y | Y | Y |
| Trend∗MSA-state fixed effects | Y | Y | Y | Y |
| | | | | |
| Number of observations | 546,612 | 546,612 | 546,612 | 546,612 |
| $R$-squared | 0.0158 | 0.0158 | 0.0159 | 0.0158 |
| Number of clusters | 347 | 347 | 347 | 347 |

**Table A2**

Comparison of risk sets for individuals transitioning into self-employment.

This table reports selected summary statistics using data from the *Current Population Survey* for 1971–1990 across workers in two sectors: those in the paid employment at $t-1$ and those in unemployment at $t-1$.

| | Status at $t-1$ | | | | |
|---|---|---|---|---|---|
| | Paid employment ($N=562043$) (1) | | Unemployment ($N=28745$) (2) | | T-test for differences (3) |
| | Mean | Standard deviation | Mean | Standard Deviation | T-statistic |
| Black | 0.086 | 0.281 | 0.184 | 0.387 | −56.20 |
| Female | 0.372 | 0.483 | 0.647 | 0.478 | −94.06 |
| Homeowner | 0.508 | 0.498 | 0.463 | 0.499 | 26.95 |
| Household income | 29478 | 29790 | 17672 | 28324 | 65.69 |
| Age | 37.072 | 12.227 | 33.185 | 12.549 | 52.50 |
| High school grad | 0.784 | 0.412 | 0.678 | 0.467 | 42.05 |
| Married | 0.660 | 0.474 | 0.513 | 0.500 | 51.11 |

affects black borrowers. Hence, it could still be the case that credit cards are an important mechanism for overcoming discrimination-based barriers to entry and would suggest that policy makers consider the differential effects that policies could have across a heterogeneous population of entrepreneurs and firms.

## Appendix

This appendix contains tables with additional results described in the body of the manuscript.

### Robustness tests with different rates

Table A1 replicates the results from Table 4, Column 1 using different approaches to account for the interest rate ceiling when a state eliminates ceilings altogether. Column 1 replicates the main results from Table 4. In Column 2 we use a rate ceiling of 25% for no-limit states across all years; in Column 3 we use a rate ceiling of 30% for no-limit states across all years; in Column 4 we use a dummy variable equal to one when the state has no limit and zero otherwise. The coefficient on *black∗rate* is positive and significant at the 5% level or better in all cases.

### Comparison of risk sets

Table A2 presents summary statistics across workers in two sectors: those in paid employment at $t-1$, and those in unemployment at $t-1$. T-tests reveal the groups differ along a number of dimensions. Individuals who are unemployed instead of in paid employment are significantly more likely to be black, female, non-homeowners, younger, and non-high school grads, are less likely to be married, and have lower household income. The difference across these two population groups underscores our focus on the transition from paid employment to self-

employment, instead of focusing on transitions from unemployment to self-employment in results subsequent to those presented in Table 4.

## References

Acemoglu, D., Johnson, S., Robinson, J.A., 2001. The colonial origins of comparative development: an empirical investigation. American Economic Review 91 (5), 1369–1401.

Ausubel, L.M., 1997. Credit card defaults, credit card profits, and bankruptcy. American Bankruptcy Law Journal 71 (Spring), 249–270.

Beck, T., Levine, R., Levkov, A., 2010. Big bad banks: the impact of US branch deregulation on income distribution. Journal of Finance 65 (5), 1637–1667.

Benmelech, E., Moskowitz, T., 2010. The political economy of financial regulation: evidence from US state usury laws in the 19th century. Journal of Finance 65 (3), 1029–1073.

Bertrand, M., Duflo, E., Mullainathan, S., 2007. How much should we trust differences-in-differences estimates? Quarterly Journal of Economics 119 (1), 249–275.

Bertrand, M., Schoar, A., Thesmar, D., 2007. Banking deregulation and industry structure: evidence from the French banking reforms of 1985. Journal of Finance 62 (2), 597–628.

Besley, T., Burgess, R., 2004. Can labor market regulation hinder economic performance? Evidence from India. Quarterly Journal of Economics 113 (1), 91–134.

Black, S.E., Strahan, P.E., 2002. Entrepreneurship and bank credit availability. Journal of Finance 57 (6), 2807–2833.

Blanchflower, D.G., Levine, P.B., Zimmerman, D.J., 2003. Discrimination in the small business credit market. Review of Economics and Statistics 85 (4), 930–943.

Capon, N., 1982. Credit scoring systems: a critical approach. Journal of Marketing 46 (2), 82–91.

Cetorelli, N., Strahan, P.E., 2006. Finance as a barrier to entry: bank competition and industry structure in local US markets. Journal of Finance 61 (1), 437–461.

Cohen-Cole, E., 2011. Credit card redlining. Review of Economics and Statistics 93 (2), 700–713.

Collins, W.J., 2004. The housing market impact of state-level anti-discrimination laws, 1960–1970. Journal of Urban Economics 55, 534–564.

Council of Economic Advisers, 2011. Economic Report of the President. Government Printing Office, Washington, DC.

DeMuth, C.C., 1986. The case against credit card interest rate regulation. Yale Journal on Regulation 3 (1), 201–242.

Evans, D., Jovanovic, B., 1989. An estimated model of entrepreneurial choice under liquidity constraints. Journal of Political Economy 97, 808–827.

Fairlie, R.W., 1999. The absence of the African American-owned business: an analysis of the dynamics of self-employment. Journal of Labor Economics 17 (1), 80–108.

Fairlie, R.W., Robb, A.M., 2008. Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States. MIT Press, Cambridge, MA.

Fazzari, S., Hubbard, G., Peterson, B., 1988. Financing constraints and corporate investment. Brookings Papers on Economic Activity 19, 141–195.

Fryer Jr., R.G., 2007. Guess who's been coming to dinner? Trends in interracial marriage over the 20th century. Journal of Economic Perspectives 21 (2), 71–90.

Furletti, M., 2004. The debate over the National Bank Act and the preemption of state efforts to regulate credit cards. Temple Law Review 77, 425.

Garmaise, M., Moskowitz, T.J., 2006. Bank mergers and crime: the real and social effects of credit market competition. Journal of Finance 61 (2), 495–538.

Gross, D., Souleles, N.S., 2002. Do liquidity constraints and interest rates matter for consumer behavior? Evidence from credit card data. Quarterly Journal of Economics 117 (1), 149–185.

Hellmann, T., Lindsey, L., Puri, M., 2008. Building relationships early: banks in venture capital. Review of Financial Studies 21 (2), 513–541.

Hochberg, Y., Ljungqvist, A., Lu, Y., 2007. Whom you know matters: venture capital networks and investment performance. Journal of Finance 62, 251–301.

Holtz-Eakin, D., Joulfaian, D., Rosen, H., 1994. Entrepreneurial decisions and liquidity constraints. RAND Journal of Economics 23, 334–347.

Hsu, D., 2004. What do entrepreneurs pay for venture capital affiliation? Journal of Finance 59, 1805–1844.

*A.K. Chatterji, R.C. Seamans / Journal of Financial Economics 106 (2012) 182–195*                                                                195

Huang, R., 2008. Evaluating the real effect of bank branching deregulation: comparing contiguous counties across US state borders. Journal of Financial Economics 87, 678–705.

Hurst, E., Lusardi, A., 2004. Liquidity constraints, household wealth, and entrepreneurship. Journal of Political Economy 112 (21), 319–347.

Kaplan, S., Zingales, L., 1997. Do investment-cash flow sensitivities provide useful measure of financing constraints? Quarterly Journal of Economics 112, 169–215.

Kerr, W.R., Nanda., R., 2009. Democratizing entry: banking deregulation, financing constraints, and entrepreneurship. Journal of Financial Economics 94 (1), 124–149.

Kortum, S., Lerner, J., 2000. Assessing the contribution of venture capital to innovation. RAND Journal of Economics 31, 674–692.

Knittel, C.R., Stango, V., 2003. Price ceilings as focal points for tacit collusion: evidence from credit cards. American Economic Review 93 (5), 1703–1729.

Kroszner, R.S., Strahan, P.E., 1999. What drives deregulation? Economics and politics of the relaxation of bank branching restrictions. Quarterly Journal of Economics 114 (4), 1437–1467.

Levine, R., 2005. Finance and growth: theory and evidence. In: Aghion, P., Durlauf, S.N. (Eds.), Handbook of Economic Growth, North Holland, Amsterdam, pp. 865–934.

Levine, R., Levkov, A., Rubinstein, Y., 2008. Racial discrimination and competition. Unpublished working paper 14273. National Bureau of Economic Research, Cambridge, MA.

McGarvey, R., 2000. Search us, says Google. Technology Review (November), ⟨http://www.technologyreview.com/web/12219/⟩.

Morse, A., 2011. Payday lenders: heroes or villains? Journal of Financial Economics 102 (1), 28–44.

Petersen, M.A., Rajan, R.G., 2002. Does distance still matter? The information revolution in small business lending. Journal of Finance 57 (6), 2533–2570.

Pope, D.G., Sydnor, J.R., 2011. What's in a picture? Evidence of discrimination from prosper.com. Journal of Human Resources 46 (1), 53–92.

Puri, M., Robinson, D.T., 2009. The economic psychology of entrepreneurship and family business. Duke University working paper.

Rajan, R.G., Zingales, L., 2003. The great reversals: the politics of financial development in the twentieth century. Journal of Financial Economics 69 (1), 5–50.

Ravina, E., 2008. Love and loans: the effect of beauty and personal characteristics in credit markets. Unpublished working paper. New York University, New York.

Robb, A.M., Fairlie, R.W., Robinson, D.T., 2009. Financial capital injections among new black and white business ventures: evidence from the Kauffman Firm Survey. Unpublished working paper. Duke University, Durham, NC.

Scott, R., 2009. The use of credit card debt by new firms. White paper, Kauffman Foundation, ⟨http://www.kauffman.org/uploadedFiles/kfs_credit_card_debt_report.pdf⟩.

Scott, R., 2010. Plastic capital: credit card debt and new business survival. Unpublished working paper. Monmouth University, West Long Beach, NJ.

Stango, V., 2000. Competition and pricing in the credit card market. Review of Economics and Statistics 82 (3), 499–508.

The Cost of Personal Borrowing in the United States, various years. South Bend, IN: Financial Publishing Company.

Time, 1986. Mounting doubts about debts. Barbara Rudolph, March 31.

Wolfers, J., 2006. Did unilateral divorce raise divorce rates? A reconciliation and new results. American Economic Review 96 (5), 1802–1820.

Zarutskie, R., 2006. Evidence on the effects of bank competition on firm borrowing and investment. Journal of Financial Economics 81, 503–537.

Zinman, J., 2002. Liquidity and consumer behavior: some evidence from the deregulation of consumer interest rate ceilings. Unpublished working paper. Dartmouth College, Hanover, NH.

# Exhibit O

# What Drives Racial Minorities to Use Fintech Lending?

## Celine Yue Fei[*]

First Draft: April 2021.
This Draft: September 2022.

### Abstract

Using linked datasets on Paycheck Protection Program and Yelp restaurants, I document that minority-owned businesses borrow more from fintech lenders than traditional lenders. To understand the mechanisms underlying this phenomenon, I estimate a two-sided matching model between borrowers and lenders. I find that fintech-minority matches generate greater values than other matches, suggesting the taste-based discrimination of Becker (1957). Counterfactual analysis shows the importance of this value channel. Disabling this channel reduces minority borrowers' use of fintech by approximately 70%. Disabling lending relationships and bank branch channels reduces minority borrowers' use of fintech by less than 2%.

*Key Words*: Fintech, Racial Barriers, Minority-owned Businesses, Paycheck Protection Program, Small Business Lending, Bank Lending, Nonbank Lending

[*]Kenan-Flagler Business School, the University of North Carolina at Chapel Hill, Chapel Hill, NC 27599. Email: Celine_Fei@kenan-flagler.unc.edu. I thank Milo Bianchi, Yasser Boualam, Gregory W. Brown, Paul Goldsmith-Pinkham, Yunzhi Hu, Robert Hauswald, Ulrich Hege, Camelia Kuhnen, Camelia Minoiu (discussant), Paige Ouimet, Samuel Rosen (discussant), Alberto Rossi, Elena Simintzi, Jeremy C. Stein, Boris Vallée, Larry Wall, Toni Whited, Nancy Xu, Constantine Yannelis (discussant), Ha-Chin Yi (discussant) and participants at the 2021 NBER Entrepreneurship Working Group, 2022 OCC Research Symposium on Financial Technology, 2022 CEAR-CenFIS Conference on Financial Innovation and 2022 Global AI Finance Research Conference for very helpful comments. Thanks to Xiaohan Cheng for excellent research assistance. I also thank Kenan Institute Small Research Grant for financial support. I alone am responsible for any errors.

Electronic copy available at: https://ssrn.com/abstract=3949148

# 1   Introduction

There is substantial evidence of racial disparities in the small business credit market (Bates (1997)).[1] With the recent advent of fintech lenders (Goldstein, Jiang, and Karolyi (2019), Thakor (2020), Berg, Fuster, and Puri (2021)), there is a debate as to whether they can extend the credit provision for minorities (Fed (2021)). While the literature shows a higher fintech usage among minority than non-minority borrowers (Bartlett, Morse, Stanton, and Wallace (2022)), little evidence exists on the mechanisms underlying these inequalities. Are fintech lenders less discriminating against racial minorities? Other than discrimination, what motivates borrowers of various racial groups to choose one lender over another? And what are the magnitudes of the trade-offs between the different mechanisms? I address these questions in this paper.

Discrimination can be one explanation for racial disparities in borrowers' choice of lenders. One form is taste-based discrimination, which occurs when decision-makers exhibit a disamenity towards minority racial groups (Becker (1957)). Another form is statistical discrimination, which emerges when decision-makers use race as a proxy for unobserved credit risk (Arrow (1973), Phelps (1972)). How can fintech financing affect discrimination? Fewer in-person interactions (Buchak, Matvos, Piskorski, and Seru (2018), Fuster, Plosser, Schnabl, and Vickery (2019)) can reduce taste-based discrimination. However, lending algorithms may introduce statistical discrimination (Kleinberg, Lakkaraju, Leskovec, Ludwig, and Mullainathan (2018), Hoffman, Kahn, and Li (2018)).

However, the endogenous matching of borrowers and lenders also permits the existence of other mechanisms.[2] Disparities in lending relationships and banking access are potential alternative channels. Evidence shows that fintech lenders substitute traditional lenders (Gopal and Schnabl (2022)), especially in areas with fewer bank branches and industries with fewer

---

[1]Other papers include Cavalluzzo and Cavalluzzo (1998), Cavalluzzo et al. (2002), Blanchflower et al. (2003), Cavalluzzo and Wolken (2005), Blanchard et al. (2008), Asiedu et al. (2012), Bates and Robb (2013).

[2]I thank Jeremy Stein for the suggestion of using an endogenous matching framework to study the PPP.

1

Electronic copy available at: https://ssrn.com/abstract=3949148

lending relationships (Erel and Liebersohn (2022)). Minority borrowers may turn to fintech even in the absence of lender discrimination since they are more likely to unbank (Rhine, Greene, and Toussaint-Comeau (2006)). Matching based on profitability can be another mechanism if less profitable borrowers use fintech (Di Maggio and Yao (2021)) and minority borrowers have worse ratings.

Because multiple mechanisms can influence the equilibrium outcome, it is essential to understand the tradeoffs between them. Complementing Erel and Liebersohn (2022), Chernenko and Scharfstein (2022) and Howell et al. (2022), I take a structural approach and directly estimate an empirical matching game model between the borrowers and lenders. The first novel finding of this paper is that fintech and minority pairs generate greater matching value than other types of pairs. This finding suggests that the Becker (1957)'s taste-based discrimination is less severe at fintech than at banks. The extent to which minorities need to be more valuable is smaller at fintech than at banks. The second novel finding is that the channel on higher matching values of fintech-minority pairs is much more relevant than other channels in explaining the higher usage of fintech among minorities.

In this paper, I exploit a unique environment, the Paycheck Protection Program (PPP),[3] where statistical discrimination is minimized to the greatest extent because the government provide full guarantee for all loans. In addition, the PPP context is a good laboratory for three other reasons. First, the Small Business Administration sets the loan terms, which precludes fintech lenders from attracting minority borrowers by offering different loan terms. Second, the Covid-19 shock hit all small businesses almost simultaneously, which controls the impact of the business development stage on fintech adoption. Third, because the Covid-19 crisis is an economy-wide shock, the interest rate is extremely low, and loan can be fully forgiven, borrowers have strong incentives to participate.[4]

---

[3]Paycheck Protection Program is a key component of the Coronavirus Aid, Relief, and Economic Security (CARES) Act enacted on April 3, 2020. See Erel and Liebersohn (2022) and Granja et al. (2022b).

[4]Admittedly, some borrowers may be rejected after submitting a loan application. This concern is mild as the survey results in Bartik et al. (2020) indicate that inability to submit an application accounts for

Electronic copy available at: https://ssrn.com/abstract=3949148

Specifically, I examine the sources of racial disparities in fintech usage using a nation-wide sample of 98,000 restaurants that received PPP loans. My sample offers several advantages by linking to Yelp.com. First, it enables me to construct a proxy for minority ownership using Yelp.com's cuisine category. This resolves the original PPP data limitation that race and ethnicity information is missing for about 80% of the sample. Second, in essence, all restaurants are eligible for the PPP, implying that there is no regulatory variation.[5] Third, as a proxy for operational performance, the Yelp rating provides a method for testing the taste-based discrimination channel.

I begin with reduced-form evidence to document basic patterns. I first demonstrate a positive and statistically significant association between minority ownership and fintech usage. In 2020, Black-, Asian-, and Hispanic-owned restaurants are 9.17%, 8.44%, and 1.22% more likely to use fintech lenders, with the sample mean being 9%. In the OLS regressions, I compare the changes in the coefficients before minority indicators with and without the observable as a control variable to determine how much various observables contribute to the variation in fintech usage. Take the Black group as an example: variations in fintech usage are explained by observed business characteristics, including *Employment Size*, *Franchise*, *Number of Ratings* and *Business Type* for 16.67%, by lending relationships for 0.55%, by the number of bank branches for 0.22%, and by across-city differences for 30.02%.

My finding that business characteristics and location account for approximately 50% of the racial disparities in fintech usage is consistent with the evidence from Chernenko and Scharfstein (2022) (their estimate is around 60%). My analysis differs from theirs in terms of sample and the outcome variable.[6] In addition, my finding that lending relationships and bank branch access only account for a small portion of racial disparities is consistent with

---

two-thirds of loan denials. In contrast, only 8% of loan applications are rejected by the SBA.

[5]In the majority of industries, qualifying requires either meeting the SBA's size requirements for small businesses or having fewer than 500 employees. The Accommodations and Food Services sector eligibility is that each location must have fewer than 500 employees.

[6]Their sample consists of PPP-recipient and non-PPP-recipient restaurants in Florida, whereas I use a national sample of PPP-recipient restaurants. While they study PPP take-up rate, I examine fintech usage.

3

Electronic copy available at: https://ssrn.com/abstract=3949148

the results of Howell et al. (2022). Another finding worth noticing is the negative coefficient before the interaction terms between lending relationships and minority racial dummies. This result indicates that fintech lenders serve as a more prominent alternative to lending relationships for minority borrowers.

Next, I present evidence in support of the taste-based discrimination channel. I find a more negative rating gap between minorities and non-minorities at fintech lenders. This suggests that fintech lenders are less discriminatory towards minority borrowers than traditional lenders, which is consistent with Chernenko and Scharfstein (2022) and Howell et al. (2022). Consider four Massachusetts restaurants that received PPP loans as an illustration. Siam Thai (minority) has a Yelp rating of 4.1 stars, whereas Santa Maria (non-minority) has a rating of 2.6 stars. Both borrowed from the Bank of America. Jing's (minority) rating was 2.3 stars, whereas Eva's (non-minority) rating was 4.2 stars. Both borrowed from PayPal, a fintech lender. In this example, a minority restaurant must be 1.5 stars *higher* than a non-minority restaurant in order to borrow from banks. In comparison, if borrowing from PayPal, the minority-owned restaurant would be 1.9 stars *lower* than the non-minority-owned restaurant. This stark difference of a positive rating gap at banks and a negative rating gap at fintech indicates that fintech lenders counteract a 3.4-star bias against minorities.

In addition, the finding that the racial gap is negative at fintech is consistent with the findings in Griffin, Kruger, and Mahajan (2022) that fintech lenders attract more borrowers who misreport their information. My results supplement theirs by extending from fraudulent borrowers to lower-rated borrowers. Exploring heterogeneity among lenders, I find that the four largest banks in my sample, JPMorgan, Bank of America, Wells Fargo, and U.S. Bank, do *not* have a substantial racial gap. Yet, relatively smaller banks have pronounced racial gaps. This contrast between big and small banks is consistent with the finding of Howell et al. (2022) that automation reduces racial disparities for large banks. Comparing results between years, the evidence of racial disparities is much weaker in 2021 than in 2020, consistent with

4

Electronic copy available at: https://ssrn.com/abstract=3949148

the findings in Fairlie and Fossen (2022) and the increased government effort to make the PPP more effective. Results are robust when restricted to a matched sample, controlling for city×month fixed effects, and controlling for approval date fixed effects.

Two caveats should be considered when interpreting the rating gap result. First, using Yelp ratings as the outcome variable instead of the default is specific to the PPP context. As discussed previously, the SBA provides full guarantee of all PPP loans. In addition, business owners can apply for loan forgiveness, meaning governments pay for the entirety of PPP loans. According to a report published by the SBA on September 11, 2022, more than 95% of the loans are forgiven. Therefore, default is not a major concern in a PPP environment. Instead, it is more important to consider the profitability and importance of the businesses, which have been shown to correlate with ratings (Bernstein and Sheen (2016), Luca (2016)). To address the possibility that ratings are influenced by food price, I include the price range as one of the covariates when constructing the matched sample. To account for differences in ratings across racial groups, I include racial dummies. Interestingly, I find that minority-owned restaurants have lower ratings, whereas fintech users have higher ratings, suggesting that rating-based sorting is not the underlying cause for the disproportionate number of minorities using fintech.

Second, while the government's full guarantee eliminates statistical discrimination based on credit risk (Fairlie and Fossen (2021), Howell, Kuchler, Snitkof, Stroebel, and Wong (2022)), lenders may be exposed to other risks correlated with race. In the earliest stages of the PPP, there was uncertainty about the program's requirements and a lack of bank personnel to process applications. As a result, banks were incentivized to make the most profitable use of their limited resources. In the regression, controlling lending relationships, bank dessert, and business characteristics is crucial. My findings that the racial gap is smaller in fintechs than in banks, conditional on the risks captured by the other channels, suggest taste-based discrimination. In addition, I find that the loan approval date for fintech borrowers in 2020 is later than for non-fintech borrowers. This result supports the argument

Electronic copy available at: https://ssrn.com/abstract=3949148

that minority borrowers initially applied to traditional lenders, were denied, and then turned to fintech lenders.

Nevertheless, reduced-form analysis cannot provide direct information about the matching procedure. Consequently, I adopt a structural approach and quantify the magnitudes of various channels using the Fox (2018) empirical matching game model.[7] The Fox (2018) estimator exploits the *Pairwise Stability* equilibrium condition that lender-borrower pairs observed in the data generate higher values than pairs not in the data. I find a positive coefficient before the interaction term between the fintech lender and minority borrower dummies, indicating that fintech-minority pairs generate higher values than other types of lender-borrower pairs ("fintech-minority value channel"). This is consistent with taste-based discrimination, as the degree to which minority borrowers need to be "more valuable" than non-minority borrowers is lower at fintech than at banks. Coefficients are positive for the lending relationship and bank branch channels, and negative for the geographic distance channel. The rating-based sorting coefficient is positive in 2020 but insignificant in 2021.

Speaking about the tradeoffs between different channels, I find that the lending relationship channel is approximately three times as important as the fintech-minority value channel in the endogenous matching game. The bank branch channel is roughly as important as the fintech-minority value channel. However, the relevance in the matching game may differ from the relevance in racial disparities in fintech usage. The counterfactual analysis reveals that the fintech-minority value channel has a remarkable and unique role in explaining racial disparities in lender selection. Shutting down this channel reduces minority borrowers' usage of fintech by approximately 70%. On the contrary, shutting down lending relationship and bank branch channels only lowers the minority borrowers' fintech usage by less than 2%. In this sense, my structural model can reconcile seemingly contradicting perspectives of lending

---

[7]I employ the Fox (2018) estimator instead of other estimators for the matching game because it does not require data on transferred utility despite the matching game model considering transferred utility between borrowers and lenders. Schwert (2018) applies the Fox (2018) estimator to the borrower-lender endogenous matching without addressing the value of fintech lenders to minority borrowers.

6

Electronic copy available at: https://ssrn.com/abstract=3949148

relationships in the PPP.[8]

Several contemporaneous papers present results that are consistent with mine. Erel and Liebersohn (2022) show that fintech lenders issued more PPP loans in ZIP codes with fewer bank branches and a greater proportion of minority households, as well as in industries with fewer banking relationships. Fairlie and Fossen (2022) find that minority-populated areas receive fewer PPP loans. In comparison to these papers, I find that, after controlling for lending relationships, bank branches, and geographic variation, fintech lenders lend disproportionately to minority-owned businesses. My paper also complements Chernenko and Scharfstein (2022), Howell, Kuchler, Snitkof, Stroebel, and Wong (2022), and Griffin, Kruger, and Mahajan (2022) by providing novel evidence that fintech lenders extend credits to lower-rated minority restaurants. Moreover, I quantify the tradeoffs between various channels in the endogenous borrower-lender matching.

More broadly, my findings contribute to the emerging literature on fintech lending in small business loans, in particular, on the financial inclusion role of fintech lenders (Jagtiani and Lemieux (2018)), the relationship with traditional lenders (Cumming, Farag, Johan, and McGowan (2021), Gopal and Schnabl (2022), Beaumont, Tang, and Vansteenberghe (2021), Donaldson, Piacentino, and Thakor (2021)), and credit supply of online lenders (Ben-David, Johnson, and Stulz (2021)). It also relates to papers on racial biases in the fintech lending process (Bartlett, Morse, Stanton, and Wallace (2022), D'Acunto, Ghosh, Jain, and Rossi (2020), Fuster, Goldsmith-Pinkham, Ramadorai, and Walther (2022), Dobbie, Liberman, Paravisini, and Pathania (2021)). My paper adds to the literature by providing novel evidence on the substantial additional value of fintech lending for minority racial groups.

---

[8]Li and Strahan (2021), Duchin et al. (2022), Balyuk et al. (2020b) and Erel and Liebersohn (2022) show lending relationships are important in PPP while Chernenko and Scharfstein (2022) and Howell et al. (2022) show lending relationships merely explain racial disparities in PPP.

7

Electronic copy available at: https://ssrn.com/abstract=3949148

# 2   Conceptual Framework

This section discusses the various channels that can contribute to racial disparities in fintech usage. I begin by developing a simple game theory model with transferable utility, à la Azevedo and Hatfield (2018), to differentiate between the *sorting* and *taste-based discrimination* channels. The primary objective of the toy model is to demonstrate how to use observables to test for the existence of the empirically difficult-to-measure racial bias in the lender's taste. I also briefly discuss how three other channels can result in more minority borrowers using fintech lenders: prior lending relationships (Li and Strahan (2021); Duchin et al. (2022)), the bank desert (Erel and Liebersohn (2022), Wang and Zhang (2020)), and the geographic location (Granja et al. (2022b)). Due to this paper's length and empirical nature, the model does not include these three easily-integrated channels.

**Model Setup.** In the economy, there is a $M^f$ mass of fintech lenders, a $M^b$ mass of banks, a $M^m$ mass of minority borrowers, and a $M^n$ mass of non-minority borrowers. Consistent with the empirical patterns presented in Figure 1, I assume that the ratings of minority and non-minority borrowers follow the normal distributions, $\gamma_i^m \sim N(\mu^m, \sigma^m)$ and $\gamma_i^n \sim N(\mu^n, \sigma^n)$, respectively.

[INSERT Figure 1 AROUND HERE]

**Payoff Function.** The payoff of a match between borrower $i$ and lender $j$, $p_{i,j}(\gamma_i, \theta_{i,j})$, is determined by the borrower's rating $\gamma_i$ and a lender preference parameter $\theta_{i,j}$.[9] The parameter $\theta_{i,j}$ may be race-neutral or race-dependent, representing the taste-based discrimination channel. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i)$ for borrowers who have been paired with traditional lenders. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta_{i,j}, \gamma_i)$ for borrowers paired with fintech lenders, where $h(\theta_{i,j}, \gamma_i)$

---

[9]Since the borrower's rating is an empirically observable variable correlated with restaurant quality, I select it as the second parameter in the payoff function. If data is available, we can examine the model's key prediction using alternative quality measures.

8

Electronic copy available at: https://ssrn.com/abstract=3949148

reflects the difference between fintech and bank preferences. I include a $\theta_{i,j}$-dependent function only for fintech lenders for the sake of simplification. As the model's most important prediction is on a relative scale, it is equal to including a function for both banks and fintech lenders with a different $\theta_{i,j}$ (as shown in the Internet Appendix D).

**Functional Form Assumptions.** $g'(\gamma_i) > 0$, indicating that higher-rated borrowers create a higher payoff. $\frac{\partial h(\theta_{i,j}, \gamma_i)}{\partial \gamma_i} > 0$ because higher-rated borrowers are empirically observed to be more likely to use fintech lenders.[10] $\frac{\partial h(\theta_{i,j}, \gamma_i)}{\partial \theta_{i,j} \partial \gamma_i} > 0$, reflecting that a greater preference (less disfavor, higher $\theta$) from the lender indicates more marginal gains.

**Matching Game.** Without loss of generality, I study a 1-lender-m-borrower matching game.[11] The borrower $i$ picks a lender $j$ and offers a transferred utility (price). If the lender $j$ accepts the borrower's application, a match $(i,j)$ occurs. The lender receives the transferred utility, and the borrower receives the total payoff minus the transferred utility. If the lender $j$ rejects the borrower's application, there is no match. The borrower $i$ may apply to a different lender $j$ or renegotiate the transferred utility to lender $j$. If no lender is able to accept borrower $i$ for any utility transfer that leaves the borrower with a positive return, borrower $i$ is unmatched in equilibrium.

**Equilibrium.** In a competitive equilibrium, pairwise stability states that any deviation from either the borrower side or the lender side cannot achieve a higher payoff. The transferred utilities (prices) clear the market such that for all matched pairs,

$$p_{i,j}\left(\gamma_i, \theta_{i,j}\right) \geq p_{i,j'}\left(\gamma_i, \theta_{i,j'}\right) \text{ for all } j' \neq j \text{ and } p_{i,j}\left(\gamma_i, \theta_{i,j}\right) \geq p_{i',j}\left(\gamma_{i'}, \theta_{i',j}\right) \text{ for } i' \in I \backslash I_j^* \quad (1)$$

Where $I$ is the entire borrower set, and $I_j^*$ is the optimal choice set of lender $j$.

---

[10] The economic explanation for why higher-rated borrowers are more likely to utilize fintech lenders may be that they are more tech-savvy.

[11] There are few instances in which a PPP borrower gained multiple loans. Less than two percent of the restaurants appear to be related to multiple loans, which are excluded from the final sample.

Electronic copy available at: https://ssrn.com/abstract=3949148

## 2.1 Sorting

In the first case, I examine the equilibrium in which the payoff function is race-neutral. Moreover, I assume $\theta_{i,j}$ is the same for all lenders. In this case, we have a unique race-neutral equilibrium. Those borrowers with ratings above the threshold $\underline{\gamma_f}$ are matched with fintech lenders, while those with ratings between $\underline{\gamma_b}$ and $\underline{\gamma_f}$ are matched with banks. The matching threshold $\underline{\gamma_b}$ and $\underline{\gamma_f}$ are determined by the following equations,

$$M^m \int_{\underline{\gamma_f}}^{\infty} f(x, \mu^m, \sigma^m)dx + M^n \int_{\underline{\gamma_f}}^{\infty} f(x, \mu^n, \sigma^n)dx = M^f \tag{2}$$

$$M^m \int_{\underline{\gamma_b}}^{\gamma_f} f(x, \mu^m, \sigma^m)dx + M^n \int_{\underline{\gamma_b}}^{\gamma_f} f(x, \mu^n, \sigma^n)dx = M^b \tag{3}$$

Where $f(\mu^m, \sigma^m)$ and $f(\mu^n, \sigma^n)$ are the density functions of the rating distribution for the minority and non-minority borrowers respectively.

Proofs in the Internet Appendix D.

While the PPP's full government guarantee precludes statistical discrimination, sorting can be a channel that transforms the disparity in rating distribution between minority and non-minority groups into unequal fintech usage in equilibrium. Suppose fintech lenders are matched with higher-rated restaurants as in Equation 2 and Equation 3. Moreover, assuming that, on average, minority borrowers have higher ratings (i.e., $\mu^m > \mu^n$). A greater proportion of minority borrowers would use fintech lenders. Notably, compared to discrimination based on taste, the rating gap between minorities and non-minorities is identical for fintech and bank customers if we simply consider the sorting channel.

## 2.2 Taste-Based Discrimination

In the second case, the payoff function is race-biased. Directly measuring discrimination based on taste is difficult. Becker (1957) presents a framework for testing the existence of

10

Electronic copy available at: https://ssrn.com/abstract=3949148

discrimination based on taste using equilibrium outcome variables that researchers may observe in the real world. Discrimination is when members of a minority are treated differently (less favorably) than members of a majority group with otherwise identical characteristics. Lenders hold a "taste for discrimination" if they have a disamenity value to lend to minority borrowers. Hence, minority borrowers may have to "compensate" lenders by being more valuable at a given interest rate or, equivalently, by accepting a lower interest rate for identical value. Because interest rate is fixed in PPP, so I focus on the former henceforth.

Like the benchmark case, the additional utility for fintech results in a higher matching threshold for fintech lenders than for banks. Unlike the benchmark case, the equilibrium is race-asymmetric in the matching thresholds of ratings. If minority borrowers feel less discriminated against at fintechs (and have a higher utility gain from fintechs, $\theta^m > \theta^n$), the additional value to compensate lender's dislike is lower at fintechs than at banks for the marginal minority borrower. Proposition 1 states this result.

**Proposition 1.** In the case where the payoff function is race dependent, the minority-non-minority rating gap at the marginal borrower is more *negative* for fintech if minority borrowers have a *higher* additional utility gain from fintech.

$$(\underline{\gamma_{mf}} - \underline{\gamma_{nf}}) - (\underline{\gamma_{mb}} - \underline{\gamma_{nb}}) < 0 \; iff \; \theta^m > \theta^n$$

$\square$

Proofs in the Internet Appendix D.

Under a scenario with limited loans such as the PPP, a rating gap at the marginal borrower indicates a rating gap of the average borrower. Corollary 1 presents this result.

**Corollary 1.**

Furthermore, suppose that the underlying distribution is the same for minority and non-minority borrowers, i.e., $\mu^m = \mu^n = \mu$ and $\sigma^m = \sigma^n = \sigma$, then the minority-non-minority rating gap between fintech lenders and banks in the conditional expectation of the rating lev-

11

Electronic copy available at: https://ssrn.com/abstract=3949148

els equals $\sigma \left( G \left( \frac{\gamma_{mf}-\mu}{\sigma} \right) - G \left( \frac{\gamma_{nf}-\mu}{\sigma} \right) \right)$, where $G(x) = \frac{\varphi(x)}{\Phi(-x)} + \frac{\varphi(x)-\varphi(\widetilde{\gamma})}{\Phi(x)-\Phi(\widetilde{\gamma})}$, with $\widetilde{\gamma} = \frac{\gamma_{mb}-\mu}{\sigma}$ and $\varphi(\bullet)$ and $\Phi(\bullet)$ as the density and cumulative distribution functions of the standard normal distribution respectively. □

Proofs in the Internet Appendix D.

To sum up, an important empirical implication of my model is that I can test whether the payoff functions are race-dependent using the difference in the minority-non-minority rating gap between fintech lenders and banks. This is analogous to the productivity gap between minority and non-minority workers in Becker (1957).

## 2.3   Lending Relationships

Racial disparities in lending relationships can result in more minority borrowers using fintech lenders through two mechanisms. First, borrowers without prior lending relationships may face competition from borrowers with lending relationships from the banking system and turn to fintech lenders as an alternative option. Minority-owned businesses are more likely to be unbanked than majority-owned businesses (Rhine et al. (2006)). Additionally, as shown in Table B5 and Table B6 in the Internet Appendix, minority-owned restaurants are less likely to have previous lending relationships. Second, the value of lending relationships may be contingent on race. Consistent with a narrative of discrimination, minority borrowers are likely to benefit more from lending relationships. For instance, through interactions and communications, lenders may have a less taste-based bias against minority borrowers.

In a broader context, beyond the PPP, fintech relies less on banking relationships due to its remarkable ability to deal with hard information (Balyuk et al. (2020a); Mills and Dang (2021)).

## 2.4   Bank Deserts

The importance of bank branch density is well-established. Firm productivity (Butler

12

Electronic copy available at: https://ssrn.com/abstract=3949148

and Cornaggia (2011)) and household wealth accumulation (Célerier and Matray (2019)) are significantly affected by the user's proximity to a bank desert. In regions where banks do not have branches, access to credit is even more restricted (Cortés et al. (2020)). Since neighborhoods with a large minority population are likely to have fewer bank branches, they may rely on fintech to access financial services. In fact, Erel and Liebersohn (2022)find that in PPP, fintech lenders reach a broader borrower base while banks' branch networks remain constrained.

## 2.5   Borrower Locations

Access to credit is drastically different for borrowers in different geographic locations. In particular, Granja et al. (2022b) shows that, rather than assisting borrowers with the greatest needs, banks tend to target regions less negatively impacted by the pandemic in the PPP. In response, borrowers in regions underserved by the traditional banking system turn to fintech lenders (Erel and Liebersohn (2022)).

# 3   Data

## 3.1   Sample Design

The analysis in this paper relies on a linked database of loan-level information on restaurants in the Paycheck Protection Program (PPP) and the full history of customer ratings downloaded from Yelp.com. For the PPP dataset, I use the loan-level data released on March 2, 2021 (through sba.gov, FOIA), which contains detailed and comprehensive loan-level information for all sizes. The completeness of the 2021-March release of the PPP data enables me to address questions that have not been answered in early studies.[12] This completeness

---

[12]Earlier studies on the Paycheck Protection Program (Erel and Liebersohn (2022), Granja et al. (2022b), Li and Strahan (2021)) use the 2020 release of the data that contains borrower names only for loans above $150,000. This paper uses the 2021 release that contains borrower-level identifiable information for loans

Electronic copy available at: https://ssrn.com/abstract=3949148

is crucial for my study because minority-owned businesses tend to be smaller (Fairlie and Robb (2008))) and received smaller loans (Atkins et al. (2022), Fairlie and Fossen (2021)). The entire PPP dataset contains around 6.46 million loans processed by 5,593 lenders. I restrict the sample to the *first-draw* recipients in 2020 and 2021, which refers to *first-time* loans applied for by borrowers in 2020 and 2021. For borrowers, I use the information on the business name, address, state, zip code, industry, business entity type, reported employment size, and franchise name for borrowers. For lenders, I use the information on the formal organization name, address, and zip code.

Businesses in the Food Services and Drinking Places sector (NAICS code 722) gained around 0.37 million loans (5.77%). I use both code-based searching algorithms and manual corrections for the procedure to link PPP loans to Yelp restaurants. Details in the Online Appendix C3. I exclude borrowers in Puerto Rico, Northern Mariana Islands, Guam, U.S. Virgin Islands. 101,803 loans are matched to a *meaningful restaurant-type* link on yelp.com, which accounts for 28.01% of the whole Food Services and Drinking Places sector loans.[13] The matching rate is reasonable given the strict criteria that require matching both addresses and names. By matching the PPP loan sample to a meaningful yelp link, I restrict it to a sample that is likely not fraud, as discussed in Griffin et al. (2022). Online Appendix C3 also compares the linked and unlinked samples, which shows a high similarity between the two for fintech usage and racial distributions in most cases. Admittedly, the sample under-represent businesses of sole proprietorship and African Americans. After matching to Yelp, For the purpose of this study, I further restrict to a sample consisting of 98,825 restaurant PPP recipients that are *active* from April 2018 to March 2021.

---

both above and below $150,000, which allows for linking PPP loans and Yelp ratings for the full sample.

[13]The sample unlinked to Yelp consists of the following parts: a non-restaurant Yelp link, a non-business or unclear address, a large difference in the name of the restaurant and loan applicant entity, and no yelp websites.

Electronic copy available at: https://ssrn.com/abstract=3949148

## 3.2   Variable Construction

First and foremost, my analysis requires the distinction between traditional and fintech lenders, for which I mainly use the *Fintech Company List* published on the SBA official website. I supplement the official list with information from the SBA state subsidiary websites and major news sources. I identify 15 fintech lenders; the full list is in Table B2 in the Appendix.[14] In the Internet Appendix Table B4, I present the comparison between my sample and the Erel and Liebersohn (2022) sample, which further confirms the reliability of my classification. Noticeably, I do not classify all non-banks as fintech lenders because SBA lending programs feature the participation of many traditional non-bank lenders to provide funding to less bank-connected small businesses. These non-banks are similar to banks in their lending technology.[15] Details on how I identify fintech lenders are in the Online Appendix C1.

Second, it is important to identify minority-owned businesses among PPP loan recipients for a representative sample. One limitation of the original PPP data is that the information on the race and ethnicity of loan recipients is missing for almost 80% of the sample and may have selection biases in the sample containing the demographic information. To address this limitation, I use the cuisine type of the restaurant as a proxy for the race and ethnicity information of the owner. I classify restaurants into four groups: African American-, Asian- (including Pacific Islander), Hispanic-, and White-owned.[16] I cross-validate my measure of minority-owned businesses by comparing the Yelp minority dummies and the PPP minority dummies. Results are reported in Appendix Table B3. The proxy provides a reliable

---

[14]Table B2 also reports the percentage of loans included in my final sample linked with Yelp ratings, which indicates that my linked sample is evenly distributed across each fintech lender.

[15]Examples include CRF Small Business Loan Company, LLC and Hana Small Business Lending, Inc. Other papers on small business lending (Gopal and Schnabl (2022)) and the mortgage credit market (Buchak et al. (2018), Fuster et al. (2019)) also make the distinction between fintech companies and other non-banks.

[16]Some examples are African, Somali, and Soul Food as African American; Asian Fusion, Japanese, Chinese, and Pakistani as Asian; Acai Bowls, Caribbean, and Mexican as Hispanic.

Electronic copy available at: https://ssrn.com/abstract=3949148

conservative measure in the sense that the false positive rate is reasonably low.[17]

Third, I use the customer ratings from Yelp.com to gauge the restaurant's quality. Yelp ratings are shown to be related to revenue increase (Luca (2016)) and are used as a proxy for operational performance (Bernstein and Sheen (2016)), restaurant sales (Anderson and Magruder (2012)) and visits (Davis et al. (2019)). Importantly, Raval (2020) shows that fake reviews are less likely on Yelp compared to Google. I collect the full history of the ratings and construct a restaurant-month panel by taking the average of ratings in each month for each restaurant. A rating panel allows me to control time trends in ratings by including monthly fixed effects.

Lastly, I also merge other datasets to enrich the scope of my analysis, including additional restaurant-level information from Yelp.com, 7(a) and 504 program loan-level data from 1990 to 2019, and HUD USPS zip code crosswalk files. In addition, I classify lenders into banks, Certified Community Development Financial Institutions (CDFIs) loan funds/Certified Development Companies (CDCs), and other non-banks using information from the Federal Financial Institutions Examination Council (FFIEC). Details on the lender classification and steps to match with FFIEC are in Online Appendix C2.

In sum, details on variable definitions and data sources can be found in Table B1 in the Appendix.

## 3.3   Matched Sample

I use a matched sample to address the concern that borrower characteristics can simultaneously affect fintech usage and the likelihood of minority ownership. I construct the matched sample by matching minority borrowers with non-minority borrowers in the same

---

[17]The concurrent literature addresses the data incompleteness of demographic information by several ways including conducting zip-code/county level analysis (Erel and Liebersohn (2022), Fairlie and Fossen (2021)), restricting to the subset of PPP recipients with demographic information (Atkins et al. (2022)), estimating the racial group based on borrower name and location (Howell et al. (2022))), and linking the PPP data with restaurant licenses and voter registrations in Florida (Chernenko and Scharfstein (2022)).

Electronic copy available at: https://ssrn.com/abstract=3949148

state, business type group (aggregated), food price range, and similar size with a difference of at most five employees. When comparing the full and matched samples, I observe patterns consistent with minority-owned businesses being in a disadvantaged location and business status. Matching based on observables can account for any non-linear dependence of the outcome variable on the matching variables, thereby avoiding functional form restrictions imposed by a linear regression model.

## 3.4  Summary Statistics

I mainly use two datasets: one restaurant-level cross-sectional dataset and one restaurant-month-level panel dataset on customer ratings. Our final sample consists of 98,825 restaurant PPP recipients active from April 2018 to March 2021. The loan and lender characteristics are observed at the PPP loan origination time; the restaurant characteristics are from Yelp.com and are observed at the time of data collection (March 2021 to July 2021).

[INSERT Table 1 AROUND HERE]

Table 1 shows the summary statistics of key variables in the cross-sectional dataset for the borrowers in the 2020 (Panel A) and 2021 (Panel B) waves for both the full and the matched samples. The recipients in the 2021 wave appear to differ from the recipients in the 2020 wave. For example, 32% of the 2020 recipients, as compared with 38% of the 2021 recipients, are minorities; 9% in 2020 and 17% in 2021 use fintech lenders. The average borrower in 2020 (2021) has 18.62 (9.39) employees and has a total number of 52.08 (33.01) customer reviews from April 2018 to March 2021. Overall, the 2021 wave tends to contain a larger part of financially disadvantaged borrowers than the 2020 sample.

Table 1 Panel C shows the summary statistics of rating stars in the panel dataset for the borrowers in the 2020 and 2021 waves. The ratings are pretty similar for the full and matched sample. However, the ratings are higher for the 2021 recipients than for 2020 recipients.

17

Electronic copy available at: https://ssrn.com/abstract=3949148

# 4   Regression Analysis

## 4.1   Fintech Lender and Minority Borrower Matching

I start by graphically illustrating the usage rate of fintech versus traditional lenders in the PPP program for minority- and non-minority-owned restaurants.

[INSERT Figure 2 AROUND HERE]

Figure 2 shows the daily dollar value of loans processed by non-fintech lenders (Panel A) and fintech lenders (Panel B) for minority- and non-minority-owned restaurants in the 2020 wave. Before the entry of major fintech lenders on April 10, 2020, there was an enormous gap between the dollar value of loans disbursed to minority- and non-minority-owned businesses. For example, on the first day of the program, the dollar value of loans disbursed by traditional lenders to minority-owned businesses is only 7.54% of the dollar value disbursed to the non-minority-owned businesses. In contrast, on the first day of entry, fintech lenders processed more than three million dollars of loans for minority borrowers, which amounts to about 35.96% of the dollar value disbursed to non-minority borrowers. Traditional lenders covered a relatively larger share of minority-owned businesses in the second tranche that started on April 27, 2020 than in the first tranche. However, the gap between fintech and traditional lenders is still prominent. The minority-to-non-minority ratio, measured by dollar value, is 53.38% for conventional lenders and 75.27% for fintech lenders. These results are consistent with findings using the early data release of the subsample of loans above $150,000 (Fairlie and Fossen (2021)).

Online Appendix A Figure A1 provides the figures for the 2021 wave. We still observe a smaller minority-to-non-minority ratio for fintech lenders. In the Online Appendix A Figure A2, I further decompose the minority-owned businesses into African American-, Asian-, and Hispanic-owned businesses and plot the daily disbursed dollar value by fintech and non-

18

Electronic copy available at: https://ssrn.com/abstract=3949148

fintech lenders. The patterns look analogical across the three racial groups, especially after the entry of major fintech lenders, suggesting systematic patterns for higher fintech usage for all minority racial groups.

[INSERT Figure 3 AROUND HERE]

Figure 3 plots the state-level minority shares separately for fintech and non-fintech loans. Panels A and B plot the minority share for fintech loans and Panels C and D for non-fintech loans in 2020 and 2021, respectively. The cross-state variation in the minority shares for non-fintech loans is moderate. In contrast, we observe a larger dispersion across states in minority shares for fintech loans. These results suggest that fintech and non-fintech lenders play different roles in providing credit to minority-owned businesses.

## 4.2   Fintech Lender and Minority Borrower Matching

In this section, I investigate the matching between fintech lenders and racial minority borrowers in a regression framework. I estimate the following specification:

$$I(\text{Fintech})_{i,c} = \beta I(\text{Minority Group})_i + \gamma X_i + \mu_c + \varepsilon_{i,c}$$

where the main dependent variable is a dummy variable equal to one if the restaurant owner $i$ in city $c$ borrows from a fintech lender in the PPP program and 0 otherwise. The main independent variables, *African American*, *Asian*, and *Hispanic*, are dummy variables equal to one if the restaurant owner $i$ is African American, Asian, or Hispanic respectively, and 0 otherwise. The omitted category is other racial and ethnic groups, mainly composed of White Americans. Standard errors are clustered at the city level.

To the greatest extent given the available data, I include the following control variables: *Employment* for business size, *I(Franchise)* for whether the business is a franchised brand,

19

Electronic copy available at: https://ssrn.com/abstract=3949148

*N. Reviews* for the number of Yelp reviews of the restaurant, and *Business Type* dummies for different company organizational formats such as Corporation, L.L.C., Sole Proprietorship, and Self-Employment (details in Appendix-Table B1).

[INSERT Table 2 AROUND HERE]

Table 2 reports the results. Columns (1) and (2) present the results of the 2020 PPP for the full sample. Column (1) shows that African American-, Asian-, and Hispanic-owned restaurants have a 9.17%, 8.44%, and 1.22%, respectively, higher likelihood of using a fintech lender in the PPP. The economic magnitude is large compared to the sample mean of fintech usage (9%). Coefficients are statistically significant at the 1% level for all groups. In column (2), I control for the business characteristics described above that may partially explain the positive association between minority ownership and fintech usage. For example, employment size is shown to be an important factor in banks' decisions on borrower priority in the PPP (Balyuk et al. (2020b), Cororaton and Rosen (2021), Humphries et al. (2020)) and is very likely to be correlated with minority ownerships. Indeed, I find that one person increase in employment is associated with a 7 percent decrease in fintech usage. After controlling for variables on business characteristics, the coefficients before African American, Asian, and Hispanic dummies decrease by around 12.98%, 12.32%, and 28.69%, respectively.

Columns (3) and (4) show the results for the matched sample. The positive association between the minority dummies and the fintech dummy remains statistically significant at 1%. The economic magnitude decreases slightly, implying that the full sample results overestimate the racial disparities due to the non-linear dependence of the outcome variable on the matching covariates. Overall, all the patterns remain the same for the matched sample. Business characteristics explain around 16.66%, 14.97%, and 10.34% for African American-, Asian-, and Hispanic-owned restaurants respectively.

Columns (5) and (6) present the results of the 2021 wave for the full sample. Likewise,

20

Electronic copy available at: https://ssrn.com/abstract=3949148

we observe that minority-owned businesses have a higher likelihood of using fintech lenders. The economic magnitude is larger compared to the 2020 wave but is if compared to the sample mean of fintech usage (17%). Results are robust when using the matched sample, as reported in columns (7) and (8). Take results using the matched sample as an example, business characteristics explain around 24.25%, 17.86%, and 10.55% for African American-, Asian-, and Hispanic-owned restaurants respectively.

Taken together, Table 2 shows that minority-owned businesses are more likely to use fintech lenders in the PPP, even after controlling for borrower characteristics including employment size, franchise, number of Yelp reviews, and business type. Taking the average of the three minority racial groups, borrower business characteristics explain around 14% in the 2020 PPP and 17.55% in the 2021 PPP.

## 4.3   Mechanisms

### 4.3.1   Lending Relationships

Racial disparities in lending relationships may be one reason why minority borrowers are more likely to utilize fintech lenders. In this section, I examine the extent to which racial disparities in lending relationships explain differences in fintech usage between minority and non-minority borrowers. Lending relationships are measured with a dummy variable equal to one if the borrower had SBA 7(a) or 504 loans between 2009 and 2019.

[INSERT Table 3 AROUND HERE]

Table 3 presents the results. Columns (1) through (4) show the 2020 PPP results for the full and matched samples. The key independent variables differ slightly in magnitude between the full and matched samples but have the same sign. Take the results of the matched sample in column (3) as an example. I find that restaurants without lending relationships are 5.62%

Electronic copy available at: https://ssrn.com/abstract=3949148

(56.20% of the sample mean) more likely to use fintech lenders, indicating that fintech lenders provide an alternative investment tool for borrowers without lending relationships. However, when comparing column (3) in Table 3 with lending relationships as a control to column (4) in Table 2 without lending relationships as a control, the coefficients before the minority racial dummies only decrease slightly (5 -6 basis points) after controlling for lending relationships. This finding suggests that lending relationships can only partially explain racial disparities in fintech usage.

In Column (4), I examine whether lending relationships have different effects on minority and non-minority borrowers by including interaction terms between lending relationships and minority racial dummies. Coefficients are negative at a 1% level of significance for the interaction terms for the African American and Asian groups. Compared to an otherwise identical White-owned restaurant, a typical African-American-owned restaurant without lending relationships is 8.19 percent more likely to use fintech. Yet, a typical African-American-owned one with lending relationships is 8.08 percent more likely to use fintech. This result indicates that fintech lenders serve as a more prominent alternative to lending relationships for minority borrowers.

In columns (5) through (8), the 2021 PPP results exhibit the same pattern as the 2020 PPP wave. Results are also robust when using a measure of prior lending relationships based on the dollar value of 7(a) and 504 loans, as reported in the Internet Appendix Table B7.

Taken together, I find that borrowers without lending relationships are more likely to utilize fintech lenders. However, lending relationships merely explain the racial differences in the borrower's preference between fintech and non-fintech lenders. In addition, minority borrowers rely more on the substitute function of fintech lenders when they do not have lending relationships.

22

Electronic copy available at: https://ssrn.com/abstract=3949148

### 4.3.2   Bank Deserts

In addition to lending relationships, the density of bank branches in the region of small businesses also contributes to the unbanked population. Minority-owned businesses are more likely to be located in regions with limited financial resources ("bank deserts"), which can compel them to rely on fintech lenders. In this subsection, I examine how much of the racial disparities in fintech usage can be attributed to the bank desert channel. I calculate bank branch density by counting the number of branches in the restaurant's zip code.

[INSERT Table 4 AROUND HERE]

Table 4 reports the results. Columns (1) through (4) show the results for the 2020 PPP for the full and matched samples. *N. Branches* can explain very little of the racial disparities in fintech usage. Take Column (3) as an example where the analysis uses a matched sample; after controlling for emphN. Branches, the coefficients before the minority racial dummies decrease only slightly (1 - 5 basis points). Furthermore, as shown in Column (4), the negative coefficients before the interaction terms between minority group dummies and emphN. Branches show that the racial gap narrows as the number of bank branches in the zip code region increases. Columns (5) through (8) show the results for the 2021 PPP wave for the full and matched samples, which show the same pattern as the 2020 PPP wave.

Taken together, similar to the lending relationship channel, I find that borrowers in the bank desert have greater racial disparities in fintech usage. However, the bank desert channel only partially explains the observed racial differences, which also mirrors the finding on lending relationships.

### 4.3.3   City Location

Lastly, I investigate the extent to which the restaurant's location can account for racial disparities in fintech usage. I include city fixed effects to control for time-invariant variations

23

Electronic copy available at: https://ssrn.com/abstract=3949148

in local economic and financial conditions that influence borrowers' choice between fintech and traditional lenders. The estimates capture the racial disparities among city residents who borrow from different lenders.

[INSERT Table 5 AROUND HERE]

Table 5 reports the results. Columns (1) through (4) show the 2020 PPP results for the full and matched samples. City fixed effects explain a large portion of the racial disparities in fintech usage. Compare the coefficient in column (3) of Table 4 without city fixed effects to the coefficient in column (4) of Table 5 with city fixed effects. The coefficient for African Americans decreases by 30.02% (using the baseline coefficient in Table 2 as the denominator). Likewise, the coefficient for Asians decreases by 12.15 percent. The coefficient before Hispanic becomes negligible and statistically insignificant. The substantial reduction in the coefficients' economic magnitude and statistical significance when controlling for city fixed effects suggests that, to a large extent, the higher likelihood that minority-owned businesses use fintech lenders is due to regional variation.

Columns (5) to (8) reports for the 2021 PPP. In the 2021 wave, cross-city variation plays an even larger role. City fixed effects explain 44.20%, 30.09%, and 19.82% of the racial disparities in fintech usage for African Americans, Asian- and Hispanic-owned restaurants, respectively. Compared to the sample mean, the remaining racial disparities in fintech usage are smaller in the 2021 wave than in the 2020 wave, indicating that non-geographic racial disparities in the lending process are reduced in the 2021 wave.

After controlling for city fixed effects, coefficients before minority racial group dummies remain positive and significant in 2020 and 2021. These results suggest racial disparities in access to the credit market both between and within cities.

24

Electronic copy available at: https://ssrn.com/abstract=3949148

### 4.3.4   Becker's Taste-Based Discrimination

Previous sections demonstrate that observable variables cannot explain a substantial proportion of racial disparities in the use of fintech. One reason for this large portion of unexplained racial disparities could be discrimination in tastes toward minority borrowers. Using the framework of Becker (1957), I examine whether we observe taste-based discrimination in the PPP in this section. When comparing banks and fintech, the question is whether minority borrowers need to be rated higher to compensate for lenders' disutility towards them.

The empirical analysis in this section is akin to the Difference-in-Differences method. I compare how the rating gap between minority and non-minority groups differs between fintech and non-fintech lenders. Thus, I address first-difference concerns, such as that minority borrowers are disproportionately affected by the pandemic or that fintech lenders are easier to use for all borrowers.

I estimate the following specification:

$$\text{Rating}_{i,t} = \beta I(\text{Fintech})_i \times I(\text{Minority})_i + \delta I(\text{Fintech})_i + \delta I(\text{Minority})_i + \gamma X_i + \mu_{c,t} + \varepsilon_{i,c,t}$$

The dataset is a restaurant-month panel where the dependent variable is the monthly average of customer ratings for a given restaurant from April 2020 to March 2021 (i.e., during the Covid crisis). The key independent variable is the interaction terms between the fintech indicator and the three minority racial group indicators. The coefficient beta captures the differences in the minority-non-minority rating gap between the fintech and non-fintech lenders. If minority borrowers are not less discriminated by fintech lenders, the coefficient would be statistically insignificant. I control for the fintech and racial group indicators and borrower characteristics, which are all time-invariant variables. I account for within-restaurant correlation in errors by clustering at the restaurant level.

[INSERT Table 6 AROUND HERE]

25

Electronic copy available at: https://ssrn.com/abstract=3949148

Table 6 reports the results. Columns (1) through (4) present the results for the 2020 wave. In column (1), the rating difference between African American-owned and non-minority-owned restaurants is 0.25 stars (6.4% of the sample mean) more negative for fintech borrowers than non-fintech borrowers. This finding suggests that the extent to which African American borrowers needed to be more valuable to "compensate" for lender disfavor is less when matching with fintech lenders, consistent with fintech lenders being less discriminative. Similarly, the rating gap between Asian-owned and non-minority-owned restaurants is 0.06 stars (1.5% of the sample mean) more negative for fintech borrowers than non-fintech borrowers. After controlling for city fixed effects in column (2), the coefficient before the interaction term with African Americans is reduced by 8%, while the coefficient with Asians is reduced by 33%. This magnitude decrease after controlling for city-fixed effects is consistent with the findings in Table 5. The findings for Hispanic-owned restaurants are insignificant, consistent with the findings in Table 5. The results of the matched sample are similar to those of the full sample in columns (3) and (4).

Columns (5) through (8) report results for the 2021 wave. Results for the 2021 PPP are overall less significant. The coefficients before the interaction terms between the fintech and racial group indicators for restaurants owned by African Americans and Asians become insignificant. However, the coefficients before the interaction terms are significant and negative for Hispanic-owned restaurants. For instance, column (5) shows that the rating gap between Hispanic- and non-minority-owned restaurants is 0.18 stars (4.6% of the sample mean) more negative for fintech borrowers than for non-fintech borrowers. One possible explanation for the difference between the 2020 and 2021 PPP is that most African American and Asian borrowers who were  excluded by traditional lenders already participated in the PPP program in 2020 using fintech, and thus the additional participants in the 2021 wave via fintech lenders are comparable between minority and non-minority groups. In 2021, an increasing number of Hispanic borrowers who were overlooked by traditional lenders in 2020 applied with fintech lenders.

26

Electronic copy available at: https://ssrn.com/abstract=3949148

Internet Appendix Table B8 presents the results on regressions on separate subsamples of fintech and non-fintech borrowers. I find that the minority-non-minority rating gap is less negative for non-fintech lenders, which is consistent with non-fintech lenders posing higher racial barriers than fintech lenders.

In addition, I explore heterogeneity among lenders by running the same regression specifications as in Table 6 but using a series of dummies for each lender. I focus on the four biggest fintech lenders, Cross River Bank, Kabbage, Square, and Paypal, and the seven largest banks, JPMorgan, Bank of America, Wells Fargo, U.S. Bank, Truist, PNC, and TD Bank.[18]

[INSERT Figure 4 AROUND HERE]

Figure 4 shows the results for the largest minority group in our sample: Asian-owned restaurants. Panel A reports results on the 2020 wave. Consistent with the pooled-lender regression results, the Asian-non-minority rating gap is negative for the fintech lenders, except being slightly positive for Cross River Bank, indicating lower barriers to using fintech lenders for minority-owned businesses. In contrast, banks tend to have positive racial discrimination, especially for smaller banks. The rating gap is positive and large for relatively "small" big banks. For the biggest three banks, JPMorgan, Bank of America, and Wells Fargo, the minority-non-minority rating gap is either not significantly different from zero or small, suggesting that big banks provide credit to a similar group of minority- and non-minority-owned restaurants in terms of their ratings. Given that big banks are likely to have better online lending platforms, this difference between big and small banks supports the argument that the automated lending process reduces the racial discrimination in small business lending

---

[18]I set the threshold of big lenders where each lender covers at least 1% of the observations in our restaurant-month panel dataset of ratings. Cross River Bank, JPMorgan, Bank of America, and Wells Fargo each cover about 2.20%, 4.74%, 6.96%, and 4.26%, respectively, of the observations, and other lenders cover a share of 1%-2% of the observations per lender.

Electronic copy available at: https://ssrn.com/abstract=3949148

(Howell et al. (2022)).

Panel B reports results on the 2021 wave. We observe no clear difference between fintech lenders and banks. This aligns with the pooled-lender regression results, which implies an improvement in 2021 in racial disparities in the program. Online Appendix Figure A3 and Figure A4 present plots for the African American- and Hispanic-owned restaurants, respectively, where we observe similar patterns to our findings of the pooled-lender regressions.

Taken together, findings in Table 6 suggest that fintech lenders features less significant taste-based discrimination. The consistency in results between Table 5 and Table 6 supports that the part of racial disparities unexplained by observables are due to taste-based discrimination. Overall, my findings suggest that fintech lenders are more inclusive of minority borrowers.

### 4.3.5   Sorting

Another potential channel discussed in section 2 is sorting based on ratings. Sorting can be a mechanism contributing to racial disparities in fintech usage only if both the fintech-rating and minority-rating relationships are of the same sign. However, in the 2020 wave, fintech users have higher ratings on average but minority borrowers have lower ratings on average (African-American-owned restaurants have higher ratings, but the coefficients are insignificant in most cases). In the 2021 wave, while we observe positive correlation between fintech usage and ratings and minority ownership and ratings (for African-American- and Asian-owned restaurants), both correlations are indistinguishable from zero. Overall, my empirical findings do not support sorting as being the channel of racial disparities in fintech usage.

Electronic copy available at: https://ssrn.com/abstract=3949148

## 4.4   Loan Approval Speed

Another explanation is the timing of loans may coincide with fintech usage. Suppose minority borrowers are less patient and prefer quicker loan processing, then they are more likely to use fintech.[19] In addition, fintech lenders are introduced later in PPP.

[INSERT Table 7 AROUND HERE]

Table 7 presents the regression results comparing the variance in the number of days required to obtain a loan approval for minority and non-minority borrowers matched with fintech and non-fintech lenders. The calculation of the gap begins on April 10, 2020, to account for the fact that fintech lenders only joined PPP after that date. In the 2020 wave, the coefficients before the interaction terms between minority racial groups and fintech indicators are insignificant for African American- and Hispanic-owned restaurants. The coefficients are positive and statistically significant at the 1% level for Asian-owned restaurants. This result is consistent with the claim that minority borrowers first applied to traditional lenders, were denied, and then turned to fintech lenders. In contrast, in 2021, minorities wait less when using fintech.

Internet Appendix Table B16 reports results where I control for the approval date fixed effects as the robustness check of Table 5 and Table 6. This estimates the minority-non-minority rating gap for loans approved on the *same* day, and thus rules out differences due to the borrower's position in the PPP application queue. Coefficients before the interaction terms between the racial group and fintech indicators are very close to those reported in Table 6, which implies that the racial discrimination does not come from a difference in loans approved earlier or later.

---

[19]The existing literature documents that fintech lenders process mortgage applications much faster than other lenders (Fuster et al. (2019)). Internet Appendix Table B12 shows that, on average, fintech lenders have a higher loan processing capacity.

29

Electronic copy available at: https://ssrn.com/abstract=3949148

## 4.5   Other Lender Types

One concern is that non-technology-related features of fintech lenders coincidentally lead to my empirical findings. In this section, I study five other types of lenders: first-time banks, non-federally-insured lenders, credit unions, community development financial institutions (CDFIs) and community development corporations (CDCs) , savings and loan associations If my documented minority-non-minority gap is due to unobserved characteristics of borrowers and lenders (and not due to racial barriers), we should observe the same patterns when comparing those types of lenders with the rest of lenders as for the comparison between fintech lenders and banks. Results are in Internet Appendix Table B11 to Table B13. For all alternative lender classifications, I do not find evidence similar to the fintech-bank classification.

# 5   Structural Estimation of the Matching Model

In this section, I use the game-theory-based matching estimator developed by Fox (2018) to estimate each channel's contribution to the matching value. The structural estimation complements the regression analysis in two ways. First, it estimates trade-offs between various channels, whereas the regression approach describes data correlations. Second, it can generate counterfactual matching assignments that tell us what would occur if fintech lenders did not provide additional value to minority borrowers.

Fox (2018) is the first to empirically estimate a many-to-many matching game with transferable utility, with an application in the automobile industry. Chen and Song (2013) and Schwert (2018) apply the Fox (2018) estimator to the borrower-lender matching setting in order to investigate the role of size, geographical distance, and lending relationships. My paper differs from theirs by estimating the value of fintech lenders to minority racial groups using the model.

Electronic copy available at: https://ssrn.com/abstract=3949148

## 5.1 Empirical Matching Model

### 5.1.1 Model Setup, Equilibrium and Advantages

The empirical matching model uses the observed matching assignment as the outcome to be explained and estimates the latent matching value function, also known as the payoff function in game theory. The estimation is based on the *Revealed Preference* principle, which states that more valuable matches are likely to occur in the data. To illustrate, suppose agents always favor high-valued matches over low-valued matches. In equilibrium, agents only form matches when both sides are unable to choose a higher-valued alternative. This equilibrium condition implies that the sum of matching values of pairs observed in the data should be greater than those of unmatched pairs.

One advantage of the Fox (2018) estimator is that it considers the interactions between players in the matching game. Other matching probability estimators, such as Probit or Logit models, assume that each player's matching probability is unaffected by other players in the game. In formal terms, the equilibrium concept is known as *Pairwise Stability*, which means that no pair of agents find it advantageous to break their existing matches to match each other. Pairwise stability implies total stability under substitutable preferences (Hatfield and Kominers (2010)).

Another advantage of the Fox (2018) matching estimator is that the model accounts for transfer payments in the equilibrium condition without requiring data on the payments (loan prices), which is crucial in my context. Loan prices in the matching game include not only the prices paid by the borrower to the lender for pairs that have been matched in reality but also the *would-be* loan prices between borrowers and lenders who have not been matched in reality. While the government sets the interest rate for the PPP program, non-price loan terms can transfer value as well. In particular, a substantial portion of the utility associated with race-dependent frictions is likely to be non-financial. Other matching models either assume no transfer payments between agents (Sørensen (2007)) or require information on

31

Electronic copy available at: https://ssrn.com/abstract=3949148

transferred payments (Akkus et al. (2016)). The multinomial choice model also requires information on transferred payments (Berry et al. (2004)).

### 5.1.2 An Illustrative Example

Consider two loans from my sample to demonstrate how the estimator Fox (2018) works. Santa Maria Atlas Pizza, a non-minority-owned restaurant in Massachusetts, borrowed from Bank of America. Jing's Garden, a minority-owned restaurant also located in Massachusetts, borrowed money from PayPal. The model compares the total latent value of the observed matches to the total latent value of the swapped matches that pair Santa Maria with PayPal and Jing's with Bank of America. [20]

For a formal description of the model, consider the match between borrower $b$ and lender $l$. The match $(b, l)$ provides utility $V_b(b, l) - t(b, l)$ to the borrower and $V_l(b, l) + t(b, l)$ to the lender, where $t(b, l)$ is the unobserved transfer payment from borrower $b$ to lender $l$, which can be positive or negative. The total matching value is given by $V(b, l) = V_b(b, l) + V_l(b, l)$. Given that utility is additively separable, so the entire set of PPP loans of the lender is worth $V_l = \Sigma_{b \in \mu(l)} V_l(b, l) + t(b, l)$. As shown in Fox (2018), summing the pairwise stability conditions for two matches $(b_1, l_1)$ and $(b_2, l_2)$ yields a condition that does not depend on transfer payments:

$$V_l(b_1, l_1) + t(b_1, l_1) + V_b(b_1, l_1) - t(b_1, l_1) \geq V_l(b_2, l_1) + t(b_2, l_1) + V_b(b_1, l_2) - t(b_1, l_2)$$

$$V_l(b_2, l_2) + t(b_2, l_2) + V_b(b_2, l_2) - t(b_2, l_2) \geq V_l(b_1, l_2) + t(b_1, l_2) + V_b(b_2, l_1) - t(b_2, l_1)$$

$$\Rightarrow V_l(b_1, l_1) + V_l(b_2, l_2) \geq V_l(b_2, l_1) + V_b(b_1, l_2) \tag{4}$$

The simple calculation above illustrates how transfer payments cancel out in equilibrium,

---

[20]In the complete model, estimation of the matching value function involves swapping every observed pair of borrower-lender matches and maximizing the number of satisfied comparisons, not just the pair in the illustrative example.

Electronic copy available at: https://ssrn.com/abstract=3949148

and we need only compare the *total* surplus of observed and counterfactual matching pairs. Even though the pairwise stability condition involves transfer payments between the borrower and the lender, Fox (2018) achieves no transfer payment data requirements by demonstrating that estimating the equilibrium is equivalent to estimating the e*sum* of latent matching values under additively separable utility.

### 5.1.3   Key Assumptions

The Fox (2018) model relies on several assumptions that merit discussion. First, as described previously, the model is based on the *Revealed Preference* assumption, which states that the observed matching assignment produces the highest total value. One caveat is that there may be multiple equilibria, whereas the observed matching outcome is only one equilibrium. Multiple equilibria are most likely to exist when borrowers and lenders can negotiate over the loan terms (transfer payments). Because the interest rate and other loan terms are determined exogenously by the SBA, this concern is minimal in the PPP setting.

Second, an important assumption for the estimator to be consistent is that the model only uses all possible matches *within* the existing loan market. Since the PPP program has strict lender eligibility and capacity restrictions, this is a reasonable assumption for my application. Importantly, to account for the fact that borrowers did not consider all banks to be very far away from them, and because the Fed's PPP Liquidity Facility was established expressly to loosen bank capacity constraints (Anbil et al. (2021)), I impose the restriction, when constructing counterfactual lender-borrower pairs, that the lender must have made at least one PPP loan in the same city as the borrower. Nevertheless, one implication is that the matching value function is collectively determined by the borrower and lender-determined characteristics, which implies that any individual borrower or lender characteristics cancel out in the equilibrium condition (Equation 4).

Third, the equivalence between pairwise stability and Equation 4 assumes that lenders

Electronic copy available at: https://ssrn.com/abstract=3949148

have a capacity constraint, with each lender distributing the same number of loans under all counterfactual matching assignments. This assumption is also reasonable for my application in light of the anecdotal evidence of lenders reaching their capacity limits in the PPP.

Fourth, the assumption of additively separable utility entails the absence of diversification benefits, which are likely to be negligible in the PPP context due to the complete government guarantee nature of the program. Finally, the model also assumes that the borrower and lender attributes in the matching value function are unaffected by the matching outcome. The fintech lender indicator and minority borrower indicator are immutable characteristics. The previous lending relationships and geographic location of borrowers and lenders are also predetermined characteristics.

### 5.1.4   Maximum Score Estimator

To estimate the model, I parameterize the matching value as a linear function, $V(b, l) = X_{b,l}'\beta + \epsilon_{b,l}$, where $X_{b,l}$ includes characteristics of the borrower and lender pair. The objective function is a sum of indicators for the satisfaction of the pairwise value comparison (inequalities in the terminology of Fox (2018)):

$$Q(\beta) = \Sigma_{n=1}^{N} \Sigma_{(b_1,l_1),(b_2,l_2) \in \mu_s} \mathbf{1}(X_{b_1,l_1}'\beta + X_{b_2,l_2}'\beta \geq X_{b_1,l_2}'\beta + X_{b_2,l_1}'\beta) \qquad (5)$$

which is a maximum score estimator (Manski (1975)). A global optimizer is required since the objective function is a step function. I employ the differential evolution algorithm to optimize the estimator, as suggested in Fox (2018) and adopted in Schwert (2018). I use the Python scipy differential evolution package. In order to avoid getting stuck in local optima, the differential evolution optimization incorporates randomness into the initialization step. This optimization procedure gives the point estimates of the matching model.

Regarding confidence intervals, the literature shows that bootstrapping is inconsistent for the maximum score estimator, whereas subsampling provides a consistent estimator (Delgado

34

Electronic copy available at: https://ssrn.com/abstract=3949148

et al. (2001), Abrevaya and Huang (2005)). In accordance with Fox (2018), I generate confidence intervals by randomly selecting 100 subsamples and utilizing the corresponding percentiles of parameter distributions. I use block subsampling to preserve the interactions, in reality, more precisely. Each random subsample consists of 90% of the borrowers and their observed and potential lenders.[21] When confidence intervals do not contain zero, coefficients are considered statistically significant.

More details on setting up the empirical matching model can be found in Internet Appendix E.

## 5.2   Estimating the Matching Model

[INSERT Table 8 AROUND HERE]

Table 8 reports estimates of the matching model. Results are consistent with the results of the regression analysis. The positive coefficient on the interaction between the fintech lender and minority borrower indicators indicates that fintech lenders and minority borrowers generate greater value than other types of pairs. Consistent with previous research, borrowers and lenders with previous loans, more branch access, and a closer location are more likely to match. Consistent with the regression results in Table 6, restaurants with higher ratings are matched with fintech lenders in 2020, and the sorting pattern becomes negative and insignificant in 2021.

All parameter estimates on the 2020 PPP sample are statistically significant at the 95% confidence level. Only the coefficients on lending relationships and bank branch channels remain statistically significant at the 95% level in 2021. Other coefficients become insignificant. The difference between 2020 and 2021 suggests that the lending relationship and bank desert are channels influencing the matching value held in broader contexts. In contrast,

---

[21]Schwert (2018) demonstrates that block subsampling yields a larger confidence interval than direct subsampling of inequalities; consequently, the results presented in the paper should be viewed as a conservative estimation of the confidence intervals.

Electronic copy available at: https://ssrn.com/abstract=3949148

other channels may be more significant in scenarios with limited resources, like the 2020 PPP.

Comparing the coefficients reveals the relative importance of the various channels in the matching process. Because the matching value is arbitrarily scaled, interpreting the magnitude itself is meaningless. Instead, I discuss the ratio of different coefficients here. The fintech-minority additional value channel is comparable to the lending relationship and bank desert channels. The additional value channel is 0.33 times as important as the lending relationship channel and 0.98 times as important as the bank desert channel, according to the 2020 PPP. In accordance with the regression analysis results, the relative importance of the additional value channel of fintech-minority matches falls to 0.26 times that of the lending relationship channel and 0.41 times that of the bank desert channel in the 2021 PPP.

The geographic distance channel is of minor relative significance, consistent with the argument that information asymmetry, which tends to be affected by distance (Agarwal and Hauswald (2010)), does not play a significant role in the PPP because the government backs all loans. Given the large number of inequalities, the model's fit is surprisingly satisfactory.[22]

## 5.3   Counterfactual

In this section, I conduct counterfactual analyses to quantify the contribution of various channels to racial disparities in fintech usage rates. For instance, I set the parameter of the fintech-minority value channel to zero and measure the impact of the predicted matching assignment on minority and non-minority borrowers' use of fintech. [23]

[INSERT Table 9 AROUND HERE]

Table 9 provides estimates of the impact of matching on fintech utilization for each alter-

---

[22]Because there are fewer counterfactual pairs in smaller samples, they tend to have better fits.

[23]Due to the possibility of ties in matching values, for each counterfactual assignment, I generate 100 random assignments for the tied ones and compute the average fintech usage rates of the 100 assignments.

Electronic copy available at: https://ssrn.com/abstract=3949148

native scenario. As a simple starting point, the first line indicates that randomly matching borrowers and lenders would result in a similar proportion of minorities and non-minorities using fintech lenders. In 2020, 7.80% of minority and 7.3% of non-minority borrowers would use fintech lenders under random assignments. Therefore, it is unlikely that the higher rate of fintech usage among minority borrowers is a result of random assignments.

The counterfactual of interest is shutting off the additional matching value channel for fintech-minority pairs. Suppose that matching fintech lenders with minority borrowers produces no additional value. In this counterfactual scenario, 5.82% of minority borrowers and 8.22% of non-minority borrowers would use fintech lenders in 2020, representing a 69.41% decrease in minority fintech usage and a 214.15% increase in non-minority fintech usage relative to the status quo. Additionally, reversing the sign of the parameter for this channel would reduce minority fintech usage and increase non-minority usage in a larger magnitude.

However, shutting off channels on lending relationships, bank desert, and geographic distance has minimal effects on minority versus non-minority fintech usage (the changes in the racial gap in fintech usage are less than 3.5 percent of the original racial gap). If the rating-based sorting channel were disabled, there would be 6.20 percent more minority borrowers and 23.91 percent fewer non-minority borrowers using fintech. This result is consistent with the positive correlation between ratings and fintech usage and the negative correlation between minority borrowers and ratings, suggesting that rating-based sorting discourages some minority borrowers from using fintech lenders. Results on the 2021 PPP have the same signs and relative magnitudes.

The counterfactual analyses demonstrate that the fintech-minority value channel has a unique and significant impact on racial disparities in fintech use. The fintech usage gap between minorities and non-minorities would decrease by approximately 110% if this channel were disabled. Shutting off channels on lending relationships, bank desert, and the geographic distance does not significantly alter racial disparities in fintech utilization.

37

Electronic copy available at: https://ssrn.com/abstract=3949148

# 6   Conclusion

I provide novel evidence on what contributes to racial disparities in fintech usage. Using the Paycheck Protection Program as a laboratory and a linked dataset on PPP loans and restaurants on Yelp.com, I find that minority borrowers are more likely to use fintech lenders and observable only accounts for a small fraction of the economically large racial disparities, which is consistent with contemporary papers (Chernenko and Scharfstein (2022), Erel and Liebersohn (2022), Howell et al. (2022)). With estimates of the tradeoffs between various channels, we can determine where to prioritize efforts to minimize racial disparities with greater precision. One reason for this large unexplained part of racial disparities could be taste-based discrimination (Becker (1957)) which is indicated by my rating-gap evidence.

With regard to external validity, this paper uses a nationwide sample of restaurants. The large geographic range of the sample mitigates concerns about biases due to the sample selection. On the one hand, the Food Services and Drinking Places sector has a similar degree of racial diversity to the average of all industries according to the U.S. Bureau of Labor Statistics. This suggests that our results are likely to provide insights into other sectors as well. On the other hand, restaurants are likely to have fewer collateral and assets, and thus the lending relationship channel plays a more important role.

This paper studies the first large-scale government loan program where major fintech lending platforms, such as Paypal, Kabbage, and Funding Circle, are allowed to be eligible lenders. Our study has important policy implications that speak to the debate on whether to allow for the participation of fintech lenders in government-guaranteed loan programs. Our findings suggest that there are systematic biases and blind spots in the traditional loan distribution channel that can be covered by fintech lenders. This has implications beyond the Covid-19 period. Whether the credit access provided by fintech lenders improves the financial and operational performance of those underserved borrowers is an interesting topic for future research. In addition, the impact of the introduction of fintech lenders on traditional lenders

Electronic copy available at: https://ssrn.com/abstract=3949148

is also a promising avenue for future research.

# References

Jason Abrevaya and Jian Huang. On the bootstrap of the maximum score estimator. *Econometrica*, 73(4):1175–1204, 2005.

Sumit Agarwal and Robert Hauswald. Distance and private information in lending. *The Review of Financial Studies*, 23(7):2757–2788, 2010.

Oktay Akkus, J Anthony Cookson, and Ali Hortacsu. The determinants of bank mergers: A revealed preference analysis. *Management Science*, 62(8):2241–2258, 2016.

Sriya Anbil, Mark A Carlson, and Mary-Frances Styczynski. The effect of the ppplf on ppp lending by commercial banks. 2021.

Michael Anderson and Jeremy Magruder. Learning from the crowd: Regression discontinuity estimates of the effects of an online review database. *The Economic Journal*, 122(563): 957–989, 2012.

Kenneth J Arrow. The theory of discrimination. In *Discrimination in labor markets*, pages 1–33. Princeton University Press, 1973.

Elizabeth Asiedu, James A Freeman, and Akwasi Nti-Addae. Access to credit by small businesses: How relevant are race, ethnicity, and gender? *American Economic Review*, 102(3):532–37, 2012.

Rachel Atkins, Lisa Cook, and Robert Seamans. Discrimination in lending? evidence from the paycheck protection program. *Small Business Economics*, 58(2):843–865, 2022.

Eduardo M Azevedo and John William Hatfield. Existence of equilibrium in large matching markets with complementarities. *Available at SSRN 3268884*, 2018.

39

Electronic copy available at: https://ssrn.com/abstract=3949148

Tetyana Balyuk, Allen N Berger, and John Hackney. What is fueling fintech lending? the role of banking market structure. 2020a.

Tetyana Balyuk, Nagpurnanand R Prabhala, and Manju Puri. Indirect costs of government aid and intermediary supply effects: Lessons from the paycheck protection program. Technical report, National Bureau of Economic Research, 2020b.

Alexander W Bartik, Zoe B Cullen, Edward L Glaeser, Michael Luca, Christopher T Stanton, and Adi Sunderam. The targeting and impact of paycheck protection program loans to small businesses. Technical report, National Bureau of Economic Research, 2020.

Robert Bartlett, Adair Morse, Richard Stanton, and Nancy Wallace. Consumer-lending discrimination in the fintech era. *Journal of Financial Economics*, 143(1):30–56, 2022.

Timothy Bates. Financing small business creation: The case of chinese and korean immigrant entrepreneurs. *Journal of Business Venturing*, 12(2):109–124, 1997.

Timothy Bates and Alicia Robb. Greater access to capital is needed to unleash the local economic development potential of minority-owned businesses. *Economic Development Quarterly*, 27(3):250–259, 2013.

Paul Beaumont, Huan Tang, and Eric Vansteenberghe. The role of fintech in small business lending. Technical report, Working paper, 2021.

Gary S Becker. The economics of discrimination. *University of Chicago Press Economics Books*, 1957.

Itzhak Ben-David, Mark J Johnson, and René M Stulz. Why did small business fintech lending dry up during march 2020? Technical report, National Bureau of Economic Research, 2021.

Tobias Berg, Andreas Fuster, and Manju Puri. Fintech lending. Technical report, 2021.

40

Electronic copy available at: https://ssrn.com/abstract=3949148

Shai Bernstein and Albert Sheen. The operational consequences of private equity buyouts: Evidence from the restaurant industry. *The Review of Financial Studies*, 29(9):2387–2418, 2016.

Steven Berry, James Levinsohn, and Ariel Pakes. Differentiated products demand systems from a combination of micro and macro data: The new car market. *Journal of Political Economy*, 112(1):68–105, 2004.

Lloyd Blanchard, Bo Zhao, and John Yinger. Do lenders discriminate against minority and woman entrepreneurs? *Journal of Urban Economics*, 63(2):467–497, 2008.

David G Blanchflower, Phillip B Levine, and David J Zimmerman. Discrimination in the small-business credit market. *Review of Economics and Statistics*, 85(4):930–943, 2003.

Greg Buchak, Gregor Matvos, Tomasz Piskorski, and Amit Seru. Fintech, regulatory arbitrage, and the rise of shadow banks. *Journal of Financial Economics*, 130(3):453–483, 2018.

Alexander W Butler and Jess Cornaggia. Does access to external finance improve productivity? evidence from a natural experiment. *Journal of Financial Economics*, 99(1):184–203, 2011.

Ken Cavalluzzo and John Wolken. Small business loan turndowns, personal wealth, and discrimination. *The Journal of Business*, 78(6):2153–2178, 2005.

Ken S Cavalluzzo and Linda C Cavalluzzo. Market structure and discrimination: The case of small businesses. *Journal of Money, Credit and Banking*, pages 771–792, 1998.

Ken S Cavalluzzo, Linda C Cavalluzzo, and John D Wolken. Competition, small business financing, and discrimination: Evidence from a new survey. *The Journal of Business*, 75 (4):641–679, 2002.

41

Electronic copy available at: https://ssrn.com/abstract=3949148

Claire Célerier and Adrien Matray. Bank-branch supply, financial inclusion, and wealth accumulation. *The Review of Financial Studies*, 32(12):4767–4809, 2019.

Jiawei Chen and Kejun Song. Two-sided matching in the loan market. *International Journal of Industrial Organization*, 31(2):145–152, 2013.

Sergey Chernenko and David S Scharfstein. Racial disparities in the paycheck protection program. 2022.

Anna Cororaton and Samuel Rosen. Public firm borrowers of the us paycheck protection program. *The Review of Corporate Finance Studies*, 10(4):641–693, 2021.

Kristle R Cortés, Yuliya Demyanyk, Lei Li, Elena Loutskina, and Philip E Strahan. Stress tests and small business lending. *Journal of Financial Economics*, 136(1):260–279, 2020.

Douglas Cumming, Hisham Farag, Sofia Johan, and Danny McGowan. The digital credit divide: Marketplace lending and entrepreneurship. *Journal of Financial and Quantitative Analysis*, 2021.

Francesco D'Acunto, Pulak Ghosh, Rajiv Jain, and Alberto G Rossi. How costly are cultural biases? *Available at SSRN 3736117*, 2020.

Donald R Davis, Jonathan I Dingel, Joan Monras, and Eduardo Morales. How segregated is urban consumption? *Journal of Political Economy*, 127(4):1684–1738, 2019.

Miguel A Delgado, Juan M Rodrıguez-Poo, and Michael Wolf. Subsampling inference in cube root asymptotics with an application to manski's maximum score estimator. *Economics Letters*, 73(2):241–250, 2001.

Marco Di Maggio and Vincent Yao. Fintech borrowers: Lax screening or cream-skimming? *The Review of Financial Studies*, 34(10):4565–4618, 2021.

Electronic copy available at: https://ssrn.com/abstract=3949148

Will Dobbie, Andres Liberman, Daniel Paravisini, and Vikram Pathania. Measuring bias in consumer lending. *The Review of Economic Studies*, 88(6):2799–2832, 2021.

Jason Roderick Donaldson, Giorgia Piacentino, and Anjan Thakor. Intermediation variety. *The Journal of Finance*, 76(6):3103–3152, 2021.

Ran Duchin, Xiumin Martin, Roni Michaely, and Hanmeng Wang. Concierge treatment from banks: Evidence from the paycheck protection program. *Journal of Corporate Finance*, 72:102124, 2022.

Isil Erel and Jack Liebersohn. Can fintech reduce disparities in access to finance? evidence from the paycheck protection program. *Journal of Financial Economics*, 146(1):90–118, 2022.

Robert Fairlie and Frank M Fossen. Did the paycheck protection program and economic injury disaster loan program get disbursed to minority communities in the early stages of covid-19? *Small Business Economics*, pages 1–14, 2021.

Robert Fairlie and Frank M Fossen. The 2021 paycheck protection program reboot: Loan disbursement to employer and nonemployer businesses in minority communities. 112: 287–91, 2022.

Robert W Fairlie and Alicia M Robb. Race and entrepreneurial success. *Cambridge, MA: The*, 2008.

Fed. Federal Reserve Bank of San Francisco, fintech, racial equity, and an inclusive financial system. *Community Development Innovation Review*, 15(2):132–132, 2021.

Jeremy T Fox. Estimating matching games with transfers. *Quantitative Economics*, 9(1): 1–38, 2018.

Electronic copy available at: https://ssrn.com/abstract=3949148

Andreas Fuster, Matthew Plosser, Philipp Schnabl, and James Vickery. The role of technology in mortgage lending. *The Review of Financial Studies*, 32(5):1854–1899, 2019.

Andreas Fuster, Paul Goldsmith-Pinkham, Tarun Ramadorai, and Ansgar Walther. Predictably unequal? the effects of machine learning on credit markets. *The Journal of Finance*, 77(1):5–47, 2022.

Itay Goldstein, Wei Jiang, and G Andrew Karolyi. To fintech and beyond. *The Review of Financial Studies*, 32(5):1647–1661, 2019.

Manasa Gopal and Philipp Schnabl. The rise of finance companies and fintech lenders in small business lending. *The Review of Financial Studies*, 2022.

João Granja, Christian Leuz, and Raghuram G Rajan. Going the extra mile: Distant lending and credit cycles. *The Journal of Finance*, 77(2):1259–1324, 2022a.

João Granja, Christos Makridis, Constantine Yannelis, and Eric Zwick. Did the paycheck protection program hit the target? *Journal of Financial Economics*, 145(3):725–761, 2022b.

John M Griffin, Samuel Kruger, and Prateek Mahajan. Did fintech lenders facilitate ppp fraud? *Journal of Finance, Forthcoming*, 2022.

John William Hatfield and Scott Duke Kominers. Matching in networks with bilateral contracts. In *Proceedings of the 11th ACM conference on Electronic commerce*, pages 119–120, 2010.

Mitchell Hoffman, Lisa B Kahn, and Danielle Li. Discretion in hiring. *The Quarterly Journal of Economics*, 133(2):765–800, 2018.

Electronic copy available at: https://ssrn.com/abstract=3949148

Sabrina T Howell, Theresa Kuchler, David Snitkof, Johannes Stroebel, and Jun Wong. Automation and racial disparities in small business lending: Evidence from the paycheck protection program. Technical report, 2022.

John Eric Humphries, Christopher A Neilson, and Gabriel Ulyssea. Information frictions and access to the paycheck protection program. *Journal of public economics*, 190:104244, 2020.

Julapa Jagtiani and Catharine Lemieux. Do fintech lenders penetrate areas that are underserved by traditional banks? *Journal of Economics and Business*, 100:43–54, 2018.

Jon Kleinberg, Himabindu Lakkaraju, Jure Leskovec, Jens Ludwig, and Sendhil Mullainathan. Human decisions and machine predictions. *The Quarterly Journal of Economics*, 133(1):237–293, 2018.

Lei Li and Philip E Strahan. Who supplies ppp loans (and does it matter)? banks, relationships, and the covid crisis. *Journal of Financial and Quantitative Analysis*, 56(7): 2411–2438, 2021.

Michael Luca. Reviews, reputation, and revenue: The case of yelp. com. *Com (March 15, 2016). Harvard Business School NOM Unit Working Paper*, (12-016), 2016.

Charles F Manski. Maximum score estimation of the stochastic utility model of choice. *Journal of Econometrics*, 3(3):205–228, 1975.

Karen G Mills and Annie V Dang. Building small business utopia: how artificial intelligence and big data can increase small business success. page 11, 2021.

Edmund S Phelps. The statistical theory of racism and sexism. *The American Economic Review*, 62(4):659–661, 1972.

Electronic copy available at: https://ssrn.com/abstract=3949148

Devesh Raval. Do bad businesses get good reviews? evidence from online review platforms. 2020.

Sherrie LW Rhine, William H Greene, and Maude Toussaint-Comeau. The importance of check-cashing businesses to the unbanked: Racial/ethnic differences. *Review of Economics and Statistics*, 88(1):146–157, 2006.

Michael Schwert. Bank capital and lending relationships. *The Journal of Finance*, 73(2): 787–830, 2018.

Morten Sørensen. How smart is smart money? a two-sided matching model of venture capital. *The Journal of Finance*, 62(6):2725–2762, 2007.

Anjan V Thakor. Fintech and banking: What do we know? *Journal of Financial Intermediation*, 41:100833, 2020.

Jeffrey Wang and David Hao Zhang. The cost of banking deserts: Racial disparities in access to ppp lenders and their equilibrium implications. 2020.

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure 1:** Distribution of Restaurant Ratings across Borrower Racial Groups

This figure plots the density of restaurant ratings for each racial group using data on customer ratings from Yelp.com. For each restaurant in our linked sample, we calculate the mean of the monthly average of ratings from April 2018 to March 2021.



Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure 2:** Minority- and Non-Minority-owned Businesses in the 2020 PPP Fintech vs. Non-Fintech (Dollar Value)

This figure plots the daily dollar value of PPP loans received by minority- and non-minority-owned restaurants that are processed by non-fintech (Panel A) and fintech (Panel B) lenders in the 2020 PPP wave for our sample. The 2020 wave spans the period from April 3, 2020 to August 8, 2020. The y-axis represents the daily dollar value of loans processed (in USD millions), and the x-axis represents the loan approval date. The blue solid line plots the non-minority-owned restaurants and the red dashed line plots the minority-owned restaurants. The first vertical dashed line indicates the entry of fintech lenders on April 10, 2020 and the second vertical dashed line indicates the beginning of the second tranche of the 2020 PPP on April 27, 2020.



**(a)** 2020 PPP, Non-Fintech Lenders



**(b)** 2020 PPP, Fintech Lenders

48

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure 3:** Percentage of Loans Distributed to Minority-owned Businesses Fintech vs. Non-Fintech (Dollar Value)

This figure plots the share of loan dollar values distributed to minority-owned businesses processed by fintech (Panels A and B) and non-fintech (Panels C and D) lenders in the 2020 and 2021 waves, based on our sample. The shares range from 0% (the lightest blue) to 100% (the darkest blue).



**(a)** Fintech in the 2020 PPP

**(b)** Fintech in the 2021 PPP

**(c)** Non-Fintech in the 2020 PPP

**(d)** Non-Fintech in the 2021 PPP

49

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure 4:** Minority-Non-Minority Rating Gap (Asian-owned) Fintech vs. Non-Fintech

This figure plots the minority-non-minority rating gap for Asian-owned restaurants in the 2020 wave (Panel A) and in the 2021 wave (Panel B), using ratings from April 2020 to March 2021 (during the Covid crisis). The y-axis represents the regression coefficients before the interaction terms between the racial group indicator and lender indicators from the regressions as in Table 6, except that we decompose the fintech indicator into several indicators for each big fintech lender and bank. The omitted category is all lenders that are not plotted. The x-axis represents each lender. We plot the biggest four fintech lenders in our sample: Cross River Bank, Kabbage, Square, and Paypal, and the largest seven banks in our sample: JPMorgan, Bank of America, Wells Fargo, U.S. Bank, Truist, PNC, and TD Bank. The dependent variable is the Rating Stars, which range from 0 to 5, based on customer ratings from Yelp.com. The Asian indicator is defined to be 1 for restaurants that we identify as Asian food restaurants. The Lender$_j$ (e.g., Kabbage) indicator is defined to be 1 for loans backed by that lender (e.g. by Kabbage). Control variables are the same as in Table 6, which contain lender dummies, racial group dummy, employment size, franchise dummy, month-city fixed effects, business type fixed effects, and eating policy dummies. Detailed variable definitions are in Appendix Table B1. Standard errors are clustered at the restaurant-lender level.



    **(a)** 2020 PPP Recipients              **(b)** 2021 PPP Recipients

Electronic copy available at: https://ssrn.com/abstract=3949148

# Tables

## Table 1: Summary Statistics

This table presents the summary statistics for the sample of restaurant PPP recipients merged with a meaningful Yelp link. For resturant and Detailed variable definitions are in Appendix Table B1.

Panel A: Restaurant-Level Cross Section 2020 PPP First Draw

| | Full Sample | | | | | | | | Matched Sample | | | | | | | |
| | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $I$(Minority) | 92,557 | 0.32 | 0.46 | 0 | 0 | 0 | 1 | 1 | 86097 | 0.33 | 0.47 | 0 | 0 | 0 | 1 | 1 |
| $I$(African American) | 92,557 | 0.01 | 0.08 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.01 | 0.08 | 0 | 0 | 0 | 0 | 1 |
| $I$(Asian) | 92,557 | 0.18 | 0.39 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.2 | 0.4 | 0 | 0 | 0 | 0 | 1 |
| $I$(Hispanic) | 92,557 | 0.13 | 0.33 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.13 | 0.34 | 0 | 0 | 0 | 0 | 1 |
| Employment | 92,557 | 18.62 | 31.02 | 1 | 5 | 11 | 21 | 500 | 86,097 | 14.79 | 17.44 | 1 | 5 | 10 | 19 | 500 |
| $I$(Franchise) | 92,557 | 0.12 | 0.33 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.11 | 0.32 | 0 | 0 | 0 | 0 | 1 |
| $I$(Fintech) | 92,557 | 0.09 | 0.29 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.1 | 0.29 | 0 | 0 | 0 | 0 | 1 |
| $\Delta$(Date) | 92,557 | 26.87 | 24.19 | 0 | 10 | 25 | 28 | 127 | 86,097 | 27.64 | 24.43 | 0 | 11 | 25 | 28 | 127 |
| $I$(Relationships) | 92,557 | 0.03 | 0.18 | 0 | 0 | 0 | 0 | 1 | 86,097 | 0.03 | 0.18 | 0 | 0 | 0 | 0 | 1 |
| Rel. (N. Loans) | 925,57 | 0.04 | 0.25 | 0 | 0 | 0 | 0 | 8 | 86,097 | 0.04 | 0.25 | 0 | 0 | 0 | 0 | 8 |
| Rel. (A. Loan) | 92,557 | 18 | 3,074 | 0 | 0 | 0 | 0 | 680,000 | 86,097 | 20 | 3,187 | 0 | 0 | 0 | 0 | 680,000 |
| $I$(New Bank) | 82,287 | 0.04 | 0.2 | 0 | 0 | 0 | 0 | 1 | 76,082 | 0.04 | 0.2 | 0 | 0 | 0 | 0 | 1 |
| $I$(CU) | 85,351 | 0.03 | 0.18 | 0 | 0 | 0 | 0 | 1 | 79,147 | 0.03 | 0.18 | 0 | 0 | 0 | 0 | 1 |
| $I$(CD) | 82,821 | 0.01 | 0.08 | 0 | 0 | 0 | 0 | 1 | 76,605 | 0.01 | 0.08 | 0 | 0 | 0 | 0 | 1 |

Panel B: Restaurant-Level Cross Section 2021 PPP First Draw

| | Full Sample | | | | | | | | Matched Sample | | | | | | | |
| | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $I$(Minority) | 6,268 | 0.38 | 0.49 | 0 | 0 | 0 | 1 | 1 | 6,024 | 0.39 | 0.49 | 0 | 0 | 0 | 1 | 1 |
| $I$(African American) | 6,268 | 0.01 | 0.11 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.01 | 0.12 | 0 | 0 | 0 | 0 | 1 |
| $I$(Asian) | 6,268 | 0.22 | 0.41 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.22 | 0.42 | 0 | 0 | 0 | 0 | 1 |
| $I$(Hispanic) | 6,268 | 0.15 | 0.36 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.16 | 0.36 | 0 | 0 | 0 | 0 | 1 |
| Employment | 6,268 | 9.39 | 13.41 | 1 | 3 | 6 | 11 | 342 | 6,024 | 8.41 | 8.66 | 1 | 3 | 6 | 10 | 93 |
| $I$(Franchise) | 6,268 | 0.06 | 0.23 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.06 | 0.23 | 0 | 0 | 0 | 0 | 1 |
| $I$(Fintech) | 6,268 | 0.17 | 0.38 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.18 | 0.38 | 0 | 0 | 0 | 0 | 1 |
| $\Delta$(Date) | 6,268 | 41.12 | 21.14 | 0 | 23 | 39 | 60 | 78 | 6,024 | 41.01 | 21.05 | 0 | 23 | 39 | 60 | 78 |
| $I$(Relationships) | 6,268 | 0.02 | 0.13 | 0 | 0 | 0 | 0 | 1 | 6,024 | 0.02 | 0.13 | 0 | 0 | 0 | 0 | 1 |
| Rel. (N. Loans) | 6,268 | 0.02 | 0.16 | 0 | 0 | 0 | 0 | 3 | 6,024 | 0.02 | 0.15 | 0 | 0 | 0 | 0 | 3 |
| Rel. (A. Loan) | 6,268 | 0 | 0.06 | 0 | 0 | 0 | 0 | 3 | 6,024 | 0 | 0.06 | 0 | 0 | 0 | 0 | 3 |
| $I$(New Bank) | 4,866 | 0.04 | 0.2 | 0 | 0 | 0 | 0 | 1 | 4,648 | 0.04 | 0.2 | 0 | 0 | 0 | 0 | 1 |
| $I$(CU) | 4,962 | 0.02 | 0.14 | 0 | 0 | 0 | 0 | 1 | 4,741 | 0.02 | 0.14 | 0 | 0 | 0 | 0 | 1 |
| $I$(CD) | 5,299 | 0.05 | 0.21 | 0 | 0 | 0 | 0 | 1 | 5,080 | 0.05 | 0.21 | 0 | 0 | 0 | 0 | 1 |

Panel C: Restaurant Ratings – Restaurant-Month-Level Panel

| | Full Sample | | | | | | | | Matched Sample | | | | | | | |
| | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max | N | Mean | S.D. | Min | P.25 | Median | P.75 | Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2020 PPP First Draw | | | | | | | | | | | |
| Rating Stars | 464,639 | 3.92 | 1.29 | 1 | 3 | 4 | 5 | 5 | 432,598 | 3.93 | 1.29 | 1 | 3 | 4 | 5 | 5 |
| | | | | | 2021 PPP First Draw | | | | | | | | | | | |
| Rating Stars | 26,492 | 4.06 | 1.25 | 1 | 4 | 5 | 5 | 5 | 25,476 | 4.06 | 1.25 | 1 | 4 | 5 | 5 | 5 |

51

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 2:** Fintech Lenders and Minority-owned Businesses – Baseline

This table reports the linear probability regression results where the dependent variable is the Fintech loan indicator (0/1). The sample is the linked restaurant-level cross-sectional dataset. The key independent variables are African American, Asian, and Hispanic indicators which are defined as 1 for restaurants with the corresponding ethnic cuisine category. The results of the 2020 and 2021 PPP waves are presented in columns (1) - (4) and columns (5) - (8), referring to PPP loans issued during April 2020 and December 2020 and during January 2021 and March 2021, respectively. The full and matched sample are indicated through sub-column heads where the matched sample is constructed by matching minority borrowers with non-minority borrowers in the same state, business type (aggregated), food price range, and having an employment size with a difference of up to five employees. In addition to the variables reported in the table, we also control for business type fixed effects. Detailed variable definitions are in Appendix Table B1. For demonstration purposes, the dependent variable is multiplied by 100. Standard errors are clustered at the city level as reported in the parentheses. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$.

| Dep. Var. | FinTech Indicator × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | 9.17*** | 7.98*** | 9.06*** | 7.55*** | 20.92*** | 15.99*** | 20.95*** | 15.87*** |
| | (1.63) | (1.59) | (1.65) | (1.64) | (5.16) | (5.03) | (5.15) | (5.05) |
| $I$(Asian) | 8.44*** | 7.40*** | 8.15*** | 6.93*** | 11.54*** | 9.76*** | 11.20*** | 9.20*** |
| | (0.41) | (0.39) | (0.41) | (0.39) | (1.39) | (1.34) | (1.40) | (1.36) |
| $I$(Hispanic) | 1.22*** | 0.87*** | 0.87*** | 0.78** | 5.67*** | 4.83*** | 5.50*** | 4.92*** |
| | (0.33) | (0.32) | (0.33) | (0.32) | (1.44) | (1.43) | (1.47) | (1.45) |
| Employment | | -0.07*** | | -0.15*** | | -0.16*** | | -0.30*** |
| | | (0.00) | | (0.01) | | (0.03) | | (0.06) |
| $I$(Franchise) | | -0.26 | | 0.18 | | -2.64 | | -2.16 |
| | | (0.32) | | (0.36) | | (1.79) | | (1.89) |
| N. Reviews (per 100) | | 0.13 | | 0.52*** | | 1.89** | | 2.07** |
| | | (0.11) | | (0.13) | | (0.83) | | (0.96) |
| Business Type FEs | | X | | X | | X | | X |
| Observations | 92,557 | 92,556 | 86,097 | 86,095 | 6,268 | 6,266 | 6,024 | 6,022 |
| Adjusted $R^2$ | 0.013 | 0.041 | 0.012 | 0.042 | 0.018 | 0.062 | 0.017 | 0.062 |

52

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 3:** Fintech Lenders and Minority-owned Businesses – Lending Relationships

This table reports the linear probability regression results where the dependent variable is the Fintech loan indicator (0/1). The sample is the linked restaurant-level cross-sectional dataset. In addition to the racial minority dummy variables in Table 2, regressions in this table include a dummy variable $I$(Relationships) that equals 1 if the borrower had SBA 7(a) or 504 loans during 2009-2019. Results with the lending relationship dummy itself are reported in odd columns. Results with interactions between lending relationships and racial minority dummies are reported in even columns. The 2020 and 2021 PPP waves and the full and matched sample are indicated through sub-column heads where the matched sample is constructed in the same way described in Table 2. In addition to the variables reported in the table, we also control for business type fixed effects. Detailed variable definitions are in Appendix Table B1. For demonstration purposes, the fintech and lending relationship indicators are multiplied by 100. Standard errors are clustered at the city level as reported in the parentheses. $^*$ p < 0.10, $^{**}$ p < 0.05, $^{***}$ p < 0.01.

| Dep. Var. | FinTech Indicator × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | 7.92*** | 8.19*** | 7.50*** | 7.76*** | 16.10*** | 16.55*** | 15.98*** | 16.43*** |
| | (1.60) | (1.64) | (1.64) | (1.68) | (5.02) | (5.13) | (5.03) | (5.15) |
| $I$(Asian) | 7.35*** | 7.55*** | 6.88*** | 7.09*** | 9.70*** | 9.84*** | 9.14*** | 9.26*** |
| | (0.39) | (0.40) | (0.39) | (0.39) | (1.34) | (1.35) | (1.35) | (1.37) |
| $I$(Hispanic) | 0.81** | 0.79** | 0.72** | 0.69** | 4.73*** | 4.80*** | 4.82*** | 4.88*** |
| | (0.32) | (0.32) | (0.32) | (0.33) | (1.43) | (1.44) | (1.45) | (1.47) |
| $I$(Relationships) × 100 | -5.52*** | -4.48*** | -5.62*** | -4.53*** | -14.74*** | -12.24*** | -15.07*** | -12.73*** |
| | (0.44) | (0.43) | (0.48) | (0.48) | (0.91) | (0.97) | (0.86) | (0.89) |
| $I$(African American) × $I$(Relationships) × 100 | | -11.50*** | | -11.23*** | | -19.60*** | | -18.99*** |
| | | (1.69) | | (1.84) | | (5.80) | | (5.88) |
| $I$(Asian) × $I$(Relationships) × 100 | | -9.08*** | | -9.25*** | | -11.54*** | | -10.50*** |
| | | (0.83) | | (0.84) | | (1.63) | | (1.64) |
| $I$(Hispanic) × $I$(Relationships) × 100 | | 1.79 | | 2.23 | | -4.88*** | | -4.11** |
| | | (1.49) | | (1.57) | | (1.70) | | (1.92) |
| Employment | -0.07*** | -0.07*** | -0.15*** | -0.15*** | -0.16*** | -0.16*** | -0.29*** | -0.29*** |
| | (0.00) | (0.00) | (0.01) | (0.01) | (0.04) | (0.03) | (0.06) | (0.06) |
| $I$(Franchise) | -0.04 | -0.06 | 0.40 | 0.39 | -2.43 | -2.44 | -1.95 | -1.97 |
| | (0.32) | (0.32) | (0.36) | (0.36) | (1.79) | (1.79) | (1.89) | (1.89) |
| N. Reviews (per 100) | 0.16 | 0.17 | 0.54*** | 0.56*** | 1.85** | 1.88** | 2.04** | 2.06** |
| | (0.11) | (0.11) | (0.13) | (0.12) | (0.83) | (0.83) | (0.95) | (0.96) |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 92,556 | 92,556 | 86,095 | 86,095 | 6,266 | 6,266 | 6,022 | 6,022 |
| Adjusted $R^2$ | 0.042 | 0.042 | 0.044 | 0.044 | 0.064 | 0.064 | 0.064 | 0.064 |

53

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 4:** Fintech Lenders and Minority-owned Businesses – Number of Branches

This table reports the linear probability regression results where the dependent variable is the Fintech loan indicator (0/1). The sample is the linked restaurant-level cross-sectional dataset. In addition to the racial minority dummy variables in Table 2 and lending relationship dummy in Table 3, regressions in this table include *N. Branches* which is the number of bank branches in the zip code region of the restaurant that are active in 2020 based on information from FFIEC. Results with the lending relationship dummy itself are reported in odd columns. Results with interactions between lending relationships and racial minority dummies are reported in even columns. The 2020 and 2021 PPP waves and the full and matched sample are indicated through sub-column heads where the matched sample is constructed in the same way as described in Table 2. In addition to the variables reported in the table, we also control for business type fixed effects. Detailed variable definitions are in Appendix Table B1. For demonstration purposes, the fintech and lending relationship indicators are multiplied by 100. Standard errors are clustered at the city level as reported in the parentheses. $^{*}$ p < 0.10, $^{**}$ p < 0.05, $^{***}$ p < 0.01.

| Dep. Var. | FinTech Indicator × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | 7.93*** | 10.45*** | 7.52*** | 10.02*** | 16.13*** | 24.98*** | 16.01*** | 25.58*** |
| | (1.59) | (2.63) | (1.64) | (2.71) | (5.02) | (7.18) | (5.04) | (7.13) |
| $I$(Asian) | 7.31*** | 8.21*** | 6.83*** | 7.73*** | 9.60*** | 11.78*** | 9.03*** | 11.32*** |
| | (0.39) | (0.61) | (0.38) | (0.61) | (1.34) | (2.11) | (1.35) | (2.15) |
| $I$(Hispanic) | 0.81** | 1.39*** | 0.71** | 1.24** | 4.70*** | 3.80* | 4.79*** | 4.05* |
| | (0.32) | (0.52) | (0.32) | (0.53) | (1.42) | (2.22) | (1.45) | (2.26) |
| N. Branches | 0.02 | 0.05** | 0.03 | 0.06** | 0.05 | 0.12 | 0.05 | 0.13 |
| | (0.02) | (0.02) | (0.03) | (0.02) | (0.08) | (0.10) | (0.09) | (0.11) |
| $I$(African American) × N. Branches | | -0.34 | | -0.35 | | -1.42* | | -1.52** |
| | | (0.24) | | (0.25) | | (0.74) | | (0.74) |
| $I$(Asian) × N. Branches | | -0.10** | | -0.10** | | -0.26 | | -0.27 |
| | | (0.05) | | (0.05) | | (0.21) | | (0.21) |
| $I$(Hispanic) × N. Branches | | -0.07 | | -0.07 | | 0.11 | | 0.09 |
| | | (0.05) | | (0.05) | | (0.25) | | (0.25) |
| $I$(Relationships) × 100 | -0.06*** | -0.06*** | -0.06*** | -0.06*** | -0.15*** | -0.15*** | -0.15*** | -0.15*** |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.01) | (0.01) |
| Employment | -0.07*** | -0.07*** | -0.15*** | -0.15*** | -0.16*** | -0.16*** | -0.29*** | -0.29*** |
| | (0.00) | (0.00) | (0.01) | (0.01) | (0.03) | (0.03) | (0.06) | (0.06) |
| $I$(Franchise) | -0.06 | -0.09 | 0.37 | 0.34 | -2.54 | -2.64 | -2.06 | -2.19 |
| | (0.32) | (0.32) | (0.36) | (0.36) | (1.81) | (1.91) | (1.91) | (1.93) |
| N. Reviews (per 100) | 0.15 | 0.14 | 0.53*** | 0.53*** | 1.81** | 1.82** | 2.00** | 2.00** |
| | (0.11) | (0.11) | (0.13) | (0.13) | (0.83) | (0.83) | (0.96) | (0.95) |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 92,556 | 92,556 | 86,095 | 86,095 | 6,266 | 6,266 | 6,022 | 6,022 |
| Adjusted $R^2$ | 0.042 | 0.042 | 0.044 | 0.044 | 0.064 | 0.064 | 0.064 | 0.064 |

54

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 5:** Fintech Lenders and Minority-owned Businesses – City Location

This table reports the linear probability regression results where the dependent variable is the Fintech loan indicator (0/1). The sample is the linked restaurant-level cross-sectional dataset. In addition to the independent variables in Table 2 - Table 4, regressions in this table include city fixed effects. Panel A reports the results with the *N. Branches* itself and Panel B reports the results with interactions between *N. Branches* and racial minority dummies. The results of the 2020 and 2021 PPP waves are presented in columns (1) - (4) and columns (5) - (8), referring to PPP loans issued during April 2020 and December 2020 and during January 2021 and March 2021, respectively. The full sample and matched sample are indicated through sub-column heads where the matched sample is constructed in the same way described in Table 2. In addition to the variables reported in the table, we also control for business type fixed effects. Detailed variable definitions are in Appendix Table B1. For demonstration purposes, the fintech and lending relationship indicators are multiplied by 100. Standard errors are clustered at the city level as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

| Dep. Var. | FinTech Indicator × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | 5.02*** | 4.92*** | 4.89*** | 4.80*** | 5.51 | 5.64 | 6.60 | 6.75 |
| | (1.67) | (1.68) | (1.71) | (1.72) | (6.07) | (6.07) | (6.01) | (5.99) |
| $I$(Asian) | 6.13*** | 6.09*** | 5.88*** | 5.84*** | 6.07*** | 6.12*** | 5.62*** | 5.66*** |
| | (0.41) | (0.41) | (0.41) | (0.41) | (1.80) | (1.80) | (1.82) | (1.82) |
| $I$(Hispanic) | 0.07 | 0.01 | 0.04 | -0.02 | 3.32* | 3.29* | 3.72* | 3.70* |
| | (0.32) | (0.32) | (0.33) | (0.33) | (1.93) | (1.94) | (1.98) | (1.98) |
| Employment | -0.06*** | -0.06*** | -0.13*** | -0.13*** | -0.13** | -0.13** | -0.30*** | -0.30*** |
| | (0.00) | (0.00) | (0.01) | (0.01) | (0.05) | (0.05) | (0.08) | (0.08) |
| $I$(Franchise) | -0.43 | -0.23 | -0.26 | -0.06 | -7.63*** | -7.44*** | -6.79** | -6.61** |
| | (0.33) | (0.33) | (0.37) | (0.37) | (2.81) | (2.83) | (2.91) | (2.93) |
| N. Reviews (per 100) | -0.60*** | -0.57*** | -0.31** | -0.28** | 0.27 | 0.32 | 0.36 | 0.39 |
| | (0.12) | (0.12) | (0.14) | (0.14) | (1.04) | (1.06) | (1.10) | (1.12) |
| N. Branches | | -0.04 | | -0.03 | | -0.07 | | -0.05 |
| | | (0.03) | | (0.03) | | (0.17) | | (0.17) |
| $I$(Relationships) × 100 | | -0.05*** | | -0.05*** | | -0.11*** | | -0.10*** |
| | | (0.00) | | (0.01) | | (0.02) | | (0.02) |
| City FEs | X | X | X | X | X | X | X | X |
| Business Type FEs | | X | | X | | X | | X |
| Observations | 88,873 | 88,873 | 82,426 | 82,426 | 4,150 | 4,150 | 3,984 | 3,984 |
| Adjusted $R^2$ | 0.062 | 0.063 | 0.063 | 0.063 | 0.078 | 0.079 | 0.084 | 0.085 |

55

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 6:** Becker's Taste-Based Discrimination, Rating Gap

This table reports the regression results from examining the difference in ratings between minority and non-minority-owned restaurants that borrow from fintech and non-fintech lenders. The sample is the linked restaurant-month-level panel. The dependent variable is *Rating Stars*, which is calculated as the monthly average of the customer ratings from Yelp.com between April 2020 and March 2021 (during the Covid crisis), ranging from 0 to 5. Key independent variables include African American, Asian, and Hispanic indicators that are defined as 1 for restaurants with the corresponding ethnic cuisine category and the Fintech indicator that is defined as 1 for loans backed by fintech lenders. The 2020 and 2021 PPP waves and the matched and full samples are indicated through sub-column heads. The matched sample is constructed in the same way as in Table 2. In addition to the variables reported in the table, we also control for city × month (or month) fixed effects, business type fixed effects, and eating policy dummies for delivery, takeout, reservations, and outdoor seating. Detailed variable definitions are in Appendix Table B1. N. Reviews is divided by 100 for demonstration purposes. Standard errors are clustered at the restaurant level and reported in parentheses. $^*$ p < 0.10, $^{**}$ p < 0.05, $^{***}$ p < 0.01.

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{FinTech}) \times I(\text{African American})$ | -0.23** | -0.22** | -0.22** | -0.22** | -0.19 | -0.36* | -0.19 | -0.37* |
| | (0.11) | (0.11) | (0.11) | (0.11) | (0.18) | (0.20) | (0.18) | (0.20) |
| $I(\text{FinTech}) \times I(\text{Asian})$ | -0.05*** | -0.05** | -0.05** | -0.05** | -0.03 | -0.01 | -0.01 | 0.01 |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.07) | (0.10) | (0.07) | (0.10) |
| $I(\text{FinTech}) \times I(\text{Hispanic})$ | -0.02 | -0.01 | -0.02 | -0.01 | -0.18** | -0.27** | -0.18** | -0.26* |
| | (0.03) | (0.03) | (0.03) | (0.03) | (0.09) | (0.13) | (0.09) | (0.13) |
| $I(\text{FinTech})$ | 0.06*** | 0.06*** | 0.05*** | 0.06*** | -0.05 | 0.00 | -0.06 | 0.00 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.04) | (0.06) | (0.04) | (0.06) |
| $I(\text{African American})$ | 0.06 | 0.08* | 0.04 | 0.06 | -0.02 | 0.04 | -0.02 | 0.04 |
| | (0.04) | (0.04) | (0.04) | (0.04) | (0.11) | (0.14) | (0.11) | (0.14) |
| $I(\text{Asian})$ | -0.03*** | -0.01 | -0.04*** | -0.02** | -0.01 | 0.02 | -0.02 | 0.02 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.03) | (0.04) | (0.03) | (0.04) |
| $I(\text{Hispanic})$ | -0.11*** | -0.10*** | -0.11*** | -0.10*** | -0.15*** | -0.08 | -0.15*** | -0.08 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.04) | (0.06) | (0.04) | (0.06) |
| N. Reviews (per 100) | 0.06*** | 0.06*** | 0.07*** | 0.07*** | 0.05*** | 0.04** | 0.07*** | 0.05** |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.02) | (0.02) | (0.02) | (0.02) |
| $I(\text{Franchise})$ | -1.05*** | -1.00*** | -1.04*** | -0.98*** | -0.94*** | -0.83*** | -0.92*** | -0.79*** |
| | (0.01) | (0.01) | (0.01) | (0.02) | (0.07) | (0.10) | (0.07) | (0.10) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Eating Policy Controls | X | X | X | X | X | X | X | X |
| Observations | 464,639 | 434,948 | 432,598 | 403,363 | 26,491 | 14,723 | 25,476 | 14,095 |
| Adjusted $R^2$ | 0.055 | 0.075 | 0.052 | 0.072 | 0.040 | 0.048 | 0.040 | 0.045 |

56

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 7:** Approval Date

This table reports the regression results from examining the difference in PPP loan approval dates between minority and non-minority-owned restaurants that borrow from fintech and non-fintech lenders. The sample is the linked restaurant-level cross-sectional dataset. The dependent variable, $\Delta$(Approval Date-PPP Starting Date), is the difference between the PPP loan approval date and PPP starting date. The starting date is April 09, 2020, for the 2020 wave and Jan 12, 2021, for the 2021 wave. The 2020 and 2021 PPP waves are indicated in column heads. The matched and full samples are indicated through sub-column heads. African American, Asian, and Hispanic indicators are defined as 1 for restaurants with the corresponding ethnic cuisine category. The Fintech indicator is defined to be 1 for loans backed by fintech lenders. The construction of the matched sample is the same as in Table 2. Detailed variable definitions are in Appendix Table B1. Standard errors are clustered at the city level as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

| Dep. Var. | $\Delta$(Approval Date, PPP Starting Date) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) $\times$ $I$(Fintech) | -2.00 | -1.49 | -2.00 | -1.40 | -3.61 | -0.01 | -3.82 | -0.04 |
| | (3.15) | (3.29) | (3.14) | (3.29) | (4.13) | (4.65) | (4.14) | (4.69) |
| $I$(Asian) $\times$ $I$(Fintech) | 3.45*** | 3.68*** | 3.63*** | 3.88*** | -8.11*** | -7.34*** | -8.20*** | -7.54*** |
| | (0.73) | (0.76) | (0.74) | (0.77) | (1.57) | (2.16) | (1.58) | (2.17) |
| $I$(Hispanic) $\times$ $I$(Fintech) | 1.41 | 0.55 | 1.43 | 0.61 | -8.72*** | -6.71** | -8.75*** | -6.83** |
| | (1.12) | (1.16) | (1.12) | (1.16) | (2.04) | (2.64) | (2.06) | (2.68) |
| $I$(Fintech) | 12.10*** | 10.72*** | 11.61*** | 10.20*** | 2.42** | 0.66 | 2.38** | 0.5 |
| | (0.46) | (0.5) | (0.47) | (0.51) | (0.94) | (1.28) | (0.96) | (1.3) |
| $I$(African American) | 7.63*** | 6.30*** | 7.12*** | 5.75*** | 8.71*** | 4.35 | 8.91*** | 4.56 |
| | (1.26) | (1.31) | (1.27) | (1.33) | (2.65) | (2.98) | (2.72) | (3.06) |
| $I$(Asian) | 8.60*** | 7.88*** | 8.12*** | 7.42*** | 2.43*** | 1.42 | 2.29*** | 1.28 |
| | (0.3) | (0.32) | (0.3) | (0.32) | (0.77) | (1.09) | (0.78) | (1.1) |
| $I$(Hispanic) | 4.56*** | 4.33*** | 4.44*** | 4.22*** | 3.15*** | 2.51* | 3.18*** | 2.50* |
| | (0.28) | (0.3) | (0.29) | (0.3) | (0.89) | (1.3) | (0.9) | (1.33) |
| Employment | -0.08*** | -0.08*** | -0.18*** | -0.18*** | -0.05** | -0.05 | -0.12*** | -0.14*** |
| | (0.00) | (0.00) | (0.01) | (0.01) | (0.02) | (0.04) | (0.03) | (0.04) |
| $I$(Franchise) | -7.22*** | -7.24*** | -7.02*** | -7.15*** | 1.21 | 0.92 | 1.62 | 1.84 |
| | (0.23) | (0.25) | (0.25) | (0.27) | (1.14) | (1.59) | (1.19) | (-1.61) |
| City FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 81,687 | 78,026 | 76,850 | 73,244 | 6,266 | 4,150 | 6,022 | 3,984 |
| Adjusted $R^2$ | 0.114 | 0.135 | 0.117 | 0.137 | 0.03 | 0.036 | 0.019 | 0.025 |

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 8:** Structural Estimation of the Matching Game Model

This table reports estimates from the Fox (2018) matching model. All borrower and lender-specific characteristics are demeaned. *Fintech* is an indicator equal to one if the lender is a fintech lender. *Minority* is an indicator equal to one if the restaurant is owned by minority racial groups. *Lending Relationships* is an indicator equal to one if the restaurant borrowed from the lender in SBA programs during 2009-2019. *Geo Distance* is the distance in miles between the zip codes of the borrower and the lender's headquarters. *N. Branches* is the number of active bank branches of the lender in the borrower's zip code region, using bank branch information from FFIEC. The bounds of the optimization procedure are fixed at 4000 to provide scale for the coefficients. *% of Inequalities Satisfied* is the fraction of matches deemed pairwise stable using the vector of parameter estimates. *N. of Inequalities In Total* are the total number of inequalities considered in the model. Point estimates are the estimated parameters using the entire sample. 90%, 95%, and 99% confidence intervals are based on subsampling, with *, **, and *** indicate the corresponding confidence interval does not include zero. Due to computational power constraints, I estimate the model state by state and the average of the 51 states in the sample are reported in this table.

|  |  | 2020 PPP | 2021 PPP |
|---|---|---|---|
| *Parameter Estimates* |  |  |  |
| Fintech × Minority | Point Est. | 1120.72*** | 421.97 |
|  | 90% CI | [683.20,1592.89] | [-385.55, 1284.63] |
|  | 95% CI | [520.50,1719.00] | [-671.63, 1544.80] |
|  | 99% CI | [263.32,1897.10] | [-1026.62, 1873.81] |
| Lending Relationships | Point Est. | 3368.36*** | 1648.33** |
|  | 90% CI | [3210.48,3514.81] | [704.43, 2052.74] |
|  | 95% CI | [3155.48,3551.83] | [275.32, 2178.54] |
|  | 99% CI | [3063.32,3600.39] | [-145.61, 2331.14] |
| N. Branches | Point Est. | 1144.41*** | 1018.40** |
|  | 90% CI | [932.89,1356.18] | [464.72, 1650.52] |
|  | 95% CI | [872.34,1419.64] | [237.96, 1898.10] |
|  | 99% CI | [774.09,1548.27] | [-137.22, 2198.52] |
| Geo Distance | Point Est. | -30.10*** | -102.39 |
|  | 90% CI | [-46.20,-5.08] | [-348.13, 93.96] |
|  | 95% CI | [-56.45,-3.43] | [-440.20, 156.31] |
|  | 99% CI | [-74.17,5.91] | [-594.88, 225.12] |
| Fintech × Ratings | Point Est. | 437.10** | -306.94 |
|  | 90% CI | [139.25,768.19] | [-1142.81, 548.09] |
|  | 95% CI | [65.16, 860.61] | [-1373.39, 810.17] |
|  | 99% CI | [-87.29,1034.99] | [-1647.14, 1242.78] |
| *Relative Importance* |  |  |  |
| $\left\lvert\frac{\text{Fintech}\times\text{Minority}}{\text{Lending Relationships}}\right\rvert$ |  | 0.33 | 0.26 |
| $\left\lvert\frac{\text{Fintech}\times\text{Minority}}{\text{N. Branches}}\right\rvert$ |  | 0.98 | 0.41 |
| $\left\lvert\frac{\text{Fintech}\times\text{Minority}}{\text{Geo Distance}}\right\rvert$ |  | 14.52 | 4.12 |
| % of Inequalities Satisfied |  | 67.34% | 72.72% |
| N. of Inequalities In Total |  | 2,142,966 | 7,859 |

58

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table 9:** Matching Game Model Counterfactual, Fintech Usage

This table reports counterfactual estimates of the fintech usage by minority and non-minority racial groups in the PPP under alternative matching assignments. Counterfactual matching assignments are generated by altering the parameters of the matching model and reassigning borrowers to lenders in the same state. The three left columns of the panel report the counterfactual estimates. The three right columns of the panel report the percentage of changes of the variable under each counterfactual matching assignment relative to the model predictions without altering the parameters (i.e., $\frac{Counterfactual-Model}{Model}$). The columns labeled "% of Minority Use Fintech" and "% of White Use Fintech" report the fraction of minority and non-minority borrowers using fintech, respectively, under each counterfactual matching assignment. The columns labeled "$\Delta$" reports the difference between the minority and non-minority groups in each case. When the matching values tie, I use a random match between borrowers and lenders. To wash out the effect due to randomness in the tie-value cases, I run each counterfactual case 100 times and report the average in this table. Due to computational power constraints, I estimate the model state by state and the average of the 51 states in the sample are reported in this table.

| | 2020 PPP | | | | | |
| | Estimated Results | | | Compared to Model Prediction | | |
| | % of Minority Use Fintech | % of White Use Fintech | $\Delta$ | % of Minority Use Fintech | % of White Use Fintech | $\Delta$ |
|---|---|---|---|---|---|---|
| Model Prediction | 19.03% | 2.62% | 16.42% | | | |
| Random Sample | 7.80% | 7.03% | 0.77% | -59.02% | 168.78% | -95.32% |
| Shut Off $\beta_{\text{Fintech}\times\text{Minority}}$ | 5.82% | 8.22% | -2.40% | -69.41% | 214.15% | -114.61% |
| Reverse $\beta_{\text{Fintech}\times\text{Minority}}$ | 2.31% | 9.84% | -7.53% | -87.86% | 276.01% | -145.85% |
| Shut Off $\beta_{\text{Lending Relationships}}$ | 19.38% | 2.45% | 16.93% | 1.81% | -6.33% | 3.11% |
| Shut Off $\beta_{\text{N. Branches}}$ | 19.07% | 2.48% | 16.59% | 0.22% | -5.09% | 1.07% |
| Shut Off $\beta_{\text{Geo Distance}}$ | 19.00% | 2.52% | 16.48% | -0.16% | -3.61% | 0.39% |
| Shut Off $\beta_{\text{Fintech}\times\text{Ratings}}$ | 20.21% | 1.99% | 18.22% | 6.20% | -23.91% | 11.00% |
| | 2021 PPP | | | | | |
| | Estimated Results | | | Compared to Model Prediction | | |
| | % of Minority Use Fintech | % of White Use Fintech | $\Delta$ | % of Minority Use Fintech | % of White Use Fintech | $\Delta$ |
| Model Prediction | 18.71% | 10.81% | 7.89% | | | |
| Random Sample | 14.96% | 12.84% | 2.12% | -20.05% | 18.72% | -73.14% |
| Shut Off $\beta_{\text{Fintech}\times\text{Minority}}$ | 13.59% | 14.48% | -0.89% | -27.35% | 33.90% | -111.24% |
| Reverse $\beta_{\text{Fintech}\times\text{Minority}}$ | 13.12% | 15.64% | -2.52% | -29.86% | 44.68% | -131.96% |
| Shut Off $\beta_{\text{Lending Relationships}}$ | 18.69% | 10.88% | 7.80% | -0.10% | 0.66% | -1.16% |
| Shut Off $\beta_{\text{N. Branches}}$ | 20.19% | 10.10% | 10.09% | 7.95% | -6.59% | 27.87% |
| Shut Off $\beta_{\text{Geo Distance}}$ | 18.76% | 10.91% | 7.86% | 0.30% | 0.87% | -0.48% |
| Shut Off $\beta_{\text{Fintech}\times\text{Ratings}}$ | 22.07% | 8.95% | 13.12% | 17.99% | -17.25% | 66.26% |

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendices

Internet Appendix A: Additional Figures . . . . . . . . . . . . .  Internet Appendix-1

Internet Appendix B: Additional Tables . . . . . . . . . . . . .  Internet Appendix-5

Internet Appendix C: Data Construction . . . . . . . . . . . .  Internet Appendix-24

Internet Appendix D: Model Discussions and Proofs . . Internet Appendix-48

Internet Appendix E: Empirical Matching Model . . . . . Internet Appendix-55

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix A: Additional Figures

**Figure A1:** Minority- and Non-Minority-owned Businesses in the 2021 PPP Fintech vs. Non-Fintech

This figure plots the daily dollar value of PPP loans received by minority- and non-minority-owned restaurants processed by non-fintech (Panel A) and fintech (Panel B) lenders in the 2021 PPP wave for our sample. The 2021 wave spans from January 12, 2021, to March 31, 2021. The y-axis represents the daily dollar value of loans processed (in USD millions), and the x-axis represents the loan approval date. The blue solid line plots non-minority-owned restaurants and the red dashed line plots minority-owned restaurants. The vertical dashed line indicates the implementation of the American Rescue Plan Act of 2021 on March 11, 2021.

Panel A: 2021 PPP, Non-Fintech Lenders



Panel B: 2021 PPP, Fintech Lenders



Internet Appendix-1

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure A2:** Loans Distributed by Fintech and Non-Fintech Lenders Across Racial Groups (Dollar Value)

This figure plots the daily amount (USD millions) of PPP loans received by African American (Panel A), Asian (Panel B), and Hispanic (Panel C) borrowers in the 2020 PPP wave for our sample. The 2020 wave spans from April 3, 2020, to August 8, 2020. Panels E to G are similar plots except they represent 2021 PPP from January 12, 2021, to March 31, 2021. The y-axis represents the daily amount of loans processed, and the x-axis represents the loan approval date. The blue solid line plots non-minority-owned restaurants and the red dashed line plots minority-owned restaurants. In Panels A to C, the first vertical dashed line indicates the time of the entry of fintech lenders on April 10, 2020, and the second vertical dashed line indicates the time of the beginning of the second tranche of the 2020 PPP on April 27. In Panels D to F, the vertical dashed line indicates the implementation of the American Rescue Plan Act on March 11, 2021.



Internet Appendix-2

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure A3:** Minority-Non-Minority Rating Gap (African-American-owned) Fintech vs. Non-Fintech

This figure plots the minority-non-minority rating gap for African-American-owned restaurants in the 2020 wave using (Panel A) and for African-American -owned restaurants in the 2021 wave (Panel B). The y-axis represents the coefficients before the interaction terms between the racial group indicator and lender indicators from the regressions as in Table 3, except that we decompose the fintech indicator into several dummies for each big fintech lender and bank. The x-axis represents specific lenders. We plot the biggest four fintech lenders in our sample: Cross River Bank, Kabbage, Square, and Paypal, and the largest seven banks in our sample: JPMorgan, Bank of America, Wells Fargo, U.S. Bank, Truist, PNC, and TD Bank. In each regression, the dependent variable is the Rating Stars, which range from 0 to 5, based on customer ratings from yelp.com. The African-American indicator is 1 for restaurants that we identify as African-American food restaurants. The Lender$_j$ (e,g., *Kabbage*) indicator is 1 for loans backed by that lender (e.g. by *Kabbage*). The omitted category is all other lenders. Control variables are the same as in Table 3 which contain lender dummies, racial group dummy, employment size, franchise dummy, month-city fixed effects, business type fixed effects, and eating policy dummies. Detailed variable definitions are in Appendix Table A1. Standard errors clustered at the restaurant-lender level.



Panel A: 2020 PPP Recipients          Panel B: 2021 PPP Recipients

Internet Appendix-3

Electronic copy available at: https://ssrn.com/abstract=3949148

**Figure A4:** Minority-Non-Minority Rating Gap (Hispanic-owned) Fintech vs. Non-Fintech

This figure plots the minority-non-minority rating gap for Hispanic-owned restaurants in the 2020 wave (Panel A), and for Hispanic-owned restaurants in the 2021 wave (Panel B). The y-axis represents the coefficients of the interaction terms of the racial group indicator and lender indicators from the regressions as in Table 3, except that we decompose the fintech indicator into several dummies for each big fintech lender and bank. The x-axis represents each lender. We plot the biggest four fintech lenders in our sample: Cross River Bank, Kabbage, Square, and Paypal, and the largest seven banks in our sample: JPMorgan, Bank of America, Wells Fargo, U.S. Bank, Truist, PNC, and TD Bank. In each regression, the dependent variable is the Rating Stars, which range from 0 to 5, based on customer ratings from yelp.com. The Hispanic-owned indicator is 1 for restaurants that we identify as Hispanic food restaurants. The Lender$_j$ (e.g., *Kabbage*) indicator is 1 for loans backed by that lender (e.g. by *Kabbage*). The omitted category is all other lenders. Control variables are the same as in Table 3 which contain lender dummies, racial group dummy, employment size, franchise dummy, month-city fixed effects, business type fixed effects, and eating policy dummies. Detailed variable definitions are in Appendix Table A1. Standard errors clustered at the restaurant-lender level.



Panel A: 2020 PPP Recipients        Panel B: 2021 PPP Recipients

Internet Appendix-4

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix B: Additional Tables

**Table B1:** Variable Definition

| Variable Name | Definition | Data Source |
|---|---|---|
| $I$(Fintech) | 1 if the lender of the loan is a fintech lender, 0 otherwise | PPP loan-level dataset<br>Consolidated fintech company list |
| $I$(Minority Borrower) | 1 if the restaurant is of minority food type, 0 otherwise | yelp.com |
| $I$(African American) | 1 if the restaurant is of African American food type, 0 otherwise | Food type classification list |
| $I$(Asian) | 1 if the restaurant is of Asian food type (including Pacific Islander), 0 otherwise | |
| $I$(Hispanic) | 1 if the restaurant is of Hispanic food type, 0 otherwise | |
| | *When multiple food categories, African American ≥ Asian ≥ Hispanic* | |
| Rating Stars | Mean of all the customer ratings in the month which range from 0 to 5 | Yelp.com |
| Eating Policy | Dummies for the following restaurant amenities: delivery, takeout, reservations, and outdoor seating | |
| Food Price | Dummies for $,$$,$$$,$$$$ | |
| Δ(Approval Date-PPP Starting Date) | Number of days between the date approved and April 3rd, 2020 for the 2020 PPP | PPP loan-level dataset |
| | Number of days between the date approved and Jan 12th, 2021 for the 2021 PPP | |
| Employment | Jobs Reported in the SBA original dataset | |
| $I$(Franchise) | 1 if the Franchise Name in the SBA original dataset is non-empty after our adjustments (see Online Appendix C3) | |

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B1:** Variable Definition (Continued)

| Variable Name | Definition | Data Source |
|---|---|---|
| Business Type FEs | Dummies based Business yype in the SBA original dataset, including Cooperative Corporation, Employee Stock Ownership Plan(ESOP), Independent Contractors, Joint Venture, Limited Liability Company(LLC), Limited Liability Partnership, Partnership, Professional Association, Qualified Joint-Venture (spouses), Self-Employed Individuals, Single Member LLC, Sole Proprietorship, Subchapter S Corporation, Tenant in Common, Tribal Concerns, Trust | |
| Approval Date FEs | Dummies for the approval date in the SBA original dataset | |
| City FEs | Dummies for cities Convert zip code in the SBA original dataset to city using the HUD-USPS ZIP Code Crosswalk data. If the zip code-city conversion is not available in the HUD data, we manually searched and find the city in the format in the HUD data. *We do not directly use the city information in the PPP data due to quality concerns.* | PPP loan-level dataset, HUD User |
| New Bank | 1 if the lender is a first-time bank, 0 otherwise (fintech lenders and non-banks are excluded). To identify whether the bank previously participated in the SBA programs, we use a combination of code-based and manual checks of lender name matching with the SBA 7(a) and 504 loan-level data from 1990-2019. | PPP loan-level dataset SBA 7(a) and 504 loan-level dataset (1990-2019) |
| CD | 1 if the lender is a CDFI or CDC, 0 otherwise (fintech lenders and other non-banks are excluded) | cdfifund.gov SBA 504 (1990-2019) |
| Uninsured | 1 if the lender is not federally insured, 0 otherwise | FFEIC |
| S&L | 1 if the lender is a Savings and Loan Association, 0 otherwise | Missing if not matched with FFEIC |
| CU | 1 if the lender is a Credit Union, 0 otherwise | |
| $I$(Relationships) | 1 if the borrower previously borrowed a SBA 7(a) or 504 loan | SBA 7(a) and 504 loan-level dataset (2009-2019) |
| Rel. (A. Loan) | Total dollar value of SBA 7(a) and 504 loans the borrower has (million USD) | |
| N. Branches | The number of bank branches in the zip code region of the restaurant that are active in 2020 based on information from FFIEC. | |

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B2:** The List of Fintech Lenders in the First Draw of the PPP Program

Loan Source shown in the PPP loan-level dataset includes the following 37 originators in the 2020-PPP round: Columbia Community CU, First State Bank, Renaissance Community Loan Fund, Inc., The Bryn Mawr Trust Company, Neighbors FCU, Ascend FCU, FirstBank, BNC National Bank, Pelican State CU, First Reliance Bank, Nano Banc, Pacific Premier Bank, Signature Bank of Georgia, The Hicksville Bank, Florida Capital Bank, National Association, Flagstar Bank, FSB, First Bank of Alabama, Stearns Bank National Association, Sterling National Bank, Bethpage FCU, Marlin Business Bank, KeyPoint CU, BCB Community Bank, Kearny Bank, Five Star Bank, Community Bank and Trust Company, Investors Bank, Peapack-Gladstone Bank, OceanFirst Bank, National Association, Financial Partners CU, Prudential Bank, Gather FCU, Northeast Bank, Southern First Bank, Malvern Bank, National Association, Orange County's CU, Neighborhood National Bank.

| Pair Num | Servicing Lender | Originating Lender | N. Our | Our/722 | N. 722 | N. All |
|---|---|---|---|---|---|---|
| 1 | Cross River Bank | Cross River Bank | 2165 | 26% | 8440 | 324588 |
| 2 | Cross River Bank | Kabbage, Inc. | 1828 | 23% | 7859 | 159823 |
| | Kabbage, Inc. | | | | | |
| 3 | Square Capital, LLC | Square Capital, LLC | 1521 | 22% | 6966 | 86109 |
| | | Celtic Bank Corporation | | | | |
| 4 | WebBank | WebBank | 1415 | 31% | 4639 | 82997 |
| 5 | First Home Bank | Loan Source Incorporated | 1019 | 28% | 3654 | 36515 |
| | Loan Source Incorporated | some bank[1] | | | | |
| 6 | Itria Ventures LLC | Itria Ventures LLC | 499 | 4% | 12106 | 197238 |
| 7 | Customers Bank | Readycap Lending, LLC | 413 | 13% | 3301 | 67836 |
| | Readycap Lending, LLC | | | | | |
| 8 | FC Marketplace, LLC (dba Funding Circle) | FC Marketplace, LLC (dba Funding Circle) | 187 | 25% | 747 | 9738 |
| | Quontic Bank | | | | | |
| 9 | Celtic Bank Corporation | Celtic Bank Corporation | 155 | 30% | 521 | 65376 |
| 10 | Fundbox, Inc. | Fundbox, Inc. | 119 | 23% | 511 | 13454 |
| 11 | Sunrise Banks, National Association | Sunrise Banks, National Association | 69 | 32% | 216 | 2200 |
| 12 | BSD Capital, LLC dba Lendistry | BSD Capital, LLC dba Lendistry | 67 | 23% | 295 | 4814 |
| 13 | Intuit Financing Inc. | Intuit Financing Inc. | 48 | 33% | 145 | 17792 |
| | Quontic Bank | | | | | |
| 14 | Opportunity Fund Community Development | Opportunity Fund Community Development | 16 | 24% | 67 | 1162 |
| 15 | FinWise Bank | FinWise Bank | 16 | 35% | 46 | 693 |

Internet Appendix-7

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B3:** Compare the Racial Group Measures PPP vs Yelp.com

This table reports the relationship between the racial group classification using information from PPP data and Yelp data. Panel A reports the share of each racial group based on information in the PPP loan-level data for each racial group using food type information from Yelp.com. Rows indicate the racial group of the restaurant owners in the PPP dataset. Columns indicate the racial group of the restaurant using food type information from Yelp.com. For example, the first row of the third column reports that 26.9% of restaurants that are classified as Hispanic based on information from Yelp.com are classified as White based on PPP information. Panel B reports the parallel results of shares of Yelp racial groups for each PPP racial groups. Panel C reports the pairwise correlations between PPP race classifications and Yelp race classifications. The sample includes all restaurant borrowers which have a valid Yelp link and non-missing race and ethnicity information in the PPP dataset.

Panel A: Cross Shares – Compare Yelp with PPP

| PPP | Yelp | | | | |
|---|---|---|---|---|---|
| | White | Non-White | Hispanic | African Ame. | Asian |
| White | 74.90% | 12.20% | 26.90% | 12.00% | 4.70% |
| Non-White | 25.10% | 87.80% | 73.10% | 88.00% | 95.30% |
| Hispanic | 3.90% | 18.30% | 51.90% | 1.80% | 1.80% |
| African Ame. | 4.00% | 5.20% | 7.50% | 80.10% | 0.50% |
| Asian | 13.70% | 59.50% | 5.90% | 1.80% | 89.60% |
| Native Ame. | 3.50% | 4.80% | 7.80% | 4.20% | 3.40% |
| Observations | 13,327 | 5,498 | 1,806 | 166 | 3,526 |

Panel B: Cross Shares – Compare PPP with Yelp

| Yelp | PPP | | | | | |
|---|---|---|---|---|---|---|
| | White | Non-White | Hispanic | African Ame. | Asian | Native Ame. |
| White | 93.70% | 40.90% | 34.20% | 65.00% | 35.80% | 63.60% |
| Non-White | 6.30% | 59.10% | 65.80% | 35.00% | 64.20% | 36.40% |
| Hispanic | 4.60% | 16.20% | 61.50% | 16.40% | 2.10% | 19.30% |
| African American | 0.20% | 1.80% | 0.20% | 16.20% | 0.10% | 1.00% |
| Asian | 1.60% | 41.10% | 4.10% | 2.30% | 62.00% | 16.20% |
| Observations | 10,657 | 8,168 | 1,525 | 821 | 5,092 | 730 |

Panel C: Pairwise Correlation

| | (1) Minority Yelp | (2) African Yelp | (3) Asian Yelp | (4) Hispanic Yelp |
|---|---|---|---|---|
| Minority PPP | 0.58*** (0.00) | | | |
| African American PPP | | 0.35*** (0.00) | | |
| Asian PPP | | | 0.52*** (0.00) | |
| Hispanic PPP | | | | 0.68*** (0.00) |
| Observations | | 18,825 | | |

Internet Appendix-8

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B4:** Compare Our Sample with the Sample in Erel and Liebersohn (2020)

The difference between our sample and the EL Sample can be attributed to 1) we exclude borrowers from Puerto Rico and non-profit organizations; 2) We adjust the lender identity to either the originating or the servicing lender is the fintech lender. For example, because Celtic Bank Corporation is also the originator of loans by Square Capital in addition to Square Capital itself as the originator, we assign those loans where the originating and servicing lender pair is Celtic Bank Corporation and Square Capital as with Square Capital. Adding the number of loans by both Celtic Bank Corporation and Square Capital gives a close number to the EL sample. Taking these modifications into account, our sample is comparable with the EL sample.

|  | Our Sample | | EL Sample | |
|---|---|---|---|---|
|  | PPP 2020 | PPP 2021 | PPP 2020 | Our/EL |
| Cross River Bank | 185207 | 139381 | 198738 | 93% |
| Kabbage, Inc. | 159823 | | 196402 | 81% |
| Square Capital, LLC | 75096 | 11013 | 0 | |
| WebBank | 74620 | 8377 | 76578 | 97% |
| Celtic Bank Corporation | 65376 | | 147317 | 44% |
| Readycap Lending, LLC | 34232 | 33604 | 34261 | 100% |
| Loan Source Incorporated | 33050 | 3594 | 0 | |
| Intuit Financing Inc. | 17792 | | 19086 | 93% |
| Fundbox, Inc. | 13454 | | 14281 | 94% |
| FC Marketplace, LLC (dba Funding Circle) | 5963 | 3775 | 6235 | 96% |
| BSD Capital, LLC dba Lendistry | 3504 | 1310 | 4076 | 86% |
| Itria Ventures LLC | 3028 | 194210 | 3556 | 85% |
| Sunrise Banks, National Association | 1655 | 545 | 0 | |
| Opportunity Fund Community Development | 978 | 184 | 990 | 99% |
| FinWise Bank | 693 | | 699 | 99% |

Internet Appendix-9

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B5:** Lending Relationships and Fintech Usage (Dummy Variable)

This table reports the regression results from examining the difference in previous lending relationships between minority and non-minority-owned restaurants. The sample is the linked restaurant-level cross-sectional dataset. Panels A and B report the regression results where the dependent variable is $I$(Relationships), a dummy variable that equals 1 if the borrower had SBA 7(a) or 504 loans during 2009-2019, on the 2020 and 2021 PPP waves respectively. The 2020 and 2021 PPP waves refer to April 2020 to December 2020 and January 2021 to March 2021. African American, Asian, and Hispanic indicators are defined as 1 for restaurants with the corresponding ethnic cuisine category. The matched and full samples are indicated through sub-column heads. The construction of the matched sample and control variables are the same as in Table 2. Detailed variable definitions are in Appendix Table B1. For demonstration purposes, dependent variables are multiplied by 100. Standard errors are clustered at the city level as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

### Panel A: 2020 PPP

| Dep. Var. | $I$(Relationships) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | -1.56** | -1.48** | -0.92 | -1.02 | -1.49** | -1.30* | -0.76 | -0.87 |
| | (0.66) | (0.66) | (0.66) | (0.68) | (0.67) | (0.67) | (0.66) | (0.68) |
| $I$(Asian) | -1.57*** | -1.50*** | -0.78*** | -1.04*** | -1.58*** | -1.45*** | -0.72*** | -1.00*** |
| | (0.16) | (0.16) | (0.16) | (0.18) | (0.17) | (0.16) | (0.16) | (0.18) |
| $I$(Hispanic) | -1.64*** | -1.63*** | -1.05*** | -0.98*** | -1.68*** | -1.70*** | -1.11*** | -1.03*** |
| | (0.15) | (0.15) | (0.15) | (0.17) | (0.15) | (0.15) | (0.15) | (0.17) |
| Employment | | 0.98*** | 0.63*** | 0.52** | | 3.18*** | 2.34*** | 2.11*** |
| | | (0.2) | (0.2) | (0.21) | | (0.44) | (0.43) | (0.45) |
| $I$(Franchise) | | | 3.84*** | 3.80*** | | | 3.87*** | 3.83*** |
| | | | (0.28) | (0.3) | | | (0.29) | (0.31) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 92,557 | 92,557 | 92,556 | 88,873 | 86,097 | 86,097 | 86,095 | 82,426 |
| Adjusted $R^2$ | 0.002 | 0.002 | 0.011 | 0.008 | 0.002 | 0.003 | 0.011 | 0.008 |

### Panel B: 2021 PPP

| Dep. Var. | $I$(Relationships) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | 0.47 | 0.61 | 0.72 | 1.89 | 0.47 | 0.59 | 0.71 | 1.89 |
| | (1.68) | (1.68) | (1.69) | (2.31) | (1.7) | (1.7) | (1.71) | (2.35) |
| $I$(Asian) | -0.88** | -0.74** | -0.45 | -0.05 | -0.90** | -0.78** | -0.47 | -0.07 |
| | (0.36) | (0.37) | (0.4) | (0.56) | (0.36) | (0.37) | (0.4) | (0.57) |
| $I$(Hispanic) | -0.85* | -0.82* | -0.65 | 0.05 | -0.87** | -0.88** | -0.69 | -0.02 |
| | (0.43) | (0.43) | (0.44) | (0.66) | (0.44) | (0.44) | (0.45) | (0.67) |
| Employment | | 2.98 | 2.51 | 2.03 | | 4.10** | 3.4 | 4.95 |
| | | (2.06) | (2.05) | (1.61) | | (2.06) | (2.13) | (3.34) |
| $I$(Franchise) | | | 1.45 | 1.47 | | | 1.43 | 1.61 |
| | | | (0.93) | (1.19) | | | (0.99) | (1.25) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 6,268 | 6,268 | 6,266 | 4,150 | 6,024 | 6,024 | 6,022 | 3,984 |
| Adjusted $R^2$ | 0.001 | 0.002 | 0.005 | 0.013 | 0.001 | 0.001 | 0.005 | -0.01 |

Internet Appendix-10

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B6:** Lending Relationships and Fintech Usage (Loan Dollar Value)

This table reports the regression results where the dependent variable is Rel. (A. Loan), which is measured using the value (in USD millions) of SBA 7(a) or 504 loans the restaurant borrowed during 2009-2019. A. Loan is winsorized at the 1% and 99% cuts. The 2020 and 2021 PPP waves as indicated through the Panels' heading. The construction of the matched sample and control variables are the same as in Table 2. Detailed variable definitions are in Appendix Table B1. Employment is divided by 100. Standard errors clustered at the city level as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

Panel A: 2020 PPP

| Dep. Var. | Rel. (A. Loan) × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) | -0.63* | -0.51 | -0.20 | -0.35 | -0.52 | -0.32 | -0.04 | -0.21 |
| | (0.33) | (0.33) | (0.33) | (0.33) | (0.33) | (0.33) | (0.33) | (0.34) |
| $I$(Asian) | -0.61*** | -0.49*** | -0.11 | -0.29*** | -0.56*** | -0.42*** | -0.06 | -0.23** |
| | (0.09) | (0.09) | (0.08) | (0.09) | (0.08) | (0.08) | (0.08) | (0.09) |
| $I$(Hispanic) | -0.58*** | -0.55*** | -0.25*** | -0.32*** | -0.52*** | -0.54*** | -0.25*** | -0.30*** |
| | (0.08) | (0.08) | (0.09) | (0.09) | (0.08) | (0.08) | (0.09) | (0.09) |
| Employment | | 1.50*** | 1.35*** | 1.32*** | | 3.31*** | 2.99*** | 2.96*** |
| | | (0.18) | (0.18) | (0.18) | | (0.32) | (0.32) | (0.34) |
| $I$(Franchise) | | | 2.19*** | 2.12*** | | | 2.10*** | 1.99*** |
| | | | (0.17) | (0.18) | | | (0.17) | (0.18) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 92557 | 92557 | 92556 | 88873 | 86097 | 86097 | 86095 | 82426 |
| Adjusted R2 | 0.001 | 0.003 | 0.010 | -0.012 | 0.001 | 0.004 | 0.011 | -0.010 |

Panel B: 2021 PPP

| Dep. Var. | Rel. (A. Loan) × 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) | -0.32* | -0.25 | -0.24 | -0.14 | -0.33* | -0.24 | -0.24 | -0.15 |
| | (0.19) | (0.19) | (0.20) | (0.27) | (0.20) | (0.19) | (0.20) | (0.29) |
| $I$(Asian) | -0.42*** | -0.35*** | -0.23** | -0.35* | -0.43*** | -0.34*** | -0.23** | -0.36* |
| | (0.11) | (0.10) | (0.10) | (0.21) | (0.11) | (0.10) | (0.10) | (0.21) |
| $I$(Hispanic) | -0.27* | -0.26 | -0.20 | -0.08 | -0.28* | -0.29* | -0.23 | -0.15 |
| | (0.16) | (0.16) | (0.16) | (0.22) | (0.17) | (0.16) | (0.16) | (0.22) |
| Employment | | 1.60** | 1.51** | 1.69* | | 3.03*** | 2.94** | 4.40** |
| | | (0.72) | (0.72) | (0.99) | | (1.13) | (1.16) | (2.10) |
| $I$(Franchise) | | | 0.39 | 0.58 | | | 0.35 | 0.60 |
| | | | (0.32) | (0.47) | | | (0.34) | (0.49) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 6268 | 6268 | 6266 | 4150 | 6024 | 6024 | 6022 | 3984 |
| Adjusted R2 | 0.001 | 0.002 | 0.003 | -0.094 | 0.001 | 0.003 | 0.003 | -0.095 |

Internet Appendix-11

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B7:** Fintech and Lending Relationship (Loan Dollar Value)

This table reports the regression results where the dependent variable is the Fintech loan indicator (0/1). The 2020 and 2021 PPP waves as indicated through the Panels' heading. The construction of the matched sample and control variables are the same as in Table 2. Detailed variable definitions are in Appendix Table B1. Employment is divided by 100. Standard errors clustered at the city level as reported in the parentheses. $^{*}$ p $< 0.10$, $^{**}$ p $< 0.05$, $^{***}$ p $< 0.01$.

Panel A: 2020 PPP

| Dep. Var. | $I$(Fintech) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Rel. (A. Loan) | -0.06*** | -0.05*** | -0.05*** | -0.05*** | -0.07*** | -0.05*** | -0.05*** | -0.05*** |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) |
| $I$(Black) | | | 7.99*** | 4.98*** | | | 7.64*** | 4.85*** |
| | | | (1.59) | (1.67) | | | (1.64) | (1.71) |
| $I$(Asian) | | | 7.43*** | 6.05*** | | | 7.08*** | 5.83*** |
| | | | (0.38) | (0.40) | | | (0.38) | (0.40) |
| $I$(Hispanic) | | | 0.87*** | 0.04 | | | 0.81** | 0.02 |
| | | | (0.32) | (0.32) | | | (0.32) | (0.33) |
| Employment | | -7.16*** | -6.39*** | -6.43*** | | -15.43*** | -13.97*** | -13.60*** |
| | | (0.32) | (0.30) | (0.30) | | (0.90) | (0.83) | (0.80) |
| $I$(Franchise) | | -1.62*** | -0.20 | -0.13 | | -1.28*** | 0.11 | -0.07 |
| | | (0.32) | (0.32) | (0.34) | | (0.36) | (0.36) | (0.38) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 92557 | 92556 | 92556 | 88873 | 86097 | 86095 | 86095 | 82426 |
| Adjusted $R^2$ | 0.000 | 0.031 | 0.041 | 0.062 | 0.000 | 0.034 | 0.042 | 0.063 |

Panel B: 2021 PPP

| Dep. Var. | $I$(Fintech) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | Full Sample | | | | Matched Sample | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Rel. (A. Loan) | -0.22*** | -0.17*** | -0.16*** | -0.13*** | -0.23*** | -0.17*** | -0.15*** | -0.10*** |
| | (0.06) | (0.05) | (0.04) | (0.03) | (0.06) | (0.05) | (0.04) | (0.03) |
| $I$(Black) | | | 16.14*** | 5.50 | | | 16.04*** | 6.60 |
| | | | (5.05) | (6.08) | | | (5.07) | (6.01) |
| $I$(Asian) | | | 10.10*** | 6.06*** | | | 9.56*** | 5.63*** |
| | | | (1.33) | (1.80) | | | (1.34) | (1.82) |
| $I$(Hispanic) | | | 4.92*** | 3.30* | | | 5.00*** | 3.70* |
| | | | (1.42) | (1.93) | | | (1.44) | (1.98) |
| Employment | | -17.36*** | -13.37*** | -12.17** | | -31.41*** | -25.83*** | -29.16*** |
| | | (3.34) | (3.12) | (4.74) | | (5.36) | (5.27) | (7.26) |
| $I$(Franchise) | | -4.89*** | -2.89 | -7.65*** | | -4.37** | -2.37 | -6.84** |
| | | (1.79) | (1.78) | (2.74) | | (1.89) | (1.88) | (2.85) |
| City FEs | | | | X | | | | X |
| Business Type FEs | | | X | X | | | X | X |
| Observations | 6268 | 6266 | 6266 | 4150 | 6024 | 6022 | 6022 | 3984 |
| Adjusted $R^2$ | 0.001 | 0.049 | 0.061 | 0.078 | 0.001 | 0.050 | 0.061 | 0.084 |

Internet Appendix-12

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B8:** Minority-Non-Minority Rating Gap (Extensions –Non-Fintech or Fintech)

This table reports the regression results from examining the difference in ratings between minority and non-minority-owned restaurants that borrow from non-fintech (Panel A) and fintech (Panel B) lenders, respectively. The sample is the linked restaurant-month-level panel dataset and we calculate the monthly average of the ratings. The sample period of ratings is April 2020 to March 2021 (during the Covid crisis). The dependent variable is the Rating Stars, which ranges from 0 to 5, based on customer ratings from yelp.com. Key independent variables include Black, Asian, and Hispanic indicators that are defined as 1 for restaurants with the corresponding ethnic cuisine category. The 2020 and 2021 PPP waves are indicated in column heads, referring to PPP loans issued during April 2020 and December 2020 and during January 2021 and March 2021, respectively. The matched and full samples are indicated through sub-column heads. The construction of the matched sample and control variables are the same as in Table 6. Detailed variable definitions are in Appendix Table B1. Employment is divided by 100 for demonstration purposes. Standard errors clustered at the restaurant level as reported in the parentheses. $^*$ p < 0.10, $^{**}$ p < 0.05, $^{***}$ p < 0.01.

Panel A: Fintech Sample

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) | -0.18* | -0.07 | -0.19* | -0.07 | -0.24* | -0.52* | -0.24* | -0.56* |
| | (0.10) | (0.11) | (0.10) | (0.11) | (0.14) | (0.30) | (0.14) | (0.29) |
| $I$(Asian) | -0.09*** | -0.05* | -0.09*** | -0.05** | -0.04 | -0.04 | -0.03 | -0.03 |
| | (0.02) | (0.03) | (0.02) | (0.03) | (0.06) | (0.13) | (0.07) | (0.13) |
| $I$(Hisp.) | -0.13*** | -0.11*** | -0.14*** | -0.11*** | -0.32*** | -0.41*** | -0.32*** | -0.41** |
| | (0.03) | (0.04) | (0.03) | (0.04) | (0.08) | (0.16) | (0.08) | (0.16) |
| N. Reviews | 0.07*** | 0.06*** | 0.07*** | 0.07*** | 0.09*** | 0.04 | 0.08*** | 0.04 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.03) | (0.03) | (0.03) | (0.03) |
| $I$(Franchise) | -1.09*** | -0.94*** | -1.07*** | -0.94*** | -0.97*** | -0.61* | -0.97*** | -0.52 |
| | (0.05) | (0.06) | (0.05) | (0.06) | (0.20) | (0.34) | (0.21) | (0.34) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Eating Policy Controls | X | X | X | X | X | X | X | X |
| Observations | 43208 | 31725 | 42147 | 30882 | 4749 | 1589 | 4659 | 1576 |
| Adjusted $R^2$ | 0.052 | 0.076 | 0.050 | 0.076 | 0.043 | 0.025 | 0.044 | 0.021 |

Internet Appendix-13

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B8:** Minority-Non-Minority Rating Gap (Extensions –Non-Fintech or Fintech) (Cont.)

Panel B: Non-Fintech Sample

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) | 0.06 | 0.08* | 0.04 | 0.06 | -0.02 | 0.04 | -0.01 | 0.04 |
| | (0.04) | (0.04) | (0.04) | (0.04) | (0.11) | (0.13) | (0.11) | (0.13) |
| $I$(Asian) | -0.03*** | -0.01 | -0.04*** | -0.02** | -0.01 | 0.03 | -0.02 | 0.03 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.03) | (0.04) | (0.03) | (0.05) |
| $I$(Hisp.) | -0.11*** | -0.10*** | -0.11*** | -0.10*** | -0.15*** | -0.09 | -0.15*** | -0.08 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.04) | (0.06) | (0.04) | (0.06) |
| N. Reviews | 0.06*** | 0.06*** | 0.07*** | 0.07*** | 0.05** | 0.03 | 0.07*** | 0.04 |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.02) | (0.02) | (0.03) | (0.03) |
| $I$(Franchise) | -1.04*** | -0.99*** | -1.03*** | -0.98*** | -0.94*** | -0.83*** | -0.92*** | -0.77*** |
| | (0.01) | (0.02) | (0.02) | (0.02) | (0.07) | (0.11) | (0.08) | (0.11) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Eating Policy Controls | X | X | X | X | X | X | X | X |
| Observations | 421431 | 391707 | 390451 | 361284 | 21742 | 11207 | 20817 | 10676 |
| Adjusted $R^2$ | 0.055 | 0.076 | 0.052 | 0.073 | 0.039 | 0.049 | 0.038 | 0.045 |

Internet Appendix-14

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B9:** First-Time Banks

This table reports the regression results of restaurants that borrow from lenders that are banks that participate in SBA programs for the first time. In Panel A, the dependent variable is the New Bank loan indicator (0/1) which equals one if the lender is a first-time bank in SBA programs. In Panel B, the dependent variable is the Rating Stars. The 2020 and 2021 PPP waves and the matched and full samples are indicated through sub-column heads. The sample coverage, variable definitions, the construction of the matched sample, and control variables is the same as in Table 5 for Panel A, and the same as in Table 6 for Panel B (except that Fintech lenders and non-banks are excluded). Detailed variable definitions are in Appendix Table B1. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panel B), as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

Panel A: First-Time Banks Usage

| Dep. Var. | $I$(New Bank) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(African American) | -0.70 | 0.15 | -0.59 | 0.38 | 5.35 | 7.54 | 5.16 | 7.36 |
| | (0.92) | (0.93) | (0.94) | (0.96) | (6.31) | (7.76) | (6.42) | (7.87) |
| $I$(Asian) | -2.19*** | -1.47*** | -2.15*** | -1.47*** | -2.55*** | -1.81** | -2.53*** | -1.84** |
| | (0.22) | (0.21) | (0.22) | (0.22) | (0.75) | (0.82) | (0.75) | (0.85) |
| $I$(Hispanic) | -0.44* | -0.16 | -0.48* | -0.22 | 1.10 | 1.99 | 0.95 | 2.09 |
| | (0.25) | (0.24) | (0.25) | (0.25) | (1.05) | (1.50) | (1.06) | (1.56) |
| N. Branches | -0.05*** | 0.00 | -0.05*** | 0.01 | 0.05 | 0.01 | 0.07 | 0.01 |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.06) | (0.10) | (0.06) | (0.11) |
| $I$(Relationships) $\times$ 100 | -0.04*** | -0.04*** | -0.04*** | -0.04*** | -0.05*** | -0.04*** | -0.05*** | -0.04*** |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.02) | (0.00) | (0.02) |
| City FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 82,285 | 78,589 | 76,080 | 72,390 | 4,865 | 2,950 | 4,647 | 2,815 |
| Adjusted $R^2$ | 0.004 | 0.134 | 0.004 | 0.134 | 0.005 | 0.098 | 0.005 | 0.094 |

Panel B: Rating Gap

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(New Bank) $\times$ $I$(African American) | 0.13 | 0.10 | 0.13 | 0.08 | 0.46* | 0.36 | 0.45* | 0.36 |
| | (0.15) | (0.19) | (0.15) | (0.19) | (0.24) | (0.31) | (0.23) | (0.31) |
| $I$(New Bank) $\times$ $I$(Asian) | 0.00 | 0.00 | -0.00 | -0.01 | -0.08 | 0.15 | -0.10 | 0.07 |
| | (0.04) | (0.05) | (0.04) | (0.05) | (0.16) | (0.34) | (0.15) | (0.36) |
| $I$(New Bank) $\times$ $I$(Hispanic) | 0.03 | 0.02 | 0.03 | 0.02 | -0.27 | -0.29 | -0.30 | -0.33 |
| | (0.04) | (0.05) | (0.04) | (0.05) | (0.18) | (0.32) | (0.18) | (0.32) |
| $I$(New Bank) | -0.01 | -0.00 | -0.00 | -0.00 | 0.20*** | 0.25* | 0.22*** | 0.28** |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.07) | (0.13) | (0.07) | (0.14) |
| Monthly FEs | X | | X | | X | | X | |
| City $\times$ Monthly FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 411,222 | 381,574 | 380,498 | 351,392 | 20,145 | 10,090 | 19,275 | 9,592 |
| Adjusted $R^2$ | 0.055 | 0.076 | 0.052 | 0.073 | 0.041 | 0.049 | 0.040 | 0.048 |

Internet Appendix-15

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B10:** Non-Federally Insured Lenders

This table reports the regression results of restaurants that borrow from lenders that are not federally insured. In Panel A, the dependent variable is the Uninsured loan indicator (0/1) which equals one if the lender is not federally insured. In Panel B, the dependent variable is the Rating Stars. The 2020 and 2021 PPP waves and the matched and full samples are indicated through sub-column heads. The sample coverage, variable definitions, the construction of the matched sample, and control variables is the same as in Table 5 for Panel A, and the same as in Table 6 for Panel B (except that Fintech lenders and non-banks are excluded). Detailed variable definitions are in Appendix Table B1. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panel B), as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

| Panel A: Non-Federally Insured Institution Usage | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dep. Var. | $I(\text{Uninsured}) \times 100$ | | | | | | | |
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{African American})$ | 0.99* | 0.69 | 0.99* | 0.68 | -0.63*** | -0.63 | -0.61*** | -0.66 |
| | (0.58) | (0.56) | (0.59) | (0.57) | (0.22) | (0.54) | (0.23) | (0.56) |
| $I(\text{Asian})$ | 0.28*** | 0.26** | 0.23** | 0.21* | 2.24*** | 0.89 | 2.30*** | 0.91 |
| | (0.10) | (0.11) | (0.10) | (0.11) | (0.57) | (0.69) | (0.58) | (0.71) |
| $I(\text{Hispanic})$ | -0.04 | 0.01 | -0.05 | 0.00 | -0.26 | -0.65 | -0.22 | -0.58 |
| | (0.08) | (0.08) | (0.08) | (0.08) | (0.31) | (0.47) | (0.32) | (0.48) |
| N. Branches | -0.00 | -0.01 | -0.00 | -0.01 | -0.01 | -0.01 | -0.01 | -0.01 |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.03) | (0.03) | (0.03) | (0.04) |
| $I(\text{Relationships}) \times 100$ | -0.00*** | -0.00*** | -0.00*** | -0.00*** | -0.01*** | -0.00 | -0.01*** | -0.00 |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| City FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 85,349 | 81,702 | 79,145 | 75,502 | 5,298 | 3,321 | 5,079 | 3,184 |
| Adjusted $R^2$ | 0.001 | 0.053 | 0.001 | 0.053 | 0.008 | 0.038 | 0.008 | 0.038 |
| Panel B: Rating Gap | | | | | | | | |
| Dep. Var. | Rating Stars | | | | | | | |
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{Uninsured}) \times I(\text{African American})$ | -0.30 | -0.35 | -0.31 | -0.39 | - | - | - | - |
| | (0.29) | (0.28) | (0.30) | (0.28) | | | | |
| $I(\text{Uninsured}) \times I(\text{Asian})$ | -0.10 | -0.08 | -0.08 | -0.08 | -0.15 | -0.22 | -0.22 | -0.22 |
| | (0.09) | (0.10) | (0.09) | (0.10) | (0.21) | (0.38) | (0.20) | (0.38) |
| $I(\text{Uninsured}) \times I(\text{Hispanic})$ | -0.08 | -0.01 | -0.08 | -0.02 | 0.58*** | 0.04 | 0.49*** | 0.01 |
| | (0.16) | (0.17) | (0.16) | (0.17) | (0.16) | (0.34) | (0.15) | (0.35) |
| $I(\text{Uninsured})$ | -0.04 | -0.03 | -0.04 | -0.02 | -0.04 | 0.24 | 0.04 | 0.25 |
| | (0.06) | (0.07) | (0.06) | (0.07) | (0.14) | (0.32) | (0.13) | (0.32) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 427,705 | 398,417 | 396912 | 368,112 | 21,815 | 11,194 | 20,931 | 10,694 |
| Adjusted $R^2$ | 0.055 | 0.076 | 0.052 | 0.073 | 0.040 | 0.041 | 0.039 | 0.035 |

Internet Appendix-16

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B11:** Credit Unions

This table reports the regression results of restaurants that borrow from credit unions and other lenders in the FFIEC list. The sample is the linked restaurant-level cross-sectional dataset (Panel A) and the linked restaurant-month-level panel dataset (Panel B). The sample period of ratings is April 2020 to March 2021 (during the Covid crisis). The CU loan indicator (0/1) equals one if the lender is a credit union. The 2020 and 2021 PPP waves are indicated in column heads. The matched and full samples are indicated through sub-column heads. Other variable definitions, the construction of the matched sample, and control variables for Panel A and Panel B are the same as in Table 2 and Table 6, respectively. Detailed variable definitions are in Appendix Table B1. We only include lenders that can be matched with the FFIEC lender list. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panel B) and are reported in the parentheses. $^*$ p $<$ 0.10, $^{**}$ p $<$ 0.05, $^{***}$ p $<$ 0.01.

Panel A: Credit Unions Usage

| Dep. Var. | $I$(CU) $\times$ 100 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) | 1.87$^*$ | 2.39$^{**}$ | 1.90$^*$ | 2.50$^{**}$ | 6.48 | 7.42 | 6.10 | 7.09 |
| | (1.02) | (1.02) | (1.05) | (1.04) | (5.75) | (6.55) | (5.70) | (6.57) |
| $I$(Asian) | -1.47$^{***}$ | -1.50$^{***}$ | -1.49$^{***}$ | -1.57$^{***}$ | -2.06$^{***}$ | -2.68$^{***}$ | -2.18$^{***}$ | -2.79$^{***}$ |
| | (0.17) | (0.21) | (0.17) | (0.21) | (0.71) | (0.87) | (0.72) | (0.90) |
| $I$(Hispanic) | 0.15 | 0.51$^{**}$ | 0.21 | 0.53$^{**}$ | -0.73 | 0.03 | -0.87 | 0.28 |
| | (0.27) | (0.25) | (0.27) | (0.26) | (0.94) | (1.34) | (0.94) | (1.35) |
| City FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 85349 | 81702 | 79145 | 75502 | 5298 | 3321 | 5079 | 3184 |
| Adjusted R2 | 0.004 | 0.099 | 0.004 | 0.098 | 0.004 | 0.070 | 0.008 | 0.084 |

Panel B: Rating Gap

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) $\times$ $I$(CU) | -0.13 | 0.03 | -0.12 | 0.04 | 0.48$^{**}$ | 0.61$^{**}$ | 0.50$^{**}$ | 0.70$^{**}$ |
| | (0.18) | (0.16) | (0.18) | (0.16) | (0.20) | (0.27) | (0.20) | (0.28) |
| $I$(Asian) $\times$ $I$(CU) | -0.13$^{***}$ | -0.12$^{**}$ | -0.12$^{***}$ | -0.11$^{**}$ | -0.01 | 0.12 | 0.00 | 0.17 |
| | (0.04) | (0.05) | (0.04) | (0.05) | (0.13) | (0.23) | (0.13) | (0.24) |
| $I$(Hisp.) $\times$ $I$(CU) | 0.01 | 0.01 | 0.00 | 0.01 | -0.01 | 0.26 | -0.01 | 0.29 |
| | (0.04) | (0.05) | (0.04) | (0.05) | (0.14) | (0.27) | (0.15) | (0.27) |
| $I$(CU) | 0.11$^{***}$ | 0.11$^{***}$ | 0.11$^{***}$ | 0.11$^{***}$ | 0.11$^*$ | -0.11 | 0.10 | -0.18 |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.07) | (0.14) | (0.07) | (0.14) |
| Monthly FEs | X | | X | | X | | X | |
| City $\times$ Monthly FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 427705 | 398417 | 396912 | 368112 | 21815 | 11194 | 20931 | 10694 |
| Adjusted R2 | 0.052 | 0.073 | 0.049 | 0.069 | 0.041 | 0.042 | 0.038 | 0.037 |

Internet Appendix-17

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B12:** CDFIs/CDCs

This table reports the regression results of restaurants that borrowed from community development-oriented lenders and banks. The sample is the linked restaurant-level cross-sectional dataset (Panel A) and the linked restaurant-month-level panel dataset (Panel B). The sample period of ratings is April 2020 to March 2021 (during the Covid crisis). In Panel A, the dependent variable is the CDC loan indicator (0/1) that equals one if the lender is a CDFI or CDC. In Panel B, the dependent variable is the Rating Stars, which range from 0 to 5, based on customer ratings from yelp.com. The 2020 and 2021 PPP waves are indicated in column heads. The matched and full samples are indicated through sub-column heads. Other variable definitions, the construction of the matched sample, and control variables for Panel A and Panel B are the same as in Table 2 and Table 6, respectively. Detailed variable definitions are in Appendix Table B1. Fintech lenders and non-banks are excluded. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panel B) and are reported in the parentheses. * $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$.

Panel A: CDFIs/CDCs Usage

| Dep. Var. | $I(\text{CDC}) \times 100$ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{Black})$ | 2.37*** | 2.27*** | 2.38*** | 2.33*** | 5.74 | 3.25 | 5.84 | 3.34 |
| | (0.77) | (0.81) | (0.79) | (0.83) | (3.70) | (3.82) | (3.76) | (3.88) |
| $I(\text{Asian})$ | 0.32*** | 0.15 | 0.29*** | 0.11 | -0.50 | -1.76** | -0.60 | -2.07*** |
| | (0.09) | (0.10) | (0.09) | (0.10) | (0.44) | (0.73) | (0.46) | (0.74) |
| $I(\text{Hispanic})$ | 0.65*** | 0.53*** | 0.66*** | 0.55*** | 0.53 | -0.74 | 0.41 | -0.87 |
| | (0.16) | (0.17) | (0.16) | (0.18) | (0.67) | (0.87) | (0.62) | (0.83) |
| City FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 82819 | 79121 | 76603 | 72910 | 4961 | 3033 | 4740 | 2890 |
| Adjusted R2 | 0.002 | -0.013 | 0.002 | -0.016 | 0.003 | 0.015 | 0.003 | 0.006 |

Panel B: Rating Gap

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{Black}) \times I(\text{CDC})$ | 0.05 | -0.01 | 0.05 | -0.01 | 0.23 | 0.22 | 0.26 | 0.23 |
| | (0.15) | (0.17) | (0.15) | (0.17) | (0.29) | (0.36) | (0.29) | (0.35) |
| $I(\text{Asian}) \times I(\text{CDC})$ | -0.07 | -0.08 | -0.07 | -0.09 | -0.30 | -0.09 | -0.25 | -0.18 |
| | (0.08) | (0.09) | (0.08) | (0.09) | (0.19) | (0.29) | (0.19) | (0.28) |
| $I(\text{Hisp.}) \times I(\text{CDC})$ | 0.06 | 0.11 | 0.05 | 0.11 | -0.06 | 0.32 | -0.03 | 0.45 |
| | (0.09) | (0.10) | (0.09) | (0.10) | (0.19) | (0.28) | (0.20) | (0.28) |
| $I(\text{CDC})$ | 0.07 | 0.04 | 0.07 | 0.04 | 0.17** | 0.05 | 0.12 | 0.03 |
| | (0.05) | (0.05) | (0.05) | (0.06) | (0.08) | (0.12) | (0.08) | (0.12) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 414237 | 384558 | 383485 | 354350 | 20611 | 10450 | 19715 | 9915 |
| Adjusted R2 | 0.052 | 0.073 | 0.048 | 0.069 | 0.042 | 0.053 | 0.039 | 0.049 |

Internet Appendix-18

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B13:** Savings & Loan Association

This table reports regression results on savings & loan associations usage and rating gap of minority and non-minority-owned restaurants. The sample is the linked restaurant-level cross-sectional dataset (Panel A) and the linked restaurant-month-level panel dataset (Panels B). The sample period of ratings in Panel B is April 2020 to March 2021 (during the Covid crisis). The S&L loan indicator (0/1) equals 1 if the lender is a savings & loan association. The 2020 and 2021 PPP waves are indicated in column heads. The matched and full samples are indicated through sub-column heads. Other variable definitions, the construction of the matched sample, and control variables for Panel A and Panel B are the same as in Table 2 and Table 6, respectively. Detailed variable definitions are in Appendix Table B1. We restrict to the sample matched with the FFEIC lender list to have a clear classification of S&L. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panels B and C) and are reported in the parentheses.* $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$.

Panel A: Savings & Loan Association Usage

| Dep. Var. | $I(\text{S\&LA}) \times 100$ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{Black})$ | -0.18*** | -0.13* | -0.18*** | -0.13* | -0.38*** | -0.12 | -0.33*** | -0.12 |
| | (0.03) | (0.08) | (0.03) | (0.07) | (0.12) | (0.08) | (0.11) | (0.08) |
| $I(\text{Asian})$ | -0.09*** | -0.06*** | -0.09*** | -0.07** | -0.38*** | -0.32* | -0.28*** | -0.36* |
| | (0.03) | (0.03) | (0.03) | (0.03) | (0.11) | (0.19) | (0.10) | (0.21) |
| $I(\text{Hispanic})$ | -0.01 | 0.00 | -0.00 | -0.00 | -0.42*** | -0.17 | -0.28*** | -0.19 |
| | (0.04) | (0.04) | (0.04) | (0.04) | (0.12) | (0.13) | (0.10) | (0.13) |
| City FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 85349 | 81702 | 79145 | 75502 | 5298 | 3321 | 5079 | 3184 |
| Adjusted R2 | -0.000 | 0.160 | -0.000 | 0.157 | 0.001 | 0.109 | -0.001 | 0.184 |

Panel B: Rating Gap

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{Black}) \times I(\text{S\&LA})$ | - | - | - | - | - | - | - | - |
| $I(\text{Asian}) \times I(\text{S\&LA})$ | 0.26* | 0.41** | 0.28** | 0.41** | | | | |
| | (0.14) | (0.17) | (0.14) | (0.18) | | | | |
| $I(\text{Hisp.}) \times I(\text{S\&LA})$ | 0.12 | 0.17 | 0.14 | 0.17 | | | | |
| | (0.18) | (0.18) | (0.18) | (0.18) | | | | |
| $I(\text{S\&LA})$ | 0.10 | 0.06 | 0.07 | 0.04 | -0.12 | 0.33 | -0.22 | 0.59 |
| | (0.06) | (0.08) | (0.07) | (0.09) | (0.29) | (0.26) | (0.36) | (0.38) |
| Monthly FEs | X | | X | | X | | X | |
| City $\times$ Monthly FEs | | X | | X | | X | | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 427705 | 398417 | 396912 | 368112 | 21815 | 11194 | 20931 | 10694 |
| Adjusted R2 | 0.052 | 0.073 | 0.048 | 0.069 | 0.040 | 0.041 | 0.038 | 0.037 |

Internet Appendix-19

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B14:** Capacity: Fintech vs Non-Fintech

This table reports the mean and standard deviation (in square brackets) of lender capacity, as measured by the number of loans disbursed in the PPP program in 2020 (Panel A) and in 2021 (Panel B) by fintech and non-fintech lenders, and the t-test results of the differences in capacity between fintech and non-fintech lenders. t-value are reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

Panel A: 2020 PPP First Draw

|  | Fintech | Non-Fintech | Diff. |
|---|---|---|---|
| N. Loans | 31052.79 | 617.85 | -30434.9*** |
|  | [36602.76] | [6865.01] | ( -27.75) |
| Observations | 53 | 4199 | |

Panel B: 2021 PPP First Draw

|  | Fintech | Non-Fintech | Diff. |
|---|---|---|---|
| N. Loans | 12238.85 | 294.05 | -11944.8*** |
|  | [34414.21] | [2803.07] | (-17.68) |
| Observations | 46 | 4062 | |

Internet Appendix-20

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B15:** Approval Date (Robustness – Restricted Starting Date for the 2020 PPP)

This table reports the regression results from examining the difference in PPP loan approval dates between minority and non-minority-owned restaurants that borrow from fintech and non-fintech lenders. The sample is the linked restaurant-level cross-sectional dataset. The starting dates of the sample are indicated in column heads. The dependent variable, $\Delta$(Approval Date-PPP Starting Date), is the difference between the PPP loan approval date and PPP starting date. The key independent variables include Black, Asian, and Hispanic indicators that are defined as 1 for restaurants with the corresponding ethnic cuisine category, the Fintech indicator that is defined to be 1 for loans backed by fintech lenders. The matched and full samples are indicated through sub-column heads. The construction of the matched sample and control variables are the same as in Table 2. Detailed variable definitions are in Appendix Table B1. Employment is divided by 100 for demonstration purposes. Standard errors clustered at the city level as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

| Dep. Var. | $\Delta$(Approval Date-PPP Starting Date) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | From April 3, 2020 | | | | From April 27, 2020 (Second Tranche) | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I$(Black) $\times$ $I$(Fintech) | -3.30 | -2.20 | -3.12 | -2.01 | 0.42 | -0.68 | 0.39 | -0.52 |
| | (3.10) | (3.25) | (3.10) | (3.26) | (3.16) | (3.42) | (3.16) | (3.42) |
| $I$(Asian) $\times$ $I$(Fintech) | 2.23*** | 3.11*** | 2.52*** | 3.39*** | 5.35*** | 4.22*** | 5.44*** | 4.38*** |
| | (0.74) | (0.76) | (0.74) | (0.77) | (0.75) | (0.78) | (0.75) | (0.79) |
| $I$(Hispanic) $\times$ $I$(Fintech) | 0.80 | 0.06 | 0.83 | 0.11 | 3.72*** | 2.87*** | 3.72*** | 2.94** |
| | (1.12) | (1.15) | (1.11) | (1.15) | (1.18) | (1.25) | (1.17) | (1.25) |
| $I$(Fintech) | 14.31*** | 11.93*** | 13.63*** | 11.27*** | 7.75*** | 7.81*** | 7.46*** | 7.45*** |
| | (0.47) | (0.48) | (0.52) | (0.52) | (0.47) | (0.51) | (0.47) | (0.51) |
| $I$(Black) | 9.63*** | 7.61*** | 8.88*** | 6.86*** | 3.61*** | 3.03** | 3.44*** | 2.90** |
| | (1.23) | (1.29) | (1.24) | (1.29) | (1.31) | (1.36) | (1.33) | (1.38) |
| $I$(Asian) | 10.37*** | 9.08*** | 9.72*** | 8.47*** | 4.24*** | 4.39*** | 4.13*** | 4.26*** |
| | (0.32) | (0.33) | (0.31) | (0.33) | (0.29) | (0.31) | (0.29) | (0.31) |
| $I$(Hispanic) | 5.47*** | 4.98*** | 5.30*** | 4.84*** | 1.69*** | 1.94*** | 1.74*** | 1.94*** |
| | (0.28) | (0.28) | (0.28) | (0.29) | (0.33) | (0.33) | (0.33) | (0.35) |
| Employment | -0.09*** | -0.09*** | -0.20*** | -0.19*** | -0.07*** | -0.06*** | -0.14*** | -0.12*** |
| | (0.00) | (0.00) | (0.01) | (0.01) | (0.00) | (0.00) | (0.01) | (0.01) |
| $I$(Franchise) | -8.15*** | -7.91*** | -7.93*** | -7.89*** | -5.62*** | -5.35*** | -5.49*** | -5.17*** |
| | (0.20) | (0.21) | (0.22) | (0.23) | (0.31) | (0.35) | (0.32) | (0.37) |
| City FEs | | X | | X | | X | | X |
| Business Type FEs | X | X | X | X | X | X | X | X |
| Observations | 92556 | 88873 | 86095 | 82426 | 56715 | 53348 | 54437 | 51109 |
| Adjusted R2 | 0.140 | 0.176 | 0.142 | 0.176 | 0.066 | 0.085 | 0.068 | 0.087 |

Internet Appendix-21

Electronic copy available at: https://ssrn.com/abstract=3949148

Internet Appendix-22

Electronic copy available at: https://ssrn.com/abstract=3949148

**Table B16:** Controlling for Approval Date Fixed Effects

This table reports the regression results of restaurants that borrow from fintech lenders. I control for approval date fixed effects in addition to the controls in specifications reported in Table 5 and Table 6. In Panel A, the dependent variable is the fintech lender indicator (0/1). In Panel B, the dependent variable is the Rating Stars. The 2020 and 2021 PPP waves and the matched and full samples are indicated through sub-column heads. The sample coverage, variable definitions, the construction of the matched sample, and control variables is the same as in Table 5 for Panel A, and the same as in Table 6 for Panel B. Detailed variable definitions are in Appendix Table B1. Standard errors are clustered at the city level (Panel A) and the restaurant level (Panel B), as reported in the parentheses. * p < 0.10, ** p < 0.05, *** p < 0.01.

**Panel A: Fintech Usage**

| Dep. Var. | $I(\text{Fintech}) \times 100$ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{African American})$ | 4.09*** | 2.42 | 3.95** | 2.48 | 16.93*** | 7.90 | 17.03*** | 9.31 |
| | (1.52) | (1.58) | (1.56) | (1.62) | (4.94) | (6.00) | (4.95) | (5.87) |
| $I(\text{Asian})$ | 3.18*** | 3.02*** | 2.98*** | 2.94*** | 8.90*** | 6.48*** | 8.34*** | 6.18*** |
| | (0.32) | (0.34) | (0.32) | (0.35) | (1.31) | (1.79) | (1.32) | (1.82) |
| $I(\text{Hispanic})$ | -1.02*** | -1.26*** | -1.03*** | -1.25*** | 4.19*** | 3.66* | 4.39*** | 4.19** |
| | (0.29) | (0.30) | (0.30) | (0.31) | (1.42) | (1.97) | (1.44) | (2.03) |
| N. Branches | 0.04* | -0.00 | 0.04** | 0.00 | 0.02 | -0.12 | 0.02 | -0.11 |
| | (0.02) | (0.03) | (0.02) | (0.03) | (0.08) | (0.17) | (0.09) | (0.17) |
| $I(\text{Relationships}) \times 100$ | -0.03*** | -0.03*** | -0.03*** | -0.03*** | -0.16*** | -0.13*** | -0.16*** | -0.13*** |
| | (0.00) | (0.00) | (0.00) | (0.01) | (0.01) | (0.02) | (0.01) | (0.02) |
| City FEs | | X | | X | | X | | X |
| Approval Date FEs | X | X | X | X | X | X | X | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 92,553 | 88,870 | 86,092 | 82,423 | 6,266 | 4,148 | 6,022 | 3,982 |
| Adjusted $R^2$ | 0.104 | 0.114 | 0.104 | 0.114 | 0.095 | 0.095 | 0.095 | 0.102 |

**Panel B: Rating Gap**

| Dep. Var. | Rating Stars | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample | 2020 PPP | | | | 2021 PPP | | | |
| | Full Sample | | Matched Sample | | Full Sample | | Matched Sample | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| $I(\text{FinTech}) \times I(\text{African American})$ | -0.23** | -0.22* | -0.23** | -0.21* | -0.15 | -0.35* | -0.16 | -0.37* |
| | (0.11) | (0.11) | (0.11) | (0.11) | (0.18) | (0.21) | (0.18) | (0.21) |
| $I(\text{FinTech}) \times I(\text{Asian})$ | -0.05** | -0.04* | -0.05** | -0.04* | -0.03 | 0.01 | -0.02 | 0.04 |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.07) | (0.10) | (0.07) | (0.10) |
| $I(\text{FinTech}) \times I(\text{Hispanic})$ | -0.01 | 0.00 | -0.02 | -0.00 | -0.17*** | -0.28** | -0.17* | -0.27** |
| | (0.03) | (0.03) | (0.03) | (0.03) | (0.09) | (0.13) | (0.09) | (0.13) |
| $I(\text{FinTech})$ | 0.05*** | 0.05*** | 0.05*** | 0.05*** | -0.06 | 0.01 | -0.06 | 0.01 |
| | (0.01) | (0.01) | (0.01) | (0.02) | (0.04) | (0.06) | (0.04) | (0.07) |
| Monthly FEs | X | | X | | X | | X | |
| City × Monthly FEs | | X | | X | | X | | X |
| Approval Date FEs | X | X | X | X | X | X | X | X |
| Other Controls | X | X | X | X | X | X | X | X |
| Observations | 464,638 | 434,947 | 432,597 | 403,362 | 26,491 | 14,721 | 25,476 | 14,093 |
| Adjusted $R^2$ | 0.055 | 0.076 | 0.052 | 0.073 | 0.043 | 0.056 | 0.042 | 0.052 |

Internet Appendix-23

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix C: Data Construction

## Internet Appendix C1 Identify Fintech Lenders

The principal source of the fintech company list I use for this study is from the SBA official website as well as the local SBA websites. I start with the fintech company list published on sba.gov.[1] I manually read the PPP lender list published on the local SBA website of all states. Arizona, California, Maryland, and North Carolina include a section on non-traditional lenders in their PPP lender lists. I include those lenders in the fintech company list as well. Finally, I also expand the list by consolidating lists from news sources below.

1 https://www.inc.com/brit-morse/fintechs-small-business-ppp-loan-applications.html

2 https://www.lendacademy.com/all-of-the-fintechs-involved-in-ppp-loans/

3 https://www.uschamber.com/co/run/finance/list-of-fintech-companies-offering-ppp-loans

I manually go through the entire sample of 128 non-bank lenders in the PPP loan-level dataset and do not identify any lenders that are clearly a fintech company but have not appeared in the above-described sources. Admittedly, some non-bank lenders may have collaborations with fintech companies, but I do not include those cases because banks may also cooperate with fintech companies to some degree.[2] However, it is very time-consuming and needs more direct information to identify all the partnerships between fintech companies and banks, and other lenders without adding more insights to the analysis. Therefore, I classify fintech and non-fintech lenders based on the SBA official lists and the above three lists from the news.

---

[1] https://www.sba.gov/sites/default/files/resource_files/Fintech_Companies_Participating_in_PPP_05.08.20_0.pdf

[2] An example of unclear fintech lending of non-bank lenders in PPP: FundEx Solutions Group... representing the best of both traditional lending and fintech. An example of partnerships between fintech companies with other PPP lenders is "CNote has entered into a partnership with The Entrepreneur Fund to serve as a new capital source." Examples of banks that work with fintech companies: Ally Bank, Bank of Hope, and Citizens Business Bank, etc. are shown to work with Lendistry in PPP.

Internet Appendix-24

Electronic copy available at: https://ssrn.com/abstract=3949148

Since the lists published on SBA websites and other news sources are primarily aimed at helping borrowers to find a suitable platform or place to apply for the PPP loan, they show the name of the lending platform instead of the lender backing the loan and therefore are not the same as the lender recorded in the PPP dataset in some cases. Therefore, for each fintech company, I manually read their website and google search-related information to identify the potential lender(s) associated with it. Table C1-1 presents the consolidated fintech company list and the lender shown in the PPP dataset. In the table, I also indicate whether the fintech company is listed in the SBA or local SBA PPP lender list.

Internet Appendix-25

Electronic copy available at: https://ssrn.com/abstract=3949148

Table C1-1 Fintech company list and match with lender name in PPP data

| Fintech company | SBA | AZ | MA | NC | CA | Lender Name in PPP |
|---|---|---|---|---|---|---|
| Biz2credit | Y | | | Y | | Itria Ventures LLC; Loan Source Incorporated |
| BlueVine | Y | Y | Y | Y | Y | Cross River Bank |
| Brex + Womply* | Y | | | | | - |
| Credibly | Y | Y | | | | - |
| Cross River Bank | Y | | | Y | | Cross River Bank |
| Divvy | Y | | | Y | | Cross River Bank |
| Forwardline Financial LLC | | Y | | | | FinWise Bank |
| Fundbox | Y | Y | | | Y | Fundbox, Inc. |
| Fundera* | Y | | | Y | | - |
| Funding Circle | Y | Y | Y | Y | Y | FC Marketplace, LLC (dba Funding Circle) |
| Intuit (Quickbooks) | Y | Y | Y | Y | Y | Intuit Financing Inc. |
| Kabbage | Y | Y | Y | Y | Y | Kabbage, Inc.; Celtic Bank Corporation |
| Lendio | Y | | Y | Y | | Sunrise Banks, National Association |
| Lendistry | | | Y | | | BSD Capital, LLC dba Lendistry |
| NAV* | Y | | | | | - |
| OnDeck | Y | Y | Y | | Y | Celtic Bank Corporation |
| Opportunity Fund Community Development | | Y | | | Y | Opportunity Fund Community Development |
| Paypal | Y | Y | Y | | Y | WebBank |
| Ready Capital | Y | | | | | Readycap Lending, LLC |
| Reliant Funding | | | | | | Cross River Bank |
| SmartBiz | | | | | | - |
| Square | Y | Y | Y | | Y | Celtic Bank Corporation |
| Veem | Y | | | | | Cross River Bank |

* Partner with multiple lenders and do not find the fintech company itself in the PPP data

Internet Appendix-26

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix C2 Lenders Classifications and Matching with FFIEC

This appendix describes the lender classifications and how I match the PPP lenders with Federal Financial Institutions Examination Council (FFIEC) financial institutions.

## 1. Lender Classification

To save some labor effort in the matching process with FFIEC, I first classify the PPP lender list into banks and non-banks. Within the non-banks, I classify lenders into CDFI/CDC, fintech non-banks, other non-banks.

## 1.1 Non-Banks

I start with the full list of 5,597 PPP lenders in the entire PPP and PPS dataset. The first step is to classify the lenders into banks (including savings, credit unions, farm credit system institutions, etc.). I use regular expressions on lender names and define the lender as a bank if either the name of the originating and the servicing lender satisfies the regular expression.[3] Examples of regular expressions contain "bank", ending with "N.A." or "National Association", and containing "Production Credit Association". For the part that does not contain expressions satisfying the regular expressions, and therefore in the list of non-banks, I manually checked them by searching on the official website and names and reassign 47 lenders into the bank list, such as AB&T, BBVA USA, and Choice Financial Group. This gives us 5,469 banks and 128 non-banks.

## 1.2 CDFI Loan Funds and 504 CDC

For my study, I further classify the non-banks into lenders that have higher weights on community development and other non-bank lenders. I use two sources of information.

---

[3]The difference between the servicing and originating lender is most relevant for fintech lenders and CDFIs, which I address in particular. For other lenders, the servicing and originating lender is the same.

Electronic copy available at: https://ssrn.com/abstract=3949148

First, I match the PPP lenders with the loan funds in the official list of "List of Certified Community Development Financial Institutions (CDFIs) with Contact Information as of October 14, 2020" published on cdfifund.gov using an exact name match. This gives 42 matches with the CDFI list. For the remaining 86 non-bank lenders, I manually checked them with the official CDFI list and find 24 pairs of matched lenders.

Second, I identify Certified Development Company (CDC) using the list of lenders that participated in previous 504 programs (SBA 504 programs are small business loan programs where the lender is CDC). I adjust lender names using the lender cleaning code as in the process of other steps related to lender names. I do not consider other non-banks whose names contain words like "community", and "development" as community development-related lenders if they are not in the CDFI and the CDC list.

In total, I identify 66 CDFIs and 23 CDCs, with eight entries in both categories.

### 1.3 Fintech Non-Banks

Using the list of fintech lenders, I identify 14 fintech lenders in the non-bank part.

### 1.4 Other Non-Banks

I classify the rest 35 non-bank lenders in the category of other non-banks.

Table C2-1 summarizes the number of pairs of originating and servicing lenders in each category.

Table C2-1 Number of Lender Pairs in Each Category

| Category | | N. in the entire PPP sample | N. in our final analysis sample |
|---|---|---|---|
| Banks | Fintech | 49 | 42 |
| | Non-fintech | 5,420 | 4,134 |
| Non-Banks | CDFI/CDC | 81 (2 are also fintech lenders) | 54 (2 are also fintech lenders) |
| | Fintech | 14 | 11 |
| | Others | 35 | 27 |

Internet Appendix-28

Electronic copy available at: https://ssrn.com/abstract=3949148

## 2. Matching PPP Lenders with FFIEC

I then match the PPP lenders with financial institutions on the FFIEC list. The starting sample is 3,701 PPP lenders who 1) are lenders in the final linked restaurant sample; 2) lend more than 100 loans in the entire PPP program; 3) banks (including fintech lenders) or other non-banks (excluding CDFI/CDC/fintech lenders) classified in step 1 described above.

Federal Financial Institutions Examination Council (FFIEC) lender information provides information on financial institutions for which the Federal Reserve has a supervisory, regulatory, or research interest, which includes a full list of depository institutions, as well as some non-depository financial companies. The data includes both active and the last instance of closed financial institutions and assigns a unique identifier (ID RSSD) for each financial institution. I keep financial institutions that are active in and after 2020 because PPP loans are originated after 2020. The data is available from the FFIEC website (ffiec.gov).

In the code-based matching step, I define a match between the FFIEC financial institutions and PPP lenders when the two lenders have the same name and are in the same city in the same state. The city and state information that I use from FFIEC is the lender's headquarters location. I search for different variants of the lender name in the matching process. For example, "XX FCU" in place of "XX Federal Credit Union". This gives a total match of 3,511 lenders.

For the remaining 190 unmatched lenders, I manually search for the lender name from FFIEC website and match it with the FFIEC lender with the same name (including the same name but different variants), a different city, but the FFIEC lender city is within 30miles distance from the PPP lender city in the same state. This gives a total match of 3,658 lenders. The remaining 43 unmatched lenders are classified as finance companies that are not included in the FFIEC lender sample. Among the 43 lenders, 6 are fintech lenders under my definition.

The FFIEC website also provides Branch Data which is the last instance of branches

Electronic copy available at: https://ssrn.com/abstract=3949148

whose head office is listed in the financial institution file. I include branches that are active in and after 2020. For PPP lenders with a matched ID RSSD identifier, we match the PPP lender with the branch's parent institutions, therefore, we can identify the branches that belong to each lender. For those PPP lenders with either no branch information from FFIEC branch data or no ID RSSD identifier, we classify them as stand-alone entities.

## 3. Further Classification for FFIEC Matched Lenders

For lenders matched with FEIEC, I classify lenders into banks vs non-banks, federally insured institutions vs non-federally insured institutions, credit unions vs non-credit unions, and savings & loan associations vs non- savings & loan associations based on lender information from FFIEC.

**Bank:** I use a broad definition of banks, meaning any depository institution. I identify depository institutions based on entity type from FFIEC lender information, including "Co-operative Bank", "Domestic Branch of a Domestic Bank", "Federal Credit Union", "Federal Savings Bank", "National Bank", "Non-member Bank", "Savings & Loan Association", "State Credit Union", "State Member Bank", and "State Savings Bank".

**Federally Insured:** A lender is classified as a federally insured institution if its primary insurer is either National Credit Union Share Insurance Fund or Deposit Insurance Fund.

**Credit Union:** Lenders whose entity types are "Federal Credit Union" or "State Credit Union" are classified as credit unions.

**Savings & Loan Association:** Lenders with entity types as "Savings & Loan Association" are defined as Savings & Loan Association.

Internet Appendix-30

Electronic copy available at: https://ssrn.com/abstract=3949148

### 4. Cross Validation and Final Lender Classification

Based on the consolidated lender dataset, only two lenders (New York Business Development Corporation, and American Lending Center) identified as non-banks by name in section 1 are matched with the FFIEC list. Their entity type is "Domestic Entity Other (DEO)" and thus I keep them as non-banks. Among the banks identified by name and matched with the FFIEC list, only eight lenders are DEO; others are all in the bank group based on the classifications in step 3. Among the eight DEO lenders, five are farm credit institutions, and I keep them as non-banks. I adjust the rest three (First Western SBLC, Inc, Capital One, National Association, and First National Bank Texas) into the non-bank category. Among the banks identified by name, only 20 are unmatched by FFIEC. This gives additional validation to my code-based classification of banks and non-banks.

Table C2-2 summarizes the number of pairs of originating and servicing lenders in each category in my final analysis sample.

Table C2-1 Number of Lender Pairs in Each Category

| Category | | N. in the entire PPP sample |
|---|---|---|
| Banks | Fintech | 42 |
| | Non-fintech | 4,131 |
| Non-Banks | CDFI/CDC | 56 |
| | Fintech | 11 |
| | Others | 30 |

Internet Appendix-31

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix C3 Linking a Business Entity Participated in the Paycheck Protection Program with a Restaurant on Yelp.com

This appendix describes the steps that I follow to match businesses in the Food Services and Drinking Places sector (NAICS code that equals 722) in the Paycheck Protection Program (PPP) to the restaurants on yelp.com. It also presents the matching criteria based on which I define a link between a business in the PPP and a restaurant on yelp.com. In addition, I provide the details on the name and address cleaning process which I use as the input for automatic search and code-based match.

## 1. Matching Steps

The starting sample is the 372,541 loans assigned to businesses in the Food Services and Drinking Places sector in the two tranches of the first draw of the PPP program in both 2020 and 2021, which are labeled with "PPP" by the Processing Method variable in the original dataset from SBA. In addition, the sample also covers 198,889 loans in the Food Services and Drinking Places sector in the second draw of the PPP program in 2021, which are labeled with "PPS" by the Processing Method variable. After the name and address adjustments, I am also able to identify the first draw participants who reapplied for the second draw.

**Step 1: Basic sample cleaning**

The basic sample cleaning serves two purposes. First, by unifying and deleting suffixes and prefixes, the business name and address are more likely to be what appears on yelp.com, which facilitates the automatic search and code-based match steps. Second, as I also study what types of borrowers participate in both the first and second draws of the PPP program, unifying and checking potical duplications makes the match across different years more reliable.

Internet Appendix-32

Electronic copy available at: https://ssrn.com/abstract=3949148

### Step 1.1 Code-based adjustments of the business name

This step aims to adjust the names to be more likely to be what restaurants use as a trading name than a formal format of a company name. Details on the cleaning steps are described in Section 3 Name and Address Cleaning Mapping.

### Step 1.2 Code-based adjustments of the business address

This step aims to adjust the addresses to be more likely to have a more unified format of different representations of the address code. Details on the cleaning steps are described in Section 3 Name and Address Cleaning Mapping.

### Step 1.3 Manual check and adjustments potential duplicated business entities

The aim of this step is to assign a unique ID for each business entity that participated in the PPP and PPS. I assume that business entities in the same zip code region with the same name are the same restaurant and assign the same business entity ID to them. More specifically, two observations in the original data will be assigned with the same business entity ID if 1) the business name in the original dataset and the 5-digit zip code is the same for the two parts of the dataset; or 2) the adjusted name, adjusted address, and the 5-digit zip code are the same for the two parts of the dataset (the adjustment rules are described in Section 3 Name and Address Cleaning Mapping).

After excluding the repetition because of participation in both PPP and PPS, I have 3,500 observations that have the same adjusted business name and 5-digit zip code. I do two rounds of manual checks on these 3,500 observations. In the first round, I detect simple cases where the addresses are either exactly the same but written in different formats (e.g., "1502 j f kennedy dr" and "1502 jfk drive") or with a very small difference in the road number (e.g., "1651 w ogden ave" and "1659 w ogden ave"). I assign the same business entity ID to the two observations. After this round of checks, I have a rest of 1,370 observations. Then, I do a second round of manual checks and google searches to gain additional information to

Internet Appendix-33

Electronic copy available at: https://ssrn.com/abstract=3949148

decide whether the business name and address in the dataset are for the same restaurant. I also gain the yelp link alongside. I find the yelp links for 1,058 observations, with 529 pairs for the same restaurant where I assign the same business entity ID and 44 observations that are different restaurants.

After the above-described steps, I assign 371,845 unique business entity IDs to the 372,541 loans (less than 1% of the businesses are potentially applying for multiple loans.) Around 60% of participants in PPP also participated in the PPS.

### Step 1.4 Basic adjustments of the franchise names

This step adjusts the franchise names in the PPP data to be close to the franchise names in real life. As the total number of franchise names (1,496) is relatively small, we do this step manually. We detect and delete some franchise names that are not for restaurant chains and the sample size decreases to 372,298 loans for the PPP sample and 198,642 loans for the PPS sample.

### Step 2: Code-based automatic search of the adjusted business name and address on yelp.com

I employ both the name search and address search on yelp.com to take into account the possibility that either one is better than the other when searching on yelp.com to find the most closely related restaurants. In both searches, I also include the zip code in the PPP data of the business entity to narrow the search range and increase the likelihood of a correct match. I use zip code instead of the city because zip code is for a much smaller region than cities in most cases. In addition, as the city information in the original PPP data has many typos, using zip code instead of the city can immune the results from the noise in the original data.

I start with the name search as it can provide a better match when the restaurant's name is related to its company name. Name search also gives results on restaurants that are closed.

Electronic copy available at: https://ssrn.com/abstract=3949148

After the name search, I match the search outcomes with the original PPP sample based on the matching criteria described in Section 2 Matching Criteria. If no match is found, I move on to the address search. While the name search may also give the correct results when the restaurant uses a different name than its company name, I complement the search results with an address search to have a higher matching rate. For time-saving reasons, I include the first ten search results suggested by Yelp (i.e., the search outcomes on the first page on yelp.com) for the next matching step.

One potential caveat in the search procedure is that the results suggested by Yelp might be incomplete and therefore I miss the correct match. However, as Yelp is a widely-used restaurant search engine with a good reputation, such a possibility is low and unlikely to be systematically biased. In most cases, Yelp search engine works with good precision and therefore it is very unlikely that the correct match is beyond the first ten results. Code for the search is available upon request.

**Step 3: Match based on the combination of name and address**

I employ matching criteria that are rather strict: only include the pair as "matched" when I am confident that both the name and address in the two data sources have meaningful connections. I also put the restriction that the restaurant found on yelp.com is in the same 5-digit zip code region as in the PPP data.

**Step 3.1 Code-based adjustments of the names and addresses**

I employ the same code-based adjustments of the names and addresses as described in Section 3 Name and Address Cleaning Mapping for the counterparts in yelp to have a uniform representation of the same name/address. This step is important for improving the matching precision. For franchise names, I further shorten the names from the version used for automatic search as the names on yelp.com is shorter in most cases. I only do the shortening step for franchise names because, for non-franchised restaurants, two might only

Electronic copy available at: https://ssrn.com/abstract=3949148

differ in the suffix.

## Step 3.2 Code-based matching of the names and addresses based on different criteria

I use a code-based rule to narrow down and split the search outcomes into subsamples according to the connections between the PPP information and information on yelp.com for the adjusted and shortened version of the names and addresses. Section 2 Matching Criteria describes the detailed matching criteria.

## Step 3.3 Manual check on a random sample for code-suggested matches under each criterion

To ensure the correctness of the matching process, I first manually check a random sample for the code-suggested matching sample for each criterion. For stricter matching criteria, the rate of correct matches is 100% or 98% and I consider all code-based matches under these criteria as "matched".

## Step 3.4 Manual correction of the matches for subsamples where the code-suggested matches are of low precision

When a random check suggests precision lower than 95%, I manually check and correct all the code-suggested matches. After the steps above, I have a sample of 104,429 total matches. I also add in the 556 matches from the manual step in 1.1, so I have a sample of 104,985 matches until this step.

## Step 3.5 Other adjustments

There are very few cases where one loan is matched with several yelp links. I manually check the 689 matches where the yelp link is duplicated. I pick the links that are more like to be a restaurant. For example, for some duplicates, one link is for a hotel and one link is for a restaurant in the hotel, then I pick the latter. When both links are for the same

Electronic copy available at: https://ssrn.com/abstract=3949148

restaurant, I choose the one with more reviews or a more complete sample period before and after the Covid-19 crisis.

Until this step, I gain a matched sample for 104,296 loans, which accounts for 28.01% of the whole PPP sample in the Food Services and Drinking Places sector. Considering the rather strict matching criteria to ensure the likelihood of false positives is very low, the matching rate is reasonable and the matched sample is useful. I further exclude the 1,769 observations where one yelp link is matched to multiple loans (1.70%, close to the percentage of potential multi-loan applications in the whole sample) and 724 observations where the yelp link is for a non-restaurant type business where I manually classify the business labels on yelp.com into labels for restaurants and non-restaurants. This gives a sample of 101,803 matches between a PPP loan and a yelp link for restaurants. I further exclude borrowers in Puerto Rico, Northern Mariana Islands, Guam, U.S. Virgin Islands and have a sample of 101,753 matches.

A final step of adjustment is to active restaurants before Covid. For the empirical analysis, I focus on the period from April 2018 to March 2021 and limit the sample to restaurants that have at least one rating record since April 2018. My final sample has 98,825 restaurant PPP recipients.


## 2. Matching Criteria

This section describes the criteria based on which I identify as a match between a business entity in the PPP data and a restaurant on yelp.com, ranked from the most strict to the least strict ones. All criteria consider both the name and the address of the business.


### Criterion 1: name the same/containing, address the same/containing, at least one is the same (75.65%)

Criterion 1 identifies matches where both the names and addresses in the PPP data and the yelp search outcomes are either exactly the same or with a relationship of one containing

Internet Appendix-37

Electronic copy available at: https://ssrn.com/abstract=3949148

the other. I pose a restriction that at least one (name or address) is exactly the same. I check 100 random samples for each case of the different combinations of name/address and exact/containing. In all cases, I have a 100% accuracy of matches for the random sample. Therefore, I consider all matches under criterion 1 are correct matches. Combining the matched search outcomes from both the name search and address search, I have 66,018 matches for non-franchise restaurants and 12,979 for franchise restaurants.

For the following criteria, I only consider the non-franchise sample because the following criteria are based on non-exact matching either for the name or the address which can only reasonably expand the matching sample for non-franchised restaurants. For names, since franchise names are already cleaned to a short version when used in the matching process and if there is no match found based on criteria 1, it is very unlikely to gain correct matches for more relaxed criteria. In addition, franchise restaurant names are already trading names, so they are what appeared on yelp.com. For non-franchised restaurants, relaxing restrictions on names might be useful since some restaurants' company name is quite different from the trading name. For addresses, non-franchised restaurants may put the corporation location or the business owner's home address in the PPP data, and by relaxing matching to related restaurants in the same zip code region, I can mitigate this data issue. Franchised restaurants cannot put the corporation location, which is the headquarter of the brand, in the PPP loan application. Franchised restaurant owners may also put their home address in the PPP application, but I consider this type of mis-input to be of a much lower percentage for franchised restaurants than for non-franchised restaurants as the separation between the business, and the owner is clearer in franchised restaurants than in a family-owned restaurant. Besides, given the high possibility of multiple restaurants under the same franchise brand in the same zip code region, I cannot easily identify correct matches if the address in the PPP data is not correct.

Internet Appendix-38

Electronic copy available at: https://ssrn.com/abstract=3949148

**Criterion 2: name the same, zip code the same (9.92%)**

Criteria 2 identifies matches where both the name and the 5-digit zip code in the PPP data and the yelp search outcomes are exactly the same. I check 100 random samples and have a 98% accuracy of matches. Therefore, I consider all matches under criteria 2 are correct matches. Combining the matched search outcomes from both the name and address searches, I have 10,361 matches for non-franchise restaurants.

**Criterion 3: name containing, address containing, zip code the same (6.01%)**

Criterion 3 identifies matches where both the names and addresses in the PPP data and the yelp search outcomes are with a relationship of one containing the other. In addition, I pose the restriction that PPP data and the yelp search outcome are in the same 5-digit zip code. I check 100 random samples and have a 100% accuracy of matches. Therefore, I consider all matches under criteria 3 are correct matches. Combining the matched search outcomes from both the name and address searches, I have 6,279 matches for non-franchise restaurants.

**Criterion 4: name containing, zip code the same, with manual check and correction for all observations (8.42%)**

Criterion 4 identifies where the names in the PPP data and the yelp search outcomes are with a relationship of one containing the other. In addition, I pose the restriction that PPP data and the yelp search outcome are in the same 5-digit zip code. I do not pose the condition that the addresses in both data sources have a containing relationship. I check 100 random samples and the accuracy is low. Therefore, I manually check all code-suggested results and adjust the match when the one suggested by code matching is incorrect. After the manual correction, I have 8,792 matches for non-franchise restaurants, combining the matched search outcomes from both the name and address searches. Among them, 86.98% of the code matches are correct, with 6,225 being of addresses like typos or different formats,

Internet Appendix-39

Electronic copy available at: https://ssrn.com/abstract=3949148

1,283 are of addresses either or a home address or corporation office, and 513 of a wrong yelp address. I correct the rest of the sample with a better match by google for additional information.

## 3. Name and Address Cleaning Mapping

### 3.1 Franchise Names

The 2021 March release of the data offers the franchise name of each small business if the company is a franchise chain company. For example, for subway, in the PPP loan-level data, the variable FranchiseName is "Subway", and the variable BorrowerName, standing for the company name, can be "2 FRIENDSIN 2ND AVE INC.", "AKOTA CORP.", "FRESH SUBWAY 62 LLC", etc. Since yelp.com shows the franchise brand name of the restaurants, I use the FranchiseName as the search input instead of using the BorrowerName in the search for non-franchised restaurants.

Early data entries of the PPP data might be incomplete and therefore I adjust the franchise name across the PPP and PPS whenever the franchise name is available for the same business entity ID. I manually check the franchise names for the part of borrowers whose digit NAICS code starts with 722 (Food Services and Drinking Places). This step improves data quality in two dimensions. First, by unifying the franchise name into the brand name on yelp.com, the search and match procedure will be more accurate and thus can give us more correct PPP-Yelp matches. For example, the original franchise name can be "starbucks master licensing agreement" which contains parts ("master licensing agreement") that are not related to the restaurant chain brand. Second, I detect franchise names that are clearly non-food services and drinking places. For instance, "Lamborghini America - dealer agreement" is a car brand, and "Laptopxchange" is an electronic service chain. I describe below the details on the criteria I use to judge whether the franchise name is a food or drinking place.

Internet Appendix-40

Electronic copy available at: https://ssrn.com/abstract=3949148

1. If the franchise name ends with the following keywords, we consider it as a food or drinking place: bagel, baguette, bakery, bar and grill/grill/grill and bar/grill and wings/ grill & cantina/ bar-b-que, bistro, bowl(s), burger(s), burrito, cafe/café, cakes, cantina, cha, chicken(s) (& biscuits), chocolate & gelato, coffee (shop), cookie dough/ cookie(s), cuisine, custard, deli, dessert, donuts, eatery, frozen yogurt, gelato & caffe, hot dogs, iced creamery/ ice cream, juice (bar), kitchen, noodles/noodle, pretzel (or starting with), restaurant (including mis-spelling: resturant), salad, sandwich (shop), smoothies, steakhouse/ steak house, street food, subs, sushi, tacos (or starting with taco)/taco shop, taphouse, taverna, tea(s), pasta, pizza/ pizzeria, wings, yogurt

2. If not, I search the franchise name in google with the restriction of only yelp.com webpages. If the search result returns a webpage in the restaurant/food category, we consider it as a food or drinking place. If all the search results on the first outcome page are not in the restaurant/food category, we google and check whether it is another type of franchise chain or not.

   Common miscategorized franchise names are art studios, car dealers, elderly care services, fitness clubs, optometrists, and training programs.

3. I do not exclude hotels in this step because some hotels also hold an eating place. We exclude yelp pages of hotels in the manual matching step and the final other adjustment steps.

Among the 1,496 (1,332 for PPP only) franchise names associated with entries of a NACIS code that starts with 722, 201 (145) names are not associated with restaurants, accounting for 490 (243) loans. 52,080 (32,283) loans whose borrowers are of a NACIS code that starts with 722 are with a franchise name representing a restaurant chain. The false positive error rate is less than 1% on the loan level. I drop the observations where the franchise name is not, so I have 372,298 loans for the PPP sample and 198,642 loans for the PPS sample.

Internet Appendix-41

Electronic copy available at: https://ssrn.com/abstract=3949148

The full list of the adjusted and the original franchise names in the original PPP data of a NACIS code that starts with 722 is available on the corresponding author's website. In the list, I generate a name for the search step. I put "1" if the original name is clearly not for food services or drinking places, and the shortened brand name otherwise.

## 3.2 Non-franchised names

Non-franchised restaurants account for the majority of the sample, 340,015 loans (or 91.27%) after the adjustment of franchise names across the PPP and PPS sample. The large sample size makes it impossible to do manual adjustments, and therefore I make code-based adjustments by deleting suffixes such as "corporation", "llc", "ltd". This serves the purpose of making the business name from the PPP data look more close to the potential restaurant trading name and facilitates the automatic search step. The cleaning code is on the corresponding author's website.

## 3.3 Address

The address cleaning step aims to cope with mainly two issues. First, it can unify the expressions across different data entries; for example, some entries may use "avenue" while some entries use "ave" for the same road type. Second, it also links more closely to the way addresses are expressed on yelp.com. The cleaning code is on the corresponding author's website.

## 3.4 Examples Before and After Cleaning

Table C3-1 presents a sample of 10 random entries of the business name and address before and after adjustments.

Internet Appendix-42

Electronic copy available at: https://ssrn.com/abstract=3949148

Table C3-1

| loannumber | businessname | businessname_org | address | address_org |
|---|---|---|---|---|
| 4374000000 | Jul-96 | july 96 corp | 2441 broadway | 2441 broadway |
| 4219000000 | pb rams investment group | pb rams investment group | 102 s main st | 102 s main st |
| 3521000000 | ahta zahkung | ahta zahkung | 318 hunt dr | 318 hunt drive. |
| 5662000000 | k&a subs tyrone | k&a subs tyrone llc | 3832 tyrone blvd | 3832 tyrone blvd |
| 8901000000 | 2 amegos | 2 amegos inc | 119 union st | 119 union st |
| 9764000000 | la eda's restaurant | la eda's restaurant | 1723 grand blvd | 1723 grand blvd |
| 1845000000 | temple bill grill gp | temple bill grill gp | 9768 bottoms rd | 9768 bottoms road |
| 7163000000 | frankies other place | frankies other place inc | 16036 red arrow hwy | 16036 red arrow hwy |
| 5586000000 | summermoon coffee cedar valley | summermoon coffee cedar valley llc | 1803 yaupon valley rd | 1803 yaupon valley rd |
| 1134000000 | molly's corral | molly's corral llc | 1519 w river rd | 1519 west river road |

## 4. Examples of the Linked Sample

Table C3-2 presents a sample of 10 random entries from our final linked sample on the PPP data and restaurant on yelp.com.

Internet Appendix-43

Electronic copy available at: https://ssrn.com/abstract=3949148

Table C3-2

https://www.yelp.com/biz/rockin-taco-and-tex-mex-frisco

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 2244000000 | | rockin taco & tex mex llc | 6890 main st ste c |

https://www.yelp.com/biz/dunkin-schenectady-3

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 2703000000 | dunkin' donuts | schenectady donuts inc | 1200 state st |

https://www.yelp.com/biz/grimaldis-luna-park-east-syracuse-2

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 3715000000 | | grimaldi's luna park inc | 6430 yorktown circle |

https://www.yelp.com/biz/biergarten-los-angeles-4

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 4760000000 | | biergarten | 206 n. western avenue |

https://www.yelp.com/biz/pizza-market-west-newton

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 5312000000 | | hanna gakob inc (pizza market) | 69 river street |

https://www.yelp.com/biz/vitales-clam-bar-berlin

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 7926000000 | | vitale's clam bar llc | 41 clementon rd |

https://www.yelp.com/biz/hidden-fortress-coffee-roasting-watsonville

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 8055000000 | | hidden fortress coffee roasting llc | 125 hangar way #270 |

https://www.yelp.com/biz/gaucho-parrilla-argentina-pittsburgh

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 8144000000 | | gaucho parrilla argentina | 1601 penn ave |

https://www.yelp.com/biz/club-37-baldwin

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 8196000000 | | club 37 inc | 3803 n m 37 |

https://www.yelp.com/biz/five-spice-omaha-2

| loannumber | franchisename | businessname_org | address_org |
|---|---|---|---|
| 8863000000 | | five spice inc | 2571 south 177th plaza |

Internet Appendix-44

Electronic copy available at: https://ssrn.com/abstract=3949148

## 5. Sample Comparison: Linked versus Unlinked

Table C3-3 compares the mean of key variables of PPP restaurant borrowers in the following samples: borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample. The difference between the second and the third sample lies in that some borrowers with a Yelp link are inactive (with no reviews) after 2018 and therefore not in the empirical analysis sample.

Table C3-3

This table reports the mean of key variables of PPP restaurant borrowers in the following samples: borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample. The sample includes restaurant borrowers in the PPP program in both years.

|  | Without Yelp Link | **Analysis Sample** | With Yelp Link But Not in Analysis Sample |
|---|---|---|---|
| *Mean* | | | |
| Initial Approval Amount | 103382.5 | 78204.27 | 45031.88 |
| Current Approval Amount | 102817.9 | 77993.58 | 44976.03 |
| Approved Date | 6/27/2020 | 5/18/2020 | 5/26/2020 |
| Jobs Reported | 20 | 18 | 11 |
| *Share* | | | |
| Franchise | 7.47% | 11.84% | 20.35% |
| Corporation | 29.17% | 33.91% | 32.27% |
| Limited Liability Company | 35.85% | 38.95% | 33.51% |
| Partnership | 2.36% | 3.01% | 2.99% |
| Subchapter S Corporation | 11.58% | 13.99% | 15.72% |
| Sole Proprietorship | 15.94% | 9.20% | 14.61% |
| Self Employed | 3.02% | 0.62% | 0.57% |
| Others | 2.08% | 0.31% | 0.34% |
| Observations | 270,738 | 98,825 | 2,978 |

While the analysis sample has loans of smaller size and approved earlier, the difference is not small. The analysis sample is also more likely to be franchised and in a formal corporate format such as corporation and L.L.C. than sole proprietorship and self-employed. This reflects the fact that more formal businesses are more likely to have active Yelp links.

Internet Appendix-45

Electronic copy available at: https://ssrn.com/abstract=3949148

Nevertheless, the difference is the share of different business types between the unlinked sample and the analysis sample is less than 3%. Overall, the analysis sample does not differ significantly from the unliked sample. On the other hand, the inactive yelp sample (the sample with a yelp link but not in the analysis sample) is much smaller compared to the unlinked sample in terms of loan size and employment size. The inactive yelp sample is also much more likely to be franchised, perhaps meaning the chains moved to other locations.

Table C3-4 shows the share of fintech loans and the total number of loans for PPP restaurant borrowers in the following samples: borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample in each business type. For the business type of Corporation, Limited Liability Company, Partnership, Subchapter S Corporation, and Self Employed, the fintech share is similar for the analysis and unlinked samples. Restaurants with the business type of Sole Proprietorship and Others have a much higher degree of fintech usage in the unlinked sample. Those are relatively smaller "restaurants" with limited types of services, for example, food trucks. Moreover, restaurants of a business type such as Sole Proprietorship and Others are less likely to have a valid and active Yelp link compared with other types of restaurants (see Table C3-3).

Table C3-5 compares the racial group shares based on the information in the PPP loan-level data for restaurant borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample. The sample includes all restaurant borrowers that have non-missing race and ethnicity information in the PPP dataset. Most of the race groups have a similar share for the linked and unlinked samples, except for African American borrowers. African American borrowers are less represented in the linked sample.

Electronic copy available at: https://ssrn.com/abstract=3949148

## Table C3-4

This table reports the share of fintech loans and the total number of loans for PPP restaurant borrowers in the following samples: borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample, across different business types. The sample includes restaurant borrowers in the PPP program in both years.

| Business Type | Without Yelp Link | | Analysis Sample | | With Yelp Link But Not in Analysis Sample | |
|---|---|---|---|---|---|---|
| | FinTech | Total N. | FinTech | Total N. | FinTech | Total N. |
| Corporation | 9.56% | 78,982 | 10.17% | 33,515 | 8.64% | 961 |
| Limited Liability Company | 8.52% | 97,071 | 8.57% | 38,493 | 5.41% | 998 |
| Partnership | 7.63% | 6,380 | 9.04% | 2,976 | 4.49% | 89 |
| S Corporation | 8.66% | 31,341 | 9.50% | 13,829 | 4.91% | 468 |
| Sole Proprietorship | 32.89% | 43,143 | 9.17% | 9,094 | 3.68% | 435 |
| Self Employed | 58.80% | 8,178 | 63.34% | 611 | 47.06% | 17 |
| Others | 31.35% | 5,643 | 8.79% | 307 | 30.00% | 10 |
| Total | | 270,738 | | 98,825 | | 2,978 |

## Table C3-5

This table reports the racial group shares based on the information in the PPP loan-level data for all restaurant borrowers that have non-missing race and ethnicity information. I report results for borrowers without a Yelp link, borrowers in the empirical analysis sample of this paper, and borrowers with a Yelp link but not in the empirical analysis sample separately.

| | Without Yelp Link | Analysis Sample | With Yelp Link But Not in Analysis Sample |
|---|---|---|---|
| hline White | 54.74% | 64.71% | 74.01% |
| Hispanic | 11.54% | 14.49% | 9.52% |
| African American | 21.64% | 4.36% | 3.36% |
| Asian | 20.13% | 26.69% | 17.28% |
| Native American | 3.14% | 3.88% | 4.43% |
| Obs. | 57,255 | 18,826 | 654 |

Internet Appendix-47

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix D: Model Discussions and Proofs

## 4.1  Race-Neutral Case

In the race-neutral case, $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i)$ for borrowers matched with traditional lenders. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta, \gamma_i)$ for borrowers matched with fintech lenders. I assume that $M^m + M^n > M^f + M^b$. Therefore, not all borrowing demand is satisfied in equilibrium.

The equilibrium in this setting is symmetric for minority and non-minority borrowers. i.e., The matching threshold is the same for minority and non-minority borrowers because the payoff function is the same for minority and non-minority borrowers. I arrive at this conclusion using the standard game theory reasoning. Suppose that the matching threshold at lender j is higher for minority borrowers than for non-minority borrowers, then the marginal minority borrower k of lender j would deviate to other lenders. Other lenders would be happy to accept the minority borrower k because her rating is higher than their marginal borrowers (and being minority does not lower the total payoff to be shared). The potential deviation lowers the matching threshold for minority borrowers at lender j. In equilibrium, the market clears at the prices (transferred utilities) so that the matching threshold for minority and non-minority borrowers is the same for lenders of the same type.

However, the matching threshold is different for fintech lenders and banks. For the marginal borrower at fintech lenders Because the total payoff to be split is higher at fintech lenders (with $\theta$), the prices (transferred utilities) are higher. The market clears at the prices so that the marginal fintech borrower is indifferent between using fintech lenders and banks so that no deviation to the other lender type happens. In addition, the marginal bank borrower is indifferent between having the loan or not.

Incentive compatibility constraints equalize the transferred utility (price) paid by the marginal borrower to fintech lenders and to banks. The wedge between the rating of the marginal borrower is determined by the additional utility parameter $h(\theta, \underline{\gamma_f})$.

Electronic copy available at: https://ssrn.com/abstract=3949148

Set outside opportunity to zero. The incentive compatibility constraints for the marginal borrower (i.e., at the thresholds) are,

$$g(\underline{\gamma_f}) + h(\theta, \underline{\gamma_f}) - p_f = g(\underline{\gamma_f}) - p_b \tag{D.1}$$

$$g(\underline{\gamma_b}) - p_b = 0 \tag{D.2}$$

Equation D.1 states that the marginal borrower at fintech lenders is indifferent between using fintech and banks. Equation D.2 states that the marginal borrower at banks is indifferent between having the loan or not.

This gives us,

$$p_f = h(\theta, \underline{\gamma_f}) + g(\underline{\gamma_b})$$

$$p_b = g(\underline{\gamma_b})$$

(1) For borrowers whose ratings are above $\underline{\gamma_f}$, their utility is

$$g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) \text{ if use fintech}$$

$$g(\gamma) - p_b = g(\gamma) - g(\underline{\gamma_b}) \text{ if use bank}$$

$\gamma > \underline{\gamma_f}$ and $\frac{\partial h(\theta_{i,j}, \gamma_i)}{\partial \gamma_i} > 0 \Rightarrow h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) > 0$.

$\gamma > \underline{\gamma_f} > \underline{\gamma_b}$ and $g'(\gamma_i) > 0 \Rightarrow g(\gamma) - g(\underline{\gamma_b}) > 0$.

Therefore, $g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) > g(\gamma) - g(\underline{\gamma_b}) > 0$. Using fintech gives them higher utility and the utility is positive. They use fintech in equilibrium.

(2) For borrowers whose ratings are between $\underline{\gamma_b}$ and $\underline{\gamma_f}$, their utility is

$$g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) \text{ if use fintech}$$

$$g(\gamma) - p_b = g(\gamma) - g(\underline{\gamma_b}) \text{ if use bank}$$

Internet Appendix-49

Electronic copy available at: https://ssrn.com/abstract=3949148

$\gamma < \underline{\gamma_f}$ and $\frac{\partial h(\theta_{i,j}; \gamma_i)}{\partial \gamma_i} > 0 \Rightarrow h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) < 0.$

$\underline{\gamma_f} > \gamma > \underline{\gamma_b}$ and $g'(\gamma_i) > 0 \Rightarrow g(\gamma) - g(\underline{\gamma_b}) > 0.$

Therefore, $g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) < g(\gamma) - g(\underline{\gamma_b})$ but $g(\gamma) - g(\underline{\gamma_b}) > 0.$ Using banks gives them higher utility and the utility is positive. They use bank in equilibrium.

(3) For borrowers whose ratings are below $\underline{\gamma_b}$, their utility is

$$g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) \text{ if use fintech}$$

$$g(\gamma) - p_b = g(\gamma) - g(\underline{\gamma_b}) \text{ if use bank}$$

$\gamma < \underline{\gamma_b} < \underline{\gamma_f}$ and $\frac{\partial h(\theta_{i,j}; \gamma_i)}{\partial \gamma_i} > 0 \Rightarrow h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) < 0.$

$\gamma < \underline{\gamma_b}$ and $g'(\gamma_i) > 0 \Rightarrow g(\gamma) - g(\underline{\gamma_b}) < 0.$

Therefore, $g(\gamma) + h(\theta, \gamma) - p_f = g(\gamma) + h(\theta, \gamma) - h(\theta, \underline{\gamma_f}) - g(\underline{\gamma_b}) < g(\gamma) - g(\underline{\gamma_b}) < 0.$ Using banks gives them higher utility but the utility is negative. They do not have loans in equilibrium.

To recap, we have a unique race-neutral equilibrium. Those borrowers with ratings above the threshold $\underline{\gamma_f}$ are matched with fintech lenders, while those with ratings between $\underline{\gamma_b}$ and $\underline{\gamma_f}$ are matched with banks. The matching threshold $\underline{\gamma_b}$ and $\underline{\gamma_f}$ are determined by the mass of lenders and borrowers.

## 4.2   Taste-Based Discrimination

### 4.2.1   Proof of Proposition 1

Set the difference between minority and non-minority borrowers for banks to zero. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i)$ for both minority and non-minority borrowers matched with banks. For fintechs, the payoff function is $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta^m, \gamma_i)$ for minorities and $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + $

Electronic copy available at: https://ssrn.com/abstract=3949148

$h(\theta^n, \gamma_i)$ for non-minorities. Set the outside option of borrowers to zero. The equilibrium in this case is given by $(\underline{\gamma_{mf}}, \underline{\gamma_{mb}}, \underline{\gamma_{nf}}, \underline{\gamma_{nb}}, p_{mf}, p_{mb}, p_{nf}, p_{nb})$ that are determined by

$$M^m \int_{\underline{\gamma_{mf}}}^{\infty} f(x, \mu^m, \sigma^m) \, dx + M^n \int_{\underline{\gamma_{nf}}}^{\infty} f(x, \mu^n, \sigma^n) \, dx = M^f \tag{D.3}$$

$$M^m \int_{\underline{\gamma_{mb}}}^{\underline{\gamma_{mf}}} f(x, \mu^m, \sigma^m) \, dx + M^n \int_{\underline{\gamma_{nb}}}^{\underline{\gamma_{nf}}} f(x, \mu^n, \sigma^n) \, dx = M^b \tag{D.4}$$

$$g(\underline{\gamma_{mf}}) + h(\theta^m, \underline{\gamma_{mf}}) - p_{mf} = g(\underline{\gamma_{mf}}) - p_{mb} \tag{D.5}$$

$$g(\underline{\gamma_{nf}}) + h(\theta^n, \underline{\gamma_{nf}}) - p_{nf} = g(\underline{\gamma_{nf}}) - p_{nb} \tag{D.6}$$

$$g(\underline{\gamma_{mb}}) - p_{mb} = 0 \tag{D.7}$$

$$g(\underline{\gamma_{nb}}) - p_{nb} = 0 \tag{D.8}$$

$$p_{mf} = p_{nf} \tag{D.9}$$

$$p_{mb} = p_{nb} \tag{D.10}$$

Equations D.5 to D.8 are the incentive compatibility constraints for the marginal borrower in the minority-fintech, non-minority-fintech, minority-bank, and non-minority-bank matches respectively. Equations D.9 to D.10 are the lender's incentive compatibility.

$$(D.7) - (D.8) + (D.10) \Rightarrow g(\underline{\gamma_{mb}}) = g(\underline{\gamma_{nb}})$$

$$g'(\gamma) > 0 \Rightarrow \underline{\gamma_{mb}} = \underline{\gamma_{nb}} \tag{D.11}$$

$$(D.5) - (D.6) + (D.9) - (D.10) \Rightarrow h(\theta^m, \underline{\gamma_{mf}}) = h(\theta^n, \underline{\gamma_{nf}}) \tag{D.12}$$

Define the minority-non-minority rating gap in matching thresholds between fintech lenders and banks as $\underline{\Delta_{fintech-bank}}\Delta_{minority-non-minority} \overset{\text{def}}{=} (\underline{\gamma_{mf}} - \underline{\gamma_{nf}}) - (\underline{\gamma_{mb}} - \underline{\gamma_{nb}})$

Internet Appendix-51

Electronic copy available at: https://ssrn.com/abstract=3949148

$$(D.11) \Rightarrow \underline{\Delta_{fintech-bank}\Delta_{minority-non-minority}} = \underline{\gamma_{mf}} - \underline{\gamma_{nf}}$$

$$\frac{\partial h}{\partial \theta \partial \gamma} > 0 \text{ and } \theta^m > \theta^n \Rightarrow \underline{\gamma_{mf}} < \underline{\gamma_{nf}}$$

Therefore, $\underline{\Delta_{fintech-bank}\Delta_{minority-non-minority}} = \underline{\gamma_{mf}} - \underline{\gamma_{nf}} < 0$ iff $\theta^m > \theta^n$

### 4.2.2  Extension on Additional Utility for Banks

The key prediction that $\Delta_{fintech-bank}\Delta_{minority-non-minority}$ is negative if fintech lenders are less discriminating does not depend on the simplification assumption on no additional utility component in payoff functions for banks. In this section, I extend the payoff function of matches with banks. It also helps to understand that the rating-gap prediction does not depend on no gap in borrowers matched with banks (D.11), which is clearly too strong to reflect the reality. Rather, (D.11) is only a notation-saving simplification. In other words, the proof in this section motivates why the main prediction to test is the double difference $\Delta_{fintech-bank}\Delta_{minority-non-minority}$ instead of two first differences $\Delta_{minority-non-minority}$ for fintech and for banks.

$p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta^{mb}, \gamma_i)$ for minority borrowers who have been paired with traditional lenders. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta^{nb}, \gamma_i)$ for non-minority borrowers who have been paired with traditional lenders. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta^{mf}, \gamma_i)$ for minority borrowers paired with fintech lenders. $p_{i,j}(\gamma_i, \theta_{i,j}) = g(\gamma_i) + h(\theta^{nf}, \gamma_i)$ for non-minority borrowers paired with fintech lenders. $g' > 0$, $\frac{\partial h}{\partial \gamma} > 0$, and $\frac{\partial h}{\partial \theta \partial \gamma} > 0$.

Fintech lenders are less discriminating against minority borrowers means that the utility gain for minorities is larger at fintech than at banks. $\theta^{mf} - \theta^{nf} > \theta^{mb} - \theta^{nb}$. The equivalence of Proposition 1 under this extension is $\underline{\gamma_{mf}} < \underline{\gamma_{nf}}$, $\underline{\gamma_{mb}} > \underline{\gamma_{nb}}$ iff $\theta^{mf} > \theta^{nf}$, $\theta^{mb} < \theta^{nb}$.

Here is the proof. The incentive compatibility constraints are,

Internet Appendix-52

Electronic copy available at: https://ssrn.com/abstract=3949148

$$g(\underline{\gamma_{mf}}) + h(\theta^{mf}, \underline{\gamma_{mf}}) - p_{mf} = g(\underline{\gamma_{mf}}) + h(\theta^{mb}, \underline{\gamma_{mf}}) - p_{mb} \tag{D.13}$$

$$g(\underline{\gamma_{nf}}) + h(\theta^{nf}, \underline{\gamma_{nf}}) - p_{nf} = g(\underline{\gamma_{nf}}) + h(\theta^{nb}, \underline{\gamma_{nf}}) - p_{nb} \tag{D.14}$$

$$g(\underline{\gamma_{mb}}) + h(\theta^{mb}, \underline{\gamma_{mb}}) - p_{mb} = 0 \tag{D.15}$$

$$g(\underline{\gamma_{nb}}) + h(\theta^{nb}, \underline{\gamma_{nb}}) - p_{nb} = 0 \tag{D.16}$$

$$p_{mf} = p_{nf} \tag{D.17}$$

$$p_{mb} = p_{nb} \tag{D.18}$$

$$(D.13) - (D.14) + (D.17) - (D.18) \Rightarrow h(\theta^{mf}, \underline{\gamma_{mf}}) - h(\theta^{mb}, \underline{\gamma_{mf}}) = h(\theta^{nf}, \underline{\gamma_{nf}}) - h(\theta^{nb}, \underline{\gamma_{nf}})$$

$$(D.15) - (D.16) + (D.18) \Rightarrow g(\underline{\gamma_{mb}}) + h(\theta^{mb}, \underline{\gamma_{mb}}) = g(\underline{\gamma_{nb}}) + h(\theta^{nb}, \underline{\gamma_{nb}})$$

$g' > 0$ and $\frac{\partial h}{\partial \gamma} > 0 \Rightarrow \underline{\gamma_{mb}} > \underline{\gamma_{nb}}$ iff $\theta^{mb} < \theta^{nb}$.

$\frac{\partial h}{\partial \theta \partial \gamma} > 0 \Rightarrow \underline{\gamma_{mf}} < \underline{\gamma_{nf}}$ iff $\theta^{mf} > \theta^{nf}$, $\theta^{mb} < \theta^{nb}$.

In this extension, while matching thresholds (D.11) at banks are relaxed to more realistic representation $\underline{\gamma_{mb}} > \underline{\gamma_{nb}}$, the key prediction on the double difference in rating does not change. $\Delta_{fintech-bank}\Delta_{minority-non-minority}$ is negative if fintech lenders are less discriminating against minority borrowers.

Internet Appendix-53

Electronic copy available at: https://ssrn.com/abstract=3949148

### 4.2.3   Proof of Corollary 1

$$
\begin{aligned}
E(\Delta\Delta|\cdot) &\overset{\text{def}}{=} \left[\mathbb{E}\left(x|x \geq \underline{\gamma_{mf}}, \mu^m, \sigma^m\right) - \mathbb{E}\left(x|x \geq \underline{\gamma_{nf}}, \mu^n, \sigma^n\right)\right] \\
&\quad - \left[\mathbb{E}\left(x|\underline{\gamma_{mb}} \leq x < \underline{\gamma_{mf}}, \mu^m, \sigma^m\right) - \mathbb{E}\left(x|\underline{\gamma_{nb}} \leq x < \underline{\gamma_{nf}}, \mu^n, \sigma^n\right)\right] \\
&= \left[\mu^m + \sigma^m \frac{\varphi(\frac{\gamma_{mf}-\mu^m}{\sigma^m})}{1-\Phi(\frac{\gamma_{mf}-\mu^m}{\sigma^m})} - \sigma^n \frac{\varphi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right)}{1-\Phi(\frac{\gamma_{nf}-\mu^n}{\sigma^n})}) - \mu^n\right] \\
&\quad - \left[\mu^m + \sigma^m \frac{\varphi\left(\frac{\gamma_{mb}-\mu^m}{\sigma^m}\right) - \sigma^m \varphi\left(\frac{\gamma_{mf}-\mu^m}{\sigma^m}\right)}{\Phi\left(\frac{\gamma_{mf}-\mu^m}{\sigma^m}\right) - \Phi\left(\frac{\gamma_{mb}-\mu^m}{\sigma^m}\right)} - \sigma^n \frac{\varphi\left(\frac{\gamma_{nb}-\mu^n}{\sigma^n}\right) - \varphi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right)}{\Phi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right) - \Phi\left(\frac{\gamma_{nb}-\mu^n}{\sigma^n}\right)} - \mu^n\right] \\
&= \sigma^m \left[\frac{\varphi(\frac{\gamma_{mf}-\mu^m}{\sigma^m})}{1-\Phi(\frac{\gamma_{mf}-\mu^m}{\sigma^m})} - \frac{\varphi\left(\frac{\gamma_{mb}-\mu^m}{\sigma^m}\right) - \varphi\left(\frac{\gamma_{mf}-\mu^m}{\sigma^m}\right)}{\Phi\left(\frac{\gamma_{mf}-\mu^m}{\sigma^m}\right) - \Phi\left(\frac{\gamma_{mb}-\mu^m}{\sigma^m}\right)}\right] \\
&\quad - \sigma^n \left[\frac{\varphi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right)}{1-\Phi(\frac{\gamma_{nf}-\mu^n}{\sigma^n})} - \frac{\varphi\left(\frac{\gamma_{nb}-\mu^n}{\sigma^n}\right) - \varphi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right)}{\Phi\left(\frac{\gamma_{nf}-\mu^n}{\sigma^n}\right) - \Phi\left(\frac{\gamma_{nb}-\mu^n}{\sigma^n}\right)}\right]
\end{aligned}
$$

$$(\text{D.19})$$

Where $\varphi(\cdot)$ and $\Phi(\cdot)$ are the density and cumulative distribution function of the standard normal distribution respectively.

Suppose that the underlying distribution is the same for minority and non-minority borrowers, i.e., $\mu^m = \mu^n = \mu$ and $\sigma^m = \sigma^n = \sigma$ , combined with(D.11) $\underline{\gamma_{mb}} = \underline{\gamma_{nb}} = \sigma\tilde{\gamma} + \mu$ , (D.13) becomes,

$$
\sigma\left(G\left(\frac{\gamma_{mf}-\mu}{\sigma}\right) - G\left(\frac{\gamma_{nf}-\mu}{\sigma}\right)\right), \text{where } G\left(x\right) = \frac{\varphi\left(x\right)}{1-\Phi\left(x\right)} - \frac{\varphi\left(\tilde{\gamma}\right) - \varphi\left(x\right)}{\Phi\left(x\right) - \Phi\left(\tilde{\gamma}\right)}
$$

Using the symmetricity of normal distribution,

$$
G\left(x\right) = \frac{\varphi\left(x\right)}{1-\Phi\left(x\right)} - \frac{\varphi\left(\tilde{\gamma}\right) - \varphi\left(x\right)}{\Phi\left(x\right) - \Phi\left(\tilde{\gamma}\right)} = \frac{\varphi\left(x\right)}{\Phi\left(-x\right)} + \frac{\varphi\left(x\right) - \varphi\left(\tilde{\gamma}\right)}{\Phi\left(x\right) - \Phi\left(\tilde{\gamma}\right)}
$$

Internet Appendix-54

Electronic copy available at: https://ssrn.com/abstract=3949148

# Internet Appendix E: Empirical Matching Model Estimation Setup

The computational costs of estimating the Fox (2018) model increase rapidly with the number of parameters. Therefore, I only include covariates that are closely related to the borrower-lender matching process but exclude most of the control variables from the regression analysis. For the same purpose, I group three minority indicators into one group: minority borrowers. As discussed in the model assumptions, only characteristics of the matched pair that are related to both borrowers and lenders enter the value function in the estimation. In addition, following the literature (Chen and Song (2013), Akkus et al. (2016), Schwert (2018)), I demean all borrower and lender characteristics so that their interactions can be interpreted as covariances.

I include the following five covariates. First, the covariate of interest in the matching value function is the product of the fintech lender indicator and the minority borrower indicator. It enters the matching value function as the analog to the coefficient on the minority borrower dummies in Table 2. A positive coefficient on the product term between the fintech lender and the minority borrower indicators means that more value is generated by matching fintech lenders with minority borrowers, whereas a negative coefficient means that more value is generated by matching fintech lenders with non-minority borrowers. I refer to this as the additional value channel of fintech lenders to minority borrowers.

Second, to account for relationship persistence, I include an indicator for whether there is an SBA loan between the borrower and the lender during 2009-2019. Third, for the bank desert channel, I include a variable on the number of active bank branches of the lender in 2020 in the zip code region of the borrower. For fintech lenders, I set the number to the maximum in my sample (11) because the online service is likely to easily accessible for every region. Fourth, as previous studies show the importance of geographic distance in banking

Internet Appendix-55

Electronic copy available at: https://ssrn.com/abstract=3949148

(Granja et al. (2022a)), I also include a covariate on the mile distance between the borrower and the lender headquarters. Because the effective distance to use fintech lenders is tiny, I set the geographic distance to zero when the match is formed with fintechs. Firth, restaurant rating is an important confounding factor, as higher-rated restaurants can be more likely to self-select into fintech users. To account for sorting by rating, I include the product of the fintech lender indicator and the borrower's rating.

Without data on the transfer payments, identification is only up to arbitrary order-preserving transformations of the parameters (Manski (1975)). A scale normalization on the parameter vector is needed. I fix the scale (bounds in the differential evolution optimization) to $\pm 4000$ and choose the parameters that satisfies a greater percentage of the pairwise stability inequalities. 4000 is chosen based on sensitivity analysis on the bounds.

As in the regression analysis, I treat the 2020 and 2021 PPP as two samples, which gives separate matching markets. Due to computational power limitations, I restrict to state-by-state estimation. I report the average of all 51 states.[4] The observed matches are the matching between borrowers and lenders that occurred in the PPP. Inequalities are generated by swapping every observed pair of borrower-lender matches in the same state, with the restriction that the lender lent at least one PPP loan in the same city as the borrower. This restriction lowers the total number of inequalities and computational demand.

---

[4]The 2021 PPP sample of 400,814 inequalities can be coped with cloud computation. I report results using the full 2021 sample in the Internet Appendix, which shows the same sign and the same relative magnitude as to the average across states. Even restricted to within-state swapping of borrower-lender matches, the 2020 PPP sample contains more than 109 million inequalities which require memory impossible with the current computer power. Another attempt is to restrict to a small random sample. The issue here is if the sample is too small, it loses many interactions among players, which gives imprecise estimations.

Internet Appendix-56

Electronic copy available at: https://ssrn.com/abstract=3949148

# Exhibit P

FEDERAL RESERVE BANK *of* NEW YORK    *Serving the Second District and the Nation*

# Liberty Street Economics

MAY 27, 2021

## Who Received PPP Loans by Fintech Lenders?

*Jessica Battisto, Nathan Godin, Claire Kramer Mills, and Asani Sarkar*

*Editor's note: Since this post was first published, the chart entitled "Fintech Lenders Were Important Sources of Credit for Black Owners" has been updated to reflect a correction in the estimated approval rates of PPP loans. For example, following the correction, we do not find that Fintech lenders approved the highest percentage of applications from Black-owned small employers, as compared to firms owned by persons of other races and ethnicities. (October 26, 2022, 1:08 pm).*



Small businesses not only account for [47 percent of U.S employment](#) but also provide a pathway to success for minorities and women. During the coronavirus pandemic, these small businesses—[especially those owned by minorities](#)—were hard hit as [consumers reduced spending disproportionately on services that require in-person physical interaction](#), such as hotels and restaurants. In response, the U.S. government launched the [Paycheck Protection Program](#) (PPP) to provide guaranteed and potentially forgivable small business loans. In this post, we examine financial technology (fintech) lenders participating in the PPP and find that, while disbursing only a small share of total loan amounts, they provide important

Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 622 of 801

support to minority business owners, who have in the past been underserved by the traditional banking industry.

## Small Business Experience during the Pandemic

The previous post showed that declines and recoveries in small business revenues differed along demographic lines. Survey evidence shows that the number of active business owners dropped by 22 percent from February to April 2020, with Black and LatinX owners suffering most. Industries with a higher concentration of female, Black, LatinX, and immigrant businesses were among the hardest hit. More recent evidence shows that these trends continued until later in 2020 with almost 80 percent of small business firms reporting drops in income with stark disparities by business owners' race.

## Bank and Fintech Lenders in the Paycheck Protection Program

The PPP is administered by the Small Business Administration (SBA), with funds allocated in three rounds or waves. A total of $659 billion in funding was authorized in the first two waves between April 3 (the PPP launch date) and August 8, 2020. In 2020, the PPP provided 5.2 million loans worth more than $525 billion. The current (that is, third) round began in January 2021 with an additional $284 billion in funding authorized, all of which was exhausted by May 4.

Eligibility is broad-based, and different from other SBA lending programs since applicants only have to document their payroll and other expenses and do not have to meet the "credit elsewhere" test. However, they can apply for and receive loans only through eligible financial institutions. Since lenders bear no credit risk when providing loans guaranteed by the U.S. government, differences between lenders in loan disbursements primarily reflect their ability to process applications and their approval decisions.

Initially, loans were mostly distributed by banks, which allowed for rapid delivery but also increased the chance that loans might go to existing bank customers rather than the hardest-hit borrowers. In an important change, the SBA authorized more nonbank lenders to accept applications toward the end of the first wave. Of particular interest are fintech lenders, defined as nonbank lenders that operate online such as Kabbage, Square, Lending Club, OnDeck, and PayPal Working Capital. Recently, fintech companies have become important lenders to small businesses, especially in places where banks have pulled out. Compared to banks, fintech lenders may be more efficient in processing applications (as was shown for mortgages), and more likely to lend to underserved businesses that are unable to borrow from banks.

## Who Applied for PPP Loans and from Which Lenders?

Which lenders did borrowers seek out for PPP loans? To examine this question, we use data from the Federal Reserve's 2020 Small Business Credit Survey, which included 9,693 small employer respondents (firms with 1-499 employees) nationwide and was carried out in September and October 2020. Some firms reported in the survey that they did not apply for PPP loans, mainly because they felt unqualified for the loan or loan forgiveness. Of applicants, 87 percent applied to either a large bank (one with more than $10 billion in deposits) or a small bank, while just 8 percent applied to fintech companies. By comparison, in the previous five years, 44 percent of firms with between one and 499 employees had used a large or small bank and 20 percent had used fintech companies.

One reason that borrowers might turn to banks is because they have an existing relationship. While that connection may facilitate loan approval and encourage banks to look out for the survival of applicant firms, it may also prevent loans from reaching the hardest-hit borrowers. Indeed, as the chart below shows, 95 percent of large bank applicants and 83 percent of small bank applicants had a prior relationship with their PPP lenders. (Borrowers may have relationships with multiple lenders). These borrowers had more employees, higher credit scores, and were more likely to have white owners. In contrast, just one in three small employers that applied to a fintech lender had worked with that lender before. These borrowers had fewer employees, lower credit scores, greater difficulty in accessing PPP credit, and were more likely to be Black-owned and to have reduced their workforce. Thus, our results suggest that PPP applicants self-select among lenders, with underserved borrowers gravitating towards fintech companies.

### Most Applicants for Fintech Loans Did Not Have a Prior Relationship



Source: Federal Reserve Banks of New York, Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, Philadelphia, Richmond, San Francisco, and St. Louis, 2020 Small Business Credit Survey, fielded September-October 2020.

Notes: This chart plots the share of Paycheck Protection Program (PPP) applicants that had an existing relationship at the lender at which they applied, by source. N equals the number of observations.

Nearly half of all small employer firms sought out PPP funds from a large bank, with little difference in application rates by

race and ethnicity (see chart below). However, there are clear differences in the racial profile of applicants to small banks and fintech lenders. Fewer Black and Hispanic owners applied to small banks than did white and Asian owners. In contrast, about one in four Black-owned firms applied to fintech lenders, more than **twice** the rate of white-, Asian-, and Hispanic-owned firms.

**Black Owners Applied to Fintech Lenders at a High Rate**



Source: Federal Reserve Banks of New York, Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, Philadelphia, Richmond, San Francisco, and St. Louis. 2020 Small Business Credit Survey, fielded September-October 2020.

Notes: This chart plots the share of Paycheck Protection Program (PPP) applicants that applied to each lender by the race/ethnicity of firm owner. N is the number of observations.

## Who Got Approved for PPP Loans and from Which Lenders?

Did fintech lenders provide credit to firms with Black owners by approving their applications at a high rate? The chart below shows that fintech lenders approved a sizeable majority of their applicants, even though most of their applicants had no existing relationship with them. PPP approval rates were highest at banks, likely reflecting the fact that most of their applicants had existing banking relationships, consistent with prior research.

**Fintech Lenders Were Important Sources of Credit for Black Owners**



Source: Federal Reserve Banks of New York, Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, Philadelphia, Richmond, San Francisco, and St. Louis, 2020 Small Business Credit Survey, fielded September-October 2020.

Note: This chart plots the Paycheck Protection Program (PPP) approval rates by lender and race/ethnicity of ownership. Approval rates for a lender are based only on the firms that applied at that lender. N is the range of observations across lenders.

## How Much PPP Credit Did Fintech Lenders Provide?

The pattern of PPP loan applications and approvals is reflected in banks' and fintech lenders' shares of PPP loan amounts (see chart below). During Wave 1, the fintech share of loan amounts (number of loans) was less than 2 percent (4 percent) as compared to 96 percent (91 percent) for banks, in part reflecting delayed authorizations from the SBA. The smaller share of fintech lenders in the loan amounts implies smaller fintech loan sizes, a topic we explore further in part three of this series. Smaller banks had a greater share by the number of loans than large banks, consistent with anecdotal evidence that large banks initially lacked the capacity to process applications, providing small banks an opportunity to gain market share.

As more fintech lenders were approved as PPP lenders, their share of lending increased to more than 10 percent of loan amounts and 20 percent by number of loans in Wave 2. While large banks maintained their shares from Wave 1 to Wave 2, those of small banks plunged by nearly half. One possible explanation is that fintech lenders appealed to small bank customers by providing a more efficient approval process which outweighed the benefits of having a prior banking relationship. By comparison, large bank customers appear to have continued to value their banking relationships.



**Share of Fintech Lending in PPP Increased at the Expense of Small Banks**

Sources: U.S. Small Business Administration, Paycheck Protection Program (PPP) data. Available at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-data. Lender types were obtained using call reports for credit unions, Summary of Deposits data for banks, and manual matching of names for nonbank lenders.

Notes: The panels show the shares of large and small banks, fintech lenders, and other lenders by number of loans and loan amounts during the Wave 1 (April 3–16, 2020) and Wave 2 (April 27–August 8, 2020) rounds of the PPP. "Other" lenders include credit unions, community development financial institutions, and finance companies.

## Inequality in Credit Access

Although fintech lenders had a small share of PPP loan volumes, they likely served borrowers who would not have received loans otherwise. Applicants who approached fintech lenders for PPP loans were more likely to lack banking relationships, be minority owned, and have fewer employees. Our results suggest that historical factors that prevent Black owners from receiving bank credit continued to operate with the PPP.

In the next post, we examine the implications of unequal credit access: whether smaller firms received the amount of PPP credit that they requested, and whether loans went to the hardest-hit areas and mitigated job losses.

Chart data  EXCEL



[]

Jessica Battisto is a senior research analyst in the Federal Reserve Bank of New York's Outreach and Education Group.

Nathan Godin is a senior research analyst in the Bank's Research and Statistics Group.



[]



[]

Claire Kramer Mills is an assistant vice president and director of community development analysis in the Bank's Outreach and Education Group.



[]

Asani Sarkar is an assistant vice president in the Bank's Research and Statistics Group.

**How to cite this post:**

Jessica Battisto, Nathan Godin, Claire Kramer Mills, and Asani Sarkar, "Who Received PPP Loans by Fintech Lenders?," Federal Reserve Bank of New York *Liberty Street Economics*, May 27, 2021, https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders.html.

**Additional Posts in the Series**

COVID-19 and Small Businesses: Uneven Patterns by Race and Income

Who Benefited from PPP Loans by Fintech Lenders?

**Related Reading**

Economic Inequality series

**Press Briefing**



---

**Disclaimer**

The views expressed in this post are those of the authors and do not necessarily reflect the position of the Federal Reserve Bank of New York or the Federal Reserve System. Any errors or omissions are the responsibility of the authors.

All Liberty Street Economics                                SEARCH

 RSS Feed

 Follow Liberty Street Economics

RECEIVE EMAIL ALERTS FOR THIS PAGE

| enter your email | SUBMIT

## About the Blog

*Liberty Street Economics* features insight and analysis from New York Fed economists working at the intersection of research and policy. Launched in 2011, the blog takes its name from the Bank's headquarters at 33 Liberty Street in Manhattan's Financial District.

The editors are Michael Fleming, Andrew Haughwout, Thomas Klitgaard, and Asani Sarkar, all economists in the Bank's Research Group.

*Liberty Street Economics* does not publish new posts during the blackout periods surrounding Federal Open Market Committee meetings.

The views expressed are those of the authors, and do not necessarily reflect the position of the New York Fed or the Federal Reserve System.

## Economic Research Tracker

 *Liberty Street Economics* is now available on the iPhone® and iPad® and can be customized by economic research topic or economist.

## Economic Inequality



This ongoing *Liberty Street Economics* series analyzes disparities in economic and

policy outcomes by race, gender, age, region, income, and other factors.

## View by Topic

BALANCE OF PAYMENTS   BANK CAPITAL   BANKS   CENTRAL BANK   CLIMATE CHANGE

CORPORATE FINANCE   COVID-19 FACILITIES   CREDIT   CRISIS   CRISIS CHRONICLES   CRYPTOCURRENCIES

CURRENCY   CURRENT ACCOUNT   DEALERS   DEMOGRAPHICS   DODD-FRANK   DSGE   DSGE-FORECAST

ECONOMIC HISTORY   EDUCATION   EMPLOYMENT   EQUITABLE GROWTH   EURO AREA   EXCHANGE RATES

EXPECTATIONS   EXPORTS   FEDERAL RESERVE   FED FUNDS   FINANCIAL INSTITUTIONS

FINANCIAL INTERMEDIATION   FINANCIAL MARKETS   FIRE SALE   FISCAL POLICY   FOMC   FORECASTING

FORECLOSURE   HEY, ECONOMIST!   HISTORICAL ECHOES   HOUSEHOLD   HOUSEHOLD FINANCE   HOUSING

HUMAN CAPITAL   INEQUALITY   INFLATION   INTERNATIONAL ECONOMICS   LABOR ECONOMICS

LABOR MARKET   LENDER OF LAST RESORT   LIQUIDITY   MACROECONOMICS   MONETARY POLICY

MORTGAGES   NEW JERSEY   NEW YORK   NEW YORK CITY   NONBANK (NBFI)   PANDEMIC   PANIC

PUERTO RICO   RECESSION   REGIONAL ANALYSIS   REGULATION   REPO   STOCKS   STUDENT LOANS

SUPPLY CHAIN   SYSTEMIC RISK   TARIFFS   TREASURY   UNEMPLOYMENT   WAGES

## Most Read this Year

1. Understanding the "Inconvenience" of U.S. Treasury Bonds
2. Balances Are on the Rise—So Who Is Taking on More Credit Card Debt?
3. The Great Pandemic Mortgage Refinance Boom
4. How Do Deposit Rates Respond to Monetary Policy?
5. Deposit Betas: Up, Up, and Away?

USEFUL LINKS

COMMENT GUIDELINES

DISCLOSURE POLICY

ARCHIVES

# Exhibit Q

# Fintech Lending: Financial Inclusion, Risk Pricing, and Alternative Information

Julapa Jagtiani
Federal Reserve Bank of Philadelphia

Catharine Lemieux
Federal Reserve Bank of Chicago

Preliminary Draft:  June 16, 2017

## Abstract

Fintech has been playing an increasing role in shaping financial and banking landscapes. Banks have been concerned about the uneven playing field because Fintech lenders are not subject to the same rigorous oversight. There have also been concerns about the use of alternative data sources by Fintech lenders and the impact on financial inclusion. In this paper, we explore the advantages/disadvantages of loans made by a large Fintech lender and similar loans that were originated through traditional banking channels. Specifically, we use account-level data from the Lending Club and Y-14M bank stress test data. We find that Lending Club's consumer lending activities have penetrated areas that could benefit from additional credit supply – such as areas that lose bank branches and in those in highly concentrated banking markets. We also find a high correlation between interest rate spreads, Lending Club rating grades, and loan performance. However, the rating grades have a decreasing correlation with FICO scores and debt-to-income ratios, indicating that alternative data is being used and performing well so far. Lending Club borrowers are, on average, more risky than traditional borrowers given the same FICO scores. The use of alternative information sources has allowed some borrowers who would be classified as subprime by traditional criteria to be slotted into "better" loan grades and therefore get lower priced credit. Also, for the same risk of default, consumers pay smaller spreads on loans from the Lending Club than from traditional lending channels.

JEL Classification: G21, G28, G18, L21
Keywords: Fintech, Lending Club, marketplace lending, banking Competition, shadow Banking, credit spreads, credit performance, P2P lending, peer-to-peer lending

Please direct correspondence to Julapa Jagtiani at Julapa.jagtiani@phil.frb.org or call 215-574-7284. The authors thank Leigh-Ann Wilkins, Raman Quinn Maingi, and John Nguyen for their research assistance. Special thanks to Ana Oppenheimer for her dedicated assistance.  The opinions expressed in this paper are the authors' own views and do not necessarily represent the views of the Federal Reserve Bank of Philadelphia, Federal Reserve Bank of Chicago, or the Federal Reserve System.  This paper is available free of charge at philadelphiafed.org/research-and-data/publications/working-paper.

# Fintech Lending: Market Penetration, Risk Pricing, and Alternative Information

## I.      Introduction

We have seen the explosive growth of online alternative lending since 2010.  Advances in Fintech lending and the use of big data have started to change the way consumers and small businesses secure financing. While the number of nonbank lenders has been growing rapidly, their total is still far from approaching the volume of traditional bank lending.  There have been a few setbacks in these markets recently, but the growth has started to pick up again.[1] It is still unclear what the long-term growth trend will be for this industry and how it will impact the financial landscape.

As with any shadow banking entity there are concerns about the potential uneven regulatory playing field.  Depository institutions are subject to a number of consumer protection and transparency regulations that attempt to ensure that customers are treated fairly, have equal access to credit, and receive offers that can be easily compared and understood. Even when shadow banking entities are subject to consumer protection and transparency laws, the supervision of their compliance is the responsibility of the Consumer Financial Protection Bureau (CFPB) which is risk-focused based on consumer complaints, the seriousness of the issues, and the availability of staff.  These entities are increasingly affiliating themselves with traditional banks.  Banking regulators have been responding to this change in the lending landscape. For example, the Federal Deposit Insurance Corporation (FDIC) has cautioned banking institutions not to abrogate their responsibility for maintaining lending standards by relying on marketplace partners.  The Office of Comptroller of the Currency (OCC) has proposed a national Fintech charter to move its associated shadow banking activities under the regulatory umbrella. And, as mentioned in a speech by Lael Brainard (2016), member of the Board of Governors of the

---

[1] Athwal (2016) reports that despite the market volatility and the concerns around recent issues at Lending Club, "most alternative lending startups continue to experience phenomenal growth" (p. 1).

Federal Reserve System, the Federal Reserve has also established a multidisciplinary working group that is engaged in a 360-degree analysis of Fintech innovation.

While the growth of nonbank lending may raise some regulatory concerns, the firms' technology platforms and their ability to use nontraditional alternative information sources to collect soft information about creditworthiness may provide significant value to consumers and small business owners, especially for those with little or no credit history. In addition, as more millennials make up the pool of small business owners and the consumer population, they are more comfortable with technology and therefore, may be more comfortable dealing with an online lender than in dealing with a traditional bank.

Over the past decade, online alternative lenders have evolved from platforms connecting individual borrowers with individual lenders,[2] to sophisticated networks featuring institutional investors, direct lending (on their balance sheet), and securitization transactions. There have also been indications that these alternative lenders may find it advantageous to partner with banking institutions to originate loans through traditional banks. As an example, the Lending Club originates some of its loans through WebBank.

While the alternative data sources and the algorithms used by online alternative lenders have allowed for faster and lower cost credit assessments, these innovations could potentially carry a risk of disparate treatment and fair lending violations. We explore some of the potential consumer benefits that could come from these new algorithms. Several questions have been raised by regulators and policymakers around these issues.

*Credit Access* -- Do Fintech firms expand the availability of credit so that previously underserved consumers now have access to credit? Can the use of alternative data (e.g., to build internal credit rating

---

[2] Frequently referred to in prior research as peer-to-peer (P2P).

systems such as the one designed by Lending Club) increase access to credit for consumers -- by allowing lenders to better assess their creditworthiness?

*Price of Credit* -- Do Fintech firms make credit available to consumers at a lower cost than traditional bank loans? The use of alternative data sources, big data and machine learning technology, and other new artificial intelligence (AI) models could reduce the cost of making credit decisions and/or credit monitoring and lower operating costs for lenders. Fintech lenders could pass on the benefits of lower lending costs to their borrowers.

*Alternative Data Sources* – Do alternative sources of information used by Fintech firms to evaluate credit applications contain additional information not embedded in the obvious risk factors used by traditional lenders? We note that certain alternative data sources are more prone to errors and thus could potentially create unfair disadvantages to vulnerable consumers. There may also be a risk of violating consumer privacy from the use of big data. Several alternative data sources have been used by Fintech lenders -- examples include information drawn from utility payments, electronic records of deposit and withdrawal transactions, insurance claims, bank account transfers, use of mobile phones or the Internet, and other personal data such as consumer's occupation or detail about their education. These data sources were not normally used by traditional lenders.

There have been policy questions around the use of big data and the appropriate policies that would regulate Fintech firms to protect consumers but without harming the innovation process.  Richard Cordray, director of the Consumer Financial Protection Bureau, March 2017, pointed out potential benefits to consumers through the use of these alternative data sources.

> "By filling in more details of people's financial lives, this information may paint a fuller and more accurate picture of their creditworthiness. So adding alternative data into the mix may make it possible to open up more affordable credit for millions of additional consumers....."

In this paper, we address many of these questions. Specifically, we explore lending activities, pricing, the role of alternative data sources, and credit performance of similar loans originated through

3

traditional banking channels versus online alternative lenders. The rest of the paper is organized as follows. The literature review is presented in Section II. In Sections III, IV, and V, we explore the impact of Fintech on credit access, the roles of alternative information sources used by Fintech lenders, and the impact of Fintech on the price of credit, respectively. Section VI concludes and discusses policy implications.

## II.       The Literature

Fintech is a new area of research.  There are a limited number of studies, partly due to the lack of data. Fintech is a broad subject area that could touch on many different aspects of financial technology, including payments related innovations such as blockchain and other distributed ledger technology, technology to facilitate payments to individuals and businesses such as Venmo, Apple Pay and Square, as well as alternative online lenders. This paper focuses on the aspect of how Fintech lenders could impact consumers and the overall banking landscape. Specifically, we explore the impact on consumers' ability to access credit, the role of alternative information sources used by Fintech lenders, and the impact on the price of credit.

### II.1  Impact of Fintech on Access to Credit

Mills and McCarthy (2014) explore whether there is a credit gap in small business lending and find a significant gap especially for very small loans (less than $50,000). Some hope that Fintech lenders will play an important role in closing this gap. Several articles have discussed and explored the role of Fintech lenders in expanding the availability of credit and allowing borrowers who were rejected by traditional banks to access the funding they need, but the results have been mixed. Many of these articles rely on survey data, and, therefore, are subject to biases in the sample selection and inconsistent standards of responses. In addition, only a couple of Fintech lenders have made their loan level data publicly available, thus providing challenges to researchers in their ability to draw broad conclusions about the industry.

4

The Joint Small Business Credit Survey Report (2015) conducted by the Federal Reserve has shown that credit access has been an important obstacle for smaller, younger, less profitable, and minority-owned businesses. Specifically, the report finds that only 29 percent of credit applications from very small businesses (that rely on contractors, no employees) received the full requested loan amount that they were seeking, and 30 percent received partial funding. Those that were not fully funded through the traditional channel have increasingly turned to online alternative lenders.[3]

Schweitzer and Barkley (2017) examine characteristics of businesses that borrow from online lenders, based on the 2015 survey.[4] The authors find that these borrowers have similar characteristics to those businesses that were denied credit from a bank and conclude that the findings are consistent with the argument that businesses denied funding by banks turned to Fintech lenders to arrange credit for their businesses that would not qualify for traditional bank financing.

In addition, there have been several surveys conducted by the various online alternative Fintech lenders that suggest the value added by their lending platforms. In the survey conducted by Funding Circle, one fifth of borrowers believed they would have been unable to secure external finance without the platform, despite being creditworthy – see Desai and Meekings (2016). Another survey[5] conducted in 2015 on behalf of OnDeck found that its borrowers did not have viable financing options outside of OnDeck and estimated that its first $3 billion in small business loans generated $11 billion in business activity. PayPal Working Capital (PPWC), based on its own data, also found that nearly 35 percent of its loans went to low-and-moderate-income (LMI) businesses, compared with 21 percent of retail bank

---

[3] With their perceived chance of being funded as the main factor in determining where they applied, small firms (with revenues less than $25,000) were nearly twice as likely to apply with an online lender as nonemployers with $100,000 in annual revenue.

[4] Note that the survey groups the data by the type of institutions -- bank (small and large), credit union, online lender and other.  It is not clear whether online lenders include online applications submitted to traditional banks or Fintech lenders.

[5] It is the OnDeck Analysis Group (2015) report.

loans – see Ahmed, Beck, McDaniel, and Schroop (2016). They also report that nearly 25 percent of PPWC loans were disbursed to the 3 percent of counties that have lost more than 10 banks since 2008.

Yet, there are studies that find contrary results. Freedman and Jin (2011) use data from Prosper to demonstrate how peer-to-peer (P2P) lenders have evolved toward serving consumers who would traditionally obtain financing from banks because the platform excludes more and more subprime borrowers. In this paper, we use loan-level data (rather than the survey data) to explore the relationship between the amount of loans made by a Fintech lender and the characteristics of the banking environment – such as the degree of banking competition, the decline in bank branches in that zip code, and whether it is a LMI neighborhood – to determine whether Fintech loans increased access to credit in those areas where traditional banks are pulling back.

Following the financial crisis, there have been concerns about the availability of credit for small business. Jagtiani and Lemieux (2016) pointed out that while credit for small businesses has rebounded, community banks (with less than $1 billion in total assets), which have been the traditional go-to source of small business credit lost ground in this market.[6] Large banks maintained their presence in the market even while the asset size of many banks grew. A big part of this change has been technology. Today the largest banks are not relying on physical offices to grow their small business lending. Technology plays an important role in allowing banks to reach a wider group of borrowers. Jagtiani and Lemieux find that between 1997 and 2014 larger banks doubled the number of counties where they had a significant presence in small business lending but did not have bank branches.

## II.2   The Roles of Alternative Information Sources

Online Fintech lenders often rely on their own algorithms for credit underwriting.  We suspect that some of the information used in their algorithms may include nontraditional information (not used by traditional banks in their lending decisions). Some Fintech lenders have developed their own online

---

[6] In 1997 over 14 percent of small community bank assets were in small business loans.  By 2016, that was down to around 11 percent.

6

lending platforms that use "big data" in their own proprietary algorithms that they developed to evaluate the credit risk of the borrowers. Through this new approach to credit risk evaluation, some consumers could potentially enhance their credit access. For example, consumers with short credit history may not satisfy a bank's traditional lending requirements, but these same consumers could potentially get a loan from an online alternative lender that uses alternative data sources.[7] There have been concerns that consumer privacy may be compromised in the process if information such as insurance claims, utility bills, transactions in bank accounts, and social network, are used by lenders without the borrower's consent.

There has been no serious research that explores these specific questions related to Fintech lenders.  An older study by Fame, Srinivasan and Woosley (2001) examines the effect of the newly developed small business credit scores on lending activities, using data collected via a phone survey of the 200 largest U.S. banking institutions. The authors find that the small business credit scoring lowered information costs and information asymmetries between borrowers and lenders -- leading to increases in small business lending (SBL).[8] Similarly, it is reasonable to expect the new algorithms used by Fintech lenders to expand lending activities to previously underserved consumers.

There have been reports by online lenders about the additional information sources that they use. Online Fintech lenders are relying more on alternative sources of information, such as sales data from Amazon, eBay and other marketplaces, shipping data from postal services, cash flow analysis from business checking accounts and payment processors; and, aspects of social media to analyze and project businesses' profitability. Crosman reports in the American Banker (June 14, 2016) that SoFi no longer uses FICO scores when determining loan qualifications. In addition, Kabbage claims that FICO scores are not part of their creditworthiness determination (although FICO scores are used for benchmarking and

---

[7] See more discussion in Demyanyk and Kolliner (2014).
[8] Specifically, the authors find small business credit scoring by banks is associated with an 8.4 percent increase in the portfolio share of small business loans, or $4 billion per institution.

investor reporting). A quote in this article by Ron Suber, president of Prosper Marketplace, states that "Prosper gets 500 pieces of data on each borrower; the FICO score is just one data point." While the company uses FICO scores to screen borrower candidates – a score of at least 640 is needed to be considered for a loan. Prosper analyzes additional data to determine the ultimate credit decision.

Moldow (2015) of Foundation Capital writes that alternative data sources, such as business sales volume from credit cards or accounting programs, the rating of a store on Yelp, the length of time a prospective borrower has used the same e-mail address, and even the amount of time a prospective borrower spends on the lending website to decide how much money to request, offer insights in determining the creditworthiness of borrowers. Mills and McCarthy (2016) report that online lenders Fundbox and Bluevine evaluate borrowers' QuickBooks, Xero, or FreshBooks data when underwriting loans. This evaluation is in addition to employing the application program interface (API), which allows a borrower to authorize direct access to various financial records in seconds.  Recently, PayPal and Square have started to offer credit to their existing business merchants based on access to sales data, which is useful during the underwriting process, and the ability to directly deduct loan repayments from the merchants' revenue, as reported by Wack in the American Banker (2015).

Previous studies that examine characteristics of borrowers find that soft information, such as applicants' looks (based on photographs) and stronger and more verifiable relational network, is related to the borrowers' success in getting funding and/or receiving a better price – see Duarte, Siegel and Young (2012) using marketplace lending data from Prosper; Lin, Prabhala and Viswanathan (2009) also using data from Prosper; and Gonzalez and Loureiro (2014) using survey data. Furthermore, Iyer, Khwaja, Luttmer, and Shue (2014) use Prosper data and find that lenders in P2P markets infer borrowers' creditworthiness by using soft information that can predict default with 45 percent greater accuracy than by using credit scores. Soft information seems to be particularly useful when screening borrowers with lower credit ratings.

8

The Consumer Financial Protection Bureau (2017) released a request for information to explore the impact of alternative data sources, including data from mobile phones, rent payment histories, electronic transactions such as deposits, withdrawals and transfers, building credit histories and increasing credit access. There have been concerns about the potential risks posed by these data sources because they may be biased and could potentially have an adverse impact on credit access to low-income and underserved communities.[9] In this paper, we shed more light on the role of alternative information sources and their relationship with traditional credit scores.  Many believe that the role of big data and alternative information will increase exponentially in the future.  Issues around consumer privacy and disparate treatment of protected classes still need to be explored.

### II.3   The Impact of Fintech on the Price of Credit

In addition to being convenient and faster for consumers, online alternative lending technology has provided enhanced efficiency to lenders through lower operating costs. It is important to investigate whether Fintech lenders pass the savings on to consumers with lower credit costs and whether the pricing is appropriate for the risk taken.[10] A few studies have attempted to compare lending rates from online alternative platform with traditional sources, but those studies have been subject to significant data limitation and the results have been mixed.

Mach, Carter, and Slattery (2014) explored the rates on small business loans, using Lending Club consumer loan data that were specified as being used for small business purposes. They find that rates vary by loan purposes and that business loans (i.e., consumer loans with small business purposes) are subject to a higher rate even after controlling for the quality of loan applications. In addition, when comparing the interest rates on Lending Club loans with interest rates on business loans reported by

---

[9] There may also be risk that online Fintech lenders could use these new data sources and data mining techniques to identify consumers who are less sophisticated and vulnerable to exploitation.

[10] Morse (2015) explores a number of issues related to Fintech disruption and financial disintermediation.  The paper concludes that at least some cost savings seem to accrue to investors (since 80 percent of P2P funds come from institutional investors), and that the borrowers' social circles and local economic indicators are useful in predicting credit risk.

National Federation of Independent Business members, the authors conclude that P2P small business borrowers paid a rate that was approximately twice as high as small business loans obtained from traditional sources. However, it should be noted that the small business purpose loans from the Lending Club consumer loan data are not likely to represent the typical small business loans because they have very small origination amounts, are unsecured and are underwritten to an individual consumer on the consumer loan platform.[11]

Demyanyk and Kolliner (2014) explore the difference in credit card rates, using data from bankrate.com, and interest rates charged on Lending Club's consumer loans.  The authors find that more creditworthy consumers receive preferred rates using a P2P lender over a credit card. However, the data are not directly comparable at the loan level.

In contrast, in Germany, De Roure, Pelizzon and Tasca (2016) use data from Auxmoney, a German P2P lending site, and bank lending and interest rates data from Deutsche Bundesbank. The authors find that, after controlling for risk characteristics of the borrowers, interest rates are comparable for loans made by P2P alternative lenders and those made by traditional banks. Furthermore, Buchak, Matvos, Piskorski and Seru (2017) study the rise of Fintech and non-Fintech shadow-banking activities in the residential lending market.[12] Evidence in their paper suggests that Fintech customers are among the borrowers who value fast and convenient services and that Fintech lenders command an interest rate premium for their services.

Emekter, Jirasakuldech and Lu (2014) explore credit risk and loan rates using Lending Club data. As expected, the authors find that borrowers with high FICO scores and low debt-to-income (DTI) ratios are associated with low default risk. Interestingly, they also find that the higher interest rates charged for the high-risk borrowers are not large enough to compensate for a higher probability of loan default.

---

[11] Lending Club started its new small business lending platform in 2014, but the data from this platform have not been made publicly available.
[12] They find that Fintech firms accounted for almost a third of shadow bank loan originations by 2015 and that Fintech lenders possess technological advantages in in pricing.

Dietrich and Wernli (2015) use data from Cashare, the biggest player in the Swiss P2P lending market (with a market share of nearly 98 percent). Data consist of information on 665 loans for private individuals granted between April 7, 2008 and December 31, 2014. The authors find that interest rates are significantly lower for larger loans amounts or when the borrower owns a home. The rates are, however, significantly higher for female borrowers and for those with higher debt-to-income (DTI) ratios.

Bertsch, Hull, and Zhang (2016) study the impact of macroeconomic factors on perceived default probabilities and therefore individual loan rates. Using Prosper and Lending Club data, the authors find borrowers in states with higher unemployment rates receive higher interest rates, even after controlling for borrower and loan characteristics, including their own employment status. They also examine how expected future improvements in the economy, as measured by changes in the real yield curve, induce decreases in interest rates in the P2P market.[13]

Pricing on platform lending seem to have evolved over the years.  For example, Lin and Wei (2016), using data from the Prosper platform, compare Prosper's pre-December 2010 auction-based model with its current posted-price model. The authors find that the interest rates assigned by the platform's current posted-price model are about 100 basis points higher than what borrowers would have received in auctions. In addition, they find that loans originated under the posted-price model are more likely to default.

We use a unique data set that allows us to compare online alternative lending rates and traditional credit card loans. We compare account-level credit card data that large banks submitted to the Federal Reserve for stress testing with online consumer loans that were made for credit card (and debt consolidation) purposes.

---

[13] They find that the December 2015 Federal Open Market Committee liftoff signaled improvements in the future outlook of the economy and lower perceived default probabilities by investors leading to lower average interest rates and reduction of credit spread.

### III.    The Data

We use five main sources of data in this paper: data on loans that were originated through online alternative channel (loan-level data from the Lending Club platform), data on loans that were originated from traditional banking channels (loan-level data from the Y-14M stress test data), consumer credit panel data (FRBNY Equifax Consumer Credit panel), banking market concentration data and bank branch information (based on the FDIC Summary of Deposits database), and economic factors (from the Haver Analytics database).

### III.1  Online Alternative Lending Channel

Our research on Fintech consumer lending focuses on the Lending Club for two reasons.  First, the company is one of the few lenders that has made its data publicly available.  Second, it is one of the larger, more established alternative lenders in this space, and, therefore, the results here are likely to apply more broadly. We use loan-level data (with detailed information about the loan and the borrower) and 5-digit zip code segment-level data (with distribution of loans by zip codes and years) from the Lending Club's consumer loans that were originated in 2007 to 2016. The loan-level database contains loan-specific information (i.e., loan rate, maturity, origination date, etc.), risk characteristics of the borrowers (i.e., FICO scores, employment, DTI ratio, age, homeownership), other risk characteristics, and monthly payment and performance of the loans. Our analysis is based on data from the Lending Club consumer loan platform.  We focus on loans that were specified for two purposes: credit cards and debt consolidation purposes. As shown in Figure 1, these loans account for more than 80 percent of Lending Club consumer loans overall.

Since the location of loans in the public version of the Lending Club data is presented at the 3-digit zip code level, we also use proprietary segment-level data at the 5-digit zip code segment level from the Lending Club to more precisely identify the location of the loans. To evaluate the differences in credit access and pricing between traditional versus alternative lending channels, we compare these

loans (for credit cards and debt consolidation) with account-level credit card data from banks, as in the following description. We observe the differences between these two lending channels in terms of lending in underserved areas, price of credit, and loan performance.



Source: Lending Club (loan-level data from the website)

### III.2  Traditional Lending Channel

To explore comparable loans made by traditional banks, we use loan-level (account-level) credit card data from the Federal Reserve's Y-14M reports, reported monthly by CCAR banks (large banks with at least $50 billion in assets). From this data set, we focus on the reporting period 2014-2016 and include only those accounts that were originated in 2015 or earlier to examine 12 months of performance period.[14] We do not include accounts that were originated prior to 2014 to avoid the sample selection bias in our analysis.  Accounts that were originated earlier and were closed (due to default or other reasons) would have been dropped from the Y-14M reports in 2014-2016.

We do not include charge cards in the analysis because there is no associated credit limit for these cards. In addition, for credit cards, we only include consumer cards that were issued for general purposes and private label cards (business cards and corporate cards are not included). Since consumers

---

[14] We note that the CCAR stress testing data is constrained by the limited number of very large systemically important banking institutions and thus may not fully represent the entire population of U.S. banking firms.

report that they borrow from the Lending Club to pay off their credit cards, we compare the average price and performance of Lending Club loans with Y-14M consumer cards, using card credit limits and Lending Club origination amounts as control factors (along with other relevant risk factors).

This loan-level data contains mostly similar information on the borrowers, and their risk characteristics as are reported on the Lending Club website (i.e., origination date, origination amount, location of the borrowers, borrowers' credit scores). However, we use a few variables for Lending Club analysis that are not reported by banks in Y-14M data, such as homeownership and DTI ratio at origination. It is important to note that while the credit card loans from Y-14M and Lending Club consumer loans that are used to pay off credit card loans (or for debt consolidation) are the most comparable products, some credit cards have rewards (cash back or points) and/or some period of low-rate promotion period (e.g., in the first six months) to encourage balance transfers from other cards. We control for the Promotion period and the rewards in our analysis that use Y-14M data.

### III.3   FRBNY Equifax Consumer Credit Panel

Who are Lending Club's borrowers?  To provide an overview of where Lending Club borrowers (our sample) are positioned among the overall population of U.S. consumers and how the trends may have changed over the years, we use the Federal Reserve Bank of New York (FRBNY) Equifax Consumer Credit Panel (CCP) database. The FRBNY Equifax CCP data set contains consolidated financial information about consumers (who have a credit record) and account-specific information about each of the credit accounts associated with the consumers.[15] Our FRBNY Equifax CCP sample includes only the primary consumers (with assigned consumer identification) who have at least three continuous years of credit records (to avoid the possibility of fake accounts) and have assigned some type of credit scores.

---

[15] Primary consumers are followed through time on the FRBNY Equifax Consumer Credit Panel, allowing us to examine their behavior over the years. Those who are part of the primary consumer's households would also be included in the database as long as they continue to belong to a primary consumer's household; they are dropped from the database otherwise.

In this paper, we focus on three important characteristics: homeownership, DTI ratio at origination, and average credit scores. We compare the trends for Lending Club borrowers with those from the overall U.S. consumer population. The summary of these differences for homeownership and DTI are presented in Figures 2A and 2B, respectively. Lending Club borrowers are less likely to own a home and are more leveraged (having a significantly higher DTI) than the average U.S. population on the consumer credit panel. In addition, the distribution of credit scores for Lending Club borrowers and the overall U.S. borrowers is presented in Figures 3A and 3B, respectively.

From the FRBNY Equifax CCP, we define homeownership as having at least one mortgage and at least a $100 balance in at least one mortgage tradeline.  Figure 2A shows that Lending Club borrowers are less likely to be homeowners compared with the general U.S. consumer population in the FRBNY Equifax CCP sample (people with credit records). Our data indicate that as of 2012-2016, about 40 percent of Lending Club borrowers did not own a home. Lending Club could be filling a credit gap for borrowers who do not have a home to serve as collateral.

Figure 2B shows that Lending Club borrowers are more leveraged than general U.S. consumers from the FRBNY Equifax CCP population. In addition, it is important to note the rising trend of DTI for Lending Club borrowers over the years. Lending Club borrowers became more leveraged starting in 2012 and appeared to have a greater risk appetite with respect to debt burden while consumers in the FRBNY Equifax CCP population de-leveraged over this time period.[16] The DTI ratio calculated from the FRBNY Equifax CCP data is the median total debt (excluding mortgages) divided by median household income.[17] The DTI for average U.S. population is significantly lower than for Lending Club borrowers.

---

[16] Lending Club borrowers' reported DTI ratio is defined as the borrowers' total monthly debt payments on the total debt obligations, excluding mortgage and the requested Lending Club loan, divided by the borrower's self-reported monthly income.
[17] For total debt calculation, we exclude severely delinquent balances (at least 120 days past due).

 

Sources: Lending Club (loan-level data from the Lending Club website) and the FRBNY Equifax CCP

Figures 3A and 3B show the distribution of the borrowers' FICO scores – for Lending Club borrowers versus the overall U.S. consumers from FRBNY Equifax CCP. Lending Club borrowers do not have very low FICO scores. Their average FICO score has been only very slightly below the average of overall Equifax consumers. The data indicate (not shown here) that as of 2009-2011, about 60 percent of Lending Club borrowers have at least a 700 FICO score, but that number dropped to about 40 percent in 2012-2016.[18]

 

Sources: Lending Club (loan-level data from the Lending Club website) and the FRBNY Equifax CCP

---

[18] It seems that the risk appetite of Lending Club started to drift upward with a rising share of subprime and near subprime loans after 2012.

***III.4   FDIC Summary of Deposits Database:***

We obtain data on market concentration based on the FDIC Summary of Deposits data, which reports deposits that each banking organization accepted from each bank branch every year.  The Herfindahl-Hirschman index (HHI), a commonly accepted measure of market concentration, is calculated in this paper at different granularities (at the 5-digit zip level, 3-digit zip level, and county level) based on the market share of deposits and number of banks in the market.[19]  The calculated HHI approximates the degree of market concentration (or degree of competition) in the banking market. The U.S. Department of Justice defines a concentrated market as one that has an HHI above 2,500. An HHI less than 1,500 indicates an unconcentrated (or competitive) banking market; an HHI between 1,500 and 2,500 indicates moderate concentration; and an HHI above 2,500 indicates highly concentrated banking market.  The HHI measure is useful in exploring the role of the Lending Club in highly concentrated markets.

We also obtain branching information from the FDIC Summary of Deposits database. We count number of branches that each bank has in each of the 5-digit zip codes, and in each of the 3-digit zip codes. We then calculate the changes in number of bank branches in each of these markets (each zip code area) over the years.[20] This information is useful in exploring the role of the Lending Club in areas that face a decline in the number of bank branches, which is another indicator of declining banking competition.

***III.5   Economic Factors:***

 We collect various economic factors from the Haver Analytics database.  For example, we use data on economic factors including local unemployment, local average household income, local home

---

[19] A market definition in terms of 5-digit zip codes corresponds to roughly a size of a town.  There are about 43,000 5-digit zip codes in the U.S.  At a less granular level, we also estimate the HHI measures at the 3-digit zip and county levels.  There are 929 3-digit zip codes and about 3,000 counties in the U.S.
[20] When there is no bank branch in the zip code, we convert 0 branch to 0.1 to avoid the indefinite amount of change when calculating the change in bank branches in terms of ratio (rather than the number of branches).

price index. We use the most granular level (5-digit zip code level) of economic factors when possible. When data are not available at the zip code level, we use county level or state level.

## IV.      The Impact of Fintech on Consumer Access to Credit

In this section, we examine whether online alternative lenders have expanded overall credit availability so consumers who were previously underserved can get credit through the Fintech lenders. We investigate whether the Lending Club made loans in areas where demand for consumer credit was not met by asking certain questions. Specifically, we explore the geographic distribution of Lending Club loans – focusing on: 1) where the banking market is highly concentrated; 2) where number of bank branches decreased significantly; and 3) where average income per capital is low (to proxy LMI neighborhoods).

### IV.1  Geographic Distribution of Lending Club Loans

Using Lending Club data on consumer lending, we find that initially its lending practices were concentrated in the Northeast and on the West Coast. Today, the Lending Club has loans in every state. Figure 4 presents the Lending Club (as a representative of Fintech lenders) consumer loan portfolio distribution as of 2010 and 2016, respectively. The map is color coded based on the portfolio concentration in the county – five brackets (colors) – in which darker colors represent a larger share of Lending Club's loan portfolio.  It is evident that, while Lending Club loans were concentrated along the West and East coasts in 2010 (about three years after its inception), the Lending Club has covered an increasing number of counties over the years. Its lending activities expanded to cover roughly the entire country by 2016, with the exception of a small pocket (in white) in the Midwest. However, the concentration seems to remain on the West and East coasts. We explore whether Lending Club's activities have had a significant relationship with the various indicators for underserved areas.

**Figure 4: Geographic Distribution of Lending Club Portfolio (Percent of Total Principal Outstanding by 5-Digit Zip)**



Source: Lending Club data                                   Source: Lending Club data

We then examine the portfolio distribution in terms of banking market concentration, as measured by the HHI.  We define the market in two ways – in terms of 3-digit zip codes and 5-digit zip codes.  As mentioned earlier, there are about 43,000 5-digit zip codes and 900 3-digit zip codes in the U.S.  A 5-digit zip code area is approximately the size of a town. The HHI calculation is based on the deposit-taking activities that each bank branch is making in the various zip codes in a given year, based on the FDIC Summary of Deposits data. A smaller HHI means a greater degree of competition.[21]

The overall landscape of the U.S. banking market (5-digit zip code market) based on banking (deposit-taking) activities is presented in Figure 5A, where approximately 80 percent of the markets are considered highly concentrated (purple). Figure 5B shows that about 50 percent of all Lending Club consumer loans are made to consumers in the highly concentrated markets with the HHI>2,500 (purple). We find that consistently half of Lending Club's new consumer loans are in areas where a few banks dominate the market; there is less banking competition.

---

[21] The Department of Justice defines a *concentrated market* as one that has an HHI above 2,500.  An HHI below 1,000 indicates a highly competitive market; otherwise, an HHI up to 1,500 indicates an unconcentrated market. An HHI between 1,500 and 2,500 indicates moderate concentration.

In addition, our regression results find a positive relationship between the share of Lending Club loans and the degree of banking market concentration (more loans in more concentrated markets), when loans are measured either by number of loans or by dollar amount of loans, even after controlling for other relevant factors.



Figure 5A: Landscapes of U.S. Banking Market by 5-Digit Zip HHI (2007-2016)

Source: FDIC Summary of Deposits Database



Figure 5B: Lending Club Consumer Loans Outstanding -- by 5-Digit Zip HHI Markets

Source: Lending Club data

We then explore the distribution of consumer loans made by the Lending Club (in terms of number of accounts and total outstanding amount) across counties with varying degrees of bank branching activities (by traditional banking firms). We divide the U.S. market into 929 zip codes (3-digit zip codes) and group them into four segments based on the percentage change in number of bank branches in a 3-digit zip code in each year. The four segments are: no decline in bank branches, up to 5 percent decline, 5-10 percent decline, and more than a 10 percent decline. Figure 6A shows the landscape of the banking markets in the period from 2007 to 2015 based on the percentage changes in bank branches in the zip codes. About 10 percent of all the banking markets experience at least a 5 percent decline (green and purple) in bank branches each year during 2014-2015.



Source: Lending Club data and FDIC Summary of Deposits (for branch data)
Note: Changes in bank branches are calculated based on 3-digit zip code market

Over the years, an increasing percentage of Lending Club loans are originated in markets that had a declining number of bank branches.  Specifically, Figure 6B shows that during the same period (2014-2015), about 40 percent of Lending Club consumer loans were made in the markets that experienced at least 5 percent decline (green and purple) in bank branches. The empirical evidence presented so far is consistent with an argument that Fintech lenders such as the Lending Club have played a role in filling the credit gap. Lending Club activities have been mainly in the areas in which there has been a decline in bank branches except for the first few years of its inception.  More than 75 percent of newly originated loans in 2014 and 2015 were in the areas where bank branches declined in the local market.

We explore this further with regression analysis, using 3-digit zip code level data derived from loan-level data from the Lending Club. The dependent variables are defined as: 1) the ratio of loan accounts originated in a specific zip code (3-digit zip) in a specific year relative to all loan accounts originated in the year, and 2) the ratio of the loan amount originated in a specific zip code (3-digit zip) in

a specific year relative to all loan amounts originated in the year.[22] The analysis focuses on key factors such as the HHI concentration index at the zip code level and the percent change in the number of bank branches in the zip code in the year. In the regression we attempt to control for factors that would influence the excess demand for credit in the local market.  Control factors include some measure of average personal income, HPI, unemployment, number of bank branches (zip code level), and year dummies.[23] The results are reported in Table 1.

Regression results suggest that the Lending Club penetrated areas that are underserved. The activities both in terms of loan accounts and loan amounts are positively related to the market concentration indicators. The coefficients of the *D_HHI_1500 to 2500* and *D_HHI_2500+* indicators are significantly positive and with larger positive coefficient for the *D_HHI_2500+* indicator, after controlling for all other relevant factors that impact the lending activities. The Lending Club made more loans in those areas (zip codes) with high banking market concentration (with HHI>,2500).

We further explore the impact of the decline in bank branching. Recall that the plots shown in Figures 6B and 7B show an increasing ratio of Lending Club loans in areas with declining bank branches. Statistically, however, the impact is weakly significant after controlling for the other relevant factors in the regressions. We explore the variable *Pct Change in Branch* which is defined as the difference in number of bank branches in the 3-digit zip from the previous year.[24] Additionally, we explore the variable *Pct Decline in Branch;* this variable assigns the value zero to all the areas with the increasing number of bank branches.[25] We find weak significance in the loan amount regression (Table 1, column 3) and insignificance in all other cases. Both *Pct Change in Branch* and *Pct Decline in Branch* are not

---

[22] Note that the most granular information about customer location is reported at 3-digit zip code level on the Lending Club website.  Thus, we define the market based on the 3-digit zips – total about 9,000 unique markets.

[23] Most of the economic factors are at the state level.  Lending Club report location by 3-digit zip code, which could not be accurately merged into 5-digit zip level data or county-level data, we had to settle for a less granular -- state-level data – for HPI, unemployment rates, and per capital income.  Bank branching information is available at the 3-digit zip code level to merge with Lending Club data.

[24] The value of this variable is positive (or negative) for markets that face increasing (or decreasing) number of bank branches, respectively.

[25] The value is the same as that of the variable *Pct Change in Branch* for areas with declining bank branches.

significant in Table 1, columns 1 and 2, indicating that the declining number of bank branches are not a significant factor in the loan account regressions.

Separately, we find that the coefficient of the variable *Number of Branches* (total number of bank branches in the zip code) is consistently positive and significant for both loan accounts and loan amount regressions. The results are consistent with the finding that declining bank branches may not be significant in determining lending activities after controlling for other economic and risk factors. Our approach differs from that used by Ahmed, Beck, McDaniel, and Schropp (2016) which uses PayPal data. The authors find a positive relationship between the decline in the number of bank branches and the number of PayPal loans in the county. We use the ratio (rather than the number) of the reduction in bank branches to total number of bank branches in the beginning of the year to control for highly populated locations (e.g., New York City or San Francisco) where more branches could be closed (e.g. through mergers) without being noticed because they are a small fraction of the population and could lead to different findings.

Our results provide evidence that support an argument that lending activities by Fintech lenders seem to have filled the credit gap. Specifically, the Lending Club data shows that about 50 percent of consumer loans are made to borrowers in highly concentrated banking markets with an HHI>2,500. The positive relationship between high market concentration and lending activities remains significant in the regressions even after controlling for other risk and economic factors. In addition, the plot of homeownership shows that the Lending Club has also made loans more accessible to consumers who do not own a home (Figure 2A), although they tend to be charged a higher credit spread (see Section VI). The heat maps also show that Lending Club has rapidly expanded geographically to cover almost all counties in the U.S. by mid-2016.

In exploring Fintech activities in areas where traditional banks are pulling out, our plots in Figures 6A and 6B show a rising trend of Lending Club loans in areas where bank branches are declining,

but the regression results do not show a significant relationship between changes in bank branching and

Lending Club activities after controlling for all the other relevant risk and economic factors associated

with the areas, such as the local unemployment rate. We find a statistically significant relationship

between Lending Club activities and local unemployment rate, consistent with the argument that some

unemployed borrowers might not be considered as risky as their FICO score indicates when

incorporating other alternative nontraditional sources of information (the topic of Section V).

**V.      The Role of Alternative Information Sources and Impact on Financial Inclusion**

One of the attractive features of getting credit from an alternative lenders is how quickly lending

decisions are made. An important advantage to Fintech lenders is that they have access to non-

traditional data sources that are not used (or not available) to traditional bank lenders, such as FICO

scores and DTI ratios. The additional sources of information include consumers' payment history (utility,

phone, PayPal, Amazon), their medical and insurance claims, their social network, and so forth.  These

are not factors that are reflected fully in the traditional credit scores.

In the case of the Lending Club, consumers are assigned a rating grade from A to G based on the

full set of information (after the loan has been approved). The loan application process is as follows: (1)

the application is submitted online; (2) Lending Club's Credit Model immediately grades and prices the

loans at application; (3) the applicant receives immediate feedback about the loan's terms they are

qualified for. Additionally, before funding, the verification process takes place. For example, if the Credit

Model data sources indicate the application is fraudulent, the application may be declined. If not, after

an offer is presented, further income or employment verification may be requested. The Lending Club

has its own proprietary models that identify whether each of the loan applications should be verified or

not. As of 2015, about 70 percent of all loans made through the Lending Club platform were verified.

We explore the correlation between Lending Club rating grades and the FICO scores as of loan

origination. It is interesting to note that while the rating grades and the FICO scores were highly

correlated at about 80 percent correlation as of origination date for loans originated in 2007, the correlation has weakened over the years. The plot in Figure 7 shows the correlation over time between FICO scores and loan grades. While we do not know how the Lending Club defines their credit grades, it is obvious that these credit grades are increasingly defined using additional metrics beyond FICO scores. The correlation has declined from over 80 percent in 2007 to approximately 35 percent in 2016. It is similar for the DTI ratio (not shown in this paper). This seems to indicate that the Lending Club is relying more on additional information.



Source: Lending Club data

The rating grades are assigned based on Lending Club's Credit Model which looks beyond FICO scores to estimate the likelihood of default. The model attempts to identify applicants with FICO scores that do not reflect their true credit quality, and thus the risk could have been mispriced based on FICO scores alone.[26] What are the implications for consumers?  Some consumers with low FICO scores (below 680) could end up being rated A by the Lending Club's Credit Model, especially in later years (2014-2015 origination). Figures 8A, 8B, and 8C present the composition of loans for each rating grade and how the composition has evolved over the years for loans originated in 2007, 2011, and 2015, respectively. There

---

[26] Lending Club has documented that its credit models have KS scores that outperform generic scores by identifying strong borrowers with lower FICOs and vice versa. See the link from the Lending Club site for more details -- at https://www.lendingclub.com/public/income-verification.action.

are some consumers that would be considered subprime that are slotted into the "better" loan grades. For loans originated in 2015 (see Figure 8C), over 25 percent of the B-rated borrowers have FICO scores in the subprime range. And, about 8 percent of loans that were assigned A-rated grade had FICO scores below 680. This provides evidence that the use of additional information sources and other soft information could allow some borrowers with low FICO scores to get access to credit -- and potentially get a lower price than if FICO scores were the only criteria.



Source: Lending Club data

## VI.    Fintech Lending and Pricing of Credit

In this section, we explore the pricing of Lending Club loans versus similar loans from traditional lenders. To compare similar bank loans with Lending Club consumer loans, we focus on loans with the purposes identified as credit cards or debt consolidation. This allows us to compare the Lending Club rating grade against credit card loans made by large banks based on Y-14M loan-level data that large CCAR banks report to the Federal Reserve monthly. The data include pricing information and other details about the account and the borrower.

Pricing is measured in terms of the credit spread between the reported interest rate and the matching Treasury rates for the same time to maturity.  The Lending Club's own rating (from A to G),

based on its internal proprietary rating system (which is used to price loans) seems to demonstrate the risk-price rank ordering consistently throughout the sample period, where better rated borrowers receive lower prices (smaller credit spreads) as shown in Figure 9A. The Lending Club uses loan grades to differentiate interest rates offered to borrowers. We observe a tight relationship between the loan grades and the interest rate spreads on the loans in the regression analysis, even after controlling for other relevant risk and economic factors.

We observe from Figure 9A that while the rating grade and spreads are consistently in rank order over the years, the spread differential between the A-rated and G-rated borrowers widened significantly to approximately 20 percent for loans originated in 2015. If we go back to that subprime borrower who was slotted into a B-rated loan grade (because of the additional information), he will be paying approximately 9 percent over Treasuries instead of 25 percent over Treasuries if he had been slotted into the G-rated loan grade, which is a meaningful difference. In addition, Figure 9B demonstrates a price-performance rank ordering throughout the sample period, where a higher probability of default is observed for loans that were subject to larger credit spreads (higher price). The interest rate spreads appear to have a strong relationship with the likelihood of becoming delinquent.





Source: Lending Club data; Treasury rates from the Bloomberg database.

In contrast, the spread differentials between the highest and the lowest FICO score brackets did not widen as much – see Figure 10.  This, again, is consistent with the different information contained in the proprietary rating grade (using alternative information sources) and the conventional FICO scores. To conclude, the use of additional information allows some borrowers who would be classified as subprime by traditional criteria to be slotted into "better" loan grades and therefore obtain lower priced credit.  And, it does not appear that this credit is "mispriced" in terms of default risk.



Source: Lending Club data; Treasury rates from the Bloomberg database.

We further explore the relationship between loan grades, loan rates (spreads), and loan performance using regression analysis, controlling for other factors that are likely to impact loan price and/or credit performance. The results are presented in Table 2A for the pricing of Lending Club loans and Table 2B for pricing of credit card loans at CCAR banks. This allows us to examine the difference in the pricing algorithms used by Lending Club compared with traditional CCAR banks.

In Table 2A, we explore important factors that determine credit spreads.  The dependent variable is the interest rate spread, which is calculated as the difference between the interest rate charged on the loans and the equivalent risk-free loans (Treasury rate of securities with the same time to maturity).  We control for risk characteristics such as DTI ratio at origination, FICO scores or rating

grades at origination, loan maturity, whether the loans required a verification, the banking market

concentration (HHI), whether the consumer owns a home, consumer's employment, income at

origination, loan amount, and economic factors (such as local unemployment rate, average income per

capita, and year dummies).  The independent variable for loan grades are measured in two ways – the

Lending Club proprietary rating in columns (1) and (2), and the traditional FICO scores in columns (3) and

(4). We find that spreads are significantly correlated with both the FICO scores and the Lending Club's

own rating. That is, larger spreads are required for less creditworthy borrowers, with everything else

fixed (controlling for other risk and economic factors).[27] As expected, the adjusted R-squares are more

than double (at over 90 percent) in columns (1) and (2) when the rating grades are included, compared

with less than 50 percent when FICO scores are used as credit risk measures in columns (3) and (4).

The results in Table 2A indicate that the Lending Club charges significantly higher spreads in

regions of higher banking market concentration – with (1,500<HHI<2,500) and (HHI>2,500).  The

coefficients are positive and significant for areas with 1,500<HHI<2,500 and HHI>2,500 in columns (1)

and (3). It appears that the Lending Club has more monopolistic power in these markets and is able to

charge higher prices.

We also explore the factors that are important in determining credit spreads for traditional

loans to compare with Lending Club loans, using Y-14M account-level data on credit cards that banks

issued to consumers (business cards are excluded) during 2014-2015.[28] For this analysis of traditional

banks, credit ratings are measured in terms of FICO scores only. Some of the cards were issued with a

promotional rates at the beginning and we control for that along with other risk and economic factors.

The results, reported in Table 2B, indicate that banks also charge higher credit spreads in areas with

---

[27] Controlling for other risk and economic factors -- including year of origination, years of employment, local unemployment rate, local average income, homeownership, DTI at origination.
[28] Banks started reporting Y-14M data for CCAR stress testing purposes in 2012 but the data became much more complete and reliable in 2014.

greater degree of market concentration, with an HHI>2,500. More market power has allowed both banks and Fintech lenders to charge consumers higher prices.

**VII.    Price of Credit and Credit Performance – Compare Fintech Loans versus Traditional Channels**

So far, we have observed a tight relationship between the Lending Club's own credit spreads and the proprietary rating grades.  We have also observed that the relationship between the rating grades and FICO scores have declined dramatically, suggesting the increasing role of alternative information sources used by the Lending Club. In this section, we explore the relationship between these credit risk measures and consumer credit performance, focusing on the delinquency within 12 months after origination. Since some borrowers with low FICO scores have been able to access credit and at a lower rate (as shown in Figure 9C, some of the A-rated borrowers actually had FICO scores below 680), we explore here how well the rating grades could predict delinquency within 12 months after origination.

Data indicate a tight relationship between credit spreads and loan grades. Recall from Table 2A how well the rating grades determined spread, with R-Square more than 90 percent compared to under 50 percent in the regressions that use FICO scores. The correlation coefficient between credit spreads and rating grades is 93.51 percent (significant at the 1% level) compared with 47.01 percent (significant at the 1% level) between spreads and FICO scores.[29] Data also indicates a tight relationship between loan grades and delinquency rates.  Figure 11 shows that the delinquency rate and rating grades are well aligned and rank ordering for all origination years, including 2015 when some borrowers with FICO scores <680 received A-rating based on Lending Club rating grades.

Overall, we find that Lending Club's rating grades have served as a good predictor for the borrowers' probability of becoming at least 60 days past due within the 12-months period following loan

---

[29] The correlation coefficient between rating grades and FICO scores is 43.69 percent (significant at the 1% level) over the entire sample period.  The coefficients declined steadily from about 80 percent for loans originated in 2007 to about 35 percent for loans originated in 2015.

origination date.[30] This is true despite the fact that the rating grades have a low correlation with the

FICO scores especially for loans originated after 2013.



Source: Lending Club loans (cards and debt consolidation purposes only)

Now, we focus on Lending Club loans that were originated during the period from January 2014

to December 2015 (with the 12-month performance period ending in December 2016).  These

origination dates are during the period when the rating grades (assigned by the Lending Club) and FICO

scores are not highly correlated (e.g., when rating grades contain different information than what is

contained in the FICO scores). Figure 12 compares delinquency rates across the credit spread brackets

for Lending Club consumer loans (loans for credit cards and debt consolidation purposes) versus

traditional credit cards (issued by large U.S. banks). Only loans originated between January 2014 and

December 2015 are included in the analysis for both Lending Club and Y-14M bank data.[31] Delinquency

rates and credit spreads line up very well for Lending Club loans, where higher credit spreads

correspond to higher delinquency rates. Surprisingly, we observe that the spreads and delinquency rates

do not line up as well for credit cards originated by large banks, especially for those loans with credit

---

[30] Loans that became at least 60 days past due (DPD) and self-cured (became current again) would also be included in these statistics.

[31] We do not include credit card accounts from the Y-14M database that were originated prior to 2014 -- to avoid the sample survival bias, because cards that defaulted and were closed before 2014 would not be included in the Y-14M reports (as of 2014).

spreads below 12 percent. Furthermore, credit card loans with spreads below 8 percent have even

higher delinquency rates, probably due to the special promotion offered to less creditworthy borrowers.

Finally, Figure 12 shows that the delinquency rates are higher for Lending Club loans than for bank loans

with the same credit spreads. The results indicate that given the same credit risk (i.e., for borrowers

with the same expected delinquency rate), consumers would be able to obtain credit at a lower rate

through the Lending Club than through traditional credit card loans offered by banks.



Sources: Lending Club loans (cards and debt consolidation purposes only) and Y-14M data on credit cards.
Note: All loans were originated during the period from January 2014 to December 2015. Delinquency status is
observed for the period within 12 months after loan origination, including all loans that became at least 60DPD.

We observed earlier that non-homeowners have an easier time getting credit from the Lending

Club than from traditional channels. Figure 13 shows that, among all the Lending Club borrowers,

homeowners are less likely to become delinquent than non-homeowners, holding the rating grade

constant. However, the homeownership factor is not statistically significant in the regression after

controlling for other relevant risk characteristics (see Table 3).  In addition, Figure 14 shows that for

loans that were originated in the same period (2014-2015) and in the same FICO score brackets, the

delinquency rate is slightly higher for Lending Club loans than for Y-14M credit card loans. These results

imply that for consumers with the same FICO scores, those who borrow from the Lending Club have a

higher risk of becoming delinquent. As shown earlier (Figure 8C), for loans that were originated in 2015,

some of the borrowers with FICO scores above 700 were assigned the lowest rating grades (F-rated and

G-rated) by the Lending Club.  Borrowers of the same FICO brackets at the Lending Club tend to be more

risky, on average, than those who stick with credit card loans through traditional lending channels.




Sources: Lending Club loans (cards and debt consolidation purposes only) that were originated in 2014 and 2015
only;  Y-14M data on credit card accounts issued to consumers during 2014-2015 period.
Note: Delinquency status is observed for the period within 12 months after loan origination.  Note also that Y-14M
credit card accounts with promotional APR flag are excluded from this plot (to accurately assign the correct credit
spread for the loans).

Overall, data support an argument that rating grades (assigned based on information not

included in the FICO scores) seem to do a good job of identifying riskier borrowers. We explore this

further using Logistic regression analysis to control for a number of additional factors (e.g., credit

spreads, borrower's risk characteristics, and economic factors). The dependent variable is the

probability that the loan becomes delinquent within 12 months following the origination date. The

results reported in Table 3 confirm the earlier findings that rating grades do a good job of predicting

future loan defaults.

**VIII.    Conclusions**

Fintech has been playing an increasing role in shaping the financial and banking landscapes.

Technology has allowed both banks and Fintech lenders to serve small businesses and consumers

without brick and mortar investments.  Banks have been concerned about the uneven playing field since Fintech lenders are not subject to the same rigorous oversight.  The FDIC and the CFPB have also expressed concerns about impacts on consumer credit access and privacy around credit provided by Fintech lenders.

In this paper, we explored the impact of Fintech lending on consumers' ability to access credit and the price of credit. In addition, we explored the role of alternative information sources potentially used by Fintech lenders. Since our results are derived based on loans originated on the Lending Club platform, one should be cautious in extrapolating the interpretation of our findings to all loans originated through other online alternative platforms. We would note that the Y-14M data are constrained by the limited number of reporters and does not include credit card lending by banks under $50 billion in total assets.

In terms of credit access, we investigated whether Lending Club loans penetrated previously underserved areas, where there is less competition in banking services, lower income borrowers, and areas where bank branches have decreased proportionately more than others.  We found that Lending Club's consumer lending activities have penetrated into areas that could benefit from additional credit supply, such as in areas that lose bank branches and in highly concentrated banking markets.

To investigate the impact on the price of credit, we explored credit spreads of similar loans (consumer loans made for the same purposes) made by the Lending Club versus traditional bank lenders. Given that credit spreads are priced accurately based on the expected delinquency of the loans, we found that for the same risk of default, consumers pay smaller spreads on loans from the Lending Club than from traditional lending channels, implying that Fintech lending has provided credit access to consumers at a lower cost.

We also found that the use of alternative information sources allowed consumers with few or inaccurate credit records (based on FICO scores) to access credit.  Some consumers with poor FICO

scores have been highly rated as low-risk borrowers. The correlation between rating grades and FICO scores declined steadily from over 80 percent in 2007 to about 35 percent for loans originated in 2015, but the rating grades continued to serve as a good predictor for future loan delinquency. There is additional (soft) information in the Lending Club's own internal rating grades that are not already incorporated in the obvious traditional risk factors.  This has enhanced financial inclusion and allowed some borrowers to be assigned better loan ratings and receive lower priced credit.

Banks are increasingly viewing these alternative lenders as potential partners rather than disrupters. Banks are associating with Fintech lenders in a number of ways. They range from providing origination services and funding to customer referrals. In some cases, these associations are seamless to customers so that the relationship with the bank is maintained. For examples, Fintech firms such as the Lending Club and Prosper are turning to commercial banks and industrial banks to originate their loans. Banks are also making equity investments in Fintech firms avoiding the cost of in-house development: Fifth Third's investment in ApplePie Capital (online lender specializing in franchise loans) is one example. Bank Alliance, a network of over 200 banks, partners with the Lending Club and Fundation to allow members to offer small dollar consumer and business loans. Members may also purchase loans from these Fintech firms to add to their balance sheets.  In addition, JPMorgan Chase has licensed technology from OnDeck to offer Chase customers small business loans in an entirely digital process. The loans are Chase-branded and held on the bank's balance sheet, where JPMorgan sets the underwriting criteria for the loans.

We have presented evidence that Fintech lenders fill credit gaps in areas where bank offices may be less available and provide credit to credit worthy borrowers that banks may not be serving. And this credit seems to be "appropriately" risk-priced. Banks are responding to these innovations by partnering with Fintech firms. This relationship is evolving quickly. We have also presented some

positive evidence of what impacts these firms have on credit access, but more remains to be done to fully answer the question about risks to borrowers presented by these new innovations.

Our results provide policy implications related to the consumer protection. While consumers' information and privacy should be protected by laws and regulations, certain private information could play a key role in allowing lenders to fully understand credit quality of the potential borrowers and allowing certain consumers access to credit that would not have been granted otherwise. Banks could potentially benefit from the alternative data sources and "big data" through partnership with online Fintech lenders.

**Table 1: Regression Results – Credit Access**
**Lending Activities in Specific Zip Codes (relative to the rest of the country)**

Dependent variable measures the lending activities in the specific zip code in a specific year – measured in terms of Number of Accounts (Columns 1 and 2) and Total Loan Amount (Columns 3 and 4). Loans were originated in 2007-2016.  Data -- panel dataset of loans in a zip code and originated in specific year.  Data is from Lending Club. Sample loans include only purposes "Credit Cards" or "Debt Consolidation."  The ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels, respectively.

| Independent Variables | Dependent Var = % of Accounts Originated in Zip (Relative to All Zips) | | Dependent Var = % of $ Loan Amount Originated in Zip (Relative to All Zips) | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Intercept | -0.0044*** | -0.0044*** | -0.00463*** | -0.0046*** |
| | (0.0006) | (0.0006) | (0.00057) | (0.00057) |
| Number of Branches | 0.00002*** | 0.00001*** | 0.00002*** | 0.00002*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.00000) |
| Unemployment Rate | 0.00007*** | 0.00007*** | 0.00006*** | 0.00006*** |
| | (0.00001) | (0.00001) | (0.00001) | (0.00001) |
| HPI | 0.000002*** | 0.000002*** | 0.000002*** | 0.000003*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) |
| Log_Income/Capita | 0.00072*** | 0.00071*** | 0.00076*** | 0.00075*** |
| | (0.00016) | (0.00016) | (0.00017) | (0.00017) |
| Pct Change in Branch | 0.00057 | -- | 0.00074* | -- |
| | (0.00040) | | (0.00042) | |
| pct_num_decline | -- | -0.00010 | -- | -0.00006 |
| | | (0.00052) | | (0.00054) |
| D_2008 | -0.00007 | -0.00007 | -0.00006 | -0.00006 |
| | (0.00007) | (0.00007) | (0.00007) | (0.00007) |
| D_2009 | -0.00019** | -0.00019** | -0.00014* | -0.00015* |
| | (0.00008) | (0.00008) | (0.00008) | (0.00008) |
| D_2010 | -0.00019** | -0.00020** | -0.0014 | -0.00015* |
| | (0.00008) | (0.00008) | (0.0001) | (0.00009) |
| D_2011 | -0.00013* | -0.00014* | -0.00009 | -0.0001 |
| | (0.00008) | (0.00008) | (0.0001) | (0.00008) |
| D_2012 | -0.00008 | -0.00009 | -0.00004 | -0.00006 |
| | (0.00008) | (0.000077) | (0.00008) | (0.00008) |
| D_2013 | -0.00004 | -0.00006 | -0.000007 | -0.00003 |
| | (0.00007) | (0.00007) | (0.00008) | (0.00008) |
| D_2014 | 0.000004 | -0.000017 | 0.00003 | -0.000001 |
| | (0.00007) | (0.00007) | (0.00007) | (0.00007) |
| D_2015 | 0.00002 | -0.000005 | 0.00003 | 0.000001 |
| | (0.00007) | (0.00007) | (0.00007) | (0.00007) |
| D_HHI_1500 to 2500 | 0.00029*** | 0.00029*** | 0.00029*** | 0.00029*** |
| | (0.00004) | (0.00004) | (0.00004) | (0.00004) |
| D_HHI_2500+ | 0.00041*** | 0.00041*** | 0.00042*** | 0.00042*** |
| | (0.00005) | (0.00005) | (0.00005) | (0.00005) |
| Adjusted R-Square | 55.89% | 55.88% | 55.32% | 55.31% |
| Observation Number | 7,887 | 7,887 | 7,887 | 7,887 |

**Table 2A:  Regression Results – Lending Club Loans**
**Price of Credit (Credit Spreads for Lending Club Loans)**

Data is loan-level from Lending Club consumer loans (with stated purposes as cards or debt consolidation) for all loans originated in 2007-2015.  Dependent variable is interest rate spread, which is calculated as the difference between the interest rate charged on the loans and the equivalent risk-free loans (i.e.; the U.S. Treasury rate of securities with the same time to maturity). Local economic factors during the origination month are measured at the most granular (zip code) level when possible.  The ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels, respectively.

| Independent Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| *Intercept* | 4.1975*** | -0.7401*** | 11.3040*** | 11.502*** |
|  | (0.0159) | (0.0659) | (0.1130) | (0.2135) |
| DTI at Origination | -- | -- | 0.04476*** | 0.05014*** |
|  |  |  | (0.0005) | (0.0005) |
| Dummy_B_Grade | 3.5302*** | 3.4282*** | -- | -- |
|  | (0.0049) | (0.0041) |  |  |
| Dummy_C_Grade | 6.67305*** | 6.5901*** | -- | -- |
|  | (0.0051) | (0.0043) |  |  |
| Dummy_D_Grade | 9.7893*** | 9.7173*** | -- | -- |
|  | (0.0060) | (0.0050) |  |  |
| Dummy_E_Grade | 12.487*** | 12.461*** | -- | -- |
|  | (0.0076) | (0.0063) |  |  |
| Dummy_F_Grade | 16.114*** | 15.996*** | -- | -- |
|  | (0.0118) | (0.0098) |  |  |
| Dummy_G_Grade | 18.0846*** | 18.1087*** | -- | -- |
|  | (0.02335) | (0.01945) |  |  |
| D_FICO_LT650 | -- | -- | 7.2099*** | 7.5743*** |
|  |  |  | (0.2675) | (0.2744) |
| D_FICO_650 to 679 | -- | -- | 6.5409*** | 6.5365*** |
|  |  |  | (0.0507) | (0.0493) |
| D_FICO_680 to 699 | -- | -- | 5.2022*** | 5.1409*** |
|  |  |  | (0.0508) | (0.04941) |
| D_FICO_700 to 749 | -- | -- | 3.1257*** | 3.0901*** |
|  |  |  | (0.0507) | (0.0493) |
| D_FICO_750 to 799 | -- | -- | 0.67274*** | 0.7274*** |
|  |  |  | (0.0530) | (0.0515) |
| D_Maturity_5 Years | -0.4242*** | -0.3658*** | 3.2831*** | 3.3825*** |
|  | (0.0039) | (0.0033) | (0.0091) | (0.0089) |
| D_Purpose_Credit Card | -0.1089*** | -0.1181*** | -1.3969*** | -1.3948*** |
|  | (0.0036) | (0.0030) | (0.0085) | (0.0082) |
| D_Verified | -- | -- | 1.5558*** | 1.4403*** |
|  |  |  | (0.0103) | (0.01003) |
| D_Source verified | -- | -- | 0.4124*** | 0.5208*** |
|  |  |  | (0.0095) | (0.0093) |

| | | | | |
|---|---|---|---|---|
| D_HHI_1500 to 2500 | 0.0349*** | 0.00183 | 0.0484*** | 0.0177* |
| | (0.0041) | (0.0034) | (0.0098) | (0.0095) |
| D_HHI_ZIP_2500+ | 0.1277*** | 0.00099 | 0.1876*** | 0.0093 |
| | (0.0064) | (0.0054) | (0.0152) | (0.0148) |
| D_Homeowner | -- | -- | 0.0979*** | 0.1441*** |
| | | | (0.0133) | (0.0129) |
| Years of Employment | -- | -- | -0.0039*** | -0.0092*** |
| | | | (0.0011) | (0.0011) |
| Local (state) HPI | -0.0021*** | -0.00003 | -0.0022*** | 0.00006 |
| | (0.00002) | (0.00002) | (0.00005) | (0.00005) |
| Log(Borrower Income) | -- | -- | -1.1865*** | -1.094*** |
| | | | (0.0092) | (0.0089) |
| Log(Origination Amt) | -- | -- | 0.3957*** | 0.3371*** |
| | | | (0.0082) | (0.0080) |
| Local Unemp Rate | 0.3557*** | 0.0013 | 0.4859*** | 0.0380*** |
| | (0.0011) | (0.0014) | (0.0027) | (0.0040) |
| Local Income per Capita | 0.0178*** | -0.00079** | 0.02373*** | 0.0048*** |
| | (0.0004) | (0.0004) | (0.0009) | (0.0009) |
| Dummy_2008 | -- | 3.3303*** | -- | 1.9353*** |
| | | (0.0713) | | (0.1995) |
| Dummy_2009 | -- | 6.4528*** | -- | 3.2517*** |
| | | (0.0684) | | (0.1953) |
| Dummy_2010 | -- | 6.14398*** | -- | 2.0696*** |
| | | (0.0666) | | (0.1903) |
| Dummy_2011 | -- | 7.0619*** | -- | 2.3342*** |
| | | (0.0659) | | (0.1886) |
| Dummy_2012 | -- | 8.9140*** | -- | 4.0256*** |
| | | (0.0653) | | (0.1869) |
| Dummy_2013 | -- | 8.7292*** | -- | 3.54071*** |
| | | (0.0650) | | (0.1862) |
| Dummy_2014 | -- | 7.4054*** | -- | 2.2906*** |
| | | (0.0649) | | (0.1858) |
| Dummy_2015 | -- | 6.5403*** | -- | 1.1159*** |
| | | (0.0648) | | (0.1856) |
| Adjusted R-square | 90.06% | 93.12% | 44.25% | 47.32% |
| Observation Number (N) | 694,234 | 694,234 | 694,234 | 694,234 |

**Table 2B:  Regression Results – Bank Loans**
**Price of Credit (Credit Spread of Credit Card Issued by Banks)**

Data is account-level consumer credit cards samples from Y-14M stress testing data that CCAR banks report monthly to the Federal Reserve.  The sample includes only credit card accounts that were originated in 2014-2015. Dependent variable is interest rate spread, which is calculated as the difference between the interest rate charged on the loans and the equivalent risk-free loans (i.e.; the U.S. Treasury rate of securities with the same time to maturity). Local economic factors during the origination month are measured at the most granular (zip code) level when possible.  Charge cards are excluded.  The ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels, respectively.

| Independent Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Intercept | 23.4980*** | 22.1564*** | 24.4156*** | 22.3499*** |
|  | (0.4078) | (0.5283) | (0.3889) | (0.5039) |
| D_FICO_Missing | -0.8914*** | 1.0116*** | -0.9017*** | 1.0018*** |
|  | (0.0585) | (0.0787) | (0.0585) | (0.0787) |
| D_FICO_LT 650 | 2.2069** | 3.9086*** | 2.2012*** | 3.9063*** |
|  | (0.0373 | (0.0503) | (0.0373) | (0.0503) |
| D_FICO_650_679 | 2.4734** | 4.0541*** | 2.4685*** | 4.0529*** |
|  | (0.0317) | (0.0432) | (0.0317) | (0.0432) |
| D_FICO_680_699 | 2.3303*** | 3.8826*** | 2.3282*** | 3.8842*** |
|  | (0.0331) | (0.0454) | (0.0331) | (0.0454) |
| D_FICO_700_749 | 1.5224*** | 2.9828*** | 1.5223*** | 2.9852*** |
|  | (0.0228) | (0.0307) | (0.0228) | (0.0306) |
| D_FICO_750_799 | 0.4197*** | 1.8322*** | 0.4213*** | 1.8357*** |
|  | (0.0213) | (0.0287) | (0.0213) | (0.0287) |
| D_FICO_Missing_Promo | -- | -14.2453*** | -- | -14.2095*** |
|  |  | (0.2658) |  | (0.2658) |
| D_FICO_LT 650_Promo | -- | -21.1559*** | -- | -21.1489*** |
|  |  | (0.1161) |  | (0.1161) |
| D_FICO_650 to 679_Promo | -- | -19.4942*** | -- | -19.4803*** |
|  |  | (0.0949) |  | (0.0949) |
| D_FICO_680 to 699_Promo | -- | -19.0732*** | -- | -19.0615*** |
|  |  | (0.1086) |  | (0.1086) |
| D_FICO_700 to 749_Promo | -- | -18.0545*** | -- | -18.0421*** |
|  |  | (0.0680) |  | (0.0679) |
| D_FICO_750 to 799_Promo | -- | -17.2831*** | -- | -17.2816*** |
|  |  | (0.0654) |  | (0.0654) |
| D_HHI_2500+ | -0.1041*** | 0.3632*** | -0.1075*** | 0.3648*** |
|  | (0.0262) | (0.0356) | (0.0262) | (0.0356) |
| D_HHI_2500+_Promo | -- | -4.3033*** | -- | -4.2956*** |
|  |  | (0.1140) |  | (0.114) |

| | | | | |
|---|---|---|---|---|
| D_Reward | -6.2833*** | -6.2289*** | -6.2821*** | -6.2269*** |
| | (0.0162) | (0.0209) | (0.0162) | (0.0209) |
| Log_Borrower Income | 0.0679*** | 0.1802*** | 0.0649*** | 0.1784*** |
| | (0.0051) | (0.0066) | (0.0051) | (0.0066) |
| Log_Credit Limit | -0.3975*** | -0.5186*** | -0.3977*** | -0.5198*** |
| | (0.0102) | (0.0132) | (0.0102) | (0.0132) |
| Local HPI | -0.0020*** | -0.0005 | -0.0387*** | -0.0374*** |
| | (0.0003) | (0.0003) | (0.0028) | (0.0036) |
| Local_Unemploy Rate_State | 0.0075 | -0.0168* | 0.0468*** | 0.0246** |
| | (0.0067) | (0.0087) | (0.0074) | (0.0096) |
| Log(Income per Capita_Zip3) | 0.1523*** | 0.1033** | 0.0414 | 0.0784* |
| | (0.0379) | (0.0492) | (0.0351) | (0.0455) |
| Number of Observations | 200,191 | 200,191 | 200,191 | 200,191 |
| R-Square (Adjusted) | 78.47% | 63.88% | 78.48% | 63.90% |
| | | | | |

**Table 3:  Logistic Regressions Results**
**Performance of Lending Club Loans**

Data include all Lending Club consumer loans (cards and debt consolidation purposes) that were originated in 2007 to April 2015 (to allow a 12 month performance window, LC performance data ends in May 2016). Dependent variable is the probability of becoming 60+DPD anytime within 12 months since the origination (including those that cured within a year).  Economic factors (unemployment and average income per capital) are at the state level.  The ***, **, and * represent statistical significance at the 1%, 5%, and 10% levels, respectively.

| Independent Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Intercept | -1.3162*** | -0.5995 | -1.8475*** | -0.6753 |
|  | (0.4748) | (0.5104) | (0.5447) | (0.58) |
| SPREAD | 0.0500*** | 0.1177*** | 0.1242*** | 0.1312*** |
|  | (0.0071) | (0.0089) | (0.0028) | (0.0028) |
| DTI at Origination | 0.0118*** | 0.0118*** | 0.0134*** | 0.0129*** |
|  | (0.0014) | (0.0014) | (0.0014) | (0.0014) |
| D_Grade B | 0.5397*** | 0.307*** | -- | -- |
|  | (0.059) | (0.0615) |  |  |
| D_Grade C | 0.9478*** | 0.5101*** | -- | -- |
|  | (0.0691) | (0.0773) |  |  |
| D_Grade D | 1.1795*** | 0.5355*** | -- | -- |
|  | (0.0848) | (0.099) |  |  |
| D_Grade E | 1.3960*** | 0.5469*** | -- | -- |
|  | (0.1026) | (0.1229) |  |  |
| D_Grade F | 1.5266*** | 0.4659*** | -- | -- |
|  | (0.1268) | (0.1525) |  |  |
| D_Grade G | 1.7597*** | 0.5549*** | -- | -- |
|  | (0.1497) | (0.1772) |  |  |
| FICO <650 | -- | -- | 1.8725*** | 0.2984 |
|  |  |  | (0.3918) | (0.4092) |
| FICO 650-679 | -- | -- | 0.4653* | 0.4206 |
|  |  |  | (0.2700) | (0.2700) |
| FICO 680-699 | -- | -- | 0.3777 | 0.3482 |
|  |  |  | (0.2698) | (0.2699) |
| FICIO 700-749 | -- | -- | 0.2468 | 0.2176 |
|  |  |  | (0.2697) | (0.2698) |
| FICO 750-800 | -- | -- | 0.0982 | 0.0551 |
|  |  |  | (0.2788) | (0.2789) |
| Dummy_CreditCard | -0.1340*** | -0.1235*** | -0.1647*** | -0.1422*** |
|  | (0.0253) | (0.0253) | (0.0253) | (0.0254) |
| Log_Borrower Income | -0.2353*** | -0.2348*** | -0.2518*** | -0.2518*** |
|  | (0.0263) | (0.0262) | (0.0264) | (0.0263) |
| Log_Origination Amt | -0.0652*** | -0.0434** | -0.0177 | -0.0147 |
|  | (0.0215) | (0.0216) | (0.0220) | (0.0220) |

| | | | | |
|---|---|---|---|---|
| D_Verify | 0.0617** | 0.0886*** | 0.0681** | 0.1027*** |
| | (0.0294) | (0.0296) | (0.0293) | (0.0296) |
| D_Source Verified | 0.0922*** | 0.1124*** | 0.1229*** | 0.1244*** |
| | (0.0278) | (0.0282) | (0.0277) | (0.0281) |
| D_Homeowner | -0.0372 | -0.0375 | -0.0373 | -0.0367 |
| | (0.037) | (0.037) | (0.037) | (0.037) |
| Years of Employment | -0.0216*** | -0.0196*** | -0.0218*** | -0.0191*** |
| | (0.00295) | (0.00296) | (0.00295) | (0.00296) |
| HPI | 0.000949*** | 0.000751*** | 0.00108*** | 0.000741*** |
| | (0.000148) | (0.000152) | (0.000148) | (0.000152) |
| Unemployment Rate | 0.00289 | 0.0223** | -0.0115 | 0.0224** |
| | (0.00728) | (0.0101) | (0.00725) | (0.0101) |
| Log_Income per Capita | -0.3105*** | -0.2243* | -0.3697*** | -0.2177* |
| | (0.1176) | (0.1192) | (0.1177) | (0.1192) |
| D_2008 | -- | -0.4826** | -- | -0.5315** |
| | | (0.2431) | | (0.2452) |
| D_2009 | -- | -1.3431*** | -- | -1.422*** |
| | | (0.2528) | | (0.2562) |
| D_2010 | -- | -1.474*** | -- | -1.5605*** |
| | | (0.2394) | | (0.2437) |
| D_2011 | -- | -1.7959*** | -- | -1.9144*** |
| | | (0.2378) | | (0.2397) |
| D_2012 | -- | -1.8857*** | -- | -2.063*** |
| | | (0.2371) | | (0.2325) |
| D_2013 | -- | -2.0087*** | -- | -2.1757*** |
| | | (0.2336) | | (0.2293) |
| D_2014 | -- | -1.8012*** | -- | -1.9533*** |
| | | (0.2273) | | (0.2271) |
| D_2015 | -- | -1.6416*** | -- | -1.791*** |
| | | (0.2256) | | (0.2269) |
| Observation (N) | 393,926 | 393,926 | 393,926 | 393,926 |
| Percent Concordant | 68.6% | 69.0% | 68.3% | 68.9% |
| Percent Discordant | 31.4% | 31.0% | 31.7% | 31.1% |

Note: the results are robust to using alternative economic factors at the (estimated) county level, based on the 3-digit zip codes of the loans.

## References

Ahmed, Usman, Thorsten Beck, Christine McDaniel, and Simon Schropp (2016) "Filling the Gap, How Technology Enables Access to Finance for Small- and Medium-Sized Enterprises," MIT Press Journals: Innovations, volume 10 number 3-4, pp. 35-48.

Agrawal, Ajay, Christian Catalini, and Avi Goldfarb (2013)  "Some Simple Economics of Crowdfunding," NBER Working Paper. http://www.nber.org/papers/w19133.pdf

Athwal, Nav (2016) "Online marketplace lending--Recently misunderstood?" Forbes, July 18, http://www.forbes.com/sites/navathwal/2016/07/18/online-marketplace-lending-recently-misunderstood/#76d20408412f.

Bertsch, Christoph, Hull, Isaiah and Xin Zhang (2016) "Monetary Normalizations and Consumer Credit: Evidence from Fed Liftoff and Online Lending," Sveriges Riksbank, Working Paper Series No. 319.

Brainard, Governor Lael (2016) "The Use of Distributed Ledger Technologies in Payment, Clearing, and Settlement," speech given at the Institute of International Finance Blockchain Roundtable, Washington, D.C., April 14.

Buchak, Greg, Gregor Matvos, Tomasz Piskorski and Amit Seru (2017) "Fintech, Regulatory Arbitrage, and the Rise of Shadow Banks," NBER Working Papers No 23288.

Consumer Financial Protection Bureau (2017) "CFPB Explores Impact of Alternative Data on Credit Access for Consumers Who Are Credit Invisible," Press Release.

Crosman, Penny (2016) "Will Fintechs Kill the FICO Score?" American Banker (June 14, 2016)

De Roure, Calebe, Pelizzon, Loriana and Paolo Tasca (2016) "How Does P2P Lending Fit into the Consumer Credit Market," Deutsche Bundesbank, Discussion Paper No. 30.

Demyanyk, Yuliya and Daniel Kolliner (2014) "Peer-to-Peer Lending is Poised to Grow," Federal Reserve Bank of Cleveland, August.

Desai, Samir and James Meekings (2016) "Small business loans through Funding Circle boost UK economy by £2.7 billion," Centre for Economics and Business Research.

Dietrich , Andreas and Reto Wernli. What Drives the Interest Rates in the P2P Consumer Lending Market? Empirical Evidence from Switzerland. European Financial Management Association. http://www.efmaefm.org/0EFMAMEETINGS/EFMA%20ANNUAL%20MEETINGS/2016-Switzerland/papers/EFMA2016_0240_fullpaper.pdf

Duarte, Siegel and Young (2012) "Trust and Credit: The Role of Appearance in Peer-to-Peer Lending." The Review of Financial Studies, Vol. 25 Issue 8, p. 2455-2484.

Emekter, Riza, Yanbin Tu, Benjamas Jirasakuldech and Min Lu (2015) "Evaluating Credit Risk and Loan Performance in Online Peer-to-Peer (P2P) Lending," Applied Economics, Volume 47 Issue 1, pp. 54-70.

Everett, Craig R. (2015)  "Group Membership, Relationship Banking and Loan Default Risk: The Case of Online Social Lending," Banking and Finance Review, Vol. 7 No 2, pp 15-54.

Fame, W. Scott, Srinivasan, Aruna and Lynn Woosley (2001) "The Effect of Credit Scoring on Small-Business Lending," Journal of Money, Credit and Banking, Vol. 33, No. 3, pp. 813-825.

Freedman, Seth and Ginger Jin (2011) "Learning by Doing with Asymmetric Information: Evidence from Prosper.com," National Bureau of Economic Research, Working Paper No. 16855.

Fromhart, Stephen (2017) "Marketplace lending 2.0," Deloitte Center for Financial Services.

Gonzalez, Laura and Yuliya Komarova Loureiro (2014) "When Can a Photo Increase Credit?: The Impact of Lender and Borrower Profiles on Online P2P Loans," Journal of Experimental and Behavioral Finance, Forthcoming; Fordham University Schools of Business Research Paper No. 2442416.

Iyer, Rajkamal, Khwaja,Asim Ijaz, Luttmer, Erzo F.P., and Kelly Shue (2009) "Screening in New Credit Markets: Can Individual Lenders Infer Borrower Creditworthiness in Peer-to-Peer Lending?" HKS Faculty Research Working Paper Series RWP09-031.

Jagtiani, Julapa and Catharine Lemieux (2016)  "Small business lending after the financial crisis: A new competitive landscape for community banks,"  Federal Reserve Bank of Chicago: *Economic Perspectives*, Volume 40, Number 3, Fall 2016.
https://www.chicagofed.org/publications/economic-perspectives/2016/3-jagtiani-lemieux

Lichtig, Brendon (2015)  "Crowdfunding Success: The Short Story-Analyzing the Mix of Crowdfunded Ventures," University of Pennsylvania Scholarly Commons.
http://repository.upenn.edu/cgi/viewcontent.cgi?article=1124&context=wharton_research_scholars

Lin, Mingfeng, N.R. Prabhala, and Siva Viswanathan (2009) "Judging Borrowers By The Company They Keep: Social Networks and Adverse Selection in Online Peer-to-Peer Lending," Western Finance Association 2009 Annual Meeting Paper.

Lin, Mingfeng and Zaiyan Wei (2016) "Market Mechanisms in Online Peer to Peer Lending," Forthcoming, Management Science.

Mach, Traci, Courtney Carter, and Cailin Slattery (2014) "Peer-to-peer lending to small businesses," Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Finance and Economics Discussion Series, Working Paper.

Miller, Zack (2016) "List of the Best Academic Research on Crowdfunding,"  The Balance.
https://www.thebalance.com/list-of-the-best-academic-research-on-crowdfunding-985245

Mills, Karen and Brayden McCarthy (2014) "The State of Small Business Lending: Credit Access During the Recovery and How Technology May Change the Game," Harvard Business School, Working Paper #15-004.

Mills, Karen and Brayden McCarthy (2016) "The State of Small Business Lending: Innovation and Technology and the Implications for Regulation," Harvard Business School, Working Paper #17-042.

Milne , Alistair and Paul Parboteeah (2016)  "The Business Models and Economics of Peer to Peer Lending," European Credit Research Institute.
https://www.ceps.eu/system/files/ECRI%20RR17%20P2P%20Lending.pdf

Moldow, Charles (2015) "A Trillion Dollar Market By the People For the People: How Marketplace Lending Will Remake Banking As We Know It," Foundation Capital.

Morse , Adair (2015)  "Peer-To-Peer Crowdfunding: Information and the Potential for Disruption in Consumer Lending,"  NBER Working Paper.  http://www.nber.org/papers/w20899.pdf

On Deck Analysis Group (2015) "The Economic Impact of OnDeck's Lending."

Philippon, Thomas (2016)  "The Fintech Opportunity,"  NBER Working Paper.
http://www.nber.org/papers/w22476.pdf

Schweitzer, Mark and Brett Barkley (2017) "Is Fintech Good for Small Business Borrowers? Impacts on Firm Growth and Customer Satisfaction," Federal Reserve Bank of Cleveland, Working Paper.

Segal, Miriam (2015) "Peer-to-Peer Lending: A Financing Alternative for Small Businesses," SBA Office of Advocacy, Issue Brief Number 10.

Toth, Michael (2016) "Marketplace Lending Vintage Performance," Orchard Platform Blog.

U.S. Department of the Treasury (2016) "Opportunities and Challenges in Online Marketplace Lending," White Paper, May 10, 2016.
https://www.treasury.gov/connect/blog/Documents/Opportunities_and_Challenges_in_Online_Marketplace_Lending_white_paper.pdf

Wack, Kevin (2015) "Why Payment Firms See Opportunity in Small-Business Lending," American Banker.

# Exhibit R

# Black founders still raised just 1% of all VC funds in 2022

**Dominic-Madori Davis** 8 months



**Some. Good. News.**

The latest Crunchbase data shows that Black startup founders in the United States raised around $264 million out of the total $33.6 billion in venture capital allocated in Q4 2022. That's an uptick from the $178 million — or 0.43% — the group raised in Q3.

In total, U.S. Black founders raised an estimated $2.254 billion out of the $215.9 billion in U.S. venture capital allocated last year. That's about 1%, a slight drop from the 1.3% raised in 2021. Let's break this down.

So Black founders in the U.S. picked up around 0.79% of VC funds raised in Q4 2022. There was a fear that, during a bear market, investors would retreat to their old-school networks, and the total amount of funding Black founders received last year is practically half the amount they raised in 2021 — a record $4.34 billion (out of around $330 billion in the U.S. and $681 billion globally).

Despite the record-breaking 2021, that amount of money equates to just 1.3% of all capital raised in the U.S. alone. No matter what, it seems the actual percentage of the money raised for this cohort barely moves, even as more and more capital floods the markets.

Tye Calloway, the founder of the fintech Cooler, told TechCrunch that it's embarrassing as a Black founder to always be associated with negative statistics, especially as one trying to fundraise.

# Exhibit S

# McKinsey & Company

McKinsey Institute for Black Economic Mobility

# Corporate commitments to racial justice: An update

In the two years since McKinsey first analyzed corporate pledges to fight racial injustice, companies have continued to pledge money—but how it's being spent remains unclear.

*by Megan Armstrong, Eathyn Edwards, and Duwain Pinder*



February 2023

**At the end of 2020,** the McKinsey Institute for Black Economic Mobility first analyzed the monetary commitments from Fortune 1000 companies and institutions that pledged to fight racial injustice following the murder of George Floyd. In response to a movement that began in America, some of the world's largest companies dedicated more than $66 billion in funds to the cause. When we analyzed the landscape up to May 2021, companies upped their commitments and made new ones to reach a cumulative amount of approximately $200 billion in earmarked funding.

We've taken another look at the racial equity commitments from 1,369 Fortune 1000 companies (including new and recently removed Fortune 1000 companies) from May 13, 2021, to October 10, 2022. Our most recent analysis finds that companies pledged about $340 billion to driving racial equity between May 2020 and October 2022, $141 billion of which has come in the last year, between May 2021 and October 2022.

## About the methodology

**We conducted a press search** to identify the financial and nonfinancial commitments made by the companies on the Fortune 1000 list. The press search resulted in press releases and public statements from companies on the list, which were examined for evidence of a financial or nonfinancial commitment to racial equity, specifically for Black Americans after the murder of George Floyd in May 2020.

Where there were commitments found, we labeled the commitment as internal and/or external and determined to which impact area they were deployed. We tracked three areas for internal commitments: workforce diversity (for example, diversity of talent pipeline, board diversity), inclusion (for example, antibias training), and equity of opportunity (for example, equitable advancement of colleagues). We tracked eight areas for external commitments: affordable housing and homeownership, education (for example, early-childhood education, K–12, higher education), job training and skilling, public infrastructure (for example, digital, transit), minority-owned enterprise development (for example, supplier diversity, access to credit, capability building), public advocacy (for example, civil rights, criminal justice reform), civic engagement (for example, voter registration, bottom-up participation), and financial inclusion (for example, financial education, household access to capital). We also noted any specific financial commitments to each of these areas. If the financial commitment was across multiple areas and not broken down by amount per area, it was noted as a commitment in each of those areas, but the financial breakdown was not tracked as it was not available.

To avoid duplication with the previous analysis of May 2020–May 2021, we referenced sources from the commitments identified in that analysis. An example of a duplicate commitment would be a press release from a company released between May 2021 and October 2022 stating the deployment of funds to a specific organization out of a pool of previously committed funds stated between May 2020 and May 2021.

As in previous years, businesses from the financial sector account for the bulk of pledges. Between May 2021 and October 2022, an additional $141 billion to promote racial equity came from 80 companies, or 8 percent of all companies. That compares with the period from May to November 2020, when 18 percent of companies pledged funds, and November 2020 to May 2021, when 10 percent of companies pledged funds. While there has been cumulative growth in the donated amounts—and the new funding reflects that there are businesses still making new decisions to support racial equity—the pace of monetary commitments has slowed year-over-year (down 32 percent since 2021).

## Since May 2020, companies have committed about $340 billion to fighting racial injustice.

**Cumulative funding of racial justice commitments by US companies,**[1]
$ billion

■ New committed funds



[1]Includes 1,369 current and recently removed Fortune 1000 companies.

**McKinsey & Company**

Sixty percent of businesses in the Fortune 1000 have not made public statements of support for racial justice as of October 2022. (There were companies that made public statements but did not make public monetary commitments.) Since May 2021, 10 percent of new commitments were directed externally (focusing efforts on areas like affordable housing and home ownership) while only 2 percent made internal commitments to promote diversity and inclusion within their organizations.

Compared with previous years, companies are making relatively fewer public statements in support of racial justice, despite the rise of the inclusive consumer. The most significant decline in public statements has been in internal commitments made from May 2021 to October 2022.

**Not all companies that pledged to support racial justice made public monetary commitments to advance racial equity.**



**Racial justice commitments, May 2020–Oct 2022,[1] % of companies**

🔵 Commitments made between May 2021 and Oct 2022

| Made statements in support of racial justice | Made external commitments to promote racial equity with regard to economic opportunities[2] | Made internal commitments to promote diversity and inclusion[3] |
|:---:|:---:|:---:|
| 40 | 30 | 25 |

[1]May not reflect all commitments made by corporate roundtables, alliances, etc.
[2]Eg, through donations, strategic investments, and changes in products/services.
[3]Eg, requiring diverse candidate pools, increasing spend with Black suppliers, launching diversity speaker series.
Source: Outside-in profiling of largest US companies by revenue (May 2020–Oct 2022); n = 1,369, encompassing new and recently removed Fortune 1000 companies

**McKinsey & Company**

Two years ago, businesses primarily dedicated their racial equity pledges to affordable housing and small and medium business initiatives. Those two areas accounted for 78 percent of the commitments during that period. In this most recent analysis, the story has changed: only 20 percent of financial commitments were dedicated to affordable housing or small-business development.

There may be more funding directed to these areas than is trackable due to how the commitments in this latest period were made; more than $112 billion worth of commitments in this most recent analysis have been broader in scope. In some cases, companies donate to an initiative that pools funds, and the initiative leaders then are responsible for deploying the funds. In others, companies establish a fund for grants or investing, and the deployments are not always disclosed. While these are valuable mechanisms for making financial commitments, specifying the amounts designated to specific areas and organizations can accelerate the pace of impact.

**Most commitments made since 2021 do not provide a breakdown of how funds would be deployed, making them difficult to track.**

**Racial justice commitments by area of investment, May 2021–Oct 2022,[1]**
$ billion

Total **140.6**

Other and mixed investment[2]
**112.7**

Small and medium-size enterprise development
**14.1**

Affordable housing
**13.5**

Financial inclusion
**<0.1**

Education[3] **0.2**

[1]Includes Fortune 1000 companies as of July 2022.
[2]Includes internal diversity and inclusion initiatives, investments that were not explicit about where funding would be allocated, and other areas of external investment, including healthcare, public infrastructure, civic engagement, job/skill training, and policy advocacy.
[3]Commitments dedicated to early childhood education, K–12, or higher education.

McKinsey & Company

Most of the money going toward fighting racial injustice is coming from one industry. From May 2021 through October 2022, 16 Fortune 1000 finance companies made up 93.0 percent of the value of commitments, followed by 4.5 percent from 11 businesses worth $588 billion in the retail sector, 1.3 percent from eight companies in the food and restaurant industry, and less than 1.0 percent for any other sector. The finance industry is able to make more contributions given the amount of money it manages. But even by looking at the number of commitments made, rather than their overall value, the finance industry still leads, accounting for 19.5 percent of all commitments.

The finance industry employs fewer Black people than other industries that made fewer commitments to fighting racial injustice. Consider the retail industry, which employs nearly three times as many Black people as the finance industry. The healthcare industry, which employs the greatest share of Black workers of any industry analyzed—21.0 percent—pledged 0.2 percent of the total commitments made between May 2021 and October 2022.

There is a real opportunity for other industries to increase—in some cases from zero—their public monetary commitments to fighting racial injustice. In particular, companies employing a large share of Black workers could consider the impact of creating stronger internal company commitments, like making investments that help increase Black executive representation.

**The finance industry has committed the largest share of funds toward advancing racial equity despite limited representation of Black workers.**

Racial justice commitments by industry, May 2021–Oct 2022[1]



Note: Figures may not sum to 100%, because of rounding.
[1] Includes Fortune 1000 companies as of July 2022.

McKinsey & Company

Based on this most recent analysis, there are three considerations for private business and public institutions looking to contribute to racial equity in the United States:

— *Specificity and transparency.* There is an opportunity to provide more details, ideally on a regular basis, about the breakdown of financial commitments and the timeline of a business's commitments. In doing so, a business can measure the success of their efforts, encourage similar behavior from industry competitors, and ultimately, help combat racial injustice in a meaningful, sustainable way.

— *Involvement of the entire economy.* Retail, hospitality, healthcare, and food service, among other industries, could consider increasing their commitments to fighting racial injustice in light of both the makeup of their workforce and their share of the US economy. Doing so may be particularly difficult—yet have an even greater impact—as businesses consider resiliency measures during uncertain economic times.

— *Importance of internal commitments.* In addition to making external commitments to racial equity, businesses can also create more equitable workplaces for their employees, particularly for entry-level and frontline workers. At a time when many businesses may be scrutinizing labor costs, they can enrich the lives of their current employees by reexamining internal processes and implementing inclusion and antibias training programs, for example. These investments can lower costly attrition rates.

While the global economy is challenging the resilience of businesses across industries, there are also opportunities to create lasting impact in achieving racial equity, one commitment at a time.

# A business can measure the success of their efforts and help combat racial injustice in a meaningful, sustainable way.

**Megan Armstrong** is a consultant in McKinsey's New York office, **Eathyn Edwards** is a consultant in the Washington, DC, office, and **Duwain Pinder** is a partner in the Ohio office.

The authors wish to thank Michael Ajibola for his contributions to this article.

Find more content like this on the
**McKinsey Insights App**



Scan • Download • Personalize



McKinsey
& Company

Designed by McKinsey Global Publishing
Copyright © 2023 McKinsey & Company. All rights reserved.

# Exhibit T

8/31/23, 2:57 PM
Venture capital for Black entrepreneurs plummeted 45% in 2022, data shows
Case 1:23-cv-03424-TWT Document 59-4 Filed 08/31/23 Page 690 of 801

# Venture capital for Black entrepreneurs plummeted 45% in 2022, data shows



In 2016, Beatrice Dixon had finally secured a deal with Target to carry her line of feminine care products. But she had one problem: She was still making them in the kitchen of her Atlanta home, and she needed to scale up — fast.

The CEO and co-founder of The Honey Pot Company, a vaginal-wellness brand, was faced with the "impossible" task of launching in 1,100 stores and needed funding to bring on manufacturers so she could deliver on the retailer's orders.

She managed to secure that crucial round of financing from the New Voices Foundation, a fund led by Richelieu Dennis that's devoted to supporting women entrepreneurs of color. Using that financing, and some funding from family and friends, Dixon was able to quit her job, move operations out of her kitchen and launch in Target stores nationwide by 2017.

Some six years later, Dixon's products are a staple in retailers across the country.

"It was really hard, man, we weren't having any luck," Dixon told CNBC in a recent interview about the struggles she faced securing investors. "I don't know what would have happened if we didn't get that money."

Dixon is one of many Black entrepreneurs who struggled to secure funding for their businesses and relied on venture capital financing earmarked for diverse founders. While Dixon and many others have ultimately succeeded, Black-led businesses and Black founders have historically faced disparities in securing VC funding.

Overall, Black entrepreneurs typically receive less than 2% of all VC dollars each year while companies led by Black women receive less than 1%, according to data from Crunchbase.

In the wake of the police murder of George Floyd and the racial justice reckoning that followed, Black founders and Black-led startups saw historic gains in securing VC funding in 2021. However, as momentum around the movement fizzled and market conditions worsened, a lot of those gains were lost by the end of 2022.

While overall VC funding dropped by 36% in 2022 as inflation and interest rates surged, financing for Black businesses saw a steeper drop of 45%, according to the Crunchbase data. That drop is the largest year-over-year decrease Black entrepreneurs have seen over the past decade.

"There were a lot of political and cultural strife problems in 2020 and early 2021 that created a higher focus on Black and diverse founders," said Kyle Stanford, a senior analyst at Pitchbook. "No one wants that to be the reason why they focus on investing in any group, but that did put a lot of focus on the problems that VC has had investing in anyone outside of a straight white male."

Marlon Nichols, the co-founder and managing general partner of MaC Venture Capital, said diverse businesses tend to take the brunt of VC slowdowns because firms typically resort to the status quo in times of economic uncertainty.

"We've always invested in white men and that's what we're going to do right now. That's where we're comfortable. That's where we know and believe that we're going to get the return," is how Nichols, who is Black, described the decisions made by some firms. "This diversity thing is cool, we'll pick it back up maybe, you know, once we've weathered this storm."

## So-called 'risky bets'

In 2014, Dixon was working at Whole Foods and suffering from an ongoing case of bacterial vaginosis that she wasn't able to shake. Then, she said, her late grandmother came to her with a solution — in a dream.

"She just told me that she had been walking with me and seeing me struggle and she knew how to fix it, and she basically hands me a piece of paper that has a list of ingredients on it and she tells me to memorize what's on the paper," Dixon said, recalling the dream of her grandmother. "I made it within a couple of days, and, basically, this formula actually healed me."

The mixture, which included ingredients such as lavender, apple cider vinegar, grapefruit seed extract and rose, worked for family and friends, too, Dixon said. Using a $21,000 loan from her brother, she began selling the product and displaying it at trade shows and expositions.
Honey Pot Company products
Courtesy: Honey Pot Company

Using her connections at Whole Foods, she got the product on the shelves of the store but wasn't able to seriously scale up and attract outside investors until she secured the deal with Target.

"It was hard. Us being Black-owned business founders, was it harder? Sure, it probably was," said Dixon. "I think every time we raised money, we had trouble doing it, you know, but I think that the important context to put there is that anybody that raises money, it's not going to be easy."

While he doesn't invest exclusively in diverse businesses, Nichols said he's more likely than some venture capitalists because MaC Venture Capital is led by a diverse team unlike other firms that are typically run by white men.

"The investors are primarily white and male and usually come from affluent communities, which means that they have very specific experiences and have been exposed to very specific things and are comfortable with very specific things," said Nichols, whose latest firm opened in 2019.

To many firms, investing in founders from diverse backgrounds is considered a riskier bet because the entrepreneurs differ from the norm they've become accustomed to, said Ladi Greenstreet, the CEO of Diversity VC, which works to tackle systemic bias within venture capital.

In the aftermath of Floyd's murder in May 2020, many major banks, corporations and investment firms pledged to change that — and make diversity a top priority moving forward.

However, the steep funding drop-off Black founders saw in 2022 indicates some of those promises may have been short-lived charity plays rather than investments that firms actually believed would bring in strong returns.

"When you take venture capital financing, the expectation is that, you know, you have a partner now, if you perform, your partner is going to continue to back you, they're going to help you to raise that next round of funding, right?" said Nichols.

For white-led teams, there's no expectation that recipients have to be "extraordinary" in their first two years of operations in order to get follow-on funding, but the bar is far higher for Black entrepreneurs, said Nichols, whose firm manages about $450 million in assets.

"For most of these Black founders, that's exactly like the expectation, you've got to be extraordinarily exceptional in order to get additional capital," he said. "And if you're truly treating this like all investments that you make then that shouldn't be the case."

## 'Huge blue ocean'

Pocket Sun is the co-founder and managing partner of SoGal Ventures, a VC firm devoted to supporting women and diverse entrepreneurs. Since the firm opened in 2016, it has seeded multiple unicorns, or startups that grew to have valuations over $1 billion. The businesses include Function of Beauty and Everly Health.

"From a financial investment perspective, this remains a huge blue ocean for people to dive in," said Sun.

"Venture capital is a very privileged and exclusive industry, and has always been that way. And it has such disproportionate decision-making power on the future of technology, the future of innovation, the future of quality of life in many ways," said Sun.

While investing in diverse teams can often be seen as a moral imperative and something that's done because it's the right thing to do, studies have shown it can lead to higher returns for investors, said John Roussel, the executive director of Colorwave.
Honey Pot Company products
Courtesy: Honey Pot Company

"And somehow, we're still stuck in this situation where we're trying to convince people of that," said Roussel, whose organization connects early stage founders to mentors and capital. "It really takes, you know, strong players taking a lead and showing people that there is opportunity here and there is generally the same success rates regardless of someone's skin color."

Dixon, the founder of The Honey Pot, pointed to her own success as an example. "Clearly, it's safe to bet on Black businesses," she said.

Products from the company are now in 4.6 million homes, nearly double the number from two years ago. They are also sold nationally in retailers such as Walmart, CVS, Walgreens and more. The Honey Pot didn't share its current valuation or how much it makes in annual sales.

Dixon called on investors to put their biases aside and see companies for their basics: balance sheets, innovation strategies and business goals, not the skin color of its teams.

"My skin color shouldn't be a part of the conversation, period," she said. "And yet, it still is, right?"

# Exhibit U

# Black Workers Still Earn Less than Their White Counterparts

Employers can examine their pay policies to root out inequities

By Stephen Miller, CEBS

June 11, 2020

*updated June 26, 2020*

As employers in the U.S. tackle issues around racism, fresh attention is being given to the racial wage gap and why black men and women, in particular, still earn substantially less than their white counterparts. Nearly 56 years after the passage of the Civil Rights Act, "we find equal pay for equal work is still not a reality," noted Jackson Gruver, a data analyst at compensation data and software firm PayScale.

Last year, PayScale analyzed differences in earnings between white men and men of color (https://www.payscale.com/data/racial-wage-gap-for-men) using data from a sample of 1.8 million employees surveyed between January 2017 and February 2019.

🔒 **SHRM RESOURCE SPOTLIGHT**

Overcoming Workplace Bias (www.shrm.org/ResourcesAndTools/Pages/overcoming-workplace-bias.aspx)

Among the findings, Gruver reported: "Even as black or African-American men climb the corporate ladder, they still make less than equally qualified white men. They are the only racial/ethnic group that does not achieve pay parity with white men at some level."

The study found that black men had the largest "uncontrolled pay gap" relative to white men, when comparing the average earnings of black men and white men in the U.S.

On average, black men earned 87 cents for every dollar a white man earned. Hispanic workers had the next largest gap, earning 91 cents for every dollar earned by white men. On the other side of the earnings spectrum, Asian men typically earned $1.15 for every dollar earned by a white male worker.

# Black Men Earn Less on the Dollar Than Male Workers of Other Races

On average, black men in the U.S. earn 87 cents for every dollar earned by white men, based on data from a sample of 1.8 million employees surveyed between January 2017 and February 2019.



Source: PayScale.

Better news was found in the controlled pay gap, a comparison of pay for black and white men with the same experience and education doing the same job in the same geographic location. This approach showed that black men earned 98 cents for every dollar earned by white men with the same qualifications. While that difference may seem small, when a 2 percent difference in pay is compounded over the course of a career, it adds up to black men taking home significantly less pay than their white male peers.

# Black Men's Earnings Trail Others with Similar Positions and Qualifications

On average, black men earn 98 cents for every dollar earned by men of other races with the same experience and education doing the same job in the same location.



Source: PayScale.

To put that in perspective, the median salary of a white man in our sample is $72,900; the controlled median pay for black or African-American men is thus $71,500," Gruver said. "This suggests a $1,400 difference in pay that is likely attributable to race."

8/30/23, 12:50 PM
Case 1:23-cv-03424-TWT    Document 59-4    Filed 08/31/23    Page 697 of 801
Black Women Still Earn Less than Men and White Counterparts

**An Opportunity Gap**

Gruver attributed much of the racial pay gap to an opportunity gap and occupational segregation.

"When we look at the opportunity gap, we find men of color have higher rates of holding individual contributor jobs than white men," he noted. The study found, for instance, that a larger percentage of black men (63 percent) and Hispanic men (61 percent) held individual contributor roles, compared with 56 percent of white men who weren't in management.

Even when they hold management positions, black men are paid less than their white counterparts. Executive-level black men earned 97 cents for every dollar white men with the same qualifications took home, PayScale found. Even more concerning, the racial wage gap widened as black men moved up the corporate ladder.

This difference may be partly attributable to occupational segregation, meaning that black men are more likely to work in industries that generally pay less, such as social services, in comparison with white men in senior positions, Gruver said.

**Black Women's Wage Gap**

"Comparing what women of color are paid to what white, non-Hispanic men make demonstrates the enormous economic impact of the double burden of sexism and racism," wrote Brandie Temple, a public-policy fellow at the nonprofit National Women's Law Center (NWLC), and Jasmine Tucker, director of research at the organization, in an online post.

NWLC calculations, based on the U.S. Census Bureau's Current Population Survey for 2016, revealed that when comparing all men and women who work full time, year-round in the U.S., women were paid just 80 cents for every dollar paid to their male counterparts. But the wage gap was even larger when looking specifically at black women who work full time, year-round—they were paid only 63 cents for every dollar paid to white, non-Hispanic men (https://nwlc.org/resources/equal-pay-for-black-women/).

"This gap, which amounts to a loss of $21,001 a year, means that black women have to work more than 19 months—until the very last day of July—to make as much as white, non-Hispanic men did in the previous 12-month calendar year," Temple and Tucker observed.

NWLC also found that:

- Black women make up 10 percent of the low-wage workforce—jobs that typically pay less than $11 per hour, or about $22,880 annually—while they make up just 6.2 percent of the overall workforce.

- Black women's share of the high-wage workforce—jobs that pay more than $48 per hour, or about $100,000 annually—is less than half their representation in the overall workforce.



# Black Women's Share of Low-Wage and High-Wage Jobs

Black women are overrepresented in low-wage jobs, and underrepresented in high-wage jobs, based on data from the U.S. Bureau of Labor Statistics.

Source: NWLC calculations based on U.S. Census Bureau's 2016 American Community Survey.

Black women who worked full time, year-round in low-wage occupations were typically paid about $21,700 annually, compared to the $36,000 typically paid to white, non-Hispanic men in these occupations, NWLC found. "This gap translates to a loss of $14,300 each year to the wage gap—more than enough to pay for an entire year's worth of rent or more than a year and a half of child care costs," Temple and Tucker noted.

Among workers in high-wage occupations—such as lawyers, engineers and physicians—black women who work full time, year-round were typically paid about $70,000, compared to the $110,000 typically paid to white, non-Hispanic men in the same jobs. This amounts to an annual loss of $40,000 each year, or $1.6 million over a 40-year career.

*[SHRM members-only toolkit: Managing Pay Equity (www.shrm.org/TemplatesTools/Toolkits/Pages/ManagingPayEquity.aspx)]*

**Education and Earnings**

Even after completing undergraduate and graduate degrees, black and Hispanic workers earned less than non-Hispanic white workers with the same, or often less, education, said Roy Eduardo Kokoyachuk, a partner at ThinkNow Research, which helps companies respond to the demographic and cultural drivers that influence consumer decisions.

In a May 2020 column for the website Market Insider, Kokoyachuk wrote that "The numbers are sobering (https://www.mediapost.com/publications/article/348809/education-alone-cant-close-the-racial-wage-gap.html). I ran the Census Current Population Survey's 2018 median income levels by race and bachelor's degree attainment, and found that black and Hispanic bachelor's degree holders earn nearly a quarter less than Asians and whites with equal levels of education (https://thinknow.com/blog/education-alone-cant-close-the-racial-wage-gap/)."



## Median Annual Earnings for Workers with Bachelor's Degrees

Black and Hispanic workers with bachelor's degrees earn nearly a quarter less than Asian and white workers with equal levels of education.

| | |
|---|---|
| Hispanic workers | $47,406 |
| Black workers | $50,108 |
| White workers | $61,176 |
| Asian workers | $62,292 |

Source: ThinkNow Research's analysis of the Current Population Survey (CPS), a joint effort between the U.S. Bureau of Labor Statistics and the Census Bureau. Data based on information collected in the 2018 CPS Annual Social and Economic Supplement.

While some undergraduate majors lead to higher wages, and Asian students were more likely to major in science, technology, engineering and math (STEM) subjects, for instance, that doesn't explain why wage differences exist more broadly, Kokoyachuk noted.

Even among black and Hispanic workers who have earned professional degrees, "their incomes still don't break six figures. Whites and Asians, however, double their incomes by earning professional degrees, allowing them to make well over $100,000 a year," Kokoyachuk said.



## Median Annual Earnings for Workers with Advanced Degrees

Annual compensation for those who hold advanced degrees, such as doctors, lawyers, dentists and pharmacists.

| | |
|---|---|
| Hispanic professionals | $70,674 |
| Black professionals | $81,559 |
| White professionals | $115,240 |
| Asian professionals | $120,889 |

Source: ThinkNow Research's analysis of the Current Population Survey (CPS), a joint effort between the U.S. Bureau of Labor Statistics and the Census Bureau. Data based on information collected in the 2018 CPS Annual Social and Economic Supplement.

NWLC's analysis found that black women with a bachelor's degree were typically paid $46,694—just under what white, non-Hispanic men with only a high school degree were paid ($46,729). Black women had to earn a master's degree to make slightly more ($56,072) than white, non-Hispanic men with just an associate degree ($54,620).

### BLACK WOMEN'S WAGE EQUALITY BY EDUCATION

| Education | Black Women's Earnings | White, Non-Hispanic Men's Earnings | What Black Women Are Paid for Every Dollar Paid to White, Non-Hispanic Men |
|---|---|---|---|

| | | |
|---|---|---|
| No high school degree | $21,847 | $36,480 | 60¢ |
| High school degree | $29,468 | $46,729 | 63¢ |
| Associate degree | $36,409 | $54,620 | 67¢ |
| Bachelor's degree | $46,694 | $75,080 | 62¢ |
| Master's degree | $56,072 | $87,051 | 64¢ |

Source: NWLC calculations based on U.S. Census Bureau's Current Population Survey, 2016 Annual Social and Economic Supplement.

**Confronting the Problem**

Although workers of all races, on average, earned higher wages in 2018 than in 2000, Kokoyachuk pointed out that "at every level of wage distribution, the gap between black and white wages was larger in 2018 than it was in 2000," the data showed.

The racial wage gap can be overcome, he said, if policymakers are committed to taking actions such as:

- Stepping up enforcement of employment anti-discrimination laws.

- Offering tax incentives for minority entrepreneurs and business owners.

Employers should consider taking these steps:

## • Performing pay audits.

While pay audits have become common to address unconscious biases against women (www.shrm.org/ResourcesAndTools/hr-topics/compensation/pages/companies-are-working-to-fix-pay-equity-issues.aspx), racial biases should not be overlooked. Employers should perform statistical self-audits of pay decisions (www.shrm.org/resourcesandtools/tools-and-samples/toolkits/pages/managingpayequity.aspx) and review policies regarding starting pay, allowable pay differences, merit pay increases and promotional pay increases to root out patterns of racial bias that may be unintentional on the part of managers.

## • Not asking applicants about their past earnings.

According to new research from Boston University (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3628729), salary history bans can substantially close both gender and racial gaps. After salary history bans were passed, wages increase for job changers by 8 percent for women and 13 percent for black people.

"Salary history bans (www.shrm.org/hr-today/news/hr-magazine/0318/pages/salary-history-bans-could-reshape-pay-negotiations.aspx)do work and are an important component in closing gender and racial pay gaps," said Tanya Jansen, co-founder of beqom, a cloud-based compensation software provider.

## • Upgrading technology.

"While instituting salary bans is progress in the right direction, companies should also consider instituting data-driven technology to help automate the compensation decision-making process and eliminate unconscious biases from the start of the recruiting and hiring process," Jansen said.

[*Update:* Beginning in August, the U.S. Army will no longer include photos of soldiers on records used to select future officers (https://www.armytimes.com/news/your-army/2020/06/25/army-ditches-promotion-photos-as-part-of-an-effort-to-eliminate-unconcious-bias/), to help eliminate unconscious biases in its promotion-and-advancement process, defense officials said on June 25.]

**Career Mentoring**

Because economic outcomes are heavily influenced by social networks, Kokoyachuk also advised improving career-mentoring programs (www.shrm.org/resourcesandtools/hr-topics/organizational-and-employee-development/pages/creating-a-mentoring-program-yodas-not-required.aspx) for minority workers.

For younger workers at the start of their careers, these efforts can include "creating better opportunities for minority graduates to mingle with or be mentored or sponsored by decision-makers from other groups," he noted. Doing so can help them build up social connections that they can use when seeking higher-paying positions.

Additional resources on addressing wage disparity and workplace-bias issues are listed below:

- SHRM resource page on Overcoming Workplace Bias (www.shrm.org/ResourcesAndTools/Pages/overcoming-workplace-bias.aspx).

- SHRM resource page on Pay Equity (www.shrm.org/ResourcesAndTools/Pages/Pay-Equity.aspx).

- SHRM How to Talk with Your Employees About Race (www.shrm.org/ResourcesAndTools/tools-and-samples/exreq/Pages/Details.aspx?Erid=1600) Express Request.

**Related SHRM Articles:**

Black Workers Face Health Care and Retirement Savings Benefits Gaps (www.shrm.org/ResourcesAndTools/hr-topics/benefits/Pages/black-workers-face-health-care-and-retirement-savings-benefits-gaps.aspx), *SHRM Online*, July 2020

The Importance of Pay Equity (www.shrm.org/hr-today/news/hr-magazine/spring2020/pages/importance-of-pay-equity.aspx), *HR Magazine*, Spring 2020

Managing Bias for Better Outcomes (https://www.hrps.org/resources/people-strategy-journal/winter2020/Pages/first-person-eberhardt.aspx), *People + Strategy Journal*, Winter 2020

Creating a Mentoring Program: Yodas Not Required (www.shrm.org/resourcesandtools/hr-topics/organizational-and-employee-development/pages/creating-a-mentoring-program-yodas-not-required.aspx), *SHRM Online*, March 2020

# HR DAILY NEWSLETTER

News, trends and analysis, as well as breaking news alerts, to help HR professionals do their jobs better each business day.

Email Address

SUBSCRIBE

8/30/23, 12:50 PM
Case 1:23-cv-03424-TWT    Document 59-4    Filed 08/31/23    Page 702 of 801
Black Women's Sub-4 in Less Than One Wide Coverage

Black Women's Sub-4 in Less Than One Wide Coverage

**CONTACT US (WWW.SHRM.ORG/ABOUT-SHRM/PAGES/CONTACT-US.ASPX)** | 800.283.SHRM (7476)

Monday - Friday 8:00 am–8:00 pm ET

© 2023 SHRM. All Rights Reserved

SHRM provides content as a service to its readers and members. It does not offer legal advice, and cannot guarantee the accuracy or suitability of its content for a particular purpose.

Disclaimer (www.shrm.org/about-shrm/Pages/Terms-of-Use.aspx#Disclaimer)

# Exhibit V





# OVERVIEW

**2** Introduction

**3** A Message From Our Founders

**8** Venture Capital Landscape for Women of Color

**18** Bridging the Gap for Women of Color Founders

**22** Fearless Organization's Impact

**49** Our Vision

**50** Acknowledgments

# FEARLESS FUND'S
# FIRST ANNUAL IMPACT REPORT

Fearless Fund invests in women of color-led consumer and technology businesses at the Pre-Seed, Seed and Series A stages. As the first venture capital firm founded by women of color for women of color, our mission is to bridge the gap in venture capital funding for historically underrepresented founders. Our goal is to create meaningful change by supporting diverse founding teams in their efforts to generate outsized returns. This report highlights the challenges, efforts, and opportunities in our journey towards achieving this goal.

## A MESSAGE FROM OUR FOUNDERS

# "When we address inequity, everyone wins."

Fearless Fund was launched in 2018 to provide support for scalable businesses led by women of color, a demographic that is highly founded, yet least funded.

As two business school classmates and entrepreneurs who have personally experienced the challenges of securing capital, we aim to create more exposure and opportunities for underrepresented founders. Fearless Fund's mission is to generate equitable change in the early-stage investment landscape.





ARIAN SIMONE
Co-Founder and Managing Partner

## Message from Arian:

When I first embarked on my entrepreneurial journey while attending Florida A&M University, I began raising capital to open a boutique. During this time, I observed a lack of diversity amongst investors. Following that experience, I set the goal of becoming the investor that I had sought out.  While continuing my entrepreneurial journey, I established the Fearless magazine, which led to the creation of the Fearless platform. The mission of this platform is to reduce racial and gender disparities, educate entrepreneurs via training, and empower individuals of color to gain access to capital. In 2010, I founded the Fearless Foundation (the "Foundation"), a 501(c)(3) non-profit organization that provides grants, programs for businesses, educational opportunities for entrepreneurs, and college scholarships for underrepresented students. The Fearless Foundation has continued to offer these resources since its inception.

Although the Foundation has successfully provided startup education and non-dilutive grants to thousands of entrepreneurs, it became evident to me that a more comprehensive solution was necessary to address the significant gap for underrepresented founders. Ayana Parsons and I founded the Fearless Fund in 2018 to bridge the gap in venture capital funding for women of color creating high-growth companies capable of generating venture-scale returns. By December 2022, Fearless Fund had invested over $25MM in 40 companies founded by women of color.

I am proud to have fulfilled the promise to become an investor, but the **shortage** of Black and brown investors remains for women and founders of color seeking to secure adequate funding for their businesses. Sustainable change will only occur by increasing the diversity of investment teams and expanding the scope of investments to more broadly incorporate diverse founders.



AYANA PARSONS

Co-Founder and General Partner

## Message from Ayana:

Growing up in Arkansas, I watched as my father, a serial entrepreneur, launched business after business(my favorite being "Ayana's Designer Perfume"). His journey inspired me, yet he struggled to scale due to a lack of capital and business connections. Meanwhile, I also watched my mother advocate for marginalized communities and become a well-known community activist and social worker. Watching the passion and drive of both of my parents motivated me to co-found Yardstick Management with my husband, Ebbie. We aimed to help mission-driven organizations overcome their most significant business challenges, particularly those affecting marginalized communities.

When starting Yardstick Ebbie and I initially struggled to secure a business loan and ultimately decided to bootstrap the business. Bootstrapping was one of the best decisions we made, allowing us to scale for over a decade and achieve a successful exit to a private equity firm with a mission aligned long-term vision implemented into their strategy.

I am driven by a desire to provide the same opportunities for success and generational wealth to smart, savvy, and resilient women of color, including my two young daughters, both of whom are budding entrepreneurs.

In 2023 and beyond, Fearless Fund aims to double down on underrepresented founders who have experienced a plethora of fundraising challenges in today's economic climate. Following a successful proof of concept via Fund I, we plan to raise additional capital to drive even more impact on a global scale.



# VENTURE CAPITAL LANDSCAPE FOR WOMEN OF COLOR

There is a notable disparity between private capital allocation to women and people of color, and their proportional populations within the US. Women make up 51% of the population, yet receive less than **3% of funding.** The discrepancy is even more noticeable for women of color, who received **less than 0.4% of funding in 2022** despite making up 20.3% of the US population. The vast majority of capital was deployed to startups led by men. Women of color continue to face significant disadvantages, both in overall venture funding and within the landscape of women-owned companies.

Source: Catalyst, Workplaces that work for women

The table below clearly demonstrates the disparities in funding allocation based on race/ethnicity amongst women in the US in 2021. The data reveals that the majority of funding (64.9%) is allocated to white women, while the percentages for other racial/ethnic groups are significantly lower.

| Race/Ethnicity | % of US Population amongst women | % of Funding Allocated to Women | Total $ Funding |
|---|---|---|---|
| American Indian | 1.5% | 1.0% | $348,056,000 |
| Asian/Native Hawaiian | 6.6% | 13.2% | $635,467,150 |
| Black | 13.9% | 11.7% | $561,348,433 |
| Latina | 18.6% | 9.2% | $441,545,606 |
| White | 59.4% | 64.9% | $3,121,742,532 |

Source: Catalyst, Women in Color in the United States; Crunchbase data

# "Black women are the most founded, yet least funded demographic of entrepreneurs."

According to a report by J.P. Morgan, Black women are the fastest growing entrepreneurial demographic in the U.S., having started 2.7 million businesses nationwide. **While constituting 42% of new businesses established between 2014 and 2019, this demographic of founders received a meager average under 2% of private funding during the aforementioned period.**

Latinx founders, who establish more businesses per capita than any other racial group in the U.S., receive a similar funding level with less than 2% of venture capital funding, including 40% of businesses owned by women. Unfortunately, these imbalanced statistics remain prevalent across all demographics of women of color.

Source: Harvard Business Review

**We partnered with Crunchbase to gather the following data on women of color founders.**

# In 2021 $337 billion of VC funding was deployed

● Startups with at least 1 WOC founder received $1.9 billion or 0.57% of total funding.

● Startups with all-women teams received 2.3% of total funding.

**In 2022, dollars allocated to women of color-founded companies dropped by ~60% vs. ~15% for the entire VC ecosystem.**

# In 2022 $288 billion of VC funding was deployed

● Startups with at least 1 WOC founder received $1.1 billion or .39% of total funding.

● Startups with all-women teams received 0.92% of total funding.

### Women-Founded Companies that Received VC Funding in 2021

| Race/Ethnicity | No. of Companies | Total $ Funding | % of VC Funding |
|---|---|---|---|
| Middle Eastern | 9 | $48,056,000 | 0.01% |
| Multi-Race | 30 | $241,201,500 | 0.07% |
| Asian/Native Hawaiian | 70 | $635,467,150 | 0.19% |
| Black | 71 | $561,348,433 | 0.17% |
| Hispanic/Latina | 58 | $441,545,606 | 0.13% |
| White | 307 | $5,814,986,176 | 1.73% |

Source: Crunchbase, new Data Parsed June 1st-Dean of June December 1, 2021.
Source: J.P. Morgan Report, Venture and the Fearless Women's Fund, a Philanthropic Outline Job and May

Venture Capital Landscape for Women of Color

### Women-Founded Companies that Received VC Funding in 2022

| Race/Ethnicity | No. of Companies | Total $ Funding | % of VC Funding |
|---|---|---|---|
| Middle Eastern | 2 | $51,100,000 | 0.02% |
| Multi-Race | 24 | $83,454,000 | 0.03% |
| Asian | 31 | $283,890,172 | 0.10% |
| Hispanic/Latina | 35 | $339,191,467 | 0.12% |
| Black | 51 | $361,736,913 | 0.13% |
| White | 114 | $1,530,495,785 | 0.53% |

Venture Capital Landscape for Women of Color

# RAISING CAPITAL AS A WOMAN OF COLOR

## Starting and growing businesses present more obstacles for women of color than any other demographic.

These challenges, explained below, have resulted in fewer opportunities for both women of color founders and investors.

### Lack of Investor Diversity/Representation

Crunchbase reports that 81% of venture capital firms lack even one Black investor.

According to a report by Forbes:

White men represent **30%** of the US population, **58%** of all Venture Capitalists and control **93%** of VC dollars.

Women of color represent **20.3%** of the US population, less than **1%** of Venture Capitalists and manage **2.1%** of VC dollars.

Source: Forbes Diversity, The Holy Grail Of Venture Capital, Catalyst.org Research, Women of Color In The United States

Venture capital is largely based on investor relationships. The bulk of Partners at high AUM VC firms have largely continued to invest in founders of similar demographics, rather than evaluating more opportunities led by underrepresented founders. According to Morgan Stanley's 2019 Beyond the VC Funding Gap report, 45% of VC firms surveyed did not know how the returns from women-founded companies compared with their overall portfolio, and 53% were unsure about multicultural-founded companies.

The aforementioned mindset results in inequities for both underrepresented founders and investors within the VC/startup environment. The disparities lead to a limited perspective and missed opportunities for outsized returns from diverse founders and businesses. **We believe that continuing on this path will exacerbate the imbalances for diverse founders and existing/aspiring investors.**

### Did You Know?

- 61% of Black female entrepreneurs utilize self-funding as their primary small business capital source

- Less than 75 Black women raised $1 million or more in VC funding since 2021



Source: Business Insider Black Female Founders Raised Millions In VC

## Representation in the workplace

According to the U.S. Bureau of Labor Statistics, while women represent over 50% of available talent and hold over 50% of management and professional-level jobs, less than 21% reach C-suite roles and only 5% achieve CEO roles at major corporations. **Women of color only represent 1% of C-suite executives in the US.** These trends may shed light on the way women of color are viewed in terms of their credibility and experience not only in Corporate America but also when starting their own businesses.





## Lack of mentorship and resources for entrepreneurs

According to Global Entrepreneurship Monitor, the number of women of color owned companies increased by 467% from 2001-2021 (vs. 114% for all women-owned businesses). Of these new businesses, only 3% become mature, sustainable businesses. There has historically been a lack of dedicated resources available to guide new entrepreneurs. While the development of underrepresented founder-focused accelerators, including Digital Undivided, Visible Hands, and Andreessen Horowitz's TxO program have provided a solution for a small portion of companies, more mentorship is needed for businesses, particularly at infancy stages.

# BRIDGING THE GAP FOR WOMEN OF COLOR FOUNDERS

## The Opportunity

As highlighted before, a disproportionately small share of venture capital funding is allocated to women of color founders, which was especially evident in 2022. **Only 1.9% of the total funding that year was directed toward female founders**, representing the lowest proportion since 2016 (after reaching a peak of 3.4% in 2019).

To illustrate the opportunity, we'll use data from a report by American Express, which states that in 2019, there were **6.4 million women of color-owned businesses in the U.S.** This **represents ~21% of the 30.8 million businesses open at that time.** Applying that 21% to the $288.3 billion of venture capital dollars invested in 2022, **we believe there is an illustrative opportunity to deploy at least $60B to women of color-led companies.** While this illustration is not perfect, we hope that it demonstrates the gap between women of color-led companies and the dollars allocated to these companies.



# Investor bias and ignorance stand as prominent causes for unequal distribution of assets.

According to a report by Morgan Stanley, 53% of male VCs believe that there aren't enough women founders out there and 43% say the same about multicultural entrepreneurs. On average, women raised less than half as much money as their male counterparts, **yet they returned 78 cents per dollar invested to investors, compared with 31 cents for the men. Additionally, private technology companies led by women are more capital-efficient, achieving 35% higher ROI, and, when venture-backed, 12% higher revenue than startups run by men.** Continued education around diverse investing, the creation of diverse teams, and dedication of more capital to diverse founders will benefit the private markets ecosystem.

Source: Forbes Diversity the Holy Grail of Venture Capital

# SOME FUNDS AND ORGANIZATIONS CHANGING THE INVESTMENT LANDSCAPE FOR WOMEN OF COLOR

## Incubators/Accelerators

360 Venture Collective
Amazon Black Business Program
Andreessen Horowitz TxO
Black Ambition
Black Girl Ventures
DigitalUndivided
Google for Startups
Nex Cubed
Plug In LA
Visible Hands
Conscious Venture Lab
Hutch, by Fearless
Lightship
Opportunity Hub [OHUB]

## Venture Capital Funds – Total $1.45B

100 Black Angels & Allies Fund
The 22 Fund
Backstage Capital
Black Star Fund
Black Tech Nation Ventures
Brown Ventures
Cake Ventures
Capitalize VC
Chingona Ventures
Cleo Capital
Cleveland Avenue
Collab Capital
Concrete Rose
Debut Capital
Emmeline Ventures
Latimer Ventures
Harlem Capital
Impact America Fund

Kapor Capital
Lightship Capital
MaC Venture Capital
New Age Capital
New Voices Fund
North Carolina SSBCI
Noemis Ventures
Overlooked Ventures
Portfolia
Precursor Ventures
RareBreed Ventures
Seae Ventures
Serena Ventures
SteelSky Ventures
Supply Change Capital
Vamos Ventures
Zane Venture Fund
Zeal Capital Partners





## FEARLESS FUND × FEARLESS FOUNDATION

**The Fearless platform was established to provide educational resources to women of color founders in order to amplify the number of mature, high-growth businesses founded by this demographic.**

# FUND IMPACT

Through the end of 2022, Fearless Fund made the following investments:



**$26.7 Million Invested**

*Excludes $50K fund-of-funds investment



Fearless Fund has invested in 40 companies which in aggregate employed over 250 people at the time of investment. By the end of 2022, these same companies grew their employee headcount to approximately 540, marking a 116% increase. Additionally, over **96%** of Fearless Fund's investments qualify under the Community Reinvestment Act, demonstrating its dedication to supporting small businesses in underrepresented metropolitan areas. Over 20% of these companies have been able to raise subsequent funding, with a meaningful increase in this percentage expected in 2023.

*Includes one Fund of Funds investment

# FUND IMPACT



| LOCATION | TOTAL INV | % TOTAL INV |
|---|---|---|
| ARIZONA | $500K | 2% |
| GEORGIA | $6.1M | 23% |
| CALIFORNIA | $5.8M | 22% |
| OHIO | $250K | 1% |
| MICHIGAN | $1.2M | 5% |
| TEXAS | $1.6M | 6% |
| FLORIDA | $1.2M | 5% |
| LOUISIANA | $1.1M | 4% |
| NEW YORK | $7.8M | 29% |
| DC | $1.1M | 4% |

## INVESTMENTS BY GEOGRAPHY

## INVESTMENTS BY STAGE

SERIES B $2M

SERIES A $4.8M

PRE-SEED $5.4M

SEED $14.4M

*Excludes $50K fund-of-funds investment

---

# FUND IMPACT

## Total investments by subsector



8 BEAUTY/HEALTH

8 ENTERPRISE SOLUTIONS

2 CONSUMER TECH

6 APPAREL AND ACCESSORIES

6 MARKETPLACE

5 FOOD AND BEVERAGE

4 FINTECH

*Excludes $50K fund-of-funds investment

## CHAMPIONING WOMEN OF COLOR

**Founder Successes:**
Our portfolio companies are breaking barriers and making history. We aim to shine a light on and uplift women of color who are paving the way for future generations of women of color entrepreneurs. Our investments have had a positive impact from portfolio companies that have gone to raise $20M-$30M+ rounds and create tangible change for employees and customers.

# FOUNDER SUCCESSES



DEEPICA MUTYALA, LIVE TINTED

Live Tinted is the **first-ever South Asian** brand to be available at Ulta, and continues to be the fastest-growing beauty brand in the retailer's Sparked program. Live Tinted has sold 1 million units since it launched in 2018 and was Named Ulta's Emerging Brand of the Year in 2021. Under Deepica's leadership, the company continues to launch innovative makeup and skincare products for all skin types and tones.

After raising over $3M in seed funding in 2021, Live Tinted has gone on to raise over $10M in Series A funding, led by Montage Ventures with participation by Halogen Ventures, Curate Capital, and Fearless Fund.

# FOUNDER SUCCESSES:



PINKY COLE, SLUTTY VEGAN

Slutty Vegan is a highly sought after plant-based burger chain that is democratizing veganism in food deserts and underserved communities. Slutty Vegan is the brainchild of Pinky Cole, a serial entrepreneur and cultural icon, who has grown the company exponentially with her wit and grit.

Slutty Vegan is now valued at $100 million with eight locations, four food trucks, and a sister company.

# FOUNDER SUCCESSES:



NYAKIO GRIECO, THIRTEEN LUNE

Thirteen Lune is an e-commerce platform designed to inspire the discovery of beauty brands created by Black and brown founders that resonate with people of all colors.

Ninety percent of the brands carried by Thirteen Lune are created by BIPOC founders, who make products for people of all colors, and 10% are dedicated to fostering allyship from non-BIPOC owned brands.

Since its inception, Thirteen Lune has scaled into 600+ doors and helped 100+ brands get on JCPenny shelves.

# FOUNDER SUCCESSES



MELISSA BUTLER. THE LIP BAR AND THREAD BEAUTY CO

The Lip Bar is a vegan and cruelty-free beauty brand that exists to help change the way you think about beauty.

Thread Beauty Co. is an inclusive beauty brand designed with the Gen Z, BIPOC community in mind. At its core, Thread is about freely expressing creativity.

In 2022, Melissa closed a $6.7 million round led by Pendulum, providing access to a robust international community through Endeavor and other women entrepreneurs to focus on expanding The Lip Bar and Thread Beauty's distribution as well as incubating a third beauty brand.

Today, The Lip Bar and Thread Beauty are sold in over 1,000 stores across the country, including Target and Walmart. Butler has plans to scale and grow her business while continuing to disrupt the beauty industry and challenge societal norms of the past.

# Get Venture Ready Program

The Fearless Foundation's inaugural 2021 Get Venture Ready ("GVR") Program is a 12-month pilot training program designed exclusively for women of color ("WOC") business owners to acquire the training, mentorship, knowledge, and skills needed to gain access to capital.

Women of Color entrepreneurs encounter distinctive obstacles in scaling their businesses, often experiencing reduced access to funding from conventional sources like banks and venture capital firms. Consequently, securing the capital required to expand their ventures and generate employment becomes challenging. Our grant programs aim to address this opportunity gap by offering financial assistance and resources to empower Women of Color entrepreneurs, enabling them to achieve their business objectives and create a meaningful impact within their communities.

## Total amount of grants awarded in 2022:

**2022 WOC GRANT:**
**150 Grants**
($10,000 - $20,000 each)

**$2,000,000**
awarded total

**2022 STRIVERS GRANT:**
**20 Grants**
($10,000 each)

**$2,000,000**
awarded total

**2022 UNITY GRANT:**
**1 Grant @ $10,000**
**$10,000 total**

**GVR PROGRAM GRANTS:**
**3 per cohort totaling $25,000 per cohort**
**$75,000 total**

**Women of Color face systemic barriers in building and sustaining their businesses. Their success requires more than capital. They require education, training, mentorship, community and more. We serve every need of our entrepreneurs through our grant programs**



## OVERALL FOUNDATION IMPACT (2022 - 2023)

# $3,655,000
Awarded in 346 grants, Average grant is $10,564

# 22,457
Women of Color have applied for our grants

# 11
Programs launched with partners MasterCard, Amazon, Nike, JPMorgan Chase, Tory Burch, Ulta, Ally, NEC, Goldman Sachs, dReam Center Church of ATL, One Musicfest

**Launched the Arian Simone Leadership Academy in 2022 in Dawa Village, Ivory Coast**

Existing complex: 2 classroom buildings, Indoor restroom, Teacher housing (3 homes), Pastor's housing, Soccer Field, Playground

Future 2023-2024: Church, 2 additional buildings (classroom and multipurpose room)



# COMMUNITY OUTREACH

## VC Summit:

Our Annual Venture Capital Summit comprises two exciting days focused on empowering women-of-color entrepreneurs and educating the community about venture capital and entrepreneurship. During these two days we cover topics from sustainable partnerships to breaking into the tech world as a female founder, and prioritizing mental health as an entrepreneur. Last year, we invested $1MM in three WOC-owned businesses. The event drew 500+ in-person attendees and over 4,000 virtual participants.

### Education Day

This is a day dedicated to educating the community around the ins and outs of venture capital and entrepreneurship. Attendees experience a day of action-packed enrichment including informative panels and fireside chats from our Fearless Fund portfolio companies and keynotes from industry experts and notable celebrities.

During last year's summit, we educated more than 4,500 women virtually and in-persona, covering topics like "Creating Sustainable Partnerships", "Breaking into the World of Tech as a Female Founder", and "Maintaining Your Mental Health".

### Demo Day

The Fearless Demo Day attracts the top women of color founders across the nation for a premiere showcase of promising startups pitching for a chance at an investment in their business.

Last year, we invested $1 million in three women of color owned businesses:

**Villie: $400,000**

Digital platform designed exclusively for new parents seeking a supportive community and a place to cherish and share their baby's milestones.

Empowering Caregivers with Advanced Software Solutions comprehensive software solutions tailored to caregivers of aging parents.

**Care Copilot: $325,000**

**Springrose: $275,000**

Revolutionizing Adaptive Intimate Apparel adaptive lingerie designed specifically for arthritis, MS, shoulder injuries, stroke, etc.





# SOCIAL MEDIA PRESENCE

## 1.6M+
impressions on Instagram in 2022

## 1.2M+
pages reached in 2022

## 122K+
followers across all platforms



**FEARLESS REMAINS FOCUSED ON ITS MISSION TO PROVIDE ADEQUATE FUNDING AND MENTORSHIP OPPORTUNITIES TO WOMEN OF COLOR ENTREPRENEURS.**

# WHAT CAN YOU DO TO HELP BRIDGE THE FUNDING GAP FOR WOMEN OF COLOR FOUNDERS?

We are calling on organizations, such as pensions, family offices, endowments, corporations, and VC funds to take decisive action and promote equity, inclusion and diversity through our set of recommendations that address the systemic barriers women of color entrepreneurs face.

**This call to action is rooted in the belief that diversity drives innovation and that investing in underrepresented groups of entrepreneurs can lead to significant social and economic benefits.**

# #FEARLESSFIVE

**Commit TODAY to one or more of our #FEARLESSFIVE actions**

## Invest

By allocating additional capital to WOC-led businesses and fund managers, institutions can play a crucial role in addressing the systemic inequities that have hindered WOC's access to capital and ability to succeed as entrepreneurs. This can be through LP or direct investments, and/or by supporting foundations and grant programs supporting this founder demographic.

## Mentor

Invest time offering guidance to a WOC founder. Provide business-specific guidance, fundraising advice, hiring support, etc.

## Hire

Evaluate the diversity within your existing organization. Make an effort to make sure there's diverse representation amongst your organization's overall team, leadership, advisors, vendors, etc.

## Data Transparency

We can't measure change without measuring data. It is challenging gathering data on the intersection of women of color entrepreneurs. We encourage founders and funders to publicly report the composition of your team's diversity across leadership, senior and overall team categories.

## Policy Advocacy

Support equity, inclusion and economic freedom today! Rally behind our mission at fearlessfreedomnow.org as we advocate for systemic change that uplifts women of color entrepreneurs and unites us all to forge a more equitable entrepreneurial ecosystem. When women of color thrive in business, we all flourish. Together, let's change the world. #FearlessFreedom

# OUR VISION

**"We exist to change the game for women of color founders." - Ayana Parsons**

**Short term goals** include raising and deploying capital into high-growth, scalable consumer and technology companies while simultaneously running GVR cohorts for earlier-stage companies.

**Longer-term,** Fearless hopes that the successful performance of its portfolio and the portfolios of other underrepresented founder-focused investors will generate additional interest from both limited partners and general partners.

With existing support from change makers including Bank of America, Costco, Equity Alliance, Insight Partners, JP Morgan, Mastercard and PayPal among others, we believe that as long as Fearless continues to grow alongside women of color entrepreneurs, there will be a long-term beneficial change that will create an everlasting impact.

# ACKNOWLEDGMENTS

## LIMITED PARTNERS

   

   

   



## FUND ADVISORS

**Rodney Sampson**
**Tracy Gray**

Writing, design, research and editing support provided by Trivia Edwards, Sam Sugarman, Omoniola Olademoji, Charlenia Snider, and 0514 Designs.



**Arian Simone Reed and Ayana Parsons**
Co-Founders and General Partners

### FEARLESS FUND

| | |
|---|---|
| **Jazmin Carr** | Community Engagement Manager |
| **William Duckworth** | Operations Associate |
| **Trivia Edwards** | Investment Analyst |
| **Kameron Hypolite** | Investment Analyst |
| **Lauryn Lawrence** | Executive Assistant & Marketing Coordinator |
| **Dave Parker** | Venture Partner |
| **Sam Sugarman** | Investment Associate |

### FEARLESS FOUNDATION

| | |
|---|---|
| **Shennice Cleckley** | Executive Director |
| **Jasena Cooper** | Director of US Programs |
| **Patricia Green** | Director of Strategic Partnerships |
| **Tiffany Mack** | Grant & Research Manager |
| **Christina Murray** | Director of International Programs |
| **LaShay Price** | Brand Director |
| **Sarah Sabastro** | US Programs Manager |
| **Charlenia Snider** | Digital Manager |
| **Helaman Souza** | International Programs Manager |



"The path to equity begins with acknowledging and challenging the biases that perpetuate inequality in all aspects of life."

– Kimberlé Crenshaw, legal scholar, and founder of the "intersectionality" concept.



#FEARLESSFIVE

# Exhibit W

**Harvard Business Review**

**Consumer Behavior**

# Black Women Are More Likely to Start a Business than White Men

by Donna Kelley, Mahdi Majbouri, and Angela Randolph

May 11, 2021



HBR Staff/Jessica Felicio/Unsplash

**Summary.**   Despite starting businesses at a high rate, 3% of Black women are running mature businesses. In contrast, white women are more than twice as likely to be mature business owners (7%), despite starting at lower rates. This disparity between high startup and low...   **more**

In the United States, an astounding 17% of Black women are in the process of starting or running new businesses. That's compared to just 10% of white women, and 15% of white men.

Yet despite this early lead, only 3% of Black women are running mature businesses. To understand why this steep drop off occurs, and how to combat it, we analyzed data from interviews with more than 12,000 people, nearly 1,700 of whom identified as entrepreneurs and nearly 1,200 of whom own established businesses.

The research was part of our work with the Global Entrepreneurship Monitor, an annual comprehensive survey of entrepreneurship rates and attributes, conducted in more than 120 economies since 1999. The large-scale survey is administered by academic research teams in each economy; we represent the U.S. team.

Our analysis offers several possible reasons Black women entrepreneurs struggle to sustain their businesses.

One explanation may be the types of businesses started: Our analysis shows that 61% of Black women entrepreneurs start businesses in either retail/wholesale or the health, education, government or social services sectors, compared to the 47% of white women and 32% of white men entrepreneurs. To the extent that these are small, informal businesses with low margins in crowded competitive contexts, they are more difficult to sustain over the long term.

Another possible explanation is access to capital, which could, in turn, influence what types of businesses Black women open. In previous research we found that 61% of Black women self-fund their total start-up capital. This is in spite of the fact that in our analysis of the GEM data only 29% of Black women entrepreneurs live in households with incomes over $75,000, compared to 52% of white men. This result, along with data showing that Black people take on a higher level of debt to go to college, and are less likely to own their own home, suggest that educated Black women are encumbered with debt, and have fewer personal resources and low collateral.

In addition, access to key resources needed for entrepreneurship are unevenly distributed in U.S. society, reinforcing the advantage of certain groups while impeding the entry and catching-up of disadvantaged groups. This only reinforces a cycle where resource limitations reduce one's ability to generate financial gains from entrepreneurship.

Combating racial and gender disparities is a long-term proposition in the U.S., but there are immediate efforts that can help accelerate this change and provide near-term benefits. The finance community, for one, needs to look beyond aiding a disadvantaged group to recognizing both the biases they bring to investment assessment and the benefit of businesses run by educated Black women in sectors that can benefit from new ideas and social impact. This may require educating the finance sector, improving finance practices and setting guidelines to ensure equity in funding entrepreneurs. For example, financial institutions could examine whether the criteria and procedures to invest or loan money are the same for all groups, as recent research suggests that different demographic groups are asked different types of questions during the funding process.

Our research also showed that Black women starting businesses in the U.S. are highly educated. Although slightly more than one-fourth of Black women in the general population have a college degree or higher level of education, we found that more than three-fourths of Black women entrepreneurs have at least a college degree. Universities are uniquely positioned then to provide Black women with experiential education practices that enable them to learn and practice entrepreneurship and develop capabilities for overcoming constraints they may face, as well as offer peer support and collaboration, in addition to expert advising.

Black women are positioned to play an increasingly visible and important role in the United States' political and economic future, particularly with the election of the first Black woman vice

president and the widespread call for change embodied in the Movement for Black Lives. Never before have we seen such potential for Black women to elevate their voice and their careers, and to achieve social and economic equality. One means for realizing this dream lies in the opportunities offered through entrepreneurship. However, this dream will not be complete without targeted efforts that enable Black women entrepreneurs to grow and sustain their businesses. This will require conscious efforts by the government and private sector to uncover and address gaps and biases in entrepreneurial ecosystems in a way that provides inclusivity and support for the diversity of entrepreneurs that bring economic and social value to American society.

*Editor's Note (5/11): The previous headline on this article was misleading, and it has been updated to correct the error.*

**Donna Kelley** is a Professor of Entrepreneurship at Babson College, and holds the Frederic C. Hamilton Chair of Free Enterprise. She is a board member of the Global Entrepreneurship Monitor (GEM) and team leader of GEM United States.

**Mahdi Majbouri** is an Associate Professor of Economics at Babson College and the technical director for the Global Entrepreneurship Monitor, Team USA. He is also a Research Fellow at the Institute of Labor Economics (IZA) and Economic Research Forum (ERF).

**Angela Randolph** is an Assistant Professor of
Entrepreneurship at Babson College. She is the
faculty director for Babson's Black Women's
Entrepreneurial Leadership Program.

# Exhibit X

Goldman Sachs | Research

The Bigger Picture | February 9, 2022

# BLACK WOMENOMICS

## Equalizing Entrepreneurship

**Gizelle George-Joseph**
gizelle.george-joseph@gs.com

**Daniel Milo**
dan.milo@gs.com



The Goldman Sachs Group, Inc.

Goldman Sachs

# Table of Contents

Executive Summary                                                                3

Investing in the Underinvested                                                   5

Entrepreneurship and Economic Equality                                          6

Capital Access Gap                                                              7

Personal Finance Gap                                                           12

Financial Information Gaps Contribute to the Financial Wellness Gap             13

Black Owned Businesses Have Worse Outcomes                                     16

Black Entrepreneurs Experience Bias and Discrimination                         18

Investing in Black Women Entrepreneurs                                         20

Good for Growth                                                               21

Fairer and Richer Society                                                     21

Disclosure Appendix                                                          22

*The Bigger Picture* is a publication series from Goldman Sachs Global Investment Research devoted to longer-term economic and policy issues, which complements our more market-focused analysis.  For other important disclosures, see the Disclosure Appendix.

# Executive Summary

**1. Black women are underrepresented in business ownership.** In Black Womenomics: Investing in the Underinvested, we highlighted the fundamental role of earnings in explaining the wealth gap. Black women, make less in the labor market and face job-related economic disadvantages driven by systemic and individual discrimination that are compounded by the intersectionality of gender. Private business ownership contributes significantly to earnings and wealth inequality. Yet, Black women are underrepresented in business ownership. This study focuses on the entrepreneurship gap of Black women, some of the core broader economic and social factors driving it and implications for earnings, wealth and economic mobility.

**2. Black women own less.** Black women own less. Black women make up roughly 6% of the US population but own just 2% of employer businesses. The imbalance is particularly stark for single Black women, just 0.5% of whom own a business—a rate that is 24 times lower than for single white men. Disparities in education and income drive some of the Black-white business ownership gap, but differences in capital access, personal finance, and financial information gaps also play a significant role.

**3. Black women have less access to capital.** Black women continue to face credit market challenges that create barriers to business ownership. Across all industries, a larger share of Black-owned businesses have inadequate initial capital. Similarly, Black entrepreneurs are 20% less likely to fund their startups with bank business loans and depend heavily on personal credit cards as the primary sources of startup capital. Moreover, Black entrepreneurs are more likely to report unmet credit needs and non-participation in seeking financing primarily due to expectations that their requests will be denied. More than half the Black business owners who seek credit report receiving less than the amount they requested from financial institutions versus a quarter of white business owners. Black women entrepreneurs cite limited access to funds as the largest barrier to success.

**4. Personal finances gap.** Historical systemic discriminatory policies and practices were foundational in creating Black Americans unequal access to financial services. Liquidity constraints and low levels of wealth create substantial barriers to entry for Black entrepreneurs. Moreover, weaker personal finances make Black women more vulnerable to negative income or spending shocks which can lead to borrowing on unfavorable terms. Black women's wealth is not only held down by a lower access to high-return assets, but also by a higher exposure to high-cost liabilities. Black women are, for instance, 5 times more likely than white men to rely on expensive payday loans.

**5. Financial information gap contributes to the financial wellness gap**. There is a significant relationship between better financial education and the financial health of Black Americans. Yet, Black Americans, and especially Black women, lag white Americans on financial knowledge. Research results show that Black Americans score significantly lower on questions related to insuring, comprehending risk, investing and go-to information sources and suggest that higher levels of financial education would lead to better financial wellness.

**6. Insufficient funding leads to worse outcomes for Black-owned businesses**. Undercapitalization impacts the growth of Black-owned businesses. This is partly due to lower levels of personal wealth to borrow against and lack of access to equity financing, but may also be due to lending discrimination. Black businesses are nearly three times more likely than white businesses to report that access to financial capital and the cost of financial capital negatively impact profits. Black women's ability to sustain their businesses also tends to fall much more sharply during a recession.

**7. Black entrepreneurs experience bias and discrimination**.  Exacerbating the credit market challenges, Black women may face discrimination in the lending market which also limits their ability to invest in their businesses.  Field experiments find that Black businesses are scrutinized at a much higher level than white-owned businesses, are prodded for more personal information and receive less customer service.  Multiple studies document that high levels of discrimination persists in the labor and credit markets.

**8. Solutions to close the entrepreneurship gap.** This study identifies public and private investment opportunities to help close the entrepreneurship gap that focus on intentional structural adjustments to reduce systemic barriers. We reiterate that it is critical that the public sector robustly address racial inequity and mandate changes to laws and policies that may also influence social behavior and close the gaps over time. Proposed actions for the private sector include reducing barriers to entry, enabling growth and increasing financial education.

**9. Good for growth.**  Our framework takes into account the broad economic disadvantages that Black women experience. Overcoming these adverse economic trends would make for not only a fairer but also a richer society.  We estimate that reducing the earnings gap for Black women, which includes increasing business ownership to drive economic mobility, could raise the level of annual US GDP by 1.4-2.1% each year, or $350-525bn in current dollars.[1]

[1]   We would like to thank Jan Hatzius our Chief Economist and Head of Global Investment Research Division for his guidance throughout the project and our colleagues Joseph Briggs and Daan Struyven for their helpful suggestions and comments.

Goldman Sachs                                                                                    The Bigger Picture

# Investing in the Underinvested

In <u>Black Womenomics: Investing in the Underinvested</u>, we highlighted the fundamental role of earnings in explaining the wealth gap. Black women make less in the labor market and face job-related economic disadvantages driven by systemic and individual discrimination that are compounded by the intersectionality of gender.  Black earnings account for about two-thirds of the average wealth gap (Exhibit 1) and an even larger share among lower-wealth households. The remainder is explained by other factors, including racial gaps in access to capital and investment opportunities including inheritances and home ownership, personal finances and financial information.

**Exhibit 1: The Earnings Gap Explains Around Two-Thirds of the Average Racial Wealth Gap**



Source: Panel Study of Income Dynamics, Goldman Sachs Global Investment Research

Access to better-paying occupations and industries drove a substantial narrowing in the wage gap of Black women relative to white men in the 80s and 90s, but that progress has stalled in the past two decades, while the wage gap with white women has increased. Exhibit 2 shows that while differences in education and occupations contribute to the widening gap, a significant and growing portion is not explained by measurable factors in the model (red bars).  This implies that factors that are harder to measure quantitatively—such as bias and discrimination and differences in career opportunities or social networks—are likely playing a role in the persistence and widening of the wage gap versus white women.

**Exhibit 2: Differences in Education, Occupations, and Industries, and Other Hard-to-Measure Factors Drive the Wage Gap of Black Women Which Has Started to Widen Again vs. White Women**



Source: Current Population Survey, Goldman Sachs Global Investment Research

# Entrepreneurship and Economic Equality

Academic research suggests that private businesses are an important component of wealth.[2]  While the median Black household owns nearly 90% less wealth than the median white household, among both Black and white families, wealth is disproportionately distributed toward entrepreneurs versus wage or salary workers.[3] Moreover, Black and white entrepreneurs are found to have more upward mobility and less downward mobility in the wealth distribution than wage/salary workers.[4]  Yet, Black women are underrepresented in business ownership. They make up roughly 6% of the US population, but own only 2% of employer businesses.

The most striking statistic is that only 0.5% of single Black women own their own business, a rate that is 24 times lower than for single white men; consistent with a large entrepreneurship gap (Exhibit 3).

For instance, although the lack of gender equality in funding startups is a broad issue, Black women have especially low representation. While there has been some progress over the past decade, Black women still account for a very low share of venture capital funding.  Project Diane finds that Black women-founded companies raised over $700mn in funding from 2018-2019 which accounts for 0.27% of funds for that period, a notable

---

2   See Cagetti, Marco, and Mariacristina De Nardi.  2006. "Entrepreneurship, frictions, and wealth." Journal of Political Economy 114, no. 5 (2006): 835-870

3   See Bradford, William D. 2003. "The Wealth Dynamics of Entrepreneurship for Black and White Families in the U.S." Review of Income and Wealth 19, no. 1: 89-116

4   See Bradford, William D. 2003. "The Wealth Dynamics of Entrepreneurship for Black and White Families in the U.S." Review of Income and Wealth 19, no. 1: 89-116

increase from the 0.06% from 2009-2017, but still limited.[5]

**Exhibit 3: Single Black Women Are 24 Times Less Likely to Own Their Own Business Than Single White Men**



Source: Survey of Consumer Finances, Goldman Sachs Global Investment Research

Disparities in income and education drive some of the Black-white private business ownership gap, but differences in capital access, personal finance, and financial information gaps play a significant role.

# Capital Access Gap

Black women continue to face credit market challenges that create barriers to business ownership. While all business owners depend on personal finance, business loans from banks and personal credit cards as the primary sources of startup capital, Black business owners depend most heavily on personal credit cards.[6]

Data from the Annual Survey of Entrepreneurs corroborates that Black entrepreneurs are 20% less likely to fund their startups with bank business loans, but are instead more likely to rely on more expensive personal credit card debt and personal and family savings (Exhibit 4, left panel).  This greater reliance on internal finance and expensive forms of external finance suggests credit constraints are more severe.  More than three quarters of Black and Hispanic women business founders cite limited access to funds or investment as a barrier to success (Exhibit 4, right panel).

---

5    "The State of Black & Latinx Women Founders." Project Diane (2020)

6    See Robb, Alicia and Morelix Arnobio. 2016. "Startup Financing Trends by Race: How Access to Capital Impacts Profitability." Annual Survey of Entrepreneurs Data Briefing Series.

Goldman Sachs

**Exhibit 4: Black Entrepreneurs Are 20% Less Likely to Fund Their Startups with Bank Business Loans and Black Women Entrepreneurs See Limited Access to Funds as a Major Barrier to Success**



Source: Annual Survey of Entrepreneurs, Project Diane, Goldman Sachs Global Investment Research

A larger share of Black-owned businesses had low amounts of initial capital across all major industries. Exhibit 5 shows the top five industries for Black business owners.

**Exhibit 5: Black-owned Businesses Had Low Amounts of Initial Capital Across Major Industries.**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

Strikingly, Black business owners are three times more likely than white business owners to have their business in the healthcare and social assistance industry, a large outlier that makes up 30% of Black-owned businesses, possibly due to the lower capital requirements to start businesses in this sector. Consistent with this explanation, Exhibit 6 shows that Black businesses are overrepresented in sectors with low capital intensity, like health care and social assistance and underrepresented in sectors with high capital intensity like real estate and construction.

**Exhibit 6: Black-owned Businesses Are Overrepresented in Low-Margin Industries**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

Access to credit is necessary to grow businesses and is a key determinant of a firm's sustainability. Black entrepreneurs are more likely to report unmet credit needs. Exhibit 7 shows that Black business owners do not receive funding requested at the same rate as white business owners. More than half of Black business owners report receiving less than the amount they requested from financial institutions versus a quarter of white business owners.

**Exhibit 7: Black Business Owners Report Receiving Less than the Amount They Requested from Financial Institutions**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

The 2021 Small Business Credit Survey, a national survey of small businesses conducted by the 12 Federal Reserve Banks, found that significantly fewer Black-owned firms receive all the funding they requested. Exhibit 8 shows that 13% of Black-owned

firms received all the financing they requested in the 12 months prior to the survey, versus 40% of white-owned firms. Forty-six percent of Black-owned firms that applied for financing received none of the financing they requested, the largest share of any group.

**Exhibit 8: Significantly Fewer Black Owned Firms Receive All the Funding They Request**



Source: 2021 Small Business Credit Survey, Goldman Sachs Global Investment Research

A striking number of Black business owners never apply for additional financing even when there is an established business need for it. Exhibit 9 shows that nearly three times more Black business owners report that they avoid applying for financing, primarily due to expectations that it would be denied, versus white entrepreneurs.

**Exhibit 9: Black Business Owners Are Three Times More Likely to Avoid Applying for Financing**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

The pandemic has further highlighted the consequences of the racial gap between Black and white-owned businesses' ability to access funds.  According to researchers at the

Federal Reserve Bank of New York, while the number of active business owners saw a record decline nationally from February to April 2020 (22%), Black businesses had the largest drop (41%). This is partially attributable to the weaker financial positions of many Black businesses going into the pandemic which may have consequently impacted their decisions to apply for funding.

Exhibit 10 further illustrates this pattern. Results from the 2021 Small Business Credit Survey find that Black business owners applied for and received less Paycheck Protection Program (PPP) funding, even after controlling for credit risk. Researchers at the Federal Reserve Bank of Boston suggest this is partly driven by historical and systemic exclusion of Black Americans from the housing market which stymied their ability to build equity and impaired their trust in financial institutions. This is compounded by the limited presence of traditional banks in Black communities which adversely impacts banking relationships and access.

**Exhibit 10: Only 61% of Black-Owned Businesses Applied for PPP Funding; Only 43% Received it**



Source: Small Business Credit Survey, Goldman Sachs Global Investment Research

The survey finds that only 61% of Black-owned firms applied for Payment Protection Program (PPP) funding, and of those, only 43% received all the funding they sought, versus 82% and 79% for white-owned businesses, respectively. Even among firms with good credit, businesses owned by Black Americans were half as likely as businesses owned by white Americans to receive all the financing they required (24% versus 48%). Black-owned applicant firms were five times as likely to receive none of the PPP funding they requested, versus white-owned businesses (20% vs 4% respectively).

Academic research suggests that persistent structural social and economic inequality have contributed to discouragement and disillusionment among minority business owners and that this has fundamentally impacted Black Americans entrepreneurial behavior.[7]  In turn, the derived entrepreneurial decisions negatively impacts potential

---

[7]    See Neville, Francois et al. 2018. 'Why Even Bother Trying?' Examining Discouragement among Racial-Minority Entrepreneurs." Journal of Management Studies 55, 3:424-456

business opportunities and outcomes and consequently, economic mobility.

# Personal Finance Gap

Historical systemic discriminatory policies and practices are foundational in Black Americans unequal access to financial services. Black entrepreneurs use personal and family savings as the main source of startup capital[8] and investors frequently require significant investment of owners' capital as an incentive or as collateral.[9] The finding that personal wealth decreases the probability that an existing firm is denied a loan is consistent with racial disparities in wealth contributing to racial differences in startup capital.[10] Moreover, low levels of wealth and liquidity constraints may create a substantial barrier to entry for black entrepreneurs.[11]

In Black Womenomics: Investing in the Underinvested, we highlighted that Black women's wealth is not only held down by a lower access to high-return assets, but also by a higher exposure to high-cost liabilities. Personal finances make Black women more vulnerable to negative income or spending shocks which can lead to borrowing on unfavorable terms.

Exhibit 11 illustrates these patterns using data from the Federal Reserve's Survey of Household Economics and Decisionmaking (SHED). The left panel shows that less than 40% of Black women have the liquidity to cover three months of expenses vs. more than 60% of white men. The right panel shows that Black women are also nearly 5 times more likely not to have a bank account than white women, consistent with structural issues such as more limited access to banking and banking products. More generally, SHED data show that 14% of Black adults are unbanked and 32% are underbanked, versus 3% and 11% of white adults, respectively.[12] Smaller liquidity buffers and more limited access to formal credit might also help explain why Black women are 5 times more likely than white men to use expensive payday loans (right panel), which typically feature annualized percentage interest rates of over 400%.

---

[8] See Robb, Alicia and Morelix Arnobio. 2016. "Startup Financing Trends by Race: How Access to Capital Impacts Profitability." Annual Survey of Entrepreneurs Data Briefing Series.

[9] See Robb, Alicia, de Zeeuw, Mels, and Barkley, Brett. 2018. "Mind the Gap: How Do Credit Market Experiences and Borrowing Patterns Differ for Minority-Owned Firms." The Federal Reserve Bank of Atlanta's Community & Economic Development (CED) Discussion Paper Series.

[10] See Robb, Alicia and Fairlie, Robert. 2007. "Access to Financial Capital Among U.S. Businesses: The Case of African-American Firms". The Annals of the American Academy of Political and Social Science 613, 47-72.

[11] See Robb, Alicia and Fairlie, Robert. 2007. "Access to Financial Capital Among U.S. Businesses: The Case of African-American Firms". The Annals of the American Academy of Political and Social Science 613, 47-72.

[12] The Federal Reserve defines fully banked individuals as individuals with a bank or credit union account and who have not used an alternative financial service in the past year such as non-bank money orders, payday loans, pawn shops or auto title loans, and tax refund advances. Underbanked is defined as having a bank account but using an alternative financial product like a payday loan while unbanked is not having a bank account.

Goldman Sachs                                                                     The Bigger Picture

**Exhibit 11: Black Women Are Nearly 5 Times More Likely Not to Have a Bank Account Than White Men**



Source: Survey of Household Economics and Decisionmaking, Goldman Sachs Global Investment Research

# Financial Information Gaps Contribute to the Financial Wellness Gap

Financial capabilities — the understanding of financial concepts and the ability to leverage that knowledge to make informed financial decisions — are essential in addressing the personal finance gap and consequently, impacts economic progress.  A study from Annamaria Lusardi and co-authors estimates that financial knowledge accounts for more than 30% of retirement wealth inequality.[13]

The TIAA Institute documents the financial knowledge gap between Black Americans and white Americans. The report uses a Personal Finance Index based on twenty-eight questions to assess financial capabilities across eight areas of personal finance: earning, consuming, saving, investing, borrowing and managing debt, insuring, comprehending risk and uncertainty and go-to information sources. The research highlights that higher levels of financial education lead to better financial competence and finds a significant relationship between better financial education and the financial wellness of Black Americans.[14]

A joint research project by the Global Financial Literacy Excellence Center and TIAA Institute corroborates these results. Researchers review the financial capabilities of Black Americans and find that while there is a gap between the finance education of Black Americans and white Americans, within the Black community, there is also a meaningful financial information gap between Black women and Black men — characteristic of the patterns identified more broadly across the US population (Exhibit 12).  On average, Black men answered 42% of the Personal Finance Index questions

---

[13]   See Lusardi, Annamaria, Michaud, Pierre-Carl and Mitchell, Olivia. 2017. "Optimal Financial Knowledge and Wealth Inequality". Journal of Political Economy, 125 (2), 431-477.

[14]   See Yakoboski, Paul, Lusardi, Annamaria and Hasler, Andrea. 2019. "African American Personal Finance Knowledge". TIAA Institute Trends and Issues.

correctly; Black women answered 35% correctly.[15]

**Exhibit 12: There Are Significant Financial Information Gaps Between Black Americans vs. white Americans and Between Black Men and Black Women**



Source: TIAA Institute-GFLEC Personal Finance Index, Goldman Sachs Global Investment Research

Black Americans scored significantly lower on questions related to insuring, comprehending risk, investing and identifying go-to information sources (Exhibit 13). The lack of financial capabilities to assess risk is salient as risk management is intrinsic in navigating financial decisions and the subsequent outcomes.[16] Interestingly, Black Americans who had participated in financial education programs scored 11 percent higher on the Personal Finance Index questions vs. those who had no exposure to related content.[17] This suggests that financial education programming increases financial capabilities.

---

[15] See Yakoboski, Paul, Lusardi, Annamaria and Hasler, Andrea. 2020. "Financial Literacy, Wellness and Resilience Among African Americans". TIAA Institute Trends and Global Financial Literacy Excellence Center.

[16] See Lusardi, Annamaria, Michaud, Pierre-Carl and Mitchell, Olivia. 2017. "Optimal Financial Knowledge and Wealth Inequality". Journal of Political Economy, 125 (2), 431-477.

[17] See Yakoboski, Paul, Lusardi, Annamaria and Hasler, Andrea. 2019. "African American Personal Finance Knowledge". TIAA Institute Trends and Issues.

**Exhibit 13: Black Americans Personal Finance Knowledge is Lower in Areas of Insuring, Comprehending Risk, Investing and Identifying Go-To Information Sources**



Source: TIAA Institute-GFLEC Personal Finance Index, Goldman Sachs Global Investment Research

The evidence suggests that financial information gaps also contribute to expensive borrowing and frictions on the investment side.  Sumit Agarwal and co-authors find that most payday borrowers who also have a credit card have substantial credit card liquidity. Consistent with personal finance information gaps, SHED survey data summarized in the left panel of Exhibit 14 shows that Black women are significantly less likely to correctly answer a survey question on the compounding of interest rates than white men.

Similarly, the right panel shows that Black women are less likely to correctly answer a survey question on stock market risk diversification.

A study by Sherman Hanna and Yoonkyung Yuh suggests that financial education familiarizing Black households with investment risk and risk tolerance would increase their likelihood of owning high-return assets.

Goldman Sachs



**Exhibit 14: Survey Data on Compounding Interest Rates and Investing in Stocks Suggest a Financial Information Gap**



Source: Survey of Household Economics and Decisionmaking, Goldman Sachs Global Investment Research

# Black Owned Businesses Have Worse Outcomes

Undercapitalization impacts the growth of Black-owned businesses. Previous research indicates that the level of startup capital, which can be impacted by lower levels of personal wealth, is a strong predictor of business success.[18]  Black businesses are more likely to report their profits negatively impacted by access to and the cost of financial capital. Exhibit 15 shows that Black business owners are nearly three times more likely than white entrepreneurs to report that access to financial capital and the cost of financial capital negatively impact the profitability of their businesses.

[18]  See Robb, Alicia and Fairlie, Robert. 2007. "Access to Financial Capital Among U.S. Businesses: The Case of African-American Firms". The Annals of the American Academy of Political and Social Science 613, 47-72.

**Exhibit 15: Black Business Owners Are Three Times More Likely than White Business Owners to Report the Negative Impact of Access to Financial Capital and The Cost of Financial Capital to Their Businesses**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

On average, business sales are much lower for Black-owned businesses than white-owned businesses and especially lower, for Black-women-owned businesses (Exhibit 16).

**Exhibit 16: Black-Owned Businesses Have Lower Sales**



Source: Annual Business Survey, Goldman Sachs Global Investment Research

Black-owned businesses also have lower profits. Exhibit 17 shows that a smaller share of Black-owned businesses had profits and a larger share had losses compared to white owned businesses.

**Exhibit 17: Black-owned Businesses Have Lower Profits**



Source: Annual Survey of Entrepreneurs, Goldman Sachs Global Investment Research

# Black Entrepreneurs Experience Bias and Discrimination

Researchers at the Enterprise Research Center in the UK underlined identified seven dimensions for entrepreneurial motivation: achievement, challenge and learning, independence and autonomy, income security and financial success, recognition and status, family and roles, dissatisfaction with prior work arrangement.[19] These results suggest that displacement in the labor market could be an important motivation for entrepreneurship. One possible reason for Black displacement is discrimination. The subject of race and prejudice and the consequent impact remains complex and, at times, controversial. However, multiple studies document that high levels of discrimination persists in the labor and credit markets.

A groundbreaking field experiment submitted fictitious resumes with names that sounded either white (e.g. Emily Walsh) or Black (e.g. Lakisha Washington) to potential employers, showed that Blacks were routinely and uniformly disadvantaged in the resume selection process, with white names receiving 50% more callbacks than Black names.[20] The study also found that credentials had a statistically insignificant impact on the outcome for Black candidates, whereas white applicants with higher quality resumes received 30% more callbacks than white applicants with lower quality resumes. This suggests that resumes with Black names were systematically removed from consideration.

---

[19] See Stephan, Ute, Hart, Mark and Drews, Cord-Christian. 2015. "Understanding Motivations for Entrepreneurship: A Review of Recent Research Evidence." Enterprise Research Center.

[20] Lincoln Quillian, Devah Pager, Ole Hexel and Arnfinn H. Midtboen. 2017. "Meta-analysis of Field Experiments Shows No Change in Racial Discrimination in Hiring Over Time," Proceedings of the National Academy of Sciences, 114 (41), 10875. Data was analyzed from 24 field experiments, which included over 54,000 applications and 25,000 recruiting roles.

Similarly, a comprehensive study published in the Proceedings of National Academy of Sciences examined callback rates of job candidates from 1990 to 2015 and found that white applicants received 36% more callbacks than Black applicants. Strikingly, the researchers also find that the level of racial discrimination against Black applicants in the hiring process has not fallen over the past 25 years.[21]  Related studies conducted for the US and other countries—from Germany to India—consistently point to racial or ethnic labor market discrimination.[22]

A recent <u>study</u> by Sterling Bone and co-authors employing mystery shoppers[23]  provides evidence that structural discrimination impacts the opportunities of Black Americans in the credit market. The research inferred three key themes (Exhibit 18).

**Exhibit 18: Black Businesses Are Scrutinized More, Black Owners Are Prodded for More Personal Information and Receive Less Customer Service Help**



*Asking about marital status when determining credit worthiness is a violation of fair lending laws.

Source: Bone et al. 2019, Goldman Sachs Global Investment Research

First, Black businesses are scrutinized at a much higher level than white-owned businesses.  Second, Black business owners are prodded for more personal information than white business owners. In the field experiment, while both Black and white testers were asked about their marital status by loan officers (in violation of the fair lending law), Black American testers were asked almost 6 times more often. Moreover, only the Black American testers were asked about the status of their spouses' employment, also a violation of the fair lending law. And third, Black business owners receive less customer service help.[24]  These studies underline that structural discrimination remains a material

[21]  Lincoln Quillian, Devah Pager, Ole Hexel and Arnfinn H. Midtboen. 2017. "Meta-analysis of Field Experiments Shows No Change in Racial Discrimination in Hiring Over Time," Proceedings of the National Academy of Sciences, 114 (41), 10875. Data was analyzed from 24 field experiments, which included over 54,000 applications and 25,000 recruiting roles.

[22]  Marianne Bertrand and Esther Duflo. 2016. "Field Experiments on Discrimination," NBER Working Paper.

[23]  Mystery shopping research methodology present mystery "shoppers" as customers to gather feedback or data to assess customer experience.

[24]  See Bone, Sterling, et al. 2019. "Shaping Small Business Lending Policy Through Matched Pair Mystery Shopping." Journal of Public Policy and Marketing, 28 (3), 391-399

factor in the disadvantage faced by Black Americans.

# Investing in Black Women Entrepreneurs

Business ownership is an important alternative to wage or salary employment and has a large impact on economic progress. Subsequently, it has important implications for inequality.

In Black Womenomics: Investing in the Underinvested, we offered several recommendations to reduce racial economic and social inequities experienced by Black Americans. The caveats are that the issues are complex, that the list is not exhaustive and is presented with the recognition that any efforts to effectively address the issues would require a multidimensional commitment across the public and private sectors which could only be successful if Black women are actively engaged in formulating the strategies and framing the outcomes.

Exacerbating the credit market challenges, Black women may face discrimination in the lending market which also limit their ability to invest in their businesses.  It is critical that discrimination is also addressed toward the goal of real and sustainable progress.

**Exhibit 19: Public Sector and Private Sector Actions to Change the Economic Disadvantages of Black Women Entrepreneurs**

| | Actions to Change the Economic Disadvantages of Black Women Entrepreneurs | |
| --- | --- | --- |
| | Public Sector | Private Sector |
| Capital Access Gap | - Enforce fair lending laws to address discrimination<br>- Direct public sector action on access to capital for small businesses, e.g. via the Small Business Administration, increase funding and regulatory support for Community Development Financial Institutions | - Increase business loans to Black women<br>- Increase investment in Black women's businesses<br>- Combine capital access with mentoring ad sponsorship<br>- Help Black women build their network |
| Financial Information Gap | - Boost financial literacy and entrepreneurship courses in school curricula | - Increase financial education in the workplace<br>- Invest in efforts that boost financial wellness of Black women |

Source: Goldman Sachs Global Investment Research

It is critical that the public sector is robustly addressing racial inequity and mandate changes to laws and policies that may also influence social behavior and close the gaps over time.

To help close the capital access and investment gaps for Black entrepreneurs, policymakers could enforce fair lending laws to address discrimination in the credit market, and especially expanded access to capital for Black women.

In this study, we again highlight the power of private capital.  The proposed actions focus on lowering barriers and creating pathways to economic security for Black women, their families, and their communities.

**Provide access to capital for Black women entrepreneurs**.  More equitable access to credit and small business loans with reasonable repayment conditions (e.g. lower rates of interests and fees, and access) and to equity investments would reduce dependence

on more expensive forms of credit and use of personal savings, factors that often inhibit the success of Black women-owned businesses.  This would likely increase the number of Black women entrepreneurs, support existing small businesses, and grow long-term wealth.

**Increase financial education.** Critical to overall financial wellness is the ability to make informed decisions that impact effective management of personal finance including investments in important financial assets that contribute to wealth appreciation. Providing Black women entrepreneurs educational frameworks that will expand their capabilities, combined with mentoring and coaching, will decrease the risks of financial pitfalls and better position them to navigate and recover more quickly from potential crises.

## Good for Growth

In Black Womenomics: Investing in the Underinvested, we highlighted that our recommendations for public policies and private investments would improve the lifetime earnings prospects of Black women, and this will also add to the country's economic potential over time. We do not quantify harder to measure benefits such as innovation and the impact on the community.

Our framework takes into account the broad economic disadvantages that Black women experience. We estimate that reducing the earnings gap for Black women, which includes increasing business ownership to drive economic mobility, could raise the level of annual US GDP by 1.4% each year or $350bn in current dollars. If the improvements benefit Black women and men alike, we estimate a larger increase in US GDP of 2.1%, which corresponds to $525bn per year.

## Fairer and Richer Society

Private business ownership has significant implications for earnings and wealth inequality, however, Black women are underrepresented in entrepreneurship. Targeted resource allocation is necessary to counter historical and systemic social and economic racial inequality.  Black women continue to make their own efforts to overcome the racial and gender barriers. However, absent directed actions that facilitate Black women's efforts to start and succeed at business ownership, sustained economic recovery and mobility would be inaccessible in the short term.  One of our key takeaways from Black Womenomics, is that equalizing Black women's positions would make for not only a fairer, but also a richer society.

# Disclosure Appendix

## Disclosures

*The Bigger Picture* is a publication series from Goldman Sachs Global Investment Research devoted to longer-term economic and policy issues, which complements our more market-focused analysis.

Prior to publication, this report may have been discussed with or reviewed by persons outside of the Global Investment Research Division. While this report may discuss implications of legislative, regulatory and economic policy developments for industry sectors and the broader economy, it does not recommend any individual security or an investment in any individual company and should not be relied upon in making investment decisions with respect to individual companies or securities.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs on a global basis. Analysts based in Goldman Sachs offices around the world produce research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy. This research is disseminated in Australia by Goldman Sachs Australia Pty Ltd (ABN 21 006 797 897); in Brazil by Goldman Sachs do Brasil Corretora de Títulos e Valores Mobiliários S.A.; Public Communication Channel Goldman Sachs Brazil: 0800 727 5764 and / or contatogoldmanbrasil@gs.com. Available Weekdays (except holidays), from 9am to 6pm. Canal de Comunicação com o Público Goldman Sachs Brasil: 0800 727 5764 e/ou contatogoldmanbrasil@gs.com. Horário de funcionamento: segunda-feira à sexta-feira (exceto feriados), das 9h às 18h; in Canada by either Goldman Sachs Canada Inc. or Goldman Sachs & Co. LLC; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs New Zealand Limited; in Russia by OOO Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman Sachs & Co. LLC. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom.

Effective from the date of the United Kingdom's departure from the European Union and the European Economic Area ("Brexit Day") the following information with respect to distributing entities will apply:

Goldman Sachs International ("GSI"), authorised by the Prudential Regulation Authority ("PRA") and regulated by the Financial Conduct Authority ("FCA") and the PRA, has approved this research in connection with its distribution in the United Kingdom.

**European Economic Area:** GSI, authorised by the PRA and regulated by the FCA and the PRA, disseminates research in the following jurisdictions within the European Economic Area: the Grand Duchy of Luxembourg, Italy, the Kingdom of Belgium, the Kingdom of Denmark, the Kingdom of Norway, the Republic of Finland, Portugal, the Republic of Cyprus and the Republic of Ireland; GS -Succursale de Paris (Paris branch) which, from Brexit Day, will be authorised by the French Autorité de contrôle prudentiel et de resolution ("ACPR") and regulated by the Autorité de contrôle prudentiel et de resolution and the Autorité des marches financiers ("AMF") disseminates research in France; GSI - Sucursal en España (Madrid branch) authorized in Spain by the Comisión Nacional del Mercado de Valores disseminates research in the Kingdom of Spain; GSI - Sweden Bankfilial (Stockholm branch) is authorized by the SFSA as a "third country branch" in accordance with Chapter 4, Section 4 of the Swedish Securities and Market Act (Sw. lag (2007:528) om värdepappersmarknaden) disseminates research in the Kingdom of Sweden; Goldman Sachs Bank Europe SE ("GSBE") is a credit institution incorporated in Germany and, within the Single Supervisory Mechanism, subject to direct prudential supervision by the European Central Bank and in other respects supervised by German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, BaFin) and Deutsche Bundesbank and disseminates research in the Federal Republic of Germany and those jurisdictions within the European Economic Area where GSI is not authorised to disseminate research and additionally, GSBE, Copenhagen Branch filial af GSBE, Tyskland, supervised by the Danish Financial Authority disseminates research in the Kingdom of Denmark; GSBE - Sucursal en España (Madrid branch) subject (to a limited extent) to local supervision by the Bank of Spain disseminates research in the Kingdom of Spain; GSBE - Succursale Italia (Milan branch) to the relevant applicable extent, subject to local supervision by the Bank of Italy (Banca d'Italia) and the Italian Companies and Exchange Commission (Commissione Nazionale per le Società e la Borsa "Consob") disseminates research in Italy; GSBE - Succursale de Paris (Paris branch), supervised by the AMF and by the ACPR disseminates research in France; and GSBE - Sweden Bankfilial (Stockholm branch), to a limited extent, subject to local supervision by the Swedish Financial Supervisory Authority (Finansinpektionen) disseminates research in the Kingdom of Sweden.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management and brokerage business. It has investment banking and other business relationships with governments and companies around the world, and publishes equity, fixed income, commodities and economic research about, and with implications for, those governments and companies that may be inconsistent with the views expressed in this report. In addition, its trading and investment businesses and asset management operations may take positions and make decisions without regard to the views expressed in this report.

**© 2022 Goldman Sachs.**

**No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.**

# Exhibit Y










# Black Women
## BUSINESS STARTUPS

A report by
The Federal Reserve Bank of Kansas City



10-J

By Dell Gines

The Federal Reserve Bank of Kansas City thanks our community partners for their support of this research project:

Omaha—Nebraska Enterprise Fund

Kansas City—SEED Law and Multicultural Business Coalition

Wichita—Create Campaign Inc.

Oklahoma City—Oklahoma City Black Chamber of Commerce

Denver—Colorado Black Chamber of Commerce

A special thanks to the 34 black women business owners who participated in focus groups.

For additional information on entrepreneurship based economic development, and entrepreneurship ecosystem building, visit www.kansascityfed.org/community/smallbusiness

CONTACT:
Dell Gines
Senior Community Development Advisor
Federal Reserve Bank of Kansas City – Omaha Branch
Dell.gines@kc.frb.org
402-221-5606


On the cover (Clockwise from upper left):
Dewanna O'Guinn, Lee Andrew Hall & Gardens
Dawn Rattan, EverFit
Tiffany Cody and Aisha Bulloucks, Smash Glam
Adrienne Haynes, SEED Law
Angela Norton, Vision Enterprises Unlimited
Shanita Bryant, Magnolia's On The Move
Angela McCain, I Am Definition
Photos by Smash Glam.

# Foreword

The Federal Reserve Bank of Kansas City serves the seven states of the Federal Reserve's Tenth District, which include Colorado, Kansas, Nebraska, Oklahoma, Wyoming, northern New Mexico and western Missouri. As the regional headquarters of the nation's central bank, the Kansas City Fed helps set national monetary policy, supervises and regulates financial institutions, maintains stability of the payments system and provides financial services to banks and other depository institutions.

To succeed in each mission area, the Federal Reserve relies on many resources, including current economic and banking data and expert analysis by its staff. Another resource is the Fed's community development function, created in the 1980s following Congress' approval in 1977 of the Community Reinvestment Act.

Community development professionals take practitioners and policymakers to the front lines of community issues through a range of initiatives, including forums, conferences, directed research and advisory councils. These initiatives position the central bank to respond effectively to emerging economic developments, long-term needs and new challenges that confront rural and urban low- and moderate-income communities.

The Kansas City Fed's community development efforts focus on research, resources and programming in the primary areas of community development investments, financial stability for the underserved, workforce development, small business development and working with strategic community development partners. The Kansas City Fed understands the vital role small businesses play in growing the economy by providing jobs, building communities and being key innovators of new technology and processes.

# Contents

Executive Summary                                                                 5

I.      Data Driven Portrait of Black Women Business Owners          7

        Profile of Black Women Business Owners                         7

        Black Women Owners and Business Credit                        12

II.     Insights into Black Women Who Own Businesses                  14

        Entrepreneurship Characteristics                              15
        Startup Motivations                                           15
        Business Challenges                                           18
        Support Systems                                               19
        Recommendations from Black Women Who Own Businesses           21
        The Impact of Race and Gender                                 22
        The Role of Faith and Belief                                  22

III.    Validity of the Findings                                      24
IV.     Recommendtions                                                26
V.      Conclusion                                                    28
        Appendix A – Full State Business Rankings                     29
        Appendix B – Focus Group Methodology and Participant Profile  31
        Appendix C – Research Validity                                33

*" … experience is the best thing, and I'm thinking you've just got to go for it. Just like you said, no turning back. You've just got to go for it."*

—Black woman business owner, Omaha, Nebraska

# Executive Summary

## Black Women Business Owner Growth

The previous quote best encapsulates the broad perspectives of the 34 black women business owners who participated in five focus groups in late 2017 conducted by the Federal Reserve Bank of Kansas City. The Bank determined it was important to gain insight into this group of business owners for two reasons. First, recent growth in the rate of business ownership by black women has been faster than any other group in the nation. From 2002-12[1], the number of businesses owned by black women increased 179 percent compared with 52 percent for all women-owned businesses and 20 percent for all businesses. The second is the important contribution small business plays in the growth of national and local economies. Businesses owned by black women tend to be significantly smaller on average than other business ownership identified by race and gender. However, research shows that these microbusinesses provide valuable contributions to local economies.[2] Research also shows that an increase in entrepreneurial activity is associated with faster local economic growth, provides a potential pathway to developing economically challenged communities, and provides local jobs and improves the tax base. [3,4,5]

The high growth rate of businesses owned by black women provides policymakers and economic developers a unique opportunity to develop policy and programming to accelerate and expand the economic impact of these businesses in their local economies. However, for policies and programs to be effective, policymakers and economic developers need a greater understanding of this group of business owners. The objective of this report is to increase this understanding.

## A Data Driven Portrait of Black Women Who Own Businesses

Businesses owned by black women, on average, are significantly smaller than businesses owned by all men and by women of different races and ethnicities. These owners are likely to start their firms between the ages of 35 and 54, and are more likely to have a bachelor's degree or higher than

> "I'm encouraged by the growing number of black women starting small businesses in our area. This trend continues the legacy of black women, who've always found creative ways to take care of their families. It bodes well for our community because they're making positive contributions … as role models, as business leaders, as empire builders, as game changers, as policy influencers and as decision makers. Black women who own small businesses are making a difference in their lives and in our community."
>
> **Lee Gash-Maxey,**
> **Colorado Black Chamber of Commerce**

black women who don't own a business. Businesses owned by black women represent 59 percent of all black-owned businesses, making black women the only women business owners with a higher share of business ownership than their male counterparts.

Many black women who own businesses have difficulty accessing credit and face capital constraints, according to the Federal Reserve System's 2016 Small Business Credit Survey. The survey indicates these women are more likely than their nonminority peers to identify that access to credit and financing for operations were a financial challenge. They also reported being less likely to receive some or all of the financing they requested, and are significantly more likely to not apply for financing because they already are discouraged borrowers.

## Characteristics of Black Women Business Owners

Two dominant entrepreneurial characteristics expressed by many black women business owners who participated in the 2017 focus groups were determination and self-learning. They said their determination manifested itself in a willingness to overcome multiple obstacles to start and run a successful business. Self-learning was a key characteristic that allowed many to start and grow a company in an environment with limited access to formal business knowledge and training. Faith and religious belief were also important characteristics of many of these owners, who said they used both as a source of motivation and a tool to support resiliency during difficult times.

Black women who own businesses tend to be highly motivated by a passion for their industry and opportunities in the marketplace. Serving their community also was expressed as a strong motivation for starting and running a business. A catalyst for making the leap into entrepreneurship often was poor treatment and the perception of being undervalued in the workplace.

Black women business owners reported that while family and friends were their primary form of support, mentors and general social networks also provided support and valuable business insight. However, many also expressed frustrations that because family members often did not understand business, they withheld support until the business demonstrated some success. Another concern they expressed was a perceived lack of adequate support from the black community and existing small business organizations. The greatest challenges many of these owners reported were a lack of their own general business knowledge at startup, being able to access sufficient financing and resources, identifying their target market and fear.

## Improving the Entrepreneurship Ecosystem for Black Women Business Owners

Based on insights from the focus groups and using an entrepreneurship ecosystem approach, several recommendations were developed to provide communities insight into how they can support this group of entrepreneurs.[6] Some suggestions: expanded research on black women who own businesses; improved diversity, inclusion and retention in local workplaces; creation of better access and more diverse funding sources accessible to black women business owners; and the development of local, culturally relevant business education and training programs for black women.

## How the Report Is Organized

Section I uses public data sources to develop a profile and provides other insights into black women business owners and ownership. Section II shares insights into the motivations, challenges and support networks of black women owners who participated in the 2017 focus groups. Section III discusses the validity of the findings. Section IV contains recommendations on how to improve the startup rate, strength and growth of businesses owned by black women. Section V concludes.

[1] Growth rates derived from the U.S. Census Bureau's 2002 and 2012 Survey of Business Owners.

[2] Rupasingha, A., and S. Contreras. (2010). "Factors Affecting Spatial Variation of Microenterprises in the Rural U.S.," presented at Economic Development in Underserved Communities: Where Research and Practice Meet. Kansas City, MO: Federal Reserve Bank of Kansas City.

[3] Barth, J.R., G. Yago and B. Zeidman. (2008). "Stumbling Blocks to Entrepreneurship in Low- and Moderate-Income Communities," in *Entrepreneurship in Emerging Domestic Markets*, pp. 69-119. Springer, Boston, MA.

[4] Edmiston, Kelly D. (2008). "Entrepreneurship in Low- and Moderate-Income Communities," in *Entrepreneurship in Emerging Domestic Markets*, pp. 1-8. Springer, Boston, MA.

[5] Cortes, B.S., and M.R. McKinnis. (2012). "Minority-Owned Small Businesses, SBA Lending, and State-Level Economic Performance," ASBBS Proceedings, 19(1), 195-207.

[6] For a summary of the Federal Reserve Bank of Kansas City's approach to entrepreneurship ecosystem building, download the Grow Your Own EBook.

# I.   Data Driven Portrait of Black Women Business Owners

The number of businesses owned by black women increased significantly faster than other businesses from 2002-12, making them the fastest-growing group of business owners in the nation during this period.[7] These businesses tend to be smaller on average than businesses owned by both males and females of all major race, ethnic and gender groups. These businesses are heavily clustered in three of the 14 North American Industry Classification System (NAICS) industries. Despite their small average size, the contribution of businesses owned by black women to national and state economies is increasing. Black women business owners report that they face greater capital challenges and constraints, making them less likely to apply for financing.

## Profile of Black Women Business Owners

Black women who own businesses mostly were between the ages of 35 and 54, have a company that has been open less than three years, have a bachelor's or master's degree and are a first-time business owner. They were more likely to work part time in their business, use their business as a secondary source of income, and capitalize their business with family savings or with sweat equity. They also were most likely to have a business in the other services or health care and social assistance industries.[8]

## Growth Rates

Growth in the number of black women who own businesses significantly outpaced all women-owned firms from 2002-12 in total firms, firms with employees, sales growth and employee growth (Chart 1).

**Chart 1: Growth Rates Black Women to All Women Firms, 2002–12**



The number of black women who owned businesses grew from 8 percent of all women-owned firms in 2002 to 15 percent of all women-owned firms in 2012 (Chart 2). Black women are the only group of women that own more businesses than their population percentage. During this same period, black women doubled both their number of firms with employees and total number of employees.

**Chart 2: Percentage of Black Women Owned Businesses to All Women Owned Businesses by Category, 2002–12**





Dawn Rattan, EverFit

[7]The period 2002-12 is used for much of the quantitative analysis based on data release dates from the U.S. Census Bureau's Survey of Small Business Owners. An update will be completed when 2017 data is released by the U.S. Census.
[8]All business data are derived from the U.S. Census 2012 Survey of Business Owners.



# BLACK WOMEN BUSINESS OWNERS

**49%** are between the ages of **35 to 54**


**50%** use personal or family savings to start their business


**38%** have a firm three years old or less


**37%** have a Bachelor's degree or higher


**46%** have their business income as their only source of income

**64%** work less than 39 hours a week on their business


**77%** are a first time business owner

**58%** own a business in the other service or health care and social assistance industries

## Average Business Size

Sales at businesses owned by black women tend to be significantly less than sales at businesses owned by women overall. On average, annual sales at businesses owned by black women are two times smaller than the next-lowest demographic group, Hispanic women, and close to five times smaller than for all women-owned businesses (Chart 3).[9]

**Chart 3: Average Women Owned Business Sales by Race and Ethnicity, 2012**



## Ownership Shift Among Men and Women

Black women were the first among all women to achieve more than 50 percent of the total business ownership within their race or ethnic group. In 2012, black women owned 59 percent of all black-owned businesses, up from 46 percent in 2002 (Chart 4).

**Chart 4: Women Owned Firms as a Percentage of Firms Within Race or Ethnicity, 2002-2012**



## Economic Impact

Sales receipts at businesses owned by black women doubled during 2002-12, from $20 billion to $42 billion (Chart 5). In 2012, businesses owned by black women accounted for 6 percent of all U.S. businesses, but produced only 0.1 percent of the sales receipts. This increases to 0.4 percent of the national sales receipts for all nonpublic companies and 3 percent of all women-owned business receipts.

**Chart 5: Black Women Business Sales Receipts, 2002-2012**



The number of employees at businesses owned by black women nearly doubled from 2002 to 2012, growing from 176,000 to 317,000 (Chart 6).

**Chart 6: Black Women Business Employees, 2002-2012**



---

[9]There may be a variety of explanations for the difference in business sales. These could include the number of new businesses started (which tend to have lower sales), the type of industries these businesses are in, and other factors of growth including access to financial, social and human capital.

## Industry Clusters

Businesses owned by black women are heavily concentrated in three industry clusters: other services; health care and social assistance; and administrative and support and waste management and remediation services. Combined, these three industries represent 68 percent of businesses owned by black women (Chart 7). In contrast, 46 percent of businesses owned by women overall were clustered in these industries. Although businesses owned by black women are overrepresented in those three industry clusters, they are underrepresented by 5 percent and 7 percent, respectively, in retail trade and professional, scientific and technical services relative to all women who own businesses. These two industries represent the fourth- and fifth-largest industries in which black women own businesses.



Lisa Kirk, Lisa Sunshine

**Chart 7: Firm Distribution by Industry Black Women and All Women, 2012**

Legend: ■ All Women  ■ Black Women

| Industry | |
|---|---|
| Other services | |
| Health care and social assistance | |
| Administrative and support, waste management and remediation services | |
| Professional, scientific and technical services | |
| Retail trade | |
| Arts, entertainment and recreation | |
| Accommodation and food services | |
| Educational services | |
| Real estate and rental and leasing | |
| Transportation and warehousing | |
| Finance and insurance | |
| Information | |
| Wholesale trade | |
| Manufacturing | |
| Construction | |
| Industries not classified | |
| Management of companies and enterprises | |
| Utilities | |
| Mining, quarrying and oil and gas extraction | |
| Agriculture, forestry, fishing and hunting | |

0%  5%  10%  15%  20%  25%  30%  35%

## State Rankings

It can be a challenge to determine which states have the best environments for supporting business startups and growth. Many publications use different methodologies and often show varied outcomes. This report, instead, will use three indicators of business ownership by black women to show which states lead the nation in various business categories. The indicators are business density, total business growth rate and the growth rate of businesses with employees.[10]

Business density, calculated as the number of businesses per 1,000 members of a population, is an important measurement that research shows contributes to state economic growth. In a 2004 Small Business Administration (SBA) research report, Ying Lowrey demonstrated that business density contributed positively to economic well-being and gross domestic product (GDP) growth at the state level (Chart 8).[11]

### Chart 8: Top Five States for Business Density of Black Women Owned Firms, 2012



From 2002 to 2012, when excluding states with small black populations, businesses owned by black women grew the fastest in Nevada with a rate of 372 percent (Chart 9).

### Chart 9: Top Five States for Total Growth Rate of Black Women Owned Firms, 2002-12



Missouri had the fastest-growing number of black-women-owned employer businesses at 112 percent (Chart 10).[12] The growth rate of employer-owned businesses may be a more suitable measure of the strength of the business environment based on what is needed to grow or maintain companies with employees. If a state is producing faster growth in employer-owned businesses, which require more inputs and managerial skill, then it could be said it has a stronger entrepreneurship ecosystem.

### Chart 10: Top Five States for Growth Rate of Black Women Owned Employer Firms, 2002-12



As previously mentioned, there is little research on businesses owned by black women. One recommendation for future research is to analyze the various factors that drive state-level performance and growth of these businesses.



Shanell Reffell, Nella Yoga

[10] See Appendix A for a full ranking.
[11] Lowrey, Y. (2004). "Business Density, Entrepreneurship and Economic Well-Being."
[12] States with a population of less than 5 percent African-American were not included in the rankings due to small changes creating large shifts in percentage growth.

## Black Women Owners and Business Credit

Businesses owned by black women that have employees were more likely to have financial challenges due to credit access and operational needs. In addition, they were less likely to apply for business funds because they were discouraged borrowers, and less likely to receive the funding requested. Alicia Robb, in a report commissioned by the SBA in 2013, said " … undercapitalized businesses had lower sales, profits, and employment, and were more likely to fail … ."[13] This makes the lack of access to credit a challenge to the performance of businesses owned by black women.

In 2017, the Federal Reserve System compiled from its 2016 Small Business Credit Survey findings that are specific to businesses with employees owned by black women. The following charts share some of the key findings from the 2016 survey (Chart 11).

### Chart 11: Greatest Business Financial Challenges, 2016



Black women owners were more likely to express having financial challenges. The greatest challenges were in funds for expansion and operating expenses.

In response to these challenges, black women owners were more likely to make a late payment, use personal funds, negotiate payments with their lender or let their debt go into collection (Chart 12).

### Chart 12: Response to Business Financial Challenges, 2016



Black women owners were much more likely to rely on personal funds to finance business needs compared to their nonminority women peers (Chart 13).

### Chart 13: Sources of Business Financing, 2016



Black women owners were much more likely to report not applying for credit because they were discouraged about credit opportunities (Chart 14). They also were significantly less likely to report they did not apply because they had sufficient financing.

### Chart 14: Reasons for Not Applying for Business Credit, 2016





Dewanna O'Guinn, Lee Andrew Hall & Gardens

[13] Robb, A., Marin Consulting LLC. (2013). "Access to Capital Among Young Firms, Minority-Owned Firms, Women-Owned Firms, and High-Tech Firms." Office of Advocacy, U.S. Small Business Administration, Washington, D.C.

Their discouragement may be a result of experiences when they have requested financing. Black women owners were much more likely to report they received none of the financing they requested (Chart 15).

### Chart 15: Amount of Business Financing Received Based on Amount Requested, 2016



■ Nonminority Women Owners   ■ Black Women Owners

None: 23% / 40%
Some: 32% / 37%
All: 45% / 22%

Black women owners were more likely to apply for financing at credit unions, online lenders and community development financial institutions (CDFI) than nonminority women owners (Chart 16).

### Chart 16: Business Loan Application Location, 2016



■ Nonminority Women Owners   ■ Black Women Owners

Large bank: 50% / 48%
Small bank: 45% / 40%
Credit union: 10% / 14%
Online lender: 19% / 24%
CDFI: 7% / 13%
Other source: 18% / 20%

"According to NWBC research, as one of the fastest-growing segments of entrepreneurs, black women business ownership has seen a sharp rise–nearly 67 percent since 2007, adding over 71,000 jobs to the economy. However, there are persistent challenges in terms of receipts, investment, representation and growth. It is important to cultivate sustainable solutions to create and improve on funding opportunities, networks and entrepreneurial supports for black women business owners so they can reach their full economic potential."

**Shannon Trudge,
National Women's Business Council**

## Summary

Businesses owned by black women have experienced unprecedented growth over the past two decades. This growth has established them as the only racial or ethnic group in which women own more than 50 percent of all businesses within the group. This expansion has led this group to be overrepresented by race and gender when compared to their population percentage in the United States. Businesses owned by black women tend to be newer, smaller and more clustered in fewer industries than their male and female business-owner peers. Black women tend to start businesses with no capital, or use personal or family savings. Employer firms owned by black women tend to have worse outcomes in the credit market than women overall. Their greatest financial challenges have been access to credit for growth and operations. They also were more likely to be discouraged borrowers, and, therefore, not apply for financing. When they did apply, they were less likely to receive funding or received less than they requested.



Adrienne Haynes, SEED Law

# II. Insights into Black Women Who Own Businesses

In late 2017, the Federal Reserve Bank of Kansas City held five focus groups with 34 black women who own businesses in Kansas City, Oklahoma City, Wichita, Omaha and Denver.[14] During these groups, four questions were asked to determine motivations, challenges and other characteristics of black women business owners.

Why did you start?
What were your challenges?
What support did you receive?
What do you wish was available to you when you started your business?

A summary of the major themes from the answers make up the basis for this section of the report. The subsections will consist of key entrepreneurship characteristics, startup motivations, business challenges, support systems, recommendations by black women business owners, the impact of race and gender and the role of faith and belief. The following table shows the major themes shared in each question.

| Startup Motivation | Startup Challenges | Startup Support | Startup Recommendations |
|---|---|---|---|
| Negative Workplace Treatment | Lack of General Business Knowledge | Positive Support | General and Specific Business Knowledge Information and Training |
| Not Feeling Valued at Work | Lack of Financing and Resources | Family and Friends | Increased Mentoring |
| General Workplace Dissatisfaction | Understanding how to Effectively Identify and Market to Key Markets | Mentors and Key Individuals | More Peer to Peer Engagement |
| Passion for Industry | Fear and Confidence | Social Network | Better Financing Opportunities |
| Business Opportunity | | Negative Support | |
| Schedule Flexibility and Freedom | | Family | |
| Service to Community and Others | | Absence of Mentoring | |
| | | Community | |

---

[14]Full participant profile and methodology is in Appendix B.

## Entrepreneurship Characteristics

The two dominant entrepreneurial characteristics that emerged from the focus groups about black women who own businesses were self-learning and determination. Many of the women said that starting and running a successful business required them to constantly learn business skills from a wide variety of sources. Some of this learning consisted of formal classes in the community; for others, it was experiential learning. Determination, or the ability to persist and continue to strive despite obstacles, also was a common theme shared by participants.

### Self-Learning

"And so I knew my craft, but I didn't know necessarily how to run a business. So, everything I just kind of learned as I went and it's working for me now."

" … We just started going to One Million Cups. We started getting more involved and I got a consulting gig that introduced us to Kauffman and FastTrac and so I went through the program."

### Determination

"You must keep going for it, otherwise, you'll always deal with that fear stage and that will keep you stuck. That will hinder you."

"Hard work and sweat, tears, blood."

"But then when you have people who are supposed to support you and they are not really supporting you, it kind of plays on you. But you've got to encourage yourself and tell yourself, 'I can do this. It's already in me, and this is what I know I can do.' "

## Startup Motivations

The purpose of the "Why did you start" question was to determine the primary motivations for business ownership by black women. There are a variety of entrepreneurship motivation theories in the research. One common theory is the push/pull theory of entrepreneurship.[15] Push motivation occurs when an entrepreneur chooses to start a business in an attempt to escape an adverse situation. This could mean starting a business because the household does not have enough income. Pull motivation occurs when an entrepreneur sees an opportunity to take advantage of. This opportunity could be the desire to start a business in a field they are passionate about or they are presented with a business opportunity.



Angela McCain, I Am Definition

As might be expected, startup motivation often is a combination of push and pull factors. For example, if an individual sees there is financial opportunity in starting a business, but that it would require them to leave a job they enjoy, they may not pursue the opportunity. Conversely, if they did not enjoy the job as much, the pull opportunity may be sufficient for them to take the entrepreneurship risk. The following shares the dominant push and pull motivations shared by women in the focus groups.

[15]Schjoedt, L., and K.G. Shaver. (2007). "Deciding on an Entrepreneurial Career: A Test of the Pull and Push Hypotheses Using the Panel Study of Entrepreneurial Dynamics Data," *Entrepreneurship Theory and Practice*, 31(5), 733-752.

## Push Themes

The dominant push motivations for women in the focus groups were workplace challenges. These challenges were broken into four subthemes of treatment, value, uncertainty and general dissatisfaction. Of 25 push comments identified, 22 were related to a workplace challenge. The following sections cover the three largest push themes of workplace treatment, perception of value and general dissatisfaction.

### Workplace Treatment

A number of women identified negative workplace treatment as a primary motivation for starting their own business. For some women, it was conflict with management; for some, it was lack of flexibility during a major life crisis; and for others it was the perception of unfair treatment.

> "I had a very terrible boss who did not appreciate the 100 percent that I was giving the organization, and I just prayed and said, 'Lord, just please,' and He's given provision … ."

> " … I used to work for a large corporation, and then my son got sick … . Companies could choose year to date from last occurrence (of family medical leave), or they could choose the calendar year. The year prior I was diagnosed with cancer, so I had taken off six weeks. My son got cancer the following year, and so it was all within a 12-month period, but two different years, and the company chose to do the 12 weeks (year to date) that way. Because of this I was out of leave time and he was diagnosed with cancer. When my son died, I was thinking, 'Gosh, who wants to work for a company that would make you choose between coming to work and being with your dying child?' "

### Perception of Workplace Value

The perception of being undervalued in the workplace was a dominant push theme. This issue showed in the form of high performance versus low reward, access to less opportunity and a lack of commitment by the employer.

> "I worked in corporate America for most of my life it feels like, and I finally found my dream job. I was excelling; I was getting to do everything that I wanted to do, and then the company sold.

> When they sold, I just assumed that I would make it through because of who I am, and every boss I've ever been under has always excelled, and they all got promotions based off a lot of times what I suggested to them. And no, I didn't make it through and I got laid off. It killed me because I was in leadership development and organizational development so I played a lot of roles in the company. The biggest part was my team and I had to sit around a table like this and watch my team cry—men, women—because they believed so much in what we had set up, and it broke me. I said I'll never do it again. But I never put someone else's dream and legacy above my own."

### General Workplace Dissatisfaction

Many women expressed a general dissatisfaction with the workplace that manifested itself as workplace fatigue.

> "I worked in corporate America for 19 years in management, and I got into corporate America out of necessity to take care of my family. I had a greater opportunity than my significant other at the time and it took me away from them. So it was an offset. I committed to it, worked a lot of hours, traveled a lot, and I burned myself out. That's what led me to start my own business."

> "I went back to work so I could get health insurance and those kinds of things. It was fun for a while because I looked at it as a job with a purpose. For many years I looked at it that way until it started becoming more of a burden than blessing. I decided I couldn't play that game anymore. So I decided to restart my business."

Workplace challenges served as a significant push factor and often were identified as a catalyst for black women when they launched their business.

## Pull Themes

As previously mentioned, pull motivations are opportunity-based motivations that pull an individual into starting a business. While impossible to weight as a motivating factor relative to push themes, participants' comments about pull motivations were nearly double the comments about push

motivations. The four main pull motivations identified were passion, opportunity, service and flexibility.

### Passion

Passion for the particular industry or business type was the pull motivation most often expressed by focus group participants.

"I would do someone's wedding or someone's company party, mostly because I have a love and passion for the industry. It's what I went to school for. I only wanted to do it the right way. I just said, 'Well, I'm going to start my own business.' "

"I've always had my own style and had that passion for fashion and wanted to be different and stand out from others. So I just kind of followed that and I did it and did pretty good."

### Opportunity

The participants identified taking advantage of an opportunity as the second-largest pull motivation. Women identified opportunity in two primary ways: the owner identified a market-based opportunity to expand their business, or a business opportunity was presented to them by another source.

"Every organization that I was working with always raised more money. I thought, 'Hmm, I'm on to something here.' Then when I found I could actually make money at it, and make a lot, then I thought I'm really on to something."

"Then maybe two years later, the second (salon) owner, got an opportunity to move back to Texas. So she offered the salon to me … . I felt right there that was a blessing for me and I had to keep telling myself, 'Do not walk away from this blessing.' "

### Other Pull Themes

Two other themes that stood out as pull motivation factors were flexibility and service. Multiple women said the ability to have flexibility and freedom were important. In some cases, this was expressed as a desire to be available for family; others said it was a desire not to be bound by workplace hierarchy or to be their own boss. In regard to service, a number of women said the motivating factor for operating their business was a desire to help people through their business.

"I started because I wanted flexibility in my schedule and lifestyle. It was very important for me to be able to contribute to be a single mom; being able to support my kids, and being able to still go to their games and still do some other activities to be a mom."

"I started my business because I worked (with disadvantaged children) for 10 years. They didn't know how to survive on their own. So I started a leadership academy because they didn't have basic interpersonal leadership skills. They didn't know how to fill out an application; they didn't know how to use an ATM."

### The Complexity of Motivation

Women in the focus groups mentioned pull motivation more than push motivation. However, motivation is complex, and either push or pull motivations may serve as a greater motivator depending on the entrepreneur and how significant the push or pull motivation is. The dominance of the push motivation factors related to black women's experience in the workplace suggest what may be at play is the disadvantaged theory of entrepreneurship. Disadvantaged theory of entrepreneurship suggests that labor market discrimination affects the rate of entrepreneurship among minority women.[16] While only one participant suggested her negative workplace experience was because of race or gender, this also may be a factor. What can be confidently suggested is that many of the participants were motivated by positive pull factors. It is worth noting that only one participant identified money as a motivator. Like identifying race and gender as a factor in their negative workplace experiences, the fact

[16]Smith-Hunter, A.E., and R.L. Boyd. (2004). "Applying Theories of Entrepreneurship to a Comparative Analysis of White and Minority Women Business Owners," *Women in Management Review*, 19(1), 18-28.

that a desire to make money is not a major motivation theme could be because it is implied that one starts business at least in part to generate revenue.[17]



Shanita Bryant, Magnolia's On The Move

## Business Challenges

The "What were your challenges when starting" question was asked to gather insight into the various obstacles black women faced when starting their businesses. The top two challenges were business knowledge and finance, with marketing challenges being a close third.

### General Business Knowledge

Participants seeking to start their own business stated that having a general knowledge of how to organize and operate a business was their biggest challenge. For some women, it was lack of knowledge about business basics. For others, it was general knowledge about the industry in which they wanted to start their business. This is consistent with research on the lack of business knowledge among black entrepreneurs at startup.[18]

"It's not knowing enough. My family has always had jobs. I've got people in my family who make six figures, but they don't know how to run a company. They don't know how to work for themselves.

I've always been a good leader, but I didn't necessarily know how to work for myself. I own a retail store, and I've never worked in retail."

"Mine was understanding the requirements when you contract with the federal government. I went to contract (with a government procurer) and he says, 'Can you bond?' 'Yeah, I have a bond.' I was excited. But it wasn't the bond that I needed."

### Finance

Financing also was seen as a major business challenge. This challenge was expressed in three themes: general lack of financing, lack of venture capital for businesses more oriented toward high growth and lack of financial management knowledge.

"I'm doing it out of my own pocket, funding it myself off of my labor. Sometimes it's hard when you do it like that because you don't have everything in place to be successful. It makes it hard to succeed sometimes. That was my biggest obstacle in real estate, just having the money to make the money."

"Being financially literate. I used to go to work and make money and do whatever with the money. In business however, you've got to move your money way different. I always knew how to make money; I didn't always know what to do with it and how to apply it the right way."

"I've done all these things to get to this point, but the real hurdle is going to be between now and June of next year when my seed round closes. If I can't raise that money, who can? I mean, I'm to that point where I have done everything I've needed to do. I did research. I put together a business plan. I have my projections and pro forma. I'm operating. I have revenue on the books. I have hired employees. But I won't be able to physically pay for the space that I've signed a lease for without raising some additional capital."

[17]In this focus group, specific questions about race and gender and startup motivation were not asked. Future research with questions specific to how race and gender affect both startup motivation and other factors of entrepreneurship would add additional insight into ownership of businesses by black women.
[18]Fairlie, R.W., and A.M. Robb. (2010). *Race and Entrepreneurial Success*. MIT Press.

## Marketing

Identifying and marketing to their target market was a challenge for many participants. Many women indicated that they initially had a product, but struggled to find a market that would be willing to purchase that product. Others discussed the challenges of finding the right marketing mix or strategy to expand their business.

> "How do you get the client? I had to understand that. I had to actually put down what that client looked like, how do they dress, where they shopped, where they did all those things and market to that."



Catina Taylor, Dream KC

> "Just learning different ideas, different tricks, different marketing strategies is a challenge right now because there's so many things you can do. What can we do? Can we do more commercials? Can we get on the radio? What are some more ideas that we can do to get ourselves out there, especially as black women."

## Fear

Many women said fear was an obstacle during the startup phase of their business and that it emerged in different areas. For some, it was a fear that they were not capable; for others, it was fear of taking the risk associated with being a business owner.

> "I think we all battle our inner selves already. We ask ourselves, 'Are we good enough to do this?' The fear plays in us. But you've got to encourage yourself and say, 'I can do this; it's already in me, and this is what I know I can do.' "

> "I have thought about it often and my fear is I'm a single mother and I don't have a family here, and I don't have any other support. If I have to go full time, I have to pay my rent. That's where I'm struggling with, but I want to do this and I want to be successful but I'm still tied up with this other fear."

## Support Systems

Black women were asked to share what support they received when they launched their businesses. Many of the responses, however, were about the *lack* of support they received. Responses were split nearly evenly between what support they received and the lack of support they received. Therefore, this subsection will identify participants' responses to both.

### Support Received

Many of the black women who own businesses said family and friends were their primary sources of support. This often was their significant other or parent. Second to family and friends was a mentor or key individual. This could be a formal or informal mentor, or

a technical expert that provided support and advice in a key business area. In addition, many women said their social network, such as a church or their general network of business relationships, provided support.

## Family and Friends

Participants cited family and friends as the most significant source of support. This support most often was in reference to encouragement, but in other instances it was financial support or business insight.

"My biggest support came, fortunately, from my mother. I had the dream; my mama had the money. So she took her retirement money and she invested it in me. That's where the B&B comes from. She was the Queen B and I'm the Baby B. Now I'm the Queen B and my daughter is the Baby B. So my first level of support was my mama. To this day, if I breathe it, my mom believes it."

"I'm thankful that I've had a lot of support, my husband being number one behind the scenes, a very quiet supporter. You rarely see him out with me at events or anything, but I'm very thankful for him."

"I have people in my corner that are pushing me. One of my girlfriends texted me the other day, 'Have you started on such and such yet?' Because I know those are the things that I need to do."

## Mentors and Key Individuals

"I had a great banker who helped me understand the structure for getting the paperwork filed correctly. I had a few struggles with that, just understanding what is the best structure."

"For me, it was a contracting officer that actually taught me how to maneuver. I could call him off the record, and we had several conversations, and he said, 'I wouldn't do it this way, I would look at it this way.' "

"But periodically, me and (my mentor), we will talk sometimes in the parking lot or we would meet

sometimes at Starbucks and we would talk. She would say, 'You can do this, you can get this done.' I say, 'I know I can.' "

## Social Network

"But I have five dynamic wonderful women in Texas. We call ourselves 'The Girls.' Anytime we need a sounding board, a cry fest, a laugh fest, a wine fest, or whatever we need to get off our chest and get back on track we talk. I believe truly in having that structure of women."

"Our church family invested into us a lot."

## Support Challenges

While many women said they had some support when they started their business, there was a consensus that black women who start a business do not have a strong enough support system. Family and friends were seen as the primary form of support by many women, while others saw them as obstacles. In addition, while mentoring was seen as a support for some women, the absence of mentors within the support system also was an issue. One race-specific issue that emerged in the discussion about support was community-centered challenges. Many women said the black community did not provide adequate support for their business.

## Family and Friends

"I found that the journey to entrepreneurship can be lonely sometimes even with the people who are closest to you. I've had so many people say, 'You know, when are you going to apply for a real job,' or things like that. It's hard to get people to jump on board with you."

"I was a junior in high school and I went home and told my mom, 'One day I'm going to own my own business.' My mother told me, 'Just finish high school and go to college and get a good job.' "

## Absence of Mentoring

"Just having a good source of information that I felt like I could trust. I had my dad who was positive, but no one in my family had owned a business. I didn't have that relationship with somebody

where I could say, 'Uncle started a business', and have that inside knowledge. I think that's what was missing, someone with information that I know truly was looking out for me."



Angela McCain, I Am Definition

"I really didn't have any support and I didn't know where to go. A mentor would have been amazing."

### Community

"And if you come to our shops and shop, and you go to her restaurant to eat, we need that support amongst ourselves especially when we're women and trying to grow our businesses. We don't have that."

"But as far as the community is concerned or with clients or other people, women, black women or anybody who's in business, I've never had them support me."

## Recommendations from Black Women Who Own Businesses

The final question in the focus group was, "What do you wish was available to you when you started your business?" The design of this question was twofold: first, to gather any additional insight into the participant's startup experience, and second, to gather recommendations on what black women owners said was needed in their community to help other black women start and grow businesses. Participants said they wished for or would recommend four things be available for black women startups: access to general and specific business knowledge, mentoring, peer engagement and financial resources.

### General and Specific Business Knowledge

"I think that if there was more information around not just how to write a business plan but rather a step-by-step process. What you need to do before you even apply for your business license? Do you have your financing in place? Do you have your investors? Just some step by step, technical assistance before you even think about your business plan … would be helpful."

### Mentoring

"Not having a mentor, not having someone, that would step-by-step hand-hold me in that early process was a struggle."

### Peer Engagement

"I would like more examples of women-owned businesses and minority-owned businesses that are readily accessible to talk to. To sit here among you all, this is the best thing I've done all week. I know that you all understand and have walked in my shoes. I needed more of this."

*Finances*

"The other thing of course is just finances and re-sources. Being able to figure out how your finances look and scale down your life so that way you can invest everything into your business, because truly you believe in yourself."

## The Impact of Race and Gender

Participants were not asked specifically about race or gender, however, significant comments about race and gender emerged throughout the conversations. Most comments were related to the combination of race and gender, meaning most participants discussed their experience of being black and a woman, not one or the other. The second-most comments on race were about community and the challenges they saw operating within the black community.

*Race and Gender*

"They're used to Caucasians or other cultures running businesses. It was just foreign to people. When they see us coming. They're like, 'Oh, you're the owner?' "

"I'm having a problem now. My audience probably thinks that my product is just for blacks, but it's not. It's just a mixture of a lot of things."

" … and (nonblack potential clients) see two African-American ladies walk up, and they think, 'Oh it's a black business' … . They think we just take pictures of black women. So we had to make a choice to just go with it and get the low-hanging fruit (black clients). If other people don't want to patronize us then that's what it's going to be until they figure out that the camera works on other people too."

*Race and Community*

### Lack of Information Sharing and Competition

"I think that we're conditioned to compete versus working together. People literally have come into my store on more than one occasion like, 'How's the store across the hall, how's the competition?' I'm like, 'We're not competition. That's my friend.' … You know, Walgreens and Costcos are right across the street. This bank is next to this bank. There is enough room for all of us to succeed, but I don't think that we're conditioned to think that. I see a lot of challenges with that."

### Support

" … but when I tried to go out into my community of people who look like me, they wanted me for free. They did not want to support me. I could not get anything to turn around so I started branching out. It wasn't until I started branching out and getting business elsewhere that they decided to say, 'Hmm, maybe we should give you a try.'  Why did it take that? Why didn't you support me in the very beginning?"

## The Role of Faith and Belief

Like race and gender, the subject of religious faith and belief was interwoven throughout the focus group conversations. This is consistent with a 2009 Pew Research report, which found that:

African-American women also stand out for their high level of religious commitment. More than eight of 10 black women (84 percent) say religion is very important to them, and roughly six of 10 (59 percent) say they attend religious services at least once a week. No group of men or women from any other racial or ethnic background exhibits comparably high levels of religious observance.[19]

Many of the participants said they used faith as a motivation to start, as a source of resilience, as a framework for interpreting life and business experiences. In addition, many used their faith institution as part of their business support network.

"Then when God continued to take me out of corporate, I kind of figured He has a plan for you and I have to go to that calling."

[19]Pew Research Center. (2009). "A Religious Portrait of African-Americans." Retrieved 2018, from Pew Research Center: http://www.pewforum.org/2009/01/30/a-religious-portrait-of-african-americans.

"Everything just kind of hit me at once and I found myself at a place where I didn't really know who I was. I just prayed and thought I needed a purpose and I needed to find out who am I."

"Church was my support. I was pregnant with my last son. When I left my other church I heard about empowering the kingdom with your gift. My gift is just working with people."

"But besides my mom, I had the community. The community has been extremely good to me. I was actually in a white church when I started my business and that church poured so much into me. It was incredible. They literally paid me to do ministry. In our churches, you know, it's volunteer. This particular church, my gift of course is cooking and serving, so I got paid."

## Summary

Black women are motivated by both push and pull factors prior to starting their businesses. Negative experiences in the workplace and a passion for the industry in which they start their businesses are two of the largest motivators. Two of the biggest challenges black women said they faced were a lack of general business information and a lack of mentoring when they started their business. The primary support most black women said they received at startup came from family and friends, but many also said there was a lack of support as they were starting their business. Many also shared that they were treated or perceived negatively as a business owner because of race and gender. Black women said belief and faith are important to their business experience, adding that faith serves as a motivator and also helps with resiliency in challenging times.

"Research has shown that when women gain more wealth, it raises up the entire family. The median income for households headed by women with a microbusiness owner or employee is significantly higher than similar households that do not have the microbusiness involvement. In addition, the children of families with self-employed parents perform better academically, attending college in higher percentages. That means we need to do more to support black women business owners, immediately, because when we support them we support black families, the communities they live in, and the regional economy and national economy overall."

**Connie Evans, President and CEO,
Association for Enterprise Opportunity**

# III. Validity of the Findings

One main criticism of qualitative inquiry, like focus groups, is the inability to both generalize the findings and determine their validity. One way to address these concerns is through triangulation, which compares findings from multiple research reports to determine similarities. There are two qualitative research reports that can be used to triangulate the findings from the Federal Reserve Bank of Kansas City focus groups. The first is a 2016 report by Walker's Legacy, under the commission of the National Women's Business Council and the U.S. Small Business Administration's Office of Advocacy.[20] The second is the 2011 Ph.D. dissertation submitted by Cassandra Bailey at Pepperdine University's Graduate School of Education and Psychology, titled "African American Female Entrepreneurs: What Motivates them to Pursue Entrepreneurism."[21]

The Walker's Legacy report is based on three meetings in Washington D.C., New York and Houston. At each meeting, 40 to 50 black women who own businesses were asked a variety of questions about startup motivations and challenges. Bailey conducted open-ended interviews with six black women business owners to assess entrepreneurship motivation. The following chart compares major findings each research report shared.[22] The shaded boxes indicate shared findings.

**Startup Motivation**

| | Federal Reserve Bank of Kansas City | Walker's Legacy | Bailey Dissertation |
|---|---|---|---|
| Passion | ▩ | | ▩ |
| Opportunity | ▩ | | ▩ |
| Flexibility and Freedom | ▩ | ▩ | ▩ |
| Service to Community | ▩ | ▩ | ▩ |
| Workplace Challenges | ▩ | ▩ | |

**Startup Challenges**

| | Federal Reserve Bank of Kansas City | Walker's Legacy | Bailey Dissertation |
|---|---|---|---|
| General Business Knowledge | ▩ | | |
| Financing | ▩ | | |
| Marketing | ▩ | | |
| Challenges Accessing Information | ▩ | | |
| Fear | ▩ | | |
| Race and Gender | ▩ | ▩ | ▩ |

**Support Environment**

| | Federal Reserve Bank of Kansas City | Walker's Legacy | Bailey Dissertation |
|---|---|---|---|
| Family and Friend Support | ▩ | | ▩ |
| Mentors and Key Individuals | ▩ | | |
| Social Network Support | ▩ | ▩ | |
| Absence of Mentoring | ▩ | | |
| Family and Friends Discouragement | ▩ | | |
| Lack of Community Support | ▩ | | |

Several findings were shared across the three research reports. All five motivations findings by the Federal Reserve Bank of Kansas City were shared by at least one other research report. Five of the six business challenge findings were shared by at least one other research report, the exception being the marketing challenge. All of the positive findings on support overlapped with at least one other research report.

None of the research reports asked a formal question about the absence of support. However, absence of mentoring was a shared finding of the Federal Reserve Bank of Kansas City and one other research report. These overlaps allow us to make a general statement about the findings' validity. They also suggest that the findings may apply to a broad cross section of black women who own businesses.

[20]Walker's Legacy. (2016). "Black Women Entrepreneurs: Past and Present Conditions of Black Women's Business Ownership." Walker's Legacy.
[21]Bailey, C.L. (2011). "African American Female Entrepreneurs: What Motivates Them to Pursue Entrepreneurism." Pepperdine University.
[22]The questions asked owners in each report are in **Appendix C.**

"The data is clear: investing in the growth and development of African-American female entrepreneurs pays off. Enhancing the potential within this demographic will help cultivate a more successful local ecosystem for all."

**Christina Long, Create Campaign**

# IV. Recommendations

Based on focus group insights, several recommendations were developed using an entrepreneurship ecosystem approach.[23] Entrepreneurship ecosystem building examines how key institutions, systems and resources are connected and can be improved to better support local entrepreneurs as they start and grow. The following are recommendations designed to help build local ecosystems that support black women businesses and improve local economic development by increasing these businesses' productivity and growth.

| | Recommendations for Public and Private Institutions |
|---|---|
| College and academia | Expand research on black women who own businesses and share with key local and national stakeholders |
| | Form clubs and organizations that support black women in business and entrepreneurship |
| Employers | Improve diversity, inclusion and retention in local workplaces |
| | Improve women and minority supplier diversity to support supply chain and operations needs with a specific focus on minority women |
| Economic development | Create and support more inclusivity in entrepreneurial networks, specifically those that support high-growth minority women-owned firms |
| Education K-12 | Increase entrepreneurship education and financial literacy in urban schools with predominantly black populations |
| Financial institutions | Focus bank Community Reinvestment Act activities and programming to support a variety of small business needs, including access to capital, in urban areas with dense black populations |
| | Improve diversity and inclusion among both frontline workers and leadership in financial institutions, microfinance organizations and angel and venture capital groups as well as improved diversity among funding recipients |
| Small business support providers | Create better connectivity and referral sharing, as well as stronger marketing in diverse communities by small business support providers |
| | Locate more small business training organizations and activities in predominantly black communities |
| Workforce development | Expand the ability of workforce institutions to train and support entrepreneurship in urban core communities |

[23]For a summary of the Federal Reserve Bank of Kansas City's approach to entrepreneurship ecosystem building, download the Grow Your Own EBook.

| | Recommendations for Communities and Programs |
|---|---|
| Accessibility | Create more culturally relevant and tailored business education and training programs for black women |
| Culture | Create social marketing campaigns that celebrate black women who own businesses and expose them to the community at large |
| | Work with black churches and community organizations to do more entrepreneurship education and support activities |
| Financial capital | Develop more capital sources with diverse leadership in the form of microlending, peer-to-peer lending, traditional lending and angel and venture capital |
| Human capital | Create strong business mentoring programs that comprise both black women business owner mentors and diverse business mentors |
| | Develop more business mentoring programs, but with black women business owner mentors as well as diverse mentors for black women |
| Infrastructure | Develop more low-cost small retail and office space, as well as co-work space in pre-dominately black communities |
| Political capital | Encourage more black women who own businesses to serve in leadership positions, both politically, on nonprofit boards and in neighborhood associations |
| Social capital | Create strong peer-to-peer networking and learning activities for black women who own businesses |
| | Encourage black women who own businesses to participate in general business networking events outside their community |

# VI. Conclusion

Businesses owned by black women in the United States have been growing significantly since 2002, more than doubling in total numbers, sales and employees. There has been, however, little research on this growth. While these businesses are some of the smallest on average, their economic impact is growing, particularly within their communities. This makes understanding the motivations, challenges and support systems important to economic and community developers and policymakers.

Black women are the only racial or ethnic group with more business ownership than their male peers.  These businesses are heavily clustered in fewer industries relative to businesses owned by other major demographic groups. Black women who start businesses tend to be between the ages of 35 and 54 and are more likely to be college educated than black women who don't own a business. They also are more likely to report having had challenges in accessing credit when compared to non-minority women owned businesses.

Black women who own businesses are determined self-learners, who mostly are motivated to start their business because of passion and to escape challenges in the workplace. They are challenged at startup by a lack of business knowledge and mentoring. Their support system is limited and they most often gain support from family and friends. Many black women who own businesses say they have been treated negatively because of their race and gender.

Finally, the Federal Reserve Bank of Kansas City recommends taking an entrepreneurship ecosystem building approach to support black women who own businesses. This approach looks at reforming, expanding, or developing organizations, institutions and programs that take a culturally sensitive and inclusive approach to supporting the needs of black women within a community context.

For more information on entrepreneurship-led economic development and entrepreneurship ecosystem building visit: www.kansascityfed.org/community/smallbusiness

# Appendix A
# Full State Business Rankings

## Business Density Rankings by State of Businesses Owned by Black Women, 2012

| Rank | State | Density | Rank | State | Density |
|------|-------|---------|------|-------|---------|
|  | United States | 75 | 26 | Alaska | 62 |
| 1 | Michigan | 101 | 27 | Hawaii | 62 |
| 2 | Georgia | 97 | 28 | Washington | 61 |
| 3 | Illinois | 96 | 29 | Oklahoma | 59 |
| 4 | Florida | 95 | 30 | North Carolina | 59 |
| 5 | California | 90 | 31 | Colorado | 59 |
| 6 | Nevada | 85 | 32 | Rhode Island | 57 |
| 7 | Oregon | 82 | 33 | Vermont | 56 |
| 8 | Texas | 82 | 34 | New Jersey | 55 |
| 9 | Tennessee | 82 | 35 | Connecticut | 53 |
| 10 | Maryland | 77 | 36 | Utah | 53 |
| 11 | New York | 76 | 37 | South Carolina | 52 |
| 12 | Louisiana | 75 | 38 | Arkansas | 52 |
| 13 | Indiana | 74 | 39 | Virginia | 51 |
| 14 | District of Columbia | 74 | 40 | Idaho | 51 |
| 15 | Wisconsin | 73 | 41 | Maine | 50 |
| 16 | Nebraska | 71 | 42 | Kansas | 49 |
| 17 | Ohio | 70 | 43 | New Mexico | 47 |
| 18 | Iowa | 69 | 44 | Delaware | 46 |
| 19 | Alabama | 67 | 45 | Pennsylvania | 45 |
| 20 | Mississippi | 67 | 46 | Montana | 44 |
| 21 | Wyoming | 66 | 47 | Kentucky | 43 |
| 22 | Minnesota | 66 | 48 | Massachusetts | 43 |
| 23 | North Dakota | 65 | 49 | West Virginia | 43 |
| 24 | Missouri | 63 | 50 | South Dakota | 41 |
| 25 | Arizona | 63 | 51 | New Hampshire | 38 |

## Growth in Black Women Owned Businesses with Employees, 2002-12
States highlighted in blue have a black population of less than 5 percent

| Rank | State | Growth Rate | Rank | State | Growth Rate |
|------|-------|-------------|------|-------|-------------|
|  | National | 179% | 36 | Colorado | 105% |
| 1 | Nevada | 372% | 37 | Massachusetts | 105% |
| 2 | Utah | 354% | 38 | New York | 100% |
| 3 | Iowa | 324% | 39 | California | 94% |
| 4 | Tennessee | 316% | 40 | Kansas | 85% |
| 5 | Wisconsin | 312% | 41 | Wyoming | 70% |
| 6 | Mississippi | 293% | 42 | Hawaii | 66% |
| 7 | Georgia | 272% | 43 | Alaska | 51% |
| 8 | Texas | 265% | 44 | Vermont | 51% |
| 9 | Indiana | 249% | 45 | New Mexico | 38% |
| 10 | Alabama | 246% | 46 | Montana | Data Not Available |
| 11 | Louisiana | 231% | 47 | New Hampshire | Data Not Available |
| 12 | Florida | 220% | 48 | North Dakota | Data Not Available |
| 13 | Arkansas | 219% | 49 | Rhode Island | Data Not Available |
| 14 | Michigan | 210% | 50 | South Dakota | Data Not Available |
| 15 | Arizona | 205% | 51 | West Virginia | Data Not Available |
| 16 | South Carolina | 203% |  |  |  |
| 17 | North Carolina | 199% |  |  |  |
| 18 | Ohio | 194% |  |  |  |
| 19 | Minnesota | 175% |  |  |  |
| 20 | Pennsylvania | 168% |  |  |  |
| 21 | Washington | 167% |  |  |  |
| 22 | Nebraska | 162% |  |  |  |
| 23 | Oklahoma | 160% |  |  |  |
| 24 | Oregon | 159% |  |  |  |
| 25 | Delaware | 151% |  |  |  |
| 26 | Missouri | 149% |  |  |  |
| 27 | Virginia | 144% |  |  |  |
| 28 | Illinois | 138% |  |  |  |
| 29 | District of Columbia | 137% |  |  |  |
| 30 | Maryland | 119% |  |  |  |
| 31 | New Jersey | 118% |  |  |  |
| 32 | Maine | 117% |  |  |  |
| 33 | Connecticut | 116% |  |  |  |
| 34 | Kentucky | 111% |  |  |  |
| 35 | Idaho | 110% |  |  |  |

# Appendix B
# Focus Group Methodology and Participant Profile

## Participant Profile

To find participants, the Federal Reserve Bank of Kansas City reached out to key partners that had strong relationships with black women who own a business. Thirty-four women participated. The following is a profile of participants:

| Owner Age | | | | | |
|---|---|---|---|---|---|
| Younger than 21 | 21 to 30 | 31 to 40 | 41 to 50 | 51 to 60 | 61 or Older |
| 3% | 6% | 36% | 36% | 18% | 0% |

| Marital Status | | |
|---|---|---|
| Married | Single | Other |
| 47% | 44% | 9% |

| Number of Children | | |
|---|---|---|
| 0 | 1 to 3 | More than 3 |
| 26% | 59% | 15% |

| Years in Business | | | |
|---|---|---|---|
| 1 Year or Less | 2 Years | 3 Years | More than 3 Years |
| 15% | 15% | 24% | 45% |

| Business Sales | | | |
|---|---|---|---|
| $0-$10,000 | $10,001 to $50,000 | $50,001 to $100,000 | Greater than $100,000 |
| 35% | 35% | 6% | 23% |

| Business Type | | | | | |
|---|---|---|---|---|---|
| Service | Retail | Wholesale | Manufacturing | Other | Multi |
| 53% | 25% | 6% | 0% | 3% | 14% |

| Number of Employees | | | |
|---|---|---|---|
| 0 | 1 to 3 | 4 to 10 | More than 10 |
| 26% | 47% | 15% | 12% |

| Education | | | | |
|---|---|---|---|---|
| HS Diploma | Associate | Bachelor's | Master's | Other |
| 15% | 18% | 35% | 26% | 6% |

## Methodology

The data acquisition methodology was focus group methodology. Five local small business support organizations that worked with black women who own a business were asked to reach out to five to 10 women to participate. Each woman that agreed to participate was provided preliminary information on the purpose of the inquiry and what would occur during the focus group.

Each focus group was in the evening at a location that the small business support organization partner determined was most appropriate and comfortable for the participants.

Ahead of the start of the focus group, there was a dinner, which gave participants the opportunity to get to know each other, and the facilitator. During this time, a participant waiver form, and the demographic intake sheet, was filled out.

The facilitator was a member of the Federal Reserve Bank of Kansas City staff with experience in small group facilitation and qualitative research.

The focus group was structured around the four questions:

- Why did you start?
- What were your challenges?
- What were your support systems?
- What do you wish was available to you when you started your business?

The facilitator asked everyone to answer the first question, as it was the primary focus of the inquiry. Participants were invited to answer each additional question at their own discretion.

Each of the focus groups was recorded and transcribed. The transcriptions were uploaded in the MAXQDA software and coded. There were three forms of coding. The first identified specific answers to each of the four questions. The second was open coding, identifying major themes that emerged outside of the primary questions. The third reviewed and revised the coding from the second coding for consistency.

Research limitations are as follows:

- Nonrandom sampling of business owner participants.
- Concentration of business owners in five Midwestern states.
- Selection bias by small business support organizations who invited the participants.

# Appendix C
# Research Validity

The Federal Reserve Bank of Kansas City used research from two outside sources about the motivation for black women to start a business to help determine the validity of the findings. Similar to the Federal Reserve Bank of Kansas City, the report by Walker's Legacy and Cassandra Bailey's dissertation also asked questions about business challenges. The following is a breakdown of the questions asked to participants in each piece of research.

| Federal Reserve Bank of Kansas City | Walker's Legacy Report | Cassandra Bailey Dissertation |
| --- | --- | --- |
| Why did you start your business? | Motivations for starting one's own business | What motivated you to become an entrepreneur? |
| What challenges did you face? | Mentors and networks | What role did family concerns play in your motivation to become an entrepreneur? |
| What support did you have? | Access to capital and resources | What social barriers did you face that challenged your decision to become an entrepreneur? |
| | Challenges to starting and maintaining one's own business | What formal or informal educational influences molded you to pursue your current professional role? |

# Exhibit Z

# The VC landscape is dire for Black women. 7 Black women who have raised millions in funding reveal their best fundraising advice.



*Britney Winters, Joanna Smith, and Tanya van Court.*

Courtesy of Britney Winters, Mamadi Doumbouya, and Tanya van Court; Skye Gould/Insider

- The venture-capital space isn't the most welcoming environment for Black women.
- As of 2020, only 93 Black women had raised $1 million or more in venture funds.
- Black women who have achieved this feat gave advice for others looking to do the same.

Tanya van Court noticed immediately that white male investors weren't backing her business.

Van Court, who is Black, launched the app Goalsetter in 2016 to teach children how to invest and save money. After raising her first $1 million in venture capital in 2018, she noticed almost 90% of her investors were from marginalized communities. Today, Goalsetter, which uses gamification to teach children healthy financial habits, has 367,000 users and received a $1 million investment from Nike in February.

She recalled white investors telling her Goalsetter was "uninvestable" and kids' fintech "wasn't a thing."

Then, she'd see those same investors fund a similar startup created by a white founder, she said.

This cycle continued until the murder of George Floyd. Then, people started paying attention to Black-owned businesses, she said. In January, her company closed a $3.9 million seed round that included the basketball stars Chris Paul and Kevin Durant as investors, and to date, her company has raised $6 million in venture capital.

The number of Black women like van Court who are raising $1 million or more in venture capital is increasing but still small — 93 as of December, up from 34 in 2018, according to the demographic study ProjectDiane. One founder said investors tended to fund people who look like them, and 70% of venture capitalists are white — according to 2019 data from Richard Kerby, a cofounder of the venture fund Equal Ventures, only 2% of venture capitalists identified as Black men in 2018 and 1% as Black women.

Case 1:23-cv-03424-TMT  Document 59-4  Filed 08/31/23  Page 798 of 801

Recall the question of who gets to be an entrepreneur in the first place. Research has found it's those born into wealth.



*Van Court said it would take decades to see whether venture capitalists kept their promise to invest in Black businesses.*

Tanya van Court

To be a Black female founder is to be doubly minoritized in a highly homogenous space. And — like in corporate America — these Black women must navigate structural barriers, closed networks of contacts, code-switching, racialized expectations, and the norms of the majority group to succeed and receive investment.

Insider spoke with van Court and six other Black female founders who've raised more than $1 million in venture capital to find out how that feat could be accomplished. The resulting guide contains their insight on choosing the right investors, pitching prospective funders, and building positive relationships with other entrepreneurs.

As the responsibility for change doesn't lie solely on the shoulders of the marginalized, the women also shared their thoughts on what venture-capital firms could do to bring more equity to the world of venture.

Here are the best practices, according to them.

## Come ready with numbers

As of 2020, according to ProjectDiane data, the median seed round for Black female entrepreneurs was $125,000, compared with the national median of $2.5 million. And alongside Latina female founders, the two groups received just 0.43% — or $715 million — of the $166 billion in venture-capital funding raised in 2020, ProjectDiane found.

This not only leaves Black female founders with less money to scale their businesses but also forces them to raise smaller amounts in shorter intervals. Being in a constant state of fundraising is stressful and steals time from other vital duties, like the product development of their companies, van Court said.

When it's time to pitch your business — whether for a pre-seed or Series D round — it's essential to have a presentation filled with numbers that showcase details like revenue growth and overall market potential of the brand, van Court said.

Britney Winters, the founder of the custom-wig shop Upgrade Boutique said one of her biggest mistakes early on was not spending enough time educating white investors on the Black beauty industry, which was worth more than $2.5 billion in 2018, according to the research firm Mintel.

> It doesn't matter if other people don't need those milestones in order to raise money. Black people get funded based on proof, period.

Adding more data to her pitch deck helped show where Upgrade Boutique could fit within the multibillion-dollar market, which helped convince more investors as her journey continued, she said. Her company closed a $1.7 million seed round in May led by Mercury Fund and the Artemis Fund, which brought her total amount raised to $2 million since she launched the business in 2019.

Rachael Twumasi-Corson and Joycelyn Mate, the cofounders of the hair-care line Afrocenchix, also used numbers to educate their white investors. While they highlighted important factors like strong customer-retention rates, they also used data when investors questioned the accuracy of their growth. But that didn't shield them from racist questions, they said.

*A July report from Crunchbase found US startups received a record $137 billion in venture funds the first half of 2021. Within this, Black entrepreneurs received $1.6 billion, just 1.2%.*

Klaus Vedfelt / Getty Images

"We had someone ask, 'Why are you talking about Africa?' and make jokes about Africans being poor," Twumasi-Corson, who raised $1.2 million in June in a round backed by Google, said. "When you're talking about white investors, they might not care about Black stories, so you have to give them this data."

## Connect with other founders

Every Black female founder needs a support group to help her navigate the venture-capital landscape, Tiffany Dufu, the founder of the networking app The Cru, said.

Her company raised a $2 million seed round in July 2020, led by Bloomberg Beta and Alpine Meridian.

"One of the most important things you can do is collaborate, communicate, ask for help, and be vulnerable with a group of women who are going through the same thing," Dufu said. These women "can help hold you accountable but also remind you that you're not going crazy," she added.

Joanna Smith, the founder of the educational company AllHere, echoed Dufu's advice. She joined a support network for Black women in tech, Visible Figures, to discuss topics such as hiring and fundraising.

"Never go it alone," said Smith, who's raised a total of $12 million in venture capital since she launched AllHere in 2017. "There's a community of women who have raised and who are eager to share what worked for them and what didn't."

# Research and link with prospective investors early

When seeking investors, be sure to research the venture-capital firm, its founder, and the ethos of the company, Smith said. This ensures more than just capital is exchanged in the relationship.

"Capital is the least of what you get from a great partnership with a VC or institutional investor," she said. "They're going to be the people you turn to when things are going great and when they are not."

Edna Martinson follows a similar philosophy. She looks at a firm's portfolio, the industries it invests in, and how it typically works with founders before pitching them. So far, she's raised $2.07 million for her learning platform, Boddle.

*Edna Martinson said the fundraising journey was a roller coaster but taught her that not everyone would understand her company's vision.*

Edna Martinson

Meanwhile, Yelitsa Jean-Charles, who's raised a total of $1.5 million in funds, works only with investors who understand her perspective as an entrepreneur and respect her as a business owner. In 2015, she founded Healthy Root Dolls, a company that hopes to use dolls to teach natural-hair care to young children of color.

"Be mindful of how much time you have," she said, "and the most valuable way to use it."

# Incubator and accelerator programs can provide funding, but proceed with caution

Tiffany Kelly, the founder of the video-creation platform Curastory said programs such as the 2021 Techstars Sports Accelerator helped her explore fundraising methods and expand her network. What's more, it helped her raise a $2.1 million pre-seed round in September.

But certain accelerators she attended were led by white men who gave fundraising techniques she had already tried as a Black female founder to no success.

While Martinson gained traction through pitch competitions and accelerator programs, she found it disappointing that women had to constantly use these methods to prove themselves.

*Between 2009 and 2019, only 10 Black women in the UK received VC funding, Extend Ventures reported.*

We Are / Getty Images

"It's almost like you need that to validate yourself before venture capitalists start looking at you," she said, "whereas some of your other counterparts are able to go in with an idea and they are able to raise venture-capital funds all of a sudden."

# But remember, the responsibility isn't all on you

While these women provided advice for maneuvering the venture-capital scene, they stressed that the systemic hindrances and institutional structures within Silicon Valley had to change for any equitable progress to be made.

"You would have to undo a lot of bias," Jean-Charles said. "Until those people are willing to put themselves in different spaces and look outside what they know, it's not going to happen."

Smith said it was imperative for funds to mentor and invest in historically underrepresented founders, as it's a key way to remain competitive. And within that, Twumasi-Corson, the cofounder of Afrocenchix, wants to see more transparency among backers.

"Investors could make this fairer and increase their returns if they set out clear, transparent success metrics and stuck to them," she said, "even when the founder doesn't look like Mark Zuckerberg."

> *You would have to undo a lot of bias. Until those people are willing to put themselves in different spaces and look outside what they know, it's not going to happen.*

Van Court, meanwhile, said venture-capital firms should meet specific diversity standards if they planned on receiving public and corporation pension funds. Some venture-capital firms get funding from government grants, as well as private entities such as university endowments and pension funds.

Van Court would also like to see firms implement a policy similar to the NFL's Rooney Rule, which requires teams with head-coach vacancies to interview people of color for the open position. But even after the murder of Floyd, she said she and many of her peers were still experiencing the same roadblocks many in the sector promised to abandon.

"The proof in the pudding is going to take more than six months or a year to see," she said. "It's going to be what happens over the next five years, then what happens over the next 10."

*Miranda Perez contributing reporting.*