# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) Case No. 1:23-CV-3424-TWT |
| v. | )<br>) |
| FEARLESS FUND MANAGEMENT, LLC;<br>FEARLESS FUND II, GP, LLC;<br>FEARLESS FUND II, LP; and<br>FEARLESS FOUNDATION, INC. | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## BRIEF OF LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND SIX ORGANIZATIONS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

Marlee (Waxelbaum) Santos
Georgia Bar No. 155779
**CROWELL & MORING LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
msantos@crowell.com

## TABLE OF CONTENTS

INTEREST OF THE *AMICUS CURIAE* ..................................................................1

INTRODUCTION .....................................................................................................2

ARGUMENT .............................................................................................................3

I.    Section 1981 Actualized the 13th Amendment's Abolition of Slavery. ..........3

    A.    Congress Enacted § 1981 in the Aftermath of Black Codes that Crippled Black Citizens' Freedom of Contract. ....................................3

    B.    Inequitable Market Access was a Badge and Incident of Slavery only Freedom of Contract Could Cure. ....................................................5

II.    Thwarting Remedial Grant Programs is Contrary to § 1981's Congressional Intent. ................................................................................................................6

III.    Prohibiting Private, Remedial Grantmaking Would Diminish Black Women's Freedom of Contract. ......................................................................9

CONCLUSION ........................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CBOCS W., Inc. v. Humphries*,
   553 U.S. 442 (2008).................................................................................................7

*City of Memphis v. Greene*,
   451 U.S. 100 (1981) (White, J. concurring) ........................................................4, 6

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   140 S. Ct. 1009 (2020)..........................................................................................2, 5

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*,
   470 F.3d 827 (9th Cir. 2006) ...............................................................................7, 8

*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968)..............................................................................................5, 6

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
   222 F.3d 289 (7th Cir. 2000) ....................................................................................7

*McDonald v. Santa Fe Trail Transp. Co.*,
   427 U.S. 273 (1976)..................................................................................................6

*Runyon v. McCrary*,
   427 U.S. 160 (1976)..................................................................................................7

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   143 S. Ct. 2141 (2023)..............................................................................................2

**Statutes**

Civil Rights Act of 1866 .................................................................................................5

**Other Authorities**

Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the
   Proper Scope of Section 1981,* 98 YALE L.J. 541, 550 (1989) ................................5

*Future: How Supporting Black Women-Owned Businesses and Entrepreneurs
   Benefits Us All*, FORBES (Apr. 27, 2023) ..................................................................9

*From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 YALE L.J. 170 (2006)................................................4

*Black women are the fastest growing group of entrepreneurs. But the job isn't easy*, J.P. MORGAN (Oct. 12, 2021).......................................................................9

M. Baradaran, *The Color of Money, Black Banks and the Racial Wealth Gap* (2017) ................................................................................................................4

R. Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* (2017) ...............................................................................4

Rebecca E. Zietlow, *Slavery, Liberty and the Right to Contract*, 19 Nev. L.J. 447 (2018)...........................................................................................................3, 5

U.S. Const. Amend. XIII .................................................................................3

United States Constitution 13th Amendment ........................................... *passim*

## INTEREST OF THE *AMICUS CURIAE*[1]

Amici are the Lawyers' Committee for Civil Rights Under Law joined by six additional national civil rights organizations: Leadership Conference on Civil and Human Rights, National Action Network, National Association for the Advancement of Colored People ("NAACP"), National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF. These organizations all have different missions, but each is committed to furthering the goal of preventing and eradicating systemic discrimination, including in the marketplace. *Amici* fully appreciate the serious harm that would result to Black communities and other communities of color if charitable efforts to advance equity were undermined.

Formed in 1963, the Lawyers' Committee is a nonpartisan, nonprofit organization that uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. To this

---

[1] The parties have consented to the filing of this brief. No counsel to a party in this case authored this brief in whole or in part. No party or party's counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief. No person or entity other than the *amici* and their counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief.

1

end, the Lawyers' Committee has participated in hundreds of cases involving issues related to voting rights, housing, employment, education, and public accommodations. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020).

## INTRODUCTION

Congress enacted § 1981 as a remedial law designed to secure the rights of newly emancipated Black citizens who were historically deprived of the rights to make and enforce economic contracts during Reconstruction. The freedom to contract and participate in the economy on equal terms "as is enjoyed by white citizens" was central to overcoming the legacy of slavery and anti-Black economic oppression. The Act's remedial purpose squarely aimed to benefit Black people. It is that remedial purpose, which is at the very heart of § 1981, that is under attack in this case.

In the face of our country's history of racism, its pervasive structural discrimination, and the pernicious effects of both, Plaintiff attempts to upend the spirit and the purpose of § 1981 to further entrench the status quo of inequitable market access. Plaintiff's challenge to the Fearless Foundation's Fearless Strivers Grant program, a remedial program that awards grants to Black women-owned

small businesses which historically have been disadvantaged in their ability to obtain funding, is contrary to § 1981's congressional purpose and intent and should not succeed.

## ARGUMENT

### I. Section 1981 Actualized the 13th Amendment's Abolition of Slavery.

Following the close of the Civil War, Congress ratified the 13th Amendment to the United States Constitution. It provides, "[n]either slavery nor involuntary servitude, … shall exist within the United States[.]" U.S. Const. Amend. XIII. Despite the amendment's clear command, American society did not welcome newly emancipated Black people and instead denied them participation in society and the marketplace. Congress responded forcefully, enacting § 1981 as a remedy for past systemic discrimination and private actors' current and future denial of access to social life, economic participation, and economic parity. Central to the fulfillment of the 13th Amendment in resistant Southern states and elsewhere, § 1981 mandated newly emancipated Black citizens' freedom of contract.

### A. Congress Enacted § 1981 in the Aftermath of Black Codes that Crippled Black Citizens' Freedom of Contract.

Though Southern states ratified the 13th Amendment, they quickly circumvented its freedoms. Rebecca E. Zietlow, *Slavery, Liberty and the Right to*

3

*Contract*, 19 NEV. L.J. 447, 448 (2018). In 1865, Southern states implemented the Black Codes—laws that forced Black people to work in a labor economy based on debt or low wages. *Id*. Despite the 13th Amendment's promise, under the Black Codes, newly freed Black people were trapped in conditions similar to chattel slavery.

Southern whites refused to contract with formerly enslaved people. And when they did, "many used the labor contract itself to restore conditions as onerous as those under slavery[,]" fixing wages, forbidding work outside the contract, and using physical violence to coerce work. Danielle Tarantolo, *From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 YALE L.J. 170, 186–87 (2006) (Tarantolo). White southerners also often "simply refused to sell land to blacks," even when not selling was economically foolish. M. Baradaran, *The Color of Money, Black Banks and the Racial Wealth Gap* 9–11, 18 (2017) (Baradaran). To bolster private exclusion, some states forbade such sales. *Id.* at 18. The inability to build wealth or own property forced Black people into sharecropping, where landowners subjected them to debt when the growing season closed, with no hope of recourse against the ever-present manipulation of the ledger. R. Rothstein, *The Color of Law: A*

*Forgotten History of How Our Government Segregated America* 154 (2017) (Rothstein); Baradaran 33–34.

The 39th Congress found that the 13th Amendment fell short of remedying "the plight of the southern [B]lacks." *City of Memphis v. Greene*, 451 U.S. 100, 131 (1981) (White, J. concurring). To implement the 13th Amendment in all states as a matter of law and fact, and to "vindicate the rights of former slaves," the 39th Congress enacted section 1 of the Civil Rights Act of 1866, later codified as § 1981.[2] *Comcast Corp.*, 140 S. Ct. at 1015.

### B.  Inequitable Market Access was a Badge and Incident of Slavery only Freedom of Contract Could Cure.

Section 1981 identified Black Codes—and all forms of inequitable economic market and social access impacting Black citizens—as badges and incidents of slavery and sought their eradication. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 442 (1968) (explaining that the Black Codes "were substitutes" for the slave "system"). If the Black Codes remained in place, Congress knew the 13th

---

[2] The Civil Rights Act of 1866 was introduced as S. 61 by Sen. Trumbull (R-IL) on Jan. 5, 1866. Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981,* 98 YALE L.J. 541, 550 (1989). S. 61 passed the United States Senate (33-12) on Feb. 12, 1866. Govtrack, https://bit.ly/2lfzg3k (last accessed Sept. 1, 2023). S. 61 passed the United States House of Representatives (111-38) on Mar. 13, 1866. Govtrack, https://bit.ly/2nlDaID (last accessed Sept. 1, 2023). The bill became the law on Apr. 8, 1866. *Jones*, 392 U.S. at 435.

Amendment would become "a mere paper guarantee." *Id.* at 443. The Reconstruction Congress recognized "freedom of contract was not an end in itself; it was a means to the end of achieving equal citizenship and fundamental rights for freed slaves…." Zietlow, 19 NEV. L.J. at 448.

By extending § 1981 to private contracting, Congress sought to ensure "a dollar in the hands of a Negro [sic] will purchase the same thing as a dollar in the hands of a white man." *Jones*, 392 U.S. at 443. Such freedoms were intended to ensure that slavery's exploitation of Black citizens was not reinstated under the Black Codes, or future similar restrictions.

Just as the 13th Amendment sought to remedy the harms formerly enslaved Black citizens suffered, § 1981 aimed to make this goal reality. The statute, remedial in nature and purpose, focused on Black citizens' rights to contract and participate equally in the marketplace.

## II. Thwarting Remedial Grant Programs is Contrary to § 1981's Congressional Intent.

Plaintiff's theory is as novel as it is wrong. Congress never could have envisioned, much less intended, that § 1981 would deny Black citizens access to programs that—like the statute—aim to remedy economic discrimination against Black people in the marketplace. To be sure, §1981 has been interpreted to protect the right to contract for other groups, *McDonald v. Santa Fe Trail Transp. Co.*, 427

6

U.S. 273, 295 (1976), but it still remains focused on the kinds of major deprivations of "basic civil rights" that animated the 39th Congress to act, *City of Memphis*, 451 U.S. at 134 (White, J., concurring). Plaintiffs' distortion of § 1981 is contrary to the express intent of Congress and must be rejected.

*Amici* have not been able to identify instances where, since its enactment in 1866, § 1981 has been successfully used as a sword against targeted remedial philanthropy. Rather, its historical use has been to counter race-based exclusion, perpetuated by past discrimination, from the marketplace. The reason is straightforward: Congress never intended to undermine remedial efforts that empower Black citizens to gain greater economic power and contract rights than they could achieve or exercise as a result of anti-Black discrimination. The seminal § 1981 cases thus target the wholesale refusal to admit Black students into an educational institution, *e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 173 (1976), and the racist discharge of Black employees, *e.g.*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 450–51 (2008). As these cases reflect, the statute's principal concern was ensuring that Black citizens were not denied the same ability to contract as white citizens. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 301 (7th Cir. 2000) ("[T]he statute … reflects the exercise of congressional authority under the

Thirteenth Amendment to relieve African Americans of the 'badges and incidents' of slavery.").

Section 1981 claims that are inconsistent with the statute's history and purposes preclude effectuation of the provision's clear remedial intent. A § 1981 defendant may defend a claim by showing that the challenged remedial programs respond to "manifest imbalance[s]." *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 836 (9th Cir. 2006). Any other interpretation would render § 1981's remedial purpose null. In *Setser v. Novack Investment Co.*, the court held, "[i]t would indeed be . . . ironic if the Civil Rights Act of 1866 was used now to prohibit" § 1981, "the only effective remedy for past discriminatory employment practices against blacks and other minorities[.]" 657 F.2d 962, 966–67 (8th Cir. 1981).

*Doe* illustrates that remedial contracting complies with § 1981's history and purpose. There, a white student brought a § 1981 claim against private schools in Hawai'i for giving preference to students of Native Hawaiian ancestry. *Id.* at 829. The Ninth Circuit held that the program did not offend § 1981. *Id.* at 849. It found that Kamehameha Schools' program was "a remedial policy[,]" not a "straightforward case of discrimination," that considered students' race to address

8

manifest imbalances between educational outcomes for Native Hawaiian students and their counterparts. *Id.* at 837.

As in *Doe*, private grantmaking to address manifest imbalances such as exist here is a "remedial policy"—not discrimination—and provides opportunity to people of color where opportunity does not otherwise exist. To read § 1981 to prohibit such remedial programs would be inconsistent with and undermine the 39th Congress' purpose in enacting § 1981.

### III. Prohibiting Private, Remedial Grantmaking Would Diminish Black Women's Economic Freedom.

Congress' intent to abolish "all badges and incidents of slavery" under § 1981 is just as important today as it was during the height of the Black Codes. And expanding, not contracting, market access to historically and currently excluded groups is as central to § 1981's design today as when it was first passed.

Market access is not equal among racial groups in today's America. Venture capital provides a stark example. Black businesses face a funding rejection rate *three times higher* than their white counterparts. *Black women are the fastest growing group of entrepreneurs. But the job isn't easy*, J.P. MORGAN (Oct. 12, 2021), https://www.jpmorgan.com/insights/business/business-planning/black-women-are-the-fastest-growing-group-of-entrepreneurs-but-the-job-isnt-easy. Black women businessowners' lack of access is even worse. Black women receive

9

less than 0.35% of all venture capital funding, despite Black people making up 14.2% of the U.S. population. *Investing in The Future: How Supporting Black Women-Owned Businesses and Entrepreneurs Benefits Us All*, FORBES (Apr. 27, 2023), https://www.forbes.com/sites/forbeseq/2023/04/27/investing-in-the-future-how-supporting-black-women-owned-businesses-and-entrepreneurs-benefits-us-all/?sh=57d757734ac2.

Applying § 1981 to prohibit private, remedial grantmaking programs that increase Black women's access to venture capital is inconsistent with its purpose and history. Black women currently have access to a mere sliver of venture capital compared to other demographic groups. Finding a program that *increases* Black women's access to funding unlawful under § 1981 would exacerbate inequitable economic access currently faced by Black communities.

## CONCLUSION

Section 1981's history and purpose demonstrate that it is a remedial statute meant to ensure and equalize Black citizens' economic market access. The long history of private, remedial grantmaking is consistent with this purpose and necessary to rid the United States of the vestiges of "badges and incidents" of slavery that the 13th Amendment meant to purge from the market.

Plaintiff's efforts to weaponize the very provision that was enacted to address the economic inequities that persist from slavery and the Black Codes, and more modern-day discrimination, is wholly misguided. The effects of years of systemic anti-Black discrimination persist across many sectors of American society. Private efforts to remediate such "manifest imbalances," such as the grantmaking here, should be upheld as lawful under § 1981.

Respectfully submitted,

/s/ *Kathryn J. Youker*
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Jon Greenbaum*
Kathryn J. Youker*
Dariely Rodriguez*
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
jgreenbaum@lawyerscommittee.org
kyouker@lawyerscommittee.org
drodriguez@lawyerscommittee.org
*\*Pro Hac Vice Forthcoming*

/s/ *Marlee (Waxelbaum) Santos*
Georgia Bar No. 155779
**CROWELL & MORING LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
msantos@crowell.com

Keith Harrison*
Laurel Pyke Malson*
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
O +1.202.624.2500
F +1.202.628.5116
E KHarrison@crowell.com
E LMalson@crowell.com

Meshach Y. Rhoades*
Amy M. Pauli*
Amber R. Gonzales*
**CROWELL & MORING LLP**
1601 Wewatta Street, Suite 815
Denver, CO 80202
O +1.303.524.8660
F +1.303.524.8650
E MRhoades@crowell.com
E APauli@crowell.com

Kevin D. Cacabelos*
**CROWELL & MORING LLP**
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
O +1.415.986.2800
F +1.415.986.2827
E KCacabelos@crowell.com
*\*Pro Hac Vice Forthcoming*

DATED:  September 1, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 5.1(C) and 7.1(D), I hereby certify that this brief has been prepared in 14-point, Times New Roman font.

/s/Marlee Santos
Marlee Santos

DATED:  September 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing brief through the CM/ECF system, which will send a notice of filing to all registered CM/ECF users.

/s/ *Marlee (Waxelbaum) Santos*
Marlee (Waxelbaum) Santos

DATED:  September 1, 2023