**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

AMERICAN ALLIANCE
FOR EQUAL RIGHTS,

*Plaintiff,*

v.

FEARLESS FUND
MANAGEMENT, LLC, *et al.*

*Defendants.*

Case No. 1:23-cv-3424-TWT

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION
(RELIEF REQUESTED BY SEPTEMBER 26, 2023)**

**INTRODUCTION**

Fearless "want[s] [the] law to be different." *SFFA v. Harvard*, 143 S.Ct. 2141, 2173-74 (2023). It'd have to be for Fearless to keep refusing to (in its words) "CONTRACT" with all races but one. Fearless thinks §1981 shouldn't bar discrimination in favor of blacks. But it does. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279-80 (1976). And there's nothing benign about Fearless' refusal to contract with Hispanics, Arabs, and Asians. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). While Fearless invokes "affirmative action," its categorical racial exclusion is precisely what the affirmative-action cases say companies can't do. And far from vindicating §1981, Fearless wants this Court to *invalidate* it by deeming racial discrimination protected by the First Amendment. Private schools made the same argument to justify segregation. They lost. *Runyon v. McCrary*, 427 U.S. 160, 176 (1976).

Fearless understands all this, which is why it unilaterally overhauled its program to try to avoid judgment. Not by ending its *racial discrimination*, but by trying to make its discrimination no longer a contract. But this maneuver doesn't work under voluntary cessation—a doctrine that Fearless never mentions, let alone tries to satisfy. Among other problems, Fearless can't claim it will never resume race-based contracting. As a firm that regularly inks venture-capital deals with only certain races, race-based contracting is Fearless' *raison d'etre*. And this program is a contract too, even after the late changes.

Fearless' program likely violates §1981. Especially because Fearless will close the application window on September 30, the Alliance needs a preliminary injunction before then that orders Fearless to stop enforcing racial exclusions in contracting. The Alliance respectfully requests a ruling **during or before the hearing on September 26**.

## ARGUMENT

The Alliance satisfies the traditional, four-factor test for a preliminary injunction. Contra Fearless, the Alliance isn't seeking a "mandatory" injunction that requires a heightened test. Opp. (Doc. 59) at 8. It wants a prohibitory injunction that *stops* Fearless from requiring applicants to be a certain race. Doc. 2 at 2; *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 n.2 (11th Cir. 1998). But regardless, Fearless' racial bar is blatantly illegal, and the application window closes in 22 days; so a preliminary injunction is warranted under any test. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

## I.   The Alliance will likely succeed on the merits.

Fearless concedes that its program discriminates. It boasts that the program flatly bars all non-blacks—including Hispanics, Native Americans, and Asians—from applying based on race. But Fearless argues that its discrimination is unchallengeable based on a mishmash of standing arguments. And Fearless claims that it's lawful as charity, speech, or affirmative action. Each argument contradicts settled law, including several binding precedents that Fearless fails to even cite.

A.     **The Alliance has standing.**

As Fearless notes, the Alliance has standing if one of its members has standing, this lawsuit is germane to its purpose, and its members needn't participate. Opp.8-9. All three requirements are met here, as they were in *SFFA*.

**1.** The Alliance's members have standing. The "inability to compete on an equal footing" for a "benefit" is a concrete injury. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (cleaned up). That injury is imminent when an applicant is "'able and ready'" to apply should the defendant "cease to use race." *Id*. Because a court can order that, causation and redressability are met. *Ne. Fla. Ch. of AGC v. Jacksonville*, 508 U.S. 656, 666 n.5 (1993). Here, Owners A-C satisfy all the program's objective requirements, except its racial bar. Mot. (Doc. 2-1) at 5-6. They are able and ready to apply if Fearless stops using race. Mot.5. So they can ask the Court for that relief now. *Jacksonville*, 508 U.S. at 666.

This theory of standing is not limited to *governmental* defendants. *Cf.* Opp.13-14. An injury is an injury; it doesn't matter who inflicts it. True, the inability-to-compete cases often involve governments, but Fearless cites no case rejecting this theory for private defendants. *SFFA* applied it to Harvard. *See* 143 S.Ct. at 2158 (agreeing with the lower courts). And *Gratz* applied it to §1981, 539 U.S. at 260-62, 275-76 & n.23, whose ban on race-based contracts "applies equally to public and private institutions," *Burgin v. Toys-R-Us-Nytex*, 1999 WL 454302, at *2 (W.D.N.Y. June 30); *see* 42 U.S.C. §1981(c). Though

3

Fearless denies that its program is a contract, Opp.14, that argument assumes Fearless is right on the merits—something this Court can't do when assessing standing, *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016).

**2.** This case is germane to the Alliance's purpose. The Alliance aims to rid America of racial classifications. Blum Decl. (Doc. 2-9) ¶3. This lawsuit challenging a racial classification couldn't be more germane. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000). Though Fearless deems the Alliance's mission too broad, Opp.11-12, it's no broader than saving the environment (Sierra Club), protecting civil liberties (ACLU), or seeking racial equity (NAACP). *Cf.* Lawyer's-Cmte.-Br. (Doc. 73-1) at 1.

Fearless accuses the Alliance—with *zero* evidence—of being a "recently-created sham organization." Opp.11. By "sham," Fearless means the Alliance lacks the "indicia of membership." Opp.12. But the indicia-of-membership test applies only to organizations with no members; it "has no applicability" to membership associations like the Alliance. *SFFA*, 143 S.Ct. at 2158. And the Alliance would satisfy it anyway. The Alliance is several years old. Suppl. Blum Decl. ¶4. It has nearly 100 members. ¶6. Its members voluntarily join, pay dues, have input, get updates, and support this suit. ¶¶8-13; *see, e.g.*, Owner A Decl. (Doc. 2-10) ¶13. And its standing members exert ultimate "control" because, "without [them]," there "would be no lawsuit." *Citizens Coal Council v. Matt Canestrale Contr.*, 40 F. Supp. 3d 632, 640-43 (W.D. Pa. 2014).

**3.** Neither the Alliance's "'claim'" nor its "'relief'" requires its members' participation. *SFFA*, 143 S.Ct. at 2157. Its claim doesn't because it's a facial challenge. *Pennell v. San Jose*, 485 U.S. 1, 7 n.3 (1988). And requests for prospective relief don't either. *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343-44 (1977). Contra Fearless, the Alliance needn't prove that "but for racial animus, [Fearless] would have contracted with [its members]," *Comcast Corp. v. NAAOM*, 140 S.Ct. 1009, 1013 (2020), any more than SFFA needed to prove that its members would have gotten into Harvard. Their injury is the inability to *compete*, and associations can vindicate that injury. *Parents Involved v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718-19 (2007). Fearless doesn't dispute, moreover, that Owners A-C meet the program's objective requirements (other than race). The Alliance proved that basic fact through declarations, the kind of insubstantial participation from members that doesn't undermine associational standing. *NCAA v. Califano*, 622 F.2d 1382, 1392 (10th Cir. 1980).

After insisting that the Alliance's members *cannot* participate in this case, Fearless demands that the Alliance divulge their legal names. Opp.9-11. It cites cases where associations lacked standing because they failed to "identify" or "name" a *specific* member who *has* standing. *E.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203-04 (11th Cir. 2018) (association identified "no specific member" who "will be injured").

The Alliance didn't commit the error from those cases. It identified and named three specific members, Owners A-C, and proved through declarations why each member has standing now. *See Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022) (finding, on a similar record, that the members' "anonymity [wa]s no barrier to standing"). Fearless reads the word "name" as requiring associations to use members' *legal* names, not pseudonyms. But none of its appellate cases say that, or even involve pseudonyms. In this circuit, associations "need not 'name names' to establish standing." *ACEP v. BCBS of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020); *accord Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999). Fearless can't even articulate what standing argument it cannot make now, but could have made if it knew the real names of Owners A-C. *See Advocs.*, 41 F.4th at 594. None exists.

While the law limits pseudonymity, those limits don't come from Article III (and aren't implicated here). Fearless cites *Doe v. Frank*, but that case is about "Rule 10(a)"—not standing. 951 F.2d 320, 322 (11th Cir. 1992). By requiring complaints to "nam[e] … all the parties," Rule 10(a) generally bars "parties" from using pseudonyms. *Id.* But an association's members are "not … parties." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1959). Rule 10(a) is satisfied here because the only plaintiff—the Alliance—is named. *See PDE v. Olentangy Loc. Sch. Bd. of Educ.*, 2023 WL 4848509, at *6 n.2 (S.D. Ohio July 28). Rule 10(a) also *allows* plaintiffs to use pseudonyms in certain

cases, proving that "pseudonyms" are "immaterial" to Article III jurisdiction. *B.R. v. F.C.S.B.*, 17 F.4th 485, 495 (4th Cir. 2021).

Aside from Rule 10(a), Fearless might seek the Alliance's members in discovery. But that "discovery dispute" would be resolved later under the discovery rules, not now under the law of "standing." *S.C. State Conf. of NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14). If the Alliance discloses its members to Fearless in discovery, it would seek a protective order; and when approving that order, this Court would decide whether sealing their identities respects the public's right to access court documents. But that dispute is not yet live because no court document with their names has been filed. *Shane Grp. v. BCBS of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016). When one is filed, the Alliance will win that its members' interests in privacy outweigh the public's interest in disclosure. *See SFFA v. Harvard*, 2023 WL 3126414, at *6 n.4 (D. Mass. Apr. 27); Supp. Blum Decl. ¶¶14-15. But again, that debate will occur later. And it will have nothing to do with standing.

Fearless does cite two district-court cases that confuse pseudonymity with standing—both "filed by AAER's counsel"—but Fearless doesn't tell the whole story. Opp.10. Fearless doesn't mention that both cases are on appeal. *Do No Harm v. Pfizer*, No. 23-15 (2d Cir.); *Speech First v. Shrum*, No. 23-6054

(10th Cir.).[1] It also doesn't mention that, for one of the cases, the Eleventh Circuit found that the same plaintiff *had* associational standing to get a preliminary injunction for its pseudonymous members. *Speech First v. Cartwright*, 32 F.4th 1110, 1113-14 (2022). And Fearless fails to mention several other prominent cases that bless associations using pseudonyms. *E.g.*, *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 274-75 (D.N.J. 2003), *aff'd on standing*, 547 U.S. 47, 52 n.2 (2006); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018), *aff'd*, 140 S.Ct. 1891, 1916 (2020). This Court should follow those cases, not the two outliers currently on appeal.

## B.    Fearless' program is a contract.

Fearless can't avoid §1981's ban on race-based contracting by relabeling its program a "charitable donation." Opp.18. This new spin is contrived: The words "charity," "donation," and the like appear nowhere in Fearless' rules, application, website, ads, posts, or any other document drafted prior to this case. Those materials instead call the program what it is: "A SKILL-BASED CONTEST." Dickey Decl., Ex. B at 2; Exs. A, C, E (Docs. 2-2, 2-4, 2-6). A contest is a contract: The operator offers the chance to win a prize, and the contestant accepts by performing the steps to enter. *United States v. Chandler*, 376 F.3d

---

[1] In *Shrum*, the ACLU filed an amicus brief agreeing with plaintiff's counsel that requiring associations to divulge their members' legal names would "misread associational standing law" and "rob members of the privacy provided by group association." ACLU-Br.18, perma.cc/2PC5-VAQ7.

1303, 1308, 1312 (collecting cases), *on reh'g*, 388 F.3d 796 (11th Cir. 2004); *Ga. Lottery Corp. v. Vasaya*, 836 S.E.2d 107, 111 (Ga. Ct. App. 2019).

Even if the program were charity, it would still be a contract. As Fearless notes, labels don't control, Opp.19, so calling something "charity" doesn't mean it's not a contract. While charitable donations often aren't contracts, they are when the money comes with strings attached. *See Atl. Dev. Auth. v. Clark Atl. Univ.*, 298 Ga. 575, 579 (2016); *Tenn. UDC v. Vanderbilt Univ.*, 174 S.W.3d 98, 112-13 (Tenn. Ct. App. 2005). Fearless attached many strings here. For example, entrants (and Fearless) must agree to arbitrate in Atlanta—waiving their rights to a court, jury, and class action. Dickey Decl., Ex. B at 2, 16-17. Entrants also must release and indemnify Fearless for various liabilities. *Id.* at 7, 13. And entrants must give Fearless an exclusive license to use their name, image, and likeness for its own benefit. *Id.* at 7. Precisely because it requires entrants to relinquish so many "RIGHTS AND REMEDIES," Fearless was right to warn entrants that its official rules "ARE A CONTRACT." *Id.* at 3.[2]

And it's those official rules, not the new rules that Fearless drafted a month after it was sued, that count. Fearless cannot moot this motion by scrub-

---

[2] Plus, by calling it a "CONTRACT" and accepting its benefits for years, Fearless is estopped from denying that the program is a contract. *McDonald Georgia Com. Ctr. 400 v. F&C Logistics, Inc.*, 2013 WL 612762, at *2 (S.D. Ga.).

bing its rules until they're no longer a contract. Such "[c]hanges made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended." *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974). To prove mootness through voluntary cessation, Fearless must carry the "heavy burden" of proving it's "absolutely clear" that its prior behavior won't recur. *Trinity Lutheran v. Comer*, 582 U.S. 449, 457 n.1 (2017).

Fearless cannot carry its burden. It forfeits the point by failing to make arguments, cite cases, or even mention voluntary cessation. *Golden v. Columbus*, 404 F.3d 950, 963 n.10 (6th Cir. 2005). Fearless also defends the original rules, which it used for years and altered only after it was sued. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013). Fearless submits no sworn testimony from any official promising that it won't use race-based contracts again. *Id.* And no official could truthfully say that, since race-based contracting is Fearless' entire business model. It mainly awards venture capital— money for equity (a contract)—only to businesses led by "wom[e]n of color." Suppl. Dickey Dec., Ex. L at 3. No wonder, then, its founder told CBS, "I knew the moment [the lawsuit] happened that we would continue to do the amazing work that we do." Suppl. Dickey Dec., Ex. M at 3.

If any doubts remained, Fearless cannot argue voluntary cessation because, even under the new rules, it would still be violating §1981. *Jacksonville*,

508 U.S. at 662. Like the original rules, its new rules attach strings to the money. They require entrants to give Fearless the right to use submissions. *See* Cleckley Decl., Ex. A (Doc. 59-3) at III. And they require entrants to release Fearless from various liabilities. *See id.* at VII. The program also remains a "Contest." *E.g.*, *id.* at I, II, III, IV, VII. It's still a contract that offers the chance to win a prize in exchange for submissions.[3]

Fearless cannot avoid §1981 by arguing that prizes are "awarded at [its] sole discretion." Opp.19. Fearless points to language in the new rules where it "reserves the right to modify, cancel, or adjust the program … for any reason." Cleckley Decl., Ex. A at VII. But that language doesn't appear in the original rules, which allow Fearless to refuse prizes only in narrow circumstances. *See* Dickey Decl., Ex. B at 12-15. Even in the new rules, this new "discretionary" language does not defeat a contract because Fearless has an implied duty to exercise that discretion in good faith. *Restatement of the Law, Consumer Contracts* §4 DD (2017); *e.g.*, *Koets, Inc. v. Benveniste*, 169 Ga. App. 352, 353-54 (1983), *aff'd*, 252 Ga. 520 (1984).[4]

---

[3] Yet another reason not to credit Fearless' voluntary cessation: If successful, its maneuvering would *itself* violate §1981. It would eliminate a contract for the discriminatory purpose of not wanting to contract with certain races. *See McNeal v. Tate Cnty. Sch. Dist.*, 460 F.2d 568, 571 (5th Cir. 1971).

[4] Fearless doesn't argue that the new rules disclaim this implied duty. Nor could it, since the closest thing to a disclaimer in the rules fails the requirement that such disclaimers be conspicuous. *Compare* Cleckley Decl., Ex. A at VII*, with Bailey v. Tucker Equip. Sales*, 236 Ga. App. 289, 290 (1999).

More fundamentally, Fearless' assertion that it can unilaterally refuse to give prizes misses the point. Fearless can (and consistently does) pay prizes. Once it does, not even Fearless denies that there's a contract. (If a business took the $20,000 but Fearless later found out it had violated the rules, Fearless surely thinks it could recover the money.) Because §1981 also creates a right to *seek* contracts on a racially equal footing, *Runyon*, 427 U.S. at 172, Fearless' refusal to create these prize-for-performance contracts with nonblacks is illegal. It's as if an employer said, "I reserve the right to hire anyone, or no one, and fire them at will, so long as they aren't black." *See Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 442 (10th Cir. 1990). Even if nothing may "require [Fearless] to grant [prizes]," if Fearless does "grant some [contestants prizes], it may not deny this opportunity to others because of their [race]." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120-21 (1985).

### C.   Fearless has no First Amendment right to discriminate.

Fearless says the First Amendment protects its right to make "charitable donation[s]" only to certain races, Opp.16, but this argument just repackages its last argument. Fearless does not deny that, if its program *is a contract*, then it has no constitutional right to discriminate. Nor could it make that argument under Supreme Court precedent. *Runyon* upheld §1981 against constitutional attack, reasoning that "'invidious private discrimination … has never been accorded affirmative constitutional protections.'" 427 U.S. at 176 (cleaned up).

Section 1981 leaves discriminators free to speak and associate however they want. *Id.* But the contracting itself is "conduct" that the First Amendment doesn't reach. *R.A.V. v. St. Paul*, 505 U.S. 377, 389-90 (1992); *accord Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("[§]1981" is "a permissible content-neutral regulation of conduct").[5]

Fearless' cases are thus irrelevant because they involve the application of antidiscrimination laws to actual speech. Opp.15-17. In *303 Creative*, the law would have required a designer to create a website for a same-sex wedding, thus compelling "pure speech." *303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2318 (2023). In *Coral Ridge*, the law would have "forc[ed] Amazon to donate to organizations it does not support." *Coral Ridge Ministries Media. v. Amazon.com*, 6 F.4th 1247, 1254 (2021). And in *Claybrooks*, the law would have dictated who a television show could cast as its lead. *Claybrooks v. ABC*, 898 F.Supp.2d 986, 999-1000 (M.D. Tenn. 2012). All three applications of the antidiscrimination laws were unusual. As *303 Creative* warned, the Court did not recognize any "right to refuse to serve members of a protected class." 143 S.Ct. at 2318. "[A]nti-discrimination laws 'do not, as a general matter, violate the

---

[5] To be approved as a 501(c)(3) charitable organization, moreover, the Fearless Foundation had to agree not to racially discriminate, thus waiving any constitutional right it might have had. *See generally Bob Jones Univ. v. United States*, 461 U.S. 574 (1983).

First ... Amendmen[t].'" *Wollschlaeger v. Gov'r, Fla.*, 848 F.3d 1293, 1317 (11th Cir. 2017) (en banc).

Fearless isn't being compelled to speak anything or associate with anyone, and its discrimination is not a necessary component of any expressive product; what Fearless wants is protection for *the discrimination itself*. Section 1981, after all, does not stop Fearless from "donating money," telling people that "Black women-owned businesses are vital to our economy," or mentoring and networking with people. Opp.16-17. It prevents discriminatory contracting. True, discrimination sends a message (support for the in-group, opposition to the out-group, etc.). But because the government can ban the conduct, it can also ban that "incidental" communicative effect. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984); *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). The contrary position would be radical. To use Fearless' example, a white-owned company could refuse to contract with blacks to "espous[e] its First Amendment belief that '[white] [male]-owned businesses are vital to our economy.'" Opp.16. Section 1981 would be a dead letter.

### D.   Fearless' program is not valid affirmative action.

The Eleventh Circuit recognizes only one "defense" to race-based contracting under §1981: "remedy[ing] the effects of past discrimination" through

a valid "affirmative action" plan. *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 474 (11th Cir. 1999). Fearless cannot use this defense for several reasons.[6]

Fearless is not "eligible" for the affirmative-action defense because its program is not an "affirmative action plan." *United States v. Brennan*, 650 F.3d 65, 97 (2d Cir. 2011). An affirmative-action plan changes an employer's selection procedures to give preferences to certain minorities until those minorities are represented at the company at a normal level. *See* 29 C.F.R. §1608.4(a)-(c); *Johnson v. Transportation Agency*, 480 U.S. 616, 628-31 (1987). But Fearless is a fund, not an employer. Its program does not alter its ordinary procedures for awarding funds. Fearless cites no case suggesting that anything like its isolated contest could qualify as an "affirmative action plan." And while its lawyers use that term, they submit no evidence or testimony suggesting that *Fearless* ever thought this program was "a bona fide, formal affirmative action program." *Williams v. Jacksonville*, 381 F.3d 1298, 1302 (11th Cir. 2004).

Even if Fearless had tried to create an affirmative-action plan, it would still be liable because its program would be an "invalid affirmative action plan." *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1110 (11th Cir. 2001). In Title VII cases, affirmative-action plans are judged under the Supreme Court's decisions in *Weber* and *Johnson*; and the Eleventh Circuit suggested in 1999 that

---

[6] The Alliance thinks this atextual exception to §1981 should be overruled. It notes the argument here solely for preservation purposes.

the same standard governs §1981. *Ferrill*, 168 F.3d at 474 & n.12. But today the test is strict scrutiny. *Gratz* later held that racial discrimination that would violate the Equal Protection Clause also violates Title VI and §1981. 539 U.S. at 275-76 n.23. And that equation of these three laws, *SFFA* makes clear, applies even when the defendant is a private actor. 143 S.Ct. at 2156 n.2. Hence why Harvard had to prove that its admissions program satisfied strict scrutiny.

Fearless has not even tried to satisfy strict scrutiny, for good reasons. Its purported purpose—"to create a pipeline of successful high-growth businesses founded by black women"—is not "sufficiently coherent." *Id.* at 2167. It uses race as a negative by barring non-blacks. *Id*. at 2168-69. Its wholesale exclusion of other races isn't narrowly tailored. *Id.* at 2164-65. It has no logical end point. *Id*. at 2171. Fearless never considered race-neutral alternatives, like giving funds to companies that never received or were previously denied capital. It *assumes* those facts are true for every black-owned business and not true for every non-black-owned business, which is impermissible racial stereotyping. *Id.* at 2170. And much more.

But even using the Title VII standard, Fearless' program would fail. Under *Weber/Johnson*, an affirmative-action plan must be justified with strong evidence of "'a manifest racial imbalance … in traditionally segregated job categories.'" *Bass*, 256 F.3d at 1113-14. It also cannot "'unnecessarily trammel the

rights of non-black employees'" or "'create an absolute bar to their advancement.'" *Id.* at 1114. Fearless violates each requirement.

Taking them in reverse order, Fearless' program creates an absolute bar for non-blacks. The program is "open only to black" owners. Dickey Decl., Ex. B at 3. It flatly bars Asians, Hispanics, Native Americans, whites, and every other race. That "hard-core, cold-on-the-docks quota" is not remotely legal. *Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987); *accord Frost v. Chrysler Motor Corp.*, 826 F. Supp. 1290, 1299 (W.D. Okla. 1993) (invalidating affirmative-action program that "completely preclude[d] consideration" of non-blacks). This gross racial exclusion is exactly what *Weber* and *Johnson* gave as an example of an *in*valid affirmative-action plan. *See Johnson*, 480 U.S. at 630 n.7, 638, 641; *United Steelworkers v. Weber*, 443 U.S. 193, 208 (1979). Even the private school in *Doe v. Kamehameha Schools* technically "allow[ed] all students to apply for admission." 470 F.3d 827, 844 (9th Cir. 2006) (en banc).[7]

Fearless' program also unnecessarily trammels the rights of nonblacks. It imposes a "rigid quota," reserving 100% of funds for black women. *In re Birmingham*, 20 F.3d 1525, 1543 (11th Cir. 1994). That percentage is not "tied in some manner to the representation of minorities in the pool of candidates." *Id.*

---

[7] The parties in *Doe* settled one day after the Supreme Court acted on the petition for certiorari, so that dubious 8-7 decision was never reviewed. *See* Grant, Doe v. Kamehameha Schools*: The Undiscovered Opinion*, 30 U. Haw. L. Rev. 355, 355 (2007-2008).

Fearless gives $20,000 to one business four times a year—arbitrary numbers that aren't supported by any evidence or explanation. Fearless' own numbers reveal that the levels of funding for Middle Eastern, Asian, and Hispanic women are *worse* than the levels of funding for black women, *see* Simone Decl., Ex. A at 7; yet Fearless' program leaves them out in the cold. And the alleged disparity is almost entirely between women and men, not between women of different races. *See id.* Fearless submitted no evidence proving that it considered "available race-neutral alternatives," such as funding *women*-owned businesses, businesses who have never received capital, or businesses who have previously been denied capital due to discrimination. *Hammon*, 826 F.2d at 81.

Turning to manifest imbalance, Fearless has no relevant evidence because it misstates the relevant inquiries. To be an affirmative-action plan, Fearless needed to show a manifest imbalance in *its* provision of capital to black-owned businesses, not that black-owned businesses generally lack "access to capital" in society or from other funders. Opp.21; *see Johnson* 480 U.S. at 631 (looking at disparities in the "employer's work force"); *Birmingham*, 20 F.3d at 1540 (looking at disparities at a specific fire department). Fearless, of course, has no such imbalance. Its program gives 100% of funds to black women, and its venture-capital business gives nearly all its funds to black women. Simone Decl., Ex. A at 13.

Fearless also ignores that the imbalance must not only exist, but exist because of *discrimination*. As its cases explain, an affirmative-action plan cannot "seek proportional representation purely for its own sake" but must prove "that the manifest imbalance resulted from a predicate of discrimination." *Shea v. Kerry*, 796 F.3d 42, 59 (D.C. Cir. 2015) (cleaned up). The creator of an affirmative-action plan must "describe with particularity the findings that led it to conclude that an entire industry had engaged in discrimination before" enacting the plan. *Birmingham*, 20 F.3d at 1539. It cannot point out "myriad" reasons for disparities and then decide, "[w]hatever the causes," it will use explicit race-based measures. BEAF-Br. (Doc. 60-1) at 14-15.

Fearless acted based on "disparities," not evidence of discrimination. Opp.4. Fearless itself pins these disparities on causes that are either nondiscriminatory or that stem from broader societal discrimination. *E.g.*, Cleckley Decl. ¶4 (fear of debt, lack of knowledge); Bradley Decl. (Doc. 59-3) ¶¶18-19 (lower generational wealth, higher consumer debt). Its post-hoc expert declaration, only a few paragraphs of which tries to prove discrimination, is insufficient. Bradley Decl. ¶¶29-31. It can only speculate that disparities "appeared to be caused" by negative attitudes, and its one cited source says disparities "might" be caused by "racial preferences or biases." *Id.* ¶31, Ex. F. at 24. Ac-

cusing an entire industry of sustained and widespread anti-black discrimination—an industry that is here *supporting* Fearless, *see* NCVA-Br. (Doc. 66-2)—is a big charge. Fearless hasn't come close to substantiating it.

Finally, Fearless cannot prove a manifest imbalance by relying on the percentage of overall funding received by black women. Opp.21. The correct comparison is between those who received funding and the pool of qualified applicants for funding. *Birmingham*, 20 F.3d at 1538-39. Yet Fearless provides no such comparison. It "simply recite[s] the racial composition …, without any sort of analysis of the raw percentages or explanation of how those percentages demonstrate vestiges of the generation-old [discrimination]." *Hammon*, 826 F.2d at 77. Its "mechanical incantation of statistics"—the "bulk of which are relevant only to discrimination in" loans and venture capital, not in contests or prizes like Fearless' program—"does not withstand" scrutiny. *Id.*

## II.  The Alliance will suffer irreparable harm without interim relief.

Fearless does not deny that racial discrimination can be irreparable, or that (if the Alliance is right on the merits) its members will suffer that harm. Fearless claims that racial discrimination imposes irreparable harm when it violates the Constitution and some statutes, but not §1981. Yet "[v]ictims of discrimination suffer irreparable injury, regardless of pecuniary damage." *Vietnamese Fishermen's Ass'n v. Knights of the KKK*, 543 F. Supp. 198, 218 (S.D.

Tex. 1982). Hence why in *Gresham*—a circuit precedent involving discrimination by private parties in housing—the Eleventh Circuit held that "[d]iscrimination … almost always results in irreparable injury." *Gresham v. Windrush*, 730 F.2d 1417, 1424 (11th Cir. 1984). This Court must follow *Gresham*, not Fearless' out-of-circuit district-court opinion from Indiana.

Fearless tries to sidestep circuit precedent by arguing that *Gresham* was just about a statutory regime that specifically authorized injunctions, but that argument ignores the decision's *additional* holding. The Eleventh Circuit first held that a violation of the Fair Housing Act was "sufficient to support an injunction," *id*. at 1423, but it didn't stop there. It separately explained that "it is reasonable to presume that irreparable injury flows from [housing] discrimination." *Id*. "[C]orrective relief" is "nearly impossible," since courts are unlikely to order innocent beneficiaries to move. *Id*. at 1424. And discrimination denies "the benefits of living in an integrated community." *Id*. at 1424.

Similar concerns make the discrimination here irreparable. Fearless plans to close the application window on September 30 and, once it's closed, argue that the Alliance's request for injunctive relief is moot. So once the application period closes, the Alliance's members face losing their opportunity to compete for this round of funds, and the status quo can't be restored without disruptive relief. *See id*. at 1424. Nor could money damages offset the "intangible and unquantifiable" harms of this racial discrimination, *Exodus Refugee*

21

*Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), or the benefits of participating in the non-monetary aspects of Fearless' program, *see* Opp.7. This case is a prime example of the "essentially irremediable nature of racial discrimination." *Gresham*, 730 F.2d at 1424.

Fearless' only other argument is that the Alliance has no irreparable harm because it supposedly delayed seeking a preliminary injunction. There was no delay. Fearless' program runs four times a year, each time accepting applications for roughly a month. Dickey Decl., Ex. B at 4. Once it learned of this program, the Alliance challenged the very next cycle. It filed this lawsuit one day after that cycle opened. And it moved for a preliminary injunction instantaneously. *Cf. Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (plaintiff "for months … conducted no discovery and made just routine, case-management filings in the district court" before seeking a preliminary injunction "over five months after filing its complaint"). The Alliance couldn't have moved much faster (and if it had tried to sue before applications opened, Fearless might have said the suit wasn't ripe). Regardless, delay does "not necessarily" prove that a harm is irreparable. *Id.* at 1248. Fearless does not explain how the Alliance's so-called delay makes its members any less discriminated against by Fearless' categorical racial bar, or any less threatened by the risk that the program will open and close before the Alliance can be heard in court.

### III.    The balance of harms favors the Alliance.

The balance of harm favors the Alliance too. Its members face the prospect of forever losing the chance to compete for funding exclusively because of their race. In contrast, Fearless faces only a slight delay of a deadline that it arbitrarily set (and, apparently, can easily move). Mot.9-10. And Fearless has no interest, under the First Amendment or otherwise, in continuing contracting practices that violate federal law.

Fearless demands that, if the Alliance's members can never apply for the program, it identify some "tangible" harm from that denial. Opp.24. It has: the inability to compete for money and other valuable prizes. And Fearless ignores the injuries that the members suffer from its racial discrimination. "[T]he denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit" inflicts that harm. *Jacksonville*, 508 U.S. at 666. "If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Teamsters v. United States*, 431 U.S. 324, 365 (1977).

Fearless responds that potential recipients will be harmed by a delay in the award of funds. But their interest in getting the money is not irreparable: If Fearless ultimately prevails, they will get it at the end of trial. And their interest in getting the money is, at most, the same as Owners A-C's. But the

latter's is greater because no one has an interest in being the beneficiary of unlawful racial discrimination. And if this Court enjoins Fearless' racial exclusion, *everyone* will be able to apply on a racially equal footing. The winners also won't be saddled with the inevitable "'stigma'" that comes with racial classifications. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995). People like Dr. Gamble *should* win these kinds of contests—but because they are impressive people who overcame serious obstacles, not based on immutable and cosmetic factors like the color of their skin. *See* Gamble Decl. (Doc. 59-5).

## IV.   The public interest favors the Alliance.

The public interest favors the enforcement of civil-rights statutes. Mot.10; *Villano v. Boynton Beach*, 254 F.3d 1302, 1306 (11th Cir. 2001). Contra Fearless, the public interest disfavors racial discrimination regardless of who benefits. Opp.25. "[R]acial discrimination is invidious in all contexts," including when a private party discriminates in favor of racial minorities. *SFFA*, 143 S.Ct. at 2166, 2156 n.2.

Section 1981 does not reflect a different policy. No doubt Fearless would prefer that the statute permitted discrimination in favor of black women while barring discrimination against them. But it will have to convince Congress to make that change. As drafted, §1981 "was meant by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald*, 427 U.S. at 298. It "protects the equal rights of

all persons." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006). It is Fearless' racial discrimination, not the Alliance's opposition to it, that violates public policy.

Finally, Fearless asserts that the "public has an interest in encouraging the First Amendment right to donate." Opp.25. But as explained, Fearless' discriminatory contracting does not implicate the First Amendment. And an injunction ordering Fearless to remove a racial restriction would increase, not decrease, the number of people who can receive money. Fearless' view of the First Amendment, by contrast, would let any group set up a similar program and reserve the money only for its favored races—precisely the opposite of what Congress envisioned when it passed §1981.

## CONCLUSION

This Court should grant a preliminary injunction by September 26.

Dated: September 8, 2023                    Respectfully submitted,

                                            _/s/   Gilbert C. Dickey_____
J. William Fawcett, Sr. (GA Bar             Thomas R. McCarthy (VA Bar
#646162)                                    #82787) (pro hac vice)
Chambliss & Fawcett, LLP                    Cameron T. Norris (VA Bar
2900 Paces Ferry Road, Ste. B-101           #91624) (pro hac vice)
Atlanta, GA 30339                           Gilbert C. Dickey (DC Bar
(770) 434-0310                              #1645164) (pro hac vice)
wfawcett@cf-firm.com                        CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Ste. 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            tom@consovoymccarthy.com
                                            cam@consovoymccarthy.com
                                            gilbert@consovoymccarthy.com

                              *Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 5.1(B) because it uses 13-point

Century Schoolbook.

                              _/s/ Gilbert C. Dickey_____

## CERTIFICATE OF SERVICE

I filed this document via ECF, which will serve all counsel of record.

Dated: September 8, 2023                    _/s/ Gilbert C. Dickey_____