IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMERICAN ALLIANCE FOR EQUAL
RIGHTS,

      Plaintiff,

          v.

FEARLESS FUND MANAGEMENT,
LLC, et al.,

      Defendants.

CIVIL ACTION FILE
NO. 1:23-CV-3424-TWT

## OPINION AND ORDER

This is an action brought under Section 1981 of the Civil Rights Act of 1866. It is before the Court on the Plaintiff's Motion for Preliminary Injunction [Doc. 2]. For the reasons set forth below, the Plaintiff's Motion for Preliminary Injunction [Doc. 2] is DENIED.

## I.   Background

The Defendant Fearless Foundation (the "Foundation") [1] seeks to "bridge the gap in venture capital funding for women of color founders building scalable, growth aggressive companies." (Compl. ¶ 14; *About*, Fearless Fund, https://www.fearless.fund/about [https://perma.cc/66QA-62VK]). To bridge this gap, the Foundation operates the Fearless Strivers Grant Contest (the

---

[1] The Complaint refers to the "Fearless Fund" as the primary Defendant, but the Defendants clarify that the Foundation solely manages the Contest. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 6 n.1). The Court thus refers to the Foundation as the primary Defendant.

"Contest"), which awards $20,000 grants to small businesses owned by Black women. (*Id.* ¶¶ 13, 15). The Contest is open only to Black women whose businesses are at least 51% owned by Black women, among other eligibility requirements. (*Id.* ¶¶ 25–26). To apply for the Foundation's grant, a contestant must agree to the Contest's Official Rules, which include details on how the contest works, how to enter, judging procedure, and other criteria. (*Id.* ¶ 23; *Official Rules*, Fearless Fund, https://www.fearless.fund/official-rules1 [https://perma.cc/3ZFP-VCNF]).[2] Contestants have the opportunity to apply for a grant during several promotion periods each year, the fourth and final one closing on September 30, 2023. (Compl. ¶ 16; Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 7).

The Plaintiff American Alliance for Equal Rights (the "Alliance") is "a nationwide membership organization dedicated to challenging distinctions and preferences made on the basis of race and ethnicity." (Compl. ¶ 6). It claims that the Contest excludes several of its members from eligibility because of their race. (*Id.* ¶ 5). The Alliance lists purportedly injured members in the Complaint as Owners A, B, and C, and describes them as small business owners ready to apply for the Contest but for their ineligibility due to their

---

[2] The Foundation revised its Official Rules in response to this lawsuit, and therefore, the Complaint's allegations do not match the information currently shown on the Contest website. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 19).

race. (*Id.* ¶¶ 31–66). The Alliance asserts one claim in its Complaint against the Defendants for violation of Section 1981 of the Civil Rights Act of 1866. It seeks a declaratory judgment that the Contest violates § 1981 and injunctive relief barring the Defendants from continuing their grant program. The Alliance now moves for a preliminary injunction.

## II.    Legal Standard

"A party seeking a preliminary injunction bears the burden of establishing its entitlement to relief." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). "To obtain such relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the public interest." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015). Importantly, a "preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *SunTrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001).

## III.    Discussion

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Congress passed § 1981 shortly after it ratified the Thirteenth Amendment, abolishing slavery. *Gen. Bldg. Contractors Ass'n, Inc. v. Penn.*, 458 U.S. 375, 384 (1982). "The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen." *Id.* at 386. And "the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

The Plaintiff alleges that the Foundation's Contest violates § 1981 by excluding non-Black applicants from the program because of their race. (Br. in Supp. of Pl.'s Mot. for PI, at 7). It contends that the Contest falls within the scope of § 1981 because contestants enter a contractual arrangement with the Foundation when they apply for the grant. (*Id.* at 8). And it contends that the discrimination itself constitutes irreparable harm and that the balance of the harms and public interest merit a preliminary injunction. (*Id.* at 9–10). Whether the Plaintiff is entitled to a preliminary injunction depends on if it has clearly shown a likelihood of success on the merits, irreparable harm, and that the balance of the harms and public interest favor an injunction.

### A. Likelihood of Success on the Merits

This motion presents several principal issues implicating the Plaintiff's ability to show a likelihood of success on the merits: first, whether it has organizational standing on behalf of its purportedly injured members; second, whether the Foundation's Contest constitutes a contractual agreement that places this case within the § 1981 realm; third, whether the First Amendment bars the Plaintiff's claim; and fourth, whether the Contest is a valid affirmative action plan. The Court considers these issues in turn.

### 1. Organizational Standing

The parties first clash over whether the Plaintiff has standing to bring the present case. For an organization to establish standing on behalf of its members, it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Foundation disputes all three requirements.

Regarding the first, the Foundation faults the Plaintiff for failing to specifically identify its injured members by name. (Defs.' Resp. Br. in Opp'n to

Pl.'s Mot. for TRO, at 9). Such a failure, it claims, precludes a finding of organizational standing. (*Id.* at 9–10 (citing *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018))). In reply, the Plaintiff counters that the anonymity of its injured members does not bar its standing. (Reply Br. in Supp. of Pl.'s Mot. for PI, at 5–6 (citing *Am. Coll. of Emergency Physicians v. BCBS of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020))). And it refutes the Foundation's reliance on several district court cases holding otherwise as being contrary to Eleventh Circuit precedent. (*Id.* at 7–8).

The Court agrees with the Plaintiff that it need not identify its injured members by name in order to have organizational standing. "[F]or prospective equitable relief, organizational plaintiffs need not 'name names' to establish standing. An organizational plaintiff seeking retrospective relief may be required to list at least one name, but only after some discovery. In other words, requiring specific names at the motion to dismiss stage is inappropriate." *Am. Coll. of Emergency Physicians*, 833 F. App'x at 241 n.8 (quotation marks and citations omitted). Therefore, at the preliminary injunction stage, the Plaintiff does not lack standing for failing to name its injured members by name.

The Foundation's reliance on *Georgia Republican Party v. SEC* in support of its position that the Plaintiff must identify at least one member by name is misplaced. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for TRO, at 9–10). In

that case, the Eleventh Circuit faulted the organizational plaintiff for "fail[ing] to allege that a specific member [would] be injured by" a proposed SEC regulation. *Ga. Republican Party*, 888 F.3d at 1203. The plaintiff claimed generally that certain members (placement agents and state and local officials) would potentially face consequences for making or receiving contributions under the regulation. But the plaintiff's lone affidavit identified only one member without alleging that the proposed rule would even regulate his conduct, much less injure him. Under these circumstances, the Eleventh Circuit concluded that the plaintiff failed to establish standing because its lone "affidavit [did] not aver that at least one of the Georgia Party's members [was] certain to be injured by" the proposed rule. *Id.* at 1204. Here, the Court faces no such problem: the Plaintiff clearly avers that three members of its organization are injured by the Contest, making *Georgia Republican Party* inapposite.

In the same case, the Eleventh Circuit also recognized that the Supreme Court in *Summers v. Earth Island Institute* rejected the notion of "probabilistic standing":

> In *Summers*, the majority rejected the dissent's theory that an organization could establish standing if "there [was] a statistical probability that some of [its] members [were] threatened with concrete injury." The Supreme Court reasoned that probabilistic standing ignores the requirement that organizations must "make specific allegations establishing that at least one identified member had suffered or would suffer harm."

7

*Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009)). Accordingly, *Summers* does not require that the Plaintiff name its injured members by name either. Rather, as the Eleventh Circuit made clear in *American College of Emergency Physicians*, the Plaintiff here need not name specific names to establish standing.

Turning to the second prong of organizational standing, the Foundation argues that the Alliance is a recently created sham organization, bearing no "indicia of a traditional membership organization" and "serves no discrete, stable group of persons with a definable set of common interests." (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 11–12 (quoting *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987))). The Plaintiff argues, in reply, that its claim is germane to its purpose of ridding the country of racial classifications, a mission "no broader than saving the environment (Sierra Club), protecting civil liberties (ACLU), or seeking racial equity (NAACP)." (Reply Br. in Supp. of Pl.'s Mot. for PI, at 4).

The Court again agrees with the Plaintiff. "The indicia of membership analysis employed in *Hunt* has no applicability in [this] case[]. Here, [the Alliance] is indisputably a voluntary membership organization with identifiable members—it is not, as in *Hunt*, a state agency that concededly has no members." *SFFA*, 143 S. Ct. at 2158. Accordingly, "[w]here, as here, an organization has identified members and represents them in good faith, our

8

cases do not require further scrutiny into how the organization operates." *Id.*

Regarding the third and final prong, the Foundation contends that the Plaintiff has failed to show that this case could be tried without the participation of its individual members. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 12–14 (citing *Ga. Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003), and *Greater Atlanta Home Builders Ass'n, Inc. v. City of Atlanta, Ga.*, 149 F. App'x 846, 848 (11th Cir. 2005))). The Foundation argues that, to the contrary, the Plaintiff's claim will depend on the circumstances of each of its injured members because they will have to prove that but-for their race, they would have been eligible to apply and be considered for the grant funding. (*Id.* at 13 (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1013 (2020))). On the other hand, the Plaintiff frames its members' injuries as their "'inability to compete on an equal footing' for a 'benefit.'" (Reply Br. in Supp. of Pl.'s Mot. for PI, at 4 (citing *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003))). In the Plaintiff's view, its members' injuries are more so their inability to apply for the grant funding, as opposed to their ultimate inability to obtain the grant funding.

The Foundation aims to distinguish this case from a line of equal protection cases implicating affirmative action, which establish as follows:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have

obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). The Foundation claims that the Plaintiff fails to cite any authority extending this reasoning to private-sector charitable donations. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 14). In reply, the Plaintiff reasons that the principle applies here, as it applied in *SFFA* where Harvard was the defendant. (Reply Br. in Supp. of Pl.'s Mot. for PI, at 3).

The Supreme Court in *Comcast* clarified that in a § 1981 case, the "plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast*, 140 S. Ct. at 1014. But Supreme Court's opinion in *Comcast* did not consider the issue of standing at all, much less organizational standing. As the Court understands the issue, an organizational plaintiff could not bring a § 1981 claim under the Foundation's proposed interpretation because it would be required to show but-for causation on behalf of all of its injured members—an inherently individualized inquiry that would likely run afoul of the third element required to establish organizational standing. At the preliminary injunction stage, the Court concludes that such an interpretation seems unlikely to govern. As the Plaintiff points out, no authority before the Court suggests that the "inability to compete on equal footing" reasoning from

10

*Gratz* should not extend to challenges to affirmative action programs brought under § 1981. Moreover, the Supreme Court in *Gratz* stated that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981." *Gratz*, 539 U.S. at 276 n.23. If the harm to the Plaintiff's members was indeed their inability to compete on equal footing (and not their ultimate inability to obtain the grant), then the relief requested would not require the participation of the Plaintiff's individual members, unlike the plaintiffs who failed to establish standing in *Georgia Cemetery* and *Great Atlanta Home Builders*, which arose outside the § 1981 context. Under these circumstances, the Court concludes that the Plaintiff has clearly shown that it likely has standing to pursue its claim.

### 2. Contract Formation

The parties next dispute whether the Contest constitutes a contractual arrangement that brings this case within the scope of § 1981. The Foundation contends that its "provision of a charitable donation is a discretionary gift, not a contractual award," and clarifies that although the Contest's rules previously used the term 'contract' to describe its application process, such a label is not determinative of its legal relationship with contestants. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 18–19). The Foundation also notes that it has amended the Contest's Official Rules to clarify that they merely set forth criteria under which individuals may apply for a grant under the program.

11

Without any underlying contractual activity, the Plaintiff cannot state a claim under § 1981, the Foundation claims. In reply, the Plaintiff argues that the Foundation's attempt to recast its Contest as a charitable donation, rather than a contractual award, fails because courts construe contests as offers for a unilateral contract. (Reply Br. in Supp. of Pl.'s Mot. for PI, at 8–9 (citing *United States v. Chandler*, 376 F.3d 1303, 1308 (11th Cir. 2004))).

Both parties rely on authority setting forth that "the labels ascribed by a contract are not determinative of the parties' legal relationship." *Lee v. Satilla Health Servs., Inc.*, 220 Ga. App. 885, 886 (1996). And they appear to agree that referring to a prospective arrangement as a "contract" does not necessarily make it one. The Court finds that the Plaintiff has carried its burden at the preliminary injunction stage to show that the case clearly falls within the scope of § 1981. All of the allegations before the Court point to the conclusion that the Contest operates as a unilateral offer to contestants that they may accept by completing their entry. And even under the Contest's new rules, contestants relinquish rights to the Foundation that amount to legal detriments. (Reply Br. in Supp. of Pl.'s Mot. for PI, at 11 (citing Doc. 59-3, at 22)). Under these circumstances, the Plaintiff has clearly shown the existence of a contractual regime that brings this case within the realm of § 1981.

### 3.  First Amendment

The Foundation contends that the First Amendment's right to free speech and expression bars the Plaintiff's § 1981 claim. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 14–18). It relies on several cases in support of its position that antidiscrimination statues cannot be used to compel an organization's expressive conduct. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023) (holding that the state of Colorado could not "use its [antidiscrimination] law to compel an individual to create speech she does not believe"); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) (holding that a Christian group's interpretation of Title II of the Civil Rights Act "would violate the First Amendment by essentially forcing Amazon to donate to organizations it does not support"); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 1000 (M.D. Tenn. 2012) (holding that a group of minority plaintiffs' § 1981 challenge to ABC's disproportionate casting of minority applicants on *the Bachelor* would, in effect, force ABC "to employ race-neutral criteria in their casting decisions in order to 'showcase' a more progressive message" in violation of the First Amendment). The Plaintiff distinguishes these cases on the ground that they apply antidiscrimination laws to actual speech, as opposed to the contracting at issue here. (Reply Br. in Supp. of Pl.'s Mot. for PI, at 13). It also notes that the Supreme Court has held that "[i]nvidious private discrimination . . . has never been accorded

affirmative constitutional protections." *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (citation omitted) (finding that two Black students' successful § 1981 challenge to a private, segregated school's admission policy in the 1970s did not violate the school's First Amendment's right to free association).

With respect to private grant funding for minority groups, "it appears that no federal court has addressed the relationship between anti-discrimination laws and the First Amendment." *Claybrooks*, 898 F. Supp. 2d at 996. The Court "does not interpret the absence of precedent on this issue as suggesting any particular result here." *Id.* The first question to address, then, is whether the Contest constitutes expressive conduct that merits First Amendment protection in the first place.

"Doubtless, determining what qualifies as expressive activity protected by the First Amendment can sometimes raise difficult questions." *303 Creative*, 143 S. Ct. at 2319. But as in *303 Creative*, "this case presents no complication of that kind." *Id.* To begin with, the Eleventh Circuit has made clear that "donating money qualifies as expressive conduct." *Coral Ridge*, 6 F.4th at 1254. Indeed, "except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id.* (citation omitted).

Determinations on the expressivity of conduct turn on "(1) whether an intent to convey a particularized message was present; and (2) whether in the

surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quotations marks, alteration, and citation omitted). "[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Id.* (citation omitted). "If we find that the conduct in question is expressive, any law regulating that conduct is subject to the First Amendment." *Coral Ridge*, 6 F.4th at 1254.

Here, the Foundation clearly intends to convey a particular message in promoting and operating its grant program: "Black women-owned businesses are vital to our economy." *Fearless Strivers Grant Contest*, Fearless Fund, https://www.fearless.fund/strivers-grant-contest [https://perma.cc/274A-R4SY]. And it carries out its commitment to that group by supporting "entrepreneurs who might otherwise lack the access to capital necessary to bring their businesses to life." (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 16). The Court likewise finds nothing that would suggest the Foundation's message was unclear such that it would not be understood by those who viewed it. That grant applicants enter a contract with the Foundation upon entry into the Contest does nothing to remove this case from the realm of First Amendment expressive conduct. *See Claybrooks*, 898 F. Supp. 2d at 992 (evaluating a First

Amendment defense in the § 1981 context). The Foundation's conduct at issue is, therefore, expressive and subject to the First Amendment.

Turning to the merits of the Defendants' proffered First Amendment defense, the Court acknowledges at the outset that the holdings of *303 Creative* and *Runyon* are difficult to square. The former held that a State could not "use its [antidiscrimination] law to compel an individual to create speech she does not believe," *303 Creative*, 143 S. Ct. at 2308, while the latter held that "[i]nvidious private discrimination . . . has never been accorded affirmative constitutional protections." *Runyon*, 427 U.S. at 176. Granted, the plaintiff in the former brought her case seeking injunctive relief from the application of a state antidiscrimination law that abridged her First Amendment speech and expression rights, while the plaintiffs in the latter brought their case seeking injunctive relief under a federal antidiscrimination law that ultimately did not abridge the defendant-schools' First Amendment association rights. But the difference in the law giving rise to the plaintiffs' claims and the constitutional provision of the First Amendment invoked as a defense seem unlikely to warrant such a divergent result on the merits.

This case contains elements of both *303 Creative* and *Runyon*. The Plaintiff seeks injunctive relief under the same federal antidiscrimination law as the plaintiff in *Runyon*, though on behalf of non-Black as opposed to Black plaintiffs. But the Foundation here seeks First Amendment protection for its

16

speech and expressive conduct, like the plaintiff in *303 Creative* and as opposed to the school in *Runyon* who sought protection for its associative conduct. Under such a hybrid circumstance, and considering the recency of the *303 Creative* decision, the Court is compelled to apply the standard governing that opinion. *Cf. 303 Creative*, 143 S. Ct. at 2315 ("When a state public accommodations law and the Constitution collide, there can be no question which must prevail." (citing U.S. Const., Art. VI, cl. 2.)). Applying § 1981 as the Plaintiff proposes would impermissibly "'modify the content of [the Foundation's] expression—and thus modify [its] 'speech itself.'" *Coral Ridge*, 6 F.4th at 1256 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578, 573 (1995)). Accordingly, because the First Amendment may bar the Plaintiff's claim, the Court cannot conclude that it has carried its heavy burden of showing a clear likelihood of success on the merits at this stage.

Practical applications support the Court's finding on this point. Take the example from the *Claybrooks* case, where the court questioned whether "anti-discrimination laws [would] require a playwright to consider white actors to play Othello." *Claybrooks*, 898 F. Supp. 2d at 998. At oral argument in this case, the Plaintiff's counsel suggested that such a circumstance would be different because "the end product that they're promoting would be pure speech." (Doc. 114 ("Hearing Transcript"), at 23:14–15). But the Court

disagrees with the Plaintiff's characterization. Such a circumstance would indeed implicate contracts for acting services between actors and the theater company, just like the Plaintiff claims the Contest implicates contracts for grant funding between contestants and the Foundation. Contracts, of course, also governed the commercial transactions between Amazon and its customers in *Coral Ridge*, even though the plaintiff in that case did not bring a § 1981 challenge. Amazon customers exchange money for goods, including when they buy products through AmazonSmile and are allowed to designate a charity to receive a portion of the proceeds from their purchase. *Coral Ridge*, 6 F.4th at 1250; (*see also* Hearing Transcript, at 38:17–25). Under the circumstances, the Court cannot conclude that § 1981 allows the Plaintiff injunctive relief prohibiting the Foundation's chosen speech and expression.

### 4. Affirmative Action Plan

Regarding its final point against a finding of a likelihood of success on the merits, the Foundation contends that its grant program is a valid affirmative action plan under *Johnson v. Transportation Agency, Santa Clara County, Cal.*, 480 U.S. 616, 626–27 (1987), which defeats the Plaintiff's § 1981 claim. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 20). The Alliance takes issue with the Foundation's casting of the Contest as an affirmative action plan under *Johnson* for several reasons. First, it claims that the affirmative action exception to § 1981 is atextual and should thus be overruled. (Reply Br. in

Supp. of Pl.'s Mot. for PI, at 15 n.6). Second, it contends that, regardless of the exception's validity, the Foundation is ineligible for the defense because its grant program is not a valid affirmative action plan. (*Id.* at 15). It notes that such plans apply to employers, not grant funds, and chides the Foundation's grant program as lacking formality. Third, the Alliance argues that strict scrutiny under *Gratz* and *SFFA* replaced *Johnson*'s affirmative action plan test and that the Foundation fails to make a "sufficiently coherent" showing that would satisfy strict scrutiny. (*Id.* at 16). And fourth, the Alliance contends that even assuming *Johnson* applies, the Contest fails to meet the requisite elements for a valid affirmative action plan. (*Id.* at 16–20).

The extent to which *SFFA* overruled the affirmative action plan defense to § 1981 under *Johnson*, if at all, is unclear. Nevertheless, the following principle from *Johnson*, articulated first in *United Steelworkers of Am. v. Weber*, 443 U.S. 193 (1979), holds true to this day:

> It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had been excluded from the American dream for so long constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.

*Johnson*, 480 U.S. at 628–29 (quoting *Weber*, 443 U.S. at 204) (quotation marks omitted).

Regardless of such a potential implied overruling, the Court concludes that, at the preliminary injunction stage, the Foundation's Contest does not

appear to be an affirmative action program of the sort that would fit within an employer's traditional affirmative action plan under the exception to § 1981. The Foundation cites no authority applying the defense to a grant fund, rather than an employer. And even if it has made a showing of a manifest racial imbalance in access to capital for Black women-owned businesses and a showing that its grant fund does not bar the advancement of other non-Black women, its means of achieving balance in that realm seem unlikely to satisfy the narrow tailoring requirement of the strict scrutiny analysis (assuming strict scrutiny applies after *SFFA*). *See Doe v. Kamehameha Sch.*, 470 F.3d 827, 842–45 (9th Cir. 2006). Accordingly, the Court concludes that the affirmative action plan defense does not preclude a showing of a likelihood of success on the merits on the Plaintiff's part.

### B. Irreparable Harm

Having found that the Plaintiff has failed to carry its burden to show a likelihood of success on the merits, the Court briefly considers the extent to which it has shown irreparable harm. The Plaintiff contends that facing a racial barrier in itself constitutes irreparable injury. (Br. in Supp. of Pl.'s Mot. for PI, at 8–9). It notes the approaching application deadline for the Contest, suggesting that its members will be irreparably harmed in their lost opportunity to apply for a grant under the program. (*Id.* at 9).

In response, the Foundation points out that no case law supports the Plaintiff's position that the "denial of the opportunity to compete for funding on the basis of race in the context of private, charitable giving is *per se* irreparable." (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for PI, at 22). The Foundation goes on to cite a similar case arising under § 1981 where the court declined to preliminarily enjoin a program supporting minority-owned businesses during the COVID-19 pandemic because the plaintiffs failed to show irreparable harm. (*Id.* at 23 (citing *Moses v. Comcast Cable Commc'ns Mgmt., LLC*, 2022 WL 2046345, at *4 (S.D. Ind. June 7, 2022))). The court in *Moses* found no presumption of irreparable harm because courts ordinarily presume such harm "only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy." *Moses*, 2022 WL 2046345, at *3 (quoting *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017)). The court then noted that no such mandatory injunctive relief existed under § 1981. *Id.*

In reply, the Plaintiff argues that the Court must follow binding Eleventh Circuit precedent in *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984), which held that "[d]iscrimination in housing, when proved, almost always results in irreparable injury." (Reply Br. in Supp. of Pl.'s Mot. for PI, at 21). The court in *Gresham* found a presumption of irreparable injury both because the plaintiff had demonstrated a likelihood of success on

21

the merits and because the governing statute authorized injunctive relief. *Gresham*, 730 F.2d at 1423. Here, the Plaintiff has not shown a likelihood of success on the merits, nor does § 1981 authorize injunctive relief. And as the Foundation's counsel pointed out at oral argument, the Plaintiff does not allege that its members will be irreparably harmed unless they receive the money from the Foundation's grant. (Hearing Transcript, at 34:9). Accordingly, the Court cannot conclude that the Plaintiff has carried its burden to clearly show irreparable injury flowing from the Foundation's alleged harm.

### C. Balance of Harms and Public Interest

Having found that the Plaintiff has failed to carry its burden to clearly show a likelihood of success on the merits and irreparable harm, the Court declines to address whether it has also shown that the balance of equities and public interest favor a preliminary injunction.

### IV.   Conclusion

For the reasons set forth above, the Plaintiff's Motion for Preliminary Injunction [Doc. 2] is DENIED.

SO ORDERED, this __27th__ day of September, 2023.

THOMAS W. THRASH, JR.
United States District Judge

22